IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

725 EATERY, CORP. dba Platinum Dolls,          :
Substituting for MLB ENTERPRISES, CORP.                Case No. 1:02-cv-4431-WHP
                                               :
        and
                                               :
689 EATERY, CORP. dba Satin Dolls,
                                               :
        Plaintiffs,
v.                                             :

THE CITY OF NEW YORK; BILL DE BLASIO,          :
as Mayor of the City of New York; and
RICK D. CHANDLER, as Commissioner of           :
Buildings of The City of New York

        Defendants.                            :

_____

SECOND AMENDED COMPLAINT OF
PLAINTIFF 725 EATERY, CORP.
AND INITIAL COMPLAINT OF PLAINTIFF
689 EATERY, CORP.

_____

        Come now Plaintiffs 725 Eatery, Corp. dba Platinum Dolls, substituting for MLB

Enterprises, Corp. dba Lace, and 689 Eatery, Corp. dba Satin Dolls, who, for their complaint

against Defendants City of New York *et al.*, state as follows:

### PRELIMINARY STATEMENT

        1.      In this Second Amended Complaint, filed after reopening of litigation originally

filed in 2002 and administratively stayed pending the outcome of state court litigation by other

parties challenging the same zoning legislation under the New York Constitution, Plaintiffs 725

Eatery, Corp. and 689 Eatery, Corp. (collectively "725/689") reassert and supplement their

1

federal constitutional challenge to the City's adult business zoning and permitting scheme, made applicable to them as a result of the 2001 Amendments to New York City's adult business zoning code. More specifically, 725/689 allege that the zoning amendments and related regulatory provisions will severely and unconstitutionally reduce the availability of constitutionally protected erotic expression in New York City, with no commensurate reduction of secondary effects relied upon to justify those Amendments, or any consideration of how speech will fare under them. Moreover, these laws unlawfully restrict the location of adult businesses based upon the content of the speech that they provide; fail to leave open sufficient alternative locations for existing businesses to continue to lawfully operate; improperly burden adult-oriented expression through the imposition of complex and punitive building permit processes; effectively render almost all of Manhattan entirely off-limits to such uses; fail to provide clear, reliable, or timely guidance as to where such businesses may relocate; and violate First Amendment and equal protection rights by treating nonconforming adult uses dramatically differently from almost every other nonconforming use in the City. Accordingly, by this Complaint, and as set forth below, 725/689 seek declaratory and preliminary and permanent injunctive relief against enforcement of the 2001 Amendments and related zoning and permitting provisions under the First and Fourteenth Amendments.

2.    This Amended and Supplemental Complaint is filed with the permission of the Court.

## JURISDICTION

2.    This is an action authorized by law to redress deprivations, under color of state law, of rights, privileges and immunities secured by the First and Fourteenth Amendments of the

United States Constitution.  Jurisdiction is conferred on this Court by 28 U.S.C. § 1331; 28

U.S.C. § 1343; 28 U.S.C. § § 2201 and 2202; and by 42 U.S.C. § 1983.

3. Venue is appropriate in the Southern District of New York because the actions

described in this Complaint have all occurred within the district.

## PARTIES

4. Plaintiff 725 Eatery, Corp. is a corporation duly organized and authorized to do

business under the laws of the State of New York.  725 owns and operates a gentleman's club,

known as Platinum Dolls, which is located in the Times Square area at 725 7th Ave. in New York

City.  On the first floor of its space, Platinum Dolls presents exotic dancing; on the second floor

is a sports bar and lounge.  In no more than 40 percent of the square footage of the publicly-

accessible space does Platinum Dolls present adult-oriented entertainment.  Platinum Dolls is

presently located in a C-6-7 zone and is within 500 linear feet of a rectory that is occasionally

used to conduct worship and religious activities.  725 desires to continually operate Platinum

Dolls, either at its current location or, if forced to move, at another available location.

5. Plaintiff 689 Eatery, Corp. is a corporation duly organized and authorized to do

business under the laws of the State of New York.  689 owns and operates a gentleman's club,

known as Satin Dolls, which is located in the Times Square area at 689 8th Ave. in New York

City.  Satin Dolls presents exotic dancing in less than 40 percent of the square footage open to

the public.  It is nonetheless an "adult eating or drinking establishment" as that term is defined in

the City's challenged adult zoning regulations.  Satin Dolls is presently located in a C-6-4 zone

and is, upon information and belief, located within 500 linear feet disqualifying use.  689 desires

to continually operate Satin Dolls, either at its current location or, if forced to move, at another available location.

6.      Defendant City of New York is a municipal corporation, organized and existing under the laws of the state of New York with its seat of government and principal place of business located in the Southern District of New York.

7.      Defendant Bill De Blasio is the Mayor of the City of New York and the successor to defendant Michael Bloomberg, who was the Mayor at the time this action was commenced. Defendant De Blasio's principal office is located in the Southern District of New York.

8.      Defendant Rick D. Chandler is the Commissioner of Buildings of the City of New York and the successor to defendant Patricia Lancaster, who was the Commission at the time this action was commenced. Defendant Chandler's principal office is located in the Southern District of New York.

9.      Defendants De Blasio and Chandler are the principal municipal officers charged with enforcement of the AZR.

10.     All of the actions by Defendants described in this Complaint were taken under color of state law.

**STATEMENT OF FACTS**

**A.  The City's Adult Use Zoning Regulations**

11.     Beginning in the early 1990s, the City of New York commenced specifically regulating where adult businesses could locate within its borders. Prior to this time, the City's original Zoning Resolution, adopted on December 15, 1961, made no distinction between adult entertainment uses and other commercial uses that do not have an adult character. While

4

historically the City had regulated several general classes of commercial establishments under its Zoning Resolution, adult-oriented businesses had never been differentiated from other commercial uses.

12.     The City's regulatory program specifically for adult businesses began on November 23, 1994, when the New York City Council imposed a one-year moratorium prohibiting the establishment of new adult businesses, barred the extension or enlargement of existing adult businesses, and prohibited the change of any use to an adult enterprise in all areas of New York City.  *See* AZR § 11-113.

13.     During the moratorium the New York City Department of City Planning ("DCP") conducted an Adult Entertainment Study ("1994 DCP Study") that purported to link concentrations of existing adult businesses, primarily in the Times Square area, to various adverse secondary effects including visual blight, nearby crime and lower property values. However, with respect to whether the effects of crime and lower property values were present in the absence of a concentration of adult uses (e.g., where there was only one adult business in a given area), the DCP's Study reached inconclusive results.

14.     While the 1994 DCP Study referenced information from other jurisdictions about a possible link between adult businesses and secondary effects, the reports and studies from these jurisdictions were not provided to the City Council when it enacted the moratorium.  The 1994 DCP Study also summarized other municipalities' attempts to regulate adult businesses, but the actual ordinances from other locations were not provided to the City Council either.

**1.  The 1995 Ordinance**

5

15.     While the moratorium was in effect, the DCP and the City Council's Land Use Committee filed a joint proposal to amend the City's zoning regulations regarding adult businesses.  The Planning Commission approved of the proposed regulations in a report issued on September 18, 1995, which summarized the basis for the proposed zoning regulations ("the 1995 Report") .

16.     Then, on October 25, 1995, the City Council enacted a comprehensive adult zoning regulatory scheme, adopting Resolution No.  1322 approving Text Amendment N 950384 ZRY to the Amended Zoning Resolution (hereafter "the 1995 Ordinance").  A copy of the 1995 Ordinance is attached as Exhibit A.  The 1995 Ordinance defined an "adult establishment" and imposed strict zoning, locational, and signage restrictions on uses that fell within that definition.

17.     The City relied upon the information contained in both the 1994 DCP Study and the 1995 Report in passing the 1995 Ordinance.

18.     Under the 1995 Ordinance, an "adult establishment" was (then) defined as a commercial business, a "substantial portion" of which includes an adult bookstore (including video stores), an adult eating or drinking establishment, an adult theater, or other adult commercial establishment.  *See* AZR § 12-10 (as amended by the 1995 Ordinance).

19.     The 1995 Ordinance defined an "adult eating or drinking establishment" as an establishment which regularly features, *inter alia*: "live performances which are characterized by an emphasis on 'specified anatomical areas' or 'specified sexual activities.'"  *See* AZR § 12-10.

20.     By its terms, none of the zoning restrictions added by the 1995 Ordinance applied expressly to adult eating or drinking establishments.  Instead, they applied only to what the ordinance defined as an "adult establishment."  The defined term "adult establishment" did not

6

include every adult eating and drinking establishment, but only those which conducted such activities in a "substantial portion" of their premises.  Consequently, whether such businesses were subject to those special zoning restrictions depended on whether such activities were conducted in a "substantial portion" of the premises.

21.     Although the text of the 1995 Ordinance did not define the term "substantial portion," among the factors to be considered were, for adult eating or drinking establishments, "the amount of floor area and cellar space accessible to customers and allocated to [adult] uses as compared to the total floor area and cellar space accessible to customers in the establishment." *See* AZR § 12-10.

22.     The definitions of "adult eating or drinking establishments," "adult theaters," and "other adult commercial establishments" also included a provision that the establishment "is not customarily open to the general public during such features because it excludes minors by reason of age." *See* AZR § 12-10.

23.     Under the 1995 Ordinance, adult establishments were permissible only in the C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, C8, and some Manufacturing Districts.  *See* AZR §§ 32-01 and 42-01 (as amended by the 1995 Ordinance).

24.     With respect to Manufacturing Districts, the 1995 Ordinance included § 42-01 which (then) contained, *inter alia*, the following provisions:

> In addition to the applicable regulations for the uses listed in a permitted Use Group, "adult establishments" sell be subject to the following provisions:
>
> (a)      adult establishments are not permitted in a manufacturing district in which residences, joint living-work quarters for artists or loft

7

dwellings are, under the provisions of the Zoning Resolution, allowed as-of-right or by special permit or authorization.

(b)    in all other manufacturing districts, adult establishments shall be located at least 500 feet from a church, a school, a residence district, a C1, C2, C3, C4, C5-1, C6-1, C6-2 or C6-3 district, or a manufacturing district other than M1-6M  in which new residences, new joint living-work quarters for artists or new loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization.

25.    In addition, the 1995 Ordinance imposed the following limitations on the location of adult establishments:

a.    Adult establishments were required to be located at least 500 feet from a church, school, Residence District, or certain Commercial and Manufacturing Districts including C1, C2, C3, C4, C5-1, C6-1, C6-2 and C6-3 districts.  *See* AZR §§ 32-01[b], 42-01[b];

b.    Adult establishments were required to be located at least 500 feet from another adult establishment.  *See* AZR §§ 32-01[c], 42-01[c];

c.    Only one adult establishment could be located on a zoning lot.  *See* AZR §§ 32-01(d), 42-01[d]; and

d.    Adult establishments could not exceed 10,000 square feet of floor area and cellar space.  *See* AZR §§ 32-01[e], 42-01[e].

26.    Existing adult establishments that were not in compliance with the regulations were given one year in which to conform to the 1995 Ordinance or terminate their business.  *See* AZR §§ 52-77, 52-734.

