IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
725 EATERY CORP.,                                  :
Substituting for MLB ENTERPRISES, CORP.
etc., *et ano.,*                                   :

                      Plaintiffs,     :

          - against -                             :          Civil Action No.
                                      02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,                      :

                      Defendants.    :
-------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*        :

                      Plaintiffs,     :

          - against -                             :          Civil Action No.
                                      02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,                      :

                      Defendants.    :
-------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*   :

                      Plaintiffs,     :

          - against -                             :          Civil Action No.
                                      02 CV 8333 (WHP)
THE CITY OF NEW YORK, et al.,                      :

                      Defendants.    :
-------------------------------------------------------------X

_____

# CLUB PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION
_____

**DANIEL A. SILVER**
**SILVER & SILVER**
One Liberty Square
New Britain, Connecticut 06050
(860) 225-3518
dan@lawsilver.com

- and -

**JENNIFER KINSLEY**
**KINSLEY LAW OFFICE**
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
kinsleylawoffice@gmail.com

*Attorneys for Plaintiffs*
*725 Eatery Corp., etc., et ano.*

**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**
601 West 26th Street, Suite 1315
New York, New York 10001
(212) 245-2222
erudofsky@zrlex.com

*Attorney for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*
*et al.*

**JOHN H. WESTON**
**G. RANDALL GARROU**
**WESTON, GARROU & MOONEY**
12121 Wilshire Boulevard, Suite 525
Los Angeles, California 90025
(310) 442-0072
johnweston@wgdlaw.com
randygarrou@wgdlaw.com

- and -

**ALAN M. ABRAMSON**
**ABRAMSON & MORAK**
35 Worth Street
New York, New York 10013
(212) 226-7098
alanabramson@abramsonmorak.com

*Attorneys for Plaintiffs*
*Club At 60th Street, Inc., etc., et al.*

# TABLE OF CONTENTS

Table of Authorities .................................................................................................i

Introduction ..........................................................................................................1

I.   Procedural History: The 1995 Ordinance, the 2001 Amendments, and Related Litigation ........................................................................................2

II.   Statement of Relevant Facts.............................................................................5

    A.   Plaintiffs' Protected Expression ...........................................................5

    B.   The City's Interest in the 2001 Amendments........................................6

    C.   The Reduction of Available Expression................................................7

    D.   The Lack of Alternative Locations.......................................................8

    E.   The Permitting Process.......................................................................10

III.   The Applicable Preliminary Injunction Standards ........................................11

IV.   The Equities Overwhelmingly Favor Issuance of a Preliminary Injunction .....................................................................................................12

    A.   Irreparable Injury..............................................................................12

    B.   Public Interest ..................................................................................13

V.   Plaintiffs are Likely to Succeed on Their Challenges to the 2001 Amendments ...................................................................................................13

    A.   The Applicable Legal Tests................................................................13

        1.   The 2001 Amendments must be analyzed under the "How Speech Will Fare"/Proportionality test articulated by Justice Kennedy in *City of Los Angeles v. Alameda Books* ........................................................13

2.	As content-based restrictions, the 2001 Amendments must also be analyzed under the *Reed v. Town of Gilbert* strict scrutiny test ............................................ 14

3.	The 2001 Amendments also fail under the "reasonable opportunity" test of *City of Renton v. Playtime Theaters, Inc.* ............................................................. 15

4.	The 2001 Amendments also fail when their asserted Justifications are analyzed under the substantial governmental interest test articulated by the *Alameda Books* plurality ........................................... 15

5.	The 2001 Amendments also fail under the *Ward v. Rock Against Racism* "substantially broader than necessary" intermediate scrutiny test ...................................... 16

B.	The 2001 Amendments to the Zoning Law Are Unconstitutional Because They Fail to Leave the Quantity and Accessibility of Speech Substantially Intact ............................................. 17

1.	*Alameda Books* controls the constitutionality of the 2001 Amendments ........................................................ 17

2.	The 2001 Amendments substantially reduce speech ................ 24

a.	The number of legally permissible relocation sites has, over time, been substantially reduced city-wide, primarily because of changes to the city's zoning maps and new day care centers and other disqualifying sensitive uses ............................ 24

b.	The number of legally permissible sites for adult businesses is inadequate to allow the quantity and accessibility of speech to remain substantially intact ............................................................... 26

c.     Those legally permissible relocation sites which remain in Manhattan are, with a few and insufficient number of exceptions, not commercially viable.........................................................27

     i.     No more than three sites in Manhattan which would be commercially viable for businesses like Plaintiffs' could simultaneously be occupied by new or relocating adult businesses ....................................27

     ii.     Adult businesses are subject to paying higher than market rent...........................................29

3.     Enforcement of the 2001 Amendments will further adversely impact expression because of other City provisions which discriminate against adult businesses and deter them from relocating ..................................30

C.     Independently, The 2001 Amendments Violate The First and Fourteenth Amendments Because They Are Unsupported By A Substantial Governmental Interest.....................................................31

1.     Introduction ................................................................31

2.     The government always bears the burden of demonstrating that speech-restricting regulations are constitutional................32

3.     Zoning restrictions that do not comport with the *Alameda Books* plurality's burden-shifting test violate the First Amendment. ................................................32

     a.     The City's burden at step one .........................................33

     b.     The business' burden at step two. ...................................33

     c.     The City's burden at step three ........................................35

4.     The City must have actually considered the evidence it submits at steps one and three of *Alameda Books* ................ 36

5.    The City cannot carry its burden of demonstrating a substantial government interest in regulating 60/40 adult uses ...................................................................37

    a.    The City's evidence at step one does not reasonably support, and in fact affirmatively disproves, the notion that 60/40 adult businesses generate secondary effects ..............................................37

    b.    Even if the City can meet its burden at step one, Plaintiffs can cast doubt on the City's evidence and rationale at step two ....................................38

6.    A fortiori, the 2001 Amendments do not comport with the justification burdens imposed on municipalities by Justice Kennedy's concurring opinion in *Alameda Books*.........40

D.    Under *Alameda Books*, the Combination of the 2001 Amendments' Minimal Public Benefit and Great Adverse Impact on The Public's Access to Expression Compels Their Invalidation...............................41

VI.    The City's Permitting Procedures for Adult Establishments Violate the First Amendment ...........................................................................41

A.    Relief sought....................................................................................41

B.    Standing ...........................................................................................42

C.    The Permitting Scheme is Unconstitutional .......................................42

1.    Discriminatory permitting procedures .....................................42

    a.    Adult businesses are not permitted to self-certify ..........43

    b.    Initial mandatory assessment of adult zoning compliance is required by DOB Counsel .......................45

2.    Lack of required procedural safeguards...................................46

    a.    The code-provided time limits .......................................47

b.    As routinely construed by the City, the time period for zoning approval of adult business permit applications is unconstitutional because its time limits are illusory and/or open ended ................48

1)    No time limits for mandatory approval by DOB counsel ........................................48

2)    Unlimited plan approval extensions .....................49

c.    As part of a scheme which uniquely affects adult businesses, the time limits for permit issuance are far longer than reasonable or necessary and constitute a facially invalid prior restraint ...........................................49

d.    The City's scheme for approving permits for adult entertainment businesses is facially invalid because it provides no effective remedy if the City violates its stated time limits and procedures.....................................50

3.    Sensitive Use Veto ....................................................52

VII.    Plaintiffs are Likely to Succeed in Their Facial Challenges to the Mandatory Termination Provisions ................................................54

A.    Relief sought...........................................................54

B.    The relevant provisions .........................................54

C.    Standing ................................................................55

D.    Reasons why Plaintiffs are likely to prevail .........................57

VIII.    Plaintiffs are Likely to Succeed on their Alternative Claim That the One Year Termination Requirements of AZR § 52-77 and 72-4 Should Not Commence Until Operation of Their Businesses Would Become Unlawful ................................................59

Conclusion................................................................60

# TABLE OF AUTHORITIES

## <u>Cases</u>

*11126 Baltimore Blvd. v. Prince George's County, Md.*, 886 F.2d 1415
(4th Cir. 1989) ..................................................................................................36

*11126 Baltimore Blvd. v. Prince George's County*, 58 F.3d 988 (4th Cir. 1995) .........................50

*729, Inc. v. Kenton Cty. Fiscal Court*, 515 F.3d 485 (6th Cir. 2008) ..............................17

*Abilene Retail #30, Inc. v. Board of Comm'rs of Dickinson County*,
492 F.3d 1164 (10th Cir. 2007) ..................................................................33, 35

*Abusaid v. Hillsborough County Bd. of County Comm'rs*, 637 F.Supp.2d 1002
(M.D. Fla. 2007) ..............................................................................................51

*Alameda Books, Inc. v. City of Los Angeles*, No. CV95-7771,
(C.D. Cal. July 16, 2008) ...........................................................................33, 35

*Alameda Books v. City of Los Angeles*, 631 F.3d 1031 (9th Cir. 2011) .........................13

*Annex Books, Inc. v. Indianapolis*, 333 F.Supp.2d 773 (S.D. Ind. 2004) .....................33

*Annex Books, Inc. v. Indianapolis*, 581 F.3d 460 (7th Cir. 2009) ...........................13, 14

*Arkansas Writers' Project v. Ragland*, 481 U.S. 221 (1987) .........................................22

*Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306
(11th Cir. 2000) ..............................................................................................51

*Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702 (7th Cir. 2003) ...........................17, 36

*Bery v. City of New York*, 97 F.3d 689 (2d Cir. 1996) ..................................................11

*Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1984) .........................................54, 57

*Café Erotica, et al. v. St. Johns County*, 143 F.Supp.2d 1331 (M.D. Fla. 2001) .........................51

*City of Erie v. Pap's AM*, 529 U.S. 277 (2000) .............................................................33

*City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750 (1988) .........................46, 47

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ......................... *passim*

*City of Los Angeles v. Preferred Communications, Inc.,* 476 U.S. 488 (1986) ...........................12

*City of New York v. Dezer Properties, Inc.*, 95 N.Y.2d 771 (2000) ................................................4

*City of New York v. The Black Garter*, 273 A.D.2d 188 (2nd Dept. 2000) ....................................56

*City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986) ............................................ *passim*

*Ctr. For Fair Pub. Policy v. Maricopa Cty., Arizona*, 336 F.3d 1153
(9th Cir. 2003) ...........................................................................................................17

*Cyrix Corp. v. Intel Corp.*, 846 F.Supp. 522 (E.D. Tex. 1994) .......................................................19

*Deeper Life Christian Fellowship, Inc. v. Bd. of Educ.*, 852 F.2d 676
(2d Cir. 1988) ...........................................................................................................12

*D.H.L. Associates, Inc. v. O'Gorman*, 199 F.3d 50 (1st Cir. 1999) ................................................36

*Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F.Supp.2d 1022
(N.D. Iowa 2004) ......................................................................................................34

*Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150 (10th Cir. 2006) ...............................................34

*Doe v. City of Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) .......................................................22

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) .........................................................................12

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................................12

*Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975) ..............................................................22

*Fernwood Books v. City of Jackson*, 601 F.Supp. 1093 (S.D. Miss. 1984) ................................13

*Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) ............................................22, 50

*For the People Theatres of N.Y., Inc. v. City of New York*, 38 Misc.3d 663
(Sup. Ct. N.Y. Co. 2012) .............................................................................................5

*For the People Theatres of N.Y., Inc. v. City of New York*, 1 Misc.3d 394
(Sup. Ct. N.Y. Co. 2003) .............................................................................................4

*For The People Theaters v. City of New York*, 27 Misc.3d 1079
(Sup. Ct. N.Y. Co. 2010) .............................................................................................5

*Frisby v. Schultz*, 487 U.S. 474 (1988) ...................................................................................32

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ......................................................46, 48, 50

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071
(6th Cir. 1994) ..................................................................................................13

*Hickerson v. City of New York*, 997 F.Supp. 418 (S.D.N.Y. 1998) .................................2

*Hickerson v. City of New York*, 146 F.3d 99 (2d Cir. 1998) ........................................36

*Kev, Inc. v. Kitsap County*, 793 F.2d 1053 (9th Cir. 1986) ........................................50

*Lady J Lingerie v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999) ......................47

*Ligon v. City of New York*, 925 F.Supp.2d 478 (S.D.N.Y. 2013) .................................13

*Marks v. United States*, 430 U.S. 188 (1977) ......................................................13, 17

*Members of City Council v. Taxpayers for Vincent,* 466 U.S. 789 (1984) ......................12

*Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334 (S.D.N.Y. 1998) .........................12

*Minneapolis Star v. Minnesota Commissioner of Revenue*, 460 U.S. 575
(1983) ...........................................................................................................22, 44

*Morscott, Inc., v. City of Cleveland*, 781 F.Supp. 500 (N.D. Oh. 1990) ........................13

*New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638
(2d Cir. 2015) .................................................................................................11

*Paulsen v. County of Nassau*, 925 F.2d 65 (2d Cir. 1991) .........................................12

*Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.*, 337 F.3d 1251
(11th Cir. 2003) ....................................................................................17, 35, 36

*Phillips v. Borough of Keyport*, 107 F.3d 164 (3d Cir. 1997) .................................22, 36

*Public Citizen, Inc. v. Pinellas County*, 321 F.Supp.2d 1275 (M.D. Fla. 2004) ..............51

*Red-Eyed Jack, Inc. v. Daytona Beach*, 165 F.Supp.2d 1322 (M.D. Fla. 2001) ..........13, 47

*Redner v. Dean*, 29 F.3d 1495 (11th Cir. 1994) ....................................................51

*Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015) ......................................... 14-15, 44, 57

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ..........................................11

*Riley v. National Federation of the Blind of N.C.*, 487 U.S. 781 (1988) .........................22

*Sammartano v. First Judicial Dt. Ct*, 303 F.3d 959 (9th Cir. 2002) ................................................13

*SDJ, Inc. v. City of Houston,* 837 F.2d 1268 (5th Cir. 1988) ..........................................................36

*SOB, Inc. v. Cty. of Benton*, 317 F.3d 856 (8th Cir. 2003) ............................................................17

*Stringfellow's of New York, Ltd. v. City of New York*, 171 Misc.2d 376
    (Sup. Ct. N.Y. Co. 1996) ...................................................................................... 1-2, 8

*T and A's, Inc. v. Town Bd. of Town of Ramapo*, 109 F.Supp.2d 161
    (S.D.N.Y. 2000) ..........................................................................................................12

*Ten's Cabaret, Inc. v. City of New York*, 1 Misc.3d 399
    (Sup. Ct. N.Y. Co. 2003) ...........................................................................................4

*Ten's Cabaret, Inc. v. City of New York*, 2010 WL 11537468
    (Sup. Ct. N.Y. Co. 2010) .........................................................................................4, 5

*TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17 (2d Cir. 2010) ....................................23

*United States v. Playboy Entertainment Group, Inc.*, 30 F.Supp.2d 702
    (D. Del. 1998) .............................................................................................................21

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) .................20-22, 32-33

*Univ. of Texas v. Camenisch*, 451 U.S. 390 (1981) .......................................................................11

*Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383 (1988) ............................................59

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ........................................................16, 44, 58

*White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163
    (2d Cir. 2007) ..................................................................................................... 16, 36-37

*Young v. American Mini-Theatres, Inc.*, 427 U.S. 50 (1976) ................................................. 19-20

*Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 2000) ................................................42, 52-53

## **Other**

http://www1.nyc.gov/site/planning/zoning/districts-tools/m3.page....................................................9

Cambridge English Dictionary,
https://dictionary.cambridge.org/us/dictionary/english/commercial-viability
(last accessed Sept. 7, 2018) ........................................................................................19

https://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page
(last accessed Sept. 3, 2018) ........................................................................................24

## INTRODUCTION

In 1995, New York City addressed what it believed to be a significant problem, particularly in the Times Square area: the concentration of adult entertainment businesses operating with garish XXX-related signage. It enacted a comprehensive regulatory scheme of zoning and other restrictions specifically aimed at these businesses ("the 1995 Ordinance"). Thereafter, there was a *drastic* reduction in the number of adult businesses throughout the City. Independently, New York City underwent considerable redevelopment and gentrification; not only was Times Square significantly improved, but the asserted secondary effects which had been cited to justify the 1995 Ordinance ceased to exist or, at a minimum, ceased to be a continuing significant problem.

