EXHIBIT L

**CITY PLANNING COMMISSION**

September 18, 1995/ Calendar No. 8        **N 950384 ZRY**

IN THE MATTER OF an application submitted by the Department of City Planning and the New York City Council Land Use Committee pursuant to Section 200 and 201 of the New York City Charter, for an amendment of the Zoning Resolution of the City of New York, relating to Sections 11-113, 12-10, 32-00, 32-01, 32-62, 32-69, 42-00, 42-01, 42-52, 42-55, 51-00, 52-38, 52-71, 52-734, 52-77, 52-82, 72-01, 72-40, concerning adult establishments.

This application for an amendment to the Zoning Resolution was filed on March 21, 1995. The proposed zoning text amendment would discontinue the current moratorium on new adult establishments and would provide permanent regulations governing the siting of adult establishments in a manner which works to protect against the adverse secondary effects of adult establishments while allowing sufficient opportunity for and access to adult materials.

**BACKGROUND**

Zoning Moratorium

On November 7, 1994, the City Planning Commission approved an application filed by the Department of City Planning for a zoning text change to establish a one-year moratorium on new adult establishments (N 950113 ZRY). The moratorium prohibited the location of new, and the expansion or enlargement of existing, adult bookstores, adult eating or drinking establishments, and

adult theaters.   The Commission approved the application after determining that the adverse secondary effects stemming from the location and proliferation of adult establishments warranted their regulation.  The moratorium was designed to provide sufficient time to develop and enact permanent zoning regulations for adult uses. The zoning text change establishing the moratorium was adopted by the City Council on November 23, 1994.

The Commission based its decision to impose the moratorium in part on a study conducted by the Department of City Planning ("Adult Entertainment Study," September 1994, DCP# 94-08, or "DCP Study"). The study was undertaken in response to growing concern that adult establishments were proliferating in New York City and concentrating in areas where such establishments had previously not located and were negatively affecting their surrounding communities.  The DCP Study assessed recent trends in the location of the adult establishments in New York City.  The Study also summarized the findings of studies from other jurisdictions as well as studies undertaken by groups within New York City regarding the impact of adult establishments on the surrounding area.[1]  The DCP

---

[1]     The DCP Study reviewed impact studies from Islip (NY), Los Angeles (CA), Indianapolis (IA), Whittier (CA), Austin (TX), Phoenix (AZ), Manatee County (FL), New Hanover (NC), and the State of Minnesota, all of which concluded that adult uses tended to produce adverse secondary effects.  The DCP Study also reviewed a June, 1993 study by the Times Square Business Improvement District, the August 1993 Chelsea Business Survey prepared by the Chelsea Action Coalition and Manhattan Community Board 4, the 1983 Annual Report by the Office of Midtown Enforcement, and the testimony from an October 6, 1993 public hearing by the Task Force on the

---

N 950384 ZRY                                                                    2

Study also included a survey by the Department of City Planning of the impact of adult establishments in areas of where they are located in less dense concentrations.

The Study made the following findings and conclusions:

- Numerous studies in other localities found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life.

- There has been a rapid growth in the number of adult entertainment uses in New York City. Between 1984 and 1993, the number of such uses increased from 131 to 177. The number of video/book stores/peep shows almost tripled and there was a 26 percent increase in topless/nude bars. Adult theaters declined by 52 percent.

- Adult entertainment is more readily accessible in NYC than it was ten years ago. There are more such establishments in a greater number of communities. Adult videos are produced in greater numbers and at lower costs. They are often available in general interest video stores as well as those devoted exclusively to adult entertainment. Cable television has significantly increased the availability of adult viewing material. Adult material is also available at newsstands and book stores.

- Adult entertainment uses tend to concentrate. The number of community districts with seven or more adult uses increased from three to eight over the last ten years. Seventy five percent of the adult uses are located in ten of the city's 59 Community Districts. In Manhattan, adult uses cluster in central locations, such as the Times Square area. In the other boroughs, adult uses appear to

Regulation of Sex-Related Businesses.

cluster along major vehicular routes, such as Queens Boulevard and Third Avenue in Brooklyn, that connect outer reaches of the city and suburbs to the central business district.

- Studies of adult entertainment uses in areas where they are highly concentrated, such as Times Square and Chelsea, identified a number of significant negative secondary impacts. In the Times Square area property owners, theater operators and other business people overwhelmingly believe that their businesses are adversely affected. An analysis of criminal complaints indicated a substantially higher incidence of criminal activity in the Times Square area where adult uses are most concentrated. In addition, the study found that the rate of increase in assessed property values for study blocks with adult uses grew at a slower rate than control blocks without adult uses.

- DCP's survey of areas with less dense concentrations of adult uses found fewer impacts than the study of the Times Square area. However, community leaders expressed concerns that adult uses impact negatively on the community and they strongly fear the potential results of proliferation.

- The strongest negative reactions to adult entertainment uses come from residents living near them.

- Where respondents indicated that their businesses or neighborhoods had not yet been adversely affected by adult uses, this typically occurred in study areas with isolated adult uses. Moreover, these same respondents typically stated that an increase in such uses would negatively impact them. Community residents fear the consequences of potential proliferation and concentration of adult uses in traditionally neighborhood-oriented shopping areas and view the appearance of one or more of these uses as a deterioration in the quality of urban life.

- Most real estate brokers report that adult entertainment establishments are perceived to negatively affect nearby property values and

decrease market values. Eighty percent of the brokers responding to the DCP survey indicated that an adult use would have a negative impact on nearby property values. This is consistent with the responses from a similar national survey of real estate appraisers.

- Adult use accessory business signs are generally larger, more often illuminated, and graphic (sexually-oriented) compared with the signs of other nearby commercial uses. Community residents view this signage as out of keeping with neighborhood character and are concerned about the exposure of minors to sexual images.

The Study concluded that the adverse effects of adult establishments justified their regulation. The Commission and the City Council agreed in adopting the moratorium, allowing time for the development and consideration of permanent regulations.

<u>The Proposal</u>

On March 21, 1995, the New York City Council Land Use Committee (Res. No. 897) and the Department of City Planning filed this joint application. A prior application (N 950166 ZRY) submitted by the New York City Council Land Use Committee was withdrawn.

The proposed zoning text change would repeal the current one-year moratorium on new adult establishments and the enlargement or extension of existing adult establishments (Section 11-113). The moratorium, which will expire in November, 1995, will not be needed if permanent zoning for adult uses is enacted.

N 950384 ZRY                                                                    5

The proposed text change would define (Section 12-10) adult establishments and four types of facilities – adult book stores, adult eating or drinking establishments, adult theaters, and other adult commercial establishments – which alone or in combination would constitute an adult establishment. These facilities, all commercial uses, include adult video stores, topless and nude bars, and peepshows; specifically excluded are commercial studios and business or trade schools. It would also define the types of materials or activities which must be present to make an establishment an adult establishment.

Under the moratorium text, the principal distinguishing characteristic of an adult establishment is that it is "customarily not open to the public because it excludes minors by reason of age." The proposed text refines the definition of adult establishment to articulate what constitutes an adult establishment. The definition's underpinnings are "specified sexual activities" and "specified anatomical areas," terms used in most zoning ordinances throughout the country. These terms specifically detail the distinguishing characteristics of adult establishments, allowing a clear understanding of what is proscribed by the regulations.

In commercial and manufacturing districts, adult establishments would be subject to special provisions (Sections 32-01 and 42-01) in addition to existing rules governing commercial uses in such

---

N 950384 ZRY

districts.

Under the special provisions, adult establishments would not be
allowed in C1, C2, C3, C4, ·C5, C6-1, C6-2, C6-3, nor M1
Manufacturing Districts that permit new residences, new joint
living-work quarters for artists, or new loft dwellings.  These
districts are: local retail and service districts mapped throughout
residential areas in all boroughs; waterfront recreation districts;
general commercial districts, providing regional shopping
opportunities in each borough; restricted central commercial
districts; certain lower density general central commercial
districts that permit residences and an array of commercial uses;
and mixed-use manufacturing districts.  Each of these districts
allows new residential uses (or other living quarters or loft
dwellings) and most community facility uses (e.g.; schools, which
include day care centers, and churches or houses of worship),
either as-of-right, by special permit, or by authorization.  Adult
establishments currently located within these zoning districts
would be required to terminate.

Adult establishments would continue to be allowed[2] in C6-4, C6-5,
C6-6, C6-7, C6-8, C6-9, C7, C8, M1 (other than mixed-use M1
Districts), M2, and M3 Districts, subject to certain limitations.

---

[2]     Prior to the moratorium, commercial uses that could also
be characterized as adult were generally allowed as-of-right in
most commercial and manufacturing districts.

---

N 950384 ZRY                                                    7

C6-4 through C6-9 districts, General Central Commercial Districts, are zoned for high commercial floor area ratios (10 or greater). C7 Commercial Amusement Districts allow large open commercial amusement establishments; C8 General Service Districts prohibit residential use and permit a broader range of service uses than other commercial zones. M1 (Light Manufacturing), M2 (Medium Manufacturing) and M3 (Heavy Manufacturing) Districts are characterized by industrial and commercial uses. C7, C8, M1 (other than mixed-use M1 Districts), M2, and M3 Districts do not permit new residences. Schools and churches are allowed as-of-right in C6 districts; they are not allowed in C7 districts. In C8 and M1 districts, schools are allowed by special permit; churches are allowed as-of-right in C8 districts and by special permit in M1 districts. Community facilities are not permitted in M2 or M3 districts. Allowing adult establishments to continue to locate in these districts affords access to adult materials in central locations of the City and in districts where new residences are precluded by zoning.

Within C6-4 through C6-9, C7, C8, M1 (other than mixed use M1 Districts), M2, and M3 Districts, adult establishments would continue to be allowed provided they are located at least 500 feet from a house of worship, a school or daycare center; or another adult establishment; or a district (other than a C6-4 through C6-9 District) in which new residences, new joint living-work quarters for artists, or new loft dwellings are permitted.

The proposed text would generally allow adult establishments that meet these zoning provisions to remain as conforming uses in such locations if a school, day care center or house of worship is subsequently established within 500 feet of it.   Adult establishments at permitted locations would be unfettered by the largely private locational decisions made subsequently by such community facilities.

Only one adult establishment, not to exceed in total 10,000 square feet of floor area and cellar space not used for enclosed storage or mechanical equipment, would be permitted on a zoning lot.

In addition, adult establishments that existed on the effective date of the zoning text change and are otherwise conforming adult establishments except that they are within 500 feet of one another, or located on the same zoning lot, or exceed 10,000 square feet, would not be subject to the amortization provisions discussed below.  Those establishments exceeding 10,000 square feet could not extend or enlarge beyond their current size.

