UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------

CLUB AT 60TH STREET, INC., et al.,

                Plaintiffs,

            -against-                          02 Civ. 8333 (WHP)

THE CITY OF NEW YORK,

                Defendant.

------------------------------------------------------------

725 EATERY CORP., et al.,

                Plaintiffs,

            -against-                          02 Civ. 4431 (WHP)

THE CITY OF NEW YORK, et al.,

                Defendants.

------------------------------------------------------------

59 MURRAY ENTERPRISES, INC., et al.

                Plaintiffs,

            -against-                          02 Civ. 4432 (WHP)

THE CITY OF NEW YORK, et al.,

                Defendants.

------------------------------------------------------------

336 LLC, et al.,

                Plaintiffs,                        18 Civ. 3732 (WHP)

            -against-

THE CITY OF NEW YORK, et al.,

                Defendants.

------------------------------------------------------------

## DECLARATION OF ANITA LAREMONT

**Anita Laremont**, declares under the penalties of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Executive Director of the New York City Department of City Planning ("DCP"), the city agency which provides staff assistance to the New York City Planning Commission ("Planning Commission"), a position I have held since August 2018. I am an attorney admitted to practice law in the State of New York, and from 2014 to January 18, 2019 I was the General Counsel at DCP. I previously served for sixteen years as General Counsel of the New York State Empire State Development Corporation. The Planning Commission is generally charged with planning for the orderly growth, development and improvement of the City of New York ("the City"); its specific responsibilities include evaluating and giving preliminary approval to amendments of the New York City Zoning Resolution ("Zoning Resolution" or "Z.R."). See New York City Charter ("Charter"), Chapter 8, §§ 191, et seq. Based on my review of plaintiffs' papers filed in support of their motions for a preliminary injunction and documents maintained by DCP, I make this declaration in opposition to those preliminary injunction motions.

2. The Zoning Resolution (and other local laws) regulates the use and development of tracts of land known as zoning lots (e.g., most private property upon which buildings are constructed). As set forth in its Preamble, in order to protect the "public health, safety and general welfare," the Zoning Resolution addresses, *inter alia,* the height and bulk of buildings and other structures; the area of yards, courts and other open spaces; the density of population; and the location of trades, industries and buildings designed for specific uses within the City and, to further these goals, the Zoning Resolution divides the City into districts. Z.R. § 11-01. Specifically, the Zoning Resolution divides the City into three basic types of zoning

districts: residential, commercial and manufacturing; within these broad categories there are numerous subgroups. The intensity of permitted use on a particular property varies based upon, among other factors, its location.

3. In 1995, the City amended the Zoning Resolution to include use regulations governing the areas in which adult establishments may be located throughout the City ("1995 Regulations"). These regulations governed the location of commercial establishments with a predominant, on-going focus on sexually explicit materials or activities, including adult or "triple X" book and video stores, many of which provide "peep booths" for private viewing on premises (referred to in the zoning text as "adult book stores"), topless bars and strip clubs (referred to in the text as "adult eating or drinking establishments"), and theaters regularly offering X-rated movies or topless or nude entertainment (referred to in the text as "adult theaters").

4. By way of amendments to the Zoning Resolution approved by the New York City Council in October, 2001, the 1995 Regulations were amended to modify, as relevant here, the definitions of "adult establishment," "adult book store" and "adult eating or drinking establishment" to more accurately reflect the legislative intent behind the 1995 regulations (the locations where adult uses may locate throughout the City were not changed through these amendments) ("2001 Amendments").

5. The 2001 amended definitions clarify that all restaurants and bars which "regularly feature" adult entertainment are governed by the adult use regulations, no matter the amount of floor area devoted to adult entertainment. As to adult bookstores, the amendments clarify, among other things, that all stores with peep booths are governed by the adult use regulations, no matter the amount of floor area devoted to adult entertainment. Other bookstores

that do not have peep booths, do not have adult printed or visual materials that make up a substantial portion of their stock-in-trade, and that otherwise do not have any of the indicia set forth in the definition of "adult establishment," are not adult establishments, do not have to comply with the adult use regulations, and may be located in any area of the city in which other bookstores may operate. See Z.R. 12-10, definition of "adult establishment" sub-divisions (1)(a), (2)(d).

