UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

689 EATERY CORP., etc., *et ano.,*       :
                     Plaintiffs,
      :

          - against -                         Civil Action No.
      :                02 CV 4431 (WHP)
THE CITY OF NEW YORK, et al.,
                     Defendants.   :
----------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*    :
                     Plaintiffs,
      :

          - against -                         Civil Action No.
      :                02 CV 4432 (WHP)
THE CITY OF NEW YORK, et al.,
                     Defendants.   :
----------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*      :
                     Plaintiffs,
      :

          - against -                         Civil Action No.
      :                02 CV 8333 (WHP)
THE CITY OF NEW YORK,
                     Defendant.    :

----------------------------------------------------------------X

**CLUB PLAINTIFFS' AMENDED REPLY TO DEFENDANT'S
RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY
INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

I.      Introduction .......................................................................................................... 1

II.     The City's Response as to the Applicable Preliminary Injunction Burden
        of Proof Entirely Ignores the Supreme Court's Clear Rule that the Burdens
        of Proof at Preliminary Injunction Track the Burdens at Trial. ........................... 2

III.    The Mandatory Termination Requirement, which Applies Only to Adult
        Businesses and not to Other Non-Conforming Uses, Imposes an
        Unconstitutional Content-Based Restriction on Speech and Violates Equal
        Protection. ............................................................................................................ 3

IV.     There Was and Is Patently Insufficient Factual Justification for the 2001
        Amendments to Satisfy Federal Constitutional Standards. ................................. 6

V.      The City Has Failed to Prove that Sufficient Alternative Sites are Available. .............. 9

        A.      The City has failed to show a likelihood that its adult zoning scheme
                will withstand scrutiny under *Alameda Books'* proportionality
                requirement. ............................................................................................ 9

                1.      The City has incorrectly misinterpreted the controlling
                        "proportionality test." .................................................................. 9

                2.      Undisputed evidence shows that the 2001 Amendments will
                        *substantially* restrict the public's access to expression. ........................... 11

        B.      Even under pre-*Alameda* case law, the City has failed to demonstrate
                a likelihood that the 2001 Amendments will be found constitutional. ................ 13

                1.      Looking at Manhattan alone, the City has failed to show
                        that it would prevail under the *Renton* alternative sites standards. ........... 13

                2.      The City has proffered no competent evidence to show a
                        likelihood that it would prevail under a *Renton* analysis even if
                        Manhattan is not considered independently. ............................................. 14

VI.     The City's Permitting Scheme is Facially Invalid ............................................... 15

        A.      The City cannot compel Plaintiffs to relocate until it first has a
                facially valid permit scheme in place, and its future plans are irrelevant. ........... 15

i

B.    The City has failed to demonstrate a likelihood that its current permitting scheme for adult businesses will be found constitutional. .................16

1.    The City has not disputed the discriminatory nature of its *existing* permit scheme and has provided no meaningful defense of its current permitting scheme for adult businesses. .................16

2.    Because the City's permitting scheme is facially discriminatory, it is a facially invalid prior restraint and cannot be salvaged by assertions of justification. .........................................................................17

3.    The City's removal of any specified time periods whatsoever for issuance of a building permit following plan approval independently demonstrates a likelihood that Plaintiffs will succeed in their permitting challenges. ...................................................19

4.    The City's defense of Plaintiffs' "sensitive use veto" challenge fails. ..........................................................................................19

VII.    Conclusion .........................................................................................................20

# TABLE OF AUTHORITIES

## Cases

*Abilene Retail #30, Inc. v. Board of Comm'rs of Dickinson County*,
492 F.3d 1164 (10th Cir. 2007) ........................................................................9

*Alameda Books, Inc. v. City of Los Angeles*, No. CV95-7771
(C.D. Cal. July 16, 2008) ..............................................................................9

*Alameda Books, Inc. v. City of Los Angeles,* 631 F.3d 1031 (9th Cir. 2011) ...............................11

*Annex Books, Inc. v. City of Indianapolis*, 581 F.3d 460 (7th Cir. 2009) ........................... 10-11

*Ashcroft v. ACLU,* 542 U.S. 656 (2004) ...................................................................... 2-3

*Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702 (7th Cir. 2003) ..................................10

*Buzzetti v. City of New York*, 140 F.3d 124 (2d Cir. 1998) ...........................................8

*City of Los Angeles v. Alameda Books*, 535 U.S. 435 (2002) ............................................. *passim*

*City of New York v. Dezer Properties, Inc.,* 95 N.Y.2d 771 (2000) ...................................7

*City of New York v. Les Hommes,* 94 N.Y.2d 267 (2000) ...............................................7

*City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986) ....................................8, 13

*Ctr. For Fair Pub. Policy v. Maricopa Cnty.,* 336 F.3d 1153 (9th Cir. 2003) ...........................11

*Doe v. San Diego*, 313 F.Supp.3d 1212 (S.D. Cal. 2018) ...............................................16

*For The People Theatres of New York, Inc. v. City of New York,*
131 A.D.3d 279 (1st Dept. 2015) .................................................................7, 9

*For The People Theatres of New York, Inc. v. City of New York,*
29 N.Y.3d 340 (2017) ................................................................................7

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990)..............................................16, 18

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418 (2006) ............... 2-3

*Hickerson v. City of New York,* 997 F.Supp. 418 (S.D.N.Y.) *aff'd* 146 F.3d 99
(2d Cir. 1998) ......................................................................................8

*New Albany DVD, LLC. v. City of New Albany*, 581 F.3d 556 (7th Cir. 2009) ...........................11

*Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015) ................................................................4

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) ...........................................2-3

*Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546 (1975) ..................................18

*Ten's Cabaret, Inc. v. City of New York,* 38 Misc.3d 663 (Sup. Ct. N.Y. Co. 2012) ...............7, 9

*Thomas v. Chicago Park District*, 534 U.S. 316 (2002) ................................................17

*Town of Islip v. Caviglia*, 73 N.Y.2d 544 (N.Y. Ct. App. 1989) ...................................4

*United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) .............................3-4

*United States v. Stevens*, 559 U.S. 460 (2010) ...............................................................16

*Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 2000) ..........................................20

## Other

https://www.nycedc.com/sites/default/files/filemanager/
Resources/Economic_Data/borough_update/May_2016_Manhattan_
Borough_Report.pdf ..........................................................................................................14

I.       **Introduction**

Plaintiffs seek to enjoin, pending trial, unnecessary, unjustified, burdensome, and unconstitutional adult use zoning regulations targeting 60/40 businesses, that, in the 18 years since their passage, have never been enforced by the City of New York.   Despite these nearly two decades of nonenforcement, during which the areas surrounding Plaintiffs' seven businesses have flourished, the City, invoking an unprecedented mandatory termination provision applicable only to non-conforming adult uses, now seeks to close Plaintiffs' businesses, to force them to attempt to relocate to sites of uncertain availability and viability, and to subject them to a  discriminatory permitting process with no enforceable issuance deadlines, which, with other delaying factors, will keep them from opening, if at all, for many months, if not years on end.

This effort, if successful, risks immediate and irreparable injury to Plaintiffs' constitutionally-protected First Amendment rights and endangers the public's ability to access expressive entertainment of its own choosing.  And without good reason.  The City has not shown that 60/40 businesses like Plaintiffs' cause any adverse impacts to surrounding property values, crime rates, or (with their decorous exterior signage) overall aesthetic character.  To the contrary, the Community Boards for the Districts in which Plaintiffs' businesses are located reported no deleterious impacts from those establishments.  In truth, a panoramic photograph of Plaintiffs' business locations and their neighbors would be both visually unremarkable and indistinguishable from any other commercial grouping because, consistent with the record in this case, they do not generate adverse secondary effects in their current locations. As a result, the City stands to gain very little by compelling Plaintiffs' nightclubs to close

In stark contrast, and particularly in Manhattan where six of Plaintiffs' seven businesses are located, Plaintiffs and the public will suffer significant temporary and potentially permanent

1

loss of their reciprocal freedoms of speech.  On balance, and given the 18-year status quo in which adult-oriented expression has been consistently and lawfully presented at Plaintiffs' businesses, and the lack of adverse secondary effects attributable to them, these circumstances decidedly support the issuance of a preliminary injunction against the 2001 Amendments.

## II.     The City's Response as to the Applicable Preliminary Injunction Burden of Proof Entirely Ignores the Supreme Court's Clear Rule that the Burdens of Proof at Preliminary Injunction Track the Burdens at Trial.

The parties agree that: 1) the Second Circuit's general rule is that a preliminary injunction should issue when the moving party establishes irreparable injury and *either*: a) a likelihood of success, or b) that it is raising significant issues coupled with a balance of hardships strongly in its favor; and 2) the Second Circuit imposes a more rigorous test for an interim injunction against enforcement of a public law.  In such cases the moving party must establish at least a slight probability of success. But the parties disagree as to which party bears the burden of proving, at this preliminary stage, whether the 2001 Amendments violate the First Amendment. As the Supreme Court has clearly stated, ***"the burdens at the preliminary injunction stage track the burdens at trial."***  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006) (emphasis added). The Third Circuit, which shares the requirement that a preliminary injunction involving a public law be based on a likelihood of success, agrees, citing both the Supreme Court's controlling opinions in *Gonzales*, 546 U.S. at 429, and *Ashcroft v. ACLU,* 542 U.S. 656, 666 (2004).  *See Reilly v. City of Harrisburg*, 858 F.3d 173, 180 (3d Cir. 2017); Pl. Br.[1] at 11. In both of those cases, the government had the burden of proof at trial, and the Supreme Court held that the government also had the burden of proof on preliminary injunction.

---

[1] References to "Pl. Br." are to the Club Plaintiffs' memorandum in support of their Motion for Preliminary Injunction.

The government clearly bears the burden at trial of proving the constitutionality of any law challenged on First Amendment grounds. *See, e.g., Ashcroft*, 542 U.S. at 666; *United States v. Playboy Entertainment Group, Inc*., 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions.) That same rule applies here.  Under *Gonzales, Ashcroft*, and *Reilly*, the City must establish probable success on the merits, not Plaintiffs.  The City neither refuted nor even responded to this crucial procedural distinction, although it agreed that Plaintiffs demonstrated irreparable injury due to the First Amendment nature of their claims. Resp.[2] at 3-4. Accordingly, Plaintiffs are entitled to interim relief because the City has failed to demonstrate a likelihood that it will prevail at trial. However, even if the burden of demonstrating a likelihood of success is on Plaintiffs at this preliminary stage, their evidence and authorities amply meet that burden.

## III. The Mandatory Termination Requirement, which Applies Only to Adult Businesses and not to Other Non-Conforming Uses, Imposes an Unconstitutional Content-Based Restriction on Speech and Violates Equal Protection.

