UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

725 EATERY CORP. d/b/a "Lace", and : 
689 EATERY, CORP. d/b/a "Satin Dolls", :
  :
                    Plaintiffs, :
  :
              -against- :
  :                                      02cv4431
CITY OF NEW YORK, BILL DE BLASIO, :
as Mayor of the City of New York, and RICK :
D. CHANDLER, as Commissioner of :
Buildings of the City of New York, :
  :
                    Defendants. :
  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

59 MURRAY ENTERPRISES, INC. a/k/a 59 :
MURRAY CORP. d/b/a "New York Dolls", :
AAM HOLDING CORP. d/b/a "Private :
Eyes", WEST 20TH ENTERPRISES CORP. :
d/b/a "VIP Club New York", and JNS :
VENTURES LTD. d/b/a "Vixen", :
  :
                    Plaintiffs, :
  :
              -against- :                02cv4432
  :
CITY OF NEW YORK, BILL DE BLASIO, :
as Mayor of the City of New York, and RICK :
D. CHANDLER, as Commissioner of :
Buildings of the City of New York, :
  :
                    Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - :

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                :
CLUB AT 60TH ST., INC., and                     :
JACARANDA CLUB, LLC d/b/a "Sapphire",            :
                                                :
        Plaintiffs,                             :       02cv8333
                                                :
        -against-                               :
                                                :
CITY OF NEW YORK,                               :
                                                :
        Defendant.                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                                                :
336 LLC d/b/a "The Erotica", CHELSEA 7          :
CORP., GOTHAM VIDEO SALES &                      :
DISTRIBUTION INC., RAINBOW                       :
STATION 7 INC., VIDEO LOVERS INC.,               :
VISHARA VIDEO, INC., EXPLORE DVD                 :
LLC, VISHANS VIDEO, INC., 725 VIDEO              :
OUTLET INC., JAYSARA VIDEO, INC.,                :
DCD EXCLUSIVE VIDEO INC., and 557                :
ENTERTAINMENT INC.,                             :       18cv3732
                                                :
        Plaintiffs,                             :       OPINION & ORDER
                                                :
        -against-                               :
                                                :
CITY OF NEW YORK, HON. BILL DE                   :
BLASIO, as Mayor of the City of New York,        :
and RICK D. CHANDLER, as Commissioner            :
of Buildings, Department of Buildings of the     :
City of New York,                               :
                                                :
        Defendants.                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

WILLIAM H. PAULEY III, Senior United States District Judge:

Plaintiffs—the owners and operators of gentlemen's cabarets (or in lay terms,

strip clubs) and adult bookstores primarily located in Manhattan—challenge the constitutionality

of amendments to sections of the Zoning Resolution of the City of New York (the "Zoning

Resolution," and the "City") that define and apply to adult establishments.  Tracing its origins to

1

the City's early 1990s crusade against adult entertainment businesses, this litigation has been ensnared in a time warp for a quarter century. During that interval, related challenges to the City's Zoning Resolution have sojourned through various levels of the state and federal courts.

Plaintiffs seek to preliminarily enjoin the City, the Mayor of the City, and the City's Commissioner of Buildings from enforcing the amendments, which would subject them to the City's stringent zoning and permitting scheme for adult establishments. In connection with Plaintiffs' motions, the parties have offered a Homeric record of affidavits, documentary evidence, and stipulations. Having reviewed the briefing and evidentiary submissions by the parties, this Court makes the following findings of fact and conclusions of law pursuant to Rules 52(a)(2) and 65 of the Federal Rules of Civil Procedure. Plaintiffs' motions for preliminary injunctions are granted, as specified in the conclusion of this Opinion & Order.

## BACKGROUND

While a far cry from political speech "entitled to the fullest possible measure of constitutional protection," Members of the City Council v. Taxpayers for Vincent, 466 U.S. 789, 816 (1984), nude dancing and erotic materials nevertheless fall within the ambit of the First Amendment's free speech guarantees, see City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (plurality opinion) (explaining that nude dancing may constitute expressive conduct that "falls only within the outer ambit of the First Amendment's protection"); Young v. Am. Mini Theatres, Inc., 427 U.S. 50, 70 (1976) (plurality) ("[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . .").

These consolidated actions represent the latest installment in a decades-long

dispute between purveyors of adult entertainment and the City that pits the First Amendment rights of private citizens against the government's interest in regulating the harmful secondary effects that may be engendered by that speech. The plaintiffs in these actions are part of an adult entertainment industry boom that began in the mid-1960s. The City—like many other municipalities across the United States—sought to contain the fallout of increased crime, lowered property values, and decreased quality of life by regulating where adult establishments could be located. Consequently, in 1995, the City adopted regulations that barred adult establishments from certain districts, prohibited them from being located near sensitive receptors such as schools and churches, and sought to disperse them.

The kaleidoscopic litigation that ensued ultimately upheld the constitutionality of the City's efforts. But it also resulted in a determination by New York's highest court that the regulatory scheme did not apply to adult establishments so long as they limited their adult component to less than 40 percent of their floor area and stock-in-trade. Unsurprisingly, many adult establishments did just that. In response to what it viewed as a naked attempt to skirt the adult-use regulations through nothing more than formalistic compliance, the City amended its regulations in 2001. According to the City, these amendments more faithfully effectuate the regulations, which it maintains were always intended to apply to establishments with a predominant, ongoing focus on sexually explicit content. On the other hand, the adult establishments principally argued that the City needed to—but did not—demonstrate some nexus between the reconfigured adult establishments and the negative secondary effects it identified in the early 1990s.

At center stage in these actions is the constitutionality of the City's 2001 amendments to its adult-use regulations. The plaintiffs may generally be cleaved into two

groups.  The first set of challengers to the City's adult-use regulations are owners and operators

of gentlemen's clubs that present exotic dancing in at least part of their establishments

(collectively, the "Club Plaintiffs").  The second set of challengers own and operate bookstores

that contain private booths for patrons to view adult films (collectively, the "Bookstore

Plaintiffs," and together with the Club Plaintiffs, the "Plaintiffs").  For background, this Court

describes the City's iterative efforts to regulate adult establishments and the legal challenges

mounted by those establishments before turning to the facts of this case.

I.       Adult Entertainment Regulation in New York City

            The events underlying these actions begin in the early 1990s, when the City

undertook efforts to regulate where adult businesses could be located.[1]  (Second Amended

Complaint of Plaintiff 725 Eatery, Corp. and Initial Complaint of 689 Eatery, Corp., ECF No. 77,

02cv4431 ("4431 Compl."), ¶¶ 11-13; Amended Complaint, ECF No. 20, 18cv3732 ("3732

Compl."), ¶¶ 43-47.)  Before that time, the City's Zoning Resolution did not distinguish between

adult establishments and non-adult commercial establishments for zoning purposes.  In late 1993,

however, the City's Department of City Planning ("DCP") undertook an "Adult Entertainment

Study," which was completed in September 1994.  (See Declaration of Kerri A. Devine, ECF

No. 101, 02cv4431 ("Devine Decl."), Ex. J (the "DCP Study").)

            A key question in these actions (and parallel challenges to the City's adult-use

regulations) is whether the DCP Study may be used to justify the City's 2001 amendments.

Thus, this Court reviews the DCP Study in considerable—though not exhaustive—depth.

---

[1]        The Club Plaintiffs' operative complaints contain materially identical recitations of the facts and legal
theories.  Likewise, Defendants filed an identical set of documents in opposition to Plaintiffs' motions for
preliminary injunction in all four actions.  (See ECF Nos. 101, 102, 103, 105, 02cv4431; ECF Nos. 58, 59, 60, 62,
02cv4432; ECF Nos. 83, 84, 85, 87, 02cv8333; ECF Nos. 50, 51, 52, 54, 18cv3732.)  For the sake of simplicity, this
Opinion & Order cites to the 4431 Complaint when referring to the Club Plaintiffs' identical allegations and to the
ECF numbers corresponding to the 02cv4431 docket when referring to documents submitted by Defendants.

A.  The 1994 Adult Entertainment Study

The purpose of the DCP Study was to evaluate the nature and extent of adverse impacts that adult establishments have on surrounding communities.  (DCP Study at 1.)  To that end, the DCP Study focused on three types of adult uses, defined generally as commercial establishments dealing in materials or activities of a sexual nature: adult video and bookstores; adult theaters showing film or live entertainment; and topless or nude bars.  (DCP Study at 1-2.)

1.  The Experience of Other Municipalities

The DCP Study briefly canvassed impact studies from several other municipalities—namely, Islip, New York; Los Angeles, California; Indianapolis, Indiana; Whittier, California; Austin, Texas; Phoenix, Arizona; Manatee County, Florida; New Hanover County, North Carolina; and the State of Minnesota.  (See DCP Study at 3-9.)  The DCP Study also reviewed methods other municipalities employed to regulate where adult establishments could be located, generally by concentrating adult uses in specified locations or by dispersing adult establishments throughout the municipality.  (See DCP Study at 9-15.)  Most of the impact studies from other municipalities appeared to find some correlation between the existence of adult establishments and increased crime, lowered commercial and residential property values, and/or lowered quality of life in surrounding commercial areas and residential neighborhoods.  However, several additional observations are warranted.

First, the DCP's scant treatment of each impact study spans only a few paragraphs, and the DCP Study's survey of these studies does not flesh out the causal link between adult establishments and negative secondary effects.  (See, e.g., DCP Study at 4 (noting that in the Los Angeles study, police department statistics indicated a "greater proportion of certain crimes in Hollywood (where the largest concentration of adult establishments is found in

the city) compared with the city as a whole").)  Second, the correlations observed in some of the impact studies can best be described as tepid.  For instance, the Los Angeles study conceded that "there was insufficient evidence to support the contention that concentrations of sex-related businesses have been the primary cause of [property devaluation]."  (DCP Study at 62.) Likewise, the Minnesota study observed that adult establishments concentrate in relatively deteriorated areas and "at most, they may slightly contribute to the continued depression of property values."  (DCP Study at 8.)  Third, the decrease in property values suggested by some of the impact studies is based on surveys of real estate professionals regarding what they believed the impact of an adult establishment would be.  Moreover, several of the impact studies rely on the experiences of and studies by other municipalities.

      2.  <u>The Antediluvian State of Affairs in Adult Entertainment</u>

The DCP Study also reviewed the adult entertainment industry as a whole and as it existed in New York City.  As for the former, the DCP Study observed the explosion in adult video sales and rentals beginning in the 1980s, along with the rise in upscale topless clubs and bars catering to a young, affluent clientele in the early 1990s.  (DCP Study at 16-19.)  With respect to New York City, the DCP charted the substantial growth of adult establishments from 9 such establishments in 1965 to 177 in 1993.  (DCP Study at 20.)  In line with nationwide trends, the number of adult bookstores or video stores and adult topless or nude bars increased between 1984 and 1993.  (DCP Study at 21.)   The DCP Study also found that the vast majority of adult establishments were located in Manhattan and Queens, especially in the Times Square and Chelsea neighborhoods in Manhattan.  (DCP Study at 20-23.)

In response to the proliferation of adult establishments in Times Square (particularly massage parlors, somewhat euphemistically referred to as "adult physical culture

establishments"), the City undertook efforts to regulate adult businesses in the mid- to late-1970s.  As the DCP Study explains, these efforts culminated in a proposal by the City Planning Commission (the "CPC") to establish five categories of adult uses, restrict those uses to particular districts, and subject them to other distance, concentration, signage, and amortization requirements.[2]  (DCP Study at 31-32.)  Notably, the CPC's proposal contained a safety valve under which the City's Board of Standards and Appeals and the CPC could exempt existing and new adult uses from these restrictions after making findings to ensure that any adverse impacts would be minimized.  (DCP Study at 32.)  Nonetheless, the City's early foray into comprehensive adult-use regulation proved only partially successful.  In particular, the CPC's proposal functionally pushed the City's adult establishments outside Manhattan and concentrated them in the outer boroughs, resulting in a public outcry that scuttled the proposed legislation.  (See DCP Study at 33 (statement by then–CPC counsel that "[t]he Commission was accused [by citizens of the four boroughs other than Manhattan] of fostering 'red light districts' in the outer boroughs[,] and the cry was raised ever more loudly to restrict adult uses to Manhattan") (second alteration in original).)  Thus, while the City eventually succeeded in eliminating massage parlors as a permitted use city-wide following a 1978 proposal by the CPC, "only part of the effort to control the location of adult uses was adopted legislatively."  (DCP Study at 33.)

       3.   Impacts of Adult Entertainment Businesses in New York City

       Importantly for purposes of Plaintiffs' motions, the DCP Study catalogues the impacts of adult uses identified by various studies and sources, starting with those identified by the CPC in 1977.  Specifically, the CPC had justified its 1970s regulatory efforts on the basis that they would "reduce the adverse economic and social effects that these concentrations

---

[2]     The five categories proposed by the CPC were adult bookstores, adult motion picture theaters, peep show providers, topless bars, and massage parlors.  (DCP Study at 31.)

produce." (DCP Study at 34 (citation omitted).) These impacts included "economic factors, increased criminal activity, the damaging influences on minors and the disruptive effects that adult uses have on neighboring residential communities and the youth of such communities." (DCP Study at 34-35 (citation omitted).)

The CPC's findings were generally corroborated by subsequent sources reviewed by the DCP Study. For instance, the 1983 Annual Report of The Mayor's Office of Midtown Enforcement highlighted the increased criminal activity occurring in districts with adult establishments. (DCP Study at 35-36.) Ten years later, a survey of businesses conducted by the Chelsea Action Coalition and Community Board No. 4 revealed widespread perceptions by the business community that adult establishments negatively impact Chelsea's reputation and the economic vitality of its businesses. (DCP Study at 37-38.) Property and business owners surveyed by the Times Square Business Improvement District (the "TSBID") in an April 1994 study also expressed their view that adult businesses negatively affect property values and contributed to declining business.[3] (DCP Study at 41.) The TSBID study also found a direct correlation between crime and the concentration of adult establishments based on a review of crime statistics. (DCP Study at 41.) Similarly, during a 1993 public hearing conducted by Manhattan's Task Force on the Regulation of Sex-Related Businesses, members of the community testified to increased crime and decreased quality of life wrought by adult establishments, especially in residential neighborhoods. (DCP Study at 38-39.) These community objections based on crime and quality of life concerns are also generally echoed in newspaper reports summarized by the DCP. (See DCP Study at 41-46.)

---

[3] The TSBID's review of data for assessed property values is somewhat inconclusive on this issue, remarking that "while it may be that the concentration of adult use establishments has a generally depressive effect on the adjoining properties . . . we do not have sufficient data to prove or disprove this thesis." (DCP Study at 40-41 (ellipses in original).)

In addition to relying on these extraneous sources, the DCP conducted its own community survey and analysis of criminal complaint statistics and property value data for six study areas to assess the impact of adult establishments.[4]  As to the former, the DCP surveyed community organizations, businesses, real estate brokers, police officers, and sanitation department officials in the study areas.  The results of the survey were mixed, suggesting that adult uses may negatively impact businesses, property values, quality of life in the community, and crime to different degrees.[5]  (DCP Study at 47-51.)  For example, over 80% of responding community organizations believed that adult establishments negatively impacted the community in some fashion.  (DCP Study at 49.)  Similarly, over 80 percent of responding real estate brokers reported that an adult establishment tended to decrease property values within a 500-foot radius, though several brokers acknowledged that the impact would be minimal or that other factors contributed to property values in the surrounding areas.  (DCP Study at 50-51.)  On the other hand, only roughly half of responding businesses believed that their business would be negatively affected by adult establishments, while a nearly equal number believed that their business would be positively affected by more bars, theaters, videos, or bookstores of any kind. (DCP Study at 49-50.)  And at the other end of the spectrum, the responding police officers "generally did not link higher incidents with adult uses," and four out of six respondents thought that adult uses had no effect on crime.  (DCP Study at 50.)

The results of the DCP Study's analysis of criminal complaint data for the three-

---

[4]     For each of the six areas—two in Manhattan and one in each of the other boroughs—the DCP compared survey blockfronts containing at least one adult use with similar control blockfronts without any adult uses.  Three of the areas studied contained only one adult use.  (DCP Study at 47.)

