UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
689 EATERY CORP., etc., *et ano.,*                   :

                            Plaintiffs,      :

             - against -                    :        Civil Action No.
                                     02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,                   :

                         Defendants.     :
------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*      :

                            Plaintiffs,      :

             - against -                    :        Civil Action No.
                                     02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,                   :

                         Defendants.     :
------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*       :

                            Plaintiffs,      :

               - against -                    :        Civil Action No.
                                     02 CV 8333 (LJL)
THE CITY OF NEW YORK,                   :

                         Defendant.     :
------------------------------------------------------------X
336 LLC., etc., *et al.,*                   :

                            Plaintiffs,      :

               - against -                    :        Civil Action No.
                                     18 CV 3732 (LJL)
THE CITY OF NEW YORK,                   :

                         Defendant.     :
------------------------------------------------------------X

**VOLUME 2 OF EXHIBITS TO
JOINT REQUEST AND STIPULATIONS REGARDING
<u>THE TAKING OF JUDICIAL NOTICE</u>**

JNR-000154

## EXHIBITS VOL. 2 of 10; pp. JNR-000157 – JNR-000206
## (Exhibits 17 through 29)

| | | **Pages** |
|---|---|---|
| Exhibit 17 | Buildings Bulletin 2020-005 (describing procedures for processing building permit applications for adult establishments in the event that the 2001 Amendments are upheld) | 000157 |
| Exhibit 18 | Adult Establishment Applications (handbook from DOB website) | 000158-000168 |
| Exhibit 19 | Excerpts from DOB "Place of Assembly" guide (https://wwwl.nyc.gov/assets/buildings /pdf/code_notes _place-of-assembly.pdf) | 000169-000170 |
| Exhibit 20 | NYC DCP "Manufacturing Districts: M3" webpage (https://www.l.nyc.gov/site/planning/zoning/districts-tools/m3.page) | 000171-000172 |
| Exhibit 21 | NYC Department of City Planning "Manufacturing Districts: January 1, 2002 to January 1, 2012" webpage (https://www.l.nyc.gov/site/planning/zoning/ districts-tools/mfg-districts-2002-2012.page) | 000173-000175 |
| Exhibit 22 | DCP "Use Groups" webpage (https://www.l.nyc.gov/site/planning /zoning/districts-tools/ use-groups.page) | 000176-000179 |
| Exhibit 23 | DCP "Manufacturing Districts: Overview" webpage (https://www.l.nyc.gov/site/planning /zoning/districts-tools/mfg-districts.page) | 000180-000181 |
| Exhibit 24 | DCP City Planning History webpage (https://www.l.nyc.gov/site/planning/about/city-planning-history.page) | 000182-000185 |
| Exhibit 25 | DCP "Community-Based Planning" webpage (https://www.l.nyc.gov/site/planning /community /community-based-planning.page) | 000186-000191 |
| Exhibit 26 | DCP "Special Purpose Districts: Citywide" webpage (https://www.l.nyc.gov/site/planning/zoning/districts-tools/ special-purpose-districts-citywide.page) | 000192-000198 |

|  |  | **Pages** |
|---|---|---|
| <u>Exhibit 27</u> | DCP "Special Purpose Districts" webpage (https://www1.nyc.gov/site/planning /zoning/districts-tools/special-purpose-districts.page) | 000199 |
| <u>Exhibit 28</u> | DCP Press Release, November 15, 2011, containing "Mayor Michael Bloomberg's Remarks at Zoning the City Conference, as Delivered by Deputy Mayor Robert K. Steel" (https://www1.nyc.gov/assets/planning/download/pdf/. about/press-releases/pr111511.pdf) | 000200-000202 |
| <u>Exhibit 29</u> | DCP's portion of the Mayor's Management Report, dated September 2012 (http://www.nyc.gov/html/ops/downloads /pdf /mmr09 l 2/dcp.pdf) | 000203-000206 |





NYC Buildings Department
280 Broadway, New York, NY 10007

Melanie E. La Rocca, Commissioner

---

## BUILDINGS BULLETIN 2020-005
### Operational

---

| | |
|---|---|
| **Supersedes:** | Prospectively and Partially Supersedes Operations Policy and Procedure Notice # 7/02 |
| **Related Bulletin(s):** | BB 2016-010 |
| **Issuer:** | Gus Sirakis, PE<br>First Deputy Commissioner |
| **Issuance Date:** | April 2, 2020 |
| **Purpose:** | This bulletin seeks to clarify the application process for Adult Establishment applications under the 2001 Zoning Resolution Amendments.[1] |

| **Related Code/Zoning Section(s):** | AC 28-104.2.1<br>AC 28-104.2.2<br>BB 2016-010<br>OPPN #7/02 | AC 28-104.7<br>AC 28-105.10<br>OPPN #8/96<br>OPPN #17/95 | BC 107<br>1 RCNY 21-02 | ZR 12-10<br>ZR 32-01<br>ZR 42-01 |
|---|---|---|---|---|

| | |
|---|---|
| **Subject(s):** | Adult Establishments, Professional Certification |

---

**I.**  **Effective**: Upon the date the 2001 Zoning Resolution Amendments become enforceable.[2]

**II.**  **Background:** Beginning with OPPN #17/95, and as currently described in OPPN #7/02(I)(A), the Department has prohibited the use of Directive 14 of 1975 and the Professional Certification of Application and Plans Process (BB 2016-010) for any filing related to Adult Establishments.

**III.**  **Description**: As a result of the 2001 Zoning Amendments, which the New York Court of Appeals upheld in For the People Theatres of N.Y. Inc. v. City of New York dated June 6, 2017, the use of Directive 14 of 1975 and/or the Professional Certification of Application and Plans Process will not be prohibited solely because the applications propose adult establishments.[3] Applications that propose Adult Establishments need not be subject to routine review by the Department's General Counsel's Office.

---

[1] Enforcement of these amendments is currently stayed, pending the outcome of 725 Eatery Corp. v. City of New York, 408 F. Supp. 3d 424 (S.D.N.Y. 2019), and related cases.
[2] See previous footnote.
[3] As defined in Zoning Resolution § 12-10.



# Adult Establishment

Applications





**Bill de Blasio**
Mayor

**Rick D. Chandler, PE**
Commissioner

nyc.gov/buildings
Version 1 | 6.2016

JNR-000158

0538

# ADULT ESTABLISHMENT
## Applications

**An adult establishment is any commercial establishment which features the depiction, description, or display of "specified anatomical areas" or "specified sexual activities" to the degree defined in the Zoning Resolution.**

## Zoning

Regulations governing use and bulk vary according to zoning districts and outline requirements for lot coverage, floor area, open space, density, yards, height, setbacks, and parking. As defined in Section 12-10 of the Zoning Resolution (1995), an adult establishment is a commercial establishment in which a substantial portion—at least 40 percent—of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, other adult commercial establishment, or any combination of the above.

When determining whether a substantial portion of a commercial establishment is used for adult purposes, the following factors are to be considered: (1) the amount of floor area and cellar space accessible to customers and allocated to such an establishment, and (2) the percentage of total floor area and cellar space accessible to customers and allocated to such establishment -- (**["adult" FA accessible to customers + "adult" cellar space accessible to customers] / [total FA accessible to customers]**).

When determining whether a substantial portion of a commercial establishment's stock-in-trade is devoted to specified materials, the following factors are to be considered: (1) the percentage of total stock accessible to customers that such materials represent -- (**["adult" stock accessible to customers] / [total stock accessible to customers]**), and (2) the amount of floor area and cellar space accessible to customers containing such materials, and (3) the percentage of total floor area and cellar space accessible to customers containing such materials -- (**["adult" FA accessible to customers + "adult" cellar space accessible to customers] / [total FA accessible to customers]**).

# ADULT ESTABLISHMENT
Applications

***This publication is a general overview of the requirements for this type of work. There may be additional, applicable Zoning Resolution, Construction Code, Multiple Dwelling Law, or Energy Code requirements.***

## FIRST STEPS

- PW1 review for scope

- Zoning District, Site Designations *(special purpose districts, waterfront area or block, flood hazard area, fire district, landmark district, little 'e' DEP designated block, wetlands, 200' within transit authority infrastructure)*

- Street status (ZR 12-10 "street" and GCL 36 frontage on a mapped street).  Also street width (wide or narrow) is important for zoning calculations in certain zoning districts

- Lot diagram *(dimensions of lot, building, yards, distance to corner street inter-section, street names, zoning use group, building occupancy group, construction classification, number of stories, buildings on adjacent lots, distance to nearest fire hydrant, curb cut application numbers, multiple dwelling classification)*

- Borough commissioner determinations, if applicable

## ADMINISTRATIVE

DOB Forms
- PW1 (verify gross floor area, including cellar counted for fees)

- PW1-A (verify use groups and occupancy classifications)

- PW1-B

- TR1

- TR8

- ZD1

JNR-000160

0540

# ADULT ESTABLISHMENT
## Applications

### Applicant

- Directive 14 of 1975 and the Professional Certification of Application and Plans Process (BB 2016-010) may not be used for any filing related to adult establishments.

- In the PW1 comments section, the applicant shall indicate whether the filing he/she is making is to create, enlarge, or extend an adult establishment or to erect a business sign accessory to an adult establishment.

- The application shall also include a separate area diagram detailing all existing uses and block and lot numbers within a 500 feet of the center line of the door(s) of the principal entrance of the adult establishment or of the center line of the ground floor door(s) giving the most direct street access to the adult establishment.

### Adult Establishments, Houses of Worship, and Schools

Pursuant to the Zoning Resolution, adult establishments are not permitted in residence districts and certain commercial districts. In districts where adult establishments are permitted, the Zoning Resolution requires that such establishments be located at least 500 feet from a house of worship, a school (both also referred to as "sensitive receptors"), or another adult establishment that was previously established. A "place of worship"/"church" is defined in PPN # 7/96. A "school" is defined in Section 12-10 of the Zoning Resolution.

Under 1 RCNY § 9000-01, the Department clarifies the criteria for determining the dates of establishment and discontinuance for adult establishments, houses of worship, and schools. The following shall be used to determine the dates of establishment for adult establishments, houses of worship, and schools and to confirm the priority of an existing establishment.

### Permitted between August 8, 2001 and July 9, 2010

An adult establishment that obtained a new-building or alteration permit between August 8, 2001, and July 9, 2010, that has not obtained a Temporary Certificate of Occupancy (TCO), or if applicable a Department sign-off, by July 10, 2011, or started operating within six months of TCO or sign-off, will lose priority to operate as an adult establishment if a new adult establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school obtained a new-building or alteration permit between

0541

# ADULT ESTABLISHMENT
## Applications

August 8, 2001, and July 9, 2010, but did not obtain a TCO, or if applicable a Department sign-off, by July 10, 2011, or start operating within six months of TCO or sign-off, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

### Permitted on or after July 10, 2010

An adult establishment that obtained a new-building or alteration permit on or after July 10, 2010, that has not obtained a TCO, or if applicable a Department sign-off, within one year from the date of permit issuance or started operating within six months of TCO or sign-off will lose priority to operate as an adult establishment if a new adult establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school obtained a new-building or alteration permit on or after July 10, 2010, but did not obtain a TCO, or if applicable a Department sign-off, within one year from the date of permit issuance, or start operating within six months of TCO or sign-off, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

### No-Work Permits Issued on or after July 10, 2010

Adult establishments authorized solely by a no-work permit that have not started operating within two months of permit issuance will lose priority to operate as an adult establishment if a new adult establishment, house of worship or school obtains a permit to be located within a 500-foot radius of the adult establishment.

If a house of worship or school authorized solely by a no-work permit issued on or after July 10, 2010 did not start operating within 2 months of permit issuance, a permit may be issued for an adult establishment to be located within a 500-foot radius of the permitted house of worship or school.

Note: Houses of worship, schools, and adult establishments in existence and operating lawfully prior to August 8, 2001, that have not ceased operations for a continuous period of one year or longer—as determined by the Department—are considered established.

JNR-000162

0542

# ADULT ESTABLISHMENT
## Applications

In order to ascertain whether an adult establishment is within 500 feet of a sensitive receptor or another adult establishment, the Department of Buildings shall determine the 500-foot distance radially as set forth below.

