UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

689 EATERY CORP., etc., *et ano.,*                    :

                    Plaintiffs,          :

        - against -                    :          Civil Action No.
                                  02 CV 4431 (LJL)

THE CITY OF NEW YORK, et al.,                    :

                    Defendants.    :

------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*          :

                    Plaintiffs,          :

        - against -                    :          Civil Action No.
                                  02 CV 4432 (LJL)

THE CITY OF NEW YORK, et al.,                    :

                    Defendants.    :

------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*          :

                    Plaintiffs,          :

        - against -                    :          Civil Action No.
                                  02 CV 8333 (LJL)

THE CITY OF NEW YORK,                    :

                    Defendant.      :

------------------------------------------------------------X

336 LLC., etc., *et al.,*                    :

                    Plaintiffs,          :

        - against -                    :          Civil Action No.
                                  18 CV 3732 (LJL)

THE CITY OF NEW YORK,                    :

                    Defendant.      :

------------------------------------------------------------X

**VOLUME 4 OF EXHIBITS TO
JOINT REQUEST AND STIPULATIONS REGARDING
<u>THE TAKING OF JUDICIAL NOTICE</u>**


JNR-000273

**EXHIBITS VOL. 4 of 10; pp. JNR-000275 – JNR-000392**
**<u>(Exhibits 36 through 41)</u>**

**<u>Page(s)</u>**

<u>Exhibit 36</u>   Zoning and the Comprehensive Plan, James A. Coon Local        000275-000292
Government Technical Series, Revised 2015
(https://www.dos.ny.gov/lg/publications/Zoning_and_ the
_Comprehensive_Plan.pdf)

<u>Exhibit 37</u>   (Former) Title 27, Chapter 1, Article 9 ("Approval of Plans"),   000293-000295
Repealed 2008

<u>Exhibit 38</u>   (Former) Title 27, Chapter 1, Article 10 ("Permits"),           000296-000297
Repealed 2008

<u>Exhibit 39</u>   (Former) Title 27, Chapter 1, Article 19 ("Issuance of Permits")  000298-000299
relevant sections), Repealed 2008

<u>Exhibit 40</u>   (Former) Title 27, Chapter 1, Article 22, Section 27-217         000300
("Certificates of Occupancy / Change of Occupancy or Use"),
Repealed 2008

<u>Exhibit 41</u>   DCP Adult Entertainment Study, November 1994 (Complete)         000301-000392



**NEW YORK STATE OF OPPORTUNITY.** | **Division of Local Government Services**

# Zoning and the Comprehensive Plan

## JAMES A. COON LOCAL GOVERNMENT TECHNICAL SERIES

**A Division of the New York Department of State**

**Andrew M. Cuomo, Governor**             **Rossana Rosado, Secretary of State**

JNR-000275

NEW YORK STATE DEPARTMENT OF STATE
99 WASHINGTON AVENUE
ALBANY, NEW YORK 12231-0001
http://www.dos.ny.gov

Revised 2015
Reprint Date: 2015

JNR-000276

## CONTENTS

Introduction.................................................................................................................1

Historical Perspective ................................................................................................1

Early Challenges to Zoning.........................................................................................2

The Zoning Enabling Laws .........................................................................................3

In Accordance with a Comprehensive Plan................................................................3

Environmental Reviews and Zoning ..........................................................................4

Spot Zoning .................................................................................................................5

Regional Housing and the Comprehensive Plan ........................................................6

Evidence of Comprehensive Planning........................................................................7

Adoption of a Comprehensive Plan............................................................................9

Conclusion .................................................................................................................10

Endnotes ....................................................................................................................12

## ZONING AND THE COMPREHENSIVE PLAN

# Introduction

New York's zoning enabling statutes (the state statutes which give cities, towns and villages the power to enact local zoning laws)[1] require that zoning laws be adopted in accordance with a comprehensive plan.  The comprehensive plan should provide the backbone for the local zoning law.

To understand the power to zone, one must understand the comprehensive plan. The comprehensive plan is the culmination of a planning process that establishes the official land use policy of a community and presents goals and a vision for the future that guides official decision-making. The comprehensive plan invariably includes a thorough analysis of current data showing land development trends and issues, community resources, and public needs for transportation, recreation, and housing. Zoning is merely one method – albeit an important one - for implementing the goals of the plan. Having a comprehensive or well-considered plan ensures that forethought and planning precede zoning and zoning amendments.

**Comprehensive Plan Statutes**

**Town Law §272-a**
**Village Law §7-722**
**General City Law §28-a**

A comprehensive plan can be prepared using either state statute or common law rules for plan preparation. Municipalities that choose not to utilize the formal process provided in the State enabling statutes must nonetheless comply with the older, more general statutory  requirement that zoning must comport  with a "comprehensive plan". They do this by referring to the substantial body of court decisions which historically have provided New York's understanding of the comprehensive plan. In either instance, a comprehensive plan that is kept current is necessary before a local government can lawfully adopt or amend zoning.

This publication describes how the terms "comprehensive plan" came into being, analyzes case law to determine how the courts have defined the term, and explains how a formal comprehensive plan is adopted under the enabling statutes.

### Historical Perspective

In describing the historical development of zoning and the events precipitating the adoption of New York's first zoning enabling act, Edward M. Bassett wrote:

> It may fairly be said, however, that the zoning enabling act embodied in the New York City charter and the building zone resolution of that city constituted the first comprehensive zoning of height, area, and use in this country.[2]

Bassett described earlier land use regulations as having a single purpose only--such as to establish height limitations, or to prohibit certain uses.[3]

1

The concept of *comprehensiveness*, both as to purposes and geographical scope, instead distinguished the first modern zoning laws. It was their comprehensiveness, though, that caused early proponents of zoning to fear whether those laws could withstand constitutional attack. Conversely, it was that very same comprehensiveness that ultimately protected the laws from declarations of unconstitutionality. The concept of *comprehensiveness* still applies, in the statutory requirement that zoning be adopted in accordance with a *comprehensive (*or *"well considered") plan*.[4]

**Early Challenges to Zoning**

Common law has long recognized that certain uses of property were, or could be, so undesirable that neighboring landowners, or the community as a whole, had the right to request their termination. Thus arose the theory of *nuisance*.[5] Although governmental regulation of the use of property through zoning has gone well beyond common-law nuisance, the landmark United States Supreme Court case upholding zoning, *Euclid v. Ambler Realty Co.*, looked to traditional nuisance law as a foundation to determine whether government possessed the power to restrict the use of land by legislative act:

> Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality....A nuisance may be merely a right thing in the wrong place, - like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.[6]

The Court looked to states' case law and, most importantly for this analysis, to the works of planning experts of the time:

> The matter of zoning has received much attention at the hands of commissions and experts, and the results of their investigations have been set forth in comprehensive reports. These reports, which bear every evidence of painstaking consideration, concur in the view that the segregation of residential, business, and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that it will increase the safety and security of home life; greatly tend to prevent street accidents....

> If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.[7]

The comprehensive scope of the City of Euclid's zoning law was used in the Supreme Court's decision to justify its finding of constitutionality, but the door was left open for constitutional

JNR-000279

challenge should a different community's zoning law be found to lack a substantial relationship to public health, safety, morals or general welfare.  It was left to future decisions and fact situations to provide further detail and clarity as to what that relationship really means.

**The Zoning Enabling Laws**

Early zoning enabling laws were fashioned with the view that zoning risked being declared unconstitutional because it had the potential to severely limit zealously-guarded property rights.[8]  To safeguard against that outcome, the drafters required the actual regulations to be based on a logical and "comprehensive plan" for the betterment of the whole community.  The comprehensive plan was to provide the means to connect the circumstances and the locality to the zoning law. It was, and is, insurance that the law bears a "reasonable relation between the end sought to be achieved by the regulation and the means used to achieve that end."[9]

> *The comprehensive plan is insurance that the ordinance bears a "reasonable relation between the end sought to be achieved by the regulation and the means used to achieve that end."*

The comprehensive plan requirement also provided the means to remove the planning process from immediate political considerations and allow for more objective analysis of community growth and need:

> Inasmuch as [the zoning laws] have an intimate effect upon land they should be framed so far as possible with the knowledge and cooperation of the landowners.  The enabling act requires preparatory procedure to make sure that the system is worked out as a coordinated whole.  This involves the appointment of a zoning commission to prepare the proposed ordinance and zoning map, the making of a preliminary report  to the local legislative body, the holding of preliminary hearings thereon, and the  holding of a public hearing by the legislative body. The ordinary state enabling act  provides checks and precautions to prevent hasty and impulsive changes.[10]

**In Accordance with a Comprehensive Plan**

In New York, the zoning enabling acts continue to require that zoning be undertaken "in accord with a well considered plan"[11] or "in accordance with a comprehensive plan."[12]  Unless the town, city or village has adopted a comprehensive plan document using the more recently-enacted statutes (described later herein), local officials must refer to the extensive body of case law to determine how zoning can meet the more general "comprehensive plan" requirement.

"Comprehensive" has been defined as "covering a matter under consideration completely or nearly completely: accounting for or comprehending all or virtually all pertinent considerations".[13] "Plan" has been defined as "a method of achieving something: a way of carrying out a design: a detailed

JNR-000280

and systematic formulation of a large-scale campaign or program of action...."[14] Put together, the words "comprehensive plan" intimate that the method proposed must be capable of being discerned and it must be inclusive. Case law has agreed.

From a planner's perspective, a plan is inclusive and comprehensive when it addresses a wide range of planning issues, perhaps through a series of component, topic-related plans. These components could include such matters as transportation patterns and future needs, natural and built resource inventories, and population trends. From a lawyer's point of view, a zoning law or amendment is inclusive when it has been enacted after and in accordance with careful study and consideration, and when it carries out a greater purpose of the community.

A common theme in the cases interpreting the requirement that zoning be in accordance with a comprehensive plan is that the zoning law (or amendment) be carefully studied before it is enacted. In *Thomas v. Town of Bedford*,[15] the New York Court of Appeals upheld a rezoning from residential to research-office use, finding that it had been enacted after careful study and consultation with experts and after extensive public hearings. In another decision, *Udell v. Haas*, the Court of Appeals stated that "one of the key factors" to be used by the courts in determining whether zoning is "in accordance with a comprehensive plan" is whether forethought has been given to the community's land use issues. The court went on to say:

> Where a community, after a careful and deliberate review of "the present and reasonably foreseeable needs of the community", adopts a general developmental policy for the community as a whole and amends its zoning law in accordance with that plan, courts can have some confidence that the public interest is being served [citations omitted].[16]

Another court has stated:

> The phrase "in accordance with a comprehensive plan" may be understood to mean (1) conforming to a master plan, (2) broad in scope of coverage, (3) all inclusive in control of use, height and area, or (4) internally consistent zoning based on a rational underlying policy.[17]

Where a local government can show that suitable studies and deliberations preceded adoption of the zoning law amendment, the potential that a zoning action will be found to reflect comprehensive planning increases. To this end, environmental assessments and impact statements can support a conclusion that a local zoning enactment "reflected a sufficient degree of comprehensiveness of planning."[18]

**Environmental Reviews and Zoning**

The State Environmental Quality Review Act (SEQRA) requires expansive environmental review

4

and thoughtful consideration of alternatives to governmental actions.[19]  Since SEQRA's enactment in the mid-1970's, court challenges to zoning actions have often been based both on comprehensive planning grounds as well as on grounds involving SEQRA compliance.

The process of evaluating environmental impacts under SEQRA, "affords an excellent opportunity for the local decision maker to weigh factors that courts have traditionally used in looking at whether an underlying context of comprehensive planning was maintained."[20] The adoption and amendment of zoning laws are "actions" for purposes of SEQRA.[21] Prior to undertaking most actions, a government agency must determine their potential "significance" by evaluating the possible significant adverse environmental impacts the action may have.[22]  If the agency determines that the action may include the potential for at least *one* significant adverse environmental impact, then it must require the preparation of an environmental impact statement (EIS).[23]  An EIS "must assemble relevant and material facts upon which an agency's decision is to be made.  It must analyze the significant adverse impacts and evaluate all reasonable alternatives."[24]

Compliance with SEQRA has been defined by the courts to require that a governmental agency take a "hard look" at the record, which includes potential environmental impacts and alternative decisions, and make a "reasoned elaboration of the basis for its decision."[25]  This standard is similar to the *Udell v. Haas* requirement for "careful and deliberate review" as evidencing comprehensive planning (discussed above).  Perhaps for this reason, the courts have upheld zoning law amendments where they have found evidence that a local legislative body studied a well-prepared EIS prior to adoption of the zoning amendment.[26]

## Spot Zoning

Perhaps the most important theme in the leading cases interpreting the requirement that zoning be in accordance with a comprehensive plan is the language in those cases indicating that the courts will look to see whether zoning is for the benefit of the whole municipality. This requirement does not, however, preclude future zoning amendments that "respond to changed conditions in the community...". The question is whether the change "conflict[s] with the fundamental land use policies and development plans of the community ...".[27]  Against this background principle, the concept of improper "spot zoning" arose.

> *The question of whether a rezoning constitutes "spot zoning" should be answered by determining whether the rezoning was done to benefit individual owners rather than pursuant to a comprehensive plan for the general welfare of the community*

*Spot zoning* refers to the rezoning of a parcel of land to a use category different from the surrounding area, usually to benefit a single owner or a single development interest. Size of the parcel is relevant, but not determinative. Illegal spot zoning occurs whenever "the change is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community."[28]

A review of the relevant cases reveals that spot zoning is the antithesis of zoning undertaken in accordance with a well-considered plan.  The landmark case in the field of spot zoning is *Rodgers v. Village of Tarrytown*,[29] in which the Court of Appeals defined the rezoning of relatively small parcels of land in terms of the comprehensive planning requirement:

5

> Thus, the relevant inquiry is not whether the particular zoning under attack consists of areas fixed within larger areas of different use, but whether it was accomplished for the benefit of individual owners rather than pursuant to a comprehensive plan for the general welfare of the community"[30]

The fact that a rezoning will benefit a landowner will not on its own invalidate the action, so long as the action accords with a comprehensive plan.  But to be in accordance with the plan, the rezoning must also further some clearly identified public purpose.  In *Save Our Forest Action Coalition, Inc. v. City of Kingston,* a 107-acre parcel within a residential district was rezoned "light industrial" in order to accommodate a local manufacturing firm and the local development corporation.  The court rejected a spot zoning challenge:

> Here, the primary motivation for the zoning amendment was to support local economic development through retention of the City's largest employer and to reap associated economic and tax benefits in connection with the development of a business park. The determination was made after an extensive review process, including a consideration of the impact on adjoining residential areas, consistency with existing zoning plans, environmental concerns and the availability of other suitable sites....In our view, the record discloses that sufficient "forethought has been given to the community's land use problems".... and that there was a "reasonable relation" between the rezoning determination and the worthwhile goal of improving the economic health of the community....[citations omitted].[31]

If the record shows that the zoning amendment seeks to accomplish valid public purposes and that "sufficient forethought" has been given it, the comprehensive plan requirement is met, even where the zoning amendment provides distinct treatment to a relatively small parcel.[32] If the evidence reveals that the rezoning was not enacted to benefit the community as a whole, or was enacted without regard to the community, the rezoning will fail to meet the comprehensive plan requirement.[33]

**Regional Housing and the Comprehensive Plan**

Zoning must be enacted to benefit the community, but what constitutes a "community" when housing is at issue?

In 1975, the Court of Appeals decided the case of *Berenson v. Town of New Castle*[34]       which broadened the concept of

> *Zoning regulations should be based on a comprehensive plan which examines the housing needs of the community and the region*

6

comprehensive plans to include an assessment of regional housing needs.  Although the case is often cited for its impact on so-called "exclusionary zoning" practices, the decision actually extends the statutory mandate that zoning be in accordance with a comprehensive plan.

The zoning law in question in *Berenson* excluded multi-family residential housing as a permitted use in any zoning district in the town.  The court recognized the right of a municipality to set up various types of use zones, with no requirement that each must contain some sort of housing balance.  The court stated that its concern was not whether each *zone* was a balanced entity, but instead whether the municipality itself was to be "a balanced and integrated community."  The court then proceeded to lay down a test for this determination, the first branch of which was that a "properly balanced and well-ordered plan for the community" had been provided (citing *Udell v. Haas, supra*).  It is the second branch of the test that expands the concept of comprehensive plans, namely, whether a zoning law demonstrates that consideration is given to regional needs and requirements.  The court stated that:

> ....There must be a balancing of the local desire to maintain the *status quo* within the community and the greater public interest that regional needs be met.  Although we are aware of the traditional view that zoning acts only upon the property lying within the zoning board's territorial limits, it must be recognized that zoning often has a substantial impact beyond the boundaries of the municipality.  Thus, the court, in examining an ordinance, should take into consideration not only the general welfare of the residents of the zoning township, but should also consider the effect of the ordinance on the neighboring communities.[35]

The "regional needs" portion of the *Berenson* decision has not been expanded beyond consideration of regional housing needs, much less does it require that a particular development project include low-income housing.[36]  Instead, the question is whether the needs of both the community itself and the region have been accommodated somewhere in the zoning law.[37]

**Evidence of Comprehensive Planning**

Finally, how may a comprehensive plan be discerned?  A comprehensive plan need not be a single document.  It need not be a formally adopted plan.[38]  Instead, the question of whether an inclusive scheme of action exists or has been undertaken is a conclusion reached only after considering an entire complex of facts, rather than by looking for a single planning document. For instance, the courts may find evidence of a plan in the zoning law *itself*, if the regulations set out in the law form a coherent pattern that furthers a land use policy that benefits the entire community.[39]   In *Asian Americans for Equality v. Koch*, the Court of Appeals stated:

7

> A well-considered plan need not be contained in a single document; indeed, it need not be written at all.  The court may satisfy itself that the municipality has a well-considered plan and that authorities are acting in the public interest to further it by examining all available and relevant evidence of the municipality's land use policies. [40]

Environmental reviews, environmental impact statements, and SEQRA findings "provide a constant source of readily identifiable considerations by which all those involved in the planning process can measure the background progress and effect of land use decisions".[41] Legislative findings relating to the adoption of a zoning law could evidence the plan,[42] as could minutes of the legislative body[43] and relevant studies.[44] A previously-adopted master plan or comprehensive plan may show evidence of comprehensive planning.[45] In *Town of Bedford village of Mount Kisco* the Court of Appeals held that:

*Examples of where courts have found evidence of comprehensive planning*

Þ *a zoning law*
Þ *environmental reviews & findings*  Þ *legislative findings relating to adoption of a law or ordinance*
Þ *minutes of the legislative body*
Þ *studies*
Þ *previously adopted plan*

> ....zoning changes must indeed be consonant with a total planning strategy, reflecting consideration of the needs of the community....What is mandated is that there be comprehensiveness of planning, rather than special interest, irrational *ad hocery*. The obligation is support of comprehensive planning, not slavish servitude to any particular comprehensive plan. Indeed sound planning inherently calls for recognition of the dynamics of change [citations omitted].[46]

What must such evidence show?  The "courts have required the municipal governing body to zone in accordance with a land use policy which is in the interest of the overall community."[47] The local governing body must show that it has given "some thought to the community's land use problems"[48] and, implicitly, must have fashioned its zoning as a regulatory means to address these problems:

> The function of land regulation is to implement a plan for the future development of the community....Its exercise is constitutional only if the restrictions are necessary to protect the public health, safety or welfare.  The requirement of a comprehensive or well-considered plan not only insures that local authorities act for the benefit of the community as a whole but protects individuals from arbitrary restrictions on the use of their land. [49]

The connection between *planning* and *regulation* serves both the underlying constitutional need to find a reasonable relationship between the ends sought to be achieved and the means chosen, as well as the strong underlying policy concern that regulation through zoning should serve the entire community. The "challenged zoning resolution itself need not be a well-considered plan, as long as it is in accord with one."[50]

8

**Adoption of a Comprehensive Plan**

Until the 1990's, the court-fashioned definitions of "comprehensive plan" alone provided guidance to towns, villages and cities as they drafted and enacted zoning laws. While these definitions provide guidance in determining whether a zoning law has a rational basis, they do not require or allude to a particular *process* for developing a plan. Recent statutory change has filled that void.

Chapter 209 of the Laws of 1993 amended the zoning enabling statutes to define a "comprehensive plan" and provide an optional process for adopting one. Under these provisions a comprehensive plan:

> ....means the materials, written and /or graphic, including but not limited to maps, charts, studies, resolutions, reports and other descriptive material that identify the goals, objectives, principles, guidelines, policies, standards, devices and instruments for the immediate and long-range protection, enhancement, growth and development of the town located outside the limits of any incorporated village or city.[51]

*What may a comprehensive plan address?*

• **Goals, objectives and policies for the immediate and long-range enhancement growth and development of the community**
• **Existing and proposed land uses, and their intensity**
• **Agricultural uses, historical resources, cultural resources, natural resources, coastal resources and sensitive environmental areas**
• **Population, demographic and socio-economic trends**
• **Transportation facilities**
• **Utilities and infrastructure**
• **Housing resources and needs**
• **Infrastructure**
• **Other governmental plans and regional needs;**
• **Economic development;**
• **Proposed means to implement goals, objectives and policies.**

Adoption of a comprehensive plan under the current State zoning enabling provisions is voluntary. If a city, town or village chooses to utilize the process, the resulting plan may range from a set of policy or vision statements to a very lengthy document composed of many subject-specific component plans (e.g., components relating to transportation, natural resources, historic resources, or population statistics). Once an actual plan is adopted, however, all land use regulations must be in accordance with it.[52] This usually means (though it is not mandated) that plan adoption is followed by the adoption of a series of zoning laws designed to "implement" the comprehensive plan. For these communities, then, the statutory requirement that zoning be "in accordance with a comprehensive or well-considered plan refers to the comprehensive plan pursuant to Town Law, §272-a, Village Law, §7-722 or General City Law, §28-a, as the case may be. For those communities which choose not to adopt a comprehensive plan pursuant to these statutes, the traditional court-fashioned definition continues to apply. [53]

A comprehensive plan may include, "at the level of detail adapted to the special requirements of the [community]," statements of goals, objectives or policies, transportation facilities, agricultural practices, housing resources, existing land uses, educational and cultural facilities, parklands,

JNR-000286

economic strategies and anything else consistent with the orderly growth and development of the local government.[54]    While the governing board ultimately adopts the plan, that board has several options for the plan's preparation: it may either prepare the plan itself, or instead delegate that function to the local planning board or to a "special board" created for the purpose.  If prepared by a planning board or special board, that board must refer the proposed plan to the governing body.[55]

> ### *Benefits of a comprehensive plan*
>
> P  **Provides a process for identifying community resources,  long range community needs, and commonly held goals**
> P  **Provides a process for developing community consensus**
> P  **Provides a blueprint for future governmental actions**

Local governments considering adopting a comprehensive plan must follow SEQRA procedures as early in their deliberations as possible.[56]  Adoption of a comprehensive plan is a "Type 1 Action" for purposes of SEQRA review, meaning that it is an action "more likely to require the preparation of an EIS."[57]    The local governing body, as the agency responsible for adopting the plan, must be the "lead agency", and is therefore responsible for assuring and documenting that SEQRA requirements are met.[58]

The board preparing the comprehensive plan must hold one or more public hearings and other meetings, as it deems necessary, to assure full opportunity for citizen participation.[59] Additionally, the governing body must hold a public hearing on the proposed plan prior to its adoption.[60]

The proposed comprehensive plan must be submitted to the appropriate county or regional planning agency for review under General Municipal Law, §239-m.[61] Adopted plans and amendments are filed with the municipal clerk and with the county planning agency. [62] Adopted[62] plans must be reviewed periodically by the local government that has adopted it.[63]

Once a comprehensive plan is adopted using the State zoning enabling statutes, all land use regulations of the community must be consistent with the comprehensive plan. In the future, the plan must be consulted prior to adoption or amendment of any land use regulation. In addition, other governmental agencies that are considering capital projects on lands covered by the adopted comprehensive plan must take the plan into consideration.[64]

**Conclusion**

New York requires that zoning be adopted in accordance with a well-considered or comprehensive plan.  This requirement reflects both underlying constitutional considerations and a public policy that  views zoning as a tool to plan for the future of communities.  Over the years, the New York courts  have defined the comprehensive plan to be the governing body's process of careful consideration and  forethought, resulting in zoning that is calculated to serve the community's general welfare.

10

During the 1990's the zoning enabling statutes were amended to provide a process for adoption of a comprehensive plan--a formal planning document that can provide goals and objectives for the community. Once the plan is adopted, the community's land use regulations must be consistent with it. For those communities that choose not to adopt a formal plan according to the statutes, the requirement that zoning be "in accordance" with a comprehensive plan still applies, but the long-standing, court-fashioned definition of comprehensive planning continues.

11

### *Endnotes*

1. General City Law §20(25); Town Law §263; Village Law §7-704.

2. Bassett, Edward M., *Zoning*: *The Laws, Administration, and Court Decisions During the First Twenty Years* (1940) p. 23.

3. *Id.* at pp. 22-23.

4. See note 1.

5. Rohan, Patrick J., *Zoning and Land Use Controls* (1998) §16.02[2].

6. *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 388 (1926).

7. *Id.,* at 394.

8. See *Golden v. Planning Board of the Town of Ramapo*, 30 N.Y.2d 359, 370, fn 4 (1972), *app. dism.* 409 U.S. 1003 (1972).

9. *Fred F. French Investing Co., Inc. v. City of New York*, 39 N.Y.2d 587, 596 (1976), *app. dism.*, 429 U.S. 990 (1976).

10. Bassett, *supra*, p. 28.

11. *Gen. City Law  §20(25).*

12. *Town Law §263; Village Law §7-704.*

13. *Webster's Third New International Dictionary (Unabridged), 2002.*

14. *Id.*

15. 11 N.Y.2d 428 (1962).

16. 21 N.Y.2d 463, 470 (1968).

17. *Udell v. McFadyen*, 40 Misc.2d 265, 267 (Sup. Ct., Nassau Co., 1963), citing Haar, *In Accordance With a Comprehensive Plan*, 68 Harvard Law Review 1154.

18. *Daniels v. Van Voris*, 241 A.D.2d 796, 798 (3rd Dept., 1997).

