UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
689 EATERY CORP., etc., *et ano.,*                    :

                  Plaintiffs,          :

        - against -                    :          Civil Action No.
                                 02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,                    :

                  Defendants.     :
-----------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*          :

                  Plaintiffs,          :

        - against -                    :          Civil Action No.
                                 02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,                    :

                  Defendants.     :
-----------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*          :

                  Plaintiffs,          :

        - against -                    :          Civil Action No.
                                 02 CV 8333 (LJL)
THE CITY OF NEW YORK,                    :

                  Defendant.     :
-----------------------------------------------------------------X
336 LLC., etc., *et al.,*                    :

                  Plaintiffs,          :

        - against -                    :          Civil Action No.
                                 18 CV 3732 (LJL)
THE CITY OF NEW YORK,                    :

                  Defendant.     :
-----------------------------------------------------------------X

**VOLUME 5 OF EXHIBITS TO
JOINT REQUEST AND STIPULATIONS REGARDING
<u>THE TAKING OF JUDICIAL NOTICE</u>**

JNR-000393

**EXHIBITS VOL. 5 of 10; pp. JNR-000395 – JNR-000560**
**(Exhibits 41-1 through 43-2)**

                                                                            **Page(s)**

Exhibit 41-1   DCP Survey of Adult Entertainment Establishments, Fall 1993      000395-000399
               [Appendix B to (1994) Adult Entertainment Study]

Exhibit 41-2   Page 22 of the DCP Adult Entertainment Study                     000400

Exhibit 41-3   1995 City Planning Commission Report                             000401-000478

Exhibit 42     March 21, 2001 DCP Application No. N 010508 ZRY                   000479-000489
               (to amend the ZR definition of adult establishment)

Exhibit 43     CEQR Negative Declaration No. 01DCP045Y of                       000490-000554
               March 26, 2001, and Environmental Assessment Statement
               No. 01DCP045Y filed March 26, 2001

Exhibit 43-1   2000 List of Adult Establishments [Appendix A to CEQR            000555-000559
               Negative Declaration of March 26, 2001]

Exhibit 43-2   Comparison of Numbers of Adult Establishments in 1993            000560
               and 2000 [Appendix B to CEQR Negative Declaration]

# *Appendix B*

## *DCP Survey of Adult Entertainment Establishments, Fall 1993*

### BRONX

| Community District | Name | Address | Use |
|---|---|---|---|
| 05 | Altagracia Restaurant | 1548 University Ave | Topless Bar |
| 05 | Ascot Movie Theatre | 2313 Grand Concourse | Movie Theater |
| 08 | Just Us Bar | 156 W 231st St | Topless Bar |
| 10 | Ruffles Bar | 4026 E Tremont Ave | Topless Bar |
| 11 | Globe Theater | 640 Pelham Parkway S | Movie Theater |
| 12 | Fools Paradise | 4074 Boston Rd | Topless Bar |
| 12 | Mickey & Anthonys Cabaret | 1769 E Gun Hill Rd | Topless Bar |
| 12 | Pretty Woman | 4141 Boston Rd | Topless Bar |

### BROOKLYN

| Community District | Name | Address | Use |
|---|---|---|---|
| 02 | Pandora Books | 88 Court St | Book Store |
| 02 | Video XXX | 851 Atlantic Av | Video Store |
| 06 | Playpen Adult Video | 463 3rd Av | Video Store |
| 07 | Corkscrew Cafe | 6120 3rd Av | Topless Bar |
| 07 | Corrados Club | 3915 1st Av | Topless Bar |
| 07 | Foxy Den | 920 3rd Av | Topless Bar |
| 07 | Moms Bar | 4201 2nd Av | Topless Bar |
| 07 | Video XXX | 952 3rd Av | Video Store |
| 07 | Video XXX Warehouse | 761 3rd Av | Video Store |
| 07 | Wild Wild West | 3901 2nd Av | Topless Bar |
| 12 | Video XXX | 1368 60th St | Video Store |
| 14 | Club Cheetah | 1496 Flatbush Av | Topless Bar |
| 15 | The Cabaret | 2937 86 St | Topless Bar |
| 15 | The Ruby Club | 1105 Quentin Rd | Topless Bar |
| 15 | XXX Video | 1103 Quentin Rd | Video Store |

## MANHATTAN

| Community District | Name | Address | Use |
|---|---|---|---|
| 01 | Adult Video | 21 Ann St | Video Store |
| 01 | Baby Doll Lounge | 34 White St | Topless Bar |
| 01 | Desire Video | 68 Reade St | Video Store |
| 01 | Harmony Theatre | 279 Church St | Other Theater |
| 01 | Kinols | 118 Nassau St | Topless Bar |
| 01 | Lovestyle Video | 376 Canal St | Video Store |
| 01 | Pussycat Lounge | 96 Greenwich St | Topless Bar |
| 01 | The Doll House | 59 Murray St | Topless Bar |
| 01 | Thunder XXX Video | 100 Greenwich St | Video Store |
| 01 | XXX Video | 11 Maiden Lane | Video Store |
| 02 | Badlands Adult Video | 388 West St | Video Store |
| 02 | Christopher St Books | 500 Hudson St | Video Store |
| 02 | Crazy Fantasy XXX Video | 331 6th Av | Video Store |
| 02 | Harmony Video | 139 Christopher St | Video Store |
| 02 | Prince Theater | 329 West St | Movie Theater |
| 02 | XXX Video | 119 Christopher St | Video Store |
| 02 | XXX Video | 220 Varick St | Video Store |
| 02 | XXX Video | 391 West St | Video Store |
| 02 | XXX Video Sale | 377 Canal St | Video Store |
| 02 | XXX Video Sale | 323 Canal St | Video Store |
| 02 | XXX Video Sale | 520 6th Av | Video Store |
| 03 | All Male Jewel Theatre | 100 3rd Av | Movie Theater |
| 03 | Chippendales | 110 1st Av | Topless Bar |
| 04 | Adonis Theater | 693 8th Av | Movie Theater |
| 04 | Adult Video | 763 8th Av | Video Store |
| 04 | Adult Video | 228 8th Av | Video Store |
| 04 | Adult Video XXX | 725 6th Av | Video Store |
| 04 | All-Star Harmony Club | 161 W 22nd St | Topless Bar |
| 04 | Back Date Magazines | 304 W 40th St | Book Store |
| 04 | Billys Topless | 729 6th Av | Topless Bar |
| 04 | Club 44 | 689 8th Av | Topless Bar |
| 04 | Hollywood Twin | 777 8th Av | Movie Theater |
| 04 | Hollywood Twin Adult Video | 777 8th Av | Video Store |
| 04 | New King Male Cinema | 356 W 44th St | Movie Theater |
| 04 | Pure Gold | 262 11th Av | Topless Bar |
| 04 | Serendib XXX Video & Peep | 755 6th Av | Video Store |
| 04 | Show World | 669 8th Av | Book Store |
| 04 | The XXX Video | 644 12th Av | Video Store |
| 04 | XXX Video | 603 6th Av | Video Store |
| 04 | XXX-Tasy Video | 691 8th Av | Peep Show |
| 04 | Zideo XX Video | 539 8th Av | Book Store |
| 04 | 300 Book Store | 300 W 40th St | Video Store |
| 05 | A Carnivale | 39 E 30th St | Book Store |
| 05 | Adult Entertainment Center | 488 8th Av | Peep Show |
| 05 | Adult Video | 795 6th Av | Video Store |
| 05 | Adult Video Express | 216 W 50th St | Video Store |
| 05 | Banana Video | 55 W 38th St | Video Store |
| 05 | Capri Theater | 738 8th Av | Movie Theater |
| 05 | Circus Cinema | 1606 Broadway | Movie Theater |

## MANHATTAN (continued)

| Community District | Name | Address | Use |
|---|---|---|---|
| 05 | Club 90 | 208 W 29th St | Topless Bar |
| 05 | Eros Theater | 738 8th Av | Movie Theater |
| 05 | Erotica | 256 W 42nd St | Video Store |
| 05 | Famous Legz Diamond | 231 W 54th St | Topless Bar |
| 05 | Flash Dancers | 1672 Broadway | Topless Bar |
| 05 | Forsyth Books | 598 7th Av | Book Store |
| 05 | Fun City | 113 W 42nd St | Video Store |
| 05 | G & A Books | 251 W 42nd St | Book Store |
| 05 | Harem | 249 W 42nd St | Movie Theater |
| 05 | Jocks | 711 7th Av | Other Theater |
| 05 | L & J Books & Videos | 584 7th Av | peep show |
| 05 | Laps | 204 W 47th St | Movie Theater |
| 05 | Les Gals | 136 W 42nd St | Peep Show |
| 05 | Manhattan Video | 60 W 39th St | Book Store |
| 05 | marquis video | 265 W 45th St | Video Store |
| 05 | Medalios | 552 8th Av | Topless Bar |
| 05 | Metropole Gogo (Runway 69) | 725 7th Av | Topless Bar |
| 05 | Neptune Video | 252 W 42nd St | Video Store |
| 05 | New David | 236 W 54th St | Other Theater |
| 05 | Nimble Video | 254 W 42nd St | Video Store |
| 05 | Peepworld | 155 W 33rd St | Video Store |
| 05 | Penn Video | 252 W 31st St | Video Store |
| 05 | Pinks | 204 W 49th St | Other Theater |
| 05 | Playpen | 266 W 43rd St | Book Store |
| 05 | Roxy Movie | 244 W 42nd St | Movie Theater |
| 05 | Salax in New York | 16 E 16th St | Topless Bar |
| 05 | Show Center | 259 W 42nd St | Peep Show |
| 05 | Show Follies Center | 711 7th Av | Book Store |
| 05 | Show Palace | 670 8th Av | Book Store |
| 05 | Slr Merchandising | 672 8th Av | Book Store |
| 05 | Stringfellow | 35 E 21st St | Topless Bar |
| 05 | Super Video | 264 W 43rd St | Video Store |
| 05 | Texas Gold | 20 W 20th St | Topless Bar |
| 05 | The Male Box | 268 W 43rd St | Video Store |
| 05 | Time Come Video | 263 W 42nd St | Video Store |
| 05 | Times Sq Adult Shopping Center | 267 W 42nd St | Video Store |
| 05 | Venus Cinema | 728 8th Av | Movie Theater |
| 05 | Video Blow Out | 247 W 42nd St | Video Store |
| 05 | Video World Center | 210 W 42nd St | Peep Show |
| 05 | Vogue Video | 296 5th Av | Video Store |
| 05 | World Famous Paradise | 42 W 33rd St | Topless Bar |
| 05 | XXX Nectar | 632 8th Av | Video Store |
| 05 | XXX Video | 776 8th Av | Video Store |
| 05 | 113 Video Center | 113 W 42nd St | Video Store |
| 05 | 241 Book Inc | 241 W 42nd St | Book Store |
| 05 | 250 Bookstore | 250 W 42nd St | Book Store |
| 06 | | 301 E 14th st | Video Store |
| 06 | All Male Adult Video | 125 3rd Av | Video Store |
| 06 | Flash Dancers Dangerous Curves | 127 E 47th St | Topless Bar |

## MANHATTAN (continued)

| Community District | Name | Address | Use |
|---|---|---|---|
| 06 | House of Dreams | 220 E 53rd St | Video Store |
| 06 | Lions Den | 230 E 53rd St | Video Store |
| 06 | Love to Love | 220 E 53rd St | Video Store |
| 06 | The Doll House | 307 E 54th St | Topless Bar |
| 06 | XXX Video | 127 3rd Av | Video Store |
| 06 | 24-hour XXX Video | 557 3rd Av | Video Store |
| 07 | Amsterdam Ave Video | 287 Amsterdam Av | Video Store |
| 07 | Eshommes | 217 W 80th St | Video Store |
| 08 | Scores | 333 E 60th St | Topless Bar |

## QUEENS

| Community District | Name | Address | Use |
|---|---|---|---|
| 01 | Candy | 29-32 Northern Blvd | Topless Bar |
| 01 | Cityscape | 35-03 38th St | Topless Bar |
| 01 | Mermaid | 31-08 31st St | Topless Bar |
| 01 | Penny Whistle | 31-07 23rd Av | Topless Bar |
| 01 | XXX Video | 36-19 Ditmars Blvd | Video Store |
| 02 | Gallaghers | 39-33 Queens Blvd | Topless Bar |
| 02 | Honeys | 49-14 Queens Blvd | Topless Bar |
| 02 | Merry-go-round | 45-15 Queens Blvd | Topless Bar |
| 02 | Naked City | 56-07 Queens Blvd | Topless Bar |
| 02 | Nickels | 69-20 Queens Blvd | Topless Bar |
| 02 | Riverhead Inn | 45-08 Vernon Blvd | Topless Bar |
| 02 | Scandals | 32-37 Greenpoint Av | Topless Bar |
| 02 | XXX Video | 31-17 Queens Blvd | Video Store |
| 03 | Cozy Cabin | 92-03 Astoria Blvd | Topless Bar |
| 03 | Earle Theater | 73-07 37th Rd | Movie Theater |
| 03 | Fair Theatre | 90-18 Astoria Blvd | Movie Theater |
| 03 | Fiddle & Bow | 92-07 Roosevelt Av | Topless Bar |
| 03 | Johnny Jays Catch Me If You Can | 112-08 Astoria Blvd | Topless Bar |
| 03 | Loveshack Adult Video | 92-20 Astoria Blvd | Video Store |
| 03 | Polk Theater | 93-09 37th Ave | Movie Theater |
| 03 | Topless Bar | 39-02 104th St | Topless Bar |
| 03 | Wileys | 95-07 31st Ave | Topless Bar |
| 04 | Adult Love Boutique | 89-18 Queens Blvd | Peep Show |
| 04 | Canhe | 92-02 Corona Av | Topless Bar |
| 04 | Dee Two Video | 86-10 Roosevelt Av | Video Store |
| 04 | Pides Place II | 81-26 Baxter Av | Topless Bar |
| 05 | Treasure Chest | 60-07 Metropolitan Av | Topless Bar |
| 06 | Goldfingers | 92-77 Queens Blvd | Topless Bar |
| 06 | Virginias | 95-36 Queens Blvd | Topless Bar |
| 06 | XXX Video Store | 98-32 Queens Blvd | Video Store |

## QUEENS (continued)

| Community District | Name | Address | Use |
|---|---|---|---|
| 07 | Candelwood Inn | 41-57 College Point Blvd | Topless Bar |
| 07 | Corsetorium Inc | 36-35 Main St | Other |
| 07 | Gallaghers II | 26-35 123rd St | Topless Bar |
| 07 | Goodtime Video | 150-36 Northern Blvd | Video Store |
| 07 | Sports Bar | 135-41 E Northern Blvd | Topless Bar |
| 08 | Mayfair Theatre | 68-25 Fresh Meadow Lane | Movie Theater |
| 09 | Andys Bar | 85-01 Rockaway Blvd | Topless Bar |
| 09 | Austin Theater | 81-07 Lefferts Blvd | Movie Theater |
| 09 | Port o Call | 93-10 Woodhaven Blvd | Topless Bar |
| 12 | Dreams Topless Bar | 90-67 Sutphin Blvd | Topless Bar |
| 12 | Gordons Topless Bar | 146-16 Hillside Av | Topless Bar |
| 12 | Krystalls | 89-25 Merrick Blvd | Topless Bar |
| 13 | Happy Tips Lounge | 215-50 Jamaica Av | Topless Bar |
| 13 | XXX Video | 245-02 S Conduit Ave | Video Store |

## STATEN ISLAND

| Community District | Name | Address | Use |
|---|---|---|---|
| 02 | Lipsticks | 3575 Victory Blvd | Topless Bar |
| 02 | Scarletts | 283 Sand Lane | Topless Bar |
| 03 | Hipps | 2945 Arthur Kill Rd | Topless Bar |

*Trends in Concentrations of Adult Entertainment Establishments,
by Community District*

Between 1984 and 1993, adult entertainment establishments have continued to concentrate in a few community districts in Manhattan. Citywide, the number of community districts with one or more adult uses has remained relatively stable over the period. However, adult uses have recently located in neighborhoods within community districts where they had not previously been.

Significantly, the number of community districts with seven or more adult entertainment establishments tripled between 1984 an 1993, from three to nine. Community district designations for adult establishments identified in the 1976 survey are not readily discernible.

Table 3 indicates in rank order the number of adult uses within each community district in 1993. Districts without adult uses are not listed. In 1993, the majority (53 percent) of adult uses in the city were located in Community Districts 1, 2, 4, and 5, Manhattan.

In 1984 and 1993, the greatest concentration of adult uses was found in Community District 5, Manhattan, which includes part of the Times Square area. In 1984, 34 percent of the citywide adult uses were located in the community district; in 1993, 30 percent of such uses were found there. Between 1984 and 1993, the number of adult establishments in the district increased by 18 percent, from 45 to 53, nearly half the rate of growth citywide.

JNR-000400

Case 1:02-cv-04431-LJL-SDA   Document 162-5   Filed 05/09/22   Page 9 of 168

**CITY PLANNING COMMISSION**

---

**September 18, 1995/ Calendar No. 8**                    **N 950384 ZRY**

---

**IN THE MATTER OF** an application submitted by the Department of City Planning and the New York City Council Land Use Committee pursuant to Section 200 and 201 of the New York City Charter, for an amendment of the Zoning Resolution of the City of New York, relating to Sections 11-113, 12-10, 32-00, 32-01, 32-62, 32-69, 42-00, 42-01, 42-52, 42-55, 51-00, 52-38, 52-71, 52-734, 52-77, 52-82, 72-01, 72-40, concerning adult establishments.

---

This application for an amendment to the Zoning Resolution was filed on March 21, 1995.  The proposed zoning text amendment would discontinue the current moratorium on new adult establishments and would provide permanent regulations governing the siting of adult establishments in a manner which works to protect against the adverse secondary effects of adult establishments while allowing sufficient opportunity for and access to adult materials.

**BACKGROUND**

Zoning Moratorium

On November 7, 1994, the City Planning Commission approved an application filed by the Department of City Planning for a zoning text change to establish a one-year moratorium on new adult establishments (N 950113 ZRY).  The moratorium prohibited the location of new, and the expansion or enlargement of existing, adult bookstores, adult eating or drinking establishments, and

---

N 950384 ZRY                                                              1

JNR-000401

adult theaters.   The Commission approved the application after determining that the adverse secondary effects stemming from the location and proliferation of adult establishments warranted their regulation.  The moratorium was designed to provide sufficient time to develop and enact permanent zoning regulations for adult uses. The zoning text change establishing the moratorium was adopted by the City Council on November 23, 1994.

The Commission based its decision to impose the moratorium in part on a study conducted by the Department of City Planning ("Adult Entertainment Study," September 1994, DCP# 94-08, or "DCP Study"). The study was undertaken in response to growing concern that adult establishments were proliferating in New York City and concentrating in areas where such establishments had previously not located and were negatively affecting their surrounding communities.  The DCP Study assessed recent trends in the location of the adult establishments in New York City.   The Study also summarized the findings of studies from other jurisdictions as well as studies undertaken by groups within New York City regarding the impact of adult establishments on the surrounding area.[1]  The DCP

---

[1]       The DCP Study reviewed impact studies from Islip (NY), Los Angeles (CA), Indianapolis (IA), Whittier (CA), Austin (TX), Phoenix (AZ), Manatee County (FL), New Hanover (NC), and the State of Minnesota, all of which concluded that adult uses tended to produce adverse secondary effects.  The DCP Study also reviewed a June, 1993 study by the Times Square Business Improvement District, the August 1993 Chelsea Business Survey prepared by the Chelsea Action Coalition and Manhattan Community Board 4, the 1983 Annual Report by the Office of Midtown Enforcement, and the testimony from an October 6, 1993 public hearing by the Task Force on the

---

JNR-000402

Study also included a survey by the Department of City Planning of the impact of adult establishments in areas of where they are located in less dense concentrations.

The Study made the following findings and conclusions:

- Numerous studies in other localities found that adult entertainment uses have negative secondary impacts such as increased crime rates, depreciation of property values, deterioration of community character and the quality of urban life.

- There has been a rapid growth in the number of adult entertainment uses in New York City. Between 1984 and 1993, the number of such uses increased from 131 to 177. The number of video/book stores/peep shows almost tripled and there was a 26 percent increase in topless/nude bars. Adult theaters declined by 52 percent.

- Adult entertainment is more readily accessible in NYC than it was ten years ago. There are more such establishments in a greater number of communities. Adult videos are produced in greater numbers and at lower costs. They are often available in general interest video stores as well as those devoted exclusively to adult entertainment. Cable television has significantly increased the availability of adult viewing material. Adult material is also available at newsstands and book stores.

- Adult entertainment uses tend to concentrate. The number of community districts with seven or more adult uses increased from three to eight over the last ten years. Seventy five percent of the adult uses are located in ten of the city's 59 Community Districts. In Manhattan, adult uses cluster in central locations, such as the Times Square area. In the other boroughs, adult uses appear to

---

Regulation of Sex-Related Businesses.

---

N 950384 ZRY                                                                    3

cluster along major vehicular routes, such as Queens Boulevard and Third Avenue in Brooklyn, that connect outer reaches of the city and suburbs to the central business district.

• Studies of adult entertainment uses in areas where they are highly concentrated, such as Times Square and Chelsea, identified a number of significant negative secondary impacts. In the Times Square area property owners, theater operators and other business people overwhelmingly believe that their businesses are adversely affected. An analysis of criminal complaints indicated a substantially higher incidence of criminal activity in the Times Square area where adult uses are most concentrated. In addition, the study found that the rate of increase in assessed property values for study blocks with adult uses grew at a slower rate than control blocks without adult uses.

• DCP's survey of areas with less dense concentrations of adult uses found fewer impacts than the study of the Times Square area. However, community leaders expressed concerns that adult uses impact negatively on the community and they strongly fear the potential results of proliferation.

• The strongest negative reactions to adult entertainment uses come from residents living near them.

• Where respondents indicated that their businesses or neighborhoods had not yet been adversely affected by adult uses, this typically occurred in study areas with isolated adult uses. Moreover, these same respondents typically stated that an increase in such uses would negatively impact them. Community residents fear the consequences of potential proliferation and concentration of adult uses in traditionally neighborhood-oriented shopping areas and view the appearance of one or more of these uses as a deterioration in the quality of urban life.

• Most real estate brokers report that adult entertainment establishments are perceived to negatively affect nearby property values and

decrease market values. Eighty percent of the brokers responding to the DCP survey indicated that an adult use would have a negative impact on nearby property values. This is consistent with the responses from a similar national survey of real estate appraisers.

- Adult use accessory business signs are generally larger, more often illuminated, and graphic (sexually-oriented) compared with the signs of other nearby commercial uses. Community residents view this signage as out of keeping with neighborhood character and are concerned about the exposure of minors to sexual images.

The Study concluded that the adverse effects of adult establishments justified their regulation. The Commission and the City Council agreed in adopting the moratorium, allowing time for the development and consideration of permanent regulations.

<u>The Proposal</u>

On March 21, 1995, the New York City Council Land Use Committee (Res. No. 897) and the Department of City Planning filed this joint application. A prior application (N 950166 ZRY) submitted by the New York City Council Land Use Committee was withdrawn.

The proposed zoning text change would repeal the current one-year moratorium on new adult establishments and the enlargement or extension of existing adult establishments (Section 11-113). The moratorium, which will expire in November, 1995, will not be needed if permanent zoning for adult uses is enacted.

---

N 950384 ZRY                                                                 5

The proposed text change would define (Section 12-10) adult establishments and four types of facilities - adult book stores, adult eating or drinking establishments, adult theaters, and other adult commercial establishments - which alone or in combination would constitute an adult establishment.  These facilities, all commercial uses, include adult video stores, topless and nude bars, and peepshows; specifically excluded are commercial studios and business or trade schools.  It would also define the types of materials or activities which must be present to make an establishment an adult establishment.

Under the moratorium text, the principal distinguishing characteristic of an adult establishment is that it is "customarily not open to the public because it excludes minors by reason of age."  The proposed text refines the definition of adult establishment to articulate what constitutes an adult establishment.  The definition's underpinnings are "specified sexual activities" and "specified anatomical areas," terms used in most zoning ordinances throughout the country.  These terms specifically detail the distinguishing characteristics of adult establishments, allowing a clear understanding of what is proscribed by the regulations.

In commercial and manufacturing districts, adult establishments would be subject to special provisions (Sections 32-01 and 42-01) in addition to existing rules governing commercial uses in such

districts.

Under the special provisions, adult establishments would not be allowed in C1, C2, C3, C4, ·C5, C6-1, C6-2, C6-3, nor M1 Manufacturing Districts that permit new residences, new joint living-work quarters for artists, or new loft dwellings. These districts are: local retail and service districts mapped throughout residential areas in all boroughs; waterfront recreation districts; general commercial districts, providing regional shopping opportunities in each borough; restricted central commercial districts; certain lower density general central commercial districts that permit residences and an array of commercial uses; and mixed-use manufacturing districts. Each of these districts allows new residential uses (or other living quarters or loft dwellings) and most community facility uses (e.g.; schools, which include day care centers, and churches or houses of worship), either as-of-right, by special permit, or by authorization. Adult establishments currently located within these zoning districts would be required to terminate.

Adult establishments would continue to be allowed[2] in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, C8, M1 (other than mixed-use M1 Districts), M2, and M3 Districts, subject to certain limitations.

---

[2]    Prior to the moratorium, commercial uses that could also be characterized as adult were generally allowed as-of-right in most commercial and manufacturing districts.

N 950384 ZRY                                                                    7

C6-4 through C6-9 districts, General Central Commercial Districts, are zoned for high commercial floor area ratios (10 or greater). C7 Commercial Amusement Districts allow large open commercial amusement establishments; C8 General Service Districts prohibit residential use and permit a broader range of service uses than other commercial zones. M1 (Light Manufacturing), M2 (Medium Manufacturing) and M3 (Heavy Manufacturing) Districts are characterized by industrial and commercial uses. C7, C8, M1 (other than mixed-use M1 Districts), M2, and M3 Districts do not permit new residences. Schools and churches are allowed as-of-right in C6 districts; they are not allowed in C7 districts. In C8 and M1 districts, schools are allowed by special permit; churches are allowed as-of-right in C8 districts and by special permit in M1 districts. Community facilities are not permitted in M2 or M3 districts. Allowing adult establishments to continue to locate in these districts affords access to adult materials in central locations of the City and in districts where new residences are precluded by zoning.

Within C6-4 through C6-9, C7, C8, M1 (other than mixed use M1 Districts), M2, and M3 Districts, adult establishments would continue to be allowed provided they are located at least 500 feet from a house of worship, a school or daycare center; or another adult establishment; or a district (other than a C6-4 through C6-9 District) in which new residences, new joint living-work quarters for artists, or new loft dwellings are permitted.

---

N 950384 ZRY                                                                    8

The proposed text would generally allow adult establishments that meet these zoning provisions to remain as conforming uses in such locations if a school, day care center or house of worship is subsequently established within 500 feet of it.   Adult establishments at permitted locations would be unfettered by the largely private locational decisions made subsequently by such community facilities.

Only one adult establishment, not to exceed in total 10,000 square feet of floor area and cellar space not used for enclosed storage or mechanical equipment, would be permitted on a zoning lot.

In addition, adult establishments that existed on the effective date of the zoning text change and are otherwise conforming adult establishments except that they are within 500 feet of one another, or located on the same zoning lot, or exceed 10,000 square feet, would not be subject to the amortization provisions discussed below.  Those establishments exceeding 10,000 square feet could not extend or enlarge beyond their current size.

The proposed text change would also limit the size, placement and illumination of accessory business signs on adult establishments. New accessory business sign regulations are proposed for adult establishments in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, and C8 Districts (Section 32-69).  In these districts, accessory business signs for adult establishments would be generally subject to the

---

N 950384 ZRY                                                                9

more restrictive sign regulations that apply to commercial uses in C1 Districts, and would be further limited to a maximum of 150 square feet per establishment, of which no more than 50 square feet may be illuminated and no portion may be flashing.

In M1, M2, and M3 Manufacturing Districts, accessory business signs for adult establishments would be limited to a maximum of 150 square feet per establishment, of which no more than 50 square feet of signage may be illuminated non-flashing (Section 42-55). In addition, such signs would not be permitted on the roof of any building or extend to a height greater than 25 feet above the curb level. These provisions would conform to the proposed sign regulations for adult uses in manufacturing zones with those sign regulations proposed for adult uses in commercial districts.

The proposed limitations on accessory business signs for adult establishments allow adult establishments to identify themselves and the products, performances or services offered within them. The content of the signage would not be regulated under zoning.

Language would be added making it clear that a non-conforming use could not be changed to an adult establishment unless it would meet the special provisions for adult establishments in Section 32-01 or 42-01 (Section 52-38).

---

N 950384 ZRY                                                                    10

Existing adult establishments and accessory business signs that do not conform to the proposal would be generally required to terminate (or change their operations to make them conforming) within one year of the effective date of this text change, or within one year of a subsequent map change (Sections 52-734 and 52-77). If the owner of a non-conforming adult establishment or non-conforming accessory business sign were unable to substantially recoup its investment in the adult component of the establishment within the year, it may apply to the Board of Standards and Appeals (BSA) for additional time to recover substantially all of the financial expenditures related to the adult nature of the use or sign.

The proposal would require such applications to be made at least 120 days before the termination date. In order to grant an extension, an applicant must demonstrate to the BSA and the BSA must find that the applicant has made substantial expenditures related to the non-conformity before the use became non-conforming; that the applicant has not substantially recovered the related investment; and that the period for which the establishment or sign may be continued is the minimum period sufficient to recover the investment.

On April 10, 1995, the City Planning Commission clarified language in the proposed zoning text and referred it for community review.

---

N 950384 ZRY                                                        11

ENVIRONMENTAL REVIEW

This application (N 950384 ZRY) was reviewed pursuant to the New York State Environmental Quality Review Act (SEQRA), and the SEQRA regulations set forth in Volume 6 of the New York Code of Rules and Regulations, Section 617.00 et seq., and the New York City Environmental Quality Review (CEQR) procedures set forth in Executive Order 91 of 1977.   The designated CEQR number is 95DCP038Y.   The Lead Agency is the City Planning Commission.

After a study of the potential environmental impacts of the proposed action, a Negative Declaration was issued on April 10, 1995.

Minor revisions were made to the proposed zoning text.   On September 18, 1995, it was determined that the revisions constitute a minor modification of the proposed text amendments and the Negative Declaration issued on April 10, 1995 remains valid.

WATERFRONT REVITALIZATION PROGRAM CONSISTENCY REVIEW

The proposed action's consistency with the Waterfront Revitalization Program (WRP) was assessed and disclosed in the Environmental Assessment Statement (EAS).   The EAS disclosed that the proposed action would be consistent with the policies of the WRP.

N 950384 ZRY                                                                                        12

**PUBLIC REVIEW**

On April 10, 1995, the proposed zoning text change was referred to the community boards for 60 days, and the Borough Boards and Borough Presidents for an additional 30 days, for information and review in accordance with the procedures for referring non-ULURP matters.

**Community Board Review**

The Commission received recommendations from the following 39 community boards.  A copy of each board's full recommendation is attached to this report.

The Bronx Community Boards:  1, 2, 3, 4, 5, 7, 9, 10, 11,12
Brooklyn Community Boards:  1, 2, 6, 8, 9, 13, 15
Manhattan Community Boards:  1, 2, 3, 4, 5, 6, 7, 8, 9, 12
Queens Community Boards:  1, 2, 3, 4, 5, 6, 7, 8, 9
Staten Island Community Boards:  1, 2, 3

Eleven community boards voted in favor of the zoning plan; eleven boards voted in favor of the proposal with modifications that would make it more restrictive; four voted in favor with modifications that would make it less restrictive; and thirteen voted against the proposal.

---

N 950384 ZRY                                                                    13

Of the thirteen community boards voting against the proposal, six of the community districts contained areas where adult uses would continue to be allowed and wanted more restrictions in these areas. Four other community boards voting against the proposal wanted adult establishments banned entirely. Of the remaining three other community boards voting against the proposal, two asked that it be withdrawn and one did not explain its action.