## 2.  Litigation Challenging the 1995 Ordinance

8

27.     On February 27, 1996, more than 100 owners and operators of adult establishments commenced an action for a declaratory judgment in the New York Supreme Court against the City of New York and its relevant officials, to have the 1995 Ordinance held unconstitutional. *See Amsterdam Video, Inc. v. City of New York*, Index No. 103568/96 (Sup. Ct. N.Y. Co.).

28.     On that same date, the New York Civil Liberties Union ("NYCLU") filed the related case of *Hickerson v. City of New York*, Index No. 103569/96 (Sup. Ct. N.Y. Co.), on behalf of various consumers of adult expression. On or about July 22, 1996, counsel for an adult cabaret commenced a separate challenge to the 1995 Ordinance. *Stringfellow's of New York, Ltd. v. City of New York*, Index No. 113049/96 (Sup. Ct. N.Y. Co.).

29.     On March 27, 1996, the City filed a Petition for Removal, pursuant to 28 U.S.C. § 1446(d), in the United States District Court for the Southern District of New York, seeking to remove the adult businesses' lawsuits to federal court. *See Amsterdam Video Inc. v. City of New York*, Docket No. 96 Civ. 2204.

30.     On June 27, 1996, Judge Miriam Goldman Cedarbaum granted the adult businesses' motions, made pursuant to 28 U.S.C. § 1447(c), to remand the state causes of action back to the New York State Supreme Court. *Hickerson v. City of New York and Amsterdam Video Inc. v. City of New York*, 932 F. Supp. 550 (S.D.N.Y. 1996). Judge Cedarbaum retained jurisdiction of the causes of action that asserted federal constitutional rights, but held them in abeyance pending resolution of the state claims.

31.     The New York Supreme Court then upheld the 1995 Ordinance under the State Constitution. *Stringfellow's of New York, Ltd. v. City of New York,* 171 Misc.2d 376 (Sup. Ct.

9

N.Y. Co. 1996). The Appellate Division, First Department, affirmed. *Stringfellow's of New York, Ltd. v. City of New York*, 241 A.D.2d 360 (1st Dept. 1997). On February 24, 1998, the New York Court of Appeals affirmed. *Stringfellow's of New York, Ltd. v. City of New York*, 91 N.Y.2d 382 (1998).

32.     The adult businesses then renewed their federal constitutional claims which had been retained by the federal court. However, the federal court held that these bookstores, theaters, and cabarets, all of which had been parties in the state proceedings, were collaterally estopped from pursuing their claims in federal court, concluding that their federal challenges were indistinguishable from their state claims, all of which had already been adjudicated by the state courts. *Hickerson v. City of New York*, 997 F.Supp. 418 (S.D. N.Y. 1998), *aff'd* 146 F.3d 99 (2d Cir. 1998), *cert. denied* 525 U.S. 1067 (1999).

33.     Counsel for the adult-oriented businesses then brought a new action in federal court to enjoin enforcement of the 1995 Ordinance based on the previously-unlitigated ground that a key term defining an adult establishment – "substantial portion" – was vague. *See Amsterdam Video, Inc. v. City of New York*, Docket No. 96 Civ. 2204 (MGC) (S.D. N.Y.).

34.     On July 24, 1998, in response to and in defense of the vagueness challenge, the City asserted before Judge Cedarbaum for the first time that any commercial establishment that had less than 40 percent of adult stock-in-trade, or allocated less than 40 percent of its accessible floor area to an adult use, would comply with the 1995 Ordinance.

35.     By the City's own representation, the 60/40 standard applied to all types of adult businesses, including any adult eating or drinking establishment that devoted less than 40 percent of its customer-accessible floor space to adult entertainment uses.

10

### 3.   The 60/40 Standard

36.      On July 22, 1998, the City's Building Department issued Operations Policy and Procedure Notice ("OPPN") 4/98, which defined the phrase "substantial portion" in the context of, *inter alia,* adult eating and drinking establishments, such that "the amount of floor area and cellar space accessible to customers allocated to adult use for performing and viewing purposes as compared to total combined floor area and cellar space accessible to the customers" was deemed a relevant consideration.

37.      Consistent with both OPPN 4/98 and the City's attorneys' representation in federal court that businesses allocating less than 40 percent of their floor space to adult entertainment uses did not fall within the range of uses regulated by the 1995 Ordinance, the 60/40 benchmark became the governing standard used by nightclubs and other enterprises to bring their establishments into compliance with the zoning law.  For example, 725 converted its second floor into a sports bar and lounge area that is not used for entertainment purposes.  689 similarly reconfigured its interior to reduce the portion of its floor space used for live entertainment to under forty percent.

38.      Despite its representation in federal court regarding the 60/40 standard, the City commenced a long series of nuisance abatement proceedings against many of the new 60/40 businesses notwithstanding that they had modified their square footage percentages in order to comply with the City's representations on the meaning of "substantial portion."  Ultimately, some establishments that had not adequately modified their businesses were closed, but judicial

11

findings were also made that adult businesses which had substantially reconfigured their businesses consistent with the City's federal court representations did not constitute adult establishments and, thus, were not subject to closure under the Nuisance Abatement Law.

39.     Even though the 1995 Ordinance provided that the City's building inspectors were to consider only relative floor space and stock in trade to determine whether a commercial establishment fell within the definition of an "adult establishment," the City, in prosecuting these nuisance abatement proceedings, sought to introduce subjective and additional non-statutory factors into the determination of whether a business was in violation of the 1995 Ordinance in the nuisance abatement actions.

40.     Ultimately, the City's approach was rejected by the New York Court of Appeals, which concluded, as to live entertainment businesses, that an eating or drinking establishment featuring adult entertainment in less than 40 percent of its floor space *could not*, as a matter of law, be an "adult establishment."  Specifically, it *rejected* the argument proposed by the City that a business featuring live adult entertainment in less than 40% of its floor space could nonetheless be deemed an "adult establishment" if its operation appeared to be what the City called a "sham."  *City of New York v. Dezer Properties, Inc.*, 95 N.Y.2d 771 (2000).

### 4.   The 2001 Amendments

41.     On March 22, 2001, the Department of City Planning submitted Application No. N 010508 ZRY to the City Planning Commission to amend the definition of "adult establishment" contained within AZR § 12-10, so as to drastically expand the number of businesses subject to the City's adult zoning restrictions.  *See* 2001 Amendments (attached as Exhibit B).

42.     Under this proposal, the significantly limiting "substantial portion" language of the 1995 Ordinance was removed from the definition of "adult establishment," rendering the 60/40 standard no longer applicable to adult theaters, adult eating or drinking establishments, adult private viewing booths, or any adult use other than a bookstore or video store.

43.     Specifically, the relevant definitional change effected by the 2001 Amendments appears in AZR § 12-10 in the first paragraph of the new definition of "adult establishment" as follows:

> 1.     Adult Establishment: An "adult establishment" is a commercial establishment ~~where a "substantial portion" of the establishment~~ *which is or* includes an . . . adult eating or drinking establishment . . . .[1]

44.     Other than one extremely minor and not currently relevant change, the 2001 Amendments made no change in the separate and specific definition of an "adult eating or drinking establishment."

45.     The zoning restrictions of AZR §§ 32-01 and 42-01 have at all times applied exclusively to what is defined as an "adult establishment" and have never expressly applied to what is defined as an "adult eating or drinking establishment" (since not all "adult eating or drinking establishments" were deemed by the 1995 Ordinance to be "adult establishments"). Consequently, by removing the "substantial portion" language from the definition of "adult establishment," the 2001 Amendments radically altered the scope of businesses which the 2001 Amendments caused to be subject to the City's adult zoning restrictions.

---

[1] The portions of the provision deleted from the 1995 Ordinance appear in strikeout.  The language added by the 2001 Amendments appears in italics.

46.     On October 31, 2001, the City Council ratified the 2001 Amendments to the Amended Zoning Resolution, which required (in AZR § 72-41) that all establishments they rendered nonconforming must terminate by October 31, 2002.

47.     The City Council did not expressly rely upon the 1994 DCP Report in adopting the 2001 Amendments, nor did it consider or take into account any other evidence regarding negative secondary effects allegedly attributable to either adult businesses generally or 60/40 businesses specifically.

48.     In fact, the City actually conceded at public hearings regarding the 2001 Amendments that, according to the Manhattan community boards in locations where 40 percent of existing adult businesses were located, "there [we]re no significant secondary impacts from the remaining adult businesses in the[se] neighborhoods."

49.     The City also conceded at public hearings that adoption of the 2001 Amendments would require all of the 101 existing 60/40 adult businesses to terminate operations.  On its face, the City's own study therefore demonstrated not only that the 2001 Amendments would have a dramatic immediate adverse impact upon the public's access to constitutionally-protected expression by closing all the existing 60/40 businesses, but that they were not necessary for any significant reduction of secondary effects.

50.     Of perhaps the greatest importance, at the time of enacting the 2001 Amendments, a substantial number of zoning changes had occurred between 1995 and 2001 which further reduced the permissible area for adult businesses; yet the City conducted no study to assess whether there would be a sufficient number of legally-permissible and constitutionally-

cognizable sites for all of the 101 60/40 businesses displaced by the 2001 Amendments to relocate.

### 5.  Litigation Challenging the 2001 Amendments

51.    On June 12, 2002, the previous Plaintiff MLB Enterprises, Corp. filed suit in this Court challenging the validity of the 2001 Amendments.  The case was consolidated with a related action filed by another nightclub, *Pulse Nite Club, Inc. v. City of New York*, Docket No. 02-cv-8113.  *See* Docket No. 8 Stipulation and Order.  Similar actions filed by other nightclubs were also treated as related cases to this action.  *See 59 Murray Corp. v. City of New York*, Docket No. 02-cv-4432; *Club at 60th Street v. City of New York*, Docket No. 02-cv-8333.

52.    Several months later, a 60/40 bookstore, a 60/40 theater, and a 60/40 cabaret (all unrelated to Plaintiffs) filed an action in New York state court seeking declaratory and injunctive relief against the 2001 Amendments.  The cases were assigned to Justice Louis B. York, in the Supreme Court, New York County (hereinafter "Judge York").  On October 29, 2002, two days before the date for termination of uses rendered nonconforming by the 2001 Amendments, Judge York granted a temporary restraining order preventing enforcement of the 2001 Amendments as against all 60/40 bookstores in the City.  On October 30, 2002, Judge York granted a similar order enjoining enforcement of the 2001 Amendments against all 60/40 eating or drinking establishments, video stores, and movie theaters throughout the City.

53.    Concluding that the City could not constitutionally eliminate all the 60/40 businesses without a new study showing any necessity for doing so, Judge York later granted summary judgment to the 60/40 businesses, applicable to all 60/40 adult businesses throughout the City.  *See For the People Theatres of N.Y., Inc. v. City of New York*, 1 Misc. 3d 394 (Sup. Ct.

N.Y. Co. 2003); *Ten's Cabaret, Inc. v. City of New York*, 1 Misc. 3d 399 (Sup. Ct. N.Y. Co. 2003) (related action brought by cabarets challenging the same law).

54.     Following the issuance of Judge York's summary judgment decision, which in effect precluded the enforcement of the 2001 Amendments against all 60/40 adult businesses throughout the City, this Court administratively closed this case since relief no longer appeared to be necessary.  *See* Docket No. 43 Sept. 26, 2003 Order.