To comply with the 1995 Ordinance, some live adult businesses limited their adult entertainment to less than 40% of their floor space, and all fully complied with the new signage restrictions. Nonetheless, in 2001, without any documented evidence of new or continuing problems, the City amended its zoning resolution ("the 2001 Amendments") to eliminate the distinction between the 60/40 businesses and the traditional fully adult businesses, effectively requiring termination of all 60/40 businesses within one year. The legislation was never enforced; it was enjoined by a series of court orders and agreements. If allowed to take effect now, the 2001 Amendments will have a devastating impact on Plaintiffs' First Amendment rights and the adult public's access to the constitutionally-protected entertainment they present.

The present case is the newest chapter in the long-standing conflict between cities' use of zoning and land use rules to restrict the location of adult entertainment businesses and the constitutional obligation to ensure that governmental regulation does not unnecessarily stifle expression or the public's access to it. While the 1995 Ordinance was held to fall on the permissible side of that line, *see Stringfellow's of New York, Ltd. v. City of New York*, 171

1

Misc.2d 376 (Sup. Ct. N.Y. Co. 1996), *aff'd* 241 A.D.2d 360 (1st Dept. 1997), *aff'd* 91 N.Y.2d

382 (1998); *Hickerson v. City of New York*, 997 F.Supp. 418 (S.D.N.Y. 1998), *aff'd* 146 F.3d 99

(2d Cir. 1998), *cert. denied* 525 U.S. 1067 (1999), the 2001 Amendments go far beyond it.

## I.      Procedural History: The 1995 Ordinance, the 2001 Amendments, and Related Litigation

In 1995, after a one-year moratorium and an Adult Entertainment Study ("1994 Study")

by the Department of City Planning ("DCP"), the City Planning Commission recommended and

the City Council adopted Zoning Resolution amendments (the "1995 Ordinance"). These

amendments, for the first time, regulated adult businesses by restricting them to certain zoning

districts and requiring 500' buffer zones between them and other adult uses, as well as sensitive

uses such as schools, daycares, and houses of worship. (PJA 349; RJN Ex. 1)[1] The DCP had not

studied premises allocating less than 40% of their space to adult entertainment (PJA 316;

Rudofsky Leg. Hist. Dec.[2] ¶ 8), nor, necessarily, any with the new subdued signage it required.

The 1995 Ordinance defined an "adult establishment" to include an adult eating and drinking

establishment which featured adult entertainment in a "substantial portion" of its customer-

accessible space (PJA 351; RJN Ex. 1), but left the term "substantial portion" undefined. *Id*.

According to the City, the 1995 definition of "adult establishment," which excluded businesses

devoting less than 40% of their customer-accessible space to adult entertainment, was actually to

have spawned "*a significant expansion of the City's adult use market*," while eliminating

---

[1]   References to "PJA" are to the Plaintiffs' Joint Appendix which, in multiple volumes, is attached to corresponding documents entitled "Notice of Filing of Plaintiffs' Joint Appendix," submitted together with this Memorandum.

[2]   Declaration of Edward S. Rudofsky Regarding Legislative History and Related Matters (PJA 312), submitted together with this Memorandum.

concentrations of adult uses presumed to cause adverse secondary effects. PJA 1446; RJN Ex. 51 at p. 59) (emphasis added).

The 1995 Ordinance survived constitutional attack. However, in response to a subsequent federal vagueness challenge, the City issued Operations Policy & Procedure Notice ("OPPN") 4/98, which defined "substantial portion" as 40% or more. (PJA 80-2; Berzak Sites Declaration ("Berzak Sites Dec.") Ex. 12). As a result, any premises featuring adult entertainment in less than 40% of its customer-accessible space was, by definition, not an adult establishment or an adult eating or drinking establishment. (*Id.*)  Thus was born the concept of the 60/40 premises: a business with less than 40% of its customer-accessible space devoted to adult entertainment or materials.

Many businesses rendered nonconforming by the 1995 Ordinance took steps to comply by changing their signage and reconfiguring their premises into 60/40's. They erected partitions, subdivided space, and created restaurants and sports bars, often at substantial expense. *See* PJA 227-311; Talla, Warech, Capeci, Lipsitz, D'Amico, and Kavanaugh Decs. ("Plaintiff Decs."). By 2001, according to the City, adult uses had dropped from 177 to 136, of which 101 were 60/40 businesses (PJA 1037, 1056-7; RJN Ex. 43 (Karnovsky Aff.)[3] at p. 5 n.3, and pp. 24-5, ¶ 55 and n.15); the higher intensity 100% uses had been dispersed; and the garish signage of the 1995 era had been eliminated and tastefully replaced. (PJA 1086-93; RJN Ex. 44 at pp. 203-10 (testimony of Iulo); *see also* PJA 1196-1240; RJN Ex. 41, at pp. 572-616 (testimony of Anastas)

Notwithstanding the reduction in adult uses and transformation of many 100% uses to less intense 60/40 businesses, the City sought to abate the complying 60/40 clubs as nuisances, alleging they were a sham because they continued to feature adult entertainment, albeit in less

---

[3] Affidavit of David Karnovsky, General Counsel of the New York City Department of City Planning, submitted as RNJ Exhibit 43.

than 40% of their space. The state court rejected this argument. *City of New York v. Dezer Properties, Inc.*, 95 N.Y.2d 771 (2000). Unable to close the compliant 60/40's, the City enacted the challenged 2001 Amendments which eliminated the "substantial portion" rule as applied to adult eating or drinking establishments and imposed a one-year termination requirement for nonconforming uses. The City's sole justification was that the courts had misunderstood the intention of the "substantial portion" provision, and thus the 2001 Amendments were merely closing a "loophole." (*See, e.g.*, PJA 851; RJN Ex. 38 at p. 28)  The City did not study whether 60/40 businesses actually caused adverse secondary effects, nor was any evidence presented of unwanted secondary effects arising from adult uses. (PJA 316-32; Rudofsky Leg. Hist. Dec. at ¶¶ 8-19) Rather, it was noted at the City Planning Commission hearing that many Community Boards felt that "there [we]re no significant secondary impacts from the remaining adult businesses in their neighborhoods." (PJA 845; RJN Ex. 37 at p. 10)  In addition, per the DCP's own counsel, the 2001 Amendments would force all of the 101 then-operating 60/40's to close (i.e. stating they would not be allowed by the proposed zoning). (PJA 858-9; RJN Ex. 38 at pp. 35-6)  No consideration was given to how protected speech would fare if that were to occur.

Various parties challenged the 2001 Amendments in state and federal court. Following the issuance of injunctive relief in the state court cases, this Court administratively closed and held in abeyance the suits before it, while multiple appeals, remands, and evidentiary hearings ensued over the next 16 years, with the City ultimately prevailing. *See Ten's Cabaret, Inc. v. City of New York*, 1 Misc.3d 399 (Sup. Ct. N.Y. Co. 2003),[4] *rev'd sub nom.*, *For the People Theatres of N.Y., Inc. v. City of New York*, 20 A.D.3d 1 (1st Dept.), *vacated and remanded*, 6 N.Y.3d 63 (2005); *Ten's Cabaret, Inc. v. City of New York*, n.o.r., 2010 WL 11537468 (Sup. Ct. N.Y. Co.

---

[4] See, also, the companion decision in *For the People Theatres of N.Y., Inc. v. City of New York*, 1 Misc.3d 394 (Sup. Ct. N.Y. Co. 2003).

2010),[5] *vacated and remanded sub nom., For the People Theatres of N.Y., Inc. v. City of New York*, 84 A.D.3d 48 (1st Dept. 2011); *For the People Theatres of N.Y., Inc. v. City of New York*, 38 Misc. 3d 663, 675 (Sup. Ct. N.Y. Co. 2012) (on remand), *aff'd* 131 A.D.3d 279 (1st Dept. 2015), *rev'd*, 29 N.Y.3d 340 (2017), *rearg. den.,* 29 N.Y.3d 1115 (2017), *cert. den.*, 138 S.Ct. 994 (2018).[6] Throughout this time, enforcement of the 2001 Amendments remained stayed, either by order or agreement.

After finality in the state courts, Plaintiffs and the City entered into an agreement for continued non-enforcement of the 2001 Amendments against Plaintiffs pending determination of certiorari petitions in the state cases and the timely filing of amended complaints and injunctive relief motions in this Court.[7] (PJA 1460; RJN Ex. 53) As a result, the 2001 Amendments and the AZR provisions they extend to 60/40 uses have never been enforced against Plaintiffs. The *status quo* is that Plaintiffs' businesses are open and free to present constitutionally-protected expression in less than 40% of their customer-accessible space.

## II.     Statement of Relevant Facts

### A.     Plaintiffs' Protected Expression

Plaintiffs regularly feature adult entertainment (as defined by the AZR) in less than 40% of their customer-accessible space and will be compelled to close at their current locations if the 2001 Amendments are enforced. *See* PJA 227-311 (Plaintiff Decs.).

---

[5] See, also, the companion decision in *For The People Theaters v. City of New York*, 27 Misc.3d 1079 (Sup. Ct. N.Y. Co. 2010).

[6] See, also, the companion denial of certiorari in *For The People Theaters v. City of New York*, 138 S.Ct. 1000 (2018).

[7] The City entered into a similar, but not identical agreement, with the plaintiffs in *336 LLC, d/b/a "The Erotica" v. New York City et al.*, Civil Action No. 18 CV 3732 (WHP), a related new action commenced by certain book and video stores.

### B.      The City's Interest in the 2001 Amendments

The City offered no justification for the 2001 Amendments other than to eliminate 60/40 businesses it perceived to be engaging in "sham compliance" with the AZR.    (*See* PJA 561-1031; RJN Exs. 33-42)  The City Council considered no empirical evidence linking 60/40 uses to negative secondary effects. *Id*.  Rather, the only evidence before the Council indicated that the 60/40 businesses in operation at the time did *not* cause any unwanted negative impacts. (*See, e.g.*, PJA 776-883; RJN Ex. 36; Exhibits to CPC Report). While in 2001 the City Council did consider the 1994 Study, that report pertained only to 100% businesses and not the numerous less intense 60/40 uses (which did not exist at the time and accordingly were not studied). (PJA 860-1; RJN Ex. 38 at pp. 37-8)

Moreover, by the time the City adopted the 2001 Amendments, the conditions that caused it to enact the 1995 Ordinance had dissipated. The 1994 Study focused on purported secondary effects amidst or attributable to a concentration of adult uses near Times Square. (PJA 216-7; Freeman Aff.[8] ¶¶ 10-15) But by 2001, following the implementation of the Times Square Redevelopment Plan, Times Square had experienced significant gentrification. (PJA 218-23; Freeman Aff. ¶¶ 16-26) Crime rates were down, and median household income and housing values were either up or static. (PJA 219-21; Freeman Aff. ¶¶ 20-23) These trends have continued to today, such that Times Square is now one of the most coveted retail locations in the City and one of the most visited tourist spots in the world. (PJA 218-9; Freeman Aff. ¶ 19)  And all this occurred while several clubs in this litigation were operating in the Times Square area as 60/40 businesses, demonstrating that these uses do not negatively impact their surroundings. (PJA 248-61, 262-4, 265-82; Werach, Capeci, Lipsitz Decs.)

---

[8] Affidavit of Dr. Lance Freeman (PJA 212), submitted together with this Memorandum.

C.       The Reduction of Available Expression

Both the 1995 Ordinance and the 2001 Amendments have significantly reduced the availability of adult expression in New York City, even though the 2001 Amendments have not been enforced. By the City's count, there were 177 adult establishments in 1993,[9] and 136 in 2001, of which 101 were 60/40.[10,11]   Today, there are as few as 19 adult eating or drinking establishments in all of New York City, including both 100% and 60/40 businesses. (PJA 186-7; Kelly Dec.[12] at pp. 26-7[13]) Moreover, given the reduced physical space that can be used to present adult expression under the 60/40 standard, the amount of adult-oriented expression available in the City is far less than either in 1995 or 2001.

---

[9] Per a 1993 DCP survey, in the fall of 1993, there were 177 adult establishments in New York City: 107 in Manhattan; 44 in Queens; 15 in Brooklyn; 8 in the Bronx; and 3 in Staten Island; of those 177 adult businesses 86 were adult bookstores, 23 were adult theaters, and 68 were adult eating or drinking establishments. (PJA 1037, 1056-7; RJN Ex. 43 (Karnovsky Aff.) at p. 5 n.3, p. 24-5 n.15)   By inference, because the operation of adult uses was then unregulated, prior to the 1995 Ordinance taking effect, they all were full (i.e., 100%) adult businesses.

[10] According to the City Planning Commission's 2001 Report, in 2000 there were 136 adult establishments in New York City, a decline of 41 such establishments.  Of those businesses, 101 were identified as 60/40 establishments (PJA 714 *et seq*.; RJN Ex. 36 at p. 6 *et seq.*), meaning that only 35 businesses were adult establishments as defined in the 1995 Ordinance.

[11] Of these 101 60/40 businesses (just before adoption of the 2001 Amendments), there were 29 adult bookstores, 36 adult eating or drinking establishments, and 36 adult theaters.  (PJA 1057; RJN Ex. 43, at p. 25 n.15)

[12] Declaration of Hugh Kelly, Ph.D, CRE in Support of Plaintiffs' Motion for Preliminary Injunction (PJA 161), submitted together with this Memorandum.

[13] Dr. Kelly identified 18 businesses, not including Veil NYC, which plaintiffs have also determined is operating 60/40, bringing the apparent total to 19.  *See* Declaration of Edward S. Rudofsky in Support of Plaintiffs' motion for Preliminary Injunction, Regarding the Status of Veil NYC and Headquarters n/k/a Rosewood Theater ("Rudofsky Veil Dec.") (PJA 335).