The proposed text change would also limit the size, placement and illumination of accessory business signs on adult establishments. New accessory business sign regulations are proposed for adult establishments in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, and C8 Districts (Section 32-69).  In these districts, accessory business signs for adult establishments would be generally subject to the

more restrictive sign regulations that apply to commercial uses in C1 Districts, and would be further limited to a maximum of 150 square feet per establishment, of which no more than 50 square feet may be illuminated and no portion may be flashing.

In M1, M2, and M3 Manufacturing Districts, accessory business signs for adult establishments would be limited to a maximum of 150 square feet per establishment, of which no more than 50 square feet of signage may be illuminated non-flashing (Section 42-55). In addition, such signs would not be permitted on the roof of any building or extend to a height greater than 25 feet above the curb level. These provisions would conform to the proposed sign regulations for adult uses in manufacturing zones with those sign regulations proposed for adult uses in commercial districts.

The proposed limitations on accessory business signs for adult establishments allow adult establishments to identify themselves and the products, performances or services offered within them. The content of the signage would not be regulated under zoning.

Language would be added making it clear that a non-conforming use could not be changed to an adult establishment unless it would meet the special provisions for adult establishments in Section 32-01 or 42-01 (Section 52-38).

N 950384 ZRY                                                                    10

Existing adult establishments and accessory business signs that do not conform to the proposal would be generally required to terminate (or change their operations to make them conforming) within one year of the effective date of this text change, or within one year of a subsequent map change (Sections 52-734 and 52-77). If the owner of a non-conforming adult establishment or non-conforming accessory business sign were unable to substantially recoup its investment in the adult component of the establishment within the year, it may apply to the Board of Standards and Appeals (BSA) for additional time to recover substantially all of the financial expenditures related to the adult nature of the use or sign.

The proposal would require such applications to be made at least 120 days before the termination date. In order to grant an extension, an applicant must demonstrate to the BSA and the BSA must find that the applicant has made substantial expenditures related to the non-conformity before the use became non-conforming; that the applicant has not substantially recovered the related investment; and that the period for which the establishment or sign may be continued is the minimum period sufficient to recover the investment.

On April 10, 1995, the City Planning Commission clarified language in the proposed zoning text and referred it for community review.

N 950384 ZRY

# ENVIRONMENTAL REVIEW

This application (N 950384 ZRY) was reviewed pursuant to the New York State Environmental Quality Review Act (SEQRA), and the SEQRA regulations set forth in Volume 6 of the New York Code of Rules and Regulations, Section 617.00 et seq., and the New York City Environmental Quality Review (CEQR) procedures set forth in Executive Order 91 of 1977. The designated CEQR number is 95DCP038Y. The Lead Agency is the City Planning Commission.

After a study of the potential environmental impacts of the proposed action, a Negative Declaration was issued on April 10, 1995.

Minor revisions were made to the proposed zoning text. On September 18, 1995, it was determined that the revisions constitute a minor modification of the proposed text amendments and the Negative Declaration issued on April 10, 1995 remains valid.

# WATERFRONT REVITALIZATION PROGRAM CONSISTENCY REVIEW

The proposed action's consistency with the Waterfront Revitalization Program (WRP) was assessed and disclosed in the Environmental Assessment Statement (EAS). The EAS disclosed that the proposed action would be consistent with the policies of the WRP.

---

N 950384 ZRY

**PUBLIC REVIEW**

On April 10, 1995, the proposed zoning text change was referred to the community boards for 60 days, and the Borough Boards and Borough Presidents for an additional 30 days, for information and review in accordance with the procedures for referring non-ULURP matters.

**Community Board Review**

The Commission received recommendations from the following 39 community boards.  A copy of each board's full recommendation is attached to this report.

The Bronx Community Boards:  1, 2, 3, 4, 5, 7, 9, 10, 11,12
Brooklyn Community Boards:  1, 2, 6, 8, 9, 13, 15
Manhattan Community Boards:  1, 2, 3, 4, 5, 6, 7, 8, 9, 12
Queens Community Boards:  1, 2, 3, 4, 5, 6, 7, 8, 9
Staten Island Community Boards:  1, 2, 3

Eleven community boards voted in favor of the zoning plan; eleven boards voted in favor of the proposal with modifications that would make it more restrictive; four voted in favor with modifications that would make it less restrictive; and thirteen voted against the proposal.

N 950384 ZRY                                                                 13

Of the thirteen community boards voting against the proposal, six of the community districts contained areas where adult uses would continue to be allowed and wanted more restrictions in these areas. Four other community boards voting against the proposal wanted adult establishments banned entirely. Of the remaining three other community boards voting against the proposal, two asked that it be withdrawn and one did not explain its action.

A general summary of the suggested changes follows.

Modifications that would make the proposal more restrictive

1)   Increase the minimum distance between adult establishments, or between adult establishments and churches, schools and day care centers from the proposed 500 feet to 750 or 1,000 feet. **(The Bronx Community Boards 11 and 12; Manhattan Community Board 12; Queens Community Boards 1 and 6; Staten Island Community Boards 1 and 3)**

2)   Add other uses to the list of sensitive receptors, such as parks, playgrounds not connected with a school, landmarks, greenways, nursing homes, recreational facilities, legal non-conforming residences located within manufacturing districts, and waterfront areas. **(The Bronx Community Boards 11 and 12; Brooklyn Community Board 6; Manhattan Community Boards 6 and 12; Queens Community Board 5; Staten Island Community Boards**

---

N 950384 ZRY                                                           14

1 and 2)

3)   Further restrict signage and/or limit the street frontage for
     adult establishments.  (Manhattan Community Boards 4, 5 and 6;
     Staten Island Community Board 1)

Modifications that would make the proposal less restrictive

1)   Allow new adult uses to locate in all commercial districts
     subject only to the 500 foot restriction from a residential
     district.  (Manhattan Community Boards 4, 5 and 6)

2)   Allow new adult uses to locate in regional shopping districts,
     in   addition   to   general   central   commercial   districts.
     (Manhattan Community Board 4)

3)   Reduce  the  minimum  required  distance  from  adult  uses  to
     residential  zones  from  500  as  proposed  to  100  feet.
     (Manhattan Community Board 6)

4)   Allow some or all of the existing adult establishments to be
     grandfathered.  (Manhattan Community Board 2)

Modifications that would clarify the text

1)   Refine the definition of "substantial" as used in the proposed
     zoning text.   Specifically exempt from the regulations art

---

N 950384 ZRY                                                           15

galleries, museums and legitimate theaters. Add to the proposal certain language from the adult use moratorium text concerning prohibiting minors in adult establishments. **(Manhattan Community Boards 1, 4, 5, and 6; Queens Community Board 7)**

2) **Limit the ability of the Board of Standards and Appeals to extend the time to amortize an adult establishment to a specific number of years. (The Bronx Community Board 11; Manhattan Community Board 12)**

Several suggestions were unrelated to zoning. Some examples include the suggestion to prohibit adult establishments from locating in city owned or controlled projects, such as industrial parks and urban renewal areas, and to encourage other governmental agencies such as the Port Authority to prohibit adult establishments in their airports and empowerment zones. Others concern requiring an adult establishment to obtain a license or permit from a city agency such as the Department of Consumer Affairs, so that the community boards would be apprised of new adult establishments. Still others would result in a dedicated enforcement agency in addition to the Department of Buildings, such as Consumer Affairs, the Police Department, or the Office of Midtown Enforcement.

**Borough President Review**

The President of the Borough of The Bronx, on July 17, 1995, recommended approval of the application with modifications, as follows:

> Prohibit adult establishments to locate within 1,000 feet of sensitive receptors and each other. The current proposal establishes a 500 feet minimum distance requirement which should be increased to 1,000 feet.
>
> Add the following to the uses from which a minimum distance of 1,000 feet would be required for establishment of adult uses.
>
> Community Facility uses listed in Use Group 3A (Section 22-13) of the Zoning Resolution which includes: Colleges or Universities, Residential care facilities (Shelters), Libraries and museums, Not-for-profit hospital staff dwellings, Nursing Homes
>
> Parks and public recreational facilities
>
> Day care Facilities, which should be further defined to include: nurseries, pre-schools, head start programs/centers, child care establishments
>
> Create an effective mechanism for enforcement as the Department of Buildings lacks the resources for meaningful enforcement of the current regulations.

The President of the Borough of Manhattan, on July 10, 1995, recommended against approval of the application. She wrote:

> Despite my conviction that the potential secondary effects in areas surrounding some adult establishments do warrant further regulation, I have concluded that the zoning text amendments now under consideration do not satisfactorily address the complex issues related to these businesses and their impacts. This proposed zoning text is neither in the best interest of many specific

N 950384 ZRY

neighborhoods, nor of the city as a whole. Without substantial revision, the City will fail to protect all the communities whose interests are affected by the proposed text amendments. Indeed, these amendments are City Hall's false promise to neighborhoods that it is responsibly and effectively dealing with this complicated set of issues.

The communities of this city that are now burdened by the impacts of a burgeoning adult-entertainment industry are entitled to a plan that both promotes fairness and provides real relief. This proposal, by contrast, would produce severely inequitable impacts.

The vast majority of the land areas identified as "available" for adult establishments to locate are in public ownership, or otherwise severely restricted. Since the adult-entertainment industry will not, in fact, be able to locate in these areas, it will gravitate instead to those few mixed use commercial areas where such businesses would remain legal, effectively stigmatizing these areas as the only viable adult establishment districts. This is unacceptable.

In addition, by applying a generic standard to a very diverse urban landscape, the proposal threatens the economic and social survival of neighborhoods -- especially those integral to our city's gay and lesbian communities -- where the presence of a spectrum of adult-use businesses has invigorated, rather than hindered, the quality of life.

In sum, far from representing a solution to the problems that have cropped up with the expansion of adult establishments, the current zoning proposal offers only the temporary illusion of a plan to make everything "go away." It is very unlikely to pass constitutional muster. Fairly analyzed with a view toward prior court precedents, it does not identify a reasonable enough range of viable locations for adult establishments to continue to locate to survive the inevitable legal challenge.

The President of the Borough of Staten Island, on July 19, 1995, recommended approval of the application with modifications, as

N 950384 ZRY                                                                    18

follows:

> A distance of 750 feet from all residential zones, public
> benefit uses such as proposed and existing parks,
> trailways, esplanades, libraries, museums, historic
> sites, day care, senior centers and must be excluded from
> any Economic Development Zones.

A copy of each Borough President recommendation is attached.

**Borough Board Review**

All of the Borough Boards submitted recommendations respecting the proposed text.

The Bronx Borough Board, on June 22, 1995, voted to approve the proposed zoning text change conditioned on the following modifications to the proposal:

> Prohibit adult establishments to locate within 1,000 feet
> of sensitive receptors and each other. The current
> proposal establishes a 500 feet minimum distance
> requirement which should be increased to 1,000 feet.
>
> Add the following to the uses from which a minimum
> distance of 1,000 feet would be required for
> establishment of adult uses.
>
> Community Facility uses listed in Use Group 3A (Section
> 22-13) of the Zoning Resolution which includes: Colleges
> or universities; Residential care facilities; Libraries
> and museums; Not-for-profit hospital staff dwellings;
> Nursing homes
>
> Parks and public recreational facilities
>
> Day care Facilities, which should be further defined to
> include: nurseries; pre-schools; head start

N 950384 ZRY

programs/centers; child care establishments

Should the proposed zoning text amendment go through adjudication, an extension of the moratorium be initiated to guard against additional uses being established before a judgement is rendered.