6. Pursuant to these regulations, all adult establishments (including adult bookstores and adult eating or drinking establishments) are allowed in the following commercial zoning districts: C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, C8 and manufacturing ("M") zoning districts, and are prohibited in residential zoning districts and in manufacturing and most commercial districts where residential uses are permitted (including MX districts). The Zoning Resolution treats all adult establishments, including bookstores fitting within that definition, distinctly from non-adult establishments, including non-adult bookstores, and hence, the prohibition against bookstores in C7 districts (or other districts where adult establishments are permitted but bookstores are barred such as M2 and M3 districts) does not apply to such adult establishments.[1]

---

[1] To the extent paragraph 87, fn 26 of the 2002 Karnovsky Affidavit (PJA Vol. 17 at 1861) submitted in the People Theatres case suggests otherwise, it appears that at the time Karnovsky was not focused on the fact that adult bookstores are distinct uses from bookstores which are not allowed in these districts. Likewise, the Elliot Sclar Declaration submitted by plaintiffs in support of their motion, erroneously indicates that adult establishments, although ostensibly allowed in C7 districtss, are not actually permitted there, because bookstores are not allowed in C7 districts. Sclar Decl., at ¶ 80 (PJA Vol. 13 at 1499). For the same reason, Sclar's argument that bookstores with booths must be classified as theaters, and subjected to the locational restrictions governing theater use is in error. Sclar Decl., at ¶¶ 89-102 (PJA Vol. 13 at 1502-07). As bookstores with booths are recognized as adult bookstores in the Zoning Resolution, they are explicitly subjected to the locational restrictions governing adult establishments. See Z.R. 12-10, definition of "adult establishment" at subdivision (2)(d)(bb).

7. The following is a list of zoning districts where adult establishments are currently permitted:

| Not permitted | Permitted |
|---|---|
| All R Districts | |
| Local commercial service districts:<br>**C1, C2, C3, C4, C5**<br>**C6-1** through **C6-3** | Central commercial office districts:<br>**C6-4** through **C6-9**<br>**C7, C8**[2]<br>• limited to 10,000 sf or less<br>• 500' from other adult uses, houses of worship, schools, or the boundaries of zoning districts in which adult uses are not permitted |
| M1-_D (which allow joint living-work quarters for artists)<br>M1-5A, M1-5B, M1-5M, M1-6M*,<br>MX Special Districts | **M1, M2, M3**<br>• limited to 10,000 sf or less<br>• 500' from other adult uses, houses of worship, schools, or the boundaries of zoning districts in which adult uses are not permitted<br>*within 500 feet of boundary of a M1-6M |

8. Of course, to the extent these areas are rezoned to other zoning districts that do not permit adult establishments, such rezoned areas will not be available for relocation of adult uses. And in the event of such re-zonings, existing adult establishments must terminate within one year from the date they become non-conforming.[3]

9. Also limiting the availability of sites for relocation of adult establishments is the fact that in those districts where adult establishments are permitted, they are subject to the further requirement that no new adult establishments may locate within 500 feet of a house of

---

[2] The Sclar Declaration's suggestion that although nominally allowed in C8 districts, adult establishments are not really permitted because such areas are incompatible with residential and retail uses, is a red herring. Sclar Decl., at ¶ 102 (PJA Vol. 13 at 1500). The Zoning Resolution explicitly allows adult establishments in C8 districts, and it should be further noted, that while these districts allow automotive uses, all commercial uses (except large, open amusements) as well as certain community facilities are permitted in C8 districts. See Z.R. 32-00. C8 Districts are mapped mainly along major traffic arteries, such as Boston Road and Jerome Avenue in the Bronx and Coney Island Avenue in Brooklyn.