Plaintiffs have sought injunctive relief based upon numerous constitutional flaws with the 2001 Amendments, all supported by voluminous factual declarations and exhibits.  Plaintiffs, however, are also entitled to a preliminary injunction solely on the basis of their facial challenge to the mandatory termination provisions, which requires no factual analyses and fully justifies interim relief allowing Plaintiffs to remain in operation at their current locations. Without regard to the constitutionality of the burdens imposed by the 2001 Amendments, the mandatory termination of (essentially) only one category of non-conforming use, expressly defined by the content of the expression it presents, i.e., adult entertainment, violates the First Amendment and equal protection, thus requiring issuance of a preliminary injunction.  Because the mandatory

---

[2] References to "Resp." are to the City's response in opposition to Plaintiffs' Motion for Preliminary Injunction.

termination provisions differentiate between businesses based exclusively on the content of their expression, the City bears the burden of proving that its discriminatory treatment of adult uses is sufficiently justified.  *See Playboy Ent.*, 529 U.S. at 816.  The City has not disputed that the mandatory termination applies almost exclusively to *adult* non-conforming uses, and it has cited no relevant authority upholding such uniquely discriminatory treatment of expressive nonconforming uses.[3] As a result, it has failed to meet its burden to demonstrate a likelihood that this aspect of its zoning scheme will survive constitutional challenge.

Under both *City of Los Angeles v. Alameda Books*, 535 U.S. 435 (2002), and *Reed v. Town of Gilbert*, 135 S.Ct. 2218 (2015), laws singling out particular expressive activities for unique treatment are content-based and require heightened justification.  Virtually the *only* non-conforming uses in the City subject to mandatory termination are those involving and defined by the content of their adult entertainment expression.  As such, under *Reed,* the City must demonstrate that the distinction is supported by a compelling interest and that the termination provision is the least restrictive means of furthering that interest or, under *Alameda,* that its benefits substantially outweigh its impact on expression, none of which it has accomplished here.

In response to Plaintiffs' challenge to its mandatory termination requirements for nonconforming adult businesses, the City offered no compelling interest to justify its uniquely

---

[3] The only case cited by the City on this point is *Town of Islip v. Caviglia*, 73 N.Y.2d 544 (N.Y. Ct. App. 1989), which is both distinguishable and reliant on overruled case law.  Specifically, *Islip* did not involve a scheme imposing a *discriminatory* termination requirement on adult non-conforming uses.  The only challenge it addressed was whether a termination requirement on non-conforming adult entertainment uses *automatically* violated the First Amendment as a content-based restriction.  No argument was made or considered asserting that *unequal* or *discriminatory* termination requirements which treat adult non-conforming uses far worse than all others violate either the First Amendment and/or the Equal Protection Clause.  Second, *Islip* based its rejection of the challenge solely on the now-rejected notion that adult zoning ordinances are content-neutral if they have content-neutral *justifications*.  That is no longer the law.  *See Alameda Books*, 535 U.S. at 448 ("These ordinances are content based, and we should call them so") (Kennedy, J., concurring); *Reed*, 135 S.Ct. 2218; *see also* Pl. Br. at pp. 14-15, 57.

discriminatory and draconian treatment of this one type of nonconforming use. Rather, the City essentially argued only that Plaintiffs have already received adequate *de facto* amortization from this litigation. That argument is a non sequitur, however, because the sole issue is whether *any* discriminatory termination requirement may be imposed uniquely against one category of expressive businesses. What is more, far less restrictive means such as nuisance abatement proceedings are available for dealing with any problematic non-conforming adult business, rendering the mandatory termination of *all* adult nonconforming uses not narrowly tailored to the City's undefined interest in closing them. Moreover, the absence of any evidence of current or recent negative impacts caused by either Plaintiffs' businesses or 60/40 uses more generally underscores that mandatory termination is an exceptionally harsh and unnecessary remedy, particularly given that virtually no other nonconforming New York uses are required to terminate at all, let alone within a year, after becoming nonconforming. Given the lack of justification for treating adult uses so glaringly differently and the availability of alternate remedies for addressing problematic businesses, Plaintiffs are likely to prevail at trial on their claim that the mandatory termination provisions are unconstitutional.

The relief Plaintiffs seek as to this claim is only preliminary, pending trial. It is narrow and not dependent on whether the 2001 Amendments are deemed unconstitutional. Even if the Court were ultimately to uphold the 2001 Amendments, allowing them to be enforced prospectively against new adult uses, the Court should still preliminarily enjoin the City from enforcing the mandatory termination provisions against Plaintiffs, given that these provisions improperly target adult uses because of the content of their expression.

**IV.    There Was and Is Patently Insufficient Factual Justification for the 2001 Amendments to Satisfy Federal Constitutional Standards.**

Plaintiffs have argued that "the 2001 Amendments violate the First and Fourteenth Amendments because they are unsupported by a substantial governmental interest." *See* Pl. Br. at pp. 31-40.  Plaintiffs' opening brief noted that (*id.* at pp. 37-38):

> The legislative record indicates that the 2001 Amendments were passed to close a perceived loophole in the application of adult business zoning regulations to businesses that present adult entertainment in less than 40% of their physical space and not to address any secondary effects caused by 60/40 uses. (*See* PJA 551-1031; RJN Exs. 33-42)  The City Council had before it the 1994 Report, but that study references only much more intense 100% adult businesses, not the benign 60/40 businesses (see PJA 860-61; RJN Ex. 38 at pp. 37-38) and is therefore [sic] irrelevant. In addition, the 1994 Report contained summaries of other jurisdictions' secondary effects studies, but the City Council did not receive or review the studies themselves, so those studies must also be discounted. (PJA 551-1031; RJN Exs. 33-42)  In reality, the City Council had no evidence before it that even remotely supported the idea that 60/40 uses generate secondary effects, nor did it appear to be adopting the 2001 Amendments based on that rationale.