[5]     Twenty-three out of twenty-eight community organizations responded, compared with seventy out of ninety-seven businesses.  The sample sizes for real estate brokers, police officers, and sanitation department officials were comparatively smaller—namely, thirteen real estate brokers in total and one police officer and sanitation department official for each survey area.  (See DCP Study at 48-51.)

month period beginning on June 1, 1993 also failed to conclusively link adult establishments with increased crime rates. (DCP Study at 52-53.) After controlling for differences in land use and the number of blockfronts examined, the DCP Study found that in three of the six study areas, the blockfronts with adult uses had fewer criminal complaints than those without adult uses. In one study area, neither the blockfront with adult uses nor the blockfront without adult uses had any criminal complaints. And in only two study areas, the number of criminal complaints was higher for the blockfronts with adult uses than those without adult uses. Thus, the DCP Study found no causal link between adult establishments and criminal complaints, explaining as follows:

> In summary, it was not possible to draw definitive conclusions from the analysis of criminal complaints. Land uses other than adult entertainment establishments, e.g. subway station access, appear to have a far stronger relationship to criminal complaints. It was not possible to isolate the impact of adult uses relative to criminal complaints.

(DCP Study at 54.)

With respect to property values, the DCP compared the percentage change in property assessed valuations between 1986 and 1992 in survey blockfronts with the percentage change in control blockfronts, the community district, and the borough as a whole. As with its analysis of crime rates, the DCP Study found the impact of adult establishments on property values to be inconclusive, notwithstanding the responses by real estate brokers to the DCP's survey. (DCP Study at 54.) In the four study areas outside of Manhattan, the total assessed valuation increased by a greater percentage in the blockfronts with adult uses than those without adult uses. (DCP Study at 54-55.) However, in the two Manhattan study areas, the valuation for the non-adult-use blockfronts "substantially exceeded" the change in the assessed valuation for the adult-use blockfronts. (DCP Study at 54.) As the DCP Study explains,

> [i]t would appear that if adult entertainment uses have negative impacts, they are

overwhelmed by other forces that increased property values overall, at least as measured by assessed values. . . . While the total assessed values on the survey blockfronts [i.e., those with adult uses] may be influenced to some extent by the presence of adult entertainment uses, demonstrating such effects is very difficult.

(DCP Study at 54; see also DCP Study at 55 (listing reasons why the DCP's assessed value findings "are necessarily ambiguous")).)

4. The DCP's Conclusions and Recommendations

Despite the inconclusive results of its own analysis of crime statistics and property values, the DCP "believe[d] it appropriate to regulate adult entertainment establishments differently from other commercial establishments."  (DCP Study at 65.)  Though it disclaimed "[c]onsideration of the specific nature and extent of regulations that would be appropriate for adult entertainment establishments" in the City, it suggested that "restrictions on the location of adult uses in proximity to residential areas, to houses of worship, to schools and to each other" as other municipalities had done merited further consideration "in light of the negative impacts of adult uses in concentration."  (DCP Study at 65.)

Specifically, the DCP Study noted that "[n]umerous studies in other localities found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life."[6]  (DCP Study at 63; see also DCP Study at 56-58 (describing the negative secondary impacts found in studies conducted by various municipalities).)  The DCP Study reiterated that the number of adult establishments in the City had increased substantially from 131 establishments in 1984 to 177 in 1993, and that adult uses often tended to cluster together.  (See

---

[6]     There is nothing inherently problematic with the DCP Study's reliance on studies conducted by other municipalities.  See City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52 (1986) ("The First Amendment does not require a city . . . to conduct new studies or produce new evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.").

DCP Study at 56, 64.)  In particular, it observed that the Times Square and Chelsea

neighborhoods—with their higher concentrations of adult establishments—had more severe

negative secondary effects than areas with sparser concentrations of adult establishments.  (See

DCP Study at 64.)  In so concluding, the DCP summarized the studies, newspaper articles, and

other sources that documented the secondary effects of adult establishments in the City.  (See

DCP Study at 58-60, 64.)  Finally, it pointed to the results of its own survey,[7] in which a

substantial majority of real estate brokers and community organizations complained about the

negative impact that adult establishments had on property values and the community.  (See DCP

Study at 61, 63-65.)

> B.  The 1995 Adult-Use Regulations

On November 23, 1994, the Council of the City of New York (the "City

Council") adopted an application submitted by the DCP and approved by the CPC for a text

amendment to the Zoning Resolution to define the term "adult establishment" as a land use.

(Plaintiffs' Joint Appendix in Support of Plaintiffs' Motion for Preliminary Injunction ("PJA") at

1473.[8])  The adopted application imposed a one-year moratorium on the establishment of new

adult businesses and the extension or enlargement of existing adult businesses to allow

permanent adult-use zoning regulations to be developed, in part, as a result of the DCP Study.

---

[7]      To be certain, the DCP acknowledged that especially for the study areas with only one adult establishment,
"the DCP survey did not yield conclusive evidence of a direct relationship between the adult use and the urban ills
affecting the community."  (DCP Study at 62; cf. 4431 Compl. ¶ 13.)  However, it attributed this result to "the fact
that, in a city as dense and diverse as New York, it is difficult to isolate specific impacts attributable to any
particular land use"—an issue that also plagued other municipal studies.  (DCP Study at 62.)

[8]      The parties have submitted over 2,000 pages of affidavits and documentary evidence in connection with
Plaintiffs' motions.  This record includes the PJA and the sequentially numbered Plaintiffs' Joint Reply Appendix in
Support of Plaintiffs' Reply to Defendant's Response to Plaintiffs' Motion for Preliminary Injunction ("PJRA").
These materials may be found at ECF Nos. 80-96, 98, and 112-115 in case number 02cv4431; ECF Nos. 34-51, 54,
and 69-72 in case number 02cv4431; ECF Nos. 59-75, 80, and 97-100 in case number 02cv8333; and ECF Nos. 29-
45, 47, and 61-64 in case number 18cv3732.  For the sake of simplicity, this Court cites to the record page when
referring to a document that is part of the PJA or PJRA unless expressly stated otherwise.

(4431 Compl. ¶ 12; 3732 Compl. ¶ 47; see Devine Decl., Ex. L (the "1995 CPC Report"), at 1-5.) The Club Plaintiffs allege that the studies and ordinances referenced by the DCP Study were not provided to the City Council when it enacted the moratorium. (4431 Compl. ¶ 14.) This section outlines the City's efforts during the one-year moratorium to create a set of permanent regulations governing the types of adult establishments studied by the DCP, as well as the morass of litigation that followed.

      1.   The 1995 CPC Report and Proposed Amendments

On March 21, 1995, the DCP and the City Council's Land Use Committee filed a joint application to amend the Zoning Resolution. (PJA at 1475; Devine Decl., Ex. I (the "Karnovsky Decl."), ¶ 25.) The CPC approved the proposed zoning regulations (with modifications in response to public comment) in a September 18, 1995 report describing the regulations and explaining their bases, which this Court refers to as the "1995 CPC Report." As explained in the preamble to the 1995 CPC Report, the proposed regulations would discontinue the one-year moratorium and "provide permanent regulations governing the siting of adult establishments in a manner which works to protect against the adverse secondary effects of adult establishments while allowing sufficient opportunity for and access to adult materials." (1995 CPC Report at 1; see also 1995 CPC Report at 5.)

As described by the CPC, the proposed regulations were referred to the City's community and borough boards and the borough presidents for review and comment. (1995 CPC Report at 13-23.) Out of thirty-nine community boards, eleven voted in favor of the proposed zoning regulations, eleven others voted in favor but wanted to make the zoning proposal more restrictive (for example, by increasing the buffer zones or adding additional sensitive receptors), four voted in favor but wanted to make the zoning proposal less restrictive

(for example, by decreasing the buffer zones or cabining the list of sensitive receptors), and thirteen voted against the proposal. (1995 CPC Report at 13-16.) Of the thirteen community boards voting against the proposal, six still sought some restrictions on adult uses, and four wanted adult establishments banned entirely. (1995 CPC Report at 13.) The borough presidents for the Bronx and Staten Island recommended approval of the proposed regulations with modification, while the borough president for Manhattan recommended against approval. (1995 CPC Report at 17-19.) Similarly, the Bronx, Queens, and Staten Island borough boards voted to approve the proposed regulations with modification, whereas the Brooklyn and Manhattan borough boards voted against approval. (1995 CPC Report at 19-21.)

The CPC also conducted public hearings on the proposed regulations on July 26 and 27, 1995. (1995 CPC Report at 23-33.) Of the eighty speakers who testified, twenty-four testified in favor of the proposal, while fifty-six opposed. As a general matter, those in favor of the proposal pointed to the adverse secondary effects of adult establishments, such as decreased quality of life, increased crime, adverse economic impacts on businesses and property values, and the intrusion of adult establishments (and with them, gaudy or inappropriate signage) on the character of residential and commercial areas. (1995 CPC Report at 25-30.) It should be noted that while some speakers who opposed the proposed regulations cited constitutional concerns and the fear that such regulations would disproportionately target the gay and lesbian communities, the "great preponderance of testimony" against the proposed regulations actually "reflected the perception that the proposal was not restrictive enough and that adult uses should be prohibited in more areas of the City" based on some of the same secondary-effects rationales. (1995 CPC Report at 25-30.)

Ultimately, the CPC found the proposed zoning regulations (with modifications)

to be "an appropriate and necessary response to the adverse secondary effects stemming from adult establishments" identified by the DCP Study, the studies conducted in the City and in other municipalities, and public testimony.  (See 1995 CPC Report at 33-42.)  It explained how the locational, anti-concentration, signage, and amortization provisions were designed to target each of the identified adverse effects stemming from adult establishments.  (See 1995 CPC Report at 42-43.)  Referencing analyses conducted by the DCP,[9]  the CPC believed that the proposed regulations would continue to allow adult establishments to locate and operate in "substantial numbers in all boroughs and in a variety of locations, assuring sufficient access to adult materials." (1995 CPC Report at 44.)  Nonetheless, the CPC found modifications warranted in response to comments by the public.  First, the CPC recommended modifications that would increase the number of potential sites in Manhattan without significantly impairing the efficacy of the proposed regulations to account for Manhattan's greater share of adult establishments and potential users.  (1995 CPC Report at 45-48.)  Second, the CPC recommended modifications that would clarify the adult-use definitions to "tailor application of the regulations to the types of enterprises studied in the DCP Study."  (1995 CPC Report at 45; see 1995 CPC Report at 48-57.)

On October 25, 1995, the City Council passed Resolution No. 1322, adopting the CPC's approval of the proposed regulations (the "1995 Regulations").  In broad strokes, §§ 32-01 and 42-01 of the Amended Zoning Resolution ("AZR") subjected adult establishments in commercial and manufacturing zones to special locational, anti-concentration, signage, and amortization provisions on top of the existing regulations that governed non-adult commercial uses in those districts.  (PJA at 353, 356; 1995 CPC Report at 6-7.)  With respect to location, AZR §§ 32-01 and 42-01 barred adult establishments from residential districts as well as

---

[9]     The version of the 1995 CPC Report submitted by the parties does not appear to attach the DCP analysis, nor does it cite to any particular document.

commercial and manufacturing districts that permitted new residential uses.  (PJA at 354, 356; 1995 CPC Report at 7.)  In the specified commercial and manufacturing districts in which adult establishments would be allowed, AZR §§ 32-01 and 42-01 required each establishment to be located at least 500 feet from certain sensitive receptors (i.e., an existing house of worship, school, or daycare center); another adult establishment; or certain districts in which new residences were permitted—though houses of worship, schools, or daycare centers subsequently established within 500 feet of a conforming adult establishment would generally not render it non-conforming.  (PJA at 354, 356-57; 1995 CPC Report at 7-8.)  The 1995 Regulations also limited the number of adult establishments per zoning lot to one establishment, not to exceed 10,000 square feet of floor area and cellar space.  (PJA at 354, 357; 1995 CPC Report at 7-8.)

Under AZR §§ 52-734 and 52-77, non-conforming existing adult establishments would generally be required to terminate or change their operations to conform within one year of the effective date of the regulations or within one year of a subsequent map change to allow business owners to recoup their investment in the adult portion of the establishment.  (PJA at 359-60; 1995 CPC Report at 11.)  The amortization provisions set forth in AZR § 72-40 allowed owners to apply the Board of Standards and Appeals at least 120 days before the termination date for additional time to amortize their establishments.  (PJA at 361-62; 1995 CPC Report at 11.)  Existing adult establishments made non-conforming solely by virtue of being located within 500 feet of another adult establishment, being located in the same zoning lot as another adult establishment, or exceeding 10,000 square feet of floor area and cellar space were not subject to the termination provisions.  (PJA at 355, 357; 1995 CPC Report at 9.)

Of course, these special restrictions apply only to "adult establishments."  On that score, the 1995 Regulations amended AZR § 12-10 to define the term "adult establishment" and

four types of adult establishments distinguished primarily by their emphasis on "specified sexual activities" and "specified anatomical areas."[10] (See 1995 CPC Report at 6.) Specifically, the proposed regulations defined an "adult establishment" as a commercial establishment in which a "substantial portion" of the establishment includes an "adult book store," "adult eating or drinking establishment," "adult theater," or other "adult commercial establishment." (PJA at 351.) In turn, AZR § 12-10 defined an "adult book store" as a book store that has a "substantial portion" of its stock-in-trade printed matter or visual representations characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas." (PJA at 351.) An "adult eating or drinking establishment" was defined in the ordinance as an eating or drinking establishment that "regularly features" live performances or films characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," or employees who, as part of their employment, "regularly expose" to patrons "specified anatomical areas." (PJA at 351-52.) Similarly, AZR § 12-10 defined an "adult theater" as a theater that "regularly features" live performances or films characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," and included "commercial establishments where such materials or performances are viewed from individual enclosures." (PJA at 352.)

Importantly for purposes of subsequent legal challenges to the City's adult-use regulations, AZR § 12-10 also offered guidance in determining whether a "substantial portion" of a commercial establishment includes an adult use or whether a "substantial portion" of a book

---

[10]   "Specified sexual activities" were defined as "(i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals pubic region, buttock, anus or female breast." (PJA at 352.) "Specified anatomical areas" were defined as "(i) less than completely concealed and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed." (PJA at 353.) As the 1995 CPC Report explains, these terms were "used in most zoning ordinances throughout the country." (1995 CPC Report at 6.)

store's stock-in-trade contains the materials enumerated in the ordinance.  The former required a consideration of the following factors:

> (1) the amount of floor area and cellar space accessible to customers and allocated to such uses; and (2) the amount of floor area and cellar space accessible to customers and allocated to such uses as compared to the total floor area and cellar space accessible to customers in the establishment.

(PJA at 353.)  As for the latter, AZR § 12-10 prescribed the following considerations:

> (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of floor area and cellar space accessible to customers containing such stock; and (3) the amount of floor area and cellar space accessible to customers containing such stock as compared to the total floor area and cellar space accessible to customers in the establishment.

(PJA at 353.)

The 1995 CPC Report explains why the CPC embraced a quantitative test based on floor area rather than a qualitative test.  Specifically, the 1995 CPC Report noted that "[p]articular concern was expressed regarding the use of the word 'substantial' in the definitions of adult book stores and of adult establishments.  Certain speakers questioned whether the word provided sufficient guidance to an enforcement official to allow enforcement in an objective, non-biased, manner."  (1995 CPC Report at 50.)  To allay these concerns, the 1995 CPC Report recommended that "substantial" be defined in terms of floor area:

> To further the general intent of the adult use regulations, the [CPC] believes an enforcement agency should consider the following factors to establish whether a "substantial" portion of an establishment is occupied by an adult use or adult materials: (1) the overall amount of floor area accessible to customers devoted to adult purposes; (2) the amount of floor area devoted to adult purposes as compared to the total commercial floor area of the establishment; and (3) the amount of stock of a sexually explicit nature as compared to the total stock.  <u>As a general guideline, the [CPC] believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an "adult establishment" or "adult bookstore."</u>

(1995 CPC Report at 50 (emphasis added).)  In sum, the CPC embraced a floor-area approach

due to its objective nature, specifically rejecting an approach based on the nature or prominence of adult materials vis-à-vis non-adult materials as overly subjective. (See 1995 CPC Report at 51 ("Other factors, such as the nature or prominence of display of adult materials, would reinsert a level of discretion into an enforcement effort which the [CPC] believes is unnecessary and should be avoided.").)