### Measuring from the Adult Establishment
When measuring from the adult establishment, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the centerline of the ground floor door(s) giving the most direct street access to the adult establishment.

### Measuring between Two Adult Establishments "A" and "B"
When measuring between two adult establishments, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of adult establishment "A" or from the center line of the ground-floor door(s) giving the most direct street access to adult establishment "A" to the center line of the door(s) of the principal entrance of adult establishment "B" or to the centerline of the ground floor door(s) giving the most direct street access to adult establishment "B."

### Measuring from the Adult Establishment to the Sensitive Receptor
With respect to measuring from the adult establishment to the sensitive receptor, the 500-foot distance shall be measured from the center line of the door(s) of the principal entrance of the adult establishment or from the center line of the ground floor door(s) giving the most direct street access to the adult establishment to the outside face of the closest demising wall of the school or place of worship. If there are outdoor spaces directly adjacent to and customarily used by such school or place of worship, such as a school playground, the 500-foot distance shall be measured from the previously described door(s) of the adult establishment to the nearest boundary point of a school playground rather than the boundary of the school building. However, if a school or place of worship shares a zoning lot with an unrelated use such as a commercial office building, the office building portion of the zoning lot shall not be considered part of the sensitive receptor site.

## Required Statement

For all applications for adult establishments submitted on or after July 10, 2010, applicants must include the following statement on the plans:

"No school, house of worship, or other adult establishment has been established within 500 feet of the center line of the door(s) of the principal

0543

# ADULT ESTABLISHMENT
## Applications

entrance of the proposed adult establishment or of the center line of the ground floor of the door(s) giving the most direct street access to the proposed adult establishment."

## BIS Required Items
- Check current Department memos and service notices

## ZONING

### Provisions of Zoning Resolution Relating to Adult Establishments

Prohibited Locations

Zoning Resolution Sections 11-30, 12-10, 32-00, 32-01, 42-00, 42-01, 42-55, 51-00, 52-00, and 72-00

Adult establishments are not permitted in the following districts or locations:
- on the same zoning lot as another adult establishment
- Residence districts
- Cl, C2, C3, C4, C5, C6-1, C6-2, or C6-3 zoning districts
- C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 zoning districts within 500' of:
    - a house of worship;
    - a school;
    - a residence district;
    - a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district,
    - a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization; or
    - another adult establishment.

EXCEPTION: An adult establishment will not become non-conforming if a church or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR §§ 32-01 and 42-01).

0544

# ADULT ESTABLISHMENT
## Applications

• Manufacturing districts in which residences, joint living-work quarters for artists, or loft dwellings are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization

• In all other manufacturing districts within 500' of:

- a house of worship;
- a school;
- a residence district;
- a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 zoning district;
- a manufacturing district, other than M1-6M district, in which new residence, new joint living-work quarters for artists, or new loft dwellings are allowed, under the provisions of the zoning resolution, as-of-right or by special permit or authorization; or
- another adult establishment.

EXCEPTION: An adult establishment will not become non-conforming if a house of worship or school locates within 500 feet of an existing adult establishment after April 10, 1995 (ZR §§ 32-01 and 42-01).

## Size Limitations

Under no circumstances may an adult establishment exceed in total 10,000 square feet of floor area or cellar space not used for enclosed storage or mechanical equipment.

## Sign Limitations

Accessory business signs for adult establishments are permitted but are subject to the sign regulations otherwise applicable in CI zoning districts except that the provisions of ZR § 32-69 shall not apply.

The maximum surface area of accessory business signs for adult establishments shall not exceed, in the aggregate, three times the street frontage of the zoning lot, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be illuminated, non-flashing signs.

# ADULT ESTABLISHMENT
## Applications

In manufacturing districts, accessory business signs for adult establishments are also not permitted on the roof of any building and are not permitted to extend above curb level at height of greater than 25 feet per ZR § 42-57.

### Termination of Existing Adult Establishments (ZR § 52-77)

General rule: In all districts, non-conforming adult establishments, including any business signs accessory thereto, shall terminate within one year from October 25, 1995, or from such later date that the adult establishment or sign becomes non-conforming.

Exceptions: Any adult establishment which existed on October 25, 1995, and which conforms to provisions of the Zoning Resolution relating to adult establishments other than the provisions of all or any combination of paragraphs (c), (d), and (e) of ZR § 32-01 or paragraphs (c), (d), and (e) of ZR § 42-01 shall not be subject to ZR § 52-77 (Amortization provision).

The Board of Standards and Appeals may, pursuant to ZR § 72-40 and ZR § 52-734, extend the time period for amortization of an adult establishment or business sign accessory thereto under specified circumstances.

### Non-Conforming Uses (ZR § 52-38)

A lawful non-conforming use may not be changed to an adult establishment, except as provided in Section 32-01 or Section 42-01.

## MULTIPLE DWELLING LAW

- N/A

## FIRE CODE

- Standpipe Systems- FC 905

- Sprinkler Systems- FC 903

JNR-000166

0546

# ADULT ESTABLISHMENT
## Applications

## BUILDING CODE

**Egress – BC Chapter 10**

- Occupant load – BC §1004

- Egress: width – BC §1005, doors – BC §1008

- Illumination – BC §1006

- Stairways: width, headroom, vertical rise – BC §1009; handrails – §1012

- Ramps: when used as an egress component – BC §1010; exterior ramps and stairways – BC §1026

- Guards – BC §1013

- Exit: exit access – BC §1014; exit and exit access doorways – §1015; exits – §1020; exit access travel distance – BC §1016; number of exits – BC §1021; exit discharge – BC §1027; corridors – BC §1018

- Exit enclosures – BC §1022

- Signage – BC §1030

**Fire Protection**

- Height and area limitations – BC Table 503

- Fire separation of separate occupancies and tenancies – BC Table 508.4

- Construction Classification – BC Table 601, 602

- Fire-rated construction details – BC Chapter 7

- Sprinkler systems – BC §903

- Standpipe systems – BC §905

- Fire alarm and detection, emergency alarms and smoke control systems (smoke, alarms, controls and carbon monoxide) – BC §907, §908 and §909

- Fire protection plan requirements – BC §28-109.2

JNR-000167

0547

# ADULT ESTABLISHMENT
## Applications

## ENERGY CODE

See Code Notes on Energy Code.

## APPLICABLE BULLETINS, DIRECTIVES, PPNS, MEMOS

- OPPN 1/1995: Adult Establishment – Moratorium on adult establishments
- OPPN 8/1996: Adult Establishment – Measuring the 500 feet distance requirement
- OPPN 7/1996: Adult Establishment – Places of Worship/Churches
- OPPN 6/1996: Adult Establishment – Applications and Complaint Procedure
- 1 RCNY 9000-1: Adult Establishments – Zoning
- Code Notes on Place of Assembly

## OTHER AGENCY APPROVALS

- Board of Standards and Appeals: for use variance
- City Planning Commission: certification required for waterfront area or block
- Department of Environmental Protection: hydrant flow test letter for new sprinkler installation; approval for SD1 and 2 or site connection; Notice to Proceed for lot with little 'e' designation
- NYC Fire Department: variance where Fire Code provisions not met
- Landmarks Preservation Commission: approval if landmark or in historic district

0548



# Place of Assembly

PA Applications



Photo: Samantha Modell



**Bill de Blasio**
Mayor
**Rick D. Chandler, PE**
Commissioner

**nyc.gov/buildings**
Version 2 |12.2015

# Place of Assembly
## NYC Building Code + NYC Administrative Code

**A Place of Assembly space is where large groups of people gather for any activity. The Department of Buildings requires a Place of Assembly Certificate of Operation in two circumstances: 1) where 75 or more people gather indoors or on roofs or roof terraces; or 2) where 200 or more people gather outdoors. Assembly spaces include but are not limited to restaurants, museums, theaters, auditoriums, churches and sports arenas.**

### NYC Building Code + NYC Administrative Code

The NYC Building Code (BC) and the NYC Administrative Code (AC) regulate assembly spaces. Among the safety issues they address: occupant load limits; exits and exit components; seating and furniture arrangements: fire alarms; sprinklers; and handicapped accessibility. Before legal operation, Places of Assembly must have a capacity sign and Certificate of Operation posted in a highly visible location within the space. Approved PA Plans should also be available at the site for yearly Fire Department inspection.

These notes outline the steps to apply for a Place of Assembly Certificate of Operation. However, these applications can only be approved after a space has been constructed (walls, doors, exits, etc.) pursuant to the required work permits, and must not exceed in occupant load the existing Certificate of Occupancy.

When the number of occupants is being changed for a proposed assembly space, a separate application to amend the number of occupants on the Certificate of Occupancy must also be filed.

Places of Assembly to serve more than 300 people must also file a Fire Protection Plan under a separate application with the Department of Buildings and the New York City Fire Department.

### New York City Fire Code

The Fire Department performs fire safety inspections in conjunction with the Buildings Department for assembly spaces. The NYC Fire Code also outlines requirements for Public Gatherings (Temporary Places of Assembly) that regulate standing areas, egress, fire guards, safety announcements, inspections, evacuation protocol and fire apparatus access. For general guidelines governing minimum requirements for Temporary Places of Assembly, please refer to TPPN #7/96.

***This publication is an overview of the requirements for this type of work. There may be additional, applicable Zoning Resolution, Construction Code, Multiple Dwelling Law or Energy Code requirements.***



## Manufacturing Districts: M3



Property in an M3-1 District in College Point, Queens

M3 districts are designated for areas with heavy industries that generate noise, traffic or pollutants. Typical uses include power plants, solid waste transfer facilities and recycling plants, and fuel supply depots. Even in M3 districts, uses with potential nuisance effects are required to conform to minimum performance standards.

Like M2 districts, M3 districts are usually located near the waterfront and buffered from residential areas. Large M3 districts are mapped along the Arthur Kill in Staten Island, along the East River shore of the South Bronx, and along the Gowanus Canal in Brooklyn. Smaller M3 districts, such as portions of Astoria, are located along the waterfront in all five boroughs and accommodate public utilities.

The two M3 districts, both with a maximum floor area ratio (FAR) of 2.0 and a maximum base height before setback of 60 feet, differ only in parking requirements. M3-1 districts are subject to the same parking requirements as M1-1, M1-2, M1-3, M2-1 and M2-2 districts; M3-2 districts, found only in Manhattan, are exempt.



## M3 Regulations

| M3 | Heavy Manufacturing District (Low Performance) | |
|---|---|---|
| | M3-1 | M3-2 |
| Manufacturing FAR | 2.0 | |
| Required Accessory Parking PRO-B | 1 per 300 sf | None |
| Permitted Sign Regulations (C = Sign Area) | 6 X street frontage | |

## Disclaimer

The Zoning Reference provides only general zoning information and is not meant to serve as a substitute for the actual regulations which are to be found in the Zoning Resolution.

Items accompanied by this symbol require the free Adobe Acrobat Reader.

Brief explanations of terms in blue italics can be viewed by clicking on the term.

JNR-000172



# Manufacturing Districts: January 1, 2002 to January 1, 2012

The maps and table that follow detail changes in the extent of manufacturing-zoned land in the City since January 1, 2002. The period covered by this analysis represents a time of extensive changes in the city's zoning map. Members of the public, researchers and elected officials have expressed great interest in the aggregate effect of these rezonings on the city's manufacturing zones. The maps and table provide details on the geography of the rezonings, date of adoption, and a hyperlink to the City Planning Commission reports. These materials provide extensive information on each rezoning. A table summarizing the changes to manufacturing districts citywide and by borough is also provided.

Manufacturing districts are mapped throughout NYC, allowing a wide array of community facility, commercial and manufacturing uses to locate as-of-right and by special permit of either the City Planning Commission or the Board of Standards and Appeals. New residences, and community facility uses that include sleeping accommodations are generally precluded.