19. *Environmental Conservation Law, Art. 8; Title 6, Official Compilation of Codes, Rules and Regulations of the State of New York (NYCRR) Part 617.*  Earlier zoning cases held, on comprehensive planning grounds alone, that deliberate and careful consideration of proposed zoning actions should include a review of reasonable alternatives.  See *Udell v. Haas*, *supra*.  See also *Northeastern Environmental Developers v. Town of Colonie*, 72 A.D.2d 881 (3rd Dept., 1979). *app. dism.* 49 N.Y.2d 800 (1980).

JNR-000289

20.  See  Damsky, Sheldon W., *SEQRA and Zoning Law's Requirement of a Comprehensive Plan*, 46 <u>Albany Law Review</u> 1292, 1297 (1982).

21.  6 NYCRR §617.2(b)(3).

22.  6 NYCRR §617.7.

23.  6 NYCRR §617.7(a)(1).

24.  6 NYCRR §617.9(b)(1).

25.  This is commonly referred to as the "hard look" test.  See *H.O.M.E.S. v. New York State Urban Development Corp.*, 69 A.D.2d 222 (4th Dept., 1979) and *Neville v. Koch*, 173 A.D.2d 323 (1st Dept., 1991), aff'd 79 N.Y.2d 416 (1992); *Matter of Jackson v. New York State Urban Development Corp.*, 67 N.Y.2d 400 (1986); *Akpan v. Koch*, 75 N.Y.2d 561 (1990), *mot. to am. den.*, 76 N.Y.2d 846 (1990); *Kahn v. Pasnik*, 90 N.Y.2d 569 (1997).

26.  See *Gernatt Asphalt Products, Inc. v. Town of Sardinia*, 87 N.Y.2d 668 (1996); *Skenesborough Stone, Inc., v. Village of Whitehall*, 254 A.D.2d 664 (3rd Dept., 1998); *Akpan v. Koch*, *supra*.

27.  *Gernatt Asphalt Products, Inc. v. Town of Sardinia*, *supra* at 685, citing *Udell v. Haas*, *supra* at 472.

28.  *Collard v. Village of Flower* Hill, 52 N.Y.2d 594, 600 (1981), citing *Rodgers v. Village of Tarrytown*, 302 N.Y. 115, 124 (1951).

29.  302 N.Y. 115 (1951).

30.  *Id.,* at 124.

31.  246 A.D.2d 217, 221-222 (3rd Dept., 1998).

32.  Similarly, floating zones--which are zoning districts created within the text of a zoning law for placement on the map at a later time--have been upheld in the face of spot-zoning claims, where it was shown that comprehensive planning supported the change.  See *Beyer v. Burns*, 150 Misc.2d 10 (Sup. Ct., Albany Co., 1991).

33.  *Cannon v. Murphy*, 196 A.D.2d 498 (2nd Dept., 1993); *Schoonmaker Homes-John Steinberg, Inc. v. Village of Maybrook*, 178 A.D.2d 722 (3rd Dept., 1991), *lv. to app. den.*, 79 N.Y.2d 757 (1992); *Lazore v. Board of Trustees of Village of Massena,* 191 A.D.2d 764 (3rd Dept., 1993); *Daniels v. VanVoris, supra*; *Rye Citizens Committee v. Board of Trustees for the Village of Port Chester*, 249 A.D.2d 478 (2nd Dept., 1998).

34.  38 N.Y.2d 102 (1975).

35.  *Id.* at 110-111.

JNR-000290

36. In *Gernatt Asphalt Products*, *Inc., supra*, at 685, the Court of Appeals specifically declined to expand the *Berenson* test for exclusionary zoning to encompass industrial uses.

37. *Asian Americans for Equality v. Koch*, 72 N.Y.2d 121, 133 (1988).

38. *Neville v. Koch*, *supra*.

39. In *Gernatt Asphalt Products, Inc. supra,* at 685, the Court of Appeals found that "[t]he amendments at issue in this case are, by their very nature, in accord with the comprehensive plan manifested in the Zoning Ordinance of the Town of Sardinia originally enacted."

40. *Asian Americans for Equality*, *supra* at 131.

41. Damsky, *supra* at 1297; *Schoonmaker Homes, supra*; *Rye Citizens Committee*, *supra.*

42. This was the case in *Town of Bedford v. Village of Mount Kisco*, 33 N.Y.2d 178 (1973).  See also *Gernatt Asphalt Products, Inc., supra*, at 684-686.  Conversely, in *Eggert v. Town Board of the Town of Westfield*, 217 A.D.2d 975, 977 (4th Dept., 1995) the relevant zoning amendment was struck down for failure to comply with the comprehensive plan requirement with the explanation that, "... [t]he record does not contain any detailed explanation by the Town Board for changing the permitted uses in the district... ."

43. *Lazore*, *supra*.

44. *Cohen v. Vecchio*, 197 A.D.2d 499 (2nd Dept., 1993), *lv. to app. den.* 83 N.Y.2d 751 (1994).

45.  *Tilles Investment Co. v. Town of Huntington*, 74 N.Y.2d 885 (1989).  The decision also implies that subsequent amendments to a zoning ordinance need not indicate an intent to abandon a previously-adopted plan.  Note, however, that the latter principle would *not* apply to a comprehensive plan adopted under the current enabling statutes (see inset, p. 1).  Where the current statutes are used to adopt a plan, all further land use actions (including zoning amendments) must comport with the plan.

46. 33 N.Y.2d 178, 188 (1973).

47. Damsky, *supra* at 1295.

48. *Eggert*, at 181.

49. *Asian Americans for Equality*, *supra* at 131.

50. *Neville v. Koch*, *supra* at 324.

51. Town Law, §272-a(2)(a); similar definitions exist for villages (Village Law, §7-722(2)(a)) and cities (General City Law, §28-a(3)(a)).

52. Town Law, §272-a(11); Village Law, §7-722(11); General City Law, §28-a(12).

JNR-000291

53.  The new statutes specify that "[n]othing herein shall be deemed to affect the status or validity of existing master plans, comprehensive plans, or land use plans."  Town Law, §272-a(1)(h); Village Law, §7-722(1)(h); General City Law, §28-a(2)(h).

54.  Town Law, §272-a(3); Village Law, §7-722(3); General City Law, §28-a(4).

55.  Town Law, §272-a(4); Village Law, §7-722(4); General City Law, §28-a(5).

56.  Town Law §272-a(8); Village Law §7-722(8); General City Law §28-a(9).  See *King v. Saratoga Board of Supervisors*, 89 N.Y.2d 341 (1996).

57.  6 NYCRR §617.4(a), (b)(1).

58.  6 NYCRR §§617.2(u), 617.6(b), 617.7(a), 617.9(a), 617.11.  See also *Matter of Coca-Cola Bottling Co. v. Board of Estimate*, 72 N.Y.2d 674 (1988).

59.  Town Law, §272-a(6); Village Law, §7-722(6); General City Law, §28-a(7).

60.  *Id.*  Note that a lead agency may hold a public hearing under SEQRA, after acceptance of a draft EIS.  See 6 NYCRR §617.9(a)(4).  This hearing may be held concurrently with hearings under the zoning enabling laws so long as both statutory time periods for notice of the hearings are met.  See 6 NYCRR §617.9(a)(4).  As to the SEQRA hearing, note the post-hearing comment period.  See 6 NYCRR §617.9(a)(4)(iii).

61.  Town Law §272-a(5)(b); Village Law §7-722(5)(b); General City Law, §28-a(6)(b).

62.  Town Law §272-a(12); Village Law §7-722(12); General City Law §28-a(13).

63.  Town Law §272-a(10); Village Law §7-722(10); General City Law §28-a(11).

64.  Town Law, §272-a(11)(b); Village Law, §7-722(11)(b); General City Law, §28-a (12)(b).

15

## ARTICLE 9 APPROVAL OF PLANS

§[C26-108.1] 27-138 **Separate approval of plans required.-** Whenever plans are required to be submitted in connection with applications for work permits, as provided in articles ten through seventeen of this subchapter, separate application shall be made for the approval of the plans therefor. The application may be made at or prior to the time of submitting the work permit application**.**

§[C26-108.2] 27-139 **Application for approval of plans.-** Applications for approval of plans shall be made on forms furnished by the department, and shall be accompanied by the required fee. The application shall contain a general description of the proposed work, its location, and such other pertinent information as the commissioner may require. All applications for approval of plans for any new construction, in which plumbing fixtures are to be installed, shall be accompanied by the following:

    1.   Information as to the availability of a public sewer system.

    2.In the event that a private sewage treatment plant is proposed, evidence of submission of plans for approval of such plant to the department of environmental protection and the department of health as required by law[shall be submitted. In the case of plans for the construction of new buildings or the alteration of existing buildings, separate application may be made for the approval of:

    (a) the lot diagram showing compliance with the zoning resolution, as provided in paragraph one of subdivision (a) of section 27-157 of article eleven of this subchapter
    (b) the foundation plans, as provided in paragraphs one and seven of subdivision (b) of section 27-157 of article eleven of this subchapter;
    (c) the floor and roof plans showing compliance with exit requirements, as provided in paragraph three of subdivision (a) of section 27-157 of article eleven of this subchapter;
    (d) the detailed architectural, structural and mechanical drawings, as provided in subdivisions (a) through (c) of section 27-157 of article eleven of this subchapter. **\*\*Local Law 65-1996.**

\*§[C26-108.3] 27-140 **Applicant.-** Applications for approval of plans shall be made in behalf of the owner or lessee or condominium unit owner or cooperative shareholder by the person who prepared or supervised the preparation of the plans, and shall be accompanied by a signed statement of the owner, condominium board of managers or cooperative board of directors stating that the applicant is authorized to make the application. In the case of applications for approval of plans for the construction or alteration of buildings, for the installation or alteration of plumbing or plumbing systems, or for the installation or alteration of service equipment which involves changes in the structure of the building or requirements for fire protection, light, heat, ventilation, or means of egress, the application shall be made by protection, light, heat, ventilation, or means of egress, the application shall be made by an architect or engineer. The full names and addresses of the owner, including the condominium unit owner or cooperative shareholder, lessee, and applicant, and of the principal officers thereof, if a corporation, shall be set forth in the application. **\*Local Law 72-1991.**

§27-140.1 **Registration requirements.-**
    (a) No person, other than those described in subdivision (c) of this section, may present, submit, furnish or seek approval of applications for approval of plans or remove any documents from the possession of the department, without first having registered with the department his or her name, address and company affiliation on a form to be furnished by the department. Consistent with article twenty-three-A of the correction law, registration may be denied to any person who has been convicted of a criminal offense relating to bribing or receipt of a bribe, giving or receiving unlawful gratuities, official misconduct, or other corruption-related acts. The commissioner, after due notice and a hearing before the office of administrative trials and hearings, pursuant to section one thousand forty-eight of the charter and rules established thereunder, shall have the power to revoke, suspend or limit the registration of any person upon a finding that such person has willfully or negligently violated the rules of the department or has engaged in any misconduct arising out of his or her business dealings with the department. Misconduct shall be defined by the rules of the commissioner promulgated pursuant to subdivision (d) of this section.

(b) No person shall use the term "registered with the department of buildings", "registered" or any similar representation in such a manner as to convey the impression that such person is registered with the department of buildings unless such person is registered in accordance with the provisions of this section.

(c) The following persons are exempt from the provisions of this section:

(i)  the owners of the premises for which the building applications are filed including, in the case of partnerships or corporations, the general partners or the principal officers of the corporation. Principal officers of a corporation shall include the president, vice presidents, secretary and treasurer;

(iii) the lessees of such premises authorized by the owner to file building applications; condominium unit owners authorized by the condominium board of managers to file building applications;

(iv) cooperative shareholders authorized by the cooperative board of directors to file building applications;

(v)  registered architects licensed by the New York state department of education;

(vi) professional engineers licensed by the New York state department of education;

(vii) attorneys admitted to practice in New York state;

master plumbers licensed pursuant to article two of subchapter two of chapter one of title twenty-six of this code;

(viii)    master fire suppression piping contractors licensed pursuant to article two of subchapter two of chapter one of title twenty-six of this code; and

(ix) master electricians licensed pursuant to subchapter one of chapter three of title twenty-seven of this code.

(d) the commissioner shall promulgate rules for the proper and efficient administration and enforcement of this section.
*Local Law 72-1991.*

**§[C26-108.4] 27-141 Plans.-** With each application for approval of plans, there shall be submitted such number of copies of the plans as the commissioner may require. All plans shall comply in form and content with requirements of this code and other applicable laws and regulations.

**§[C26-108.5] 27-142 Applicant's statement.-**

(a)      A signed statement of the applicant shall also be submitted with the application, stating that he or she is authorized by the owner to make the application and that, to the best of his or her knowledge and belief, the plans and the work shown thereon comply with the provisions of this code and other applicable laws and regulations. If there are practical difficulties in the way of carrying out the strict letter of the law, the applicant shall set forth the nature of such difficulties in such signed statement.

(b)      In addition to all other requirements of this article, an application for approval of plans for the alteration of an existing building or the construction of a new building shall be accompanied by a signed statement of the applicant certifying either (1) that the building to be altered, or the site of the new building, as the case may be, contains no occupied housing accommodations subject to control under chapter three of title twenty-six of the administrative code, or (2) that the owner has notified the city rent agency of his or her intention to file such plans and has complied with all requirements imposed by the regulations of such agency as preconditions for such filing.

**§[C26-108.6] 27-143 Examination of application and plans**.- All applications for approval of plans and all plans submitted in connection therewith, and any amendments thereto, shall be numbered, docketed and examined promptly after their submission. The examination shall be made under the direction of the commissioner for compliance with the provisions of this code and other applicable laws and regulations. The commissioner may at his or her discretion, when the application is submitted by an architect or an engineer, designate portions of the examination for limited supervisory check. The personnel employed for examination of plans shall be qualified engineers or architects experienced in building construction and design.

**\*§[C26-108.7] 27-144 Approval of application and plans.-** Except as otherwise provided in section 27-198 and section 27-198.1 of article nineteen of this subchapter, applications and plans complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and written notice of

approval shall be given the applicant promptly and no later than forty calendar days after the submission thereof, and applications and plans failing to comply with the provisions of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such times for an additional twenty days. Whenever an application and accompanying plans have been rejected and are thereafter revised and resubmitted to meet stated grounds of rejection, the revised application and plans shall be approved if they meet the stated grounds of rejection, or shall be rejected if they fail to meet the stated grounds of rejection; and written notice of approval or written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than twenty calendar days after the resubmission thereof. *Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-108.8] 27-145 Conditional approval of plans.-** All approvals of plans given prior to the submission of the work permit application shall be conditioned upon and subject to compliance with the requirements of this code and other applicable laws and regulations in effect at the time of submission of the permit application, and shall also be conditioned upon the submission of the work permit application not later than twelve months after the date of notice of plan approval.

**§[C26-108.9] 27-146 Endorsement of approved plans.-** All plans and amendments thereto, when approved by the commissioner, shall be stamped or endorsed approved under the official seal of the department, followed by a notation of the date of plan approval. One set of such approved plans shall be retained in the department office of the borough in which the building premises or equipment is located; and after the issuance of a work permit, a second set of such approved plans shall be retained at the place where the building premises or equipment is located, and shall be open at all times to inspection by the commissioner and his or her authorized representatives until final inspection of the work is complete

**ARTICLE 10 PERMITS**

**§[C26-109.1] 27-147 When permits required.-** No building construction or alteration work, foundation or earthwork, demolition or removal work, or plumbing work shall be commenced, and no signs or service equipment of the types listed in articles sixteen and seventeen of this subchapter shall be erected, installed, altered, repaired, or used, nor shall any service equipment of the types listed in article eighteen of this subchapter be used or operated, unless and until a written permit therefor shall have been issued by the commissioner. The provisions of this section shall not apply, however, to minor alterations and ordinary repairs, as defined and delineated in article five of this subchapter or to work or equipment exempted from permit requirements under the provisions of sections 27-176, 27-179, 27-184, and 27-189 of this subchapter.

**§[C26-109.2] 27-148 Classification of permits.-** For the purposes of this code, permits shall be classified as follows:

> **(a)** **New building permits**: for the construction of new buildings, as provided in article eleven of this subchapter.
> **(b)** **Alteration permits**: for the alteration of existing buildings, as provided in article twelve of this subchapter.
> **(c)** **Foundation and earthwork permits**: for the construction or alteration of foundations, including earthwork excavation and fill, as provided in article thirteen of this subchapter.
> **(d)** **Demolition and removal permits**: for the demolition or removal of existing buildings, as provided in article fourteen of this subchapter.
> **(e)** **Plumbing permits**: for the installation or alteration of plumbing and plumbing systems including gas piping, as provided in article fifteen of this subchapter.
> **(f)** **Sign permits**: for the erection or alteration of signs and sign installations, as provided in article sixteen of this subchapter.
> **(g)** **Equipment work permits**: for the installation or alteration of service equipment, as provided in article seventeen of this subchapter.
> **(h)** **Equipment use permits**: for the use and operation of service equipment, as provided in article eighteen of this subchapter.

** **§[C26-109.3] 27-149 Separate permits required**.- Separate permits shall be required, as provided above, except that separate permits for foundations and earthwork, or for the installation or alteration of service equipment, other than fire suppression piping systems, shall not be required whenever plans for such work are included in and form a part of the plans for the construction of new buildings or the alteration of existing buildings.
*** Local Law 107-1993.*

*** §[C26-109.4] 27-150 Application for permit.-** All applications for permits shall be submitted on forms furnished by the department, and shall be accompanied by the required fee. The application shall contain a general description of the proposed work or equipment, its location, and such other pertinent information as required pursuant to section 27-198.1 or as the commissioner may require.
*\*Local Law 76-1985, language juxtaposed per Ch. 907-1985.*

**§[C26-109.5] 27-151 Applicant.-** Applications for permits shall be made by or in behalf of the owner or lessee of the buildings; and if made by a person other than the owner, the application shall be accompanied by a signed statement of the applicant declaring that he or she is authorized by the owner to make the application. The full names of the owner, lessee, and applicant, and of the principal officers thereof, if a corporation, shall be set forth in the application.

**§[C26-109.6] 27-152 Other application requirements**.- In addition to the foregoing general requirements, applications for permits shall be subject to the further requirements of articles eleven through eighteen of this subchapter, as the same may be applicable.

** **§[C26-109.7] 27-153 Place of filing applications.-** Except as otherwise provided by rule, applications for permits and accompanying papers and plans shall be filed in the department office in the borough in which the work or equipment is located. Applications shall be numbered and docketed promptly as received; and for purposes of identification and reference, all such papers shall be marked with the block and lot number of the property to which they apply, and with street and house number where possible. ***Local Law 107-1993.*

**§[C26-109.8] 27-154 Amendments to applications.-** Subject to the limitations of section 27-155 of this article, amendments to permit applications and any accompanying plans and papers may be submitted at any time before final inspection of the work or equipment is completed; and such amendments shall be deemed part of the original permit application and shall be filed therewith.

**§[C26-109.9] 27-155 Time limitation of application.-** An application for a permit shall be deemed to have been abandoned twelve months after date of submission, unless such application has been diligently prosecuted after rejection in whole or in part, or a permit shall have been issued under article nineteen of this subchapter except that the commissioner may, for reasonable cause, grant extensions of time for additional twelve month periods.

## ARTICLE 19 ISSUANCE OF PERMITS

**§[C26-118.1] 27-191 Approval of permit application.-**All applications for permits and any accompanying plans and papers, including any amendments thereto, shall be examined promptly after their submission for compliance with the provisions of this code and other applicable laws and regulations. Except as otherwise provided in section 27- 198 of this article, applications complying with the provisions of this code and other applicable laws and regulations shall be approved by the commissioner and the permit issued promptly and not later than forty calendar days after the submission thereof, and applications failing to comply with the requirements of this code and other applicable laws and regulations shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than forty calendar days after the submission thereof, except that on or before the fortieth day, the commissioner may on good cause shown, and upon notification to the applicant, extend such time for an additional twenty days. Whenever a permit application has been rejected and is thereafter revised and resubmitted to meet stated grounds of rejection, the revised application shall be approved if it meets the stated grounds of rejection, or shall be rejected if it fails to meet the stated grounds of rejection; and the permit shall be issued or written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than 20 calendar days after the resubmission thereof.

**§[C26-118.2] 27-192 Approval of application in part**.-The commissioner may approve the application and issue a permit for construction of part of a building, including foundations, before complete plans and specifications for the entire building have been submitted and approved, provided that adequate information and detailed plans or statements have been submitted complying with the provisions of this code and any other applicable laws and regulations, and provided further that the holder of such permit shall proceed with the building operation at his or her own risk and without assurance that a permit for construction of the entire building will thereafter be issued**.**

**§[C26-118.3] 27-193 Signature to permit.-** Every permit issued by the commissioner shall have his or her signature affixed thereto; but the commissioner may authorize any subordinate to affix such signature.

**§[C26-118.4] 27-194 Posting of permit.-** A permit card bearing the permit number, application number, location of the premises or equipment for which the permit is issued, and such other information as the commissioner may determine, shall be furnished the applicant in connection with the issuance of the permit; and such permit card shall be posted in a conspicuous place at such location open to public inspection during the entire time of the prosecution of the work or the use and operation of the equipment, or until the expiration of the permit. No such permit card shall be posted or displayed at any location other than the location of the premises or equipment for which the permit was issued.

**§[C26-118.5] 27-195 Notice of commencement of work.-** At least twenty-four hours written notice shall be given to the commissioner before the commencement of any work for which a permit has been issued. Before any work is commenced on an item of construction requiring controlled inspection, all persons responsible for such controlled inspection shall be notified in writing at least seventy-two hours prior to such commencement.

**\*§[C26-118.6] 27-196 Expiration of permit.-**Except as otherwise provided in section 27-190 of article eighteen of this subchapter, all permits issued by the commissioner shall expire by limitation and become invalid if the permitted work or use is not commenced within twelve months from the date of issuance of the permit or, if commenced, is suspended or abandoned for a period of twelve months thereafter. All permits for work in a special flood hazard area as delineated in reference standard RS4-4 shall expire if the actual start of permanent construction has not occurred within one hundred eighty-eight days of the date on which such permit is issued. The commissioner may, however, upon good cause shown, reinstate a work permit at any time within a period of two years from the date of issuance of the original permit, provided that the work shall comply with all the requirements of this code and other applicable laws and regulations in effect at the time application for reinstatement is made, and provided further that the applicant shall pay a renewal fee in accordance with section 26-211 of the code.
*\*Local Law 38-1990; Local Law 33-1988.*

**\*\*§[C26-118.7] 27-197 Revocation of permit.-** The commissioner may, on notice to the applicant, revoke any permit for failure to comply with the provisions of this code or other applicable laws and regulations; or whenever there has been any false statement or any misrepresentation as to a material fact in the application or accompanying plans and papers upon the basis of which the permit was issued; or whenever any permit has been issued in error and

conditions are such that a permit should not have been issued. Such notice shall inform the applicant that he or she shall have the right to present to the commissioner or his or her representative within five business days or personal service or ten days of the posting of service by mail information as to why the permit should not be revoked. The commissioner may suspend a permit immediately when the commissioner has determined that an imminent peril to life or property exists and shall at the same time notify the applicant that the permit shall be revoked and that the applicant has the right to present to the commissioner or his or her representative within five business days of personal service or ten days of the posting of service by mail information as to why the permit should not be revoked.

**\*\*Local Law 11-1988.**

**ARTICLE 22 CERTIFICATES OF OCCUPANCY**

**§[C26-121.5] 27-217 Change of occupancy or use.-**

(a) No change shall be made in the occupancy or use of an existing building which is inconsistent with the last issued certificate of occupancy for such building, or which would bring it under some special provision of this code or other applicable law or regulation, unless a new certificate of occupancy is issued by the commissioner certifying that such building or part thereof conform to all of the applicable provisions of this code and all other applicable laws and regulations for the proposed new occupancy or use.

(b) Except as provided by law, a new certificate of occupancy shall not be required where the change of use is within the same use group as listed in the amended zoning resolution. Where a building exceeds three stories in height and the change does not exceed twenty per cent of the total floor area, an amendment to the existing certificate of occupancy for such use shall be issued by the commissioner certifying that the proposed new occupancy and use conforms to the provisions of the laws governing building construction and that the proposed use will not be in conflict with any provisions of the labor law, multiple dwelling law or the zoning resolution.

# *Adult Entertainment Study*

## *Department of City Planning*



**City of New York**
Rudolph W. Giuliani, *Mayor*

**Department of City Planning**
Joseph B. Rose, *Director*

September, 1994
DCP# 94-08

JNR-000301

# *Table of Contents*

|  | Page |
|---|---|
| EXECUTIVE SUMMARY | i |

**I.   Introduction**
- Study objectives .................................................. 1
- Definition of adult entertainment establishments ..................... 1

**II.  Studies and Regulations in Other Localities**
- Impacts found in other localities ................................... 3
- Regulations in other localities .................................... 9

**III. The Adult Entertainment Industry**
- Industry trends .................................................. 16
- Inventory and trends, by location and type ......................... 19
- Industry views .................................................. 24

**IV.  Adult Entertainment Zoning in New York City**
- Current zoning .................................................. 28
- Prior zoning proposals in NYC .................................... 31

**V.   Adult Entertainment Impacts in New York City**
- Impacts identified by the City Planning Commission, 1977 ............. 34
- Impacts identified by the Office of Midtown Enforcement .............. 35
- Impacts identified in the Chelsea Business Survey ................... 37
- Impacts identified at the public hearing of the Task Force on the Regulation of Sex-Related Businesses ............................................ 38
- Impacts identified in the Times Square Business Improvement District Study ... 40
- Impacts identified in newspaper reports and correspondence ........... 41

**VI.  Survey of Adult Entertainment Uses**
- Summary Survey Results ............................................ 47
- Analysis of Criminal Complaint Data ............................... 52
- Analysis of Property Assessed Values .............................. 54

**VII. Overall Study Findings and Conclusion** ......................... 56

**APPENDICES**
- A.   Study Areas
- B.   DCP Survey of Adult Entertainment Establishments, Fall 1993

# EXECUTIVE SUMMARY

Municipalities throughout the country regulate the locations of adult entertainment establishments to limit their impacts on neighborhoods and the quality of life. Despite the recent proliferation of such uses in New York City -- an increase of 35 percent in 10 years -- current zoning regulations do not distinguish adult entertainment establishments from similar commercial uses without an "adult character." For example, triple-X (XXX) video stores and video stores that do not purvey pornography are regulated identically in the Zoning Resolution. The Department of City Planning (DCP) undertook the "Adult Entertainment Study" to determine the nature and extent of the secondary impacts of adult entertainment uses on communities in the city. The Study includes: (1) a survey of existing studies concerning the impacts of adult entertainment establishments and regulations of such establishments in other localities; (2) a description of the adult entertainment business in New York City; (3) a review of studies and reports on adult entertainment establishments in New York City; (4) a DCP survey of the impacts such establishments have on communities in the City; and, (5) overall study findings and conclusion.