A general summary of the suggested changes follows.

Modifications that would make the proposal more restrictive

1)   Increase the minimum distance between adult establishments, or between adult establishments and churches, schools and day care centers from the proposed 500 feet to 750 or 1,000 feet. **(The Bronx Community Boards 11 and 12; Manhattan Community Board 12; Queens Community Boards 1 and 6; Staten Island Community Boards 1 and 3)**

2)   Add other uses to the list of sensitive receptors, such as parks, playgrounds not connected with a school, landmarks, greenways, nursing homes, recreational facilities, legal non-conforming residences located within manufacturing districts, and waterfront areas. **(The Bronx Community Boards 11 and 12; Brooklyn Community Board 6; Manhattan Community Boards 6 and 12; Queens Community Board 5; Staten Island Community Boards**

N 950384 ZRY                                                                 14

1 and 2)

3)   Further restrict signage and/or limit the street frontage for
     adult establishments.  (Manhattan Community Boards 4, 5 and 6;
     Staten Island Community Board 1)

Modifications that would make the proposal less restrictive

1)   Allow new adult uses to locate in all commercial districts
     subject only to the 500 foot restriction from a residential
     district.  (Manhattan Community Boards 4, 5 and 6)

2)   Allow new adult uses to locate in regional shopping districts,
     in   addition   to   general   central   commercial   districts.
     (Manhattan Community Board 4)

3)   Reduce the minimum required distance from adult uses to
     residential  zones  from  500  as  proposed  to  100  feet.
     (Manhattan Community Board 6)

4)   Allow some or all of the existing adult establishments to be
     grandfathered.  (Manhattan Community Board 2)

Modifications that would clarify the text

1)   Refine the definition of "substantial" as used in the proposed
     zoning text.  Specifically exempt from the regulations art

---

N 950384 ZRY                                                        15

galleries, museums and legitimate theaters. Add to the proposal certain language from the adult use moratorium text concerning prohibiting minors in adult establishments. **(Manhattan Community Boards 1, 4, 5, and 6; Queens Community Board 7)**

2) Limit the ability of the Board of Standards and Appeals to extend the time to amortize an adult establishment to a specific number of years. **(The Bronx Community Board 11; Manhattan Community Board 12)**

Several suggestions were unrelated to zoning. Some examples include the suggestion to prohibit adult establishments from locating in city owned or controlled projects, such as industrial parks and urban renewal areas, and to encourage other governmental agencies such as the Port Authority to prohibit adult establishments in their airports and empowerment zones. Others concern requiring an adult establishment to obtain a license or permit from a city agency such as the Department of Consumer Affairs, so that the community boards would be apprised of new adult establishments. Still others would result in a dedicated enforcement agency in addition to the Department of Buildings, such as Consumer Affairs, the Police Department, or the Office of Midtown Enforcement.

N 950384 ZRY

JNR-000416

**Borough President Review**

The President of the Borough of The Bronx, on July 17, 1995, recommended approval of the application with modifications, as follows:

> Prohibit adult establishments to locate within 1,000 feet of sensitive receptors and each other.   The current proposal establishes a 500 feet minimum distance requirement which should be increased to 1,000 feet.

> Add the following to the uses from which a minimum distance of 1,000 feet would be required for establishment of adult uses.

> Community Facility uses listed in Use Group 3A (Section 22-13) of the Zoning Resolution which includes:  Colleges or Universities, Residential care facilities (Shelters), Libraries and museums, Not-for-profit hospital staff dwellings, Nursing Homes

> Parks and public recreational facilities

> Day care Facilities, which should be further defined to include:   nurseries,    pre-schools,    head    start programs/centers, child care establishments

> Create an effective mechanism for enforcement as the Department of Buildings lacks the resources for meaningful enforcement of the current regulations.

The President of the Borough of Manhattan, on July 10, 1995, recommended against approval of the application.  She wrote:

> Despite my conviction that the potential secondary effects in areas surrounding some adult establishments do warrant further regulation, I have concluded that the zoning text amendments now under consideration do not satisfactorily address the complex issues related to these businesses and their impacts.  This proposed zoning text is neither in the best interest of many specific

---

N 950384 ZRY                                                                17

neighborhoods, nor of the city as a whole. Without substantial revision, the City will fail to protect all the communities whose interests are affected by the proposed text amendments. Indeed, these amendments are City Hall's false promise to neighborhoods that it is responsibly and effectively dealing with this complicated set of issues.

The communities of this city that are now burdened by the impacts of a burgeoning adult-entertainment industry are entitled to a plan that both promotes fairness and provides real relief. This proposal, by contrast, would produce severely inequitable impacts.

The vast majority of the land areas identified as "available" for adult establishments to locate are in public ownership, or otherwise severely restricted. Since the adult-entertainment industry will not, in fact, be able to locate in these areas, it will gravitate instead to those few mixed use commercial areas where such businesses would remain legal, effectively stigmatizing these areas as the only viable adult establishment districts. This is unacceptable.

In addition, by applying a generic standard to a very diverse urban landscape, the proposal threatens the economic and social survival of neighborhoods -- especially those integral to our city's gay and lesbian communities -- where the presence of a spectrum of adult-use businesses has invigorated, rather than hindered, the quality of life.

In sum, far from representing a solution to the problems that have cropped up with the expansion of adult establishments, the current zoning proposal offers only the temporary illusion of a plan to make everything "go away." It is very unlikely to pass constitutional muster. Fairly analyzed with a view toward prior court precedents, it does not identify a reasonable enough range of viable locations for adult establishments to continue to locate to survive the inevitable legal challenge.

The President of the Borough of Staten Island, on July 19, 1995, recommended approval of the application with modifications, as

N 950384 ZRY                                                                18

follows:

> A distance of 750 feet from all residential zones, public benefit uses such as proposed and existing parks, trailways, esplanades, libraries, museums, historic sites, day care, senior centers and must be excluded from any Economic Development Zones.

A copy of each Borough President recommendation is attached.

Borough Board Review

All of the Borough Boards submitted recommendations respecting the proposed text.

The Bronx Borough Board, on June 22, 1995, voted to approve the proposed zoning text change conditioned on the following modifications to the proposal:

> Prohibit adult establishments to locate within 1,000 feet of sensitive receptors and each other. The current proposal establishes a 500 feet minimum distance requirement which should be increased to 1,000 feet.

> Add the following to the uses from which a minimum distance of 1,000 feet would be required for establishment of adult uses.

> Community Facility uses listed in Use Group 3A (Section 22-13) of the Zoning Resolution which includes: Colleges or universities; Residential care facilities; Libraries and museums; Not-for-profit hospital staff dwellings; Nursing homes

> Parks and public recreational facilities

> Day care Facilities, which should be further defined to include: nurseries; pre-schools; head start

---

N 950384 ZRY                                                        19

programs/centers; child care establishments

Should the proposed zoning text amendment go through adjudication, an extension of the moratorium be initiated to guard against additional uses being established before a judgement is rendered.

The Brooklyn Borough Board on June 20, 1995, voted 21-0-0, to disapprove the application, requesting an extension of the existing moratorium " . . . until such time that a zoning resolution is submitted which adequately protects Brooklyn's neighborhoods." The Borough Board stated: the proposal "regulates the location, proximity, size and signage of adult establishments inequitably throughout the city"; the 500 foot radius does not provide adequate protection; there is no maximum time limit for amortizing non-conforming adult establishments; and, concentrations of adult establishments may result in particular neighborhoods.

The Manhattan Borough Board, on July 20, 1995, voted against the proposal, stating that there was a need to enforce existing sign and nuisance laws, suggesting that consideration be given to more stringent sign and window display restrictions for adult establishments; questioning the appropriateness of zoning controls as the best regulatory tool for adult establishments; noting that some Borough Board members support the proposal's anti-concentration provision; suggesting that the definitions should be improved for clarity and to avoid potential abuse; requesting a formula for amortization; and recommending a registration program

---

N 950384 ZRY

20

for adult uses to fund adequate enforcement and provide community notification, review and approval.

The Queens Borough Board, on July 25, 1995, voted 13-0-0 to approve the proposal conditioned on the following:

> The 500 feet minimum distance requirement is extended to 1,000 feet to provide adequate protection for our communities against adverse secondary impacts of adult establishments;

> Modification of the proposal to prohibit the location of adult uses in manufacturing districts that are within an approved General Project Plan (i.e. Queens West, College Point Corporate Park) and to restrict such uses to within 1,000 feet of the boundaries of such Plan;

> Modification of the proposal to prohibit the location of adult uses on waterfront properties in Queens that are zoned for manufacturing use;

> The Office of Midtown Enforcement be charged with the responsibility of monitoring the activities of all adult establishments citywide.

The Staten Island Borough Board, on July 5, 1995, voted 4-0-3, to approve the proposal with modifications/conditions, as follows:

> A distance of 750 feet from all residential zones, public benefit uses such as proposed and existing parks, trailways, esplanades, libraries, museums, historic sites, day care, senior centers and must be excluded from any Economic Development Zones.

Borough Board recommendations are attached.

---

N 950384 ZRY

City Planning Commission Public Hearing

On July 12, 1995 (Calendar No. 10), the City Planning Commission scheduled July 26 and July 27, 1995 for a public hearing on this application.  The hearing was duly held on July 26, 1995 (Calendar No. 23), and adjourned.  The hearing was continued on July 27, 1995 (Calendar No. 1), and closed.

Eighty speakers testified, 24 in favor and 56 opposed to the application.  Written testimony, correspondence and petitions were also submitted both in favor of and in opposition to the application.

Those speaking in favor of the proposal included the Deputy Mayor for Planning and Community Relations, the Director of the Mayor's Office of Midtown Enforcement, two councilmembers representing districts in Brooklyn and Queens, representatives of the Real Estate Board of New York, the League of American Theater Producers, the Times Square Business Improvement District, the Grand Central/34th Street Partnerships, the 42nd Street Development Project, Inc., the Tribeca Community Association, COMET (Communities of Maspeth Elmhurst Together), three community boards located in The Bronx, Manhattan and Queens, the Queens Village Civic Association, the Rose Hill Civic Association (Manhattan), the

N 950384 ZRY                                                                            22

JNR-000422

Common Ground Community (Times Square), and several individuals. A representative of the Borough President of The Bronx spoke in favor of the proposal on the condition that it be modified to be more restrictive.

Written testimony or material in support was submitted by a councilmember representing the East Side of Manhattan, the St. Ambrose Council, No. 1463, Knights of Columbus (College Point), St. Malachy's Catholic Church (Times Square area), the New York Foundling Hospital, the Hotel Association of New York City, Inc., three Members of the Assembly representing districts located in Queens, the Sunset Park Restoration, the Preservation League of Staten Island, a gallery owner in the Times Square area, the Joint Community Council of College Point, Inc., and numerous letters were submitted by individuals.

Those speaking in opposition included the Borough Presidents of Brooklyn and Manhattan, five councilmembers representing districts in Brooklyn and Manhattan, counsel for the Coalition For Free Expression, five members of the legislature representing assembly or senatorial districts located in The Bronx, Brooklyn and Manhattan, a representative of the New York Civil Liberties Union, the proprietor of an adult establishment, two employees of adult establishments, a representative of the Working Group for Free Expression, the Leslie-Lohman Gay Art Federation, the National Coalition Against Censorship, the New York City Americans for

N 950384 ZRY                                                          23

Democratic Action, the Empire State Pride Agenda, Lambda Legal Defense and Education Fund, Feminists for Free Expression, an adult video store owner, the publisher of a newsletter related to the adult entertainment industry, two representatives of Brooklyn and Manhattan community boards, counsel representing the Herald Square South Civic Association, a representative of the Gay and Lesbian Independent Democrats, Care About The Slope (Brooklyn), the Gowanus Canal Community Development Corporation and Carol Gardens Association, Inc., the Friends of the North Shore Greenbelt on the Staten Island Waterfront, and many individuals.

Written testimony or material in opposition was submitted by the Brooklyn Chinese-American Association, the Fashion Center District Management Association, the Franklin Furnace, Our Lady of Good Counsel Church (Staten Island), the Gay Men's Health Crisis (GMHC), Faith United Methodist Church (Staten Island), St. John's Lutheran Church (Brooklyn), the Riverbay Corporation Co-op City, the Federation of Italian-American Organizations of Brooklyn, Ltd., the Concerned Citizens of Withers Street and Area Block Association, Inc., Americans for Decency (Staten Island), Staten Island Friends of Clearwater, the pastor of S.S. Cyril and Methodius Roman Catholic Church (Brooklyn), the Polish American Congress - Downstate NY Division, Concerned Citizens of Greenpoint, a representative of Community Board No.1, Brooklyn, Lambda Associates of Staten Island, two Members of Congress representing districts located in The Bronx and in Manhattan, five Members of the Assembly

N 950384 ZRY

24

representing districts located in Brooklyn and Manhattan, and more than 3,000 petitions or letters were submitted from individuals.

The reasons cited in testimony in favor of or in opposition to the proposed zoning text amendment often mirrored the testimony related to the adult use zoning moratorium.  Those in favor of the proposal generally noted the adverse secondary effects of adult establishments, both when concentrated in small geographic areas, such as in the Times Square, Chelsea and Queens Boulevard areas, or when dispersed in commercial and residential neighborhoods throughout the City.  They expressed concern with quality of life issues such as public loitering and litter; increased crime, including prostitution near where adult establishments have proliferated or concentrated; adverse economic impacts on real estate values or economic activity; the proliferation of adult uses into neighborhoods where they have not traditionally located, including residential and local commercial areas; and inappropriate signage, out of character with other commercial signs in the area.

Some of those testifying in opposition to the zoning plan generally cited what they believe would be inappropriate or unconstitutional restraints on speech.  Others testifying indicated their belief that the regulations would have a disproportionate impact on certain groups such as the gay and lesbian communities.  A number of speakers expressed their fear that the regulations would be used to target and shut down a number of establishments with a gay and

JNR-000425

lesbian clientele.  One speaker questioned the sufficiency of the environmental analysis.

The great preponderance of testimony against the zoning application, however, reflected the perception that the proposal was not restrictive enough and that adult uses should be prohibited in more areas of the City.

Several testifying for or against the proposal noted the negative impacts of adult establishments, especially when located in concentration.  The theater organization representative stated: "Whenever we saw bookstores, peep shows, whenever we saw massage parlors, topless bars, there were street problems.  The theater people didn't just come out like you would have from a department store.  They were hustled."  The Director of the Office of Midtown Enforcement testified that it has been that agency's experience "when adult establishments begin to locate in particular areas, they attract other similar enterprises, and an atmosphere is created that soon leads to the opening of massage parlors, other types of brothels and variations of illegal sex-related businesses . . . Between December of 1991, and I think it was June of 1994, we closed 45 brothels that opened along Queens Boulevard and Roosevelt Avenue areas and they sprung up when the adult video stores and entertainment businesses started to move to Queens."

The Times Square Business Improvement District testified about that

N 950384 ZRY                                                              26

District's study of adult establishments: "Our findings, comparing control blocks to study blocks and drawing on official data from the Police Department and Department of Finance, show a slower increase in property values for blockfronts and individual, properties near pornographic establishments, and a correlation between the concentration of such establishments and increased criminal complaints as well as arrests." The representative of the 42nd Street Development Project testified in favor of the proposal to regulate adult establishments, and referring to Disney's renovation of the historic New Amsterdam Theater; The New 42, a renovation of the Victory Theater as a performing arts venue for young people; and Madame Tussaud's, stated: "In our view, none of these exciting new entertainment uses would have come to 42nd Street if we had not been making progress toward the goal of eliminating blight from the Project area."

The representative of the Real Estate Board testified that "Leasing brokers have reported increased difficulties, delays and additional costs when offering space to potential tenants when adult uses are visibly operating in the vicinity." To buttress his statement, he noted the difficulty World Wide Plaza had in securing a major long-term tenant until a nearby adult use was eliminated, and that Citicorp conditioned its commencement of construction of its new headquarters building on the departure of adult establishments from the east midtown area. The general counsel to the Grand Central and 34th Street Partnerships cited the negative economic effects of

N 950384 ZRY

JNR-000427

adult establishments in midtown Manhattan by testifying "Finally, I wish to emphasize that the issue here is economic impact.  In my judgment, after having been involved in efforts to redevelop midtown over the last 5 years, sex-related businesses are an obstacle to economic development."  The gallery owner testified "Recently a topless bar opened across the street from me and there has been a drop of about 25% in my walk-up business."  A community board member from Manhattan noted the negative effects of the proliferation of adult establishments and their visibility in her community district:  "There used to be one (adult establishment) . . . in Tribeca . . .  In recent years there has been a proliferation and they are on Canal, on Reade, they are on White, and Murray and Church Street.  Parents don't have a choice where they walk their kids."

Several testifying against the proposal noted impacts stemming from adult establishments.  For example, the Borough President of Brooklyn testified that he believes adult uses such as "topless bars, triple X video stores, and strip clubs . . . place a burden on our neighborhoods and jeopardize the stability of our communities."  Impacts of adult establishments were also noted by a councilmember testifying against the proposal.  In response to a question from the Commission about whether communities view the signage and window displays as the problem with adult establishments or whether the problem stems from activities within the establishments, the councilmember testified about a topless bar

N 950384 ZRY                                                                    28

JNR-000428

located near his home that "did not advertise much." He stated: "There used to be a topless bar around the corner from where I live . . . that women who went to the health club down the street, who came out at ten at night, and were on their way home were being accosted by the patrons of that club . . . " He continued that in addition to police reports about guns and drugs that were being drawn into the area because of what he said was going on inside the club, "It was making Brooklyn Heights into a red light zone with one establishment." Another councilmember from Brooklyn testifying in opposition to the proposal noted that a community organization which fights prostitution works in the same corridor in Sunset Park that is home now to most of the adult uses in Brooklyn.

A number of individuals expressed concern that the proposal would alter the current location of adult establishments, benefitting certain neighborhoods where adult uses are currently located but would not be allowed under the proposal, to the detriment of other neighborhoods with few if any adult establishments. Brooklyn Borough President labelled the proposal "unfair," noting that certain neighborhoods in that borough "that do not presently have sex related businesses are vulnerable to concentrations that could produce new red light districts." The Borough President of Manhattan testified "I am glad the dispersal rules will reduce the concentration around Times Square . . . but I oppose putting unfair pressures on areas such as the blocks south of Herald Square and other vital places where people live, work and go to school." A

councilmember from Brooklyn and a councilmember from Manhattan described the plan as "guaranteeing" the relocation of existing adult businesses to locations where they would continue to be allowed under the new zoning but do not currently exist, creating "the incentive for such stores to shoe-horn themselves into every possible available site." The Bronx Borough President testified that the proposal would unduly impact the South Bronx and Hunts Point where businesses "will be vulnerable to the secondary effects of adult entertainment uses."

Others testified that the proposal would unduly limit access to adult materials. Counsel to the Coalition for Free Expression, representing many speakers, stated his belief that less than one percent of the land area of Manhattan would be available under the plan for adult establishments, and that not all sites may be suitable for adult uses. A representative of a lesbian and gay advocacy organization testified that the proposal "will rid predominantly lesbian and gay neighborhoods of so-called adult use establishments that have not only peacefully existed for years, but have provided sexually explicit materials in safe, gay-friendly, sex-positive environments." The Borough President of Manhattan testified that she opposed "the impact of this proposal on areas such as Christopher Street . . . (where adult) uses would be wiped out."

Considerable testimony was received about the language of the

---

N 950384 ZRY                                                                    30

proposed zoning text, particularly as it defines adult establishments. Speakers noted the importance of having clear language so that the regulations would not enforced against activities or establishments that were not intended to be captured by the proposal. An AIDS activist writer stated his opposition to the proposed zoning text because "under it some building inspector would decide if the material at the experimental theaters I frequent would be actionable or not. The WOW Cafe is New York City's lesbian theater. If several pieces in a given season deal explicitly with lesbian sexuality, would WOW run afoul of the law?" He stated that the proposed text exposes what he characterized as pioneering performing venues specializing in provocative material, much of which is sexual, to potential harassment.

Testimony was offered by a number of speakers that signs for adult establishments were out of character with the neighborhoods in which such establishments were located. The representative of the Rose Hill Civic Association in Manhattan testified that an adult video store in that neighborhood has "in your face signage." He noted further that a general interest video store in the neighborhood has an adult section within the store: "No one objects to that. No one in a million years objects to that." Others testified that regulating signs alone was sufficient to blunt the impact of adult establishments. The negative impact of signage was discussed above in the testimony of the councilmember from Brooklyn. The Borough President of Manhattan testified that

N 950384 ZRY

31

she favored "strengthening the signage laws, to reduce the visually assaultive nature of some of these uses and control the impacts . . . (making) a simple walk to school or the supermarket feel like a gauntlet of out-of-place flashing neon in some communities." A community board member from Manhattan testified that she, as a feminist, was offended by the signage of an adult establishment in Tribeca, and stopped patronizing a retailer adjacent to the adult establishment when the adult use moved in.  An individual testifying in opposition to the plan submitted testimony that " . . . there is a sexually-oriented video store on Amsterdam Avenue in the mid-70s that would probably not be considered a problem were modest 'time place and manner' regulations going to window and light display adopted."  A representative of a midtown Manhattan community district, which supported part of the zoning plan, noted the community board's support " . . . of even more stringent regulations for signs and window displays as other people mentioned tonight."

The three Borough Presidents who supported the proposal with conditions that would make it more restrictive, Queens, Staten Island and The Bronx, suggested that additional uses be considered sensitive receptors and the buffer between zones where adult establishments would continue to be located and those where adult uses would be prohibited be increased from 500 feet to either 750 or 1,000 feet.  The Bronx Borough President testified that sensitive receptors should include community facility uses listed

JNR-000432

in Use Group 3A of the Zoning Resolution, and parks and public recreation facilities.  He also called for expanding the definition of day care centers to include:  nurseries, pre-schools, Head Start programs/centers, and child care establishments.

**CONSIDERATION**

The Commission believes that the adoption of the proposed zoning text creating permanent regulations for adult establishments is, as modified in the manner described below, an appropriate and necessary response to the adverse secondary effects stemming from adult establishments.  The proposed text comprehensively addresses the aspects of adult establishment operations shown to have such adverse effects in a manner.  At the same time, the proposal continues to provide ample opportunity for adult establishments to locate and operate throughout New York City.  The Commission is reaching this conclusion based on the findings of the DCP Study, the study conducted by the Times Square BID, the Chelsea Business Survey, the Task Force on the Regulation of Adult Businesses, and public testimony received in the course of the Commission's review of the proposed text as well as the testimony received in connection with the adult use moratorium.  Studies conducted in a variety of jurisdictions throughout the country regarding the detrimental effect of adult establishments on the surrounding neighborhoods are consistent with and support the Commission's conclusions regarding New York City.

N 950384 ZRY

Efforts to regulate adult uses in New York City date back to the mid-1970s. In 1977, the City Planning Commission adopted zoning provisions regulating adult uses after finding that adult establishments generated adverse secondary effects. In its report, the Commission cited several adverse secondary effects stemming from adult establishments, including their negative impact on business and development, increased criminal activity, their damaging influence on minors and their disruptive impact on neighboring residential communities and the youth of these communities.

While the 1977 regulations were never adopted by the Board of Estimate, the adverse secondary effects shown to be associated with these sorts of establishments have continued to the present day, particularly where the establishments have located in concentration. The Times Square area, the historical situs of adult establishments, demonstrates the myriad of problems resulting from the location and concentration of adult establishments. Studies prepared by the Times Square BID and testimony from representatives of the Times Square BID, the Office of Midtown Enforcement, the 42nd Street Development Project, Inc., and the Common Ground Community document a higher incidence of crime and lower property values on blocks with adult establishments as compared to blocks without adult uses, economic disinvestment in these areas, high sanitation and police costs, more public loitering, an atmosphere of intimidation, a general loss of quality

N 950384 ZRY

34

JNR-000434

of life, and the tendency for other adult activities, including illegal activities, to locate in adjoining areas.

The 42nd Street corridor between Seventh and Eighth Avenues languished for years as a blighted, dirty, unsafe area with run-down buildings, enough so that it was designated an urban renewal area. While economic activity and development was underway in nearby areas of the City, this corridor remained an uninviting location for businesses. A similar situation is presently occurring along Eighth Avenue in Times Square as new adult establishments have concentrated in this area. Public loitering and litter has increased dramatically on one block in the wake of three adult uses opening in close proximity to one another, creating an atmosphere of fear and impacting negatively on the quality of life on the block. Retailers have stated their unwillingness to locate on the block because of the character of the area.

Moreover, statistics for this area indicate that property values increase and criminal activity drops when the adult uses leave an area. As the state has taken control of a major portion of the 42nd Street block and adult establishments have moved, crime decreased dramatically and the area's cleanliness ratings have substantially improved. Economic activity has followed, including plans for the renovation and reuse of the New Amsterdam and Victory Theaters, the development Madame Tussaud's, and plans for a hotel

JNR-000435

and entertainment complex.  This activity would not be taking place if the blighting influence of adult establishments remained in the project area.

As documented by the DCP Study, Times Square is no longer the only place in the City with a concentration of adult uses.  Instead, in recent years adult establishments have begun locating in a variety of areas, including areas which previously had no adult uses, throughout New York City.  As further documented by the DCP Study, adult uses tend to concentrate.  Over the past ten years the number of community districts having seven or more adult uses has grown from three to eight.  Seventy-five percent of adult establishments are located in just ten of the city's 59 community boards.

As adult uses have begun concentrating in new areas, adverse secondary effects similar to those identified in Times Square have followed.  The Chelsea Business Survey documents a high incidence of indoor prostitution arrests and other illegal sex-related activities in areas with concentrations of adult establishments.  The Office of Midtown Enforcement similarly reported that it has closed down numerous illegal sex related businesses in the Chelsea area adjacent to the adult establishments.  OME also noted that the illegal businesses continue to open and are drawn to the area by the presence of the adult uses.

Furthermore, the Chelsea Business Survey showed that a large

N 950384 ZRY

JNR-000436

majority of the commercial tenants in the area reported a negative impact on the economic vitality of their businesses stemming from the proximity of adult uses.  An even larger percentage believe that the concentration of adult businesses has resulted in a declining potential for doing business in Chelsea.  The general counsel of the 34th Street BID reported a similar situation in a nearby area, noting that while other portions of the BID were experiencing an economic boom, retail operators did not want to open on 33rd Street between 5th and 6th Avenues, the site of three adult uses.

Testimony from elected representatives and residents from other areas of the city with concentrations of adult uses, such as Sunset Park in Brooklyn and Queens Boulevard in Queens, reported a litany of adverse effects stemming from the establishments including a high incidence of prostitution arrests (Sunset Park); an impediment to economic activity (Sunset Park and Queens Boulevard); disorderly conduct, public loitering and litter (Queens Boulevard); a high incidence of criminal activity related to illegal sex-related businesses (Queens Boulevard); and a negative impact on the community's children and residential neighborhoods (Sunset Park and Queens Boulevard).  In support of this testimony, a representative of the Office of Midtown Enforcement noted that between December of 1992 and June of 1994 the Office had closed down 45 brothels along Queens Boulevard and Roosevelt Avenues.  The representative noted that the establishments started springing up when adult video

N 950384 ZRY                                                                          37

stores and adult entertainment businesses began opening up in this area.

The studies and the public testimony heard by the Commission also demonstrate the existence of adverse secondary effects stemming from adult establishments even when located in isolation. According to 80% of local real estate brokers responding to DCP surveys, the presence of a single adult establishment would have a negative impact on nearby property values and would decrease property values. This concern is mirrored by the testimony of the Brooklyn Borough President who attested to the negative impact of a single adult use on the nearby Metrotech development. Other significant real estate transactions and development projects have not gone forward because of the proximity of an adult establishment or were made contingent on the departure of the adult establishment, such as the Worldwide Plaza project in west midtown.

In addition, the testimony and studies demonstrate that residential communities and local retail strips are particularly susceptible to the adverse impacts of isolated adult uses. Area residents and elected officials report that a single adult use in a local retail area negatively changes the character of the area and impacts on the economic viability of nearby retail uses. Parents are concerned about the exposure of children to adult materials and strongly object to raising families in properties adjoining adult uses; indeed the strongest negative reaction to adult

JNR-000438

establishments comes from persons living near them.  The residents believe that both their property values and quality of life decline due the presence of adult uses.

Finally, the studies and public testimony document the negative impact stemming from many of these establishments' signage.  While information from the Office of Midtown Enforcement and several of the BIDs indicates that the great majority of the existing business signs fully comply with zoning, substantial testimony was produced indicating that in many areas, the amount of illumination and the amount of signage was out of character with the surrounding neighborhood and had a detrimental effect.

In sum, the studies and testimony indicate substantial adverse secondary effects stemming from the location and concentration of adult uses.  These include:  the negative impact adult establishments have on economic development and revitalization; their tendency to decrease property value, thereby limiting tax revenue; an impediment to economic activity; their tendency to encourage criminal activity, particularly when the establishments are located in concentration; the proliferation of illegal sex-related businesses; their damaging impact on neighborhood character and residents including children; and the costs associated with maintaining and patrolling areas.

This demonstration of substantial adverse secondary effects

---

N 950384 ZRY                                                              39

stemming from the location and concentration of adult uses convinces the Commission of the need to establish a framework for regulating the location of adult uses. Moreover, the Commission believes that the appropriate time to impose these regulations is now. The deleterious effects of adult establishments have gone unchecked for too long a time. Prior to the enactment of the moratorium text, adult uses had begun opening at a fast rate in areas throughout the city, including neighborhood retail and residential areas which historically did not have adult uses. In many cases the new adult uses located in close proximity to other adult establishments, aggravating the negative impact to the surrounding community. While the moratorium has successfully halted this trend for the past several months it will go out of effect at the end of November. Without permanent regulations in place, the ability to locate adult establishments in new areas and create new areas of concentration would once again be permitted. This would have a devastating impact on the future well-being of many New York City neighborhoods and must not happen.

Studies conducted in other jurisdictions support the Commission's conclusions regarding the impact of adult establishments. These studies indicated a number of adverse effects stemming from the location and operation of adult establishments similar to those found in New York City, including: creating impediments to economic development and negatively impacting the value of commercial and residential properties, increased criminal activity, increased

N 950384 ZRY

litter and public loitering, negative impacts residential neighborhoods, and harm to quality of life.

The municipalities surveyed in these other studies are varied, ranging from large, populous cities like Los Angeles and Phoenix, to suburban municipalities such as Islip, New York. New York City has a similar variety of neighborhoods, from dense, mixed-use highly urban areas, to single and two-family neighborhoods in many parts of the outer boroughs, to almost rural areas in portions of Staten Island. Thus, while none of the other studies considers a municipality which duplicates New York City in terms of variety of neighborhoods and built conditions, combined they have attributes of the range of neighborhood conditions found in New York City. The findings of adverse secondary effects and the conditions found in these other studies are relevant to the different neighborhoods of New York City and emphasize the need for regulation to respond to the adverse secondary effects of adult establishments.

While New York City is a unique municipality in many ways, it is not unique in having a variety of neighborhoods, residents and businesses being subjected to the adverse secondary impacts of adult establishments. Suggestions made during the public testimony that the uniqueness of New York City precludes providing New York City residents and neighborhoods with protection against the negative impacts of these establishments are a disservice to the many neighborhoods and individuals of New York City and ignore the

---

N 950384 ZRY

JNR-000441

very real harm tending to stem from adult establishments. The Commission notes that numerous other jurisdictions, including the ten most populous cities in the country after New York City, regulate adult establishments in order to combat their adverse secondary effects. The large majority of the ordinances analyzed use techniques similar to those included in this text to respond to the adverse secondary effects.

The Commission also agrees that the proposed regulations, modified as noted below, provide the appropriate framework of regulation. The regulations are designed to minimize the potential for adverse secondary effects throughout the city and provide additional protection to those areas and uses particularly vulnerable to the negative effects of adult uses. The requirement that adult uses may not locate closer than 500 feet from one another, coupled with the requirements that they be at least 500 feet from schools, day care centers, and houses of worship, guarantees that no community will see a concentration of adult uses. Limiting the size of adult establishments to 10,000 square feet ensures that no community will see a "de facto" concentration of adult uses within a single establishment.