55.     The Appellate Division thereafter reversed Judge York's decision and upheld the constitutionality of 2001 Amendments.  *For the People Theatres of N.Y., Inc. v. City of New York*, 20 A.D.3d 1 (1st Dept. 2005) ("Appellate Division I").  The Appellate Division then stayed its Order and granted leave to appeal to the Court of Appeals.  *For the People Theatres of N.Y., Inc. v. City of New York*, 2005 N.Y. App. Div. LEXIS 6994 (1st Dept. June 14, 2005).

56.     On further review, in 2005, the New York Court of Appeals vacated the decision of the Appellate Division, concluding that it was constitutionally relevant whether 60/40 businesses were so transformed in character that they no longer resembled the kinds of exclusively adult uses found by the City in 1994 to generate negative secondary effects and that this question should be determined, in the present time, as a matter of fact.  The court concluded that the issue should be resolved by a trial to determine whether these businesses' technical compliance with the 60/40 formula was merely a sham.  It did not indicate how many then-existing businesses must be deemed a sham in order to uphold the 2001 Amendments, nor whether the 2001 Amendments could lawfully apply to non-sham businesses.  Thus, the court remanded the matter to Judge York for a trial. *See For the People Theatres of N.Y., Inc. v. City*

16

*of New York*, 6 N.Y.3d 63 (2005). Three dissenting Judges (Kaye, C.J., G.B. Smith, & Ciparick, JJ.) would have struck down the 2001 Amendments as facially unconstitutional, without remand.

57.     On March 29, 2010, on remand, Judge York concluded that the Court of Appeals imposed a very "light" burden on the City and concluded that, with respect to 60/40 bookstores, the City had met this light burden.  *For The People Theaters v. City of New York* , 27 Misc. 3d 1079 (Sup. Ct. N.Y. 2010).  However, he found that, with respect to theaters, the City failed to meet its burden of proof and permanently enjoined enforcement of the 2001 Amendments against theaters. The City did not appeal Judge York's judgment relating to theaters.

58.     In a separate unpublished ruling of April 14, 2010, Judge York reached the same conclusion for 60/40 eating or drinking establishments as he had for 60/40 bookstores, concluding that the City had met what Judge York had characterized as its "light burden" in upholding the 2001 Amendments as against those businesses.

59.     By Orders granted June 15, 2010, the Appellate Division, First Department, once again stayed enforcement of the 2001 Amendments pending appeal to that Court.

60.     On April 7, 2011, a unanimous panel of the Appellate Division vacated Judge York's findings relating to both 60/40 eating or drinking establishments and 60/40 bookstores. The Appellate Division remanded the case to Judge York with instructions concerning how to determine whether 60/40 businesses have a predominant focus on sexually explicit materials. *See For the People Theatres of N.Y., Inc. v. City of New York*, 84 A.D.3d 48 (1st Dept. 2011) ("Appellate Division II").

61.     On August 30, 2012, after carefully reconsidering the trial evidence and following the directions from the Appellate Division, Justice York declared the 2001 Amendments to be

facially unconstitutional and permanently enjoined the City from enforcing them against any business. *See For the People Theatres of N.Y., Inc. v. City of New York*, 38 Misc. 3d 663, 675 (Sup. Ct. N.Y. Co. 2012).

62.     On July 21, 2015, the Appellate Division affirmed Justice York's judgment that permanently enjoined the City from enforcing the 2001 Amendments. *See For the People Theatres of N.Y., Inc. v. City of New York*, 131 A.D.3d 279 (1st Dept. 2015) ("Appellate Division III").

63.     On June 6, 2017, the New York Court of Appeals, with only five Judges sitting, reversed the Appellate Division and trial judge, upholding the constitutionality of the 2001 Amendments. *For the People Theatres of N.Y., Inc. v. City of New York*, 29 N.Y.3d 340 (2017). U.  While there is some overlap, the majority of the constitutional challenges presented in this Complaint were not presented in the state court litigation and none of the Plaintiffs herein were parties to the state litigation.  Additionally, the adult eating or drinking establishments in the state court litigation did not raise any First Amendment challenges to the 2001 Amendments, electing to assert only challenges based upon the New York Constitution.

64.     On June 7, 2017, the City agreed to stay all enforcement of the 2001 Amendments for 30 days.

65.     Prior to July 7, 2017, the City and 725/689 agreed to a further informal period of non-enforcement of the 2001 Amendments against 725/689 and other parties previously engaged in administratively-closed litigation in this Court, culminating in the entry into a formal Litigation Management Agreement between the City and the federal parties on September 25, 2017.

18

66.     On June 27, 2017, the New York Court of Appeals denied an application by the state court plaintiffs for a stay pending an application to the United States Supreme Court for a writ of certiorari. On July 6, 2017, Supreme Court Justice Ruth Bader Ginsburg denied a similar application by the adult book and video store plaintiffs in the state court cases.

67.     All of the state court plaintiffs timely moved for reargument of the Court of Appeals' June 6th decision; those motions were denied on September 12, 2017.

68.     On September 25, 2017, without waiving any claims or making any concessions, the City and counsel for 725/689 entered into a stipulation under which the City agreed to refrain from enforcing certain aspects of the Amended Zoning Resolution against a delineated group of businesses, including 725/689, pending certain actions by the businesses to raise and preserve their claims against the City and to pursue related litigation milestones.

69.     On February 20, 2018, the United States Supreme Court denied certiorari in the state court cases.  All litigation in those cases has now concluded.

70.     By a combination of judicial orders and litigation-related agreements of deferred enforcement dates, as of the date of filing this Second Amended Complaint, 725/689's businesses have been allowed to lawfully operate under the 2001 Amendments at all times since the effective date of the challenged legislation – October 30, 2002 -  without interruption.

### 6. The 2004 and 2010 Adult Zoning Amendments

71.     The City amended its adult zoning provisions twice since 2001, first in Resolution 586-2004 adopted on September 9, 2004, and later in Resolution 499-2010 adopted on October 13, 2010.  These amendments implemented primarily technical changes in the provisions of AZR

§§ 32-01 and 42-01 describing the types of mixed use manufacturing districts in which and near which adult uses were prohibited from operating.

### 7.  Additional Amendments Impacting Permissible Adult Use Locations

72.     As will be discussed in detail, *infra*, the effect of the City's 2001 Amendments in reducing sites for adult establishments was dramatically heightened by a series of post-2001 resolutions adopting zoning changes which significantly reduced the previously-legally-permissible areas for adult establishments.

### B.  The Impact of the City's Adult Use Zoning Regulations

73.     In the 24 years since the City of New York initially regulated the location of adult businesses, the City's ever-changing regulatory scheme has had a *dramatically* increasing adverse impact upon the quantity and availability of adult-oriented expression.

74.     The impact of the initial 1995 Ordinance on the availability of expression was comparatively minor because, even though it caused the closure of a large number of adult businesses, it nonetheless allowed a sufficiently robust avenue for the public's access to live adult entertainment as a result of the combined amount of expression available from the few 100 percent sites that remained as legally-permissible, plus the similar expression which the public could view at the 60/40 businesses which it allowed to operate.

75.     Moreover, the City, in its 1997 New York Court of Appeals brief, argued in defense of the 1995 Ordinance that the legislation "d[id] not restrict establishments which sell or display limited amounts of adult material [i.e., 60-40] establishments" would result in "a significant expansion of the City's adult use market."

76.     In contrast, the impact of the 2001 Amendments on expression is drastic because they have not only eliminated the option of compliance by 60/40 businesses, but, as a result of zoning and demographic changes, there were significantly fewer legally-permissible sites for adult businesses in 2001 than in 1995.  Today, there are far fewer legally-permissible sites for adult businesses than even existed in 2001.

### 1.   The Zoning Regulations Have Dramatically Reduced the Number of Adult Businesses.

77.     According to the city's own Study, as of the fall of 1993, there were approximately 177 adult establishments in New York City: 107 in Manhattan; 44 in Queens; 15 in Brooklyn; 8 in the Bronx; and 3 in Staten Island.  A survey performed by the City's Department of City Planning in 1993 indicated that, of these 177 adult businesses, 86 were adult bookstores, 23 were adult theaters, and 68 were adult eating or drinking establishments. Upon information and belief, the adult establishments that existed in New York City at that time offered exclusively adult material and entertainment and thus devoted 100 percent of their stock in trade and/or floor space to adult uses.

*78.*     In contrast, according to the City Planning Commission's 2001 Report, which provided the legislative history for the 2001 Amendments, in 2000 there were 136 adult establishments in New York City, a drop-off of 41 such establishments.  *See* CPC 2001 Report, at 6.  Of those businesses, 101 were identified as 60/40 establishments, meaning that a mere 35 businesses were operating as "adult establishments" meeting the definitional standard contained in the 1995 Ordinance.  *Id.*

79.     Of these 101 businesses existing just before adoption of the 2001 Amendments, there were "35 adult bookstores, 57 adult eating or drinking establishments and 44 adult theaters." *Id*. at 9.

80.     Today, there are as few as 20 adult eating or drinking establishments in all of New York City, including both 100 percent and 60/40 busiensses.  The City's zoning regulations have contributed significantly to this dramatic decline in the number and availability of adult entertainment establishments.

## 2.  The Zoning Regulations Do Not Make Available A Sufficient Number of Lawful Sites for the Location Of Adult Businesses.

81.     Upon information and belief, the total number of potential sites where adult establishments can now simultaneously be located is less than the number that would be displaced by enforcement of the 2001 Amendments.  Because of the City's 500 foot separation requirement between adult businesses, the relevant issue is not the total number of legally-permissible sites, but the total number where adult businesses could simultaneously relocate. The presence of a single adult business removes several acres around it which might otherwise be legally permissible for other relocating or new adult businesses.  *See Walnut Properties, Inc. v. City of Whittier*, 861 F.2d 1102, 1108 n.4 (9th Cir. 1988).  This lack of sites is particularly acute in Manhattan, the City's – and indeed the United States' – economic, entertainment, and cultural center.

82.     The percentage of available space -- which was extremely limited in the first place -- has been significantly curtailed and reduced in the 22 years since the 1995 Ordinance was adopted.  This is the case due to changing urban development standards, the location of

additional sensitive receptors, and shifting zoning patterns, particularly in allowing residential uses in manufacturing areas where they were previously not allowed, so as to address the City's housing shortage.

83.     Despite the City's changing landscape, the City offered no additional locations for the businesses which would be displaced by its enactment of the 2001 Amendments.

84.     To the contrary, even as far back as 2002, the City acknowledged that "[s]ince 1995, there have been 13 changes in the zoning map which have rezoned certain areas where adult uses had been permitted. These map changes have reduced the amount of unencumbered land area available to adult establishments by about 200 acres." *See* David Karnovsky Aff., *For the People Theatres of N.Y., Inc. v. City of New York*, No. 121080/02 (Sup. Ct. N.Y. Co. Oct. 2002), at ¶ 87.

85.     In October 2002, the City further acknowledged that "since 1995, changes in the number and location of 'sensitive receptors' have further reduced the land area available to adult establishments by another 65 acres, again reducing the number of potential development sites." *Id*.  The City also stated that "the estimated number of potential sites for adult businesses in New York City decreased by 9% between 1995 and 2000." *Id*. at ¶ 88.

86.     Since October 2002 there have been many more changes in the zoning map which have rezoned areas and they have caused significant further reductions in the areas where adult uses are permitted.