### D.    The Lack of Alternative Locations

By labeling 60/40 businesses as adult establishments, the 2001 Amendments subject Plaintiffs to the full range of adult use restrictions contained in the AZR. For example, in addition to the 500' buffer zone from sensitive uses and other adult businesses, adult establishments are prohibited in and within 500 feet of Residence Districts and in and within 500 feet of Mixed Use manufacturing districts which mix residential and non-residential uses. *See* AZR §§ 32-01(b), 42-01(a), (b) (PJA 402, 410; RJN Exs. 8, 10) In the 1995 Ordinance litigation, the City claimed there were over 500 locations where an adult use would be permissible,[14] though without indicating how many could exist simultaneously. But since then, numerous Manufacturing Districts, which were previously available for adult uses, have been rezoned for residential or mixed use and therefore now exclude adult enterprises. In addition, since 1995, significant numbers of new schools and houses of worship ("sensitive uses") have located within areas that would otherwise accommodate adult uses, and also rendering the surrounding properties unavailable under the 500' buffer zone requirement.

Despite the shrinking permissible area for adult uses, the City offered no additional locations for the businesses which would be displaced by the 2001 Amendments. To the contrary, the City acknowledged (in 2002) in the Karnovsky Affidavit that "[s]ince 1995, there have been 13 changes in the zoning map which have rezoned certain areas where adult uses had been permitted. These map changes have reduced the amount of unencumbered land area available to adult establishments by about 200 acres." (PJA 1065; RJN Ex. 43, at pp. 33-4, ¶ 76)

---

14 *Stringfellow's of N.Y., Inc. v. City of New York*, 171 Misc.2d 376, 391 (Sup. Ct. N.Y. Co. 1996) ("[d]uring the enactment process, the City calculated that a total of approximately 500 adult establishments will be able to operate in the new adult zones."), *aff'd* 241 A.D.2d 360 (1st Dept. 1997), *aff'd* 91 N.Y.2d 382, 419 (1998) (based on its maps, the City claims the 1995 Ordinance "leaves at least 500 potential sites for adult establishments to relocate and operate").

The City further acknowledged that "since 1995, changes in the number and location of 'sensitive receptors' have further reduced the land area available to adult establishments by another 65 acres, again reducing the number of potential development sites." *Id.* As the City also noted, "the estimated number of potential sites for adult businesses in New York City decreased by 9% between 1995 and 2000."  (PJA 1066; RJN Ex. 43, at pp. 34-5, ¶77)   Since 2001that number has declined significantly due in part to numerous rezonings.  (*See* PJA 2-3; Berzak Sites Dec. at ¶ 6(a) and attached Exhibits 1-C, 2-C, 3-C, 4-C, 5-C (at PJA 22, 34, 38, 42, 46)) Importantly, the City never studied or ascertained the effect of its zoning changes on the availability of adult use locations.

Also problematic is that many of the legally-permissible sites for adult businesses are in remote areas of the City without regard for whether such areas could support the displaced uses. For instance, adult uses are nominally permitted in C7 Districts, which are "designed to permit large open amusement parks," such as Coney Island in Brooklyn, and are "mapped in only a few areas." *See* AZR § 31-17. Adult establishments are also allowed in C8 Districts, which are for automotive and other heavy commercial services that require large amounts of land. "Since these service establishments often involve objectionable influences, such as noise from heavy service operations and large volumes of truck traffic, they are incompatible with both residential and retail uses." *See* AZR § 31-18. M3 Manufacturing Districts, which are also nominally permissible for adult establishments, are "designated for areas with heavy industries that generate noise, traffic or pollutants. Typical uses include power plants, solid waste transfer facilities and recycling plants, and fuel supply depots." *See* http://www1.nyc.gov/site/planning/zoning/districts-tools/m3.page. These areas are therefore not suitable for adult business relocation or for any place where the public gathers.

Moreover, many of the sites the City may argue are legally available are not practically available in the commercial marketplace for any commercial use, much less an adult business. For example, some do not offer sufficient square footage to accommodate an adult entertainment use.  (PJA 15-6; Berzak Sites Dec. ¶ 38)  Others are unavailable for any commercial use because they are dedicated to specific long-term uses. (PJA 12; *Id.* at ¶ 28) Still others are environmentally unsound and require significant and costly remediation to be commercially viable.  And in the unlikely event that a permissible location were found and secured for an adult use, the presence of that use precludes any surrounding property from being utilized for or by any other adult business.  (AZR §§ 32-01(c), 42-01(c))   As a result, there are an insufficient number of legally and practically available properties to house the adult businesses that would be displaced by the 2001 Amendments.

### E.      The Permitting Process

Even if an adult business locates an available site, the process for obtaining building permits – a prerequisite to construction, renovation, and occupancy – fails to ensure prompt governmental approval. Unlike all other businesses, adult uses may not use architect self-certification to obtain plan approvals and thus bypass the Department of Building's ("DOB") very time-consuming review of an applicant's plans. Additionally, and also unique amongst all other businesses in the City, the zoning component of adult businesses' permit applications must first be reviewed and approved by DOB's  legal counsel before DOB will process the rest of the application.  (PJA 116; Berzak Permit Dec. ¶ 28)  There are no time limits for review of these applications by DOB's legal counsel (PJA 116; *Id*. at ¶ 29) and, as a result, applications languish for months, and frequently *far* longer. (PJA 13; *Id.* at ¶ 31) As such, reasonably prompt relocation is both legally and practically impossible.

10

### III.   The Applicable Preliminary Injunction Standards

Preliminary injunctions preserve the relative position of the parties during litigation. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). A party seeking a preliminary injunction must show: 1) irreparable harm; 2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and 3) that an injunction is in the public interest. *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015). In the Second Circuit, a party challenging governmental action must meet the "likelihood of success" standard.  *Bery v. City of New York*, 97 F.3d 689, 694 (2d Cir. 1996). However, where free speech rights are at issue, a party moving to enjoin legislation satisfies the "likelihood of success" test when the government is unable to meet the burdens it would have at trial. *See Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017):

> In deciding whether to issue a preliminary injunction, plaintiffs normally have the burden of demonstrating a sufficient likelihood of prevailing on the merits. However, in First Amendment cases where "the [g]overnment bears the burden of proof on the ultimate question of [a statute's] constitutionality, [plaintiffs] must be deemed likely to prevail [for the purpose of considering a preliminary injunction] unless the [g]overnment has shown that [plaintiffs'] proposed less restrictive alternatives are less effective than [the statute]." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). This is because "the burdens at the preliminary injunction stage track the burdens at trial," and for First Amendment purposes they rest with the [g]overnment. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, et al.*, 546 U.S. 418, 429 (2006).

In short, where a party raising a First Amendment facial challenge to an ordinance seeks a preliminary injunction, the injunction should issue unless the government meets its burden of demonstrating a likelihood that the challenged legislation is constitutional.

Regardless of which side must demonstrate the likelihood of success, based upon the arguments and evidence presented in support of this motion and the heightened standards for review where laws affect expression, there is a strong likelihood that Plaintiffs will prevail on the

merits of their claims. *See, e.g., Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803 n.22 (1984); *City of Los Angeles v. Preferred Communications, Inc.*, 476 U.S. 488, 496 (1986).

## IV.   The Equities Overwhelmingly Favor Issuance of a Preliminary Injunction.

### A.      Irreparable Injury

Plaintiffs' and the public's rights to free speech will be irreparably harmed absent an injunction. Even the temporary deprivation of First Amendment rights constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir. 1991); *Deeper Life Christian Fellowship, Inc. v. Bd. of Educ.*, 852 F.2d 676, 679 (2d Cir. 1988); *Million Youth March, Inc. v. Safir*, 18 F.Supp.2d 334, 339 (S.D.N.Y. 1998). The 2001 Amendments mandate the termination of all 60/40 businesses in New York City, and they constitute the majority of outlets for adult expression.  Consequently, not only will the 2001 Amendments immediately affect these Plaintiffs' ability to present constitutionally-protected, expressive dance performances, but enforcement will certainly reduce if not eliminate the public's access to such expression. *See* 59 Murray Amended Complaint at ¶¶ 77 *et seq.*; 725 Amended Complaint at ¶¶ 73 *et seq.*; Club at 60th Amended Complaint at ¶¶ 78 *et seq.*; *T and A's, Inc. v. Town Bd. of Town of Ramapo*, 109 F.Supp.2d 161, 169-70 (S.D.N.Y. 2000). Plaintiffs and their patrons will therefore be irreparably harmed absent an injunction.

Additionally, some Plaintiffs face insolvency or bankruptcy if relief is denied.  That *alone* is sufficient to supply the irreparable injury needed for injunctive relief.  *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (issuing preliminary injunction protecting adult entertainment dancing business).

**B.      Public Interest**

A preliminary injunction is in the public interest when it enforces the Constitution. *Ligon v. City of New York*, 925 F.Supp.2d 478, 541 (S.D.N.Y. 2013); *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *see also Fernwood Books v. City of Jackson*, 601 F.Supp. 1093, 1101 (S.D. Miss. 1984) (adult business case); *Morscott, Inc., v. City of Cleveland*, 781 F.Supp. 500, 506 (N.D. Oh. 1990) (same); *Red-Eyed Jack, Inc. v. Daytona Beach*, 165 F.Supp.2d 1322, 1330 (M.D. Fla. 2001) (same). Because enforcement of the 2001 Amendments will have an immediate impact not only on Plaintiffs' protected First Amendment rights, but also on the public's corresponding First Amendment right of access to such expression, the public interest weighs in favor of a preliminary injunction. *Sammartano v. First Judicial Dt. Ct*, 303 F.3d 959, 974 (9th Cir. 2002).

**V.      Plaintiffs are Likely to Succeed on Their Challenges to the 2001 Amendments.**

**A.      The Applicable Legal Tests**

**1.      The 2001 Amendments must be analyzed under the "How Speech Will Fare"/Proportionality test articulated by Justice Kennedy in *City of Los Angeles v. Alameda Books*.**

The test articulated in Justice Kennedy's concurrence in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 444-53 (2002), constitutes the Supreme Court's most recent pronouncement on adult business zoning and establishes the controlling legal test in this case.[15]

---

[15] Because his vote in *Alameda Books* was the narrowest opinion concurring in the judgment, it is well-settled that Justice Kennedy's opinion is to be taken as the holding of the Court and is binding on the lower courts under *Marks v. United States*, 430 U.S. 188, 193 (1977). *See, e.g. Annex Books, Inc. v. Indianapolis*, 581 F.3d 460, 465 (7th Cir. 2009); *Alameda Books v. City of Los Angeles*, 631 F.3d 1031, 1037 (9th Cir. 2011).

In *Alameda Books*, Justice Kennedy held that adult zoning laws are content-based[16] and must be evaluated under a proportionality test which takes into account "how speech will fare," something the plurality's test failed to do.  *Id*. at 450.  Under this standard, the City has the burden to demonstrate "that its regulation has the *purpose* and *effect* of suppressing secondary effects, while leaving the quantity *and accessibility* of speech substantially intact."  *Id*. at 449 (emphases added).  As such, Justice Kennedy's concurrence considers both the effect of an adult zoning scheme on expression and the benefits reasonably expected to be derived from that scheme, and then balances them to see whether the benefits sufficiently outweigh the suppression of expression.  As noted by the Seventh Circuit in *Annex Books*, 581 F.3d at 462:  "[T]o prevail, the City needs evidence that the restrictions actually have public benefits great enough to justify any curtailment of speech."

As the most recent standard announced by the Supreme Court specifically regarding adult zoning, the *Alameda Books* "how speech will fare"/proportionality standard governs this Court's determination of the 2001 Amendments' constitutionality.  However, a number of other First Amendment principles guide this Court's review as well.

> 2. **As content-based restrictions, the 2001 Amendments must also be analyzed under the *Reed v. Town of Gilbert* strict scrutiny test.**

Although not an adult zoning case, *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015), refined the Supreme Court's analysis of time, place, or manner restrictions on expression identified by its content.  *Reed* held that laws which, on their face, are content-based are subject to strict scrutiny even if they are justified on the basis of content-neutral purposes.  *Id*.  Under

---

[16] "The fiction that this sort of ordinance is content neutral – or 'content neutral' – is perhaps more confusing than helpful....These ordinances are content based, and we should call them so." *Id*. at 442 (Kennedy, J., concurring).

*Reed*, such laws may be upheld only if necessary to a compelling governmental interest that could not be achieved by less restrictive regulations.  *Id*.

> 3.  **The 2001 Amendments also fail under the "reasonable opportunity" test of *City of Renton v. Playtime Theaters, Inc.***

Under *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 54 (1986), an adult zoning regulatory scheme is facially invalid if it fails to allow a "reasonable opportunity" to open and operate an adult entertainment business.

> 4.  **The 2001 Amendments also fail when their asserted justifications are analyzed under the substantial governmental interest test articulated by the *Alameda Books* plurality.**

Although the four-justice *Alameda Books* plurality was largely unconcerned with how speech would fare under Los Angeles's adult zoning ordinance, it did further clarify the *Renton* standards regarding whether a city has relied on sufficient content-neutral justifications for adult zoning regulations.  The plurality, joined by Justice Kennedy, held that cities could no longer justify such ordinances merely by producing "shoddy evidence." *Alameda Books*, 535 U.S. at 438.  Rather, "the City certainly bears the burden of providing evidence that supports a link between concentrations of adult operations and asserted secondary effects."  *Id*. at 437.  In attempting to meet its burden, "a municipality may rely on evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest," but "[t]his is not to say that a municipality can get away with shoddy data or reasoning."  *Id*. at 438.  Continuing, the plurality observed:

> The municipality's evidence must fairly support its rationale for its ordinance.  If plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings, the municipality meets the *Renton* standard.  If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to

15

supplement the record with evidence renewing support for a theory that justifies
its ordinance.

*Id*. at 438-9.  In attempting to meet its burden under the *Alameda Books* plurality, the City is limited to secondary effects evidence that was considered by the legislative body at the time it enacted the adult use zoning restriction.  *See White River Amusement Pub, Inc. v. Town of Hartford*, 481 F.3d 163 (2d Cir. 2007).

> **5.      The 2001 Amendments also fail under the *Ward v. Rock Against Racism* "substantially broader than necessary" intermediate scrutiny test.**

The final applicable constitutional test for analyzing a time, place, and manner restriction was set forth initially in *Ward v. Rock Against Racism*, 491 U.S. 781 (1989).  *Ward* involved sound level restrictions in public parks, a classic content-neutral time, place, and manner restriction.  Although rejecting the notion that a city must always use the "least restrictive alternative" when enacting content-neutral regulations of expression, the Court held that a city was nonetheless prohibited from enacting even truly content-neutral regulations of expression if they were "*substantially* broader than necessary."  *Id.* at 799 (emphasis added).

For the reasons that follow, the 2001 Amendments fail constitutional scrutiny under all of the applicable and controlling legal tests.

**B.**   **The 2001 Amendments to the Zoning Law Are Unconstitutional Because They Fail to Leave the Quantity and Accessibility of Speech Substantially Intact.**

**1.**   ***Alameda Books* controls the constitutionality of the 2001 Amendments.**

Justice Kennedy's *Alameda Books* concurrence constitutes the holding of the case under *Marks*, 430 U.S. 188,[17] and, as such, must be used to analyze the 2001 Amendments. *Alameda Books* involved an ordinance prohibiting more than "one adult entertainment business in the same building, structure or portion thereof." *Alameda Books*, 535 U.S. at 429. Two stores, each operating a combined adult bookstore and adult video arcade as a single business "under the same roof," challenged the ordinance, the effect of which was to require both stores to close one of their uses, with the option of relocating and running the other one as a separate business at a new location. *Id.* at 432.