The Brooklyn Borough Board on June 20, 1995, voted 21-0-0, to disapprove the application, requesting an extension of the existing moratorium " . . . until such time that a zoning resolution is submitted which adequately protects Brooklyn's neighborhoods." The Borough Board stated: the proposal "regulates the location, proximity, size and signage of adult establishments inequitably throughout the city"; the 500 foot radius does not provide adequate protection; there is no maximum time limit for amortizing non-conforming adult establishments; and, concentrations of adult establishments may result in particular neighborhoods.

The Manhattan Borough Board, on July 20, 1995, voted against the proposal, stating that there was a need to enforce existing sign and nuisance laws, suggesting that consideration be given to more stringent sign and window display restrictions for adult establishments; questioning the appropriateness of zoning controls as the best regulatory tool for adult establishments; noting that some Borough Board members support the proposal's anti-concentration provision; suggesting that the definitions should be improved for clarity and to avoid potential abuse; requesting a formula for amortization; and recommending a registration program

N 950384 ZRY

for adult uses to fund adequate enforcement and provide community notification, review and approval.

The Queens Borough Board, on July 25, 1995, voted 13-0-0 to approve the proposal conditioned on the following:

> The 500 feet minimum distance requirement is extended to 1,000 feet to provide adequate protection for our communities against adverse secondary impacts of adult establishments;
>
> Modification of the proposal to prohibit the location of adult uses in manufacturing districts that are within an approved General Project Plan (i.e. Queens West, College Point Corporate Park) and to restrict such uses to within 1,000 feet of the boundaries of such Plan;
>
> Modification of the proposal to prohibit the location of adult uses on waterfront properties in Queens that are zoned for manufacturing use;
>
> The Office of Midtown Enforcement be charged with the responsibility of monitoring the activities of all adult establishments citywide.

The Staten Island Borough Board, on July 5, 1995, voted 4-0-3, to approve the proposal with modifications/conditions, as follows:

> A distance of 750 feet from all residential zones, public benefit uses such as proposed and existing parks, trailways, esplanades, libraries, museums, historic sites, day care, senior centers and must be excluded from any Economic Development Zones.

Borough Board recommendations are attached.

N 950384 ZRY                                                                            21

City Planning Commission Public Hearing

On July 12, 1995 (Calendar No. 10), the City Planning Commission scheduled July 26 and July 27, 1995 for a public hearing on this application.  The hearing was duly held on July 26, 1995 (Calendar No. 23), and adjourned.  The hearing was continued on July 27, 1995 (Calendar No. 1), and closed.

Eighty speakers testified, 24 in favor and 56 opposed to the application.  Written testimony, correspondence and petitions were also submitted both in favor of and in opposition to the application.

Those speaking in favor of the proposal included the Deputy Mayor for Planning and Community Relations, the Director of the Mayor's Office of Midtown Enforcement, two councilmembers representing districts in Brooklyn and Queens, representatives of the Real Estate Board of New York, the League of American Theater Producers, the Times Square Business Improvement District, the Grand Central/34th Street Partnerships, the 42nd Street Development Project, Inc., the Tribeca Community Association, COMET (Communities of Maspeth Elmhurst Together), three community boards located in The Bronx, Manhattan and Queens, the Queens Village Civic Association, the Rose Hill Civic Association (Manhattan), the

N 950384 ZRY                                                                22

Common Ground Community (Times Square), and several individuals. A representative of the Borough President of The Bronx spoke in favor of the proposal on the condition that it be modified to be more restrictive.

Written testimony or material in support was submitted by a councilmember representing the East Side of Manhattan, the St. Ambrose Council, No. 1463, Knights of Columbus (College Point), St. Malachy's Catholic Church (Times Square area), the New York Foundling Hospital, the Hotel Association of New York City, Inc., three Members of the Assembly representing districts located in Queens, the Sunset Park Restoration, the Preservation League of Staten Island, a gallery owner in the Times Square area, the Joint Community Council of College Point, Inc., and numerous letters were submitted by individuals.

Those speaking in opposition included the Borough Presidents of Brooklyn and Manhattan, five councilmembers representing districts in Brooklyn and Manhattan, counsel for the Coalition For Free Expression, five members of the legislature representing assembly or senatorial districts located in The Bronx, Brooklyn and Manhattan, a representative of the New York Civil Liberties Union, the proprietor of an adult establishment, two employees of adult establishments, a representative of the Working Group for Free Expression, the Leslie-Lohman Gay Art Federation, the National Coalition Against Censorship, the New York City Americans for

Democratic Action, the Empire State Pride Agenda, Lambda Legal Defense and Education Fund, Feminists for Free Expression, an adult video store owner, the publisher of a newsletter related to the adult entertainment industry, two representatives of Brooklyn and Manhattan community boards, counsel representing the Herald Square South Civic Association, a representative of the Gay and Lesbian Independent Democrats, Care About The Slope (Brooklyn), the Gowanus Canal Community Development Corporation and Carol Gardens Association, Inc., the Friends of the North Shore Greenbelt on the Staten Island Waterfront, and many individuals.

Written testimony or material in opposition was submitted by the Brooklyn Chinese-American Association, the Fashion Center District Management Association, the Franklin Furnace, Our Lady of Good Counsel Church (Staten Island), the Gay Men's Health Crisis (GMHC), Faith United Methodist Church (Staten Island), St. John's Lutheran Church (Brooklyn), the Riverbay Corporation Co-op City, the Federation of Italian-American Organizations of Brooklyn, Ltd., the Concerned Citizens of Withers Street and Area Block Association, Inc., Americans for Decency (Staten Island), Staten Island Friends of Clearwater, the pastor of S.S. Cyril and Methodius Roman Catholic Church (Brooklyn), the Polish American Congress - Downstate NY Division, Concerned Citizens of Greenpoint, a representative of Community Board No.1, Brooklyn, Lambda Associates of Staten Island, two Members of Congress representing districts located in The Bronx and in Manhattan, five Members of the Assembly

representing districts located in Brooklyn and Manhattan, and more than 3,000 petitions or letters were submitted from individuals.

The reasons cited in testimony in favor of or in opposition to the proposed zoning text amendment often mirrored the testimony related to the adult use zoning moratorium. Those in favor of the proposal generally noted the adverse secondary effects of adult establishments, both when concentrated in small geographic areas, such as in the Times Square, Chelsea and Queens Boulevard areas, or when dispersed in commercial and residential neighborhoods throughout the City. They expressed concern with quality of life issues such as public loitering and litter; increased crime, including prostitution near where adult establishments have proliferated or concentrated; adverse economic impacts on real estate values or economic activity; the proliferation of adult uses into neighborhoods where they have not traditionally located, including residential and local commercial areas; and inappropriate signage, out of character with other commercial signs in the area.

Some of those testifying in opposition to the zoning plan generally cited what they believe would be inappropriate or unconstitutional restraints on speech. Others testifying indicated their belief that the regulations would have a disproportionate impact on certain groups such as the gay and lesbian communities. A number of speakers expressed their fear that the regulations would be used to target and shut down a number of establishments with a gay and

lesbian clientele.  One speaker questioned the sufficiency of the environmental analysis.

The great preponderance of testimony against the zoning application, however, reflected the perception that the proposal was not restrictive enough and that adult uses should be prohibited in more areas of the City.

Several testifying for or against the proposal noted the negative impacts of adult establishments, especially when located in concentration.  The theater organization representative stated: "Whenever we saw bookstores, peep shows, whenever we saw massage parlors, topless bars, there were street problems.  The theater people didn't just come out like you would have from a department store.  They were hustled."  The Director of the Office of Midtown Enforcement testified that it has been that agency's experience "when adult establishments begin to locate in particular areas, they attract other similar enterprises, and an atmosphere is created that soon leads to the opening of massage parlors, other types of brothels and variations of illegal sex-related businesses . . . Between December of 1991, and I think it was June of 1994, we closed 45 brothels that opened along Queens Boulevard and Roosevelt Avenue areas and they sprung up when the adult video stores and entertainment businesses started to move to Queens."

The Times Square Business Improvement District testified about that

N 950384 ZRY

District's study of adult establishments: "Our findings, comparing control blocks to study blocks and drawing on official data from the Police Department and Department of Finance, show a slower increase in property values for blockfronts and individual, properties near pornographic establishments, and a correlation between the concentration of such establishments and increased criminal complaints as well as arrests." The representative of the 42nd Street Development Project testified in favor of the proposal to regulate adult establishments, and referring to Disney's renovation of the historic New Amsterdam Theater; The New 42, a renovation of the Victory Theater as a performing arts venue for young people; and Madame Tussaud's, stated: "In our view, none of these exciting new entertainment uses would have come to 42nd Street if we had not been making progress toward the goal of eliminating blight from the Project area."

The representative of the Real Estate Board testified that "Leasing brokers have reported increased difficulties, delays and additional costs when offering space to potential tenants when adult uses are visibly operating in the vicinity." To buttress his statement, he noted the difficulty World Wide Plaza had in securing a major long-term tenant until a nearby adult use was eliminated, and that Citicorp conditioned its commencement of construction of its new headquarters building on the departure of adult establishments from the east midtown area. The general counsel to the Grand Central and 34th Street Partnerships cited the negative economic effects of

N 950384 ZRY

adult establishments in midtown Manhattan by testifying "Finally, I wish to emphasize that the issue here is economic impact. In my judgment, after having been involved in efforts to redevelop midtown over the last 5 years, sex-related businesses are an obstacle to economic development." The gallery owner testified "Recently a topless bar opened across the street from me and there has been a drop of about 25% in my walk-up business." A community board member from Manhattan noted the negative effects of the proliferation of adult establishments and their visibility in her community district: "There used to be one (adult establishment) . . . in Tribeca . . . In recent years there has been a proliferation and they are on Canal, on Reade, they are on White, and Murray and Church Street. Parents don't have a choice where they walk their kids."

Several testifying against the proposal noted impacts stemming from adult establishments. For example, the Borough President of Brooklyn testified that he believes adult uses such as "topless bars, triple X video stores, and strip clubs . . . place a burden on our neighborhoods and jeopardize the stability of our communities." Impacts of adult establishments were also noted by a councilmember testifying against the proposal. In response to a question from the Commission about whether communities view the signage and window displays as the problem with adult establishments or whether the problem stems from activities within the establishments, the councilmember testified about a topless bar

located near his home that "did not advertise much." He stated:
"There used to be a topless bar around the corner from where I live
. . . that women who went to the health club down the street, who
came out at ten at night, and were on their way home were being
accosted by the patrons of that club . . . " He continued that in
addition to police reports about guns and drugs that were being
drawn into the area because of what he said was going on inside the
club, "It was making Brooklyn Heights into a red light zone with
one establishment." Another councilmember from Brooklyn testifying
in opposition to the proposal noted that a community organization
which fights prostitution works in the same corridor in Sunset Park
that is home now to most of the adult uses in Brooklyn.