[3] Although ZR Section 52-77 does establish a route whereby adult establishments may seek permission from the New York City Board of Standards and Appeals to continue in business for a period of longer than a year in order to amortize the costs of such establishments, the provision has never been timely utilized, to the knowledge of the Department of City Planning.

worship, a school or another adult establishment (known as sensitive receptors). However, to the extent that additional sensitive receptors locate in areas where adult uses have or will be lawfully established, those adult establishments may remain as lawful non-conforming uses notwithstanding the subsequent addition of a sensitive receptor.

10. According to plaintiffs, currently there are approximately 38 adult establishments operating at prohibited locations on a 60/40 basis (12 eating or drinking establishments and 26 bookstores with peep booths). See Kelly Decl., at ¶ 38, Table 4 (PJA Vol. at 187); Rudofsky Decl., at ¶ 3 (PJA Vol. 4 at 336-37) & Knecht Decl., at ¶¶ 21 – 25 (PJA Vol. 14 at 1650-53).[4] In addition to these 38 adult establishments, DCP has identified an additional two adult establishments (both in Queens) that are operating at prohibited locations. DCP has also identified three additional adult establishments (one each in Manhattan, the Bronx and Queens) that are located in the buffer, and would be prohibited unless they are grandfathered at those locations.[5] Attached hereto as Exhibit A is a list of each of these 43 adult establishments (as identified by plaintiffs and DCP (highlighted)) that would have to relocate, their address, their borough, block and lot, and the square footage of the lot size where each adult establishment is currently located. Of these 43 adult establishments, 24 are located in

---

[4] Although not identified in the plaintiffs' declarations, the 336 LLC Amended Complaint asserts that plaintiff Vishara Video, Inc. operates an adult bookstore at 781 Eighth Avenue in Manhattan. ECF 20, at ¶ 22. However, based upon plans that Vishara Video submitted to the City Department of Buildings, it appears that this location may not be an adult establishment insofar as it purports to have none of the indicia of an adult bookstore as set forth in Zoning Resolution 12-10, definition of an adult establishment. This location will nevertheless be counted as an establishment that would have to relocate.

[5] DCP does not have records indicating when either these establishments, or the relevant sensitive receptors, were established at these locations.

Manhattan, five in Brooklyn, 11 in Queens and three in the Bronx; 17 are eating or drinking establishments and 26 are bookstores.

11. As detailed below, there are numerous lots in New York City where adult establishments can relocate. To reach this conclusion, DCP staff analyzed all zoning districts to determine where adult establishments are and are not permitted. In areas where adult uses are permitted, DCP excluded from the analysis any "encumbered lots" unlikely to be developed for commercial use (such as lots occupied with public utilities, transportation facilities such as airports and large tracts of publicly owned property) and any lots located within 500 feet of any "sensitive receptors" (i.e., houses of worship, schools and day care centers, and existing adult establishments). DCP also excluded from its analysis the proposed re-zonings of Gowanus and Industrial Core in Brooklyn (if it turns out that either of these proposed zoning changes are not adopted, or the boundaries are modified, the number of eligible lots will increase).[6] DCP did not exclude from its analysis coastal areas; although the Sclar Declaration refers to coastline changes due to coastal erosion and Superstorm Sandy (Sclar Decl., at ¶¶ 77 & 78 (PJA Vol. 13 at 1498-99), the New York City shoreline materially remains unchanged since 2002, and does not affect the areas available for adult establishments. Based on this evaluation, DCP determined that City-wide there are more than 2,800 lots larger than 2,500 square feet where adult establishments

---

[6] DCP's analysis included a review of DCP zoning maps as of October 31, 2018 and reflects all re-zonings as of that date. DCP also eliminated the areas of the proposed re-zonings of Gowanus and the North Brooklyn Industrial Core, which are the only proposed rezonings whose details have been publicly announced. The scope of the two proposed re-zonings are set forth at https://www1.nyc.gov/site/planning/plans/gowanus/gowanus-framework.page (at pages 77 & 83) and https://www1.nyc.gov/site/planning/plans/north-brooklyn-vision-plan/north-brooklyn-vision-plan.page (at page 77). Since October 31, 2018 there have been a handful of other re-zonings, but none of those affected the availability of sites for adult establishments.