In addition, Plaintiffs emphasized the affirmative evidence before the City Council in 2001 that the existing 60/40 businesses in Manhattan generated no undesirable secondary effects and presented expert testimony from Dr. Lance Freeman demonstrating that the conditions in Times Square which precipitated the 1995 Ordinance no longer exist.  *Id*. at pp. 6, 38-9.

In opposition, the City disputed not a single fact advanced by Plaintiffs regarding the legislative history of the 2001 Amendments, but instead asserted that "the 2001 Amendments address the negative secondary effects identified in the 1994 DCP Study" (Resp. at 26-32) -- a study that Plaintiffs have proven by uncontroverted expert testimony is outdated and irrelevant. In addition, the City admitted (as it must, given the legislative history) that the purpose of the 2001 Amendments was ___**not**___ to address negative secondary effects associated with 60/40 uses but rather to "close [perceived] loopholes in the 1995 zoning regulations." *Id*. at 8, 14-16. However, there were no such "loopholes." What the City considered "sham compliance" with its 60/40 rule, the

New York Court of Appeals found to be *bona fide* compliance. *See City of New York v. Dezer Properties, Inc.*, 95 N.Y.2d 771 (2000); *City of New York v. Les Hommes*, 94 N.Y.2d 267 (2000). The City thus adopted the 2001 Amendments only in order to legislate around these judicial decisions, ***not*** because there were any adverse secondary effects caused by 60/40 uses that required further intervention. And surely today the City cannot possibly justify its intention to close Plaintiffs' businesses on the basis of the 1994 Study, given that its application to modern-day New York City is specious at best.

Plaintiffs' conclusion that the 2001 Amendments were and are unsupported by a substantial government interest is supported by the state court rulings analyzing the constitutionality of the Amendments under the New York Constitution. The state trial court found, and the Appellate Division affirmed, that the City failed to prove the constitutionally required nexus between 60/40 uses and adverse secondary effects, and that Plaintiffs had proven there were no such secondary effects. *See Ten's Cabaret, Inc. v. City of New York*, 38 Misc.3d 663 (Sup. Ct. N.Y. Co. 2012) (findings of fact and conclusions of law), *aff'd sub nom. For The People Theatres of New York, Inc. v. City of New York*, 131 A.D.3d 279 (1st Dept. 2015).

While the New York Court of Appeals subsequently upheld the 2001 Amendments under the state constitution, *see For The People Theatres of New York, Inc. v. City of New York*, 29 N.Y.3d 340 (2017), *cert. den.* 138 S.Ct. 994, 1000 (2018), ***the affirmed findings of fact were never challenged or overturned***. Accordingly, the New York courts' affirmed findings of fact clearly establish that Plaintiffs have a likelihood of success on their federal challenge, since Plaintiffs will either establish the same facts based on estoppel or through the same overwhelming evidence that supported the state courts' factual findings in the first instance.

Cases such as *Buzzetti v. City of New York*, 140 F.3d 134 (2d Cir. 1998), and *Hickerson v. City of New York*, 997 F.Supp. 418 (S.D.N.Y.) *aff'd* 146 F.3d 99 (2d Cir. 1998), upholding the facial constitutionality of the 1995 Ordinance, are irrelevant for purposes of analyzing whether the 2001 Amendments were factually justified by sufficient evidence of secondary effects, either at the time of enactment or as they are being applied today. Although the lower state courts recognized and the City Council had evidence before it that by 2001 the facts on the ground had dramatically changed due to compliance with the 1995 signage standards and the 60/40 use requirements, vastly reducing both the number and impact of adult uses and 60/40 uses in particular, the City and the New York Court of Appeals, in its ruling which ignored the facts found by the lower state courts and facilely permitted the City to rely on the 1994 Study to justify the 2001 Amendments, did not take these changes into account. Thus, while the New York Court of Appeals upheld the 2001 Amendments under the state constitution, that conclusion is not controlling ***for purposes of applying federal constitutional standards***, and judged by the federal standards, the 2001 Amendments were (and remain) woefully devoid of justification.

This is so regardless of whether the 2001 Amendments are judged by the traditional *Renton* analysis which requires the City to show that the amendments are narrowly tailored to its interest in reducing adverse secondary effects, *see, e.g., City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), or by Justice Kennedy's "proportionality test" from *Alameda Books*, 535 U.S. at 444-53 (Kennedy, J., concurring), which requires a comparison of the justifications with the burdens imposed on expression when reviewing speech-restrictive zoning (e.g., zoning restrictions applicable to adult uses, but none other).  He observed:

> ***The plurality's analysis does not address how speech will fare under the city's ordinance***. As discussed, ***the necessary rationale for applying intermediate scrutiny*** is the promise that zoning ordinances like this one may reduce the costs of secondary effects ***without substantially reducing speech***. For this reason, it does

not suffice to say that inconvenience will reduce demand and fewer patrons will lead to fewer secondary effects. *** ***It is no trick to reduce secondary effects by reducing speech or its audience; but a city may not attack secondary effects indirectly by attacking speech.*** [Emphases added.]