One final point is worth noting. Notwithstanding the preeminence of what eventually became known as the "60/40 Standard," the 1995 CPC Report acknowledged that "there may be exceptions to this general guideline," such as an establishment that moves a disproportionate amount of adult materials into a small floor area or one with over 10,000 square feet of floor area devoted to adult purposes, irrespective of the overall size of the establishment. (1995 CPC Report at 50-51.) The overarching theme is that the regulations "[were] not intended to cover general interest book or video stores with a section of adult materials that is modest in scale as compared to the overall size of the establishment." (1995 CPC Report at 51.) Rather, the CPC reiterated that "adult establishments" were "intended to be only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities."[11] (1995 CPC Report at 49.) In other words, the CPC emphasized that this "limited range of establishments" analyzed in the DCP Study and found to give rise to adverse secondary effects "are the only establishments covered by the adult use regulations." (1995 CPC Report at 49.)

---

[11] In a similar vein, the terms "regularly" and "characterized by an emphasis" were meant to circumscribe the applicability of the proposed regulations to establishments "that have a principal focus on sexual activities or anatomy as entertainment" and those "that have adult entertainment on a frequent, on-going basis." (1995 CPC Report at 51-52.)

2. <u>Legal Challenges to the 1995 Regulations</u>

The 1995 Regulations opened a Pandora's box of litigation by over 100 owners and operators of adult establishments as well as patrons of such establishments. (<u>See</u> 4431 Compl. ¶¶ 27-28.) Defendants removed two of those actions—<u>Amsterdam Video, Inc. v. City of New York</u> and <u>Hickerson v. City of New York</u>—to the Southern District of New York. The court remanded the claims arising under the New York state constitution in both actions and held in abeyance the federal constitutional claims pending the determination of the state constitutional claims in state court. <u>See</u> <u>Hickerson v. City of New York</u>, 932 F. Supp. 550, 559 (S.D.N.Y. 1996). Subsequently, <u>Amsterdam Video</u> and <u>Hickerson</u> were consolidated with a third case filed in New York state court—<u>Stringfellow's of New York, Ltd. v. City of New York</u>.

On summary judgment, the state court upheld the 1995 Regulations under the state constitution, applying the standards set forth by New York's highest court in <u>Town of Islip v. Caviglia</u>, 540 N.E.2d 215 (N.Y. 1989). <u>Stringfellow's of N.Y., Ltd. v. City of New York</u>, 653 N.Y.S.2d 801, 814 (N.Y. Sup. Ct. 1996). In particular, the <u>Stringfellow's</u> court determined that the 1995 Regulations were content-neutral, that defendants proffered sufficient evidence of adverse secondary effects, that the 1995 Regulations were no broader than necessary to achieve a significant governmental purpose, and that defendants demonstrated an adequate number of available alternative locations. Both the New York Appellate Division and the New York Court of Appeals unanimously affirmed. <u>Stringfellow's of N.Y., Ltd. v. City of New York</u>, 663 N.Y.S.2d 812 (N.Y. App. Div. 1997) (memorandum), <u>aff'd</u> 694 N.E.2d 407 (N.Y. 1998).

Following the New York Court of Appeals' decision in <u>Stringfellow's</u>, the <u>Hickerson</u> court denied plaintiffs' motion for a temporary restraining order and preliminary injunction staying enforcement of the 1995 Regulations. The court found that plaintiffs failed to

demonstrate a likelihood of success on the merits because the collateral estoppel effect of the state court factual findings in Stringfellow's would also be dispositive of plaintiffs' federal constitutional claims.  Hickerson v. City of New York, 997 F. Supp. 418, 424 (S.D.N.Y. 1998).  The Second Circuit affirmed, agreeing that plaintiffs could not show a likelihood of success on the merits because "the New York courts' rejection of plaintiffs' state constitutional claims forecloses plaintiffs from relitigating, in the form of a First Amendment claim in federal court, the same issues that were resolved against them in state court."  Hickerson v. City of New York, 146 F.3d 99, 103 (2d Cir. 1998).  In so holding, the Second Circuit rejected plaintiffs' contention that collateral estoppel ought not to apply, explaining that "the issues decided and the standards applied by the New York state courts . . . are the same that would be applicable to plaintiffs' First Amendment claim."  Hickerson, 146 F.3d at 104.

Though the Second Circuit's holding in Hickerson was principally procedural, another panel of the Second Circuit upheld the 1995 Regulations against facial challenges under the First Amendment and Equal Protection Clause of the Fourteenth Amendment less than three months earlier.  See Buzzetti v. City of New York, 140 F.3d 134 (2d Cir. 1998).  In Buzzetti— litigated roughly contemporaneously with the cases meandering their way through the state courts—the proprietor of a strip club and a female topless dancer sought to preliminarily enjoin the enforcement of the 1995 Regulations, as relevant here, on the basis that the regulations constituted a presumptively invalid content-based restriction.  The district court denied plaintiffs' motion, holding that because the 1995 Regulations withstood the intermediate-scrutiny test governing content-neutral time, manner, and place regulations under City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986), plaintiffs failed to establish a likelihood of success on the merits.  Buzzetti v. City of New York, 1997 WL 164284, at *2-3, *6 (S.D.N.Y. Apr. 8, 1997).

The Second Circuit affirmed the district court's First Amendment holding for largely the same reasons.  Buzzetti, 140 F.3d at 139-41.

   3.   The 60/40 Standard

       At the same time that federal and state courts grappled with the constitutionality of the 1995 Regulations, the City's Department of Buildings ("DOB") periodically provided enforcement guidance in the form of Operations Policy and Procedure Notices ("OPPNs"), which further interpreted various aspects of the 1995 Regulations.  As relevant here, Appendix A to OPPN # 6/96—issued on October 25, 1996—echoed the factors set forth in AZR § 12-10 for determining whether a "substantial portion" of an establishment was devoted to an adult establishment or whether a "substantial portion" of an establishment's stock-in-trade was devoted to specified materials.  (PJA at 488.)  It did not, however, reference the CPC's "general guideline" that an establishment "would need to have at least 40 percent of its accessible floor area used for adult purposes" to constitute an "adult establishment" or "adult bookstore."  (1995 CPC Report at 50.)

       On July 22, 1998—on the heels of the New York Court of Appeals' decision in Stringfellow's and the Second Circuit's decisions in Buzzetti and Hickerson—the DOB issued OPPN # 4/98 to tease out the meaning of "substantial portion" as used in AZR § 12-10.  (See PJA at 502.)  In particular, OPPN # 4/98 explained that an establishment included an adult bookstore "if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials."[12]  (PJA at 503.)  With respect to adult eating or drinking establishments, the DOB advised that whether a "substantial portion" of an eating or

---

[12]       Separately, a bookstore would also be considered an "adult book store" if a "substantial portion," defined as "at least 40 percent of the book store's total [accessible stock]," was "comprised of adult materials."  (PJA at 503.)

drinking establishment included an adult use should depend on "the amount of floor area and cellar space accessible to customers allocated to adult use for performance and viewing purposes as compared to total combined floor area and cellar space accessible to customers."  (PJA at 503.)  Thus, according to OPPN # 4/98, a "substantial portion" of an establishment "is devoted to an adult use"—making the establishment an "adult eating or drinking establishment"—if it "has at least 40 percent of the floor and cellar area that is accessible to customers[] available for adult performance and viewing purposes."  (PJA at 503.)

The DOB's issuance of OPPN # 4/98 appears to have been motivated (at least in part) by developments in the <u>Amsterdam Video</u> litigation proceeding in this district.  In a hearing on plaintiff's preliminary injunction motion just two days after the release of OPPN # 4/98, the City represented to the court that any commercial establishment with less than 40 percent of its stock-in-trade or accessible floor area devoted to adult uses would comply with the 1995 Regulations—ostensibly, to avert plaintiff's constitutional vagueness challenge to the "substantial portion" language in AZR § 12-10.  (4431 Compl. ¶¶ 33-35; 3732 Compl. ¶¶ 63-65; <u>see</u> PJA at 1675-76.)  Thus, according to Plaintiffs, the 1995 Regulations did not apply to any adult business so long as it complied with the 60/40 Standard.  Less than a week after the DOB issued OPPN # 4/98, the 1995 Regulations became enforceable on July 28, 1998 when the U.S. Supreme Court denied a stay in <u>Amsterdam Video</u>, thereby ending the judicial stays that had been in effect.  <u>See</u> <u>City of New York v. Les Hommes</u>, 724 N.E.2d 368, 370 (N.Y. 1999).

OPPN # 6/98, which the DOB released on August 13, 1998 to supersede OPPN # 4/98, further refined the meaning of the phrase "substantial portion."  (<u>See</u> PJA at 506.)  Although OPPN # 6/98 left unchanged the guidance set forth by OPPN # 4/98 with respect to adult bookstores, it restated the "substantial portion" test with respect to commercial

establishments with two or more uses in part as follows:

> The determination as to whether a "substantial portion" of a commercial establishment with two or more uses, at least one of which is not a book store, an eating or drinking establishment, a theater, or an "other adult commercial establishment," includes an adult use should include consideration of (1) the amount of floor area and cellar space accessible to customers allocated to adult use and (2) such amount of floor area and cellar space as compared to total combined floor area and cellar space accessible to customers.

> Thus, if [such a commercial establishment] has at least 40 percent of the floor and cellar area that is accessible to customers available to adult use, then a "substantial portion" of the establishment is devoted to an adult use and the commercial establishment is deemed to be an adult establishment.

(PJA at 507.)  Of note—and somewhat inconsistent with the City's representations in Amsterdam Video—OPPN # 6/98 stated that this 60/40 Standard "shall not apply to a commercial establishment that is entirely an eating or drinking establishment, a theater, an 'other adult establishment,' or any combination thereof," (PJA at 508), sowing the seeds for additional litigation.

In this regulatory milieu, many adult establishments modified their interior configurations to comply with the 60/40 Standard.  Eating and drinking establishments erected partitions to separate their establishments into adult and non-adult sections or otherwise reduced the amount of accessible floor space devoted to adult uses.  (See 4431 Compl. ¶ 37; PJA at 229-30, 263-64, 267, 269-70, 285-86, 299-300.)  Likewise, bookstores redesigned their floor space and interiors or reduced the number of private viewing booths in which patrons could view sexually explicit films.  (See 3732 Compl. ¶ 66; PJA at 1622-23, 1645, 1664.)  Notwithstanding its position in Amsterdam Video, the City commenced nuisance abatement proceedings against certain of these so-called "60/40 establishments" that it believed to be engaged in sham compliance with the 60/40 Standard.  The City argued that the "substantial portion" test applied only to adult bookstores and multi-use commercial establishments, not single-use eating or

drinking establishments regularly featuring adult entertainment. All three levels of the New York state judiciary rejected the City's contention that a single-use eating or drinking establishment with any adult component fell outside the 60/40 Standard.[13] See City of New York v. Dezer Props., Inc., 732 N.E.2d 943, 943 (N.Y. 2000) (memorandum) (reasoning that as a matter of statutory interpretation, "the interpretation urged by the City would effectively excise the 'substantial portion' component from the enactment in cases of eating or drinking establishments").

C. The 2001 Zoning Amendments

As previewed earlier, the adoption of the 60/40 Standard raised the issue of whether the 1995 Regulations applied to establishments that—at least literally—complied with the 60/40 Standard but essentially retained their non-conforming nature. As it did in Dezer Properties, the New York Appellate Division suggested that an adult bookstore's sham compliance with the 60/40 Standard did not place it outside the reach of the 1995 Regulations. See City of New York v. Les Hommes, 685 N.Y.S.2d 49, 50 (N.Y. App. Div. 1999) (memorandum), rev'd 724 N.E.2d 368 (N.Y. 1999). The New York Court of Appeals reversed, emphasizing the need to enforce the plain language of the City's guidelines as written—namely, by considering only floor area and stock-in-trade. Les Hommes, 724 N.E.2d at 371-72. Stated differently, because neither the 1995 Regulations nor the City's guidance mentioned other factors that might be germane to a determination of bona fide compliance with the 60/40

---

[13]    Notably, although the New York Appellate Division rejected the City's argument that the 60/40 Standard did not apply to any single-use establishment with an adult component, it found that the establishment nevertheless "failed to prove compliance with the [60/40 Standard]" despite having only 28 percent of its total floor space dedicated to adult entertainment because its attempt to comply was, "as a matter of law, a sham" that left the non-conforming nature essentially intact. City of New York v. Dezer Props., Inc., 697 N.Y.S.2d 41, 45 (N.Y. App. Div. 1999), rev'd 732 N.E.2d 943 (N.Y. 2000). The New York Court of Appeals reversed, holding that whether the establishment actually complied with the 60/40 Standard was not properly before the Appellate Division and consequently could not be reached by the high court. Dezer Props., 732 N.E.3d at 943.

Standard, "inject[ing] those considerations into the mix" was improper. <u>Les Hommes</u>, 724

N.E.2d at 371-72. Confronted with these judicial decisions, the City opted again to amend the

Zoning Resolution.[14]

    1.  <u>The 2001 CPC Report and Proposal</u>

    On August 8, 2001, the CPC approved an application by the DCP to amend the

1995 Regulations. In substance, the application sought to eliminate the 60/40 Standard

principally by amending the definitions of "adult establishment" and "adult eating or drinking

establishment." The City Council passed Resolution No. 2096 on October 31, 2001, thereby

adopting the CPC's approval of these amendments (the "2001 Amendments"). (<u>See</u> PJA at 379-

83.) Like the 1995 Regulations, the 2001 Amendments were also accompanied by a CPC report

that explained the amendments and the reasons behind them. (<u>See generally</u> PJA at 709-834

("2001 CPC Report").)

    According to the CPC, the 1995 Regulations needed to be amended "to address

attempts by adult establishments to remain in operation through superficial measures which do

not alter the character of the establishments as enterprises with a 'predominant, on-going focus

on sexually explicit materials or activities,'" as well as "several court rulings [that] have

narrowed the scope and application of the [1995 Regulations] in a manner which the [DCP]

believes is contrary to the original intent." (2001 CPC Report at 3-4.) The CPC noted that as of

2000, 101—or 74 percent—of the City's 136 adult establishments were 60/40 establishments.

(2001 CPC Report at 6.) Out of those 101 establishments, 75 were pre-existing establishments

---

[14]    OPPN # 6/98 was itself superseded by OPPN # 1/00. (<u>See</u> PJA at 506.) OPPN # 1/00 "stated explicitly that it was intended to address the Court of Appeals decision in <u>Les Hommes</u>, and that it 'sets forth additional considerations or factors not specifically set forth in [the prior OPPN] to assure that the adult use provisions are not undermined by sham efforts at compliance." <u>City of New York v. Warehouse on the Block, Ltd.</u>, 703 N.Y.S.2d 900, 901-02 (N.Y. Sup. Ct. 2000) (alteration in original). Nonetheless, because it is immaterial to this Court's decision and because the parties do not address it in their briefing or even appear to have included it in the record, this Court declines to consider it.

that had subsequently adopted 60/40 configurations.  (2001 CPC Report at 9-10.)  While the total

number of adult establishments decreased city-wide between 1993 and 2000, Times Square still

housed the greatest concentration of adult establishments.  (2001 CPC Report at 6-8.)

        As with the 1995 Regulations, the 2001 Amendments were referred to the City's

community boards, borough boards, and borough presidents for review and comment.  Of those

voting, twelve community boards voted to approve the proposal, two voted to approve but

recommended more restrictive provisions, five—all located in Manhattan—voted against the

proposal, and one voiced qualified opposition.  (2001 CPC Report at 20-23.)  The voting for the

borough boards and borough presidents followed a similar pattern, with the Queens borough

board and borough president voting in favor of the application, the Brooklyn borough board also

voting in favor, and the Manhattan borough board and borough president voting in opposition.