Most manufacturing districts that existed on January 1, 2002 were mapped at the time of the 1961 Zoning Resolution. The drafters of the 1961 Zoning Resolution used 1950s employment data to base many of their decisions on the size and scale of the city's Manufacturing Districts. In 1955, the industrial sectors provided 1.8 million jobs, with 971,000 of those jobs in manufacturing. Since then, as a result of significant changes in the employment structure of New York City's economy, the number of industrial and manufacturing jobs has fallen continuously. By 2001, less than a third of 1955 industrial jobs remained in NYC and the manufacturing sector made up less than 20 percent of its 1955 levels. By 2011, the industrial and manufacturing sectors shrank to less than 25% and 10%, respectively, of 1955 levels.

Between 2002 and January 2012, the City Planning Commission and City Council approved rezonings of manufacturing districts to reflect local characteristics better and to guide new investment. The modifications to manufacturing districts are diverse, in cases permitting new residential neighborhoods to grow in post-industrial areas, or a different industrial typology to be developed to support more modern business facilities. These modifications are also widely dispersed, encompassing every borough. By rezoning underutilized stretches of former industrial areas, the City in some cases recognized new housing and businesses that were already being created, or provided new opportunities based on future development potential.

The manufacturing rezonings in this 10-year period reduced the total acreage of these districts by 5.2 percent or slightly more than 1,100 acres citywide. Over 20,000 acres remain manufacturing districts today. The most substantial reduction occurred in Brooklyn where approximately 360 acres of lot area zoned for manufacturing have been rezoned, representing a decline of roughly 8.2 percent. Manhattan, however, had the greatest share of its manufacturing districts rezoned. Approximately 26% of lot area zoned for manufacturing, or 265 acres, were mapped to another district. The changes in lot area are calculated for each borough and explained in the summary table below.

Changes to Manufacturing Zones from January 1, 2002 to January 1, 2012: by Acres of Land

| | NYC | Manhat-tan | Bronx | Brooklyn | Queens | Queens, excluding airports | Staten Island |
|---|---|---|---|---|---|---|---|
| **Lot area zoned for manufacturing in 2002** | **21,653** | **1,002** | **2,397** | **4,411** | **9,667** | **8,779** | **4,175** |
| M districts | 21,059 | 883 | 2,386 | 4,197 | 9,418 | 4,530 | 4,175 |
| MU districts | 594 | 119 | 11 | 215 | 249 | 249 | · |
| **Lot area zoned for manufacturing in 2012** | **20,450** | **758** | **2,293** | **4,144** | **9,490** | **4,602** | **3,765** |
| M districts | 19,607 | 638 | 2,176 | 3,816 | 9,212 | 4,323 | 3,765 |
| MU districts | 843 | 120 | 117 | 328 | 278 | 278 | · |
| **Change in lot area zoned for manufacturing, 2002-2012*** | **(816)** | **(232)** | **(88)** | **(236)** | **(175)** | **(175)** | **(86)** |
| Increase in M area due to rezonings | 38 | 3 | 17 | 6 | 13 | 13 | · |
| New M | 14 | 3 | · | 2 | 9 | 9 | · |
| New MU | 24 | · | 17 | 4 | 4 | 4 | · |
| Decrease in M area due to rezonings | 855 | 235 | 104 | 242 | 187 | 187 | 86 |
| M to C | 390 | 166 | 56 | 45 | 78 | 78 | 45 |
| M to R | 379 | 31 | 49 | 149 | 109 | 109 | 41 |
| MU to C | 37 | 37 | · | · | · | · | · |
| MU to R | 49 | · | · | 48 | 0.3 | 0.3 | · |
| Modification of M zones | 1,089 | 39 | 266 | 270 | 515 | 515 | · |
| M to M | 651 | 32 | 177 | 68 | 375 | 375 | · |
| M to MU | 324 | 7 | 89 | 157 | 71 | 71 | · |
| MU to MU | 110 | · | · | 45 | 65 | 65 | · |
| MU to M | 4 | · | · | · | 4 | 4 | · |
| **Change in lot area from other actions, 2002-2012*** | **(395)** | **(33)** | **(26)** | **(124)** | **(39)** | **(39)** | **(113)** |
| M to new park, public open space or preserved natural area | 213 | 10 | 26 | 46 | 17 | 17 | 113 |
| MU to new park, public open space or preserved natural area | 0.4 | · | · | · | 0.4 | 0.4 | · |
| GPP | 122 | 23 | · | 78 | 21 | 21 | · |

| | NYC Acres (±) | Manhat-tan loss Acres (±) | Bronx loss Acres (±) | Brookly n loss Acres (±) | Queens loss Acres (±) | Queens loss, excluding airports Total Acres (±) | Staten Island loss Acres (±) |
|---|---|---|---|---|---|---|---|
| **Decline in manufacturing districts by boro, 2002-2012**** | **(1,152)** | **(265)** | **(114)** | **(360)** | **(214)** | **(214)** | **(199)** |

*Slight discrepancy in area differences is attributable to rounding errors and changes in boundary geography over the time period.

**Combined net loss in Manufacturing districts by rezonings, establishments of parks and GPPs.

Mixed Use (MU) includes Special Mixed Use Districts, all other Special Districts in which M1 Districts are paired with a Residence District, M1-D Districts, and select Manufacturing Districts within Special Districts, which permit new residences.

GPP areas include land under the jurisdiction of General Project Plans approved by the Empire State Development Corporation or its subsidiaries.

# Maps

The changes in manufacturing districts are shown in the map below. To view more detailed borough maps of these changes and timelines explaining the rezonings in chronological order, click on a borough in the map below.

Case 1:02-cv-04431-LJL-SDA Document 162-2 Filed 03/09/22 Page 22 of 53



Bronx Brooklyn Manhattan Queens Staten Island Citywide Timeline

## Industrial Business Zones

The Industrial Business Zones (IBZs) were created in early 2006 in areas of the Bronx, Brooklyn and Queens. The IBZ program evolved from the City's earlier policies focused on In-Place Industrial Parks (IPIP), which provided business support services to industrial and manufacturing businesses located within the IPIP and addressed issues related to inrastructure and the business environment. Like the IPIPs, policies applying to the IBZs continue to offer targeted support services for industrial firms and attend to area-wide improvements. The designation also provides relocation tax credits to qualifying businesses that locate within an IBZ to direct investment to New York City's strongest industrial areas. To create more certainty on land use policy, IBZ designation also carries a commitment by the Bloomberg Administration not to support a rezoning permitting new residences. Only manufacturing districts may be designated as IBZs. Currently, the IBZ Boundary Commission is reviewing proposed modified and new boundaries. To learn more about the IBZ program, the current IBZ boundaries, and to review the proposed boundaries, please visit the NYC Economic Development Corporation's website.

Items accompanied by this symbol require the free Adobe Acrobat Reader.

Brief explanations of terms in blue italics can be viewed by clicking on the term.



## Use Groups

Permitted uses are grouped in 18 *use groups* based on the similarity and compatibility of their functions. The use groups are permitted in appropriate zoning districts either as-of-right or, if certain conditions are met, by authorization or special permit.

This page provides a general overview of use regulations in respective zoning districts and is not meant to serve as a substitute for the actual regulations which are to be found in the Zoning Resolution.

Uses allowed in residential districts are listed in Article II, Chapter 2. Uses allowed in commercial districts are listed in Article III, Chapter 2. Uses allowed in manufacturing districts are listed in Article IV, Chapter 2.

The use group chart below illustrates which use groups are permitted within each zoning district. For detailed information about which uses are permitted as-of-right or by discretionary action refer to the Chapter relating to the district or Article VII.

| Zoning Districts | Residential Use Groups | | Community Facility Use Groups | | Retail & Commercial Use Groups | | | | | | | | | | | Gen. Service | Mfg. Use Groups | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **USE GROUPS** | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 |
| **Residential Districts** | | | | | | | | | | | | | | | | | | |
| **R1 R2** Single-family detached | ■ | | ■ | ■ | | | | | | | | | | | | | | |
| **R3A* R3X R4A R5A** Single- & two-family detached | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | |
| **R3-1 R4-1*** Single- & two-family detached & semi-detached | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | |
| **R4B*** Single- & two-family detached, semi-detached & attached | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | |
| **R3-2 R4 R5 R5B* R6–R10** Detached, semi-detached & attached | ■ | ■ | ■ | ■ | | | | | | | | | | | | | | |
| **Commercial Districts** | | | | | | | | | | | | | | | | | | |
| **C1** Local Retail | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | |
| **C2** Local Service | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | ■ | | | | |
| **C3** Waterfront & Recreation | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | | |
| **C4** General Commercial | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | |
| **C5** Central Commercial (Restricted) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | |
| **C6** Central Commercial (General) | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | | | | |
| **C7** Commercial Amusements | | | | | | | | | | | | ■ | ■ | | | | | |
| **C8** General Service | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | ■ | ■ | |
| **Manufacturing Districts** | | | | | | | | | | | | | | | | | | |
| **M1** Light Manufacturing | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | ■ | ■ | |
| **M2** Medium Manufacturing | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | ■ | ■ | ■ |
| **M3** Heavy Manufacturing | | | | | ■ | ■ | ■ | ■ | ■ | ■ | ■ | | | | | ■ | ■ | ■ |

* Zero lot line buildings permitted

**Use Group 1**

Single-family detached residential development.

Allowed in: R1, R2, R3-1, R3-2, R3A, R3X, R4, R4-1, R4A, R4B, R5, R5A, R5B, R5D, R6-R10, C1, C2, C3, C4, C5, C6. Click to see the allowed uses listed in the Zoning Resolution: 📄 22-11

**Use Group 2**

All other types of residential development designed for permanent occupancy.

Allowed in: R3-1, R3-2, R3A, R3X, R4, R4-1, R4A, R4B, R5, R5A, R5B, R5D, R6-R10, C1, C2, C3, C4, C5, C6. Click to see the allowed uses listed in the Zoning Resolution: 📄 22-12

**Use Group 3**

Community facilities, such as schools, libraries, museums, college dormitories, nursing homes and residential facilities for special needspopulations.

Allowed in: R1, R2, R3-1, R3-2, R3A, R3X, R4, R4-1, R4A, R4B, R5, R5A, R5B, R5D, R6-R10, C1, C2, C3, C4, C5, C6. Click to see the allowed uses listed in the Zoning Resolution: 📄 22-13

## Use Group 4

Community facilities, such as houses of worship, community centers, hospitals, ambulatory health care facilities and non-profit facilities without sleeping accommodations.

Allowed in: R1, R2, R3-1, R3-2, R3A, R3X, R4, R4-1, R4A, R4B, R5,R5A, R5B, R5D, R6-R10, C1, C2, C3, C4, C5, C6, C8, M1. Click to see the allowed uses listed in the Zoning Resolution: 📄 22-14

## Use Group 5

Transient hotels

Allowed in: C1, C2, C4, C5, C6, C8, M1. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-14

## Use Group 6

Retail and service establishments that serve local shopping needs, such as food and small clothing stores, beauty parlors and dry cleaners.

Allowed in: C1, C2, C4, C5, C6, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-15

## Use Group 7

Home maintenance and repair services, such as plumbing and electrical shops which serve nearby residential areas.

Allowed in: C2, C6, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-16

## Use Group 8

Amusement establishments such as small bowling alleys and movie theaters, and service uses, such as upholstery and appliance repair shops.

Allowed in: C2, C4, C6, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-17

## Use Group 9

Services to business establishments and other services, such as printers or caterers.

Allowed in: C2, C4, C5, C6, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-18

## Use Group 10

Large retail establishments such as department stores and appliance stores which serve a large area

Allowed in: C4, C5, C6, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-19

## Use Group 11

Custom manufacturing activities such as art needlework and jewelry manufacturing

Allowed in: C5, C6, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-20

## Use Group 12

Large entertainment facilities such as arenas and indoor skating rinks which draw large numbers of people

Allowed in: C4, C6, C7, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-21

## Use Group 13

Low coverage or open uses, such as golf driving ranges, children's small amusement parks, camps and banquet halls

Allowed in: C7, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-22

## Use Group 14

Facilities for boating and related activities which are suitable in waterfront recreation areas

Allowed in: C2, C3, C7, C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-23

## Use Group 15

Large commercial amusement establishments, including typical amusement park attractions

Allowed in: C7. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-24

## Use Group 16

Semi-industrial uses, including automotive uses and other services, such as custom woodworking and welding shops

Allowed in: C8, M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 32-25

JNR-000178

**Use Group 17**

Light industrial uses that can normally conform to high performance standards

Allowed in: M1, M2, M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 42-14

**Use Group 18**

Heavy industrial uses

Allowed in: M3. Click to see the allowed uses listed in the Zoning Resolution: 📄 42-15

**Disclaimer**

The Zoning Reference provides only general zoning information and is not meant to serve as a substitute for the actual regulations which are to be found in the Zoning Resolution.