## Background

In 1977, after concluding that adult entertainment uses had negative impacts on communities, the City Planning Commission proposed new zoning regulations distinguishing adult entertainment uses and restricting their potential locations. The proposal was withdrawn at the Board of Estimate due to a lack of consensus regarding the appropriate extent of such regulations and concern that the regulations being proposed might result in the movement of adult uses to new locations.

The recent proliferation of adult entertainment establishments, often identified by graphic signage, has led to widespread concern about potential deterioration in the quality of life in many of the city's neighborhoods. Some residents, concerned about the negative impacts of adult uses in their neighborhoods and fearful of the potential results of proliferation, have organized ad hoc groups and appealed to local officials to have them closed down. Such local opposition ultimately resulted in the voluntary closing of adult video stores and bars in Astoria, Jackson Heights, Chelsea, Murray Hill, Forest Hills, and Bay Ridge. Two bills have been introduced in the City Council to regulate the location of adult entertainment uses. A resolution has also been introduced at the Council calling for zoning amendments to restrict adult entertainment uses.

The consensus among those expressing opposition to the operation of adult uses is that adult entertainment establishments have a negative impact on the communities in which they are located. These impacts include: inappropriate exposure of children and teenagers to graphic

sexual images, increased crime, diminishing property values, adverse effects upon the climate for other types of commercial activities, and overall negative influences upon community character.

## Recent Trends in the Location of Adult Entertainment Uses

After burgeoning growth in the early 1970's, the number of adult entertainment establishments in the city declined by 13 percent from 151 in 1976 to 131 in 1984.[1]  By 1993, however, DCP identified 177 such establishments with assistance from the 59 Community Boards.  This represents an increase of 35 percent over the last decade. Should this growth continue at the same rate, an additional 60 adult entertainment establishments will be operating in the city by the year 2002.  The DCP survey focused on three types of uses:  triple-X video and bookstores, adult live or movie theaters, and topless or nude bars.   These adult uses were further limited to those which identified themselves as "adult," through signage or other advertising. The survey may understate the total number of adult entertainment uses. The locations of these establishments are shown on a map following page 20. More than 75 percent of the adult establishments were located in zoning districts that permit residences. Since the survey was completed, several new adult entertainment establishment have opened.

The production and distribution of sexually explicit materials has changed dramatically in recent years.  Adult material is more readily accessible than it used to be, and a greater variety of products are available to segments of the adult entertainment audience - both inexpensive material and fancier entertainment are more readily available than ten years ago. In particular, triple-X videos are now produced cheaply and sold for prices below $5, whereas only a few years ago adult films commanded prices of approximately $100.  In addition there are more topless bars than previously, due to a proliferation of topless bars affecting an "upscale" image. Partially as a result of these changes in the adult use industry, adult entertainment establishments are now found more widely throughout the city.

In terms of their location, adult entertainment uses have continued an  historical tendency to concentrate in specific areas. Over the last ten years most adult entertainment establishments have continued to concentrate within a few community districts in Manhattan.  However, within that period the number of community districts citywide with seven or more adult entertainment

---

[1]   Historical data was obtained from various sources. Caution should be exercised in interpreting trend data because the defining characteristics of adult use may vary among sources.

establishments tripled, from three to nine.  Between 1984 and 1993, the number of adult bookstores/peep shows/video stores increased citywide from 29 to 86 establishments.  Within this category, 74 percent consisted of adult video stores, none of which were noted in the 1984 survey.  Adult movie and live theaters continued to decline from 48 in 1984 to 23 in 1993. Topless and nude bars increased by 26 percent in the same time period, from 54 to 68.

## Impacts Found and Regulations in Other Localities

Other jurisdictions that have studied the effects of adult entertainment uses have consistently found that these uses have negative secondary impacts.  This has been the case for large cities (such as Chicago and Los Angeles), medium-sized cities (such as Austin, Texas) and small villages (such as Islip, New York). Similar negative secondary impacts (e.g., a relationship between the concentration of adult entertainment uses and increased incidence of crime) have been found despite widespread variation in land use patterns and other local conditions. While New York may differ from these other jurisdictions in certain respects, their experience with adult entertainment uses is highly relevant to consideration of the need for some form of regulation.  Both the United States Supreme Court and the New York Court of Appeals have recognized that, in adopting regulations, a municipality may rely on the experiences of other jurisdictions that have determined that adult uses have secondary impacts.  Relevant studies from other jurisdictions include the following:

The Town of Islip, in Suffolk County on Long Island, prohibited adult uses from locating in downtown commercial areas because they would produce a "dead zone" that shoppers would avoid.  Other government efforts to revitalize or stabilize these areas and attract private investment would be impacted negatively.

The City of Indianapolis, Indiana, conducted national and local surveys of real estate appraisers regarding the impact of adult uses on property values in middle-income residential neighborhoods.  A majority of the appraisers, seventy five percent, responded that such a use located within one block of such a residential neighborhood would have a negative effect on the value of both residential and commercial properties.

The City of Whittier, California, in a study of the impacts of adult establishments found higher turnover rates in commercial and residential areas adjacent to adult uses.  The study also

JNR-000305

compared 38 types of criminal activity over two time periods, showing a total increase of 102 percent for the study area containing adult businesses, while the city as a whole had only an eight percent increase.

A study by the City of Austin, Texas, compared areas with adult businesses to other areas containing similar land uses but no adult businesses, and found a sex crimes rate between two and five times greater in the areas with adult businesses. The study also showed that the sex-related crime rate was 66 percent higher in areas having two or more adult businesses than in those areas having only one such business.

Phoenix, Arizona, studied the relationship between arrests for sex crimes and the locations of adult businesses, and found an overall increase of six times the sex crime rate in the study areas with adult uses over the control areas without such uses.

The State of Minnesota reported that a study conducted in that state examining the effects of sexually-oriented businesses upon property values and crime rates indicated that such businesses had a strong negative impact on the crime rate. The addition of one sexually-oriented business to a census tract area caused an increase in the overall crime rate index in that area by more than nine percent. In another state study, it was determined that there was a statistically significant correlation between the location of adult businesses and neighborhood deterioration. Housing values were significantly lower in an area with three adult businesses than in an area with only one adult business. Also, there was a significantly higher crime rate associated with two adult businesses in an area than was associated with only one adult business in an area.

Many other cities currently regulate adult uses differently from other commercial uses and several of these are discussed later in this study. Most often, these regulations disperse such uses rather than concentrating them in any particular area of the municipality and may also exclude them from certain areas. For example, Los Angeles, California, generally prohibits new adult uses from locating within a certain distance of another such use. Los Angeles enacted its dispersal zoning after a study concluded that the concentration of adult uses had negative impacts on criminal activity, property values, and public perceptions of the quality of life.

## Impacts Identified in Studies in New York City

Several studies have identified the impacts associated with adult entertainment establishments in New York City. In 1977, the City Planning Commission proposed a zoning plan to limit the

concentration of adult uses after relating the proliferation of such establishments to economic decline, and finding a linkage between increased numbers of felonies and the concentrations of adult uses.

In 1993, the Chelsea Business Survey concluded, after surveying 100 businesses located in that community, that dispersal zoning should be enacted to prevent the transformation of Chelsea into a red light district.  A majority of the businesses surveyed felt that a recent proliferation of adult entertainment establishments in Chelsea had hurt them economically.

This year, the Times Square Business Improvement District (TSBID), after conducting a study of the secondary effects of the concentration of adult use establishments in the Times Square area, called for the dispersal of adult uses in commercial and manufacturing areas.  The TSBID study shows that the rate of increase in assessed values for blocks with an adult use did not increase as much as the rate of increase on nearby control blocks without adult uses.  The study also notes that there were almost twice as many complaints about crime for the study blocks with adult establishments as nearby control blocks without adult uses.  Property and business owners expressed the view that adult uses located in the area, particularly in concentration, have had a negative impact on their businesses, deterring potential customers.

DCP, as part of this Study, selected six study areas where adult uses were located. Because Times Square was already being studied by TSBID, DCP's selected study areas which had lesser concentrations of adult uses. Most of the areas are in the other boroughs and in some cases contained only a single isolated adult entertainment use. DCP surveyed representatives from community boards, local organizations and local businesses, as well as real estate brokers, police and sanitation officers, and representatives of the adult entertainment industry to gather information on land use, street conditions, signage, and impacts.  An analysis of assessed values and crime data was also made.  The six study areas are shown on the map following page 47.

Many residents and community organizations cited adult entertainment establishments as having significant or potentially significant negative impacts in their communities. Real estate brokers indicated that such establishments have negative impacts on property values. These findings are consistent with the data found in the TSBID study and the Chelsea Business Survey, along with other data described in more detail in this report.

In some cases, particularly in study areas with only one adult entertainment establishment, the DCP survey did not yield conclusive evidence of a direct relationship between the adult use and

the urban ills affecting the community. This reflects the fact that, in a city as dense and diverse as New York, it is difficult to isolate specific impacts attributable to any particular land use. Other cities that have conducted similar studies have acknowledged this same difficulty. For instance, the Los Angeles City Planning Department concluded that while assessed valuation of properties in areas characterized by adult uses "generally" tended to increase to a lesser degree than similar control areas, "there was insufficient evidence to support the contention that concentrations of sex-related businesses have been the primary cause of these patterns". Adult entertainment businesses were nevertheless perceived by the majority of the Los Angeles respondents as exerting a negative impact on surrounding business and residential properties. Whether or not such negative impacts had actually occurred, or were only perceived to have occurred, could not always be determined by the survey, but the study concluded that "in terms of the attitudes of the respondents towards such businesses, the conclusion must be drawn that the overall effect on surrounding properties is considered to be negative."

DCP's survey identified strong concerns about the negative impacts of adult uses similar to those found in the Los Angeles study. Even in those study areas where it could not be readily determined that negative impacts were already being felt, there was a strong body of opinion, especially among residents, that adult entertainment uses were having negative impacts and that a further proliferation of these uses in the community would lead to a neighborhood deterioration. The experience of urban planners and real estate appraisers indicates that negative perceptions associated with an area can lead to disinvestment in residential neighborhoods and a tendency to shun shopping streets where unsavory activities are occurring, leading to economic decline. In "The Appraisal of Real Property," seventh edition, by the American Institute of Real Estate Appraisers, the forces that influence real estate value are described as follows. "The market value of real property reflects and is affected by the interplay of basic forces that motivate the activities of human beings. These forces, which produce the variables in real estate market values, may be considered in four major categories: *social ideals and standards* (emphasis added), economic changes and adjustments, governmental controls and regulation, and physical or environmental changes." The attitudinal data in the survey is thus significant even in those instances where the current negative impacts of adult entertainment establishments are difficult to measure.

Fear of the potential proliferation of adult uses is a well founded concern. Taken alone it may not seem significant if someone smokes in a subway car, scribbles graffiti, jumps a subway turnstile, aggressively panhandles or squeegees a car windshield, particularly in a city where there are other pressing problems such as homelessness, violent crime and unemployment. But

vi

when these small incidents, and establishments, proliferate and accumulate, they can tear at the urban fabric. Similarly, as the city's experience in the Times Square area indicates, the proliferation of adult uses in an area does have significant and potentially devastating impacts on the character of a community. The City has adopted an aggressive and comprehensive policy of addressing various quality-of-life issues that has begun to yield beneficial results. The problems posed by adult entertainment establishments are among the important quality-of-life issues that affect our neighborhoods and communities.

## Overall Findings and Conclusion

- *Numerous studies in other localities found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life.*

- *There has been a rapid growth in the number of adult entertainment uses in New York City. Between 1984 and 1993, the number of such uses increased from 131 to 177. The number of video/book stores/peep shows almost tripled and there was a 26 percent increase in topless/nude bars. Adult theaters declined by 52 percent.*

- *Adult entertainment is more readily accessible in NYC than it was ten years ago. There are more such establishments in a greater number of communities. Adult videos are produced in greater numbers and at lower costs. They are often available in general interest video stores as well as those devoted exclusively to adult entertainment. Cable television has significantly increased the availability of adult viewing material. Adult material is also available at newsstands and book stores.*

- *Adult entertainment uses tend to concentrate. The number of community districts with seven or more adult uses increased from three to nine over the last ten years. Seventy five percent, of the adult uses are located in nine of the city's 59 Community Districts. In Manhattan, adult uses cluster in central locations, such as the Times Square area. In the other boroughs, adult uses appear to cluster along major vehicular routes connecting outer reaches of the city and suburbs to the central business district such as Queens Boulevard and Third Avenue in Brooklyn.*

- *Studies of adult entertainment uses in areas where they are highly concentrated, such as Times Square and Chelsea, identified a number of significant negative secondary impacts.In the Times Square area property*

JNR-000309

*owners, theater operators and other business people overwhelmingly believe that their businesses are adversely affected. An analysis of criminal complaints indicated a substantially higher incidence of criminal activity in the Times Square area where adult uses are most concentrated. In addition, the study found that the rate of increase in assessed property values for study blocks with adult uses grew at a slower rate than control blocks without adult uses.*

- *DCP's survey of areas with less dense concentrations of adult uses found fewer impacts than the study of the Times Square area. However, community leaders expressed concerns that adult uses impact negatively on the community and strongly fear the potential results of proliferation.*

- *The strongest negative reactions to adult entertainment uses comes from residents living near them.*

- *Where respondents indicated that their businesses or neighborhoods had not yet been adversely affected by adult uses, this typically occurred in study areas with isolated adult uses. Moreover, these same respondents typically stated that an increase in such uses would negatively impact them. Community residents fear the consequences of potential proliferation and concentration of adult uses in traditionally neighborhood-oriented shopping areas and view the appearance of one or more of these uses as a deterioration in the quality of urban life.*

- *Most real estate brokers report that adult entertainment establishments are perceived to negatively affect nearby property values and decrease market values. Eighty percent of the brokers responding to the DCP survey indicated that an adult use would have a negative impact on nearby property values. This is consistent with the responses from a similar national survey of real estate appraisers.*

- *Adult use accessory business signs are generally larger, more often illuminated, and graphic (sexually-oriented) compared with the signs of other nearby commercial uses. Community residents view this signage as out of keeping with neighborhood character and are concerned about the exposure of minors to sexual images.*

Based on these findings, DCP believes it is appropriate to regulate adult entertainment establishments differently from other commercial establishments. The experience of other jurisdictions, the city's historic experience in Times Square, studies performed by the TSBID and the Chelsea Business Survey, and DCP's own survey establish, the negative effects of adult entertainment uses. Consideration of the specific nature and extent of regulations that would be appropriate for

adult entertainment establishments in New York City was not within the scope of this Study. However, in light of the negative impacts of adult uses in concentration, the following regulatory techniques, which have been used in other jurisdictions, merit consideration in developing adult use regulations: restrictions on the location of adult uses in proximity to residential areas, to houses of worship, to schools and to each other.

ix

JNR-000311

# I. INTRODUCTION

## Study Objectives

The Department of City Planning undertook a study to evaluate the nature and extent of adverse impacts associated with adult entertainment uses in other localities and in New York City. The study responds to concerns of city residents, businesses, and elected officials about the proliferation of adult entertainment establishments in various parts of the city. The issues posed by adult uses are complex, and often involve speech or conduct protected by the federal and New York State constitutions. Any regulation must be based on a careful analysis of past, present and potential adverse impacts of adult uses upon the quality of life in the city's neighborhoods, as well as the effects of possible regulatory solutions upon protected speech.

This study includes (1) a survey of existing studies concerning the impacts of adult entertainment establishments and of regulation of such establishments in other localities; (2) a description of the adult entertainment business in New York City; (3) a review of studies and reports on adult entertainment establishments in New York City; (4) a DCP survey of the impacts such establishments have on communities in the City; and (5) a set of overall findings and recommendations.

## Definition of Adult Entertainment Establishments

There is a vast array of businesses that may be considered "adult." These include video and bookstores, motels, massage parlors, sex clubs, topless and bottomless or nude bars (not all of which serve alcohol), and peep shows. Materials may include sexually explicit videos or magazines. Services may include body rubs, or entertainment such as nude dancing.

For purposes of the DCP survey, an adult entertainment establishment is a commercial use that defines itself as such through exterior signs or other advertisements. Thus, a "triple-X or XXX" video store is an adult entertainment establishment, but a neighborhood video store that devotes a small area to triple-X videos is not. This self-defining characteristic allowed the survey to focus on those establishments for which there is some consensus that the use is adult. It also means that it is possible to obtain adult entertainment materials, such as videos and magazines, at establishments that sell primarily non-adult materials and that some businesses that are devoted to

adult entertainment but do not publicly proclaim the fact were not included in the DCP survey. The survey was further restricted to three types of such uses: adult video and bookstores, adult live or movie theaters, and topless or nude bars. Other uses directly associated with the commercialization of sex, such as massage parlors or brothels (which are not permitted in New York City), and sex clubs, as well as some of those uses indirectly associated with the commercialization of sex such as discos, motels, newsstands, and candy stores that sell some adult magazines, were excluded from the study.

The term "adult use" is technically defined differently from municipality to municipality, but generally refers to a commercial establishment that purveys materials or services of a sexual nature. For example, both the City of Boston, Massachusetts, and the Town of Islip, New York, classify adult book stores to mean those that exclude minors by reason of age.[1] Other cities such as Detroit and Los Angeles classify adult uses on the basis of the content of the materials shown or the types of activities that may be found in adult establishments; the uses emphasize "specified sexual activities" or "specified anatomical areas.[2] A movie theater generally showing adult films is an example of such a use.

---

[1]   "The adults-only definition recommended to be applied in the Islip Town ordinance avoids emphasis on the content of material, thereby avoiding Constitutional questions based on the First Amendment, and allowing pornographic uses to define themselves." Study and Recommendations for Adult Entertainment Businesses in the Town of Islip, Town of Islip Department of Planning and Development, 1978

[2]   "Specified Anatomical Areas" shall mean and include any of the following: (a) Less than completely and opaquely covered human genitals, public region, buttocks, anus or female breasts below a point immediately above the top of the areolae; or (b) Human male genitals in a discernable turgid state, even if completely and opaquely covered. "Specified Sexual Activities" shall mean and include any of the following: (a) The fondling or other erotic touching of human genitals, public region, buttocks, anus or female breasts; (b) Sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation or sodomy; (c) masturbation, actual or simulated; or (d) Excretory functions as part of or in connection with any of the activities set forth in (a) through (c) above. Planning and Zoning Code, Los Angeles, Section 12.70.B.13-B.14.

2

## II.   STUDIES AND REGULATIONS IN OTHER LOCALITIES

## Impacts Found in Other Localities

DCP reviewed impact studies from the following municipalities:  Islip (NY), Los Angeles (CA), Indianapolis (IA), Whittier (CA), Austin (TX), Phoenix (AZ), Manatee County (FL), New Hanover County (NC), and the State of Minnesota.

### Islip, New York

The Town of Islip completed a study[3] of adult uses in September, 1980. The study formed the basis of new zoning provisions that allowed adult uses only in Industrial I Districts, by special exception of the Board of Appeals.  Adult uses would not be allowed to locate within 500 feet of residential uses and public facilities, nor would they be permitted to locate within one half-mile of another adult use.  Islip proposed the one-half mile requirement to prevent a concentration of sex businesses visible to the driving public, thereby hindering the creation of a "combat zone."

By limiting adult uses to certain industrial zones, Islip proposed to prevent "skid row effects" in declining downtown commercial areas.  The proposal was expected to further other anti-skid row efforts such as new public investment, the prohibition of certain residential conversions, and restrictions on new bars.  It was also formulated to prevent "dead zones" from developing in commercial areas.  According to the study, these areas are avoided because shoppers do not want to be associated in any way with adult uses, or have their children walk by adult uses.

Citing its case study, Islip indicated that the main complaint about a given adult book store is its proximity to an adjoining residential area.  Other impacts included parking in residential areas (store patrons may wish to "hide" their automobile from view by parking away from the adult establishment).  The study, relying on newspaper articles, indicated that another impact is the reputed association of the adult book store operators with organized crime.  Islip's study stated that persons who protested the establishment of the book store feared retaliation:  " . . . the potential for violence or other illegal behavior is clearly possible."[4]

---

[3]   "Study and Recommendations for Adult Entertainment Businesses in the Town of Islip," Department of Planning and Development, 1980.

[4]   Ibid. p.12

The individual site analyses identified similar impacts found in the case study. Some establishments were located close to residential areas, causing uncharacteristic parking impacts, night-time activity, noise and dust. Other establishments located in declining downtown areas created dead zones or discouraged shoppers from walking in pedestrian-oriented commercial areas.

## Los Angeles, California

In 1977, the Los Angeles City Planning Department completed a study[5] of adult uses for the Planning Committee of the City Council. The study was intended to determine whether a concentration of adult establishments has a blighting or degrading effect on nearby properties and/or neighborhoods. The study provided a basis for zoning regulations adopted the following year that prohibited adult entertainment businesses within 1,000 feet of another such business or within 500 feet of any religious institution, school or public park. More restrictive provisions were added subsequently.

Police Department statistics indicated a greater proportion of certain crimes in Hollywood (where the largest concentration of adult establishments is found in the city) compared with the city as a whole.

Other impacts could be traced to public perceptions. The study examined public testimony and found that many people, particularly the elderly, were afraid to walk the streets in Hollywood. Others had expressed concern that children were being exposed to sexually explicit materials and unsavory persons. Some businesses were no longer remaining open in the evenings and others had left the area allegedly directly or indirectly because of the establishment of adult businesses. Some churches in Hollywood were driving the elderly to services and others were providing private guards in their parking lots.

A survey of real estate professionals indicated that the concentration of adult establishments had an adverse economic effect on the value of commercial and residential property. Business persons believed that the quality of life and business was adversely affected by litter, graffiti, difficulty in recruiting employees and retaining and attracting customers. Also noted was difficulty in renting office space and keeping desirable tenants.

---

[5]   "Study of the Effects of the Concentration of Adult Entertainment Establishments in the City of Los Angeles," Los Angeles City Planning Department, June, 1977

4

*Indianapolis, Indiana*

The Indianapolis Division of Planning undertook a study[6], published in 1984, to determine if zoning controls were warranted for adult entertainment businesses. The study recommended that adult uses should be allowed only by special exception in commercial districts oriented beyond a neighborhood, and not within 500 feet of a residential, school, church or park property line, or historic area.

The Indianapolis study analyzed crime data, including sex crimes, and real estate data, including a national survey of real estate appraisers. The study cautions that the analyses should not be construed as conclusively proving a causal relationship between adult uses and increased crime or decreased property values. However The study found that major crimes occurred in study areas that contained at least one adult entertainment establishment at a rate that was 23 percent higher than six control areas (similar areas but without adult establishments), and 46 percent higher than the Indianapolis Police District. The average sex-related crime rate per 10,000 population in the control areas over a five-year period was 26.2, while that rate for the study areas was 46.4.

A survey of real estate professionals was undertaken in conjunction with the Indiana University School of Business' Division of Research. It consisted of a 20 percent random sample of nationwide members of the American Institute of Real Estate Appraisers and a 100 percent sample of Member Appraisers Institute members who practiced in 22 Metropolitan Statistical Areas (MSA) of a size similar to Indianapolis.

The appraisers were asked to give their "best professional opinion" about property values in a hypothetical situation where an adult bookstore was about to locate in a middle-income, residential neighborhood. A majority of appraisers (75%) responding to the national survey thought that an adult bookstore located within one block would have a negative effect on the value of both residential (80%) and commercial (72%) properties. At a distance of three blocks, 71 percent thought that the impact of an adult bookstore fell off sharply so that the impact was negligible on both residential (64%) and commercial (77%) properties.

---

6    "Adult Entertainment Businesses in Indianapolis, An Analysis," Division of Planning, 1984.

*Whittier, California*

In 1978, the City of Whittier, citing "operational characteristics which may have a deleterious effect on immediately adjacent residential and commercial areas," defined and regulated adult uses through a conditional use permit.[7] The urgency measure was based on the Detroit dispersal model, pending a planning study of adult businesses and subsequent legislation, if necessary.  The purpose of the study and eventual legislation was to protect adjacent commercial and residential districts within the City from the "possible blighting or downgrading effect of adult businesses" although the study cautioned, however, that adult businesses were only one of a variety of factors influencing the study areas.

The study found higher turnover rates in commercial and residential areas adjacent to adult uses.  A compilation of police statistics indicated that all of the nude model studios and three massage parlors were actively involved in prostitution and that a number of assaults and thefts had occurred on the premises.  There were also numerous reports of excessive noise, drunkenness and pornographic litter connected to adult businesses.  A comparison of 38 types of criminal activity between two time periods, 1970-73 and 1974-77, showed a total increase of 102 percent for the study area containing adult businesses while the city, as a whole, only had an eight percent increase.  Citizens testified at several public hearings about their fears of walking on nearby streets, of their children being confronted by offensive individuals or exposed to sexually explicit material, and some reported that businesses had left the area.  The report discussed the difficulty of assessing the moral and emotional impact of adult businesses on a neighborhood but suggested that it could be gauged by community outrage.

The study concluded that the prolonged concentration of adult businesses adversely impact neighborhoods based on experiences in other municipalities, and recommended the regulation of a variety of defined sexually-oriented businesses by locational restrictions within portions of industrial areas and shopping centers subject to a conditional use permit.

---

7       "Staff Report, Whittier City Planning Commission, Amendment to Zoning Regulations, Adult Businesses in C-2 Zone with Conditional Use Permit (Case No. 353.015), January 9, 1978.

JNR-000317

## Austin, Texas

In 1986, the City of Austin conducted a study[8] to provide a factual basis for the development of a new ordinance regulating adult-oriented businesses.