The requirement that they be at least 500 feet away from residential districts, from commercial districts other than high density C6-4 through C6-7 districts, and from manufacturing districts permitting new residential uses protects sensitive

N 950384 ZRY

residential areas and local retail strips from the adverse effects of even a single adult establishment. The requirement that they be located away from certain sensitive receptors similarly protects families and children from the detrimental effects of adult establishments. In the areas where both adult and residential uses would be permitted as-of-right, namely the high density C6 districts, the intensity of development and the variety of existing uses will help to mitigate the negative effect of isolated adult uses.

By limiting the size and permitted illumination of adult business signs, the regulations respond to the criticisms that adult business signs are out of character with their surrounding areas. Finally, the amortization provisions of the proposed text would require that adult uses in the most sensitive areas go out of business after the operators recoup their investment in the adult business or change the nature of their business to comply with the requirements of the text. This provision thus ensures that the neighborhoods currently experiencing the adverse secondary effects of adult uses do not become the permanent repository of adult establishments.

All told, the proposed text presents a comprehensive framework for responding to each of the adverse secondary effects found to be associated with adult establishments. Each component provides a targeted response to identified adverse secondary effects and works

---

N 950384 ZRY                                                                    43

with the other elements to create an effective regulatory scheme. As proposed, the regulations would allow for adult uses in areas where their adverse secondary impact is limited and provides for considerably more protection in those areas than is currently permitted.

At the same time, the regulations continue to provide ample opportunity throughout the city for the location and relocation of adult uses.  Adult uses would be able to locate in substantial numbers in all boroughs and in a variety of locations, assuring sufficient access to adult materials.  Analyses by DCP staff make it clear that the proposed regulations would allow the opportunity for all currently operating adult establishments to relocate within the city as well as allowing for expansion of the adult market.  In undertaking this assessment, DCP staff took into account the fact that certain properties, such as wetlands, properties occupied by public works, and large properties owned by the city, were unlikely to be developed with adult establishments.  DCP staff also considered only those sites fronting built roadways.  Analyses by the Transportation Division of DCP indicate that 80 percent of the areas in the outer boroughs where adult establishments could locate are within a ten minute walk from a rapid transit line or major bus route.

Moreover, the Commission notes that the proposed regulations apply only to certain adult uses, namely establishments similar to those

N 950384 ZRY                                                        44

studied in the DCP study. It is only adult book and video stores, adult theaters, adult eating or drinking establishments and other similar adult commercial establishments which are covered by the regulations. Because of this focus, purveyors and consumers of adult materials will also have access to these materials through media such as cable programming, direct mail, and on-line computer services. As another example, adult sections in general interest video and book stores will be unaffected by the regulations and will provide an additional outlet for adult materials.

<u>Modifications</u>

While the Commission agrees that the proposed text generally represents an appropriate and measured response to regulating the adverse secondary effects resulting from the operation and concentration of adult uses, it also believes that certain modifications to the proposal and to the text are important to improve the regulatory scheme and to help tailor application of the regulations to the types of enterprises studied in the DCP Study. As discussed below, the modifications would increase the number of potential sites in the Borough of Manhattan by more than 40 percent and would add additional clarity to the definitions of adult uses.

A.  Adding Area in Manhattan

A number of individuals' testimony and comments from some community

JNR-000445

boards, borough presidents, and borough boards raised objections to the size and location of the areas in Manhattan that would be available for adult establishments. The concerns expressed were two-fold. Some testimony suggested that more establishments should be allowed in Manhattan because it is the traditional location of adult establishments and because of its high density of development and land use. Other testimony expressed fear that limiting the number of available sites in Manhattan would result in displacing "Manhattan" adult uses to the outer boroughs, along with their adverse secondary effects.

As indicated above, the Commission notes that even without modification, the proposed text would allow adult establishments to locate in numerous areas throughout the City, including Manhattan in sufficient numbers to permit existing establishments to relocate and to allow some growth of adult establishments. In addition, the Commission notes that the proposed regulations, as drafted, would not result in the creation of any "red light district" or new concentration of adult uses. Rather the anti-concentration provisions of the regulations and the protection of sensitive receptors ensure that every neighborhood in New York City receives greater protection from the adverse secondary effects of adult uses than it does now. Finally, the Commission notes that one of the principal reasons that the administration and the City Council began studying the impact of adult uses was the fact that adult establishments had begun opening and concentrating in areas where

N 950384 ZRY                                                                    46

they traditionally had not located. As such, the proposed regulations respond to a city-wide concern by regulating the location of adult uses throughout New York City.

While the proposed text provides a uniform response to a city-wide problem and at the same time provides sufficient access to adult materials, the Commission recognizes that a majority of the existing uses are in Manhattan. It also recognizes that the density of development generally and the number of potential users -- workers, residents, tourists and other visitors -- is greater in Manhattan than in the other Boroughs. Because of this the Commission believes that it is appropriate on a land use basis to modify the proposal slightly to allow more potential sites in Manhattan in a manner which does not significantly impair the regulation's responsiveness to combating the adverse secondary effects of adult establishments.

To accomplish these objectives, the Commission believes that it is appropriate to modify the text to remove the proposed 500 foot buffer between the zoning districts where adult uses would continue to be permitted (manufacturing zones not allowing residential use, C6-4 to C6-7, C7, and C8 zones) and adjoining high density commercial and manufacturing districts where such uses would be prohibited (C5-2 to C5-5 and M1-6M zones). These districts possess many of the characteristics of the zones where adult uses are permitted, such as dense development and a multiplicity of existing

N 950384 ZRY                                                                    47

uses which contribute to their surroundings and which would help combat or mitigate the adverse secondary effects of nearby adult establishments.   As such, it is not as critical to maintain a buffer in these locations than there is in other areas where there is less dense development in adjoining areas or where adjoining development is predominantly residential.

The Department of City Planning estimates that this modification would increase the number of potential sites in Manhattan by more than 40% and would result in no additional areas in the other Boroughs becoming available for adult establishments.   The additional areas in Manhattan include portions of midtown between 6th and 7th Avenues, additional area north of the Herald Square area and some small portions of lower Manhattan.   The additional areas are in proximity to areas where adult establishments exist today and would provide ample opportunity for both consumers and purveyors to have access to adult materials and uses.   At the same time, the modification is sufficiently narrow so that it will not significantly impair the effective regulatory scheme provided by the proposed text.

B.   Language concerns

Concerns were expressed during the public review process about the language of the text, particularly the language use to define adult establishments.   Many of the comments were based on a belief that

N 950384 ZRY                                                                     48

the language could be interpreted to allow for enforcement against establishments not intended to be covered by the adult use regulations, such as art galleries, legitimate theaters, and book stores with an emphasis on gay and lesbian themes.

The Commission believes that the proposed definitions, while consistent with the definitions used in numerous other jurisdictions, could benefit from minor language changes to help clarify the intention of regulations and to ensure appropriately focused enforcement. Furthermore, certain guidelines should direct the enforcement of the adult use regulations.

As a general matter, "adult establishments" are intended to be only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually explicit materials or activities. These are the establishments analyzed in the DCP study and found to have adverse secondary effects and as such are the only establishments covered by the adult use regulations. Because the regulations are intended to cover this limited range of establishments, enforcement efforts must be similarly tailored. As a preliminary question then, an enforcement agency should consider whether an establishment falls within the definition of an adult establishment.

---

N 950384 ZRY                                                                      49

## 1. *"Substantial"*

Particular concern was expressed regarding the use of the word "substantial" in the definitions of adult book stores and of adult establishments. Certain speakers questioned whether the word provided sufficient guidance to an enforcement official to allow enforcement in an objective, non-biased, manner.

To further the general intent of the adult use regulations, the Commission believes an enforcement agency should consider the following factors to establish whether a "substantial" portion of an establishment is occupied by an adult use or adult materials: (1) the overall amount of floor area accessible to customers devoted to adult purposes; (2) the amount of floor area devoted to adult purposes as compared to the total commercial floor area of the establishment; and (3) the amount of stock of a sexually explicit nature as compared to the total stock. As a general guideline, the Commission believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an "adult establishment" or "adult bookstore." However, there may be exceptions to this general guideline. A disproportionately large amount of adult materials, as compared to total stock, moved into a smaller amount of floor area should allow an establishment to be deemed an adult establishment. In addition, the Commission believes that 10,000 or

N 950384 ZRY

JNR-000450

more square feet of commercial space occupied by adult uses or adult materials is "substantial" regardless of the overall size of an establishment.   These factors and the approach make it clear that the regulations are not intended to cover general interest book or video stores with a section of adult materials that is modest in scale as compared to the overall size of the establishment.

The Commission believes that the three factors outlined above are the factors an enforcement agency should look to in determining whether or not an establishment has a substantial portion of adult uses or materials.   Other factors, such as the nature or prominence of display of adult materials, would reinsert a level of discretion into an enforcement effort which the Commission believes is unnecessary and should be avoided.   To make sure that enforcement efforts are focused on the three criteria, the Commission believes that the adult use text should be modified to identify the three factors described above as the relevant factors in determining whether the "substantial" requirement is met.

2.   *Regularly and Characterized by an Emphasis*

Similar concerns were voiced about use of the words "regularly" and "characterized by an emphasis" included in many of the definitions. The Commission notes that the words "characterized by an emphasis on" are used with the intent of regulating those performances,

---

N 950384 ZRY

JNR-000451

videos and materials that have a principal focus on sexual activities or anatomy as entertainment. It is not intended to regulate performances or films displaying incidental nudity. The word "regularly" is intended to apply to those establishments that have adult entertainment on a frequent, on-going basis. It is not intended to cover establishments which offer adult entertainment on an occasional basis, such as a monthly live performance or a nightly midnight showing at a movie theater. For eating or drinking establishments and for other commercial establishments, adult entertainment should be a principal form of entertainment at the establishment. For theaters, adult entertainment should be the principal purpose of the theater showing the adult material.

3. *Live Performances*

Certain speakers indicated their fear that the regulations would be read broadly to apply legitimate theatrical performances and films including nudity or having a sexual theme. Examples raised in the testimony include "Love Valor and Compassion," "Oh Calcutta" as well as some Off-Broadway or experimental productions.

Theaters featuring these sorts of performances were not the focus of the DCP Study and should not be included within the definition of an adult theater. The Commission believes that the proposed language, by limiting application of the regulations to those theaters "regularly featuring" performances or materials

N 950384 ZRY

52

"characterized by an emphasis" on explicit matters goes a long way in ensuring that the regulations are focused on the sorts of theaters considered by the DCP Study. To further ensure a tailored application, however, the Commission believes that it is appropriate to supplement the proposed text by adding language to the definitions of adult theaters, adult eating or drinking establishments and other adult commercial establishments that the establishment must also exclude minors during performances. The additional language would preclude the possibility of enforcing the regulations against establishments showing legitimate theatrical productions as these establishments do allow minors to view performances.

4. *Book Stores*

Additional concern was voiced that the regulations could be read broadly to have the unintended effect of closing down certain book stores serving community needs. This concern was expressed most strongly by members of the gay and lesbian communities. These individuals indicated their fear that overbroad enforcement of the regulations could result in a number of bookstores whose stock is focused on gay and lesbian themes being shut down. The individuals suggested that a number of book stores in the West Village and Chelsea as would be susceptible to such overbroad regulation. The speakers indicated that these establishments were important cultural and social assets, particularly for the gay and lesbian

communities, and should not be regulated as an adult establishment.

The Commission shares the concern of these individuals and notes that the adult use regulations must not be interpreted so broadly as to cause important social and cultural gathering spots for gay and lesbian individuals to close. Because of this concern, Department of City Planning staff visited the bookstores cited during the public testimony to consider whether the regulations could, or should, be applied to the noted establishments.[3]  The visits confirmed the public testimony that the bookstores are important assets for their communities and neighborhoods that should be encouraged. Furthermore, the visits made it clear that these establishments would not fall within the definition of "adult bookstore." Each of the stores carries a stock-in-trade covering a wide range of topics.  These include books on family matters such as adopting and raising children in a gay household, biographies by and about prominent gay individuals, health and health care issues, poetry and literature with gay themes or by gay authors, gay and lesbian erotica, and social matters affecting gay and lesbian communities.  The amount of stock which could be considered to be of the sort described in the definition of adult bookstores was a small percentage of the total stock and occupied only a small

---

[3]     The bookstores mentioned during the public review process and visited by DCP staff were the Oscar Wilde Bookstore, a Different Light Bookstore, and the Creative Visions Bookstore.  The Commission notes that other bookstores with a gay or lesbian focus exist in other parts of the city.

---

N 950384 ZRY

amount of floor area. Applying the factors and criteria noted in this report, it is clear that these bookstores would not fall within the definition of "adult bookstore," as there is not a "substantial portion" of materials characterized by sexually explicit matters. Instead, these are general interest bookstores having a gay or lesbian theme. As such, the bookstores -- and others with a similar focus -- would be allowed to continue in their current location. Similar bookstores could open pursuant to the Zoning Resolution provisions pertaining to general bookstores.

5.  *Art Galleries*

The Commission also shares the concern of certain individuals and organizations that the text as proposed could be read inappropriately broadly to include within its terms art galleries displaying sexually explicit artwork. This was not the intention of the regulations and the Commission agrees that art galleries should not be regulated as an adult establishment.

To clarify the intention that the regulations cover a limited group of establishments (namely adult book and video stores, adult theaters, adult eating or drinking establishments, and similar establishments) the Commission believes that it is appropriate to make a minor modification to the text to include an express reference to "book store" in the definition of "adult bookstore", "theater" in the definition of "adult theater," and "eating or

JNR-000455

drinking establishment" in the definition of "adult eating and drinking establishment." For example, the Commission believes that the definition of "adult book store" should be modified to read "An adult book store is a book store which has . . . " Because book stores, theaters, eating or drinking establishments, and art galleries are all identified in the Zoning Resolution as separate uses, this modification would make it clear that art galleries could not be considered an adult establishment. Section 32-00 of the Zoning Resolution reinforces this point by providing that:

> whenever a use is specifically listed in a Use Group and could also be construed to be incorporated within a more inclusive listing, either in the same or another Use Group, the more specific listing shall control.

The Commission believes that the text changes and guidelines discussed above will provide for the objective, tailored and effective enforcement of the adult use regulations.

The Commission also notes and commends the Buildings Department's and the Office of Midtown Enforcement's enforcement efforts in connection with the adult moratorium text. The Department has established a comprehensive procedure for examining possible violations of the adult use moratorium, including reporting requirements and assigning possible enforcement actions to a group of its most experienced inspectors. The Commission believes that these practices have helped ensure the fair and effective

---

N 950384 ZRY

JNR-000456

enforcement of the adult use moratorium and encourages the Department to continue these practices for the enforcement of the permanent regulations.   The Commission also notes that OME will continue to participate in the enforcement of adult establishment regulations.

Additional Comments

A number of additional modifications to the proposed text were suggested in the course of public testimony.   The Commission has the following comments on the suggestions.

A.   Regulation of Signs.

A number of speakers indicated that the signs of many adult establishments were out of character with their neighborhoods and had a significant adverse effect.   Some of these speakers suggested that signage was the only problem with adult establishments and that regulation should be limited to signage regulation.

The Commission agrees that the signs for many adult establishments are out of character with their neighborhoods and require more extensive regulation than is presently provided by zoning.   As noted above, the proposed text achieves this goal by requiring that business signs for adult establishments comply with the most restrictive commercial sign regulations applicable in any zoning

district and provides further limitations on the amount of illumination and the overall size of the sign. These strict regulations would prohibit flashing signs. The proposed text thus responds to the criticisms expressed during the course of public review while continuing to allow the adult use operator an adequate opportunity to notify the public of its business.

The Commission does not agree, however, that sign regulations alone would be adequate to combat all of the adverse secondary effects of adult uses. Many of the adverse secondary effects identified in the DCP Study, the other studies and during the public hearing -- reduced property values, creation of economic dead zones, heightened crime, change in neighborhood character -- exist independently of the signage. Accordingly, while regulation of signage is an important aspect of the proposed regulations, it must supplement a comprehensive scheme of regulation.

B.   Regulation of the Size of Adult Establishments.

The proposed text limits the size of any adult establishment to 10,000 square feet. Some concern was voiced during the course of review that this limitation would result in "sex superstores" in the outer boroughs. The Commission believes that this concern is unfounded. Moreover, the Commission believes that there are important land use considerations for the size limit.

---

N 950384 ZRY                                                                    58

At present, adult establishments may locate without any size limitations other than those generally applicable to book stores, eating or drinking establishments and theaters.  The 10,000 square foot limit is a threshold used in a number of instances in the Zoning Resolution to distinguish between small and mid-size uses, such as certain retail uses in manufacturing districts.

The 10,000 square foot limit reflects a reasonable balance between the desire to avoid an undue concentration of uses within a single establishment and the need and desire to develop regulations allowing locational opportunities for all types of adult uses. Department of City Planning surveys of existing establishments indicate that while the large majority of adult establishments occupy a small area, there are some existing establishments occupying 10,000 square feet or more.  The 10,000 square foot limit will assure that these larger sorts of establishments will have the opportunity to locate.

Moreover, the Commission believes that it is unlikely that the proposed regulations will result in increasing the number of large adult establishments.  At this time, adult book and video stores tend to occupy a small floor area regardless of whether they are locating near other adult uses or are opening in new areas.  The Commission believes that it is inappropriate, particularly in this area of constitutional concern, to limit further the size of adult establishments in response to speculative concerns that the adult

---

N 950384 ZRY

use market might change in a way that exacerbates its adverse secondary effects.

## C. Distinguishing Treatment of Different Adult Establishments.

Additional comments made during the course of public review suggested that different sorts of adult uses had different adverse secondary effects and as such should be treated differently. Persons raising this concern seemed to suggest that adult book and video stores in particular should be subject to lesser regulation than other sorts of adult uses.

As already noted, all of the adult uses which would be covered by the proposed regulations have been shown to produce adverse secondary effects. Because of this, the Commission believes that their regulation is vital.  Nothing in the studies or in the public testimony justifies distinctive treatment of any adult use. Nor is the distinctive treatment necessary as numerous locations exist where any adult use, including adult book and video stores, may locate. The existing proposal, as modified by the Commission, reflects the proper balance of responding to the adverse secondary effects of adult establishments uses while providing sufficient opportunity for these uses to locate throughout New York City.

D.  Adding to the list of Sensitive Receptors/Increasing the Buffer Zone to 750 or 1,000 Feet.

As indicated above, numerous comments were received from many community boards, certain borough presidents, borough boards, other elected officials and by individuals and groups which recommended making the regulations more stringent.  The recommendations were generally of two sorts.  The first was to enlarge buffers and increase the distance between adult uses and sensitive receptors to 750 or 1000 feet.  The second was to expand the list of sensitive receptors.  Among the uses proposed to be added are parks and playgrounds, nursing homes, colleges and universities, legal non-conforming residences, libraries and museums, landmarks, and recreational facilities.

The Commission agrees with the concerns of many neighborhoods that their communities not be burdened by the adverse secondary effects of adult uses.  However, it believes that the proposed text achieves this objective without encroaching on purveyors and consumers of adult materials' rights to receive and disseminate this material.  As proposed, the regulations protect all neighborhoods by providing locations throughout the City available for adult establishments, by providing anti-concentration measures between these establishments, by providing for buffers around schools, day care centers and houses of worship, by providing strict sign regulations, and by requiring most non-conforming uses

JNR-000461

to go out of business within a year's time.

These substantial protections are achieved at the same time as providing significant location opportunities to adult establishment operators.  The Commission notes that any further addition to the list of sensitive receptors or extension of the buffer would be beyond the scope of the present action and as such would require a new application for a text amendment.  In addition, a variety of different uses have been suggested as additional sensitive receptors.  Because the addition of sensitive receptors raises a number of procedural and policy questions, and because the Commission believes that the regulations as proposed will provide significant protection against the adverse secondary effects of adult establishments, the Commission believes that the list of sensitive receptors should remain unchanged at this time.

Because of the Commission's concern that the regulations provide effective and comprehensive protection against the adverse secondary effects of adult establishments, it believes that it is important to monitor the location and operation of adult uses under the proposed regulations to ensure that the goal of comprehensive protection is achieved.  The Commission notes that the Department will report back to the Commission and the City Council in two years time on the effect and enforcement of the adult use regulations.  This report will note the location of adult establishments and their proximity to facilities such as parks and

N 950384 ZRY

playgrounds.  At that time the Commission can review whether any modifications are needed.

In connection with this concern, the Commission notes that day care facilities, nursery and pre-schools, and headstart programs licensed pursuant to the City Health Code or operated by the Board of Education or a religious institution as part of an elementary school would fall within the definition of "schools" in the Zoning Resolution and would thus be sensitive receptors.  Department of City Planning staff has contacted the Department of Health and confirmed that all of these facilities are licensed pursuant to the Health Code.  The Commission also notes, as discussed below, that for purposes of measuring the 500 foot buffer, a school playground would be considered part of the school.  Finally, the Commission notes that many of the uses suggested as sensitive receptors, such as libraries, are community facilities which are not permitted as of right in many of the districts where adult uses would be allowed to locate.

E.   Grandfathering.

Additional comments suggested the "grandfathering" of existing adult uses, to allow all existing uses to continue at their present locations.  The Commission believes that this would substantially reduce the effectiveness of the proposed text in responding to the adverse secondary effects of adult establishments.

---

N 950384 ZRY                                                            63

Grandfathering existing uses would have the effect of freezing certain locations and certain neighborhoods as the situs of adult establishments. Because the existing establishments would in effect have a monopoly in the area, there would be a strong incentive to keep an inappropriate use operating within a neighborhood. This is an unfair burden on surrounding tenants and property owners.

As drafted, the regulations allow the operators of adult establishments one year's time to continue operations and to amortize their investment. Because the amortization is linked to the non-conforming nature of the establishment, the Commission believes most adult establishments will have to terminate in one year's time. The regulations also permit the operator to apply to the Board of Standards and Appeals for additional time to operate if it is necessary to allow the operator to recoup substantially all of its investment in the adult nature of the establishment. This process assures that adult operators receive sufficient financial benefit from their adult enterprise. At the same time, it assures neighborhoods that have been subjected to the adverse secondary effects of adult establishments they will ultimately be protected by a comprehensive scheme of regulation.

F. Other Comments.

One additional comment which should be addressed was made by

---

N 950384 ZRY                                                    64

members of the public regarding the requirement that adult establishments be located at least 500 feet from sensitive receptors. These comments questioned how the Department of Buildings would measure the distance with respect to the sensitive receptor. The purpose of the 500 foot buffer is to protect families, children in particular, from the adverse secondary effects of adult establishments. To further this purpose, the distance from a sensitive receptor should be measured from the boundary of any day care center, school or house of worship use including adjoining outdoor spaces customarily used by school children or a congregation as part of the school or house of worship function. The 500 foot buffer should be measured from the boundary of a school playground, for example, rather than from the boundary of the school building. If a school or house of worship shares a zoning lot with an unrelated use, however, such as a commercial office building, the office building portion of the zoning lot should not be considered part of the sensitive receptor site.

**RESOLUTION**

RESOLVED, that the City Planning Commission finds that the action described herein will have no significant impact on the environment; and be it further

RESOLVED, that the City Planning Commission, in its capacity as the

N 950384 ZRY                                                                    65

City Coastal Commission, has reviewed the waterfront aspects of this application and finds that the proposed action is consistent with WRP policies; and be it further

RESOLVED, by the City Planning Commission, pursuant to Section 200 of the New York City Charter, that based on the environmental determination, the WRP determination, and the consideration described in this report, the Zoning Resolution of the City of New York, effective as of December 15, 1961, and as subsequently amended, is further amended as follows:

Matter in Graytone is new, to be added;
Matter in ~~strikeout~~ is old, to be deleted;
Matter within #   # is defined in Section 12-10;
*** indicates where unchanged text appears in the Zoning Resolution

***

~~11-113~~

~~For adult establishments~~

~~Notwithstanding any other provision of this Resolution to the contrary, in all districts, no new #adult establishment# shall be allowed, nor shall any existing #adult establishment# be #enlarged# or #extended#, nor shall any #non-conforming use# be changed to an #adult establishment#, for an interim period of one year from the effective date of this amendment.~~

***

N 950384 ZRY                                                              66

12-10

DEFINITIONS

***

Adult Establishment

An "adult establishment" is a #use# which includes:

(a)   Adult bookstore — an establishment listed in Use Group 6 or 12 having as a significant portion of its stock in trade books, magazines, other periodicals, films, slides or video tapes, and which establishment is customarily not open to the public because it excludes minors by reason of age; or,

(b)   Adult eating or drinking establishment — an eating or drinking establishment listed in Use Group 6A, 6C, 10 or 12A which customarily presents topless or nude dancers, strippers or similar entertainments, and which establishment is customarily not open to the public because it excludes minors by reason of age; or,

(c)   Adult theater — an establishment listed in Use Group 8 or 13 which customarily presents motion pictures, films, videotapes, slide shows, or live performances featuring topless or nude dancers, strippers or similar entertainments, including an establishment where such entertainment is viewed from an enclosure, and which establishment is customarily not open to the public because it excludes minors by reason of age.

Adult Establishment

An "adult establishment" is a commercial establishment where a "substantial portion" of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof, as defined below:

(a) An adult book store is a book store which has as a "substantial portion" of its stock-in-trade any one or more of the following:

(1) books, magazines, periodicals or other printed matter which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or,

JNR-000467

(2) photographs, films, motion pictures, video cassettes, slides or other visual representations which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

(b) An adult eating or drinking establishment is an eating or drinking establishment which regularly features any one or more of the following:

(1) live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or

(2) films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or,

(3) employees who, as part of their employment, regularly expose to patrons "specified anatomical areas," and

which is not customarily open to the general public during such features because it excludes minors by reason of age.

(c) An adult theater is a theater which regularly features one or more of the following:

(1) films, motion pictures, video cassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas"; or,

(2) live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities", and

which is not customarily open to the general public during such features because it excludes minors by reason of age.

An adult theater shall include commercial establishments where such materials or performances are viewed from individual enclosures.

(d) An other adult commercial establishment is a facility -- other than an adult book store, adult eating or drinking establishment, adult theater, commercial studio, or business or trade school -- which features employees who as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes minors by reason of age.

For the purpose of defining #adult establishments#, "specified sexual activities" are: (i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human

N 950384 ZRY                                                          68

masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast.

"Specified anatomical areas" are: (i) less than completely and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed.

For the purpose of determining whether a "substantial portion" of an establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or combination thereof, the following factors shall be considered: (1) the amount of #floor area# and #cellar# space accessible to customers and allocated to such #uses#; and (2) the amount of #floor area# and #cellar# space accessible to customers and allocated to such uses as compared to the total #floor area# and #cellar# space accessible to customers in the establishment.

For the purpose of determining whether a bookstore has a "substantial portion" of its stock in materials defined in paragraphs (a) (1) or (a) (2) hereof, the following factors shall be considered: (1) the amount of such stock accessible to customers as compared to the total stock accessible to customers in the establishment; and (2) the amount of #floor area# and #cellar# space accessible to customers containing such stock; and (3) the amount of #floor area# and #cellar# space accessible to customers containing such stock as compared to the total #floor area# and #cellar# space accessible to customers in the establishment,

\*\*\*

32-00

GENERAL PROVISIONS

In order to carry out the purposes and provisions of this Resolution, the #uses# of #buildings or other structures# and of tracts of land have been classified and combined into Use Groups. A brief statement is inserted at the start of each Use Group to describe and clarify the basic characteristics of that Use Group. Use Groups 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15 and 16, including each #use# listed separately therein, are permitted in #Commercial Districts# as indicated in Sections 32-11 to 32-25, inclusive . , except that any such #use# which is also an #adult

establishment# shall, in addition, be subject to the provisions of Section 32-01 (Special Provisions for Adult Establishments).

32-01

Special Provisions for Adult Establishments

In addition to the applicable regulations for the #uses# listed in a permitted Use Group, #adult establishments# shall be subject to the following provisions:

(a)   #adult establishments# are not permitted in C1, C2, C3, C4, C5, C6-1, C6-2, or C6-3 Districts;

(b)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, #adult establishments# shall be located at least 500 feet from a church, a #school#, a #residence district#, a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 district, a or a #manufacturing district# other than M1-6M in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. However, on or after the effective date of this amendment, an #adult establishment# that otherwise complies with the provision of this paragraph shall not be rendered #non-conforming# if a church or a #school# is established on or after April 10, 1995 within 500 feet of such #adult establishment#.

(c)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 Districts, #adult establishments# shall be located at least 500 feet from another #adult establishment#.

(d)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 Districts, no more than one #adult establishment# permitted under this Section shall be located on a #zoning lot#.

(e)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 Districts, #adult establishments# shall not exceed in total 10,000 square feet of #floor area# and #cellar# space not used for enclosed storage or mechanical equipment.

(f)   #adult establishments# which existed on the effective date of this amendment and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

***

**N 950384 ZRY**                                                         70

32-60

SIGN REGULATIONS

\*\*\*

32-62

Permitted Accessory Business Signs

C1, C2, C3, C4, C5, C6, C7, C8

In all districts, as indicated, #accessory business signs# are permitted subject to the provisions of the following Sections:

\*\*\*

Section 32-69 (Additional Accessory Business Sign Regulations for Adult Establishments)

\*\*\*

32-69

Additional Accessory Business Sign Regulations for Adult Establishments

C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 C8

#Accessory business signs# for #adult establishments# are permitted only as set forth in this Section, and are limited to locations in the districts indicated.

All permitted #accessory business signs# for #adult establishments# shall conform with all the #sign# regulations applicable in C1 Districts as set forth in this Chapter, except that the provisions of Section 32-64 (Surface Area and Illumination Provisions) shall not apply. In lieu thereof, the maximum #surface area# of all #accessory business signs# for #adult establishments# shall not exceed, in the aggregate, three times the #street# frontage of the #zoning lot#, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be #illuminated# non-#flashing signs#.

\*\*\*

42-00

GENERAL PROVISIONS

In order to carry out the purposes and provisions of this Resolution, the #uses# of #buildings or other structures# and of tracts of land have been classified and combined into Use Groups.

N 950384 ZRY                                                                71

A brief statement is inserted at the start of each Use Group to describe and clarify the basic characteristics of that Use Group. Use Groups 4B, 4C, 5, 6A, 6B, 7, 8, 9B, 9C, 10B, 10C, 11, 12A, 12C, 12D, 12E, 13, 14, 16, 17 or 18, including each #use# listed separately therein, and certain #uses# listed in Use Groups 3A, 6C, 9A, 10A or 12B are permitted in #Manufacturing Districts# as indicated in Sections 42-11 to 42-15, inclusive—. , except that any such #use# which is also an #adult establishment# shall, in addition, be subject to the provisions of Section 42-01 (Special Provisions for Adult Establishments).

42-01

Special Provisions for Adult Establishments

In addition to the applicable regulations for the #uses# listed in a permitted Use Group, #adult establishments# shall be subject to the following provisions:

(a)  #adult establishments# are not permitted in a #manufacturing district# in which #residences#, #joint living-work quarters for artists# or #loft dwellings# are, under the provisions of the Zoning Resolution, allowed as-of-right or by special permit or authorization.

(b)  in all other #manufacturing districts#, #adult establishments# shall be located at least 500 feet from a church, a #school#, a #residence district#, a C1, C2, C3, C4, C5-1, C6-1, C6-2, or C6-3 district, or a #manufacturing district# other than M1-6M in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. However, on or after the effective date of this amendment, an #adult establishment# that otherwise complies with the provision of this paragraph shall not be rendered #non-conforming# if a church or a #school# is established on or after April 10, 1995 within 500 feet of such #adult establishment#.

(c)  #adult establishments# shall be located at least 500 feet from another #adult establishment#.

(d)  no more than one #adult establishment# permitted under this Section shall be located on a #zoning lot#.