87.     For example, upon information and belief, since 2001, the City has substantially rezoned portions of (and/or created special zoning districts in) College Point, Queens; Hunters Point, Queens; Long Island City, Queens; Willets Point, Queens; Sunset Park, Queens; DUMBO,

Brooklyn; Greenpoint, Brooklyn; Williamsburg, Brooklyn; Manhattan's West Side; and Hunts

Point, Bronx, among other areas.

88.     Moreover, according to the Department of City Planning:

Between 2002 and January 2012, the City Planning Commission
and City Council approved rezonings of manufacturing districts to
reflect local characteristics better and to guide new investment.

The modifications to manufacturing districts are diverse, in cases
permitting new residential neighborhoods to grow in post-
industrial areas.... These modifications are also widely dispersed,
encompassing every borough.

*See* http://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page.

89.     The "manufacturing rezonings in this 10-year period [2002 to 2012] reduced the

total acreage of these districts by 5.2 percent or slightly more than 1,100 acres citywide." *Id*.

90.     In Manhattan, in the first 10 years after the City enacted the 2001Amendments,

"[a]pproximately 26% of lot area zoned for manufacturing, or 265 acres, were mapped into

another district." *Id*.

91.     In Brooklyn, 149 acres were rezoned from Manufacturing Districts to Residence

Districts. Similarly, in Queens, 109 acres were rezoned from Manufacturing Districts to

Residence Districts. The Bronx lost 56 acres of Manufacturing Districts to Residence Districts

through rezoning. Forty-one acres of Manufacturing Districts were rezoned to Residence

Districts in Staten Island. And, in Manhattan 31 acres were rezoned to residential from

Manufacturing Districts.

92.     Adult establishments are not permitted to locate in Residence Districts or within

500 feet of Residence Districts. *See* AZR §§ 32-01(b), 42-01(b). Thus, by rezoning

24

Manufacturing Districts to Residence Districts, adult businesses have lost not only substantial areas consisting of land which have themselves been rezoned, but have lost substantially more area as a result of the large 500-foot buffer zone that surrounds all Residence Districts. The same is true for C1, C2, C3, C4, C5-1, C6-1, C6-2 and C6-3 Districts.

93.     Adult establishments are also barred from "Mixed Use" manufacturing districts, which mix residential and non-residential uses. *See* AZR § 42-01(a).  This is significant because, since 2002, the City has rezoned at least 324 acres from Manufacturing Districts, where adult establishments might be permissible, to Mixed Use manufacturing districts, which bar adult uses. Again, these lost areas are made substantially larger by virtue of AZR § 42-01(b)'s prohibition on adult uses locating within 500 feet of any of these mixed-use manufacturing districts.

94.     Upon information and belief, the City is currently in the process of potentially rezoning other permissible areas, such as the vast Gowanus section of Brooklyn, which could make very substantial additional areas unavailable for adult uses.

95.     Since the 2001 Amendments were enacted, the City has also rezoned at least 213 acres from Manufacturing Districts to new parks, public open spaces, or preserved natural areas. Indeed, at least 113 acres on Staten Island that the City previously indicated were permissible for adult establishments were rezoned to parkland. Adult establishments are prohibited in each of those areas, which are traditionally deemed to be "encumbered" (and therefore not constitutionally countable) by the City.

96.     Upon information and belief, in the 16 years that have elapsed since the 2001 Amendments were enacted (but never enforced), the City never studied or ascertained the effects or consequences of these additional restrictions indirectly imposed on adult establishments by the

various zoning map changes.  The City therefore has made no attempt to determine "how speech would fare" (*City of Los Angeles v. Alameda Books*, 535 U.S. 425, 450 (2002)), as a result of these changes, since it did no new mapping study contemporaneous with enactment of the 2001 Amendments or at any time since.

97.     In addition, as a result of the 2001 Amendments, many legally-permissible sites for adult businesses are consigned to limited remote areas of the City without consideration of whether such areas could support or are suitable for the displaced uses and without consideration of the overall impact on "how speech will fare," including an assessment of the impact of these changes on the public's access to protected expression.

98.     For instance, adult establishments are nominally allowed in C7 Districts. However, C7 Districts are only "designed to permit large open amusement parks," such as Coney Island in Brooklyn, and are "mapped in only a few areas." *See* AZR § 31-17.

99.     Adult establishments are also nominally allowed in C8 Districts.  These zoning districts provide for automotive and other heavy commercial services that often require large amounts of land. According to the Zoning Resolution, "[s]ince these service establishments often involve objectionable influences, such as noise from heavy service operations and large volumes of truck traffic, they are incompatible with both residential and retail uses." *See* AZR § 31-18.

100.    M3 Manufacturing Districts, which are also nominally permissible for adult establishments, are "designated for areas with heavy industries that generate noise, traffic or pollutants. Typical uses include power plants, solid waste transfer facilities and recycling plants, and fuel supply depots." *See*  http://www1.nyc.gov/site/planning/zoning/districts-tools/m3.page.

101.    Many other areas which the City counted in 1994 as available for adult businesses are occupied by warehouses, gasoline storage tanks, parking lots and other such facilities, or undeveloped land, that are ill-suited for the relocation of adult businesses.

102.    Other sites which the City in 1994 counted as permissible for adult businesses are not legally-available for new or relocating adult live entertainment uses, including as the result of long-term leases which make them unavailable for any other commercial use, as well as long-term leases or restrictive covenants specifically prohibiting their use by an adult entertainment business.   725/689 are informed and believe that the City did not exclude the otherwise permissible sites that were subject to any of these legal restrictions when it constructed its 1994 maps of available properties.

103.    Other areas which the City's 1994 maps counted as available for adult businesses consist of land with physical characteristics which render them unavailable for any kind of commercial development.

104.    Upon information and belief, many of the suggested legally-permissible sites are such that they exclude nightclubs, bars, and/or eating or drinking establishments and would never, as a practical matter, become available for adult eating or drinking establishment use.

105.    Many of the areas which the City's 1994 maps counted as available for adult businesses are already fully developed (including the overwhelming majority of such areas in Manhattan) and in a manner which would make them commercially unfeasible for establishment of eating or drinking establishments generally and/or particularly unfeasible for relocation by any adult eating or drinking establishment.

106.     Other areas which the City's 1994 maps counted as available for adult businesses are burdened with toxic waste problems that would make occupying the sites financially unfeasible.

107.     The cost of altering or developing many of the City's proposed legally-permissible sites to transform their physical characteristics so that they are suitable for use as an adult business is insurmountable. The physical features of such sites present unreasonable obstacles to opening an adult business. These hindrances are such that they cannot be overcome without incurring expenses that no reasonable business person would, or in many circumstances could, incur.  As a result, as a practical matter, these sites would not be developed by adult entertainment businesses, so the public would never gain access to adult expression at such sites.

108.     In addition to the foregoing, application of the zoning scheme's numerous 500-foot separation requirements (e.g., from churches, schools, parks, other adult uses, and various commercial and manufacturing districts) drastically reduces the actual number of potentially available relocation sites.  For example, because of the City's 500-foot separation requirement between adult businesses, one adult use in a designated area makes ineligible, for relocation, any other site within a radius of 785,398 square feet.  These restrictions not only impact the ability of the first adult business to relocate, but also have a drastically increasing restrictive impact on the ability of each subsequent relocating or new adult business to find a site, since each such new or relocating business removes a minimum of yet another 785,398 square feet of potential available area.

109.     Even if a business does manage to find a vacant legally permissible site, the space may be encumbered and unavailable if it is subject to lease restrictions precluding "pornographic

28

uses." Indeed, such language is included in the standard lease forms of the Real Estate Board of New York ("REBNY") and the Bar Association of the City of New York's Committee on Real Property Law. Since these leases are legally enforceable, such land is not legally permissible.

110.    The combination of the City's zoning restrictions and each and all of the effects noted above is to severely and unconstitutionally limit the legally-permissible and constitutionally-countable sites for adult live entertainment businesses in the City of New York. In sum, the public's access to this form of adult entertainment will not fare well if the 2001 Amendments are allowed to take effect because, *inter alia,* there would be no reasonable opportunity for all of them to reestablish at new locations.

111.    Additionally, even assuming, *arguendo*, that all the displaced businesses could eventually reestablish at new locations, most of them would require at least a year, if not more, to relocate and, in the meantime, the public's access to constitutionally-protected live adult entertainment would be severely diminished.

### 3.  The Permit Requirements for Zoning Limit the Availability and Feasibility of Relocating Adult Businesses.

112.     Whenever one seeks to change a use of land in New York City by changing either its use or its occupancy, one must first obtain zoning approval from the City.

113.    Additionally, City zoning approval must take place prior to changing a use from non-adult to adult.

114.    Whenever any use (e.g., either adult or non-adult) requires zoning approval, it is unlawful to proceed with construction or remodeling until such approval is obtained.

115.   For all businesses requiring zoning approval other than adult businesses, the City provides expeditious procedures for obtaining zoning approval directly from Building Department personnel.

116.   When an adult business seeks zoning approval, the procedures it must follow differ in two key respects from the procedures for non-adult businesses.

a.   First, pursuant to the City's "Directive 14 and the Professional Certification of Application and Plans Process (OPPN#5/02)," architects for building permit applicants for non-adult uses are permitted to self-certify zoning compliance.  Although Building Department officials review the self-certification, that review occurs far more promptly than it would in the absence of self- certification.  In contrast, pursuant to OPPN # 7/02, "[n]o permit issued under a professionally certified application shall be a basis for an establishment to secure its priority to operate as an *adult* establishment." (Emphasis added).   Consequently, zoning approval applications for non-adult uses take far less time to process.

b.   Second, zoning permit applications for adult businesses are reviewed by the City's legal counsel, whereas zoning permits for non-adult businesses are not.  Non-adult permit applicants merely have their zoning approved or rejected by Building Department personnel, who typically do so quite expeditiously.  In contrast, in all cases where a building permit is sought by an adult business permit applicant, the Building Department forwards the application to the City's legal counsel, who then review it for zoning compliance.  There are no time limits for review of these applications by the City's legal counsel and, as a result, it usually takes dramatically longer for zoning approval requests submitted by adult business applicants to be granted or denied than comparable applications submitted by non-adult uses.

30

117.    Plaintiffs are aware of instances where applications to the Building Department for building permits for uses involving presentation of adult entertainment were pending for more than a year and at least one where the application languished unresolved indefinitely.

118.    Because of the lack of any time limits for final approval, and the requirement for adult business permit applicants to submit to open-ended zoning approval procedures not required for comparable non-adult businesses, the City's permitting scheme for adult businesses constitutes a content-based prior restraint on expression.

119.    Wholly apart from the impermissible and discriminatory delay it imposes on adult business building permit applicants, the difference in permit-processing procedures for adult and non-adult businesses to obtain zoning approval has another distinct and very significant adverse impact on expression.  Specifically, since 1995, the City's zoning laws have prohibited adult uses from locating in otherwise permissible areas if they are within 500 feet of a pre-existing adult use or any pre-existing sensitive use, such as a school or house of worship.  To resolve disputes as to whether any nearby potentially disqualifying uses were established prior to the establishment of any particular adult business, the 2001 Amendments authorized the Building Department to establish rules for determining the establishment date for adult businesses.