Justice Kennedy expressed concern that the plurality opinion represented a "subtle expansion" of the Court's holding in *Renton*, 475 U.S. at 445, in which he did "not concur." He explained that government may not diminish the adverse secondary effects claimed to attend adult speech by the simple expedient of reducing the speech itself.  He cautioned:

> [A] city may not regulate the secondary effects of speech by suppressing the speech itself.... [A] city must advance some basis to show that its regulation has the purpose *and effect* of suppressing secondary effects, *while leaving the quantity and accessibility of speech substantially intact*....  The rationale of the ordinance must be that it will suppress secondary effects and not by suppressing speech.

*Id.* at 445, 449-50 (emphasis added). He went on:

---

[17] *See 729, Inc. v. Kenton Cty. Fiscal Court*, 515 F.3d 485, 505 n.1 (6th Cir. 2008); *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702, 722 (7th Cir. 2003); *SOB, Inc. v. Cty. of Benton*, 317 F.3d 856, 862 n.1 (8th Cir. 2003)*; Ctr. For Fair Pub. Policy v. Maricopa Cty., Arizona*, 336 F.3d 1153, 1161 (9th Cir. 2003); *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., Fla.*, 337 F.3d 1251, 1264 (11th Cir. 2003).

The plurality's analysis does not address how speech will fare under the city's ordinance. As discussed, the necessary rationale for applying intermediate scrutiny is the promise that zoning ordinances like this one may reduce the costs of secondary effects without substantially reducing speech. For this reason, it does not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects. This reasoning would as easily justify a content-based tax: Increased prices will reduce demand, and fewer customers will mean fewer secondary effects. But a content-based tax may not be justified in this manner. *See Arkansas Writers' Project, Inc. v. Ragland*, 481 U. S. 221 (1987); *Forsyth County v. Nationalist Movement*, 505 U. S. 123 (1992). *It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.*

*Id*. at 450 (emphasis added).  Accordingly, a city must demonstrate both that its regulation will effectively reduce secondary effects and that it will do so without reducing the availability of the relevant expression. *Id*. at 451 ("The claim, therefore, must be that...the quantity of speech will be substantially undiminished, and that the total secondary effects will be significantly reduced.").

The dispersal law in *Alameda Books* could not, Justice Kennedy explained, have the practical effect of causing one of two adult uses operating under the same roof to close, for that would impermissibly diminish the quantity of expression:

If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results: One business will either move elsewhere or close. The city's premise cannot be the latter. It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice. Content-based taxes could achieve that, yet these are impermissible.... The claim, therefore, must be that this ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be significantly reduced. This must be the rationale of a dispersal statute.

*Id*. at 450-1.

Given its focus on "how speech will fare" under a scheme requiring relocations, Justice Kennedy's proportionality test necessarily includes not just the number of permissible relocation

sites, but gives equal consideration to their economic and commercial viability. In other words, it must be reasonably likely that relocating businesses will be able to be at least sufficiently profitable to continue as ongoing businesses at their relocated sites. *See* Cambridge English Dictionary, https://dictionary.cambridge.org/us/dictionary/english/commercial-viability (last accessed Sept. 7, 2018) (defining "commercial viability" as "the ability of a business, product, or service to compete effectively and to make a profit"); *cf. Cyrix Corp. v. Intel Corp.*, 846 F.Supp. 522, 541 (E.D. Tex. 1994) (commercial viability is the ability to sell product at a profit and afford the development and continuation of an ongoing business.). Otherwise, the businesses will close rather than relocate, and the public's access to speech will be substantially diminished.

Justice Kennedy made clear the ordinance's constitutionality depended upon whether the combination bookstore-video arcades would be split into two separate businesses with one relocated, rather than closed, and if not, the resulting reduction in speech would doom the ordinance.  In other words, if it were not economically or commercially viable to bifurcate and operate the two businesses separately, and at least one of the businesses would close after bifurcation, the result would be a substantial, and a forbidden, reduction in speech.

Given Justice Kennedy's focus on future business operations, the statement in *Renton*, adopted from Justice Powell's concurrence in *Young v. American Mini-Theatres, Inc.*, 427 U.S. 50, 78 (1976), that "[t]he inquiry for First Amendment purposes is not concerned with economic impact," is no longer accurate.  *Renton*, 475 U.S. at 54.  Indeed, as Justice Powell noted in *Young* with regard to ongoing business operations after an adult zoning ordinance takes effect:

> Nor is there any significant overall curtailment of adult movie presentations, or the opportunity for a message to reach an audience. On the basis of the District Court's finding, Ante, at 2453, n. 35, it appears that if a sufficient market exists to support them the number of adult movie theaters in Detroit will remain approximately the same, free to purvey the same message.

*Id*. at 79 (Powell, J., concurring).   And the *Young* plurality observed:

> The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that "(t)he Ordinances *do not affect the operation of existing establishments* but only the location of new ones. There are myriad locations in the City of Detroit which must be over 1000 feet from existing regulated establishments. This burden on First Amendment rights is slight."

*Id*. at 71 n.35 (emphasis added) (internal citations omitted).

Here, in contrast to *Young*, the 2001 Amendments require *all* existing 60/40 businesses to close.  Under *Alameda Books*, because this ordinance requires relocation, how speech will fare depends upon both the legal permissibility *and* commercial viability of relocation sites the City claims are available to the 60/40 businesses, because if the 60/40 businesses by and large close rather than relocate, the 2001 Amendments will have the unconstitutional effect of greatly reducing speech.

As such, both the rationale and effect of the 2001 Amendments requiring all existing 60/40 businesses to close are that the businesses will relocate to legally permissible sites and, therefore, that there will be no substantial reduction in constitutionally-protected expression as a result. However, the evidence is that the opposite will happen. The 60/40 clubs, for the most part, will not be able to relocate (and any which do will require well over a year to do so). The result will be an enormous reduction in the quantity and accessibility of speech.

The Supreme Court has indeed recognized that the economic consequences of regulations of speech matter. For example, two years before his proportionality test in *Alameda Books*, Justice Kennedy authored the majority opinion in *United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803 (2000), where the Court measured the effect on speech of a law regulating sexually explicit programming by evaluating the economic choice it forced cable broadcasters to make. The law required cable operators to either scramble sexually explicit images transmitted to

20

non-subscribing homes or to curtail such broadcasts during restricted hours. *Id.* at 806. The Court found relevant that "it appears not to be economical to convert simpler RF or baseband scrambling systems to alternative scrambling technologies on a systemwide scale."  *Id.* at 808. Consequently, most cable operators had "'no practical choice but to curtail the targeted programming during the [regulated] sixteen hours.'" *Id.* at 809. The Court relied on and cited the factual findings of the court below, *United States v. Playboy Entertainment Group, Inc.,* 30 F.Supp.2d 702 (D. Del. 1998), which underscored the economic basis for its decision:

> The effect on Playboy of cable systems moving to time-channeling is primarily economic. However, Playboy argues that the economic impact of § 505 is significant and serves as a quantitative measure of lost First Amendment opportunities suffered by Playboy and its viewers. Time channeling, the removal of sexually explicit programming during two-thirds of the broadcast day, precludes all households from receiving such programming during that time. Given that 30 to 50% of all adult programming is viewed by households prior to 10:00 p.m., the impact on Playboy and its viewers is significant. Playboy estimates its losses at $25 million through 2007, or 15% of revenues. The Government estimates Playboy's losses through 2002 at $6 million. The actual amount of Playboy's losses is of little relevance to our First Amendment analysis. Suffice it to say that Playboy will lose a significant amount of money as a result of cable operators' time channeling in order to comply with § 505.

*Id*. at 711-2.

Because converting to more sophisticated scrambling technology permitting 24-hour broadcasting "appeared not to be economical," Playboy had been forced to comply by reducing its broadcasting from 24 to eight hours per day, dramatically reducing the public's access to its programming.  *Playboy Ent.*, 529 U.S. at 808.  Taking this economic impact into account, the Court concluded that the law significantly restricted speech, making clear that a highly relevant constitutional question in a case evaluating the validity of restrictions on expressive businesses is whether the options for compliance are commercially feasible.

The Court likewise found the economic impact and impracticality of a regulation on an expressive business relevant in *Erznoznik v. City of Jacksonville*, 422 U.S. 205 (1975).  There, the Court struck down a law prohibiting showing nudity at a drive-in theater. Rejecting the City's defense, the Court noted that the business economics of attempting to comply was relevant:

> [T]the deterrent effect of this ordinance is both real and substantial. Since it applies specifically to all persons employed by or connected with drive-in theaters, the owners and operators of these theaters are faced with an unwelcome choice: to avoid prosecution of themselves and their employees they must either restrict their movie offerings *or construct adequate protective fencing which may be extremely expensive or even physically impracticable.*

*Id.* at 217 (emphasis added).

To the same effect are myriad tax cases, where taxes directly imposed economic burdens uniquely on expressive businesses.  *See, e.g., Minneapolis Star v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (1983); *Arkansas Writers' Project v. Ragland*, 481 U.S. 221 (1987); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123 (1992) (striking licensing law imposing unique fees on expressive businesses).  Indeed Justice Kennedy expressly found this lines of cases relevant in his *Alameda Books* opinion.  *See Alameda Books*, 535 U.S. at 445.  See also *Riley v. National Federation of the Blind of N.C.*, 487 U.S. 781 (1988), where the Court struck down a North Carolina charitable solicitation law under the First Amendment, in part, because of the economic burden it imposed on fundraisers.

The burden rests with the City to demonstrate that its law is constitutional. As the Supreme Court has stated, "[w]hen the government restricts speech [it] bears the burden of proving the constitutionality of its actions." *Playboy Ent.*, 529 U.S. at 813; *see also Doe v. City of Albuquerque*, 667 F.3d 1111, 1135 (10th Cir. 2012); *Phillips v. Borough of Keyport*, 107 F.3d 164, 177 (3d Cir.) (en banc), *cert. denied*, 522 U.S. 932 (1997).

Further, even though the Amendments were adopted in 2001, the City must demonstrate, on today's facts, that they leave speech substantially intact. *TJS of New York, Inc. v. Town of Smithtown*, 598 F.3d 17, 18 (2d Cir. 2010) ("We hold that the First Amendment requires courts to consider the adequacy of alternative sites available when the ordinance is *challenged*.") (emphasis in original). **"**[T]he First Amendment does not allow courts to ignore post-enactment, extralegal changes and the impact they have" on speech. *Id.* at 23.

Before *Alameda Books,* the question of whether a municipal adult zoning law left adequate alternative avenues of communication did not (with some limited exceptions) necessarily include the commercial viability of the relocation sites, as noted by *TJS*, citing *Renton* and pre-*Alameda Books* decisions from the Ninth Circuit. *Id.* at 27-8.  But *TJS* neither involved, nor even mentioned, the issue here: "how will speech fare?"  Indeed, the *only* reference to *Alameda Books* in *TJS* is fleeting in a footnote discussing a decidedly unrelated point, namely content neutrality.  *Id.* at 22 n.5.  Given the narrowness of the primary issue that was presented, i.e., at what point in time are alternative avenues measured, neither the parties nor the court raised or addressed how speech will fare. Indeed, after noting the factors determining whether a site qualified as a potential alternative avenue for expression, the court pointed out that the plaintiff bookstore did "not object to this formulation for determining availability."  *Id.* at 28.  As a result, not only was the question of how speech will fare not addressed, but because the agreed-upon formulation for determining alternative sites was based on pre-*Alameda Books* precedent, the *TJS* court had no occasion to consider Justice Kennedy's controlling opinion.

So how will speech fare under the 2001 Amendments?  Quite simply, speech will be decimated.  The 2001 Amendments will not leave the quantity and accessibility of expression substantially intact.

### 2. The 2001 Amendments substantially reduce speech.

**a. The number of legally permissible relocation sites has, over time, been substantially reduced city-wide, primarily because of changes to the city's zoning maps and new day care centers and other disqualifying sensitive uses.**

Demographic changes and alterations to the City's zoning map over the years have substantially reduced the number of sites meeting all of the zoning requirements for adult businesses. More particularly, many commercial districts where adult businesses were permitted have been rezoned into districts where they are not allowed. (PJA 22, 34, 38, 42, 46; Berzak Sites Dec. Exs. 1-C, 2-C, 3-C, 4-C, 5-C)   Residential uses are now allowed in many manufacturing districts, barring adult businesses from locating there or within 500 feet of such changed districts. *Id.*

For example, portions of the following areas in Queens where adult uses could previously locate have either been rezoned or had special use districts created disqualifying adult businesses from locating there or within 500 feet: College Point, Hunters Point, Long Island City, Willets Point, and Sunset Park. *See* https://www1.nyc.gov/site/planning/zoning/districts-tools/mfg-districts-2002-2012.page (last accessed Sept. 3, 2018).  (PJA 1300; RJN Ex. 46)  Likewise, more than a quarter of the land in Manhattan zoned for manufacturing in 2001 was mapped into other zoning districts, resulting in a loss in Manhattan of approximately 265 acres. *Id.*  To the same effect, several manufacturing districts in Brooklyn and the Bronx have been rezoned as residence uses, precluding adult businesses from locating there or nearby.  According to the City's website above, this includes DUMBO, Greenpoint, and Williamsburg in Brooklyn and the Hunt's Point area of the Bronx. *Id.* The effect of these changes is shown graphically in Exhibits 1-C, 4-C and 3-C, respectively, of the Berzak Sites Dec.  (PJA 22, 42, 38)

Additionally, since the original 1995 Ordinance was adopted, the number of documented disqualifying sensitive uses (i.e., houses of worship and schools) has dramatically increased compared to what is shown in the maps prepared by the City in 1995 (the "1995 Maps") to defend the 1995 Ordinance. This dramatic increase in identified disqualifying sensitive uses and corresponding reduction in legally permissible areas for adult business is reflected in Berzak's 2018 map of Manhattan (PJA 24; Berzak Sites Dec. Ex. 1-E), which both identifies and shows 106 existing sensitive uses just in Manhattan in areas depicted as legally permissible for adult businesses in the City's 1995 Maps. Comparing the City's 1995 Manhattan map to Berzak's corresponding Manhattan map (his Exhibit 1-E), it fairly appears that the number of legally permissible sites for adult businesses today throughout the entire City is materially less than either what existed in 1995 or in what was reflected in the City's 1995 Maps.

The Berzak Sites Dec. contains sequential maps for each of the five boroughs, starting with the City's 1995 maps purportedly showing legally permissible sites for adult uses.[18] Berzak's most detailed maps are for Manhattan and show, step by step, that there are now no more than even a *theoretical* maximum of 16 legally permissible sites in Manhattan which could simultaneously be occupied by adult entertainment businesses. (PJA 20-30; Berzak Sites Dec. Exs. 1-A through 1-K) The maps for the outer boroughs are more limited and reflect only the impact of the numerous zoning map changes in those boroughs. These maps do not reflect the numerous other additional reductions in legally permissible areas for adult businesses caused by sensitive uses, existing adult businesses, and properties unsuitable for any generic commercial

---

[18] These maps were prepared by Michael Berzak, a long-time New York City architect who is intimately familiar with the City's criteria for legally permissible locations for adult businesses. (PJA 2)

25

use,[19] but nonetheless make clear that the legally permissible area for adult businesses in 1995 has been greatly reduced in *all* the boroughs.