A number of individuals expressed concern that the proposal would
alter the current location of adult establishments, benefitting
certain neighborhoods where adult uses are currently located but
would not be allowed under the proposal, to the detriment of other
neighborhoods with few if any adult establishments. Brooklyn
Borough President labelled the proposal "unfair," noting that
certain neighborhoods in that borough "that do not presently have
sex related businesses are vulnerable to concentrations that could
produce new red light districts." The Borough President of
Manhattan testified "I am glad the dispersal rules will reduce the
concentration around Times Square . . . but I oppose putting unfair
pressures on areas such as the blocks south of Herald Square and
other vital places where people live, work and go to school." A

N 950384 ZRY                                                       29

councilmember from Brooklyn and a councilmember from Manhattan described the plan as "guaranteeing" the relocation of existing adult businesses to locations where they would continue to be allowed under the new zoning but do not currently exist, creating "the incentive for such stores to shoe-horn themselves into every possible available site." The Bronx Borough President testified that the proposal would unduly impact the South Bronx and Hunts Point where businesses "will be vulnerable to the secondary effects of adult entertainment uses."

Others testified that the proposal would unduly limit access to adult materials. Counsel to the Coalition for Free Expression, representing many speakers, stated his belief that less than one percent of the land area of Manhattan would be available under the plan for adult establishments, and that not all sites may be suitable for adult uses. A representative of a lesbian and gay advocacy organization testified that the proposal "will rid predominantly lesbian and gay neighborhoods of so-called adult use establishments that have not only peacefully existed for years, but have provided sexually explicit materials in safe, gay-friendly, sex-positive environments." The Borough President of Manhattan testified that she opposed "the impact of this proposal on areas such as Christopher Street . . . (where adult) uses would be wiped out."

Considerable testimony was received about the language of the

proposed zoning text, particularly as it defines adult establishments. Speakers noted the importance of having clear language so that the regulations would not enforced against activities or establishments that were not intended to be captured by the proposal. An AIDS activist writer stated his opposition to the proposed zoning text because "under it some building inspector would decide if the material at the experimental theaters I frequent would be actionable or not. The WOW Cafe is New York City's lesbian theater. If several pieces in a given season deal explicitly with lesbian sexuality, would WOW run afoul of the law?" He stated that the proposed text exposes what he characterized as pioneering performing venues specializing in provocative material, much of which is sexual, to potential harassment.

Testimony was offered by a number of speakers that signs for adult establishments were out of character with the neighborhoods in which such establishments were located. The representative of the Rose Hill Civic Association in Manhattan testified that an adult video store in that neighborhood has "in your face signage." He noted further that a general interest video store in the neighborhood has an adult section within the store: "No one objects to that. No one in a million years objects to that." Others testified that regulating signs alone was sufficient to blunt the impact of adult establishments. The negative impact of signage was discussed above in the testimony of the councilmember from Brooklyn. The Borough President of Manhattan testified that

she favored "strengthening the signage laws, to reduce the visually assaultive nature of some of these uses and control the impacts . . . (making) a simple walk to school or the supermarket feel like a gauntlet of out-of-place flashing neon in some communities." A community board member from Manhattan testified that she, as a feminist, was offended by the signage of an adult establishment in Tribeca, and stopped patronizing a retailer adjacent to the adult establishment when the adult use moved in. An individual testifying in opposition to the plan submitted testimony that " . . . there is a sexually-oriented video store on Amsterdam Avenue in the mid-70s that would probably not be considered a problem were modest 'time place and manner' regulations going to window and light display adopted." A representative of a midtown Manhattan community district, which supported part of the zoning plan, noted the community board's support " . . . of even more stringent regulations for signs and window displays as other people mentioned tonight."

The three Borough Presidents who supported the proposal with conditions that would make it more restrictive, Queens, Staten Island and The Bronx, suggested that additional uses be considered sensitive receptors and the buffer between zones where adult establishments would continue to be located and those where adult uses would be prohibited be increased from 500 feet to either 750 or 1,000 feet. The Bronx Borough President testified that sensitive receptors should include community facility uses listed

in Use Group 3A of the Zoning Resolution, and parks and public recreation facilities.  He also called for expanding the definition of day care centers to include:  nurseries, pre-schools, Head Start programs/centers, and child care establishments.

CONSIDERATION

The Commission believes that the adoption of the proposed zoning text creating permanent regulations for adult establishments is, as modified in the manner described below, an appropriate and necessary response to the adverse secondary effects stemming from adult establishments.  The proposed text comprehensively addresses the aspects of adult establishment operations shown to have such adverse effects in a manner.  At the same time, the proposal continues to provide ample opportunity for adult establishments to locate and operate throughout New York City.  The Commission is reaching this conclusion based on the findings of the DCP Study, the study conducted by the Times Square BID, the Chelsea Business Survey, the Task Force on the Regulation of Adult Businesses, and public testimony received in the course of the Commission's review of the proposed text as well as the testimony received in connection with the adult use moratorium.  Studies conducted in a variety of jurisdictions throughout the country regarding the detrimental effect of adult establishments on the surrounding neighborhoods are consistent with and support the Commission's conclusions regarding New York City.

Efforts to regulate adult uses in New York City date back to the mid-1970s. In 1977, the City Planning Commission adopted zoning provisions regulating adult uses after finding that adult establishments generated adverse secondary effects. In its report, the Commission cited several adverse secondary effects stemming from adult establishments, including their negative impact on business and development, increased criminal activity, their damaging influence on minors and their disruptive impact on neighboring residential communities and the youth of these communities.

While the 1977 regulations were never adopted by the Board of Estimate, the adverse secondary effects shown to be associated with these sorts of establishments have continued to the present day, particularly where the establishments have located in concentration. The Times Square area, the historical situs of adult establishments, demonstrates the myriad of problems resulting from the location and concentration of adult establishments. Studies prepared by the Times Square BID and testimony from representatives of the Times Square BID, the Office of Midtown Enforcement, the 42nd Street Development Project, Inc., and the Common Ground Community document a higher incidence of crime and lower property values on blocks with adult establishments as compared to blocks without adult uses, economic disinvestment in these areas, high sanitation and police costs, more public loitering, an atmosphere of intimidation, a general loss of quality

of life, and the tendency for other adult activities, including illegal activities, to locate in adjoining areas.

The 42nd Street corridor between Seventh and Eighth Avenues languished for years as a blighted, dirty, unsafe area with run-down buildings, enough so that it was designated an urban renewal area. While economic activity and development was underway in nearby areas of the City, this corridor remained an uninviting location for businesses. A similar situation is presently occurring along Eighth Avenue in Times Square as new adult establishments have concentrated in this area. Public loitering and litter has increased dramatically on one block in the wake of three adult uses opening in close proximity to one another, creating an atmosphere of fear and impacting negatively on the quality of life on the block. Retailers have stated their unwillingness to locate on the block because of the character of the area.

Moreover, statistics for this area indicate that property values increase and criminal activity drops when the adult uses leave an area. As the state has taken control of a major portion of the 42nd Street block and adult establishments have moved, crime decreased dramatically and the area's cleanliness ratings have substantially improved. Economic activity has followed, including plans for the renovation and reuse of the New Amsterdam and Victory Theaters, the development Madame Tussaud's, and plans for a hotel

and entertainment complex.  This activity would not be taking place if the blighting influence of adult establishments remained in the project area.

As documented by the DCP Study, Times Square is no longer the only place in the City with a concentration of adult uses.  Instead, in recent years adult establishments have begun locating in a variety of areas, including areas which previously had no adult uses, throughout New York City.  As further documented by the DCP Study, adult uses tend to concentrate.  Over the past ten years the number of community districts having seven or more adult uses has grown from three to eight.  Seventy-five percent of adult establishments are located in just ten of the city's 59 community boards.

As adult uses have begun concentrating in new areas, adverse secondary effects similar to those identified in Times Square have followed.  The Chelsea Business Survey documents a high incidence of indoor prostitution arrests and other illegal sex-related activities in areas with concentrations of adult establishments. The Office of Midtown Enforcement similarly reported that it has closed down numerous illegal sex related businesses in the Chelsea area adjacent to the adult establishments.  OME also noted that the illegal businesses continue to open and are drawn to the area by the presence of the adult uses.

Furthermore, the Chelsea Business Survey showed that a large

N 950384 ZRY

majority of the commercial tenants in the area reported a negative impact on the economic vitality of their businesses stemming from the proximity of adult uses.  An even larger percentage believe that the concentration of adult businesses has resulted in a declining potential for doing business in Chelsea.  The general counsel of the 34th Street BID reported a similar situation in a nearby area, noting that while other portions of the BID were experiencing an economic boom, retail operators did not want to open on 33rd Street between 5th and 6th Avenues, the site of three adult uses.

Testimony from elected representatives and residents from other areas of the city with concentrations of adult uses, such as Sunset Park in Brooklyn and Queens Boulevard in Queens, reported a litany of adverse effects stemming from the establishments including a high incidence of prostitution arrests (Sunset Park); an impediment to economic activity (Sunset Park and Queens Boulevard); disorderly conduct, public loitering and litter (Queens Boulevard); a high incidence of criminal activity related to illegal sex-related businesses (Queens Boulevard); and a negative impact on the community's children and residential neighborhoods (Sunset Park and Queens Boulevard).  In support of this testimony, a representative of the Office of Midtown Enforcement noted that between December of 1992 and June of 1994 the Office had closed down 45 brothels along Queens Boulevard and Roosevelt Avenues.  The representative noted that the establishments started springing up when adult video

stores and adult entertainment businesses began opening up in this area.

The studies and the public testimony heard by the Commission also demonstrate the existence of adverse secondary effects stemming from adult establishments even when located in isolation. According to 80% of local real estate brokers responding to DCP surveys, the presence of a single adult establishment would have a negative impact on nearby property values and would decrease property values. This concern is mirrored by the testimony of the Brooklyn Borough President who attested to the negative impact of a single adult use on the nearby Metrotech development. Other significant real estate transactions and development projects have not gone forward because of the proximity of an adult establishment or were made contingent on the departure of the adult establishment, such as the Worldwide Plaza project in west midtown.

In addition, the testimony and studies demonstrate that residential communities and local retail strips are particularly susceptible to the adverse impacts of isolated adult uses. Area residents and elected officials report that a single adult use in a local retail area negatively changes the character of the area and impacts on the economic viability of nearby retail uses. Parents are concerned about the exposure of children to adult materials and strongly object to raising families in properties adjoining adult uses; indeed the strongest negative reaction to adult

establishments comes from persons living near them. The residents believe that both their property values and quality of life decline due the presence of adult uses.