may be located: of those nearly 2,200 lots are larger than 5,000 square feet and of those approximately 1,500 lots are larger than 10,000 square feet.[7]

12. Plaintiffs and DCP have identified 24 adult establishments (nine are eating or drinking establishments and 15 are bookstores) in Manhattan that would have to relocate if the adult use provisions in the Zoning Resolution were enforced.[8] As indicated on Exhibit B attached hereto, there are a wide variety of locations in Manhattan where adult establishments could relocate. Specifically, in Manhattan there are 39 lots: 35 lots larger than 2,500 square feet, of those over 30 lots are larger than 5,000 square feet and of those over 20 lots are larger than 10,000 square feet.[9] Exhibit B identifies, for each lot, the address, the block and lot number, the size (square footage) of the lot, the zoning designation and the type of land use permitted. Buildings on many of these lots are multiple stories, and Exhibit B also identifies the total square footage available for adult use on each lot.

---

[7] DCP notes that in prior litigation the City stated that approximately 500 "sites" of 10,000 square feet were available for adult establishments, which constituted approximately four percent of City land. It is possible that this site number included sites with multiple lots; in any event, currently the total land area available that is unencumbered by, for instance, public utilities or transportation facilities (approximately 2.8 percent) has not decreased significantly.

[8] See Kelly Decl., at ¶ 38, Table 4 (PJA Vol. 4 at 187); Rudofsky Decl., at ¶ 3 (PJA Vol. 4 at 336-37) & Knecht Decl., at ¶ 21 (PJA Vol. 14 at 1650-53).

[9] Four of these lots are between 1,400 and 2,500 square feet. Several of the adult establishments that would have to relocate (such as Chelsea 7 Corp., Xcellent DVD and 725 Video Outlet) are less than 2,500 square feet. See Exhibit A. Also, to be clear, Exhibit B only identifies the square footage of the lot available for an adult establishment. The floor area ratio of the lots may allow for multiple floors to be built. Further, the lots may contain additional square footage where adult activity is not permitted. Assuming the applicable zoning permits it, multiple uses are allowed on a single lot, and owners or tenants can reconfigure buildings to meet a tenant's requirements.

13. The 39 lots are comprised of 27 lots that DCP and plaintiffs' witness, Michael Berzak, agree are available for adult establishments, as well as an additional 12 lots that Berzak failed to identify.[10] Specifically, DCP analyzed the 85 lots Berzak identified as available, and eliminated 58 lots because of their proximity to sensitive receptors, they were owned by public entities, or were too small (specifically, one lot was only 196 square feet).[11] While Berzak eliminated a number of lots because they were occupied by, for instance, commercial establishments, or were vacant, DCP included those lots since those are invalid reasons to omit a lot as being available for a relocating adult establishment. If adult use is permitted on a lot pursuant to zoning, then the actual occupancy at any given time by another permitted use is irrelevant to the determination of whether a lot is available for occupancy by an adult establishment, as lawful uses frequently change at any given location, based on market conditions and other variables.

14. The areas in Manhattan permitting adult establishments, such as the Hudson Yards, Meatpacking and Hells Kitchen neighborhoods are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment,[12] in addition to manufacturing and industrial uses. And these areas are largely accessible by public transportation. The zoning districts mapped in these neighborhoods are high-density commercial districts which are typically only mapped in areas with a high degree of transit accessibility as

---

[10] Six of those 12 lots are in the Hudson Yards special district, which was re-zoned in a manner that allows adult use after the City submitted its papers in the prior adult use litigations. These six lots are denominated "HY" under the "Special District" column on Exhibit B.

[11] One lot (Manhattan, Block 1090, Lot 7) identified by Berzak could not be located by DCP.