In this case there was (and is) clearly no effort made by the City to satisfy its burden of demonstrating both that 60/40 uses generate adverse secondary effects and that whatever amelioration of secondary effects may occur is not substantially outweighed by the deleterious impact on expression, other than its reliance on the 1994 Study (made at a time when there were no 60/40 uses and they clearly were not studied) -- a reliance plainly not justified by the facts. *See Ten's Cabaret*, 38 Misc.3d 663, *aff'd sub nom. For The People Theatres of New York, Inc. v. City of New York,* 131 A.D.3d 279; *Abilene Retail #30, Inc. v. Board of Comm'rs of Dickinson Cty.*, 492 F.3d 1164, 1173-4 (10th Cir. 2007) (requiring government to produce evidence establishing a link between the types of businesses it intends to regulate and the secondary effects it seeks to remedy); *Alameda Books, Inc. v. City of Los Angeles*, No. CV95-7771, at *9 (C.D. Cal. July 16, 2008) (same). Moreover, there was (and is) no effort made by the City at all to analyze the qualitative impact of the 2001 Amendments on how speech will fare or to explain how the 2001 Amendments reduce secondary effects ***without*** reducing speech or its audience, as required by *Alameda*. As a result, the City's 2001 Amendments are unconstitutional, because they are unsupported by a sufficient governmental interest in regulating the location of 60/40 businesses.

V.      **The City Has Failed to Prove that Sufficient Alternative Sites are Available.**

     A.      **The City has failed to show a likelihood that its adult zoning scheme will withstand scrutiny under *Alameda Books'* proportionality requirement.**

          1.      **The City has incorrectly misinterpreted the controlling "proportionality test."**

At p. 16 of its Response, the City says:

> Plaintiffs' purported proportionality test – that the City should be required to prove that its regulations decrease secondary effects more than they decrease the availability of the relevant expression – is based on a flawed and overbroad reading of Justice Kennedy's concurrence in *Alameda Books*.

But it is clearly the City's reading of Justice Kennedy's opinion which is flawed. If anything, Justice Kennedy's articulation of his proportionality test was even *more strongly worded* than the City's (and Plaintiffs') paraphrasing of it. He actually gave as an example of a valid ordinance one having only a "trivial" impact on expression," *Alameda Books*, 535 U.S. at 445, but then announced an alternative test *slightly* less demanding of the City, specifically, that any adult zoning law "leave the quantity and accessibility of the speech substantially undiminished." *Id.* He pronounced the contours of his new proportionality test as follows: "[A] promised proportional reduction does not suffice… The claim must therefore be that ... the quantity of speech will be substantially undiminished, and that secondary effects will be *significantly* reduced." *Id.* at 451 (emphasis added.) Accordingly, the City must *at least* prove that its regulations decrease secondary effects more than they decrease the availability of the relevant expression. The City's assertion that Plaintiffs have given this test an "overbroad" interpretation is utterly contrary to the clear language in the opinion.

The City relies on an older Seventh Circuit opinion, *Ben's Bar, Inc. v. Vill. of Somerset*, 316 F.3d 702 (7th Cir. 2003), a case argued just seven days after *Alameda Books* was decided, for its strained interpretation of this otherwise plain language from Justice Kennedy. *Ben's Bar* did not even *attempt* to interpret Justice Kennedy's proportionality test. It merely examined his comments on the justification component, without discussing or analyzing the mandated "proportionality" analysis, i.e., a balancing of perceived benefits with burdens on expression. *Ben's Bar* is also inconsistent with more recent Seventh Circuit rulings. *See, e.g., Annex Books, Inc. v. City of Indianapolis,* 581 F.3d 460, 465 (7th Cir. 2009) (describing Justice Kennedy's

proportionality test as the holding of the Court and applying it to an adult use hours of operation restriction); *New Albany DVD, LLC. v. City of New Albany*, 581 F.3d 556, 561 (7th Cir. 2009) (applying proportionality test to city's attempted litter removal justification for adult zoning ordinance).

Likewise, the City relies on *Ctr. For Fair Pub. Policy v. Maricopa Cnty.*, 336 F.3d, 1153 (9th Cir. 2003). That case, held that Justice Kennedy's proportionality requirement was not intended to apply to restrictions on hours of operation of adult businesses, but only to adult zoning laws—as involved here. Indeed, the Ninth Circuit itself, on remand in *Alameda*, concluded that the proportionality test *fully applied*. *Alameda Books, Inc. v. City of Los Angeles*, 631 F.3d 1031 (9th Cir. 2011):

> Most important for our purposes, Justice Kennedy's concurrence provided that "a city must advance some basis to show that its regulation has the purpose and effect of suppressing secondary effects, while leaving the quantity and accessibility of speech substantially intact." 535 U.S. at 449.  Put another way, "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion." *Id*. Justice Kennedy reasoned that "[i]t is no trick to reduce secondary effects by reducing speech or its audience." Id. at 450,. Applying that principle to the present facts, [J. Kennedy's] concurrence explained that, "the premise [underlying the Ordinance] must be that businesses—even those that have always been under one roof—will for the most part disperse rather than shut down."  [535 U.S.] at 451.  Taken as a whole, then, the Supreme Court's *Alameda Books* opinion requires courts to employ the new burden-shifting framework when applying the traditional *Renton* analysis, and provides that a municipality's justification must not be that its regulation will reduce secondary effects simply by reducing speech proportionately.

### 2.    Undisputed evidence shows that the 2001 Amendments will *substantially* restrict the public's access to expression.

The *undisputed* evidence is more than sufficient for issuance of a preliminary injunction. First, it is undisputed that enforcement of the 2001 Amendments will cause the immediate closure of 24 existing 60/40 businesses in Manhattan *alone*. Laremont Dec. at 6-7. Second, according to the City, at *most* there are legally permissible locations in Manhattan for only 13 of these 24

businesses. (Plaintiffs believe the number is only 9.) *See* Reply Declaration of Michael Berzak Re Sites Issues ("Berzak Sites Reply Dec") at ¶ 8, Plaintiffs' Joint Reply Appendix ("PJRA") at 2025 *et seq.* The evidence is also undisputed that, as a practical matter, it would take more than a year for any of the displaced 60/40 eating and drinking establishments to reopen at a new location, assuming they were able to find one, and some *far* longer. *See* Berzak Permitting Dec., ¶ 45, PJA 121.