(2001 CPC Report at 23-24.)

        Public support for the 2001 Amendments waned in comparison to the 1995

Regulations.  At a May 23, 2001 public hearing conducted by the CPC, five speakers testified in

favor of the application compared to thirteen who opposed it.  (2001 CPC Report at 24.)  Broadly

speaking, those who supported the proposal lamented the exploitation of the 60/40 Standard by

adult establishments and the judicial interpretations of the 1995 Regulations that they claimed

undermined the intent of the regulations.  (2001 CPC Report at 24-25.)  On the other hand, those

who testified against the proposed amendments asserted that the record did not demonstrate any

correlation between 60/40 establishments and adverse secondary effects, that the proposed

amendments were overbroad and raised the specter of bias in enforcement, and that adult

establishments had already made substantial financial expenditures in reliance on the 60/40

Standard.  (2001 CPC Report at 25-28.)

Nevertheless, the CPC found the proposed amendments (with modifications) appropriate to "clarify certain definitions in the text, in order to effectuate the [CPC's] original intent in response to efforts by the operators of adult establishments to undermine implementation of the 1995 Regulations." (2001 CPC Report at 29.) It emphasized that the 1995 Regulations were adopted to address the negative secondary effects flowing from establishments similar to those described in the DCP Study—that is, establishments "with a predominant, on-going focus on sexually explicit materials or activities." (2001 CPC Report at 30 (quoting 1995 CPC Report at 49).)

With respect to bookstores, the CPC explained that the "substantial portion" qualifier and the "general guideline" that eventually morphed into the 60/40 Standard enabled enforcement officials to distinguish in an objective, non-biased manner between adult bookstores and neighborhood bookstores with a small amount of adult material. (2001 CPC Report at 30-31.) However, it pointed to the increasing clarity that the 60/40 Standard "[was], alone, an insufficient measure of whether a book or video store has a 'predominant on-going focus' on sexually explicit materials" in light of efforts by adult establishment owners to achieve superficial, mathematical compliance while maintaining "a physical lay-out or methods of operation which reflect a predominant focus on the sale of adult materials."[15] (2001 CPC Report at 32-34.) In rejecting the argument that it first needed to demonstrate adverse secondary effects by 60/40 establishments, the CPC noted the lack of any indication that sham compliance somehow ameliorated those secondary effects or transformed adult bookstores into non-adult

---

[15] The CPC detailed some of these tactics, which include buying inexpensive instructional videos, martial arts films, or cartoons in bulk and leaving opened cartons of titles on the floors or "stacked haphazardly on shelves without any attempt at organization or categorization." (2001 CPC Report at 32-33.) As indicia of a predominant focus on the sale of adult materials, the CPC cited layouts requiring customers to pass through an adult section to reach a non-adult section, a greater selection of adult material than non-adult material, or layouts requiring customers to consummate any transactions in adult sections of the establishment. (2001 CPC Report at 33.)

establishments.  (2001 CPC Report at 34-35.)

In contrast with the definition for adult bookstores, the definition for an "adult eating or drinking establishment" did not contain the "substantial portion" language or any consideration of floor area because the DCP Study did not identify any "neighborhood bars or restaurants with only 'incidental' topless or nude entertainment."  (2001 CPC Report at 31.) Therefore, the CPC had found "no basis to conclude that the negative secondary effects of adult establishments are any less present where topless or nude dancers frequent only part of the customer-accessible floor space in an eating or drinking establishment."  (2001 CPC Report at 31-32.)  But the 2001 CPC Report faulted the courts with propagating an erroneous interpretation of the "substantial portion" test that was "plainly inconsistent" with the intent of the 1995 Regulations "that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing."  (2001 CPC Report at 35-37 & n.3.)

The 2001 Amendments left intact the basic locational and anti-concentration provisions of the 1995 Regulations applicable to adult establishments.  Critically, however, they expanded the reach of the 1995 Regulations to encompass at least some 60/40 establishments. The 2001 Amendments struck the "substantial portion" language from AZR § 12-10's definition of "adult establishment," now defining it as "a commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof . . . ."  (PJRA at 1916 (emphasis added); 2001 CPC Report at 15-16, 38.)  AZR § 12-10 now defined an "adult eating or drinking establishment" as one that "regularly features in any portion" of the establishment live performances or films characterized by an emphasis on "specified anatomical areas" or "specified sexual activities," or

employees who, as part of their employment, "regularly expose" to patrons "specified anatomical areas." (PJRA at 1917-18 (emphasis added); see 2001 CPC Report at 14-15, 37.) With respect to adult theaters, the 2001 Amendments now clarified that "commercial establishments where [live performances or films characterized by an emphasis on 'specified anatomical areas' or 'sexual activities'] are viewed from one or more individual enclosures." (PJRA at 1918-19 (emphasis added); see 2001 CPC Report at 37.)

As for adult bookstores, the 2001 Amendments left the "substantial portion" language from the 1995 Regulations but established criteria relating to layout and method of operation through which a bookstore that facially complied with the "substantial portion" test would nevertheless fall within the purview of the adult-use regulations. (See 2001 CPC Report at 11-14, 34.) Specifically, the 2001 Amendments provided that non-adult materials would not be considered stock-in-trade for purposes of the "substantial portion" assessment if the establishment had any of several enumerated features—namely (1) a layout requiring customers to pass through areas containing adult materials to access non-adult materials; (2) one or more peep booths in which patrons can view adult films or live performances; (3) requiring transactions for non-adult materials to be made in areas with adult materials; (4) offering non-adult materials only for sale but offering adult materials for sale or rental; (5) a greater variety of adult materials than non-adult materials; (6) restricting minors from the bookstore or from any section of the bookstore offering non-adult material; (7) disproportionately larger advertisements of adult materials than non-adult materials; (8) disproportionately larger window displays of adult materials than non-adult materials; or (9) other features relating to layout and method of operation determined by the Commissioner of Buildings to suggest that adult materials are a "substantial purpose of the business conducted" in the establishment. (PJRA at 1920-24.)

The 2001 Amendments also added a specific amortization provision to allow adult establishments that had made financial expenditures to comply with the 60/40 Standard to recoup their investments.  The CPC explicitly rejected the alternative course of allowing existing 60/40 establishments to remain indefinitely, noting that 60/40 establishments were never intended to be allowed under the 1995 Regulations, which the 2001 Amendments purported to clarify.  (2001 CPC Report at 42-43.)  Thus, AZR § 72-41 established a one-year amortization period for any adult establishment existing as of August 8, 2001 in a prohibited location that had made investments in reliance on the 60/40 Standard.  (PJRA at 1929-31; see 2001 CPC Report at 43-44.)  AZR § 72-41—like AZR § 72-40—afforded such 60/40 establishments an opportunity to apply to the Board of Standards and Appeals at least 120 days before the October 31, 2002 termination date for extensions of time.

Finally, the 2001 Amendments also amended AZR §§ 32-01 and 42-01 to define the locational restrictions by reference to an adult business's establishment, as opposed to the terms "located" and "existed."  (PJRA 1924-25, 1926-28.)  The CPC explained that this change would address "interpretive problems where there is a conflict as to priority between two competing establishments."  (2001 CPC Report at 40.)  Thus, the 2001 Amendments added identical provisions to AZR §§ 32-01 and 42-01 explaining that an adult establishment would be deemed established

> upon the date of a permit issued by the department of buildings therefor, or, in the case of an adult establishment in existence prior to August 8, 2001, as determined by the department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an adult establishment.

(PJRA at 1926, 1928; see 2001 CPC Report at 16-19, 40-41.)

2.  Legal Challenges to the 2001 Amendments

The 2001 Amendments spawned a fresh wave of federal and state constitutional challenges by 60/40 establishments, including the three federal actions brought by the Club Plaintiffs.[16]  While the state court litigation resulted in the New York Court of Appeals upholding the constitutionality of the 2001 Amendments in 2017, its "long, complicated, and confusing history" featured three trips through the New York appellate courts.  For the People Theatres of N.Y., Inc. v. City of New York, 79 N.E.3d 461, 463 (N.Y. 2017), cert. denied 138 S. Ct. 994 (2018) and 138 S. Ct. 1000 (2018).  To provide a better understanding of the arguments and issues at play in these cases—many of which are recycled from the state court litigation— this Court traces the contours of the state court litigation.

On October 29 and 30, 2002—just before the expiration of the one-year termination period—the New York Supreme Court issued a temporary restraining order enjoining the enforcement of the 2001 Amendments against 60/40 establishments.  (4431 Compl. ¶ 52; see also 3732 Compl. ¶ 79.)  In late 2003, the New York Supreme Court granted summary judgment in favor of 60/40 establishments challenging the 2001 Amendments.  The trial court noted that the City did not offer any evidence justifying the 2001 Amendments, highlighting the City's concession that it had not studied the impact of 60/40 establishments.  For the People Theatres of N.Y., Inc. v. City of New York, 768 N.Y.S.2d 783, 785 (N.Y. Sup. Ct. 2003).  It also rejected the City's reliance on the DCP Study on the rationale that 60/40 establishments arose after the 1995 Regulations, and thus could not have been studied by the DCP in 1993.  For the People Theatres of N.Y., 768 N.Y.S.2d at 786.  Thus, the trial court held the 2001 Amendments to be unconstitutional because the City failed to demonstrate that the predominant purpose of the

---

[16]     A fourth action brought by owners and operators of another gentlemen's cabaret, captioned Pulse Nite Club, Inc. v. City of New York, was voluntarily dismissed on April 26, 2018.  (See ECF No. 3, 02cv6193.)

2001 Amendments was to address negative secondary effects and because the 2001 Amendments were "broader than needed to achieve the City's purpose of ameliorating negative secondary effects." For the People Theatres of N.Y., 768 N.Y.S.2d at 785 (citing Town of Islip, 540 N.E.2d at 218).

The New York Appellate Division reversed and declared the 2001 Amendments constitutional. For the People Theatres of N.Y., Inc. v. City of New York, 793 N.Y.S.2d 356, 371 (N.Y. App. Div. 2005). The Appellate Division found unpersuasive plaintiffs' contention that the City provided no evidence or study linking 60/40 establishments and the negative secondary effects identified in the DCP Study. It reasoned that the City was not required to conduct its own study of 60/40 establishments, and that the City was entitled to rely on the DCP Study and studies by other municipalities so long as that evidence was reasonably believed to be relevant to the problem at hand. For the People Theatres of N.Y., 793 N.Y.S.2d at 367-68. Accordingly, the Appellate Division upheld the 2001 Amendments because the City reasonably believed that 60/40 establishments retained their essential nature and predominant focus on sexually explicit expression, plaintiffs failed to cast doubt on the City's rationale, and the 2001 Amendments left open sufficient areas for lawful speech. For the People Theatres of N.Y., 793 N.Y.S.2d at 368-71.

A divided New York Court of Appeals agreed that the City proffered enough evidence in the first instance that 60/40 establishments retained their essential nature creating negative secondary effects.[17] For the People Theatres of N.Y. v. City of New York, 843 N.E.2d

---

[17] The dissent disagreed that the 2001 Amendments functioned merely as a clarification of the 1995 Regulations, instead characterizing them as creating "new law." For the People Theatres of N.Y., 843 N.E.2d at 1134 (Kaye, C.J., dissenting). Similarly, because it saw 60/40 establishments as fundamentally different from the pre-1995 adult establishments, it argued that the 2001 Amendments could not be justified by reference to the 1995 Regulations. For the People Theatres of N.Y., 843 N.E.2d at 1136.

1121, 1131 (N.Y. 2005). However, the majority found that plaintiffs also furnished evidence disputing the City's rationale and remanded for a factual determination as to whether the 60/40 establishments were "so transformed in character that they no longer resemble the kinds of adult uses found . . . to create negative secondary effects . . . or whether these business' technical compliance with the 60/40 formula is merely a sham . . . ." For the People Theatres of N.Y., 843 N.E.2d at 1132-33. As relevant here, the Court of Appeals rejected the notion that the City needed to conduct a new study connecting 60/40 establishments with negative secondary effects. For the People Theatres of N.Y., 843 N.E.2d at 1132, 1133.

Following remand and a bench trial, the New York Supreme Court upheld the constitutionality of the 2001 Amendments as they related to adult bookstores and adult eating and drinking establishments.[18] For the People Theatres of N.Y., Inc. v. City of New York, 897 N.Y.S.2d 618, 625 (N.Y. Sup. Ct. 2010). It noted that the City's burden "was a 'light' one" and that the City had "provided substantial evidence that [plaintiffs'] dominant, ongoing focus is on adult matters." For the People Theatres of N.Y., 897 N.Y.S.2d at 625. The New York Appellate Division once again reversed, vacated the lower court's determination of constitutionality, and remanded with further instructions. In particular, the Appellate Division faulted the trial court's "extremely terse decision" with failing to adequately explain "whether the 60/40 establishments are similar in nature to adult establishments that have been shown by means of empirical data to cause negative 'secondary effects.'" For the People Theatres of N.Y., Inc. v. City of New York, 923 N.Y.S.2d 11, 17-18 (N.Y. App. Div. 2011).

Following a second remand, the trial court struck down the 2001 Amendments as

---

[18] The trial court found the 2001 Amendments unconstitutional with respect to adult theatres and entered a permanent injunction. The City did not appeal this portion of the judgment.

facially unconstitutional under the federal and state constitutions.[19]  For the People Theatres of
N.Y., Inc. v. City of New York, 954 N.Y.S.2d 801, 809 (N.Y. Sup. Ct. 2012).  The court found
"significant and distinct differences between the 1994 adult entities and 60-40 entities," such that
"the current establishments no longer resemble their 1994 predecessors."  For the People
Theatres of N.Y., 954 N.Y.S.2d at 810.  Based on its conclusion that 60/40 establishments did
not predominantly focus on sexual matters, the court determined that "there [was] no need for the
2001 amendments."  For the People Theatres of N.Y., 954 N.Y.S. 2d at 810.

A divided panel of the New York Appellate Division affirmed.  The majority
restated four criteria it previously identified for assessing whether a 60/40 establishment retained
a predominant, ongoing sexual focus—that is, the (1) "presence of large signs advertising adult
content"; (2) a "significant emphasis on the promotion of materials 'specified sexual activities'
or 'specified anatomical areas'"; (3) the "exclusion of minors from the premises on the basis of
age"; and (4) "difficulties in accessing nonadult materials."  For the People Theaters of N.Y. v.
City of New York, 14 N.Y.S.3d 338, 346 (N.Y. App. Div. 2015) (citation and quotation marks
omitted).  The Appellate Division concluded as an evidentiary matter that the City satisfied only
the second factor for both adult bookstores and adult drinking and eating establishments, and
thus failed to carry its burden.[20]  For the People Theaters of N.Y., 14 N.Y.S.3d at 346-49.

On June 6, 2017—almost fifteen years after the state court litigation

---

[19]     In a separate dicta section, the court doubted that "an 18 year old study of the negative effects of the 100%
entities can be applied to the current 60-40 entities without determining the actual negative secondary effect of these
institutions today."  For the People Theatres of N.Y., 954 N.Y.S.2d at 810.  It lambasted the City's "fictionalized
reliance on the [DCP Study]" and remarked that the 2001 Amendments should have been struck down as urged by
the New York Court of Appeals' dissent.  For the People Theatres of N.Y., 954 N.Y.S.2d at 810.