📄 Items accompanied by this symbol require the free Adobe Acrobat Reader.

Brief explanations of terms in blue italics can be viewed by clicking on the term.

JNR-000179



# Manufacturing Districts: Overview



Today's underlined manufacturing uses and the zoning districts in which they are located encompass far more than factories engaged in the manufacture of goods. The range of industrial and manufacturing activities important to New York City's economy is enormous—from catering suppliers, lighting fabricators, and warehouse and distribution centers to film production studios, ferry and ship terminals, and essential municipal facilities like sewage treatment plants, train yards and sanitation garages. In addition to these traditional and emerging industrial uses, manufacturing districts permit many commercial uses and, with limitations, some community facility uses.

Industrial uses are permitted in the three manufacturing districts—M1, M2 and M3—according to the characteristics of their operations. Each of the three districts incorporate differing performance standards that limit the amount and type of industrial nuisances permitted. Light manufacturing uses (Use Group 17) are permitted in all manufacturing districts. In general, the more potentially noxious uses (Use Group 18) are limited to M3 districts, but may also locate in M1 and M2 districts if they comply with the higher performance standards of those districts. All industrial uses must also comply with applicable city, state and federal environmental regulations.

With some exceptions, commercial uses, including hotels and business, professional and government offices, are permitted in manufacturing districts. Certain large retail uses are permitted in M1 districts only by a City Planning Commission special permit. However, many retail and service uses, as well as hotels and motels, are prohibited in M2 and M3 districts. Community facilities are excluded entirely from M2 and M3 districts and restricted to a few uses in M1 districts. Certain community facilities, such as schools, are allowed in M1 districts only by special permit.

The 1961 Zoning Resolution separated industrial and residential areas to ensure safety and insulate residential communities from industrial traffic and other irritants, and to shield industry from nuisance-generated complaints. No new residences were permitted in manufacturing districts, although many existing residences remained as non-conforming uses because of historic land use patterns.

Today, new residential developments and conversions are permitted in selected M1 districts that have a significant number of existing residences. Paired districts, mapped in Mixed Use Districts (MX) and the Special Long Island City Mixed Use District, combine an M1 district with a residential district, allowing a fine-tuned mixture of appropriate uses. Other older industrial areas, like SoHo and NoHo in Manhattan, have changed significantly as obsolete industrial buildings within M1-5A, M1-5B, M1-5M and M1-6M districts are converted to residential use by special permit. New residences are prohibited in all M2 and M3 districts.

JNR-000180

The floor area ratio (FAR) is the primary instrument for controlling building size in manufacturing districts. Four different floor area ratios (1.0, 2.0, 5.0 and 10.0) regulate the intensity of land use in the city's ma ufacturing districts. In some instances, high parking and loading berth requirements also act to control building size. Height and setback regulations are similar to those for residence and commercial districts. Yard regulations, which are generally the same for all manufacturing districts, are designed to provide open space and buffer areas—primarily at the boundaries of residence districts. As a further protection for adjacent residential areas, there are special regulations for industries located on district boundaries. These include requirements for adequate enclosure and screening of industrial activities and limitations on the location of business entrances, display windows and signs.

For detailed information, and a comparison of district requirements, open the ⬚ Manufacturing Districts Zoning Data Tables.

Manufacturing Districts: an overview of changes to manufacturing districts from January 1, 2002 to January 1, 2012 that includes maps and tables.

**Disclaimer**

The Zoning Reference provides only general zoning information and is not meant to serve as a substitute for the actual regulations which are to be found in the Zoning Resolution.

⬚ Items accompanied by this symbol require the free Adobe Acrobat Reader.

Brief explanations of terms in blue italics can be viewed by clicking on the term.



## City Planning History



View of Lower Manhattan Skyline from Brooklyn, ca. 1961

Since adoption of the country's first Zoning Resolution in 1916, New York City has played a seminal role in the history and development of planning and zoning. This rich history is captured through decades of planning reports, land use maps and historic photographs documenting a changing urban landscape. Many of these documents serve as a critical resource for the Department, for the City and for the planning profession.

## History of the City Planning Commission

New York City has been a pioneer in the development of urban planning in the United States; the nation's first comprehensive zoning resolution was enacted by the city in 1916. But it was not until 20 years later that New Yorkers voted to approve a new City Charter that established the City Planning Commission and gave it the responsibility to prepare plans and to draft and approve amendments to the Zoning Resolution.

Shortly after the turn of the century, the drive to establish a permanent planning agency in New York City was led by two advocates of municipal reform, George McAneny and Edward M. Bassett. McAneny had been elected Manhattan Borough President in 1909; he was president of the City Club and chairman of its Committee on City Planning. Bassett, a lawyer and a former congressman, was appointed to the Public Service Commission in 1907 and played an important part in planning for the city's expanding subway system.

In 1912, at the urging of the Fifth Avenue Association, whose members were concerned about congestion and declining land values, McAneny submitted a report to the Board of Estimate, formally known as the Board of Estimate and Apportionment, calling for more extensive building controls. The board, a quasi-legislative body consisting of the Mayor, Borough Presidents, Comptroller and, what is known today as the City Council President, did not act on it.

One year later, however, the Board of Estimate appointed a Committee on City Planning to make recommendations on possible limitations on the heights of buildings and selected McAneny to be its chairman.

The Committee on City Planning issued its report in 1914 and recommended the creation of a permanent city planning agency. The appendix of the report contained the draft of a bill (passed by the state legislature later that year) which

JNR-000182

gave the Board of Estimate the power to regulate heights and uses of buildings.

Another committee, under Bassett's leadership, was appointed to gather data necessary to evolve a coherent plan of land use districting. This committee's report formed the basis for the landmark 1916 Zoning Resolution, which reflected borough and local interests (Bassett and McAneny had carefully crafted the resolution to win their support). The resolution regulated the heights of buildings and divided the city into districts by land use. However, no agency was created to administer the new zoning law. The Chief Engineer of the Board of Estimate advised the Board on zoning amendments.

In 1926, Mayor James J. Walker appointed a Committee on Plan and Survey to study planning in New York and to draft a bill that would create a planning agency. The committee was composed of distinguished New Yorkers including McAneny, Bassett, Herbert Lehman, and Nicholas Murray Butler. In 1928 the committee proposed the creation of a City Planning Commission with jurisdiction over the city's physical development. Bassett drafted an amendment to the City Charter intended to create a City Planning Commission. However, the bill died in the state legislature.

Business associations, the newspapers, the Real Estate Board, the East Side Chamber of Commerce, and influential New Yorkers continued to press for a planning body. Mayor Walker sponsored a bill to create a planning department-with power over zoning-headed by a single commissioner. Local Law No. 16 was signed by Mayor Walker on July 17, 1930, after it had passed the Board of Estimate by a slim majority.

However, the new agency was ineffective as it had no real authority. When the depression dictated budget cuts, the department was abolished on February 1, 1933 for reasons of economy.

When Fiorello H. LaGuardia became mayor in 1934, he promised to establish a new planning agency. A commission to revise the City Charter was formed in 1935, with proposed revisions subject to vote by the electorate, and the mayor had his opportunity.

Public hearings on the proposed new charter began in May, 1936. LaGuardia and Bassett spoke in favor of a planning body. Ironically, George McAneny said that a planning agency should be advisory, with no zoning authority. The planning commission was opposed by some elected officials and others, including the Bronx Board of Trade, the Bronx and Queens Chambers of Commerce, and various Staten Island groups. The planning body was endorsed by the Citizens Union, the Regional Plan Association, the City Club, the Merchants Association, and the League of Women Voters.

The struggle for and against the charter went on into the fall. The planning commission proposal remained intact but faded into the background as other segments of the new charter took center stage in the discussions. In November, New Yorkers voted to adopt the new City Charter by nearly 65% approval.

The establishment of the City Planning Commission provided the structure for comprehensive planning in New York City, replacing a haphazard planning and zoning system that functioned principally through the interaction of interest groups and political forces. For the first time New York had a professional agency with a single purpose: to serve the people of New York by planning for the entire city.

Mayor LaGuardia selected Adolph A. Berle to be the first chairman of the City Planning Commission. He was replaced several months later by Rexford Tugwell, formerly an adviser to President Franklin D. Roosevelt. Among the first group of commissioners was Lawrence Orton of the Regional Plan Association, who served for 31 years, the longest tenure of any commissioner.

As established by the 1936 Charter, the City Planning Commission had seven members, six appointed by the mayor with the chief engineer of the Board of Estimate serving ex-officio as the seventh member. To ensure the political autonomy of the commission, the six appointees—one designated by the mayor as chairman—were to serve eight-year

JNR-000183

overlapping terms. In that way, a majority of members could not be appointed during a mayor's single four-year term of office. The chief engineer of the Board of Estimate, a career civil servant, was not subject to appointment for a term.

View the 🖶 Brooklyn Daily Eagle announcing the members of the newly formed City Planning Commission.

The 1936 Charter also provided for the establishment of the Department of City Planning, headed by the chairman of the City Planning Commission and staffed with engineers, architects, experts, and other officers and employees as needed. Both the Commission and the Department began functioning in 1938.

The commission did not reach full strength until 1945 when Mayor LaGuardia appointed the sixth member. The stipulation that the chief engineer serve ex-officio was dropped when the Charter was revised in 1963 to require that all seven members of the commission be appointed by the mayor. The Charter amendment of 1975 added two requirements: that the City Council would approve by advice and consent the six commission members-other than the chairman-appointed for eight-year terms, and that the commission would consist of at least one resident from each borough of the city.

View the 🖶 City Planning Commissioners' terms of office from 1938-1989.

In the wake of the elimination of the Board of Estimate in 1989, a 1989 Charter amendment made effective in 1990 further altered the composition of the Commission by increasing the number of commissioners to thirteen: seven members appointed by the Mayor, including the Chair; one appointed by each Borough President; and one appointed by the Public Advocate. The Chair serves at the pleasure of the Mayor, while the other Commissioners are appointed to staggered five year terms. However, all members shall be chosen for their independence, integrity, and civic commitment, and the appointment of all members, other than the chair, is subject to the advice and consent of the City Council. This is the structure of today's City Planning Commission, which reviews nearly 500 public and private applications a year, and has, since its establishment 75 years ago, reviewed more than 25,000 land use applications.

## NYC Zoning History

### 1916 Zoning Resolution

As early as the 1870's and 1880's, New Yorkers began to protest the loss of light and air as taller residential buildings began to appear in Manhattan. In response, the state legislature enacted a series of height restrictions on residential buildings, culminating in the Tenement House Act of 1901.

By then, New York City had become the financial center of the country and expanding businesses needed office space. With the introduction of steel frame construction techniques and improved elevators, technical restraints that had limited building height vanished. The Manhattan skyline was beginning to assume its distinctive form.

In 1915, when the 42-story Equitable Building was erected in Lower Manhattan, the need for controls on the height and form of all buildings became clear. Rising without setbacks to its full height of 538 feet, the Equitable Building cast a seven-acre shadow over neighboring buildings, affecting their value and setting the stage for the nation's first comprehensive zoning resolution.

Other forces were also at work during the same period. Housing shortages, caused by an influx of new immigrants, created a market for tenements built to maximum bulk and minimum standards. Warehouses and factories began to encroach upon the fashionable stores along Ladies' Mile, edging uncomfortably close to Fifth Avenue. Intrusions like these and the impacts of rapid growth added urgency to the calls of reformers for zoning restrictions separating residential, commercial and manufacturing uses and for new and more effective height and setback controls for all uses.