The study analyzed crime rates, comparing areas with adult businesses to other areas containing similar land uses but no adult businesses.  The results were that the sex-related crime rate was between two and five times greater in the areas with adult businesses.  The study also showed that the sex-related crime rate was 66 percent higher in areas having two or more adult businesses than in those areas having only one such business. The study included a survey of 120 real estate brokers and appraisal firms. The results showed that 88 percent of the respondents believed the presence of an adult business would decrease property values of residential property within a one-block radius and 69 percent felt an adult use would reduce the value of commercial property within the same radius.

## Phoenix, Arizona

In 1979, the Planning Department of Phoenix designed a study to determined if there was a relationship between arrests for sex crimes and the locations of adult businesses. The number of property crimes, violent crimes and sex-related crimes in 1978 were compared for three study areas containing adult businesses and three otherwise similar control areas that did not contain adult businesses.

There was a significantly greater difference between the study and control areas for sex-related crimes than for property or violent crimes: an overall increase of six times the sex crime rate in the study areas over the control areas. Although more than half of the arrests for sex crimes were for indecent exposure, the remainder of sex crimes remained significantly high.  In one study area with a concentration of adult businesses and the highest number of reported sex crimes for the areas studied, 89 percent of the reported indecent exposure cases were committed at the addresses of the adult businesses.  When compared to its control area, the sex crime rate (per 1,000 residences) for that study area, was over 11 times greater; in the remaining two study areas, which each contained one adult business, the sex crimes rate was four times and almost three times as great as the comparable control areas.

---

8    "Report On Adult Oriented Businesses in Austin," Office of Land Development Services, City of Austin, May 19, 1986.

*Minnesota*

In 1988, the Attorney General of Minnesota formed a Working Group on the Regulation of Sexually-Oriented Businesses to review data presented by various jurisdictions within the state.[9]

In 1980, the Minneapolis Crime Prevention Center examined the effects of sexually-oriented businesses upon property values and crime rates. The study concluded that such businesses concentrate in areas which are relatively deteriorated but, at most, they may slightly contribute to the continued depression of property values. However, it was clear that sexually-oriented businesses had a strong negative impact on the crime rate. The addition of one sexually-oriented business to a census tract area caused an increase in the overall crime rate index in that area by slightly more than nine percent per 1,000 people/year.

In 1978, the St. Paul Division of Planning and the Minnesota Crime Control Planning Board conducted a joint study of the relationship between adult uses and neighborhood blight. They found a statistically significant correlation between the location of adult businesses and neighborhood deterioration, although adult businesses tend to locate in somewhat deteriorated areas. Housing values were significantly lower in an area with three adult businesses than in an area with only one adult business. There was a significantly higher crime rate associated with two adult businesses in an area than was associated with only one adult business in an area.

*Manatee County, Florida*

The Planning and Development Department of Manatee County undertook a study to investigate the impact of a proposed adult entertainment ordinance. The study recommended that adult uses be limited to commercial locations at least 500 feet from a residential district and 2,000 feet from churches, schools, child care facilities and public recreation areas. Also, no adult establishment should be located within 1,000 feet of another such use.

Manatee County relied on studies of other cities to identify the likely impacts of adult entertainment establishments. In addition to those of Boston, Detroit, Los Angeles and Indianapolis, studies from the following cities were reviewed: Austin, Texas; Phoenix, Arizona; Saint Paul, Minnesota;

---

9       Report of the (Minnesota) Attorney General's Working Group on the Regulation of Sexually-
        Oriented Businesses, June 6, 1989.

Amarillo, Texas; and, Beaumont, Texas.  Impacts found in these studies included a relatively high incidence of crime including sex-related crimes, declining neighborhood conditions, a statistically significant decrease in residential property value when more than two adult bars were found in an area, increased glare, noise, and traffic, and a decline of neighborhood-oriented businesses. Among the study recommendations, Manatee County notes:

> *The sign is often the most notable physical element of an adult entertainment business. Adult entertainment signs should be controlled to protect the general public from the negative aesthetics of "poor-taste."  Sign controls should be considered which still protect a business's freedom to advertise, but also minimize public's exposure to such uses.*

### New Hanover County, North Carolina

In July, 1989, the New Hanover County Planning Department published a study[10] in support of proposed zoning text amendments designed to control the location of adult entertainment businesses.  The one or two adult businesses located in the County had not generally been a problem; the proposed zoning regulations were considered preventative.

New Hanover, like Manatee County, relied on studies of other cities to predicate its proposed zoning text amendments.[11]  Potential adverse impacts from adult uses and adult uses in concentration could be anticipated, according to the report, based on studies completed in Boston, Detroit, Los Angeles, Indianapolis, Beaumont, Phoenix, Amarillo, and others.  Those impacts have been identified in the discussion, above.

## Regulations in Other Localities

In communities throughout the United States, adult entertainment uses have appeared recently within or close to stable residential areas, leading many communities to adopt rules placing locational and other restrictions on these uses.  In the New York metropolitan area, many Long

---

[10]   "Regulation of Adult Entertainment Establishments in New Hanover County," New Hanover County Planning Department, July, 1989.

[11]   New Hanover County cites the following studies in its analyses of impacts in other cities:

  •   McClendon, Bruce W., "Zoning for Adults Only," Zoning News, August 1985, pp. 1-3.

  •   Yow, Robert B., "Adult Entertainment Zoning:  A Case Study," Carolina Planning, Vol. 7, No. 1, Spring 1981, pp. 33-41.

Island communities (Islip, Brookhaven, Smithtown, Babylon, and Huntington, among others) have enacted zoning regulations that restrict the location and operation of adult businesses. In general, these restrictions attempt to protect residential and commercial areas by allowing adult uses only in low-visibility industrial districts.[12]

In St. Petersburg, Florida, the city's 1993 adult entertainment ordinance restricts adult uses to a handful of locations in the city and forces existing adult businesses to move within a year's time.[13] In communities around Atlanta, Georgia, new nude dancing operations now require a rezoning and are prohibited within 1,000 feet of residences and community facilities.[14] Orange County, California, requires a special permit for topless dancing clubs.[15] In Jackson, Mississippi, a 1992 ordinance restricts topless bars and other adult businesses to areas zoned for light industrial uses and requires distances ranging from 250 to 1,000 feet from residential uses and community facilities.[16] In San Diego, California, adult entertainment is not permitted within 500 feet of a school or home or within 1,000 feet of another adult entertainment use.[17] Los Angeles enacted a similar ordinance in 1988.[18] Seattle, Washington, recently enacted an ordinance restricting adult stores to manufacturing zones 1,000 feet away from churches, residential areas, schools and play grounds.[19]

---

[12] Jim Puzzanghera, "Town OKs 3-Month Limit On Porn," New York Newsday, North Shore Edition, June 23, 1993, p.31.

[13] Nichole M. Christian, "Vixen Vexes Neighbors," St. Petersburg Times, City Edition, February 6, 1993, p.1.

[14] Matt Kempner, "Sugar Hill Sets Tight Restrictions on Nude Clubs," The Atlanta Journal and Constitution, September 14, 1993, p. J-1.

[15] Bob Elston, "Orange County Focus: Newport Beach; County Tells Club to Halt Topless Dancing," Los Angeles Times, February 5, 1993, p. B-3.

[16] Greg Henderson, "Supreme Court Allows Adult Entertainment Restrictions," Washington News, April 19, 1993.

[17] Pauline Repard, "Topless Bar Has Its Eyes on Auto Lot in Chula Vista," The San Diego Union-Tribune, May 12, 1993, p. B-1.

[18] Josh Meyer, "City Arms for New Legal War on Porn; Law Enforcement: A Zoning Ordinance Will be the City's Major Weapon as it Seeks to Shut Down Pornography Shops in Hollywood," Los Angeles Times, January 27, 1990, p. B-1.

[19] Geordie Wilson, "Tukwila Appeals Anti-Porn Case - Zoning of 'Adult' Outlets At Issue,"The Seattle Times, February 21, 1992, p. B-1.

10

DCP relied on a variety of sources, including the Planners Advisory Service of the American Planning Association, to obtain information about how other cities regulate adult entertainment establishments. The Manhattan Borough President's office supplied information obtained from the National League of Cities, and information that they culled for the Borough President's Task Force on Sex-Related Businesses. Although some of the referenced material used herein may be dated, and the cities may have adopted more recent regulations, the purpose is to illustrate differences in regulatory strategies.

Essentially, two types of zoning regulations have been developed to control adult entertainment establishments. The control techniques include the concentration of adult uses in a specified location, and the dispersal of adult uses apart from one another. Dispersal models often exclude adult uses from areas in proximity to residential districts while also limiting their concentration where they are permitted. Concentration models are guided by regulations developed for Boston, Massachusetts; dispersion models follow the Detroit, Michigan ordinance. The Detroit dispersal model has been used more often than the Boston concentration model to control the location of adult entertainment establishments.

CONCENTRATION MODELS

*Boston, Massachusetts*

Boston established a two-block "adult entertainment district" in a downtown area known as the "combat zone," where approximately ninety percent of adult uses in the city were concentrated. The purpose of the district was to prevent the spread of adult uses to other areas of the city. Under the Boston zoning code, an adult entertainment district may be established as an overlay district superimposed upon existing zoning districts.

The overlay district allows adult entertainments and bookstores that are characterized as such because they "exclude minors by reason of age." According to information provided by the Boston Redevelopment Authority, adult use operators will prohibit attendance by minors in order to avoid violating the Massachusetts obscenity law. The overlay district allows the use of moving or flashing lights prohibited elsewhere in the city, and generally has fewer restrictive sign regulations compared with other Boston districts. Outside the overlay district, preexisting adult establishments may continue unless they have been abandoned for at least two years.

*Seattle, Washington, and Camden, New Jersey*

Seattle and Camden have developed zoning regulations generally following the Boston model of concentrating adult uses in one or more specified areas of the city. Seattle allows adult motion picture theaters in only three business and commercial districts. Non-conforming adult theaters must be discontinued. Camden has set aside a single area of the city where adult uses are permitted. Camden believes such a strategy will facilitate the city's ability to police adult establishments.

## DISPERSAL MODELS

*Detroit, Michigan*

In 1972, Detroit amended its "anti-skid row" zoning ordinance, which prohibited concentrations of certain uses, to include adult theaters, mini-theaters, bookstores and cabarets, characterized by "specified sexual activities" or "specified anatomical areas." Detroit enacted the skid row regulations after a study indicated that the concentration of these businesses "tends to attract an undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move else-where."[20]

Not more than two adult businesses may be located within 1,000 feet of each other or within 500 feet of a residential area. The Detroit ordinance allowed a waiver of the 1,000 foot regulation upon certain findings by the Zoning Commission; the 500 foot requirement is not subject to the waiver provisions. The Detroit ordinance applied only to prospective uses.

*Atlanta, Georgia, and Kansas City, Missouri*

Atlanta prohibits adult bookstores, theaters and entertainment establishments from locating within 1,000 feet from any other such use. Adult uses may not be located within 500 feet of residential uses or houses of worship. An original amortization provision was amended

---

[20]   Jules B. Gerard, <u>Local Regulation of Adult Businesses</u>, Clark Boardman Callaghan, 1988.

JNR-000323

subsequently to apply solely to bath houses and to comply with a judicial decision.[21]

In Kansas City, adult bookstores, motion picture theaters, bath houses, massage shops, modeling and body painting studios may be located only in certain commercial districts, over which an overlay is placed. The adult uses may not locate within 1,000 feet of a residence district or a house of worship or school. No more than two uses may be located within 1,000 feet of each other. A petition of consent by a majority of residents or property owners within 1,000 feet of the proposed use may be made to the City Plan Commission to waive the restrictions on location.

*Los Angeles, California*

The Los Angeles ordinance regulates adult arcades, bookstores, cabarets, motels, motion picture theaters, adult theaters, massage parlors, and sexual encounter establishments. These establishments are characterized by their emphasis on specified sexual activities or specified anatomical areas.

The ordinance that prohibits the establishment of an adult entertainment business within 1,000 feet of another such business or within 500 feet of any religious institution, school or public park. Los Angeles determined that adult uses, in concentration, result in blighting conditions.

A 1984 amendment to the ordinance[22] added that an adult entertainment business may not be located within 500 feet of any lot in an agricultural or residential zone, or within "limited commercial" zones, unless approved by exception. No more than one adult use may be located within any building containing another adult entertainment business.

---

21    Rohan, Patrick J., Zoning and Land Use Controls, New York: Matthew Bender & Co., 1988, p. 11-32, Note 32: "The purpose of this amendment is to make the zoning ordinance conform to the decision of the United States Supreme Court in *Young v. American Mini Theatres, Inc., et. al.* (Decided June 24, 1976) . . . "

22    Various amendments have been made to the ordinance, including a provision prohibiting, after March 6, 1988, the continued operation of adult businesses located within 500 feet of a residential zone unless a conforming site is not "reasonably available" elsewhere. This provision has been successfully challenged on appeal; the businesses argued that the city has not provided them with a sufficient number of possible relocation sites, abridging their First Amendment rights. [Topanga Press v. City of Los Angeles, U.S. Court of Appeals, Ninth Circuit, 989 F.2d 1524, as reported in Land Use Law and Zoning Digest, Vol. 45, No. 9, September 1993].

*Town of Islip, New York*

Islip's ordinance is noteworthy in that it has been the subject of litigation reviewed by the New York Court of Appeals.[23] Islip defines adult uses to include adult bookstores, drive-in theaters, cabarets, motels, theaters, massage establishments, and peep shows.  As in Boston, adult uses are characterized by their exclusion of minors by reason of age.

The zoning ordinance restricts  the location of adult uses to light industrial districts by special exception of the Zoning Board of Appeals. Adult uses are allowed as-of-right[24] in Industrial Districts, and prohibited from locating within 500 feet of any area zoned for residential use, or any school, park or house of worship.  In addition, an adult use may not be located within a one-half mile radius of another such use.  These restrictions may be waived based on findings that the proposed use will have no negative impacts.  No more than one adult use may be located on any lot. The Islip ordinance also contained amortization provisions for uses which became non-conforming.

*Chicago, Illinois*[25]

Chicago also follows the Detroit dispersal model for regulating the location of adult entertainment establishments.  However, in 1977 Chicago established a licensing requirement for all adult use businesses.

One of the primary purposes of this regulation was to prevent or limit the involvement of organized crime or other syndicates in the operation of adult-use establishments. The license application requires the prospective adult use operator to provide a great deal of personal and financial information.  If the establishment is to have a manager, a separate manager's statement must also be filed.

The prospective operator of a sex-related business is also required to sign an affidavit

---

23    Town of Islip v. Caviglia, 542 NYS, 2d 139.

24    The Appellate Division, Second Department, invalidated and severed the provision of the ordinance that required adult uses to obtain a special permit.

25    Information on Chicago's regulations is based on a memorandum prepared by the Manhattan Borough President's Office for the Borough President's Task Force on Sex-Related Businesses, June 17, 1993.

14

attesting to those activities that will occur at his or her establishment.  If, for example, the applicant signs an affidavit saying his or her business will be an adult-use book store and it is later determined that a "mini motion picture theater" is also operating at the site, the license can be revoked.

## III.  THE ADULT ENTERTAINMENT INDUSTRY

## Industry Trends

Adult entertainment is a multi-billion dollar, international industry that includes an ever changing and expanding range of activities.[26]  The latest additions to the industry include phone-sex lines, international computer networks that offer sexually explicit messages, lingerie modeling shops, and "upscale" topless bars or strip clubs catering to businessmen.

It is difficult to obtain data on adult use organizations — they often consist of a maze of smaller companies that operate retail or service businesses, or distributorships.  Linkages have been reported between sexually oriented businesses and organized crime.[27]  Although it has experienced some significant changes in recent years, by most accounts the industry is booming in the United States.  The tremendous growth in adult video sales and rentals and the resulting decline in the number of adult movie theaters is one significant change in the industry over the last ten years.  Another is the entry of lower-end triple-X video entrepreneurs whose operations have recently emerged in many New York City neighborhoods.

### Adult Video Sales and Rentals

As documented in recent newspaper and magazine articles, adult video sales and rentals are a segment of the industry that has experienced significant growth since 1980.  Industry insiders contend that despite a 1986 Reagan Administration "all-out campaign" against pornographer, "the number of adult-video makers and their videotapes has risen, cheap amateur videos have proliferated and the industry has expanded beyond magazines and videos to computer networks."[28]  One trade monthly, Adult Video News, reported adult video sales and rentals in general interest video stores have soared 75% since 1991 to $2.1 billion last year, and by hundreds of millions more if

---

[26]   Information contained in this section is based on an extensive review of recent newspaper articles on the adult entertainment industry.  Given the recent proliferation of adult video stores and topless entertainment in New York City's neighborhoods, the literature review focused primarily on these uses.

[27]   State of Minnesota, "Report of the Attorney General's Working Group on the Regulation of Sexually Oriented Businesses," June 6, 1989

[28]   "Despite U.S. Campaign, A Boom in Pornography," The New York Times, July 4, 1993, p. A-20.

JNR-000327

adult-only outlets are included.[29] Thus, Adult publications and videos are readily available at newsstands, general video stores and other outlets that are not characterized as adult entertainment establishments for purposes of DCP's study.

Concurrent with the growth in adult video is a decline in the number of adult movie theaters. The Adult Film Association of America recently estimated that the number of adult movie theaters across the United States had declined from 800 in 1979 to about 50 in 1990.[30] The estimate appears low considering the number of adult movie theaters located in New York City alone.

The growth in the adult video sales and rentals segment of the adult industry is directly related to the increasing availability of inexpensively produced triple-X videocassettes that have flooded the market in recent years. Adult video producers have cut costs dramatically by shooting on videotape rather than film, shooting for fewer days, cutting the length of scripts, using cheaper sets, and slashing production budgets. Performers' salaries, even for top stars, have dropped steadily from more than $1,000/day five years ago to as low as $100/day. Adult Video News estimates that in 1983, eight percent of the releases were shot on videotape, with the balance shot on film. Last year, 97 percent of the releases were shot on videotape. The Adult Video Association contends that cost cutting by producers of adult home videos has caused the price of a triple-X videocassette to plunge from $100 a few years ago to as low as $5 today.[31]

Despite criticism that the latest entrepreneurs in the sex industry are delivering an inferior product, demand for their products appears to remain strong. One Los Angeles-based company, Evil Angel Productions, is typical of the latest producers of cheap adult videos. The company grossed $34,000 in 1990 when it produced and released eight tapes. In 1993, the company grossed $1 million by shooting, manufacturing and distributing a new hard-core videotape every three weeks.[32] Sales for another Hollywood-based price-cutter, Video Exclusives, rose from $3 million in 1981 to $30 million in 1991. Other hard-core video producers in Hollywood, where about 50

---

[29]    The Wall Street Journal, July 11, 1994, p. 1.

[30]    John Needham, "Gone With the Sin: Closure of Adult Theater in Santa Ana Reflects Trend Credited To - Or Blamed On - The Videocassette Revolution," Los Angeles Times, August 14, 1990, p. E-1.

[31]    John Johnson, "Demand Is Strong, But Police Crackdowns and A Saturated Market Spell Trouble for One of L.A.'s Biggest Businesses," Los Angeles Times, February 17, 1991, p. 8.

[32]    "Despite U.S. Campaign, A Boom in Pornography," The New York Times, July 4, 1993, p. A-20.

17

JNR-000328

of the nation's 60 or so manufacturers of hard-core videotapes are located, report similar growth.[33] Despite these successes, some in the industry believe that the market for these products has peaked and that the novelty of pornography will simply wear off over time. Triple-X videos are still a billion-dollar business, says Gene Ross, an editor at Adult Video News, but the business "peaked a couple of years ago and is on a downward trend."[34] However, as one Los Angeles police expert on the industry explains, "No one should rush to write the obituary for porn. Although . . . the business climate has become tougher, the industry is not likely to disappear. The entrepreneurs of sex have proven that . . . many people still really want the stuff."[35]

## Topless Entertainment

In recent years, upscale topless clubs have become a booming segment of the adult entertainment industry. An article in The New York Times describes the proliferation of topless bars as a national phenomenon in large cities.[36] According to a recent report in New York Newsday, topless clubs that cater to a young, affluent clientele have become one of the fastest growing and most lucrative segments of the adult entertainment industry in New York City. By conservative estimates, the topless club industry in New York City is a $50 million a year business, employing about 1,500 dancers.[37] In two years, the number of these clubs has grown from about five in 1990 to more than 30 in 1992, not including clubs throughout the city that operate without liquor licenses.[38]

Several factors appear to have influenced the recent proliferation of upscale topless clubs in New York. First, responding to the devastating effects of the recession on eating and drinking businesses, some entrepreneurs have retooled their establishments and used topless performances as a successful marketing device to win back their affluent male clientele. Second, the clubs have

---

[33]   John Johnson, "Demand Is Strong, But Police Crackdowns and A Saturated Market Spell Trouble for One of L.A.'S Biggest Businesses," Los Angeles Times, February 17, 1991, p. 8.

[34]   Ibid.

[35]   Ibid.

[36]   "Strip Clubs Putting On a Suit and Tie," The New York Times, p. B5, March 26, 1994.

[37]   Walter Fee, "Bare Market: For New Upscale Clubs, It's Boom and Bust," New York Newsday, City Edition, December 20, 1992, p. 7.

[38]   Ibid.

JNR-000329

shed their "sleazy" reputations and become more mainstream by providing topless entertainment in safe, elegant surroundings furnished with other attractions such as giant closed circuit television screens, pool tables, and air hockey. Third, the instant financial success of the newest upscale topless clubs in Manhattan has attracted a number of imitators.

In a recent interview with New York Newsday, Jay Bildstein, the owner of Scores, a topless "sports bar" on the upper East Side of Manhattan, explained that while the new clubs may vary greatly in style, the corporate organization is often similar. Club owners typically contract with national organizations which, in exchange for a percentage of gross income, recruit and market the dancers. In the New York area, Goldfingers and Pure Platinum are two of the most successful national marketing organizations associated with local topless clubs. Typically, the dancers are treated as independent contractors, thereby releasing management from the responsibility for withholding taxes or social security, and protecting the club owners from potential legal liability for the dancers' behavior. The typical customer is an affluent male repeat customer between the ages of 25 and 30.[39]

Certain factors appear to be influencing the recent proliferation of triple-X video stores and nude bars in or near residential neighborhoods in New York City, such as Murray Hill, Chelsea, Sunset Park, Sunnyside and Forest Hills. First, the availability of low-budget videotapes has enabled increasing numbers of low-end porn entrepreneurs to enter into a market that was previously closed to them. Second, topless bars have been successfully recast as upscale adult uses, catering to young businessmen with money to spend.

## Inventory and Trends, by Location and Type

The locations of adult entertainment establishments in New York City that were identified by the DCP survey in 1993 are shown on the following map. Data in this Section was obtained from different sources, and may reflect differences in definitions as to what constitutes adult entertainment. Pre-1993 data is presented because it is the most thorough available and, outside of Midtown Manhattan, provides an understanding of the location of adult uses at that time.

---

[39]   Molly Gordy, "What's Under the Paint? How to Keep the Law Happy When Topless is a Business." New York Newsday, Manhattan Edition, September 17, 1992, p. 29.

*Citywide Trends: 1965 to 1993*

Citywide trends in adult entertainment establishments are indicated in Table 2.

| TABLE 2 CITYWIDE TRENDS IN THE NUMBER OF ADULT ENTERTAINMENT ESTABLISH-MENTS | | | | |
|---|---|---|---|---|
| Year | 1965 | 1976 | 1984 | 1993 |
| Total Number | 9 | 151 | 131 | 177 |

Sources: 1965 and 1976 data, Office of Midtown Enforcement files;  1984 data, Police Department;  1993 data, Department of City Planning.

In 1965, the number of adult establishments was small because the sale and distribution of pornography was largely restricted. By 1976, most restrictions were removed and the number of adult establishments burgeoned to 151. Between 1976 and 1984, the number of adult entertainment establishments declined 13 percent, from 151 to 131 citywide. In Midtown Manhattan alone, the number of adult uses declined by 48, from 97 to 49. This may be attributable to enforcement efforts by the city, the start of major construction projects in west Midtown that increased investor confidence in the area, and changing technology.[47]

However, the decline was offset by an increase of 28 adult uses, from 30 to 58 establishments, in the other boroughs.  The decline in adult uses in the Midtown area is probably unrelated to the increase in such uses to other areas of the city during that period.[48] Between 1984 and 1993, the number of adult entertainment establishments increased 35 percent citywide, from 131 to 177. This trend—analyzed below—can be attributed to the advent of the adult video store, and greater numbers of topless or nude bars stemming from their changing, upscale image.

*Trends by Borough*

Between 1984 and 1993, the greatest increases in adult entertainment establishments were found in Manhattan and Queens. Both boroughs had a 47 percent increase in adult uses; from 73 to 107 in Manhattan, and from 30 to 44 in Queens. Adult uses in the Bronx declined by two, from 10 to eight. In Brooklyn, adult establishments decreased by one, from 16 to 15. Staten Island had an increase of a single establishment.

---

[48] More detailed analysis indicates that the decline in adult uses in Manhattan was in bookstores/ peep shows and theaters; the increase in adult uses in boroughs other than Manhattan was largely from topless bars

---

[47] 1983 Annual Report, Mayor's Office of Midtown Enforcement, p. 36.

JNR-000331



## Distribution of Adult Uses
in Manhattan Community Districts 1 - 8

●    adult use
━━    community district boundary
CD 2    community district designation
───    major streets

*Source: Dept. of City Planning, 1993*

**Adult Entertainment Study**
Department of City Planning / City of New York

# Citywide Distribution of Adult Uses by Community District

●    adult use
━━    community district boundary
18    community district designation
▨    area not part of any community district
═══    borough boundary

*Source: Dept. of City Planning, 1993*

**Adult Entertainment Study**
Department of City Planning / City of New York



Among the five boroughs, most adult entertainment establishments continue to be located within Manhattan. In 1976, 80 percent of all such uses were located in Manhattan, decreasing to 56 percent in 1984 and increasing to 61 percent in 1993. Queens has had the second greatest concentration of adult uses in New York City. In 1976, Queens contained 11 percent of the city's adult uses, rising to 23 percent in 1984, and increasing marginally to 25 percent in 1993. The Bronx, Brooklyn and Staten Island each have less than 10 percent of all adult establishments located in the city.