(e)  that #adult establishments# shall not exceed in total 10,000 square feet of #floor area# and #cellar# space not used for enclosed storage or mechanical equipment.

(f)  #adult establishments# which existed on the effective date of this amendment and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the

N 950384 ZRY                                                             72

provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

\*\*\*

42-50

SIGN REGULATIONS

\*\*\*

42-52

Permitted Accessory Business Signs or Advertising Signs

M1, M2, M3

In all districts, as indicated, #accessory business signs# or #advertising signs# are permitted with no restriction on size, illumination or otherwise, except as ~~otherwise~~ provided in Section 42-54 (Special Provisions Applying along District Boundaries) and subject to the provisions of Section 42-53 (Additional Regulations for Advertising Signs) ~~and Section 42-55 (Additional Regulations for Business and Advertising Signs in Certain Manufacturing Districts).~~ and Section 42-55 (Additional Accessory Business Sign Regulations for Adult Establishments).

\*\*\*

42-55

Additional Accessory Business Sign Regulations for Adult Establishments

M1, M2, M3

In all districts, as indicated, all permitted #accessory business signs# for #adult establishments# shall conform with the provisions of this Chapter, except that the maximum #surface area# of all #accessory business signs# for #adult establishments# shall not exceed, in the aggregate, three times the #street# frontage of the #zoning lot#, but in no event more than 150 square feet per establishment, of which no more than 50 square feet may be #illuminated# and no portion thereof may be #flashing#

No #accessory business signs# for #adult establishments# shall be permitted on the roof of any #building#, nor shall such signs extend above #curb level# at a height greater than 25 feet.

\*\*\*

N 950384 ZRY                                                                 73

ARTICLE V

NON-CONFORMING USES AND NON-COMPLYING BUILDINGS

CHAPTER 1

STATEMENT OF LEGISLATIVE INTENT

51-00

PURPOSE OF REGULATIONS GOVERNING NON-CONFORMING USES AND NON-COMPLYING BUILDINGS

***

In the case of a few objectionable non-conforming uses which are detrimental to the character of residence the districts in which such uses are located, a reasonable statutory period of life is established for such uses, in order to permit the owner gradually to make his plans for the future during the period when he the owner is allowed to continue the non-conforming uses of his the property, thereby minimizing any loss, while at the same time assuring the public that the district in which such non-conformity exists will eventually benefit from a more nearly uniform character.

***

52-30

CHANGE OF NON-CONFORMING USE

***

52-38

Special Regulations for Adult Establishments

In all districts, a #non-conforming use# may not be changed, initially or in any subsequent change, to an #adult establishment#, except as provided in Section 32-01 (Special Provisions for Adult Establishments) or Section 42-01 (Special Provisions for Adult Establishments).

***

52-70

TERMINATION OF CERTAIN NON-CONFORMING USES AFTER AMORTIZATION

N 950384 ZRY                                                           74

52-71

General Provisions

In specified districts, specific #non-conforming signs#, specific #non-conforming uses# of #land with minor improvements#, specific #non-conforming# objectionable #uses#, certain specific types of #uses# involving open storage or salvage , #non-conforming# #adult establishments#, or certain #non-conforming public parking lots# may be continued for a reasonable period of useful life as set forth in this Chapter, provided that after the expiration of that period such #non-conforming uses# shall terminate in accordance with the provisions of this Chapter.

***

52-73

Non-conforming Signs

***

52-734

Non-conforming accessory business signs for adult establishments

In all districts, a #non-conforming accessory business sign# for an #adult establishment# shall terminate within one year from the effective date of this amendment or from such later date that such #sign# becomes #non-conforming#, except that such #sign# may be continued for a limited period of time by the Board of Standards and Appeals pursuant to Section 72-40 (Amortization of Certain Adult Establishments and Signs for Adult Establishments).

***

52-77

Termination of Adult Establishments

In all districts, a #non-conforming# #adult establishment# shall terminate within one year from the effective date of this amendment or from such later date that the #adult establishment# becomes #non-conforming#, except that such establishment may be continued for a limited period of time by the Board of Standards and Appeals pursuant to Section 72-40 (Amortization of Certain Adult Establishments and Signs for Adult Establishments). However, the provisions of this Section shall not apply to an #adult establishment# subject to the provisions of paragraph (f) of Section 32-01 or 42-01 (Special Provisions for Adult Establishments).

N 950384 ZRY                                                              75

\*\*\*

52-80

REGULATIONS APPLYING TO NON-CONFORMING SIGNS

\*\*\*

52-82

Non-Conforming Business Signs

Any #non-conforming accessory business sign#, except a #flashing sign# or a #sign# subject to the provisions of Section 52-734 (Non-conforming accessory business signs for adult establishments), may be structurally altered, reconstructed, or replaced in the same location and position, provided that such structural alteration, reconstruction, or replacement does not result in:

(a)   the creation of a new #non-conformity# or an increase in the degree of #non-conformity# of such #sign#;

(b)   an increase in the #surface area# of such #sign#; or

(c)   an increase in the degree of illumination of such #sign#.

\*\*\*

72-01

General Provisions

The Board of Standards and Appeals (referred to hereinafter as the Board) shall have the power, pursuant to the provisions of the New York City Charter and of this Resolution, after public notice and hearing:

\*\*\*

(f)   to make such administrative determinations and findings as may be set forth in this Resolution at Sections 15-021 and 15-50 et seq., or pursuant to Section 72-40 (Amortization of Certain Adult Establishments and Signs for Adult Establishments).

\*\*\*

72-40

AMORTIZATION OF CERTAIN ADULT ESTABLISHMENTS AND SIGNS FOR ADULT ESTABLISHMENTS

The Board of Standards and Appeals may permit any #non-conforming# #adult establishment# or any #non-conforming accessory business

N 950384 ZRY                                                          76

sign# for an #adult establishment# to continue for a limited period of time beyond that provided for in Section 52-734 (Non-conforming accessory business signs for adult establishments) or Section 52-77 (Termination of Adult Establishments), provided that:

(a) an application is made by the owner of such establishment to the Board of Standards and Appeals at least 120 days prior to the date on which such establishment or #sign# must terminate;

(b) the Board shall find, in connection with such establishment or #sign#, that:

(1) the applicant had made, prior to the #non-conformity#, substantial financial expenditures related to the #non-conformity#; and,

(2) the applicant has not recovered substantially all of the financial expenditures related to the #non-conformity#; and,

(3) the period for which such establishment or #sign# may be permitted to continue is the minimum period sufficient for the applicant to recover substantially all of the financial expenditures incurred related to the #non-conformity#.

For the purpose of this Section, "financial expenditures" shall mean the capital outlay made by the applicant to establish the #adult establishment# or #sign#, exclusive of the fair market value of the #building# in which such #use# or #sign# is located and exclusive of any improvements unrelated to the #non-conforming# #adult establishment# or #non-conforming accessory business sign# for #adult establishments#.

***

JNR-000477

The above resolution (N 950384 ZRY), duly adopted by the City Planning Commission on September 18, 1995 (Calendar No. 8), is filed with the Office of the Speaker, City Council and the Borough Presidents, in accordance with the requirements of Section 197-d of the New York City Charter.

JOSEPH B. ROSE, Chairman

VICTOR ALICEA, Vice Chairman,

IRWIN G. CANTOR, P.E., KATHY HIRATA CHIN, ESQ, ALEXANDER GARVIN, ANTHONY I. GIACOBBE, ESQ., WILLIAM J. GRINKER, Commissioners

AMANDA M. BURDEN, A.I.C.P., MAXINE GRIFFITH, BRENDA LEVIN, EDWARD T. ROGOWSKY, RONALD SHIFFMAN, A.I.C.P., JACOB B. WARD, ESQ., Commissioners, voting no.

Dissenting Statement of Commissioners Rogowsky and Shiffman, attached.

N 950384 ZRY

JNR-000478

Sent By: LIPSITZ GREEN FAHRINGER;         2127556998;         Mar-27-01  9:29;         Page 2

DEPARTMENT OF CITY PLANNING BRIEFING SHEET          PREPARED BY: David Karnovsky

A P P L I C A T I O N

PROJECT NAME: Adult Establishment Text Changes     LOCATION: Citywide          212-755-6998

APPLICANT: Dept of City Planning                                    BORO/CB: All

APPLICATION NUMBER(S)        ACTION(S) REQUESTED

N 010508 ZRY            • Zoning Text Change: Amendments of the Zoning Resolution relating to
                          Sections 12-10, 32-01, and 42-01, concerning adult establishments.

DATE: RECEIVED:     03/23/01
    MAP RECEIVED:  _____          ACTION TO BE TAKEN: CERTIFICATION  _____
    CERTIFIED:      Ref: 03/26/01                      PRE-HEARING REVIEW   _____
    CPC HEARING:   _____                            POST HEARING FOLLOW-UP _____
    CPC DEADLINE:  _____                            NON-ULURP            __X__

I N F O R M A T I O N

ZONING DESIGNATION:    All
SPECIAL AREA NAME:     N/A
RESTRICTIVE DECL.:     N/A
CEQR DETERMINATION:    Neg Dec

                          CEQR NO.  01DCP054Y   CEQH SIGN OFF DATE 03/23/01
                          WRP REVIEW NO. _____   WRP SIGN OFF DATE _____

AREA AND PROJECT DESCRIPTION/HISTORY

Background

In 1995, the City Planning Commission and the City Council adopted comprehensive zoning
regulations governing the locations where "adult establishments" could be maintained or sited
in the future (the "1995 Adult Use Regulations" or the "Regulations"). The 1995 Adult Use
Regulations were adopted in response to a 1994 Department of City Planning Study (the "DCP
Study") which concluded that triple-X video and bookstores, adult live or movie theaters and
topless or nude bars have significant negative secondary impacts. These impacts include higher

Continued on next page

I S S U E S

R E C O M M E N D A T I O N S :

CB:  _____  IN FAVOR    _____  WITH CONDITIONS   BP:  _____ IN FAVOR  _____  WITH CONDITIONS
     _____  OPPOSED     _____  NO VOTE                _____ OPPOSED   _____  NO VOTE
     _____  ABSTAINING  _____  WAIVED                 _____ ABSTAINING _____  WAIVED
STAFF COMMENTS:

Sent By: LIPSITZ GREEN FAHRINGER;            2127556998;          Mar-27-01  9:30;          Page 3

continued from cover page

incidence of criminal activity; deterioration in the quality of urban life, by
a damaging impact on neighborhood character, children and other residents; and
negative impacts on economic development and revitalization and nearby property
values. ( DCP Study at iv-ix, pp.56-68). As a first response to the DCP Study,
the City Planning Commission and the City Council in 1994 enacted a one-year
moratorium on new adult entertainment establishments in the City . This was
followed by the adoption of permanent regulations in 1995.

The 1995 regulations address those establishments similar in nature to the types
of enterprises described and studied in the DCP Study, namely book and video
stores, theaters, eating or drinking establishments and other commercial
enterprises with a "predominant, on-going focus on sexually explicit materials
or activities." (CPC Report N950384ZRY (CPC Report) at p.49.) In general terms,
the regulations restrict the permitted locations of such adult establishments by
prohibiting them in all residence districts, certain commercial districts and
manufacturing districts that permit new residential uses; by requiring that adult
establishments be at least 500 feet from such districts; by requiring that each
adult establishment in a permitted location be at least 500 feet from another
such establishment; and by requiring that adult establishments be at least 500
feet from certain "sensitive receptors" ( schools, day care centers, and houses
of worship). The amendments were designed to "minimize the potential for adverse
secondary effects throughout the city" and protect those areas and uses
"particularly vulnerable to the negative effects of adult uses." (CPC Report at
p.42).

Implementation of the 1995 regulations did not begin until 1998, when the United
States Supreme Court declined review of the constitutional issues following the
New York State Court of Appeals decision in Stringfellow's of New York, Ltd. v.
City of New York, 91 N.Y. 2d 382 (1998). That decision upheld the
constitutionality of the 1995 amendments, finding that the amendments were
content neutral regulations designed to address the secondary effects of adult
uses in New York City, and that there would continue to be reasonable alternative
avenues for communication in the form of areas in which adult establishments
could remain or to which they could relocate.

Enforcement efforts since 1998 have pointed to a need to adjust the regulations
to address attempts by adult establishments to remain in operation through
superficial measures which do not alter the character of the establishments as
enterprises with a "predominant, on-going focus on sexually explicit materials
or activities." In addition, several court rulings have narrowed the scope and
application of the 1995 Adult Use Regulations in a manner which the Department
of City Planning believes is contrary to the original intent, thus requiring
further amendments.

In adopting the 1995 Adult Use Regulations, the City Planning Commission noted
that the Department would report back to the Commission and the City Council on
the effect of the Regulations in two years time following the start of
enforcement and that the Commission would review at that time whether any
modifications are needed. Part I of this Briefing Sheet therefore analyzes the
numbers and locations of Adult Establishments as of 2000, as well as trends since
1993. Part II describes the proposed zoning text changes.

I. Status Report on Adult Establishments

A. Overall Numbers and Locations

The 1995 Adult Use Regulations govern four types of "adult establishment": adult
book stores; adult eating or drinking establishments; adult theaters; and other
adult establishments.[1] A listing of such adult establishments in 2000 has been

---

[1]An "adult book store" is defined as a book store which has a
"substantial portion" of its stock-in-trade in printed or visual material
characterized by an emphasis upon the depiction or description of "specified
sexual activities" or "specified anatomical areas," each of which are defined
terms under the Zoning Resolution. In determining whether a "substantial

2

0553

developed by the Department of City Planning using information prepared by the Department of Buildings and the Mayor's Office of Midtown Enforcement. It includes adult establishments in locations where such uses are permissible as well as adult establishments that operate on a '60/40' basis ('60/40' adult establishments) in locations where adult establishments are prohibited.[1]

There were 136 adult establishments in 2000, with 10% or 74%, consisting of '60/40' establishments. The breakdown by type of establishment was as follows; Book stores - 35 (with 29 operating as '60/40' establishments); Eating or drinking - 57 (with 36 operating as '60/40' establishments); and Theaters - 44 (with 36 operating as '60/40' establishments). The breakdown of the number of establishments by borough is as follows: Bronx - 9 (with 6 operating as '60/40' establishments); Brooklyn - 13 (with 9 operating as '60/40' establishments); Manhattan - 69 (with 56 operating as '60/40' establishments); Queens - 41 (with 29 operating as '60/40' establishments); and Staten Island - 4 (with 1 operating as a '60/40' establishment).

---

portion" of a book store's stock-in-trade consists of such adult printed or visual material. Several factors must be considered: (i) the amount of adult printed or visual material accessible to customers as compared to the total stock; (ii) the amount of floor area and cellar space accessible to customers containing adult printed or visual material; and (iii) the amount of floor area and cellar space accessible to customers containing adult printed or visual material as compared to the total floor area and cellar space accessible to customers in the establishment. An "adult eating or drinking establishment" is defined as an eating or drinking establishment which "regularly features" live performances or films, motion pictures, videos or other recorded entertainment, which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas," or has employees who, as part of their employment, regularly expose "specified anatomical parts" to patrons, and which is not customarily open to the general public because it excludes minors by reason of age. An adult theater is defined as a theater which "regularly features" such live or recorded performances and which is not customarily open to the general public during such features because it excludes minors by reason of age. An other adult establishment is a facility not otherwise described in the regulations which features employees who, as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes minors by reason of age. A commercial establishment which includes an adult book store, adult eating or drinking establishment, adult theater, or other adult establishment qualifies as an "adult establishment" subject to the 1995 Adult Use Regulations where such adult use occupies the entirety or a "substantial portion" of the commercial establishment.

[1]The term "'60/40' adult establishment" as used herein refers to three categories of commercial establishment: (1) book or video stores at locations where adult establishments are prohibited under the Regulations which have sought to configure themselves so that 40% or less of their stock-in-trade is in adult printed or visual material and 40% or less of their floor area is dedicated to adult printed or visual material, but which have been identified as having one or more of the features described in the proposed amendments to the definition of "substantial portion" under the proposed text amendments (see Part II); (2) eating or drinking establishments at locations where adult establishments are prohibited under the Regulations which have been identified as regularly featuring live or recorded adult entertainment, but which have sought to configure themselves so that the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area; and, (3) theaters at locations where adult establishments are prohibited under the Regulations which have been identified as regularly featuring live or recorded adult entertainment, but which have sought to configure themselves so that the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area. The interior configurations and method of operation of these establishments are, however, subject to change. Accordingly, the numbers and locations of adult establishments as of any given date may vary slightly from the information presented here.

3

0554

B. Trends

Citywide Trends: 1993 to 2000: The 1994 DCP Study identified 177 adult
establishments in New York City as of 1993. As indicated above, in 2000, there
were 136 adult establishments, which represents a 23 percent decline over the
seven year period. Factors apart from enforcement of the Zoning Resolution which
likely contributed to this decline include redevelopment of Times Square and a
strong local economy in which landlords have a choice of tenants other than adult
establishments. The number of adult establishments may also be affected by the
increased availability of adult material on cable television, and the burgeoning
phenomenon of access through the internet.

Trends by Borough from 1993 to 2000: The greatest decline in adult establishments
between 1993 and 2000 was in Manhattan, from 107 to 69. In 1993, 60% of the
City's adult uses were in that borough; in 2000, 51% were so located. The number
of adult establishments declined by three in Queens, although 29 of 41 current
establishments (71%) are operating as '60/40' establishments. The number of adult
establishments declined by two in Brooklyn, although 9 of 13 current
establishments (69%) are operating as '60/40' establishments. The Bronx and
Staten Island each experienced an increase of one establishment, with 6 of 9
current establishments (67%) in the Bronx and 1 of 4 current establishments (26%)
in Staten Island operating as '60/40' establishments.

Trends in Concentrations by Community District: As in 1993, the greatest
concentration of adult uses in 2000 was found in Community District 5, which
includes part of the Times Square area.  In 1993, 53 or 30% of the City's adult
uses were located there; in 2000, the number had declined to 29 establishments,
or 21% of the Citywide total.  Thirteen adult establishments closed on West 42nd
Street between 7th and 8th Avenues. Of the 29 current establishments, 19 operate
as '60/40' establishments.

Community District 4, Manhattan, which also includes part of the Times Square
area, continues to have the second greatest concentration of adult
establishments.  In 1993, 19 establishments (11% of the citywide total) were
located in the district.  In 2000, there were 16 adult establishments in the
district, 12% of the citywide total. Of the current 16 establishments, 14 operate
as '60/40' establishments.

Community District 2, Manhattan, had 11 adult establishments in both 1993 and
2000, and continues to have the third greatest concentration of adult
establishments citywide. Of the current 11 establishments, 10 operate as '60/40'
establishments.

Outside Manhattan, concentrations that had developed as of 1993 remained in 2000.
Community District 7, Brooklyn, had 7 adult establishments concentrated in Sunset
Park west of Third Avenue in 1993 and in 2000, with 4 operating as '60/40'
establishments. Along the Queens Boulevard corridor there were 11 adult
establishments in 1993; as of 2000, there were 14 in the section straddling
Districts 2 and 6, with 10 operating as '60/40' establishments.

Trends within Categories of Adult Uses: Comparisons of the relative distribution
of types of adult uses between 1993 and 2000 are difficult to make. The survey
performed by the Department of City Planning in 1993 as part of the DCP Study
relied on self-identification to categorize adult uses as book
stores/videostores, theaters or eating or drinking establishments; in addition,
many establishments identified as book stores in the survey included peep booths
that would render them classified as adult theaters or as combination adult video
stores/theaters under the 1995 Adult Use Regulations.  According to the 1993
data, there were 86 adult bookstores, 68 adult eating or drinking establishments,
and 23 adult theaters.  In 1993, bookstores represented 49%, eating or drinking
establishments 38%, and theaters 13%, of all adult uses. In 2000, there were 35
adult book stores, 57 adult eating or drinking establishments and 44 adult
theaters.  Book stores comprised 26%, eating or drinking establishments 42%, and
theaters 32% of all adult establishments in 2000. Note, however, that utilization
of the 1993 classification methodology would tend to show a larger number of book
stores and smaller number of theaters.

Trends in Number of Adult Establishments at Permissible Locations: In 1995, at
the time of adoption of the Adult Use Regulations, it was estimated that 29 of
the 177 adult establishments identified in the 1993 survey which formed part of

4

the DCP Study could remain in their current locations following adoption of the Regulations. As of 2000, there were 35 adult establishments at permissible locations. Nine of these existed in 1991, and 26 were established during or after 1998, following implementation of the 1995 Adult Use Regulations. Of the 26 new establishments at permissible locations, 3 are in the Bronx, 1 are in Brooklyn, 9 are in Manhattan, 12 are in Queens and 1 is in Staten Island.

Trends in Number of '60/40' Adult Establishments: Since 1998, when implementation of the 1995 Adult Use Regulations began, approximately 26 new adult establishments have opened which operate as '60/40' establishments at prohibited locations. Of these, 3 are in the Bronx, 4 are in Brooklyn, 14 are in Manhattan, 4 are in Queens, and 1 is on Staten Island. One such establishment goes by the name of "Sixty/Forty Video."

Of the 101 adult establishments operating as '60/40' establishments in 2000, 60 had been identified as adult establishments in the 1993 DCP survey.

Trends in location within zoning districts

In 1993, of the 177 adult establishments identified in the DCP survey, approximately 11% (18) were located in C1 and C2 Districts. Ten uses, or 6%, were located in C4 Districts. Approximately 40% (70 businesses) of adult establishments were located in C5 and C6 (central commercial) Districts. Forty-five adult establishments, or about 25% of the total number, were located in C8 and manufacturing districts.

Of the 136 establishments in 2000, approximately 16 % (21 businesses) are located in C1 and C2 districts. Approximately 3% (4 businesses) are located in C4 districts, 33% (45 businesses) are located in C5 and C6 districts, and 41 % (56 businesses) in C8 and in M1, M2 and M3 districts. Twenty-four percent of adult establishments (32 establishments) are located in high commercial density, centrally located general commercial districts (C6-4 through C6-9). Ten percent (13 establishments) are located in residence districts.

Part II.   The Proposed Amendments

A.   General Description

The proposed text changes would amend the 1995 Adult Use Regulations in several respects. The principal changes are as follows:

1. Definitions of Adult Establishments: (a) Adult Book Store- The definition of an "adult book store" would be modified to provide that non-adult printed or visual material is not considered stock-in-trade for purposes of determining whether a "substantial portion" of book store's stock-in-trade consists of adult printed or visual material, where one or more features is present at the premises. These features, described in more detail in II.B. below, include, among others: the presence of a peep booth featuring adult material on the premises; the absence of any fixed, permanent and complete partition between adult and non-adult sections of the store; a greater number of titles of adult than non-adult printed or visual material; and an interior configuration and layout which requires customers to pass through an adult section of the store in order to access a non-adult section. These changes are intended to address establishments which have engaged in superficial compliance with the regulations by increasing the amount of non-adult books or videos sold at the premises and the amount of floor area dedicated thereto, without changing the nature of the establishment as an enterprise with a predominant, on-going focus on sexually explicit materials. In adopting the "substantial portion" test as an element of the definition of "adult bookstore", the Commission sought to prescribe a method for the identification of book and video stores with a "predominant, on-going focus" on sexually explicit materials similar in nature to those described and studied in the DCP Study. The Commission stated that as a "general guideline" an establishment would need to have at least 40 percent of its stock-in-trade and floor area used for adult purposes to make it similar to the establishments studied in the DCP Study. It recognized, however, that there might be exceptions to this general guideline.

Enforcement efforts since 1998 have demonstrated that a focus on the relative amounts of adult and non-adult books or videos and a comparison of the amount of

5

0556

floor area devoted to each type of material are, alone, insufficient measures of whether a book or video store has a "predominant on-going focus" on sexually explicit materials.  In response to enforcement efforts, adult establishment owners have expanded their inventory of non-adult videos in order to bring the adult stock below 40% of the total, in such a way that they cannot be viewed as having a reasonable expectation that patrons will purchase the non-adult materials.  This has often been accomplished by buying carton-fulls of old instructional videos, kung-fu or karate films, cartoons and the like, which are inexpensive to purchase in bulk.  Often, dozens of the same title are offered, another economizing measure which nevertheless assists in achieving a mathematical compliance.  The cartons have sometimes been left opened on the floor of the bookstore, and in other cases the non-adult titles are simply stacked haphazardly on shelves without any attempt at organization or categorization.  A frequent observation of inspectors has been that the non-adult titles are gathering dust.

At the same time, these establishments continue to have a physical lay-out or methods of operation which reflect a predominant focus on the sale of adult materials.  Features of such establishments include, for example: the presence of peep booths featuring adult material; the absence of a fixed, permanent and complete visual partition between adult and non-adult sections of the store; a method of operation which requires customer transactions with respect to non-adult material to be made in a section of the store which includes adult material; an interior configuration and lay-out which requires customers to pass through the adult section in order to reach the non-adult section.  The presence of one or more of these and other factors enumerated in the proposed amendments to the definition of "adult book store" under ZR 12-10 makes these book or video stores distinct from the "general interest" book or video store (DCP Report at $1) that was not intended to be subject to the 1995 Adult Use Regulations.

The courts have recognized that what they have termed a "mechanical" or "Pavlovian" approach to defining an "adult book store" "does not comport with the history or spirit of the Zoning Resolution and, in fact, makes a mockery of the legislation."  The efforts at facial compliance by adult establishment owners have been described as "sham" and as "superficial measures leaving the essentially non-conforming nature of [the] business intact."  Nonetheless, the courts have recognized that the current Zoning Resolution constrains them to consider stock-in-trade and floor area as the "singular factor[s]" in measuring compliance, and have questioned the ability of the Department of Buildings to take other features of the establishments into consideration pursuant to administrative guidelines.  The proposed amendments establish objective factors, relating principally to physical lay-out and method of operation, by which a bookstore which has achieved only a facial or superficial compliance with the "substantial portion" test would be considered an "adult book store".

(b) Adult Eating or Drinking Establishment.  The definition of an "adult eating or drinking establishment" would be modified to provide that such an establishment is an "eating or drinking establishment" which regularly features adult live performances or films in "any portion of the establishment," thereby affirming the intent of the 1995 Adult Use Regulations that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing.  The amendment responds to a series of court rulings which have misunderstood the nature of the "substantial portion" analysis as it applies to "adult eating or drinking establishments."

The 1995 Adult Use Regulations require a two-step analysis to decide whether an eating or drinking establishment is an "adult establishment": First, an "eating or drinking establishment" qualifies as an "adult eating or drinking establishment" where it "regularly features" adult entertainment.  This determination is based solely on whether live or recorded entertainment characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas" are "regularly featured" in the eating or drinking establishment; Second, a determination is made whether the adult "use", i.e., the adult eating or drinking establishment, occupies a "substantial portion" of the entire "commercial establishment", rendering it an "adult establishment".  In virtually all cases, the adult eating or drinking establishment occupies the entire establishment and the "substantial portion" test is clearly met.  This result was clearly contemplated by the CPC, which recognized that, in most if not all instances, the adult "use" would be the only

6

one at the premises.  (CPC Report at 6, stating that the proposed adult use amendments would define "adult establishments and four types of facilities- adult book stores, adult eating or drinking establishments, adult theaters, and other adult commercial establishments - which alone or in combination would constitute an adult establishment.")

The court rulings mistakenly applied an analysis under which, once it is found that an eating and drinking establishment "regularly features" adult entertainment, it must then be determined whether a "substantial portion" of the floor area of the establishment is dedicated to that adult entertainment.  If, under this test, the amount of floor area dedicated to adult entertainment is 40% or less, the eating or drinking establishment is not an "adult establishment". This approach has led to the artificial separation of adult eating or drinking establishments into purportedly "adult" and "non-adult" sections.  The courts have repeatedly recognized the absurdity of this result, one court stating, with respect to a so-called '60/40' eating or drinking establishment:

> There is still no conceivable reason why anyone uninterested in topless dancing would choose defendants' club over the many other nightclubs, bars and restaurants... Defendant's establishment is still clearly an integrated adult enterprise and of the type that was intended, under ZR 12-10, to be removed from residential city areas ..

Due to the judicial interpretation of how the "substantial portion" test applies to these establishments, the result has nonetheless been that such '60/40' eating or drinking establishments have continued in operation.

The concept that only the specific area where adult entertainment is offered in an "eating or drinking establishment" constitutes the "adult eating or drinking establishment" is plainly inconsistent with the intent of the 1995 Adult Use Regulations.  An "adult eating or drinking establishment" is clearly defined as an "eating or drinking establishment" that "regularly features" adult entertainment, not as "the part" of an eating or drinking establishment that "regularly features" adult entertainment.  Stated differently, to determine the presence of an "adult eating or drinking establishment" does not require a comparison of floor space within the eating or drinking establishment.  That comparison was only made relevant for "adult bookstores", because bookstores were a type of use recognized by the CPC as sometimes having a mixed presentation of adult and non-adult materials.  Adoption of the "substantial portion" floor area test to determine the existence of an adult bookstore was thus considered important to avoid forcing small neighborhood video or bookstores with only a minor amount of adult material to close or move.  By contrast, there is no basis to conclude that the negative secondary effects of adult establishments are any less present where topless or nude dancers frequent only part of the customer - accessible floor space in an eating or drinking establishment.

(c) Adult Theater- The definition of an "adult theater" would be modified  to clarify that a commercial establishment with one or more peep booths or similar individual enclosures featuring adult material qualifies as an "adult theater." Modifications to the definition of an "adult establishment" would also affirm the intent of the 1995 Adult Use Regulations  that the amount of floor area dedicated to adult entertainment is immaterial to the determination whether the theater is an "adult theater."

2. Location Regulations and Buffer Zone Provisions for 'Mixed Use' Manufacturing Districts: The 1995 Adult Use Regulations provide that adult establishments are not permitted in Manufacturing Districts in which residences, joint living-work quarters for artists or loft dwelling are allowed as-of-right or by special permit or authorization. The Regulations also provide that adult establishments shall be located at least 500 feet from such Manufacturing Districts, other than an M1-6M district. Notwithstanding the clear language of the Zoning Resolution, the courts have  held that adult establishments are permitted in one such district ( Area 'M' or the Special South Richmond Development District), since a residential use is only allowed in Area M if a finding is made that such use would not have an adverse  effect on existing commercial or manufacturing uses (see ZR Sec. 107-69). Reasoning that authorizing a residential use in Area 'M' would necessarily have such an effect, since a pre-existing adult establishment would thereby become subject to the one-year amortization period and be forced to close thereafter, the court concluded that the City Planning Commission could

0558

not make the finding, with the result that residential uses are not allowed in Area 'M' and adult establishments are. The proposed text affirms the original intent of the 1995 Adult Use Regulations that adult establishments are not permitted in Manufacturing Districts such as Area 'M' and that adult establishments must be located at least 500 feet of such districts, by providing that the relevant provisions of the Zoning Resolution apply regardless of whether the provisions or findings of a special permit or authorization require an assessment of the impact of a new residential use on commercial or manufacturing uses within the district.

3.  Priority Rights - The 1995 Adult Use Regulations provide that, in districts in which adult establishments are permitted, an adult establishment shall be located at least 500 feet from another adult establishment. The Regulations utilize but do not define the terms "located" and "existed," raising interpretative problems where there is a conflict as to priority between two competing establishments. In one situation , the Department of Buildings was required to render a determination concerning the priority claims of an adult bookstore located within 500 feet of an adult eating or drinking establishment . The adult eating or drinking establishment secured a building permit prior to the opening of the adult bookstore, but did not itself open for business until after the bookstore had opened. The Department of Buildings determined that the eating or drinking establishment had priority for purposes of the 500 foot rule, based on the doctrine of vested rights under zoning, pursuant to which the eating and drinking establishment had the right to initiate and continue to establish the use upon receipt of the building permit. The court determined otherwise, finding that the word "existing" as used in the Zoning Resolution and Department of Buildings directives should be interpreted to mean actual opening, rather than permit issuance. The proposed text would modify the relevant provisions to codify the approach adopted by the Department of Buildings, in order to provide for a system that is better capable of administration and enforcement. The modifications would provide that an adult establishment is "established" upon the date of a permit issued by the Department of Buildings, subject to rules promulgated by the Department of Buildings regarding the failure to perform authorized work or to operate under the permit and discontinuance of use. The Department of Buildings would also be responsible for identifying adult establishments lawfully established prior to the effective date of the amendments, and for establishing permit filing requirements for new establishments which wish to establish a priority for purposes of the 500 foot rule, but do not require a new building or alteration permit in order to open for business.