120.    Specifically,  the 2001 Amendments amended AZR §§  32-01 and 42-01 to provide that:

> an adult establishment shall be established upon the date of a permit issued by the department of buildings therefor, or, in the case of an adult establishment in existence prior to August 8, 2001, as determined by the department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation

pursuant to a permit and the discontinuance of an adult establishment.

121.   Pursuant to the authority of this language in the 2001 Amendments, the City established a formal rule (found in Title 1 of the Rules of the City of New York at 1 RCNY § 9000-01), which sets forth the procedure by which a new or relocating adult entertainment business may vest and protect its proposed location against disqualification from later arriving schools, religious institutions, or other adult uses situated within 500 feet of the new or relocating adult business.  This section defines the relevant "establishment dates" for both "sensitive uses" (i.e., houses of worship and schools, including day care centers) and adult businesses, including those which require building permits and those which do not.

122.   Section 9000-01(b)(1) defines the date of establishment for new adult and sensitive uses requiring construction established from and after August 8, 2001, and states, in pertinent part, that "[t]he date of establishment of an adult establishment, house of worship, or school shall be the date of issuance of an appropriate department permit."

123.   Section 9000-01(b)(2) recognizes a "no work" permit which, can be obtained by any sensitive use or adult use which desires to establish its priority under the adult zoning scheme if the use does not otherwise require obtaining a building permit.  It states that "with respect to applications for permits filed solely to establish priority, where no work requiring a building permit is proposed, the use or operation for which the permit is issued must commence within two months of the issuance of such permit . . . ."

124.   There are no time limits for the City to grant or deny a requested "no work" zoning priority permit, but all adult businesses seeking such a permit must first obtain zoning

approval from the City's legal counsel.  No such requirement is imposed on any sensitive use seeking such approval.

125.    The City's permit scheme provides an easy avenue for any sensitive use, adult business competitor, or any other person or entity who may be staunchly opposed to the establishment of a new adult eating or drinking establishment to block it from opening. Specifically, it can easily obtain a lease on a very small nearby property, announce to City officials its intent to operate there either as a school or house of worship, and, with any luck, obtain its building permit or "no work" permit before the adult eating or drinking establishment gets its requisite permit granted.  Under the City zoning scheme, any such after-arriving sensitive use would have priority and prevent the establishment of the targeted adult eating or drinking establishment notwithstanding that the permit application of the latter entity had been filed first and it had already spent enormous time and money to search for and acquire the location, prepare all the relevant architectural plans, and pursue acquisition of its building permits.  Put another way, any such entity trying to block an adult business would have a "sensitive use veto." *Young v. City of Simi Valley*, 216 F.3d 807, 814 (9th Cir. 2000).[2]

126.    This sensitive use veto practice has already in fact been used in New York, and 725/689 are fearful that it would happen again at any site to which they might relocate their business if the 2001 Amendments are enforced against them.  Both this aspect of the City's

---

2.    *Young* holds that any adult business scheme for permitting and zoning which creates the possibility of a "sensitive use veto" is facially unconstitutional under the First Amendment.

permitting scheme for adult businesses, as well as the fact that it allows for discriminatory and open-ended delay, presently chill and deter 725/689 from relocating.

### 4.  The Zoning Regulations Impose Severe Penalties for Violations, Which Create a Chilling Effect on Protected Expression.

127.    All 60/40 businesses in New York City will now face the difficult choice to either: 1) close the business because it is operating in a location now prohibited in light of the 2001 Amendments and, as a result, silence the constitutionally-protected expression the business presents; 2) eliminate the expressive component of the business to focus solely on the 60 percent of the business that does not provide adult entertainment and, as a result, silence the constitutionally-protected expression the business presents; 3) attempt to relocate the business to a lawful, available site, running the risk that the permitting process alone may take more than a year and that, in the meantime, a sensitive use or other adult business may locate within 500 feet of the new location, thereby rendering the location unlawful, and incurring exorbitant costs to remediate the land and render it suitable for public accommodation; or 4) continue to operate at its existing non-conforming location under the threat of criminal charges and/or nuisance abatement proceedings, among other possible sanctions.

128.    Should a business elect to stay in its non-conforming location, Section 11-61 of the City's Zoning Resolution provides, in pertinent part, that the owner or operator of any place in violation of a provision of the Zoning Resolution "shall be guilty of a misdemeanor." Section 55.10(2)(b) of New York's Penal Law states that any offense defined outside its chapter which is declared by law to be a misdemeanor "shall be deemed a class A misdemeanor." NYPL § 70.15(1) then authorizes a sentence of imprisonment of up to one year for a class A

34

misdemeanor. Therefore, criminal charges – punishable by a year in jail – may be filed against business owners perceived to be in violation of the 2001 Amendments.

129.    The 2001 Amendments therefore create irreparable injury to business owners by requiring them to choose between foregoing constitutional rights of free expression and facing criminal prosecution. The threat of criminal penalties under the 2001 Resolution is sufficient to constitute irreparable injury because it will have a chilling effect on free expression.  The loss of First Amendment rights, even if for minimal periods of time, constitutes an irreparable injury not capable of redress by monetary damages.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).

130.    The 2001 Amendments also create irreparable injury by seriously compromising the First Amendment rights of New York City residents and other consenting adults to gain access to constitutionally-protected, adult-oriented expression.

131.    For the reasons that follow, and as described above, the City's adult business zoning and permitting scheme, made applicable to 725/689 by the 2001 Amendments, violates the First and Fourteenth Amendments.

### STATEMENT OF CLAIMS

### CLAIM ONE:
### PLAINTIFFS 725/689 ARE ENTITLED
### TO DECLARATORY AND INJUNCTIVE RELIEF
### PREVENTING THE APPLICATION OF THE
### 2001 AMENDMENTS TO EXISTING 60/40
### ADULT NIGHTCLUBS.

132.    The previous allegations in this Complaint are hereby incorporated by reference as though fully set forth herein.

133.    725/689 seek and are entitled to a declaration that the 2001 Amendments (and the entire adult zoning regulatory scheme they have caused to become applicable to them) were unconstitutional at the time of their original enactment and are unconstitutional today, which declaration would incorporate each of the facts alleged *supra,* and each of the following facts and legal conclusions.

> ### A.    The 2001 Amendments Violate The First and Fourteenth Amendments Under the "How Speech Will Fare" Proportionality Test of *Alameda Books*.

134.    The 2001 Amendments are facially invalid under the First Amendment based on the controlling opinion of Justice Kennedy in *Alameda Books*, 535 U.S. at 444-453, which held that adult zoning laws are content-based and must be evaluated under a proportionality test which takes into account "how speech will fare."  Under this test the City must demonstrate that both the *purpose* and *effect* of the law will be to significantly reduce adverse secondary effects while having no significant adverse impact on expression.

> #### 1.    The 2001 Amendments' Adverse Impact on Expression

135.    The 2001 Amendments violate the "how speech will fare" proportionality test in multiple ways.  First, their enforcement will have a *substantial* adverse impact on expression in that they will require permanent discontinuation of the presentation of adult live dance entertainment at the majority of locations currently presenting such entertainment in the City.

136.    Second, for numerous reasons, including each of the following, the 2001 Amendments cannot survive the "how speech will fare" test because there is no reasonable

opportunity[3] for new adult businesses (including displaced, relocating 60/40 businesses) to open and operate.

      a.     First, as a result of post-2001 unrelated zoning and demographic changes, there are dramatically fewer legally-permissible sites for adult businesses today which are commercially viable for any type of commercial use and not nearly enough such sites for all displaced 60/40 businesses to relocate.  Additionally, due to the 500-foot separation requirements of AZR §§ 32-01(b), (c) and AZR §§ 42-01(b), (c), all 60/40 adult live entertainment businesses displaced by the 2001 Amendments must compete for sites with displaced 60/40 adult book and video stores.

      b.     Second, the existing zoning scheme also denies a reasonable opportunity to relocate or open, in part, due to the commercial uncertainty caused by the City's power (under AZR § 52-77) to unilaterally compel termination of such a business within a year merely by changing the zoning designation (in multiple defined ways) of its site or any site within 500 feet.  In stark contrast, pursuant to AZR § 52-11, *et seq.*, the overwhelming majority of other types of uses in New York City may continue to operate in perpetuity following a zoning change rendering their use non-conforming.

      c.     Third, the existing zoning and permitting system also denies a reasonable opportunity to open or relocate because there is open-ended delay in the required process for obtaining zoning approval.  This open-ended delay constitutes an impermissible prior

---

[3]  The term "reasonable opportunity" as used here includes, but is not limited to, how that term was used in *City of Renton v. Playtime Theatres*, 475 U.S. 41, 54 (1986).

restraint on expression and, *per se*, denies a reasonable opportunity to open or relocate. Specifically:

      i.      The City prohibits construction or remodeling of a site for a new or relocating adult business to commence until a building permit has been issued.

      ii.      The City will not issue either a building or "no work" permit until it has given zoning approval.

      iii.      There are no time limits for the City to rule on an adult business' request for zoning approval (not even for a "no work" priority permit).

      iv.      Determinations on applications for zoning approval for adult entertainment businesses have historically been delayed indefinitely (in one or more cases), or for over a year (in others).

      d.      Fourth, the existing zoning and permitting system also denies a reasonable opportunity to open or relocate, in part, because, in multiple ways, it generates enormous content-based *financial* burdens for adult live entertainment businesses.

      i.      Because of the artificial scarcity of legally permissible sites caused by the City's adult zoning scheme, upon information and belief, the rent for an adult entertainment use is higher than the rent for a comparable non-adult entertainment use at the same location.  Consequently, because of this City-created scarcity of sites, adult live entertainment businesses are not able to compete on an equal footing with others looking for a site to operate a live entertainment business, as required by *Renton*, 475 U.S. at 54.

ii.      The City's content-based regulatory scheme also imposes dramatically unequal and significant start-up expenses on adult businesses because, unlike non-adult uses, adult uses are not permitted to have their architects self-certify zoning compliance in order to obtain immediate issuance of their building permit.  Instead, an adult business' permit application's zoning compliance may be determined only by City officials causing open-ended delay. Consequently, adult businesses, and only adult businesses, must pay significant rent and delay construction while awaiting zoning approval that may go on for several months, if not years.  The City could easily mitigate the problem, but has not.  The City provides no time limits for its officials to complete their investigations and rule on zoning approvals for adult uses.  As a result, significant costs caused by delays in commencing construction (e.g., payment of rent for very long periods pending the City's determination of zoning approval) are uniquely imposed on adult business permit applicants and not imposed on other permit applicants.  This, as well, denies adult businesses a reasonable opportunity to open or relocate.

iii.      The City will not accept an application for zoning approval for any type of business unless the application is signed by the landlord or owner. Consequently, one wishing to establish an adult business must typically commit financially to the property, whether by purchase, lease or other agreement, merely to be entitled to seek the City's determination of whether the property is in fact properly zoned for the intended use.  This process does not cause comparable

financial risk for the overwhelming majority of building permit applicants for non-adult uses since they can easily determine zoning compliance without entering into a lease by merely looking at a zoning map.  In contrast, those seeking sites for adult businesses cannot readily or definitively determine the zoning permissibility of a site because, as described more fully *infra,* surrounding uses may disqualify their proposed site, and their existence (or continued existence) may not be obvious.  Moreover, an adult use might lose its priority and zoning approval during the building permit application process and be locked into a lease for a business that is not viable at the location.