There are far fewer legally permissible relocation sites than in the past, and it is the City's burden to show enough viable sites for relocation to insure that there will be no significant overall adverse impact on access to expression.  The combination of significantly reduced potential sites for adult businesses and other obstacles to relocation discussed *infra* will cause enforcement of the 2001 Amendments to almost certainly result in closure, rather than relocation, of the 60/40 businesses, and a corresponding dramatic reduction in both speech and access to speech.

> **b.    The number of legally permissible sites for adult businesses is inadequate to allow the quantity and accessibility of speech to remain substantially intact.**

It is the City's burden to at least demonstrate that the 2001 Amendments will leave the quantity and accessibility of speech substantially intact *today*.  *TJS*, 598 F.3d at 30.  Considering only the quantity of speech as measured by the number of legally permissible and viable locations, and ignoring not only the accessibility of the speech for significant portions of the public but also all the additional factors discussed hereafter which would further reduce the likelihood of many businesses to relocate, it is clear that the 2001 Amendments cannot stand.  As noted above, substantial zoning changes and the numerous new (and/or previously unaccounted-for) sensitive uses have drastically reduced the number of legally permissible sites in all the boroughs and, in Manhattan alone, allow legally permissible locations for no more than a theoretical maximum of 16 adult businesses to operate simultaneously.

---

[19]  All of these are either statutory or otherwise traditional judicial criteria for disqualifying otherwise available areas.

Against the greatly diminished number of potential sites, there are eight 60/40 adult eating and drinking establishments in Manhattan (Plaintiffs' six businesses and two more (*see* PJA 337-8; Rudofsky Veil Dec. [on Status of Veil and Headquarters] ¶¶ 4, 6), 14 60/40 adult bookstores with video booths (PJA 1650, Knecht Declaration ¶ 21), and an unknown number of additional 60/40 bookstores without video booths (*Id.* at ¶ 33), all of which will be forced to close and potentially compete for the limited relocation sites.  In short, there are not enough even *theoretically* permissible relocation sites for Plaintiffs to relocate in Manhattan.  Given this disparity between theoretically legally permissible sites and the number of businesses competing for those sites, the quantity and accessibility to speech will not remain substantially intact if the 2001 Amendments take effect.

> c.  **Those legally permissible relocation sites which remain in Manhattan are, with a few and insufficient number of exceptions, not commercially viable.**
>
> i.  **No more than three sites in Manhattan which would be commercially viable for businesses like Plaintiffs' could simultaneously be occupied by new or relocating adult businesses.**

Manhattan is unique and quite different in many respects from the other four boroughs, particularly with respect to entertainment, generally, and adult entertainment specifically. (PJA 163-9; Kelly Dec. ¶¶ 6-16)  Plaintiffs' Manhattan businesses are significantly closer and more accessible to their patrons than the available relocation sites in the outer boroughs, and particularly to those who live or work nearby and tourists or business travelers or those who are patronizing other Manhattan attractions. (PJA 188-9, 198-203; Kelly Dec. ¶¶ 42, 57-66)

The effect of the 2001 Amendments will be particularly acute for businesses in Manhattan, where the majority of the City's adult businesses are located, including all but one of Plaintiffs'.  There is insufficient legally permissible land for more than 16 of the 21 displaced

60/40 adult businesses to relocate in Manhattan, but even that low number is deceptively high. Berzak personally inspected each site within the 16 potentially permissible areas in Manhattan and determined that no more than five of those sites are commercially viable for any of Plaintiffs' businesses.  (PJA 3, 15; Berzak Sites Dec. ¶¶ 6(d-e), 37)  Of those five sites, adult businesses could simultaneously operate in only three given the ordinance's required 500 foot separation between adult businesses.  (PJA 15; *Id*. at ¶ 37)  Moreover, as noted above, Plaintiffs and their six Manhattan businesses would be competing not only with each other for those three sites, but also with at least two additional 60/40 eating and drinking establishments,[20] at least 14 displaced 60/40 adult bookstores with video booths[21] and an unknown additional number of 60/40 bookstores without video booths.[22] This total of *at least* 22 (but likely far more) displaced Manhattan 60/40 businesses leaves an inadequate number of even theoretical legally permissible locations in Manhattan for relocation of Plaintiffs' businesses, since only 16 theoretically possible sites exist in Manhattan which could be simultaneously occupied by adult uses; and, of those, only three are commercially feasible for relocation.  Thus, all of Plaintiffs' Manhattan 60/40 businesses must close and either not relocate or attempt to relocate to the outer boroughs, neither of which will leave the quantity of or the public's access to adult entertainment substantially intact but, to the contrary, will decimate them.

Moving to the outer boroughs, which are both significantly physically and culturally distant from Manhattan, is, for Plaintiffs and their patrons at best problematic. Statistically, the outer boroughs' residents are on a per capita basis less financially well off and have far less

---

[20] Veil NYC and Headquarters n/k/a Rosewood Theater.  (*See* PJA 335; Rudofsky Veil Dec.)

[21] (PJA 1650; Knecht Dec. ¶ 21)

[22] (PJA 1656; *Ibid.* at ¶ 33)

disposable income for entertainment. Many of Plaintiffs' patrons either live or are only temporarily in Manhattan, and the areas to which the zoning law relegates Plaintiffs are much less accessible to their patrons than Plaintiffs' current locations in Manhattan, and much less likely to be patronized by them. (PJA 236; Talla Dec. ¶ 38) (PJA 242; Talla Dec. Ex. A, ¶ II-C [and ¶ II-C in Exhibit A to all other Client Decs]) (PJA 193; Kelly Dec. ¶ 49)   Specifically, public transit to the sites eligible for adult businesses in the outer boroughs is decidedly inferior to transit to the existing businesses in Manhattan.   (PJA 198-9; Kelly Dec. ¶ 57)   And, in the nighttime hours when consumer demand for adult entertainment peaks, service in the outer boroughs is sparse. (PJA 199-202; *Id.* at ¶¶ 58-65)   Indeed, to travel from Manhattan to adult-permissible locations in the outer boroughs via public transportation requires extensive travel time – in excess of an hour each way – and requires multiple connections to get there, all of which disincentivizes a patron seeking an evening of entertainment. (PJA 200-5; *Id.* at ¶¶ 63, 64, 67) And particularly for tourists and other non-residents whose time in Manhattan is limited, two or three extra hours of travel on public transportation is a significant barrier to accessibility. Similarly, fares for private transportation services to the outer boroughs (e.g., taxis, Uber, Lyft) are substantial and, with tolls and tips, average between approximately $65 and $100 round trip. (PJA 201-2; *Id.* at ¶ 64)   Patrons will simply stay in Manhattan and avoid adult entertainment altogether.

### ii.   Adult businesses are subject to paying higher than market rent.

Owners of buildings that satisfy the AZR's adult use location restrictions recognize that, because of the inelastic supply of such locations and the competition among all of the businesses compelled to close by the 2001 Amendments, any businesses which attempt to relocate can be forced to pay significantly higher rent than could be obtained from a non-adult business tenant.

The added cost to a business forced to pay significantly more than market rent can either be absorbed by the business or passed on to customers. But because of the diminished accessibility to adult businesses in the outer boroughs, and the fact that those living in the areas near the relocation sites, on average, have less disposable income, Plaintiffs' will be unable to recoup or even absorb that added expense, and therefore survive.  (PJA 205-9; Kelly Dec. at ¶¶ 68-79)

   3.   **Enforcement of the 2001 Amendments will further adversely impact expression because of other City provisions which discriminate against adult businesses and deter them from relocating.**

In *Renton*, the Supreme Court upheld the challenged ordinance because adult businesses were treated no differently from non-adult businesses: "That respondents must fend for themselves in the real estate market, *on an equal footing with other prospective purchasers and lessees*, does not give rise to a First Amendment violation." *Renton*, 475 U.S. at 54 (emphasis added).  Here, however, adult businesses are *not* on equal footing. First, as detailed in Point VI, *infra,* and the accompanying Berzak Permitting Declaration, the City's permitting scheme discriminates against them in significant ways, imposing additional and substantial discriminatory barriers to their relocating. Second, as detailed in Point VII, the City's non-conforming use provisions not only treat adult businesses in a uniquely discriminatory manner, but force them to terminate within a year if the City enacts any new zoning change affecting nearby land which renders an existing lawful adult site non-conforming.   Both of these discriminatory features will inhibit relocations.

For each of the foregoing reasons, the 2001 Amendments fail to ensure that both the quantity of and accessibility to adult speech of the type Plaintiffs present will remain substantially intact. To the contrary, the Amendments and the factors described above (and in

more detail below) create an existential threat to adult businesses and their expression and will impermissibly force the existing 60/40 businesses to close rather than relocate.

> **C.**   **Independently, The 2001 Amendments Violate The First and Fourteenth Amendments Because They Are Unsupported By A Substantial Governmental Interest.**

> **1.**   **Introduction**

There are two related, but alternative, analyses of secondary effects case law, both of which support Plaintiffs' position and satisfy their burden at this stage to show a likelihood of success.  The first is premised on Justice Kennedy's controlling concurring opinion in *Alameda Books* (*see* discussion in Point V-A, *supra*), and the second is premised on the *Alameda Books* plurality opinion.  Justice Kennedy agreed with most aspects of the plurality's test, but also required government to prove that a challenged adult zoning regulation would not only further a substantial governmental interest, but that it would be *effective* in furthering that interest:  "The purpose *and effect* of a zoning ordinance must be to reduce secondary effects."  *Alameda Books*, 535 U.S. at 449 (emphasis added).  Additionally, he stated that the benefit from any secondary effects reduction must *significantly* outweigh any potentially adverse effect the ordinance may have on expression.  *Id.* "[A] promised proportional reduction does not suffice."  *Id.* at 451.  The *Alameda Books* plurality adopted the *Renton* secondary effects test*,* but added a three-stage evidentiary procedure for evaluating whether adequate justification had been demonstrated.  Because both tests apply the plurality's three-stage evidentiary procedure, and most of the subsequent lower court cases have been litigated under this test, Plaintiffs begin with an analysis under the *Alameda Books* plurality's formulation.

31

2.     **The government always bears the burden of demonstrating that speech-restricting regulations are constitutional.**

As stated in *Playboy Ent.*, 529 U.S. at 817: "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."  Accordingly, under either of the two potentially applicable tests, the City has the burden to demonstrate an adequate justification for its speech regulation.  This burden necessarily includes bearing both the initial burden of production as well as the ultimate burden of persuasion.

3.     **Zoning restrictions that do not comport with the *Alameda Books* plurality's burden-shifting test violate the First Amendment.**

Under *Renton*, 475 U.S. at 49, adult zoning laws are evaluated under the same test for content-neutral time, place, and manner restrictions which applies to restrictions making no mention of the content of the expression, to wit, that the restriction be shown by the government to be "content-neutral, ... narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Frisby v. Schultz*, 487 U.S. 474, 481 (1988).  *Renton* concluded that adult zoning laws were properly analyzed under this test if it were shown that they had a content-neutral purpose of targeting adult uses' alleged secondary effects. *Renton*, 475 U.S. at 49.  The *Alameda Books* plurality considered *Renton* controlling, though clarifying some of its application. Under the *Alameda Books* plurality/*Renton* test, a city is generally required to show that, *at the time of enactment*, it reasonably relied upon either its own or other cities' studies of secondary effects.  *See id*. at 51.

The *Alameda Books* plurality expounded upon the procedure by which courts are to judge a city's secondary effects rationale, *Alameda Books*, 535 U.S. at 438-9, requiring the government to shoulder the initial burden of producing evidence that the business not only caused the asserted adverse secondary effects, but that the regulation was a reasonable measure to reduce

those effects. *Id.*; *Annex Books, Inc. v. Indianapolis*, 333 F.Supp.2d 773, 783-84 (S.D. Ind. 2004). If the government passes this initial hurdle, the plaintiffs may then "cast doubt on [the government's] rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Alameda Books*, 535 U.S. at 438-9. "If plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." *Id.* at 439.

### a.      The City's burden at step one

The government bears the burden at step one of the *Alameda Books* plurality test. *See Alameda Books, Inc. v. City of Los Angeles*, No. CV95-7771, at *9 (C.D. Cal. July 16, 2008). At this stage, the government must "provid[e] evidence that supports a link" between the type of business it intends to regulate and "asserted secondary effects." *Id.* The evidence need not be conclusive, but must fairly support the city's rationale. *Abilene Retail #30, Inc. v. Board of Comm'rs of Dickinson County*, 492 F.3d 1164, 1173-4 (10th Cir. 2007). It is insufficient for the government to produce evidence that proves some other secondary effect than the one it intends to address or links the asserted secondary effect to businesses other than the one it seeks to regulate. *Id.* at 1174. Rather, when the government chooses to rely on outside evidence, "the experience elsewhere [must be] germane to the measure under consideration." *City of Erie v. Pap's AM*, 529 U.S. 277, 313 (2000). If the government fails to produce relevant evidence establishing a nexus between the identified secondary effects and the businesses being regulated, the city's ordinance automatically fails at step one, without any further requirement that the business cast doubt on the government's rationale. *See Abilene Retail*, 492 F.3d at 1176.

Implicit within the requirement that the evidence considered by the city at step one be relevant to the city's unique situation is the recognition that different types of adult businesses may generate different secondary effects, or none at all. *See, e.g.*, *Doctor John's, Inc. v. City of Sioux City, Iowa*, 305 F.Supp.2d 1022, 1038 (N.D. Iowa 2004) ("[a]t this point, the City appears to be relying on mere speculation regarding the potential for "secondary effects" of stores selling the sorts of products Doctor John's stocks, to justify a purportedly "content neutral" ordinance"); *Abilene Retail*, 492 F.3d at 1175 n.9 (citing studies reflecting that different types of adult businesses have different relationships to crime and property values). In fact, even the Supreme Court itself appeared to embrace a tailored proof requirement in *Alameda Books*, when the plurality observed that a city must present evidence of a connection between "the speech regulated by the ordinance and the secondary effects that motivated the adoption of the ordinance." *Alameda Books*, 535 U.S. at 441. Thus, to meet its burden at step one, a city must present evidence that establishes a nexus between the regulated businesses and the secondary effects the city seeks to ameliorate.

### b.     The business' burden at step two

If the government meets its initial burden, the burden shifts to the businesses to "cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings." *Id*. at 438-9. At step two, a business may also challenge a city's rationale by producing evidence that its subclass of adult business is "relevantly different than those types of businesses analyzed in the studies supporting the ordinance." *Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1168 (10th Cir. 2006). Proof that a particular sexually oriented business has not generated the types of secondary effects the government ostensibly targeted, while not necessarily sufficient to

invalidate an ordinance, is nonetheless sufficient to at least cast the requisite doubt at step two. *See Abilene Retail*, 492 F.3d at 1185-6 (Ebel, J., concurring, and joined on/in this by the other two panel judges). Importantly, the *Abilene* majority also noted that under *Alameda Books* "municipalities need to make a showing that the evidence on which they relied is germane to their local experience." *Id*. at 1178. The plaintiff may rely on expert testimony to cast doubt on the city's rationale. *Id*. at 1187. Thus, at step two, the regulated businesses must be given an opportunity to challenge the secondary effects rationale advanced by the government at step one.