Finally, the studies and public testimony document the negative impact stemming from many of these establishments' signage. While information from the Office of Midtown Enforcement and several of the BIDs indicates that the great majority of the existing business signs fully comply with zoning, substantial testimony was produced indicating that in many areas, the amount of illumination and the amount of signage was out of character with the surrounding neighborhood and had a detrimental effect.

In sum, the studies and testimony indicate substantial adverse secondary effects stemming from the location and concentration of adult uses. These include: the negative impact adult establishments have on economic development and revitalization; their tendency to decrease property value, thereby limiting tax revenue; an impediment to economic activity; their tendency to encourage criminal activity, particularly when the establishments are located in concentration; the proliferation of illegal sex-related businesses; their damaging impact on neighborhood character and residents including children; and the costs associated with maintaining and patrolling areas.

This demonstration of substantial adverse secondary effects

stemming from the location and concentration of adult uses convinces the Commission of the need to establish a framework for regulating the location of adult uses. Moreover, the Commission believes that the appropriate time to impose these regulations is now. The deleterious effects of adult establishments have gone unchecked for too long a time. Prior to the enactment of the moratorium text, adult uses had begun opening at a fast rate in areas throughout the city, including neighborhood retail and residential areas which historically did not have adult uses. In many cases the new adult uses located in close proximity to other adult establishments, aggravating the negative impact to the surrounding community. While the moratorium has successfully halted this trend for the past several months it will go out of effect at the end of November. Without permanent regulations in place, the ability to locate adult establishments in new areas and create new areas of concentration would once again be permitted. This would have a devastating impact on the future well-being of many New York City neighborhoods and must not happen.

Studies conducted in other jurisdictions support the Commission's conclusions regarding the impact of adult establishments. These studies indicated a number of adverse effects stemming from the location and operation of adult establishments similar to those found in New York City, including: creating impediments to economic development and negatively impacting the value of commercial and residential properties, increased criminal activity, increased

N 950384 ZRY

litter and public loitering, negative impacts residential neighborhoods, and harm to quality of life.

The municipalities surveyed in these other studies are varied, ranging from large, populous cities like Los Angeles and Phoenix, to suburban municipalities such as Islip, New York. New York City has a similar variety of neighborhoods, from dense, mixed-use highly urban areas, to single and two-family neighborhoods in many parts of the outer boroughs, to almost rural areas in portions of Staten Island. Thus, while none of the other studies considers a municipality which duplicates New York City in terms of variety of neighborhoods and built conditions, combined they have attributes of the range of neighborhood conditions found in New York City. The findings of adverse secondary effects and the conditions found in these other studies are relevant to the different neighborhoods of New York City and emphasize the need for regulation to respond to the adverse secondary effects of adult establishments.

While New York City is a unique municipality in many ways, it is not unique in having a variety of neighborhoods, residents and businesses being subjected to the adverse secondary impacts of adult establishments. Suggestions made during the public testimony that the uniqueness of New York City precludes providing New York City residents and neighborhoods with protection against the negative impacts of these establishments are a disservice to the many neighborhoods and individuals of New York City and ignore the

very real harm tending to stem from adult establishments. The Commission notes that numerous other jurisdictions, including the ten most populous cities in the country after New York City, regulate adult establishments in order to combat their adverse secondary effects. The large majority of the ordinances analyzed use techniques similar to those included in this text to respond to the adverse secondary effects.

The Commission also agrees that the proposed regulations, modified as noted below, provide the appropriate framework of regulation. The regulations are designed to minimize the potential for adverse secondary effects throughout the city and provide additional protection to those areas and uses particularly vulnerable to the negative effects of adult uses. The requirement that adult uses may not locate closer than 500 feet from one another, coupled with the requirements that they be at least 500 feet from schools, day care centers, and houses of worship, guarantees that no community will see a concentration of adult uses. Limiting the size of adult establishments to 10,000 square feet ensures that no community will see a "de facto" concentration of adult uses within a single establishment.

The requirement that they be at least 500 feet away from residential districts, from commercial districts other than high density C6-4 through C6-7 districts, and from manufacturing districts permitting new residential uses protects sensitive

N 950384 ZRY

residential areas and local retail strips from the adverse effects of even a single adult establishment. The requirement that they be located away from certain sensitive receptors similarly protects families and children from the detrimental effects of adult establishments. In the areas where both adult and residential uses would be permitted as-of-right, namely the high density C6 districts, the intensity of development and the variety of existing uses will help to mitigate the negative effect of isolated adult uses.

By limiting the size and permitted illumination of adult business signs, the regulations respond to the criticisms that adult business signs are out of character with their surrounding areas. Finally, the amortization provisions of the proposed text would require that adult uses in the most sensitive areas go out of business after the operators recoup their investment in the adult business or change the nature of their business to comply with the requirements of the text. This provision thus ensures that the neighborhoods currently experiencing the adverse secondary effects of adult uses do not become the permanent repository of adult establishments.

All told, the proposed text presents a comprehensive framework for responding to each of the adverse secondary effects found to be associated with adult establishments. Each component provides a targeted response to identified adverse secondary effects and works

N 950384 ZRY                                                          43

with the other elements to create an effective regulatory scheme. As proposed, the regulations would allow for adult uses in areas where their adverse secondary impact is limited and provides for considerably more protection in those areas than is currently permitted.

At the same time, the regulations continue to provide ample opportunity throughout the city for the location and relocation of adult uses.  Adult uses would be able to locate in substantial numbers in all boroughs and in a variety of locations, assuring sufficient access to adult materials.  Analyses by DCP staff make it clear that the proposed regulations would allow the opportunity for all currently operating adult establishments to relocate within the city as well as allowing for expansion of the adult market.  In undertaking this assessment, DCP staff took into account the fact that certain properties, such as wetlands, properties occupied by public works, and large properties owned by the city, were unlikely to be developed with adult establishments.  DCP staff also considered only those sites fronting built roadways.  Analyses by the Transportation Division of DCP indicate that 80 percent of the areas in the outer boroughs where adult establishments could locate are within a ten minute walk from a rapid transit line or major bus route.

Moreover, the Commission notes that the proposed regulations apply only to certain adult uses, namely establishments similar to those

studied in the DCP study. It is only adult book and video stores, adult theaters, adult eating or drinking establishments and other similar adult commercial establishments which are covered by the regulations. Because of this focus, purveyors and consumers of adult materials will also have access to these materials through media such as cable programming, direct mail, and on-line computer services. As another example, adult sections in general interest video and book stores will be unaffected by the regulations and will provide an additional outlet for adult materials.

<u>Modifications</u>

While the Commission agrees that the proposed text generally represents an appropriate and measured response to regulating the adverse secondary effects resulting from the operation and concentration of adult uses, it also believes that certain modifications to the proposal and to the text are important to improve the regulatory scheme and to help tailor application of the regulations to the types of enterprises studied in the DCP Study. As discussed below, the modifications would increase the number of potential sites in the Borough of Manhattan by more than 40 percent and would add additional clarity to the definitions of adult uses.

A.  Adding Area in Manhattan

A number of individuals' testimony and comments from some community

boards, borough presidents, and borough boards raised objections to the size and location of the areas in Manhattan that would be available for adult establishments. The concerns expressed were two-fold. Some testimony suggested that more establishments should be allowed in Manhattan because it is the traditional location of adult establishments and because of its high density of development and land use. Other testimony expressed fear that limiting the number of available sites in Manhattan would result in displacing "Manhattan" adult uses to the outer boroughs, along with their adverse secondary effects.

As indicated above, the Commission notes that even without modification, the proposed text would allow adult establishments to locate in numerous areas throughout the City, including Manhattan in sufficient numbers to permit existing establishments to relocate and to allow some growth of adult establishments. In addition, the Commission notes that the proposed regulations, as drafted, would not result in the creation of any "red light district" or new concentration of adult uses. Rather the anti-concentration provisions of the regulations and the protection of sensitive receptors ensure that every neighborhood in New York City receives greater protection from the adverse secondary effects of adult uses than it does now. Finally, the Commission notes that one of the principal reasons that the administration and the City Council began studying the impact of adult uses was the fact that adult establishments had begun opening and concentrating in areas where

they traditionally had not located. As such, the proposed regulations respond to a city-wide concern by regulating the location of adult uses throughout New York City.

While the proposed text provides a uniform response to a city-wide problem and at the same time provides sufficient access to adult materials, the Commission recognizes that a majority of the existing uses are in Manhattan. It also recognizes that the density of development generally and the number of potential users -- workers, residents, tourists and other visitors -- is greater in Manhattan than in the other Boroughs. Because of this the Commission believes that it is appropriate on a land use basis to modify the proposal slightly to allow more potential sites in Manhattan in a manner which does not significantly impair the regulation's responsiveness to combating the adverse secondary effects of adult establishments.

To accomplish these objectives, the Commission believes that it is appropriate to modify the text to remove the proposed 500 foot buffer between the zoning districts where adult uses would continue to be permitted (manufacturing zones not allowing residential use, C6-4 to C6-7, C7, and C8 zones) and adjoining high density commercial and manufacturing districts where such uses would be prohibited (C5-2 to C5-5 and M1-6M zones). These districts possess many of the characteristics of the zones where adult uses are permitted, such as dense development and a multiplicity of existing

uses which contribute to their surroundings and which would help combat or mitigate the adverse secondary effects of nearby adult establishments.    As such, it is not as critical to maintain a buffer in these locations than there is in other areas where there is less dense development in adjoining areas or where adjoining development is predominantly residential.

The Department of City Planning estimates that this modification would increase the number of potential sites in Manhattan by more than 40% and would result in no additional areas in the other Boroughs becoming available for adult establishments.    The additional areas in Manhattan include portions of midtown between 6th and 7th Avenues, additional area north of the Herald Square area and some small portions of lower Manhattan.    The additional areas are in proximity to areas where adult establishments exist today and would provide ample opportunity for both consumers and purveyors to have access to adult materials and uses.    At the same time, the modification is sufficiently narrow so that it will not significantly impair the effective regulatory scheme provided by the proposed text.

B.   Language concerns

Concerns were expressed during the public review process about the language of the text, particularly the language use to define adult establishments.    Many of the comments were based on a belief that

the language could be interpreted to allow for enforcement against establishments not intended to be covered by the adult use regulations, such as art galleries, legitimate theaters, and book stores with an emphasis on gay and lesbian themes.

The Commission believes that the proposed definitions, while consistent with the definitions used in numerous other jurisdictions, could benefit from minor language changes to help clarify the intention of regulations and to ensure appropriately focused enforcement. Furthermore, certain guidelines should direct the enforcement of the adult use regulations.