[12] Indeed, as plaintiffs point out, eight lawful adult establishments already operate in Manhattan. Kelly Decl., at ¶ 38 (PJA Vol. 4 at 187) & Knecht Decl., at ¶ 27 (PJA Vol. 14 at 1654).

well as an established pattern of commercial development, where a high degree of future commercial development is anticipated. Thus, these districts are typically vibrant, flourishing commercial centers supporting a wide range of activities from professional offices to entertainment uses. Given their accessibility to regional rail connections, multiple subway lines and bus routes, these districts attract a wide range of potential customers, and are therefore some of the most desirable locations to locate for commercial establishments of all types.

15. DCP recognizes that if an adult establishment relocates to one of these identified available lots, the number of remaining lots available for such use may be further reduced due to the buffer requirement in ZR Section 32-01(c) (which requires a 500-foot buffer for new adult establishments in specified C districts), and the prohibition (ZR Section 32-01 (d)) against more than one adult establishment on a zoning lot. Attached hereto as Exhibit C is a chart that shows the 39 available lots in Manhattan (each identified by an address in the columns on the top and left side of the chart). The rows of the chart indicate what effect an adult establishment relocating to a specific lot (indicated as a black box on the chart) has on the availability of other lots. The blank box in a row indicates that the lot in that column would not be available, and the boxes with numbers indicate the square footage for one floor available for an adult establishment for the lot in that column. For example, if an adult establishment was relocated to 530 West 33rd Street, lot 1007020175 (row 25), 35 of 39 lots would still be available and only part of lot 1006760001 would be available (94,779 square feet of that lot's 105,051 square feet). DCP also analyzed what the effect would be on available lots if all 24 adult establishments attempted to relocate in Manhattan. In that case, up to 13 adult establishments could simultaneously relocate in Manhattan.

16. The four other boroughs of New York City have an even wider variety of lots where adult establishments could relocate.[13] For instance, in Brooklyn[14] there are over 700 lots larger than 2,500 square feet, of these over 500 lots are larger than 5,000 square feet and of these over 300 lots are larger than 10,000 square feet. Exhibit D attached hereto is a map of Brooklyn that shows these available lots. These lots are in various neighborhoods in Brooklyn such as Sunset Park, Coney Island, East New York, Downtown Brooklyn, Gowanus and Red Hook, that are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial uses. Moreover, some of these neighborhoods, such as Downtown Brooklyn, Gowanus and Red Hook, as well as North Brooklyn, have developed hotels with over 2,000 rooms for tourists and are located in or near M1 districts, where adult entertainment uses are permitted. And these areas are largely accessible by public transportation. As with the examples in Manhattan, the districts mapped in these neighborhoods are only mapped in transit-accessible areas with an established commercial character, which feature a vibrant mix of professional, entertainment, and other commercial uses,

---

[13] As indicated above, DCP conducted an in-depth analysis of the available lots in Manhattan where an adult establishment could relocate. For the four other boroughs, DCP utilized the PLUTO tax lot dataset to determine where adult establishments could relocate. PLUTO is the standard dataset used in all DCP land use analysis and is the primary property dataset used by the City. PLUTO, like all datasets, may contain some errors or update lags. This typically requires spot checking sites either in the field or using street view software. For Manhattan, DCP spot checked each location determined to be available for adult establishments according to PLUTO. Some sites were later disqualified based on visual evidence (i.e. public facility/ownership, roadways, other transportation and utility uses, etc.). Spot checking was not conducted for the available lots identified in the other four boroughs due to the large numbers of lots identified through PLUTO and the likelihood that spot checking would render only a minimal number of these identified lots unavailable.

[14] Plaintiffs' papers identify five adult establishments in Brooklyn that would have to relocate if the adult use Zoning Resolution was enforced. See Knecht Decl., at ¶ 23 (PJA Vol. 14 at 1652).

benefitting from the access to a broad base of potential customers provided by multiple subway lines and bus routes.