This means that, *for at least a year*, the public will absolutely be denied access to the entertainment presented by the Club Plaintiffs. Regardless of whether the majority of these businesses will ever have a reasonable opportunity to relocate, the uncontroverted facts demonstrate that public access to expression will be permanently and severely diminished in Manhattan and will be totally eliminated *anywhere* for at least a year.

Additionally, the undisputed evidence is that even among the few legally permissible lots in Manhattan, a far smaller number of them actually represent viable sites where a reasonable businessman would attempt to relocate.[4]  If the 2001 Amendments force businesses to close or relocate, but the relocation sites, though legally permissible, are not commercially feasible for such businesses, as a practical matter, there will be few or no relocating businesses and access to expression will be severely diminished.

Regardless of whether these various factors are relevant considerations under any pre-*Alameda* adult zoning law test, they are all highly relevant to a correct evaluation under *Alameda*'s proportionality requirement, which includes a practical, real-world examination of "how speech

---

[4] Plaintiffs' expert, Michael Berzak, an architect with decades of experience in locating adult entertainment businesses in New York, has personally inspected every arguably legally permissible lot in Manhattan which the City contends to be legally permissible and constitutionally countable and has found only 3 to be commercially viable for a relocating adult business.  Berzak Sites Reply Dec., ¶ 13, PJRA 2026-27.

will fare." *Alameda Books*, 535 U.S. at 450.  The undisputed facts here clearly demonstrate that the 2001 Amendments will substantially diminish the public's access to expression.

Finally, as stated in Point IV, *supra*, because there is no evidence before the Court that 60/40 uses have caused significant adverse secondary effects (and they have operated as an excellent field study to disprove the necessity for this ordinance during the last 17 ½ years), there is no question but that, under *Alameda's* proportionality test, *both* components of that test fully point in Plaintiffs' favor and that the City has failed to demonstrate a likelihood that it will be able to demonstrate the constitutionality of this ordinance

**B.     Even under pre-*Alameda* case law, the City has failed to demonstrate a likelihood that the 2001 Amendments will be found constitutional.**

Even prior to *Alameda Books,* an adult zoning law would be unconstitutional if it failed to allow a "reasonable opportunity to open and operate" an adult business.  *Renton*, 415 U.S. at 54. One *minimum* requirement under that prior case law was that if an adult zoning law forced more businesses to close than there were lawful relocation sites, it was facially invalid.  The City has failed to demonstrate a likelihood that it would prevail even under this minimal test.

**1.     Looking at Manhattan alone, the City has failed to show that it would prevail under the *Renton* alternative sites standards.**

The *undisputed* evidence demonstrates that there are an insufficient number of locations in Manhattan to which the existing businesses in operation in Manhattan can relocate. The parties agree there will be 24 displaced businesses and that *at least* 11 of them could not relocate in Manhattan.   (Plaintiffs believe only *nine* could do so.)   And the undisputed evidence also demonstrates that, because of its globally unique characteristics, Manhattan must be treated as a discrete jurisdiction for *Renton* alternative avenues analysis. Plaintiffs submitted uncontroverted expert testimony from urban planning expert Hugh Kelly demonstrating that entertainment

locations in Manhattan and in the outer boroughs are fundamentally unequal and that there are substantial economic, access, and audience benefits to being located in Manhattan that do not exist elsewhere in the City.  But the Court need not rely on Kelly's opinion to determine Manhattan's significance for zoning purposes; the City itself concedes that Manhattan is "the economic and financial capital of the world" and is home to 92.5% of the creative sector jobs in New York. *See* https://www.nycedc.com/sites/default/files/filemanager/Resources/Economic_Data/borough_upd ate/May_2016_Manhattan_Borough_Report.pdf, at 2, 4. And the Times Square area alone generates $110 billion annually in tourism income, attributes that can hardly be replicated in the outer boroughs. *Id*. at 9. Focusing specifically on Manhattan, the evidence before the Court shows that the 2001 Amendments fail the *Renton* test because they require closure of 24 businesses and, as Plaintiffs show, allow for only nine businesses to relocate.

> **2.    The City has proffered no competent evidence to show a likelihood that it would prevail under a *Renton* analysis even if Manhattan could not be considered independently.**

Even if the City may use outer borough lots to satisfy *Renton*, it is the City's burden to demonstrate a likelihood that those boroughs present a reasonable opportunity for relocation of all the displaced businesses city-wide. The City has presented no competent evidence of that fact, but only entirely unsupported *conclusions*. For example, the City admitted that for the outer boroughs, it did not conduct any on-site inspections, relying instead on PLUTO tax records (Laremont Dec. at 11, n. 13), but those records do not identify the proximity of existing nearby adult businesses and sensitive uses which would disqualify the site. (Neither do the City's maps of current available locations indicate consideration of nearby sensitive or adult uses.) Even more significantly, the City merely estimated the total number of permissible lots for all five boroughs, but that estimate is meaningless because it failed to state how many could be occupied *simultaneously* given the

500-foot buffer requirement. In short, the City has proffered no competent evidence to carry its burden on alternative sites even under a traditional *Renton* test.