[20]     The dissenters took issue with the majority's "mechanical and mathematical approach" in considering the
factors the Appellate Division previously identified.  For the People Theaters of N.Y., 14 N.Y.S.3d at 355-56.  In
their view, the City only needed to demonstrate that the essential nature of the 60/40 establishments—i.e., a
predominant, ongoing focus on sexually explicit materials or activities—had not changed to sustain the 2001
Amendments.  For the People Theaters of N.Y., 14 N.Y.S.3d at 354, 358 (Andrias, J., dissenting).

commenced—the New York Court of Appeals unanimously reversed, holding that the City demonstrated that the 60/40 establishments "retained a predominant focus on sexually explicit materials or activities." For the People Theatres of N.Y., Inc. v. City of New York, 79 N.E.3d 461, 463 (N.Y. 2017). The Court of Appeals faulted the lower courts with conflating intermediate scrutiny with the proper evidentiary standard under the burden-shifting framework set forth by the plurality opinion in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002). For the People Theatres of N.Y., 79 N.E.3d at 475. It explained that the lower courts held the City to an erroneously high burden of proof in applying a "rigidly mechanical approach" to assessing the predominant focus of 60/40 establishments. For the People Theatres of N.Y., 79 N.E.3d at 475. Based on its agreement that the City satisfied the second factor identified by the Appellate Division, it affirmed that "the City had relevant evidence reasonably adequate to support its conclusion that the adult establishments retained a predominant, ongoing focus on sexually explicit activities or materials." For the People Theatres of N.Y., 79 N.E.3d at 475-76.

II.     The Club Plaintiffs' and Bookstore Plaintiffs' Actions

Following the New York Court of Appeals' decision in For the People Theatres, the City agreed not to enforce the 2001 Amendments against Plaintiffs while the state court plaintiffs sought re-argument before the New York Court of Appeals and certiorari before the U.S. Supreme Court. (4431 Compl. ¶¶ 64-68; 3732 Compl. ¶¶ 88-92.) The New York Court of Appeals denied re-argument on September 12, 2017, though it purportedly left the motion by the adult bookstores unresolved. (4431 Compl. ¶ 67; 3732 Compl. ¶ 88.) On February 20, 2018, the Supreme Court denied certiorari, bringing the state court litigation to a close. (4431 Compl. ¶ 69; 3732 Compl. ¶ 93.)

A. <u>The Plaintiffs</u>

These actions are brought by plaintiffs that would not be considered "adult establishments" under the 1995 Regulation but would apparently be so classified under the 2001 Amendments. The Club Plaintiffs are comprised of the following entities. Plaintiffs 725 Eatery, Corp. and 689 Eatery, Corp. own and operate gentlemen's clubs located in the Times Square area of Manhattan—respectively, Platinum Dolls and Satin Dolls. (4431 Compl. ¶¶ 4-5.) Plaintiffs 59 Murray Enterprises, Inc., AAM Holding Corp., West 20th Enterprises Corp., and JNS Ventures Ltd. also own and operate gentlemen's clubs scattered across New York City— respectively, New York Dolls in the Tribeca area of Manhattan (now known as "Flashdancers Downtown"), Private Eyes in Manhattan's Hell's Kitchen (now known as "Flashdancers NYC"), VIP Club New York in Manhattan's Flatiron District, and Vixen in the Ridgewood area of Queens. (Second Amended & Supplemental Complaint, ECF No. 26, 02cv4432 ("4432 Compl."), ¶¶ 7-10; PJA at 266.) Finally, Plaintiffs Club at 60th, Inc. and Jacaranda own or operate Sapphire, a gentlemen's club located in Manhattan. (Second Amended Complaint for Declaratory and Injunctive Relief Under 42 U.S.C. § 1983, ECF No. 42, 02cv8333 ("8333 Compl."), ¶¶ 7-8, 10-16.) The Club Plaintiffs are all 60/40 establishments who, under AZR § 32-01 or AZR § 42-01, would be required to terminate under the Zoning Resolution based on their current location. (4431 Compl. ¶¶ 4-5; 4432 Compl. ¶¶ 7-10; 8333 Compl. ¶¶ 7-8, 10-16; PJA at 228-31, 248-50, 262-63, 266-69, 284-85, 298-99.)

The Bookstore Plaintiffs are 336 LLC, Chelsea 7 Corp., Gotham Video Sales & Distribution Inc., Rainbow Station 7 Inc., Video Lovers Inc., Vishara Video, Inc., Explore DVD LLC, Vishans Video, Inc., 725 Video Outlet Inc., Jaysara Video, Inc., DCD Exclusive Video Inc., and 557 Entertainment Inc. As discussed, the Bookstore Plaintiffs operate bookstores in

Manhattan, Brooklyn, and Queens that contain private viewing booths in which patrons may discreetly view sexually explicit films on a screen within the enclosed booth, including those that may be judged by society as deviant. (3732 Compl. ¶¶ 10-28, 95-99; PJA 1619-21.) The Bookstore Plaintiffs offer non-adult information and retail stock, as well as some adult-oriented information. (3732 Compl. ¶ 31; PJA at 1617, 1644.) Like the Club Plaintiffs, the Bookstore Plaintiffs would be required to terminate under the City's adult-use regulations based on their location. (3732 Compl. ¶¶ 10-28; PJA at 1628-29, 1645, 1663-64.)

The defendants in these actions are the City, Mayor Bill de Blasio, and Commissioner of Buildings Melanie E. La Rocca. Defendant de Blasio succeeded defendant Michael Bloomberg, who was Mayor when the Club Plaintiffs commenced their actions. Defendant La Rocca succeeded defendant Rick D. Chandler, who was Commissioner of Buildings when the operative complaints in these actions were filed. Both individual defendants, who are automatically substituted for their predecessors under Rule 25(d) of the Federal Rules of Civil Procedure, are the principal municipal officers charged with enforcing the Zoning Resolution. (4431 Compl. ¶ 9; 3732 Compl. ¶¶ 35-36.) Finally, the City is responsible for drafting and enacting the Zoning Resolution through its various departments and agencies. (3732 Compl. ¶ 33-34.)

B. The Claims

Plaintiffs assert causes of action under 42 U.S.C. § 1983 to vindicate the alleged deprivations of their First Amendment and Fourteenth Amendment rights.[21] Though the

---

[21] Section 1983 provides a private right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. To state a § 1983 claim, a plaintiff must "allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988). Defendants do not dispute that Plaintiffs may properly bring their claims under § 1983.

operative complaints (especially those filed by the Club Plaintiffs) are engorged by legal arguments and conclusions more appropriate for a brief, they advance materially the same theories when stripped to their core. Accordingly, this Court reviews them in the aggregate.

The central theme that undergirds the Club Plaintiffs' and Bookstore Plaintiffs' complaints is that the 2001 Amendments, if enforced, would decimate—and have already dramatically reduced—adult-oriented expression. For instance, the Club Plaintiffs allege that the fifty-seven adult eating or drinking establishments existing at the time the City adopted the 2001 Amendments have now been culled to as few as twenty such establishments. (4431 Compl. ¶¶ 76-80.) And for their part, the Bookstore Plaintiffs claim that of the roughly forty adult bookstores with booths that existed at the time of the 2001 Amendments, only twenty to twenty-five bookstores currently exist. (3732 Compl. ¶¶ 96, 100; PJA at 1626, 1649.) These bookstores would be considered "adult establishments" under the 2001 Amendments based on the presence of booths, but might not have been considered "adult establishments" under the 1995 Regulations so long as they limited their booths to a portion of their establishment. (3732 Compl. ¶¶ 96, 100; PJA at 1624.) Of these bookstores, virtually none are located in permissible areas. (3732 Compl. ¶ 97.)

The other side of the equation, according to Plaintiffs, is that the number of adult establishments that would need to relocate if the City enforced the 2001 Amendments dwarfs the number of potential permissible sites for adult establishments that the regulations leave open, especially when factoring in the anti-concentration requirements. (4431 Compl. ¶ 81, 108-110; 3732 Compl. ¶¶ 101-102.) Plaintiffs maintain that this "musical chairs" scenario is exacerbated by the fact that the permissible areas for relocation have only been shrinking since 1995 (when the City last assessed potential alternative sites) based on the subsequent re-zoning of previously

allowable sites into prohibited zones and changes in the number and location of sensitive receptors.[22] (See 4431 Compl. ¶¶ 82-96; 3732 Compl. ¶¶ 104-127.) Moreover, Plaintiffs aver that the potential areas where adult establishments would be nominally permissible consist largely of remote or undeveloped areas in the City unsuitable for retail commercial enterprises, such as areas designated for amusement parks or heavy industry or areas containing toxic waste. (See 4431 Compl. ¶¶ 97-107; 3732 Compl. ¶¶ 140-158.)

Accordingly, Plaintiffs claim that the 2001 Amendments violate their First Amendment free speech rights by suppressing protected expression without any concomitant reduction in secondary effects and by failing to provide sufficient alternative avenues for adult expression. (4431 Compl. ¶¶ 48-50, 135-169; 3732 Compl. ¶¶ 164-168.) Separately, the Club Plaintiffs claim that by singling out non-conforming adult establishments for termination, the City's mandatory termination provisions violate the Fourteenth Amendment's equal protection guarantees and also constitute an invalid content-based restriction in violation of the First Amendment. (4431 Compl. ¶¶ 179-194.) Finally, the Bookstore Plaintiffs also assert a cause of action for deprivation of property under the Fourteenth Amendment's Due Process Clause. (3732 Compl. ¶¶ 173-174.)

Plaintiffs also challenge the constitutionality of the provisions of the 2001 Amendments that key AZR §§ 32-01 and 42-01's locational and anti-concentration provisions of the adult use regulation to the date that a business receives a permit from the DOB. (4431 Compl. ¶¶ 118-119; 3732 Compl. ¶¶ 131-134.) In substance, they allege that the process for adult establishments to obtain a permit from the DOB differs from the process for non-adult

---

[22]     In connection with the 1995 Regulations, the DCP generated maps of the permissible areas where adult establishments could relocate. (3732 Compl. ¶¶ 104-106.) These maps represented that approximately 4 percent of its total area remained available for adult uses. (3732 Compl. ¶ 107; accord 4432 Compl. ¶¶ 86-87; 8333 Compl. ¶¶ 87-88.)

establishments in two significant ways. First, adult establishments may not use a self-certification procedure that substantially expedites the DOB approval process. (4431 Compl. ¶¶ 115-116; 3732 Compl. ¶ 135.) Second, permit applications by adult establishments must be reviewed by the City's legal counsel for zoning compliance, for which there is no time limit. (4431 Compl. ¶ 116.) The result is that permit applications by adult establishments may take over a year—if ever—to resolve, further deterring adult establishments from attempting to relocate. (4431 Compl. ¶ 117; 3732 Compl. ¶ 135; see also, e.g., PJA at 300.)

According to Plaintiffs, the amendments to AZR §§ 32-01 and 42-01 are also problematic because they give sensitive receptors such as schools or churches a de facto veto over an adult use, through which a sensitive receptor that opposes an adult establishment may establish priority ahead of the adult establishment by simply obtaining a permit while the adult establishment waits (possibly forever) for approval of its application.[23] (4431 Compl. ¶¶ 119-126; 3732 Compl. ¶¶ 136-139.) Based on the foregoing, Plaintiffs contend that the City's permitting scheme constitutes an impermissible prior restraint on speech in violation of the First Amendment and deprives them of equal protection of the laws in violation of the Fourteenth Amendments. (4341 Compl. ¶¶ 116, 118, 198-202; 3732 Compl. ¶¶ 169-172.)

Ultimately, Plaintiffs seek to enjoin Defendants from enforcing the 2001 Amendments, as well as a judgment declaring the 2001 Amendments to be facially unconstitutional. (See 4431 Compl., at 62; 4432 Compl., at 61; 8333 Compl., at 61-62; 3732 Compl., at 60.) The Club Plaintiffs also seek declaratory and injunctive relief relating to the termination provisions codified at AZR §§ 52-77 and 72-41. (See 4431 Compl., at 62; 4432

---

[23] Though not specifically addressed in the Zoning Resolution, a sensitive receptor is also deemed established based on the date the DOB issues a permit. (Declaration of DOB Deputy Borough Commissioner Rodney Gittens, ECF No. 103 ("Gittens Decl."), ¶ 16.)

Compl., at 61; 8333 Compl., at 61-62.)  Finally, all Plaintiffs seek attorney's fees under 42

U.S.C. § 1988.  (<u>See</u> 4431 Compl., at 62; 4432 Compl., at 61; 8333 Compl., at 62; 3732 Compl.,

at 61.)

      C.  <u>Procedural History</u>

      The Club Plaintiffs originally filed their actions in 2002 and subsequently moved

for preliminary injunctive relief and summary judgment in late 2002 and early 2003.  (ECF No.

13, 02cv4431; ECF No. 11, 02cv8333.)  Following the New York Supreme Court's initial

invalidation of the 2001 Amendments in late 2003, however, this Court administratively closed

the Club Plaintiffs' cases on September 26, 2003 on consent of the parties but allowed the cases

to be reopened for good cause on petition by any party.  (ECF No. 43, 02cv4431.)  The Club

Plaintiffs' actions lay dormant for the next fifteen years while the constitutionality of the 2001

Amendments ping-ponged through the New York state courts.

      By Order dated April 23, 2018, this Court reopened the Club Plaintiffs' actions

following a request by the Club Plaintiffs for a conference.  (ECF No. 51, 02cv4431; ECF No.

12, 02cv4432; ECF No. 40, 02cv8333.)  The Bookstore Plaintiffs commenced their action days

later.  (<u>See</u> ECF No. 1, 18cv3732.)  Following the granting of several extensions, Plaintiffs

simultaneously filed their motions for preliminary injunctions.  (ECF No. 78, 02cv4431; ECF

No. 32, 02cv4432; ECF No. 57, 02cv8333; ECF No. 27, 17cv3732.)  The parties jointly

informed this Court that they did not believe an evidentiary hearing to be necessary and that no

party requested such a hearing.  (<u>See</u> ECF No. 117, 02cv4431; ECF No. 81, 02cv4432; ECF No.

105, 02cv8333; ECF No. 69, 17cv3732.)  Accordingly, this Court resolves the preliminary

injunction motions on the parties' briefs, documentary exhibits, and stipulations of fact.  <u>See</u>

<u>trueEx, LLC v. MarkitSERV Ltd.</u>, 266 F. Supp. 3d 705, 720 n.108 (S.D.N.Y. 2017) (deeming

parties' explicit waiver of an evidentiary hearing as "consent[ing] to the making of findings entirely on the paper record before the Court" (citations omitted)); accord Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998) (noting that a party "may, of course, waive its right to an evidentiary hearing, but it is not entitled to have the court accept its untested representations as true if they are disputed" (internal citations omitted)).

DISCUSSION

I.    Matters Considered

        In the Second Circuit, courts "routinely consider hearsay evidence in determining whether to grant preliminary injunctive relief," including affidavits, depositions, and sworn testimony.  Mullins v. City of New York, 626 F.3d 47, 52 (2d Cir. 2010) (collecting cases); accord Park Irmat Drug Corp. v. Optumrx, Inc., 152 F. Supp. 3d 127, 132 (S.D.N.Y. 2016) (citation omitted) (explaining that in deciding a motion for a preliminary injunction, a "court may consider the entire record[,] including affidavits and other hearsay evidence").  As the Supreme Court has observed, "the decision of whether to award preliminary injunctive relief is often based on 'procedures that are less formal and evidence that is less complete than in a trial on the merits.'"  Mullins, 626 F.3d at 51-52 (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  Nonetheless, "motions for preliminary injunction should not be resolved on the basis of affidavits that evince disputed issues of fact."  Davis v. N.Y.C. Hous. Auth., 166 F.3d 432, 437-48 (2d Cir. 1999).

        Based on the foregoing principles, this Court considers the evidentiary record submitted by the parties, though it addresses three additional matters in greater detail.  First, Plaintiffs request that this Court take judicial notice of over eighty documentary exhibits, categorized as follows: (1) City Council resolutions amending the City's Zoning Resolution;

(2) provisions of the AZR; (3) provisions of the New York City Administrative Code pertinent to

the City's permitting scheme; (4) DOB materials, including directives, OPPNs, bulletins,

handbooks, and rules; (5) portions of the legislative history of the 2001 Amendments, which

includes the DCP's application, reports accompanying the application, and transcripts of City

Council and CPC hearings; (6) portions of the case record for the state court challenges to the

2001 Amendments, including maps and studies admitted into the evidentiary record; (7) portions

of the DCP's website; (8) studies purporting to demonstrate the uniqueness of Manhattan; and

(9) stipulations and agreements between the parties to stay enforcement of the 2001

Amendments.  (See PJA at 339-47, 1685-90; PJRA at 1882-90.)  Each set of plaintiffs also

requests that this Court take judicial notice of certain adjudicative facts.