JNR-000184

The concept of enacting a set of laws to govern land use and bulk was revolutionary, but the time had come for the city to regulate its surging physical growth. The groundbreaking Zoning Resolution of 1916, though a relatively simple document, established height and setback controls and designated residential districts that excluded what were seen as incompatible uses. It fostered the iconic tall, slender towers that came to epitomize the city's business districts and established the familiar scale of three- to six-story residential buildings found in much of the city. The new ordinance became a model for urban communities throughout the United States as other growing cities found that New York's problems were not unique.

But, while other cities were adopting the New York model, the model itself refused to stand still. The Zoning Resolution was frequently amended to be responsive to major shifts in population and land use caused by a variety of factors: continuing waves of immigration that helped to swell the city's population from five million in 1916 to over eight million in 2010; new mass transit routes and the growth corridors they created; the emergence of technology and consequent economic and lifestyle changes; the introduction of government housing and development programs; and, perhaps more than anything else, the increase in automobile usage, which revolutionized land use patterns and created traffic and parking problems never imagined in 1916.

🗐 1916 Zoning Resolution including all amendments adopted prior to November 1, 1960 represents the final amended version of the Zoning Resolution prior to the 1961 comprehensive amendment.

🗐 1916 Building Zone Plan

🗐 1916 Zoning Resolution

**1961 Zoning Resolution**

By mid-century, many of the underlying planning principles of the 1916 document no longer stood the test of time. If, for example, the city had been built out at the density envisioned in 1916, it could have contained over 55 million people, far beyond its realistic capacity. New theories were capturing the imaginations of planners. Le Corbusier's "tower-in-the-park" model was influencing urban designers of the time and the concept of incentive zoning - trading additional floor area for public amenities - began to take hold. The last, still vacant areas on the city's edges needed to be developed at densities that recognized the new, automobile-oriented lifestyle. Also, demands to make zoning approvals simpler, swifter and more comprehensible were a constant.

Eventually, it was evident that the original 1916 framework needed to be completely reconsidered. After lengthy study and public debate, the current Zoning Resolution was enacted and took effect in 1961.

The 🗐 1961 Zoning Resolution (30.6 MB) was a product of its time. It coordinated use and bulk regulations, incorporated parking requirements and emphasized the creation of *open space*. It introduced incentive zoning by adding a bonus of extra floor space to encourage developers of office buildings and apartment towers to incorporate plazas into their projects. In the city's business districts, it accommodated a new type of high-rise office building with large, open floors of a consistent size. Elsewhere in the city, the 1961 Zoning Resolution dramatically reduced residential densities, largely at the edges of the city.

Although based upon the leading planning theories of the day, aspects of those zoning policies have revealed certain shortcomings over the years. The emphasis on open space sometimes resulted in buildings that overwhelm their surroundings, and the open spaces created by incentive zoning provisions have not always been useful or attractive. Urban design theories have changed as well. Today, tower-in-the-park developments, set back far from the city street, are often viewed as isolating and contrary to the goal of creating a vibrant urban streetscape.

Time passes, land uses change, and zoning policy accommodates, anticipates and guides those changes. In a certain sense, zoning is never final; it is renewed constantly in response to new ideas—and to new challenges.

JNR-000185
1714



## Community-Based Planning

### <u>Overview</u>

Community-based planning is essential to the city's vitality. People who are close to neighborhood issues can clearly identify community needs and advocate passionately for local concerns.

As part of Mayor Bill de Blasio's Housing New York plan, the Department of City Planning (DCP) is organizing a series of place-based planning studies to foster diverse, livable neighborhoods with mixed-income housing and supporting services. PLACES is a people-centered planning approach in which DCP and other agencies work collaboratively with communities, stakeholders and elected officials to actively shape their neighborhoods. Learn more about PLACES studies.

Community-based planning studies vary to respond to the distinct needs of individual communities, but may include recommendations for affordable housing preservation and development, economic development, and priority investments in infrastructure and community supporting services. Problems that are service-related (such as clogged drains, broken street lights, park maintenance problems, etc.) can be brought to the attention of the community board district manager's office. These may be dealt with at the community board's monthly District Service Cabinet meeting attended by representatives from city agencies (Police, Parks and Recreation, Sanitation, etc.).

**Useful Information:**
DCP also provides technical assistance and advice to individuals and community-based organizations.

The city is divided into 59 community districts, each represented by a community board. DCP's website contains a wealth of information on each, including data organized by community district, land use, population, housing, community facilities, much of which is included in maps. Demographic information is provided for New York City, the five boroughs and other geographic areas on our Population pages. The Census FactFinder tool provides easy access to population information for a selected area.

The Department has a central office at 120 Broadway in Manhattan and borough offices. DCP borough offices are usually the first place to contact for local concerns. The DCP central divisions (212-720-3300) may be contacted about citywide questions (population, housing, economic development, and the waterfront). Zoning information can be found on our website, or on our zoning and land use web application, ZoLa. The website also includes an explanation of zoning, parts of the Zoning Handbook, a basic guide to New York City zoning and the Zoning Resolution text and maps. We have a general FAQ and zoning-specific FAQ to address any questions. You can also call the Zoning Help Desk for any questions not already addressed on our website.

Descriptions about land use and environmental review processes, and the status and details about DCP initiatives and other land use applications are also found on the Department's website. DCP offers a variety of data products, including base map files and land use data, for free download or by a license agreement.

### <u>197-a Plan</u>

JNR-000186

One of the formal ways to develop a community-based plan is set out in Section 197-a of the City Charter, which authorizes community boards and borough boards, along with the Mayor, the City Planning Commission (the "Commission"), the Department of City Planning ("DCP"), and any Borough President, to sponsor plans for the development, growth, and improvement of the city, its boroughs and communi ies. Once approved by the Commission and adopted by the City Council, 197-a plans guide future actions of city agencies in the areas addressed in the plans. Neighborhood or civic groups within the larger community may draft a 197-a plan, but they must be approved, sponsored, and submitted by a community board, borough board, or borough president. A ⬛ DCP illustrated description of the 197-a plans process explains how this works in simple terms.

DCP provides technical assistance to help 197-a sponsors meet standards for form, content and sound planning policy for proposed 197-a plans (known as "threshold standards") as set out in the ⬛ Rules for the Processing of Plans Pursuant to Charter Section 197-a. In addition to the threshold standards, the rules outline procedures and a timetable for the 197-a process. DCP's ⬛ 197-a Plan Technical Guide provides useful "how-to" instructions and a description of the kinds of analyses most relevant to typical planning issues. The guide may also help community boards determine whether a 197-a plan is the most appropriate vehicle for addressing their issues. Both the *Rules* and the *Guide* can be purchased at the City Planning Bookstore.

Review of 197-a plans occurs in two stages. The first stage, the threshold review, is conducted by the Department of City Planning and the City Planning Commission to ensure that a plan is complete, coherent and properly documented before it is reviewed on its merits. The second stage, substantive review, allows for community board, borough president, City Planning Commission and City Council consideration of the plan's objectives, policies and proposals. The process may culminate in approval of the plan as submitted, approval as modified by the City Planning Commission and/or the City Council, or disapproval.

Taking a 197-a plan from inception to adoption is a lengthy process and requires the continuing commitment of its sponsors even after adoption to ensure successful implementation. With that commitment, an appropriate set of objectives and a realistic outlook, a community board may find the 197-a process well worth the effort.

To date, thirteen 197-a plans have been adopted: eleven were sponsored by community boards; one by a borough president and one by the Department of City Planning. One plan has been disapproved and one withdrawn.

### Status of 197-a Plans*

| Plan | Sponsor | Focus | Current Status |
|---|---|---|---|
| **Adopted** | | | |
| ⬛ Partnership for the Future | Bronx CB 3 | Comprehensive | Adopted: 11/92 (as modified by CPC) |
| ⬛ The Chelsea Plan | Manhattan CB 4 | Zoning | Adopted: 5/96 (as modified by CPC) |
| ⬛ Red Hook Plan | Brooklyn CB 6 | Comprehensive | Adopted: 9/96 (as modified by CPC) |
| ⬛ Stuyvesant Cove Plan | Manhattan CB 6 | Waterfront | Adopted: 3/97 (as modified by CPC) |
| ⬛ Comprehensive Manhattan Waterfront Plan | Manhattan BP | Waterfront | Adopted: 4/97 (as modified by CPC/CC) |
| ⬛ New Waterfront Revitalization Program | DCP | Waterfront | Adopted: 10/99 |

JNR-000187

Community Based Planning

| Plan | Sponsor | Focus | Current Status |
|---|---|---|---|
| Williamsburg Waterfront Plan | Brooklyn CB 1 | Waterfront/ Comprehensve | Adopted: 1/02 (as modified by CPC) |
| Greenpoint Plan | Brooklyn CB 1 | Comprehensve | Adopted: 1/02 (as modified by CPC) |
| CD 8: River to Reservoir Preservation Strategy | Bronx CB 8 | Comprehensive | Adopted: 11/03 |
| CB 8 197-a Plan for Queensboro Bridge Area | Manhattan CB 8 | Waterfront / Streetscapes | Adopted: 8/06 |
| CB 9 197-a Plan: Hamilton Heights, Manhattanville, Morningside Heights | Manhattan CB 9 | Comprehensive | Adopted: 12/07 (as modified by CPC) |
| CB 6 197-a Plan for Eastern Section of Community District 6 | Manhattan CB 6 & East Side Rezoning Alliance | Comprehensive with focus on waterfront and open space | Adopted: 3/08 (as modified by CPC/CC) |
| New Connections/ New Opportunities: Sunset Park 197-a Plan | Brooklyn CB 7 | Comprehensive with focus on the waterfront | Adopted: 12/09 (as modified by CPC) |

**Other**

| | | | |
|---|---|---|---|
| West Village | Manhattan CB 2 | Land Use/Zoning | Withdrawn 8/96 |
| Little Neck/Douglaston | Queens CB 11 | Zoning | Disapproved 5/99 |

\* As of May 2010

### Implementation of 197-a Plans

Once a 197-a plan is adopted, the sponsor's work is not over! The sponsor, usually a community board, should work with city agencies to ensure that 197-a plan goals are met. If rezonings are recommended in the plan, the sponsor may encourage the Department of City Planning to initiate a zoning map change application (under Section 197-c of the City Charter). Rezonings based on the recommendations in four 197-a plans have been adopted.

| 197-a Plan | Rezoning Initiatives | CPC Reports (Adoption Date) |
|---|---|---|
| Chelsea Plan | Chelsea Rezoning | N 990452 ZRM and C 990453 ZMM - (9/9/99) |
| | West Chelsea Rezoning | C 050162A ZMM - (6/23/05) |
| | West Chelsea Special District | N 050161A ZRM - (6/23/05) |
| Williamsburg Waterfront Plan | Greenpoint Williamsburg Rezoning | N 050110A ZRK C 050111A ZMK C 040115 MMK C 040116 MMK C 040417 MMK C 040418 MMK - (5/11/05) |

JNR-000188

| 197-a Plan | Rezoning Initiatives | CPC Reports (Adoption Date) |
|---|---|---|
| Greenpoint Plan | Greenpoint Williamsburg Rezoning | N 050110A ZRK<br>C 050111A ZMK<br>C 040115 MMK<br>C 040116 MMK<br>C 040417 MMK<br>C 040418 MMK - (5/11/05) |
| CD 8: River to Reservoir Preservation Strategy | North Riverdale | C 050043 ZMX - (12/7/04) |
| | Central Riverdal/Spuyten Duyvil | C 040515 ZMX - (9/28/04) |
| | Riverdale-On-Hudson | C 050480 ZMX - (10/11/05) |
| | Van Cortland Village | C 040516 ZMX - (9/28/04) |
| | Natural Area Text Change (SNAD) | N 050093 ZRY - (2/2/05) |

Some 197-a plans have recommendations that focus on issues other than zoning. The first adopted 197-a plan, sponsored by Bronx CB 3, aimed at revitalizing the district and recommended measures to facilitate new mixed income housing development and increase the population. Those goals have been substantially met. The Stuyvesant Cove 197-a Plan envisioned a publicly-accessible waterfront park and pedestrian esplanade. The waterfront park was constructed and opened in 2003. A major recommendation of the Manhattan CB 8 197-a Plan is the transformation of a former heliport site to a waterfront park and esplanade. The City, in consultation with CB 8, is in the planning stage for these waterfront improvements.