*Trends within Categories of Adult Uses*

Between 1984 and 1993, the number of adult bookstores/peep shows/video stores increased citywide 197 percent, from 29 to 86 establishments. Adult topless/nude bars also increased during the period, by 26 percent, from 54 to 68. Adult movie and live theaters declined over the period by 52 percent, from 48 to 23 establishments. Adult theaters declined from 41 percent of all adult uses in New York City in 1976, to 37 percent in 1984, and 13 percent in 1993.

Bookstores/peep shows comprised 44 percent of all adult uses in 1976, declining to 22 percent of the total in 1984. However, in 1993, the category consisted of 49 percent of the citywide total number of adult entertainment establishments, reflecting the rise in adult video establishments from none reported in 1984, to 64 in 1993. In 1993, adult video stores made up 74 percent of all establishments in the book/peep/video category. Their recent proliferation represents the largest percentage gain among all adult uses since the mid-1970s.

Topless and nude bars increased their share of all adult uses between 1976 and 1984, from 15 percent to 41 percent, respectively. By 1993, adult bars — although continuing to increase in absolute numbers — declined as a percentage of all adult uses to 38 percent of the total, reflecting the proliferation of adult video establishments.

If growth in the various segments of the business continue over the next decade at the same rate as they did between 1984 and 1993, by the year 2002, there would be a 197 percent increase in the number of bookstore/peep shows/videos from 86 to approximately 250; a 26 percent increase in topless/nude bars from 68 to 86; and a 52 percent decline in the number of adult movie and live theaters from 23 to 11.



se

*Trends in Concentrations of Adult Entertainment Establishments,*
*by Community District*

Between 1984 and 1993, adult entertainment establishments have continued to concentrate in a few community districts in Manhattan. Citywide, the number of community districts with one or more adult uses has remained relatively stable over the period. However, adult uses have recently located in neighborhoods within community districts where they had not previously been.

Significantly, the number of community districts with seven or more adult entertainment establishments tripled between 1984 an 1993, from three to nine. Community district designations for adult establishments identified in the 1976 survey are not readily discernible.

Table 3 indicates in rank order the number of adult uses within each community district in 1993. Districts without adult uses are not listed. In 1993, the majority (53 percent) of adult uses in the city were located in Community Districts 1, 2, 4, and 5, Manhattan.

In 1984 and 1993, the greatest concentration of adult uses was found in Community District 5, Manhattan, which includes part of the Times Square area. In 1984, 34 percent of the citywide adult uses were located in the community district; in 1993, 30 percent of such uses were found there. Between 1984 and 1993, the number of adult establishments in the district increased by 18 percent, from 45 to 53, nearly half the rate of growth citywide.

JNR-000335

| Rank | Community District* | Establishments in Each District |
|---|---|---|
| 1 | M5 | 53 |
| 2 | M4 | 19 |
| 3 | M2 | 11 |
| 4 | M1 | 10 |
| 5 | M6  Q2  Q3 | 9 |
| 6 | Q2 | 8 |
| 7 | K7 | 7 |
| 8 | Q1  Q7 | 5 |
| 9 | Q4 | 4 |
| 10 | B12  K15  Q6  Q9  Q12 | 3 |
| 11 | B5  K2  M3  M7  Q13  S2 | 2 |
| 12 | B8  B10  B11  K6  K12  K14  M8  Q5  Q8  S3 | 1 |

TABLE 3
1993 RANK ORDER OF COMMUNITY DISTRICTS WITH ADULT USES

*Borough designations:  B = the Bronx;  K = Brooklyn;  M = Manhattan;  Q = Queens;  S = Staten Island.
Source:    Department of City Planning survey, 1993

Community District 4, Manhattan, had the second greatest concentration of adult uses in the city in 1984 and 1993. The district, located west of Community District 5, encompasses Chelsea, Clinton and part of the Times Square area. In 1984, seven percent of the city's adult entertainment establishments were located in the community district. By 1993, 11 percent of such establishments were located there. Between 1984 and 1993, the number of adult uses within the district increased by ten establishments from nine to 19, or by more than 110 percent. The growth rate in adult uses in the community district over the nine-year period was more than triple that of the city as a whole. This data suggests that over the past decade, while adult uses have spread to more Community Districts, there is a persistent tendency toward concentration of significant numbers of adult uses.

*Location of Adult Uses by Zoning District*

For purposes of this analysis, zoning districts were grouped according to certain characteristics. C1 local retail and C2 local service districts were grouped together because they are both mapped widely in residential neighborhoods throughout the city. C4 general commercial districts are regional commercial districts, mapped in each borough. They comprise the city's major and secondary shopping centers. C5 restricted central commercial districts and C6 general central

commercial districts were grouped into a single category because they are mapped principally in midtown and downtown Manhattan and downtown Brooklyn. These districts allow a broad array of commercial uses, and are characterized by high commercial densities. C8 general service districts that permit automotive uses, were grouped with M1, M2 and M3 districts that permit industrial uses. Residential use is not permitted in C8 districts and generally not permitted in manufacturing districts except in certain circumstances.

The analysis indicates that of the 177 adult entertainment establishments, approximately 18 percent (31) are located in C1 and C2 districts. Ten uses, or approximately six percent, are located in C4 districts. Approximately forty percent (70) of adult uses in New York City are located in C5 and C6 central commercial districts. Forty-five adult uses, or approximately 25 percent of the total number, are located in C8 and manufacturing districts. Combined, approximately 88 percent of adult entertainment establishments are located in commercial or manufacturing districts.[49]

The remaining adult uses, 21, or approximately 12 percent of the total number, are located in residence districts which do not permit commercial uses. These uses may be legal non-conforming commercial uses in residential districts, or the locations may be classified as within residential districts, because of the primary characteristic of the tax lot.[50]

All commercial districts except C8 permit residential use.[51] Many light manufacturing/ mixed use zones permit residential uses in certain circumstances. More than 75 percent of the adult entertainment establishments are located in those commercial or manufacturing zoning districts that also permit residential uses.

## Industry Views

Members of the adult entertainment industry met with city planners to discuss industry issues and needs. Those responding to the DCP invitation represented topless and nude clubs, triple-X

---

49   Forty-two adult uses, or 24 percent of the citywide total, are located in M1-6, C5-3, C6-4, C6-5, C6-6, and C6-7 districts within the Midtown Special District.

50   Due to limitations in technology, different computer systems were used to cross-reference street address and zoning district. The predominant zoning classification of a tax lot was used to classify zoning districts.

51   Residential uses are also not permitted in C7 districts. C7 districts, which accommodate large, open amusement uses, are not widely mapped.

24

video/bookstores/peep shows, live theaters, and suppliers. Some represented the Adult Industry Trade Association (AITA) as well as their own individual establishments. The meeting was designed to familiarize the representatives with the study and obtain specific information about location decisions, employment and revenues, tourism and industry changes and trends.

Industry representatives argued that there are a number of positive impacts directly attributable to adult businesses. For example, it was stated that "safer sex," due to the change in sexual mores caused by AIDS, has been promoted by the increase in triple-X video stores and the corresponding decrease in live sex clubs. Others noted that adult businesses provided safe places on otherwise dark streets because these businesses traditionally stay open very late. Also, late night uses on a street have encouraged other businesses to stay open later to cater to the customers drawn to adult businesses in the evening. Adult businesses often provide important rental revenues to landlords because they are willing to occupy vacant storefronts on a short-term basis. The manager of a triple-X video store in the East 50's in Manhattan observed 11 new businesses had since opened after his store opened in December 1992, observing that the presence of an adult business on the block is not a deterrent to new businesses. Industry representatives maintained that adult entertainment businesses earn revenue for the city, provide jobs and stimulate tourism. This would be true to the extent they do not discourage the growth of other businesses that would generate more employment, tax revenue and tourism.

## Segmented Industry

The industry appears to regard itself as segmented — tourist oriented v. neighborhood-oriented, upscale v. tawdry, community fixture v. transitional presence, eye-catching v. discreet signage, triple-X products v. entertainment. A number of establishments that were invited to the meeting declined to attend because they did not identify with perceived industry wide concerns. One adult bookstore owner, located for many years on Eighth Avenue in the mid-30's, said he was not part of the problem; the owner of a sexually-oriented boutique on the Upper West Side said he was a neighborhood service and disassociated himself from "heavy-duty" adult businesses. People attending the meeting questioned whether the DCP study had examined segments of the adult entertainment industry separately to isolate possible impacts or if the study had grouped all adult businesses together.

## Location

The basic locational criterion for adult entertainment businesses is to be "where the customers are." In Manhattan, this is often determined by where the tourists are; "Broadway is better than Twelfth Avenue," said one club owner. In the other boroughs, a good location is one with easy access to public transit, main arterials and plenty of parking for local residents and commuters passing by on the way home. Mass transit and available parking are always important, wherever you are, commented one participant.

Adult entertainment businesses tend to be transitional and locate in areas that are "moving upwards"; they are rarely found in poorer neighborhoods. One statement submitted at the meeting maintained that some major real estate developments owe their existence to the ability of landlords to warehouse property by renting space to adult businesses that are willing to accept high rents and short leases during the period when a major assemblage is underway.

## Economics

One corporation that operates two upscale, topless bars provided a number of statistics about their operation. Combined figures for both clubs during the last fiscal year show that they employed a total of 218 employees, had an annual payroll of $1,302,627 and grossed more than $600,000/month on credit card business alone. Credit cards rather than cash are the preferred method of payment. The legitimate, licensed nature of the business was stressed as well as the desire to be fully integrated into the New York City business community.

## Marketing

According to a representative of two topless clubs in Manhattan, it is essential to be near tourist areas where people are drawn to adult uses by publicity and signage. About 40 percent of the approximately 5,000 weekly patrons at their club on Broadway in midtown Manhattan are tourists; approximately 15 percent of the clientele at their downtown Manhattan club are tourists. However, the manager of a triple-X video store in the East 50's in Manhattan, and the owner of a triple-X video store in the West 30's in Manhattan, said they have a non-tourist clientele; most customers are local residents or office workers. One of the video store owners said that eighty percent of his customers are men between 30-50 years old and 20 percent are couples or women; customers want cleanliness and safety in a convenient location that is not "sleazy." Signage for his store, he said, was originally obtrusive (to "announce" the store's presence) but is now muted in an effort to

26

blend into the neighborhood blockfront.

## State Liquor Authority (SLA)

Participants representing topless bars stated that their establishments are particularly orderly and well-run because they must conform to stringent State Liquor Authority (SLA) requirements. If the SLA finds a "pattern of disorder" during an inspection, the bar owner will face disciplinary action — ranging from a warning letter to revocation of a liquor license. The SLA regulates liquor sales and the degree of performance nudity. Since SLA regulations do not allow total nudity, nude clubs do not serve liquor and are not governed by the SLA.

## Trends

In response to a question about industry trends, the group responded that there was oversaturation of adult businesses in New York City, particularly in Manhattan, and that these establishments were closing. It should be noted that of 177 invitations mailed to the adult entertainment establishments identified in DCP's survey, 27 were returned primarily because the adult business was no longer located at that address. Concentrations of uses were said to be due to the "copycat factor" and the tendency of bar patrons to want to "barhop." These statements indicating a tendency of adult uses to concentrate in a community confirmed the conclusion of DCP's analysis of the location of adult uses by Community Districts. It was said that the emergence of Blockbuster Video (which does not carry any triple-X videos) had driven out some `mom-and-pop' video stores that had a small section of triple-X videos, leaving the field clear for triple-X video stores in a few neighborhoods.

## Summary

In a letter to the City Council dated March 9, 1994, AITA acknowledged concerns by some community groups regarding signage and windows and said AITA had been formed mainly to "address these problems by working as a liaison between community groups and adult use places." Most participants agreed that some adult businesses are regarded negatively by the community, but claimed this reaction is based on a visceral response and not on any secondary effects.

# IV.   ADULT ENTERTAINMENT ZONING IN NEW YORK CITY

## Current Zoning

The Zoning Resolution of the City of New York currently[52] regulates several general classes of commercial establishments which may or may not be characterized as adult uses.  For example, the Resolution regulates:

- theaters (including movie houses),
- bookstores (including video stores), and
- eating or drinking establishments (including bars).

The zoning regulations are no different for a neighborhood video store or a triple-X video store, or for a bar or a topless or nude bar.  However, the Resolution does distinguish physical culture or health establishments from adult physical culture or health establishments.[53]

Theaters, bookstores, and bars are commercial uses, generally allowed as-of-right in most commercial and manufacturing districts.  Commercial uses are generally prohibited from locating in residence districts.  However, some commercial uses that are non-conforming in residence districts are essentially "grandfathered" and may continue at these locations until they have been abandoned for a period of time.

### *Theaters*

Theaters (which include movie houses or motion picture theaters) are listed in the Zoning Resolution in Use Groups 8 and 13.  Theaters are allowed as-of-right in C2 (Local Service), C4 (General Commercial), C6 (General Central Commercial), C7 (Commercial Amusement) and C8 (General Service) Districts.  Theaters limited to a maximum capacity of 500 persons are allowed in C1 (Local Retail) Districts only by special permit of the Board of Standards and Appeals.  In C1-5

---

52      The Zoning Resolution of The City of New York, adopted December 15, 1960, and as amended.

53      The latter establishments, massage parlors, are considered to purvey prostitution and are not permitted in New York City.

through C1-9 Districts (mapped in high density areas), motion picture theaters must provide an indoor waiting area based on seating capacity.

Theaters are also allowed as-of-right in most manufacturing districts, except that in M1-5A and M1-5B Districts (mapped in Soho and Noho in Manhattan) theaters with 100 or more seats are allowed only by special permit of the Board of Standards and Appeals.

## Bookstores

Bookstores are listed in Use Groups 6C and 12B. They are allowed as-of-right in most commercial districts and in M1 (Light Manufacturing) Districts. Bookstores are not allowed in C3 Districts, and in M2 (Medium Manufacturing) and M3 (Heavy Manufacturing) Districts. Video stores have been treated as bookstores for zoning purposes.

## Eating or drinking establishments

Eating or drinking establishments are listed in the Zoning Resolution in Use Groups 6A and 6C, and 10 and 12. Eating or drinking establishments include any use that serves food or drink, including alcohol, not otherwise more specifically listed in the Resolution.

Most eating or drinking establishments, including those with music for which there is no cover charge and specified showtime such as restaurants and bars listed in Use Group 6A, are allowed as-of-right in most commercial and manufacturing districts. They are allowed as-of-right in C1, C2, C4, C5 (Restricted Central Commercial), C6, C7 and C8 Districts, and in C3 (Waterfront Recreation) Districts by special permit of the Board of Standards and Appeals. They are also allowed as-of-right in manufacturing districts.

Eating or drinking establishments with entertainment, but not dancing, with a capacity of 200 persons or less[54] are treated similarly to eating or drinking establishments listed in Use Group 6A, with certain exceptions. In C1-1 through C1-4, C2-1 through C2-4, and C5 Districts these establishments must obtain a special permit from the Board of Standards and Appeals. A special permit is also required in M1-5A and M1-5B Districts. Some special purpose districts may have additional restrictions on certain entertainment establishments but none distinguish between adult and other forms of entertainment.

Large eating or drinking establishments with entertainment, or those of any capacity with dancing, are listed in Use Groups 10 and 12. These establishments are permitted as-of-right in C6, C7, C8, most manufacturing districts, and in C4 districts 100 feet or more from a residence district. They

---

54    Eating or drinking establishments with musical entertainment, but not dancing, with a capacity of 200 persons or less, are allowed similarly as eating or drinking establishments in Use Group 6A.

are allowed only by special permit of the Board of Standards and Appeals in C2, C3, M1-5A, M1-5B, LMM, M1-5M, M1-6M, and in C4 districts within 100 feet of a residence district.

## Signs

Signs are regulated under the provisions of use regulations in the Zoning Resolution. Regulations include definitions, size or surface area, illumination, height, projection and location. Basic regulations for accessory business signs are summarized in Table 1.

| TABLE 1 BASIC ACCESSORY BUSINESS SIGN REGULATIONS | | | | | |
|---|---|---|---|---|---|
| Zoning Districts | Size* | Illumination | Projection** | Height above Curb Level | Location |
| C1 | 3; 150 | 3 times frontage; up to 50 sq. ft. | 1 ft. | 25 ft. | |
| C2 | 3; 150 | 3 times frontage; up to 50 sq. ft. | 1 ft. | 25 ft. | Certain accessory business signs facing and in proximity to a residence district or public park shall conform to the sign regulations in C1 Districts |
| C4 | 5; 500 | Illuminated or flashing | 1 ft. | 40 ft. | |
| C5 | 3; 200 | Not permitted*** | 1 ft. | 25 ft.† | |
| C6 | 5; 500 | Illuminated or flashing | 1 ft. | 40 ft. | |
| C6-5 or C6-7 | No restriction | Illuminated or flashing | 8 ft. | No restriction | |
| C8 | 6; 750 each sign | Illuminated or flashing; 5 times frontage, up to 500 sq. ft. each sign | 1 ft. | 40 ft.†† | |
| M | No restriction | Illuminated or flashing | No restriction | No restriction††† | |

\*    To determine the maximum permitted surface area, multiply the first number by the street frontage; the second number indicated is a "cap" on the maximum number of square feet allowed.
\*\*   In districts where 1 foot is identified, double- or multi-faced signs may project up to 18 inches beyond the street line.
\*\*\*  Except in C5-4 Districts.
†    In C5-4 Districts, may extend up to 40 feet high.
††   Non-illuminated or indirectly illuminated signs may extend to 58 feet high.
†††  Except that within 500 feet of a residence or C1 or C2 district, restrictions apply to certain illuminated signs; indirectly illuminated signs may extend to 58 feet high.

30

# Prior Zoning Proposals in New York City

In New York City, a modern-day attempt at regulating adult establishments through zoning was made in 1975, after a proliferation of sex establishments outside of the Times Square area. DCP proposed to restrict the location of "adult physical culture establishments," a zoning term for massage parlors which were then permitted uses in New York City, in the Times Square area. The zoning proposal, which included a provision that non-conforming facilities were to be amortized within one year, was adopted in 1976 by the Board of Estimate. Outside the Times Square area, a one-year moratorium was placed on new massage parlors.

In 1976, the United States Supreme Court upheld a Detroit "anti-skid row" zoning ordinance that placed locational restrictions and concentration limits on a variety of uses, including adult entertainment establishments. Shortly after the court decision in early 1977, the Mayor's Midtown Manhattan Action Office and the DCP prepared zoning recommendations modeled after Detroit.

The City Planning Commission (CPC) proposed establishing five categories of adult uses: adult bookstores, adult motion picture theaters, adult coin-operated entertainment facilities (peep shows), adult "topless" entertainment establishments (topless bars), and adult physical culture establishments (massage parlors). According to the Commission,[55] "By creating separate definitions for these adult uses it is now possible to distinguish in the Zoning Resolution adult uses and other uses. Without such definitions adult uses were for all purposes treated the same as their non-adult counterparts and were thus allowed to locate in any zoning district where the general use was permitted."

Under the proposal, adult entertainment uses would be allowed only in C4 and C6-4 through C6-9 Districts, which are General Commercial and General Central Commercial Districts, respectively. Existing adult entertainment uses outside of these districts, or within 500 feet of a residence district (R1 through R10 Districts), would not be allowed to continue as non-conforming uses. Adult physical culture establishments not subject to the 1976 amortization provisions would not be allowed after one year in any district in New York City, and the moratorium would be lifted.

---

[55]     Report of the City Planning Commission, N 760137 ZRY, January 26, 1977, Calendar #23.

JNR-000344

In addition, adult uses would be subject to distance, concentration, sign and amortization restrictions, as follows:

- *No adult use could be located within 500 feet of a residence district.*
- *In C4 Districts, no new adult use could be established where, within a 1,000 foot radius, two or more adult uses existed. In C6-4 through C6-9 Districts, no new adult use could be established where, within a 1,000 foot radius, three or more adult uses existed. Each adult use within a single establishment would be considered a separate primary use.*
- *No sign for any adult use could display or describe a specified sexual activity or a specified sexual area. No adult use could have more than one accessory business sign, except that an adult motion picture theater could, in addition, have a marquee. No advertising signs would be permitted for an adult use. No adult use sign could be illuminated or extend beyond the street line, except for adult motion picture theater marquees.*
- *Amortization provisions dictated that adult uses that failed to meet the proposed location and distance requirements would be required to terminate within one year. Where existing establishments within districts in which adult uses would be permitted exceeded the proposed concentration provisions, the adult uses closest to a residential district would generally be amortized first.*

The proposal would have allowed the Board of Standards and Appeals (BSA) to exempt existing adult uses, located in districts in which such uses would continue to be permitted, from the concentration and amortization provisions of the new regulations. Similarly, the City Planning Commission would have been authorized to allow a new adult use notwithstanding the proposed concentration provisions. In each case, the BSA or CPC, as applicable, would be required to make findings to ensure that any adverse impacts from the adult establishment were minimized. According to Norman Marcus, who at the time was counsel to the City Planning Commission, "This safety valve procedure was felt essential to withstand a challenge to the reasonableness of the regulation."[56]

Numerous speakers appeared at the public hearing, both in favor of and in opposition to the proposed zoning regulations. In general, business and civic groups from Manhattan were supportive of the plan. Those in opposition included representatives of boroughs outside

---

56    "Zoning Obscenity: Or, The Moral Politics of Porn," Norman Marcus, <u>Buffalo Law Review</u>, Vol. 27, 1978

Manhattan, religious institutions, and civil libertarians.

Subsequent to the Commission public hearing, several modifications were made to the proposal. For example, C4-1 Districts, characterized by suburban-style large shopping centers, were eliminated from the proposal as districts where adult entertainment establishments would be permitted. Also, adult entertainment establishments would not be permitted within 200 feet of a school or church.

The modified proposal was then reconsidered. According to Marcus:

> By virtue of the recent Commission amendments, the heretofore dispersed and scattered eligible adult use regional commercial zones had been reduced to a handful of readily identifiable concentration targets in these boroughs — and as such, drew sharp denunciations. The Commission was accused [by citizens of the four boroughs other than Manhattan] of fostering "red light districts" in the outer boroughs and the cry was raised ever more loudly to restrict adult uses to Manhattan. The legislation foundered.[57]

Marcus observed that the public's failure to understand the crucial distinction between pornography and obscenity, i.e., what is and what is not legally protected speech, resulted in a lack of sufficient political support needed to adopt a regulatory plan to limit the location and concentration of adult establishments.

In continuing to wrestle with the issue of adult establishments, the City Planning Commission in 1978 proposed, and the Board of Estimate adopted, new zoning text that distinguished adult physical culture establishments from physical culture establishments.[58] Adult physical culture establishments were eliminated as a permitted use in all districts in the city. They were to be amortized within one year. All other physical culture or health establishments would be permitted only by special permit of the Board of Standards and Appeals. The citywide moratorium on physical culture or health establishments that became effective in 1976 was deleted. Thus, only part of the effort to control the location of adult uses was adopted legislatively.

---

57   Ibid.

58   Resolution of the Board of Estimate, November 16, 1978, Cal. No. 145, approving a report (N 780387 ZRY) of the City Planning Commission, November 8, 1978, Cal. No. 16.

JNR-000346

# V. ADULT ENTERTAINMENT IMPACTS IN NEW YORK CITY

## Impacts Identified by the City Planning Commission, 1977

On January 26, 1977, the City Planning Commission reported to the Board of Estimate its recommendation for zoning text changes relating to adult uses. The recommended zoning changes would have reduced existing concentrations of adult uses and prevented future concentrations, . . . "thereby substantially reducing the adverse economic and social effects that these concentrations produce. At the same time, adult uses will be prevented from disrupting residential neighborhoods by regulations requiring all adult uses to be located at least 500 feet from the nearest residence district boundary."[59] In its report, the Commission cited several negative impacts of adult uses including economic factors, increased criminal activity, the damaging influences on minors and the disruptive effects that adult uses have on neighboring residential communities and the youth of such communities.

At the public hearing on the proposed text amendments, many of the speakers appeared in favor of the proposal, expressing concerns about the blighting effect that the concentration of adult uses has had on the West Side of Manhattan. Some identified other reasons to support the proposal. For example, a psychiatrist who was a former Deputy Commissioner of the City's Addiction Services Agency and founder of Phoenix House -- the city's major residential addiction rehabilitation program, said that the growth of adult uses has " . . . a direct bearing upon the number of young people who become addicted to heroin or dependent upon other drugs." He described the adult entertainment business as parasitic, attracting and victimizing adolescents and breeding prostitution and addiction. The doctor stated that limiting or dispersing adult uses can destroy the "pathological matrix." Most who spoke in opposition to the proposal did so because it would continue to permit adult uses near their communities.

The Commission noted that it analyzed the efforts of several municipalities, including Boston, Detroit, Minneapolis, Dallas and Atlantic City, to combine the best efforts of all these cities in a regulatory plan for New York. The Commission rejected the Boston concentration model, stating in the report that "Statistics indicate that the implementation of this zoning method in Boston has resulted in an increase in both the crime rate of the Boston Business and Entertainment district and an increase in the vacancy rate of the surrounding buildings." The Commission felt that a

---

59      Report of the City Planning Commission, N 760137 ZRY, January 26, 1977, Calendar No. 23.

JNR-000347

dispersion strategy, modelled after Detroit's regulatory plan, would provide room for constitutionally protected speech as well as protection for the health, safety and general welfare of the people.

The Commission noted that a proliferation of adult entertainment uses in the Times Square and Theater Districts could be related to the decade-old absence of major investment or development decisions, and to a substantial decline in economic viability. For a three-year period, tax arrears on West 42nd Street were 26 percent higher than the overall rate for Midtown. During a two-year period in the early 1970s, sales tax revenues in the area declined by 43 percent compared to an 11 percent increase citywide. In addition, jobs in retail sales declined in the area at a rate greater than that of the city as a whole. The Commission identified several businesses in the area that had closed, for example the Chase Manhattan Bank branch in Times Square, and noted that the " . . . decline of economic activity . . . can be directly related to the escalation of adult uses."