B.  Detailed Comparison of Existing and Proposed Zoning Controls

ZR 12-10: Adult bookstores: The definition of an "adult book store" would be amended to clarify the circumstances under which a "substantial portion" of the stock-in-trade of a book store consists of adult printed or visual material. Under the proposed text, printed or visual material which does not consist of adult printed or visual material ("other printed or visual material") would not be considered stock-in-trade for purposes of the definition of "substantial portion" where the book store has one or more of the following features:

a.  The absence of separate sections of the store with stock-in-trade of any "adult printed or visual material" and stock-in-trade of "other printed or visual material," or the presence of any "adult printed or visual material" in a section of the store otherwise consisting primarily of "other printed or visual material."

b. An absence of any fixed, permanent and complete visual partition between a section of the store with "adult printed or visual material" and a section of the store with "other printed or visual material";

c. An interior configuration and lay-out which requires  customers to pass through a section of the store with "adult printed or visual material" in order to access a section of the store with "other printed or visual material";

d. One or more individual enclosures where adult movies or live performances are available for viewing by customers;

e. A method of operation which requires customer transactions with respect to

B

"other printed or visual material" to be made in a section of the store which includes "adult printed or visual material";

f. A method of operation under which "other printed or visual material" is offered to customers on a substantially more limited basis than "adult printed or visual material," such as the offering of "other printed or visual material" for sale only and the offering of "adult printed or visual material" for sale or rental;

g. A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";

h. A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";

i. A sign that advertises the availability of "adult printed or visual material" which is disproportionately large relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

j. A window display in which the number of products or area of display of "adult printed or visual material" is disproportionately high relative to the number of products or area of display of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

k. Other features, as set forth in rules adopted by the commissioner of buildings, which render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store.

The proposed text also reorganizes and reorders existing language. The definition of "adult printed or visual material" is also clarified to include product packaging or wrapping that depicts "specified sexual activities" or "specified anatomical areas".

ZR 13-10 Adult Eating or Drinking Establishments: Under the proposed text, an adult eating or drinking establishment is defined as "an eating or drinking establishment" which "regularly features" "in any portion of such establishment" live or recorded performances characterized by an emphasis upon the depiction of "specified sexual activities" or "specified anatomical areas". An "eating or drinking establishment" is defined to include; (i) any portion of a commercial establishment within which food or beverages are offered for purchase, or are available to or are consumed by customers or patrons, and (ii) any portion of a commercial establishment from which a portion of a commercial establishment described in (i) above is accessible by customers or patrons.

The proposed text also modifies the definition of an adult eating or drinking establishment to provide that such an establishment is not customarily open to the general public during live or recorded adult entertainment either because it "excludes or restricts minors." The current text applies where the establishment "excludes minors by reason of age". This change addresses attempts by adult establishments to evade application of the 1995 Adult Use Regulations by implementing policies which purport to allow for admission of minors, subject to certain restrictions. While such efforts have been uniformly rejected by the courts, the amendment would eliminate any further attempts at evasion of this kind.

ZR 12-10 Adult Theaters: The current text provides that an adult theater includes a commercial establishment where live or recorded sexually-oriented entertainment is viewed from individual enclosures. The proposed text clarifies that an adult theater exists where there are "one or more" such individual enclosures. The proposed text also eliminates language interpreted by the courts as requiring application of a "substantial portion" test to the amount of floor area dedicated to adult entertainment in order to determine whether the theater is an "adult theater."

9

ZR 12-10 "Mixed Use" Establishments: The current text provides that an "adult establishment" is a "commercial establishment where a substantial portion of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof..." This language anticipated the possibility of a bona fide "mixed use" establishment consisting of both an adult and a non-adult use, although no such uses were identified in the DCP Study.  Since adoption of the 1995 Adult Use Regulations, operators of adult establishments have sometimes claimed "mixed use" status through the artificial separation of an adult establishment into multiple components, e.g., a topless bar and "cigar lounge." The inspection and enforcement history demonstrate, however, that these so-called "mixed use" establishments function as integrated adult establishments. The proposed text, therefore, provides that an "adult establishment" is a commercial establishment "which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof..."

ZR 32-01 Special Provisions for Adult Establishments: The current text of ZR 32-01(b) provides that in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, adult establishments shall be located at least 500 feet from, among others, "a Manufacturing District, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of right or by special permit or authorization." The proposed text clarifies that the 500 foot buffer provision applies under this circumstance regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

The current text of 32-01(c) provides that in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 districts, adult establishments shall be located at least 500 feet from another adult establishment, but does not set forth a definition of when an adult establishment is considered located and in existence for purposes of this provision. The proposed text provides that an adult establishment shall be "established" upon the date of a permit issued by the Department of Buildings or, in the case of an adult establishment lawfully established prior to the effective date of the proposed text, as determined by the Department of Buildings. The establishment of an adult establishment through permit issuance is subject to such rules as the Department of Buildings shall prescribe regarding the failure to perform authorized work or to operate under a permit and discontinuance of use.

ZR 42-01 Special Provisions for Adult Establishments: The current text of 42-01(a) provides that adult establishments are not permitted in a Manufacturing Districts in which " #residences#,  #joint living-work quarters for artists# or #loft dwellings# are, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization." The proposed text clarifies that this provision applies  regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

The current text of 42-01(b) provides that in Manufacturing Districts in which adult establishments are permitted (i.e, a district which is not a Manufacturing District in which residences, joint living-work quarters for artists or loft dwellings are allowed as-of-right or by special permit or authorization), adult establishments shall be located at least 500 feet from, among others, "a Manufacturing District, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of right or by special permit or authorization." The proposed text clarifies that this provision applies regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

The current text of 42-01(c) provides that in Manufacturing Districts in which adult establishments are permitted (i.e., a district which is not a Manufacturing District in which residences, joint living-work quarters for artists or loft

10

0561

dwellings are allowed as-of-right or by special permit or authorization), such adult establishments shall be located at least 500 feet from another adult establishment. The proposed text provides that an adult establishment shall be established upon the date of a permit issued by the Department of Buildings, therefor or, in the case of an adult establishment lawfully established prior to the effective date of the proposed text, as determined by the Department of Buildings. The establishment of an adult establishment through permit issuance is subject to such rules as the Department of Buildings shall prescribe regarding the failure to perform authorized work or to operate under a permit and the discontinuance of the use.

11

0562



DEPARTMENT OF CITY PLANNING
CITY OF NEW YORK

ENVIRONMENTAL ASSESSMENT AND REVIEW DIVISION

Joseph B. Rose, *Director*
Department of City Planning

March 26, 2001

Michael Weil
Department of City Planning
22 Reade Street, Room 3E
New York, New York 10007

Re:   **Adult Establishment Text Change**
      CEQR No. 01DCP054Y
      ULURP No. N 010508 ZRY

Dear Mr. Weil:

Under City Environmental Quality Review, the lead agency is required to determine whether a proposed action may or will not have a significant effect on the environment. In accordance with this regulation, the City Planning Commission has determined that the proposed action will not have a significant effect on the environment.

Enclosed is the Negative Declaration for CEQR No.01DCP054Y, Adult Establishment Text Change, including supporting statements for the finding that the project will not have a significant effect. The proposal involves an application by the Department of City Planning for a modification of the Zoning Resolution which would amend the 1995 Adult Use Regulations. Specifically, the changes would clarify the definition of an Adult Establishment (Section 12-10 of the Zoning Resolution), and modify the location regulations and buffer zone provisions for "mixed-use" manufacturing districts and priority rights (Sections 32-01 and 42-01 of the Zoning Resolution). Implementation of the proposed action could result in discontinuance or closure of approximately 100 of the 136 known adult establishments identified as '60/40' adult establishments.

The term "'60/40' adult establishment" refers to the following commercial establishments: book or video stores where 40% or less of their stock-in-trade is in adult printed or visual material and 40% or less of their floor area is dedicated to adult printed or visual material; eating or drinking establishments where the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area; and theaters where the adult

Robert Dobruskin, *Director*
James P. Merani, R.A., *Deputy Director*
22 Reade Street, New York, N.Y. 10007-1216 Room 4E (212) 720-3420
JNR-000490
http://www.ci.nyc.ny.us/planning

0564

**Adult Establishment Text Change**
CEQR No. 01DCP054Y

entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area.

Sincerely,

*Robert Dobruskin*

Robert Dobruskin

cc.    Joseph B. Rose
       City Planning Commissioners
       Alessandra Sumowicz
       Gail Benjamin, Director, City Council, Land Use Review Division
       The Hon. Fernando Ferrer, The Bronx Borough President
       The Hon. C. Virginia Fields, Manhattan Borough President
       The Hon. Howard Golden, Brooklyn Borough President
       The Hon. Guy V. Molinari, Staten Island Borough President
       The Hon. Claire Shulman, Queens Borough President
       All Community Boards
       David Karnovsky
       Joseph Ketas
       Lance Michaels
       Lawrence Parnes
       Gail Benjamin
       John Cahill
       Phil Sperling
       Esther Ginsberg
       Pat Bussey
       James Merani
       Douglas Brooks
       Bala Roa
       Regina Myer
       Richard Barth
       John Young
       Ken Bergin



CITY PLANNING COMMISSION
CITY OF NEW YORK

OFFICE OF THE CHAIRMAN

March 26, 2001

## NEGATIVE DECLARATION

**Project Identification**
Adult Establishment Text Change
CEQR No. 01DCP054Y
ULURP No. N 010508 ZRY
SEQRA Classification: Type I

**Lead Agency**
City Planning Commission
22 Reade Street
New York, NY 10007

Contact: Robert Dobruskin
(212) 720-3423

**Name, Description and Location of Proposal:**

Adult Establishment Text Change
The proposal involves an application by the Department of City Planning for a modification of the Zoning Resolution which would amend the 1995 Adult Use Regulations. Specifically, the changes would clarify the definition of an Adult Establishment (Section 12-10 of the Zoning Resolution), and would modify the location regulations and buffer zone provisions for "mixed-use" manufacturing districts and priority rights (Sections 32-01 and 42-01 of the Zoning Resolution). Implementation of the proposed action could result in discontinuance or closure of approximately 100 of the 136 known adult establishments identified as '60/40' adult establishments.

The term "'60/40' adult establishment" refers to the following commercial establishments: book or video stores where 40% or less of their stock-in-trade is in adult printed or visual material and 40% or less of their floor area is dedicated to adult printed or visual material; eating or drinking establishments where the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area; and theaters where the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area.

**Statement of No Significant Effect:**

The Environmental Assessment and Review Division of the Department of City Planning, on behalf of the City Planning Commission, has completed its technical review of the Environmental Assessment Statement dated March 23, 2001, prepared in connection with the ULURP Application N 010508 ZRY. The City Planning Commission has determined that the proposed action will have no significant effect on the quality of the environment.

**Adult Establishment Text Change**
**Negative Declaration**
CEQR No. 01DCP054Y
Page 2

**Supporting Statement:**
The above determination is based on an environmental assessment which finds that no significant effects on the environment which would require an Environmental Impact Statement are foreseeable.

This Negative Declaration has been prepared in accordance with Article 8 of the Environmental Conservation Law 6NYCRR part 617.

Should you have any questions pertaining to this Negative Declaration, you may contact James Merani at (212) 720-3628.

Date:   03/23/01

Robert Dobruskin, Director
Environmental Assessment & Review Division
Department of City Planning

Date:   03/26/01

Joseph B. Rose, Chairman
City Planning Commission

ENVIRONMENTAL ASSESSMENT STATEMENT

PART I

APPLICANT INFORMATION & ACTION SUMMARY

A.   LEAD AGENCY

Agency:   **Department of City Planning**

Contact:   **Robert Dobruskin**

Address:   **22 Reade Street, 4E**

_____   **New York, NY 10007**

_____

Phone:   **212-720-3423**

FAX:   **212-720-3495**

B.   PRIVATE OR NON-LEAD AGENCY APPLICANT

Applicant:   _____

Contact:   _____

Address:   _____

_____

_____

Phone:   _____

FAX:   _____

C.   APPLICATION IDENTIFICATION

Project name:   **Adult Establishment Text Changes** _____

CEQR # (agency initials followed by year and number):   **01DCP054Y**

BSA #:   _____

ULURP #:   **N 010508 ZRY** _____

LEGISLATIVE INTRO #:   _____

CAPA #:   _____

01DCP054Y

RECEIVED

MAR 2 3 2001

CENTRAL INTAKE
DEPT. OF CITY PLANNING

0568

D.  ACTION DESCRIPTION

1.    Provide a Sanborn or other land use map showing the boundaries of the directly affected area.[*]

2     Describe the location of the directly affected area as follows:

Citywide - **See Attachment**

Borough _____

Community District(s) _____

Tax block(s) and lot(s) _____

Street address, vanity address and nearest cross streets (minimum of two) to property:

If the action would apply to the entire City or to areas that are so extensive that site-specific description is not appropriate or practicable, describe the area likely to be affected by the action:

**See Attachment**

_____

[*] The directly affected area consists of the project site and the area subject to any change in regulatory controls that the action includes.

6

3.   Describe the action for which environmental review is being performed and, briefly, what consequences would result from or be generated by the action:

**See attachment.**

**The proposed text changes would amend the 1995 Adult Use Regulations in several respects.  The principal changes concern the definitions of adult establishments; the location regulations and buffer zone provisions for "mixed-use" manufacturing districts, and priority rights.  The proposed amendments would modify ZR sections 12-10, 32-01 and 42-01.  The proposed text is included in Appendix E.**

4.   Physical dimensions and scale of project (fill in dimensions as appropriate):   **N/A**

Total contiguous square feet owned or controlled by project sponsor:
_____ square feet.

Project square feet to be developed:   _____ square feet.

Gross floor area of project, in square feet:   _____

If the action is an expansion, indicate percent or expansion proposed in the number of units, square feet or other appropriate measure:
_____% of _____.

7

Dimensions (in feet) or largest proposed structure: _____ height; _____ width; _____ length.

Linear feet of frontage along a public thoroughfare _____

5.   Construction:   **N/A**


Will the action result in demolition of or significant physical alteration to any improvement?




Will the action involve either above ground construction resulting in any ground disturbance or in-ground construction?



If single phase project:  Anticipated period of construction _____ months (including demolition)


If multi-phased:

Total number of phases anticipated _____ (number)

  Describe phases and construction schedule:



Anticipated date of commencement of phase 1 _____ month _____ year (including demolition)

Approximate completion date of final phase _____ month _____ year

8

JNR-000497

0571

**E.   APPROVALS**

1.     Will the action be reviewed pursuant to the Uniform Land Use Review

       Procedure (ULURP) set forth in section 197-c of the Charter?

              **No.**

2.     Identify below and describe as appropriate all City approvals

       required for the action, regardless of whether environmental review

       is required for any individual approval.


LAND USE APPROVALS SOUGHT (for BSA approvals, see following section):

Zoning text amendment __**X**_____

Zoning map amendment _____

City map change _____

       *Street map change:

       *Park map change:

Special permit _____

       *Specify type _____

       *Specify section of Zoning Resolution _____

       *New or renewal? _____

       *Expiration date _____

Site selection for facility _____

Acquisition of real property by the City _____

       *Public easement: _____

Franchise _____

       *Type of franchise _____

       *New or renewal? _____

       *Expiration date _____

Urban renewal area designation or alteration _____

Urban renewal plan _____

       *New or amended? _____

9

Concession _____

Sanitary or waterfront landfill _____

Revocable consent _____

      *New, modified or renewal? _____

      *Expiration date _____

City Planning authorization _____

Charter §197-a plan _____

Disposition of City property _____

Other (specify) _____


BOARD OF STANDARDS AND APPEALS APPROVALS SOUGHT:


Special permit _____

      *Type of special permit _____

      *Specify section of Zoning Resolution _____

      *New or renewal? _____

      *Expiration date _____

Variance _____

      *Type of variance, if known (use or bulk) _____

Other (specify) _____


OTHER CITY APPROVALS SOUGHT:

Legislation _____

Rulemaking _____

      *Specify agency _____

Construction of public facilities _____

     *Specify

Funding of construction _____

     *Specify

10

0573

Funding of programs _____

     *Specify

Policy or plan _____

Landmarks Preservation Commission approvals (exempt from CEQR) _____

Department of Buildings approvals (exempt from CEQR) _____

Other (specify) _____

2.     Specify all state and federal approvals, actions or funding required for the action, regardless of whether environmental review is required for any individual action.  **None.**

### F.  ACTION TYPE

Is the action Type I action or an unlisted action?  Consult the Type I list in 6 NYCRR §617.12(b) and the City list at §6-15(a) of Executive Order No. 91 or 1977.  (See attachments 3 and 4).  Type I actions have been determined to be more likely to require preparation of an environmental impact statement than other actions.  Prior to finalizing the EAS, it may be appropriate to reconsider the answer to this question in light of

other parts of the EAS or supporting materials.  Check below as appropriate:

       Unlisted _____

       Type I _____**X**_____

         *Specify Type I category or categories __**617.4 (b) (2)**__

_____

11

After completing or receiving Part I, the lead agency must send a copy of it, with any other information it deems necessary, to the Office of Environmental Coordination - 100 Gold Street, 2nd Floor, New York, New York 10038.   In addition, if an action includes discretionary actions/approvals by City agencies other than the lead agency, the lead agency should provide those involved agencies with notice of its lead agency status and send them Part I of the EAS.

12

0575

**PART II**

**SITE AND ACTION DESCRIPTION**

This Part provides a detailed description of the proposed action and addresses the physical and socioeconomic context of the proposed action. Materials prepared for other purposes may be used to satisfy this Part where appropriate. Where appropriate, the action description should include the cumulative effects of related actions. This Part also requires applicants to submit analyses for all applicable categories of environmental impacts.

**A. CATEGORIZING YOUR ACTION**

(1) LOCALIZED ACTIONS include: a) site specific actions which would result in a specific or known development at particular locations; and b) actions involving changes in regulatory controls that affect one or more sites in a well defined localized geographic area and are not associated with specific or known development on each of those sites. Localized actions may be a mix of (a) and (b).

(2) AREAWIDE/PROGRAMMATIC ACTIONS include those actions that would apply to the entire City, or to areas that are so extensive that site-specific description and/or analysis would not be appropriate or practicable.

Check the category of action that is reflective of the actions proposed:

Category 1: (a) _____ and/or (b) _____

Category 2: ___**X**___

For more information on categorizing your action, consult the introduction to the EAS Guidebook, at pages 8-9.

Subparts B, D, E and F of this Part should be completed for all localized actions. Subpart C, entitled "Project Description," is generally completed only

13

for site specific actions which would result in a specific or know development at particular locations.

If your action is localized and involves changes in regulatory controls that affect one or more sites not associated with a specific development, then it is generally appropriate to include in subpart E one or more reasonable development scenarios for such sites and, to the extent possible, to provide information about such scenario(s) similar to that requested in subpart C.

If your action is areawide/programmatic, then you may generally skip subparts B through E of this Part (pages 16-25 of this form), unless completion of those subparts is helpful in describing your action, and proceed directly to subpart F on page 25.  If you skip subpart B through E, be sure to attach texts and/or maps that will serve as the action description in lieu of completion of those subparts.

**B.  SITE DESCRIPTION   The affected area is described in the attachment.**

Except where otherwise indicated, answer the following questions with regard to the directly affected area.  (The directly affected area, also called the area directly affected by the action, consists of the project site and the area subject to any change in regulatory controls that the action includes.) Indicate N.A. if not applicable.

1.   MAPS:

In addition to the Sanborn or other land use map requested in Part I, provide a tax map and zoning map showing the boundaries of the directly affected area.

2.   PHYSICAL SETTING (both developed and undeveloped areas):

Total square feet of directly affected area: _____ square feet
Current general breakdown of area:

Water surface area: _____ square feet
Roads, building and other paved surfaces: _____ square feet
Other: _____ square feet

14

JNR-000503

0577

3.    PRESENT LAND USE:

    <u>Residential</u>
    Total no. of dwelling units _____
    Number of low-to-moderate income units[1] _____
    Gross floor area _____ sq. ft.
    Number of stories _____
    Describe type of residential structures:


    <u>Commercial</u>
    Retail _____ Number of buildings and gross floor area of each building
(sq. ft.):


_____


Office _____   Number of buildings and gross floor area of each building
  (sq. ft.):


Other _____   Number of buildings and gross floor area of each building
  (sq. ft.):


Specify type(s):


Number of stories and height of each building:


<u>Manufacturing/Industrial</u>
Type of use(s):


Number of buildings and gross floor area of each building (sq. ft.):


Number of stories and height of each building:

_____

    [1]  Low-to-moderate income units are units with monthly
carrying costs of not more than 30% of the median area monthly
income.  The Department of Housing Preservation and Development
may be contacted for assistance in applying this definition

15

0578

Open storage area _____ sq. ft.

If any unenclosed activities, specify:

Community facility
Number of buildings and gross floor area of each building (sq. ft.):

Number of stories and height of each building:

Type of community facility:

Vacant land
If there any vacant land in the directly affected area:  Describe briefly.

Publicly accessible open space
Is there any existing publicly accessible open space in the directly affected area?  Describe briefly.

Does the directly affected area include any mapped City, State or Federal parkland or any mapped or otherwise known wetland?

Other land use
Gross floor area _____ sq. ft.
Number of stories _____
Type of use:

4.    EXISTING PARKING:
      Garages
      Number of spaces accessible to public: _____
      Number of spaces not accessible to public: _____
      Attended or non-attended? _____

16

JNR-000505

0579

Operating hours _____
Self-park _____
Non-self-park (please specify)


Lots
Number of spaces accessible to public:   _____
Number of spaces not accessible to public _____


Attended or non-attended?   _____
Operating hours _____
Self-park _____
Non-self-park (please specify)

Other (including street parking) - please specify and provide same data as for lots and garages, as appropriate.


5.    STORAGE TANKS:

Gas or service stations _____
Oil storage facility _____
Other, specify:


Size tanks:
Last NYFD inspection date:
Location and depth of tanks:


6.    CURRENT USERS:

Number of residents:   _____
Number and type of businesses:


Number and type of workers by businesses:



Number and type of non-residents who are not workers:



7.    HISTORIC AND ARCHAEOLOGICAL RESOURCES:

Answer the following two questions with regard to the directly affected area, lots abutting that area, lots along the same blockfront or directly across the street from the same blockfront, and, where the directly affected area includes a corner lot, lots which front on the same street intersection.   (See Section F of the EAS Guidebook.)

17

JNR-000506

0580

Do any of the areas listed above contain improvement, interior landscape feature, aggregate of landscape features, or archaeological resource that:

(a)   has been designated (or is calendared for consideration as) a New York City Landmark, Interior Landmark or Scenic Landmark;
(b)   is within a designated New York City Historic District;
(c)   has been listed on, or determined eligible for, the New York State or National Register of Historic Places;
(d)   is within a New York State or National Register Historic District; or
(e)   has been recommended by the New York State Board for listing on the New York State or National Register of Historic Places?

Identify any resource.



Do any of the areas listed in the introductory paragraph to 7 on page 19 contain any historic or archaeological resource, other than those listed in response to the previous question?  Identify any resource.


8.   WATERFRONT:

Is any part of the directly affected area within the City's Waterfront Revitalization Program boundaries?   (A map of the boundaries can be obtained at the Department of City Planning bookstore.)  If yes, append a map showing the directly affected area as it relates to such boundaries. A map requested in other parts of this form may be used.  (See Section K of the EAS Guidebook.)  The text amendment affects all districts citywide, including all zoned land within the Coastal Zone.



**C.   PROJECT DESCRIPTION**          **See attachment**

This subpart should generally be completed only if your action includes a specific or known development at particular locations.

1.   PROPOSED USES:

Residential
Total no. of dwelling units _____
Number of low-to-moderate income units _____
Gross floor area _____ sq. ft.
Number of stories _____
Describe type(s) of residential structures:

18

<u>Commercial</u>
Retail _____ Number of buildings and gross floor area of each building
   (sq. ft.):



Office _____ Number of buildings and gross floor area of each building
   (sq. ft.):



Other _____ Number of buildings and gross floor area of each building
   (sq. ft.):



Specify type(s):



Number of stories and height of each building:



<u>Manufacturing/Industrial</u>
Type of use(s):



Number of buildings and gross floor area of each building (sq. ft.):



Number of stories and height of each building:



Open storage area _____ sq. ft.

19

0582

If any unenclosed activities, specify:

Community facility
Number of buildings and gross floor area of each building (sq. ft.):

Number of stories and height of each building:

Type of community facility:

Vacant land
Is there any vacant land in the directly affected area?  Describe briefly?

Publicly accessible open space
Any existing publicly accessible open space to be removed or altered?
If yes, describe:

Any publicly accessible open space to be added?  If yes, describe:

Other land use
Gross floor area _____ sq. ft.
Number of stories _____
Type of use:

2.    PROPOSED PARKING:
      Garages:
      Number of spaces accessible to public:  _____

Number of spaces not accessible to public:  _____
Attended or non-attended?  _____

20

0583

Operating hours _____
Self-park _____
Non-self-park (please specify)


Lots:
Number of spaces accessible to public:   _____
Number of spaces not accessible to public:   _____
Attended or non-attended?   _____
Operating hours _____
Self-park   _____
Non-self-park (please specify)

Other (including street parking) - please specify and provide same data as for lots and garages, as appropriate.


Number of location of proposed curb cuts:



3.    PROPOSED STORAGE TANKS:

      Gas or service stations _____
      Oil storage facility _____
      Other, specify:



      Size of tanks:
      Location and depth of tanks:



4.    PROPOSED USERS:

      Number of residents:   _____
      Number and type of businesses:


      Number and type of workers for each business:


      Number and type of non-residents who are not workers:


5.    HISTORIC AND ARCHAEOLOGICAL RESOURCES:



21

0584

Will the action affect any historic or archaeological resource identified in response to either of the two questions at number 7 on pages 19 and 20. Describe briefly.

6.    DISPLACEMENT:

Will the action directly displace specific business or affordable and/or low income residential units?  Describe briefly.  (See Section C of the EAS Guidebook.)

7.    CHANGES TO EXISTING COMMUNITY FACILITIES:

Will the action directly eliminate, displace or alter pubic or publicly funded community facilities such as educational facilities, libraries, hospitals and other health care facilities, libraries, hospitals and other health care facilities, day care centers, police stations, or fire stations?  (See Section D of the EAS Guidebook.)

**D.    ZONING INFORMATION**              **See attachment.**

What is the zoning classification(s) of the directly affected area? The proposed text amendment affects all districts citywide

What is the maximum amount of floor area that can be developed in the directly affected area under the present zoning?  Describe in terms of bulk for each use.

What is the proposed zoning of the directly affected area?

What is the maximum amount of floor area that could be developed in the directly affected area under the proposed zoning?  Describe in terms of bulk for each use.

22

0585

What are the predominant land uses and zoning classifications within a 1/4 mile radius of the proposed action?

E.   **ADDITIONAL INFORMATION**          See attachment.

Attach any additional information as may be needed to describe the action.  If your action involves changes in regulatory controls that affect one or more sites not associated with a specific development, it is generally appropriate to include here one or more reasonable development scenarios for such sites and, to the extent possible, to provide information about such scenario(s) similar to that requested in subpart C on pages 20-24 above.

F.   **ANALYSES**          See attachment.

Attach analyses for each of the impact categories listed below (or indicate where an impact category is not applicable).  For localized actions, sections B through N of the EAS Guidebook set forth methodologies developed by the City to be used in analyses prepared for the listed categories.  Other methodologies developed or approved by the lead agency may also be utilized.  If a different methodology is contemplated, it may be advisable to consult with OEC. For areawide/programmatic actions, consult section A of the guidebook.  You should also attach any other necessary analyses or information relevant to the determination whether the action may have a significant effect on the environment, including, where appropriate, information on combined or cumulative impacts, as might occur, for example, where actions are interdependent or occur within a discrete geographical area or time frame.

23

0586

If you believe that a positive declaration is appropriate because the action may have a significant effect on the environment, you may indicate that here and explain briefly.  In that case, the analyses otherwise required by this subpart do not have to be submitted (unless the lead agency specifically requests them).

Neighborhood character - Section B of the EAS Guidebook

Socioeconomic analysis/placement - Section C of the EAS Guidebook

Community facilities - Section D of the EAS Guidebook

Open space - Section E of the EAS Guidebook

Historic and archaeological resources - Section F of the EAS Guidebook

Transportation - Section G of the EAS Guidebook

Air quality - Section H of the EAS Guidebook

Infrastructure[2] and energy impacts - Section I of the EAS Guidebook

Natural resources - Section J of the EAS Guidebook

Noise - Section M of the EAS Guidebook

Solid waste - Section N of the EAS Guidebook

_____

[2]For purposes of this form, infrastructure refers only to the means by which wastewater is discharged and drinking water supplied.

24

JNR-000513

0587

## G.   APPLICANT CERTIFICATION

Preparer's name: **Kenneth J. Bergin**
Preparer's signature:
Date: **March 23, 2001**


Principal:
Name of principal representative: **Robert Dobruskin**
Title of principal representative: **Director, EARD, Dept. of City Planning**
Signature of principal representative:
Date: **March 23, 2001**

NOTE:   Any person who knowingly makes a false statement or who knowingly falsifies any statement on this form or allows any such statement to be falsified shall be guilty of an offense punishable by fine or imprisonment or both, pursuant to section 10-154 of the New York City Administrative Code, and may be liable under other applicable laws.

25

0588

**PART III**

~~ENVIRONMENTAL ASSESSMENT AND DETERMINATION~~

**ADULT ESTABLISHMENT TEXT CHANGE**

**CEQR No. 01DCP054Y**

The lead agency should complete this Part after Parts I and II have been completed.  In completing this Part, the lead agency should consult 6 NYCRR §617.11 (attached) which contains the State Department of Environmental Conservation's criteria for determining significance.

The lead agency should ensure the creation of a record sufficient to support the determinations in this Part. The record may be based upon analyses submitted by the applicant with Part II of the EAS.  The EAS Guidebook sets forth methodologies developed by the City to be used in analyses prepared for the listed categories.  Alternative or additional methodologies may be utilized by the lead agency.

1.      For each of the impact categories below, consider whether the action may have a significant effect on the environment with respect to that impact category.  If it may, answer yes.

Neighborhood Character                    _____

Socioeconomic impacts/displacement        _____

Community facilities                      _____

Open space                                _____

Historic and archaeological resources     _____

Transportation                            _____

Air quality                               _____

-26-

Infrastructure and energy          _____

Natural resources                  _____

Waterfront revitalization          _____

Hazardous materials                _____

Noise                              _____

Solid Waste                        _____

2.    Are there any aspects of the action relevant to the determination whether the action may have a significant effect on the environment, such as combined or cumulative impacts, that were not fully covered by other responses and supporting materials?  If there are such aspects, explain them and state whether, as a result of them, the action may have a significant effect on the environment.

3.    If the lead agency has determined in its answers to questions 1 and 2 of this Part that the action will have no significant effect on the environment, a negative declaration is appropriate.  The lead agency may, in its discretion, further elaborate here upon the reasons for issuance of a negative declaration.

4.    If the lead agency has determined in its answers to questions 1 and 2 of this part that the action may have a significant effect on the environment, a conditional negative declaration (CND) may be appropriate if there is a private applicant for the action and the action is not Type I.  A CND is only appropriate where the mitigation measures identified will modify the proposed action so that no significant adverse environmental impacts will result.  If a CND is appropriate, the lead agency should describe here the conditions to the action that will be undertaken and how they will mitigate potential significant impacts.