      iv.      Consequently, the City's requirement for landlord approval before an adult business may seek City zoning approval denies adult businesses a reasonable opportunity to open and operate.

e.      Fifth, the existing zoning and permitting system also denies a reasonable opportunity to open or relocate, in part, because of the commercial uncertainty caused by the failure of its adult zoning scheme to provide a mechanism for guaranteeing the vesting of any adult site. Specifically:

      i.      Under New York law, engaging in significant development in reliance on permits issued by the City does not vest the right to operate a use if the use is later found to be non-conforming.  *Parkview Associates v. New York*, 71 N.Y.2d 274 (1998).

      ii.      Even if the City approves an adult business' application for either a building permit or "no work" permit, that permit may later be revoked at any

time, and the business required to terminate, if the City learns that an unknown and not obviously operating disqualifying public or private use (e.g., a house of worship, school or other adult business) has been maintained since prior to August 8, 2001, within 500 feet of the entrepreneur's approved proposed site (including on any floor of a tall building whose base is within 500 feet).  *See* 1 RCNY § 9000-01(a).  There is no requirement that such uses even have permits.

      iii.     Worse, under AZR § 52-61*,* sites occupied by non-conforming schools, houses of worship, or other adult businesses retain their vested non-conforming use rights even if they have been closed or abandoned for up to two years.  Consequently, a potentially disqualifying pre-2001 proximate use (many of which uses had no obligation to have a permit) could easily go unnoticed if its site is temporarily unoccupied when an adult entrepreneur seeks either a building permit or "no work" priority permit.   But under New York law, the abandoned use could later resurface and require termination of any adult use at any site within 500 feet if the adult use did not pre-date the initial establishment of the abandoned disqualifying use.

137.   Third, even apart from the scarcity of legally permissible relocation sites cognizable under the *Renton* alternative sites test, there are either no or extremely few legally-permissible sites for relocating 60/40 live entertainment businesses which would be commercially viable for those businesses.  While commercial viability of sites specifically for an adult use is not a relevant factor in this Circuit when analyzing sites under the prior "alternative sites" test of *Renton*, it is a significant relevant factor in determining "how speech will fare"

under Justice Kennedy's proportionality test since it will directly affect how much of this type of expression will survive.

138.   Fourth, even if commercially-viable and legally-permissible relocation sites could eventually be found for all displaced 60/40 businesses which provide a reasonable opportunity for their relocation, the ordinance fails to provide adequate time to relocate to avoid depriving the public of a significant amount of access to expression.  Relocating businesses like 725/689's would likely require at least one and possibly several years to accomplish.  First, the business must locate and secure a commercially-viable location.   Next, the business must submit appropriate architectural drawings for governmental design and construction approval.  Before the City will consider these plans, it must first grant zoning approval through both the Building Department and the City's legal counsel, which could take months or even years given the lack of express timelines for zoning review.  Following zoning approval, the business then must commence and complete construction, obtain all City inspection approvals and occupancy permits, engage and train a new workforce in its new facility, and make its presence known to the public, all before it can open a new business.  These daunting and time-consuming tasks likely deter adult businesses from undertaking the relocation process.

139.   In short, enforcement of the 2001 Amendments will have a dramatic adverse impact on "how speech will fare," because a business cannot present constitutionally-protected expression during the lengthy relocation process.

## 2.        Lack of Adequate Justification

140.   Finally, both at the time it enacted the 2001 Amendments and currently, the City lacked (and still lacks) adequate justification for those amendments sufficient to impose the

severe burdens on expression triggered by re-characterizing 60/40 businesses as adult entertainment establishments.

141.    By the time the City enacted the 2001 Amendments, a cumulative combination of economic, development, and demographic changes, along with the original 1995 zoning scheme, had already dramatically altered the area around Times Square, while still allowing reasonable access to adult-oriented expression at 60/40 businesses located in and near Times Square and at other locations in Manhattan.

142.    Under such circumstances, the City had the burden to demonstrate that its 2001 Amendments would be effective in further reducing secondary effects and that the benefit from any such claimed further secondary effect reductions would outweigh the dramatic adverse impact on expression caused by the 2001 Amendments. The City failed to meet that burden.

**B.      The 2001 Amendments Are Partially Facially Invalid**

**Under the "How Speech Will Fare" Proportionality Test**
**of *Alameda Books*, At Least to the Extent That They Impose**
**Severe Restraints on Expression Within the Borough of Manhattan**

143.    At all times relevant hereto, the City of New York has consisted of five boroughs: Manhattan (New York County); The Bronx (Bronx County); Brooklyn (Kings County); Queens County (Queens County); and Staten Island (Richmond County).

144.    Among the five boroughs, Manhattan is and at all relevant times has been unique, both to the City of New York and in a national and international sense.  Among other things, it is the transportation hub for the entire New York metropolitan area and includes the central business district and the overwhelming majority of hotels and tourist attractions.  According to a 2012 study, on any given day there are upwards of four million individuals residing and/or

working in, and/or visiting Manhattan.  *See* Moss and Quing, *The Dynamic Population of Manhattan*, Rudin Center for Transportation Policy and Management of the New York University Wagner School of Public Service (available at https://wagner.nyu.edu/files/rudincenter/dynamic_pop_manhattan.pdf).

145.    The majority of businesses which will be adversely impacted and forced to close or relocate by the 2001 Amendments are located in the Borough of Manhattan.

146.    While Manhattan houses the largest number of businesses which will be adversely affected by the 2001 Amendments, due (among other things) to its population density and multiplicity of sensitive receptors, it has by far the fewest number of available alternative sites to which such businesses can relocate.

147.    For all of these reasons, the 2001 Amendments will disproportionately adversely impact the presentation of and access to expression within the Borough of Manhattan.

148.    For each of the reasons above, 725/689 alternatively seek and are entitled to a declaration that the 2001 Amendments are partially facially invalid under the First Amendment based on the controlling opinion of Justice Kennedy in *Alameda Books* specifically as to any currently existing 60/40 establishments located in the Borough of Manhattan.

149.    Alternatively, 725/689 seek and are entitled to a declaration that the 2001 Amendments are partially facially invalid under the First Amendment based on the controlling opinion of Justice Kennedy in *Alameda Books* to the extent they preclude the continued presentation of live adult expression at sites in the Borough of Manhattan which have been continuously occupied by 60/40 establishments presenting such expression since prior to the adoption of the 2001 Amendments.

**C.     The 2001 Amendments Also Violate
The First and Fourteenth Amendments
Under the "Reasonable Opportunity" Test of *City of Renton*.**

150.    Plaintiffs seek and are entitled to a declaration that the 2001 Amendments, both at the time of enactment and currently, are also facially invalid under the First Amendment based on the "reasonable opportunity" test established in *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 54 (1986).

151.    Under *Renton*, an adult zoning ordinance is facially invalid if it fails to allow a "reasonable opportunity" to "open and operate" an adult entertainment business.  *Id.*

152.    For each of the reasons stated *supra* under the "how speech will fare" proportionality test, the 2001 Amendments fail to allow new and displaced adult live entertainment businesses a "reasonable opportunity to open and operate" in New York.

**D.     The 2001 Amendments Are Partially Facially Invalid Under the *Renton*
"Reasonable Opportunity" Test At Least to the Extent They Impose
Severe Restraints on Expression Within the Borough of Manhattan.**

153.    For each of the reasons described *supra*, 725/689 alternatively seek and are entitled to a declaration that the 2001 Amendments are at least partially facially invalid under the First Amendment based on the *City of Renton* "reasonable opportunity" test as to any currently-existing 60/40 establishments located in the Borough of Manhattan.

154.    Alternatively, 725/689 seek and are entitled to a declaration that the 2001 Amendments are at least partially facially invalid under the First Amendment based on the *City of Renton* "reasonable opportunity" test to the extent they preclude the continued use of sites in the Borough of Manhattan which have been continuously occupied by 60/40 establishments presenting such expression since prior to the adoption of the 2001 Amendments.

45

### E.   The 2001 Amendments Also Violate The First and Fourteenth Amendments Because They Are Unsupported By A Substantial Governmental Interest.

155.   Plaintiffs seek and are entitled to a declaration that the 2001 Amendments are also facially invalid under the First Amendment based on the "substantial government interest" test established by a majority of the Court in *Alameda Books*.

156.   In *Alameda Books,* a majority of the Supreme Court held that an adult zoning ordinance must be found facially invalid if, *inter alia,* a city cannot demonstrate that it had a "substantial government interest" in enacting it, and that this cannot be demonstrated by "shoddy evidence."

157.   In *White River Amusement Pub, Inc., v. Town of Hartford*, 481 F.3d 163 (2d Cir. 2007), the Second Circuit Court of Appeals held that a city may meet this test, if at all, only with evidence it actually considered at the time of adoption of the ordinance.

158.   At the time of enactment of the 2001 Amendments, the City failed to conduct a secondary effects study and had before it no evidence establishing that the 60/40 live entertainment businesses then existing were producing any of the secondary effects which the City's 1994 Study attributed to their 100 percent predecessors.  In fact, to the contrary, the City had before it in 2001 evidence that the 60/40 businesses operating in Manhattan were actually not causing any negative secondary effects.

159.   Notwithstanding whether the assumptions underlying the 1995 Ordinance were correct or whether that ordinance itself ameliorated any asserted secondary effects caused by 100 percent businesses, changing demographic, geographic, and zoning patterns had effectively eliminated any perceived or actual secondary effects in Times Square by the time of the 2001

46

Amendments.  And this occurred while 60/40 businesses were in operation in the Times Square area, unregulated by the 1995 Ordinance. Nonetheless, without any new evidence or other meaningful justification that there was a problem to be solved or that the proposed solution would significantly ameliorate the perceived problem, the City adopted the 2001 Amendments, bringing 60/40 businesses within the ambit of the original 1995 Ordinance.

160.    Consequently, and particularly because it was expanding the reach of a prior adult zoning scheme, the City failed to demonstrate that any substantial government interest was served by enactment of the 2001 Amendments.

**F.      The 2001 Amendments Also Violate The First and Fourteenth Amendments Because They Are Unsupported By A Substantial Governmental Interest, At Least to the Extent They Impose Severe Restraints on Expression Within the Borough of Manhattan.**

161.    For each of the reasons stated *supra*, 725/689 alternatively seek and are entitled to a declaration that the 2001 Amendments are at least partially facially invalid under the First Amendment based on the *Alameda Books* "substantial government interest" test as to 60/40 establishments located in the Borough of Manhattan.

162.    Alternatively, 725/689 seek and are entitled to a declaration that the 2001 Amendments are at least partially facially invalid under the First Amendment because they are unsupported by a substantial governmental interest in regulating the continued use of sites which have been continuously occupied by 60/40 establishments presenting such expression in the Borough of Manhattan since prior to the adoption of the 2001 Amendments.

**G.      The 2001 Amendments Also Violate The First and Fourteenth Amendments Under the "Substantially Broader Than Necessary" Intermediate Scrutiny Test of *Ward v. Rock Against Racism*.**

47

163.    Plaintiffs seek and are entitled to a declaration that the 2001 Amendments are also facially invalid under the First Amendment based on the "substantially broader than necessary" intermediate scrutiny test established by the Supreme Court in *Ward v. Rock Against Racism*, 491 U.S. 781 (1689).