### c.     The City's burden at step three

If the business succeeds in casting doubt on the city's secondary effects rationale, the burden then shifts back to the government "to supplement the record with evidence *renewing support* for a theory that justifies its ordinance." *Alameda Books*, 535 U.S. at 439 (emphasis added). In other words, merely satisfying its burden at step one does not mean the government satisfies its burden at step three. *Alameda Books*, No. CV95-7771, at *36. Courts are not required to defer to the city's findings at this stage, as the government's burden at step three is "higher, and may well include providing empirical evidence to support its position." *Id*. (citing *Alameda Books*, 535 U.S. at 439).

There is little case law explaining the city's burden at step three of *Alameda Books*, perhaps due to the fact that cities often fail at step one and businesses often fail at step two. *See, e.g., Peek-A-Boo Lounge v. Manatee County*, 337 F.3d 1251 (11th Cir. 2003). The only appellate decision directly discussing the government's burden at step three is Judge Ebel's concurring opinion in basis for the outcome. *Id*. at 1167. When the burden shifted back to the government in that case, it presented evidence attacking the credibility and conclusions of the adult business'

35

expert,[23] but did not present additional studies or theories other than the ones it had considered in adopting the challenged ordinance. The court did not find that presentation sufficient to warrant granting summary judgment to the County. *Id*. As such, the City's presentation at step three should be limited to whatever additional support it may offer for the secondary effects it identified at step one.

4.      **The City must have actually considered the evidence it submits at steps one and three of *Alameda Books*.**

Based on *Renton*, 475 U.S. at 44, 51-2, and consistent with a vast body of subsequent precedent,[24] the Second Circuit has required that a municipality's reliance on secondary effects must be based upon evidence that was actually before its legislative body at the time of enactment. *White River*, 481 F.3d at 171.

At issue in *White River* was the validity of a town's anti-nudity ordinance. *Id*. at 165-6. Prior to enactment, the selectboard considered similar laws adopted by neighboring towns and letters from the town attorney relaying that the federal court had upheld an identical ordinance; two selectboard members also discussed secondary effects with their constituents. *Id*. at 172. The court held that this evidence was insufficient to establish a substantial governmental interest. *Id*. at 173. It criticized the town for not reviewing studies of secondary effects and discounted what vague information the two selectpersons who interviewed constituents may have gained, because

---

[23] Coincidentally, that expert, Dr. Daniel Linz, has also offered testimony in this case in support of Plaintiffs. (*See* PJA 1098 *et seq*; RJN Ex. 44 at pp. 307 *et seq.*)

[24] *See, e.g., D.H.L. Associates, Inc. v. O'Gorman*, 199 F.3d 50, 57-58 (1st Cir. 1999); *Hickerson v. City of New York*, 146 F.3d 99, 105 (2d Cir. 1998); *11126 Baltimore Blvd. v. Prince George's County, Md.*, 886 F.2d 1415, 1423 (4th Cir. 1989); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1274 (5th Cir. 1988); *Ben's Bar, Inc. v. Village of Somerset*, 316 F.3d 702, 725 (7th Cir. 2003); *Peek-A-Boo*, 337 F.3d at 1268; *but see Phillips v. Borough of Keyport*, 107 F.3d 164 (3d Cir. 1997).

that evidence was not passed on to the select board as a whole. *Id*. The town was then left with little to nothing in the way of secondary effects evidence to support its ordinance. *Id*.

Several important and binding principles can be gleaned from *White River*. First, only evidence that was *actually considered* by the city is relevant to the question of whether the challenged ordinance is narrowly tailored to address a substantial governmental interest. *Id*. at 172-3. Second, only *pre-enactment* evidence of secondary effects is relevant to the *Renton* inquiry. *Id*. at 171. Thus, taken together with the Supreme Court's tradition of analyzing only the evidence that was actually relied upon by a city, *White River* mandates that steps one and three of *Alameda Books* be limited to pre-enactment secondary effects evidence.

> 5. **The City cannot carry its burden of demonstrating a substantial government interest in regulating 60/40 adult uses.**
>
>> a. **The City's evidence at step one does not reasonably support, and in fact affirmatively disproves, the notion that 60/40 adult businesses generate secondary effects.**

Applying the principles discussed above, the City fails to meet its burden at step one of the *Alameda Books* plurality's test. At this stage, the City is limited to presenting pre-enactment evidence that was actually available to all voting members of the city council. The City is also limited to evidence supporting a causal link between 60/40 businesses and the specific secondary effects the City sought to reduce, which are ambiguous and undefined. The City can present no such evidence and thus cannot carry its burden at this stage.

The legislative record indicates that the 2001 Amendments were passed to close a perceived loophole in the application of adult business zoning regulations to businesses that present adult entertainment in less than 40% of their physical space and not to address any secondary effects caused by 60/40 uses. (*See* PJA 551-1031; RJN Exs. 33-42)  The City Council had before it the 1994 Report, but that study references only much more intense 100% adult

businesses, not the benign 60/40 businesses[25] (*see* PJA 860-1; RJN Ex. 38 at pp. 37-8) and is therefore irrelevant.[26]   In addition, the 1994 Report contained summaries of other jurisdictions' secondary effects studies, but the City Council did not receive or review the studies themselves, so those studies must also be discounted. (PJA 551-1031; RJN Exs. 33-42)   In reality, the City Council had no evidence before it that even remotely supported the idea that 60/40 uses generate secondary effects, nor did it appear to be adopting the 2001 Amendments based on that rationale.

**b.      Even if the City can meet its burden at step one, Plaintiffs can cast doubt on the City's evidence and rationale at step two.**

Even if the City meets its burden at step one with respect to 60/40 businesses, Plaintiffs can cast direct doubt on the City's rationale in both of the ways described by the *Alameda Books* plurality. *Alameda Books*, 535 U.S. at 438-9 (holding that plaintiffs may cast doubt on a city's secondary effects rationale "either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings.").

As described by Columbia University urban planning professor, Dr. Lance Freeman, the conditions in Times Square that precipitated the 1995 Ordinance are no longer present. (PJA 214-5; Freeman Aff. ¶¶ 5-8) By 2001, the blight and high crime that contributed to the depression of Times Square in earlier decades was gone, replaced by tourist attractions, upscale shopping, and more affluent residents. (PJA 216-23; *Id.* at ¶¶ 12-26)  Significantly, the Times Square improvements occurred while a 60/40 business – Plaintiff 725 Eatery, formerly operated

---

[25] Plaintiffs' step two evidence, discussed *infra*, demonstrates the benign nature of these businesses.  However, it is the City's burden to show the opposite and it should have done so at step one in order to comply with constitutional requirements.

[26] In fact, reduced-percentage adult nightclubs were created to comply with the 1995 Ordinance and did not exist any place else in the country as of 2001.  As such, given their novelty, 60/40 uses had not been the subject of any secondary effects studies in New York or elsewhere. (*See* PJA 1331; RJN Ex. 48 (Linz Report), at p. 1)

as MLB – was in operation in the district, which suggests that 60/40 businesses do not depress real estate markets or lead to increased crime rates. (PJA 262-4; Capeci Dec.)  Given this pattern of gentrification, it was unreasonable for the City to conclude, based on its 1994 Report, that 60/40 businesses generated negative secondary effects.

Even more dramatic proof of this point comes from the City's own records.  The City in fact had before it conclusive evidence that 60/40 uses do *not* generate secondary effects (PJA 312 *et seq.*; Rudofsky Leg. Hist. Dec. at ¶ 8 *et seq.*, esp. 12-3), making any assumption to the contrary unreasonable and unjustifiable.  As one member of the City Planning Commission observed, "the community boards in Manhattan where fully 40% or more of these establishments exist have expressed satisfaction that there are no significant secondary impacts from the remaining adult use establishments in their neighborhoods." (PJA 845; RJN Ex. 37 at p. 10)  Given this concession, the City cannot meet its burden at step one of demonstrating that it reasonably relied on evidence that 60/40 uses cause unwanted secondary effects.

It was also unreasonable for the City to believe that 60/40 uses negatively impacted their environments in light of the fact that the existing businesses had removed the garish signage that predated the 1995 Ordinance and replaced it with much more subdued exterior marketing. As market research expert Michael Anastas concluded, the subdued signage displayed by the 60/40 businesses highly correlates with positive impressions of a neighborhood.  (PJA 1233-36; RJN Ex. 44 at pp. 609-12) (PJA 1424; RJN Ex. 50, at p. 21) Moreover, Plaintiffs have affirmatively cast doubt on the City's assumption that 60/40 businesses are associated with higher crime rates. (*See* PJA 1331; RJN Ex. 48 (Linz Report))  In actuality, 60/40 uses are a "very insignificant source of crime events within their neighborhoods."  (PJA 1369; *Id*. at p. 39)

Because Times Square had experienced gentrification even with a 60/40 business in operation in its district, because the businesses had replaced garish signage with more subdued marketing that correlates with positive impressions of livability, and because 60/40 uses were not shown to have significantly contributed to crime events, the City acted unreasonably in assuming that 60/40 businesses caused unwanted secondary effects.

> **6.      A fortiori, the 2001 Amendments do not comport with the justification burdens imposed on municipalities by Justice Kennedy's concurring opinion in *Alameda Books*.**

Because the 2001 Amendments lacked adequate justification under the *Alameda Books* plurality's test (which completely accepted *Renton*), it follows, *a fortiori*, that these provisions fail under Justice Kennedy's *Alameda Books* concurrence, which did not fully accept the plurality's interpretation of *Renton*. *Alameda Books*, 535 U.S. at 444-5 ("[I]n my view, the plurality's application of *Renton* might constitute a subtle expansion, with which I do not concur.") (Kennedy, J., concurring).

Given the absence of evidence before the City Council that 60/40 businesses caused adverse secondary effects, and the additional evidence supplied by Plaintiffs which affirmatively demonstrates the lack of such effects, it necessarily follows that the City could not reasonably have expected the 2001 Amendments to be effective in reducing any significant secondary effects, much less that they would be sufficiently effective to outweigh their dramatic reduction of expression.  Consequently, it follows that the 2001 Amendments lacked adequate justification under the more rigorous proportionality test established by Justice Kennedy.

**D.**   **Under *Alameda Books*, the Combination of the 2001 Amendments' Minimal Public Benefit and Great Adverse Impact on The Public's Access to Expression Compels Their Invalidation.**

As discussed previously, there were no significant secondary effects remaining to be remedied by the 2001 Amendments, so any anticipated future public benefit would be minimal at best.   Conversely, the Amendments will drastically reduce public access to sexually oriented expression.   Individually, both their utter lack of potential benefit and the enormous reduction in expression they will cause invalidate the Amendments; but together they unquestionably render the 2001 Amendments facially invalid under *Alameda Books*' proportionality test:   "The claim, therefore, must be that . . . the quantity of speech will be *substantially* undiminished, and that the total secondary effects will be *significantly* reduced."   *Alameda Books*, 535 U.S. at 451 (emphasis added). That is *certainly* not the case with the 2001 Amendments.

**VI.**   **The City's Permitting Procedures for Adult Establishments Violate the First Amendment.**

**A.**   **Relief sought**

Plaintiffs seek interim injunctive relief from enforcement of the 2001 Amendments because, for each of the following reasons, the City's relevant permit requirements impose an unconstitutional burden on Plaintiffs' ability to relocate and open a new business:

1.   Both on its face and as routinely construed by the City's Department of Buildings ("DOB"), the City's building and zoning approval scheme violates the First Amendment because it is a discriminatory content-based scheme subjecting adult businesses seeking zoning and construction approval to significantly more burdensome and time-consuming requirements than all others.   No aspect of this discriminatory treatment is justified, nor narrowly tailored to avoid burdening adult businesses more than reasonably necessary.

41

2.      The City's building permit and zoning approval scheme, both on its face and as construed and applied, constitutes an unconstitutional prior restraint on expression because its unique permitting procedure for adult entertainment establishments lacks procedural safeguards required by the First Amendment: a) It fails to provide reasonably brief time limits for granting or denying these businesses' applications for either plan approvals or permits; b) its express time limits are illusory and open ended; and c) the permitting scheme lacks any effective remedy for the City's failure to comply with those time limits.

3.      The City's permitting and zoning scheme is facially unconstitutional under the First Amendment because it permits the "sensitive use veto" found facially invalid in *Young v. City of Simi Valley*, 216 F.3d 807, 814 (9th Cir. 2000).

**B.      Standing**

Unless enjoined, the 2001 Amendments will force immediate closure of Plaintiffs' 60/40 business locations.   All Plaintiffs have indicated they would want to relocate if they had a reasonable opportunity to find a relocation site, but are presently reluctant or are unwilling to do so because of the unconstitutional permitting scheme and thus have standing to challenge the City's zoning/construction permitting procedures.

**C.      The Permitting Scheme is Unconstitutional.**

**1.      Discriminatory permitting procedures**

The City's permitting procedures for adult businesses violate the First and Fourteenth Amendments because, *inter alia,* they impose discriminatory and significantly burdensome content-based procedures on adult business building permit applicants not imposed on any other applicants and without adequate justification.

### a.      Adult businesses are not permitted to self-certify.

Since at least 1975, the DOB has had a streamlined method for obtaining building permits, known as "self-certification," which bypasses the time-consuming and costly process otherwise required to review building plans.  *See* DOB Directive No. 14 of 1975, which is currently embodied in the DOB's "Buildings Bulletin 2016-010" (PJA 462; RJN Ex. 20) (PJA 140; Berzak Permit Dec. Ex. 7):

> The Department of Buildings ... [has] a Professional Certification Program ... under which construction and other submittal documents are accepted with no Department examination based on the professional certification of an applicant who is a Registered Design Professional (RDP), i.e., a New York State licensed Professional Engineer or Registered Architect.
>
> ***
>
> The Department's acceptance of a submission under the professional certification program ... shall have the same force and effect as the approval of construction documents after full examination by the Department.  The Department will rely on the truth and accuracy of statements contained in the professionally certified application of the registered design professional … as verification of compliance with the provisions of the Zoning Resolution, the New York City Construction Codes, and all other applicable laws and rules.

Self-certified plan approval applications not involving zoning changes are stamped approved when submitted, and the related building permits are issued promptly thereafter.  (PJA 114; Berzak Permit Dec. ¶ 21)  Although self-certified applications involving a zoning change are subject to a mandatory zoning audit, this generally takes no more than 3 to 4 weeks, after which the building permits are promptly issued.  (*Id.*)  In contrast, applications which are not self-certified undergo a far lengthier permit process.  Non-self certified plan reviews typically require anywhere from 3 to 4 months even in the simplest cases not involving any zoning change.  (*Id.*)  If a zoning change is involved, it will take even longer.  (*Id.*)

Inexplicably, adult establishment businesses are the only uses expressly denied the option of self-certifying their plans.  (*See, e.g.,* PJA 61-73, 87-90; Berzak Sites Dec. Exs. 8, 9, 14 (OPPN Nos. 17/95, 6/96, 7/02); PJA 91-102; Berzak Sites Dec. Ex. 15 (DOB Adult Establishment Handbook issued June 2016)  This discriminatory denial of self-certification for adult business building permit applications adds a *minimum* of 2 to 3[27] additional months to their processing, without any justification for denying adult businesses this option which is available to all other applicants.  An architect allowed to self-certify non-adult business applications is surely no less capable of assessing the validity of similar plans for an adult business.