As a general matter, "adult establishments" are intended to be only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities. These are the establishments analyzed in the DCP study and found to have adverse secondary effects and as such are the only establishments covered by the adult use regulations. Because the regulations are intended to cover this limited range of establishments, enforcement efforts must be similarly tailored. As a preliminary question then, an enforcement agency should consider whether an establishment falls within the definition of an adult establishment.

---

N 950384 ZRY

## 1. *"Substantial"*

Particular concern was expressed regarding the use of the word "substantial" in the definitions of adult book stores and of adult establishments.   Certain speakers questioned whether the word provided sufficient guidance to an enforcement official to allow enforcement in an objective, non-biased, manner.

To further the general intent of the adult use regulations, the Commission believes an enforcement agency should consider the following factors to establish whether a "substantial" portion of an establishment is occupied by an adult use or adult materials: (1) the overall amount of floor area accessible to customers devoted to adult purposes; (2) the amount of floor area devoted to adult purposes as compared to the total commercial floor area of the establishment; and (3) the amount of stock of a sexually explicit nature as compared to the total stock.   As a general guideline, the Commission believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an "adult establishment" or "adult bookstore."   However, there may be exceptions to this general guideline.   A disproportionately large amount of adult materials, as compared to total stock, moved into a smaller amount of floor area should allow an establishment to be deemed an adult establishment.   In addition, the Commission believes that 10,000 or

more square feet of commercial space occupied by adult uses or adult materials is "substantial" regardless of the overall size of an establishment. These factors and the approach make it clear that the regulations are not intended to cover general interest book or video stores with a section of adult materials that is modest in scale as compared to the overall size of the establishment.

The Commission believes that the three factors outlined above are the factors an enforcement agency should look to in determining whether or not an establishment has a substantial portion of adult uses or materials. Other factors, such as the nature or prominence of display of adult materials, would reinsert a level of discretion into an enforcement effort which the Commission believes is unnecessary and should be avoided. To make sure that enforcement efforts are focused on the three criteria, the Commission believes that the adult use text should be modified to identify the three factors described above as the relevant factors in determining whether the "substantial" requirement is met.

2. *Regularly and Characterized by an Emphasis*

Similar concerns were voiced about use of the words "regularly" and "characterized by an emphasis" included in many of the definitions. The Commission notes that the words "characterized by an emphasis on" are used with the intent of regulating those performances,

videos and materials that have a principal focus on sexual activities or anatomy as entertainment. It is not intended to regulate performances or films displaying incidental nudity. The word "regularly" is intended to apply to those establishments that have adult entertainment on a frequent, on-going basis. It is not intended to cover establishments which offer adult entertainment on an occasional basis, such as a monthly live performance or a nightly midnight showing at a movie theater. For eating or drinking establishments and for other commercial establishments, adult entertainment should be a principal form of entertainment at the establishment. For theaters, adult entertainment should be the principal purpose of the theater showing the adult material.

3. *Live Performances*

Certain speakers indicated their fear that the regulations would be read broadly to apply legitimate theatrical performances and films including nudity or having a sexual theme. Examples raised in the testimony include "Love Valor and Compassion," "Oh Calcutta" as well as some Off-Broadway or experimental productions.

Theaters featuring these sorts of performances were not the focus of the DCP Study and should not be included within the definition of an adult theater. The Commission believes that the proposed language, by limiting application of the regulations to those theaters "regularly featuring" performances or materials

"characterized by an emphasis" on explicit matters goes a long way in ensuring that the regulations are focused on the sorts of theaters considered by the DCP Study. To further ensure a tailored application, however, the Commission believes that it is appropriate to supplement the proposed text by adding language to the definitions of adult theaters, adult eating or drinking establishments and other adult commercial establishments that the establishment must also exclude minors during performances. The additional language would preclude the possibility of enforcing the regulations against establishments showing legitimate theatrical productions as these establishments do allow minors to view performances.

4.  *Book Stores*

Additional concern was voiced that the regulations could be read broadly to have the unintended effect of closing down certain book stores serving community needs. This concern was expressed most strongly by members of the gay and lesbian communities. These individuals indicated their fear that overbroad enforcement of the regulations could result in a number of bookstores whose stock is focused on gay and lesbian themes being shut down. The individuals suggested that a number of book stores in the West Village and Chelsea as would be susceptible to such overbroad regulation. The speakers indicated that these establishments were important cultural and social assets, particularly for the gay and lesbian

communities, and should not be regulated as an adult establishment.

The Commission shares the concern of these individuals and notes that the adult use regulations must not be interpreted so broadly as to cause important social and cultural gathering spots for gay and lesbian individuals to close. Because of this concern, Department of City Planning staff visited the bookstores cited during the public testimony to consider whether the regulations could, or should, be applied to the noted establishments.[3]   The visits confirmed the public testimony that the bookstores are important assets for their communities and neighborhoods that should be encouraged.   Furthermore, the visits made it clear that these establishments would not fall within the definition of "adult bookstore."   Each of the stores carries a stock-in-trade covering a wide range of topics.   These include books on family matters such as adopting and raising children in a gay household, biographies by and about prominent gay individuals, health and health care issues, poetry and literature with gay themes or by gay authors, gay and lesbian erotica, and social matters affecting gay and lesbian communities.   The amount of stock which could be considered to be of the sort described in the definition of adult bookstores was a small percentage of the total stock and occupied only a small

---

[3]   The bookstores mentioned during the public review process and visited by DCP staff were the Oscar Wilde Bookstore, a Different Light Bookstore, and the Creative Visions Bookstore.   The Commission notes that other bookstores with a gay or lesbian focus exist in other parts of the city.

amount of floor area.  Applying the factors and criteria noted in this report, it is clear that these bookstores would not fall within the definition of "adult bookstore," as there is not a "substantial portion" of materials characterized by sexually explicit matters.  Instead, these are general interest bookstores having a gay or lesbian theme.  As such, the bookstores -- and others with a similar focus -- would be allowed to continue in their current location.  Similar bookstores could open pursuant to the Zoning Resolution provisions pertaining to general bookstores.

5.  *Art Galleries*

The Commission also shares the concern of certain individuals and organizations that the text as proposed could be read inappropriately broadly to include within its terms art galleries displaying sexually explicit artwork.  This was not the intention of the regulations and the Commission agrees that art galleries should not be regulated as an adult establishment.

To clarify the intention that the regulations cover a limited group of establishments (namely adult book and video stores, adult theaters, adult eating or drinking establishments, and similar establishments) the Commission believes that it is appropriate to make a minor modification to the text to include an express reference to "book store" in the definition of "adult bookstore", "theater" in the definition of "adult theater," and "eating or

drinking establishment" in the definition of "adult eating and drinking establishment." For example, the Commission believes that the definition of "adult book store" should be modified to read "An adult book store is a book store which has . . . " Because book stores, theaters, eating or drinking establishments, and art galleries are all identified in the Zoning Resolution as separate uses, this modification would make it clear that art galleries could not be considered an adult establishment.  Section 32-00 of the Zoning Resolution reinforces this point by providing that:

> whenever a use is specifically listed in a Use Group and could also be construed to be incorporated within a more inclusive listing, either in the same or another Use Group, the more specific listing shall control.

The Commission believes that the text changes and guidelines discussed above will provide for the objective, tailored and effective enforcement of the adult use regulations.

The Commission also notes and commends the Buildings Department's and the Office of Midtown Enforcement's enforcement efforts in connection with the adult moratorium text.  The Department has established a comprehensive procedure for examining possible violations of the adult use moratorium, including reporting requirements and assigning possible enforcement actions to a group of its most experienced inspectors.  The Commission believes that these practices have helped ensure the fair and effective

enforcement of the adult use moratorium and encourages the Department to continue these practices for the enforcement of the permanent regulations.    The Commission also notes that OME will continue to participate in the enforcement of adult establishment regulations.

Additional Comments

A number of additional modifications to the proposed text were suggested in the course of public testimony.    The Commission has the following comments on the suggestions.

A.    Regulation of Signs.

A number of speakers indicated that the signs of many adult establishments were out of character with their neighborhoods and had a significant adverse effect.    Some of these speakers suggested that signage was the only problem with adult establishments and that regulation should be limited to signage regulation.

The Commission agrees that the signs for many adult establishments are out of character with their neighborhoods and require more extensive regulation than is presently provided by zoning.    As noted above, the proposed text achieves this goal by requiring that business signs for adult establishments comply with the most restrictive commercial sign regulations applicable in any zoning

district and provides further limitations on the amount of illumination and the overall size of the sign. These strict regulations would prohibit flashing signs. The proposed text thus responds to the criticisms expressed during the course of public review while continuing to allow the adult use operator an adequate opportunity to notify the public of its business.

The Commission does not agree, however, that sign regulations alone would be adequate to combat all of the adverse secondary effects of adult uses. Many of the adverse secondary effects identified in the DCP Study, the other studies and during the public hearing -- reduced property values, creation of economic dead zones, heightened crime, change in neighborhood character -- exist independently of the signage. Accordingly, while regulation of signage is an important aspect of the proposed regulations, it must supplement a comprehensive scheme of regulation.

B.  Regulation of the Size of Adult Establishments.

The proposed text limits the size of any adult establishment to 10,000 square feet. Some concern was voiced during the course of review that this limitation would result in "sex superstores" in the outer boroughs. The Commission believes that this concern is unfounded. Moreover, the Commission believes that there are important land use considerations for the size limit.

At present, adult establishments may locate without any size limitations other than those generally applicable to book stores, eating or drinking establishments and theaters.  The 10,000 square foot limit is a threshold used in a number of instances in the Zoning Resolution to distinguish between small and mid-size uses, such as certain retail uses in manufacturing districts.

The 10,000 square foot limit reflects a reasonable balance between the desire to avoid an undue concentration of uses within a single establishment and the need and desire to develop regulations allowing locational opportunities for all types of adult uses. Department of City Planning surveys of existing establishments indicate that while the large majority of adult establishments occupy a small area, there are some existing establishments occupying 10,000 square feet or more.  The 10,000 square foot limit will assure that these larger sorts of establishments will have the opportunity to locate.

Moreover, the Commission believes that it is unlikely that the proposed regulations will result in increasing the number of large adult establishments.  At this time, adult book and video stores tend to occupy a small floor area regardless of whether they are locating near other adult uses or are opening in new areas.  The Commission believes that it is inappropriate, particularly in this area of constitutional concern, to limit further the size of adult establishments in response to speculative concerns that the adult

use market might change in a way that exacerbates its adverse secondary effects.

## C. Distinguishing Treatment of Different Adult Establishments.

Additional comments made during the course of public review suggested that different sorts of adult uses had different adverse secondary effects and as such should be treated differently. Persons raising this concern seemed to suggest that adult book and video stores in particular should be subject to lesser regulation than other sorts of adult uses.