17. In Queens there are nearly 1,000 lots larger than 2,500 square feet, of these nearly 700 lots are larger than 5,000 square feet and of these over 500 lots are larger than 10,000 square feet.[15] Exhibit E attached hereto is a map of Queens that shows these available lots. These neighborhoods, including Long Island City, Sunnyside, Maspeth and College Point, provide access to the city's broad customer base through their proximity to multiple subway lines and bus routes. These areas have an established pattern of commercial development, and in addition to their transit accessibility, have a high degree of accessibility to customers arriving by taxi, personal automobile, and increasingly, users of ride-hailing services. Given this unique mix of accessibility, these neighborhoods have a high degree of commercial activity suitable for a wide range of potential establishments. Moreover, some of these neighborhoods, such as Long Island City, La Guardia, Flushing and Jamaica-JFK have developed hotels with over 3,000 rooms for tourists and are located in M1 districts where adult entertainment uses are permitted.

18. In the Bronx there are over 550 lots larger than 2,500 square feet, of these over 450 lots are larger than 5,000 square feet and of these over 300 lots are larger than 10,000 square feet.[16] Exhibit F attached hereto is a map of Bronx that shows these available lots. These neighborhoods, including Hunts Point, Port Morris/ Mott Haven and Eastchester, provide access

---

[15] Plaintiffs' papers identify eight adult establishments in Queens that would have to relocate if the adult use Zoning Resolution was enforced. See Kelly Decl., at ¶ 38, Table 4 (PJA Vol. 4 at 187) & Knecht Decl., at ¶ 24 (PJA Vol. 14 at 1653). DCP has identified an additional three adult establishments that would have to relocate.

[16] Plaintiffs' papers identify two adult establishments in the Bronx that would have to relocate if the adult use Zoning Resolution was enforced. See Knecht Decl., at ¶ 25 (PJA Vol. 14 at 1653). DCP has identified one additional adult establishments that would have to relocate.

to the city's broad customer base through their proximity to multiple subway lines and bus routes. These areas have an established pattern of commercial development, and in addition to their transit accessibility, have a high degree of accessibility to customers arriving by taxi, personal automobile, and increasingly, users of ride-hailing services. Given this unique mix of accessibility, these neighborhoods have a high degree of commercial activity suitable for a wide range of potential establishments. The Bronx has over 1,000 hotel rooms in the borough providing rooms for tourists who could be using Bronx-based entertainment establishments. Approximately 36 percent of hotel rooms in the Bronx are located in M1 districts where adult establishments may be located.

19. In Staten Island there are over 550 lots larger than 2,500 square feet, of these over 450 lots are larger than 5,000 square feet and of these over 350 lots are larger than 10,000 square feet[17] Exhibit G attached hereto is a map of Staten Island that shows these available lots. These neighborhoods include the West Shore and Charleston, which are characterized by an established pattern of commercial development, albeit on a smaller scale than that in other boroughs. These areas are transit-accessible to borough residents by car, but transit accessibility from outside the borough is more limited than in similar areas in other boroughs, due to the lack of robust public transit options.

20. According to plaintiffs, each borough should be considered separately to determine where permissible adult uses may locate, given that they are different counties. Sclar Decl., at ¶ 105 (PJA Vol. 13 at 1508). This assertion is simply incorrect. New York City encompasses five county-level administrative divisions called boroughs, and each borough is

---

[17] Plaintiffs' papers do not identify any adult establishments in Staten Island that would have to relocate if the adult use Zoning Resolution was enforced.

coextensive with a respective county. Pursuant to Chapter 8 of the New York City Charter, planning and zoning for the City, including all boroughs, is the responsibility of DCP. Hence, the consideration of where adult establishments may locate must be undertaken on a City-wide basis, as is the case with respect to all uses under zoning. As is clear from the above analysis, there is more than sufficient space in vibrant areas within the City of New York for adult establishments to operate.

Dated:     New York, New York
               January 30, 2019

                                              **Anita Laremont**