**VI.     The City's Permitting Scheme is Facially Invalid.**

> **A.     The City cannot compel Plaintiffs to relocate until it first has a facially valid permit scheme in place, and its future plans are irrelevant.**

Attempting to defend the constitutionality of its building permitting scheme for adult businesses, the City submitted the declaration of DOB's Deputy Borough Commissioner Rodney Gittens for the apparent sole purpose of discussing speculative, poorly defined, and seemingly self-contradictory[5] permitting procedures which he claims "*will* be applicable" to adult business permit applicants if the 2001 Amendments are upheld. Gittens Dec., ¶ 1. Gittens candidly acknowledges that no such procedures are presently in place and that "[i]f and when the 2001 Amendments become enforceable, DOB will publish the permitting procedures applicable to adult establishments." *Id.* at 9, n. 9. While there are a host of reasons why the City's speculative proposal would not comply with constitutional requirements, the simplest dispositive response is that it is *irrelevant* to oppose the relief here sought because it offers no current protection to Plaintiffs and their First Amendment rights. Should the 2001 Amendments be enforced against Plaintiffs, the City's existing permitting procedures offer no guarantee that Plaintiffs could relocate to a conforming location within a reasonable time period or even at all.

The City's assertion that it will amend its faulty procedures at some later date in effect equates to a representation that the City will not apply its laws in a way that violates the First

---

[5] The possible future plans are self-contradictory because Gittens states that once DOB has reviewed an adult business' building permit application for adult zoning locational compliance, "DOB [staff] will not subject adult establishment applications' code . . . compliance to any further plan exam review." *Id.* at 6, ¶ 9.  But, in the same paragraph he says that "adult establishments will not be permitted to professionally certify permit applications/plans."  If the building plans may not be self-certified, then, like the plans of any other non-self-certifying applicant, all the construction details must be reviewed and approved by DOB plan exam officials.

Amendment.  But courts have repeatedly rejected these kinds of invitations to simply trust the government, particularly where fundamental free speech rights are at stake.  *See, e.g., United States v. Stevens*, 559 U.S. 460, 480 (2010) ("We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly.").  The Court should similarly reject the City's speculative promises here.

**B.    The City has failed to demonstrate a likelihood that its current permitting scheme for adult businesses will be found constitutional.**

**1.    The City has not disputed the discriminatory nature of its *existing* permit scheme and has provided no meaningful defense of its current permitting scheme for adult businesses.**

Plaintiffs asserted three distinct grounds of facial challenge to the City's existing permitting scheme for adult businesses. The City has not effectively defended any of those challenges, much less met its burden of showing a likelihood it would prevail on any or all of these points at trial.

First, Plaintiffs demonstrated that the existing permitting scheme has a discriminatory impact on adult businesses in two distinct respects: 1) it is the only category of use whose architects are denied the time-shortening option to self-certify their building plans; and 2) it is the only category of use where applications for approval of construction documents must first be pre-approved by the City's legal counsel. The City has not factually disputed either of these two well-documented allegations. Consequently, because the existing permitting scheme is uniquely discriminatory in its application to adult uses, Plaintiffs are entitled to challenge it facially. The City responds that facial challenges are disfavored, but entirely ignores the controlling Supreme Court decision directly on point, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990), holding that a facial constitutional challenge will lie against facially neutral permitting procedures and requirements if the "scheme...is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses." *See also Doe v. San Diego*, 313 F.Supp.3d

1212 (S.D. Cal. 2018) (recognizing the propriety of a facial challenge and issuing a preliminary injunction to adult businesses against enforcement of a facially neutral warrantless inspection requirement, applicable to all businesses subject to a police permit, upon a showing that such requirement had a unique and more onerous potential application to adult businesses).[6]

> **2.    Because the City's permitting scheme is facially discriminatory, it is a facially invalid prior restraint and cannot be salvaged by assertions of justification.**

The Gittens Declaration offers asserted justifications for the acknowledged discriminatory treatment given to adult business building permit applicants.  Those justifications are both flawed and entirely irrelevant to the constitutional question which must be addressed.

First, the only justification offered for the practice of mandatory preliminary review of adult business building permit applications by the City's legal counsel is the potentially complicated nature of determining whether the business is a truly compliant 60/40 use.  *See* Gittens Dec., ¶ 10. That analysis could conceivably, on rare occasions, involve legal determinations not easily within the ken or expertise of Building Department officials. However, the facts are undisputed that the City requires this same pre-clearance by its legal counsel even for all of the fully 100% adult businesses which have sought building permits, none of whom have complicated legal issues involving 60/40 compliance. Berzak Reply Permit Declaration, ¶ 6, PJRA 1976. All that is involved for those businesses is a determination of zoning and location compliance, and that is precisely what the Building Department is responsible for and well capable of determining.

---

[6] The City's reliance on *Thomas v. Chicago Park District*, 534 U.S. 316 (2002), is misplaced.  The City incorrectly relies on *Thomas'* statement that "we have never required that a content-neutral permit scheme regulating speech *in a public forum* must adhere to the procedural requirements set forth in *Freedman.*" (Resp. at 39) (emphasis added.) Permit requirements for private property do not fall under this observation. Nor did *Thomas* deal with a situation like the one both here and in *FW/PBS,* where a content-neutral "scheme...is more onerous with respect to sexually oriented businesses than with respect to the vast majority of other businesses." *FW/PBS*, 493 U.S. at 225.

17

Likewise, there is no justification for uniquely denying architects for adult business building permit applicants the ability to self-certify their construction plans.  Those architects typically have a high degree of experience in grappling with the relevant adult zoning questions, often not significantly different from the experience and understanding of many, if not most, DOB officials.  Moreover, if that were the sole justification for denying self-certification, the scheme is overbroad, since a less intrusive scheme would allow such businesses self-certification for all of their *construction* plans even if the architects were not allowed to self-certify zoning compliance.