Rule 201 of the Federal Rules of Evidence authorizes courts to, at any stage of the

proceeding, "judicially notice a fact that is not subject to reasonable dispute because it: (1) is

generally known within the trial court's territorial jurisdiction; or (2) can be accurately and

readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R.

Evid. 201(b), (d).  While a court has discretion to take judicial notice of a fact, it "must take

judicial notice if a party requests it and the court is supplied with the necessary information."

Fed. R. Evid. 201(c).

This Court need not take judicial notice of the documentary exhibits because it

can consider those documents as part of the record on these motions.  To the extent that Plaintiffs

seek judicial notice of adjudicative facts contained within those documentary exhibits, they have

not identified such facts.  Cf. Wright & Miller, 21B Fed. Prac. & Proc. Evid. § 5107.1 (2d ed.

1995) (advising that though the rule "does not state what the request for judicial notice must

contain in order to make judicial notice mandatory[,] [a]t a bare minimum, the request should

specify precisely the adjudicative fact that the court should notice, state whether [the] fact can be noticed as a matter of common knowledge, and, if not, cite the court to some source of reasonably indisputable accuracy in which the noticed fact may be found" (footnote omitted)).

Absent additional specificity from Plaintiffs, this Court declines the invitation to sift through the record to divine what facts Plaintiffs seek to establish. See Kortright Capital Partners LP v. Investcorp Inv. Advisers Ltd., 327 F. Supp. 3d 673, 688 (S.D.N.Y. 2018) (reiterating that "'[j]udges are not like pigs, hunting for truffles buried in' the record" (citation omitted) (alteration in original)). In any event, as discussed above, courts may consider even inadmissible evidence in assessing the propriety of preliminary injunctive relief, be it in the form of affidavits or documentary evidence. Accord Flores v. Town of Islip, 2019 WL 1515291, at *2 (E.D.N.Y. Apr. 8, 2019) (concluding that "at a threshold level, declarations, depositions, and other documentary evidence may be considered at the preliminary injunction stage"). Thus, the documents subject to Plaintiffs' judicial notice request may properly be considered.

As for the Plaintiffs' proffered adjudicative facts, this Court will take judicial notice of the fact that the 2001 Amendments have not been enforced against any of the Plaintiffs through the present date. The record contains a Litigation Management Agreement dated September 25, 2017 between the Club Plaintiffs and Defendants making such a representation. (PJA at 1462-64.) Similarly, the Bookstore Plaintiffs and Defendants entered into a Stipulation and Agreement dated August 2, 2017 that reflects the City's forbearance from enforcing the 2001 Amendments. (PJA at 1879-80.) Finally, the parties have stipulated to the accuracy of this fact. (See Stipulation re Club Plaintiffs' Judicial Notice Requests ("Club Plaintiffs' Stipulation"), ¶ 4(a); Stipulation Relating to Judicial Notice ("Bookstore Plaintiffs'

Stipulation"),[24] ¶ 2.)

On the other hand, this Court declines to take judicial notice of the Club

Plaintiffs' proposed fact that

> [t]he City's analysis, in response to the constitutional challenge to the [1995 Regulations], that there were in excess of 500 potential sites to which adult establishments could relocate under the [1995 Regulations], did not include consideration of the 500-foot buffer zone being imposed around all then-existing and new adult establishments.

(PJA at 345.)  As an initial matter, the Club Plaintiffs simply make this assertion in their opening

and reply briefs without making any effort to point this Court to a source from which this fact

may be "accurately and readily determined."  Fed. R. Evid. 201(b).  But even setting that aside,

this Court's independent review of the Plaintiffs' Joint Appendix reveals some ambiguity in the

veracity of this fact.  (Compare PJA at 1446 (representation in City's appellate brief before the

New York Court of Appeals that the DCP "also took into account . . . the requirement that an

adult establishment be located a 500-foot distance from . . . other adult establishments"), with

PJA at 1457 (deposition testimony by the DCP's then–Director of Zoning and Urban Design that

the DCP made no effort to analyze the impact of adult establishments on the location of other

adult establishments).)  Against this backdrop, judicial notice would be improper.[25]  This Court

has reviewed the remainder of Plaintiffs' requests for judicial notice and to the extent not

expressly addressed herein, denies them as unnecessary to its disposition of the preliminary

injunction motions without prejudice to renewal at a later time.

---

[24]     The Club Plaintiffs' Stipulation is docketed at ECF No. 119 in 02cv4431, ECF No. 79 in 02cv4432, and ECF No. 104 in 02cv8333.  The Bookstore Plaintiffs' Stipulation is docketed at ECF No. 67 in 18cv3732.

[25]     In any event, the Club Plaintiffs and Defendants have stipulated that the maps the City generated in the mid-1990s "did not depict the then-existing adult businesses or the 500' buffer areas around them where new adult uses were prohibited, as [indicated] in the asterisked footnote on those maps."  (Club Plaintiffs' Stipulation ¶ 4(b).)  The asterisked footnote referenced in paragraph 4(b) states that "[r]estrictions from existing adult entertainment uses [are] not shown."  (See PJA at 1811-15.)

Second, though the parties have submitted expert affidavits and analyses, as well as other affidavits that border on lay opinion testimony, such evidence has been considered on the basis that courts may consider inadmissible evidence in context of a preliminary injunction. E.g., Flores, 2019 WL 1515291, at *2 (citing, inter alia, Mullins, 626 F.3d at 52). Third, the parties have stipulated that various documents are true and accurate copies of the originals.[26] (See Club Plaintiffs' Stipulation ¶¶ 1-2, 5; Bookstore Plaintiffs' Stipulation ¶¶ 1, 3.) The parties also stipulate that the portions of the City's Administrative Code submitted as Exhibits 16-19 to the Club Plaintiffs' request for judicial notice were repealed in 2008, and that since 2008, "there is no legal provision imposing a specific number of days in which DOB is to issue a building alteration permit following approval of all construction documents or plans and following submission of a proper and complete application for such a permit." (Club Plaintiffs' Stipulation ¶ 4(c)(d).)

## II. Legal Standard

A preliminary injunction has been characterized as an "extraordinary and drastic remedy" that "should not be granted unless the movant, by a clear showing, carries the burden of persuasion." Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam); see also Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 9 (2008). A party seeking a preliminary injunction must typically establish (1) the likelihood of irreparable harm in the absence of injunctive relief; (2) either a likelihood of success on the merits, or sufficiently serious questions going to the merits of its claims to make them fair ground for litigation; (3) that the balance of hardships tips in the movant's favor; and (4) that a preliminary injunction is in the public interest. N.Y. *ex rel.*

---

[26] These are Exhibits 1-53, 2A-5A, and 82-88 to the Club Plaintiffs' request for judicial notice; Exhibit H to the Gittens Declaration, submitted by Defendants; Exhibits I-L to the Devine Declaration, submitted by Defendants; and Exhibits 54-81 to the Bookstore Plaintiffs' request for judicial notice.

Schneiderman v. Actavis PLC, 787 F.3d 638, 650 (2d Cir. 2015); see also Salinger v. Colting, 607 F.3d 68, 79-80 (2d Cir. 2010).

But where, as here, "a preliminary injunction is sought against government action taken in the public interest pursuant to a statutory or regulatory scheme, the less-demanding 'fair ground for litigation' standard is inapplicable, and therefore a 'likelihood of success' must be shown." Forest City Daly Hous., Inc. v. Town of N. Hempstead, 175 F.3d 144, 149 (2d Cir. 1999) (citation omitted); accord Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund, Ltd., 598 F.3d 30, 35 n.4 (2d Cir. 2010) (discussing three limited exceptions to the general preliminary injunction standard). This "higher standard reflects the judicial deference toward 'legislation or regulations developed through presumptively reasoned democratic processes.'" Forest City Daly Hous., 175 F.3d at 149 (citation omitted). Fundamentally, the "purpose of such interim equitable relief is not to conclusively determine the rights of the parties, but to balance the equities as the litigation moves forward." Trump v. Int'l Refugee Assistance Project, 137 S. Ct. 2080, 2087 (2017) (internal citation omitted).

III. Analysis

A. Irreparable Injury

Irreparable harm has been described as "the single most important prerequisite for the issuance of a preliminary injunction." Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (citations and quotation marks omitted). A plaintiff must demonstrate that absent preliminary injunctive relief, it is likely to "suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." Habitat for Horses v. Salazar, 745 F. Supp. 2d 438, 448 (S.D.N.Y. 2010) (quotation mark omitted) (quoting Grand River Enter. Six Nations,

Ltd. v. Pryor, 481 F.3d 60, 66 (2d Cir. 2007)).  Nevertheless, a plaintiff "need only show a

'threat of irreparable harm, not that irreparable harm already [has] occurred.'"  Airbnb, Inc. v.

City of New York, 373 F. Supp. 3d 467, 480 (S.D.N.Y. 2019) (alterations in original) (quoting

Mullins, 626 F.3d at 55).

Defendants do not dispute the presumption that a movant has established

irreparable harm in the absence of injunctive relief where, as here, the claims involve an alleged

deprivation of a constitutional right.  See Mitchell v. Cuomo, 748 F.2d 804, 806 (2d Cir. 1984).

Indeed, as the Second Circuit has reaffirmed, "[t]he loss of First Amendment freedoms, even for

minimal periods of time, unquestionably constitutes irreparable injury."[27] N.Y. Progress &

Protection PAC v. Walsh, 733 F.3d 483, 486 (2d Cir. 2013) (quoting Elrod v. Burns, 427 U.S.

347, 373 (1976)).  Thus, assuming that the 2001 Amendments—which purportedly impose a

direct limitation on speech—violate the Constitution, Plaintiffs have demonstrated irreparable

harm.  Accord Monserrate v. N.Y. State Senate, 695 F. Supp. 2d 80, 90 (S.D.N.Y. 2010).

B.  Likelihood of Success on the Merits

To establish a likelihood of success on the merits, Plaintiffs "need not show that

success is an absolute certainty," but only that "the probability of [their] prevailing is better than

fifty percent."  Airbnb, Inc., 373 F. Supp. 3d at 480 (alteration in original) (quoting Eng v.

Smith, 849 F.2d 80, 82 (2d Cir. 1988)).  Further, Plaintiffs need not demonstrate a likelihood of

success on the merits of every claim—rather, they need only "show a likelihood of success on

---

[27]    In abrogating the presumption of irreparable injury that courts in this circuit routinely applied to copyright infringement claims, the Second Circuit has explained that courts "must not adopt a 'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm."  Salinger, 607 F.3d 68, 80 (2d Cir. 2010) (citing eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391, 393-94 (2006)).  Although the Second Circuit suggested that eBay would apply "with equal force to an injunction in any type of case," it still limited its holding to the copyright infringement context.  Salinger, 607 F.3d at 78 & n.7 (emphasis in original).  Thus, absent precedent from the Supreme Court and Second Circuit directly on point, this Court joins others in this district that have continued to presume irreparable injury based on an alleged constitutional deprivation.  See, e.g., Christa McAuliffe Intermediate Sch. PTO, Inc. v. de Blasio, 364 F. Supp. 3d 253, 276 (S.D.N.Y. 2019); Airbnb, Inc., 373 F. Supp. 3d at 498.

the merits of at least one of [their] claims." L.V.M. v. Lloyd, 318 F. Supp. 3d 601, 618

(S.D.N.Y. 2018) (citations omitted). Because this Court finds that Plaintiffs are more likely than

not to succeed on the merits of their First Amendment free speech claims—the crux of their

complaints—it does not address their alternative theories for finding the 2001 Amendments

unconstitutional. See Eve of Milady v. Impression Bridal, Inc., 957 F. Supp. 484, 487 (S.D.N.Y.

1997) (declining to address other claims based on finding that certain claims "provide a basis for

granting a preliminary injunction").

      1.  Legal Principles

The First Amendment to the U.S. Constitution prohibits Congress from making

laws abridging the freedom of speech. U.S. Const. amend. I. The First Amendment's

protections apply to the states and municipalities like the City through the Due Process Clause of

the Fourteenth Amendment. See Edwards v. South Carolina, 372 U.S. 229, 235 (1963)

(collecting cases). As a prefatory matter, this Court also notes that while Plaintiffs carry the

burden of persuading this Court that they are entitled to a preliminary injunction, Mazurek, 520

U.S. at 972, Defendants bear the burden of justifying the governmental infringement on speech

protected by the First Amendment, Nakatomi Invs., Inc. v. City of Schenectady, 949 F. Supp.

988, 991 (N.D.N.Y. 1997); see United States v. Playboy Entmt. Grp., Inc., 529 U.S. 803, 816

(2000); N.Y. Youth Club v. Town of Harrison, 150 F. Supp. 3d 264, 272 (S.D.N.Y. 2015).[28]

The Second Circuit has explained that "[a]t the heart of our First Amendment

---

[28]    The Club Plaintiffs appear to argue that in the First Amendment context, a plaintiff seeking a preliminary injunction must be deemed likely to prevail unless the government shows that plaintiffs' proposed less restrictive alternatives would be less effective than the statute, citing to the Third Circuit's decision in Reilly v. City of Harrisburg, 858 F.3d 173, 180 (3d Cir. 2017). This Court finds Reilly to be inapplicable to the extent the Club Plaintiffs argue that Defendants must show that less restrictive alternatives would be less effective than the 2001 Amendments. For that proposition, Reilly quoted the Supreme Court's decision in Ashcroft v. ACLU, 542 U.S. 656 (2004). But Ashcroft dealt with a content-based restriction on speech, and those must use the least restrictive means available in order to survive strict scrutiny. Because this Court determines that the 2001 Amendments are content-neutral—or at least properly analyzed under intermediate scrutiny—this proposition has no application here.

jurisprudence lies the concern that if the government were able to impose content-based burdens

on speech, it could effectively drive certain ideas or viewpoints from the marketplace."

Mastrovincenzo v. City of New York, 435 F.3d 78, 97-98 (2d Cir. 2006) (quotation marks

omitted) (quoting Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir. 2005)). Thus,

content-based restrictions on speech are presumptively invalid and must withstand strict scrutiny.

See Mastrovincenzo, 435 F.3d at 98 & n.15 (explaining that a content-based restriction must

"serve[] a compelling governmental interest, [be] necessary to serve the asserted [compelling]

interest, [be] precisely tailored to serve that interest, and [be] the least restrictive means readily

available for that purpose" (citation omitted) (third alteration in original)). On the other hand,

"regulations of expressive activity that are not based on content" trigger only intermediate

scrutiny. Mastrovincenzo, 435 F.3d at 98 (citation omitted). In other words, content-neutral

regulations may "limit the time, place, or manner of expression—whether oral, written, or

symbolized by conduct—even in a public forum, so long as the restrictions are reasonable, are

narrowly tailored to serve a significant governmental interest, and leave open ample alternative

channels for communication of the information." Mastrovincenzo, 435 F.3d at 98.

In the context of First Amendment challenges to adult entertainment zoning

regulations, this Court is also guided by the Supreme Court's secondary-effects doctrine

developed by Young v. American Mini Theatres, City of Renton v. Playtime Theatres, and their

progeny.[29] In its seminal Young decision, the Supreme Court upheld Detroit's zoning ordinance

for adult films against First Amendment and Fourteenth Amendment challenges, explaining that

---

[29]     The Club Plaintiffs advance several "tests" drawn from disembodied snippets of various opinions by the
Supreme Court and individual Justices under which the 2001 Amendments purportedly fail. In this Court's view,
the Supreme Court's jurisprudence with respect to time, place, and manner regulations more generally, and adult
zoning ordinances in particular, is largely consistent. Accordingly, it declines the Club Plaintiffs' invitation to
analyze the constitutionality of the 2001 Amendments separately under each of these "tests."