If your community is interested in learning more about the 197-a process or alternative approaches to planning, please contact the Department of City Planning's Planning Coordination Division at 212-720-3464.

**Integrating Different Visions**
Recently the city's growing population and strong real estate market have created interest in private or institutional redevelopment of under-utilized areas. In cases where rezoning is required, these proposals may be in conflict with community plans in various stages of development. Wherever possible, DCP encourages local stakeholders to find common ground regarding their different visions. In cases where there is a 197-a plan and a conflicting rezoning proposal, DCP seeks to ensure that the competing plans are reviewed in a manner that guarantees equal consideration of each.

Columbia University proposed an expansion of its academic campus and other rezonings for one of the geographic areas covered by the Manhattan Community Board 9 197-a Plan. Public review began in June 2007 for Columbia University's expansion proposal in West Harlem and the 197-a plan proposed by Manhattan Community Board 9. In December 2007, the City Council adopted the CB 9 197-a Plan, as modified by the City Planning Commission, and the Columbia University rezoning proposal, as modified by the City Planning Commission. The recommendations in both plans, as modified, were reconciled.

The East River Realty Company (ERRC) proposed a rezoning for one of the geographic areas covered by the 197-a Plan submitted by Manhattan Community Board 6. Public review began in August 2007 for the East River Realty Company's proposal to redevelop the former Con Edison sites on First Avenue on Manhattan's east side. On January 28, 2008 the City Planning Commission approved the CB 6 197-a Plan with modifications, and the ERRC proposal with modifications. On March 26, 2008 the City Council adopted the CB 6 197-a Plan with additional modifications, and the ERRC proposal, also with additional modifications.

**Task Forces**

JNR-000189

Some broader topics identified for attention by communities such as transportation or infrastructure improvements, job access or building code enforcement, do not lend themselves to a formal plan or report but are more appropriate for a concerted action strategy. These subjects might best be dealt with through a task force made up of representatives of appropriate agencies, community groups and elected officials. Successful outcomes achieved in recent years have included active leadership and cooperation of the Mayor's Office, city agencies and elected officials in conjunction with active participation and commitment of local stakeholders.

Examples of highly successful task forces formed in recent years to develop solutions to pressing local issues include:

- The Hunts Point Vision Plan, developed in cooperation with business and community leaders, elected officials and multiple City agencies, is a comprehensive initiative aimed at promoting a competitive business environment and sustainable community on the Hunts Point Peninsula in the South Bronx. Following the Vision Plan's recommendations, the Department initiated zoning measures, adopted by the City Council in July 2008, to encourage the growth of the food industry sector and create a buffer between the manufacturing district and the adjacent residential neighborhood.

- In response to the broad range of concerns expressed by participants about the future of 125th Street in Harlem, the Mayor formed the 125th Street Interagency Working Group. In addition to DCP, the team consisted of representatives from the Economic Development Corporation (EDC) and several other city agencies including the Departments of Cultural Affairs, Transportation, Small Business Services, and Housing Preservation and Development (HPD). The team worked together with the Advisory Committee to identify solutions for issues raised during the planning process. A rezoning proposal was adopted by the City Council in April 2008; follow-up measures were adopted in November, 2008 and June 2011.

- The redevelopment plan for Stapleton in Staten Island, including the former Navy Homeport, with construction of an almost mile-long esplanade along New York Harbor, stems from recommendations made in 2004 by the Task Force on Homeport Redevelopment. An RFP by the City's Economic Development Corporation will foster development of 350 residential units, a banquet hall and waterfront restaurant, sports complex, ground-floor retail and farmers market, and a major economic use such as a movie studio or office space. In June, 2013, ground was broken on the New Stapleton Waterfront Development Plan for which the City is committing $32 million toward infrastructure improvements and the construction of a new waterfront esplanade that will provide the public with waterfront access.

- The Staten Island Growth Management Task Force, convened with the support of the Mayor's Office in 2003 in response to overdevelopment in the borough, made recommendations that have resulted in significant zoning changes and enforcement improvements. Following these measures, new construction conformed to more desirable patterns and the number of new permits was reduced to a rate compatible with Staten Island neighborhoods. Other recommendations have emerged from the Task Force, including comprehensive studies of the West and North Shores of the Island, which have been completed.

- An outgrowth of the Mayor's Staten Island Growth Management Task Force was a Transportation Task Force to address one of the Island's most serious concerns. It was comprised of elected officials, City agencies, State transportation agencies, Community Board chairs and the Staten Island Chamber of Commerce. The Task Force worked at the Mayor's directive over the course of three months in 2006, to produce a short term action plan, and medium and long term recommendations that were presented to address transportation issues focusing on development patterns, roadways and highways, bridges and mass transit. Significant progress has been and continues to be made by the task force.

- During public review of the comprehensive redevelopment plan for Jamaica, the City convened a number of agency commissioners to at community meetings in Jamaica to develop strategies about longstanding local service needs and infrastructure issues much like the Staten Island task forces which tackled similar problems.

JNR-000190

The rezoning was adopted in September 2007 and subsequently the City has invested more than $200 million in various projects in and around downtown Jamaica, including two new schools (PS/IS 48 and PS/IS 277), distinctive street lighting along Jamaica Avenue, streetscape improvements on Hillside Avenue and upgrades to area parks.

Ite   s accompanied by this symbol require the free Adobe Acrobat Reader.

JNR-000191

Case 1:02-cv-04431-LJL-SDA Document 162-2 Filed 05/09/22 Page 39 of 53



# Special Purpose Districts: Citywide



## SPECIAL COASTAL RISK DISTRICT

**Zoning Resolution Chapter:**
137-00
**Maps**: see below
**Effective Date**: see below

The Special Coastal Risk District (CR) was created in 2017 to address coastal areas that are currently at exceptional risk from flooding and may face greater risk in the future. The Special Districts places limits on new development in these highly vulnerable areas and, in certain instances, to protect sensitive natural areas and ensure that new development is consistent with open space and infrastructure plans.

The Special Coastal Risk Districts are mapped in the following neighborhoods:

CR-1::     Broad Channel, Queens
           **Maps:** 24b, 24d, 30a, 30c
           **Effective Date:** 6/21/2017

CR-2:      Hamilton Beach, Queens
           **Maps:** 18b
           **Effective Date:**6/21/2017

CR-3:      Buyout Areas, Staten Island
           **Map:** 27d, 34a
           **Effective Date:** 9/7/2017

## SPECIAL ENHANCED COMMERCIAL DISTRICT

**Zoning Resolution Chapter:**
132-00
**Maps**: see below
**Effective Date**: see below

JNR-000192



The purpose of the Special Enhanced Commercial District (EC) is to promote and maintain a lively and engaging pedestrian experience along commercial avenues.

The Special Enhanced Commercial District is mapped in the following areas:

EC-1:    Fourth Avenue, Park Slope and South Park Slope, Brooklyn
**Maps:** 16c, 16d
**Effective Date:** 11/29/2011

EC-2:    Columbus Avenue and Amsterdam Avenue, Upper West Side Manhattan
**Maps:** 8c, 5d
**Effective Date:** 6/28/2012

EC-3:    Broadway, Upper West Side, Manhattan
**Map:** 8c, 5d
**Effective Date:** 6/28/2012

EC-4:    Broadway, Bedford-Stuyvesant
**Map:** 13b, 17a
**Effective Date:** 10/11/2012

EC-5:    Ocean Hill and East New York, Brooklyn
**Map:** 17c
**Effective Date:** 4/20/2016

EC-6:    East New York, Brooklyn
**Map:** 17c
**Effective Date:** 4/20/2016

## SPECIAL LIMITED COMMERCIAL DISTRICT

**Zoning Resolution Chapter:**
83-00



**Maps**:                                    12c
**Effective Date**: 10/9/69

The Special Limited Commercial District (LC) attempts to preserve the character of commercial areas within historic districts by permitting only those commercial uses compatible with the historic district, and by mandating that all commercial uses be in completely enclosed buildings. In addition, limitations are placed on the size and illumination of signs. There is one such special district mapped in Greenwich Village.

## SPECIAL MIXED USE DISTRICTS

**Zoning Resolution Chapter:**
📄 123-00
**Maps**: see below
**Effective Date**: see below



The Special Mixed Use District (MX) was established in 1997 to encourage investment in, and enhance the vitality of, existing neighborhoods with mixed residential and industrial uses in close proximity and create expanded opportunities for new mixed use communities. New residential and non-residential uses (commercial, community facility and light industrial) can be developed as-of-right and be located side-by-side or within the same building. Pairing an M1 district

JNR-000194

11/14/2018                    Zoning Districts & Tools: Special Purpose Districts | City of...

Case 1:02-cv-04431-LJL-SDA   Document 162-2   Filed 05/09/22   Page 42 of 53

with an R3 through R10 district (e.g. M1-2/R6) ensures a balanced variety of uses.

Residential uses are generally subject to the bulk controls of the governing residence district; commercial, industrial and community facility uses are subject to the M1 district bulk controls, except that community facilities are subject to residential FAR limits. Most light industrial uses are permitted in each MX district as-of-right, others are subject to restrictions and Use Group 18 uses are excluded altogether, except for small breweries.

Special Mixed Use Districts are mapped in the following neighborhoods::

MX-1:    Port Morris, Bronx
         **Maps:** 🗺 6a, 6b
         **Effective Date:** 12/10/97

MX-2:    DUMBO, Brooklyn
         **Map:** 🗺 12d
         **Effective Date:** 7/29/09

MX-4:    Flushing/Bedford, Brooklyn
         **Maps:** 🗺 12d, 13b
         **Effective Date:** 5/9/01

MX-5:    Red Hook, Brooklyn
         **Map:** 🗺 16a
         **Effective Date:** 1/30/02

MX-6:    Hudson Square, Manhattan
         **Map:** 🗺 12a
         **Effective Date:** 7/23/08

MX-7:    Morrisania, Bronx
         **Maps:** 🗺 3d, 6c
         **Effective Date:** 8/19/03

MX-8:    Greenpoint-Williamsburg, Brooklyn
         **Maps:** 🗺 12c, 12d, 13a, 13b
         **Effective Date:** 9/28/04

MX-9:    Northern Hunters Point Waterfront, Queens
         **Map:** 🗺 9b
         **Effective Date:** 8/16/06

MX-10:   Atlantic and Howard Avenues, Brooklyn
         **Map:** 🗺 17a
         **Effective Date:** 10/29/07

MX-11:   Gowanus, Brooklyn
         **Map:** 🗺 16c
         **Effective Date:** 3/11/09

MX-12:   Borough Park, Brooklyn
         **Map:** 🗺 22c
         **Effective Date:** 10/27/10

MX-13:   Lower Concourse, Bronx
         **Map:** 🗺 6a
         **Effective Date:** 6/30/09

MX-14:   Third Avenue/Tremont Avenue, Bronx

JNR-000195

**Maps:** 3c, 3d
**Effective Date:** 10/13/10

MX-15:    West Harlem, Manhattan
**Map:** 3b
**Effective Date:** 11/13/12

MX-16:    Ocean Hill / East New York, Brooklyn
**Map:** 17c
**Effective Date:** 4/20/16

## SPECIAL NATURAL AREA DISTRICT

**Zoning Resolution Chapter:**
105-00
**Maps**: see below
**Effective Date**: see below



The purpose of the Special Natural Area District (NA) is to guide new development and site alterations in areas endowed with unique natural characteristics, including forests, rock outcrops, steep slopes, creeks and a variety of botanic and aquatic environments. In the four Special Natural Areas, the City Planning Commission reviews proposals for new development, enlargements and site alterations to maximize protection of natural features. Natural features are protected by limiting modifications in topography, by preserving tree, plant and marine life, and natural water courses, and by encouraging clustered development.