Crime data for 1975 were also analyzed, leading the Commission to state: "Increases in felonious criminal activity in areas where concentrations of adult uses are located are overwhelming." The Commission observed that in Midtown, police posts (subareas of a precinct) in which one or more adult uses were located had 69.5 percent more verified complaints than those in other subareas. Posts with one or more adult uses constituted 34.5 percent of the total posts in Midtown, but accounted for 47.1 percent of all complaints. Comparing posts with one or more adult uses to posts without an adult use, complaints for felonious assault were 142.3 percent higher, grand larceny complaints were 88.9 percent higher, rape was 185.2 percent higher and robbery was 130.2 percent higher.

## Impacts Identified By the Office of Midtown Enforcement

The 1983 Annual Report of The Mayor's Office of Midtown Enforcement (OME) supported the City Planning Commission's earlier findings. The OME's report stated that in the early and mid-1970's, "Times Square was clogged with pimps, johns, and hookers as well as the addicts and muggers who along with them preyed on the public." The report noted that 1,200 prostitutes worked out of the dozen or so prostitution hotels and the 23 massage parlors concentrated along Eighth Avenue between 34th and 55th Streets, and another twelve sex businesses were wedged in between these businesses.

OME strategies (including investigation, enforcement, seeking and obtaining legislative changes in

the Nuisance Abatement Law, closing hotels and obtaining substantial financial penalties from hotel operators) worked to clean-up Times Square. According to the annual report, "At the end of 1983 Eighth Avenue is no longer `The Minnesota Strip,' infested with the crowds of pimps, prostitutes and johns which once thrived on the atmosphere created by the multiplicity of sex uses. The crowds are no longer there because most of the sex uses which supported or attracted them have been closed."[60]

Between 1978 and 1983, OME reported that it closed 106 illegal establishments, of which 82 were sex-related businesses. Additionally, they "virtually eliminated" the practice of sexually explicit handbilling on city streets, and after obtaining a zoning amendment establishing a permanent ban on heterosexual massage parlors, closed 37 illegally operated sex-related businesses in midtown.

After reducing the number of sex-related businesses in midtown by 46 percent from 121 in 1978 to 65 at the end of 1983, OME reported that "Its accomplishments have resulted in increased investor and consumer confidence in the midtown area as manifested by:  the renovation and expansion of the Port Authority Bus Terminal; the opening of the new Milford Plaza Hotel on Eighth Avenue, the construction of the Marriott Marquis Hotel on Broadway; and the proposed 42nd Street Development Project."

The OME Annual Report for 1983 also reported the criminal activity occurring in sex-related businesses because, in part, convictions for prostitution occurring inside a premises are used by OME as a basis for civil litigation. Between 1978 and 1983, the numbers of arrests for prostitution and obscenity inside sex-related businesses located in midtown decreased from 419 to 300. The change in the number of such arrests for any given year is a function of many factors, e.g., deployment of police personnel, unrelated litigation defining obscenity, and reflects only in part the drop in the number of massage parlors and other commercially-operated houses of prostitution. It is significant, however, that  the concentration of sex-related businesses has been closely associated with substantial numbers of arrests within those establishments for prostitution and obscenity.

---

60  It was found - in another study - that sex uses in the Times Square area supported hustling and hanging out on the street because of their configuration. The Final Environmental Impact Statement for the 42nd Street Development Project stated "most of these establishments present opaque facades to the street. This is presumably important to draw potential customers inside (rather than allowing them to look in) and also to provide some sense of privacy. The correlative, however, is that these operations do not look outwards or take a special interest in the sidewalks outside. As a result, and also because the sex-establishment patrons hurry in and out, the sidewalks are left unclaimed and thus available to those hustling and hanging out." New York State Urban Development Corporation, Vol. 1, August 1984.

JNR-000349

# Impacts Identified in The Chelsea Business Survey

In August, 1993, the Chelsea Action Coalition and Community Board 4, Manhattan, prepared a study[61] describing the effects that sex-related establishments have on other businesses in the Chelsea section of New York City. The Coalition called upon the city to "develop zoning proposals that will disperse, but not eliminate, these (adult) businesses . . .". The Chelsea Action Coalition called for zoning proposals because it felt that the neighborhood " . . . was being transformed before our eyes into a red light district."

The study identified the locations of sex-related adult establishments in a 76 block area of Manhattan between 13th and 32nd Streets, and Fifth and Ninth Avenues. Nine legal triple-X video stores, eleven locations closed in fiscal year 1993 for illegal sex-related activities, and seven locations of "multiple indoor prostitution arrests" in fiscal year 1993 were mapped within the study area. The Coalition stated that the concentration of triple-X video stores and peep shows "is intolerable," and "harmful to our community," noting that " . . . under the Constitution the City is permitted to prohibit this type of concentration."

Representatives of the Coalition and Community Board surveyed 100 businesses located near the triple-X video stores "to determine whether these `adult use' businesses had negatively impacted upon the economic vitality of the Chelsea business community." Responses to eight questions were tabulated, and illustrative comments made by respondents were included in the study report. Negative impacts stemming from the adult video establishments reported by area businesspersons included: a decline in the overall reputation of the community, a reduction in the economic vitality of individual business; a declining potential for business in the community; and observations that businesses may leave or have left Chelsea because of the adult video stores.

Sixty-one percent of respondents felt that the triple-X rated video stores had a negative impact on their business. Ninety-five percent believe that the reputation of Chelsea has been hurt by these stores. Nearly two-thirds think the economic vitality of their business has been hurt, and 88 percent think the potential for doing business in Chelsea has been negatively affected by the adult stores.

---

61      "The Chelsea Business Survey, An Assessment of the Economic Impact of XXX-Rated Video Stores in Chelsea," The Chelsea Action Coalition and Community Board 4, 1993.

JNR-000350

Specific comments made by businesspersons included the following:

> My clients don't like to come to my office and have to go by these stores. The
> storefronts also lower my image as a business which is very detrimental to me.
>
> *- publishing consultant*

> There is a XXX store on the next block. We work until 8:00 P.M. Mon. -
> Thurs. and it is scary to walk past the seedy element that hangs out there.
>
> *- retail furniture store*

## Impacts Identified At The Public Hearing of The Task Force on the Regulation of Sex-Related Businesses

The Task Force on the Regulation of Sex-Related Businesses was established in 1993 by the Borough President of Manhattan, Ruth W. Messinger, in response to community concerns about increasing concentrations of sex-related businesses.

The Task Force conducted a public hearing on October 6, 1993, at which more than 20 people testified. Approximately twice as many individuals testified in favor of regulating adult entertainment establishments as those opposed to government regulation of adult uses. Those speaking in favor of regulation discussed adult establishments in various neighborhoods in Manhattan: Tribeca and Downtown Manhattan, Chelsea, East Harlem, Times Square, and the East Side; the majority spoke of Times Square and Chelsea.

The Task Force structured the hearing as a fact-finding hearing to obtain testimony about how adult uses impact residents, businesses and Manhattan neighborhoods. The impacts identified by the testimony are summarized below, and a copy of the transcript of the public hearing is available for review at DCP.

Crime, including drugs and prostitution, was the most frequently cited impact from adult establishments. For example, the President of the 42nd Street Development Project,[62] referring to

---

[62]    The transcript of the testimony, at pages 110 through 116, is instructive of the effects of the concentration of adult uses.

a concentration of sex-related uses on 42nd Street between 7th and 8th Avenues, cited a 60 percent drop in crime after the Project took title to two-thirds of the project area in April 1990 and a majority of the site was cleared.

Several speakers noted that certain crimes were associated with adult entertainment establishments. One speaker, for example, stated that there had been no houses of prostitution in a particular neighborhood for ten years but, subsequent to the opening of a triple-X video store, two houses of prostitution had opened. These illegal establishments have since been closed by the city.

Quality-of-life impacts, such as littering, noise, late night operations, offensive signage, and general negative perceptions about neighborhoods or certain streets, were often mentioned as impacts. For example, the not-for-profit operator of an SRO stated that persons loitering near two adult establishments located across the street from the residence have made the street "intimidating," giving it a "different feeling" from that which had existed before the second adult use moved to the street. In other cases, certain impacts such as offensive signage depicting eroticism or sexually-explicit words were noted as especially problematic for children. It was observed that these signs are sometimes located near school bus stops.

Most of those testifying identified the impacts of adult entertainment establishments as especially troublesome in residential neighborhoods. Many noted the problem of adult uses in concentration, and expressed concern about the proliferation of these establishments absent the enactment of controls.

In general, those testifying against government regulation of adult entertainment establishments disputed the testimony about impacts. For example, testimony was offered that an adult burlesque theater provides 50 percent of the business of the commercial parking lot located across the street from it. Rather than having a negative impact on nearby businesses, it was claimed, the adult establishment brings in business and benefits other businesses. Others stated that the testimony of those proffering impacts from adult establishments was anecdotal. An adult video distributor, alluding to the Chelsea Business Survey, complained of bias in surveys and stated: "The way you phrase a question can determine the reply."

JNR-000352

# Impacts Identified in the Times Square Business Improvement District Study

In June 1993, a Times Square Business Improvement District (TSBID) study[63] found that pending city-wide legislation, placing locational restrictions on adult entertainment uses, would remove adult uses from most of the Times Square area; the approximately 40 adult uses presently within the area would only be allowed in small clusters in manufacturing districts to the south and west of the TSBID.  Aware of the legislative history of similar legislation around the country, the TSBID contracted for a further study on the secondary effects of adult entertainment uses and their concentration, which was issued in April 1994.[64]

The TSBID requests that the city restrict adult establishments in residential neighborhoods, and develop "legal and effective ways to mandate dispersal of these uses in commercial and manufacturing districts in such a way that no designated area becomes saturated, producing the negative impacts that Times Square and, Eighth Avenue in particular, suffer."

The study, focused on the impacts of the dense concentrations of adult entertainment uses along 42nd Street between Seventh and Eighth Avenues and along Eighth Avenue between 42nd and 50th Streets.  It briefly summarized the history and demographics of the area, crime statistics, and the results of 53 in-person and telephone interviews with large and small-scale business and property owners including retail, restaurant, hotel and theater enterprises as well as community boards, civic organizations, churches, schools and social service agencies.  It also analyzed trends in property values.

Data for assessed property values for the 1985/86 and 1993/94 years were analyzed individually and in aggregation for study and control blockfronts to derive the specific and overall changes in valuation over that period of time.  According to the study, aggregate data showed that the rate of increase of total assessed values for the study blocks with adult uses did not increase as much as the rate of increase for the control blocks without adult uses. For specific blocks, the rates of increase for other uses tended to be less than those for adult uses.  The report stated that the

---

63    "Report on Adult Use Establishments in the Times Square Business Improvement District and the Effect of the New York City Council's Proposed Neighborhood Protection Act," Insight Associates (in association with Raven Design Works), June 14, 1993.

64    "Secondary Effects of the Concentration of Adult Use Establishments in the Times Square Area," Times Square Business Improvement District, April, 1994 (prepared by Insight Associates).

40

proximity of an adult use may be "subjectively viewed" by assessors, and cited further corroboration by an appraiser with the Department of Finance. The study of property values concluded that "while it may be that the concentration of adult use establishments has a generally depressive effect on the adjoining properties . . . we do not have sufficient data to prove or disprove this thesis."

There were almost twice as many complaints about crime for the 42nd Street study block as the control block, and more than twice as many complaints for the Eighth Avenue study blocks as the control blocks. The number of criminal complaints are highest near 42nd Street where adult uses are most concentrated and decline further along Eighth Avenue. Prostitution arrests were higher on Eighth Avenue than Ninth Avenue but even higher for the area west of Ninth Avenue. Police statistics indicate that there has been a 54 percent decrease in crime during the past five years in the Times Square area, where the number of adult uses has also declined.

A survey of property and business owners in the Times Square area revealed several impacts from adult entertainment establishments located in the area, particularly in concentration. All (12) expressed the view that adult use businesses have a negative effect on the property values of businesses located in their vicinity, emphasizing the negative effects of a concentration of adult businesses. Theater organization executives (3) stated that adult uses are detrimental to their business. One cited complaints from theater patrons about an adjacent adult use. Representatives of restaurants (7) attributed declining business during evening hours, inability to book corporate parties, and "flamboyant" adult use advertising as having a negative impact on their businesses. Three hotel operators and one hotel owner "agreed that the dense concentration of adult entertainment venues was a deterrent to their trade". One hotelier stated bookings are down; customers have sent photographs of the adjacent porn store to complain to the hotel's national booking office. Of five retailers interviewed, two stated that "unsavory" people loiter in front of adult uses, and are involved in petty crime.

## Impacts Identified in Newspaper Reports and Correspondence

Newspaper articles since 1993 have chronicled neighborhood concerns and opposition to the proliferation of adult entertainment establishments throughout New York City. Previously located in a few specific areas, e.g., the Times Square area, or isolated locations, triple-X video stores and topless/nude bars can now be found in or near areas of a more residential character. Some residents, outraged by the nature of adult uses in their neighborhoods, and afraid of potential negative impacts, have organized *ad hoc* groups and appealed to local officials to have them closed

41

down.  Using a combination of picketing, petitions, publicity and pressure tactics on landlords, these neighborhood groups have often been able to directly influence the location of adult entertainment uses.

The following is an abstract gathered from New York City newspapers, both daily and weekly, of the opinions and actions of local residents who oppose the operation of adult uses in their neighborhoods.  Although anecdotal and subjective, these comments demonstrate the concern, outrage and sense of intrusion that many people feel.

Fear over the potential consequences of proliferation is a major factor in neighborhood opposition to adult entertainment uses.  A businessman on Sixth Avenue in Chelsea who has just had a triple-X video store move into the ground floor space in his office building states: "Then I see every couple of blocks has that kind of store and just worry that the neighborhood would change to be like Times Square."  A member of Manhattan Community Board 4 is more explicit: "You get three to five of these stores in an area and you create a strip.  Have a strip, and you get prostitution and other related problems."

In the Chelsea area, concern is so great about the proliferation of adult entertainment uses that residents and businesspeople joined in a coalition that has been successful in routing four of the nine adult uses in the neighborhood.  The Chelsea Action Coalition has held protest marches and rallies to denounce such uses and has picketed adult entertainment uses to intimidate both the store owner and the potential patron.  A woman who participated in a protest march with her eight year old daughter said she did so because, when she and her daughter walk down Sixth Avenue, her daughter says: "Don't look, Mommy.  It's a very dirty store."  The Coalition has publicized the names of landlords who rent space to adult entertainment uses, pressuring landlords to evict them.  After being picketed, one owner of a triple-X video store, at Seventh Avenue and 23rd Street, converted two-thirds of his store to conventional videos, put up a sign stating, "Ladies and Kids are Welcome," and distributed flyers apologizing for opening the store in a residential neighborhood.  The Coalition has also reached out to the community board and the City Council, asking for legislative action.

Fear of proliferation of adult uses can mobilize community action even when local civic leaders and police officials agree that the sole adult use has provoked no illegal activity or even complaints about quality-of-life issues.  When a local bar, located on upper Fourth Avenue in Bay Ridge, introduced topless dancers and started leafletting the neighborhood, over 1,000 people signed a petition opposing it.  "This is a community issue for those of us who live in Bay Ridge," said one

resident.  Citing the belief that the topless club sets a precedent that other such establishments might follow, the leader of an ad hoc group formed to fight the topless club also reflected an apprehension that an adult entertainment use attracts people from outside the neighborhood: "This place is bringing in people from all over the place, who are not of, by or for this community.  We've got people from Brooklyn Heights, Bensonhurst, members of the Hell's Angels, all kinds of people in there."  The club owner, a long-time resident of Bay Ridge, met with local elected officials, civic leaders and police officials, and offered a number of concessions by curtailing dancing on Sundays and restricting dancing to after 9:00 pm on other nights. The community organization threatened daily protests if the bar continued to feature topless dancing.  The club owner changed the topless format, saying he "did not want to insult the community or church."  "Communities have a lot of power in situations like this (because) if nothing else works, they could make it economically impossible for the club to operate by continuously picketing the place," said a local official.

Concerted community action has also been effective in Astoria, Queens.  When an awning advertising "Adult Video" was installed for a store undergoing renovation on Ditmars Boulevard, irate civic leaders, politicians, clergy and residents hastily assembled a group called the Coalition for the Protection of Children.  "I've never seen the community united like this on any issue," said a local politician suggesting that this was because the store was in the middle of a residential area and within walking distance of four schools.  After negotiations with the landlord and store owner failed, the Coalition scheduled twice-daily protests opposite the store.  Local newspapers provided publicity, listing protest times and telephone numbers for further information as well as the name of the store owner.  The owner soon assured the Coalition that the store would become family-oriented with an adults-only section but it was finally shut down in the face of continued opposition.  The Coalition vowed to demonstrate against other adult entertainment uses because "this is a significant problem in the city," according to one local legislator.

Residents on the Upper West Side joined with local politicians to picket and rally in front of a triple-X video store on Amsterdam Avenue.  The store is still doing business but the signage was altered to a format less objectionable to the community.  A year later, some neighbors picketed a newly-opened sex "boutique" eight blocks away between Amsterdam Avenue and Broadway, calling it a "smut shop."  A couple living in the small building said they were afraid the store would attract transients and expose children to X-rated material.  "We don't have any control or say about what's moving onto our block," said a woman who complained to the community board.  "I believe in freedom of speech," added a neighbor who organized the demonstrations.  "I understand that people have the right to sell and buy these things.  I just don't want it across the street."

43

JNR-000356

Concern over a triple-X video store on Bleecker Street in Greenwich Village located 200 feet from a church and parochial school prompted an informal protest by residents that led to the cancellation of the lease. "To have a store with pictures of a donkey having sex with a woman located 40 yards from an elementary school is simply unacceptable," said a member of a nearby block association. Another resident, concerned that an influx of triple-X video stores could harm the tourist business in the Village, stated: "No one wants to do away with the First Amendment but this is degrading to the quality of life in the neighborhood." A number of merchants complained about the high visibility of a triple-X video store that has semi-naked women painted on the windows and flashing lights over the door. "This is bad for the atmosphere of the entire neighborhood. A lot of tourists come through here, and the [triple-X video] store can hurt everybody's business."

In November, at a community board meeting in the Clinton area of Manhattan, residents of West 30th Street in Manhattan testified for six hours about a 15 foot illuminated sign, "NUDE," that advertises a new topless club on Eighth Avenue near Madison Square Garden. Although worried about the proliferation of adult entertainment uses eroding their quality of life, it was reported that residents were most outraged by the blatant signage. "A lot of them just want to go into [the club] and smash the joint," said a member of the community board.

About 400 residents marched and picketed a 24-hour triple-X video store on Flatbush Avenue in Brooklyn because "it's a block and a half from an elementary school, and near a McDonald's and Burger King where high school kids hang out," according to one civic leader. "We feel it doesn't belong here."

In Community Board 12 in the Bronx, a neighborhood bordering Westchester County, residents have organized several protests against a topless club that opened in January on East Gun Hill Road near Laconia Avenue. The opposition is concerned about the location of the club. "The guy is surrounded by churches and schools," said the community board chairman noting that the three other adult entertainment uses in the district are in primarily commercial areas. Last fall, the Board was successful in deterring the owner of a bar on East 233rd Street from converting to a strip club. "We basically just told him that he was hurting the neighborhood's image and himself by doing it and that we'd fight him," said the chairman of the community board. "He agreed to stop."

In Jackson Heights, Queens, members of the Jackson Heights Neighborhood Association objected to a nude juice bar located on a commercial strip, Northern Boulevard, two blocks from a school. When informal protests were ineffective, they initiated protests every Friday and Saturday night.

"We're not questioning at all the First Amendment or the right to be nude," said a local merchant and civic leader. "It's just their location, period."

On East 53rd Street in Manhattan, between Second and Third Avenues, some residents have formed a block association to protest the appearance of two triple-X video stores. The stores epitomize a relapse for the previously notorious block known as the Loop for its male prostitution and profusion of adult entertainment uses. "This was just beginning to get cleaned up," said one nearby resident. "Now, this." A landlord across the street from the video stores complained: "Every one of our potential renters refer to those stores. They are unhappy to see this type of clientele in a residential neighborhood." The owner of an adjacent 55-unit apartment house, however, claimed to have a waiting list. At one of several protest rallies in front of the stores, one man who had brought his two young sons, said: "Bringing up kids in this environment is hard. My oldest started to ask, What's that, Daddy, as we walk by their big signs."

The explicit signage and gaudy lighting that draw attention to adult entertainment uses are a focus of much of the local condemnation. "These gross caricatures of sexual objects are an insult," said a member of Manhattan Community Board 4. "It's all psychological," said a store owner in Murray Hill directly across the street from a triple-X video store. "The store looks terrible but they're not doing anything wrong." A Chelsea resident agreed: "The problem is not that its a porn store but that it looks like hell."

Some residents perceive other impacts emanating from the presence of an adult entertainment use. Residents reported seeing prostitutes for the first time on Third Avenue and 37th Street, in Manhattan, a result, allegedly, of the presence of a 24-hour triple-X video store. A local civic group held frequent demonstrations and set up a table on the sidewalk where volunteers sat and harangued customers of the triple-X video store. Although the signage has been described as muted, passersby had a clear view through the windows of the store interior. "It's an assault to the eye," said a member of the Murray Hill Committee Zoning Alliance who led twice-weekly protests and claimed to have gathered 7,000 signatures opposing the adult use. The owner masked the windows but eventually closed citing lack of business.

Neighbors joined in nightly demonstrations outside an upscale, nude cabaret, Runway 69, on Austin Street in Forest Hills, Queens. The landlord was subjected to a barrage of telephone calls protesting the presence of the nude dancers. "I don't want to sound like I'm all for it [the nude club]," said one local merchant, "but Forest Hills is changing." The club replaced a disco that attracted police attention because of the young, rowdy crowd. Afraid that the adult entertainment

use would increase congestion, attract disreputable outsiders and attract crime, the demonstrators continued until the landlord negotiated to buy out the club's lease.

Referring to the First Amendment right of free speech that covers adult entertainment uses, a member of a neighborhood association in the East 60s in Manhattan claimed: "Everybody has a right to go to these places but when it becomes a nuisance, when it becomes a major problem, we can exercise our First Amendment rights to protest noise, sanitation problems, traffic and crimes."

There have been numerous letters and petitions from community groups and local organizations protesting the intrusion of adult uses into their community and asking the City to find solutions for the problem. "(We) just wish to live quietly and raise (our) families in quiet residential communities," wrote the president of one borough-wide civic group. A taxpayers' group in Glendale said that having to pass adult uses was offensive for children and adults who participated in activities at the many schools and churches prevalent in the area. Another neighborhood group in Queens asked for a moratorium on any new sexually-oriented bars.

The executive director of The New York Foundling Hospital was concerned that their young charges were exposed to the "blatant and offensive" signs advertising triple-X video stores in Chelsea. A neighborhood association in Manhattan, wrote that it "sees the proliferation of pornographic businesses as a dangerous trend that violates the integrity of our East Side neighborhood." A resident of the East Side wrote: "We, who live in the city's residential areas, are not opposed to free speech, we just feel porn establishments should exercise their free speech in more appropriate commercially zoned areas. The tenants of a residential hotel in the Times Square area submitted a number of signed petitions and wrote: "Although the people who live in this building and in this neighborhood can prove no hard numbers about how their businesses have been harmed or prove that crime has increased, they do know that the quality of their lives and their neighborhood is being deleteriously impacted." Another civic group summed it up when it wrote: "many law-abiding citizens view these establishments as a threat to the quality of life in their neighborhoods. Such concerns are quite valid and should not be easily dismissed."

JNR-000359

# VI.  SURVEY OF ADULT ENTERTAINMENT USES

In 1993-94, DCP surveyed street and signage conditions, local organizations and businesses, real estate brokers, and police and sanitation officers, and analyzed criminal complaint and property assessment data for six study areas throughout the city to obtain information about the impacts of adult entertainment establishments.  A map indicating the location of the study areas follows. The Times Square area was not chosen as a study area because the TSBID Study was already underway. DCP's study areas were mostly in the other boroughs in areas with lesser concentrations of adult uses. Three of the six study areas contained a single isolated use.  Within each study area, DCP selected "survey" blockfront(s), containing one or more adult entertainment establishments, and "control" blockfront(s), which have similar land uses, except for an adult use.  A map of each study area is included in Appendix A.

## Summary Survey Results

### Planners' Assessment

Sidewalk and street frontages on the survey and control blockfronts in each of the six study areas were studied for noise, traffic, sanitation, and loitering. Caution should be exercised in generalizing from this survey.  Observations were made during the cold weather months, and over a brief amount of time.  Cold weather will discourage loitering because few people want to remain outdoors for extensive periods under such conditions.  Surveyors did not spend significant amounts of time observing each street element, although observations were made more than once, on various days of the week, at different times of the day or night, and on numerous blockfronts.

On survey blockfronts in half of the study areas, impacts were noted.  They were generally associated with non-adult uses, e.g., noise from voices and pedestrian congestion were noted on a blockfront in Study Area 2, but the impacts are associated with a playground.  In Study Area 3, pedestrians were observed waiting on the sidewalk, but for meals served in a church.  However, some noise from music emanating through the walls onto the street was noted for the topless bar in Study Area 6.

### Signage Review

Accessory business signs were examined for all ground floor commercial uses located on the

**Study Areas:**

*1* - within Manhattan Community Districts 4 & 5
*2* - within Manhattan Community District 7
*3* - within Bronx Community District 5
*4* - within Brooklyn Community District 7
*5* - within Queens Community District 2
*6* - within Staten Island Community District 2

# Study Areas

 study area

*5*   study area designation

Adult Entertainment Study
Department of City Planning / City of New York

survey and control blockfronts in all six study areas. Little difference was noted for most signs on the survey blockfronts compared with the control blockfronts, except with respect to adult entertainment establishments.

In general, signage is characterized by the name of the establishment located above the storefront. Sometimes the accessory business signs are illuminated; less frequently they are flashing. Where there are display windows, additional signs are generally found; these are often neon or illuminated. Signs are generally flush with the buildings, but are sometimes located on projecting canopies.