-27-

JNR-000516

0590

5.   If the lead agency has determined that the action may have a significant effect on the environment, and if a conditional negative declaration is not appropriate, then the lead agency should issue a positive declaration. Where appropriate, the lead agency may, in its discretion, further elaborate here upon the reasons for issuance of a positive declaration. In particular, if supporting materials do not make clear the basis for a positive declaration, the lead agency should describe briefly the impacts it has identified that may have a significant effect on the environment.

LEAD AGENCY CERTIFICATION

**ADULT ESTABLISHMENT TEXT CHANGE**

**CEQR No. 01DCP054Y**

Preparer's Name                    James Merani, Project Manager

Preparer's signature

Date                               March 23, 2001

Name of Lead Agency Representative     Robert Dobruskin

Title of Lead Agency Representative    Director, DCP Environmental Review

Signature

Date                               March 23, 2001

-28-

JNR-000517

0591

**EAS ATTACHMENT – CEQR NO. 01DCP054Y**

**A. DESCRIPTION OF THE PROPOSED ACTION**
**A.1. The Proposed Text Amendments**
**A.2   Purpose and Need**

In 1995, the City Planning Commission and the City Council adopted comprehensive zoning regulations governing the locations where "adult establishments" could be maintained or sited in the future (the "1995 Adult Use Regulations" or the "Regulations"). The 1995 Adult Use Regulations were adopted in response to a 1994 Department of City Planning Study (the "DCP Study") which concluded that triple-X video and bookstores, adult live or movie theaters and topless or nude bars have significant negative secondary impacts. These impacts include higher incidence of criminal activity; deterioration the quality of urban life, by a damaging impact on neighborhood character, children and other residents; and negative impact on economic development and revitalization and nearby property values. ( DCP Study at iv-ix, pp.56-65). As a first response to the DCP Study, the City Planning Commission and the City Council in 1994 enacted a one-year moratorium on new adult entertainment establishments in the City . This was followed by the adoption of permanent regulations in 1995.

The 1995 regulations address those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a "predominant, on-going focus on sexually explicit materials or activities." (CPC Report N950384ZRY (CPC Report) at p.49.) In general terms, the regulations restrict the permitted locations of such adult establishments by prohibiting them in all residence districts, certain commercial districts and manufacturing districts that permit new residential uses; by requiring that adult establishments be at least 500 feet from such districts; by requiring that each adult establishment in a permitted location be at least 500 feet from another such establishment; and by requiring that adult establishments be at least 500 feet from certain "sensitive receptors" ( schools, day care centers, and houses of worship). The amendments were designed to "minimize the potential for adverse secondary effects throughout the city" and protect those areas and uses "particularly vulnerable to the negative effects of adult uses." (CPC Report at p.42).

Implementation of the 1995 regulations did not begin until 1998, when the United States Supreme Court declined review of the constitutional issues following New York State Court of Appeals decision in Stringfellow's of New York, Ltd. v. City of New York, 91 N.Y. 2d 382 (1998). That decision upheld the constitutionality of the 1995 amendments, finding that the amendments were content neutral regulations designed to address the secondary effects of adult uses in New York City, and that there would continue to be reasonable alternative avenues of communication in the form of areas in which adult establishments could remain or to which they could relocate.

1

0592

Enforcement efforts since 1998 have pointed to a need to adjust the regulations to address attempts by adult establishments to remain in operation through superficial and formalistic measures which do not alter the character of the establishments as enterprises with a "predominant, on-going focus on sexually explicit materials or activities." In addition, several court rulings have narrowed the scope and application of the 1995 Adult Use Regulations in a manner which the Department of City Planning believes is contrary to the original intent, thus requiring further amendments. The key features of the current and proposed regulations are described in more detail below.

The 1995 Adult Use Regulations govern four types of "adult establishment": adult book stores; adult eating or drinking establishments; adult theaters; and other adult establishments. An "adult book store" is defined as book store which has a "substantial portion" of its stock-in-trade in printed or visual material characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas," each of which are defined terms under the Zoning Resolution. In determining whether a "substantial portion" of a book store's stock-in-trade consists of such adult printed or visual material, several factors must be considered: (i) the amount of adult printed or visual material accessible to customers as compared to the total stock; (ii) the amount of floor area and cellar space accessible to customers containing adult printed or visual material; and (iii) the amount of floor area and cellar space accessible to customers containing adult printed or visual material as compared to the total floor area and cellar space accessible to customers in the establishment. An "adult eating or drinking establishment" is defined as an eating or drinking establishment which "regularly features" live performances or films, motion pictures, videos or other recorded entertainment, which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas," or has employees who, as part of their employment, regularly expose "specified anatomical parts" to patrons, and which is not customarily open to the general public because it excludes minors by reason of age. An adult theater is defined as theater which "regularly features" such live or recorded performances and which is not customarily open to the general public during such features because it excludes minors by reason of age. An other adult establishment is a facility not otherwise described in the regulations which features employees who, as part of their employment , regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes minors by reason of age. A commercial establishment which includes an adult book store, adult eating or drinking establishment, adult theater, or other adult establishment qualifies as an "adult establishment" subject to the 1995 Adult Use Regulations where such adult use occupies the entirety or a "substantial portion" of the commercial establishment.

The location regulations of the 1995 Adult Use Regulations are intended to limit the negative secondary impacts of adult establishments . Under these regulations, adult establishments are not permitted in residence, C1, C2, C3, C4, C5, C6-1, C6-2, or C6-3 districts, or in manufacturing districts in which residences, joint living-work quarters for artists, or loft dwellings are allowed as-of-right or by special permit or authorization. Adult establishments continue to be permitted in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, and C8 districts, and in all other manufacturing

2

0593

districts, subject to the following provisions: (i) adult establishments cannot be located within 500 feet of a school, day care center, house of worship or a residence district, a C1, C2, C3, C4, C5, C6-1, C6-2, or C6-3 district, or a manufacturing district in which residences, joint living-work quarters for artists, or loft dwellings are allowed as-of-right or by special permit or authorization; (ii) adult establishments cannot be located within 500 feet of another adult establishment; (iii) no more than one adult establishment may be permitted on a zoning lot; and (iv) adult establishments cannot exceed 10,000 square feet of floor area and cellar space not used for enclosed storage or mechanical equipment.

The 1995 Adult Use Regulations also include (i) sign regulations which restrict the size and location of accessory business signs for adult establishments in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, C8, M1, M2, and M3 districts; (ii) amortization provisions which allowed non-conforming adult establishments and accessory business signs to continue in operation for up to one year following the effective date of the regulations; and (iii) special regulations which restrict the ability of a non-conforming use to convert to a non-conforming adult establishment.

The proposed text changes would amend the 1995 Adult Use Regulations in several respects. The principal changes are as follows:

1. Definitions of Adult Establishments: (a) Adult Book Store- The definition of an "adult book store" would be modified to provide that non-adult printed or visual material is not considered stock-in-trade for purposes of determining whether a "substantial portion" of book store's stock-in-trade consists of adult printed or visual material, where one or more features is present at the premises. These features, described in more detail in A.3 below , include, among others: the presence of a peep booth featuring adult material on the premises; the absence of any fixed, permanent and complete partition between adult and non-adult sections of the store; a greater number of titles of adult than non-adult printed or visual material; and an interior configuration and lay-out which requires customers to pass through an adult section of the store in order to access a non-adult section. These changes are intended to address establishments which have engaged in a superficial and formalistic compliance with the regulations by increasing the amount of non-adult books or videos sold at the premises and the amount of floor area dedicated thereto, without changing the nature of the establishment as an enterprise with a predominant, on-going focus on sexually explicit materials ; (b) Adult Eating or Drinking Establishment- The definition of an "adult eating or drinking establishment" would be modified to provide that such an establishment is an "eating or drinking establishment" which "regularly features" adult live performances or films in "any portion of the establishment," thereby affirming the intent of the 1995 Adult Use Regulations that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing; (c) Adult Theater- The definition of an "adult theater" would be modified  to clarify that a commercial establishment with one or more peep booths or similar individual enclosures qualifies as an "adult theater." Modifications to the definition of an "adult establishment" would also affirm the intent of the 1995 Adult Use Regulations  that the amount of floor area dedicated to adult entertainment is immaterial to the determination whether the theater is an "adult theater."

3

0594

2. Location Regulations and Buffer Zone Provisions for 'Mixed Use' Manufacturing Districts:
The 1995 Adult Use Regulations provide that adult establishments are not permitted in
Manufacturing Districts in which residences, joint living-work quarters for artists or loft dwelling
are allowed as-of-right or by special permit or authorization. The Regulations also provide that
adult establishments shall be located at least 500 feet from such Manufacturing Districts, other
than an M1-6M district. Notwithstanding the clear language of the Zoning Resolution, the courts
have  held that adult establishments are permitted in one such district ( Area 'M' of the Special
South Richmond Development District), since a residential use is only allowed in Area M if a
finding is made that such use would not have an adverse  effect on existing commercial or
manufacturing uses (see ZR Sec. 107-69). Reasoning that authorizing a residential use in Area
'M' would necessarily have such an effect, since a pre-existing adult establishment would
thereby become subject to the one-year amortization period and be forced to close thereafter, the
court concluded that the City Planning Commission could not make the finding, with the result
that residential uses are not allowed in Area 'M' and adult establishments are. The proposed text
affirms the original intent of the 1995 Adult Use Regulations that adult establishments are not
permitted in Manufacturing Districts such as Area 'M' and that adult establishments must be
located at least 500 feet of such districts, by providing that the relevant provisions of the Zoning
Resolution apply regardless of whether the provisions or findings of a special permit or
authorization require an assessment of the impact of a new residential use on commercial or
manufacturing uses within the district.

3. Priority Rights- The 1995 Adult Use Regulations provide that, in districts in which adult
establishments are permitted, an adult establishment shall be located at least 500 feet from
another adult establishment. The Regulations utilize but do not define the terms "located" and
"existed," raising interpretive problems where there is a conflict as to priority between two
competing establishments. In one situation , the Department of Buildings was required to render
a determination concerning the priority claims of an adult bookstore located within 500 feet of an
adult eating or drinking establishment . The adult eating or drinking establishment secured a
building permit prior to the opening of the adult bookstore, but did not itself open for business
until after the bookstore had opened. The Department of Buildings determined that the eating or
drinking establishment had priority for purposes of the 500 foot rule, based on the doctrine of
vested rights under zoning, pursuant to which the eating and drinking establishment had the right
to initiate and continue to establish the use upon receipt of the building permit. The court
determined otherwise, finding that the word "existing" as used in the Zoning Resolution and
Department of Buildings directives should be interpreted to mean actual operation, rather than
permit issuance. The proposed text would modify the relevant provisions to codify the approach
adopted by the Department of Buildings, in order to provide for a system that is better capable of
administration and enforcement. The modifications would provide that an adult establishment is
"established" upon the date of a permit issued by the Department of Buildings , subject to rules
promulgated by the Department of Buildings regarding the failure to perform authorized work or
to operate under a permit and discontinuance of use. The Department of Buildings would also be
responsible for identifying  adult establishments lawfully established prior to the effective date of
the amendments, and for establishing permit filing requirements for new establishments which

4

wish to establish a priority for purposes of the 500 foot rule, but do not require a new building or alteration permit in order to open for business.

## A.3.  Comparison of Existing and Proposed Zoning Controls

ZR 12-10: Adult bookstores:  The definition of an "adult book store" would be amended to clarify the circumstances under which a "substantial portion" of the stock-in-trade of a book store consists of adult printed or visual material. Under the proposed text, printed or visual material which does not consist of adult printed or visual material ("other printed or visual material") would not be considered stock-in-trade for purposes of the definition of "substantial portion" where the book store has one or more of the following features:

a. The absence of separate sections of the store with stock-in-trade of any "adult printed or visual material" and stock-in-trade of "other printed or visual material," or the presence of any "adult printed or visual material" in a section of the store otherwise consisting primarily of "other printed or visual material."

b. An absence of any fixed, permanent and complete visual partition between a section of the store with "adult printed or visual material" and a section of the store with "other printed or visual material";

c. An interior configuration and lay-out which requires  customers to pass through a section of the store with "adult printed or visual material" in order to access a section of the store with "other printed or visual material";

d. One or more individual enclosures where adult movies or live performances are available for viewing by customers;

e. A method of operation which requires customer transactions with respect to "other printed or visual material" to be made in a section of the store which includes "adult printed or visual material";

f. A method of operation under which "other printed or visual material" is offered to customers on a substantially more limited basis than "adult printed or visual material," such as the offering of "other printed or visual material" for sale only and the offering of "adult printed or visual material" for sale or rental;

g. A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";

h. A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";

5

0596

i. A sign that advertises the availability of "adult printed or visual material" which is disproportionately large relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

j. A window display in which the number of products or area of display of "adult printed or visual material" is disproportionately high relative to the number of products or area of display of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

k. Other features, as set forth in rules adopted by the commissioner of buildings, which render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store.

The proposed text also reorganizes and reorders existing language. The definition of "adult printed or visual material" is also clarified to include product packaging or wrapping that depicts "specified sexual activities" or "specified anatomical areas".

ZR 12-10 Adult Eating or Drinking Establishments: The proposed text affirms the intent of the 1995 Adult Regulations to cover any eating or drinking establishment which "regularly features" sexually-oriented live performances or films by eliminating language interpreted by the courts as requiring application of the "substantial portion" test to such establishments. Under the proposed text, an adult eating or drinking establishment is defined as "an eating or drinking establishment" which "regularly features" "in any portion of such establishment" live or recorded performances characterized by an emphasis upon the depiction of "specified sexual activities" or "specified anatomical areas". An "eating or drinking establishment" is defined to include: (i) any portion of a commercial establishment within which food or beverages are offered for purchase, or are available to or are consumed by customers or patrons, and (ii) any portion of a commercial establishment from which a portion of a commercial establishment described in (i) above is accessible by customers or patrons.

The proposed text also modifies the definition of an adult eating or drinking establishment to provide that such an establishment is not customarily open to the general public during live or recorded adult entertainment either because it "excludes or restricts minors." The current text applies where the establishment "excludes minors by reason of age". This change addresses attempts by adult establishments to evade application of the 1995 Adult Use Regulations by implementing policies which purport to allow for admission of minors, subject to certain restrictions. While such efforts have been uniformly rejected by the courts, the amendment would eliminate any further attempts at evasion of this kind.

ZR 12-10 Adult Theaters: The current text provides that an adult theater includes a commercial

6

0597

establishment where live or recorded sexually-oriented entertainment is viewed from individual enclosures. The proposed text clarifies that an adult theater exists where there are "one or more" such individual enclosures. The proposed text also affirms the intent of the 1995 Adult Use Regulations by eliminating language interpreted by the courts as requiring application of a "substantial portion" test to the amount of floor area dedicated to adult entertainment in order to determine whether the theater is an "adult theater."

ZR 12-10 "Mixed Use" Establishments:  The current text provides that an "adult establishment" is a "commercial establishment where a  substantial portion of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof..." This language anticipated the possibility of a bona fide "mixed use" establishment consisting of both an adult and a non-adult use, although no such uses were identified in the DCP Study. Since adoption of the 1995 Adult Use Regulations, operators of adult establishments have sometimes claimed "mixed use" status through the artificial separation of an adult establishment into multiple components, e.g., a topless bar and "cigar lounge." The inspection and enforcement history demonstrate, however, that these so-called "mixed use" establishments function as integrated adult establishments. The proposed text, therefore, provides instead that an "adult establishment" is a commercial establishment "which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof..."

ZR 32-01 Special Provisions for Adult Establishments: The current text of ZR 32-01(b) provides that in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C-7 or C-8 Districts, adult establishments shall be located at least 500 feet from, among others, "a Manufacturing District, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution , as-of right or by special permit or authorization." The proposed text clarifies that the 500 foot buffer provision applies under this circumstance regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

The current text of 32-01(c) provides that in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 districts, adult establishments shall be located at least 500 feet from another adult establishment, but does not set forth a definition of when an adult establishment is considered located and in existence for purposes of this provision. The proposed text provides that an adult establishment shall be "established" upon the date of a permit issued by the department of buildings, therefor or, in the case of an adult establishment in existence prior to the effective date of the proposed text, as determined by the department of buildings. The establishment of an adult establishment through permit issuance is subject to such rules as the department of buildings shall prescribe regarding the failure to perform authorized work or to operate under a permit and discontinuance of use.

7

0598

ZR 42-01 Special Provisions for Adult Establishments: The current text of 42-01(a) provides that adult establishments are not permitted in a Manufacturing Districts in which " #residences#, #joint living-work quarters for artists# or #loft dwellings# are,  under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization." The proposed text clarifies that this provision applies  regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

The current text of 42-01(b) provides that in Manufacturing Districts in which adult establishments are permitted (i.e, a district which is not a Manufacturing District in which residences, joint living-work quarters for artists or loft dwellings are allowed as-of-right or by special permit or authorization), adult establishments shall be located at least 500 feet from, among others, "a Manufacturing District, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution , as-of right or by special permit or authorization." The proposed text clarifies that this provision applies regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

The current text of 42-01(c) provides that in Manufacturing Districts in which adult establishments are permitted (i.e., a district which is not a Manufacturing District in which residences, joint living-work quarters for artists or loft dwellings are allowed as-of-right or by special permit or authorization), such adult establishments shall be located at least 500 feet from another adult establishment. The proposed text provides that an adult establishment shall be established upon the date of a permit issued by the department of buildings, therefor or, in the case of an adult establishment in existence prior to the effective date of the proposed text, as determined by the department of buildings. The establishment of an adult establishment through permit issuance is subject to such rules as the department of buildings shall prescribe regarding the failure to perform authorized work or to perform under a permit and the discontinuance of the use.

## B.  POTENTIAL IMPACTS OF THE PROPOSED ACTION

Analysis Year: An analysis year of 2003 has been selected.  It is assumed that the proposed action would be adopted in 2001 and that enforcement of the provisions of the text amendment would begin thereafter.  The full effects of the proposal, however, would take several years to be felt, with continued enforcement, the closing or conversion of some adult establishments to conforming uses, and the relocation of some businesses in areas where they are permitted taking place over this period.

0599

## B.1. Land Use, Zoning, and Public Policy

No significant adverse impacts related to land use, zoning, or public policy are anticipated. In general, the proposed action is expected to result in beneficial land use effects.

## Existing Conditions

A complete listing of adult establishments in 2000 by address is attached as Appendix A. The list was developed by DCP using information from the Department of Buildings and the Mayor's Office of Midtown Enforcement. It includes adult establishments in locations where such uses are permissible, as well as adult establishments that operate on a '60/40' basis ('60/40 adult establishments[1]) in locations where adult establishments are prohibited. As shown in Appendix B: Table 1, there were 136 adult establishments in 2000, with 101 or 74%, consisting of '60/40' establishments. The breakdown by type of establishment, as set forth in Appendix B: Table 1, is as follows: Book stores - 35 (with 29 operating as '60/40'establishments); Eating or drinking - 57 (with 36 operating as '60/40' establishments); and Theaters - 44 (with 36 operating as '60/40' establishments). The breakdown of the number of establishments by borough is as follows: Bronx - 9 (with 6 operating as '60/40' establishments); Brooklyn - 13 (with 9 operating as '60/40' establishments); Manhattan - 69 (with 56 operating as '60/40' establishments); Queens - 41 (with 29 operating as '60/40' establishments); and Staten Island - 4 (with 1 operating as a '60/40'

---

[1]The term "'60/40' adult establishment" as used herein refers to two categories of commercial establishment: (1) book or video stores at locations where adult establishments are prohibited under the Regulations which have sought to configure themselves so that 40% or less of their stock-in-trade is in adult printed or visual material and 40% or less of their floor area is dedicated to adult printed or visual material, but which have been identified as having one or more of the features described in the proposed amendments to the definition of "substantial portion" under the proposed action (see Appendix E); (2) eating or drinking establishments at locations where adult establishments are prohibited under the Regulations which have been identified as regularly featuring live or recorded adult entertainment, but which have sought to configure themselves so that the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area; and, (3) theaters at locations where adult establishments are prohibited under the Regulations which have been identified as regularly featuring live or recorded adult entertainment, but which sought to configure themselves so that the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area. The establishments included in the list have been so described on at least one occasion during 1999, 2000 or 2001. The interior configurations and method of operation of these establishments are, however, subject to change. Accordingly, the numbers and locations of adult establishments on any given date may vary slightly from the list in Appendix A. The list is not intended to be used for or to be relied upon for regulatory or enforcement purposes.

9

0600

establishment).

Citywide Trends: 1993 to 2000: The 1994 DCP Study identified 177 adult establishments in New York City as of 1993. As indicated above, in 2000, there were 136 adult establishments, which represents a 23 percent decline over the seven year period. Factors apart from enforcement of the Zoning Resolution which likely contributed to this decline include redevelopment of Times Square and a strong local economy in which landlords have a choice of tenants other than adult establishments. The number of adult establishments may also be affected by the increased availability of adult material on cable television, and the burgeoning phenomenon of access through the internet.

Trends by Borough from 1993 to 2000: The greatest decline in adult establishments between 1993 and 2000 was in Manhattan, from 107 to 69. In 1993, 60% of the City's adult uses were in that borough; in 2000, 51% were so located. The number of adult establishments declined by three in Queens, although 29 of 41 current establishments (71%) are operating as '60/40' establishments. The number of adult establishments declined by two in Brooklyn, although 9 of 13 current establishments (69%) are operating as '60/40' establishments. The Bronx and Staten Island each experienced an increase of one establishment, with 6 of 9 current establishments (67%) in the Bronx and 1 of 4 current establishments (25%) in Staten Island operating as '60/40' establishments.

Trends in Concentrations by Community District: As in 1993, the greatest concentration of adult uses in 2000 was found in Community District 5, which includes part of the Times Square area. In 1993, 53 or 30% of the City's adult uses were located there; in 2000, the number had declined to 29 establishments, or 21% of the Citywide total. Thirteen adult establishments closed on West 42nd Street between 7th and 8th Avenues. Of the 29 current establishments, 19 operate as '60/40' establishments.

Community District 4, Manhattan, which also includes part of the Times Square area, continues to have the second greatest concentration of adult establishments. In 1993, 19 establishments (11% of the citywide total) were located in the district. In 2000, there were 16 adult establishments in the district, 12% of the citywide total. Of the current 16 establishments, 14 operate as '60/40' establishments.

Community District 2, Manhattan, had 11 adult establishments in both 1993 and 2000, and continues to have the third greatest concentration of adult establishments citywide. Of the current 11 establishments, 10 operate as '60/40' establishments.

Outside Manhattan, concentrations that had developed as of 1993 remained in 2000. Community District 7, Brooklyn, had 7 adult establishments concentrated in Sunset Park west of Third Avenue in 1993 and in 2000, with 4 operating as '60/40' establishments. Along the Queens Boulevard corridor there were 11 adult establishments in 1993; as of 2000, there were 14 in the section straddling Districts 2 and 6, with 10 operating as '60/40' establishments.

10

0601

<u>Trends within Categories of Adult Uses</u>: Comparisons of the relative distribution of types of adult uses between 1993 and 2000 are difficult to make. The survey performed by the Department of City Planning in 1993 as part of the DCP Study relied on self-identification to categorize adult uses as book stores/videostores, theaters or eating or drinking establishments; in addition, many establishments identified as book stores in the survey included peep booths that would render them classified as adult theaters or as combination adult video stores/theaters under the 1995 Adult Use Regulations. According to the 1993 data, there were 86 adult bookstores, 68 adult eating or drinking establishments, and 23 adult theaters. In 1993, bookstores represented 49%, eating or drinking establishments 38%, and theaters 13%, of all adult uses. In 2000, there were 35 adult book stores, 57 adult eating or drinking establishments and 44 adult theaters. Book stores comprised 26%, eating or drinking establishments 42%, and theaters 32% of all adult establishments in 2000. Note, however, that utilization of the 1993 classification methodology would tend to show a larger number of book stores and smaller number of theaters.

<u>Trends in Number of Adult Establishments at Permissible Locations</u>: In 1995, at the time of adoption of the Adult Use Regulations, it was estimated that 29 of the 177 adult establishments identified in the 1993 survey which formed part of the DCP Study could remain in their current locations following adoption of the Regulations. As of 2000, there were 35 adult establishments at permissible locations. Nine of these existed in 1993, and 26 were established during or after 1998, following implementation of the 1995 Adult Use Regulations. Of the 26 new establishments at permissible locations, 3 are in the Bronx, 1 are in Brooklyn, 9 are in Manhattan, 12 are in Queens and 1 is in Staten Island.

<u>Trends in Number of '60/40' Adult Establishments:</u> Since 1998, when implementation of the 1995 Adult Use Regulations began, approximately 26 new adult establishments have opened which operate as '60/40' establishments at prohibited locations. Of these, 3 are in the Bronx, 4 are in Brooklyn, 14 are in Manhattan, 4 are in Queens, and 1 is on Staten Island. One such establishment goes by the name of "Sixty/Forty Video."

Of the 101 adult establishments operating as '60/40' establishments in 2000, 60 had been identified as adult establishments in the 1993 DCP survey.

<u>General land use conditions in areas where adult establishments are located</u>: The zoning districts in which the 136 adult establishments in existence as of 2000 are located are characterized by a broad range of land use conditions, and include C1 and C2 districts, C4 through C6 districts, C8 districts, and M1, M2 and M3 manufacturing districts. For a detailed description of the land use conditions in these districts, see 95DCPO38Y.

Of the 136 establishments in 2000, approximately 15 % (21 businesses) are located in C1 and C2 districts. Approximately 3% (4 businesses) are located in C4 districts, 33% (45 businesses) are located in C5 and C6 districts, and 41 % (56 businesses) in C8 and in M1, M2 and M3 districts. Twenty-four percent of adult establishments (32 establishments) are located in high commercial density, centrally located general commercial districts (C6-4 through C6-9). Ten percent (13

11

0602

establishments) are located in residence districts.

<u>Existing land use conditions in areas where adult establishments are permitted under the proposed action:</u>

For a description of land uses by borough in the areas where adult establishments are permitted, see 95DCPO38Y at pp. 31-33. Since 1995, there have been 11 rezonings which have reduced the amount of land area described in 95DCPO38Y in which adult establishments are permitted. These are listed in Appendix C.   As a result of these rezonings, the estimated total number of acres in New York City where adult establishments are permitted has been reduced from 4,962 to 4,812, or a 3% reduction. In addition, changes since 1995 in the number and location of 'sensitive receptors' (houses of worship, schools and day care centers) from which adult establishments must be located at least 500 feet under ZR Sec. 32-01 and 42-01  have reduced the total number of acres in New York City where adult establishments are permitted by an estimated 66.36 acres, or a 1% reduction. It is estimated that these rezonings and changes in the number and location of sensitive receptors have reduced the estimated number of potential sites for adult establishments in New York City from 514 to 466, a 9% reduction.  As indicated above, the number of adult establishments at prohibited locations which may seek to relocate to permitted locations has decreased from an estimated 148 in 1995 to 101 in 2000, a decline of 32%.

**Future No-Action Conditions**

<u>Trends in the location, number, and types of adult establishments:</u>

Absent the proposed amendments, the 101 '60/40' adult establishments would likely remain at their current locations. New '60/40' adult establishments could open at prohibited locations, continuing a trend which has resulted in the opening of 26 '60/40' adult establishments since 1998. It is expected that these would tend to locate in areas where there is a concentration of '60/40' adult establishments today.

It is difficult to determine precisely how the overall number or types of adult establishments would change by 2003, due to the changing character of the adult entertainment industry, redevelopment trends, and the strength of the local economy. Continued growth in access to adult material through cable television, the internet and other media could produce a further decline in the number of adult establishments, principally book stores and videostores. Redevelopment trends in Midtown Manhattan and other commercial areas, combined with a  continued strength in the local real estate market which affords landlords a greater choice of tenants, could also contribute to a further decline.

If the decline in the number of adult establishments were to continue at the same rate as between 1993 and 2000, the number of establishments would decrease from 136 to 118 in 2003, a 13%

12

0603

reduction.

Potential zoning changes in areas where adult establishments are permitted:

The Department of City Planning is considering several rezoning proposals, which if adopted would reduce the amount of land area where adult establishments are permitted. All zoning map changes are subject to City Planning Commission and City Council approval. Some of the proposals have been advanced as formal applications, and have been certified by the City Planning Commission, while others are less developed and preliminary, and no final recommendations have been made whether to proceed. However, in each instance they have been included as potential zoning changes within the analysis period. These rezoning actions are listed and described in more detail in Appendix C. Assuming for analysis purposes that each of these rezonings is adopted, the number of acres in New York City where adult establishments are permissible would be reduced from 4,746 to approximately 4,588, a 3% reduction. It is estimated that these rezonings would reduce the estimated number of potential sites for adult establishments in New York City from 466 to 428, an 8% reduction. Changes in the number and location of sensitive receptors could also affect the number of acres and number of potential locations available for adult establishments, but the likely trend with respect to sensitive receptors is difficult to predict.

Adoption of the potential zoning changes would render three adult establishments as non-conforming uses, making them subject to the one-year amortization provisions of ZR Sec. 52-77.

**Future Action Conditions**

The proposed action is expected to result in beneficial land use effects and an improved quality of life throughout the city. No significant adverse effects to land use are anticipated.

As a result of the proposed action, '60/40' adult establishments would be required to discontinue operations or face closure through enforcement. Implementation of the proposed action could therefore result in discontinuance or closure of 101 of the 136 adult establishments identified as in existence as of 2000. Discontinuance or closing of adult establishments at locations where they were not intended to be allowed under the 1995 Adult Use Regulations will remove the secondary effects of these establishments and is expected to have a revitalizing effect on the business climate as well as help promote an improved residential environment.

The proposed action is not expected to result in significant adverse land use effects in commercial and manufacturing areas in which adult establishments may lawfully locate. The discontinuance and closure of '60/40' adult establishments which operate at prohibited locations may result in the relocation of a number of these establishments to these areas. However, the provisions of the 1995 Adult Use Regulations which require adult establishments to be located 500 feet from another in these areas and which impose size and signage controls on lawful adult establishments will serve to limit the negative secondary effects that adult establishments could

13

have on businesses and other uses in these areas.

It is unlikely that all discontinued or closed '60/40' establishments would seek to relocate to permissible locations. However, even if this were the case, there would be sufficient capacity and locational opportunities for these and future adult establishments in commercial and manufacturing areas in which adult establishments are allowed. Assuming adoption of all of the potential rezonings described above in the discussion of future no-action conditions, there would be 4,588 acres and 428 potential sites available for adult establishments at permissible locations.

## B.2. Socioeconomics

By limiting the adverse secondary effects of adult establishments and promoting an improved business climate and residential environment, the proposed action should result in beneficial socioeconomic effects. No significant adverse socioeconomic impacts are anticipated. The proposed action should improve socioeconomic conditions in areas where '60/40' adult establishments operate at impermissible locations, but is not expected to result in substantial socioeconomic changes in areas where they would be permitted to remain and locate. It would not directly displace residential populations so that socioeconomic profiles in a neighborhood would be substantially altered, or directly displace substantial numbers of employees or businesses that are unusually important. It would not result in new development that would be markedly different from existing uses, development, and activities in a neighborhood or change conditions in the real estate market.

The proposed action would not significantly affect economic conditions in the adult entertainment industry. Adult videos would continue to be widely produced and available in general interest video stores as well as businesses devoted exclusively to adult entertainment. The widespread availability of sexually explicit materials through cable television, the internet, and other media would be unaffected. The proposal would result in the discontinuance or closing of '60/40' adult establishments which operate in prohibited locations. Some such '60/40' establishments would relocate to permitted locations, while others would convert to a permitted use. New adult establishments would continue to be able to locate in areas in which they are permitted.

## B.3 Community Facilities and Services

No significant adverse impacts related to community facilities and services are anticipated. The proposed action would not physically alter any community facilities or directly affect the delivery of community facility services. Consequently, no direct effects to community facilities would occur. Compared to projected future no-action conditions, the proposed action is not expected to result in a net increase or decrease of residents or employees. Consequently, a detailed assessment of community facilities and services has not been conducted.