164.    In *Ward*, the Court held that a time, place and manner regulation of expression may not "burden substantially more speech than is necessary to further the government's legitimate interests[;] . . . Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* at 799.

165.    Given the changing geographic, demographic, and zoning patterns in New York city, the 2001 Amendments were no longer "necessary to further the government's legitimate interests," and they burdened substantially more speech than was necessary to accomplish any lingering substantial interests the City may claim to have still had.

**H.    The 2001 Amendments Are Partially Facially Invalid Under the *Ward* "Substantially Broader Than Necessary" Test At Least to the Extent They Imposed Severe Restraints on Expression Within the Borough of Manhattan.**

166.    All or nearly all the secondary effects in New York relied on in the City's 1994 Study pertained to asserted secondary effects in the Borough of Manhattan, and primarily consisted of the adverse impact of visual blight, garish signs, and concentrations of adult businesses.

167.    By 2001, the concentrations of such businesses, garish signs, and visual blight in Manhattan had all been eliminated.   The overwhelming number of the limited businesses presenting adult entertainment which did remain in Manhattan had converted to 60/40 businesses

48

and had significantly subdued signage.  When the City enacted the 2001 Amendments, there was no evidence before it that the Amendments were necessitated by the few remaining 60/40 businesses.  In fact, to the contrary, the City had before it evidence from the Manhattan community boards demonstrating that the 60/40 businesses in Manhattan were not causing negative secondary effects in 2001.

168.    For each of the reasons stated *supra*, 725/689 alternatively seek and are entitled to a declaration that the 2001 Amendments are at least partially facially invalid under the First Amendment based on the *Ward* "substantially broader than necessary" intermediate scrutiny test as they apply to 60/40 establishments located in the Borough of Manhattan.

169.    Alternatively, 725/689 seek and are entitled to a declaration that the 2001 Amendments are at least partially facially invalid under the First Amendment based on the *Ward* "substantially broader than necessary" intermediate scrutiny test to the extent they preclude the continued use of sites in the Borough of Manhattan which have been continuously occupied by 60/40 establishments presenting such expression since prior to the adoption of the 2001 Amendments.

## I.    The 2001 Amendments Violate
The First And Fourteenth Amendments
On The Grounds That They Are Content-Based
And Fail Strict Scrutiny.

170.    Under *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015), the government may not regulate expression based on its content.  To do so subjects the regulation to strict scrutiny and presumptively violates the First Amendment.

171.     The 2001 Amendments create a separate class of businesses that present adult-oriented expression and then regulate that expression differently from other non-expressive businesses on the basis of their content.

172.     The City lacks a compelling governmental interest justifying the differential treatment of adult businesses imposed in the 2001 Amendments.

173.     The zoning and permitting regulations contained in the 2001 Amendments are not the least restrictive means of achieving the government's objective.

174.     The 2001 Amendments are therefore impermissibly content-based, fail strict scrutiny, and violate the First Amendment on their face.

**J.       General Allegations as to Declaratory Claims**

175.     There is an actual controversy among the parties as Defendant City maintains that the 2001 Amendments are constitutional in all respects.

**K.       Injunctive Relief**

176.     As set forth in this Complaint, 725/689 will suffer irreparable injury if the 2001 Amendments are enforced against them.  This injury will include not only cessation of their expression and the closure of their business, but also the continuing elimination of their expression for at least a year or more, if not permanently, until if and when they secure and open another location.

177.     725/689 have no adequate remedy at law.

178.     For each of these reasons, 725/689 seek and should be granted interim and permanent injunctive relief to prevent application of the 2001 Amendments consistent with the extent of declaratory relief to which they may be found entitled.

**CLAIM TWO:**

**PLAINTIFFS 725/689 ARE ENTITLED
TO DECLARATORY AND INJUNCTIVE RELIEF
PREVENTING THE APPLICATION OF THE
MANDATORY TERMINATION REQUIREMENTS
OF AZR §§ 52-77 AND 72-41 AS TO ALL
BUSINESSES RENDERED NON-CONFORMING
BY THE 2001 AMENDMENTS.**

### A.     The Termination Requirements Violate
### The First And Fourteenth Amendments.

179.    The previous allegations in this Complaint are hereby incorporated by this reference as though fully set forth herein.

180.    725/689 seek and are entitled to a declaration that the mandatory termination requirements of AZR §§ 52-77 and 72-41 are facially unconstitutional in all applications.

181.    Alternatively, 725/689 seek and are entitled to a declaration that the mandatory termination requirements of AZR §§ 52-77 and 72-41 are partially facially unconstitutional as to all 60/40 businesses rendered non-conforming by the 2001 Amendments.  These declarations are based on the facts alleged *supra* and each of the following facts and legal conclusions.

182.    AZR § 52-11 states the general rule in New York City that, absent any modification or abandonment of the use, "[a] non-conforming use may be continued."  This rule applies to the overwhelming majority of New York land uses.

183.    AZR § 52-77 (enacted as part of the original 1995 Ordinance) establishes adult entertainment businesses as one of the extremely rare exceptions to the City's general rule that a non-conforming use is not required to terminate and, absent changes, may remain in perpetuity. It requires any adult entertainment business to terminate within one year after it first becomes

51

non-conforming (typically after a subsequent zoning change).   Virtually no other non-conforming business or use in New York City is subject to a mandatory termination requirement (of any kind, let alone after a brief one year period) even though all non-conforming uses are disfavored and either have adverse effects where located or are no longer compatible with the new zoning designation which rendered them non-conforming.

184.   As an exception to AZR § 52-77, AZR § 72-41 applies exclusively to those commercial establishments which became non-conforming specifically by enactment of the 2001 Amendments, and which made any financial expenditures prior to enactment of the 2001 Amendments in order to comply with the 1995 Ordinance.   It specifically requires all such establishments to terminate their nonconforming use by a particular date, specifically, October 31, 2002.   AZR § 72-41 expressly states that the mandatory termination requirement of AZR § 52-77 does not apply to those businesses governed by AZR § 72-41.   Any establishments rendered non-conforming by the 2001 Amendments which did not make financial expenditures in order to comply with the 1995 Ordinance are not subject to the termination provisions of AZR § 72-41 and, instead, are governed by the separate termination provisions of AZR § 52-77.

185.   725/689, as the occupant of property used by 60/40 businesses since enactment of the 2001 Amendments, is subject to actions being brought against it by the City to enforce both the 2001 Amendments and whichever of the two AZR mandatory termination provisions the City may conclude applies to them, i.e., either AZR § 52-77 or § 72-41.

186.   To the extent the City should conclude 725/689 made relevant and sufficient financial expenditures prior to October 31, 2001 in order to bring its site in compliance with the 1995 Ordinance as used by the type of 60/40 tenant it desired (which brings it far more rental

52

income than any use presenting no adult entertainment), the City would necessarily conclude that 725/689 were subject to the mandatory October 31, 2002 closing requirement of ARS § 72-41. 725/689 reasonably fears that the City may seek to subject it to the termination provisions and, accordingly, has a present concrete interest in obtaining a declaration of the facial unconstitutionality of AZR § 72-41.

187.    Alternatively, should the City should conclude 725/689 did not make sufficient (or any) relevant financial expenditures in order to bring their businesses into compliance with the 1995 Ordinance, 725/689 would be subject to enforcement of the mandatory termination provisions of AZR § 52-77.  Consequently, 725/689 also reasonably fears that the City may enforce AZR § 52-77 against it.  For that reason, 725/689 have a concrete present interest in obtaining a declaration of the facial unconstitutionality of both AZR §§ 72-41 and 52-77.

188.    725/689 require and seek declaratory relief only as against AZR § 52-77.  If 725/689 and/or any other displaced or new adult business were able to relocate or locate at a new site, they would always be vulnerable to a one-year mandatory termination necessitated by defined zone changes in their own or nearby zones.  AZR § 52-77 requires termination of adult business within one year of the applicability of any future defined zone change in either the zone in which an adult business is located or in any zone whose border is less than 500 feet from the adult business.  Such zone change would render the adult use (such as a relocated 725/689) non-conforming.  Since 2001, the City has  invoked AZR § 52-77 to terminate one or more 100 percent adult business uses at sites which remained conforming even after the 2001 Amendments.  This lurking, omnipresent, documented possibility of accelerated termination, unrelated to its own conduct, presently chills 725/689 from attempting to relocate now given the

huge investment in time and money that would be required to do so.  Consequently, 725/689 have a concrete present interest in obtaining a declaration of the facial unconstitutionality of AZR § 52-77..

189.    To the extent both AZR § 52-77 and AZR § 72-41 single out non-conforming adult entertainment businesses and treat them not only differently, but dramatically more harshly than almost all other non-conforming businesses and uses, they are content-based restrictions of expression as defined both in Justice Kennedy's controlling opinion in *Alameda Books* and also the opinion of a majority of the Supreme Court in *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015).

190.    725/689 seek and are entitled to a declaration of the facial unconstitutionality of these content-based sections in all their potential applications based on the strict scrutiny review required by the Court in *Reed v. Town of Gilbert*, for each of the following reasons:

a.    The City has no compelling interest in treating lawful non-conforming adult entertainment establishments differently, and far more harshly, from virtually all other types of non-conforming uses in New York.

b.    AZR §§ 52-77 and 72-41 are neither "narrowly tailored," nor the "least restrictive alternative" to accomplish any legitimate municipal goals.  This is particularly true because they apply to 60/40 establishments which were not shown, generically, to cause any of the secondary effects assertedly attributed to the types of businesses at issue in the City's 1994 Study and because the City considered evidence affirmatively disproving the notion that 60/40 businesses generate secondary effects when it adopted the 2001 Amendments.

191.    Regardless of whether AZR §§ 52-77 and 72-41 are subject to strict scrutiny review as content-based restrictions, they are nonetheless facially unconstitutional in all their applications to the extent they are evaluated under any of the less rigorous constitutional tests previously set out herein, including the "how speech would fare" proportionality test of *Alameda Books*, the "reasonable opportunity" test of *City of Renton,* the "substantial government interest" test of the *Alameda Books* plurality (joined by Justice Kennedy), and the "substantially broader than necessary" intermediate scrutiny test of *Ward v. Rock Against Racism.*

192.    AZR §§ 52-77 and 72-41 are also facially unconstitutional under the Equal Protection clause of the Fourteenth Amendment because they treat non-conforming adult entertainment expressive uses far more harshly than almost every other type of non-conforming use, absent any compelling or otherwise sufficient governmental interest.

193.    To the extent 725/689 alternatively seek a determination that AZR §§ 52-77 and 72-41 are, in any event, partially facially unconstitutional as to all 60/40 businesses rendered non-conforming by the 2001 Amendments, that claim is additionally based on the allegations above and the further fact that the City had no compelling or otherwise adequate justification for applying those provisions specifically to these types of businesses, and particularly given the absence of any evidence that there remained any problems to be solved at the time the City enacted the 2001 Amendments.

194.    Apart from the foregoing various reasons why AZR §§ 52-77 and 72-41 are independently unconstitutional, they are derivatively unconstitutional to the extent they enforce the unconstitutional 2001 Amendments, since they require the termination of expressive

businesses while, for each of the reasons previously stated herein, the City provides no reasonable opportunity for relocation of those businesses.