Denying self-certification for adult business building permit applications is an obvious content-based discrimination which is unconstitutional not only under *Reed*'s strict scrutiny test, *supra,* but also under 1) *Alameda Books*' proportionality test, 2) the *Alameda Books* plurality's substantial government interest test, and 3) even *Ward*'s intermediate scrutiny test.  Additionally, as noted in *Minneapolis Star v. Minn. Com'r. of Rev*, 460 U.S. 575, 585 (1983):

> [D]ifferential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional.

* * *

> Where the State devises classifications that infringe on the fundamental guarantees protected by the Constitution the Court has demanded more of the State in justifying its action. But there is no *infringement*, and thus the Court has never required more, unless the State's classifications *significantly burden* these specially protected rights.  As we said in *Massachusetts Board of Retirement* v. *Murgia*, 427 U.S. 307, 312 (1976) *(per curiam)* (emphasis added), "equal protection analysis requires strict scrutiny of a legislative classification only when the   classification *impermissibly interferes* with the exercise of a fundamental right . . . ."  (Dissenting opinion of J. Rehnquist, *id.* at 600.)

---

27 Although self-certification of plan applications trims 3 to 4 months off the basic process, any required zoning approval in self-certified applications must be separately audited by a DOB examiner, which adds 3 to 4 weeks to the process for *those* permit applicants, so the net minimum extra time attributable to not being able to self-certify is 2 to 3 months.

Not being able to self-certify building permit applications constitutes an obvious significant burden imposed uniquely on adult businesses.

### b. Initial mandatory assessment of adult zoning compliance is required by DOB Counsel.

All DOB permit applications involving zoning changes (often including mere changes of use) must, *inter alia*, obtain zoning approval from DOB plan examiners.  While zoning review for non-adult uses which are not self-certified is concurrent with review of all their other plans (or with self-certified applications, immediately on filing), that is not the case for adult businesses.  DOB's mandatory policy in every case involving a permit application for an adult establishment is to first send the application to DOB legal counsel to verify compliance with the City's adult zoning locational restrictions and to do nothing to process the rest of the proposed plans pending approval by legal counsel.[28] (PJA 116; Berzak Permit Dec. ¶¶ 28-30).  Typically, this review by counsel takes three to four months though in some egregious cases it has taken far more than 4 months (PJA 117-8; *Id*. at ¶¶ 30-1), during all of which times the rest of the plans languish, not to be reviewed until adult zoning has been approved.  (PJA 116; *Id*. at ¶ 28)  This 3 to 4 month (or more) delay is another obvious significant discriminatory burden.

Either denial of self-certification for adult businesses or the time-consuming mandatory extra step of requiring preliminary adult zoning approval by DOB legal counsel would, alone, violate the First and Fourteenth Amendments.  However, the combination of these two discriminatory practices is unquestionably unconstitutional.  Until the City modifies its building permit procedures to eliminate this discriminatory treatment and at least guarantee an equal

---

[28] Once DOB counsel has approved it for "adult zoning," the application is returned to DOB plan examiners who then must review all the building plans, and also review the application for all other aspects of zoning, e.g., approval of any change of use group classification, or occupancy load, required for all other applications.  (PJA 116-7; Berzak Permit Dec. ¶¶ 28, 31)

opportunity for adult establishments to obtain building permits, the City may not compel them to relocate, and a preliminary injunction should be granted to protect them against enforcement of the City's termination requirement pending trial.

### 2.      Lack of required procedural safeguards

In *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), the Supreme Court held that licensing requirements for adult entertainment businesses are prior restraints on expression and are facially unconstitutional unless they contain procedural safeguards preventing even the *possibility* of their being used to censor by delay.  Proof of actual delay is not required.  If the City's building permit procedures were the same for all businesses, they would not be subject to facial challenge but could be challenged only as applied.  *See, e.g., City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 760-1 (1988).  However, here, as in *FW/PBS,* the City has unique and burdensome procedural requirements for adult business permit applications not imposed on any other businesses, e.g., denial of the self-certification option and mandatory time-consuming adult zoning review by DOB legal counsel.  Consequently, those procedures must conform to and include the time limits and other procedural safeguards articulated in *FW/PBS*:

> [Dallas] asserted at oral argument that it requires every business – without regard to whether it engages in First Amendment-protected speech – to obtain a certificate of occupancy when it moves into a new location or the use of the structure changes.  …  Under the challenged ordinance, however, inspections are required for sexually oriented businesses whether or not the business has moved into a new structure and whether or not the use of the structure has changed. Therefore, even assuming the correctness of the city's representation of its "general" inspection scheme, the scheme involved here is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses. For example, inspections are required whenever ownership of a sexually oriented business changes, and when the business applies for the annual renewal of its permit. We, therefore, hold, as a threshold matter, that petitioners may raise a facial challenge to the licensing scheme, and that as the suit comes to us, the businesses challenging the scheme have a valid First Amendment interest.

493 U.S. at 225; *see also Lakewood*, 486 U.S. at 760 ("the Constitution requires that the city establish *neutral* criteria to ensure that the licensing decision is not based on the content or viewpoint of the speech being considered") (emphasis added).  The holdings in both *Lakewood* and *FW/PBS*  clearly subject the City's building permit scheme to scrutiny of its time limits and procedures under First Amendment prior restraint standards because of its unequal application to adult entertainment businesses.

Lastly, merely because the complained of procedures may represent only a step in obtaining a building permit or "no work" permit does not exempt them from First Amendment procedural requirements.  For example, consider *Lady J Lingerie v. City of Jacksonville*, 176 F.3d 1358 (11th Cir. 1999), where  adult entertainment was permitted "as of right" in one of the two zones where adult entertainment was allowed, but nearly all of the available sites were in the other zone, where a discretionary zoning exception was required. The process of obtaining such an exception "persuade[d] [the court] to treat it like a license." *Id*. at 1362; *see also Red-Eyed Jack*, 165 F.Supp.2d at 1328.

### a.    The code-provided time limits

On its face, the Administrative Code establishes a two-step process for obtaining DOB permits.  The first step is to apply for approval of building plans.  NYCAC § 27-144 requires DOB to act on such plans within 40 days of their submission, but allows DOB one 20 day extension (for a total of 60 days) on notice to the applicant. (PJA 134-5; Berzak Permit Dec. Ex. 5)  The second step is to apply for issuance of a permit.  DOB will not accept a permit application until the supporting plans have been approved.  (PJA 111; Berzak Permit Dec. ¶¶ 11, 13)  NYCAC § 27-191 requires DOB to act on the permit application within 40 days of its

submission but allows DOB one 20 day extension (for a total of 60 days) on notice to the applicant.  (PJA 137; Berzak Permit Dec. Ex. 6)

> **b**.   **As routinely construed by the City, the time period for zoning approval of adult business permit applications is unconstitutional because its time limits are illusory and/or open ended.**

*FW/PBS,* 493 U.S. at 225, held that even a fixed period for license approval is nonetheless open-ended, illusory, and thus unconstitutional, if there are no mandatory time limits for other government departments (e.g., fire, health, and building) to approve constituent elements of the license.  The City's adult business permitting scheme suffers from this defect.

### 1)  No time limits for mandatory approval by DOB legal counsel

DOB's plan examiners refer every adult business application as soon as it is filed to DOB legal counsel to verify adult zoning compliance.  (PJA 116; Berzak Permit Dec. ¶ 28)   Until that has been completed, the examiners will do nothing to process or review any submitted adult business permit plans.  *Id*.  There is no time limit for DOB counsel to act, and it typically takes at least 3 to 4 months, though sometimes *much* more.  (PJA 116-7; *Id.* at ¶¶ 29-31)

In *FW/PBS*, 493 U.S. at 225, the voided permit scheme required a final decision by the chief of police within 30 days, but the Court found the time limit illusory because the permit could not be issued until other City departments had signed off (including, *inter alia*, for adult zoning), and there were no specific time limits for these other departments to act.   Similarly here, the seemingly fixed 40 day time limit for DOB to grant or deny plan approval is equally illusory, because plan examiners will not begin to review plans until DOB legal counsel has first verified adult zoning compliance, for which there is no required time limit.

Because the City construes its permitting scheme to require DOB counsel adult zoning approval for *every* adult business permit application, it is as subject to facial challenge as if the open-ended required referral to counsel were stated on the face of the code.

### 2) Unlimited plan approval extensions

Additional indefiniteness taints the City's permit scheme for adult businesses.  The one 20-day extension of time for plan approval authorized by the facial language of NYCAC § 27-144 is routinely construed by the Building Department to allow an unlimited number of extensions, and without even giving the code-required contemporary notice.  (PJA 113; Berzak Permit Dec. ¶ 18)

If this were merely a case of isolated violations, it would not be subject to facial challenge.  However, because the City *routinely* interprets and applies § 27-144 to allow unlimited extensions, the plan approval scheme constitutes an impermissible prior restraint on expression of indefinite duration, in violation of the requirements of the First Amendment.

### c. As part of a scheme which uniquely affects adult businesses, the time limits for permit issuance are far longer than reasonable or necessary and constitute a facially invalid prior restraint.

No permit may be applied for until its plans have been approved.  (PJA 111; Berzak Permit Dec. ¶ 13).  NYCAC § 27-144 allows 60 days for plan approval.  However, DOB has an additional 60 days to actually issue the permit. (PJA 138; Berzak Permit Dec. Ex. 6 (NYC Adm. Code § 27-191))

Although permits are almost always issued promptly after plan approval[29] (*see* PJA 115; (Berzak Permit Dec. ¶ 26), because discretion to utilize the full 60 days for permit issuance is

---

[29] This is irrefutable proof that the 60 days allowed for permit issuance following plan approval are excessive and thus inherently unreasonable.

expressly authorized by the NYCAC, for First Amendment purposes, it is subject to facial challenge, and the City must demonstrate that the 60 days is reasonable. *See, e.g., Kev, Inc. v. Kitsap County*, 793 F.2d 1053, 1060 (9th Cir. 1986) (holding that County has the burden to justify the amount of time allotted to grant or deny license applications by adult businesses and their entertainers); *FW/PBS*, 493 U.S. 215 (holding that procedurally deficient licensing schemes may be challenged on their face). Importantly, proof of actual abuse of discretion is not necessary in a facial challenge to a licensing scheme if it affords City officials discretion to delay the issuance of a permit. *See, e.g., Forsyth County*, 505 U.S. at 129; *Plain Dealer*, 486 U.S. at 756-7.

These constitutional safeguards are even more necessary here, where this additional 60 days could be used to delay permits for adult businesses to allow permits to be issued first to a pending potentially disqualifying proximate sensitive use. *See* Point VI(A)(3), *infra*.

As noted above, the City must demonstrate the reasonableness of its 60 day time limit for permit issuance following plan approval. *Kev*, 793 F.2d 1053; *accord 11126 Baltimore Blvd. v. Prince George's County*, 58 F.3d 988, 998 (4th Cir. 1995) (en banc) ("the record is devoid of any evidence that would support the necessity of a 150-day delay to complete the administrative review process for the zoning scheme implemented by the County").  Given that DOB never needs this amount of time to issue a permit following plan approval, that is a burden the City cannot meet.

> **d.    The City's scheme for approving permits for adult entertainment businesses is facially invalid because it provides no effective remedy if the City violates its stated time limits and procedures.**

Even if deemed reasonable, the City's two sequential 40-plus-20-day time limits are meaningless without an effective remedy to redress the City's failure to comply with its express

time limits and procedures.  The mere right to seek mandamus is not an effective remedy.  As made clear in *Plain Dealer*, "an application could languish indefinitely before the Council, with the Newspaper's only judicial remedy being a petition for mandamus.…  Even if judicial review were relatively speedy, *such review cannot substitute for concrete standards to guide the decisionmaker's discretion*." *Plain Dealer*, 486 U.S. at 771 (emphases added) (internal citations omitted).

As noted in the Berzak Permit Dec., the City *routinely* takes longer to review adult business applications than the 60 days allowed by § 27-144.  (PJA 113; Berzak Permit Dec. ¶¶ 17-8)  This consistent violation of its own requirements is attributable to the lack of a meaningful code-provided remedy.  Moreover, because the City uniquely delays adult business building permits by denying self-certification and requiring zoning approval by DOB counsel, the lack of meaningful remedies for the City's violation of its time limits and procedures is particularly significant.  The required verification of adult zoning compliance by DOB counsel which adds a *minimum* of three months to the permit application process, provides a striking example of why a code-provided meaningful remedy is necessary for whenever the City fails to meet its own express time limits.  Such is constitutionally required where a city imposes permit requirements uniquely affecting adult businesses.  *See, e.g., Redner v. Dean*, 29 F.3d 1495, 1500-1 (11th Cir. 1994); *Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1310-1 (11th Cir. 2000); *Café Erotica, et al. v. St. Johns County*, 143 F.Supp.2d 1331, 1335 (M.D. Fla. 2001); *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 637 F.Supp.2d 1002 (M.D. Fla. 2007); *Public Citizen, Inc. v. Pinellas County*, 321 F.Supp.2d 1275, 1294-5 (M.D. Fla. 2004).

Until the City adopts new procedures which 1) treat adult business permit applications comparably to their non-adult counterparts, 2) provide the procedural safeguards including time

limits required by the First Amendment, and 3) provide effective remedies if the City fails to comply with its time limits, Plaintiffs will not have a reasonable opportunity to relocate and/or open new businesses, and enforcement of the 2001 amendments should be enjoined until the City adopts such procedures.

### 3.    Sensitive Use Veto

The City's permitting scheme for enforcing its adult zoning restrictions also violates the First Amendment because it has the same defects found facially invalid in *Simi Valley*, 216 F.3d at 814, *i.e.,* the potential for a "sensitive use veto.  In that case, the plaintiff raised, *inter alia*, a facial challenge to Simi Valley's adult zoning and permitting scheme, arguing "that people will be deterred from attempting to obtain an adult use permit - and thus engage in a protected activity - because the ordinance makes the process prohibitively difficult and risky." *Id.* at 815. While the plaintiff's adult business permit application was pending, opponents established a disqualifying sensitive use within 500 feet of plaintiff's proposed location.  Characterizing the problem as a "sensitive use veto," the court found the ordinance to be facially invalid.  *Id*. at 814, 186.  "Because ... a sensitive use could preempt an adult establishment for *any reason* at *any time* before the approval of the adult use permit, there exist[ed] a realistic danger that the [ordinance] itself will significantly compromise recognized First Amendment protections of parties not before the Court."  *Id.* at 815.  Moreover, the court observed that "[t]he *procedure* by which a city dispenses its permits may deprive potential businesses of reasonable alternative avenues of communication in the same way that a paucity of available sites would."  *Id*. at 817 (emphasis added).