As already noted, all of the adult uses which would be covered by the proposed regulations have been shown to produce adverse secondary effects. Because of this, the Commission believes that their regulation is vital. Nothing in the studies or in the public testimony justifies distinctive treatment of any adult use. Nor is the distinctive treatment necessary as numerous locations exist where any adult use, including adult book and video stores, may locate. The existing proposal, as modified by the Commission, reflects the proper balance of responding to the adverse secondary effects of adult establishments uses while providing sufficient opportunity for these uses to locate throughout New York City.

D.  Adding to the list of Sensitive Receptors/Increasing the Buffer
Zone to 750 or 1,000 Feet.

As indicated above, numerous comments were received from many
community boards, certain borough presidents, borough boards, other
elected officials and by individuals and groups which recommended
making the regulations more stringent.  The recommendations were
generally of two sorts.  The first was to enlarge buffers and
increase the distance between adult uses and sensitive receptors to
750 or 1000 feet.  The second was to expand the list of sensitive
receptors.  Among the uses proposed to be added are parks and
playgrounds, nursing homes, colleges and universities, legal non-
conforming residences, libraries and museums, landmarks, and
recreational facilities.

The Commission agrees with the concerns of many neighborhoods that
their communities not be burdened by the adverse secondary effects
of adult uses.  However, it believes that the proposed text
achieves this objective without encroaching on purveyors and
consumers of adult materials' rights to receive and disseminate
this material.  As proposed, the regulations protect all
neighborhoods by providing locations throughout the City available
for adult establishments, by providing anti-concentration measures
between these establishments, by providing for buffers around
schools, day care centers and houses of worship, by providing
strict sign regulations, and by requiring most non-conforming uses

N 950384 ZRY                                                    61

to go out of business within a year's time.

These substantial protections are achieved at the same time as providing significant location opportunities to adult establishment operators. The Commission notes that any further addition to the list of sensitive receptors or extension of the buffer would be beyond the scope of the present action and as such would require a new application for a text amendment. In addition, a variety of different uses have been suggested as additional sensitive receptors. Because the addition of sensitive receptors raises a number of procedural and policy questions, and because the Commission believes that the regulations as proposed will provide significant protection against the adverse secondary effects of adult establishments, the Commission believes that the list of sensitive receptors should remain unchanged at this time.

Because of the Commission's concern that the regulations provide effective and comprehensive protection against the adverse secondary effects of adult establishments, it believes that it is important to monitor the location and operation of adult uses under the proposed regulations to ensure that the goal of comprehensive protection is achieved. The Commission notes that the Department will report back to the Commission and the City Council in two years time on the effect and enforcement of the adult use regulations. This report will note the location of adult establishments and their proximity to facilities such as parks and

N 950384 ZRY

playgrounds.  At that time the Commission can review whether any
modifications are needed.

In connection with this concern, the Commission notes that day care
facilities, nursery and pre-schools, and headstart programs
licensed pursuant to the City Health Code or operated by the Board
of Education or a religious institution as part of an elementary
school would fall within the definition of "schools" in the Zoning
Resolution and would thus be sensitive receptors.  Department of
City Planning staff has contacted the Department of Health and
confirmed that all of these facilities are licensed pursuant to the
Health Code.  The Commission also notes, as discussed below, that
for purposes of measuring the 500 foot buffer, a school playground
would be considered part of the school.  Finally, the Commission
notes that many of the uses suggested as sensitive receptors, such
as libraries, are community facilities which are not permitted as
of right in many of the districts where adult uses would be allowed
to locate.

E.   Grandfathering.

Additional comments suggested the "grandfathering" of existing
adult uses, to allow all existing uses to continue at their present
locations.  The Commission believes that this would substantially
reduce the effectiveness of the proposed text in responding to the
adverse secondary effects of adult establishments.

---

N 950384 ZRY                                                    63

Grandfathering existing uses would have the effect of freezing certain locations and certain neighborhoods as the situs of adult establishments. Because the existing establishments would in effect have a monopoly in the area, there would be a strong incentive to keep an inappropriate use operating within a neighborhood. This is an unfair burden on surrounding tenants and property owners.

As drafted, the regulations allow the operators of adult establishments one year's time to continue operations and to amortize their investment. Because the amortization is linked to the non-conforming nature of the establishment, the Commission believes most adult establishments will have to terminate in one year's time. The regulations also permit the operator to apply to the Board of Standards and Appeals for additional time to operate if it is necessary to allow the operator to recoup substantially all of its investment in the adult nature of the establishment. This process assures that adult operators receive sufficient financial benefit from their adult enterprise. At the same time, it assures neighborhoods that have been subjected to the adverse secondary effects of adult establishments they will ultimately be protected by a comprehensive scheme of regulation.

F. Other Comments.

One additional comment which should be addressed was made by

N 950384 ZRY                                                              64

members of the public regarding the requirement that adult establishments be located at least 500 feet from sensitive receptors. These comments questioned how the Department of Buildings would measure the distance with respect to the sensitive receptor. The purpose of the 500 foot buffer is to protect families, children in particular, from the adverse secondary effects of adult establishments. To further this purpose, the distance from a sensitive receptor should be measured from the boundary of any day care center, school or house of worship use including adjoining outdoor spaces customarily used by school children or a congregation as part of the school or house of worship function. The 500 foot buffer should be measured from the boundary of a school playground, for example, rather than from the boundary of the school building. If a school or house of worship shares a zoning lot with an unrelated use, however, such as a commercial office building, the office building portion of the zoning lot should not be considered part of the sensitive receptor site.

**RESOLUTION**

RESOLVED, that the City Planning Commission finds that the action described herein will have no significant impact on the environment; and be it further

RESOLVED, that the City Planning Commission, in its capacity as the

N 950384 ZRY                                                              65

City Coastal Commission, has reviewed the waterfront aspects of this application and finds that the proposed action is consistent with WRP policies; and be it further

RESOLVED, by the City Planning Commission, pursuant to Section 200 of the New York City Charter, that based on the environmental determination, the WRP determination, and the consideration described in this report, the Zoning Resolution of the City of New York, effective as of December 15, 1961, and as subsequently amended, is further amended as follows:

Matter in Graytone is new, to be added;

Matter in ~~strikeout~~ is old, to be deleted;

Matter within #    # is defined in Section 12-10;

*** indicates where unchanged text appears in the Zoning Resolution

***

~~11-113~~

~~For adult establishments~~

~~Notwithstanding any other provision of this Resolution to the contrary, in all districts, no new #adult establishment# shall be allowed, nor shall any existing #adult establishment# be #enlarged# or #extended#, nor shall any #non-conforming use# be changed to an #adult establishment#, for an interim period of one year from the effective date of this amendment.~~

***

N 950384 ZRY                                                              66

12-10

DEFINITIONS

\*\*\*

~~Adult Establishment~~

~~An "adult establishment" is a #use# which includes:~~

~~(a) Adult bookstore — an establishment listed in Use Group 6 or 12 having as a significant portion of its stock in trade books, magazines, other periodicals, films, slides or video tapes, and which establishment is customarily not open to the public because it excludes minors by reason of age; or,~~

~~(b) Adult eating or drinking establishment — an eating or drinking establishment listed in Use Group 6A, 6C, 10 or 12A which customarily presents topless or nude dancers, strippers or similar entertainments, and which establishment is customarily not open to the public because it excludes minors by reason of age; or,~~

~~(c) Adult theater — an establishment listed in Use Group 8 or 13 which customarily presents motion pictures, films, videotapes, slide shows, or live performances featuring topless or nude dancers, strippers or similar entertainments, including an establishment where such entertainment is viewed from an enclosure, and which establishment is customarily not open to the public because it excludes minors by reason of age.~~

Adult Establishment

An "adult establishment" is a commercial establishment where a "substantial portion" of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof, as defined below:

(a) An adult book store is a book store which has as a "substantial portion" of its stock-in-trade any one or more of the following:

(1) books, magazines, periodicals or other printed matter which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or,

(2) photographs, films, motion pictures, video cassettes, slides or other visual representations which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

(b) An adult eating or drinking establishment is an eating or drinking establishment which regularly features any one or more of the following:

(1) live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or,

(2) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or,

(3) employees who, as part of their employment, regularly expose to patrons "specified anatomical areas," and

which is not customarily open to the general public during such features because it excludes minors by reason of age.

(c) An adult theater is a theater which regularly features one or more of the following:

(1) films, motion pictures, video cassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas"; or,

(2) live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities", and

which is not customarily open to the general public during such features because it excludes minors by reason of age.

An adult theater shall include commercial establishments where such materials or performances are viewed from individual enclosures.

(d) An other adult commercial establishment is a facility -- other than an adult book store, adult eating or drinking establishment, adult theater, commercial studio, or business or trade school -- which features employees who as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes minors by reason of age.

For the purpose of defining #adult establishments#, "specified sexual activities" are: (i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human

masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast.

"Specified anatomical areas" are: (i) less than completely and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed.

For the purpose of determining whether a "substantial portion" of an establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or combination thereof, the following factors shall be considered: (1) the amount of #floor area# and #cellar# space accessible to customers and allocated to such #uses#; and (2) the amount of #floor area# and #cellar# space accessible to customers and allocated to such uses as compared to the total #floor area# and #cellar# space accessible to customers in the establishment.

For the purpose of determining whether a bookstore has a "substantial portion" of its stock in materials defined in paragraphs (a) (1) or (a) (2) hereof, the following factors shall be considered: (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of #floor area# and #cellar# space accessible to customers containing such stock; and (3) the amount of #floor area# and #cellar# space accessible to customers containing such stock as compared to the total #floor area# and #cellar# space accessible to customers in the establishment,

***

32-00

GENERAL PROVISIONS

In order to carry out the purposes and provisions of this Resolution, the #uses# of #buildings or other structures# and of tracts of land have been classified and combined into Use Groups. A brief statement is inserted at the start of each Use Group to describe and clarify the basic characteristics of that Use Group. Use Groups 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16, including each #use# listed separately therein, are permitted in #Commercial Districts# as indicated in Sections 32-11 to 32-25, inclusive——.— , except that any such #use# which is also an #adult

establishment# shall, in addition, be subject to the provisions of Section 32-01 (Special Provisions for Adult Establishments).

32-01

Special Provisions for Adult Establishments

In addition to the applicable regulations for the #uses# listed in a permitted Use Group, #adult establishments# shall be subject to the following provisions:

(a)   #adult establishments# are not permitted in C1, C2, C3, C4, C5, C6-1, C6-2, or C6-3 Districts;

(b)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, #adult establishments# shall be located at least 500 feet from a church, a #school#, a #residence district#, a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 district, a or a #manufacturing district# other than M1-6M in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. However, on or after the effective date of this amendment, an #adult establishment# that otherwise complies with the provision of this paragraph shall not be rendered #non-conforming# if a church or a #school# is established on or after April 10, 1995 within 500 feet of such #adult establishment#.

(c)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 Districts, #adult establishments# shall be located at least 500 feet from another #adult establishment#.