Finally, the reasons for which the government ostensibly adopted a regulatory provision or standard practice are not constitutionally relevant when those provisions or practices impose presumptively-invalid prior restraints on expression. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558 (1975). Because such schemes either single out expressive businesses on their face, or routinely apply to them in a more onerous manner, these schemes stand or fall on whether they provide, *inter alia,* adequate procedural safeguards to ensure against the possibility of censorship by delay. *FW/PBS*, 493 U.S. at 229-30. In that regard, the City has not disputed any of Plaintiffs' contentions regarding the lack of any meaningful and enforceable time periods for action on their building permit applications.  While the City continues to require that compliant applications for approval of plans and/or construction documents must be granted within 40 days of filing, with one allowed 20-day extension, it has not disputed any of Berzak's factual allegations that these time limitations are never observed in practice for adult uses.

A hypothetical is useful to demonstrate why the City's written time limits and procedures are inadequate for protection of First Amendment rights.  Suppose, for example, a fully compliant building permit application is submitted for a new adult use at a lawful location.  The City acknowledges that, under the current scheme, such an application must first still be processed by

18

its legal department before the construction plans will even be reviewed by the Building Department, and that the legal department routinely takes several months to complete its review without recourse for the applicant. As this example demonstrates, a serious facial problem with the scheme is that it provides no *remedy* for violation of the 40-day requirement. The legal and Building Departments may (and routinely *do*) simply delay issuing a permit indefinitely, as they conduct their various levels of review, leaving the applicant without the ability to conduct business. As noted by the cases cited in Plaintiffs' Brief, such a scheme is as unenforceable and unconstitutional as one lacking any time limits whatsoever.

> **3.    The City's removal of any specified time periods whatsoever for issuance of a building permit following plan approval independently demonstrates a likelihood that Plaintiffs will succeed in their permitting challenges.**

Plaintiffs also challenged the City's permitting scheme on the ground that it established a second excessively long time period of 40 days (with one allowed 20-day extension) for granting a building permit *after* DOB has granted an application for approval of construction plans. The City merely points out that this provision has been repealed.[7] But Title 28, which replaced Title 27, suffers from an even more serious flaw, in that it contains *no time periods for permit issuance after plan approval whatsoever*. Because this is a facial challenge, the failure to establish any such time limits is fatal to the City's permitting scheme as applied to expressive businesses.

> **4.    The City's defense of Plaintiffs' "sensitive use veto" challenge fails.**

The main thrust of both the Gittens Declaration (p. 11, ¶ 21) and the City's Response (pp. 42-43) is that this claim is defeated because of what the City pronounces *will be* the likely procedures they will implement if the 2001 Amendments are upheld. Importantly, it does not

---

[7] While the City repealed the relevant portions of Title 27 in 2008, it never updated the sole online publication of these changes until very recently, after Plaintiffs had prepared their opening papers. *See* Garrou Declaration, PJRA 1978-81.

dispute that, currently, sensitive uses may avail themselves of procedures which allow them to obtain priority over adult business permit applicants who already have permit applications pending. As discussed previously, the City's hypothesized, speculative, and poorly defined future scheme is not at all relevant to today's conditions, and, until some new scheme has been duly enacted, cannot be the basis for denial of interim injunctive relief.

Additionally, Plaintiffs' point, buttressed by the holding in *Simi Valley*, 216 F.3d 807 (9th Cir. 2000), is that a zoning scheme for adult businesses is facially invalid if it fails to determine priority *at the time of filing* the permit application (assuming a timely and ultimately successful pursuit of the permit)*, not at the time of the permit's *issuance*. The City's proposed solution clearly does not purport to comply with this standard.

## VII.    Conclusion

As demonstrated in Plaintiffs' original motion and this brief, Plaintiffs are likely to prevail on their challenges to *at least* one or more of the three regulations at issue -- the 2001 Amendments, the mandatory termination provisions, and DOB's discriminatory permitting system -- any one of which would independently support an order of interim relief. The City has failed to meet its burden to demonstrate the likely constitutionality of those provisions. Because interim relief is needed to prevent serious, immediate, and conceded irreparable injury, Plaintiffs urge the Court to enter an Order in each of the above-captioned actions preliminarily enjoining enforcement of the 2001 Amendments, or alternatively, the mandatory termination provisions of AZR  52-77 and 72-41, and granting the Plaintiffs such other, further and different relief as is just, necessary and proper.

Respectfully submitted,


**DANIEL A. SILVER**
**SILVER & SILVER**
One Liberty Square
New Britain, Connecticut 06050-0698
(860) 225-3518

- and -

**JENNIFER KINSLEY**
Kinsley Law Office
Post Office Box 19478
Cincinnati, Ohio 45219
(513) 708-2595
kinsleylawoffice@gmail.com

*Attorneys for Plaintiffs*
*725 Eatery Corp., etc., et ano.*

By:  s/ Jennifer M. Kinsley
     Jennifer M. Kinsley


**EDWARD S. RUDOFSKY**
**ZANE and RUDOFSKY**
601 West 26th Street, # 1315
New York, New York  10001
(212) 245-2222

*Attorneys for Plaintiffs*
*59 Murray Enterprises, Inc., et al.*


By:  s/Edward S. Rudofsky
     Edward S. Rudofsky


21

**JOHN H. WESTON**
**G. RANDALL GARROU**
**WESTON, GARROU & MOONEY**
12121 Wilshire Boulevard, Suite 525
Los Angeles, CA 90025-1176
(310) 442-0072

- and -

**ALAN M. ABRAMSON**
**ABRAMSON & MORAK**
35 Worth Street New York, NY 10013
(212) 226-7098

*Attorneys for Plaintiffs*
*Club At 60th Street, Inc., etc., et al.*


By: s/John Weston_____
　　　John Weston