"[r]easonable regulations of the time, place, and manner of protected speech, where those

regulations are necessary to further significant governmental interests, are permitted by the First

Amendment."[30] Young, 427 U.S. at 63 n.18 (majority). Thus, it held that apart from treating

"adult theaters differently from other theaters and the fact that the classification is predicated on

the content of the material shown in the respective theaters, the regulation of the place where

such films may be exhibited does not offend the First Amendment." Young, 427 U.S. at 63. A

plurality of the Court also upheld the ordinance on equal protection grounds, concluding that

because "what is ultimately at stake is nothing more than a limitation on the place where adult

films may be exhibited, . . . the city's interest in the present and future character of its

neighborhoods adequately supports its classification of motion pictures" based on "the nature of

its content." Young, 427 U.S. at 70-72 (plurality) (footnote omitted).

The Supreme Court built upon this framework in Renton, which it viewed as

"largely dictated by [its] decision in [Young]." Renton, 475 U.S. at 46. Under Renton, the

Supreme Court first characterized the ordinance at issue as a time, place, and manner regulation

because it "does not ban adult theaters altogether, but merely provides that such theaters may not

be located within 1,000 feet of [certain sensitive receptors]." Renton, 475 U.S. at 46. After

finding the time, place and manner regulation to be content-neutral, the majority framed the

relevant inquiry as whether the ordinance "is designed to serve a substantial governmental

interest and allows for reasonable alternative avenues of communication." Renton, 475 U.S. at

47-50. A majority of the Supreme Court subsequently reaffirmed Renton's core intermediate

scrutiny framework. See Alameda Books, 535 U.S. at 440 (plurality); Alameda Books, 535 U.S.

---

[30] To be sure, while the Court omitted any mention of alternative channels of expression from its articulation of the relevant legal standard, a plurality of the Court observed that "[t]he situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." Young, 427 U.S. at 71 n.35 (plurality).

at 448-49 (Kennedy, J., concurring in the judgment).

2. <u>Application</u>

As an initial matter, this Court finds that the City's adult-use regulations are "properly analyzed as a form of time, place, and manner regulation" because they do not categorically ban adult establishments, but principally restrict their location.  <u>Renton</u>, 475 U.S. at 46-47.  Following the Supreme Court's lead in <u>Renton</u>, this Court next determines the content-neutrality of the City's adult-use regulations before applying the appropriate level of scrutiny.

a. <u>Content-Neutrality</u>

The "principal inquiry" for content-neutrality purposes is "whether the government has adopted a regulation of speech because of [agreement or] disagreement with the message it conveys."  <u>Lederman v. N.Y.C. Dept. of Parks & Recreation</u>, 731 F.3d 199, 202 (2d Cir. 2013) (citation omitted) (alteration in original).  An ordinance that regulates "expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech."  <u>Mastrovincenzo</u>, 435 F.3d at 98 (citation omitted); <u>see also</u> <u>Turner Broad. Sys., Inc. v. FCC</u>, 512 U.S. 622, 643 (1994) ("[L]aws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content neutral.").  Even if a regulation "has an incidental effect on some speakers or messages but not others," it is content-neutral so long as it "serves purposes unrelated to the content of expression."  <u>Ward</u>, 491 U.S. at 791.  Accordingly, "[r]egulations that target 'only [the] potential harmful secondary effects of speech' are . . . content-neutral and trigger intermediate, rather than strict, scrutiny."  <u>Mastrovincenzo</u>, 435 F.3d at 98 (second alteration in original) (citation omitted).

Here, this Court concludes that the City's adult-use regulations are content-neutral.  Despite the fact that they <u>apply</u> only to adult establishments, the 1995 Regulations and

the 2001 Amendments are at bottom <u>justified</u> by the desire to reduce the adverse secondary effects of adult establishments, based on a fair read of the 1994 DCP Study, the 1995 CPC Report, and the 2001 CPC Report. <u>See</u> <u>Renton</u>, 475 U.S. at 47 (finding ordinance to be content-neutral because it was "aimed not at the <u>content</u>" of adult films shown in adult theaters, "but rather at the <u>secondary effects</u>" of adult theaters on the surrounding community" (emphasis in original)). Stated differently, the purpose of the adult-use regulations is not to suppress adult expression based on its content. <u>Accord</u> <u>Buzzetti</u>, 140 F.3d at 140 (finding the 1995 Regulations to be content-neutral); <u>Stringfellow's of N.Y.</u>, 694 N.E.2d at 416-17 (same). This Court's determination is further bolstered by other courts that have reached the same conclusion in analyzing adult entertainment ordinances. <u>See, e.g.</u>, <u>Renton</u>, 475 U.S. at 47-48; <u>Giggles v. World Corp. v. Town of Wappinger</u>, 341 F. Supp. 2d 427, 430 (S.D.N.Y. 2004).

　　　　To be certain, Plaintiffs' assertion that the 2001 Amendments should be considered content-based restrictions on speech that are subject to strict scrutiny has some appeal. For instance, even the <u>Renton</u> majority acknowledged that the ordinances at issue in that case and <u>Young</u> "[did] not appear to fit neatly into either the 'content-based' or the 'content-neutral' category," <u>Renton</u>, 475 U.S. at 47, and its determination that such ordinances are content-neutral is hardly undisputed, <u>see</u> <u>Renton</u>, 475 U.S. at 56-57 (Brennan, J., dissenting) (describing the <u>Renton</u> majority's content-neutrality analysis as "misguided" because the ordinance on its face "imposes special restrictions on certain kinds of speech on the basis of <u>content</u>" (emphasis in original)); <u>Alameda Books</u>, 535 U.S. at 448 (Kennedy, J., concurring in the judgment) ("The fiction that this sort of ordinance is content neutral—or 'content neutral'—is perhaps more confusing than helpful . . . . These ordinances are content based, and we should call them so."); <u>Alameda Books</u>, 535 U.S. at 457 (Souter, J., dissenting) (describing laws

applicable "selectively only to speech of particular content" as "content correlated"); TJS of N.Y., Inc. v. Town of Smithtown, 598 F.3d 17, 22 (2d Cir. 2010) (describing the determination of whether zoning ordinances that target adult uses "are in fact content-neutral" as "a tricky question").

And as Plaintiffs point out, the Supreme Court recently reemphasized—albeit in a different context than here—that facially content-based regulations must survive strict scrutiny, even if they are justified without reference to a content-based purpose. Reed v. Town of Gilbert, 135 S. Ct. 2218, 2227-28 (2015). In striking down a municipal code that subjected different categories of signs to different restrictions based on the information they conveyed, the Supreme Court explained that "[g]overnment regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." Reed, 135 S. Ct. at 2227. Thus, courts must first "consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys" before considering the regulation's purported justifications or motives. Reed, 135 S. Ct. at 2227-28 (citation omitted).

Yet the federal courts of appeals that have considered Reed's impact on the Supreme Court's secondary-effects doctrine have roundly rejected the notion that Reed changed the applicable law for zoning ordinances like the 2001 Amendments. For instance, the Eleventh Circuit acknowledged that "Reed has called into question the reasoning undergirding the secondary-effects doctrine" but nevertheless adhered to the Supreme Court's secondary-effects cases as "directly control[ling]." See Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, 703 F. App'x 929, 935-36 (11th Cir. 2017) (per curiam) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989)); cf. Cricket Store 17, LLC v. City of Columbia, 676 F. App'x 162, 167 (4th Cir. 2017) (affirming district court's content-neutrality

determination under the <u>Renton</u> rubric without any discussion of <u>Reed</u>).  Likewise, the Seventh

Circuit expressed doubts that "<u>Reed</u> upends established doctrine for evaluating regulation of

businesses that offer sexually explicit entertainment, a category the Court has said occupies the

outer fringes of First Amendment protection."  <u>BBL, Inc. v. City of Angola</u>, 809 F.3d 317, 326

n.1 (7th Cir. 2015); <u>accord</u> <u>Free Speech Coalition, Inc. v. Attorney Gen. U.S.</u>, 825 F.3d 149, 161

n.8 (3d Cir. 2016).

      Finally, despite Justice Kennedy's differences with the <u>Alameda Books</u> plurality,

he endorsed the "central holding of <u>Renton</u>" that "[a] zoning restriction that is designed to

decrease secondary effects and not speech should be subject to intermediate rather than strict

scrutiny" because zoning regulations—even if content based—"have a prima facie legitimate

purpose."  <u>Alameda Books</u>, 535 U.S. at 448 (Kennedy, J., concurring in the judgment).

Therefore, irrespective of the precise label that applies to adult-use zoning ordinances, this Court

analyzes the 2001 Amendments through the lens of intermediate scrutiny.

      b.  <u>Narrow Tailoring</u>

      For the intermediate scrutiny inquiry, the "narrow tailoring requirement is

satisfied so long as the . . . [content-neutral] regulation promotes a substantial governmental

interest that would be achieved less effectively absent the regulation," <u>Mastrovincenzo</u>, 435 F.3d

at 98 (emphasis removed) (alterations in original) (citation and quotation mark omitted).  The

regulation need not be "the least restrictive or least intrusive means of [achieving the stated

governmental interest]."  <u>Hobbs</u>, 397 F.3d at 149 (quoting <u>Ward v. Rock Against Racism</u>, 491

U.S. 781, 798 (1989)).  In the free speech context, a "content-neutral 'time, place, or manner'

restriction will be considered narrowly tailored unless 'a substantial portion of the burden on

speech does not serve to advance its goals.'"  <u>Mastrovincenzo</u>, 435 F.3d at 98 (quoting <u>Ward</u>,

491 U.S. at 799); see TJS of N.Y., 598 F.3d at 22 (describing the adult zoning cases as descended from and "bear[ing] a strong family resemblance" to the time, place, and manner cases). Stated differently, "the law must not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" Packingham v. North Carolina, 137 S. Ct. 1730, 1736 (2017) (citation omitted).

In Alameda Books, the Supreme Court clarified the evidentiary standard for "determining whether an ordinance serves a substantial governmental interest" under Renton. Alameda Books, 535 U.S. at 433 (plurality). After restating Renton's holding that "a municipality may rely on any evidence that is 'reasonably believed to be relevant' for demonstrating a connection between speech and a substantial, independent government interest," a plurality of the Court articulated the following framework: (1) as an initial matter, the "municipality's evidence must fairly support the municipality's rationale for its ordinance"; (2) "[i]f plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings," the municipality satisfies the Renton standard; and (3) "[i]f plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance." Alameda Books, 535 U.S. at 438-39. Though this evidentiary burden is not a high bar, "[t]his is not to say that a municipality can get away with shoddy data or reasoning." Alameda Books, 535 U.S. at 438; accord Alameda Books, 535 U.S. at 451 (Kennedy, J., concurring in the judgment) (stating that "very little evidence is required" to allow municipalities "latitude to experiment").

Before applying these principles to the 2001 Amendments, this Court briefly

discusses Justice Kennedy's concurrence in <u>Alameda Books</u> given its importance to Plaintiffs'

briefs. In relevant part, Justice Kennedy agreed with the correctness of the plurality's

evidentiary framework but argued that the plurality gave short shrift to the antecedent question of

"what proposition . . . a city need[s] to advance in order to sustain a secondary-effects

ordinance." <u>Alameda Books</u>, 535 U.S. at 449 (Kennedy, J., concurring in the judgment). He

emphasized that "a city must advance some basis to show that its regulation has the purpose and

effect of suppressing secondary effects, while leaving the quantity and accessibility of speech

substantially intact." <u>Alameda Books</u>, 535 U.S. at 449. Put another way, a municipality may not

propose to "reduce secondary effects by reducing speech in the same proportion," but rather, the

"rationale of the ordinance must be that it will suppress secondary effects—and not by

suppressing speech." <u>Alameda Books</u>, 535 U.S. at 450.

      While the Second Circuit has not weighed in, other courts of appeals have—

without extensive analysis—regarded Justice Kennedy's concurrence as the controlling opinion

under the rule articulated by <u>Marks v. United States</u>, 430 U.S. 188 (1977). <u>See, e.g.</u>, <u>Connection</u>

<u>Distrib. Co. v. Holder</u>, 557 F.3d 321, 361-62 (6th Cir. 2009); <u>Ben's Bar, Inc. v. Vill. of</u>

<u>Somerset</u>, 316 F.3d 702, 722 (7th Cir. 2003); <u>SOB, Inc. v. County of Benton</u>, 317 F.3d 856, 862

n.1 (8th Cir. 2003); <u>Ctr. for Fair Pub. Pol'y v. Maricopa County</u>, 336 F.3d 1153, 1161 (9th Cir.

2003); <u>Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County</u>, 337 F.3d 1251, 1264 (11th

Cir. 2003). <u>Marks</u> provides that "[w]hen a fragmented Court decides a case and no single

rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be

viewed as that position taken by those Members who concurred in the judgments on the

narrowest grounds." <u>Marks</u>, 430 U.S. at 193 (quotation marks omitted). This rule only applies

when "one opinion is a logical subset of other, broader opinions"—that is, "only when the

narrow opinion is the common denominator representing the position approved by at least five justices." United States v. Alcan Aluminum Corp., 315 F.3d 179, 189 (2d Cir. 2003) (quoting King v. Palmer, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)).

Concededly, the precedential import of Justice Kennedy's concurrence is somewhat unclear, despite the general consensus among the federal circuit courts. For one thing, the "common denominator representing the position approved by at least five justices" is arguably the plurality's evidentiary framework, the soundness of which Justice Kennedy expressly noted. Alcan Aluminum Corp., 315 F.3d at 189. But in any event, this Court does not understand Justice Kennedy's concurrence to have fundamentally altered the Supreme Court's secondary-effects framework. Accord Ctr. for Fair Pub. Pol'y, 336 F.3d at 1163 (collecting cases "explicitly stat[ing] that Justice Kennedy's separate decision did little, if indeed anything, to the traditional Renton framework"); see also Ben's Bar, 316 F.3d at 721 (describing the difference between Justice Kennedy's concurrence and the plurality opinion as "quite subtle"). Rather, this Court views the concurrence's "how speech will fare" discussion as clarifying or restating familiar analytical principles, including that a time, place, and manner regulation must leave open adequate alternative channels for the regulated speech. Accord Alameda Books, 535 U.S. at 443 (plurality) (considering concurrence's views as "simply a reformulation of the requirement that an ordinance warrants intermediate scrutiny only if it is a time, place, and manger regulation and not a ban"); World Wide Video of Wa., Inc. v. City of Spokane, 368 F.3d 1186, 1195 (9th Cir. 2004) ("Conceptually, this question dovetails with the requirement that an ordinance must leave open adequate alternative avenues of communication.").

Applying these principles here, Defendants' stated interest of reducing the negative secondary effects of establishments with predominant, ongoing focus on adult-oriented

expression certainly qualifies as a "substantial governmental interest." See Alameda Books, 535

U.S. at 436 (finding that "reducing crime is a substantial government interest"); Renton, 475

U.S. at 50 (regarding a municipality's "interest in attempting to preserve the quality of urban life

[as] one that must be accorded high respect" (quoting Young, 427 U.S. at 71 (plurality)));

Buzzetti, 140 F.3d at 140 ("[C]oncerns similar to those advanced by New York City, such as

preventing crime, maintaining property values, and preserving the quality of urban life and the

character of city neighborhoods, constitute 'substantial governmental interest[s].'" (second

alteration in original)).  Thus, the pertinent question is whether the 2001 Amendments are

sufficiently tailored to that interest.

    The Club Plaintiffs contend that the 2001 Amendments fail to satisfy the narrow

tailoring requirement based on the lack of evidence of new or continuing secondary effects from

60/40 establishments.  In particular, they rehash the argument raised in the For the People

Theatres litigation that the DCP never studied the secondary effects of 60/40 establishments and

that in fact, some individuals testified to their belief that 60/40 establishments did not result in

any significant impacts.  In this Court's view, the Club Plaintiffs ask too much of Defendants,

who need only demonstrate that the 2001 Amendments promote the City's interest in reducing

secondary effects more effectively than if they did not exist.