The Special Natural Area Districts are mapped in the following neighborhoods:

NA-1:    Emerson Hill, Dongan Hills, Todt Hill, Lighthouse Hill and the central wetlands of Staten Island
**Maps:** 21b, 26a, 26b, 26c, 26d, 27a, 27b
**Effective Date:** 12/19/74

NA-2:    Riverdale, Spuyten Duyvil and Fieldston, Bronx
**Maps:** 1a, 1b, 1c, 1d
**Effective Date:** 5/21/75

NA-3:    Shore Acres Area, Staten Island
**Map:** 21d
**Effective Date:** 12/1/77

NA-4:    Fort Totten, Queens
**Maps:** 7d, 11c

JNR-000196

**Effective Date:** 4/28/83

## SPECIAL PLANNED COMMUNITY PRESERVATION DISTRICT

**Zoning Resolution Chapter:**
103-00



**Maps**:                                     3b, 4b, 6a, 9b, 10d, 11b, 14c, 15a

**Effective Date**: 7/18/74

The Special Planned Community Preservation District (PC) designation protects the unique character of communities that have been planned and developed as a unit. Those communities characteristically have large landscaped open spaces and a superior relationship of buildings, open spaces, commercial uses, and pedestrian and vehicular circulation. No demolition, new development, enlargement or alteration of landscaping or topography is permitted within the district except by special permit of the City Planning Commission. Preservation districts have been mapped in Sunnyside Gardens and Fresh Meadows in Queens, Parkchester in the Bronx and Harlem River Houses in Manhattan.

## SPECIAL SCENIC VIEW DISTRICT

**Zoning Resolution Chapter:**
102-00

JNR-000197

Case 1:02-cv-04431-LJL-SDA Document 162-2 Filed 05/09/22 Page 45 of 53



**Maps**: 12b, 12d

**Effective Date**: 10/24/74



The Special Scenic View District (SV) is intended to prevent obstruction of outstanding scenic views as seen from a public park, esplanade or mapped public place. No buildings or structures are allowed to penetrate a scenic view plane except by special permit of the City Planning Commission. The Brooklyn Heights Scenic View District (SV-1) extends over an area west of the Brooklyn Heights Promenade to protect the views of the Lower Manhattan skyline, Governors Island, the Statue of Liberty and the Brooklyn Bridge.

**Disclaimer**

The Zoning Reference provides only general zoning information and is not meant to serve as a substitute for the actual regulations which are to be found in the Zoning Resolution.

Items accompanied by this symbol require the free Adobe Acrobat Reader.

Brief explanations of terms in blue italics can be viewed by clicking on the term.

JNR-000198

Case 1:02-cv-04431-LJL-SDA Document 163-2 Filed 05/09/22 Page 46 of 53



## Special Purpose Districts



The City Planning Commission has been designating special zoning districts since 1969 to achieve specific planning and urban design objectives in defined areas with unique characteristics. Special districts respond to specific conditions; each special district designated by the Commission stipulates zoning requirements and/or zoning incentives tailored to distinctive qualities that may not lend themselves to generalized zoning and standard development.

**Disclaimer**

The Zoning Reference provides only general zoning information and is not meant to serve as a substitute for the actual regulations which are to be found in the Zoning Resolution.

**About Us > Press Releases**

**FOR IMMEDIATE RELEASE**
November 15, 2011

**CONTACT:**
Rachaele Raynoff / Jovana Rizzo (City Planning) – (212) 720-3471

**Mayor Michael Bloomberg's Remarks at Zoning the City Conference, as Delivered
By Deputy Mayor Robert K. Steel**

I think that the Mayor would want to tell you that when he thought about this ten years ago, that basically people weren't sure about the position of New York.

It was ten years ago that Amanda Burden joined the administration, when New York City was still reeling after the 9/11 attacks.

And basically what we've seen is at that time people thought all over that New York might never recover. And in fact Mayor Bloomberg said at the time that he would rather have New York's hand to play than anyone else's. And some people thought he was boastful, but I'd like to say I think instead he's proven to be prescient.

And a good person who was side by side with the Mayor throughout all of this was Amanda Burden and the City Planning group.

Many people have seen that New York has not only survived but really prospered, and the evidence is all around you. The commercial real estate market in New York is the strongest in the nation. We've regained 90% of the jobs lost during the national recession. And people are voting for New York – with their feet. We see people want to live, work and visit in New York and the evidence is all around us.

The population today is at an all-time high of 8.4 million – and we see and are beginning to plan for another million people moving to New York by 2035.

What Amanda and her team at City Planning have done to frame all of this and help us think about it has been critical. They all understand New York and all great cities have to have things in common. They grow and change with changing times. And in that spirit, they've used the 1961 Zoning Resolution – whose birthday we're here celebrating – to carefully and creatively re-sculpt the city.

To date, they have steered 114 rezonings through New York City's "uniform land use review procedure," known as "ULURP," and with great success.

These rezonings, and other major projects they've accomplished, cover almost 37% of the land area of all five boroughs. By far the most extensive re-shaping of the city in the last 50 years. And that's really an astonishing accomplishment, in and of itself, almost 40% of the city having been rezoned.

And what's more striking is not just the fact of the rezonings but what that's done to basically change and adjust to make New York more competitive in the future. And the way we think about it is it's not just each individual aspect, but the sum of the parts and what is created is even more important.

Because of these efforts, we've dramatically re-cast the future of the entire city in four major ways that today's conference will address: Making New York more economically competitive; more equitable; more aesthetically pleasing; and more sustainable.

And that's all continuing today. Because today also the Mayor plans to announce a comprehensive new set of "green zoning" proposals – which we'll talk about a bit more in a few minutes.

Now in terms of economically competitive, what we mean is a better home for people of all income levels, improving the quality of life, and also increase the environmental sustainability for the years ahead.

But the past is prologue – so let's talk about what we intend to do and how we think about our accomplishments to date.

And that really starts with how we're making New York a far more competitive city – one that's better equipped to succeed in the rough-and-tumble world which we've all seen is the reality of today's global economy.

To do that, we've zeroed in on what we view is long under-used land throughout the city, and – combining zoning policy with targeted public investment – have begun unlocking this potential of this property to create jobs and make the economy continue to grow. This means jobs in restaurants and entertainment, offices and shops, and, of course, jobs in construction.

Our work has ranged from Willets Point to Downtown Brooklyn, and from Coney Island to an area where an important engine of New York's future is moving into high gear: And that's Hudson Yards on Manhattan's Far West Side.

Six years ago, the City Council approved our proposed extensive rezoning of more than 60 square blocks around the Hudson Yards: The first step toward making it a vibrant new mixed-use community, and an extension of Midtown's central business district.

Because we know that when new mass transit blazes the way, private development follows, we've also financed and begun building the first major addition to our subway system in many, many years. The extension of our Number 7 line from Times Square right into the Hudson Yards area – is set for completion about two years from today. I know because I have been down seen the cavern and the new station all look terrific and the Mayor is excited about taking a ride on this new train before he leaves office.

The result is clear.

Last week, we broke ground on $555 million worth of new housing that's going to go up on a tract of the West Side that's been vacant for more than 45 years. And the week before, we announced plans for the first major office tower to go up in the Hudson Yards area. 1.8 million square feet of a fantastic new building. Together, these projects will produce thousands of construction jobs in the very near future.

The leading edge of thousands more jobs to come, in an entirely new community – and the largest transit-oriented new development in the nation – that's going to help to define New York City's future.

Second, we're also making New York a more equitable city. Most of you know that New York is in the midst of the largest affordable housing initiative ever undertaken by any American city: A commitment to create and preserve enough housing for half a million people by the year 2014.

Our goal is to keep New York a city for people of all income levels. And zoning – specifically inclusionary zoning – has been a key element of our strategy to accomplish just that. In a nutshell, inclusionary zoning doesn't impede the private housing market; instead we believe it incentivizes the market. It allows developers to build more – so long as producing more affordable housing is part of the bargain.

In some communities where inclusionary zoning has been employed – such as Greenpoint and Williamsburg – affordable units now make up as much as a third of new housing that's been built or planned. That creates affordable housing where it might not otherwise exist. And it promotes the kind of ethnic and economic diversity that defines urban living at its best.

Third, we've used rezoning to make New York a more physically attractive and inviting city – one with an unsurpassed quality of life.

A few minutes ago, I spoke about unlocking the economic potential of long-overlooked parts of our city. The same can be said about tapping into the neglected recreational and aesthetic potential of all of the city's assets. That certainly includes much of New York's beautiful, and often sorely mistreated, 520 miles of shoreline along the bays and rivers.

When people first came to New York, they dreamed of moving inland and upward in the island of Manhattan. Today, our goal is to take them back to the edge of the water to live and enjoy, and also have a viable commerce at the same place.

Opening up our waterfront to the public is one of Amanda's great passions. And all of the administration is looking forward to following her. On our watch, we have created more than 370 acres of new waterfront parks and some 20 miles of new shoreline greenways along, for example, the rezoned East River waterfront of Greenpoint and Williamsburg.

In the same vein, we have, through rezoning, led the reclamation of what just 10 years ago was considered a derelict eyesore – A rusting relic of the past that everyone thought absolutely needed to be demolished.Of course, I'm speaking of the High Line.

It is to Amanda's ever-lasting credit, and we all enjoy it whenever we go, that when she looked at the High Line, she saw something that could be better and infinitely more exciting for the whole area.

She took the lead in transforming it into what it is today: The most visually stimulating and most widely discussed new

city park, not just in New York, but in the country and outside the borders of the United States.

It's done everything a park should do, and even more. It's catalyzed some $2 billion in new private investment along its path; 30 projects, 22 of which are built, 4 of which are coming out of the ground and four on the drawing board are what's going on right now in that area.

It's also become an international destination, and burnished New York's reputation as the place you come to see the future.

The Fourth point I want to mention and finally, our rezonings are also creating a more sustainable city.

And that really illustrates how we thoroughly modified the 1961 Zoning Resolution – which envisioned a future of automobile-dependent development in New York City's periphery. Instead – and in keeping with our PlaNYC sustainability agenda – we're now encouraging transit-oriented development.

Hudson Yards, which I previously mentioned, is a gold-star example of that plan. We've also pursued that goal through rezonings of Coney Island, along Harlem's 125th Street and in the St. George area of Staten Island.

And in what's destined to become one of New York City's largest middle-income communities, in the long-abandoned industrial area of Hunters Point, on the East River waterfront of Queens.
In fact, the new ferry service launched earlier this year that serves Hunters Point has already proved wildly popular with residents all along the East River in Queens and Brooklyn.
Transit-oriented development is good policy, both environmentally and economically. And so are the City's comprehensive new "green zoning" proposals, which will go out for public review next month.

They'd remove current regulations that impede new construction of "green buildings" and also, very importantly, discourage or prevent energy-efficient retro-fits in existing buildings. Installing solar panels and sun-control shades and awnings; creating green roofs; building roof-top greenhouses where fresh local produce can be grown: All would become easier for developers and current building owners.

And that would not only further shrink our carbon footprint: It would create construction jobs in making building upgrades. It would improve the quality of the air we breathe by reducing our dependence on electricity generated by using fossil fuels, and also cut energy costs for businesses, residential landlords, and individual homeowners too.

That's a good note for me to make my final point for this morning: That the rezoning goals I've just ticked through – making New York more competitive, equitable, aesthetically pleasing, and environmentally sustainable – And in no way are these four ambitions mutually exclusive. Instead they come together and support each other. This is what we are focused on in this administration.
Keeping New York a livable city with a strong quality of life; Diversifying our economy; And replacing a "Manhattan-centric" economic focus with a strategy that builds on assets and creates jobs in all five of our boroughs.

That's the plan we're charting for New York's future.

---

**Department of City Planning**
The Department of City Planning (DCP) promotes strategic growth, transit-oriented development, and sustainable communities in the City, in part by initiating comprehensive, consensus-based planning and zoning changes for individual neighborhoods and business districts, as well as establishing policies and zoning regulations applicable citywide. It supports the City Planning Commission and each year reviews more than 500 land use applications for actions such as zoning changes and disposition of City property. The Department assists both government agencies and the public by providing policy analysis and technical assistance relating to housing, transportation, community facilities, demography, waterfront and public space.



# DEPARTMENT OF CITY PLANNING
## Amanda M. Burden, Director

**Key Public Service Areas**
- ✓ Promote strategic growth, transit-oriented development and sustainable communities in the City.
- ✓ Conduct land use and environmental reviews.