Significantly, however, the signage for the adult entertainment establishments is characteristically at odds with that of other establishments. In half of the study areas, signage for the adult uses occupies a greater percentage of storefront surface area than other commercial uses located within the same blockfronts. For example, on blockfronts in Study Area 2, accessory business signs cover approximately 25 to 40 percent of the storefront surface area, but the adult use signage occupies 80 to 100 percent of such area. On blockfronts in Study Area 6, accessory business signs cover about 20 percent of frontage; the adult use has signage covering approximately twice that amount.

On blockfronts in four of the six study areas, adult use signage tends to be illuminated when that of non-adult commercial uses is not. For example, on blockfronts in Study Area 1, approximately 80 percent (32 of 37) of the ground floor commercial accessory business signs are non-illuminated. In stark contrast, 75 percent (3 of 4) of the adult entertainment establishments have illuminated signs. On blockfronts in Study Area 4, signs on most of the adult entertainment establishments are illuminated, but non-adult uses located on these blockfronts generally have non-illuminated signage.

In half of the study areas, graphic material for adult use signage was noted. For example, in Study Area 5, the outline of the female figure was a component of the adult use business sign. Flashing signs were generally not noted for the adult uses located in the six study areas. The structure of the signage for the adult use located in Study Area 3 is typical of that of movie theaters. Significantly, the movie marquee and movie poster board display windows are devoid of graphic material; only "XXX" and "adult" indicate that pornography is shown inside.

*Community Responses*

Twenty-eight local organizations, including the community district offices, within the six study

areas were contacted and 23 responded to DCP's survey; not all responded to each question asked. A majority (14 of 22) informed the surveyor that over the last year they had received comments about adult entertainment establishments located in their communities. Five said that these comments represented about half of all comments made about commercial uses; four informed DCP that they made up an even greater (a high) proportion of such comments. The comments, primarily from residents, mentioned graphic signage, potential proliferation of uses, proximity to residential neighborhoods, negative influence on children and teenagers and the nature of the adult use itself.

More than 80 percent of those surveyed (19 of 23) responded that adult entertainment estab-lishments negatively impact the community in some way. Two-thirds (12 of 18) stated that the impacts from adult uses are different from those of similar establishments not characterized as adult; however, bars and discos were often said to create problems whether they have an adult use character or not. Approximately 20 percent of those responding (4 of 19) indicated that the impacts are the same for all types of adult uses studied.

Nearly 40 percent (9 of 23) of those responding stated that they have dealt with the owner or manager of an adult business about a community concern. Only two reported that the issue was resolved.

## Business Responses

Ninety-seven businesses located within the survey and control blockfronts were contacted and asked to respond to DCP's business survey, and 70 agreed; not all responded to each question asked.

Approximately 20 percent (13 of 60) of those responding stated that they have received comments about adult uses in their area. For example, some said they were aware that residents, clients, etc., perceived that the adult use was inappropriate for the neighborhood, or that a proliferation would be bad for the community.

Thirty-three percent (17 of 52) responded "not known" to a question about how nearby adult uses impact their business. However, seventeen percent (9 of 52) responding to the question think that nearby adult uses do impact their business. Nine (of 40 responding) believe the impacts are the same for all types of adult uses, i.e., adult bars, triple-X video stores, and adult theaters. Twenty percent of the businesses responding (11 of 53) think that the impacts from nearby adult entertain-

ment establishments are different from the impacts of similar establishments not characterized as adult.

Nearly half of the businesses responding (27 of 57) believe that their business would be negatively affected if more adult establishments were to locate near them. However, a nearly equal number (24 of 55) believe that their business would be positively affected if more bars, movies or theaters, or video/bookstores of any kind were to locate nearby.

About 10 percent of the businesses responding (4 of 44) stated that they have dealt directly with the owner or manager of an adult business about a business concern. Half advised the surveyor that the concern was resolved.

## Police Responses

The community liaison or beat officer was interviewed for each of the six study areas.

When the survey and control blockfronts were compared for criminal complaints and allegations, the officers generally did not link higher incidents with adult uses. Three officers believe that criminal allegations are higher on the survey blockfronts compared to the control blockfronts but, in two of these cases, the higher incidence of allegations was attributed by them to uses unrelated to the adult use. In a single instance, an officer replied that the adult entertainment establishment located in the study area has some effect on crime, and then "only rarely." Four of the six officers thought the adult uses have no effect on crime.

One officer stated that if more adult entertainment establishments were to locate in the study area, crime probably would increase. However, that officer and another responded that more bars, movies or theaters, or video/bookstores of any kind would effectively increase crime in the study area.

## Real Estate Brokers Responses

Nineteen real estate brokers from all of the six study areas were interviewed; not all responded to each question asked.

It is significant that more than 80 percent of the brokers responding (11 of 13) reported that an adult entertainment establishment tends to decrease the market value of property that lies within 500 feet of it. When the distance is increased from between 500 to 1,000 feet of an adult use, a

majority of brokers (7 of 13) indicated that the same phenomenon would occur.  At 1,000 or more feet, less than 25 percent of the brokers (3 of 13) responded in this manner.  The pattern of response was basically unchanged when the question referred to two adult uses (a concentration) instead of one.  In addition, approximately two-thirds (8 of 13) of the brokers expressing an opinion said that the presence of an adult entertainment establishment lengthens the time it takes to sell or lease nearby property, or the turnover rate of nearby properties.

Several brokers added comments to explain their responses about the impact of adult entertainment establishments on nearby property values.  Some said that property value decreases would be minimal, or that values may be affected differently depending on the age make-up of the area.  One broker suggested the area of impact as one avenue or two short blocks; most brokers said that it was not the physical distance but the perceived impact that mattered most.  One broker said that impact depends on whether the (real estate) market is up or down.  In general, commercial brokers said that impacts on commercial properties would tend to be limited because the value of store-fronts on such strips is determined more by locational factors, business volume, etc., than by a nearby adult use.  Not all comments were negative:  for example, one broker asserted that a particular adult bar offers customers check cashing, a service that would not otherwise be available in the manufacturing district to which he was referring.

Three brokers related incidents in which an adult use negatively impacted other properties.  One incident involved a children's gym that moved after a topless bar located within the same shopping center.  Another broker reported that a prospective residential loft purchase was terminated after it was reported that the Flower District planned to move.  The purchaser feared that the vacant space would be occupied by adult uses.  A third incident concerned the broker — he stated that when he learned that his wife's company was planning to move to a building containing a storefront adult use, he intervened and found new offices for the company.  Subsequently, he heard that the space in the building containing the adult use took a long time to rent.

*Sanitation  Interview*

The Sanitation Department official representing each study area was interviewed.  Sanitation problems were attributed to one adult use, located in the Study Area 6.  The problem consisted of two violations issued over the past year for litter and broken glass in the accessory parking lot.

# Analysis of Criminal Complaint Data

The Police Department provided DCP with information about criminal complaints for the three-month period beginning June 1, 1993, for the survey and control blockfronts within the six study areas. The complaints were drawn from precinct files. Criminal complaints are allegations of unlawful acts, generally reported by a victim. The study analyzed this data to see if there was any association between it and adult uses.

Within each study area, there were generally more complaints noted in the survey blockfronts compared with the control blockfronts, as shown in Table 4, below. Only in Study Area 3 were more complaints recorded for the control blockfronts compared to the survey blockfronts. In Study Area 4, an equal number of complaints was noted for the survey and control blockfronts. Study Area 6 has too few complaints for meaningful analysis.

| TABLE 4 CRIMINAL COMPLAINTS ON SURVEY AND CONTROL BLOCKFRONTS | | |
|---|---|---|
| Study Area | Complaints on Survey Blockfronts | Complaints on Control Blockfronts |
| Study Area 1 | 80 | 24 |
| Study Area 2 | 16 | 10 |
| Study Area 3 | 47 | 99 |
| Study Area 4 | 8 | 8 |
| Study Area 5 | 117 | 29 |
| Study Area 6 | 3 | 0 |

Within each study area, the number of survey and control blockfronts often differ. In Study Areas 1, 4, 5 and 6, the number of survey blockfronts is greater than the number of control blockfronts. To account for these differences, a control blockfront was "paired" with the survey blockfront that has the most similar land uses (and an adult entertainment establishment).

Criminal complaints for the paired blockfronts are shown in Table 5, below.[65]

| TABLE 5<br>CRIMINAL COMPLAINTS ON "PAIRED" BLOCKFRONTS | | |
|---|---|---|
| Study Area | Complaints on Control Blockfront | Complaints on Paired Survey Blockfront |
| Study Area 1 | 10 | 7 |
| Study Area 2 | 10 | 16 |
| Study Area 3 | 99 | 47 |
| Study Area 4 | 8 | 2 |
| Study Area 5* | 23 | 49 |
| | 6 | 10 |
| Study Area 6 | 0 | 0 |

\*    Two control blocks were chosen for the study area; it spans approximately one mile, and the character of it changes.

In Study Areas 1, 3 and 4, there were more complaints noted on the control blockfronts compared with the survey blockfronts. However, in Study Areas 2 and 5, more complaints were noted on the survey blockfronts compared with the control blockfronts. In Study Area 6 there were no complaints on either the control or survey blockfront.

Other land use related criteria could affect the analysis. For example, the location of the paired control and survey blockfronts was analyzed for proximity to transportation facilities such as subway stations and limited-access highways. These facilities bring concentrations of people into an area, and by doing so may affect the incidence of criminal complaints. In general, the blockfronts located closest to subway stations and a limited-access highway ramp had more criminal complaints than blockfronts located farther away. Excluding from this analysis one of the paired blockfronts in Study Area 5 that is distant from subway access, and Study Area 6, because there were too few complaints to consider, the analysis found that in each of the other study areas the number of criminal complaints was greater near transportation facilities, notwithstanding the location of an adult use.

In addition, caution should be exercised in making inferences using criminal complaints. Data was

---

65    Due to limitations in reported data, in Study Area 1 — where the complaints were generally listed by street intersection rather than by blockfront — 25th Street was chosen for the two survey blockfronts and 21st Street was chosen for the two control blockfronts.

JNR-000367

collected for the limited purpose of identifying differences in criminal complaints between survey and control blockfronts within each study area, not between or among study areas. Differences in the number of criminal complaints between or among study areas may be a function of variations in population densities, or other factors for which no study controls were established. Additionally, data was gathered for a single, limited period of time; not for trend analysis.

In summary, it was not possible to draw definitive conclusions from the analysis of criminal complaints. Land uses other than adult entertainment establishments, e.g., subway station access, appear to have a far stronger relationship to criminal complaints. It was not possible to isolate the impact of adult uses relative to criminal complaints.

## Analysis of Property Assessed Values

For each study area, property assessed valuations were identified for 1986, 1989 and 1992, and the percentage changes between 1986 to 1992 were noted for the study area, survey blockfronts, control blockfronts, community district, and borough. The survey and control blockfronts were compared using the data indicating the percentage changes. The survey blockfronts were also compared in the same way with the community district and borough.

The analysis of trends in assessed valuation relative to adult entertainment uses was inconclusive. It would appear that if adult entertainment uses have negative impacts, they are overwhelmed by other forces that increased property values overall, at least as measured by assessed values. Even at the small scale of the survey blockfront, there is a wide diversity in the assessed value trends ranging from an increase of more than 18 percent to an increase of more than 200 percent over the period of analysis, strongly suggesting the importance of other factors. The influences on assessed value that the city's assessors take into account are numerous and include the sale prices of similar comparable properties adjusted for differences in size, age, and location. While the total assessed values on the survey blockfronts may be influenced to some extent by the presence of adult entertainment uses, demonstrating such effects is very difficult.

In the two Manhattan study areas (Study Areas 1 and 2), the change on the control blockfronts substantially exceeded the change in the assessed valuation on the survey blockfronts. Between 1986 and 1992, the total assessed valuation on the control blockfronts in Study Area 1 increased 165 percent; the survey blockfronts increased 68 percent. In Study Area 2 during that period, the control blockfronts increased 134 percent; the survey blockfronts increased 18 percent.

However, in the other four study areas, total assessed valuations increased by a greater percentage

on the survey blockfronts compared to the control blockfronts. In Study Area 3 (the Bronx), the total assessed valuation on the survey blockfront increased by 164 percent over the six-year period; the control blockfront increased a 155 percent. In Study Area 4 (Brooklyn), the total assessed valuation on the survey blockfronts increased 78 percent; the control blockfront by 19 percent. Study Areas 5 (Queens) and 6 (Staten Island) had increases of 153 percent and 202 percent on the survey blockfronts, and 149 percent and 88 percent on the control blockfronts, respectively.

There are several additional reasons why the assessed value findings are necessarily ambiguous. First, the survey blockfronts tend to be commercial strips or shopping streets. Commercial property in a stable area is likely to have assessed values updated with greater frequency by assessors, who take into account income and expense data that tends to have a net overall positive effect with inflation. Under the Direct Income Capitalization method used by assessors, this tends to yield a higher assessed valuation.

Second, the adjoining community district tends to contain a greater proportion of residential property, which is subject to legal limitations on the increase in assessed valuation. Since 1983, residential property in Class 1 (primarily one- to three-family houses) have had their potential annual assessment increase limited to six percent and their potential maximum five-year increase capped at 20 percent (unless the increase is due to a "physical change" such as construction). In addition, in the absence of a sale, residential property tends not to be reassessed, particularly compared to non-residential property in an active area.

Third, the total assessed value of the survey blockfronts is very small as would be expected compared to the community districts; in some cases less than one percent. While trends in the community district would tend to be reflective of local area trends, the magnitude of the survey blockfront component of total assessed value in the district is so small that its contribution to the community district trend would tend to be imperceptible, whether its specific impact was negative or positive.

# VII. OVERALL STUDY FINDINGS AND CONCLUSION

DCP found that the number of adult entertainment establishments increased substantially throughout New York City between 1984 and 1993, increasing 35 percent - from 131 to 177. More than 75 percent of adult entertainment establishments are located in zoning districts that permit residential uses. Often these uses are found in concentration, such as in the Times Square area and Chelsea in Manhattan. Adult uses are now located in more of the city's neighborhoods than before, and have clustered within them. For example, between 1984 and 1993, the number of community districts with seven or more adult entertainment establishments tripled, from three to nine. Seventy-five percent of the adult uses are located in nine of the city's 59 community districts. Outside of central locations, adult businesses have clustered along major thoroughfares, such as Queens Boulevard and Third Avenue in Brooklyn. Adult entertainment is more readily accessible now than it was ten years ago. Cable television, newstands, bookstores and many general interest video stores also provide adult viewing material.

The proliferation of adult entertainment establishments within New York City is attributable in part to the increase in adult video stores, which recently have begun to carry inexpensive videos, and growing numbers of high-priced topless and nude bars. Changing sexual mores since the scourge of AIDS may be another factor. One segment of that industry, adult triple-X videos, reported $2.1 billion in sales and rentals in 1993. Within New York City, the topless club segment of the industry is estimated conservatively as a $50 million a year business, employing about 1,500 dancers.

DCP found secondary impacts, similar to those found in studies done by other localities. For example, the Town of Islip, New York found that adult uses create "dead zones" in commercial areas which shoppers avoid. Los Angeles, California found a greater proportion of certain crimes in areas of concentration of adult uses compared to the city as a whole, and other impacts traced to negative public perceptions about adult uses, such as the need to provide private security guards in parking lots and closing area businesses early. Los Angeles also found that adult businesses were perceived by the majority of survey respondents as exerting a negative impact on surrounding business and residential properties, stating "in terms of the attitudes of the respondents towards such businesses, the conclusion must be drawn that the overall effect on surrounding properties is considered to be negative."

Indianapolis, Indiana in cooperation with the Indiana University School Of Business' Division of Research, surveyed national real estate appraisers and found that 75 percent of the appraisers felt that an adult bookstore located within a block of a residential neighborhood would have a negative effect on real property. Major crimes occurred in study areas that contained at least one adult

entertainment establishment at a rate that was 23 percent higher than six control areas (similar areas without adult entertainments), and 46 percent higher than the Indianapolis Police District.

The City of Whittier, California found higher turnover rates in commercial and residential areas adjacent to adult uses. The study compared 38 types of criminal activity over two time periods, showing a total increase of 102 percent for the study area containing adult businesses, while the city as a whole, only had an eight percent increase.

A study by the City of Austin, Texas compared areas with adult businesses to other areas containing similar land uses but no adult businesses, revealing a sex crimes rate between two and five times greater in the areas with adult businesses. The study also showed that the sex-related crime rate was 66 percent higher in areas having two or more adult businesses than in those areas having only one such business.

Phoenix, Arizona studied the relationship between arrests for sex crimes and the locations of adult businesses, finding an overall increase of six times the sex crime rate in the study areas with adult uses over the control areas without such uses.

The State of Minnesota reported that a study conducted in that state examining the effects of sexually oriented businesses upon property values and crime rates indicated clearly that such businesses had a strong negative impact on the crime rate. The addition of one sexually oriented business to a census tract area caused an increase in the overall crime rate index in that area by more than nine percent. In another state study, it was determined that there was a statistically significant correlation between the location of adult businesses and neighborhood deterioration. Housing values were significantly lower in an area with three adult businesses than in an area with only one adult business. Also, there was a significantly higher crime rate associated with two adult businesses in an area than was associated with only one adult business in an area.

Many other localities such as Manatee County, Florida, and New Hanover County, North Carolina, relied on the studies of other localities to predicate zoning text amendments, a method sanctioned by the United States Supreme Court.[66] As a result of these impact studies, numerous communities enacted zoning laws to restrict the location of sex businesses and to require their dispersal. Some of the communities include Islip, Huntington, Brookhaven, Smithtown and Babylon on Long Island; St. Petersburg, Florida; Atlanta, Georgia; Orange County, California;

---

[66] City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986)

Los Angeles, California; Seattle, Washington; Camden, New Jersey; Kansas City, Missouri; Jackson, Mississippi; San Diego, California; and, Chicago, Illinois.

Studies and reports have documented the impacts or secondary effects of adult entertainment establishments located within New York City. A 1977 City Planning Commission report noted that the concentration of adult establishments in the Times Square area created adverse economic and social impacts. The Commission related the proliferation of adult entertainment uses to a decade-old absence of major investment in that area, citing tax arrearage, sales declines, the loss of jobs, and closed businesses. Increases in felonious criminal activity was characterized as "overwhelming" in areas where there were concentrations of adult uses. Complaints for felonious assault were 142.3 percent higher in police posts with one or more adult uses compared to posts without an adult use.

In 1994, the Times Square Business Improvement District published a study, "Secondary Effects of the Concentration of Adult Use Establishments in the Times Square Area." While conditions in the Times Square area have improved dramatically since 1977, the study found that the rate of increase of total assessed property values for the study blocks with adult uses did not increase as much as the rate of increase for the control blocks without adult uses. In addition, there were almost twice as many complaints about crime for the study blocks with adult entertainment establishments as nearby control blocks without adult uses. Property and business owners expressed the view that adult uses located in the area, particularly in concentration, have a negative impact on their businesses, deterring potential customers. The study expresses the concern that the recent proliferation of adult uses (from 36 in June, 1993 to 43 in April, 1994) constitutes a threat to more recent commercial prosperity and residential stability in the area.

Many residents of the communities in which adult entertainment establishments are located have complained about the impacts from these establishments. These impacts include: exposure of children and teenagers to graphic sexual images, increased crime, diminishing property values, adverse effects upon the climate for other types of commercial activities and overall negative influences upon community character. Sexually explicit business signs or displays visible from the public street are particularly offensive.

The public's concern about the impact on residential neighborhoods of even a single adult entertainment use, the threat of a proliferation of adult entertainment establishments in the city's neighborhoods, and especially a concentration of adult uses, is evidenced by a review of recent newspaper articles. DCP's survey of newspaper articles about the proliferation of adult enter-

JNR-000372

tainment establishments shows widespread public concern about their impacts, such as increased crime, attracting disreputable outsiders to a residential area, changing neighborhood character, and outrage and fear.

For example, a businessman on Sixth Avenue in Chelsea who has just had a triple-X video store move into the ground floor space in his office building stated "Then I see every couple of blocks has that kind of store and just worry that the neighborhood would change to be like Times Square."[67] Concern over a triple-X video store on Bleecker Street in Greenwich Village located 200 feet from a church and parochial school prompted an informal protest by residents that led to the cancellation of the lease. "To have a store with pictures of a donkey having sex with a woman located 40 yards from an elementary school is simply unacceptable," said a member of a nearby block association. In another example, a report stated that about 400 residents marched and picketed a 24-hour triple-X video store on Flatbush Avenue in Brooklyn because, according to one civic leader, "it's a block and a half from an elementary school . . . we feel it doesn't belong here." In Community Board 12 in the Bronx, residents organized several protests against a recently opened topless club because of its location. "The guy is surrounded by churches and schools," said the community board chairman, noting that the three other adult uses are in primarily commercial areas.

In 1993, the Chelsea Action Coalition, in cooperation with Community Board No. 4, Manhattan, published the Chelsea Business Survey, which identified negative impacts associated with a concentration of sex-related businesses in that community. Of 100 businesses surveyed, 61 percent felt that the triple-X video stores had a negative impact on their businesses and 88 percent thought the potential for doing business in Chelsea has been negatively affected by the adult stores.

Several impacts from adult entertainment establishments were noted in a public hearing held October, 1993, by the Manhattan Borough President's Task Force on the Regulation of Sex-Related Businesses. More than 20 testified; approximately twice as many in favor of regulating adult businesses as those opposed to government regulation.

---

[67]    References to "Times Square" are often made by New Yorkers concerned about the proliferation and concentration of adult establishments. It is not hard to understand why. According to the 1983 Annual Report of the Mayor's Office of Midtown Enforcement, in the mid-1970's "Times Square was clogged with pimps, johns, and hookers as well as the addicts and muggers who along with them preyed on the public." The report states that 1,200 prostitutes worked out of the dozen or so prostitution hotels and the 23 massage parlors concentrated along Eighth Avenue between 34th and 55th Streets, and another twelve sex businesses were wedged in between these businesses.

JNR-000373

Those citing negative impacts from adult establishments noted crime most frequently, and quality of life impacts such as littering, noise, late night operations, offensive signage, and general perceptions about neighborhoods or certain streets. For example, the President of the 42nd Street Development Project, referring to a concentration of sex-related uses on 42nd Street between Seventh and Eighth Avenues, cited a 60 percent drop in crime after the Project took title to two-thirds of the project area in April, 1990 and a majority of the site was cleared. The operator of a not-for-profit SRO stated that persons loitering near two adult establishments located across the street from the residence have made the street "intimidating," giving it a "different feeling" from that which had existed before the second adult use moved to the street. Some observed that offensive signage depicting eroticism or sexually explicit words were noted as especially problematic for children; sometimes these signs were located near school bus stops.

Some noted that the impacts from adult entertainment establishments were positive, e.g., a burlesque theater owner stated that her business provided 50 percent of the business of the commercial parking lot located across the street. The positive impacts of adult entertainment establishments were further noted in a meeting held by DCP and industry representatives. They maintain that their businesses earn revenue for the city, provide jobs, and stimulate tourism.

Through the fall of 1993 and continuing into 1994, DCP surveyed street and signage conditions, local organizations and businesses, real estate brokers, and police and sanitation officers, and analyzed criminal complaint and property assessment data for six study areas throughout the city to obtain information about the impacts of adult entertainment establishments. Four of the six study areas were in boroughs other than Manhattan and in some cases contained a single isolated adult use. Surveyors found few problems but much of the work involving street conditions (noise, loitering, litter) was done during the winter months, and the results should be reviewed with caution.

Significantly, the survey noted that signage for the adult entertainment establishments is characteristically at odds with that of other nearby commercial establishments. In half the study areas, signage for the adult use occupies a greater percentage of storefront surface area than other commercial uses located within the same blockfronts. In one study area, accessory business signs cover approximately 25 to 40 percent of the storefront surface area, but the adult use signage occupies 80 to 100 percent of such area. In four of the six study areas, adult use signage tends to be illuminated when that of non-adult commercial uses is not. In one study area, approximately 80 percent of the ground floor commercial accessory business signs are non-illuminated; in stark contrast 75 percent of the adult establishments have illuminated signs. Also, in half of the study

areas graphic material was noted for adult use signage.

It is also significant that more than 80 percent of the real estate brokers responding to DCP's survey reported that an adult entertainment establishment tends to decrease the market value of property within 500 feet. When the distance is increased from between 500 to 1,000 feet of an adult use, a majority of brokers indicated that the same phenomenon would occur. The pattern of response was basically unchanged when the question referred to two adult uses instead of one. In addition, approximately two-thirds of the brokers expressing an opinion stated that the presence of an adult entertainment establishment lengthens the time it takes to sell or lease nearby property, or the turnover rate of nearby properties. This is consistent with general principles of determining market value of real property, that value reflects and is affected by forces that motivate the activities of people, including social ideals and standards.

In surveys of community organizations, more than 80 percent responded that adult entertainment establishments negatively impact the community in some way. Nearly half of the businesses believe that their business would be negatively affected if more adult establishments were to locate near them. Where respondents indicated that their businesses or neighborhoods were not adversely affected by adult uses, the uses were not typically found in concentration; however, the respondents expressed a fear of the consequences of the potential proliferation and concentration of adult establishments in traditionally neighborhood-oriented shopping areas, along with a deterioration in the quality of urban life.

These perceptions are bolstered by the findings in the TSBID Study and the Chelsea Business Survey, along with other studies described in more detail in this report. Years of urban planning experience confirm that these perceptions of negative impacts are important because people act on their perceptions. As Deputy Commander Peter J. Buccino of the New York Police Department stated in a recent unrelated newspaper article on privately funded community patrols: "Residents . . . tell me they feel safer . . . To tell you the truth, perception often becomes reality."[68] As cited in a legal case on adult uses, "urban sociologist Mel Ravitz stated a sociological axiom: If people believe something to be true, even if it not originally, they will tend to act as if it were true and, in so doing, help produce the condition originally believed."[69]

---

[68]  "Hiring Private Security Guards to Cut Neighborhood Crime," The New York Times, August 18, 1994, p. C6.

[69]  Gibbs vs. American Mini-Theatres, as cited in "Adult Entertainment, A 40 Acre Study," Planning Division, Department of Planning & Economic Development, St. Paul, Minnesota, 1983.