14

0605

## B.4 Open Space

No significant adverse open space impacts are anticipated. The proposed action is not expected to result in a net increase of 200 residents or 500 employees; to physically change, diminish, or eliminate existing open space resources; or to reduce the utilization or aesthetic value of open space resources. Typically, actions that do not result in such changes do not require an open space analysis.

## B.5.    Shadows

No significant adverse impacts are anticipated. The proposed action would not affect permitted building bulk or height, and would not result in increased shadows.

## B.6. Historic Resources

No significant adverse impacts to historic resources are anticipated.

<u>Archaeological Resources</u>: The proposed action is unlikely to result in the disturbance of archaeological resources. The proposed action would not alter permitted building bulk or likely building footprints, and would not result in an increased disturbance of archaeological resources compared to no-build conditions. Therefore the proposed action would not result in adverse impacts related to archaeological resources.

<u>Architectural Resources</u>: No significant impacts on architectural resources are anticipated as a result of the proposed action. Compared to no-build conditions, the proposed action would not result in induced construction, demolition, or significant physical alteration to buildings, structures, or objects, or in changes in scale, visual prominence, or visual context. Consequently, no significant impacts to architectural resources are anticipated.

## B.7.    Urban Design/Visual Resources

Significant adverse impacts related to urban design and visual resources are not anticipated. The proposed action is not expected to result in any of the conditions that would typically trigger the need for a detailed assessment of urban design and visual resource impacts. The proposed action would not result in buildings or structures that would be substantially different in height, bulk, form, setbacks, size, scale, use, or arrangement than currently exists or is permitted. The proposed action would not result in changes in block form, the demapping of active streets or the mapping of new streets, or affect the street hierarchy. The proposed action would not affect any significant visual resources.

## B.8.    Neighborhood Character

15

0606

The proposed action is expected to result in beneficial effects to neighborhood character in areas where adult establishments are not allowed. No significant adverse impacts to neighborhood character are anticipated in areas where they would be allowed to remain or relocate.

As defined in the *CEQR Technical Manual*, neighborhood character is considered to be an amalgam of the various elements that give a neighborhood its distinct personality. These elements typically include land use, urban design, visual resources, historic resources, socioeconomic conditions, traffic, and noise.

The proposed action would not exceed any of the thresholds which would typically indicate the need to conduct a detailed assessment of the potential for neighborhood character impacts. Specifically, the proposed action would not result in: (1) development that would conflict with existing uses, conflict with land use policy or other public plans for the area, change land use character, or result in a significant land use impact; (2) substantially different building bulk, form, size, scale, or arrangement; block form, street pattern, or street hierarchy; streetscape elements, such as street wall, landscaping, curb cuts, loading docks, and pedestrian activity and circulation; changes to natural features; or in a significant urban design impact; (3) substantial direct changes to a visual feature, such as unique and important public view corridors and vistas, or to public visual access to such a feature; (4) substantial direct changes to a historic resource, substantial changes to public views of a historic resource; or in a significant impact on historic resources; (5) substantial changes to an aspect of traffic that contributes to the character of an area and change in LOS to C or below accompanied by substantial changes in traffic patterns, roadway classification, or vehicle mix, substantial increases in traffic volumes on residential streets, or a significant traffic impact; (6) significant adverse noise impacts and a change in acceptability category; (7) substantial direct or indirect displacement or addition of population, employment, or businesses; (8) substantial changes in the character of businesses; (9) substantial differences in population or employment density from the prevailing condition; or (10) a significant socioeconomic conditions impact.

The proposed action would result in beneficial land use effects. The discontinuance or closing of "60/40" establishments would reduce the secondary adverse effects of adult establishments, thereby improving the quality of life and having a positive effect on neighborhood character.

## B.9.    Natural Resources

For the purpose of this analysis, natural resources are defined as plant and animal species and any area capable of functioning to support environmental systems and maintain the City's environmental balance. The proposed action is not expected to affect natural resources. Consequently, no significant adverse impacts on natural resources are anticipated. It would not induce new development or permit development to occur in areas where it would not be allowed under existing zoning controls.

## B.10. Hazardous Materials

16

0607

The proposed action is not expected to result in significant adverse impacts related to hazardous materials. Generally, hazardous materials are defined as those substances that pose a threat to human health or the environment. These substances include, but are not limited to, heavy metals, volatile organic compounds, semivolatile organic compounds, methane, polychlorinated biphenyls, or hazardous wastes. The proposed text would neither induce new levels of development nor affect permitted building footprints. Consequently, the proposed action would not lead to an increased exposure of people or the environment to hazardous materials, increase pathways to the exposure of hazardous materials, or introduce new activities or processes using hazardous materials.

## B.11.   Waterfront Revitalization Program

No significant adverse impacts are anticipated. The Waterfront and Open Space Division of the Department of City Planning, as advisors to the City Coastal Commission, has reviewed the proposed action and determined that it is consistent with the policies and intent of the New York City Waterfront Revitalization Program. The proposed action would restrict adult establishments to a smaller area of the Coastal Zone than where they are currently located as "60/40" establishments. While a number of the areas where adult uses would continue to be permitted are located in the Coastal Zone, the proposed text would prevent new adult uses from concentrating in the Coastal Zone, thus limiting the adverse secondary effects associated with adult establishments. Overall, the proposed action is expected to result in an improved business climate and residential environment in the Coastal Zone.

## B.12.   Infrastructure

No significant adverse impacts are anticipated. The City's infrastructure comprises the physical systems that support its population, including water supply, wastewater, sanitation, energy, roadways, bridges, tunnels, and public transportation. Many of these topics fall under categories discussed elsewhere in this document (i.e., "Solid Waste," "Energy," "Traffic and Parking," and "Transit and Pedestrians.") For the purpose of this discussion, "infrastructure" includes water supply, sewage treatment, and stormwater management only. The proposed action would not affect any of these elements of the city's infrastructure.

Water Supply: Because of the size of the city's water supply system and because the city is committed to maintaining adequate water supply and pressure for all users, few actions have the potential to result in significant adverse impacts on that system. The proposed action would not result in any of the conditions that typically indicate the need for further assessment, including the generation of an exceptionally large demand for water, and the inducement of development at the end of the water system. Consequently, the proposed action is unlikely to have an appreciable effect on the City's water supply system.

Wastewater Treatment: The City is committed to adequately treating all wastewater generated in the City and to maintaining its wastewater treatment plants at or below the capacity permitted by

17

0608

applicable State and Federal permits, orders, and decrees. To achieve this goal, Citywide programs and policies have been and would continue to be developed to accommodate expected flows through the City's plants and ensure that they fall within authorized capacities. Therefore, only unusual actions with very large flows could have the potential for significant impacts on sewage treatment.

The proposed action would not result in an increase in sanitary sewage flows. It would not induce new development, permit development to occur in areas where it is not currently allowed, or result in an increase in residents or employees.

Stormwater Management: The proposed action would have no effect on stormwater management. The proposed action would not involve industrial activities, separate sewer or stormwater systems; or the construction of new stormwater outfall, conditions which would typically require an assessment of stormwater management.

## B.13. Solid Waste and Sanitation Services

No significant adverse impacts are anticipated. Typically, actions that result in the development of housing or other types of uses do not need to be evaluated for consistency with the City's Comprehensive Solid Waste Management Plan, unless the amount of development would be unusually large. Because the proposed action would not result in new levels of development or allow uses other than those permitted under existing zoning, such an evaluation has not been conducted and is not necessary.

## B.14. Energy

No significant adverse energy impacts are anticipated. The proposed action would not induce new levels of development, result in increased energy consumption, affect the transmission or generation of energy, generate substantial indirect enerrgy consumption. All new structures requiring heating and cooling are subject to the New York State Energy Conservation Code, which reflects State and City energy policy.

## B.15. Traffic and Parking

The proposed action is not expected to result in significant adverse traffic and parking impacts related to street conditions, roadway conditions, and parking facilities. In particular, the proposed action would not significantly affect traffic flow and operating conditions, parking conditions, goods delivery, and vehicular and pedestrian safety. The proposed action would not induce new levels of development and would not allow uses other than those permitted under existing zoning. The proposed action would not result in development densities that would exceed those identified in Table 30-1 of the CEQR Technical Manual. Table 3O-1 lists minimum development densities which have the potential for requiring traffic analysis.

18

The proposed action is unlikely to affect traffic conditions. It would result in discontinuance or closing of the approximately 74% of existing adult establishments that operate as "60/40" establishments and would limit future adult establishments to areas where adult establishments are permitted. The proposed action would not result in new levels or types of development compared to future no-action conditions.

## B.16. Transit and Pedestrians

It is projected that the proposed action would not result in significant adverse impacts related to transit operations or pedestrians. Specifically, the proposed action is not expected to have significant effects on rail and subway facilities and services, bus service, and pedestrian flow and conditions. The proposed action would not induce new levels of development and would not allow uses other than those permitted under the existing zoning. The proposed action would not result in additional person trips above the levels identified in Table 30-1 of the CEQR Technical Manual. In addition, there are no known conditions related to the proposed action or to transit operations or pedestrian activity that would warrant further transit and pedestrian analysis.

The proposed action would limit adult establishments to areas in which they are currently permitted. It is not expected to significantly affect the number or type of adult establishments. Consequently, no effects related to transit operations or pedestrian conditions are anticipated.

## B.17. Air Quality

The proposed action is not expected to result in significant adverse air quality impacts related to mobile sources, stationary sources, or construction activities. The proposed action would be in compliance with all state and federal Ambient Air Quality Standards and with the State Implementation Plan (SIP) for carbon monoxide. The proposed action is not expected to affect air quality – it would not induce new levels of development or permit development to occur in areas where it is not currently allowed.

Mobile source analysis: A preliminary screening analysis for mobile source air quality impacts was performed using the methods described in the CEQR Technical Manual. The analysis indicates that the proposed action would not result in any condition which typically indicates the need for further mobile source analysis.

Stationary source analysis: To determine whether a detailed assessment of stationary source impacts would be appropriate, a screening analysis was performed using the methods described in the CEQR Technical Manual. The analysis indicates that the proposed action would not result in any condition which typically indicates the need for further stationary source analysis.

Construction activities:

19

The proposed action is not projected to result in significant adverse air quality impacts from construction activities, such as construction-generated dust emissions, emissions from construction equipment, and emissions from construction generated traffic. Typically, such impacts occur only when a proposed action involves a long-term construction period or construction activities of a great magnitude. Because the proposed action would involve neither of these conditions, significant impacts are not expected.

## B.18. Noise

No significant adverse impacts are anticipated. For CEQR purposes, the three principal types of noise sources that affect the New York City environment are mobile sources, stationary sources, and construction activities. The proposed action is not expected to result in significant adverse impacts related to any of these sources of noise.

Stationary source noise: To determine whether an analysis of stationary source noise effects would be appropriate the screening methods included in the CEQR Technical Manual were used. The screening procedure indicated that such an analysis would not be necessary, as the proposed action would not result in any of the following: the operation of a stationary source within 1,250 feet of a receptor, with a direct line of site to that receptor; development that would include unenclosed mechanical equipment for manufacturing or building ventilation purposes; or development that would be located in an area with high ambient noise levels resulting from stationary sources, such as unenclosed manufacturing activities or other loud uses.

Construction noise: To determine whether an analysis of stationary source noise effects would be warranted the screening methods included in the CEQR Technical Manual were used. The screening procedure indicated that further analysis would not be needed as the proposed action would not cause construction equipment to be operating within 1,000 feet of a receptor for an extended period of time.

Mobile source noise: Mobile sources are those noise sources that move in relation to a noise-sensitive receptor -- principally automobiles, buses, trucks, aircraft, and trains. To determine whether a detailed analysis of mobile noise sources would be appropriate the initial screening procedures included in the CEQR Technical Manual were applied.

With respect to vehicular traffic noise, no significant effects are anticipated as the proposed action would not generate or reroute vehicular traffic. Impacts related to aircraft noise and train noise are also not anticipated. The proposed action would not result in the placement of receptors within flight paths or rail facilities, or increase aircraft or train noise.

20

0611

APPENDIX A

ADULT ESTABLISHMENTS, 2000
PREPARED FOR THE MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
|-----|------|----|------|-------|--------|----------|
| 1 | BK | 302 | VIDEO XXX | 853 | ATLANTIC AV | 60/40 ADULT THEATER |
| 2 | BK | 301 | PUMPS | 1089 | GRAND ST | ADULT EATING OR DRINKING |
| 3 | BK | 315 | ADULT CINEMA | 711 | KINGS HIGHWAY | 60/40 ADULT THEATER |
| 4 | BK | 311 | VIDEO | 455 | KINGS HWY | 60/40 ADULT THEATER |
| 5 | BK | 315 | SAM VIDEO, INC | 1103 | QUENTIN RD | 60/40 ADULT BOOK STORE |
| 6 | BK | 307 | CORRADOS CLUB | 3915 | 1ST ST | ADULT EATING OR DRINKING |
| 7 | BK | 307 | WILD WILD WEST | 3901 | 2ND AV | ADULT EATING OR DRINKING |
| 8 | BK | 307 | SWEET CHERRY | 4201 | 2ND AV | ADULT EATING OR DRINKING |
| 9 | BK | 307 | LEXUS VIDEO | 122 | 29TH ST | 60/40 ADULT BOOK STORE |
| 10 | BK | 307 | PLEASURE VIDEO | 750 | 3RD AV | 60/40 ADULT BOOK STORE |
| 11 | BK | 307 | VIDEO XXX | 761 | 3RD AV | 60/40 ADULT THEATER |
| 12 | BK | 307 | VIDEO XXX WAREHOUSE | 952 | 3RD AV | 60/40 ADULT BOOK STORE |
| 13 | BK | 312 | WAREHOUSE ON THE BLOCK | 1368 | 60TH ST | 60/40 ADULT BOOK STORE |
| 14 | BX | 212 | PRETTY WOMAN | 41-51 | BOSTON RD | ADULT EATING OR DRINKING |
| 15 | BX | 201 | DEVINE CLUB | 611 | E 133RD ST | 60/40 ADULT EATING OR DRINKING |
| 16 | BX | 212 | JUNIORS | 1625 | E 233RD ST | 60/40 ADULT EATING OR DRINKING* |
| 17 | BX | 202 | | 501 | HUNTS POINT AV | ADULT EATING OR DRINKING |
| 18 | BX | 202 | AL'S MR. WEDGE | 673 | HUNTS POINT AV | 60/40 ADULT EATING OR DRINKING |
| 19 | BX | 202 | EL COCHE | 910 | HUNTS POINT AV | 60/40 ADULT EATING OR DRINKING |
| 20 | BX | 202 | STACY'S | 1098 | LAFAYETTE AV | 60/40 ADULT EATING OR DRINKING |
| 21 | BX | 212 | LOVE SHACK | 3703 | PROVOST AV | ADULT BOOK STORE* |
| 22 | BX | 212 | LOVE SHACK | 3436 | ROMBOUTS AV | 60/40 ADULT THEATER |
| 23 | MN | 107 | AMSTERDAM AVE VIDEO | 287 | AMSTERDAM AV | 60/40 ADULT BOOK STORE |
| 24 | MN | 101 | ANN ST. ADULT ENTER CENTER | 21 | ANN ST | 60/40 ADULT THEATER |
| 25 | MN | 102 | RAINBOW VIDEO & GIFTS | 330 | BLEEKER ST | 60/40 ADULT BOOK STORE |
| 26 | MN | 105 | FLASH DANCERS | 1672 | BROADWAY | ADULT EATING OR DRINKING* |
| 27 | MN | 102 | 323 CANAL VIDEO | 323 | CANAL ST | 60/40 ADULT BOOK STORE |
| 28 | MN | 101 | 376 VIDEO STORE | 376 | CANAL ST | 60/40 ADULT BOOK STORE |
| 29 | MN | 101 | SAMANTHA VIDEO | 98 | CHAMBERS ST | 60/40 ADULT BOOK STORE |
| 30 | MN | 102 | VIVID VIDEO | 100 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 31 | MN | 102 | 119 CHRISTOPHER ST. VIDEO | 119 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 32 | MN | 102 | HARMONY VIDEO | 139 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 33 | MN | 102 | LONDON FETISH NYC | 85 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 34 | MN | 102 | VILLAGE PLEASURES | 88 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |

21

\* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED
HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.
ADULT ESTABLISHMENTS, 2000
PREPARED FOR MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
|---|---|---|---|---|---|---|
| 35 | MN | 103 | MANHATTAN SIGHT & SOUND | 206 | E 14TH ST | 60/40 ADULT THEATER |
| 36 | MN | 105 | TENS | 35 | E 21ST ST | 60/40 ADULT EATING OR DRINKING |
| 37 | MN | 106 | X-PRESSIONS | 230 | E 53RD ST | 60/40 ADULT THEATER |
| 38 | MN | 108 | SCORES | 333 | E 60TH ST | 60/40 ADULT EATING OR DRINKING |
| 39 | MN | 101 | THUNDER XXX VIDEO | 100 | GREENWICH ST | 60/40 ADULT THEATER |
| 40 | MN | 101 | PUSSYCAT LOUNGE | 96 | GREENWICH ST | 60/40 ADULT EATING OR DRINKING |
| 41 | MN | 102 | CHRISTOPHER ST BOOKS | 500 | HUDSON ST | 60/40 ADULT THEATER |
| 42 | MN | 101 | NY DOLLS | 59 | MURRAY ST | 60/40 ADULT EATING OR DRINKING |
| 43 | MN | 105 | VIP CLUB | 20 | W 20TH ST | 60/40 ADULT EATING OR DRINKING |
| 44 | MN | 104 | UNICORN | 277 | W 22ND ST | 60/40 ADULT THEATER |
| 45 | MN | 104 | PRIVILEGE | 565 | W 23RD ST | ADULT EATING OR DRINKING |
| 46 | MN | 105 | NATIONAL LIQUIDATORS | 158 | W 27TH ST | 60/40 ADULT BOOK STORE |
| 47 | MN | 105 | PENN VIDEO | 252 | W 31ST ST | 60/40 ADULT BOOK STORE |
| 48 | MN | 105 | PEEPWORLD | 155 | W 33RD ST | 60/40 ADULT THEATER |
| 49 | MN | 105 | EMPIRE EROTICA | 44 | W 33RD ST | ADULT THEATER |
| 50 | MN | 105 | CLUB PARADISE | 50 | W 33RD ST | ADULT EATING OR DRINKING |
| 51 | MN | 105 | KINEMATICS | 61 | W 37TH ST | ADULT THEATER |
| 52 | MN | 105 | FAMOUS SPORTS VIDEO | 32 | W 39TH ST | 60/40 ADULT BOOK STORE |
| 53 | MN | 105 | MANHATTAN VIDEO | 60 | W 39TH ST | 60/40 ADULT THEATER |
| 54 | MN | 104 | 300 BOOK CENTER | 300 | W 40TH ST | ADULT BOOK STORE |
| 55 | MN | 105 | FUN CITY | 113 | W 42ND ST | 60/40 ADULT THEATER |
| 56 | MN | 105 | PEEP-O-RAMA | 121 | W 42ND ST | 60/40 ADULT THEATER |
| 57 | MN | 105 | VTNY | 136 | W 42ND ST | 60/40 ADULT THEATER |
| 58 | MN | 104 | PRIVATE EYES | 320 | W 45TH ST | 60/40 ADULT EATING OR DRINKING |
| 59 | MN | 105 | SALAKA VIDEO | 20 | W 46TH ST | 60/40 ADULT THEATER |
| 60 | MN | 105 | GAIETY BURLESK | 201 | W 46TH ST | ADULT THEATER |
| 61 | MN | 105 | AD VID EXP/MIXED EMOTIONS | 216 | W 50TH ST | 60/40 ADULT THEATER |
| 62 | MN | 105 | BARE ELEGANCE | 216 | W 50TH ST | 60/40 ADULT EATING OR DRINKING |
| 63 | MN | 107 | LES HOMMES | 217 | W 80TH ST | 60/40 ADULT THEATER |
| 64 | MN | 102 | WESTWORLD VIDEO | 354 | WEST ST | ADULT THEATER |
| 65 | MN | 102 | BADLANDS ADULT VIDEO | 388 | WEST ST | 60/40 ADULT THEATER |
| 66 | MN | 101 | BABY DOLL LOUNGE | 34 | WHITE ST | 60/40 ADULT EATING OR DRINKING |

22

JNR-000539

| 67 | MN | 103 | NYC VIDEO & CD | 61 | 4TH AV | 60/40 ADULT THEATER |
| 68 | MN | 102 | CRAZY FANTASY XXX VIDEO | 331 | 6TH AV | 60/40 ADULT BOOK STORE |

\* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED
HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.
ADULT ESTABLISHMENTS, 2000
PREPARED FOR MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
|---|---|---|---|---|---|---|
| 69 | MN | 104 | ADULT VIDEO STORE | 603 | 6TH AV | 60/40 ADULT BOOK STORE |
| 70 | MN | 104 | ADULT VIDEO XXX | 725 | 6TH AV | 60/40 ADULT BOOK STORE |
| 71 | MN | 104 | BILLYS TOPLESS | 729 | 6TH AV | 60/40 ADULT EATING OR DRINKING |
| 72 | MN | 104 | SERENDIB XXX VIDEO & PEEP | 755 | 6TH AV | 60/40 ADULT THEATER |
| 73 | MN | 105 | SHOW FOLLIES CENTER | 711 | 7TH AV | 60/40 ADULT THEATER |
| 74 | MN | 105 | LACE | 725 | 7TH AV | 60/40 ADULT EATING OR DRINKING |
| 75 | MN | 105 | NRS XXX VIDEO | 414 | 8TH AV | 60/40 ADULT THEATER |
| 76 | MN | 105 | ADULT ENTERTAINMENT CENTER | 488 | 8TH AV | 60/40 ADULT THEATER |
| 77 | MN | 104 | JOY VIDEO | 557 | 8TH AV | 60/40 ADULT THEATER |
| 78 | MN | 105 | BLUE X VIDEO | 610 | 8TH AV | ADULT BOOK STORE* |
| 79 | MN | 105 | X-LENT VIDEO | 610 | 8TH AV | ADULT BOOK STORE |
| 80 | MN | 105 | XXX NECTAR | 630 | 8TH AV | ADULT BOOK STORE |
| 81 | MN | 105 | EURO WORLD | 632 | 8TH AV | ADULT BOOK STORE |
| 82 | MN | 105 | NUWAN | 632 | 8TH AV | 60/40 ADULT THEATER |
| 83 | MN | 105 | PLAYGROUND | 634 | 8TH AV | ADULT THEATER |
| 84 | MN | 105 | NO. ONE VIDEO CENTER | 636 | 8TH AV | 60/40 ADULT BOOK STORE |
| 85 | MN | 104 | SHOW WORLD | 669-675 | 8TH AV | 60/40 ADULT THEATER |
| 86 | MN | 104 | CLUB 44 | 689 | 8TH AV | 60/40 ADULT EATING OR DRINKING |
| 87 | MN | 104 | XXX-TASY VIDEO | 691 | 8TH AV | 60/40 ADULT THEATER |
| 88 | MN | 104 | PLAYPEN | 693 | 8TH AV | 60/40 ADULT THEATER |
| 89 | MN | 104 | DVD PALACE | 733 | 8TH AV | 60/40 ADULT THEATER |
| 90 | MN | 104 | NILULPUL | 737 | 8TH AV | 60/40 ADULT BOOK STORE |
| 91 | MN | 104 | ADULT VIDEO | 763 | 8TH AV | 60/40 ADULT BOOK STORE |
| 92 | QN | 403 | JOHNNY JAYS | 112-08 | ASTORIA BLVD | 60/40 ADULT EATING OR DRINKING |
| 93 | QN | 403 | COZY CABIN | 92-03 | ASTORIA BLVD | 60/40 ADULT EATING OR DRINKING |
| 94 | QN | 403 | LOVESHACK ADULT VIDEO | 92-20 | ASTORIA BLVD | 60/40 ADULT THEATER |
| 95 | QN | 404 | ILADA'S II | 81-26 | BAXTER AV | 60/40 ADULT EATING OR DRINKING |
| 96 | QN | 407 | | 32-17 | COLLEGE POINT BLVD | ADULT EATING OR DRINKING |
| 97 | QN | 407 | | 36-05 | COLLEGE POINT BLVD | ADULT THEATER |

23

0614

| 98  | QN | 407 | CANDELWOOD INN          | 41-57  | COLLEGE POINT BLVD | 60/40 ADULT EATING OR DRINKING |
| 99  | QN | 413 |                         | 147-95 | FARMERS BLVD       | ADULT EATING OR DRINKING       |
| 100 | QN | 402 | FOXES                   | 32-37  | GREENPOINT AV      | 60/40 ADULT EATING OR DRINKING |
| 101 | QN | 412 | LEGENDS/SUPERSONIC VIDEO | 173-18 | JAMAICA AV         | 60/40 ADULT THEATER            |
| 102 | QN | 413 | SIXTY/FORTY VIDEO       | 215-05 | JAMAICA AV         | 60/40 ADULT THEATER            |

* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED
HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.
ADULT ESTABLISHMENTS, 2000
PREPARED FOR MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
| --- | --- | --- | --- | --- | --- | --- |
| 103 | QN | 405 |                        | 48-81  | MASPETH AV          | ADULT THEATER                  |
| 104 | QN | 405 | VIXEN                  | 60-07  | METROPOLITAN AV     | 60/40 ADULT EATING OR DRINKING |
| 105 | QN | 407 | GOODTIME VIDEO         | 150-36 | NORTHERN BLVD       | 60/40 ADULT BOOK STORE         |
| 106 | QN | 411 | VIDEO WAREHOUSE        | 254-09 | NORTHERN BLVD       | 60/40 ADULT THEATER            |
| 107 | QN | 401 |                        | 29-40  | NORTHERN BLVD       | ADULT EATING OR DRINKING       |
| 108 | QN | 401 | RUNWAY 69              | 30-30  | NORTHERN BLVD       | ADULT EATING OR DRINKING*      |
| 109 | QN | 402 | LOVE SHACK VIDEO WORLD | 31-19  | QUEENS BLVD         | ADULT THEATER*                 |
| 110 | QN | 402 | GALLAGHERS             | 39-33  | QUEENS BLVD         | 60/40 ADULT EATING OR DRINKING |
| 111 | QN | 402 | NEW YORK STYLE EATS    | 45-02  | QUEENS BLVD         | 60/40 ADULT EATING OR DRINKING |
| 112 | QN | 402 | HONEYS                 | 49-14  | QUEENS BLVD         | 60/40 ADULT EATING OR DRINKING |
| 113 | QN | 402 | NICKELS                | 69-20  | QUEENS BLVD         | 60/40 ADULT EATING OR DRINKING |
| 114 | QN | 406 | GOLDFINGERS            | 92-77  | QUEENS BLVD         | 60/40 ADULT EATING OR DRINKING |
| 115 | QN | 406 | WIGGLES                | 96-24  | QUEENS BLVD         | 60/40 ADULT EATING OR DRINKING |
| 116 | QN | 406 | SUNRISE VIDEO          | 97-01  | QUEENS BLVD         | 60/40 ADULT BOOK STORE         |
| 117 | QN | 406 | XXX VIDEO STORE        | 98-32  | QUEENS BLVD         | 60/40 ADULT BOOK STORE         |
| 118 | QN | 401 |                        | 24-03  | QUEENS PLAZA NORTH  | ADULT EATING OR DRINKING       |
| 119 | QN | 402 |                        | 27-02  | QUEENS PLAZA SOUTH  | ADULT EATING OR DRINKING       |
| 120 | QN | 413 |                        | 248-58 | ROCKAWAY BLVD       | ADULT EATING OR DRINKING       |
| 121 | QN | 404 | DEE TWO VIDEO          | 86-10  | ROOSEVELT AV        | 60/40 ADULT BOOK STORE         |
| 122 | QN | 403 | FIDDLE & BOW           | 92-07  | ROOSEVELT AV        | 60/40 ADULT EATING OR DRINKING |
| 123 | QN | 413 | SUNRISE CANDY INC.     | 245-02 | S CONDUIT AV        | 60/40 ADULT BOOK STORE         |
| 124 | QN | 412 | CAFE EUROPA            | 94-02  | SUTPHIN BLVD        | 60/40 ADULT EATING OR DRINKING |
| 125 | QN | 402 | SIDEBAR                | 45-08  | VERNON BLVD         | 60/40 ADULT EATING OR DRINKING |
| 126 | QN | 409 | PORT O'CALL            | 93-10  | WOODHAVEN BLVD      | 60/40 ADULT EATING OR DRINKING |
| 127 | QN | 407 | VIBRATIONS             | 20-31  | 129TH ST            | 60/40 ADULT EATING OR DRINKING |
| 128 | QN | 413 | LOVE SHACK             | 139-14 | 246TH ST            | 60/40 ADULT THEATER            |

0615

| 129 | QN | 402 |                  | 51-07 | 27TH ST         | ADULT EATING OR DRINKING        |
|-----|----|-----|------------------|-------|-----------------|----------------------------------|
| 130 | QN | 401 | PHENOMENON       | 62-05 | 30TH AV         | 60/40 ADULT EATING OR DRINKING  |
| 131 | QN | 401 | MERMAID          | 31-08 | 31ST ST         | 60/40 ADULT EATING OR DRINKING  |
| 132 | QN | 402 |                  | 43-19 | 37TH ST         | ADULT EATING OR DRINKING        |
| 133 | SI | 503 | THE BLACK GARTER | 35    | ANDROVETTE ST   | ADULT EATING OR DRINKING*       |
| 134 | SI | 503 | HIPPS            | 2945  | ARTHUR KILL RD  | ADULT EATING OR DRINKING        |
| 135 | SI | 502 | BAYWATCH CLUB    | 630   | MIDLAND AV      | 60/40 ADULT EATING OR DRINKING  |
| 136 | SI | 502 | LIPSTICKS        | 3575  | VICTORY BLVD    | ADULT EATING OR DRINKING        |

* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED
HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.

25

0616

JNR-000542

## APPENDIX B

**TABLE 1**
ADULT ESTABLISHMENTS BY TYPE AND STATUS, 2000

| TYPE | | 60/40 STATUS | (%) |
|------|------|------|------|
| BOOKSTORES | 35 | 29 | (83) |
| EATING OR DRINKING | 57 | 36 | (63) |
| THEATERS | 44 | 36 | (82) |
| **TOTALS** | **136** | **101** | **(74)** |

**TABLE 2**
ADULT ESTABLISHMENTS BY BOROUGH AND STATUS, 2000

| BOROUGH | | 60/40 STATUS | (%) |
|------|------|------|------|
| BRONX | 9 | 6 | (67) |
| BROOKLYN | 13 | 9 | (69) |
| MANHATTAN | 69 | 56 | (81) |
| QUEENS | 41 | 29 | (71) |
| STATEN ISLAND | 4 | 1 | (25) |
| **TOTAL** | **136** | **101** | **(74)** |

**TABLE 3**
ADULT ESTABLISHMENTS BY BOROUGH, 1993 AND 2000

| BOROUGH | 1993 | 2000 |
|------|------|------|
| BRONX | 8 | 9 |
| BROOKLYN | 15 | 13 |
| MANHATTAN | 107 | 69 |
| QUEENS | 44 | 41 |
| STATEN ISLAND | 3 | 4 |
| **TOTAL** | **177** | **136** |

0617

## APPENDIX C

**Rezonings Since 1995**

| | | |
|---|---|---|
| Hostos, the Bronx | 3.45 acres | 3 locations |
| Port Morris, the Bronx | 0.6 | 5 |
| Chelsea | 15.86 | 4 |
| Williamsburg Bridge | 3.79 | 3 |
| DUMBO, Brooklyn | 5.62 | 3 |
| Mill Basin, Brooklyn | 23.39 | 0 |
| Vinegar Hill, Brooklyn | 4.65 | 3 |
| Downtown Flushing | 50.31 | 0 |
| Durst, Midtown Manhattan | 3.7 | 1 |
| Lynch, Brooklyn | 0.3 | 0 |
| Steinway Street, Queens | <u>18.0</u> | <u>4</u> |
| **Total:** | **150.08** | **26** |

**Potential Rezonings**

| | | |
|---|---|---|
| Long Island City | 33.6 | 12 |
| Northside, Brooklyn | 65.5 | 12 |
| Greenpoint, Brooklyn | 39.9 | 7 |
| Flushing/Bedford, Brooklyn | <u>18.4</u> | <u>7</u> |
| **Total:** | **157.4** | **38** |
| **All Rezoning Areas** | **307.48 ac** | **64 locations** |

0618

# APPENDIX D, CURRENT ZONING

ZR 12-10: Definitions.  This section defines terms used in the Zoning Resolution.  Under current zoning, adult establishments are defined as follows:

Adult establishment (10/25/95)

An "adult establishment" is a commercial establishment where a "substantial portion" of the establishment includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof, as defined below:

(a)   An adult book store is a book store which has as a "substantial portion" of its stock-in-trade any one or more of the following:

    (1)   books, magazines, periodicals or other printed matter which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

    (2)   photographs, films, motion pictures, videocassettes, slides or other visual representations which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas."