## B.      Injunctive Relief

195.    725/689 will suffer irreparable injury if either AZR § 72-41 or § 52-77 is enforced against their locations.  The irreparable injury will also include the certain loss of all 725/689's First Amendment rights and the reciprocal First Amendment rights of their patrons to view the constitutionally protected expression they would otherwise continue to present at their existing locations.

196.    725/689 have no adequate remedy at law.

197.    For each and all of these reasons, 725/689 seek and are entitled to preliminary and permanent injunctive relief to prevent application of AZR §§ 52-77 and 72-41 consistent with the extent of declaratory relief to which they may be found entitled.

## CLAIM THREE:

**PLAINTIFFS 725/689 ARE ENTITLED
TO A DECLARATION THAT THE CITY'S ENTIRE
ADULT ZONING SCHEME IS INVALID ON ITS FACE, AS CONSTRUED,
AND AS APPLIED, BECAUSE ITS PERMIT PROCEDURE
CONSTITUTES AN IMPERMISSIBLE, CONTENT-BASED
PRIOR RESTRAINT PROMOTING OPEN-ENDED DELAY AND
BECAUSE IT AUTHORIZES AN IMPERMISSIBLE SENSITIVE USE
VETO AND TO INJUNCTIVE RELIEF PREVENTING ENFORCEMENT
OF THE CITY'S ADULT ZONING SCHEME BASED ON
ITS FAULTY PERMITTING PROCEDURES.**

### A.      The Permitting Scheme
Violates the First And Fourteenth Amendments.

198.    The previous allegations in this Complaint are hereby incorporated by this reference as though fully set forth herein.

199.    725/689 seek and are entitled to a declaration that the City's procedures for providing zoning approval of adult business permit applications are facially unconstitutional, which declaration would incorporate each of the facts alleged *supra,* and each of the following legal conclusions.

200.    The City's mechanism for new or relocating adult uses to obtain zoning approval imposes no time limits within which the City must grant or deny such an approval and also imposes a content-based, delay-inducing procedural hurdle - the additional requirement to obtain zoning approval from the City's legal counsel without any time limits - not imposed on non-adult businesses.  The City also discriminates against adult businesses on the basis of their content by denying adult businesses the ability, afforded to all other uses, to architecturally self-certify. These facts, both individually and taken together, compel the conclusion that the City's permit scheme for adult businesses is a content-based prior restraint on expression which violates the First Amendment.  *See FW/PBS v. City of Dallas*, 493 U.S. 215 (1990).  For the same reasons, this scheme is also unconstitutional as routinely construed and applied by City officials.

201.    Because this differential treatment of adult entertainment uses is content-based, it is also subject to and fails strict scrutiny.  *See Reed v. Town of Gilbert*, *supra*.  This differential treatment is broader than necessary to accomplish any compelling governmental purpose and therefore violates the First Amendment.  For the same reasons, the permit requirements also violate the Equal Protection clause of the Fourteenth Amendment.

202.    Lastly, the City's permitting and zoning scheme is also facially unconstitutional because it authorizes a "sensitive use veto" of the type found facially invalid in *Young v. City of Simi Valley*, 216 F.3d 807, 814 (9th Cir. 2000).

57

### B.    Injunctive Relief

203.    Invalidation of these permit requirements alone will not provide adequate protection for new or relocating adult entertainment uses, because, without such permits, those adult uses cannot be insulated from the disqualifying impact of new schools or houses of worship which, while the adult use's application is pending, apply for and obtain zoning approval of locations within 500 feet of the applicant's proposed adult site (all of which are given priority over any unpermitted use under 1 RCNY § 9000-01(a)).

204.    The only constitutionally-adequate remedy for protection of First Amendment rights is to prevent enforcement of the adult zoning ordinance, given the faulty permitting procedures that are required as precursors to location or relocation of an adult use.

205.    Consequently, 725/689 also seek and are entitled to preliminary and permanent injunctive relief against enforcement of the City's entire adult zoning scheme.

### CLAIM FOUR:

**IN THE ALTERNATIVE, PLAINTIFFS 725/689 ARE ENTITLED TO A DECLARATION THAT THE ONE-YEAR TERMINATION PERIOD REQUIRED BY AZR § 52-77, BOTH AS A MATTER OF STATUTORY CONSTRUCTION AND CONSTITUTIONAL LAW, STARTS TO RUN ONLY WHEN THE ORDINANCE WHICH CREATES THE NONCONFORMITY FIRST BECOMES APPLICABLE TO THEM, I.E., AFTER ANY AND ALL DEFFERRED ENFORCEMENT PURSUANT TO JUDICIAL ORDERS AND LITIGATION-RELATED AGREEMENTS HAS EXPIRED, AND TO INJUNCTIVE RELIEF TO PREVENT ENFORCEMENT OF THE TERMINATION REQUIREMENT AGAINST 725/689 UNTIL AT LEAST ONE YEAR FOLLOWING SUCH EXPIRATION.**

### A.    The Court Should Construe the Termination Provision to Begin on the Date of Non-Conformity.

58

206.    The previous allegations in this Complaint are hereby incorporated by this reference as though fully set forth herein.

207.    725/689 alternatively seek and are entitled to a declaration that the one-year termination period required by AZR § 52-77, both as a matter of statutory construction and constitutional law, starts to run only when the ordinance which creates the non-conformity first becomes applicable to them, i.e., after any and all deferred enforcement pursuant to judicial orders and litigation-related agreements has expired, which declaration would incorporate each of the facts alleged *supra*, and each of the following facts and legal conclusions.

208.    725/689 and/or their predecessors in interest began presenting adult entertainment at their current locations prior to the adoption of the 2001 Amendments.

209.    Due to a combination of state court orders and litigation-related non-enforcement, 725/689 continue to lawfully operate at their existing locations.

210.    Because of a combination of judicial orders, operation of law and litigation-related non-enforcement agreements, the 2001 Amendments will not become applicable to 725/689 until such time, if ever, as all judicial orders and litigation-related temporary non-enforcement agreements allowing the use to continue have expired.

211.    Consequently, as a matter of statutory construction, 725/689 are entitled to a declaration that the 2001 Amendments shall not be enforceable against them until one year after the expiration of all protective judicial orders and litigation-related temporary non-enforcement agreements.

212.    725/689 also seek and are entitled to a declaration that AZR § 52-77 would be unconstitutional, in violation of the First Amendment, if construed to require immediate

59

termination upon expiration of all protective judicial orders and litigation-related temporary non-enforcement agreements.

213.   If the 2001 Amendments are allowed to immediately terminate businesses at sites where such uses have lawfully operated throughout a 16-year period of litigation-deferred enforcement, there will be a dramatic drop in the public's access to such expression for at least a year (and likely much longer) even assuming relocation sites are found.   Such a loss of expression would violate the First Amendment's "how speech would fare" proportionality test.

214.   Not only would immediate enforcement of the 2001 Amendments cause all businesses like 725/689's to disappear *entirely* from the City for at least a year (if not permanently), but the well over a thousand persons who depend on these lawful businesses for their livelihood throughout New York will all be immediately out of work, to not only their detriment but also to the detriment of their families and their dependents who rely on them for support.

215.   Laws are required to be construed in a manner so as to preserve their constitutionality.   *See, e.g., Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 505-506 n.13 (1984); *Miller v. California*, 93 U.S. 2607 (1973).[4]

216.   Additionally, if AZR § 52-77 were construed to require immediate termination the instant a good faith lawsuit filed by a pre-existing lawful business had concluded, there would be no time whatsoever for an orderly termination of that business on conclusion of all good faith legal challenges to the legislation creating the non=conformity.   An affected owner would have

---

[4] By this alternative claim, MLB/689 do not intend to waive any of their constitutional challenges to the facial validity of AZR § 52-77.

to elect between: (a) utilizing the statutory one-year period to close down and relocate its business; or (b) foregoing its constitutional challenges to the validity of the law causing it to become non-conforming.  Such a Hobson's choice would deprive the affected owner of any reasonable opportunity to attempt to timely relocate its business.  As such, the application of the termination provision would cause AZR § 52-77 to violate the "how speech will fare" proportionality test of *Alameda Books*, as well as the "reasonable opportunity" requirement of *City of Renton*.

217.    For each of the foregoing reasons, 725/689 are entitled to a declaration that, both as a matter of pure statutory construction and constitutional law, they would be entitled to one year to terminate their business following the expiration of any judicial order or litigation-related non-enforcement agreement which prevents enforcement of the 2001 Amendments against them.

218.    There is an actual controversy between the parties, as the City maintains that AZR § 52-77 is constitutional in all respects and, upon information and belief, requires 725/689 to cease their use of their existing locations immediately upon expiration of any further periods of litigation-related agreed non-enforcement.

## B.    Injunctive Relief

219.    725/689 will suffer irreparable injury if AZR § 52-77 is enforced, resulting from both the loss of their and the public's reciprocal First Amendment rights caused by the forced immediate termination of protected erotic expression at their current site, and also from the related irreparable injury that would be caused by the forced closure of their businesses without adequate notice or time to wind up their affairs and those of their work force.

220.    725/689 have no adequate remedy at law.

221.   Consequently, 725/689 alternatively seek and are entitled to interim and permanent injunctive relief to prevent application of the 2001 Amendments for one year after all non-enforcement compelled by judicial orders and litigation-related agreements has expired, and/or consistent with the extent of declaratory relief to which they may be found entitled.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs 725 Enterprises, Corp. and 689 Eatery Corp. request the following relief against Defendants City of New York *et al.*:

1.   A declaration that the 2001 Amendments violate the First Amendment and are facially unconstitutional;

2.   Preliminary and permanent injunctive relief, to be sought by separate motion, enjoining Defendants City of New York City *et al.* from enforcing the 2001 Amendments and the adult business zoning and permitting scheme which is given effect through the 2001 Amendments;

3.   A declaration that the termination provisions of AZR §§ 52-77 and 72-41 violate the First and Fourteenth Amendments and are facially unconstitutional;

4.   A declaration that the one-year termination provision providing that the time period does not begin until the conclusion of this litigation;

5.   Preliminary and permanent injunctive relief, to be sought by separate motion, enjoining Defendants City of New York City *et al.* from enforcing AZR §§ 52-77 and 72-41;

6.   An award of Plaintiff's reasonable attorney fees and costs pursuant to 42 U.S.C. 1988; and

7.      Any such other relief in law or equity that this Court deems appropriate under the

circumstances.

Respectfully submitted,

 /s/ Daniel Silver
DANIEL A. SILVER
Silver & Silver LLP
One Liberty Square
New Britain, Connecticut 06051
(860) 225-3518
dan@lawsilver.com

JENNIFER M. KINSLEY
Kinsley Law Office
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
kinsleylawoffice@gmail.com

Counsel for Plaintiffs 725 Eatery, Corp.
and 689 Eatery, Corp.

## CERTIFICATE OF SERVICE

I hereby certify that an exact copy of the foregoing Second Amended Complaint was provided to all counsel of record via the Court's CM/ECF system on the 18th day of November, 2018.

 /s/ Jennifer M. Kinsley
JENNIFER M. KINSLEY
Kinsley Law Office
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
kinsleylawoffice@gmail.com