The identical flaws that infected the *Simi Valley* ordinance also render New York City's law invalid.  In *Simi Valley*, the ordinance provided that "the buffer zone requirement between

adult businesses and sensitive uses must be satisfied as of the date of a project's approval, not just as of the application's *filing date*." *Id.* at 817 (emphasis added).  That problem is also present here as made clear by 1 RCNY § 9000-01(b), which states that, "[e]xcept as otherwise provided in subdivision a of this section, the date of establishment of an adult establishment, house of worship, or school shall be the date of issuance of an appropriate department permit." (PJA 129-30; Berzak Permit Dec. Ex. 3)  Thus, as in *Simi Valley*, a business competitor or determined opponent, can prevent an adult business from opening in New York City by establishing a "house of worship" or other disqualifying sensitive use nearby, and with self-certification or a supportive City official, unfairly obtain its zoning priority permit before the adult business's own pending adult use priority permit is approved.  That will prevent the proposed adult business from ever opening even though its application may have been pending for months and required substantial sums to acquire the site and prepare plans for the permit.

The possibility of this sensitive use veto is particularly heightened where, as discussed *supra*, the City's permitting scheme discriminates against adult businesses, requiring substantially longer time to process their applications than those of others.[30]

New York City's zoning/permitting scheme is facially unconstitutional for allowing the possibility of a sensitive use veto.  Until that scheme is modified to meet constitutional requirements, enforcement of the 2001 Amendments must be enjoined since Plaintiffs will have no "reasonable opportunity" to relocate.  *Simi Valley*, 216 F.3d at 817.[31]

---

[30] Also, as noted in the Berzak Permit Dec., at ¶¶ 37-42, there is a very real possibility that opponents or competitors may use these features to prevent the opening of a new adult business. (PJA 118-20)

[31] "We conclude that the Simi Valley ordinance, as interpreted by the City, denies an adult business owner-applicant a reasonable opportunity to open and operate an adult enterprise in Simi Valley."  *Simi Valley*, 216 F.3d at 817.

**VII.   Plaintiffs are Likely to Succeed in Their Facial Challenges to the Mandatory Termination Provisions.**

    **A.   Relief sought**

Plaintiffs are likely to prevail in obtaining declaratory and injunctive relief on their facial challenges to the mandatory termination requirements of AZR §§ 52-77 and 72-41 because:  1) these termination requirements are facially unconstitutional in *all* applications;  and 2) alternatively, these termination requirements are unconstitutional as to 60/40 businesses rendered nonconforming by the 2001 Amendments.  *See Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1984) (holding that a law may be found partially invalid even if some of its applications might be valid).  Applying *Brockett*'s reasoning, § 52-77's mandatory termination requirement is invalid as applied to 60/40 businesses even if it might be applied validly to 100% adult businesses which became nonconforming under the City's adult zoning restrictions.

    **B.   The relevant provisions**

Under AZR § 52-11, absent abandonment or any significant modification, "[a] non-conforming use may be continued."  (PJA 412; RJN Ex. 11)  This rule applies to the overwhelming majority of New York City land uses. *See* AZR Art. 5, Chap. 2.  However, AZR § 52-77, enacted as part of the original 1995 Ordinance, makes adult entertainment establishments the very rare exception to the rule.  (PJA 423-26; RJN Ex. 14)  AZR § 52-77 requires an adult entertainment establishment to terminate within one year after it first becomes nonconforming (most likely after a subsequent zoning change rendering its location nonconforming under either AZR § 32-01 or § 42-01).  Virtually no other nonconforming use in New York City is subject to a mandatory termination requirement of *any* kind, let alone after merely one year, even though non-conforming uses are generally disfavored and either cause adverse effects or are no longer consistent or compatible with surrounding uses.  For example,

even a gas station in a neighborhood rezoned as residential qualifies for the grandfather effect of AZR § 52-11.

The only businesses not subject to AZR § 52-77's termination requirement are 60/40 businesses rendered non-conforming by the 2001 Amendments which a) were operative as of August 8, 2001, and b) made financial expenditures to convert to 60/40 businesses in order to comply with the 1995 Ordinance.  Those businesses are subject, instead, to § 72-41, which, as part of the 2001 Amendments, imposed a one year termination requirement as measured from an *express date*, October 31, 2001 rather than the date the use becomes nonconforming.[32] (PJA 427-30; RJN Ex. 15)

### C.    Standing

Most of Plaintiffs' businesses existed prior to adoption of the 2001 Amendments and made financial expenditures in order to comply with the 1995 Ordinance and are governed by the termination requirements of AZR § 72-41.  These include all Plaintiffs except Jacaranda, 725, and 689.  These three Plaintiffs opened 60/40 businesses after 2001 at sites which had been converted before 2001 to 60/40 businesses and thereafter were continually used by lawful 60/40 businesses both prior to and after the 2001 Amendments.  (*See* PJA 227, 248; Talla, Warech Decs.)  Consequently, should the 2001 Amendments be upheld, but for AZR § 52-77, these Plaintiffs would be entitled under AZR § 52-11 to continue as lawful nonconforming uses (because the initial use of their properties was both pre-2001 and lawful).  Consequently, these Plaintiffs have standing to challenge AZR § 52-77.

Plaintiff Club at 60th, the only landlord Plaintiff, neither owns nor operates a 60/40 business but is the sub-lessor of property it subleased to a 60/40 business before and after

---

[32] AZR § 72-41 expressly states that the mandatory termination requirement of AZR § 52-77 does not apply to those businesses subject to § 72-41.

enactment of the 2001 Amendments and subsequently to Jacaranda (its current tenant).  As such, Club at 60th has standing to challenge AZR § 52-77 as it is clearly subject to an action by the City to enforce that section's termination requirement based on the asserted non-conforming use by its current sublessee.

Lastly, all club Plaintiffs would want to relocate if the 2001 amendments are upheld. They have standing to seek declaratory and injunctive relief against AZR § 52-77 for the additional reason that they are chilled and deterred from relocating because the existence of § 52-77 denies them a reasonable opportunity to do so.  (*See* PJA 227-311; Ex. A to each of "Client Decs" (i.e., the Talla, Warech, Lipsitz, D'Amico and Kavanagh Declarations))  This is because any Plaintiff relocating to a new site will always be subject to mandatory one-year termination under § 52-77 in the event of a zoning change that renders the use nonconforming. One year is insufficient to recoup the investment necessary to locate, obtain, develop and launch new businesses like Plaintiffs'.  (*Id.*)

These concerns with forced terminations are not merely hypothetical.  The City utilized AZR § 52-77 to attempt to terminate at least one adult business, the Black Garter, because of a subsequent zoning change which assertedly rendered it nonconforming.  *See City of New York v. The Black Garter,* 273 A.D.2d 188 (N.Y. 2000).[33]  Consequently, both the face of the zoning scheme and the City's past enforcement action demonstrate that § 52-77's mandatory termination requirements apply and will be invoked to terminate a previously lawful adult business rendered nonconforming by a subsequent zoning change.

---

[33] The Black Garter prevailed because, at that time, the City's adult zoning scheme expressly prohibited such zoning changes from disqualifying a pre-existing adult use.  However, on September 9, 2004, the City amended both AZR §§ 32-01 and 42-01 to remove the language which allowed Black Garter to make a successful statutory construction argument.

Moreover, the facial language of both §§ 52-77 and 72-41 makes clear that termination is to be applied prospectively to existing lawful adult businesses even where only the *definition* of a use has changed and not a zone's district or its characteristics..  *A fortiori*, it is clear that § 52-77's mandatory one-year termination would apply in the event of a future re-zoning rendering Plaintiffs' relocated businesses, once again, non-conforming.

Because this mandatory one year termination provision presently chills Plaintiffs from attempting to relocate their businesses, all 60/40 Plaintiffs as well as Club at 60th, the one lessor plaintiff, have a concrete present interest in obtaining a declaration of the facial unconstitutionality of  AZR § 52-77.

### D.      Reasons why Plaintiffs are likely to prevail

To the extent both AZR §§ 52-77 and 72-41 single out nonconforming adult entertainment uses and treat them dramatically more harshly than all other nonconforming uses, they are content-based, and, for the reasons below, impermissible.  *See Alameda Books*, 535 U.S. at 444-5; *Reed*, 135 S.Ct. 2218.

First, the City has no compelling interest in subjecting nonconforming adult entertainment establishments to mandatory termination, thereby treating them far more harshly than virtually all other nonconforming uses.  In particular, the City has no such compelling interest in mandatory termination for 60/40 establishments, given the lack of evidence and findings in support of the 2001 Amendments suggesting that 60/40 businesses generated unwanted secondary effects. Thus, the record does not establish that mandatory termination would serve a sufficiently compelling or even substantial governmental purpose as applied to lawful 60/40 businesses.  As noted, *supra*, under *Brockett*, the Court may find § 52-77 invalid as applied to 60/40 businesses even if constitutional in *other* applications, e.g., to 100% uses.

Furthermore, neither AZR § 52-77 nor § 72-41 is narrowly tailored or constitutes the least restrictive alternative to accomplish any compelling municipal goals.  This is particularly true because the 60/40 establishments to which they apply were not shown, either in the City's 1994 Study or as part of the 2001 Amendments, to cause the secondary effects attributed to the 100% adult businesses addressed in the City's 1994 Study and in fact were absolved by the City from generating significant secondary impacts.  *See* Point V(B)(5)(c), *supra.*  This, coupled with the trial testimony of Michael Anastas summarizing his survey demonstrating that 60/40 businesses operating with subdued signage are not viewed by the average citizen as a source of blight (PJA 1223-36; RJN Ex. 44 at pp. 609-12), strongly supports the assertion that the mere presence of live adult entertainment does not, alone, establish any of the secondary effects specifically pointed to in 1994.

Moreover, a less restrictive alternative would allow newly nonconforming businesses substantially more time not only to recoup their investment, but to reduce the likelihood of closure of the business for a substantial period.  It would take substantially longer than one year to relocate most of Plaintiffs' businesses.  (*See, e.g.*, PJA 121; Berzak Permit Dec. ¶¶ 44-5) (PJA 227-311; Talla, Warech, Lipsitz, D'Amico and Kavanagh Decs.)

Finally, even if less rigorous constitutional scrutiny applies, it remains likely that both termination provisions facially violate the First Amendment under all other constitutional tests previously described, including *Alameda Books*' proportionality test*, Renton*'s reasonable opportunity test, the *Alameda Books* plurality's substantial government interest test, and *Ward*'s substantially broader than necessary intermediate scrutiny test.

**VIII.**   **Plaintiffs are Likely to Succeed on their Alternative Claim That the One Year Termination Requirements of AZR § 52-77 and 72-4 Should Not Commence Until Operation of Their Businesses Would Become Unlawful.**

In the alternative to their facial challenge to the termination requirements of AZR §§ 52-77 and 72-41, Plaintiffs, asserting the rights of their patrons, seek a preliminary injunction to allow them to remain open for *at least* one year following either a final judgment against them or the expiration of all other agreed or ordered stays of enforcement.  This is based on the fact that: 1) Plaintiffs have at all times operated lawfully because enforcement of the 2001 Amendments against them has always been stayed, either by judicial order or by a litigation agreement; 2) Plaintiffs have had and continue to have several good faith reasons to believe the 2001 Amendments may ultimately be overturned; and 3) closing their businesses would render their challenges moot.

However, as shown by Berzak Permit Dec. ¶¶ 43-5 (PJA 120-1) and, for example, the Talla Dec., ¶ 35 (PJA 235), it would take Plaintiffs *more* than a year to relocate from whatever point they decide to attempt to do so (even assuming they *could* do so).  Regardless of whether the 2001 Amendments may fairly and immediately apply to Plaintiffs, the controlling principle is that the members of the public who seek access to Plaintiffs' expression will be denied access to it for *at least* a year, even if Plaintiffs all attempt to relocate the moment a final judgment is entered or any stays expire.  Because Plaintiffs have third party standing to assert their customers' First Amendment rights (*see, e.g., Virginia v. American Booksellers Ass'n, Inc.*, 484 U.S. 383, 392-3 (1988)), and because *Alameda Books*, 535 U.S. at 449, protects not only Plaintiffs' rights, but their patrons' rights of access to protected expression, even if the Court rejects every other challenge raised by Plaintiffs, at a minimum, an injunction should issue protecting Plaintiffs for at least one year following finality of the litigation, or, in the alternative,

59

at least following expiration of the last stay of enforcement, whether by judicial order or litigation agreement, so Plaintiffs would have at least one year thereafter to attempt to relocate.

## CONCLUSION

The 2001 Amendments violate Plaintiffs' First and Fourteenth Amendment rights, threaten to impose immediate, irreparable, constitutional injury, and do not serve the public interest.  More specifically, speech will fare extremely poorly if the 2001 Amendments are enforced, as the existing 60/40 businesses in Manhattan cannot all be relocated to economically viable, commercially available, lawful locations consistent with the City's draconian zoning restrictions.  The City will derive very little benefit, if any at all, from forcing these businesses to move or close down, as the conditions in Times Square that precipitated the original zoning law in 1995 are gone and the neighborhoods in which the 60/40 businesses are located neither report nor have reported secondary effects attributable to them.  And even if the businesses attempt to comply with the relocation requirement, their ability to do so is tenuous at best, given that the City singles out adult and 60/40 businesses for differential permitting treatment which imposes potentially endless delays.  Moreover, Plaintiffs' businesses cannot realistically relocate and open in less than a year and likely would require *far* more, during which time they will be closed and the public's access to expression severely reduced.

For all of these reasons, Plaintiffs' Motion for Preliminary Injunctive Relief should be granted, and the Court should enjoin the City of New York from enforcing the 2001 Amendments during the pendency of this litigation.

Dated:       New York, New York
               November 21, 2018

Respectfully submitted,


__/s/ Daniel A. Silver_____
**DANIEL A. SILVER**
**SILVER & SILVER**
One Liberty Square
New Britain, Connecticut 06050
(860) 225-3518
dan@lawsilver.com


- and -

__/s/ Jennifer Kinsley_____
**JENNIFER KINSLEY**
**KINSLEY LAW OFFICE**
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
kinsleylawoffice@gmail.com


*Attorneys for Plaintiffs*
*725 Eatery Corp., etc., et ano.*

__/s/ Edward S. Rudofsky_____
**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**
601 West 26th Street, Suite 1315
New York, New York 10001
(212) 245-2222
erudofsky@zrlex.com


*Attorney for Plaintiffs*
*59 Murray Enterprises, Inc., etc.*
*et al.*

__/s/ John H. Weston_____
**JOHN H. WESTON**
**G. RANDALL GARROU**
**WESTON, GARROU & MOONEY**
12121 Wilshire Boulevard, Suite 525
Los Angeles, California 90025
(310) 442-0072
johnweston@wgdlaw.com
randygarrou@wgdlaw.com


- and -


**ALAN M. ABRAMSON**
**ABRAMSON & MORAK**
35 Worth Street
New York, New York 10013
(212) 226-7098
alanabramson@abramsonmorak.com


*Attorneys for Plaintiffs*
*Club At 60th Street, Inc., etc., et al.*