(d)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 Districts, no more than one #adult establishment# permitted under this Section shall be located on a #zoning lot#.

(e)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 Districts, #adult establishments# shall not exceed in total 10,000 square feet of #floor area# and #cellar# space not used for enclosed storage or mechanical equipment.

(f)   #adult establishments# which existed on the effective date of this amendment and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

***

N 950384 ZRY

32-60

SIGN REGULATIONS

\*\*\*

32-62

Permitted Accessory Business Signs

C1, C2, C3, C4, C5, C6, C7, C8

In all districts, as indicated, #accessory business signs# are permitted subject to the provisions of the following Sections:

\*\*\*

Section 32-69 (Additional Accessory Business Sign Regulations for Adult Establishments)

\*\*\*

32-69

Additional Accessory Business Sign Regulations for Adult Establishments

C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 C8

#Accessory business signs# for #adult establishments# are permitted only as set forth in this Section, and are limited to locations in the districts indicated.

All permitted #accessory business signs# for #adult establishments# shall conform with all the #sign# regulations applicable in C1 Districts as set forth in this Chapter, except that the provisions of Section 32-64 (Surface Area and Illumination Provisions) shall not apply. In lieu thereof, the maximum #surface area# of all #accessory business signs# for #adult establishments# shall not exceed, in the aggregate, three times the #street# frontage of the #zoning lot#, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be #illuminated# non-#flashing signs#.

\*\*\*

42-00

GENERAL PROVISIONS

In order to carry out the purposes and provisions of this Resolution, the #uses# of #buildings or other structures# and of tracts of land have been classified and combined into Use Groups.

N 950384 ZRY                                                                                          71

A brief statement is inserted at the start of each Use Group to describe and clarify the basic characteristics of that Use Group. Use Groups 4B, 4C, 5, 6A, 6B, 7, 8, 9B, 9C, 10B, 10C, 11, 12A, 12C, 12D, 12E, 13, 14, 16, 17 or 18, including each #use# listed separately therein, and certain #uses# listed in Use Groups 3A, 6C, 9A, 10A or 12B are permitted in #Manufacturing Districts# as indicated in Sections 42-11 to 42-15, inclusive~.~ , except that any such #use# which is also an #adult establishment# shall, in addition, be subject to the provisions of Section 42-01 (Special Provisions for Adult Establishments).

42-01

Special Provisions for Adult Establishments

In addition to the applicable regulations for the #uses# listed in a permitted Use Group, #adult establishments# shall be subject to the following provisions:

(a)  #adult establishments# are not permitted in a #manufacturing district# in which #residences#, #joint living-work quarters for artists# or #loft dwellings# are, under the provisions of the Zoning Resolution, allowed as-of-right or by special permit or authorization.

(b)  in all other #manufacturing districts#, #adult establishments# shall be located at least 500 feet from a church, a #school#, a #residence district#, a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 district, or a #manufacturing district# other than M1-6M in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. However, on or after the effective date of this amendment, an #adult establishment# that otherwise complies with the provision of this paragraph shall not be rendered #non-conforming# if a church or a #school# is established on or after April 10, 1995 within 500 feet of such #adult establishment#.

(c)  #adult establishments# shall be located at least 500 feet from another #adult establishment#.

(d)  no more than one #adult establishment# permitted under this Section shall be located on a #zoning lot#.

(e)  that #adult establishments# shall not exceed in total 10,000 square feet of #floor area# and #cellar# space not used for enclosed storage or mechanical equipment.

(f)  #adult establishments# which existed on the effective date of this amendment and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the

provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

\*\*\*

42-50

SIGN REGULATIONS

\*\*\*

42-52

Permitted Accessory Business Signs or Advertising Signs

M1, M2, M3

In all districts, as indicated, #accessory business signs# or #advertising signs# are permitted with no restriction on size, illumination or otherwise, except as ~~otherwise~~ provided in Section 42-54 (Special Provisions Applying along District Boundaries) and subject to the provisions of Section 42-53 (Additional Regulations for Advertising Signs) ~~and Section 42-55 (Additional Regulations for Business and Advertising Signs in Certain Manufacturing Districts).~~ and Section 42-55 (Additional Accessory Business Sign Regulations for Adult Establishments).

\*\*\*

42-55

Additional Accessory Business Sign Regulations for Adult Establishments

M1, M2, M3

In all districts, as indicated, all permitted #accessory business signs# for #adult establishments# shall conform with the provisions of this Chapter, except that the maximum #surface area# of all #accessory business signs# for #adult establishments# shall not exceed, in the aggregate, three times the #street# frontage of the #zoning lot#, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be #illuminated# and no portion thereof may be #flashing#

No #accessory business signs# for #adult establishments# shall be permitted on the roof of any #building#, nor shall such signs extend above #curb level# at a height greater than 25 feet.

\*\*\*

ARTICLE V

NON-CONFORMING USES AND NON-COMPLYING BUILDINGS

CHAPTER 1

STATEMENT OF LEGISLATIVE INTENT

51-00

PURPOSE OF REGULATIONS GOVERNING NON-CONFORMING USES AND NON-COMPLYING BUILDINGS

***

In the case of a few objectionable non-conforming uses which are detrimental to the character of ~~residence~~ the districts in which such uses are located, a reasonable statutory period of life is established for such uses, in order to permit the owner gradually to make ~~his~~ plans for the future during the period when ~~he~~ the owner is allowed to continue the non-conforming uses of ~~his~~ the property, thereby minimizing any loss, while at the same time assuring the public that the district in which such non-conformity exists will eventually benefit from a more nearly uniform character.

***

52-30

CHANGE OF NON-CONFORMING USE

***

52-38

Special Regulations for Adult Establishments

In all districts, a #non-conforming use# may not be changed, initially or in any subsequent change, to an #adult establishment#, except as provided in Section 32-01 (Special Provisions for Adult Establishments) or Section 42-01 (Special Provisions for Adult Establishments).

***

52-70

TERMINATION OF CERTAIN NON-CONFORMING USES AFTER AMORTIZATION

---

N 950384 ZRY

52-71

General Provisions

In specified districts, specific #non-conforming signs#, specific
#non-conforming uses# of #land with minor improvements#, specific
#non-conforming# objectionable #uses#, certain specific types of
#uses# involving open storage or salvage , #non-conforming# #adult
establishments#, or certain #non-conforming public parking lots#
may be continued for a reasonable period of useful life as set
forth in this Chapter, provided that after the expiration of that
period such #non-conforming uses# shall terminate in accordance
with the provisions of this Chapter.

***

52-73

Non-conforming Signs

***

52-734

Non-conforming accessory business signs for adult establishments

In all districts, a #non-conforming accessory business sign# for an
#adult establishment# shall terminate within one year from the
effective date of this amendment or from such later date that such
#sign# becomes #non-conforming#, except that such #sign# may be
continued for a limited period of time by the Board of Standards
and Appeals pursuant to Section 72-40 (Amortization of Certain
Adult Establishments and Signs for Adult Establishments).

***

52-77

Termination of Adult Establishments

In all districts, a #non-conforming# #adult establishment# shall
terminate within one year from the effective date of this amendment
or from such later date that the #adult establishment# becomes
#non-conforming#, except that such establishment may be continued
for a limited period of time by the Board of Standards and Appeals
pursuant to Section 72-40 (Amortization of Certain Adult
Establishments and Signs for Adult Establishments). However, the
provisions of this Section shall not apply to an #adult
establishment# subject to the provisions of paragraph (f) of
Section 32-01 or 42-01 (Special Provisions for Adult
Establishments).

\*\*\*

52-80

REGULATIONS APPLYING TO NON-CONFORMING SIGNS

\*\*\*

52-82

Non-Conforming Business Signs

Any #non-conforming accessory business sign#, except a #flashing sign# or a #sign# subject to the provisions of Section 52-734 (Non-conforming accessory business signs for adult establishments), may be structurally altered, reconstructed, or replaced in the same location and position, provided that such structural alteration, reconstruction, or replacement does not result in:

(a)   the creation of a new #non-conformity# or an increase in the degree of #non-conformity# of such #sign#;

(b)   an increase in the #surface area# of such #sign#; or

(c)   an increase in the degree of illumination of such #sign#.

\*\*\*

72-01

General Provisions

The Board of Standards and Appeals (referred to hereinafter as the Board) shall have the power, pursuant to the provisions of the New York City Charter and of this Resolution, after public notice and hearing:

\*\*\*

(f)   to make such administrative determinations and findings as may be set forth in this Resolution at Sections 15-021 and 15-50 et seq., or pursuant to Section 72-40 (Amortization of Certain Adult Establishments and Signs for Adult Establishments).

\*\*\*

72-40

AMORTIZATION OF CERTAIN ADULT ESTABLISHMENTS AND SIGNS FOR ADULT ESTABLISHMENTS

The Board of Standards and Appeals may permit any #non-conforming# #adult establishment# or any #non-conforming accessory business

N 950384 ZRY

sign# for an #adult establishment# to continue for a limited period of time beyond that provided for in Section 52-734 (Non-conforming accessory business signs for adult establishments) or Section 52-77 (Termination of Adult Establishments), provided that:

(a) an application is made by the owner of such establishment to the Board of Standards and Appeals at least 120 days prior to the date on which such establishment or #sign# must terminate;

(b) the Board shall find, in connection with such establishment or #sign#, that:

(1) the applicant had made, prior to the #non-conformity#, substantial financial expenditures related to the #non-conformity#; and,

(2) the applicant has not recovered substantially all of the financial expenditures related to the #non-conformity#; and,

(3) the period for which such establishment or #sign# may be permitted to continue is the minimum period sufficient for the applicant to recover substantially all of the financial expenditures incurred related to the #non-conformity#.

For the purpose of this Section, "financial expenditures" shall mean the capital outlay made by the applicant to establish the #adult establishment# or #sign#, exclusive of the fair market value of the #building# in which such #use# or #sign# is located and exclusive of any improvements unrelated to the #non-conforming# #adult establishment# or #non-conforming accessory business sign for #adult establishments#.

***

The above resolution (N 950384 ZRY), duly adopted by the City Planning Commission on September 18, 1995 (Calendar No. 8), is filed with the Office of the Speaker, City Council and the Borough Presidents, in accordance with the requirements of Section 197-d of the New York City Charter.


JOSEPH B. ROSE, Chairman

VICTOR ALICEA, Vice Chairman,

IRWIN G. CANTOR, P.E., KATHY HIRATA CHIN, ESQ, ALEXANDER GARVIN, ANTHONY I. GIACOBBE, ESQ., WILLIAM J. GRINKER, Commissioners


AMANDA M. BURDEN, A.I.C.P., MAXINE GRIFFITH, BRENDA LEVIN, EDWARD T. ROGOWSKY, RONALD SHIFFMAN, A.I.C.P., JACOB B. WARD, ESQ., Commissioners, voting no.


Dissenting Statement of Commissioners Rogowsky and Shiffman, attached.