    Defendants have met their burden of providing evidence that supports a link

between the regulated speech and the asserted secondary effects.  Alameda Books, 535 U.S. at

441 (plurality).  The DCP Study certainly demonstrates some nexus between deleterious

secondary effects and establishments with a predominant, ongoing focus on adult-oriented

expression—both through its survey of the experiences of other municipalities as well as its own

surveys and analysis.  And the 2001 CPC Report, which cites to judicial determinations that

mechanical compliance with the 60/40 Standard leaves the essentially non-conforming nature of the adult business intact, fairly supports the underlying rationale for the 2001 Amendments that 60/40 establishments may still have a predominant and ongoing focus on adult-oriented expression.  (2001 CPC Report at 33-35.)  Cf. City of Erie v. Pap's A.M., 529 U.S. 277, 296-97 (2000) (relying on findings in judicial opinions and the municipality's own findings).  Therefore, Defendants had a reasonable basis to infer that regulating the location of 60/40 establishments would alleviate the negative secondary effects associated with establishments with a predominant, ongoing focus on sexual activity or materials.

Although the Club Plaintiffs correctly observe that certain individuals opposed the 2001 Amendments because they did not perceive any negative secondary effects from 60/40 establishments, (see, e.g., 2001 CPC Report at 23, 25-26), the First Amendment does not require a municipality to "conclusively prove its theory for establishing . . . a connection" between the regulated speech and the secondary effects sought to be abated.  White River Amusement Pub, Inc. v. Town of Hartford, 481 F.3d 163, 170 (2d Cir. 2007).  Likewise, the Club Plaintiffs' suggestion that the City must furnish evidence linking 60/40 establishments with secondary effects runs afoul of the notion that "a city need not prove that such a link exists or prove that its ordinance will be effective in suppressing secondary effects."  White River, 481 F.3d at 171. Because Defendants have shown that they "relied on some evidence 'reasonably believed to be relevant' to the problem of negative secondary effects" in enacting the 2001 Amendments, they have "demonstrate[d] that [they] further[] a substantial government interest."  White River, 481 F.3d at 171 (citation omitted).

c.  Reasonable Alternative Channels

In the adult entertainment context, the Second Circuit has reaffirmed that

"whether the challenged restriction leaves open adequate alternative avenues of communication" requires "an assessment of available other locations, and whether those alternatives afford a reasonable opportunity to locate and operate such a business." TJS of N.Y., 598 F.3d at 21-22 (citing Hickerson, 146 F.3d at 107-08 and Buzzetti, 140 F.3d at 140-41). A municipality need not "identify the exact locations to which adult establishments may locate, 'as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are physically and legally available to accommodate the adult establishments.'" TJS of N.Y., 598 F.3d at 22 n.4 (quoting Hickerson, 146 F.3d at 107).

This availability inquiry centers on "whether proposed sites are physically and legally available, and whether they are part of an actual commercial real estate market in the municipality." TJS of N.Y., 598 F.3d at 27. Though this determination is fact dependent and somewhat nebulous, the Second Circuit has summarized some of the relevant considerations. These factors include the (1) "pragmatic likelihood of [sites] ever becoming available to a generic commercial enterprise," which connotes "genuine possibility"; (2) "accessibility to the general public"; (3) "the surrounding infrastructure"; and (4) "whether the sites are suitable for some generic commercial enterprise." TJS of N.Y., 598 F.3d at 27-28 (citations and quotation marks omitted) (alteration in original).

Availability does not mean that the acquisition or use of land must be profitable or commercially practicable, and sites are not rendered unavailable simply by being "'already occupied by existing businesses,' not 'currently for sale or lease' or otherwise not 'commercially viable,'" TJS of N.Y., 598 F.3d at 27 (quoting Renton, 475 U.S. at 53-54). Similarly, the fact that a site must be developed or is located in an industrial or manufacturing zone does not make it unsuitable. TJS of N.Y., 598 F.3d at 28; see Renton, 475 U.S. at 53 (finding reasonable

alternative avenues of communication based on "acreage in all stages of development from raw land to developed, industrial, warehouse, office, and shopping space that is criss-crossed by freeways, highways, and roads" (citation omitted)).  On the other hand, land may be excluded as unavailable if "the physical features of a site or the manner in which it has been developed are 'totally incompatible with <u>any</u> average commercial business,' or the site lacks the basic infrastructure that is a precondition to private development."  <u>TJS of N.Y.</u>, 598 F.3d at 28 (citations omitted) (emphasis in original).  In other words, the touchstone is whether "sites are part of the commercial market generally," irrespective of whether they meet the needs of adult businesses specifically.  <u>TJS of N.Y.</u>, 598 F.3d at 28.

With respect to the temporal dimension of this prong, the Second Circuit held that "courts must consider the adequacy of alternatives available at the time the ordinance is challenged."  <u>TJS of N.Y.</u>, 598 F.3d at 22.  In other words, a court "should account for circumstances as they exist at the time the court issues its judgment, or as close as is practicable to that time . . . ."  <u>TJS of N.Y.</u>, 598 F.3d at 23.  As the Second Circuit observed, the "First Amendment does not allow courts to ignore post-enactment, extralegal changes and the impact they have on the sufficiency of alternative avenues of communication."  <u>TJS of N.Y.</u>, 598 F.3d at 23.  It reasoned that the First Amendment inquiry must "be attuned to [the] realities" that "[t]he alternatives available when a statute is passed can disappear" or that "if a municipality opens up new land to development, the availability of alternative sites might very well increase."  <u>TJS of N.Y.</u>, 598 F.3d at 23.

Finally, this Court rejects Plaintiffs' unsupported contention that the availability of adequate sites must, as a categorical matter, be considered on a county-by-county basis— namely, that Defendants must demonstrate the presence of sufficient alternative channels for

adult expression in Manhattan.  See Hickerson, 146 F.3d at 108 n.5 (rejecting argument that "the

First Amendment requires proof of adequate available sites on a borough-by-borough basis" as

"without foundation and unsupported by case law"); cf. Mastrovincenzo, 435 F.3d at 101

(explaining that the "requirement that 'ample alternative channels' exist does not imply that

alternative channels must be perfect substitutes for those channels denied to plaintiffs by the

regulation at hand").  Whatever the merits of Plaintiffs' arguments as to Manhattan's uniqueness

with respect to real estate, entertainment, or culture, (e.g., PJA at 161-211), the First Amendment

simply "does not guarantee the right to communicate one's views at all times and places and in

any manner that may be desired," Heffron v. Int'l Soc'y for Krishna Consciousness, 452 U.S.

640, 647 (1981).  With these guiding principles in mind, this Court turns to the current

alternative relocation sites throughout the City.

   Defendants submit a declaration by the DCP's Executive Director along with

analyses completed by the DCP as to the areas in each borough where adult establishments could

relocate.  (Declaration of Anita Laremont, ECF No. 102 ("Laremont Decl."), ¶¶ 1, 11.)  This

analysis purports to account for encumbered lots unlikely to be developed for commercial use,

lots located within 500 feet of sensitive receptors or existing adult establishments, and lots

subject to rezoning.  (Laremont Decl. ¶ 11.)  The DCP's analysis concludes that over 2,800 lots

larger than 2,500 square feet exist in which adult establishments may be located, which appears

to represent 2.8% of the City's land.  (Laremont Decl. ¶ 11 & n.7.)  By borough, the DCP

identified 36 lots in Manhattan, over 700 lots in Brooklyn, nearly 1,000 lots in Queens, over 550

lots in the Bronx, and over 550 lots in Staten Island that could accommodate adult businesses.

(Laremont Decl. ¶¶ 12-13, 16-19; Stipulation Among All Parties re Certain Undisputed Facts,

ECF No. 118, 02cv4431.)  According to the DCP, these areas are transit-accessible and have

established patterns of commercial development. (Laremont Decl. ¶¶ 14, 16-19.)

This Court also recognizes that courts assessing the constitutionality of the 1995 Regulations and the 2001 Amendments have found that they allowed sufficient alternative channels for communication. Buzzetti, 140 F.3d at 140-41; Stringfellow's of N.Y., 694 N.E.2d at 418-19; see For the People Theatres of N.Y., 793 N.Y.S.2d at 371 (concluding without analysis that "sufficient area is available so that the amendments do not have the effect of suppressing, or greatly restricting access to, lawful speech"). In particular, the DCP estimated that as of 1995, nearly 5,000 acres of unencumbered land—or 500 sites of over 10,000 square feet—representing 4% of the City's land area remained available for the 148 establishments that would need to relocate under the 1995 Regulations. (See Karnovsky Decl. ¶ 71.) And as of 2001, the DCP calculated that 101 displaced establishments would have had roughly 4,800 unencumbered acres and 450 sites in which to relocate. (Karnovsky Decl. ¶¶ 72-73.) Nonetheless, the available percentage of the municipality's land area or acreage are not necessarily dispositive. Cf. MJ Entmt. Enters., Inc. v. City of Mount Vernon, 328 F. Supp. 2d 480, 485 (S.D.N.Y. 2004) (recognizing that "there is no bright line test for how much land ensures reasonable alternative avenues of communication"); T & A's, Inc .v. Town Bd. Of Town of Ramapo, 109 F. Supp. 2d 161 173-74 (S.D.N.Y. 2000) (same).

On this preliminary record, this Court is skeptical that the 2001 Amendments leave open sufficient alternative avenues of communication. With respect to the outer boroughs, the DCP generated a map for each borough identifying the areas allowing and prohibiting adult establishments as October 31, 2018. (See Laremont Decl., Exs. D-G.) For areas permitting adult establishments, the DCP distinguished between privately owned lots with non-transportation or utility land uses and lots that were either publicly owned or had transportation or utility land

uses, such as John F. Kennedy International Airport and LaGuardia Airport.  Compared to the

maps the DCP created in connection with the 1995 Regulations, the 2018 maps appear to offer

slightly less available space for adult entertainment.

But the City's maps do not seem to indicate how the amount of available land

would be affected by the requirement that adult establishments be located at least 500 feet from

sensitive receptors or other adult establishments.  Accord Cochran v. Town of Marcy, 143 F.

Supp. 2d 235, 238 (N.D.N.Y. 2001) (issuing preliminary injunction in part based on "substantial

questions . . . as to whether any locations exist within the Town to which plaintiff's business

could legally relocate").  Indeed, the DCP's analysis concedes that when accounting for the

impact of an adult establishment on the location of other adult establishments, only a maximum

of thirteen adult establishments could co-exist in Manhattan,[31] even though the DCP identified

thirty-six lots in Manhattan.  (Laremont Decl. ¶ 15.)  When extrapolated to the City as a whole,

this statistic suggests that not assessing the effect of the AZR's anti-concentration provisions

may lead to a substantial overestimation of the alternative avenues for speech.  See TJS of N.Y.,

598 F.3d at 22 n.4 (requiring a municipality to prove at minimum that the "general areas that

remain available . . . contain enough potential relocation sites that are physically and legally

available").

The maps submitted by the Club Plaintiffs' expert, Michael Berzak, support this

intuition.  (See PJA at 19-46.)  As Berzak explains, his maps demonstrate the effect of

subsequent zoning changes for each borough.  And for Manhattan, Berzak's maps progressively

superimpose the effect of subsequent zoning changes, existing sensitive receptors and adult

establishments, sites unavailable for any commercial use, and the AZR's anti-concentration

---

[31]     Defendants do not appear to have included a current map reflecting the permissible areas for relocation in
Manhattan.

provisions.  (PJA at 2, 9-13.)  A review of Berzak's Manhattan maps—which Defendants do not appear to refute—indicates that the potential alternative sites for adult businesses to relocate has substantially diminished since 1995, and there is no reason to believe that this result would not similarly be felt in the outer boroughs.  Based on this evidence, this Court finds that Plaintiffs have sufficiently demonstrated at this stage that the enforcement of the 2001 Amendments will deny them adequate alternative channels to offer their adult expression.

      C.   <u>Balance of Hardships and the Public Interest</u>

      The preliminary injunction inquiry also requires courts to "balance the competing claims of injury[,] . . . consider the effect on each party of the granting or withholding of the requested relief, and pay particular regard [to] the public consequences in employing the extraordinary remedy of preliminary relief."  <u>Amarin Pharma, Inc. v. U.S. Food & Drug Admin.</u>, 119 F. Supp. 3d 196, 237-38 (S.D.N.Y. 2015) (internal citations and quotation marks omitted). Because "[t]hese factors merge when the Government is the opposing party," <u>Batalla Vidal v. Nielsen</u>, 279 F. Supp. 3d 401, 436 (E.D.N.Y. 2018) (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)), this Court considers them in tandem.

      This Court determines that the balance of hardships weighs in favor of Plaintiffs and the issuance of preliminary injunctive relief would not disserve the public interest.  Many of the Club Plaintiffs and Bookstore Plaintiffs have submitted affidavits attesting to the hardship they may face if the 2001 Amendments were enforced, including the loss of their businesses, the potential breach of their contracts and leases, the possibility that their employees will lose their jobs, the threat of criminal prosecution, and the financial and time costs of relocation.  (<u>See</u> PJA at 227-311, 1616-1669.)  Moreover, granting the requested relief would not result in any harm to Defendants, who have already refrained from enforcing the 2001 Amendments for eighteen

years.  While this Court credits Defendants' contention that the 2001 Amendments are designed to abate the pernicious secondary effects of adult establishments, it also recognizes that the City "does not have an interest in the enforcement of an unconstitutional law."[32]  N.Y. Progress & Prot. PAC, 733 F.3d at 488 (quotation marks omitted) (quoting Am. Civil Liberties Union v. Ashcroft, 322 F.3d 240, 247 (3d Cir. 2003)).  Rather, as this circuit has recognized, "securing First Amendment rights is in the public interest."  N.Y. Progress & Prot. PAC, 733 F.3d at 488; see also Ligon v. City of New York, 925 F. Supp. 2d 478, 541 (S.D.N.Y. 2013) ("[T]he public interest lies with the enforcement of the Constitution.").

CONCLUSION

The adult-use regulations that are the subject of these now-revived constitutional challenges are a throwback to a bygone era.  The City's landscape has transformed dramatically since Defendants last studied the secondary effects of adult establishments twenty-five years ago. As Proust might say, the "reality that [the City] had known no longer existed," and "houses, roads, [and] avenues are as fugitive, alas, as the years."  Marcel Proust, Swann's Way, in Remembrance of Things Past (C.K. Scott Moncrieff trans., 1922) (1913).

This Court reiterates that its determination of this motion says nothing about whether Plaintiffs will in fact succeed on the merits of their claims.  However, for the reasons stated above, Plaintiffs' motions for preliminary injunctions are granted.  Defendants are enjoined from enforcing the 2001 Amendments pending a final judgment on the merits.  Cf. Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2307 (2016) (reiterating the propriety of an injunction prohibiting the enforcement of a facially unconstitutional statute).  Because

---

[32]    Of course, this Court's "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses."  trueEx, LLC, 266 F. Supp. 3d at 720 n.108; see also Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981) ("[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.").

Defendants do not identify any "costs or damages" they may incur if wrongfully enjoined, this Court waives the Rule 65(c) bond requirement in its discretion. Accord Christian Fellowship Ctrs. of N.Y., Inc. v. Vill. of Canton, 377 F. Supp. 3d 146, 167 n.16 (N.D.N.Y. 2019); see Rex Medical L.P. v. Angiotech Pharms. (US), Inc., 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) ("It is well-settled that a district court has 'wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm [to the non-movant].'" (citations omitted)).

The parties in all four actions are directed to appear for a status conference on October 31, 2019 at 11:00 a.m. and to file a joint status report by October 24, 2019 detailing their respective positions on how to proceed with the balance of this action. Counsel are further directed to confer with each other prior to the conference regarding all of the subjects to be considered pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and to outline their discovery plan pursuant to that Rule in their joint status report.

The Clerk of Court is directed to terminate the motions pending at ECF No. 78 in 02cv4431, ECF No. 32 in 02cv4432, ECF No. 57 in 02cv8333, and ECF No. 27 in 18cv3732 and file a copy of this Opinion & Order on all four dockets.

Dated: September 30, 2019
 New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.