**Critical Objectives**
- Strengthen housing and economic development throughout the City.
- Enhance the City's neighborhoods, urban design and public spaces, including use of the waterfront and waterways.
- Provide effective planning information and analysis.
- Process land use and environmental review applications efficiently.

### Scope of Agency Operations

The Department of City Planning (DCP) promotes strategic growth, transit-oriented development and sustainable communities to enhance quality of life in the City, in part by initiating comprehensive, consensus-based planning and zoning changes for individual neighborhoods and business districts, as well as establishing policies and zoning regulations applicable citywide.  It supports the City Planning Commission and each year reviews approximately 450 land use applications for actions such as zoning changes, special permits and other discretionary approvals. The Department assists both government agencies and the public by providing policy analysis and technical assistance relating to housing, transportation, community facilities, demography, waterfront and public space.

**DCP Rezoning:2002 - Present**

DCP Rezonings Adopted

DCP Rezonings in Public Review

*Since 2002 DCP has initiated or completed 119 rezonings citywide, about 36% of the City's land area. Visit the DCP website for more information on rezonings and other initiatives.*

### Performance Report

✓ **Promote strategic growth, transit-oriented development and sustainable communities in the City.**

- During Fiscal 2012 DCP completed 43 planning projects and proposals spanning all five boroughs. Typically these proposals analyze a wide range of land use, housing, urban design, transportation and economic development issues, and recommend



Number of Projects and Proposals Presented to the Public

strategies to achieve specific planning goals.  The proposals are developed in consultation with key stakeholders and often result in zoning changes, which require a formal public land use and environmental review, including continued public outreach and review, approval by the City Planning Commission (CPC) and adoption by the City Council.  Planning proposals and technical analyses that do not require zoning changes or formal land use review, such as transportation plans and demographic studies, are typically released as public reports and made available on DCP's website.

- As part of the Mayor's commitment to better assist New Yorkers doing business with the City and improve customer service, DCP publicly announced its launch of BluePRint, a business process reform initiative that simplifies and streamlines the Agency's review of land use applications prior to the formal start of the Uniform Land Use Review Procedure (ULURP), the City's land use review process. Developed in partnership with industry professionals, BluePRint's goal is to reduce the time most projects spend in pre-certification by having a clear and predictable review process for both applicants and Agency staff.  When fully implemented, City Planning will be able to review two-thirds of all applications 25 to 50 percent faster, saving property owners seeking to improve or develop their property hundreds of millions of dollars in soft and carrying costs.

- In March 2012 revisions to New York City's Waterfront Revitalization Program (WRP) were referred for public review by the Department. The revisions aim to improve projects within the coastal zone by promoting climate resilient designs, increasing public access to the waterfront, facilitating economic development while protecting natural resources and improving interagency coordination to foster a clear, predictable development process. These revisions will advance and complement Vision 2020: NYC Comprehensive Waterfront Plan, released in 2011, and the City's Waterfront Vision and Enhancement Strategy (WAVES), a sustainable blueprint for NYC's waterfront and waterways.

- In April 2012 the City Council adopted Zone Green, the Department's citywide zoning text amendment that removes zoning impediments to allow for more energy-efficient buildings throughout New York City.  Zone Green will help facilitate green investment, such as generating solar energy on rooftops, and has the potential to greatly increase energy savings for property owners through building improvements.  Building on PlaNYC objectives, Zone Green is one of several DCP green initiatives that promote sustainable communities throughout New York City.

- Following extensive outreach with community partners, the Department advanced for public review four rezoning initiatives to reinforce and preserve the existing built character of residential neighborhoods across the City; these include Manhattan's West Harlem; Woodhaven and Richmond Hill, Queens; and Bedford Stuyvesant North, Brooklyn. The Department's Upper West Side Neighborhood Retail Streets Initiative, adopted by the City Council in June 2012, identified zoning solutions to reinforce existing local retail character and support a lively, pedestrian friendly environment along main shopping corridors.

- In September 2011 DCP launched ZoLa, the Zoning and Land Use web application, providing a new and simple way for the public to access a wide range of land use and zoning information in an interactive, highly readable map format. ZoLa provides an easy way to see the zoning changes that have been adopted or proposals under consideration in a neighborhood or citywide and is a part of NYC Simplicity, Mayor Bloomberg's plan that harnesses technology to make government more transparent, customer-focused, innovative and efficient.

- The Department, in conjunction with the New York City Economic Development Corporation, released North Shore 2030: Improving and Reconnecting the North Shore's Unique and Historic Assets in December 2011. This report outlines a twenty year vision for Staten Island's North Shore through four strategies: promote jobs that strengthen maritime and industrial businesses; reconnect people with the working waterfront through increased public access; support and create neighborhood centers through more local retail, services and housing options; and improve connections and mobility for residents and businesses through coordinated transportation improvements. The plan will be accompanied by the North Shore 2030 Action Agenda that highlights new and on-going commitments of City and regional agencies.

- In June 2012 the Department referred a zoning text amendment that modifies parking requirements in Downtown Brooklyn to simplify regulations, encourage affordable and mixed-income housing by eliminating parking requirements for affordable housing units, and provide more opportunities for use of existing parking spaces by residents, employees and visitors.  This innovative policy proposal to reduce parking regulations in an area well served by mass transit was developed in consultation with public stakeholders who called for revising regulations to better reflect actual demand in the high-density civic center.

- DCP continued to collaborate with government agencies and stakeholders during Fiscal 2012 to advance projects and proposals in Lower Manhattan and the Hudson Yards area, as well as for significant open spaces throughout the five boroughs.  These include:
  - In Lower Manhattan, Pier 15 of the East River Waterfront esplanade was completed and opened to the public introducing new public seating areas and landscaping.  Four new storefront improvements were completed under the Fulton-Nassau Crossroads program, and completion of the Pearl Street Playground and Fulton Street sidewalk improvements conclude the Fulton Open Spaces Project.
  - In Manhattan's Hudson Yards area, text amendments affecting implementation of the Eastern Rail Yard and the Highline were approved by the City Planning Commission.
  - A new 2.26-acre waterfront park was mapped as part of the Department's Lower Concourse rezoning in the Bronx. The new park would provide easily-accessible open space and much-needed active recreational opportunities for existing and new residents.

JNR-000204

| | Actual | | | | | Target | | 5-Yr. Trend |
|---|---|---|---|---|---|---|---|---|
| Performance Statistics | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| *Projects and proposals completed and presented to the public* | 34 | 35 | 35 | 32 | 43 | * | * | Upward |
| *- Economic development and housing proposals* | 7 | 11 | 9 | 9 | 11 | * | * | Upward |
| *- Neighborhood enhancement proposals* | 16 | 16 | 15 | 8 | 4 | * | * | Downward |
| *- Planning information and policy analysis* | 11 | 8 | 11 | 15 | 28 | * | * | Upward |
| ★ *Number of significant milestones achieved for DCP-facilitated projects related to Lower Manhattan* | 6 | 6 | 6 | 6 | 8 | * | * | Upward |
| ★ *Number of significant milestones achieved for DCP-facilitated projects related to Hudson Yards* | 11 | 12 | 11 | 2 | 3 | * | * | Downward |
| ★ *Number of significant milestones achieved for DCP-facilitated projects related to significant open-space proposals* | 5 | 5 | 5 | 5 | 7 | * | * | Upward |
| ★Critical Indicator    "NA" - means Not Available in this report | | | | | | | | |

✓ **Conduct land use and environmental reviews.**

- The Department referred 465 land use applications for public review, a nearly 5 percent increase from last fiscal year.  Seventy-four percent of applications were referred within six months, similar to Fiscal 2011 and better than the established target of 70 percent.  The median time to refer applications rose by 6 days to 43 days, reflecting a higher proportion of more complex applications requiring interagency review.



**Land Use Applications Referred**

- Many land use actions considered by the City Planning Commission are subject to the City Environmental Quality Review (CEQR) process which identifies any potential adverse environmental effects of proposed actions as well as measures to mitigate significant impacts. In Fiscal 2012 the Department completed 199 environmental review applications with 87 percent of reviews completed within six months, a 13 point improvement over the prior fiscal year. The median time to complete an application decreased by 27 days to 12 days as fewer projects required extensive environmental review.

| | Actual | | | | | Target | | 5-Yr. Trend |
|---|---|---|---|---|---|---|---|---|
| Performance Statistics | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| *Land use applications referred* | 636 | 557 | 459 | 444 | 465 | * | * | Downward |
| ★  *- Within 6 months (%)* | 74% | 79% | 80% | 74% | 74% | 70% | 70% | Neutral |
| *- Within 6-12 months (%)* | 10% | 6% | 7% | 12% | 9% | * | * | Upward |
| *- Within 13 months or more (%)* | 16% | 15% | 13% | 14% | 17% | * | * | Neutral |
| ★*Median time to refer land use applications (days)* | 48 | 33 | 28 | 37 | 43 | * | * | Neutral |
| *Environmental review applications completed* | 288 | 224 | 249 | 208 | 199 | * | * | Downward |
| ★  *- Within 6 months (%)* | 71% | 71% | 61% | 74% | 87% | * | * | Upward |
| *- Within 6-12 months (%)* | 8% | 8% | 7% | 6% | 2% | * | * | Downward |
| *- Within 13 months or more (%)* | 21% | 21% | 32% | 20% | 11% | * | * | Downward |
| ★*Median time to complete environmental review applications (days)* | 46 | 22 | 47 | 39 | 12 | * | * | Downward |
| ★Critical Indicator    "NA" - means Not Available in this report | | | | | | | | |

## Agency Customer Service

| Performance Statistics | Actual | | | | | Target | | 5-Yr.Trend |
|---|---|---|---|---|---|---|---|---|
| Customer Experience | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| Percent of e-mails responded to in 14 days | NA | NA | 95 | 96 | 75 | NA | 85 | NA |
| Percent of letters responded to in 14 days | NA | NA | 42 | 70 | 52 | NA | 50 | NA |
| Completed customer requests for interpretation | NA | NA | 4 | 3 | 1 | NA | NA | NA |
| CORE customer experience rating (0-100) | NA | NA | 83 | 81 | 83 | NA | 80 | NA |

## Agency Resources

| | Actual | | | | | Plan[1] | | 5-Yr.Trend |
|---|---|---|---|---|---|---|---|---|
| Resource Statistics | FY08 | FY09 | FY10 | FY11 | FY12 | FY12 | FY13 | |
| Expenditures ($ millions)[2] | $24.4 | $26.9 | $26.2 | $23.7 | $25.9 | $24.7 | $22.7 | Neutral |
| Revenues ($ millions) | $2.3 | $3.3 | $2.7 | $1.7 | $2.4 | $3.0 | $2.7 | Downward |
| Personnel | 324 | 311 | 284 | 263 | 253 | 277 | 269 | Downward |
| Overtime paid ($ thousands) | $39 | $38 | $38 | $40 | $15 | $17 | $15 | Downward |

[1]*Authorized Budget Level*          *"NA" - Not Available in this report*
[2]*Expenditures include all funds.*

## Noteworthy Changes, Additions or Deletions

- Beginning with the Fiscal 2013 Preliminary Mayor's Management Report, the MMR will be restructured to focus on the goals that the agency intends to achieve during the fiscal year.  Each goal will be accompanied by a performance measure or measures that will quantify the agency's progress toward achieving that goal. For Fiscal 2013 the Department of City Planning's services and goals are:

  Service 1:   Shape the use and development of land in the City's neighborhoods, business districts and waterfront through participatory planning and zoning changes.
  Goal 1a:   Advance economic development, housing and neighborhood enhancement land use projects and proposals for public review.

  Service 2:   Manage land use and environmental review processes to assure consistency with applicable City policies and regulations.
  Goal 2a:   Ensure that discretionary land use and environmental review actions subject to City Planning Commission review are consistent with sound planning principles.
  Goal 2b:   Conduct timely and thorough review of land use and environmental applications.

  Service 3:   Prepare information and policy analysis for other government agencies, elected officials and the public.
  Goal 3a:   Provide quality technical expertise and planning to other City agencies and the public to support decision making.

- Also beginning in Fiscal 2013, performance targets were added for select customer service indicators.  For DCP, performance targets were added to three such indicators.

For more information please visit the website at: www.nyc.gov/dcp

JNR-000206