JNR-000375

The analysis of criminal complaint data and property assessed valuation data was less conclusive than the surveys. Regarding criminal complaints, it appears that land uses other than adult entertainment establishments, e.g., subway station access, have a far stronger relationship to criminal complaints. It was not possible to isolate the impact of adult uses relative to criminal complaints. One reason is that data was collected for the limited purpose of identifying differences between survey and control blockfronts within each study area, not between or among study areas. Differences in the number of complaints between or among study areas may be a function of variations in population densities, or other factors for which no study controls were established. Additionally, data was gathered for a single period of time, not for trend analysis.

Comparisons of percentage changes in assessed valuations between 1986 to 1992 for the study areas, survey and control blockfronts, community district, and borough, did not reveal any significant relationship. It would appear that the negative impacts of adult entertainment uses on property values that were found in other studies were overwhelmed by forces that increased property values overall, at least as measured by assessed values. DCP found that demonstrating the effects of adult uses on property values on survey blockfronts is very difficult for several reasons, including the lack of sales and lease data, assessment practices, and the small total assessed value of the survey blockfront relative to the community district.

In some cases, particularly in study areas with only one adult entertainment establishment, the DCP survey did not yield conclusive evidence of a direct relationship between the adult use and the urban ills affecting the community. This reflects the fact that, in a city as dense and diverse as New York, it is difficult to isolate specific impacts attributable to any particular land use. Other cities that have conducted similar studies have acknowledged this same difficulty. For instance, the Los Angeles City Planning Department concluded that while assessed valuation of properties in areas characterized by adult uses "generally" tended to increase to a lesser degree than similar control areas, "there was insufficient evidence to support the contention that concentrations of sex-related businesses have been the primary cause of these patterns". Adult entertainment businesses were nevertheless perceived by the majority of the Los Angeles respondents as exerting a negative impact on surrounding business and residential properties. Whether or not such negative impacts had actually occurred, or were only perceived to have occurred, could not always be determined by the survey, but the study concluded that "in terms of the attitudes of the respondents towards such businesses, the conclusion must be drawn that the overall effect on surrounding properties is considered to be negative."

DCP's survey identified strong concerns about the negative impacts of adult uses similar to those found in the Los Angeles study. Even in those study areas where it could not be readily determined that negative impacts were already being felt, there was a strong body of opinion, especially among residents, that adult entertainment uses were having negative impacts and that a further proliferation of these uses in the community would lead to a neighborhood deterioration. The experience of urban planners and real estate appraisers indicates that negative perceptions associated with an area can lead to disinvestment in residential neighborhoods and a tendency to shun shopping streets where unsavory activities are occurring, leading to economic decline. In "The Appraisal of Real Property," seventh edition, by the American Institute of Real Estate Appraisers, the forces that influence real estate value is described as follows. "The market value of real property reflects and is affected by the interplay of basic forces that motivate the activities of human beings. These forces, which produce the variables in real estate market values, may be considered in four major categories: *social ideals and standards* (emphasis added), economic changes and adjustments, governmental controls and regulation, and physical or environmental changes." The attitudinal data in the survey is thus significant even in those instances where the current negative impacts of adult entertainment establishments are difficult to measure.

Fear of the potential proliferation of adult uses is a well founded concern. Taken alone it may not seem significant if someone smokes in a subway car, scribbles graffiti, jumps a subway turnstile, aggressively panhandles or squeegees a car windshield, particularly in a city where there are other pressing problems such as homelessness, violent crime and unemployment. But when these small incidents, and establishments, proliferate and accumulate, they can tear at the urban fabric. Similarly, as the city's experience in the Times Square area indicates, the proliferation of adult uses in an area does have significant and potentially devastating impacts on the character of a community. The City has adopted an aggressive and comprehensive policy of addressing various quality-of-life issues that has begun to yield beneficial results. The problems posed by adult entertainment establishments are among the important quality-of-life issues that affect our neighborhoods and communities.

## Overall Findings and Conclusion

- *Numerous studies in other localities found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life.*

JNR-000377

- *There has been a rapid growth in the number of adult entertainment uses in New York City. Between 1984 and 1993, the number of such uses increased from 131 to 177. The number of video/book stores/peep shows almost tripled and there was a 26 percent increase in topless/nude bars. Adult theaters declined by 52 percent.*

- *Adult entertainment is more readily accessible in NYC than it was ten years ago. There are more such establishments in a greater number of communities. Adult videos are produced in greater numbers and at lower costs. They are often available in general interest video stores as well as those devoted exclusively to adult entertainment. Cable television has significantly increased the availability of adult viewing material. Adult material is also available at newsstands and book stores.*

- *Adult entertainment uses tend to concentrate. The number of community districts with seven or more adult uses increased from three to nine over the last ten years. Seventy five percent, of the adult uses are located in nine of the city's 59 Community Districts. In Manhattan, adult uses cluster in central locations, such as the Times Square area. In the other boroughs, adult uses appear to cluster along major vehicular routes connecting outer reaches of the city and suburbs to the central business district such as Queens Boulevard and Third Avenue in Brooklyn.*

- *Studies of adult entertainment uses in areas where they are highly concentrated, such as Times Square and Chelsea, identified a number of significant negative secondary impacts.In the Times Square area property owners, theater operators and other business people overwhelmingly believe that their businesses are adversely affected. An analysis of criminal complaints indicated a substantially higher incidence of criminal activity in the Times Square area where adult uses are most concentrated. In addition, the study found that the rate of increase in assessed property values for study blocks with adult uses grew at a slower rate than control blocks without adult uses.*

- *DCP's survey of areas with less dense concentrations of adult uses found fewer impacts than the study of the Times Square area. However, community leaders expressed concerns that adult uses impact negatively on the community and strongly fear the potential results of proliferation.*

- *The strongest negative reactions to adult entertainment uses comes from residents living near them.*

- *Where respondents indicated that their businesses or neighborhoods had not yet been adversely affected by adult uses, this typically occurred in study areas with isolated adult uses. Moreover, these same respondents*

*typically stated that an increase in such uses would negatively impact them. Community residents fear the consequences of potential proliferation and concentration of adult uses in traditionally neighborhood-oriented shopping areas and view the appearance of one or more of these uses as a deterioration in the quality of urban life.*

- *Most real estate brokers report that adult entertainment establishments are perceived to negatively affect nearby property values and decrease market values. Eighty percent of the brokers responding to the DCP survey indicated that an adult use would have a negative impact on nearby property values. This is consistent with the responses from a similar national survey of real estate appraisers.*

- *Adult use accessory business signs are generally larger, more often illuminated, and graphic (sexually-oriented) compared with the signs of other nearby commercial uses. Community residents view this signage as out of keeping with neighborhood character and are concerned about the exposure of minors to sexual images.*

Based on these findings, DCP believes it is appropriate to regulate adult entertainment establishments differently from other commercial establishments. The experience of other jurisdictions, the city's historic experience in Times Square, studies performed by the TSBID and the Chelsea Business Survey, and DCP's own survey establish, the negative effects of adult entertainment uses. Consideration of the specific nature and extent of regulations that would be appropriate for adult entertainment establishments in New York City was not within the scope of this Study. However, in light of the negative impacts of adult uses in concentration, the following regulatory techniques, which have been used in other jurisdictions, merit consideration in developing adult use regulations: restrictions on the location of adult uses in proximity to residential areas, to houses of worship, to schools and to each other.

65

# *Department of City Planning*

**Joseph B. Rose**, *Director*
**Andrew S. Lynn**, *Executive Director*
**William Bernstein**, *First Deputy Executive Director*

**Strategic Planning**
Sandy Hornick, *Deputy Executive Director*
Richard Barth, *Deputy Director*

**Zoning & Urban Design**
Marilyn Mammano, *Director*
Tony Levy, *Deputy Director*
Kenneth J. Bergin, *Project Director*
Louisa Craddock

**Executive Office**
Melissa Salten Rothman, *former Special Counsel to the Chairman*
Carol Levine

**Manhattan Office**
Robert Flahive, *Director*
Jacquelyn Harris-Strobert, *Deputy Director*
Meenakshi Srinivasan
Nanette Smith
Walter McRae
Andrew Smith
Albert Depas

**Queens Office**
Dennis Ferris, *Director*
Victor L'Eplattenier, *Deputy Director*
Syed S. Ahmed
Robert Mazzucco
Fred Lee
Elizabeth Errico

**Brooklyn Office**
Douglas Brooks, *Director*
Alberto Villar, *former Deputy Director*
Purnima Kapur
Rosalind Silver
Susan Silverman
Winston Von Engel
Rosalie Hoffman

**Bronx Office**
John Phillips, *Director*
Balaram Rao, *Associate Director*
Kate Brower

**Staten Island Office**
Pablo Vengoechea, *Director*
Mitchell Korbey, *Deputy Director*
Howard Geyer

**Counsel's Office**
William Valletta, *former Counsel*
Patricia Prothro

**Operations & Procurement**
Antonio Mendez, *Director*
Gerald Anderson

**Planning Coordination**
Anne Pizzicara, *Director, Community Based Planning*
James McConnell, *Computer Graphics*

**Graphics**
Eustace Pilgrim, *Acting Director*
Carol Lubowski

**Computer Information Services**
Linda Goldsmith, *Director*
Anne Kelly, *Deputy Director*
Barbara Bartlett
Richard Steinberg, *Director of Geographic Systems*
Derrick Devore
Robert Taszymowicz
Wendy Smyth, *Director of Planning Support*
Heidi Berman, *Deputy Director of Planning Support*
Dorothy Bruce
Roger Baldwin
Ella Liskovich

**Housing, Economic & Infrastructure Planning**
Eric Kober, *Director*
Connie Fishman, *Deputy Director*
Richard Satkin
Frank Cartolano

Working Committee

## *Appendix A*

*Study Areas*

Study Areas 1 through 6 are identified in the following listing. A map of each area follows.

## Study Area 1

Study Area 1 is located within the Chelsea section of Manhattan, Community Districts 4 and 5. It is bounded by 14th and 31st Streets, and Fifth and Seventh Avenues.

## Study Area 2

Study Area 2 is located within the Upper West Side of Manhattan, Community District 7. It is bounded by West 71st and 78th Streets, and West End and Columbus Avenues.

## Study Area 3

Study Area 3 is located within the Fordham section of the Bronx, Community District 5. It is bounded by East 184th Street, Valentine Avenue, East 181st Street, and Walton Avenue.

## Study Area 4

Study Area 4 is bounded by 32nd and 44th Streets, and Fourth and First Avenues, including an area 200 feet to the west of First Avenue between 39th and 41st Streets. The study area is located within the Sunset Park neighborhood of Brooklyn, Community District 7.

## Study Area 5

The study area is located in the Sunnyside neighborhood of Queens, Community District 2. It is bounded by 38th Street, 43rd Avenue, Roosevelt Avenue, 58th Street, Queens Boulevard, 51st Street and 47 Avenue.

## Study Area 6

Study Area 6 is located within the South Beach neighborhood of Staten Island, Community District 2. It is bounded by Oceanside Avenue, Wentworth and Hickory Avenues, Foch Avenue, Humbert Street and Cedar Avenue, and Austin Avenue.



## Study Area 1
within Manhattan CD 4 and CD 5

- ●   Adult Use
- ▨   Survey Blockfront(s)
- ▨   Control Blockfront(s)
- ▬   Study Area (*Generally within 500 to 1,000 feet of an Adult Use*)

dult Entertainment Study

partment of City Planning / City of New York



# Study Area 2
within Manhattan CD 7

- ● Adult Use
- Survey Blockfront(s)
- Control Blockfront(s)
- Study Area (*Generally within 500 to 1,000 feet of an Adult Use*)

Adult Entertainment Study

Department of City Planning / City of New York



## Study Area 3
within Bronx CD 5

- ● Adult Use
- Survey Blockfront(s)
- Control Blockfront(s)
- ▬ Study Area

Adult Entertainment Study
Department of City Planning / City of New York



## Study Area 4
within Brooklyn CD 7

- ● Adult Use
- ▨ Survey Area
- ▨ Control Survey Area
- ▬ Surrounding Area (*Generally within 500 to 1000 feet of an Adult Use*)

Adult Entertainment Study

Department of City Planning / City of New York

JNR-000385



## Study Area 5
within Queens CD 2

- Adult Use
- Survey Blockfront(s)
- Control Blockfront(s)
- Study Area (*Generally within 500 to 1,000 feet of an Adult Use*)

Adult Entertainment Study
Department of City Planning / City of New York

Hylan Blvd.

Fort
Wadsworth

Sand Lane

Robin Rd.

Olympia Blvd.

Father Capodanno Blvd.

South Beach

BOROUGH
KEY

NORTH
W          E
S

Lower
New York
Bay

0       500       1000

FEET

# Study Area 6
within Staten Island CD 2

●     Adult Use

     Survey Blockfront(s)

    Control Blockfront(s)

▬▬▬     Study Area

Adult Entertainment Study

Department of City Planning / City of New York

## *Appendix B*

*DCP Survey of Adult Entertainment Establishments, Fall 1993*

### BRONX

| Community District | Name | Address | Use |
|---|---|---|---|
| 05 | Altagracia Restaurant | 1548 University Ave | Topless Bar |
| 05 | Ascot Movie Theatre | 2313 Grand Concourse | Movie Theater |
| 08 | Just Us Bar | 156 W 231st St | Topless Bar |
| 10 | Ruffles Bar | 4026 E Tremont Ave | Topless Bar |
| 11 | Globe Theater | 640 Pelham Parkway S | Movie Theater |
| 12 | Fools Paradise | 4074 Boston Rd | Topless Bar |
| 12 | Mickey & Anthonys Cabaret | 1769 E Gun Hill Rd | Topless Bar |
| 12 | Pretty Woman | 4141 Boston Rd | Topless Bar |

### BROOKLYN

| Community District | Name | Address | Use |
|---|---|---|---|
| 02 | Pandora Books | 88 Court St | Book Store |
| 02 | Video XXX | 851 Atlantic Av | Video Store |
| 06 | Playpen Adult Video | 463 3rd Av | Video Store |
| 07 | Corkscrew Cafe | 6120 3rd Av | Topless Bar |
| 07 | Corrados Club | 3915 1st Av | Topless Bar |
| 07 | Foxy Den | 920 3rd Av | Topless Bar |
| 07 | Moms Bar | 4201 2nd Av | Topless Bar |
| 07 | Video XXX | 952 3rd Av | Video Store |
| 07 | Video XXX Warehouse | 761 3rd Av | Video Store |
| 07 | Wild Wild West | 3901 2nd Av | Topless Bar |
| 12 | Video XXX | 1368 60th St | Video Store |
| 14 | Club Cheetah | 1496 Flatbush Av | Topless Bar |
| 15 | The Cabaret | 2937 86 St | Topless Bar |
| 15 | The Ruby Club | 1105 Quentin Rd | Topless Bar |
| 15 | XXX Video | 1103 Quentin Rd | Video Store |

## MANHATTAN

| Community District | Name | Address | Use |
|---|---|---|---|
| 01 | Adult Video | 21 Ann St | Video Store |
| 01 | Baby Doll Lounge | 34 White St | Topless Bar |
| 01 | Desire Video | 68 Reade St | Video Store |
| 01 | Harmony Theatre | 279 Church St | Other Theater |
| 01 | Kinols | 118 Nassau St | Topless Bar |
| 01 | Lovestyle Video | 376 Canal St | Video Store |
| 01 | Pussycat Lounge | 96 Greenwich St | Topless Bar |
| 01 | The Doll House | 59 Murray St | Topless Bar |
| 01 | Thunder XXX Video | 100 Greenwich St | Video Store |
| 01 | XXX Video | 11 Maiden Lane | Video Store |
| 02 | Badlands Adult Video | 388 West St | Video Store |
| 02 | Christopher St Books | 500 Hudson St | Video Store |
| 02 | Crazy Fantasy XXX Video | 331 6th Av | Video Store |
| 02 | Harmony Video | 139 Christopher St | Video Store |
| 02 | Prince Theater | 329 West St | Movie Theater |
| 02 | XXX Video | 119 Christopher St | Video Store |
| 02 | XXX Video | 220 Varick St | Video Store |
| 02 | XXX Video | 391 West St | Video Store |
| 02 | XXX Video Sale | 377 Canal St | Video Store |
| 02 | XXX Video Sale | 323 Canal St | Video Store |
| 02 | XXX Video Sale | 520 6th Av | Video Store |
| 03 | All Male Jewel Theatre | 100 3rd Av | Movie Theater |
| 03 | Chippendales | 110 1st Av | Topless Bar |
| 04 | Adonis Theater | 693 8th Av | Movie Theater |
| 04 | Adult Video | 763 8th Av | Video Store |
| 04 | Adult Video | 228 8th Av | Video Store |
| 04 | Adult Video XXX | 725 6th Av | Video Store |
| 04 | All-Star Harmony Club | 161 W 22nd St | Topless Bar |
| 04 | Back Date Magazines | 304 W 40th St | Book Store |
| 04 | Billys Topless | 729 6th Av | Topless Bar |
| 04 | Club 44 | 689 8th Av | Topless Bar |
| 04 | Hollywood Twin | 777 8th Av | Movie Theater |
| 04 | Hollywood Twin Adult Video | 777 8th Av | Video Store |
| 04 | New King Male Cinema | 356 W 44th St | Movie Theater |
| 04 | Pure Gold | 262 11th Av | Topless Bar |
| 04 | Serendib XXX Video & Peep | 755 6th Av | Video Store |
| 04 | Show World | 669 8th Av | Book Store |
| 04 | The XXX Video | 644 12th Av | Video Store |
| 04 | XXX Video | 603 6th Av | Video Store |
| 04 | XXX-Tasy Video | 691 8th Av | Peep Show |
| 04 | Zideo XX Video | 539 8th Av | Book Store |
| 04 | 300 Book Store | 300 W 40th St | Video Store |
| 05 | A Carnivale | 39 E 30th St | Book Store |
| 05 | Adult Entertainment Center | 488 8th Av | Peep Show |
| 05 | Adult Video | 795 6th Av | Video Store |
| 05 | Adult Video Express | 216 W 50th St | Video Store |
| 05 | Banana Video | 55 W 38th St | Video Store |
| 05 | Capri Theater | 738 8th Av | Movie Theater |
| 05 | Circus Cinema | 1606 Broadway | Movie Theater |

## MANHATTAN (continued)

| Community District | Name | Address | Use |
|---|---|---|---|
| 05 | Club 90 | 208 W 29th St | Topless Bar |
| 05 | Eros Theater | 738 8th Av | Movie Theater |
| 05 | Erotica | 256 W 42nd St | Video Store |
| 05 | Famous Legz Diamond | 231 W 54th St | Topless Bar |
| 05 | Flash Dancers | 1672 Broadway | Topless Bar |
| 05 | Forsyth Books | 598 7th Av | Book Store |
| 05 | Fun City | 113 W 42nd St | Video Store |
| 05 | G & A Books | 251 W 42nd St | Book Store |
| 05 | Harem | 249 W 42nd St | Movie Theater |
| 05 | Jocks | 711 7th Av | Other Theater |
| 05 | L & J Books & Videos | 584 7th Av | peep show |
| 05 | Laps | 204 W 47th St | Movie Theater |
| 05 | Les Gals | 136 W 42nd St | Peep Show |
| 05 | Manhattan Video | 60 W 39th St | Book Store |
| 05 | marquis video | 265 W 45th St | Video Store |
| 05 | Medalios | 552 8th Av | Topless Bar |
| 05 | Metropole Gogo (Runway 69) | 725 7th Av | Topless Bar |
| 05 | Neptune Video | 252 W 42nd St | Video Store |
| 05 | New David | 236 W 54th St | Other Theater |
| 05 | Nimble Video | 254 W 42nd St | Video Store |
| 05 | Peepworld | 155 W 33rd St | Video Store |
| 05 | Penn Video | 252 W 31st St | Video Store |
| 05 | Pinks | 204 W 49th St | Other Theater |
| 05 | Playpen | 266 W 43rd St | Book Store |
| 05 | Roxy Movie | 244 W 42nd St | Movie Theater |
| 05 | Salax in New York | 16 E 16th St | Topless Bar |
| 05 | Show Center | 259 W 42nd St | Peep Show |
| 05 | Show Follies Center | 711 7th Av | Book Store |
| 05 | Show Palace | 670 8th Av | Book Store |
| 05 | Slr Merchandising | 672 8th Av | Book Store |
| 05 | Stringfellow | 35 E 21st St | Topless Bar |
| 05 | Super Video | 264 W 43rd St | Video Store |
| 05 | Texas Gold | 20 W 20th St | Topless Bar |
| 05 | The Male Box | 268 W 43rd St | Video Store |
| 05 | Time Come Video | 263 W 42nd St | Video Store |
| 05 | Times Sq Adult Shopping Center | 267 W 42nd St | Video Store |
| 05 | Venus Cinema | 728 8th Av | Movie Theater |
| 05 | Video Blow Out | 247 W 42nd St | Video Store |
| 05 | Video World Center | 210 W 42nd St | Peep Show |
| 05 | Vogue Video | 296 5th Av | Video Store |
| 05 | World Famous Paradise | 42 W 33rd St | Topless Bar |
| 05 | XXX Nectar | 632 8th Av | Video Store |
| 05 | XXX Video | 776 8th Av | Video Store |
| 05 | 113 Video Center | 113 W 42nd St | Video Store |
| 05 | 241 Book Inc | 241 W 42nd St | Book Store |
| 05 | 250 Bookstore | 250 W 42nd St | Book Store |
| 06 | | 301 E 14th st | Video Store |
| 06 | All Male Adult Video | 125 3rd Av | Video Store |
| 06 | Flash Dancers Dangerous Curves | 127 E 47th St | Topless Bar |

## MANHATTAN (continued)

| Community District | Name | Address | Use |
|---|---|---|---|
| 06 | House of Dreams | 220 E 53rd St | Video Store |
| 06 | Lions Den | 230 E 53rd St | Video Store |
| 06 | Love to Love | 220 E 53rd St | Video Store |
| 06 | The Doll House | 307 E 54th St | Topless Bar |
| 06 | XXX Video | 127 3rd Av | Video Store |
| 06 | 24-hour XXX Video | 557 3rd Av | Video Store |
| 07 | Amsterdam Ave Video | 287 Amsterdam Av | Video Store |
| 07 | Eshommes | 217 W 80th St | Video Store |
| 08 | Scores | 333 E 60th St | Topless Bar |

## QUEENS

| Community District | Name | Address | Use |
|---|---|---|---|
| 01 | Candy | 29-32 Northern Blvd | Topless Bar |
| 01 | Cityscape | 35-03 38th St | Topless Bar |
| 01 | Mermaid | 31-08 31st St | Topless Bar |
| 01 | Penny Whistle | 31-07 23rd Av | Topless Bar |
| 01 | XXX Video | 36-19 Ditmars Blvd | Video Store |
| 02 | Gallaghers | 39-33 Queens Blvd | Topless Bar |
| 02 | Honeys | 49-14 Queens Blvd | Topless Bar |
| 02 | Merry-go-round | 45-15 Queens Blvd | Topless Bar |
| 02 | Naked City | 56-07 Queens Blvd | Topless Bar |
| 02 | Nickels | 69-20 Queens Blvd | Topless Bar |
| 02 | Riverhead Inn | 45-08 Vernon Blvd | Topless Bar |
| 02 | Scandals | 32-37 Greenpoint Av | Topless Bar |
| 02 | XXX Video | 31-17 Queens Blvd | Video Store |
| 03 | Cozy Cabin | 92-03 Astoria Blvd | Topless Bar |
| 03 | Earle Theater | 73-07 37th Rd | Movie Theater |
| 03 | Fair Theatre | 90-18 Astoria Blvd | Movie Theater |
| 03 | Fiddle & Bow | 92-07 Roosevelt Av | Topless Bar |
| 03 | Johnny Jays Catch Me If You Can | 112-08 Astoria Blvd | Topless Bar |
| 03 | Loveshack Adult Video | 92-20 Astoria Blvd | Video Store |
| 03 | Polk Theater | 93-09 37th Ave | Movie Theater |
| 03 | Topless Bar | 39-02 104th St | Topless Bar |
| 03 | Wileys | 95-07 31st Ave | Topless Bar |
| 04 | Adult Love Boutique | 89-18 Queens Blvd | Peep Show |
| 04 | Canhe | 92-02 Corona Av | Topless Bar |
| 04 | Dee Two Video | 86-10 Roosevelt Av | Video Store |
| 04 | Pides Place II | 81-26 Baxter Av | Topless Bar |
| 05 | Treasure Chest | 60-07 Metropolitan Av | Topless Bar |
| 06 | Goldfingers | 92-77 Queens Blvd | Topless Bar |
| 06 | Virginias | 95-36 Queens Blvd | Topless Bar |
| 06 | XXX Video Store | 98-32 Queens Blvd | Video Store |

## QUEENS (continued)

| Community District | Name | Address | Use |
|---|---|---|---|
| 07 | Candelwood Inn | 41-57 College Point Blvd | Topless Bar |
| 07 | Corsetorium Inc | 36-35 Main St | Other |
| 07 | Gallaghers II | 26-35 123rd St | Topless Bar |
| 07 | Goodtime Video | 150-36 Northern Blvd | Video Store |
| 07 | Sports Bar | 135-41 E Northern Blvd | Topless Bar |
| 08 | Mayfair Theatre | 68-25 Fresh Meadow Lane | Movie Theater |
| 09 | Andys Bar | 85-01 Rockaway Blvd | Topless Bar |
| 09 | Austin Theater | 81-07 Lefferts Blvd | Movie Theater |
| 09 | Port o Call | 93-10 Woodhaven Blvd | Topless Bar |
| 12 | Dreams Topless Bar | 90-67 Sutphin Blvd | Topless Bar |
| 12 | Gordons Topless Bar | 146-16 Hillside Av | Topless Bar |
| 12 | Krystalls | 89-25 Merrick Blvd | Topless Bar |
| 13 | Happy Tips Lounge | 215-50 Jamaica Av | Topless Bar |
| 13 | XXX Video | 245-02 S Conduit Ave | Video Store |

## STATEN ISLAND

| Community District | Name | Address | Use |
|---|---|---|---|
| 02 | Lipsticks | 3575 Victory Blvd | Topless Bar |
| 02 | Scarletts | 283 Sand Lane | Topless Bar |
| 03 | Hipps | 2945 Arthur Kill Rd | Topless Bar |