(b)   An adult eating or drinking establishment is an eating or drinking establishment which regularly features any one or more of the following:

    (1)   live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or

    (2)   films, motion pictures, videocassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

    (3)   employees who, as part of their employment, regularly expose to patrons "specified anatomical areas"; and

0619

which is not customarily open to the general
public during such features because it excludes
minors by reason of age.

(c)   An adult theater is a theater which regularly
features one or more of the following:

(1)   films, motion pictures, videocassettes,
slides or similar photographic reproductions
characterized by an emphasis on the depiction
or description of "specified sexual
activities" or "specified anatomical areas";
or

(2)   live performances characterized by an
emphasis on "specified anatomical areas" or
"specified sexual activities"; and

which is not customarily open to the general
public during such features because it excludes
minors by reason of age.

An adult theater shall include commercial
establishments where such materials or
performances are viewed from individual
enclosures.

(d)   An other adult commercial establishment is a
facility -- other than an adult book store, adult
eating or drinking establishment, adult theater,
commercial studio, or business or trade school --
which features employees who as part of their
employment, regularly expose to patrons "specified
anatomical areas" and which is not customarily
open to the general public during such features
because it excludes minors by reason of age.

For the purpose of defining #adult establishments#,
"specified sexual activities" are: (1) human genitals
in a state of sexual stimulation or arousal; (2) actual
or simulated acts of human masturbation, sexual
intercourse or sodomy; or (3) fondling or other erotic
touching of human genitals, pubic region, buttock, anus
or female breast.

"Specified anatomical areas" are: (1) less than
completely and opaquely concealed: (i) human genitals,
pubic region, (ii) human buttock, anus, or (iii) female
breast below a point immediately above the top of the
areola; or (2) human male genitals in a discernibly
turgid state, even if completely and opaquely
concealed.

For the purpose of determining whether a "substantial

portion" of an establishment includes an adult
bookstore, adult eating or drinking establishment,
adult theater, or other adult commercial establishment,
or combination thereof, the following factors shall be
considered (1) the amount of #floor area# and #cellar#
space accessible to customers and allocated to such
#uses#; and (2) the amount of #floor area# and #cellar#
space accessible to customers and allocated to such
uses as compared to the total #floor area# and #cellar#
space accessible to customers in the establishment.

For the purpose of determining whether a bookstore has
a "substantial portion" of its stock in materials
defined in paragraphs (a)(1) or (a)(2) hereof, the
following factors shall be considered: (1) the amount
of such stock accessible to customers as compared to
the total stock accessible to customers in the
establishment; and (2) the amount of #floor area# and
#cellar# space accessible to customers containing such
stock; and
(3) the amount of #floor area# and #cellar# space
accessible to customers containing such stock as
compared to the total #floor area# and #cellar# space
accessible to customers in the establishment.

0621

APPENDIX E, PROPOSED ZONING

Matter in greytone is new, to be added;
Matter in ~~strikeout~~ is existing text, to be deleted;
*** indicates where unchanged text appears in the Resolution

**Section 12-10**
**DEFINITIONS**

***

**Adult Establishment** (10/25/95)

1.      Adult Establishment:  An "adult establishment" is a commercial establishment ~~where a~~ ~~"substantial portion" of the establishment~~ which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof as defined below:

(a)      An adult book store is a book store ~~which has as~~ that offers "printed or visual material" for sale or rent to customers where a "substantial portion" of its stock-in-trade of "printed or visual material" consists of "adult printed or visual material", defined as ~~any one or~~ ~~more of the following:~~

~~(1) books, magazines, periodicals or other printed matter which are characterized by an~~ ~~emphasis upon the depiction or description of "specified sexual activities" or "specified~~ ~~anatomical areas"; or~~

~~(2) photographs, films, motion pictures, video cassettes or other visual representations~~ ~~which are~~ "printed or visual material" characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas";

(b)      An adult eating or drinking establishment is an eating or drinking establishment which regularly features in any portion of such establishment any one or more of the following:

(1)      live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; or

(2)      films, motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

(3)      employees who, as part of their employment, regularly expose to patrons "specified anatomical areas"; and

which is not customarily open to the general public during such features because it

JNR-000548

0622

excludes or restricts minors.

(c)    An adult theater is a ~~theater~~ commercial establishment which regularly features one or more of the following:

    (1)    films, motion pictures, videocassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

    (2)    live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; and

which is not customarily open to the general public during such features because it excludes or restricts minors.

An adult theater shall include commercial establishments where such materials or performances are viewed from one or more individual enclosures.

(d)    An other adult commercial establishment is a facility — other than an adult book store, adult eating or drinking establishment, adult theater, commercial studio, or business or trade school — which features employees who as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes or restricts minors.

~~For the purpose of defining adult establishments,~~

2.    Defined Terms:

    (a)    For purposes of paragraph (1) (a), "printed or visual materials" are books, magazines, or other printed matter, including product packaging or wrapping, or photographs, films, motion pictures, video cassettes, slides or other visual matter;

    (b)    For purposes of paragraph (1)(a)(b) and (c), "specified sexual activities" are: (~~1~~ i) human genitals in a state of sexual stimulation or arousal; (~~2~~ ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (~~3~~ iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast;

    (c)    For purposes of paragraph (1)(a)(b)(c) and (d), "specified anatomical areas" are: (~~1~~ i) less than completely and opaquely concealed: (~~i~~ aa) human genitals, pubic region,(~~ii~~ bb) human buttock, anus, or (~~iii~~ cc) female breast below a point immediately above the top of the areola; or (~~2~~ ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed.

~~For the purpose of determining whether a "substantial portion" of an establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other adult commercial~~

~~establishment, or combination thereof, the following factors shall be considered: (1) the amount of *floor area* and *cellar* space accessible to customers and allocated to such *uses* and (2) the amount of *floor area* and *cellar* space accessible to customers and allocated to such uses as compared to the total *floor area* and *cellar* space accessible to customers in the establishment.~~

(d)  For the purpose of determining under paragraph (1)(a) whether ~~a bookstore has~~ a "substantial portion" of ~~its stock in materials defined in paragraphs (a)(1) or (a)(2) hereof~~ a book store's stock-in-trade of "printed or visual" material consists of "adult printed or visual material", the following factors shall be considered: ~~(1)~~ (i) the amount of ~~such~~ stock of "adult printed or visual material" accessible to customers as compared to the total stock of "printed or visual material" accessible to customers in the establishment; and ~~(2)~~ (ii) the amount of *floor area* and *cellar* space accessible to customers containing ~~such~~ stock of "adult printed or visual material"; and ~~(3)~~ (iii) the amount of *floor area* and *cellar* space accessible to customers containing ~~such~~ stock "of adult printed or visual material" as compared to the ~~total~~ amount of *floor area* and *cellar* space accessible to customers ~~in the establishment~~ containing "printed or visual material" which is not "adult printed or visual material", provided that "printed or visual material" which is not "adult printed or visual material" (hereinafter for purposes of this paragraph "other printed or visual material") shall not be considered stock-in-trade for purposes of this paragraph where such store has one or more of the following features:

(aa)  The absence of separate sections of the store with stock-in-trade of any "adult printed or visual material" and stock-in-trade of "other printed or visual material," or the presence of any "adult printed or visual material" in a section of the store otherwise consisting primarily of "other printed or visual material."

(bb)  An absence of any fixed, permanent and complete visual partition between a section of the store with "adult printed or visual material" and a section of the store with "other printed or visual material";

(cc)  An interior configuration and lay-out which requires customers to pass through a section of the store with "adult printed or visual material" in order to access a section of the store with "other printed or visual material";

(dd)  One or more individual enclosures where adult movies or live performances are available for viewing by customers;

(ee)  A method of operation which requires customer transactions with respect to "other printed or visual material" to be made in a section of the store which includes "adult printed or visual material";

(ff)  A method of operation under which "other printed or visual material" is

offered to customers on a substantially more limited basis than "adult printed or visual material," such as the offering of "other printed or visual material" for sale only and the offering of "adult printed or visual material" for sale or rental;

(gg)  A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";

(hh)  A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";

(ii)  A sign that advertises the availability of "adult printed or visual material" which is disproportionately large relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

(jj)  A window display in which the number of products or area of display of "adult printed or visual material" is disproportionately high relative to the number of products or area of display of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

(kk)  Other features, as set forth in rules adopted by the commissioner of buildings, which render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store as evidenced by an amount of customer activity and/or volume of sale or rental transactions involving "other printed or visual material" relative to the amount of customer activity and/or volume of sale or rental transactions involving "adult printed or visual material" which is disproportionately low by comparison with the proportion of "other printed or visual material" and "adult printed or visual material" offered for sale or rent in the store, or the proportion of #floor area# and #cellar# space accessible to customers containing stock of "adult printed or visual material" to that containing stock of "other printed or visual material."

(e)  For the purposes of paragraph (1) (b), an "eating or drinking establishment" includes: (i) any portion of a commercial establishment within which food or beverages are offered for purchase, or are available to or are consumed by customers or patrons, and (ii) any portion of a commercial establishment from

which a portion of a commercial establishment described in (i) above is accessible by customers or patrons.

\*\*\*

**32-01**
**Special Provisions for Adult Establishments**

\*\*\*

(b)  In C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, #adult establishments# no #adult establishment# shall be located at least established less than 500 feet from a church, a #school#, a #Residence District#, a C1, C2, C3, C4, C5-1, C6-1, C6-2 or C6-3 District, or a #Manufacturing District#, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization.  No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# on #commercial# or #manufacturing uses# within a #Manufacturing District# shall be construed as a limitation on the scope of this provision.  However, on or after October 25, 1995, an #adult...

(c)  in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, #adult establishments# no #adult establishment# shall be located established at least less than 500 feet from another a previously established #adult establishment#.

(d)  in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 districts, no more than one #adult establishment# permitted under this Section shall be located established on a #zoning lot#.

\*\*\*

(f)  #adult establishments# which existed on were established on the effective date...

For purposes of this section, an #adult establishment# shall be established upon the date of a permit issued by the department of buildings therefor, or, in the case of an #adult establishment# in existence prior to [effective date of proposed text], as determined by the department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an #adult establishment#.

\*\*\*

**42-01**

**Special Provisions for Adult Establishments**

\* \* \*

(a)     #adult establishments# are not permitted in a #Manufacturng District# in which #residences#, #joint loving-work quarters for artists# or #loft dwellings# are, under the provisions of the Zoning Resolution, allowed as-of-right or by special permit or authorization. No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# on #commercial# or #manufacturing uses# within a "Manufacturing District# shall be construed as a limitation on the scope of this provision.

(b)     In all other #Manufacturing Districts#, ~~#adult establishments#~~ no #adult establishment# shall be ~~located~~ established ~~at least~~ less than 500 feet from a church, a #school#, a #Residence District#, a C1, C2, C3, C4, C5-1, C6-1, C6-2 or C6-3 District, or a #Manufacturing District#, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# on #commercial# or #manufacturing uses# within a "Manufacturing District# shall be construed as a limitation on the scope of this provision. However, on or after October 25, 1995, an #adult establishment# that otherwise complies with the provisions of this paragraph shall not be rendered #non-conforming# if a church or a #school# is established on or after April 10, 1995 within 500 feet of such #adult establishment#.

(c)     ~~#Adult establishments#~~ No #adult establishment# shall be ~~located at least~~ established less than 500 feet from another #adult establishment#.

(d)     No more than one #adult establishment# permitted under this Section shall be ~~located~~ established on a #zoning lot#.

\*\*\*

(f)     #Adult establishments# which ~~existed on~~ were established on October 25, 1995 and conform to all provisions of the Zoning Resolution relating to #adult establishments# other than the provisions of all or any combination of paragraphs (c), (d), and (e) of this Section, shall not be subject to the provisions of Section 52-77 (Termination of Adult Establishments).

For purposes of this section, an #adult establishment# shall be established upon the date of a permit issued by the department of buildings therefor, or, in the case of an #adult establishment# in existence prior to [effective date of proposed text], as determined by the department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to

perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an #adult establishment#.

-end-

0628

APPENDIX A

ADULT ESTABLISHMENTS, 2000
PREPARED FOR THE MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
|---|---|---|---|---|---|---|
| 1 | BK | 302 | VIDEO XXX | 853 | ATLANTIC AV | 60/40 ADULT THEATER |
| 2 | BK | 301 | PUMPS | 1089 | GRAND ST | ADULT EATING OR DRINKING |
| 3 | BK | 315 | ADULT CINEMA | 711 | KINGS HIGHWAY | 60/40 ADULT THEATER |
| 4 | BK | 311 | VIDEO | 455 | KINGS HWY | 60/40 ADULT THEATER |
| 5 | BK | 315 | SAM VIDEO, INC | 1103 | QUENTIN RD | 60/40 ADULT BOOK STORE |
| 6 | BK | 307 | CORRADOS CLUB | 3915 | 1ST AV | ADULT EATING OR DRINKING |
| 7 | BK | 307 | WILD WILD WEST | 3901 | 2ND AV | ADULT EATING OR DRINKING |
| 8 | BK | 307 | SWEET CHERRY | 4201 | 2ND AV | ADULT EATING OR DRINKING |
| 9 | BK | 307 | LEXUS VIDEO | 122 | 29TH ST | 60/40 ADULT BOOK STORE |
| 10 | BK | 307 | PLEASURE VIDEO | 750 | 3RD AV | 60/40 ADULT BOOK STORE |
| 11 | BK | 307 | VIDEO XXX | 761 | 3RD AV | 60/40 ADULT THEATER |
| 12 | BK | 307 | VIDEO XXX WAREHOUSE | 952 | 3RD AV | 60/40 ADULT BOOK STORE |
| 13 | BK | 312 | WAREHOUSE ON THE BLOCK | 1368 | 60TH ST | 60/40 ADULT BOOK STORE |
| 14 | BX | 212 | PRETTY WOMAN | 41-51 | BOSTON RD | ADULT EATING OR DRINKING |
| 15 | BX | 201 | DEVINE CLUB | 611 | E 133RD ST | 60/40 ADULT EATING OR DRINKING |
| 16 | BX | 212 | JUNIORS | 1625 | E 233RD ST | 60/40 ADULT EATING OR DRINKING* |
| 17 | BX | 202 | | 501 | HUNTS POINT AV | ADULT EATING OR DRINKING |
| 18 | BX | 202 | AL'S MR. WEDGE | 673 | HUNTS POINT AV | 60/40 ADULT EATING OR DRINKING |
| 19 | BX | 202 | EL COCHE | 910 | HUNTS POINT AV | 60/40 ADULT EATING OR DRINKING |
| 20 | BX | 202 | STACY'S | 1098 | LAFAYETTE AV | 60/40 ADULT EATING OR DRINKING |
| 21 | BX | 212 | LOVE SHACK | 3703 | PROVOST AV | ADULT BOOK STORE* |
| 22 | BX | 212 | LOVE SHACK | 3436 | ROMBOUTS AV | 60/40 ADULT THEATER |
| 23 | MN | 107 | AMSTERDAM AVE VIDEO | 287 | AMSTERDAM AV | 60/40 ADULT BOOK STORE |
| 24 | MN | 101 | ANN ST. ADULT ENTER CENTER | 21 | ANN ST | 60/40 ADULT THEATER |
| 25 | MN | 102 | RAINBOW VIDEO & GIFTS | 330 | BLEEKER ST | 60/40 ADULT BOOK STORE |
| 26 | MN | 105 | FLASH DANCERS | 1672 | BROADWAY | ADULT EATING OR DRINKING* |
| 27 | MN | 102 | 323 CANAL VIDEO | 323 | CANAL ST | 60/40 ADULT BOOK STORE |
| 28 | MN | 101 | 376 VIDEO STORE | 376 | CANAL ST | 60/40 ADULT BOOK STORE |
| 29 | MN | 101 | SAMANTHA VIDEO | 98 | CHAMBERS ST | 60/40 ADULT BOOK STORE |
| 30 | MN | 102 | VIVID VIDEO | 100 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 31 | MN | 102 | 119 CHRISTOPHER ST. VIDEO | 119 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 32 | MN | 102 | HARMONY VIDEO | 139 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 33 | MN | 102 | LONDON FETISH NYC | 85 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |
| 34 | MN | 102 | VILLAGE PLEASURES | 88 | CHRISTOPHER ST | 60/40 ADULT BOOK STORE |

21

0612

JNR-000555

\* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.

ADULT ESTABLISHMENTS, 2000
PREPARED FOR MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
|---|---|---|---|---|---|---|
| 35 | MN | 103 | MANHATTAN SIGHT & SOUND | 206 | E 14TH ST | 60/40 ADULT THEATER |
| 36 | MN | 105 | TENS | 35 | E 21ST ST | 60/40 ADULT EATING OR DRINKING |
| 37 | MN | 106 | X-PRESSIONS | 230 | E 53RD ST | 60/40 ADULT THEATER |
| 38 | MN | 108 | SCORES | 333 | E 60TH ST | 60/40 ADULT EATING OR DRINKING |
| 39 | MN | 101 | THUNDER XXX VIDEO | 100 | GREENWICH ST | 60/40 ADULT THEATER |
| 40 | MN | 101 | PUSSYCAT LOUNGE | 96 | GREENWICH ST | 60/40 ADULT EATING OR DRINKING |
| 41 | MN | 102 | CHRISTOPHER ST BOOKS | 500 | HUDSON ST | 60/40 ADULT THEATER |
| 42 | MN | 101 | NY DOLLS | 59 | MURRAY ST | 60/40 ADULT EATING OR DRINKING |
| 43 | MN | 105 | VIP CLUB | 20 | W 20TH ST | 60/40 ADULT EATING OR DRINKING |
| 44 | MN | 104 | UNICORN | 277 | W 22ND ST | 60/40 ADULT THEATER |
| 45 | MN | 104 | PRIVILEGE | 565 | W 23RD ST | ADULT EATING OR DRINKING |
| 46 | MN | 105 | NATIONAL LIQUIDATORS | 158 | W 27TH ST | 60/40 ADULT BOOK STORE |
| 47 | MN | 105 | PENN VIDEO | 252 | W 31ST ST | 60/40 ADULT BOOK STORE |
| 48 | MN | 105 | PEEPWORLD | 155 | W 33RD ST | 60/40 ADULT THEATER |
| 49 | MN | 105 | EMPIRE EROTICA | 44 | W 33RD ST | ADULT THEATER |
| 50 | MN | 105 | CLUB PARADISE | 50 | W 33RD ST | ADULT EATING OR DRINKING |
| 51 | MN | 105 | KINEMATICS | 61 | W 37TH ST | ADULT THEATER |
| 52 | MN | 105 | FAMOUS SPORTS VIDEO | 32 | W 39TH ST | 60/40 ADULT BOOK STORE |
| 53 | MN | 105 | MANHATTAN VIDEO | 60 | W 39TH ST | 60/40 ADULT THEATER |
| 54 | MN | 104 | 300 BOOK CENTER | 300 | W 40TH ST | ADULT BOOK STORE |
| 55 | MN | 105 | FUN CITY | 113 | W 42ND ST | 60/40 ADULT THEATER |
| 56 | MN | 105 | PEEP-O-RAMA | 121 | W 42ND ST | 60/40 ADULT THEATER |
| 57 | MN | 105 | VTNY | 136 | W 42ND ST | 60/40 ADULT THEATER |
| 58 | MN | 104 | PRIVATE EYES | 320 | W 45TH ST | 60/40 ADULT EATING OR DRINKING |
| 59 | MN | 105 | SALAKA VIDEO | 20 | W 46TH ST | 60/40 ADULT THEATER |
| 60 | MN | 105 | GAIETY BURLESK | 201 | W 46TH ST | ADULT THEATER |
| 61 | MN | 105 | AD VID EXP/MIXED EMOTIONS | 216 | W 50TH ST | 60/40 ADULT THEATER |
| 62 | MN | 105 | BARE ELEGANCE | 216 | W 50TH ST | 60/40 ADULT EATING OR DRINKING |
| 63 | MN | 107 | LES HOMMES | 217 | W 80TH ST | 60/40 ADULT THEATER |
| 64 | MN | 102 | WESTWORLD VIDEO | 354 | WEST ST | ADULT THEATER |
| 65 | MN | 102 | BADLANDS ADULT VIDEO | 388 | WEST ST | 60/40 ADULT THEATER |
| 66 | MN | 101 | BABY DOLL LOUNGE | 34 | WHITE ST | 60/40 ADULT EATING OR DRINKING |

22

0613

JNR-000556

| 67 | MN | 103 | NYC VIDEO & CD | 61 | 4TH AV | 60/40 ADULT THEATER |
| 68 | MN | 102 | CRAZY FANTASY XXX VIDEO | 331 | 6TH AV | 60/40 ADULT BOOK STORE |

\* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.

ADULT ESTABLISHMENTS, 2000
PREPARED FOR MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

| OBS | BORO | CD | NAME | HOUSE | STREET | USE TYPE |
| --- | --- | --- | --- | --- | --- | --- |
| 69 | MN | 104 | ADULT VIDEO STORE | 603 | 6TH AV | 60/40 ADULT BOOK STORE |
| 70 | MN | 104 | ADULT VIDEO XXX | 725 | 6TH AV | 60/40 ADULT BOOK STORE |
| 71 | MN | 104 | BILLYS TOPLESS | 729 | 6TH AV | 60/40 ADULT EATING OR DRINKING |
| 72 | MN | 104 | SERENDIB XXX VIDEO & PEEP | 755 | 6TH AV | 60/40 ADULT THEATER |
| 73 | MN | 105 | SHOW FOLLIES CENTER | 711 | 7TH AV | 60/40 ADULT THEATER |
| 74 | MN | 105 | LACE | 725 | 7TH AV | 60/40 ADULT EATING OR DRINKING |
| 75 | MN | 105 | NRS XXX VIDEO | 414 | 8TH AV | 60/40 ADULT THEATER |
| 76 | MN | 105 | ADULT ENTERTAINMENT CENTER | 488 | 8TH AV | 60/40 ADULT THEATER |
| 77 | MN | 104 | JOY VIDEO | 557 | 8TH AV | 60/40 ADULT THEATER |
| 78 | MN | 105 | BLUE X VIDEO | 610 | 8TH AV | ADULT BOOK STORE* |
| 79 | MN | 105 | X-LENT VIDEO | 610 | 8TH AV | ADULT BOOK STORE |
| 80 | MN | 105 | XXX NECTAR | 630 | 8TH AV | ADULT BOOK STORE |
| 81 | MN | 105 | EURO WORLD | 632 | 8TH AV | ADULT BOOK STORE |
| 82 | MN | 105 | NUWAN | 632 | 8TH AV | 60/40 ADULT THEATER |
| 83 | MN | 105 | PLAYGROUND | 634 | 8TH AV | ADULT THEATER |
| 84 | MN | 105 | NO. ONE VIDEO CENTER | 636 | 8TH AV | 60/40 ADULT BOOK STORE |
| 85 | MN | 104 | SHOW WORLD | 669-675 | 8TH AV | 60/40 ADULT THEATER |
| 86 | MN | 104 | CLUB 44 | 689 | 8TH AV | 60/40 ADULT EATING OR DRINKING |
| 87 | MN | 104 | XXX-TASY VIDEO | 691 | 8TH AV | 60/40 ADULT THEATER |
| 88 | MN | 104 | PLAYPEN | 693 | 8TH AV | 60/40 ADULT THEATER |
| 89 | MN | 104 | DVD PALACE | 733 | 8TH AV | 60/40 ADULT THEATER |
| 90 | MN | 104 | NILULPUL | 737 | 8TH AV | 60/40 ADULT BOOK STORE |
| 91 | MN | 104 | ADULT VIDEO | 763 | 8TH AV | 60/40 ADULT BOOK STORE |
| 92 | QN | 403 | JOHNNY JAYS | 112-08 | ASTORIA BLVD | 60/40 ADULT EATING OR DRINKING |
| 93 | QN | 403 | COZY CABIN | 92-03 | ASTORIA BLVD | 60/40 ADULT EATING OR DRINKING |
| 94 | QN | 403 | LOVESHACK ADULT VIDEO | 92-20 | ASTORIA BLVD | 60/40 ADULT THEATER |
| 95 | QN | 404 | ILADA'S II | 81-26 | BAXTER AV | 60/40 ADULT EATING OR DRINKING |
| 96 | QN | 407 | | 32-17 | COLLEGE POINT BLVD | ADULT EATING OR DRINKING |
| 97 | QN | 407 | | 36-05 | COLLEGE POINT BLVD | ADULT THEATER |

23

0614

JNR-000557

```
98    QN   407   CANDELWOOD INN              41-57    COLLEGE POINT BLVD   60/40 ADULT EATING OR DRINKING
99    QN   413                               147-95   FARMERS BLVD               ADULT EATING OR DRINKING
100   QN   402   FOXES                       32-37    GREENPOINT AV        60/40 ADULT EATING OR DRINKING
101   QN   412   LEGENDS/SUPERSONIC VIDEO    173-18   JAMAICA AV           60/40 ADULT THEATER
102   QN   413   SIXTY/FORTY VIDEO           215-05   JAMAICA AV           60/40 ADULT THEATER
```

* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED
HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.
                         ADULT ESTABLISHMENTS, 2000
            PREPARED FOR MARCH 26, 2001 REPORT TO THE CITY PLANNING COMMISSION

```
OBS    BORO   CD    NAME                  HOUSE    STREET               USE TYPE

103    QN     405                         48-81    MASPETH AV           ADULT THEATER
104    QN     405   VIXEN                 60-07    METROPOLITAN AV      60/40 ADULT EATING OR DRINKING
105    QN     407   GOODTIME VIDEO        150-36   NORTHERN BLVD        60/40 ADULT BOOK STORE
106    QN     411   VIDEO WAREHOUSE       254-09   NORTHERN BLVD        60/40 ADULT THEATER
107    QN     401                         29-40    NORTHERN BLVD              ADULT EATING OR DRINKING
108    QN     401   RUNWAY 69             30-30    NORTHERN BLVD              ADULT EATING OR DRINKING*
109    QN     402   LOVE SHACK VIDEO WORLD 31-19   QUEENS BLVD                ADULT THEATER*
110    QN     402   GALLAGHERS            39-33    QUEENS BLVD          60/40 ADULT EATING OR DRINKING
111    QN     402   NEW YORK STYLE EATS   45-02    QUEENS BLVD          60/40 ADULT EATING OR DRINKING
112    QN     402   HONEYS                49-14    QUEENS BLVD          60/40 ADULT EATING OR DRINKING
113    QN     402   NICKELS               69-20    QUEENS BLVD          60/40 ADULT EATING OR DRINKING
114    QN     406   GOLDFINGERS           92-77    QUEENS BLVD          60/40 ADULT EATING OR DRINKING
115    QN     406   WIGGLES               96-24    QUEENS BLVD          60/40 ADULT EATING OR DRINKING
116    QN     406   SUNRISE VIDEO         97-01    QUEENS BLVD          60/40 ADULT BOOK STORE
117    QN     406   XXX VIDEO STORE       98-32    QUEENS BLVD          60/40 ADULT BOOK STORE
118    QN     401                         24-03    QUEENS PLAZA NORTH         ADULT EATING OR DRINKING
119    QN     402                         27-02    QUEENS PLAZA SOUTH         ADULT EATING OR DRINKING
120    QN     413                         248-58   ROCKAWAY BLVD              ADULT EATING OR DRINKING
121    QN     404   DEE TWO VIDEO         86-10    ROOSEVELT AV         60/40 ADULT BOOK STORE
122    QN     403   FIDDLE & BOW          92-07    ROOSEVELT AV         60/40 ADULT EATING OR DRINKING
123    QN     413   SUNRISE CANDY INC.    245-02   S CONDUIT AV         60/40 ADULT BOOK STORE
124    QN     412   CAFE EUROPA           94-02    SUTPHIN BLVD         60/40 ADULT EATING OR DRINKING
125    QN     402   SIDEBAR               45-08    VERNON AV            60/40 ADULT EATING OR DRINKING
126    QN     409   PORT O'CALL           93-10    WOODHAVEN BLVD       60/40 ADULT EATING OR DRINKING
127    QN     407   VIBRATIONS            20-31    129TH ST             60/40 ADULT EATING OR DRINKING
128    QN     413   LOVE SHACK            139-14   246TH ST             60/40 ADULT THEATER
```

24

0615

| 129 | QN | 402 |                   | 51-07 | 27TH ST         | ADULT EATING OR DRINKING        |
|-----|----|-----|-------------------|-------|-----------------|---------------------------------|
| 130 | QN | 401 | PHENOMENON        | 62-05 | 30TH AV         | 60/40 ADULT EATING OR DRINKING  |
| 131 | QN | 401 | MERMAID           | 31-08 | 31ST ST         | 60/40 ADULT EATING OR DRINKING  |
| 132 | QN | 402 |                   | 43-19 | 37TH ST         | ADULT EATING OR DRINKING        |
| 133 | SI | 503 | THE BLACK GARTER  | 35    | ANDROVETTE ST   | ADULT EATING OR DRINKING*       |
| 134 | SI | 503 | HIPPS             | 2945  | ARTHUR KILL RD  | ADULT EATING OR DRINKING        |
| 135 | SI | 502 | BAYWATCH CLUB     | 630   | MIDLAND AV      | 60/40 ADULT EATING OR DRINKING  |
| 136 | SI | 502 | LIPSTICKS         | 3575  | VICTORY BLVD    | ADULT EATING OR DRINKING        |

* - PURSUING OR RELATED TO A JUDICIAL DETERMINATION

THE NUMBER AND LOCATIONS OF ADULT ESTABLISHMENTS AS OF ANY GIVEN DATE MAY VARY SLIGHTLY FROM THE INFORMATION PRESENTED
HEREIN. THIS LIST IS NOT INTENDED TO BE USED FOR OR TO BE RELIED UPON FOR REGULATORY OR ENFORCEMENT PURPOSES.

25

0616

JNR-000559

## APPENDIX B

**TABLE 1**
ADULT ESTABLISHMENTS BY TYPE AND STATUS, 2000

| TYPE | | 60/40 STATUS (%) | |
|---|---|---|---|
| BOOKSTORES | 35 | 29 | (83) |
| EATING OR DRINKING | 57 | 36 | (63) |
| THEATERS | 44 | 36 | (82) |
| **TOTALS** | **136** | **101** | **(74)** |

**TABLE 2**
ADULT ESTABLISHMENTS BY BOROUGH AND STATUS, 2000

| BOROUGH | | 60/40 STATUS (%) | |
|---|---|---|---|
| BRONX | 9 | 6 | (67) |
| BROOKLYN | 13 | 9 | (69) |
| MANHATTAN | 69 | 56 | (81) |
| QUEENS | 41 | 29 | (71) |
| STATEN ISLAND | 4 | 1 | (25) |
| **TOTAL** | **136** | **101** | **(74)** |

**TABLE 3**
ADULT ESTABLISHMENTS BY BOROUGH, 1993 AND 2000

| BOROUGH | 1993 | 2000 |
|---|---|---|
| BRONX | 8 | 9 |
| BROOKLYN | 15 | 13 |
| MANHATTAN | 107 | 69 |
| QUEENS | 44 | 41 |
| STATEN ISLAND | 3 | 4 |
| **TOTAL** | **177** | **136** |

0617