UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

689 EATERY CORP., etc., *et ano.,*                  :

                        Plaintiffs,      :

           - against -                            :          Civil Action No.
                                                  02 CV 4431 (LJL)

THE CITY OF NEW YORK, et al.,                    :

                      Defendants.    :

------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*     :

                        Plaintiffs,      :

           - against -                            :          Civil Action No.
                                                  02 CV 4432 (LJL)

THE CITY OF NEW YORK, et al.,                    :

                      Defendants.    :

------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*          :

                        Plaintiffs,      :

            - against -                            :          Civil Action No.
                                                  02 CV 8333 (LJL)

THE CITY OF NEW YORK,                              :

                      Defendant.     :

------------------------------------------------------------X

336 LLC., etc., *et al.,*                                  :

                        Plaintiffs,      :

            - against -                            :          Civil Action No.
                                                  18 CV 3732 (LJL)

THE CITY OF NEW YORK,                              :

                      Defendant.     :

------------------------------------------------------------X

**VOLUME 6 OF EXHIBITS TO**
**JOINT REQUEST AND STIPULATIONS REGARDING**
**THE TAKING OF JUDICIAL NOTICE**

JNR-000561

**EXHIBITS VOL. 6 of 10; pp. JNR-000563 - JNR-000895**
**(Exhibits 44-47)**

|  |  | **Page(s)** |
|---|---|---|
| Exhibit 44 | Transcript of New York City Planning Commission Public Hearing held May 23, 2001 | 000563-000638 |
| Exhibit 45 | August 8, 2001 New York City Planning Commission Report (Complete) | 000660-000840 |
| Exhibit 45-1 | Pages 6-7 of the 2001 NYC Planning Commission Report (discussing numbers and location – by Boroughs – of adult businesses) | 000841-000842 |
| Exhibit 46 | Transcript of New York City Planning Commission Public Hearing held August 8, 2001 | 000843-000854 |
| Exhibit 47 | Transcript of October 1, 2001 Hearing of Zoning and Franchises Subcommittee of New York City Council | 000855-000895 |

ING COMMISSION PUBLIC HEARING

May 23, 2001

ADULT USES

0631

543

PUBLIC HEARING – MAY 23, 2001

1

2

3      This is the City Planning Commission Public

4      Hearing of May 23, 2001.   The time is 10:07 AM.

5

6      ROLL CALL:

7

8      CHAIRMAN ROSE                          HERE

9      COMMISSIONER ABNEY                     HERE

10     COMMISSIONER BATTAGLIA                 HERE

11     COMMISSIONER BURDEN                    ABSENT

12     COMMISSIONER CANTOR                    HERE

13     COMMISSIONER CAVALUZZI                 HERE

14     COMMISSIONER CHIN                      HERE

15     COMMISSIONER GARVIN                    HERE

16     COMMISSIONER GELBER                    HERE

17     COMMISSIONER GRINKER                   ABSENT

18     COMMISSIONER KNUCKLES                  HERE

19     COMMISSIONER MEROLO                    HERE

20

21     CITYWIDE

22     CALENDAR NUMBER 10:              N010508 ZRY

23

544

1  THIS IS A PUBLIC HEARING IN THE MATTER OF AN

2  APPLICATION FOR AN AMENDMENT OF THE ZONING

3  RESOLUTION RELATING TO ADULT ESTABLISHMENTS.

4

5  CHAIRMAN ROSE: First speakers is Richard Bearak

6  representing Borough President Golden.

7  RICHARD BEARAK:  Good morning, Chairman Rose and

8  members of the City Planning Commission and also

9  like to welcome Ms. Gelber.  My name is Richard

10  Bearak.  I am Deputy Director of land use planning

11  for Borough President Howard Golden, and I am

12  going to read his remarks.  I am pleased to have

13  this opportunity to comment on the Department of

14  City Planning's proposal to modify the "adult

15  establishment" regulations of the zoning

16  resolution.  In 1995, the City Planning Commission

17  and City Council approved a far reaching text

18  amendment to control the location and

19  concentration of "adult establishments" in New

20  York City.  At that time, the Brooklyn Borough

21  Board determined that the 1995 proposal was

22  deficient in protecting residential and family

23  oriented uses and that the amendment had the

545

1  potential to create new concentrations of "adult
2  establishments". While these regulations would
3  decrease "adult establishments" in Times Square,
4  it would disperse the problems to other areas of
5  the city. The Borough Board's concerns have been
6  realized. In 1995, there were 15 "adult
7  establishments" in Brooklyn; there are now 24.
8  Many of these establishments are concentrated in
9  Sunset Park causing blight on that community. To
10 make matters worse, litigation delayed the
11 effective date of the 1995 amendment until 1998,
12 and the intent of those regulations were
13 undermined by court challenges by the owners of
14 "adult establishments" and judicial interpretation
15 of what defines an adult operation. In April,
16 representatives of City Planning reported that it
17 was aware of only 13 such establishments in
18 Brooklyn of which only 4 were operating in
19 compliance with the intent of that amendment. I
20 proposed a resolution to the Brooklyn Borough
21 Board in full support of the current proposal to
22 strengthen the adult use regulations. On May 15,
23 2001, the Board adopted this resolution. However,

0634

546

1   I am concerned that the benefits of this text are

2   subject to the discretion of the Commissioner of

3   Buildings in regard to the pursuit of effective

4   inspections and adjudication.  Therefore, I also

5   recommended to the Department of Buildings -

6   conduct inspections of all "adult establishments"

7   in Brooklyn within 60 days of the effective date

8   of this zoning amendment.  Further, the Department

9   of Buildings should provide a status report within

10  180 days of the effective date of this zoning text

11  amendment indicating the dates of inspections,

12  whether a violation was issued, judicial status,

13  judicial outcome and current operating status of

14  the establishment.  Subsequently, the Department

15  of Buildings should provide quarterly updates of

16  the status report to community boards, borough

17  presidents, the City Council and the City Planning

18  Commission.  Another matter of concern to me is

19  the lack of adequate regulation of signage

20  depicting adult content, material or

21  entertainment.  The current sign regulations only

22  govern "adult establishments".  Businesses that

23  stock adult content and material that are not

0635

547

6

1  classified as an "adult establishment" are not

2  subject to the limitations on adult content

3  advertisement signs.  To address this oversight,

4  the Brooklyn Borough Board and I call on the

5  Department of City Planning to conduct a study of

6  illuminated signs at establishments advertising

7  adult content material or entertainment to

8  determine the appropriateness of the existing sign

9  regulations.  I urge the City Planning Commission

10  to approve the proposed text amendment and to work

11  with the Department of Buildings to insure

12  aggressive and responsive action in closing these

13  illegal businesses.  Thank you.

14  CHAIRMAN ROSE: Thank you.  Next speaker is Doris

15  Diether.  Excuse me, Mr. Bearak, we have one

16  question.  Excuse me Doris.

17  DORIS DIETHER:  That's alright.

18  CHAIRMAN ROSE: Commissioner Gelber.

19  MARILYN GELBER:  Mr. Bearak, if I understand your

20  testimony correctly, the Borough President is

21  fully supportive of these changes to the text, but

22  is concerned about enforcing the text and, do I

23  understand correctly, that the Borough President's

0636

548

7

1   office community boards have not received

2   appropriate reports from the Department of

3   Buildings on their enforcement of the law.  Is

4   that the concern?

5   RICHARD BEARAK: Yes, from 1998 to only a few weeks

6   ago we were really in the dark of what was going

7   on.  Many letters we would write to Brooklyn

8   Buildings would not be responded to.  We would

9   take second and third letters, and finally we

10  would get responses.  But, more recently, on the

11  behalf of the Department of City Planning at our

12  Brooklyn Borough Board meeting in April the

13  Borough President asked the City Planning

14  representatives to reach out to Buildings and they

15  pulled a great amount of information, so we did

16  learn that actually since 1998 the Department of

17  Buildings in Brooklyn alone did over 400

18  inspections of 27 establishments, so it is just a

19  matter of not communicating what they were doing.

20  But, again, what they did was really helpful and

21  we would like that trend to continue, but I think

22  they need to let outside people know what the

23  Department of Buildings is doing and their

0637

549

efforts, that would be helpful as well.

MARILYN GELBER: Thank you.

CHAIRMAN ROSE: Thank you.  Now Doris.

DORIS DIETHER:  I am Doris Diether, Community Board #2.  Although we had a very short resolution which, I believe, you received, we did discuss this legislation in detail at the Board and at the Committee and although we were, in general, definitely in favor of the amendments to the resolution, there was one loophole that we mentioned that we felt should be taken care of, and that's the statement that the usage should be 500 from each other or 500 feet from a Residence District.  There is no definition of where the 500 feet starts or ends.  The Buildings Department has taken the interpretation that it is entrance to entrance, and we had a very interesting situation in the West Village where an establishment that was on the corner, less than 500 feet from a Residence District, moved its entrance around the corner to another street which made it 502 feet away from the Residence District.  And we think that there should be either a 500 foot radius or

0638

**550**

9

1   500 feet from any part of the building to any part

2   of the other building or church or Residence

3   District, rather than just saying 500 feet and

4   leaving it up to the Buildings Department to

5   interpret it.  But, in general, we are in favor of

6   the amendments.  Thank you.

7   CHAIRMAN ROSE:  Thank you.  Next speaker is John

8   Cornelius.

9   JOHN CORNELIUS:  My name is John Cornelius.  I am

10  from the Borough of Queens.  I am an officer of

11  the Bryant Park Civic Association.  I am a

12  representative to the Queens Civic Congress.  I am

13  a representative of Community Board #7.  I am on

14  the Zoning Task Force of the Borough President for

15  the Borough of Queens.  We all strongly support

16  this amendment.  I am sorry we have to be back

17  here today because this thing started during the

18  Dinkins administration, 1993.  At that time, we

19  talked about the 60/40 which was supposed to only

20  apply to book stores or video.  Now, what happened

21  was, it was presented in the draft, and when it

22  finally appeared in the Appellate Court, the

23  Appellate Court said well it is not in the law,

0639

**551**

10

1   why didn't you specify.  We can't enforce

2   something that is not specified in the law.  So

3   now we are back her again, redoing it.  So if it

4   was done right the first time we would not be back

5   here.  I strongly do support this and the

6   communities strongly support it.  Thank you very

7   much.

8   CHAIRMAN ROSE: Thank you. Next we have a number of

9   speakers in opposition to the proposed amendments

10  by prior arrangement, Mr. Fahringer, who will be

11  speaking on behalf of a number of people who are

12  testifying, has asked for some more time and a

13  number of people who have signed up to appear in

14  opposition but chose not speak in recognition of

15  the fact that Mr. Fahringer will be given some

16  extra time. Let me just read through the names of

17  the people who are appearing and signed up in

18  opposition, but not choosing to speak:  Erica

19  Dobno, Coalition for Free Expression, in

20  opposition; Anthony De Silva, in opposition; Sal

21  Parete, in opposition; Asif Zafar, in opposition;

22  C. Abeysekera, in opposition; Gideon Kiriat, in

23  opposition; Alex Inberg, in opposition; Thomas

552

11

1   Parron, in opposition; Dan Pzazzali, in

2   opposition; Dan J. Zozzali, in opposition; Andrew

3   Savino, in opposition; Andrew Cohen, in

4   opposition; Corey Breier, in opposition; Robbie

5   Glessman, in opposition; Mahinda Senaratne, in

6   opposition; John Valdina, Jr., in opposition;

7   Ananda Peirii, in opposition; Fred Menna, in

8   opposition; Joseph Valdina, in opposition; John

9   Valdina, Sr., in opposition; Danny Mercalde, in

10  opposition; Richard R. Mare, in opposition;

11  Karuppu Perera, in opposition, representing Fun

12  City Video; Arlene Mare, in opposition; Vinny

13  Video Inc., in opposition; Tony Sinapi, in

14  opposition; Vishan's Video, in opposition;

15  Assendra Indraratne (Alex), in opposition; Midland

16  Video, in opposition; Parakrama Balasyriya, in

17  opposition; W.S.L. Cooray, in opposition; Thom

18  Simmonds for Show World, in opposition; Anthony

19  Sinapi, in opposition.   Now, Mr. Fahringer.

20  Herald Price Fahringer.

21  HERALD FAHRINGER: Mr. Chairman and members of

22  Commission.   I am grateful for this opportunity to

23  address you on what we consider to be an extremely

553

12

important issue.  I represent the Coalition of
Free Expression which consists of a collection of
businesses that, in one form or another, provide
at least in some degree adult information to the
public.  To place the constitutional issues in
proper prospective I think it is important that we
review just briefly a couple of fundamentals that
I know you are familiar with.  Number one, it is
important for us all to remember that the material
that is dispensed by the establishments that I
represent is constitutionally protected.  The City
has never contended that it is illegal or unlawful
under prevailing constitutional standards.  Number
two, it is clear, under the law, and I think this
is acknowledged by both sides, that this, because
it is constitutionally protected, it cannot be
completely banned.  And then I think it is
important that we remember and remind ourselves
that one of the most cherished policies of this
nation is that we the people decide what we will
read and see.  The government does not make that
choice for us.  And I urge, as diplomatically as I
can, that I believe this law interferes with that

0642

554

13

1  right of choice, and I would like to show you why

2  in the few minutes that I have today.   First and

3  foremost, because you cannot ban completely this

4  form of information that is protected and under

5  the imperatives of the First Amendment, any

6  commercial enterprise has a right to sell some

7  adult material and, recognizing that fact in July

8  1998, the City in a judicial proceeding actually

9  installed in the law by way of judicial fiat the

10  doctrine that has now come to be known as the

11  60/40 rule.   In essence, what they indicated was

12  that if an establishment reduced its adult

13  business to less than 40% that complied with the

14  law, and they did not have to move, they could not

15  be closed, they had a right to remain there as a

16  legal business.   What happened then was implicit

17  in that doctrine is the realization that by

18  reducing, in the case of a filmstrips or video

19  store, which is easy to illustrate but everything

20  I say here would apply to any other form of

21  entertainment, by reducing their stock to 40% and

22  reducing the floor space that can be used in an

23  establishment to offer for sale that material to

0643

555

14

1   the public, they either eliminated any adverse

2   secondary effects or reduced it to a level that

3   was socially acceptable.  As a result of that,

4   over a hundred establishments went out and

5   complied with the law.  They reduced their stock

6   or they reconfigured their premises in such a way

7   that they met the requirements.  And as

8   verification of that, to re-enforce that for you,

9   the city launched a fairly aggressive offensive to

10   enforce the zoning resolution and it is all

11   documented in more than 20 cases, perhaps closer

12   to 30 cases, a great majority of which we handle,

13   the courts held they were in compliance with the

14   law, they were in the terms of the 60/40 rule,

15   they had met those requirements.  But, most

16   importantly, and I would like to stress this,

17   those proceedings were brought under the nuisance

18   abatement law.  The claim of the city was that

19   because these businesses distributed or sold or

20   offered for sale adult materials they were a

21   public nuisance.  They were a danger to the public

22   health, welfare and safety of the community.  In

23   each of those cases that I have identified for

0644

556

15

1   you, the court concluded (1) that they were in

2   compliance with the law, but (2) that they did not

3   create a risk to the health, safety and welfare of

4   the community.  So, what it seems to me is clear

5   that if an establishment reduces that portion of

6   their business having to do with adult material,

7   whatever it may be, to less than 40% then it does

8   not create any adverse secondary effects.  Now why

9   is that important?  Because the only power a

10  legislative body has to regulate materials that

11  are protected by the First Amendment is, it causes

12  adverse secondary effects.  The issue, it seems to

13  me, the singular issue and the most important

14  issue is that you must contend with is, there has

15  never been any showing that establishments that

16  have reduced the adult materials to less than 40%

17  of their business cause any adverse secondary

18  effects.  All the studies that have ever been

19  conducted have been with establishments that

20  exclusively deal in that material.  We now have

21  over 20 court decisions that say, *no they are not*

22  *causing any harm to the community* and even, I

23  think more persuasive, as recently as within the

557

16

1   last two weeks, Community Board #5 that has more

2   "adult establishments" in its district than any

3   other community board voted unanimously against

4   this law and indicated in their resolution that

5   they did not believe the establishments within

6   their area caused any adverse secondary effect.

7   This we think lends enormous force to our argument

8   here in these chambers today because who would

9   know better than the 50 people that are drawn from

10  the community that form the Community Board whose

11  very purpose is to monitor the community and to

12  determine whether or not, its needs, and what has

13  to be done and they come forward and affirmatively

14  say that we do not believe these establishments

15  are causing any adverse secondary effect.

16  Community Board #4 which is the next district that

17  has the next largest number of "adult

18  establishments" reached the same conclusion.  They

19  firmly issued a resolution saying they were

20  opposed to this law and indicated that they felt

21  that their community needed no more protection

22  from these establishments which are operating

23  60/40, that is important.  By reducing the stock

0646

558

17

1   or the material to 40% there was no basis for any

2   further restrictions.  I think this is compelling

3   evidence in support of the proposition that the

4   very source of authority, these 11 conditions that

5   have been built into the law they impact on video

6   stores, are unwarranted because in a way, if I may

7   use the adage or the vernacular, it's like putting

8   the cart before the horse.  It seems to me that

9   before you can come in and impose any restrictions

10   on those establishments that have reduced their

11   adult business to less than 40%, you have to have

12   clear cut evidence, a study perhaps as was done

13   back in 1994, or some basis of empirical evidence

14   to say an establishment that reduces its stock to

15   less than 40% causes adverse secondary effect.

16   You have the courts saying it does not, you have

17   the community boards saying it does not and there

18   is nothing in the record that I have found so far

19   that would indicate that they do.  And so there

20   would be no basis for imposing any restrictions.

21   It would be just as if, if I may use this analogy

22   which I think is anaphoric, it is just as if you

23   went out to a Borders or any other store that also

0647

559

18

1   handles erotic books and you were to say, we are

2   going to impose on them these restrictions.  It

3   would be struck down in the blink of an eye

4   because you have no authority to do that unless

5   that establishment causes adverse secondary

6   effects, and since these do not cause adverse

7   secondary effects, there is no basis for

8   regulating them.  If I could just make one other

9   point, which I think is very important, assuming

10  for a moment that this were to become law, it is

11  imperative that there be an amortization clause

12  because what happened here, and I don't think

13  there is any dispute about this, when the 60/40

14  rule became law in July 1998, over 100

15  establishments by the City's own figures, over 100

16  establishments went out and made drastic radical

17  renovations and reconfigurations of their

18  businesses at great expense and hardship to comply

19  with this rule.  We have in our papers, which

20  incidentally I have a written statement (20

21  copies) that I will submit to the Commission

22  today, I have it with me here today, we document

23  that one establishment, Show World, that I

0648

560

19

1    represent spent over $100,000 restructuring its

2    premises so that they could put on off-Broadway

3    shows, which is what they are doing now, have

4    other film festivals there. And, it seems to me,

5    as I understand the law of zoning is any change of

6    that sort where people have relied upon the

7    preceding law there has to be an amortization

8    provision that would allow them an opportunity to

9    recoup the expense.  By way of example, a viewing

10   booth to be installed in many of these places have

11   opened up under the 60/40 rule.  To go out and

12   purchase a viewing booth can be $6,000-10,000 per

13   booth.  Some establishments have 4-6 booths in

14   them; that could be $60,000.  If this law is

15   enacted, then they certainly have a right, under

16   fundamental basic principals of due process, to

17   recover that money and every law that I have ever

18   examined, even your initial law, your original

19   law, allowed a period of amortization.  The other

20   factor that I would like to urge, assuming this

21   law were to pass your judgment, it seems to me

22   that there was a moratorium, a period of time,

23   where people can be allowed to adjust to these

0649

561

20

1   provisions if they are going to have to install

2   and erect partitions and whatnot there has to be

3   some provision in the law for that as well.  The

4   rest of what I have said I think is pretty well

5   covered in my written statement.  I would like to

6   conclude by offering you this view and maybe I am

7   to deeply committed to what I consider to be some

8   of the fundamental principals of a free society.

9   I believe New York City is the greatest city in

10  the world, and I think that greatness in large

11  measure is due to its high level of tolerance of

12  all points of view, of all forms of entertainment.

13  We take pride in that and this law that would by

14  indirection, by really manipulating the zoning

15  law, will suppress a source of information that

16  the public has a right to and thereby interferes

17  with that choice is simply alien, foreign to the

18  most fundamental principals of a free society.  I

19  would call upon you to do what is right here.  ---

20  --tape blank-----

21  ....any new restrictions and particularly such

22  draconian restrictions as are proposed here take

23  effect. Thank you very much for your time and

562

21

1     attention.

2     CHAIRMAN ROSE: Thank you.  Appreciate your

3     testimony. Next speaker is Beth Haroules.

4     BETH HAROULES: Good morning.  My name is Beth

5     Haroules.  I am a staff attorney at the New York

6     Civil Liberties Union.  The NYCLU is the New York

7     affiliate of the American Civil Liberties Union.

8     We have long been devoted to the protection and

9     enhanced of the fundamental rights and

10    constitutional values embodied in the Bill of

11    Rights.  In the forefront of those efforts has

12    been our defense of rights of free expression

13    under the Federal Constitution's First Amendment

14    in Article 1 Section 8 of the New York State

15    Constitution.  It is well settled under Supreme

16    Court New York Court of Appeals precedent that

17    sexually explicit material that is not legally

18    obscene remains protected by both the First

19    Amendment and by Article 1 Section 8.  It is

20    similarly well situated that a municipality may

21    under certain circumstances regulate "adult

22    establishments", but the municipality may not

23    eliminate "adult establishments" outright.  The

0651

563

21

1   zoning proposal need not result in total

2   suppression of non-obscene adult-oriented material

3   to be constitutionally invalid.  It will be deemed

4   unconstitutional if the limitation on adult uses

5   works a substantial restriction on speech.  In

6   this regard, the Supreme Court has noted that one

7   is not to have the exercise of his of her liberty

8   of expression in appropriate places abridged on

9   the plea that it may be exercised in some other

10  place.  Zoning ordinances that infringe First

11  Amendment rights must be strictly scrutinized.

12  Only this approach can assure that cities will not

13  use their zoning powers as a pretext for

14  suppressing constitutionally protected expression.

15  In 1995, the City of New York adopted a zoning

16  regime with respect to "adult establishments", the

17  goal of which was to restrict significantly the

18  number and availability of adult book stores,

19  theatres, and places of adult entertainment within

20  New York City.  The city conceded from the outset

21  that approximately 28 existing adult business

22  would be permitted to remain at their current

23  locations after the zoning enactment was

0652

564

23

1   implemented.  Accordingly, more than 84% of the

2   "adult establishments" in existence in 1985 would

3   have been required to move, to close or to

4   otherwise change the nature of their business.

5   The 1995 zoning amendments ultimately withstood

6   Federal and New York State Constitutional

7   challenges and in July 1998 as the city began

8   enforcement efforts against establishments that

9   offered sexually explicit adult materials, the

10  Commissioner of Buildings formally adopted the

11  60/40 rule.  Under that rule, a commercial

12  establishment was deemed not to be an "adult

13  establishment" if it restricted its sexually

14  explicit materials or entertainment to less than

15  40% of its stock-in-trade.  As city officials

16  learned, almost all of the then existing "adult

17  establishments" complied with the dictates of the

18  60/40 rule and changed the nature of their

19  businesses to conform to the city's rule-making

20  and to meet the demands in the marketplace.

21  Indeed, the Department of City Planning's briefing

22  sheet suggests that 40 new "adult establishments"

23  had begun to offer sexually explicit adult

0653

565

24

1   entertainment in mainstream commercial locations

2   throughout the five boroughs.  After three years

3   of defeats in the enforcement actions brought by

4   the city against bonafide legitimate commercial

5   establishments that offer sexually explicit

6   entertainment and that comply fully with the

7   city's interpretative regulations.  The city is

8   now launching a new offensive against sexually

9   explicit adult entertainment.  We believe that the

10  proposed zoning changes you are now considering

11  cannot survive constitution scrutiny when measured

12  against the doctrinal standards embraced by the

13  state and Federal constitutions.  I will briefly

14  summarize, I do have a submission that I provided

15  to you.  What you have here is a regulation that

16  must be drafted with precision to be applied with

17  careful consistency to prevent the delegation of

18  standardless discretion to local functionaries.

19  The proposed amendments to the zoning resolution

20  do not cure the infirmities of the definitions

21  that were always contained in the adult zoning

22  resolution.  You confer unlimited and standardless

23  discretion to the Commissioner of Building and to

0654

566

25

1   the inspection staff of the Building Department to

2   determine what an "adult establishment" is.  You

3   define ""adult establishment" as a commercial

4   establishment where a "substantial portion" of the

5   establishment includes adult uses.  An adult book

6   store has a "substantial portion" of its stock-in-

7   trade in certain materials characterized by an

8   emphasis upon certain "specified sexual

9   activities" or "specified anatomical areas".  An

10  adult eating or drinking establishment or other

11  adult commercial establishment regularly features

12  certain media or live performances characterized

13  by the same emphasis.  How much is substantial?

14  How often is regularly?  How much of the described

15  activity is permissible before it becomes

16  characterized by an emphasis upon the sexual

17  activities or anatomical areas specified in the

18  statute.  By their very terms, the amendments

19  continue to sweep with their ambit locations as

20  diverse as Internet cafes and the New York Public

21  Library where Internet access is afforded to

22  people who want to access sexually explicit sites.

23  Similarly, the proposed amendments purport to

567

26

1    offer guidelines to building inspectors in

2    assessing a true "substantial portion".  These

3    subsections direct the building inspectors to draw

4    irrebuttable presumptions that a commercial

5    establishment is an adult commercial establishment

6    because the establishment contains certain

7    features.  Those features include a mix of factors

8    ranging from the configuration of the commercial

9    and retail space to how stock is displayed, to how

10   customer transactions are handled, to a form of

11   forensic accounting to be conducted by the

12   Building Department inspectors to determine

13   whether only certain portions of the

14   establishment's stock-in-trade generate income to

15   the establishments.  These guidelines establish

16   conclusive or irrebuttable presumptions.  They

17   have long been disfavored under the due process

18   clause because such presumptions are not

19   necessarily or universally true.  In fact, in

20   standards of due process, requires the state to

21   allow individuals the opportunity to rebut the

22   presumptions.  A personal example, Tower Video's

23   upper west side location, adult materials are not

0656

**568**

27

1   separated by partition from the other videos and

2   DVD's offered for sale and because of the layout

3   of the store, customer transactions for other

4   materials may occur in or adjacent to the adult

5   areas.  The presence of such features confers

6   "adult establishment" status on Tower Video and

7   the store will not be afforded that opportunity to

8   rebut the presumptions.  Finally, as we've urged

9   the body to do in the past, there are other less

10   restricted alternatives to approach the quality of

11   life issues that confront the city with respect to

12   sexually explicit entertainment.  Restrictions on

13   advertisements, however, are not without

14   constitutional difficulties.  Signs are a form of

15   expression protected by the free speech clause.

16   Nevertheless, signage laws and public nuisance

17   laws already exist.  Enforcement of those

18   provision, revision of those provisions, would

19   likely offer a viable alternative for addressing

20   any quality of life issues.  If such provisions

21   were not accessibly restrictive and ordinarily

22   tailored they might survive constitutional

23   scrutiny.  The pure breath and draconian nature of

**569**

28

1   the amended regulations the city is proposing now

2   cannot be seen in any other fashion as an attempt

3   to suppress completely sexually explicit materials[1]

4   here.  We recognize people are offended by these

5   material, people are offended by the bonafide

6   businesses that market the materials and promote

7   sexually explicit expression.  We recognize people

8   do not want these businesses in their

9   neighborhoods.  Were this not the case, zoning

10  changes would not be proposed and would not

11  command popular support.  If we want the

12  government to serve as the arbiter of good taste

13  we might as well abolish the First Amendment and

14  let the city decide on the basis of a popular vote

15  what sort of expression is to be permitted and

16  what sort of speech is not.  It may be a

17  truism....

18  CHAIRMAN ROSE: Please try to conclude.

19  BETH HAROULES: I'm concluding here.  But it is a

20  message that the courts in the city have

21  constantly directed to the administration.  The

22  city should not be engaged in censorship of

23  protected expression, whether such expressive

0658

**570**

29

1    material is located at the Brooklyn Museum, at the

2    Dialo Mural in the Bronx, on ads placed on city

3    buses or in legitimate commercial enterprises that

4    offer sexually explicit material.   We urge the

5    City Planning Commission to reject these proposed

6    amendments.  Thank you.

7    CHAIRMAN ROSE: Thank you.   Alex Garvin.

8    ALEX GARVIN:  Ms. Haroules, thank you very much

9    for your testimony.  If I understand you

10   correctly, we are trying to improve and clarify

11   the current legislation.  Two previous speakers

12   and you talked about amortization as a problem.

13   You raise the issue of Internet access.  Are there

14   any other specific items that are in the proposal

15   before us to clarify the existing legislation that

16   you believe cause problems.

17   BETH HAROULES:  No there isn't.  The

18   legislation... what you are doing here, as I read

19   the proposed amendments, is to revert to the

20   original definitions that were contained in the

21   zoning resolution and then add certain features

22   that mandate that the Buildings Department ignore

23   the reality of what other types of businesses

0659

**571**

30

1    might be conducted on the premises.  We think you

2    are actually looking at amendments that make the

3    statute much more constitutionally impermissible.

4    The 60/40 rule was adopted by the Buildings

5    Department.  It came from this commission's

6    dictates in its planning memo that you thought

7    that looking at anything other than 40% of stock-

8    in-trade, and you had three definitional criterias

9    for the Buildings Department to look to, if you

10   looked at anything else that would insert a level

11   of discretion into the enforcement efforts that

12   you thought was misplace and inadvisable.  That I

13   believe was a response to our objections about

14   inferring complete discretion on the Buildings

15   Department to come in to decide what was an "adult

16   establishment".  Internet cafes, I think, are a

17   perfect example because you have unfettered,

18   unfiltered access to the Internet.  You clearly

19   can access sexually explicit material and under

20   the new definitions the presence of one computer

21   that has accessed that site converts the status of

22   that café into an adult eating and drinking

23   establishment.  You are going, I think, in

0660

572

31

1   completely the wrong direction here.  You

2   obviously know that we think the statute is

3   misplaced to begin with.  We concede that there

4   have been three years of litigation on procedural

5   issues.  The definitional issues were only raised

6   after the Supreme Court had rejected the cert

7   petitions and I believe, Mr. Fahringer's group

8   went back into Federal Court and court council

9   including Mr. Fredericks who testified today

10  before you on a different matter, agreed that the

11  60/40 rule that was in your planning memo should,

12  in fact, be the enforcement standard in the field.

13  What has happened is you have got what we had

14  predicted, businesses will move to comply, that's

15  to seat the demand of the marketplace.  Those

16  businesses move to comply, they are no longer

17  "adult establishments" and as you have seen

18  additional locations now that there is a bright

19  line test that protects them have, in fact, either

20  taken on or increased the amounts of adult

21  materials that they offer.  That again, I think is

22  a function of the marketplace and it shows you the

23  vitality of this form of expression.  We do think

0661

573

32

1    that in terms of what is being proposed here, you

2    are going to find yourself enmeshed in additional

3    litigation.  It give the Buildings...

4    CHAIRMAN ROSE: I think we can agree on that.

5    BETH HAROULES: Yeah, exactly.  You know an "adult

6    establishment" when you see it.  I mean it's the

7    old obscenity test.  That obscenity test doesn't

8    apply here when it comes to sexually explicit

9    material.  You know, I have a 3-year-old daughter,

10   I don't look forward to having to explain to her

11   about anything that she comes upon in New York,

12   but I think it is part of my role as a parent to

13   provide a straightforward answer to her about all

14   of these issues and I think that is the duty of

15   the people in the City of New York.  I think it is

16   the duty of the Planning Commission to address

17   people's desires, as you have heard over the

18   years, that "adult establishments" are in your

19   face.  We have suggested alternative options for

20   the city to pursue that would probably pass

21   constitutional muster, certainly would eliminate

22   the need for extensive litigation that just ties

23   the city and everybody, including us, up in

0662

574

33

1   litigation that we do not think has to happen.

2   CHAIRMAN ROSE: Thank you very much.   Marilyn.

3   MARILYN GELBER: Ms. Haroules, based on what you

4   have just said, I understand the Civil Liberties

5   Union does not contest the right, the

6   responsibility, of local government to protect

7   communities from perceived public nuisances.  At

8   the same time, if I understand your testimony

9   today, these further refinements of the zoning

10  ordinance you say are really not to the point and

11  rather we should begin to look at controlling

12  public nuisances through doing some other things

13  and at the end of your prior statement you began

14  to talk about that a little bit.  You spoke a

15  little bit about signage.  You spoke about some

16  other things.  Could you just very quickly talk to

17  us about some of those things that you think would

18  be helpful in protecting communities from

19  perceived public nuisances associated with these

20  businesses.

21  BETH HAROULES: Well, it comes back, we recognize

22  Supreme Court precedent and Court of Appeals

23  precedent that indicate that "adult

0663

575

34

1   establishments" can be regulated.  By the same

2   token you can't eliminate them and our testimony

3   goes to the point that we think that what happens

4   under the new definitions is the elimination of

5   any establishment that offers materials that

6   people find offensive.  In terms of the signage

7   issues, we had discussed, in previous lives, the

8   ability of the city to deal with the neon signs,

9   to deal with displayed items in windows, to deal

10  with the way wares are presented into the street.

11  You do have the ABC laws that are in place that

12  deal with adult drinking and eating establishments

13  where there are complaints that frankly are no

14  different than complaints that are generated

15  against any bar because of ambient levels of noise

16  and traffic, congestion, crowding.  Those are all

17  options that we had urged the city to consider

18  pursuing.  In the grand scheme of things, the

19  city's obligation to regulate is governed by

20  taking the least restrictive approach that is

21  available to the city.  We believe that efforts to

22  look at the signage would follow up on that.

23  There is also the issue of enforcement and a lot

576

35

1    of the earlier complaints and, I think, some of

2    the ambient complaints that continue to filter out

3    about the presence of, and it is largely I believe

4    again, a bar ambience location in the outer

5    boroughs, deals with whether or not there are

6    appropriate enforcement techniques employed by

7    local police, employed by the community boards,

8    employed by the neighborhoods.  We had, a long

9    time ago, urged local civic associations to

10   actually sit down with the owners and operators.

11   These are business, they employ people in the

12   community where they are located.  They serve the

13   people in the community where they are located,

14   whether or not folks want to admit that they avail

15   themselves of the services.  They want to be good

16   neighbors and it seems to me that the city should

17   not be in the business of refereeing or of setting

18   rules or changing rules in midstream.  Those are

19   areas that we would urge the City Council and the

20   City Planning Commission to pursue.

21   CHAIRMAN ROSE: Thank you.  Next speaker is

22   Christopher Farrell.

23   CHRISTOPHER FARRELL:  Good morning commissioners.

577

36

1    I come here today as a consumer who is concerned

2    about the, in particular, the availability of gay

3    literature in New York City and because of that I

4    want to read a short passage from a book of Boyd

5    McDonald.   *Two conservatives from the anti-*

6    *homosexual right wing have given public*

7    *recognition to the allure and power of*

8    *homosexuality.   Senator Jesse Helms, a leading*

9    *anti-homosexual crusader, was quoted as saying,*

10   *"the homosexual movement threatens the strength*

11   *and survival of the American family as the basic*

12   *unit of society.   Heaven knows, homosexuality is*

13   *alluring, but Jesse's praise seems overwrought*

14   *suggesting, as it does, that heterosexuality has*

15   *been a faint attraction and that men would stop*

16   *marrying and having children if homosexuality were*

17   *accepted as an alternative.   Just as David H.*

18   *Sadder?? of the U.S. Supreme Court similarly*

19   *heaped excessive praise on homosexuality in a*

20   *legal opinion promulgated when he was a New*

21   *Hampshire judge in 1987 and dug up recently by the*

22   *New York Times.   The opinion, signed by David but*

23   *not necessarily written by him, is that*

578

37

1    *homosexuals could be forbidden to adopt children*

2    *or serve as foster parents because they do not*

3    *provide appropriate role models for children.*

4    *David's opinion, ipso facto, admits that*

5    *heterosexuality is not, as heterosexuals claims,*

6    *natural but must be learned from role models.  His*

7    *opinion also shows, interalia, fear that the*

8    *allure of homosexuality is so intense that*

9    *children of homosexual parents would be unable to*

10   *resist it.  In some, both conservatives, Jesse and*

11   *David, knew heterosexuality as too weak to compete*

12   *with the strength of homosexuality.*

13   *Heterosexuality, therefore, needs government*

14   *support.*  That passage is marked by an acerbic wit

15   and an iconoclastic prospective which are

16   hallmarks of gay literature.  It is also part of a

17   book called <u>Lude</u> which is a series of

18   autobiographical accounts by gay men of their

19   sexual activity and one would fairly have to say

20   that the book is characterized by an emphasis on

21   sexual activity and, as such, under the zoning

22   provisions required, it would have to be, in any

23   store that sold it, subjugated to an area that was

0667

579

38

1    hidden from view and, if it wasn't, the store that

2    sold it would be an "adult establishment" and

3    would not be allowed to operate in most parts of

4    the city.  An emphasis on sexual activity is not a

5    hallmark only of this particular work of gay

6    literature, it is a hallmark of much of gay

7    literature and the reason that it is, is because

8    there is a notion that accounts of gay lives

9    should be silenced and shamed and hidden and this

10    zoning provision says that is exactly right.  If

11    you have a book that is characterized by an

12    emphasis on gay sexual activity, hide it away, or

13    we will not allow you to sell that book in most

14    parts of New York City.  When you begin to

15    regulate businesses based on their contents you

16    threaten the ability of many people to exercise

17    their rights to enjoy the kind of literature they

18    want and I urge you to consider that and to reject

19    these proposals for zoning revisions.  Thank you.

20    CHAIRMAN ROSE: Thank you.  Next speaker is Ira

21    Weiner.

22    IRA WEINER:  Good morning Chairman and members of

23    the Board.  My name is Ira Weiner.  I practice law

0668

580

39

1    in New York and New Jersey with an emphasis on

2    constitutional litigation.  There are numerous

3    constitutional defects in the proposed amendments

4    to the zoning ordinance.  I would like to address

5    one, perhaps two, of those that I deem central

6    problems in this ordinance.  The last study that

7    was done by the city in support of these kinds of

8    ordinances was in 1994, seven years ago, and it

9    relied to a great extent on studies that had been

10   done earlier, especially the one that was sited in

11   the Rentin versus Playtime Theater case.  Now the

12   Rentin study and such, go back to a debate in

13   society as to what to do with adult businesses,

14   should they be concentrated in one part of the

15   city leaving the rest of the city relatively free

16   of such businesses or should they be dispersed

17   throughout the city.  The Rentin study and other

18   studies that were relied upon in the 1994 study

19   recommended dispersal throughout the city.  In the

20   1995 ordinance, by imposing 500 foot requirements

21   of one business to another and other such did, in

22   fact, implement dispersal.  So, we now have a city

23   in which adult businesses have been dispersed.

0669

581

40

1    You have to understand that none of these studies

2    showed that adult businesses caused negative

3    secondary effects.  At most, what they showed was

4    that concentrations of adult businesses, where a

5    lot of them are grouped into a small area,

6    produced the possibility of negative secondary

7    effects.  Well, New York City has now dispersed

8    the adult businesses.  There are many adult

9    businesses, over 100, which are much smaller,

10   which have lost 60% of the business due to the

11   existing ordinance and we are now in a situation

12   that has never been addressed by any of the

13   studies that the city has ever conducted.  We are

14   in a situation where the city has now had

15   dispersed businesses and the question is under the

16   present characteristic are there any negative

17   secondary effects that need to be addressed.  Now,

18   the city has looked and said well there is still

19   plenty of adult business around, but the city's

20   most recent study has not addressed the effect of

21   dispersal of adult businesses and, consequently, I

22   believe that one of the reasons why these

23   amendments are unconstitutional is the lack of a

582

41

1    study that addresses the present situation in the

2    City of New York.  You are operating in a vacuum.

3    You don't know, and there is nothing in the prior

4    studies that addresses whether or not there is an

5    actual problem that needs to be resolved at the

6    present time by even more restrictive regulations

7    upon the locations and operations of adult

8    businesses.  Thank you.

9    CHAIRMAN ROSE: Thank you.  Next speaker is Daniel

10    Golub.

11    DANIEL GOLUB:  Good morning.  My name is Daniel

12    Golub and I represent Assembly member Richard

13    Gottfried and I am prepared to deliver his

14    testimony.  My name is Assembly Member Richard

15    Gottfried.  I am sorry the legislative session in

16    Albany does not permit me to be here in person.

17    The assembly district I represent includes

18    Chelsea, Clinton, Midtown, the Lincoln Center area

19    and parts of Murray Hill.  For more than 20 years

20    I have fought against various "adult

21    establishments" that engaged in practices that

22    diminished the quality of life in these

23    communities.  I am well aware of the problems many

**583**

42

1    of these places can cause for a neighborhood

2    residence and businesses and I applaud the efforts

3    of concerned citizens to improve the quality of

4    life in their neighborhoods.  However, these

5    proposed regulations are not the effort of

6    communities trying to improve the quality of life

7    in their neighborhoods.  They are part of this

8    administration's continued effort to use scarce

9    public resources to regulate constitutionally

10   protected speech and concentrate adult uses in a

11   few communities.  Just as I was concerned by the

12   planning commission's "adult establishment"

13   regulations in 1995, I am even more concerned

14   today about the commission's proposed amendments

15   to the 1995 regulations.  In an effort to close

16   loopholes in the regulation of adult businesses,

17   the commission has proposed overbroad and

18   subjective definitions of adult use establishments

19   that would allow regulations to be arbitrarily or

20   capriciously enforced against a wide variety of

21   businesses.  While the 1995 regulations were

22   enforceable against businesses where a

23   "substantial portion" of the business included an

0672

584

43

1    adult entertainment establishment, the new

2    regulations target all businesses that include any

3    adult entertainment establishment. And, in an

4    attempt to regulate those businesses which sell

5    both adult and non-adult material, the new

6    regulations define 11 features that would quality

7    a business as an "adult establishment". Enforcing

8    these new regulations would require the Department

9    of Buildings inspectors to, among other things,

10   monitor customer activity and sales volume to

11   determine the "substantial purpose" of an

12   establishment from paragraph 2 DKK. Such language

13   introduces an unacceptable degree of subjective

14   judgment into the regulation process. In

15   addition, the new regulations invite another

16   protracted and costly First Amendment battle over

17   the vagueness of the new language. Even if this

18   regulation withstands constitutional scrutiny, it

19   is a wasteful use of city resources. The

20   Department of Buildings has too few inspectors to

21   fulfill its currently mandated lifesaving

22   responsibilities:   overseeing building

23   construction and alteration, enforcement of

585

44.

1    energy, safety, labor and other laws related to

2    construction activity and making emergency

3    repairs.  It is a waste of city resources to

4    employ inspectors to count the number of adult

5    titles on sale in video stores, as required by

6    paragraph 2 DGG, or determine whether a window

7    display contains a disproportionately high number

8    of adult entertainment products as required by 2

9    DJJ.  Insofar as the new regulations increase the

10   pressure on "adult establishments" they will

11   continue to drive "adult establishments" into the

12   few zones left available to them. The new

13   regulations will force adult entertainment

14   businesses to relocate to one small specific area

15   of Manhattan, in effect, creating an "adult

16   establishment" zone adjacent to the Hudson River

17   waterfront.  This area would become practically

18   the only area in New York City where "adult

19   establishments" could legally operate and that

20   would be unfair to the residents and businesses of

21   that area and it would frustrate the community's

22   desire to develop the neighborhood as a parks and

23   recreation area.  The regulations continue a

0674

586

45

1   disturbing trend towards cutting off New Yorker's

2   access to non-obscene material to which they have

3   a constitutional right.   While "adult

4   establishment" may not cater to your taste or

5   mine, placing unreasonable restrictions upon an

6   individuals ability to exercise his or her lawful

7   entertainment choices is in direct contradiction

8   to New York's tradition of tolerance of diversity.

9   There are viable alternatives for dealing with the

10   secondary problems that "adult establishments"

11   create in their neighborhoods.   Confining the

12   proposed regulations to simply restricting signage

13   or window displays could meet the concerns of many

14   community members.   The city should also explore

15   regulatory and enforcement strategies relating to

16   such problems as double parking and leaf letting.

17   These are the "adult establishment" related issues

18   that impact the quality of life in our

19   communities, not what is sold or goes on inside.

20   For all these reasons, I urge the commission to

21   set aside these new regulations and develop a

22   package, in consultation with the community and

23   civic leaders, which can meet the quality of life

587

46

1  concerns without being unduly restrictive of civil

2  liberties, difficult and expensive to enforce and

3  unfairly discriminatory towards certain areas of

4  the city.  Thank you.

5  CHAIRMAN ROSE: Thank you.  Next speaker is Martin

6  Mehler.

7  MARTIN MEHLER:  Good morning Jim Rose and members

8  of the commission.  My name is Martin Mehler and I

9  represent 69-20 Queens Blvd. Inc. which does

10  business under the trade name of Nickels.  Nickels

11  is a legitimate business which has been a good

12  neighbor in its community for over 20 years.  It

13  has all of the requisite licenses necessary to

14  conduct its business which include, but are not

15  limited to, those issued by the New York City

16  Department of Consumer Affairs and the New York

17  State Liquor Authority.  In order to comply with

18  the 60/40 restrictions placed by the new amended

19  zoning regulations my client has incurred a

20  substantial legal, as well as construction costs,

21  in order to comply with these amendments.

22  Nickels, in fact, was forced to close for over one

23  year to come within the amended zoning resolution

588

47

1   and had to resort to the courts to force the New

2   York City Buildings Department to drop a condition

3   for approval of the various buildings permits

4   necessary to reopen, namely, that it have no

5   portion of its premises devoted to any sort of

6   adult activity which was clearly in violation of

7   the zoning amendments which are presently in

8   force.  In fact, I had to go to court and force

9   the city to allow these building permits to be

10  issued so that my client could go forward.  This

11  took approximately one year.  The position of

12  Nickels is that the city cannot impose these new

13  restrictions on topless bars without undertaking a

14  thorough study to establish the effect which the

15  present law has on a premises such as Nickels and

16  the surrounding communities in which they are

17  located.  We do not believe that any such study

18  would justify the new restrictions that have been

19  proposed, but the present situation in which there

20  has plainly been no study at all to justify the

21  new restrictions sought to be imposed at this time

22  is an affront to my client's constitutional

23  rights.  We also urge that any new restrictions be

**589**

48

1    the subject of  ----rest of side A of tape blank -

2    ---

3

4

5    ....and approximately $150,000 dollars worth of

6    renovations in order to bring this establishment

7    within compliance of the existing regulations.

8.   CHAIRMAN ROSE: Thank you.  Next speaker is Carmen

9    Vazquez.

10   CARMEN VAZQUEZ: Thank you Commissioner Rose and

11   members of the commission for the opportunity to

12   address you today in opposition to this amendment.

13   My name is Carmen Vazquez and I am the director of

14   public policy for the Lesbian and Gay Community

15   Services Center.  Once again we reject the logic

16   and need for this law, the original one adopted in

17   '95 and this amendment before you.  We view both

18   efforts as little more than censorship and the

19   imposition of the mayor's morality on the rest of

20   us.  Debates on what constitutes indecency and one

21   person's view of written and visual materials or

22   live performance as pornography and another

23   person's view of that same material as art are

0678

590

49

| | |
|---|---|
| 1 | older than the entire history of western |
| 2 | civilization.  It is why freedom of expression and |
| 3 | the First Amendment to the Constitution of the |
| 4 | United States are revered in our society.  In |
| 5 | addition to our objections to what we consider |
| 6 | censorship, we also think this proposed change is |
| 7 | as many have said today too broad and dangerously |
| 8 | subjective.  The '95 court approved rule |
| 9 | specifically defined "substantial portion", the |
| 10 | new rules do not.  Will a single book or picture |
| 11 | qualify as substantial?  The center has an entire |
| 12 | bathroom depicting male genitals that has been |
| 13 | preserved as part of the legacy of Keith Iving's?? |
| 14 | body of artistic works.  Will we have to cover |
| 15 | them up?  The proposals are unfair.  Many |
| 16 | businesses spent considerable amounts of money as |
| 17 | you have heard today to bring their stores in |
| 18 | compliance with the 60/40 rule.  If business |
| 19 | owners comply with the law, only to have the law |
| 20 | change, it becomes a game of circle logic that |
| 21 | they can't possibly win.  The proposals will be |
| 22 | challenged in court, the city will lose and the |
| 23 | merchants will comply with the courts only to face |

**591**

50.

1  another round of legislation.  It makes no sense.

2  The proposals finally, I believe, are unnecessary

3  waste of taxpayers' money.  We think the city can

4  make better use of our city inspectors' time than

5  to have them looking for male genitals in a

6  discernibly turgid state even if completely and

7  opaquely concealed.  This could apply to any

8  number of proms in New York City.  It could apply

9  to what I have witnessed in just about any dance

10  club in New York City.  It might even apply to

11  some of those Calvin Klein ads so prominently

12  displayed in the very same Times Square that this

13  legislation was intended to originally clean up.

14  I believe the existing regulations, although we

15  opposed them originally, are enough.  The allow

16  individuals to purchase erotica without walking in

17  isolated parts of the city where they have reason

18  to fear for their safety.  They offer customers

19  choices.  They protect minors and adults from

20  being exposed to materials they might not have

21  wanted or expected to see.  We don't need more

22  censorship.  Please reject the proposed changes to

23  the laws regulating "adult establishments".  Thank

0680

**592**

51

1   you.

2   CHAIRMAN ROSE:  Ms. Vazquez, can you describe the

3   nature of your organization.

4   CARMEN VAZQUEZ:  The Lesbian and Gay Community

5   Services Center is a multipurpose center located

6   on 13ᵗʰ Street in the West Village, 208 West 13ᵗʰ

7   Street.  We provide mental health and social

8   services, cultural programming, advocacy and

9   education for the community.

10  CHAIRMAN ROSE: It's a 501C3.

11  CARMEN VAZQUEZ:  It is a 501C3.

12  CHAIRMAN ROSE: So then it's not a commercial

13  establishment.

14  CARMEN VAZQUEZ:  No.

15  CHAIRMAN ROSE:  So the good news is .... your

16  bathroom is safe.

17  CARMEN VAZQUEZ:  Yes, I understand that.  However,

18  there is an awful lot of commercial establishments

19  in our community that this rule does apply to, and

20  we speak on their behalf.

21  CHAIRMAN ROSE: Thank you very much.

22  CARMEN VAZQUEZ:  Thank you.

23  CHAIRMAN ROSE: We appreciate your testimony.  Next

0681

593

1   speaker is William Dobbs.

2   WILLIAM DOBBS: Good morning.  It's kind of surreal

3   to be back here six years later.  On a personal

4   note, I saw some of you at Ed Rogowsky's memorial

5   and I am reminded of, gee, how much history has

6   gone by.  I have two pages on a race through but

7   as I was sitting the back I was thinking God it's

8   so serious and ponderous.  We are talking about

9   pleasure, after all, and I brought along one of

10  the masks from one of the demos against this,

11  those in audience can see the Rudy? ears of

12  Disney.  I am Bill Dobbs. I am from a small group

13  of community organizations and activists called

14  New Yorkers for Free Expression.  I know that you

15  take pride in what you do up here, and I urge you

16  to protect the city from the mayor's censorship

17  urges.  The 1995 plan has turned 98% of this great

18  city into a censorship zone.  There have been

19  drastic changes.  Take a look at Times Square.

20  There is surely less choice and competition in the

21  West Village where I go, as a gay man, the amount

22  of videos that are available.  Building inspectors

23  have now been turned into culture tsars.  Not a

**594**

1    department of the city that has been free of

2    internal problems and corruption.  Sailors are

3    coming here, I think fleet week starts today.

4    Anybody who doesn't already know what Times Square

5    is now is going to slit their wrists.  The current

6    proposal is dangerous because it gives sweeping

7    powers.  It is as if the rule of law will be, "I

8    know a triple X business when I see it" and this

9    three-card monte that is played with these

10   regulations is disturbing because there is no way

11   that a retailer can win under it.  And there is no

12   way the consumers can win under it.  It imposes an

13   onerous burden on the city and on city and

14   taxpayer resources and it is a drastic

15   interference with my rights to see and read what I

16   wish as a gay man and my freedom to associate with

17   whom I wish to associate with.  The mayor's

18   record, as many people have noted, is abysmal.

19   This is a building after all that was guarded by

20   sharpshooters at his behest during an AIDS

21   protest.  To even get to the steps of City Hall is

22   a feat these days.  The mayor has lost what, two

23   dozen major free expression cases.  The Brooklyn

0683

595

54

1   Museum controversies have been mentioned and the

2   mayor went further though, he even suggested that

3   the citizenry of this city, to protect itself

4   against those who might wish to enjoy adult

5   materials should video tape customers going into

6   those businesses.  Does anybody recall the mayor

7   going on TV doing that?  In college, in the

8   Midwest in the 1970s I learned that one of the

9   stores I used to go to was the first to sell adult

10  magazines in the 1940s and the 1950s, long before

11  I was there.  This plan not only imposes an, "I

12  know it when I see it" but it turns back the clock

13  to a time when adult material was sold under the

14  counter.  The negative secondary effects, 130

15  businesses or so, in 620 square miles.  I went to

16  Queens Boulevard to see the straight clubs out

17  there because I had never seen them.  They blend

18  in like one of those stars in that flag over there

19  but the truth is that what drives people crazy

20  about this stuff and what you have got to reckon

21  with is that people are insane at the very idea

22  that somebody could be sitting in a topless bar

23  right now enjoying themselves or sitting in a gay

596

55

1    burlesque club or going to purchase a video.

2    Whose quality of life are we talking about?  Why

3    do I need to have my choices taken away?  Now the

4    Big Apple's is beset by bluenoses.   It's

5    frightening to witness what you unleashed in 1995.

6    I was privileged, but frightened to see, a raid,

7    an enforcement raid on a midtown video store a

8    number of years ago.  About 14 people came in,

9    cops, city attorneys, a photographer, horrible.

10    You hold the power.  I urge you to use that power

11    not just to reject this proposal but to stand up

12    and say, "you know the bedrock of the First

13    Amendment is the public's ability to tolerate that

14    which we don't like.  As somebody who often has a

15    minority viewpoint I know that my viewpoint is

16    silenced all the time.  That is precisely what

17    happened to gay culture historically.  So I urge

18    you to reject this proposal,(surprise, surprise)

19    but I also would go further, I urge you to repeal

20    what you did in 1995.  It is a disgrace.  Thank

21    you.

22    CHAIRMAN ROSE: Next speaker is Charles Axelrod.

23    CHARLES AXELROD:  Good morning Mr. Chairman and

0685

**597**

56

```
1     members of the Commission.  My name is Charles

2     Axelrod.  I am an attorney for Westjoe Restaurant

3     Inc., a topless bar which does business under the

4     name of New York Dolls.  My client is licensed by

5     the Department of Consumer Affairs and the New

6     York State Liquor Authority.  It has spent

7     substantial sums of money in legal fees,

8     architectural fees, licensing fees and

9     construction costs in a good faith effort to

10    comply with the requirements of the current

11    amended zoning resolution.  The building

12    department has approved our filed plans and the

13    city has conceded that our premises comply with

14    the current amended zoning resolution and the city

15    has discontinued the enforcement action it had

16    commenced against our premises.  It is

17    respectfully suggested that before this commission

18    considers the city's proposed changes, the city

19    must conduct a study to determine the affect which

20    the current AZR has had on topless bars and the

21    communities in which they are located.  We believe

22    that such a study would establish that the new

23    restrictions proposed by the city are not
```

**598**

1    justified.  Further, we urge that fundamental

2    fairness requires that any new restrictions be the

3    subject of a reasonable moratorium or amortization

4    period.  Thank you.

5    CHAIRMAN ROSE:  Can you tell us sir how much

6    approximately your client spent trying to come

7    into compliance....

8    CHARLES AXELROD:  I do not have the specific

9    numbers at this time.

10    CHAIRMAN ROSE: Apropos of the request for a

11    potential amortization period it would be useful

12    if such information could be submitted.

13    CHARLES AXELROD:  I will make an effort to do so.

14    CHAIRMAN ROSE: Thank you.  Next speaker is Jeremy

15    Lacfer.

16    JEREMY LAUFER:  Jeremy Laufer, actually.  I am the

17    district manager for Brooklyn Community Board #7.

18    I am here to speak in favor of the proposed

19    changes.  Our community board met last week, May

20    16, and unanimously approved of the proposed

21    changes in the regulations after having a public

22    hearing on May 9 at P.S. 24 which happens to be

23    one block away from one of the supposed 60/40

599

58

1    establishments.  I going to comment on something

2    one of the earlier speakers had mentioned about

3    enforcement and the earlier speaker seemed to

4    mention enforcement by the Community Boards and

5    the NYPD.  I want to point out the community

6    boards are not enforcement agencies and we don't

7    have powers with regard to that and, as far as the

8    NYPD is concerned, Commissioner Karek has made

9    clear to us in a letter that he sent to Senator

10   Connor that while the NYPD does do enforcement

11   around these establishments that they do no do

12   zoning enforcement and that is left to the

13   Department of Buildings.  Now I want to relate

14   some of the information that we have from my

15   community board which I don't believe I mentioned,

16   is Sunset Part, in Brooklyn where we now have I

17   believe at least 12 of these establishments, 8 or

18   9 of which I believe are considered 60/40s.

19   However, we received a letter on 4/5 from the

20   Department of Buildings that mentioned that they

21   did recently do an inspection of these

22   establishments.  Four of the businesses, which are

23   located in an M1-2D zone are not in compliance

0688

**600**

59

1   with the 60/40 law and they received violations.

2   Well it's nice that they actually did the

3   enforcement but if they are not in compliance with

4   the 60/40 law then these are "adult

5   establishments" if I am correct and they should

6   have been shut down because they are not allowed

7   in an M1-2D zone, however, they received

8   violations.  I want to relate to you a story from

9   about two-three years ago even when I was in a

10  former capacity in the same district.  There was

11  an adult video store that opened around the corner

12  from a church less than 500 feet from Our Lady of

13  Chestacova? which is located on 25th street in

14  Sunset Park.  There was a protest with the church

15  members and the local city councilman's office and

16  they succeeded in getting the attention of the

17  Department of Buildings who padlocked the store.

18  They went back to court, they got a ruling and

19  they changed around the configuration of their

20  floor space, they reopened a week later.  They

21  have the same external appearance in which I get

22  complaints every weeks from parents that there is

23  a neon sign with a woman performing a sex act

0689

**601**

1  which can be viewed from the Gowanus Expressway

2  and anybody passing through the neighborhood gets

3  the idea that Sunset Park is a red-light district

4  cause all you see from the Gowanus Expressway, in

5  addition to our other signs, are all these "adult

6  establishments". I want to point out that

7  complying with the 60/40 rule does not necessarily

8  mean changing the nature of your business when

9  your external appearance doesn't change and you

10  continue to advertise to the consumer that you

11  have all these sex related items and you don't

12  even acknowledge that you have other items

13  externally. I want to finally point out that our

14  community, community Board #7, recently got a new

15  power plan from the state. We have the Gowanus

16  Expressway, which is a major asthma corridor in

17  the city. We have the least amount of parkland in

18  Brooklyn which has the least amount of parkland in

19  the state of any county. We have an interim waste

20  transfer site in our community in addition to our

21  already established marine transfer station and

22  now we have one of the larger red-light districts

23  in the city. I believe the football term is

**602**

61

1     called piling on, it's a personal foul in

2     football, this is something that our community

3     takes very personally and it is just piling on

4     additional negative uses in our community and

5     something that our community board, as I said

6     unanimously approved for your proposed

7     regulations, the city's proposed regulations and I

8     wanted to thank you for the opportunity to speak

9     today.

10    CHAIRMAN ROSE: Thank you.  Marilyn Gelber.

11    MARILYN GELBER: Could you please go into a little

12    bit more detail about what kinds of other public

13    nuisances are created as a result.  You talked

14    about the visual impact, that's a problem to the

15    community, are there other things related to

16    parking or other things.

17    JEREMY LAUFER:  Yes, actually I would like to see

18    if I could this board the statistics on this, but

19    I do believe that arrests for prostitution in our

20    community have gone up.  I would like to get you

21    the statistics on that so I can prove that.  I

22    can't prove that the amount of prostitution, of

23    course, has increased but arrests I do believe

0691

603

62

1   have gone up.

2   MARILYN GELBER: Thank you.

3   CHAIRMAN ROSE: Thank you.   Next speaker is Abbey

4   Ehmann.

5   ABBEY EHMANN:  Good morning.  I can't believe I

6   have to follow this guy.  The first person who is

7   for this.  I wrote on my little slip that I

8   represent myself, but I actually feel that I more

9   accurately represent consumers of adult

10  entertainment and possibly the performers since I

11  don't see any boas back there anywhere.  The

12  negative secondary effects of the older proposal

13  are that numbers of my friends have had to move

14  out of the city.  They were no longer allowed to

15  make their living the way they had been and I mean

16  if I can use one example and it's slightly

17  anecdotal.  Billy's Topless, they never had any

18  negative secondary effects.  For 20 years they

19  functioned with no problems from their community

20  board and I believe they are closed down now and

21  about to be a bagel store.  I think New York City

22  needs more strip clubs and less bagel stores

23  personally but.  And this place was so small that

0692

**604**

63

1   they were really able to even adjust it to come

2   into compliance with the 60 40 rules.  They could

3   only have really three dancers dancing at a time

4   so I mean they would have had to put the one

5   topless dancer in the bathroom in order to have

6   their square footage comply so instead the guy who

7   owned the place put bathing suit tops on all these

8   people.  I would love to answer some question

9   because I feel that I can answer some of these

10  things.  What is acceptable?  I mean, if anyone

11  read the New York Times Magazine article, the

12  adult entertainment business is a 10 billion

13  dollar business and there is obviously a demand

14  for this material and even though people might be

15  ashamed or embarrassed to admit it because of the

16  way it seems to be perceived by society, obviously

17  someone's buying this stuff and I like to think

18  that most of them are in New York because there

19  don't seem to be as many in Alabama.  But that is

20  why a lot of us move here is for the freedom of

21  expression and the tolerance.  So can I answer a

22  question or two.  Any anecdotal questions, about

23  what happened to the people who have been put out

0693

605

64

1   of business by the original zoning.  Nothing.....

2   CHAIRMAN ROSE:  If you'd like to make a point,

3   feel free to make it.

4   ABBY EHMANN:  Okay.  I am not a professional so I

5   didn't have a prepared statement.

6   CHAIRMAN ROSE: I think you've stated your views

7   very clearly I think.

8   ABBY EHMANN:   Thank you.

9   CHAIRMAN ROSE: Thank you. We appreciate your

10  testimony.  Next speaker is J. Grabarz.

11  JOE GRABARZ:  Good morning Chairman Rose and

12  members of the Commission. My name is Joe Grabarz.

13  I am the deputy executive director of the Empire

14  State Pride agenda, New York State and New York

15  City's largest gay and lesbian advocacy and

16  political organization.  I am here today to

17  testify in opposition to the proposed amendments

18  to the zoning changes regarding adult businesses.

19  We oppose the regulations as unnecessary,

20  overbroad and disproportionately harmful to the

21  lesbian, gay, bisexual and transgender communities

22  of New York.  Historically, lesbian and gay

23  transgendered people have been scapegoats in

0694

**606**

65

1    morality campaigns.  Our fear is that once again

2    when a zoning ordinance of the type proposed here

3    is enforced the anti-gay bias that is pervasive

4    throughout society will play itself out in a way

5    that disproportionately impacts our community.

6    Will gay oriented sexually explicit materials be

7    prohibited more regularly than provocative

8    straight porn.  Will a business that contains nude

9    non-obscene photos of two men fall under these

10   regulations while those that have pictures of a

11   busty woman will not.  These regulations increase

12   the discretion of city inspectors by changing the

13   definition of what is a regulated business thus

14   the potential for selective enforcement is now

15   even greater.  The recent closing of gay clubs in

16   New York City only heightens our concern that

17   actions falling under the guise of quality of life

18   might in fact contain an element of lifestyle

19   enforcement intentional or otherwise.  It begs the

20   exercise of an arbitrary prurience in enforcing an

21   irrational anatomical hierarchy.  Whether

22   desirable or not, many adult book stores have

23   served as the first meeting place for adult gay

607

1    men.  In a society that still oppresses gay

2    people, in a state that, in fact, still fails to

3    grant basic civil right protections to gay and

4    lesbian citizens.  Many gay men find their first

5    validation of their identity in these

6    establishments.  While things have improved with

7    programs and organizations to support gay youth,

8    some gay adults still use the establishments as

9    their first verification of their sexual

10    orientation.  If these businesses are legal and

11    legitimate then there is no compelling reason why

12    they should cease to serve this function.  I urge

13    the City Planning Commission to reject these

14    proposed regulations.  As a civil rights movement

15    born right here in this very city, out of the

16    harassment of a legitimate lawful business

17    establishment that was seen by many as running

18    counter to the moral morays of the times. The gay

19    and lesbian community is particularly sensitive to

20    government efforts to clamp down on businesses

21    which, though sexually oriented, are in fact

22    productive lawful parts of their neighborhoods.

23    Many of the businesses that would now fall under

**608**

1       these new regulations have peacefully existed in

2       these neighborhoods for years without complaints

3       of their neighbors.  The sweeping regulations

4       promulgated in 1995 seemed to have effectively

5       kept the ratio of adult businesses to a

6       significantly reduced level and as a number of

7       courts have observed, may have gone too far.  At

8       the risk of sounding cynical, this new proposal

9       seems to be a political solution in search of a

10      problem.

11      CHAIRMAN ROSE: Mr. Grabarz, do you have any

12      instances or indication of anything in the

13      enforcement of the original text that in any way,

14      shape or form indicates a bias or an orientation

15      towards a particular kind of content on the one

16      hand.  Is there anything in these proposed

17      amendments under consideration that you believe is

18      oriented towards gay, lesbian materials as opposed

19      to any other.  I understand your expression of a

20      concern about targeting of enforcement.  Can you

21      give us the basis for that?

22      JOE GRABARZ:  Yes, absolutely.  When laws as broad

23      as this provide the kind of discretion to

0697

**609**

1    enforcement officials that this law provides then

2    the disproportionate bias that existing government

3    functionaries are exercised in a disproportionate

4    way. I think beginning in 1969 with Stonewall and

5    right up to the closing of Twilo?? this past month

6    that discretion by government functionaries

7    operating on behalf of the state of New York and

8    the City of New York and its citizens have been

9    enforced disproportionately.  I think that we see

10   that in profiling that is generally recognized as

11   a problem amongst police officers but also through

12   other....

13   CHAIRMAN ROSE: Let me make clear... I am asking a

14   specific question.  Is anything in the application

15   or enforcement of the regulations as adopted by

16   this commission pursuant to the zoning resolution

17   regarding adult materials, do you have any

18   instances or evidence that would indicate that

19   those regulations have been enforced in any way

20   disproportionately or oriented towards any kind of

21   substance focus.

22   JOE GRABARZ:  I did not come prepared today to

23   name specific adult business that would have

**610**

69

1   fallen under that category or look at exactly why

2   they were considered adult businesses.  However, I

3   can provide some of that for you.  I can provide

4   the fact that reasonably, based on how other

5   discretionary laws have been enforced that it

6   would in fact have a disproportionate impact.

7   Just in the definition of what in is itself

8   specific sexual activities, there is in fact an

9   irrational anatomically hierarchy that

10  disproportionately for example, would affect

11  women, you know an erect nipple on a female versus

12  an erect nipple on a male, section of anal

13  intercourse or the depiction of the buttocks.  I

14  don't find a rational.....

15  CHAIRMAN ROSE: The question, by all means if you

16  do have any evidence or concern that the

17  regulations have been enforced disproportionately

18  we now have several years worth of enforcement

19  history and if you are not prepared to do it

20  today, that's fine.  If you do have any instance

21  or basis for believing that there is any kind of

22  disproportionate either effect or application of

23  these rules please submit that in writing.

0699

**611**

70

1   JOE GRABARZ:  Yes, I certainly will do that as I

2   certainly have no reason to believe that the way

3   these kinds of discretionary rules are

4   disproportionately enforced across the board that

5   there would be any difference in this situation.

6   CHAIRMAN ROSE: Alex Garvin.

7   ALEX GARVIN:  I'd like to follow up slightly

8   different on what the chairman asked.  Is there

9   anything in the clarification of the regulations

10  that are in front of us today that could be

11  unreasonably or disproportionately directed

12  towards any group?

13  JOE GRABARZ: I think by broadening it you give a

14  discretion to the enforcers that begs the exercise

15  of individual bias.

16  ALEX GARVIN:  Thank you.

17  CHAIRMAN ROSE: Thank you very much.  Next speaker

18  is Irving Poy.

19  IRVING POY:  Good morning.  My name is Irving Poy,

20  on behalf of the Queens Borough President.  I

21  thank the Commission for this opportunity to

22  speak.  In 1995, these amendments, the original

23  adult use text were enacted with the support of

0700

**612**

71

1    the Queens Borough Board and the Borough President

2    to separate adult entertainment establishments and

3    the related negative influences away from

4    residences, schools, and houses of worship.  Since

5    1995, and through the attempts to enforce it,

6    there have been court rulings, interpretations and

7    practices that circumvent the intent of these

8    adult use text regulations.  Included in today's

9    proposed text amendment are clarifications on what

10   constitutes an adult use, adult book store, eating

11   and drinking establishment or theater by content

12   or activity.  These amendments will provide the

13   opportunity to enforce these regulations as

14   intended to protect the areas around residences,

15   schools and houses of worship from the negative

16   influences of these uses.  The Queens Borough

17   Board and Borough President support the original

18   adult use regulations enacted in 1995.  Most

19   recently all community boards in Queens that took

20   action voted in favor of them.  On 5/14 the Queens

21   Borough Board voted 1602 to approve these

22   regulations and last Thursday 5/17 the Borough

23   President held a public hearing and a

0701

**613**

1    recommendation of support is on its way to the

2    City Planning Commission.  In closing, on behalf

3    of the Queens Borough Board and Borough President,

4    we urge you to support and approve these test

5    amendments.

6    CHAIRMAN ROSE: Thank you very much. We appreciate

7    your testimony.  Next speaker is Theresa

8    Jefferson.

9    THERESA JEFFERSON:  A transgender, bisexual and

10   HIV affected LGTBH communities'  For over 20 years

11   AVP has provided counseling and advocacy for

12   thousands of victims of bias motivated violence,

13   domestic violence, sexual assault, HIV related

14   violence and police misconduct.  AVP educates the

15   public about violence against or within our

16   communities and works to reform public policies

17   impacting all lesbian, gay, transgender, bisexual

18   and HIV affected people.  AVP provides free and

19   confidential assistance to crime victims through

20   our 24 hour bilingual hotline assuring long-term

21   counseling, support groups and advocacy.  We would

22   like to express our grave concern for any further

23   limitations on adult businesses in New York City

**614**

73

1  that are now under consideration.  In 1995, when

2  the current limitations were proposed and approved

3  AVP stood in strong opposition for a variety of

4  reasons.  These reasons hold true six years later

5  because they are rooted in our core beliefs and in

6  our victim services, human justice and anti-

7  oppression work.  First, we strongly believe that

8  any act that limits free expression is

9  unconstitutional and in and of itself an act of

10  violence.  At AVP we monitor daily hate speech in

11  the larger context of hate activities and crimes

12  and yet we never ask that those words be muted or

13  silenced.  Second, as a public health concern, we

14  are quite aware that adult businesses are also

15  venues in which agencies such as AVP, other LGTB

16  service providers and AIDS service organizations

17  can educate, provide outreach and disseminate

18  life-saving information to often hard to reach

19  members of our community in relative safety.

20  These critical community help activities are

21  particularly crucial as we at AVP continue to

22  fight the ever-growing tide of violence directed

23  at our community and as our sister organizations

**615**

74

1    attempt to address the spiraling HIV sera

2    conversion rates in the city. Further, limiting

3    the number of adult businesses in New York City

4    will in no way mitigate the need for the people

5    who patronize them to be made aware of AVP

6    services and personal  safety issues, but will

7    however certainly make it more difficult for AVP

8    and other organizations to reach them if they are

9    dispersed to more marginal and less safe areas of

10   the city.  But these venues are seen and

11   experienced as safe for the community's outreach

12   workers lies in the face of the rhetoric

13   indicating that adult businesses generate negative

14   secondary effects in the form of crime,

15   prostitution, violence and other vices.  Rhetoric,

16   by the way that has yet to be substantiated.    In

17   fact, the oldest adult businesses serving the LGTB

18   community, those in the West Village, exist at

19   street level, at the base of apartment buildings,

20   alongside coffee shops and dry cleaners.  Their

21   normalcy within the context of commerce in that

22   neighborhood underscores the way in which they are

23   viewed by the community as just another commercial

0704

**616**

1    establishment among other familiar commercial

2    establishments.  Finally, beyond the chilling

3    effect that these new regulations would

4    undoubtedly have on the safety, health and well-

5    being of New York's LGTB community, these changes

6    could clearly have a breathtaking effect on all

7    residents of the city.  For instance, the proposed

8    regulatory changes are so extraordinarily vague

9    they would seem to indicate that any bookstore

10   catering to the gay community, women or otherwise

11   progressive individuals could be shuttered based

12   on the most conservative reading of the new

13   regulations.  A more liberal reading could, in the

14   extreme, result in a Barnes & Nobel with a

15   significant gay women's sexuality and other

16   suspect sections being closed as well.  And

17   further, movie theaters that display cutting edge

18   and/or foreign films under these more vague

19   amendments could be forced to go dark.  These

20   amendments, like the regulations they stem from,

21   are draconian, counterproductive, nonsensical,

22   more than likely unconstitutional and quite

23   unnecessary....

0705

**617**

76

1    CHAIRMAN ROSE: You can slow down, no need to race

2    through your concluding paragraph.

3    THERESA JEFFERSON:  Thanks. .... more than likely

4    unconstitutional and quite unnecessary in a city

5    that is not overrun by adult businesses.  Thank

6    you.

7    CHAIRMAN ROSE: Thank you very much.  We appreciate

8    your testimony.  Is there anybody else wishing to

9    speak who has not yet been heard?  Okay, the

10   record will remain open for 10 days for additional

11   written comments.  The hearing on this matter is

12   now closed.

13

0706

**There are NO Bates Numbered Pages**

**JNR-000639 through JNR-000659**

CITY PLANNING COMMISSION
_____

August 8, 2001/Calendar No. 34                    N 010508 ZRY

_____

**IN THE MATTER OF** an application submitted by the Department of
City Planning, pursuant to Section 201 of the New York City
Charter, for an amendment of the Zoning Resolution of the City of
New York, relating to adult establishments.

_____

This application for an amendment of the New York City Zoning

Resolution was filed by the Department of City Planning on March

22, 2001.  The proposed zoning text changes consist of amendments

to current zoning rules adopted in 1995 for adult establishments.

The principal changes in the proposed amendments relate to the

definitions of an "adult book store" and an "adult eating or

drinking establishment."


BACKGROUND

Nature and Purpose of Proposed Amendments


In 1995, the City Planning Commission and the City Council

adopted comprehensive zoning regulations governing the locations

where "adult establishments" could be maintained or sited in the

future (the "1995 Adult Use Regulations" or the "1995

Regulations"). The 1995 Adult Use Regulations were adopted by the

City Planning Commission on September 18, 1998 (N950384ZRY)in

response to a 1994 Department of City Planning Study (the "DCP

Study") which  concluded that triple-X video and bookstores,

adult live or movie theaters and topless or nude bars have

significant negative secondary impacts on the neighborhoods in which they are located. These impacts include a higher incidence of criminal activity; deterioration in the quality of urban life, by a damaging impact on neighborhood character, children and other residents; and negative impacts on economic development, neighborhood revitalization efforts and property values ( DCP Study at iv-ix, pp.56-65). As a first response to the DCP Study, the City Planning Commission and the City Council in 1994 enacted a one-year moratorium on new adult entertainment establishments in the City . This was followed by the adoption of permanent regulations in 1995.

The 1995 regulations are intended to address those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a "predominant, on-going focus on sexually explicit materials or activities" (CPC Report N950384ZRY, p.49.). In general terms, the 1995 Regulations restrict the permitted locations of such adult establishments by prohibiting them in all residence districts, certain commercial districts and manufacturing districts that permit new residential uses; by requiring that adult establishments be at least 500 feet from such districts; by requiring that each adult establishment in a permitted location be at least 500 feet from another such establishment; and by requiring that adult establishments be at

N 010508 ZRY

2

0710

least 500 feet from certain "sensitive receptors" (schools, day care centers, and houses of worship). The amendments were designed to "minimize the potential for adverse secondary effects throughout the city" and protect those areas and uses "particularly vulnerable to the negative effects of adult uses.)" (CPC Report N950384ZRY, p.42).

Implementation of the 1995 Regulations did not begin until 1998, when the United States Supreme Court declined review of the constitutional issues following the New York State Court of Appeals decision in <u>Stringfellow's of New York, Ltd. v. City of New York,</u> 91 N.Y. 2d 382 (1998). That decision upheld the constitutionality of the 1995 amendments, finding that the amendments were content neutral regulations designed to address the secondary effects of adult uses in New York City, and that there would continue to be reasonable alternative avenues for communication in the form of areas in which adult establishments could remain or to which they could relocate.

Enforcement efforts since 1998 have pointed to a need to adjust the regulations to address attempts by adult establishments to remain in operation through superficial measures which do not alter the character of the establishments as enterprises with a "predominant, on-going focus on sexually explicit materials or activities." In addition, several court rulings have narrowed the scope and application of the 1995 Adult Use Regulations in a

3

N 010508 ZRY

manner which the Department of City Planning believes is contrary to the original intent, thus requiring further amendments.

In adopting the 1995 Adult Use Regulations, the City Planning Commission noted that the Department would report back to the Commission and the City Council on the effect of the Regulations in two years time following the start of enforcement and that the Commission would review at that time whether any modifications are needed.  Part I of this background section sets forth the Department's analysis of the numbers and locations of Adult Establishments as of 2000, as well as trends since 1993.  Part II describes the proposed zoning text amendments.

## I. Status Report on Adult Establishments

### A.  Overall Numbers and Locations

The 1995 Adult Use Regulations govern four types of "adult establishment": adult book stores; adult eating or drinking establishments; adult theaters; and other adult establishments.[1]

---

[1] An "adult book store" is defined as a book store which has a "substantial portion" of its stock-in-trade in printed or visual material characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas," each of which are defined terms under the Zoning Resolution. In determining whether a "substantial portion" of a book store's stock-in-trade consists of such adult printed or visual material, several factors must be considered: (i) the amount of adult printed or visual material accessible to customers as compared to the total stock; (ii) the amount of floor area and cellar space accessible to customers containing adult printed or visual material; and (iii) the amount of floor area and cellar space accessible to customers containing adult printed or visual material as compared to the total floor

N 010508 ZRY

4

0712

A listing of such adult establishments in 2000 has been developed by the Department of City Planning using information prepared by the Department of Buildings and the Mayor's Office of Midtown Enforcement. It includes adult establishments in locations where such uses are permissible as well as adult establishments that operate on a '60/40' basis ('60/40' adult establishments) in locations where adult establishments are prohibited.[2]

---

area and cellar space accessible to customers in the establishment. An "adult eating or drinking establishment" is defined as an eating or drinking establishment which "regularly features" live performances or films, motion pictures, videos or other recorded entertainment, which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas," or has employees who, as part of their employment, regularly expose "specified anatomical parts" to patrons, and which is not customarily open to the general public because it excludes minors by reason of age. An adult theater is defined as theater which "regularly features" such live or recorded performances and which is not customarily open to the general public during such features because it excludes minors by reason of age. An "other adult establishment" is a facility not otherwise described in the regulations which features employees who, as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes minors by reason of age. A commercial establishment which includes an adult book store, adult eating or drinking establishment, adult theater, or other adult establishment qualifies as an "adult establishment" subject to the 1995 Adult Use Regulations where such adult use occupies the entirety or a "substantial portion" of the commercial establishment.

[2]The term "'60/40' adult establishment" as used herein refers to three categories of commercial establishment: (1) book or video stores at locations where adult establishments are prohibited under the 1995 Regulations which have sought to configure themselves so that 40% or less of their stock-in-trade is in adult printed or visual material and 40% or less of their floor area is dedicated to adult printed or visual material, but which have been identified as having one or more of the features described in the proposed amendments to the definition of "substantial portion" under the proposed text amendments (see Part II); (2) eating or drinking establishments at locations where adult establishments are prohibited under the 1995 Regulations which have been identified as regularly featuring live or recorded adult entertainment, but which have sought to configure themselves so that the adult entertainment takes place in a section of the establishment which comprises no more than 40% of the establishment's total floor area; and, (3) theaters at locations where adult establishments are prohibited under the 1995 Regulations which have been identified as regularly featuring live or recorded adult entertainment, but which have sought to configure themselves so that the adult entertainment takes place in a section of the

5

There were 136 adult establishments in 2000, with 101 or 74%, consisting of '60/40' establishments. The breakdown by type of establishment is as follows: Book stores - 35 (with 29 operating as '60/40' establishments); Eating or drinking - 57 (with 36 operating as '60/40' establishments); and Theaters - 44 (with 36 operating as '60/40' establishments). The breakdown of the number of establishments by borough is as follows: Bronx - 9 (with 6 operating as '60/40' establishments); Brooklyn - 13 (with 9 operating as '60/40' establishments); Manhattan - 69 (with 56 operating as '60/40' establishments); Queens - 41 (with 29 operating as '60/40' establishments); and Staten Island - 4 (with 1 operating as a '60/40' establishment).

B. Trends

Citywide Trends: 1993 to 2000: The 1994 DCP Study identified 177 adult establishments in New York City as of 1993. As indicated above, in 2000, there were 136 adult establishments, which represents a 23 percent decline over the seven year period. Factors apart from enforcement of the Zoning Resolution which likely contributed to this decline include redevelopment of Times Square and a strong local economy in which landlords have a

---

establishment which comprises no more than 40% of the establishment's total floor area. The interior configurations and method of operation of these establishments are, however, subject to change. Accordingly, the numbers and locations of adult establishments as of any given date may vary from the information presented here.

---

N 010508 ZRY

0714

choice of tenants other than adult establishments. The number of adult establishments may also be affected by the increased availability of adult material on cable television, and the burgeoning phenomenon of access through the internet.

Trends by Borough from 1993 to 2000: The greatest decline in adult establishments between 1993 and 2000 was in Manhattan, from 107 to 69. In 1993, 60% of the City's adult uses were in that borough; in 2000, 51% were so located. The number of adult establishments declined by three in Queens, although 29 of 41 current establishments (71%) are operating as '60/40' establishments. The number of adult establishments declined by two in Brooklyn, although 9 of 13 current establishments (69%) are operating as '60/40' establishments. The Bronx and Staten Island each experienced an increase of one establishment, with 6 of 9 current establishments (67%) in the Bronx and 1 of 4 current establishments (25%) in Staten Island operating as '60/40' establishments.

Trends in Concentrations by Community District: As in 1993, the greatest concentration of adult uses in 2000 was found in Community District 5, which includes part of the Times Square area. In 1993, 53 or 30% of the City's adult uses were located there; in 2000, the number had declined to 29 establishments, or 21% of the Citywide total. Thirteen adult establishments closed on West 42nd Street between 7th and 8th Avenues. Of the 29 current

7

establishments, 19 operate as '60/40' establishments.

Community District 4, Manhattan, which also includes part of the Times Square area, continues to have the second greatest concentration of adult establishments.   In 1993, 19 establishments (11% of the citywide total) were located in the district.   In 2000, there were 16 adult establishments in the district, 12% of the citywide total. Of the current 16 establishments, 14 operate as '60/40' establishments.

Community District 2, Manhattan, had 11 adult establishments in both 1993 and 2000, and continues to have the third greatest concentration of adult establishments  citywide. Of the current 11 establishments, 10 operate as '60/40' establishments.

Outside Manhattan, concentrations that had developed as of 1993 remained in 2000.   Community District 7, Brooklyn, had 7 adult establishments concentrated in Sunset Park west of Third Avenue in 1993 and in 2000, with 4 operating as '60/40' establishments. Along the Queens Boulevard corridor there were 11 adult establishments in 1993; as  of 2000, there were 14 in the section straddling Districts 2 and 6, with 10 operating as '60/40' establishments.

<u>Trends within Categories of Adult Uses</u>: Comparisons of the relative distribution of types of adult uses between 1993 and

N 010508 ZRY

8

0716

2000 are difficult to make. The survey performed by the Department of City Planning in 1993 as part of the DCP Study relied on self-identification to categorize adult uses as book stores/videostores, theaters or eating or drinking establishments; in addition, many establishments identified as book stores in the survey included peep booths that would render them classified as adult theaters or as combination adult video stores/theaters under the 1995 Adult Use Regulations. According to the 1993 data, there were 86 adult bookstores, 68 adult eating or drinking establishments, and 23 adult theaters. In 1993, bookstores represented 49%, eating or drinking establishments 38%, and theaters 13%, of all adult uses. In 2000, there were 35 adult book stores, 57 adult eating or drinking establishments and 44 adult theaters. Book stores comprised 26%, eating or drinking establishments 42%, and theaters 32% of all adult establishments in 2000. Note, however, that utilization of the 1993 classification methodology would tend to show a larger number of book stores and smaller number of theaters.

Trends in Number of Adult Establishments at Permissible Locations: In 1995, at the time of adoption of the Adult Use Regulations, it was estimated that 29 of the 177 adult establishments identified in the 1993 survey which formed part of the DCP Study could remain in their current locations following adoption of the Regulations. As of 2000, there were 35 adult establishments at permissible locations. Nine of these existed

9

N 010508 ZRY

in 1993, and 26 were established during or after 1998, following implementation of the 1995 Adult Use Regulations. Of the 26 new establishments at permissible locations, 3 are in the Bronx, 1 is in Brooklyn, 9 are in Manhattan, 12 are in Queens and 1 is in Staten Island.

Trends in Number of '60/40' Adult Establishments:  Since 1998, when implementation of the 1995 Adult Use Regulations began, approximately 26 new adult establishments have opened which operate as '60/40' establishments at prohibited locations. Of these, 3 are in the Bronx, 4 are in Brooklyn, 14 are in Manhattan,  4 are in Queens, and 1 is on Staten Island. One such establishment goes by the name of "Sixty/Forty Video."

Of the 101 adult establishments operating as '60/40' establishments in 2000, 60 had been identified as adult establishments in the 1993 DCP survey.

Trends in location within zoning districts

In 1993, of the 177 adult establishments identified in the DCP survey, approximately 31% (18) were located in C1 and C2 Districts.   Ten uses, or 6%, were located in C4 Districts. Approximately 40% (70 businesses) of adult establishments were located in C5 and C6 (central commercial) Districts.   Forty-five adult establishments, or  about 25% of the total number, were

N 010508 ZRY

10

0718

located in C8 and manufacturing districts.

Of the 136 establishments in 2000, approximately 15 % (21 businesses) are located in C1 and C2 districts. Approximately 3% (4 businesses) are located in C4 districts, 33% (45 businesses) are located in C5 and C6 districts, and 41 % (56 businesses) in C8 and in M1, M2 and M3 districts.  Twenty-four percent of adult establishments (32 establishments) are located in high commercial density, centrally located general commercial districts (C6-4 through C6-9).  Ten percent (13 establishments) are located in residence districts.

## Part II.   The Proposed Amendments

The proposed amendments to the Zoning Resolution (ZR) are as follows:

ZR §12-10: Adult bookstores: The definition of an "adult book store" would be amended to clarify the circumstances under which a "substantial portion" of the stock-in-trade of a book store consists of adult printed or visual material. Under the proposed text, printed or visual material which does not consist of adult printed or visual material ("other printed or visual material") would not be considered stock-in-trade for purposes of the definition of "substantial portion" where the book store has one or more of the following features:

---

JNR-000670

0719

a.   The absence of separate sections of the store with stock-in-trade of any "adult printed or visual material" and stock-in-trade of "other printed or visual material," or the presence of any "adult printed or visual material" in a section of the store otherwise consisting primarily of "other printed or visual material."

b. An absence of any fixed, permanent and complete visual partition between a section of the store with "adult printed or visual material" and a section of the store with "other printed or visual material";

c. An interior configuration and lay-out which requires customers to pass through a section of the store with "adult printed or visual material" in order to access a section of the store with "other printed or visual material";

d. One or more individual enclosures where adult movies or live performances are available for viewing by customers;

e. A method of operation which requires customer transactions with respect to "other printed or visual material" to be made in a section of the store which includes "adult printed or visual material";

f. A method of operation under which "other printed or visual

material" is offered to customers on a substantially more limited basis than "adult printed or visual material," such as the offering of "other printed or visual material" for sale only and the offering of "adult printed or visual material" for sale or rental;

g. A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";

h. A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";

i. A sign that advertises the availability of "adult printed or visual material" which is disproportionately large relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

j. A window display in which the number of products or area of display of "adult printed or visual material" is disproportionately high relative to the number of products or

13

N 010508 ZRY

0721

area of display of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

k. Other features, as set forth in rules adopted by the commissioner of buildings, which render the sale or rental of "adult printed or visual material" a substantial purpose of the business conducted in such store.

The proposed text also reorganizes and reorders existing language. The definition of "adult printed or visual material" is also clarified to include product packaging or wrapping that depicts "specified sexual activities" or "specified anatomical areas".

ZR §12-10 Adult Eating or Drinking Establishments: Under the proposed text, an adult eating or drinking establishment is defined as "an eating or drinking establishment" which "regularly features" "in any portion of such establishment" live or recorded performances characterized by an emphasis upon the depiction of "specified sexual activities" or "specified anatomical areas". An "eating or drinking establishment" is defined to include: (i) any portion of a commercial establishment within which food or beverages are offered for purchase, or are available to or are

N 010508 ZRY

14

0722

consumed by customers or patrons, and (ii) any portion of a commercial establishment from which a portion of a commercial establishment described in (i) above is accessible by customers or patrons.

The proposed text also modifies the definition of an adult eating or drinking establishment to provide that such an establishment is not customarily open to the general public during live or recorded adult entertainment either because it "excludes or restricts minors." The current text applies where the establishment "excludes minors by reason of age".

ZR §12-10 Adult Theaters: The current text provides that an adult theater includes a commercial establishment where live or recorded sexually-oriented entertainment is viewed from individual enclosures. The proposed text clarifies that an adult theater exists where there are "one or more" such individual enclosures. The proposed text also eliminates language interpreted by the courts as requiring application of a "substantial portion" test to the amount of floor area dedicated to adult entertainment in order to determine whether the theater is an "adult theater."

ZR §12-10 "Mixed Use" Establishments: The current text provides that an "adult establishment" is a "commercial establishment where a substantial portion of the establishment includes an

N 010508 ZRY

15

0723

adult book store, adult eating or drinking establishment, adult
theater, or other adult commercial establishment, or any
combination thereof..." The proposed text clarifies that an
"adult establishment" is a commercial establishment "which is or
includes an adult book store, adult eating or drinking
establishment, adult theater, or other adult commercial
establishment, or any combination thereof..."

ZR §32-01 Special Provisions for Adult Establishments: The
current text of ZR §32-01(b) provides that in C6-4, C6-5, C6-6,
C6-7, C6-8, C6-9, C-7 or C-8 Districts, adult establishments
shall be located at least 500 feet from, among others, "a
Manufacturing District, other than an M1-6M District, in which
new #residences#, new #joint living-work quarters for artists# or
new #loft dwellings# are allowed, under the provisions of the
Zoning Resolution, as-of right or by special permit or
authorization." The proposed text clarifies that the 500 foot
buffer provision applies under this circumstance regardless of
whether the provisions or findings of such a special permit or
authorization require an assessment of the impact of new
residences, new joint living-work quarters for artists or new
loft dwellings on commercial or manufacturing uses within the
Manufacturing District.

The current text of §32-01(c) provides that in C6-4, C6-5, C6-6,
C6-7, C6-8, C6-9, C7 or C8 districts, adult establishments shall

be located at least 500 feet from another adult establishment, but does not set forth a definition of when an adult establishment is considered located and in existence for purposes of this provision. The proposed text provides that an adult establishment shall be "established" upon the date of a permit issued by the Department of Buildings or, in the case of an adult establishment lawfully established prior to the effective date of the proposed text, as determined by the Department of Buildings. The establishment of an adult establishment through permit issuance is subject to such rules as the Department of Buildings shall prescribe regarding the failure to perform authorized work or to operate under a permit and discontinuance of use.

ZR §42-01 Special Provisions for Adult Establishments: The current text of §42-01(a) provides that adult establishments are not permitted in a Manufacturing Districts in which "#residences#, #joint living-work quarters for artists# or #loft dwellings# are, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization." The proposed text clarifies that this provision applies regardless of whether the provisions or findings of such a special permit or authorization require an assessment of the impact of new residences, new joint living-work quarters for artists or new loft dwellings on commercial or manufacturing uses within the Manufacturing District.

JNR-000676

The current text of §42-01(b) provides that in Manufacturing
Districts in which adult establishments are permitted (i.e, a
district which is not a Manufacturing District in which
residences, joint living-work quarters for artists or loft
dwellings are allowed as-of-right or by special permit or
authorization), adult establishments shall be located at least
500 feet from, among others, "a Manufacturing District, other
than an M1-6M District, in which new #residences#, new #joint
living-work quarters for artists# or new #loft dwellings# are
allowed, under the provisions of the Zoning Resolution , as-of-
right or by special permit or authorization." The proposed text
clarifies that this provision applies regardless of whether the
provisions or findings of such a special permit or authorization
require an assessment of the impact of new residences, new joint
living-work quarters for artists or new loft dwellings on
commercial or manufacturing uses within the Manufacturing
District.

The current text of §42-01(c) provides that in Manufacturing
Districts in which adult establishments are permitted (i.e., a
district which is not a Manufacturing District in which
residences, joint living-work quarters for artists or loft
dwellings are allowed as-of-right or by special permit or
authorization), such adult establishments shall be located at
least 500 feet from another adult establishment. The proposed
text provides that an adult establishment shall be established

upon the date of a permit issued by the Department of Buildings, therefor or, in the case of an adult establishment lawfully established prior to the effective date of the proposed text, as determined by the Department of Buildings. The establishment of an adult establishment through permit issuance is subject to such rules as the Department of Buildings shall prescribe regarding the failure to perform authorized work or to operate under a permit and the discontinuance of the use.

## ENVIRONMENTAL REVIEW

This application (N 010508 ZRY) was reviewed pursuant to the New York State Environmental Quality Review Act (SEQRA), and the SEQRA regulations set forth in Volume 6 of the New York Code of Rules and Regulations, Section 617.00 et seq. and the City Environmental Quality Review (CEQR) Rules of Procedure of 1991 and Executive Order No. 91 of 1977.  The designated CEQR number is 01DCP054Y.  The lead agency is the City Planning Commission.

After a study of the potential environmental impact of the proposed action, a negative declaration was issued on March 26, 2001.

## PUBLIC REVIEW

On March 26, 2001, this text change was duly referred to the

N 010508 ZRY

19

0727

community boards, borough boards and borough presidents for information and review in accordance with the procedure for referring non-ULURP matters.

## Community Board Review

On April 26, 2001, Community Board 12, the Bronx, voted unanimously recommending approval of the proposal.

On May 8, 2001, Community Board 1, Brooklyn, voted 35-0-0 in favor of the proposal.

On May 16, 2001, Community Board 7, Brooklyn, voted 32-0-0 in favor of the proposal.  It recommended removal of all adult establishments in the community, and more restrictive regulations for adult establishments.

On May 21, 2001, Community Board 10, Brooklyn, voted unanimously in support of the proposal.

On April 17, 2001, Community Board 1, Manhattan, voted 28-4-3 in favor of the proposed text change.

On April 19, 2001, Community Board 2, Manhattan, voted 21-14 in favor of the proposal, and also recommended that language be added to the text so that the 500 foot buffer would be measured

---

N 010508 ZRY

radially from all points along the lot line.

At its May, 2001, monthly meeting, Community Board 3, Manhattan, recommended disapproval of the application, citing speech concerns.

On May 2, 2001, Community Board 4, Manhattan, voted 42-0-1, recommending disapproval of the proposal, stating that further protections from adult establishments are unneeded.

On May 10, 2001, Community Board 5, Manhattan, voted 27-0-1, recommending disapproval of the proposed zoning text change, stating that the proposal is unneeded and overbroad, and would allow arbitrary and capricious enforcement against a wide variety of businesses.

In May, 2001, Community Board 6, Manhattan, voted 37-2-0, recommending disapproval of the application, citing enforcement concerns.

On May 1, 2001, Community Board 7, Manhattan, voted 25-7-7, recommending disapproval of the proposal.  The Board stated that the regulations and proposal are unwarranted and unenforceable intrusions on constitutional rights.

On May 16, 2001, Community Board 8, Manhattan, voted 18-16-0, in

N 010508 ZRY

0729

favor of the proposed zoning text change.

On May 15, 2001, Community Board 1, Queens, voted 26-0-3, recommending approval of the application.

On May 3, 2001, Community Board 2, Queens, voted 28-0-0 in favor of the proposal.

On May 1, 2001, Community Board 4, Queens, voted unanimously recommending approval of the application.

On May 9, 2001, Community Board 5, Queens, voted in favor of the proposal.

On April 25, 2001, Community Board 6, Queens, voted unanimously to approve the proposed zoning text change.

On May 8, 2001, Community Board 9, Queens, voted unanimously recommending approval of the application.

On May 7, 2001, Community Board 11, Queens, voted 27-1 in favor of the proposed zoning text change.

On April 24, 2001, Community Board 3, Staten Island, voted 21-5-1 in opposition to adding language to the text affirming that adult establishments are not permitted in or within 500 feet of

N 010508 ZRY

22

Manufacturing Districts such as Area 'M' of the Special South Richmond Special District, stating that it would allow more residential development in the area.

## Borough Board Review

On May 15, 2001, the Brooklyn Borough Board voted 23-0-0 in favor of the application. The Board called upon the Department of City Planning to study the effects of illuminated signs at establishments advertising adult content, material or entertainment to determine the appropriateness of existing sign regulations, and for the Department of Buildings to provide inspection reports on adult establishments.

On May 17, 2001, the Manhattan Borough Board voted 6-3-6 to recommend disapproval of the application.

On May 14, 2001, the Queens Borough Board voted 16-0-2 to recommend approval of the application.

## Borough President Review

On May 21, 2001, The Manhattan Borough President recommended disapproval of the application. The Borough President stated that few, if any, secondary effects have been observed and that affected communities feel no need for further protection.

N 010508 ZRY

23

0731

Additionally, she noted the First Amendment concerns expressed by several community boards and that additional enforcement would be required of an overburdened staff in the Department of Buildings.

On May 29, 2001, the Queens Borough President recommended approval of the proposed zoning text change.

**CITY PLANNING PUBLIC HEARING**

On May 7, 2001, (Calendar No.1), the City Planning Commission scheduled May 23, 2001, for a public hearing on this application (N 010508 ZRY).  The hearing was duly held on May 23, 2001 (Calendar No.10).  There were 18 speakers, 5 in favor of the application and 13 in opposition.

Speakers in support of the proposal stated that the operators of adult establishments have taken advantage of loopholes and erroneous judicial interpretations of the 1995 Regulations in order to remain in place or locate new adult establishments in areas where such businesses were intended to be prohibited.  The Brooklyn Borough President stated that "...the intent of those (1995 zoning) regulations was undermined by court challenges by the owners of adult establishments and judicial interpretation of what defines an adult operation."  He further noted that the number of adult establishments in Brooklyn increased from 15 in 1995 to 24 at present, concentrating "...in Sunset Park, causing

JNR-000683

0732

blight in that community."  A representative of Community Board 7, Brooklyn, which encompasses Sunset Park, stated in support of the proposal that eight or nine of the adult establishments located in that community are "60/40" establishments.

The representative of the Queens Borough President stated that court interpretations have allowed adult establishments that were to close or relocate under the 1995 zoning regulations to remain near residential areas and schools.  The representative stated that the proposed text is needed to allow enforcement of the zoning as intended.

A representative of Community Board No. 2 in Manhattan spoke in favor of the amendments, while recommending that changes be made to the methods utilized by the Department of Buildings for measuring the 500 foot buffer zone.

Those speaking in opposition stated that the proposal was unsupported by the record, unnecessary and unwarranted, overly broad in its reach, raised due process concerns and issues of bias in enforcement, and was unfair to establishments which have made financial expenditures in reliance on the current regulations.

Several speakers testified that the City cannot adopt the amendments without first conducting a study demonstrating that

N 010508 ZRY

25

0733

'60/40' establishments with adult materials or entertainment have negative secondary effects.  A speaker representing members of the Coalition For Free Expression stated that, in adopting the '60/40' test, the City acknowledged "that if an establishment reduced its adult entertainment to less than 40%, then any potential adverse secondary effects would be eliminated," and stated that in enforcement litigation the courts had repeatedly concluded that '60/40' establishments "did not create a risk to the health, safety and welfare of the community".  When the speaker was asked by the Commission to point to any particular nuisance abatement proceeding or similar action in which such findings had been made, he was unable to do so.

Several speakers testified that the proposed zoning text change vests too much discretionary power in the hands of the Commissioner of Buildings, inviting content-based censorship. One speaker representing the New York Civil Liberties Union stated that language used in defining adult establishments, e.g., "characterized by an emphasis," fails to specify adequate standards for identifying what an adult establishment is, thereby "sweep(ing) within their ambit locations as diverse as Internet cafes and the New York Public Library."  She stated that the proposed features in Section 12-10 (2) (d) (aa-kk) fail constitutional scrutiny because "they direct the building inspectors to draw an irrebuttable presumption that a commercial establishment is an 'adult' commercial establishment" merely

N 010508 ZRY                                                          26

0734

because they contain the proposed features.  By example, the
representative stated that Tower Video on the Upper West Side
does not separate by partitions adult videos from others,
conferring on Tower Video "adult" status without an "opportunity
to rebut the presumption created by the amendments."

Another speaker, representing a lesbian and gay community center,
said that the proposal could apply to any establishment with
adult material.  A different speaker observed that much gay
literature is "characterized by an emphasis on sexual activity,"
while another stated that the regulations "would seem to indicate
that any bookstore catering to the gay community, women or
otherwise progressive individuals could be shuttered based on the
most conservative reading of the new regulations."  The director
of a gay and lesbian advocacy organization stated that the
proposal would allow biases to be introduced into enforcement
which would more likely be directed at the homosexual community.
The Commission asked the director to highlight any language in
the Zoning Resolution which evidences bias, and to identify any
instances of what he believed to have been discriminatory
enforcement of the 1995 Regulations by the City.  The speaker
responded that by broadening the regulations, the amendments
would create opportunities for the exercise of bias.

Several speakers noted that commercial establishments with adult
materials or entertainment have made financial expenditures to

comply with the '60/40' test.  An attorney for one eating or drinking establishment with adult entertainment informed the Commission that his client spent in excess of $90,000, while another stated his client spent more than $150,000 including legal fees.  Others stated that their costs to comply with the rule ranged from $35,000 to $400,000 plus additional promotional, marketing and operating costs.  One speaker noted that viewing booths cost six to ten thousand dollars, and argued that time must be given to recoup those investments.  Several of these individuals further stated that any new restrictions must be the subject of a reasonable moratorium or amortization period to be fair and avoid an impermissible  governmental taking without just compensation.

Some speakers, including representatives of the New York Civil Liberties Union and a state senator, suggested consideration of restricting signs or window displays as alternative measures to control the impacts that may stem from adult establishments.  At the same time, the representative of the New York Civil Liberties Union acknowledged that the City's ability to restrict the expressive features of adult signage is limited.

There were no other speakers and the hearing was closed.


**CONSIDERATION**

The Commission believes that the proposed changes to the Zoning Resolution, as modified herein, are appropriate.

The Commission notes at the outset that the proposed amendments are limited in nature and do not alter the basic provisions of the 1995 Adult Use Regulations which: restrict the permitted locations of adult establishments by prohibiting them in all residence districts, certain commercial districts and manufacturing districts that permit new residential uses; require that adult establishments be at least 500 feet from such districts; require that each adult establishment in a permitted location be at least 500 feet from another such location; and require that adult establishments be at least 500 feet from schools, day care centers and houses of worship. Instead, the principal purpose of the amendments is to clarify certain definitions in the text, in order to effectuate the Commission's original intent in response to efforts by the operators of adult establishments to undermine implementation of the 1995 Regulations.

The 1995 Adult Use Regulations were adopted in response to the 1994 DCP Study, which concluded that triple-X video and bookstores, adult live or movie theaters and topless or nude bars have significant negative secondary impacts in New York City. The 1995 Regulations adopted by the Commission in response to the Study are designed to "minimize the potential for adverse

N 010508 ZRY

29

0737

secondary effects throughout the city" and protect those areas
and uses "particularly vulnerable to the negative effects of
adult use..." (CPC Report N950384ZRY, p. 42).

In adopting the 1995 Regulations, the Commission sought to
address those establishments similar in nature to the types of
enterprises described and studied in the DCP Study, "namely book
and video stores, theaters, eating or drinking establishments and
other commercial enterprises with a predominant, on-going focus
on sexually explicit materials or activities" (CPC Report
N950384ZRY, p. 49).  In order to give substance to the DCP Study,
the Commission was charged with the difficult task of defining in
the language of the Zoning Resolution what constitutes an "adult
bookstore", "adult eating or drinking establishment", an "adult
theater" and an "other adult establishment".

In doing so, the Commission recognized that, in the case of book
and video stores, the sale of a small amount of adult materials
at neighborhood or general interest book or video stores did not
render these establishments the type of establishment analyzed in
the DCP Study.  The Commission was likewise concerned that, in
drawing the distinction between adult and non-adult book and
video stores, enforcement officials be able to do so in an
objective, non-biased manner.  The result was to define an adult
book or video store according to whether a "substantial portion"
of its stock and floor area are devoted to adult material.  The

Commission stated that as a "general guideline", an establishment would need to have at least 40 percent of its accessible stock and floor area dedicated to adult material in order to make it similar to the establishments studied in the DCP Study; this general guideline evolved into the so-called '60/40' standard embodied in Department of Buildings enforcement guidelines.

In defining an "adult eating or drinking establishment", the relevant considerations were different. An "adult eating or drinking" establishment was defined simply as an "eating or drinking establishment" that "regularly features" adult entertainment. Under this definition, the analysis does not require a comparison of how floor area is utilized within the establishment. That comparison was only made relevant for "adult bookstores", because book and video stores were a type of use recognized by the Commission as sometimes having a mixed presentation of adult and non-adult materials. Adoption of the "substantial portion" floor area test to determine the existence of an adult bookstore was thus considered important to avoid forcing small neighborhood video or bookstores with only a small amount of adult material to close or move. By contrast, the DCP Study did not identify the existence of neighborhood bars or restaurants with only 'incidental' topless or nude entertainment. There was and is no basis to conclude that the negative secondary effects of adult establishments are any less present where topless or nude dancers frequent only part of the customer-

31

N 010508 ZRY

0739

accessible floor space in an eating or drinking establishment.
The amount of floor area dedicated to adult entertainment is also
immaterial to the determination whether a theater is an "adult
theater".

Enforcement efforts and the results of litigation since 1998 have
demonstrated a need to amend these definitions and other aspects
of the regulations.  In the case of book and video stores, it has
become abundantly clear that a definition which emphasizes the
relative amounts of adult and non-adult books or videos and a
comparison of the amount of floor area devoted to each type of
material is, alone, an insufficient measure of whether a book or
video store has a "predominant on-going focus" on sexually
explicit materials.  This is because, in response to enforcement
efforts, adult establishment owners have engaged in superficial
compliance with the regulations by increasing the amount of non-
adult books or videos sold at the premises and the amount of
floor area dedicated thereto, without any reasonable expectation
that the non-adult materials would attract customers.  This has
often been accomplished by buying carton-fulls of old
instructional videos, kung-fu or karate films, cartoons and the
like, which are inexpensive to purchase in bulk.  Often, dozens
of the same title are offered, another economizing measure which
nevertheless assists in achieving a mathematical compliance.  The
cartons have sometimes been left opened on the floor of the
bookstore, and in other cases the non-adult titles are simply

0740

stacked haphazardly on shelves without any attempt at organization or categorization. A frequent observation of inspectors has been that the non-adult titles are there to gather dust.

At the same time, these establishments continue to have a physical lay-out or methods of operation which reflect a predominant focus on the sale of adult materials. Features of such establishments include, for example: the presence of peep booths featuring adult material; a method of operation which requires customer transactions with respect to non-adult material to be made in a section of the store which includes adult material; an interior configuration and lay-out which requires customers to pass through the adult section in order to reach a non-adult section; and a greater number of different titles of adult material than non-adult material. The presence of one or more of these and other factors enumerated in the proposed amendments to the definition of "adult book store" under ZR 12-10 makes these book or video stores distinct from the "general interest" book or video store that was not intended to be the subject of the 1995 Adult Use Regulations.

The courts have recognized that what they have termed a "mechanical" or "Pavlovian" approach to compliance "does not comport with the history or spirit of the Zoning Resolution and, in fact, makes a mockery of the legislation." The efforts at

N 010508 ZRY

33

0741

facial compliance by adult establishment owners have been described as "sham" and as "superficial measures leaving the essentially non-conforming nature of [the] business intact." Nonetheless, the courts have recognized that the current Zoning Resolution constrains them to consider stock-in-trade and floor area as the "singular factor[s]" in measuring compliance, and have questioned the ability of the Department of Buildings to take other features of the establishments into consideration pursuant to administrative guidelines. The proposed amendments establish objective factors, relating principally to physical lay-out and method of operation, by which a bookstore which has achieved only a facial or superficial compliance with the "substantial portion" test would be considered an "adult book store".

At the public hearing, representatives of the adult entertainment industry and others argued that the Commission cannot modify the definition of "adult book store" (or, for that matter, the definitions of "adult eating or drinking establishment" and "adult theater") and that it must conduct a new study to demonstrate that establishments operating on a '60/40' basis have secondary impacts before any changes may be made. The Coalition For Free Expression has further argued that the courts have in fact made affirmative findings that establishments reconfigured to operate on a '60/40' basis do not have secondary adverse impacts.

N 010508 ZRY

34

0742

The Commission rejects the notion that it is powerless to respond to pervasive efforts by the operators of adult establishments to subvert the intent of the 1995 regulations.  It is absurd to suggest that, in adopting the "substantial portion" definition of "adult book store", the Commission validated superficial and sham compliance undertaken without any intent of making the non-adult aspect of the business a truly functioning part of the operation. Nothing in the Commission's consideration of the 1995 Regulations suggests, for example, that an adult video store which buys carton-fulls of cheap non-adult videos which are left open on the floor thereby becomes non-adult.  Nor, as the representative of the Coalition For Free Expression acknowledged at the public hearing, has there ever been finding of fact in any judicial or other enforcement proceeding that adverse secondary impacts are curtailed through these kinds of superficial measures.  To the contrary, the courts have repeatedly acknowledged the "sham" quality of such efforts.

In the case of "adult eating or drinking establishments",  court rulings have mistakenly applied an analysis under which, once it is found that an eating and drinking establishment "regularly features" adult entertainment, it must then be determined whether a "substantial portion" of the floor area of the establishment is dedicated to that adult entertainment.  If, under this test, the amount of floor area dedicated to adult entertainment is 40% or less, the eating or drinking establishment is not an "adult

N 010508 ZRY

JNR-000694

0743

establishment".[3]  This approach has led to the artificial
separation of adult eating or drinking establishments into
purportedly "adult" and "non-adult" sections.  The courts have
repeatedly recognized the absurdity of this result, one court
stating, with respect to a so-called '60/40' eating or drinking
establishment:

> There is still no conceivable reason why anyone
> uninterested in topless dancing would choose
> defendants' club over the many other nightclubs, bars
> and restaurants... Defendant's establishment is still
> clearly an integrated adult enterprise and of the type
> that was intended, under ZR 12-10, to be removed from

---

[3]The court rulings proceed from a misunderstanding of the
relevant tests under the regulations. The 1995 Regulations
require a two-step analysis to decide whether an eating or
drinking establishment is an "adult establishment": First, an
"eating or drinking establishment" qualifies as an "adult eating
or drinking establishment" where it "regularly features" adult
entertainment.  This determination is based solely on whether
live or recorded entertainment characterized by the depiction or
description of "specified sexual activities" or "specified
anatomical areas" are "regularly featured" in the eating or
drinking establishment; Second, a determination is made whether
the adult "use", i.e., the adult eating or drinking
establishment, occupies a "substantial portion" of the entire
"commercial establishment", rendering it an "adult
establishment". In virtually all cases, the adult eating or
drinking establishment occupies the entire establishment and the
"substantial portion" test is clearly met.  This result was
clearly contemplated by the Commission, which recognized that, in
most if not all instances, the adult "use" would be the only one
at the premises.  (CPC Report at 6, stating that the proposed
adult use amendments would define "adult establishments and four
types of facilities- adult book stores, adult eating or drinking
establishments, adult theaters, and other adult commercial
establishments - which alone or in combination would constitute
an adult establishment.") The courts have collapsed this two-step
analysis into one, requiring examination of whether a
"substantial portion" of the floor area of the eating or drinking
establishment is dedicated to adult entertainment.

---

0744

residential city areas...

Due to the judicial interpretation of how the "substantial portion" test applies to these establishments, the result has nonetheless been that such '60/40' eating or drinking establishments have continued in operation.

The concept that only the specific area where adult entertainment is offered in an "eating or drinking establishment" constitutes the "adult eating or drinking establishment" is plainly inconsistent with the intent of the 1995 Adult Use Regulations. Under the proposed amendments, the definition of "adult eating or drinking establishment" would be modified to provide that such an establishment is an "eating or drinking establishment" which regularly features adult live performances or films in "any portion of the establishment," thereby affirming the intent of the 1995 Adult Use Regulations that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing.

The definition of an "adult theater" would similarly be modified to clarify that a commercial establishment with one or more peep booths or similar enclosures featuring adult material qualifies as an "adult theater".

Other features of the amendments include the following:

N 010508 ZRY

37

1.   "Mixed Use" Establishments: The current text provides that
an "adult establishment" is a "commercial establishment where a
substantial portion of the establishment includes an adult book
store, adult eating or drinking establishment, adult theater, or
other adult commercial establishment, or any combination
thereof..."  This language anticipated the possibility of a bona
fide "mixed use" establishment consisting of both an adult and a
non-adult use, although no such uses were identified in the DCP
study.  Since adoption of the 1995 Adult Use Regulations,
operators of adult establishments have sometimes claimed "mixed
use" status through the artificial separation of an adult
establishment into multiple components, e.g., a topless bar and
"cigar lounge."  The inspection and enforcement history
demonstrate, however, that these so-called "mixed use"
establishments function as integrated adult establishments.  The
proposed text, therefore, provides that an "adult establishment"
is a commercial establishment "which is or includes an adult book
store, adult eating or drinking establishment, adult theater, or
other adult commercial establishment, or any combination
thereof..."

2. Location Regulations and Buffer Zone Provisions for 'Mixed
Use' Manufacturing Districts: The 1995 Regulations provide that
adult establishments are not permitted in Manufacturing Districts
in which residences, joint living-work quarters for artists or
loft dwelling are allowed as-of-right or by special permit or

---

N 010508 ZRY

38

0746

authorization. The Regulations also provide that adult establishments shall be located at least 500 feet from such Manufacturing Districts, other than an M1-6M district. Notwithstanding the clear language of the Zoning Resolution, the courts have held that adult establishments are permitted in one such district ( Area 'M' of the Special South Richmond Development District), since a residential use is only allowed in Area M if a finding is made that such use would not have an adverse effect on existing commercial or manufacturing uses (see ZR Sec. 107-69). Reasoning that authorizing a residential use in Area 'M' would necessarily have such an effect, since a pre-existing adult establishment would thereby become subject to the one-year amortization period and be forced to close thereafter, the courts concluded that the City Planning Commission could not make the finding, with the topsy-turvy result that residential uses are not allowed in Area 'M' and adult establishments are.

The proposed text affirms the original intent of the 1995 Adult Use Regulations that adult establishments are not permitted in Manufacturing Districts such as Area 'M' and that adult establishments must be located at least 500 feet of such districts, by providing that the relevant provisions of the Zoning Resolution apply regardless of whether the provisions or findings of a special permit or authorization require an assessment of the impact of a new residential use on commercial or manufacturing uses within the district. The Commission notes

N 010508 ZRY

39

0747

that Community Board 3 in Staten Island has opposed this change,
on the basis that it would facilitate residential development in
Area M.   The Commission believes that the existing regulations
provide an appropriate framework for the authorization of
residential use in Area M, and that the results of adult use
litigation should not be used to thwart their clear intent.

3.   <u>Priority Rights</u> - The 1995 Adult Use Regulations provide
that, in districts in which adult establishments are permitted,
an adult establishment shall be located at least 500 feet from
another adult establishment. The 1995 Regulations utilize but do
not define the terms "located" and "existed," raising
interpretive problems where there is a conflict as to priority
between two competing establishments. In one situation , the
Department of Buildings was required to render a determination
concerning the priority claims of an adult bookstore located
within 500 feet of an adult eating or drinking establishment .
The adult eating or drinking establishment secured a building
permit prior to the opening of the adult bookstore, but did not
itself open for business until after the bookstore had opened.
The Department of Buildings determined that the eating or
drinking establishment had priority for purposes of the 500 foot
rule, looking to the doctrine of vested rights under zoning,
pursuant to which the eating and drinking establishment had the
right to initiate and continue to establish the use upon receipt
of the building permit. The court determined otherwise, finding

JNR-000699

0748

that the word "existing" as used in the Zoning Resolution and Department of Buildings directives should be interpreted to mean actual operation, rather than permit issuance. The proposed text would modify the relevant provisions to codify the approach adopted by the Department of Buildings, in order to provide for a system that is better capable of administration and enforcement. The modifications would provide that an adult establishment is "established" upon the date of a permit issued by the Department of Buildings, subject to rules promulgated by the Department of Buildings regarding the failure to perform authorized work or to operate under the permit and discontinuance of use. The Department of Buildings would also be responsible for identifying adult establishments lawfully established prior to the effective date of the amendments, and for establishing permit filing requirements for new establishments which wish to establish a priority for purposes of the 500 foot rule, but do not require a new building or alteration permit in order to open for business.

## Modifications

While the Commission agrees that the proposed text represents an appropriate response to issues which have emerged since the adoption and implementation of the regulations, it also believes that certain modifications to the text, as proposed, are important to ensure appropriate implementation and to maintain enforcement remains objective and non-biased.  These modifications are discussed below:

N 010508 ZRY

41

0749

1.   <u>Amortization</u>: At the public hearing, a number of speakers
testified that it would be inappropriate to adopt and implement
the proposed amendments to the definitions of "adult bookstore"
and "adult eating or drinking establishment" without also
providing for an amortization period or delayed effective date to
allow adult use operators the opportunity to recoup investments
they have made over the past several years in meeting the '60/40'
"substantial portion" test.

It is well-established that when a zoning change takes
effect that prohibits a particular use, uses of that type in
existence as of the effective date are considered legal non-
conforming and may remain in place.  Alternatively, the City may
establish an amortization provision to allow for recoupment of
the owner's investment in the use over a prescribed period; at
the expiration of the amortization period, the use must go out of
existence.  In this regard, the 1995 Adult Use Regulations
provided a one year amortization period for adult establishments
located in areas where they would be prohibited.

The Commission notes that the purpose of the current
amendments is only to clarify the original intent of the 1995
regulations, and reiterates its view that adult establishments
were never intended to be allowed to remain in place through
superficial compliance measures.  The Commission nevertheless
recognizes that '60/40' establishments have been found by the

N 010508 ZRY                                                    42

0750

courts to be lawful uses under the current regulations.  For that reason, the proposed regulations cannot be applied on an immediate basis to existing '60/40' establishments at prohibited locations where a financial investment has been made to achieve compliance.

At the same time, the Commission strongly believes that it would be contrary to the underlying purpose of the regulations for these establishments to remain in place indefinitely. Accordingly, the Commission endorses the Department's proposal that, in order to fully effectuate the intent of the regulations, an amortization provision be added to the text to ensure that '60/40' establishments do not become permanent fixtures at locations where adult establishments were never intended to be. A new section 72-41 would establish a one year amortization period for any establishment in existence as of August 8, 2001 which: (1) made an investment in reliance on the '60/40' "substantial portion" test (e.g., the reconfiguration of a bar to create separate 'adult' and 'non-adult' sections); and (2) is classified as an "adult establishment" at a prohibited location under the amendments.

As was the case under the 1995 Regulations, the operator would also have an opportunity to apply to the Board of Standards and Appeals for extension of the one-year period, based on a showing that this period is inadequate for reasonable recoupment

N 010508 ZRY

43

0751

of its investment.

The Commission notes that, upon adoption, the amendments would be fully enforceable with respect to any new establishments which open at prohibited locations after August 8, 2001.

2.   Separation Requirements: It has consistently been the Commission's intent that the regulations govern "only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial establishments with a predominant, on-going focus on sexually explicit materials or activities" (CPC Report N950384ZRY, p. 49).   For that reason, the Commission believes that certain modifications to the amendments are needed to avoid their potential application to establishments which are not the intended subject of the regulations.

Under the amendments as originally proposed, a video or bookstore which has achieved a superficial mathematical compliance with the "substantial portion" test would nonetheless be considered an adult bookstore if one or more of ten different physical or operational criteria is present.   Two of these are as follows:

The absence of separate sections of the store with stock-in-trade of any "adult printed or visual material" and stock-

JNR-000703

0752

in-trade of "other [i.e. non-adult] printed or visual material," or the presence of any "adult printed or visual material" in a section of the store otherwise consisting primarily of "other printed or visual material"...

An absence of any fixed, permanent and complete visual partition between a section of the store with "adult printed or visual material" and a section of the store with "other printed or visual material".

These provisions were included because the Department considered it a matter of common-sense that the absence of separation between adult and non-adult sections is a characteristic which distinguishes adult establishments from neighborhood video stores.

Speakers at the public hearing nevertheless argued that these provisions are 'overbroad'. This is because an absence of separation between adult and non-adult materials may be found at several types of establishments which do not have any 'secondary impacts' which warrant classification as adult establishments. To illustrate:

1.   General interest bookstores sometimes carry small numbers of books of nude photography which could be classified as 'adult printed or visual material' under the regulations.  These books are not physically separated from any other books in the 'Art' or 'Photography' sections.

2.   Large video/record stores sometimes include

0753

pornographic videos among their offerings.  These adult videos may sometimes found on a separate aisle, labeled 'Adult'.  Although the aisle is physically separated from the other aisles (e.g. Western; Comedy; Foreign, etc.), there is no "fixed, permanent and complete visual partition" between the Adult and other aisles.

Neither of these examples pertain to the type of establishment which is the intended subject of the regulations.

Accordingly, the Commission believes that the above 'separation' criteria should be eliminated from the proposal. The Commission believes that the remaining physical and operational criteria are adequate to effectively describe the distinction between an adult book/video store and a neighborhood book/video store.

3.   Other Language Changes

As discussed above, a key purpose of the amendments is to establish objective criteria, relating principally to physical lay-out and method of operation, by which a video or bookstore which has achieved only a facial or superficial compliance with the "substantial portion" test would be considered an "adult bookstore".  These criteria include, for example, the presence of a peep booth on the premises, or a lay-out which requires

46

customers to pass through an area of the establishment with adult materials in order to access non-adult materials.

At the public hearing, several speakers argued that the language of the proposed amendments is ambiguous in certain respects. The Commission has considered these comments, and believes that certain minor language changes should be made to the criteria, to ensure that enforcement will continue to proceed in a objective, non-biased manner.

By way of illustration, the proposed amendments include as one of the criterion the following:

> A method of operation under which "other [non-adult] printed or visual material" is offered to customers on a substantially more limited basis than "adult printed or visual material" such as the offering of "other printed or visual material" for sale only and the offering of "adult printed or visual material" for sale or rental.

This criterion reflects numerous observations by Department of Buildings inspectors that one way in which '60/40' establishments have continued to operate as establishments with a "predominant on-going focus" on sexually explicit materials is by refusing to rent non-adult videos, while conducting a thriving rental business in adult videos.

The difficulty with the above provision as originally proposed is in knowing what other methods of operation, apart

47

N 010508 ZRY

0755

from the rental/sale distinction, would qualify as the offer of non-adult materials to customers on a "substantially more limited basis" than adult material. To address this concern, the Commission has modified the provision to eliminate the phrase "substantially more limited basis" and restrict its application to the sale/rental distinction.

This and other similar changes will serve to eliminate perceived ambiguities in the text, and are important to address concerns expressed about their impact upon enforcement. At the same time, however, the Commission considers it critical that the City retain the ability to address future, unanticipated situations in which compliance with the regulations is merely a sham. For that reason, the Commission strongly endorses provision in the proposed amendment, as modified, which allows the Commissioner of Buildings to define, by rule adopted under the Citywide Administrative Procedure Act, "[o]ther features relating to configuration and layout or method of operation which the Commissioner has determined render the sale or rental of 'adult printed or visual material' a substantial purpose of the business conducted in such store." This provision recognizes that the adult use industry is likely to continue in its attempts to avoid application of the regulations and to subvert their intent, and that the City should have the capacity to respond promptly and effectively.

**RESOLUTION**

RESOLVED, that the City Planning Commission finds that the action described herein will have no significant impact on the environment; and be it further

RESOLVED, by the City Planning Commission, pursuant to Section 200 of the New York City Charter, that based on the environmental determination and consideration described in this report, the Zoning Resolution of the City of New York, effective as of December 15, 1961, and as subsequently amended, is further amended as follows:

***

Matter in greytone is new, to be added;

Matter in ~~strikeout~~ is existing text, to be deleted;

*** indicates where unchanged text appears in the Resolution

**Section 12-10**

**DEFINITIONS**

***

N 010508 ZRY

49

0757

`Adult Establishment` (10/25/95)

1.   Adult Establishment:   An "adult establishment" is a
commercial establishment ~~where a "substantial portion" of the
establishment~~ which is or includes an adult book store, adult
eating or drinking establishment, adult theater, or other adult
commercial establishment, or any combination thereof as defined
below:

(a)   An adult book store is a book store ~~which has as~~ that
      offers "printed or visual material" for sale or rent to
      customers where a "substantial portion" of its stock-in-
      trade of "printed or visual material" consists of "adult
      printed or visual material", defined as ~~any one or more of
      the following:~~

      ~~(1) books, magazines, periodicals or other printed matter
      which are characterized by an emphasis upon the depiction or
      description of "specified sexual activities" or "specified
      anatomical areas"; or~~

      ~~(2) photographs, films, motion pictures, video cassettes or
      other visual representations which are~~ "printed or visual
      material" characterized by an emphasis upon the depiction or
      description of "specified sexual activities" or "specified
      anatomical areas";

---

JNR-000709

(b)   An adult eating or drinking establishment is an eating or
      drinking establishment which regularly features in any
      portion of such establishment any one or more of the
      following:

   (1)   live performances which are characterized by an
         emphasis on "specified anatomical areas" or "specified
         sexual activities"; or

   (2)   films, motion pictures, video cassettes, slides or
         other photographic reproductions which are
         characterized by an emphasis upon the depiction or
         description of"specified sexual activities" or
         "specified anatomical areas"; or

   (3)   employees who, as part of their employment, regularly
         expose to patrons "specified anatomical areas"; and

   which is not customarily open to the general public during
   such features because it excludes or restricts minors ~~by
   reason of age~~.

(c)   An adult theater is a ~~theater~~ commercial establishment which
      regularly features one or more of the following:

(1)   films, motion pictures, videocassettes, slides or similar photographic reproductions characterized by an emphasis on the depiction or description of "specified sexual activities" or "specified anatomical areas"; or

(2)   live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities"; and

which is not customarily open to the general public during such features because it excludes or restricts minors ~~by reason of age~~.

An adult theater shall include commercial establishments where such materials or  performances are viewed from one or more individual enclosures.

(d)   An other adult commercial establishment is a facility — other than an adult book store, adult eating or drinking establishment, adult theater, commercial studio, or business or trade school   — which features employees who as part of their employment, regularly expose to patrons "specified anatomical areas" and which is not customarily open to the general public during such features because it excludes or restricts minors ~~by reason of age~~.

---

N 010508 ZRY

JNR-000711

~~For the purpose of defining adult establishments,~~

2.   Defined Terms:

(a)   For purposes of paragraph (1) (a), "printed or visual
materials" are books, magazines, or other printed
matter, including product packaging or wrapping, or
photographs, films, motion pictures, video cassettes,
slides or other visual matter;

(b)   For purposes of paragraph (1) (a) (b) and (c), "specified
sexual activities" are: (~~1~~ i) human genitals in a state
of sexual stimulation or arousal; (~~2~~ ii) actual or
simulated acts of human masturbation, sexual
intercourse or sodomy; or (~~3~~ iii) fondling or other
erotic touching of human genitals, pubic region,
buttock, anus or female breast;

(c)   For purposes of paragraph (1) (a) (b) (c) and (d),
"specified anatomical areas" are: (~~1~~ i) less than
completely and opaquely concealed: (~~i~~ aa) human
genitals, pubic region,(~~ii~~ bb) human buttock, anus, or
(~~iii~~ cc) female breast below a point immediately above
the top of the areola; or (~~2~~ ii) human male genitals in
a discernibly turgid state, even if completely and
opaquely concealed.

N 010508 ZRY

~~For the purpose of determining whether a "substantial portion" of~~
~~an establishment includes an adult bookstore, adult eating or~~
~~drinking establishment, adult theater, or other adult commercial~~
~~establishment, or combination thereof, the following factors~~
~~shall be considered: (1) the amount of~~ *floor area and cellar*
~~space accessible to customers and allocated to such uses and (2)~~
~~the amount of~~ *floor area and cellar* ~~space accessible to customers~~
~~and allocated to such uses as compared to the total~~ *floor area*
~~and cellar space accessible to customers in the establishment.~~

(d)   For the purpose of determining under paragraph (1)(a)
      whether ~~a bookstore has~~ a "substantial portion" of ~~its~~
      ~~stock in materials defined in paragraphs (a)(1) or~~
      ~~(a)(2) hereof~~ a book store's stock-in-trade of "printed
      or visual" material consists of "adult printed or
      visual material", the following factors shall be
      considered: ~~(1)~~ (i) the amount of ~~such~~ stock of "adult
      printed or visual material" accessible to customers as
      compared to the total stock of "printed or visual
      material" accessible to customers in the establishment;
      and ~~(2)~~ (ii) the amount of *floor area* and *cellar* space
      accessible to customers containing ~~such~~ stock of "adult
      printed or visual material"; and ~~(3)~~ (iii) the amount
      of *floor area* and *cellar* space accessible to customers
      containing ~~such~~ stock "of adult printed or visual
      material" as compared to the ~~total~~ amount of  *floor*

JNR-000713

*area* and *cellar* space accessible to customers ~~in the~~
~~establishment~~ containing "printed or visual material"
which is not "adult printed or visual material",
provided that "printed or visual material" which is not
"adult printed or visual material" (hereinafter for
purposes of this paragraph "other printed or visual
material") shall not be considered stock-in-trade for
purposes of this paragraph where such store has one or
more of the following features:

(aa) An interior configuration and lay-out which
     requires customers to pass through an area of the
     store with "adult printed or visual material" in
     order to access an area of the store with "other
     printed or visual material";

(bb) One or more individual enclosures where adult
     movies or live performances are available for
     viewing by customers;

(cc) A method of operation which requires customer
     transactions with respect to "other printed or
     visual material" to be made in an area of the
     store which includes "adult printed or visual
     material";

JNR-000714

0763

(dd) A method of operation under which "other printed or visual material" is offered for sale only and "adult printed or visual material" is offered for sale or rental;

(ee) A greater number of different titles of "adult printed or visual material" than the number of different titles of "other printed or visual material";

(ff) A method of operation which excludes or restricts minors from the store as a whole or from any section of the store with "other printed or visual material";

(gg) A sign that advertises the availability of "adult printed or visual material" which is disproportionate in size relative to a sign that advertises the availability of "other printed or visual material," when compared with the proportions of adult and other printed or visual materials offered for sale or rent in the store, or the proportions of floor area or cellar space accessible to customers containing stock of adult and other printed or visual materials;

(hh) A window display in which the number of products
or area of display of "adult printed or visual
material" is disproportionate in size relative to
the number of products or area of display of
"other printed or visual material," when compared
with the proportions of adult and other printed or
visual materials offered for sale or rent in the
store, or the proportions of floor area or cellar
space accessible to customers containing stock of
adult and other printed or visual materials;

(ii) Other features relating to configuration and lay-
out or method of operation, as set forth in rules
adopted by the commissioner of buildings, which
the commissioner has determined render the sale or
rental of "adult printed or visual material" a
substantial purpose of the business conducted in
such store.  Such rules shall provide for the
scheduled implementation of the terms thereof to
commercial establishments in existence as of the
date of adoption, as necessary.

(e)  For the purposes of paragraph (1) (b), an "eating or
drinking establishment" includes: (i) any portion of a
commercial establishment within which food or beverages
are offered for purchase, or are available to or are

N 010508 ZRY                                                      57

JNR-000716

0765

consumed by customers or patrons, and (ii) any portion
of a commercial establishment from which a portion of a
commercial establishment described in (i) above is
accessible by customers or patrons.

\*\*\*

32-01

**Special Provisions for Adult Establishments**

\*\*\*

(b)   In C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8

Districts, #adult establishments# no #adult

establishment# shall be located at least established

less than 500 feet from a church, a #school#, a

#Residence District#, a C1, C2, C3, C4, C5-1, C6-1, C6-

2 or C6-3 District, or a #Manufacturing District#,

other than an M1-6M District, in which new

#residences#, new #joint living-work quarters for

artists# or new #loft dwellings# are allowed, under the

provisions of the Zoning Resolution, as-of-right or by

special permit or authorization.  No provisions or

findings of such special permit or authorization which

require an assessment of the impact of new

#residences#, new #joint living-work quarters for

JNR-000717

artists# or new #loft dwellings# on #commercial# or #manufacturing uses# within a #Manufacturing District# shall be construed as a limitation on the scope of this provision.  However, on or after October 25, 1995, an #adult...

(c)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts, #adult establishments# no #adult establishment# shall be ~~located~~ established ~~at least~~ less than 500 feet from ~~another~~ a previously established #adult establishment#.

(d)   in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7, or C8 districts, no more than one #adult establishment# permitted under this Section shall be ~~located~~ established on a #zoning lot#.

* * *

(f)   #adult establishments# which ~~existed on~~ were established on the effective date...

For purposes of this section, an #adult establishment# shall be established upon the date of a permit issued by the department of buildings therefor, or, in the case of an #adult establishment# in existence prior to August 8, 2001, as determined by the

---

N 010508 ZRY

59

0767

department of buildings, subject to rules as the department of buildings may prescribe regarding the failure to perform work authorized under a permit or to commence operation pursuant to a permit and the discontinuance of an #adult establishment#.

\*\*\*

42-01

Special Provisions for Adult Establishments

\*\*\*

(a)   #adult establishments# are not permitted in a #Manufacturing District# in which #residences#, #joint living-work quarters for artists# or #loft dwellings# are, under the provisions of the Zoning Resolution, allowed as-of-right or by special permit or authorization. No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# on #commercial# or #manufacturing uses# within a "Manufacturing District# shall be construed as a limitation on the scope of this provision.

(b)   In all other #Manufacturing Districts#, #adult establishments# no #adult establishment# shall be located

N 010508 ZRY

established ~~at least~~ less than 500 feet from a church, a #school#, a #Residence District#, a C1, C2, C3, C4, C5-1, C6-1, C6-2 or C6-3 District, or a #Manufacturing District#, other than an M1-6M District, in which new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# are allowed, under the provisions of the Zoning Resolution, as-of-right or by special permit or authorization. No provisions or findings of such special permit or authorization which require an assessment of the impact of new #residences#, new #joint living-work quarters for artists# or new #loft dwellings# on #commercial# or #manufacturing uses# within a "Manufacturing District# shall be construed as a limitation on the scope of this provision. However, on or after October 25, 1995, an #adult establishment# that otherwise complies with the provisions of this paragraph shall not be rendered #non-conforming# if a church or a #school# is established on or after April 10, 1995 within 500 feet of such #adult establishment#.

(c)   ~~Adult establishments#~~ No #adult establishment# shall be ~~located at least~~ established less than 500 feet from another #adult establishment#.

(d)   No more than one #adult establishment# permitted under this Section shall be ~~located~~ established on a #zoning lot#.

N 010508 ZRY

\*\*\*

(f)   #Adult establishments# which ~~existed on~~ were established on
October 25, 1995 and conform to all provisions of the Zoning
Resolution relating to #adult establishments# other than the
provisions of all or any combination of paragraphs (c), (d),
and (e) of this Section, shall not be subject to the
provisions of Section 52-77 (Termination of Adult
Establishments).

For purposes of this section, an #adult establishment# shall be
established upon the date of a permit issued by the department of
buildings therefor, or, in the case of an #adult establishment#
in existence prior to August 8, 2001, as determined by the
department of buildings, subject to rules as the department of
buildings may prescribe regarding the failure to perform work
authorized under a permit or to commence operation pursuant to a
permit and the discontinuance of an #adult establishment#.

\*\*\*

72-01

General Provisions

\*\*\*

N 010508 ZRY                                                              62

JNR-000721

0770

(f)   to make such administrative determinations and findings as

      may be set forth in this Resolution or pursuant to Section

      72-40 (AMORTIZATION OF CERTAIN ADULT ESTABLISHMENTS AND

      SIGNS FOR ADULT ESTABLISHMENTS), or to Section  72-41

      (Continuation of Certain Adult Establishments).


                              ***

72-40

Amortization of Certain Adult Establishments and Signs For Adult
Establishments

                              ***

This section shall not apply to commercial establishments

described in section 72-41.

                              ***

**72 - 41**

**Continuation of Certain Adult Establishments**


Any commercial establishment in existence as of August 8, 2001

which: (i) subsequent to September 18, 1995 and prior to August

8, 2001 made financial expenditures so as to avoid becoming

subject to the provisions of Section 32-01 or 42-01 (Special

Provisions for Adult Establishments); and (ii) is defined as an

#adult establishment# pursuant to the amendments to the

definition of #adult establishment# in Section 12-10 adopted on

(date of Council adoption), shall terminate as an #adult

establishment# within one year from (date of Council adoption).

N 010508 ZRY

JNR-000722

Notwithstanding the foregoing,  the Board of Standards and
Appeals may permit such #adult establishment# to continue for a
limited period beyond such one year period, provided that:

    (b)   an application is made by the owner of such
          establishment to the Board of Standards and Appeals at
          least 120 days prior to the date on which such
          establishment must terminate;

    (c)   the Board shall find, in connection with such
          establishment, that:

        (1)  the applicant had made, subsequent to September
              18,1995 and prior to August 8, 2001, substantial
              financial expenditures so as to avoid becoming
              subject to the provisions of Section 32-01 or 42-
              01 (Special Provisions for Adult Establishments);

        (2)  the applicant has not recovered substantially all
              such financial expenditures; and

        (3)  the period for which such establishment may be
              permitted to continue is the minimum period
              sufficient for the applicant to recover
              substantially all of such financial expenditures;

For purposes of this Section, "financial expenditures" shall mean the following: (i) any capital outlay for improvements made in connection with the configuration or reconfiguration of the amount of #floor area# and #cellar# space within such establishment accessible to customers either: (a) containing books, magazines, periodicals or other printed matter or photographs, films, motion pictures, video cassettes, slides or other visual matter characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or (b) allocated to one of the activities described in paragraphs (b) (c) or (d) of section 1 of the definition of #adult establishment# in Section 12-10; and (ii) any purchases of books, magazines, periodicals, or other printed matter, or photographs, films, motion pictures, video cassettes, slides or other visual matter, which are not characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas".

The provisions of Sections 52-77 and 72-40 shall not apply to commercial establishments subject to this Section.

The above resolution (N 010508 ZRY), duly adopted by the City

JNR-000724

0773

Planning Commission as modified on August 8, 2001,

(Calendar No. 34), is filed with the Office of the Speaker, City

Council and the Borough Presidents in accordance with the

requirements of Sections 197-d and 200 of the New York City

Charter.

JOSEPH B. ROSE, Chairman

ALBERT ABNEY, ANGELA M. BATTAGLIA, AMANDA M. BURDEN, A.I.C.P.,
IRWIN G. CANTOR, P.E., ALEXANDER GARVIN, MARILYN G. GELBER,
KENNETH J. KNUCKLES, ESQ., JOHN MEROLO

WILLIAM J. GRINKER, abstaining

Commissioners

N 010508 ZRY

66

0774

Planning Commission as modified on August 8, 2001,

(Calendar No. 34), is filed with the Office of the Speaker, City

Council and the Borough Presidents in accordance with the

requirements of Sections 197-d and 200 of the New York City

Charter.

JOSEPH B. ROSE, Chairman

ALBERT ABNEY, ANGELA M. BATTAGLIA, AMANDA M. BURDEN, A.I.C.P.,
IRWIN G. CANTOR, P.E., ALEXANDER GARVIN, MARILYN G. GELBER,
KENNETH J. KNUCKLES, ESQ., JOHN MEROLO


WILLIAM J. GRINKER, abstaining

Commissioners

N 010508 ZRY

66

0775



# THE CITY OF NEW YORK   Borough Of The Bronx

OFFICE OF THE
CHAIRPERSON

MAY 15 2001

3188

## COMMUNITY BOARD #12

FATHER RICHARD F. GORMAN, *CHAIRMAN*
CARMEN ANGUEIRA, *DISTRICT MANAGER*

4101 WHITE PLAINS ROAD
BRONX, NEW YORK 10467
TELEPHONE: (718) 881-4455/6
FAX: (718) 231-0635

*JBR*
*Weil*
*Karnovsin*
*michaels*
*Parnes*
*Romero*
*Kapur*

**10 May 2001**

**The Honorable Joseph B. Rose
Chairman
City Planning Commission (C.P.C.)
Director
Department of City Planning (D.C.P.)
City of New York
22 Reade Street
The Bronx, New York   10007-1216**

**Dear Chairman Rose:**

**Since its inception in the earliest years of this current Municipal Administration, the effort to rid our neighborhoods of the scourge of so-called "adult entertainment" by the enactment of Zoning Text Amendments governing the siting of said enterprises has been wholeheartedly and unstintingly supported by Community Board #12 (The Bronx).  One of the great accomplishments for which this Administration will be recalled is the successful contest to fix new regulations governing the siting of "XXX" establishments in <u>THE ZONING ORDINANCE OF THE CITY OF NEW YORK</u>.  Regrettably, opponents of these new rules have detracted from our victory by concocting various forms of "sham**

BAYCHESTER, EDENWALD, FISHBAY, OLINVILLE, WAKEFIELD, WILLIAMSBRIDGE, WOODLAWN

The Honorable Joseph B. Rose
Chairman
City Planning Commission (C.P.C.)
Director
Department of City Planning (D.C.P.)
City of New York
10 May 2001
Page Two (2)

compliance" designed to undermine and neutralize them.   In Bronx Community District #12, we have two (2) instances of which I am cognizant where stores that are, in fact, "adult entertainment" establishments are utilizing the "60/40" ratio rule in a manner designed to subvert and cancel out both the intent and the objectives of the new regulations. Any action on the part of the City of New York to remedy this circumstance would, most certainly, be to the benefit of this District as well as of the entire City.

Accordingly, at its regularly scheduled meeting for the month of April convened on Thursday evening, 26 April 2001, the membership of Community Board #12 (The Bronx) unanimously passed a resolution endorsing additional Zoning Text Amendments devised to eliminate the opportunities for "sham compliance" with the newly sanctioned norms for siting "adult entertainment" establishments in the City of New York.   This Community Board and the citizens that we serve stand ready to join with you once more in order to cement our triumph for common sense and common decency relative to the "adult entertainment" industry in this town.   Kindly inform Community Board #12 of how we may be of further support and assistance.

The Honorable Joseph B. Rose
Chairman
City Planning Commission (C.P.C.)
Director
Department of City Planning (D.C.P.)
City of New York
10 May 2001
Page Three (3)


With warm personal regards, I remain


Respectfully,

*F. Richard F. Gorman*

FATHER RICHARD F. GORMAN
Chairman


pc   The Honorable Fernando Ferrer, Bronx Borough President
     The Honorable Eliot L. Engel, Member of Congress
     The Honorable Ruth Hassell-Thompson, State Senator
     The Honorable Guy J. Velella, State Senator
     The Honorable Jeffrey Dinowitz, Member of Assembly
     The Honorable Carl E. Heastie, Member of Assembly
     The Honorable June M. Eisland, Councilwoman
     The Honorable Lawrence A. Warden, Councilman
     The Honorable Kenneth J. Knuckles, C.P.C. Commissioner


JNR-000729

0778



# COMMUNITY BOARD No. 1

**435 GRAHAM AVENUE - BROOKLYN, N.Y. 11211-2429**
**PHONE: (718) 389-0009**
**FAX: (718) 389-0098**

**The City of New York**

MAY 17 2001

HON. HOWARD GOLDEN
BROOKLYN BOROUGH PRESIDENT

VINCENT V. ABATE
CHAIRMAN

GERALD A. ESPOSITO
DISTRICT MANAGER

RABBI JOSEPH WEBER
FIRST VICE-CHAIRMAN

RONALD E. WEBSTER
SECOND VICE-CHAIRMAN

MINERVA MOISES
THIRD VICE-CHAIRPERSON

HAZEL T. HUNTER
FINANCIAL SECRETARY

BRUNILDA RIVERA
RECORDING SECRETARY

CHRISTOPHER H. OLECHOWSKI
MEMBER-AT-LARGE

HON. KENNETH K. FISHER
COUNCILMAN, 33rd CD

HON. VICTOR L. ROBLES
COUNCILMAN, 34th CD

greenpoint—williamsburg

May 15,2001

Commissioner Joseph Rose
Director
New York City Department of City Planning
22 Reade Street    Room  3E
New York, New York 10007-1216

RE:   **Adult Establishment Text Change (No. 010508 ZRY)**

Dear Commissioner Rose:

Prior to providing our comments regarding the Adult Establishment Text Change (No. 010508 ZRY) Community Board No.1 wants take this opportunity to reiterate its position regarding the Adult Establishment Text Amendment (N 950384 ZRY) that was introduced in 1995 and subsequently adopted into the zoning resolution. Attached is a copy of our comments at that time, which reflect the Board's original recommendation opposing the zoning text and a request that the proposal be withdrawn with a moratorium be implemented.

Community Board No. 1 held a public hearing on May 8,2001 and reviewed the item: Adult Establishment Text Change (ULURP No. N010508 ZRY) which offers amendments to the earlier text.

We are still steadfast in our opposition to the "Adult Establishment Text" because it permits (as of right development) for these obnoxious uses in a large portion of the District's manufacturing zoned areas.

JNR-000730

0779

However, because the newly proposed changes would tighten up loopholes in the previous text Community Board No. 1 felt it prudent to consider them.

Please be advised that at the Board Meeting, which was held on May 8, 2001, the members of Community Board No. 1 voted to accept the text changes without conditions. The vote of the Board was as follows: 35 "YES; 0 "NO"; 0 "ABSTENTIONS".

Attached please find a copy of the Board's District Development Committee's ULURP Report.

Working for a Better Greenpoint-Williamsburg.

Sincerely,

Vincent V. Abate
Chairman

VVA/mbw
Enclosures: 2 Attachments

JNR-000731

0780



# COMMUNITY BOARD No. 1

*The City of New York*

### 435 GRAHAM AVENUE - BROOKLYN, N.Y. 11211-2429
### PHONE: (718) 389-0009
### FAX: (718) 389-0098

C B 1

greenpoint — williamsburg

HON. HOWARD GOLDEN
BROOKLYN BOROUGH PRESIDENT

VINCENT V. ABATE
CHAIRMAN

GERALD A. ESPOSITO
DISTRICT MANAGER

HON. KENNETH K. FISHER
COUNCILMAN, 33rd CD

HON. VICTOR L. ROBLES
COUNCILMAN, 34th CD

RABBI JOSEPH WEBER
FIRST VICE-CHAIRMAN

RONALD E. WEBSTER
SECOND VICE-CHAIRMAN

MINERVA MOISES
THIRD VICE-CHAIRPERSON

HAZEL T. HUNTER
FINANCIAL SECRETARY

BRUNILDA RIVERA
RECORDING SECRETARY

CHRISTOPHER H. OLECHOWSKI
MEMBER-AT-LARGE

**TO:**     Members of Community Board No. 1, Brooklyn

**FROM:**   Ronald E. Webster, Chairperson, District Development Committee

**DATE:**   May 8, 2001

**SUB.:**   Adult Establishment Text Changes # N 010508 ZRY

---

**ACTION TO BE TAKEN BY COMMUNITY BOARD:**     Review and deliberate on the request By the City of New York's Department of City Planning to approve zoning text changes Concerning adult establishments.

**PURPOSE:**

The Dept. Of City Planning (DCP) seeks Community Board No. 1's (CB1) approval of zoning text changes concerning adult establishments.. Per the information sent by DCP to CB1 on the above referenced matter ..." The proposed zoning text changes consist of technical amendments to current zoning rule adopted in 1995 for adult establishments...furthermore..." The amendments are proposed in response to attempts by operators of adult establishments to evade enforcement under regulations through superficial compliance measures which do not alter the character of the establishments as enterprises with a predominant focus on sexually explicit materials or activities. In addition, several court rulings have narrowed the scope and Application of the regulations in ways which are contrary to the original intent of the City Planning Commission and the City Council, thus requiring amendments.

The principal changes in the proposed amendments relate to the definitions of adult Book store  and an adult eating or drinking establishment . For example, the changes with respect to adult book and video stores are intended to address establishments which have sought to avoid enforcement under regulations merely by increasing the Amount of non-adult books or videos sold at the premises and the amount of floor area dedicated to such material, in such a way that there is no reasonable expectation that patrons will purchase the non-adult material or the absence of any separation between sections of the store with adult and non-adult material. The proposed

JNR-000732

amendments address this type of "sham" compliance by establishing objective factors, relating principally to   physical lay-out and method of operation.

The changes relating to the definition of  adult eating and drinking establishments would reaffirm the original intent of the City Planning Commission and the City Council that any bar or restaurant which regularly features adult entertainment is subject to the regulations irrespective of the amount of floor space within the establishment devoted to topless or nude entertainment.


RECOMMENDATION:

The Committee met on Tuesday, May 1st to review and deliberate on the above referenced matter and voted in the majority with one abstention  to accept the proposed adult establishment text changes without conditions.

JNR-000733

0782



# COMMUNITY BOARD No. 1
### 435 GRAHAM AVENUE - BROOKLYN, N.Y. 11211-2429
### PHONE: (718) 389-0009
### FAX: (718) 389-0098

*The City of New York*



greenpoint— williamsburg

HON. HOWARD GOLDEN
BROOKLYN BOROUGH PRESIDENT

VINCENT V. ABATE
CHAIRMAN

GERALD A. ESPOSITO
DISTRICT MANAGER

HON. KENNETH K. FISHER
COUNCILMAN, 33rd CD

HON. VICTOR L. ROBLES
COUNCILMAN, 34th CD

RABBI JOSEPH WEBER
FIRST VICE-CHAIRMAN

RONALD E. WEBSTER
SECOND VICE-CHAIRMAN

MINERVA MOISES
THIRD VICE-CHAIRPERSON

HAZEL T. HUNTER
FINANCIAL SECRETARY

BRUNILDA RIVERA
RECORDING SECRETARY

CHRISTOPHER H. OLECHOWSKI
MEMBER-AT-LARGE

May 15, 2001

Commissioner Joseph Rose
Director
New York City Department of City Planning
22 Reade Street   Room 3E
New York, New York 10007-1216

RE:   **Adult Establishment Text Change**
**(No. 010508 ZRY)**

Dear Commissioner Rose:

Prior to providing our comments regarding the Adult Establishment Text Change (No. 010508 ZRY) Community Board No. 1 wanted to take this opportunity to reiterate its position regarding the Adult Establishment Text Amendment (N 950384 ZRY) that was introduced in 1995 and subsequently adopted into the zoning resolution. Attached is a copy of our comments at that time, which reflect the Board's original recommendation to oppose the zoning text and a request that the proposal be withdrawn.

Community Board No. 1 held a public hearing on May 8, 2001 and reviewed the item: Adult Establishment Text Change (ULURP No. N010508 ZRY), which offers amendments to the earlier text.

Please be advised that at the Board Meeting, which was held on May 8, 2001, the members of Community Board No. 1 voted to accept the text changes without conditions. The vote of the Board was as follows: 35 "YES; 0 "NO"; 0 "ABSTENTIONS".

Attached please find a copy of the Board's District Development Committee's ULURP Report.

Working for a Better Greenpoint-Williamsburg.

Sincerely,

*Vincent V. Abate*

Vincent V. Abate
Chairman

VVA/mbw
Enclosures: 2 Attachments

0783

ADULT ESTABLISHMENT ZONING TEXT AMENDMENT
(ULURP # N950384ZRY)

his is an application submitted jointly by the Department of City
lanning and the Land Use Committee of the New York City Council to
egulate and restrict the operation and conduct of Adult
stablishments throughout New York City. Adoption of these
mendments will supersede the moratorium on the creation of new
dult Establishments that was enacted in 1994. The Board's review
f this item is performed pursuant to Section 200 of the City
harter.

mong the many components of this comprehensive legislation, the
ollowing are of particular significance to Brooklyn Community
oard 1:

* no Adult Establishment will be permitted to exist in
  "light commercial", i.e., C1 - C6-3 or manufacturing
  districts that permit as of right residential use; (such
  uses are currently prohibited in purely residentially
  zoned districts);

* Adult Establishments will only be permitted in those
  portions of "heavy commercial", i.e., C6-4 - C8, and
  manufacturing districts that do not permit as of right
  residential use provided that no such establishment can
  be situated within 500 ft. of a church, a school
  (including a day care center), a residential zoned
  district or those commercial and manufacturing zoned
  districts that do not permit this use;

* all Adult Establishments established after the passage of
  this legislation cannot be situated within 500 ft. of
  another such use and cannot be larger than 10,000 sq.
  ft.; and

* the size and location of signs advertizing Adult
  Establishments will be restricted to minimize impact.

rrently, none of the 177 existing Adult Establishments identified
this proposal's Environmental Assessment Statement are situated
Brooklyn CB1. The legislation's innovative amortization
ovisions governing the closing of existing Adult Establishments
tuated in non-complying districts will, thus, not directly affect
is district. CB1 is, however, situated in close proximity to
dtown Manhattan, an area that will be heavily affected by the
ortization provision.

ile implementation of this legislation will eliminate the as of
ght ability to establish Adult Establishments in virtually all of
1's commercially zoned sectors, a large portion of the area's
nufacturing zoned districts will permit as of right development,

even after the 500 ft. provision is applied. The affected areas
include substantial segments of northern and eastern Greenpoint,
eastern Williamsburg and the entire East River waterfront. Several
substantial non-complying residential enclaves are situated in this
area. Finally, the development of the East River waterfront for
positive mixed use purposes is currently being explored by CB1 and
will be addressed in a forthcoming Section 197-A Plan; this will
certainly not include Adult Establishments as an appropriate use.

CONSIDERATION

After careful consideration, Brooklyn Community Board 1 recommends
that this proposal be REJECTED. We further urge that the
legislation be immediately WITHDRAWN and the moratorium on the
creation of new Adult Establishments maintained in place. While we
do not dispute the legislation's goal of significantly restricting
the visibility and prevalence of a clearly obnoxious use, we
believe the means employed are grossly unfair and will greatly
undermine the interests of our community and similarly situated
neighborhoods.

We take this position for the following reasons:

First, despite its surface appearance as a law of general
application, the impact of this legislation will be extremely
unbalanced, to the direct detriment of Williamsburg and Greenpoint.
Specifically, this proposal will restrict a use that can now
legally occur in most of the City to a selected few neighborhoods
that will now be compelled to bear the full burden. The resulting
drastic restriction in the areas of legal supply in a market of
increasing demand will have substantial and negative effects upon
the impacted communities. This manipulation of the zoning ordinance
is extremely inequitable and violates the spirit of the City
Charter's Fair Share provisions.

Second, the extreme alteration of the Adult Establishment market
that this legislation will generate together with CB1's close
proximity to mid-town Manhattan and numerous major transportation
routes will make Williamsburg and Greenpoint particularly
vulnerable to the proliferation of such uses if the proposal is
approved. Thus, the fact that no Adult Establishments currently
exist within CB1's borders proves absolutely nothing regarding the
legislation's post approval impact.

Passage of this legislation will create a radical sea change in the
economic realities of the Adult Establishment industry. Many of
those neighborhoods that are currently most economically viable as
Adult Establishment host communities will now be off limits to
future development, or even current operations. This will, by
default, make easily accessible manufacturing zoned areas far more
economically attractive to Adult Establishment operators. In our
view, Williamsburg and Greenpoint will be among the most
"attractive" of these communities. Situated literally in the shadow

0784

of Manhattan, dissected by the BQE and in close proximity to the Queensborough, Williamsburgh and Greenpoint Avenue Bridges and the Queens Midtown Tunnel, CB1 will provide a distressingly central and highly convenient alternative location for these uses. Specifically, we fear that the industrial portions of the following major thoroughfares - Flushing, Metropolitan, Kent, Vandervoort and Greenpoint Avenues and Grand and West Streets - will be particularly vulnerable if this legislation is approved. The fact that several of these routes have already suffered from a less stationary "Adult" use, i.e., prostitution, vividly underlines their potential as Adult Establishment strips. For these reasons, the impact of this legislation will hardly be benign to CB1; its passage will, instead, unfurl a huge welcome mat throughout Greenpoint and Williamsburg to the operators of these obnoxious uses.

Third, the fact that the current legislation does not go as far in prohibiting existing Adult Establishments as did the Mayor's 1994 proposal does not significantly reduce its negative impact upon CB1. While the 1994 proposal would have effectively exiled these uses from virtually all of Manhattan, the current measure will still radically alter the market. According to the proposal's Environmental Assessment Statement, no more than 99 of the 177 current Adult Establishments will be situated in zoning compliant districts after approval. This number will, however, substantially plummet further when the impact of the 500 ft. rule is applied. Under any circumstances, probably half of the existing uses will still be compelled to seek alternate locations in complying districts. When one adds the fact that this continues to be a growth industry, the legislation's negative impact potential upon CB1 becomes abundantly clear.

Fourth, the legislation's mechanical application of the zoning ordinance will yield particularly unfair results in communities, like CB1, that developed prior to the initiation of zoning. Our substantial manufacturing districts contain within them several significant non-complying residential enclaves that, in many instances, are situated well beyond 500 ft. of the nearest residential district. The solid Beadel Street enclave situated from Morgan to Porter Avenues is only one of several such communities in CB1. Under the proposed legislation, these areas will receive absolutely no protection but could witness the totally legal creation of an Adult Establishment in their very midst. Such a patently unfair development might very well endanger the delicate balance that, despite unfavorable zoning, has preserved these enclaves as viable residential neighborhoods; it also underlines the severe limitations that zoning has in addressing issues that, as this, involve far more than the mere use of land.

Fifth, the fact that as of right Adult Establishment development can, under the proposed legislation, occur along CB1's entire East River waterfront is totally unacceptable; it is also clearly inconsistent with the recommendations contained in the City's own Waterfront Development Plan, which encourage mixed use and even

residential Section 197-A planning efforts, which, when promulgated, will certainly not envision the creation of an East River red light district! Inclusion of this area, which occurred solely as a result of the mechanical application of the highly flawed zoning formula, makes absolutely no sense and should never have occurred.

It is no answer that this provision will not retard the development potential of the waterfront, since implementation of any plan increasing its mixed use and residential zoning will, as a consequence, prohibit the operation of Adult Establishments in the affected area. We know, however, that it is one thing to plan for an area and quite another to transform the recommendations into reality. Achievement of the latter often requires the securance of political and financial commitments from any number of public and private sector players. In our view, inclusion of the East River waterfront in an as of right Adult Establishment zone will greatly discourage those parties from making any such commitments and, instead, prompt them to invest the few available dollars in communities not so encumbered. It might even inhibit the City from advancing approval of the development plan itself. In this way, a "minor" problem might very well convert itself into a major impediment to positive waterfront development.

Sixth, since the legislation's constructive provisions significantly restricting the signage of Adult Establishments, which will combat one of this use's most offensive secondary impacts, are not inherently tied to its other components, they should be severed from the main proposal and enacted as separate legislation. They do not, however, go far enough. The solicitation of Adult Establishment business through the distribution of leaflets, brochures, etc., is an equally obnoxious practice that, if not restricted, could easily negate the effectiveness of the signage regulations. For this reason, the City Council should enact supplementary local legislation that severely restricts the distribution of this material. Such especially odious practices as distribution to minors should be made a criminal offence. Regulations of these purely commercial activities are, in our view, fully compatible with the requirements of the First Amendment.

Seventh, we also question the efficacy of the 500 ft. rule as an effective buffer zone between separate Adult Establishments and between such uses and the designated residential and commercial districts and institutional facilities. Under this approach, Adult Establishments can open well less than one long block away from solid, residentially zoned communities in areas that themselves are often semi-residential. Implementation of this provision will, in our view, significantly undermine the stability of the outer perimeters of all residentially and commercially zoned communities situated in Greenpoint and Williamsburg. It simply will not do.

0785



JBR
Weil
Myers
Michaels
Paines
Romero

OFFICE OF THE
CHAIRPERSON    THE CITY OF NEW YORK
MAY ? 1 200  BOROUGH OF BROOKLYN
3255          COMMUNITY BOARD #7

RECEIVED

MAY ? ? 2001

DEPT. OF CITY PLANNING
URBAN DESIGN

Sara Gonzalez
*Chair*

Jeremy Laufer
*District Manager*

HOWARD GOLDEN
*Borough President*

May 17, 2001

Mr. Joseph Rose
Commissioner
Department of City Planning
22 Reade Street
New York, New York 10007-1216

Dear Mr. Rose:

As a follow up to Community Board #7's Public Hearing on DCP's proposed new regulations regarding adult entertainment businesses, which we held on May 9, 2001, our Board voted on the following motion at our General Board Meeting on May 16, 2001:

> *Community Board #7 supports the goal of removing all sex/adult related establishments in our community. Furthermore, as a step in the right direction, the Community Board supports the Department of City Planning's proposal to tighten regulations and close loopholes. Be it further known, our Community Board would like to see additional regulations implemented:*
> *A) The 500 foot rule should be changed to 2000 feet from a church, school, resident or park;*
> *B) Any video/book store which sells any sex item would be classified as a sex shop;*
> *C) Signage pertaining to selling adult/sex materials including peep shows or booths should be prohibited;*
> *D) The Community Board supports Councilman Angel Rodriguez' position that a law should be enacted that takes revenue percentage into account when determining adult/sex businesses.*

The motion passed by a vote of 32 - yeas; 0 - nays; and 0 abstentions.

We hope that the position of our Community Board would be taken into account when the

4201 Fourth Avenue, Brooklyn, NY  11232     (718) 854-0003   FAX (718) 436-1142
*Serving Sunset Park, Greenwood and Windsor Terrace*

JNR-000737                                                                    0786

Thank you for your attention to this matter.

Sincerely,

Jeremy Laufer
District Manager

cc:     Ms. Regina Myer, Director, Brooklyn Planning Office
        Ms. Roz Silver



# Community Board Ten

**The City of New York**

621 - 86 Street • Brooklyn, N.Y. 11209
(718) 745-6827 • FAX (718) 836-2447

DENISE VIRGA
*DISTRICT MANAGER*

*JBR*
*Myer*
*Weil*
*Michael*
*Paines*
*Roneri*

STEPHEN A. HARRISON
*Chairperson*

ELEANOR SCHIANO
*Vice Chairperson*

MARY ANN WALSH
*Secretary*

DINO LAMIA
*Treasurer*

OFFICE OF THE
PERSON

MAY 2 4 2001
32-90

May 22, 2001

Joseph B. Rose
Director
Department of City Planning
22 Reade Street
New York, New York 10007-1216

Re: N 010508 ZRY
Adult Establishment Text Changes

Dear Director Rose:

At the duly publicized meeting conducted by Community Board Ten on the evening of Monday, May 21, 2001, the Board voted unanimously:

a.  Strongly opposing all of the adult establishments that have opened in our community and taking whatever steps that are necessary to see that they are closed;

b.  amending the 1995 Zoning Rules to close the loopholes that currently exist which allow these types of establishments to open and exist in our communities;

c.  encouraging all of our elected Federal, State and City officials to enact legislation to remove these loopholes and other loopholes which presently exist; and

d.  encouraging ALL relevant governmental agencies to more strictly enforce the laws which prohibit these types of establishments from existing.

A copy of the report is attached for your persual.

If you should require additional information, please do not hesitate to contact me.

Sincerely,

Denise Virga
Denise Virga
District Manager

Enclosure
cc:  Stephen A. Harrison
     Craig Eaton
     Borough President Howard Golden

HOWARD GOLDEN, BOROUGH PRESIDENT

INR-000739

0788

**CB10 Zoning and Land Use Committee**
Recommendation on Land Use Review Application
for a Zoning Text Change concerning adult establishments
Report Date: May 9, 2001          Committee Meeting Date: May 21, 2001

The Zoning and Land Use Committee met in quorum on May 21, 2001 at the offices of CB10 to review an Application by the Dept. Of City Planning for a Zoning Text Change concerning adult establishments which was referred to the City Planning Commission for Review.

As previously reported at our April meeting, in 1995 Zoning rules were adopted with the intent of limiting and restricting certain types of adult establishments which were found to negatively impact on communities in the City of New York. The proposed Amendments are proposed in response to attempts by operators of adult establishments to evade enforcement under the 1995 regulations. In sum, there are loopholes in the prior Zoning rules which permit adult establishments to open and operate and the proposed Amendments will attempt to close these loopholes.

For example, the 1995 Rules prohibit sex shops, x-rated theaters and topless establishments from operating within 500 feet of churches, schools and homes. BUT, there is a Rule called the 60/40 Rule which allows these types of shops to operate if they limit their sex-oriented content to 40 percent of their stock or floor space. If a shop obeys this 60/40 limit, under the current Zoning Rules as adopted in 1995, they can operate where they want and in effect avoid the Zoning Regulations. The current Amendment will close this loophole once and for all.

As a parent of three young children, I am concerned that as I drive on 3rd Avenue in CB 7, my children are exposed to neon lights and other descriptive signs which invite patrons to enter these types of establishments. As well, this issue is of a concern to the ZALUC members and all residents of our Community. Although at present these types of establishments do not exist within the confines of our CB 10, the adult sex shop industry has expanded significantly into our neighboring Sunset Park area.

Based upon the foregoing, in support of our CB 7 members and our neighbors residing in CB 7 the ZALUC recommends that CB 10 issue a recommendation (a) strongly opposing all of the adult establishments that have opened in our community and taking whatever steps that are necessary to see that they are closed; (b) amending the 1995 Zoning Rules to close the loopholes that currently exist which allow these types of establishments to open and exist in our communities; © encouraging all of our elected Federal, State and City officials to enact legislation to remove these loopholes and other loopholes which presently exist; and (d) encouraging ALL relevant governmental agencies to more strictly enforce the laws which prohibit these types of establishments from existing.

Respectfully submitted,

CRAIG A. EATON
Chair

0789

Vote:

Craig A. Eaton, Chair - For          Anthony Ceretti - For
Dino Lamia - For                     Louise Riso - For
Fran Vella Marrone - For             Eleanor Schiano - For
Harriet Rosenberg - For              Mary Ann Walsh - For

0790

*gbr*
*Baith*
*michaels*
*Paines*
*Ramero*

## COMMUNITY BOARD No. 1

CITY OF NEW YORK

Madelyn Wils
*Chairperson*

OFFICE OF THE
CHAIRPERSON

Paul Goldstein
*District Manager*

APR 3 0 2001
3041

April 27, 2001

Mr. Joe Rose, Chairman
City Planning Commission
22 Reade Street
New York, NY 10007

Re: Adult establishment
text changes

Dear Chairman Rose:

At our April 17th monthly meeting Community Board #1 adopted the attached resolution expressing our support of the proposed zoning text changes which will allow for better enforcement of the adult establishment regulations adopted in 1995.

Sincerely,

*Madelyn Wils*

Madelyn Wils
Chairperson

Attachment

cc:   V. Fields
      K. Freed
      C. DeSaram

01.ltrs.cpc

## COMMUNITY BOARD #1 MANHATTAN
## RESOLUTION

### DATE:  APRIL 17, 2001

### COMMITTEE OF ORIGIN: QUALITY OF LIFE

COMMITTEE VOTE:   8 IN FAVOR   1 OPPOSED   1 ABSTAINED   0 RECUSED
BOARD VOTE:   28 IN FAVOR   4 OPPOSED   3 ABSTAINED   0 RECUSED

RE:          **Proposed adult establishment text changes**

WHEREAS:   The proposed zoning text changes consists of technical amendments of
current zoning rules adopted in 1995 for adult establishments by the City
Planning Commission and the City Council and approved by CB #1, and

WHEREAS:   Operators of adult establishments have attempted to evade enforcement
under the regulations through superficial compliance measures, and

WHEREAS:   Several court rulings have narrowed the scope and applications of the
regulations in ways which are contrary to the original intent of the City
Planning Commission and the City Council, thus requiring amendments,
and

WHEREAS:   The proposed zoning text changes relating to the definitions of an "adult
book store" and an "adult eating or drinking establishment" will define the
physical lay-out and method of operation, now

THEREFORE
BE IT
RESOLVED
THAT:          CB #1 approves City Planning's application N 010508 ZRY – Adult
Establishment text changes.

res.april17

JNR-000743

0792



# CITY OF NEW YORK
# COMMUNITY BOARD NO. 2, MANHATTAN

3 Washington Square Village • New York, New York  10012-1899 • (212) 979-2272 • FAX (212) 254-5102
Greenwich Village • Little Italy • Soho • Noho • Hudson Square
E-Mail communitybd2@earthlink.net

Jim Smith
Chair

Arthur W. Strickler
District Manager

Carol Yankay
1st Vice-Chair

Ann Arlen
2nd Vice-Chair

Jeanne Wilcke
Treasurer

Michael Mirisola
Secretary

Doris B. Nash
Assistant Secretary

April 27, 2001

Joseph Rose
Chair
City Planning Commission
22 Reade Street
New York, New York  10007

Dear Chairman Rose:

At its Full Board meeting on April 19, 2001, Community Board #2, Manhattan (CB#2, Man.) adopted the following resolution:

**ADULT ESTABLISHMENTS,   CITY PLANNING  COMMISSION  PROPOSED TEXT AMENDMENTS**

**WHEREAS**  City Planning proposes to modify and clarify text in the Adult Establishment regulations which went into effect several years ago:

**WHEREAS**  we would like to see additional language that would clarify that the 500' barrier be measured radically from the perimeter of the lot line;

**THEREFORE BE IT RESOLVED**  that CB2 recommends approval of the text amendments; and

**FURTHER BE IT RESOLVED**  that we urge City Planning add language to the text to make clear that the 500' foot barrier must be measured radically from all points along the lot line.

VOTE:  Passed, with 21 Board members in favor and 14 in opposition.

Please advise us of any action or decision taken in response to this resolution.

JNR-000744

0793

Sincerely

Jim Smith, Chair
Community Board #2, Manhattan

Jeanne Wilcke, Chair
Zoning & Housing Committee
Community Board #2, Manhattan

JM/gh

cc:   Hon. Thomas K. Duane, NYS Senator – via fax
      Hon. Deborah Glick, NYS Assemblymember – via fax
      Hon. Kathryn Freed, Councilmember- via fax
      Hon. Margarita Lopez , Councilmember
      Hon. Christine Quinn, Councilmember – via fax
      Hon. C. Virginia Fields, Man. Borough  President – via fax
      Commissioner Rosemarie O'Keefe, CAU – via fax
      Blane Roberts, Community Liaison, MBPO – via fax
      Ron Livian, Man. Borough Commissioner, NYC Dept. of Buildings
      Vivian Awner, Community Board Liaison, CPC
      Roy Starrin, NYC Board of Standards & Appeals

0794



# THE CITY OF NEW YORK
## MANHATTAN COMMUNITY BOARD NO. 3
59 EAST 4TH STREET - NEW YORK, N.Y. 10003
PHONE: (212) 533-5300 - FAX: (212) 533-3659

LISA KAPLAN, BOARD CHAIR                    MARTHA DANZIGER, DISTRICT MANAGER

*#3309*
OFFICE OF THE
CHAIRPERSON

*JBR*
*Barth*
*Weil*
*Michael:*
*Parnes*
*Romer*

MAY 2 9 2001

May 25, 2001

Mr. Joseph B. Rose, Director
City Planning Commission
22 Reade Street
New York, New York 10007-1216

Re:  N 010508 ZRY, Adult Establishment Text Changes

Dear Mr. Rose:

At its  May 2001  monthly meeting, Community Board #3 passed the following motion:

   To oppose the text change owing to concerns about its violation of 1st
   Amendment rights and other free speech guarantees.

If you have any questions, please do not hesitate to call.

Sincerely,

LISA KAPLAN, CHAIR, COMMUNITY BOARD #3

JNR-000746

0795



CITY of NEW YORK
**MANHATTAN COMMUNITY BOARD No. 4**
330 West 42nd Street, 26th floor   New York, NY   10036
Tel: (212) 736-4536   Fax: (212) 947-9512
email: commboard4@aol.com

KATHERINE GRAY
Chair

ANTHONY M. BORELLI
District Manager



May 3, 2001

Hon. Joseph B. Rose
City Planning Commission
22 Reade Street
New York, New York 10007

Re:    No 010508ZRY

Dear Commissioner Rose:

Manhattan Community Board No.4 has reviewed your request for Adult Entertainment Text
Changes in the New York City Zoning Code.

When the more comprehensive changes were presented in 1995, this Board reluctantly and
with many caveats supported the need for regulations dealing with the spread and
concentration of adult establishments.  We were particularly concerned with perceived first
amendment issues as outlined in that 1995 letter here enclosed.

With respect, we believe the general public does not need further protection from adult
establishments. Further the proposals designed to close "loopholes," are not substantive in that
the text frequently uses "substantial portion" or "an emphasis upon," phrases which are open to
many interpretations.

More importantly, the Department of Buildings, even under its new jurisdiction, has many
more immediately necessary assignments (i.e. building safety, unauthorized repairs,
conversions, etc.), and indeed has too few inspectors to fulfill its other mandated
responsibilities.  We believe enforcement of the proposed text change would be a waste of
manpower and other assets.

Hon. Joseph Rose
May 3, 2001
Page 2

Therefore, Manhattan Community Board No. 4 declines to support Zoning Text Change
N010508ZRY

Sincerely,

Katherine Gray

Katherine Gray
Chair
Manhattan Community Board No. 4

Ross Graham (MN)                    Ed Kirkland (MN)

Ross Graham                         Ed Kirkland
Chair                               Chair
South Hell's Kitchen Planning Committee   Chelsea Preservation & Planning Committee

This letter was passed at Manhattan Community Board No. 4's May 2, 2001 full board meeting.

cc:    Hon. Rudolph Giuliani, Mayor
       Hon. C. Virginia Fields, Manhattan Borough President
       Hon. Jerrold Nadler, United States Representative
       Hon. Tom Duane, State Senator
       Hon. Eric Schneiderman, State Senator
       Hon. Deborah Glick, State Assemblymember
       Hon. Richard Gottfried, State Assemblymember
       Hon. Scott Stringer, State Assemblymember
       Hon. Ronnie Eldridge, City Councilmember
       Hon. Christine Quinn, City Councilmember
       Laura Engler, Land Use Division, MBPO



**MANHATTAN COMMUNITY BOARD FIVE**
450 Seventh Avenue, Suite 2109
New York, NY 10123-2199
(212) 465-0907
fax: (212) 465-1628

*OBR*
*Barth*
*michaels*
*weil*
*opposed*

Kyle Merker, *Chair*

Kathy Kinsella, *District Manager*

*Rome*

OFFICE OF THE
CHAIRPERSON

*3243*

MAY 1 8 2001

May 11, 2001

Hon. Joseph B. Rose
Chair
City Planning Commission
22 Reade Street
New York, NY 10007

RE: **Zoning Text Amendment – Adult establishment (N010508 ZRY)**

Dear Chair Rose:

At the regularly scheduled monthly meeting of Community Board Five on Thursday, May 10, 2001, the Board passed the following resolution with a vote of 27 in favor, 0 opposed, 1 abstention:

WHEREAS, In 1995 zoning rules were adopted to regulate adult establishments, by limiting them to certain commercial districts and to all manufacturing districts, except manufacturing districts where residential uses are permitted, and also by limiting their density and size in permitted commercial and manufacturing districts; and

WHEREAS, Such regulations were based upon findings that adult uses, such as triple-X video and bookstores, adult live or movie theaters, and topless or nude bars have significant negative secondary impacts on the community, including higher incidence of criminal activity, deterioration of the quality of life, damaging impact on neighborhood character, and negative impact on economic development and revitalization and nearby property values; and

WHEREAS, Since the enforcement of the adult regulations commenced in 1998, the number of adult establishments has decreased from 177 to 136 citywide and from 53 to 29 in Community Board Five, although Community Board Five continues to have the largest number of adult use establishments in the City; and

WHEREAS, Numerous businesses have avoided being defined as adult establishments under the 1995 regulations by adapting 60% or more of their floor area to non-adult uses while restricting adult uses to 40% or less of their floor area, and therefore have remained open for business in locations where adult establishments, as defined under the 1995 regulations, would be prohibited; and

WHEREAS, The Department of City Planning now desires to amend the zoning text to eliminate the "60-40" test and to define adult establishments as those which contain any one or more specified features; and

WHEREAS, Community Board Five believes that the proposed changes would create overbroad definitions of adult use establishments that may violate the First Amendment to the U.S. Constitution and will allow arbitrary and capricious enforcement against a wide variety of businesses; and

WHEREAS, Community Board Five does not find any significant negative secondary impacts of adult uses within its district at this time and accordingly believes that there is no need for further regulation of these uses; therefore, be it

RESOLVED, That Community Board Five **does not approve** of the proposed zoning text changes relating to adult establishments.

Thank you for your attention to this matter.

Sincerely,

*Kyle Merker*

*Michael D Utevsky*

Kyle Merker
Chair

**JNR-000749**

Michael Utevesky
Chair, Land Use & Zoning

Hon. G. Virginia Fields

Hon. Margarita Lopez

0798

05/13/2001   00:51   2126833749

# CITY OF NEW YORK
# COMMUNITY BOARD SIX MANHATTAN

866 United Nations Plaza, Ste. 308, New York, NY 10017 (212) 319-3750 Fax: (212) 319-3772

## MAY 2001

**RE:** Proposed Text Changes to the Zoning Resolution Regarding Adult Establishments

**WHEREAS,** the Zoning Resolution of New York City includes sections which define "adult" and, " a substantial portion of its stock"; and

**WHEREAS,** the printed or visual material, including books, theaters, performances, photographs, film, and video tapes, which are characterized by an emphasis on the depiction or description of specified sexual activities or specified anatomical areas are defined as "adult"; and

**WHEREAS,** the City of New York has, by application of the Zoning Resolution attempted to control the location of such businesses, (resulting in the 60% -- 40% ratio now utilized in defining compliance with existing zoning), as determined and enforced by the Department of Buildings; and

**WHEREAS,** the administration has found this insufficient and is seeking a more restrictive standard; and

**WHEREAS,** Community Board 6, Manhattan, voted in favor of the original "Adult Uses" proposals; now

**THEREFORE, be it**

**RESOLVED,** Community Board 6, Manhattan, opposes extension or the Zoning text for the purpose of limiting or controlling the sale of "adult" printed materials, films, theaters, performances and video tapes which are characterized by the description or depiction of specified sexual activities or specified anatomical area as making the Zoning Resolution too complicated and making enforcement of the Building Codes too complex; and be it further

**RESOLVED,** that the inspectors of the Department Buildings are ill-equipped to make the judgments about the applicability of content of the materials to the text of the Zoning Resolution; and be it further

**RESOLVED,** that it is a contrivance to use the Zoning Resolution to measure and gauge the content of printed materials, films and video tapes, "adult" or otherwise.

**PASSED:** 37 in Favor, 2 Opposed, 0 Abstentions, & 0 Present but not eligible to vote

| Post-it® Fax Note | 7671 | Date | # of pages ▶ |
|---|---|---|---|
| To *Laura Engler* | | From *Carol Pepper* | |
| Co./Dept. M BPO | | Co. CB6 | |
| Phone # | | Phone # | |
| Fax # | | Fax # | |

JNR-000750

0799

# COMMUNITY BOARD 7  Manhattan

3096

## RESOLUTION

Date: May 1, 2001
Committee of Origin: Land Use
Re: Adult Establishment Text Changes.
Full Board Vote:   25 In Favor 7 Against   7 Abstentions  0 Present

WHEREAS, in 1995 the Department of City Planning (DCP) and the New York City Council approved text changes to the Zoning Resolution (ULURP #N950384 ZRY) to regulate adult establishments; and

WHEREAS, that zoning amendment required the closing of adult establishments throughout most of the city, and relegated them to manufacturing zones, including, but not limited to, the proposed Hudson River waterfront area; and

WHEREAS, the currently proposed zoning amendment (ULURP #N010508 ZRY) expands the definitions of 'adult establishment' and attempts to increase enforceability of the regulations adopted in 1995; and.

WHEREAS, Community Board 7/Manhattan acknowledges that some residents of this district, along with other communities throughout the city, have legitimate concerns about the spread and concentration of adult establishments, as well as issues relating to signage regulations; and

WHEREAS, Community Board 7/Manhattan finds that the City has failed to present adequate verifiable data to support its assertions of alleged negative secondary effects caused by adult establishments, which are in fact legal businesses; and

WHEREAS, Community Board 7/Manhattan found the original 1995 zoning text amendment and finds the currently proposed zoning text amendment to be deliberate attempts to regulate the content of certain forms of speech; and

WHEREAS, Community Board 7/Manhattan Manhattan found the original 1995 zoning text amendment and finds the currently proposed zoning text amendment to be unwarranted intrusions on rights guaranteed to all under the Constitution of the United States of America and the Constitution of the State of New York; and

WHEREAS, Community Board 7/Manhattan accordingly found the original 1995 zoning text amendment and finds the currently proposed zoning text amendment to be flawed in both concept and design, containing provisions which the Board believes to be unenforceable both practically and legally; and

WHEREAS, Community Board 7/Manhattan finds that the very existence of the current proposal vindicates its earlier position that the regulations are unenforceable both practically and legally;

BE IT RESOLVED THAT Community Board 7/Manhattan opposes the proposed zoning text amendment (ULURP #N010508 ZRY); and

BE IT FURTHER RESOLVED THAT Community Board 7/Manhattan calls upon the Mayor, the Director of City Planning, and the Department of City Planning, to withdraw the proposed zoning text amendment; and

BE IT FURTHER RESOLVED THAT Community Board 7/Manhattan calls upon the City Planning Commission to reject the proposed text amendment if it is not withdrawn.
*Committee: 5-0-0-0.*

JNR-000751   0800

250 West 87 Street  New York, NY 10024-2706  *Phone:* (212) 362-4008  *Fax:*(212) 595-9317
*Website: www.CB7.org   E-Mail Address: Office@cb7.org*



**Whitepot**
*Settled 1653*

The City of New York
**Community Board #6, Queens, Rego Park & Forest H**
73-05 Yellowstone Boulevard, Forest Hills, N.Y. 11375
**(718) 263-9250**                    FAX: (718) 263-2211

OFFICE OF THE
CHAIRPER

APR 30
3046

*yours Michaels Paines Romeo*
Claire Shulman
President
Borough of Queen

May 27, 2001

Joseph C. Hennessy
Chairman

Kathleen H. Reilly
District Manager

Gail M. Gordon
1st. Vice Chairman

Steven Goldberg
2nd Vice Chairman

Todd Reisman
Vice Chairman-Secretary

Renee B. Elias
Vice Chairman-Finance

Norman Tepper, P.E.
Vice Chairman-Land Use

Lynn C. Schulman
Vice Chairman-Scoping

Virginia F. Wilson
Asst. District Manager

Joseph P. Rose, Director
Dept. of City Planning
22 Reade Street
New York, N. Y.  10007-1216

Re:  N010508  ZRY

Dear Director Rose:

At its regularly scheduled meeting on May 25, 2001
Community Board 6 voted unanimously to approve the Dept.
of City Planning application for a zoning text change for
adult establishments.

Very truly yours,

Kathleen H. Reilly
District Manager

pmb



Kenneth M. Moltner
Chair

Victoria Caramante
District Manager

505 Park Avenue
Suite 620
New York, N.Y. 10022
(212) 758-4340
(212) 758-4616 (Fax)
www.decny.com/cb8 - Websit
CB8M@aol.com - E-Mail

JBR
Weil
Michael
Barth
Parnes
Romer

## The City of New York
## Manhattan Community Board 8

May 17, 2001

Hon. Joseph B. Rose
Chairman
NY City Planning Commission
22 Reade Street
New York, NY 10007-1216
Via Mail and Facsimile: (212) 720-3356

RE: Adult Establishment Zoning Text Amendment - N010508ZRY

Dear Chairman Rose,

At its full Board meeting on Wednesday, May 16, 2001, Manhattan Community Board 8 adopted the
following resolution by a vote of 18 in favor, 16 opposed and 0 abstentions:

WHEREAS the proposed Adult Establishment zoning text amendment consists of technical
amendments to current zoning rules adopted in 1995 for adult establishments, the principal changes
relating to the definitions of "an adult book store" and an "adult eating or drinking establishment";

BE IT RESOLVED THAT Manhattan Community Board 8 recommends approval of the proposed
Adult Establishment Zoning Text Amendment, N010508ZRY.

Please advise us of any action taken with regard to this matter.

Sincerely,

Kenneth M. Moltner℗
Chair

c:      Hon. C. Virginia Fields
        Hon. A. Gifford Miller
        Hon. Eva S. Moskowitz
        Ms. Shampa Chanda

0802

# COMMUNITY BOARD No. 1

**435 GRAHAM AVENUE - BROOKLYN, N.Y. 11211-2429**
**PHONE: (718) 389-0009**
**FAX: (718) 389-0098**

*The City of New York*

MAY 1 7 2001

HON. HOWARD GOLDEN
BROOKLYN BOROUGH PRESIDENT

VINCENT V. ABATE
CHAIRMAN

GERALD A. ESPOSITO
DISTRICT MANAGER

RABBI JOSEPH WEBER
FIRST VICE-CHAIRMAN

RONALD E. WEBSTER
SECOND VICE-CHAIRMAN

MINERVA MOISES
THIRD VICE-CHAIRPERSON

HAZEL T. HUNTER
FINANCIAL SECRETARY

BRUNILDA RIVERA
RECORDING SECRETARY

CHRISTOPHER H. OLECHOWSKI
MEMBER-AT-LARGE

HON. KENNETH K. FISHER
COUNCILMAN, 33rd CD

HON. VICTOR L. ROBLES
COUNCILMAN, 34th CD

greenpoint —
williamsburg

*Support*

May 15, 2001

Commissioner Joseph Rose
Director
New York City Department of City Planning
22 Reade Street    Room 3E
New York, New York 10007-1216

**RE: Adult Establishment Text Change (No. 010508 ZRY)**

Dear Commissioner Rose:

Prior to providing our comments regarding the Adult Establishment Text Change (No. 010508 ZRY) Community Board No.1 wants take this opportunity to reiterate its position regarding the Adult Establishment Text Amendment (N 950384 ZRY) that was introduced in 1995 and subsequently adopted into the zoning resolution. Attached is a copy of our comments at that time, which reflect the Board's original recommendation opposing the zoning text and a request that the proposal be withdrawn with a moratorium be implemented.

Community Board No. 1 held a public hearing on May 8, 2001 and reviewed the item: Adult Establishment Text Change (ULURP No. N010508 ZRY) which offers amendments to the earlier text.

We are still steadfast in our opposition to the "Adult Establishment Text" because it permits (as of right development) for these obnoxious uses in a large portion of the District's manufacturing zoned areas.

0803

However, because the newly proposed changes would tighten up loopholes in the previous text Community Board No. 1 felt it prudent to consider them.

Please be advised that at the Board Meeting, which was held on May 8, 2001, the members of Community Board No. 1 voted to accept the text changes without conditions. The vote of the Board was as follows: 35 "YES; 0 "NO"; 0 "ABSTENTIONS".

Attached please find a copy of the Board's District Development Committee's ULURP Report.

Working for a Better Greenpoint-Williamsburg.

Sincerely,

Vincent V. Abate
Chairman

VVA/mbw
Enclosures: 2 Attachments

0804



# COMMUNITY BOARD No. 1

**435 GRAHAM AVENUE - BROOKLYN, N.Y. 11211-2429**
**PHONE: (718) 389-0009**
**FAX: (718) 389-0098**



*The City of New York*

HON. HOWARD GOLDEN
BROOKLYN BOROUGH PRESIDENT

VINCENT V. ABATE
CHAIRMAN

HON. KENNETH K. FISHER
COUNCILMAN, 33rd CD

GERALD A. ESPOSITO
DISTRICT MANAGER

HON. VICTOR L. ROBLES
COUNCILMAN, 34th CD

RABBI JOSEPH WEBER
FIRST VICE-CHAIRMAN

RONALD E. WEBSTER
SECOND VICE-CHAIRMAN

MINERVA MOISES
THIRD VICE-CHAIRPERSON

HAZEL T. HUNTER
FINANCIAL SECRETARY

BRUNILDA RIVERA
RECORDING SECRETARY

CHRISTOPHER H. OLECHOWSKI
MEMBER-AT-LARGE

TO: Members of Community Board No. 1, Brooklyn

FROM: Ronald E. Webster, Chairperson, District Development Committee

DATE: May 8, 2001

SUB.: Adult Establishment Text Changes # N 010508 ZRY

---

**ACTION TO BE TAKEN BY COMMUNITY BOARD:** Review and deliberate on the request By the City of New York's Department of City Planning to approve zoning text changes Concerning adult establishments.

**PURPOSE:**

The Dept. Of City Planning (DCP) seeks Community Board No. 1's (CB1) approval of zoning text changes concerning adult establishments.. Per the information sent by DCP to CB1 on the above referenced matter ..." The proposed zoning text changes consist of technical amendments to current zoning rule adopted in 1995 for adult establishments...furthermore..." The amendments are proposed in response to attempts by operators of adult establishments to evade enforcement under regulations through superficial compliance measures which do not alter the character of the establishments as enterprises with a predominant focus on sexually explicit materials or activities. In addition, several court rulings have narrowed the scope and Application of the regulations in ways which are contrary to the original intent of the City Planning Commission and the City Council, thus requiring amendments.

The principal changes in the proposed amendments relate to the definitions of adult Book store and an adult eating or drinking establishment . For example, the changes with respect to adult book and video stores are intended to address establishments which have sought to avoid enforcement under regulations merely by increasing the Amount of non-adult books or videos sold at the premises and the amount of floor area dedicated to such material, in such a way that there is no reasonable expectation that patrons will purchase the non-adult material. Or the absence of any separation between sections of the store with adult and non-adult material. The proposed

0805

amendments address this type of "sham" compliance by establishing objective factors, relating principally to    physical lay-out and method of operation.

The changes relating to the definition of  adult eating and drinking establishments would reaffirm the original intent of the City Planning Commission and the City Council that any bar or restaurant which regularly features adult entertainment is subject to the regulations irrespective of the amount of floor space within the establishment devoted to topless or nude entertainment.

## RECOMMENDATION:

The Committee met on Tuesday, May 1st to review and deliberate on the above referenced matter and voted in the majority with one abstention  to accept the proposed adult establishment text changes without conditions.



# COMMUNITY BOARD No. 1
### 435 GRAHAM AVENUE - BROOKLYN, N.Y. 11211-2429
### PHONE: (718) 389-0009
### FAX: (718) 389-0098

*The City of New York*

**C B 1**

greenpoint —— williamsburg

HON. HOWARD GOLDEN
BROOKLYN BOROUGH PRESIDENT

VINCENT V. ABATE
CHAIRMAN

HON. KENNETH K. FISHER
COUNCILMAN, 33rd CD

GERALD A. ESPOSITO
DISTRICT MANAGER

HON. VICTOR L. ROBLES
COUNCILMAN, 34th CD

RABBI JOSEPH WEBER
FIRST VICE-CHAIRMAN

RONALD E. WEBSTER
SECOND VICE-CHAIRMAN

MINERVA MOISES
THIRD VICE-CHAIRPERSON

HAZEL T. HUNTER
FINANCIAL SECRETARY

BRUNILDA RIVERA
RECORDING SECRETARY

CHRISTOPHER H. OLECHOWSKI
MEMBER-AT-LARGE .

May 15,2001

Commissioner Joseph Rose
Director
New York City Department of City Planning
22 Reade Street   Room  3E
New York, New York 10007-1216

RE:   **Adult Establishment Text Change
(No. 010508 ZRY)**

Dear Commissioner Rose:

Prior to providing our comments regarding the Adult Establishment Text Change (No. 010508 ZRY) Community Board No.1 wanted  to take this opportunity to reiterate its position regarding the Adult Establishment Text Amendment (N 950384 ZRY) that was introduced in 1995 and subsequently adopted into the zoning resolution. Attached is a copy of our comments at that time, which reflect the Board's original recommendation to oppose the zoning text and a request that the proposal be withdrawn.

Community Board No. 1 held a public hearing on May 8,2001 and reviewed the item: Adult Establishment Text Change (ULURP No. N010508 ZRY), which offers amendments to the earlier text.

Please be advised that at the Board Meeting, which was held on May 8,2001, the members of Community Board No. 1 voted to accept the text changes without conditions. The vote of the Board was as follows: 35 "YES; 0 "NO"; 0 "ABSTENTIONS".

Attached please find a copy of the Board's District Development Committee's ULURP Report.

Working for a Better Greenpoint-Williamsburg.

Sincerely,

*Vincent V. Abate*

Vincent V. Abate
Chairman

VVA/mbw
Enclosures: 2 Attachments

0807

ADULT ESTABLISHMENT ZONING TEXT AMENDMENT
(ULURP # N950384ZRY)

This is an application submitted jointly by the Department of City Planning and the Land Use Committee of the New York City Council to regulate and restrict the operation and conduct of Adult Establishments throughout New York City. Adoption of these amendments will supersede the moratorium on the creation of new Adult Establishments that was enacted in 1994. The Board's review of this item is performed pursuant to Section 200 of the City Charter.

Among the many components of this comprehensive legislation, the following are of particular significance to Brooklyn Community Board 1:

- no Adult Establishment will be permitted to exist in "light commercial", i.e., C1 - C6-3 or manufacturing districts that permit as of right residential use; (such uses are currently prohibited in purely residentially zoned districts);

- Adult Establishments will only be permitted in those portions of "heavy commercial", i.e., C6-4 - C8, and manufacturing districts that do not permit as of right residential use provided that no such establishment can be situated within 500 ft. of a church, a school (including a day care center), a residential zoned district or those commercial and manufacturing zoned districts that do not permit this use;

- all Adult Establishments established after the passage of this legislation cannot be situated within 500 ft. of another such use and cannot be larger than 10,000 sq. ft.; and

- the size and location of signs advertizing Adult Establishments will be restricted to minimize impact.

Currently, none of the 177 existing Adult Establishments identified in this proposal's Environmental Assessment Statement are situated in Brooklyn CB1. The legislation's innovative amortization provisions governing the closing of existing Adult Establishments situated in non-complying districts will, thus, not directly affect this district. CB1 is, however, situated in close proximity to midtown Manhattan, an area that will be heavily affected by the amortization provision.

While implementation of this legislation will eliminate the as of right ability to establish Adult Establishments in virtually all of CB1's commercially zoned sectors, a large portion of the area's manufacturing zoned districts will permit as of right development,

even after the 500 ft. provision is applied. The affected areas include substantial segments of northern and eastern Greenpoint, eastern Williamsburg and the entire East River waterfront. Several substantial non-complying residential enclaves are situated in this area. Finally, the development of the East River waterfront for positive mixed use purposes is currently being explored by CB1 and will be addressed in a forthcoming Section 197-A Plan; this will certainly not include Adult Establishments as an appropriate use.

CONSIDERATION

After careful consideration, Brooklyn Community Board 1 recommends that this proposal be REJECTED. We further urge that the legislation be immediately WITHDRAWN and the moratorium on the creation of new Adult Establishments maintained in place. While we do not dispute the legislation's goal of significantly restricting the visibility and prevalence of a clearly obnoxious use, we believe the means employed are grossly unfair and will greatly undermine the interests of our community and similarly situated neighborhoods.

We take this position for the following reasons:

First, despite its surface appearance as a law of general application, the impact of this legislation will be extremely unbalanced, to the direct detriment of Williamsburg and Greenpoint. Specifically, this proposal will restrict a use that can now legally occur in most of the City to a selected few neighborhoods that will now be compelled to bear the full burden. The resulting drastic restriction in the areas of legal supply in a market of increasing demand will have substantial and negative effects upon the impacted communities. This manipulation of the zoning ordinance is extremely inequitable and violates the spirit of the City Charter's Fair Share provisions.

Second, the extreme alteration of the Adult Establishment market that this legislation will generate together with CB1's close proximity to mid-town Manhattan and numerous major transportation routes will make Williamsburg and Greenpoint particularly vulnerable to the proliferation of such uses if the proposal is approved. Thus, the fact that no Adult Establishments currently exist within CB1's borders proves absolutely nothing regarding the legislation's post approval impact.

Passage of this legislation will create a radical sea change in the economic realities of the Adult Establishment industry. Many of those neighborhoods that are currently most economically viable as Adult Establishment host communities will now be off limits to future development, or even current operations. This will, by default, make easily accessible manufacturing zoned areas far more economically attractive to Adult Establishment operators. In our view, Williamsburg and Greenpoint will be among the most "attractive" of these communities. Situated literally in the shadow

of Manhattan, dissected by the BQE and in close proximity to the Queensborough, Williamsburgh and Greenpoint Avenue Bridges and the Queens Midtown Tunnel, CB1 will provide a distressingly central and highly convenient alternative location for these uses. Specifically, we fear that the industrial portions of the following major thoroughfares - Flushing, Metropolitan, Kent, Vandervoort and Greenpoint Avenues and Grand and West Streets - will be particularly vulnerable if this legislation is approved. The fact that several of these routes have already suffered from a less stationary "Adult" use, i.e., prostitution, vividly underlines their potential as Adult Establishment strips. For these reasons, the impact of this legislation will hardly be benign to CB1; its passage will, instead, unfurl a huge welcome mat throughout Greenpoint and Williamsburg to the operators of these obnoxious uses.

Third, the fact that the current legislation does not go as far in prohibiting existing Adult Establishments as did the Mayor's 1994 proposal does not significantly reduce its negative impact upon CB1. While the 1994 proposal would have effectively exiled these uses from virtually all of Manhattan, the current measure will still radically alter the market. According to the proposal's Environmental Assessment Statement, no more than 99 of the 177 current Adult Establishments will be situated in zoning compliant districts after approval. This number will, however, substantially plummet further when the impact of the 500 ft. rule is applied. Under any circumstances, probably half of the existing uses will still be compelled to seek alternate locations in complying districts. When one adds the fact that this continues to be a growth industry, the legislation's negative impact potential upon CB1 becomes abundantly clear.

Fourth, the legislation's mechanical application of the zoning ordinance will yield particularly unfair results in communities, like CB1, that developed prior to the initiation of zoning. Our substantial manufacturing districts contain within them several significant non-complying residential enclaves that, in many instances, are situated well beyond 500 ft. of the nearest residential district. The solid Beadel Street enclave situated from Morgan to Porter Avenues is only one of several such communities in CB1. Under the proposed legislation, these areas will receive absolutely no protection but could witness the totally legal creation of an Adult Establishment in their very midst. Such a patently unfair development might very well endanger the delicate balance that, despite unfavorable zoning, has preserved these enclaves as viable residential neighborhoods; it also underlines the severe limitations that zoning has in addressing issues that, as this, involve far more than the mere use of land.

Fifth, the fact that as of right Adult Establishment development can, under the proposed legislation, occur along CB1's entire East River waterfront is totally unacceptable; it is also clearly inconsistent with the recommendations contained in the City's own Waterfront Development Plan, which encourage mixed use and even

the expanded implementation of current Section 197-A planning efforts, which, when promulgated, will certainly not envision the creation of an East River red light district! Inclusion of this area, which occurred solely as a result of the mechanical application of the highly flawed zoning formula, makes absolutely no sense and should never have occurred.

It is no answer that this provision will not retard the development potential of the waterfront, since implementation of any plan increasing its mixed use and residential zoning will, as a consequence, prohibit the operation of Adult Establishments in the affected area. We know, however, that it is one thing to plan for an area and quite another to transform the recommendations into reality. Achievement of the latter often requires the securance of political and financial commitments from any number of public and private sector players. In our view, inclusion of the East River waterfront in an as of right Adult Establishment zone will greatly discourage those parties from making any such commitments and, instead, prompt them to invest the few available dollars in communities not so encumbered. It might even inhibit the City from advancing approval of the development plan itself. In this way, a "minor" problem might very well convert itself into a major impediment to positive waterfront development.

Sixth, since the legislation's constructive provisions significantly restricting the signage of Adult Establishments, which will combat one of this use's most offensive secondary impacts, are not inherently tied to its other components, they should be severed from the main proposal and enacted as separate legislation. They do not, however, go far enough. The solicitation of Adult Establishment business through the distribution of leaflets, brochures, etc., is an equally obnoxious practice that, if not restricted, could easily negate the effectiveness of the signage regulations. For this reason, the City Council should enact supplementary local legislation that severely restricts the distribution of this material. Such especially odious practices as distribution to minors should be made a criminal offence. Regulations of these purely commercial activities are, in our view, fully compatible with the requirements of the First Amendment.

Seventh, we also question the efficacy of the 500 ft. rule as an effective buffer zone between separate Adult Establishments and between such uses and the designated residential and commercial districts and institutional facilities. Under this approach, Adult Establishments can open well less than one long block away from solid, residentially zoned communities in areas that themselves are often semi-residential. Implementation of this provision will, in our view, significantly undermine the stability of the outer perimeters of all residentially and commercially zoned communities situated in Greenpoint and Williamsburg. It simply will not do.

6080



*JBR*
*Young*
*Michaels*
*Weil*
*Paines*
*Romero*

# Community Board No. 2

OFFICE OF THE
43-22 50th Street
Woodside, New York 11377
CHAIRPERSON
MAY (718) 533-8773
2001
Fax (718) 533-8777

3153
3158

Joseph Conley
*Chairman*

May 7, 2001

Dolores M. Rizzotto
*District Manager*

Joseph B. Rose, Director          Fax (212) 720-3219
Department of City Planning
22 Reade Street
New York, New York 10007

RE:   ULURP #N 010508 ZRY/MODIFICATIONS TO ADULT
      ESTABLISHMENT TEXT CHANGES

Dear Mr. Rose:

    Community Board 2 received the information on the above
noted matter.  On May 3, 2001 Board 2 held a Public Hearing on
the matter.

    Following that hearing, at the regular monthly board meeting
a motion was made, and seconded, to approve the text changes.
The vote was 28 In Favor, 0 Opposed, 0 Abstentions.

                                Sincerely yours,

                                Dolores Rizzotto
                                District Manager

DR:mm
cc:  Hon. Claire Shulman, President, Borough of Queens
     Hon. Walter McCaffrey, Council Member
     Hon. John Sabini, Council Member
     John Young, Director, Qns Office, DCP
     Jed Weiss, Qns Office, DCP

b:adult2/17



**The City of New York**

OFFICE OF THE CHAIRPERSON

*Community Board 4 Q*
*104-03 Corona Avenue 2ⁿᵈ Floor*
*Corona, NY 11368-2923*
*Phone: (718) 760-3141  Fax (718) 760-5971*

MAY 4 – 2001

3) 0 ⁰

*Richard Italiano*
*Chairperson*

*Rose Renda-Rothschild*
*District Manager*

9BR
young
Weil
Micha
Parne
Ramer

May 2, 2001

Hon. Joseph Rose, Director
DEPT. OF CITY PLANNING
22 Reade Street
Room 3E
New York, NY  10007

Dear Mr. Rose:

**ADULT ESTABLISHMENT TEXT CHANGE**
**CEQR NO 01 DCP054Y**
**ULURP NO N 010508ZRY**

The Members of Community Board 4 Queens at the May 1, 2001 meeting of the Full Board voted to recommend approval of the above-mentioned text as presented by our Queens City Planning Liaison to the Land Use Committee of CB 4.

The vote was unanimous.

Sincerely,

Miriam Levenson, Chairperson
ULURP & Zoning Committee

**JNR-000762**

*SERVING:    CORONA    CORONA HEIGHTS    ELMHURST*



# Community Board No. 5

**Borough of Queens**

Ridgewood, Maspeth, Glendale, Middle Village, South Elmhurst

61-23 Myrtle Avenue • Glendale, N.Y. 11385

(718) 366-1834

OFFICE OF THE ~~...~~  MAY 16 2001

3220

Francis J. Principe
*Chairperson*

Gary Giordano
*District Manager*

May 14, 2001

Mr. Joseph Rose, Director
NY City Dept. of City Planning
22 Reade Street
New York, NY 10007-1216

                    Re: CB5Q Recommendations for Proposed
                        Adult Entertainment Establishments
                        Zoning Text Changes
                        ULURP #- N 010508 ZRY
                        CEQR # - 01DCP054Y

Dear Mr. Rose & Staff:

At our Monthly Meeting conducted the evening of Wednesday, May 9, 2001, 7:30pm, the members of CB5Q adopted the following Resolution, put forth by our Zoning and Land Use Review Committee:

WHEREAS, the Department of City Planning has requested comments from Community Boards related to the Proposed Zoning Text Changes for Adult Entertainment Establishments, known as ULURP #- N 010508ZRY and CEQR #-01DCP054Y; and,

WHEREAS, the Zoning and Land Use Review Committee of Community Board 5, Queens met to discuss these proposed text changes on Tuesday, May 1, 2001,at 7:30pm, and the Committee members agreed that these proposed zoning text changes should help to curtail adult entertainment establishments in residential areas;

THEREFORE, BE IT, RESOLVED that Community Board 5, Queens supports the proposed changes of the Dept. of City Planning related to Adult Entertainment Establishments, and are specifically in favor of the proposed abolition of the 60/40 rule that allows adult entertainment establishments to exist outside of manufacturing areas, and believes that no adult entertainment establishment should exist within 500 feet of a residential area, a house of worship or a park. Further, we are informed that there are two (2) adult entertainment establishments in District 5, Queens, one of which is located within 500 feet of a residential area,and we encourage enforcement of applicable laws related to this location.

                              Sincerely,
                              *Gary Giordano*
                              Gary Giordano, DM

JNR-000763

0812

CC: Hon. Claire Shulman, Queens Borough President

COMM BOARD 6          Fax:263-2211          May 14 2001  14:37    P.02   *JBR michael Parnes YOUNG Romero*

Whitepot
Settled 1653

The City of New York
## Community Board #6, Queens, Rego Park & Forest Hills
73-05 Yellowstone Boulevard, Forest Hills, N.Y. 11375
**(718) 263-9250**                          FAX: **(718) 263-2211**

*3/66*

Claire Shulman
*President
Borough of Queens*

Joseph C. Hennessy
Chairman

Kathleen H. Reilly
District Manager

Gail M. Gordon
1st. Vice Chairman

Steven Goldberg
2nd Vice Chairman

Todd Reisman
Vice Chairman-Secretary

Renee B. Elias
Vice Chairman-Finance

Norman Tepper, P.E.
Vice Chairman-Land Use

Lynn C. Schulman
Vice Chairman-Scoping

Virginia F. Wilson
Asst. District Manager

May 14, 2001

Joseph P. Rose, Director          Re:  N010508  ZRY
Dept. of City Planning
22 Reade Street
New York, N. Y.   10007-1216

Dear Director Rose:

     At its regularly scheduled meeting on April 25, 2001
Community Board 6 voted unanimously to approve the Dept.
of City Planning application for a zoning text change for
adult establishments.

               Very truly yours,

               Kathleen H. Reilly/pw

               Kathleen H. Reilly
               District Manager

     pmb

0813

*City of New York*

# COMMUNITY BOARD NO. 9

OFFICE OF THE CHAIRPERSON
Queens Borough Hall
120-55 Queens Boulevard, Room 310-A
Kew Gardens, NY  11424

MAY 2001

(718) 286-2686
Fax (718) 286-2685
Meeting Hotline (718) 286-2689

Paul Sapienza, Chairperson   *   Mary Ann Carey, District Manager   *   Claire Shulman, Borough President

May 15, 2001

**OFFICERS**
Paul Sapienza,
Chairperson

Sam Esposito,
1st Vice Chairperson

Ivan Mrakovcic,
2nd Vice Chairperson

Joseph Todisco,
Executive Secretary

**BOARD MEMBERS**
Martha Aponte
Evelyn Baron
Wallace Bock
Donna Caltabiano
Maria Camacho
John Carter
James Coccovillo
Sandye Cochran
Joan DeCamp
Anton Dietrich
Arlene Fiumano
Lucille Fostel
Sylvia Hack
Guillermo Larregui
Leonora Lavan
Priscilla Levine
Alvira Liogys
Vishnu Mahadeo
Robert Mangieri
Allen Maurer
Angela Moloney
Carl Perrera
Rabbi Daniel Pollack
Claudio Ramirez
Michael Rollo
Rabbi Chaim Schnek
Dr. Stephen Sofer
Bernice Spitzer
Maria Thomson
Marie Turley
Jonathan Wilner

Joseph B. Rose, Director
Department of City Planning
22 Reade Street
New York, NY 10007-1216

Dear Mr. Rose:

Attached please find a copy of the Adult Establishment Text
Change ULURP No. 01058ZRY Resolution voted on by
Community Board #9 at it's meeting on May 8, 2001.

If there are any questions please feel free to call me at the above
telephone number.

Sincerely,

Paul Sapienza
Chairperson

0814

*"SUPPORT A DRUG FREE COMMUNITY BOARD NO. 9"*

*City of New York*



# COMMUNITY BOARD NO. 9

**Queens Borough Hall**
**120-55 Queens Boulevard, Room 310-A**
**Kew Gardens, NY  11424**

(718) 286-2686
Fax (718) 286-2685
Meeting Hotline (718) 286-2689

Paul Sapienza,  Chairperson  *  Mary Ann Carey,  District Manager  *  Claire Shulman, Borough President

**OFFICERS**
Paul Sapienza,
Chairperson

Sam Esposito,
1st Vice Chairperson

Ivan Mrakovcic,
2nd Vice Chairperson

Joseph Todisco,
Executive Secretary

**BOARD MEMBERS**
Martha Aponte
Evelyn Baron
Wallace Bock
Donna Caltabiano
Maria Camacho
John Carter
James Coccovillo
Sandye Cochran
Joan DeCamp
Anton Dietrich
Arlene  Fiumano
Lucille Fostel
Sylvia Hack
Guillermo Larregui
Leonora Lavan
Priscilla Levine
Alvira Liogys
Vishnu Mahadeo
Robert Mangieri
Allen Maurer
Angela Moloney
Carl Perrera
Rabbi Daniel Pollack
Claudio Ramirez
Michael Rollo
Rabbi Chaim Schnek
Dr. Stephen Sofer
Bernice Spitzer
Maria Thomson
Marie Turley
Jonathan Wilner

May 8, 2001

Community Board 9 unanimously supports the Adult
Establishment Text Change ULURP No. 01058ZRY.

*"SUPPORT A DRUG FREE COMMUNITY BOARD NO. 9"*
*Richmond Hill, Woodhaven, Kew Gardens & Ozone Park*

*weil*
*michaels*

**(718) 225-1054**
**FAX (718) 225-4514**

*Parnes*
*Romero*



## Community Board No. 11

213-02 A 42 Avenue, Bayside, NY 11361

Claire Shulman, President
Borough of Queens

Melinda Katz, Director
Community Boards

**BERNARD HABER**
CHAIRMAN

**ANNE MARIE BORANIAN**
DISTRICT MANAGER

May 8, 2001

OF THE
RSON
MAY 1 0 2001
3156

Mr. Joseph B. Rose
Chair
Department of City Planning
22 Read Street
New York, New York 10007

RE: N 010508 ZRY
    Adult Establishment Text Changes

Dear Chairman Rose:

Please be advised that at the May 7, 2001 Community Board 11 meeting a public hearing was held on the above referenced application.

A motion by the Board was made to approve the application for a zoning text change on Adult Establishments which passed by a vote of 27 in favor and 1 opposed.

We trust you find this information useful.

Very truly yours,

*Bernard Haber, P.E.*

Bernard Haber, P.E.
Chair

lv

0816

*Serving Communities of: Auburndale, Bayside, Douglaston, Hollis Hills, Little Neck, Oakland Gardens*



*Zoning*

*JBR*
*Brooks*
*Michael*
*Paines*
*Romer*

BOROUGH OF STATEN ISLAND
# COMMUNITY BOARD 3

655-218 Rossville Avenue, Staten Island, N.Y. 10309
Telephone: (718) 356-7900, 7903
FAX: (718) 966-9013

OFFICE OF THE
CHAIRPERSON

APR 2 6 2001

3009                    April 25, 2001

Mr. Joseph Rose, Chairman
City Planning Commission
22 Reade Street
New York, NY  10007

Re:  N010508 ZRY
       Adult Establishments Text Changes

Dear Mr. Rose:

The Land Use Committee of Community Board #3 held a public meeting on Wednesday, April 18, 2001 to discuss the application for a 45 day Comment regarding the text changes.  Jane Meconi, representing the Staten Island Office of City Planning, made a presentation to the board members and area residents.

At the April 24, 2001 General Board meeting the following motion was passed by a vote of 21 in favor, 5 opposed, 1 abstaining:

"That Community Board #3 is OPPOSED to Part II, #2 Location Regulations and Buffer Zone Provisions for 'Mixed Use' Manufacturing Districts, which opens the door for more residential development in this area."

                                          Very truly yours,

*John Antoniello*                          *Lydia Ragucci*

John Antoniello,                           Lydia Ragucci,
Chairman of the Board                      Land Use Chairman

JA:LR:da

0817

Annandale ● Arden Heights ● Bay Terrace ● Charleston ● Eltingville ● Great Kills ● Greenridge ● Huguenot



THE CITY OF NEW YORK
**OFFICE OF THE PRESIDENT**
BOROUGH OF MANHATTAN

**C. VIRGINIA FIELDS**
BOROUGH PRESIDENT

May 18, 2000

## APPLICATION #:

N010508 ZRY

## APPLICANT:

The Department of City Planning
22 Reade Street
New York, New York 10007

## REQUEST:

This is a request by the Department of City Planning, pursuant to Adult Establishment Zoning Text (N950384- 9/18/95) to amend Sections 12-10 - Definitions, 32-01 & 42-01 - Special Provisions for Adult Establishments.

## PROJECT BACKGROUND/DESCRIPTION:

The proposed zoning text changes consist of technical amendments to current zoning rules adopted in 1995 for adult establishments. The regulations are a comprehensive set of location restrictions designed to minimize the potential for adverse secondary effects throughout the City. The proposal would not change the districts in which adult establishments may be located nor change existing restrictions.

## JNR-000769

MUNICIPAL BUILDING  •  1 CENTRE STREET  •  NEW YORK, NY 10007
PHONE (212) 669-8300   FAX (212) 669-4305
www.cvirginiafields.com

0818

The main changes relate to the definitions of "adult book store" and "adult eating or drinking establishment". The changes to the definitions would reaffirm the original intent of the City Planning Commission and the City Council.

The proposed amendments would address "sham" compliance by avoiding enforcement through superficial measures and would establish objective factors to be used for enforcement.

## SUMMARY OF COMMUNITY BOARD ACTION:

Manhattan Community Board #1, on April 17, 2001, voted to recommend the approval of the Zoning Text Change.

Manhattan Community Board # 2, on April 19, 2001, voted to recommend approval of the text amendments and urged City Planning to add language to make clear that the 500' barrier be measured radially from all points along the lot line; and

Manhattan Community Board # 4, on May 2, 2001, voted to decline to support The Zoning Text Change N010508 ZRY because it believes that: the general public does not need further protection from adult establishments; the text changes to close loopholes are not substantive; and enforcement by the Department of Buildings would be a waste of time since they have more immediately necessary assignments.

Manhattan Community Board #5, on May 10, 2001, voted to oppose The Zoning Text Change N010508 ZRY, because it believes that the proposed changes would create overbroad definitions and may violate the First Amendment to the U. S. Constitution. It finds no significant secondary impacts and therefore no need for further regulation.

Manhattan Community Board #6, on May 9, 2001, voted to oppose the extension of the Zoning Text for the purpose of limiting the sale of "adult materials. It believes that the Department of Buildings is not equipped to apply the changes and that the text change is a contrivance to use the Zoning Resolution as a measure of what is "adult.

Manhattan Community Board # 7, on May 1, 2001, voted to oppose the proposed zoning text because: the City has failed to present verifiable data to support assertions of negative secondary effects; the original 1995 zoning text and the proposed zoning text are deliberate attempts to regulate certain forms of speech, are unwarranted intrusions on rights guaranteed by the Constitutions of the United States and the State of New York, are flawed in content and design, and are unenforceable practically and legally.

Manhattan Community Board # 8, on May 17, 2001, voted to recommend approval of the Zoning Text Amendment.

## SUMMARY OF BOROUGH BOARD ACTION:

On May 17, 2001, the Manhattan Borough Board voted 6 in favor, 3 against with 6 abstentions to recommend disapproval of the application.

## BOROUGH PRESIDENT ACTION:

      The Manhattan Borough President recommends approval.

X      The Manhattan Borough President recommends disapproval.

      The Manhattan Borough President recommends approval, subject to the conditions detailed below.

      The Manhattan Borough President recommends disapproval, unless the conditions detailed below are addressed as described.

## COMMENTS:

The Manhattan Borough President agrees with Community Boards 4, 5, 6 and 7. Of the seven Manhattan Community Boards that voted, the majority voted for disapproval of the application. At the Manhattan Borough Board Meeting of May 17, 2001, on the vote for disapproval of Application # N010508 ZRY the vote was 6 in favor, 3 against and 6 abstentions. Manhattan Community Boards who abstained were those where the application had not come before the full Board.

The Adult Establishment Zoning Text was approved in 1995, with the support of many of the community boards most directly affected by "adult establishments". The number of adult establishments has decreased measurably.  Few, if any, secondary effects have been observed (criminal activity, deterioration of quality of life, damaging neighborhood character, reducing economic development and property values). There is no further need for protection felt by these communities.

It is of much concern to these very community boards that the First Amendment may be violated with approval of this application. In addition, if the application were to be approved the imposition of enforcement of these amendments on an already overburdened Department of Buildings would be impractical.

0820

**The Manhattan Borough President therefore recommends disapproval of this application**

Report and Recommendation
Accepted:

C. Virginia Fields
Manhattan Borough President

0822

CITY OF NEW YORK

# PRESIDENT   OF   THE   BOROUGH   OF   BROOKLYN

BOROUGH HALL    209 JORALEMON STREET    BROOKLYN, N.Y.  11201

HOWARD GOLDEN
PRESIDENT

1-718/802-3700
FAX: 1-718/802-3778

## facsimile transmittal

To:      Distribution

From:   Howard Golden

Date:   May 18, 2001

Re:      Brooklyn Borough Board Resolution

Attached is the Brooklyn Borough Board's resolution for ULURP application 010508
ZRY. If you have any questions, please contact Mr. Richard Bearak at (718) 802-4057.

Distribution

    City Planning Commission
    Honorable Peter F. Vallone
    Speaker of the City Council
    Brooklyn City Council Delegation
    Satish Babbar, R.A., Commissioner
    Department of Buildings
    Brooklyn Community Board Chairpersons
    Gail Benjamin, Director
    City Council, Land Use Division
    Regina Myer, Director
    Department of City Planning, Brooklyn Office
    ✓Kenneth Bergin, Department of City Planning
    Marilyn Mosley
    Richard Bearak

JNR-000773

0823

## Community/Borough Board Recommendation

**CITY PLANNING COMMISSION**
22 Reade Street, New York, NY 10007
FAX # (212) 720-3356

### INSTRUCTIONS

1. Return this completed form with any attach- ments to the Calendar Information Office, City Planning Commission, Room 2E at the above address.

2. Send a copy of the completed form with any attachments to the applicant's representative as indicated on the Notice of Certification, one copy to the Borough President, and one copy to the Borough Board, when applicable.

*APPLICATION #* 010595 ZRY

*DOCKET DESCRIPTION*

Technical amendments proposed by the Department of City Planning to amend the Zoning Resolution (Sections 12-10 and 32-01) to modify the regulations governing adult establishments.

*COMMUNITY BOARD NO.* _____

*BOROUGH* _____   *BOROUGH BOARD* Brooklyn

*DATE OF PUBLIC HEARING* May 15, 2001   *LOCATION* Brooklyn Borough Hall

*WAS QUORUM PRESENT?* _X_ *YES* ____ *NO*   (A public hearing shall require a quorum of 20% of the appointed members of the board, but in no event fewer than seven such members.)

*VOTE ADOPTING RECOMMENDATION TAKEN*

*DATE* __ May 15, 2001 __   *LOCATION* Brooklyn Borough Hall

*RECOMMENDATION*

_X_ APPROVE   ____ APPROVE WITH MODIFICATIONS/CONDITIONS

____ DISAPPROVE   ____ DISAPPROVE WITH MODIFICATIONS/CONDITIONS

*EXPLANATION OF RECOMMENDATION-MODIFICATION/CONDITIONS (Attach additional sheets if necessary)*

SEE ATTACHMENTS

JNR-000774

0824

RESOLUTION BROOKLYN BOROUGH BOARD
MAY 15, 2001
ULURP Application 010508 ZRK
Modification of Adult Establishment Regulations

WHEREAS, adult establishments have a detrimental effect on the quality of life in neighborhoods; and

WHEREAS, in 1995, the City Planning Commission adopted an amendment to the New York City Zoning Resolution that intended to regulate the location, proximity, size and signage of adult establishments; and

WHEREAS, efforts by the Department of Buildings to enforce the intent of the 1995 regulations were undermined by court challenges by the owners of adult entertainment operations and judicial interpretation of what constitutes an adult establishment; and

WHEREAS, there has been a significant increase in the number of establishments featuring adult content, materials or entertainment in Brooklyn; and

WHEREAS, the Department of City Planning has proposed an amendment to the Zoning Resolution as a means to address the inadequacies of the existing regulations; and

WHEREAS, upon the adoption of the proposed text, the Department of Buildings should immediately determine whether these establishments featuring adult contain, materials or entertainment are in violation based on standards that define adult establishments and zoning siting standards; and

WHEREAS, the Zoning Resolution does not adequately address signage controls for establishments advertising adult content, material or entertainment; now therefore be it

RESOLVED that the Brooklyn Borough Board recommends approval of the Modification of Adult Establishment Regulations; and be it further

RESOLVED that the Brooklyn Borough Board calls on the Department of Buildings to:
 • Conduct inspections of all adult establishments in Brooklyn, within 60 days of the effective date of this zoning text amendment.
 • Provide the Brooklyn Borough Board with a status report within 180 days of the effective date of this zoning text amendment indicating the date of inspection(s), whether a violation was issued, judicial status, judicial outcome and current operating status of the establishment
 • Provide the Brooklyn Borough Board with quarterly updates of the above referenced report; and be it further

RESOLVED that the Brooklyn Borough Board calls on the Department of City Planning to conduct a study, in consultation with community boards and local elected officials, of illuminated signs at establishments advertising adult content, material or entertainment to determine the appropriateness of the existing sign regulations.

JNR-000775

0825



THE CITY OF NEW YORK
**OFFICE OF THE PRESIDENT**
BOROUGH OF MANHATTAN

**C. VIRGINIA FIELDS**
BOROUGH PRESIDENT

Meeting of May 17, 2001

# MANHATTAN BOROUGH BOARD

## DRAFT RESOLUTION

### Re: ULURP Application N0101508 ZRY
### Adult Establishment Text Change

WHEREAS, the proposed text changes would better reflect the original intent of the Adult Establishment Zoning Text (N950384 ZRY – 9/18/95), which was to reduce adverse secondary effects that were said to result from adult establishments in residential and neighborhood retail districts; and

WHEREAS, these adverse secondary impacts were said to include a higher incidence of criminal activity; deterioration of the quality of urban life caused by a damaging impact on neighborhood character, children and other residents; and negative impacts on economic development and revitalization and nearby property values; and

WHEREAS, the text changes clarify the current zoning rules but do not change them; and

WHEREAS, the text changes amend the definitions of "adult book store" and "adult eating or drinking establishment"; and

WHEREAS, the text change would refer to those establishments whose predominant focus is on the sale of adult material; and

WHEREAS, the layout of these establishments does not present a physical separation between adult and non-adult material and requires customers to walk through adult sections to access non-adult sections; and

WHEREAS, an "adult eating or drinking establishment" would be defined as regularly featuring "adult entertainment" irrespective of the amount of space devoted to this; and

JNR-000776

*Zoning*

# Queens Borough Board Recommendation

**APPLICATION: ULURP #010508 ZRY**      **COMMUNITY BOARD: CW**

<u>DOCKET DESCRIPTION</u>

IN THE MATTER of an application submitted by the NYC Department of City Planning for a text change to amend the 1995 Adult Use Regulations, to modify the definitions of Adult Book Stores, Adult Eating and Drinking Establishments, and Adult Theaters, and related location regulations.

<u>BOROUGH BOARD MEETING</u>

A Borough Board Meeting was held on Monday May 14, 2001 at 5:30 P.M. pursuant to Section 85(a) of the New York City Charter. The applicant made a presentation.

<u>CONSIDERATION</u>

Subsequent to a review of the application and consideration of the discussion at the Borough Board meeting, the following issues and impacts have been identified:

o    The Department of City Planning (DCP) has proposed zoning text changes that would amend the definitions of Adult Book Stores, Adult Eating and Drinking Establishments, Adult Theaters, and modify related location regulations;

o    Definitions would be amended as follows:

   –  *Adult Book Stores* would be determined by the physical configuration or layout and operations of the store, regardless of the ratio between adult and non-adult material;

   –  *Adult Eating and Drinking Establishments* would be any establishment that regularly feature adult live performances or films in any portion of the establishment, regardless of the percentage of floor space used for those purposes;

   –  *Adult Theaters* would be any commercial establishment with one or more peep booths or similar enclosures featuring adult material, regardless of the number of booths or percentage of floor space used for those purposes;

o    Adult establishments would continue to be not permitted in any manufacturing district in which residences are allowed, either as-of-right or by special permit, under the provisions of the Zoning Resolution;

o    Adult establishments would be established upon the date of a work permit issued by the Department of Buildings (DOB). DOB would also be responsible for identifying adult establishments lawfully established prior to the effective date of the amendments;

o    Adult use regulations were adopted in 1995 to reduce the significant negative secondary impacts caused by these establishment as identified in the 1994 Department of City Planning study. Enforcement of the new regulations began in 1998, following a United States Supreme Court decision that upheld the constitutionality of the 1995 regulations;

o    The intent of the adult use regulations are to separate those uses from areas around residences, schools, houses of worship, and certain commercial areas where such activities are inappropriate and have negative impacts;

JNR-000777

0827



THE CITY OF NEW YORK
**OFFICE OF THE PRESIDENT**
BOROUGH OF MANHATTAN

**C. VIRGINIA FIELDS**
BOROUGH PRESIDENT

May 18, 2000

**APPLICATION #:**

N010508 ZRY

**APPLICANT:**

The Department of City Planning
22 Reade Street
New York, New York 10007

**REQUEST:**

This is a request by the Department of City Planning, pursuant to Adult Establishment Zoning Text
(N950384- 9/18/95) to amend Sections 12-10 - Definitions, 32-01 & 42-01 - Special Provisions for
Adult Establishments.

**PROJECT BACKGROUND/DESCRIPTION:**

The proposed zoning text changes consist of technical amendments to current zoning rules adopted
in 1995 for adult establishments. The regulations are a comprehensive set of location restrictions
designed to minimize the potential for adverse secondary effects throughout the City. The proposal
would not change the districts in which adult establishments may be located nor change existing
restrictions.

JNR-000778

0828

The main changes relate to the definitions of "adult book store" and "adult eating or drinking establishment". The changes to the definitions would reaffirm the original intent of the City Planning Commission and the City Council.

The proposed amendments would address "sham" compliance by avoiding enforcement through superficial measures and would establish objective factors to be used for enforcement.

## SUMMARY OF COMMUNITY BOARD ACTION:

Manhattan Community Board #1, on April 17, 2001, voted to recommend the approval of the Zoning Text Change.

Manhattan Community Board # 2, on April 19, 2001, voted to recommend approval of the text amendments and urged City Planning to add language to make clear that the 500' barrier be measured radially from all points along the lot line; and

Manhattan Community Board # 4, on May 2, 2001, voted to decline to support The Zoning Text Change N010508 ZRY because it believes that: the general public does not need further protection from adult establishments; the text changes to close loopholes are not substantive; and enforcement by the Department of Buildings would be a waste of time since they have more immediately necessary assignments.

Manhattan Community Board #5, on May 10, 2001, voted to oppose The Zoning Text Change N010508 ZRY, because it believes that the proposed changes would create overbroad definitions and may violate the First Amendment to the U. S. Constitution. It finds no significant secondary impacts and therefore no need for further regulation.

Manhattan Community Board #6, on May 9, 2001, voted to oppose the extension of the Zoning Text for the purpose of limiting the sale of "adult materials. It believes that the Department of Buildings is not equipped to apply the changes and that the text change is a contrivance to use the Zoning Resolution as a measure of what is "adult.

Manhattan Community Board # 7, on May 1, 2001, voted to oppose the proposed zoning text because: the City has failed to present verifiable data to support assertions of negative secondary effects; the original 1995 zoning text and the proposed zoning text are deliberate attempts to regulate certain forms of speech, are unwarranted intrusions on rights guaranteed by the Constitutions of the United States and the State of New York, are flawed in content and design, and are unenforceable practically and legally.

Manhattan Community Board # 8, on May 17, 2001, voted to recommend approval of the Zoning Text Amendment.

JNR-000779

<u>SUMMARY OF BOROUGH BOARD ACTION:</u>

On May 17, 2001, the Manhattan Borough Board voted 6 in favor, 3 against with 6 abstentions to recommend disapproval of the application.

<u>BOROUGH PRESIDENT ACTION:</u>

    The Manhattan Borough President recommends approval.

X     The Manhattan Borough President recommends disapproval.

    The Manhattan Borough President recommends approval, subject to the conditions detailed below.

    The Manhattan Borough President recommends disapproval, unless the conditions detailed below are addressed as described.

<u>COMMENTS:</u>

The Manhattan Borough President agrees with Community Boards 4, 5, 6 and 7. Of the seven Manhattan Community Boards that voted, the majority voted for disapproval of the application. At the Manhattan Borough Board Meeting of May 17, 2001, on the vote for disapproval of Application # N010508 ZRY the vote was 6 in favor, 3 against and 6 abstentions. Manhattan Community Boards who abstained were those where the application had not come before the full Board.

The Adult Establishment Zoning Text was approved in 1995, with the support of many of the community boards most directly affected by "adult establishments". The number of adult establishments has decreased measurably.  Few, if any, secondary effects have been observed (criminal activity, deterioration of quality of life, damaging neighborhood character, reducing economic development and property values). There is no further need for protection felt by these communities.

It is of much concern to these very community boards that the First Amendment may be violated with approval of this application. In addition, if the application were to be approved the imposition of enforcement of these amendments on an already overburdened Department of Buildings would be impractical.

JNR-000780

0830

The Manhattan Borough President therefore recommends disapproval of this application

Report and Recommendation
Accepted:

C. Virginia Fields
Manhattan Borough President

JNR-000781

# Borough President Recommendation

**CITY PLANNING COMMISSION**
22 Reade Street, New York, NY 10007
FAX# (212) 720-3356

**INSTRUCTIONS**

1. Return this completed form with any attachments to the Calendar Information Office, City Planning Commission, Room 2E at the above address.

2. Send one copy with any attachments to the applicant's representative as indicated on the Notice of Certification.

**APPLICATION #**   N0101508 ZRY

**DOCKET DESCRIPTION**

The Department of City Planning is seeking a zoning text change concerning adult establishments.

| COMMUNITY BOARD NO. | BOROUGH |
|---|---|
| All | Manhattan |

**RECOMMENDATION**

☐ APPROVE
☐ APPROVE WITH MODIFICATIONS/CONDITIONS (List below)
☒ DISAPPROVE

EXPLANATION OF RECOMMENDATION – MODIFICATION/CONDITIONS (Attach additional sheets if necessary)

JNR-000782

# Queens Borough Presidents Recommendation

**APPLICATION: ULURP #010508 ZRY**                    **COMMUNITY BOARD: CW**

### DOCKET DESCRIPTION

IN THE MATTER of an application submitted by the NYC Department of City Planning for a text change to amend the 1995 Adult Use Regulations, to modify the definitions of Adult Book Stores, Adult Eating and Drinking Establishments, and Adult Theaters, and related location regulations.

### PUBLIC HEARING

A Public Hearing was held in the Borough President's Conference Room at 120-55 Queens Boulevard on May 17, 2001 at 10:30 A.M. pursuant to Section 82(5) of the New York City Charter and was duly advertised in the manner specified in Section 197-c (i) of the New York City Charter. The applicant made a presentation. There were two (2) speakers in favor with none against. The hearing was closed.

### CONSIDERATION

Subsequent to a review of the application and consideration of the discussion at the Borough Board meeting, the following issues and impacts have been identified:

o   The Department of City Planning (DCP) has proposed zoning text changes that would amend the definitions of Adult Book Stores, Adult Eating and Drinking Establishments, Adult Theaters, and modify related location regulations;

o   Definitions would be amended as follows:

  -   *Adult Book Stores* would be determined by the physical configuration or layout and operations of the store, regardless of the ratio between adult and non-adult material;

  .   *Adult Eating and Drinking Establishments* would be any establishment that regularly feature adult live performances or films in any portion of the establishment, regardless of the percentage of floor space used for those purposes;

  -   *Adult Theaters* would be any commercial establishment with one or more peep booths or similar enclosures featuring adult material, regardless of the number of booths or percentage of floor space used for those purposes;

o   Adult establishments would continue to be not permitted in any manufacturing district in which residences are allowed, either as-of-right or by special permit, under the provisions of the Zoning Resolution;

o   Adult establishments would be established upon the date of a work permit issued by the Department of Buildings (DOB). DOB would also be responsible for identifying adult establishments lawfully established prior to the effective date of the amendments;

o   Adult use regulations were adopted in 1995 to reduce the significant negative secondary impacts caused by these establishment as identified in the 1994 Department of City Planning study. Enforcement of the new regulations began in 1998, following a United States Supreme Court decision that upheld the constitutionality of the 1995 regulations;

o   The intent of the adult use regulations are to separate those uses from areas around residences, schools, houses of worship, and certain commercial areas where such activities are inappropriate

JNR-000783

QUEENS BOROUGH PRESIDENTS RECOMMENDATION
ULURP #010508 ZRY
Page 2

- o  There are currently 41 adult establishments in Queens  Of that number 28 are operating as "60/40" establishments;

- o  In 1993, there were 11 adult establishments on Queens Boulevard  As of 2000 there were 14 such establishments (straddling Districts 2 and 6)  with 10 of them operating as "60 40" establishments;

- o  The Queens Community Boards acted as follows
    - CB 01 - Public Hearing 5/15/01 - Approved 23-C-0
    - CB 02 - Public Hearing 5/03/01 - Approved 24-3-0
    - CB 03 - Public Hearing 4/19/01 - Approved 9-7-19
    - CB 04 - Public Hearing 5/01/01 - Approved Voice House
    - CB 05 - Public Hearing 5/09/01 - Approved 41-0-0
    - CB 06 - Public Hearing 4/25/01 - Approved 23-C-0
    - CB 07 - Waived Hearing
    - CB 08 - Waived Hearing
    - CB 09 - Public Hearing 5/08/01 - Approved 32-C-0
    - CB 10 - Waived Hearing
    - CB 11 - Public Hearing 5/07/01 - Approved 27-1-0
    - CB 12 - Public Hearing 5/16/01 - Approved 23-C-0
    - CB 13 - Waived Hearing
    - CB 14 - Waived Hearing

- o  The Queens Borough Board approved the application by a vote of 16-0-2 at the May 15, 2001 meeting.

RECOMMENDATION

Based on the above consideration, The Queens Borough Board hereby recommends approval of this application.

_Claire Shulman_
**PRESIDENT, BOROUGH OF QUEENS**

5 29/01
DATE

**BLANK PAGE**

0834

# Exhibit 37

0835

1

1

2

3

4             CITY PLANNING COMMISSION

5             PUBLIC HEARING

6

7

8             August 8, 2001

9

10

11             ADULT USES VOTE

12

13

14

15

16

17

18

19

20

0836

2

1

2    CITY PLANNING COMMISSION PUBLIC HEARING OF AUGUST

3                        8, 2001

4        VOTE:  CAL. NO. 34 - CITYWIDE - N 010508 ZRY

5

6    Good Morning, this is the Public Hearing for the

7    City Planning Commission, held in City Hall.

8    Today is August 8, 2001.  The time is 10:16 A.M.

9

10    ROLL CALL:

11    Chairman Rose                    Present

12    Commissioner Abney               Present

13    Commissioner Battaglia           Present

14    Commissioner Burden              Present

15    Commissioner Cantor              Present

16    Commissioner Cavaluzzi           Absent

17    Commissioner Chin                Absent

18    Commissioner Garvin              Present

19    Commissioner Gelber              Present

20    Commissioner Grinker             Present

0837

3

1    Commissioner Knuckles          Present

2    Commissioner Merolo            Present

3

4    A quorum is present.

5

6    CITYWIDE

7    CALENDAR NUMBER 34:            N010508 ZRY

8

9    **WOMAN**: In the matter of an application for an

10   amendment of the zoning resolution of the City of

11   New York relating to adult establishments.  For a

12   favorable report proposed as modified; Chairman

13   Rose.

14   CHAIRMAN ROSE:  When this Commission adopted, in

15   conjunction with the City Council, zoning to

16   regulate the location of adult uses within the

17   City of New York, we were very explicit at the

18   time about what we were trying to do, what kind of

19   establishments we were seeking to regulate and

20   this commission put in place a set of restrictions

0838

OFFICE OF THE CHAIRMAN Fax:212-720-3213

4

1    to make sure that these regulations were being

2    enforced against the kinds of businesses that we

3    were intending and not against the kinds of

4    businesses that we were not intending.  And, we

5    put protections in place to make sure that there

6    was a clear direction to the Department of

7    Buildings.  We also explicitly acknowledged the

8    fact that it might be, in putting those

9    protections and restrictions in place, that we

10   would inadvertently allow for either loopholes or

11   misinterpretations in terms of what we were trying

12   to do,    while the regulations that we adopted

13   have met every legal and constitutional test

14   unanimously being upheld by 19 judges throughout

15   every step of the judicial process.  As we noted

16   at the time of adoption, the interpretation of the

17   regulations have clearly indicated a need for us

18   to come back and further clarify exactly what we

19   were doing to make sure that the spirit and the

20   intent and the letter of the original regulations

0839

1    are, in fact, enforced.  And those two provisions

2    are that **BLANK SPACE IN TAPE** book stores and

3    video stores that are not adult in nature from

4    being enforced again.  We never discussed or

5    intended that those sets of provisions to be

6    applied to strip bars, to eating and drinking

7    establishments, and the amendment that is before

8    us now clarifies that.  Similarly, we always

9    envisage the fact that to the extent that

10   mathematical calculations that still left adult

11   businesses as what they were, and simply

12   subterfuges or sham demonstrations of compliance

13   with those provisions, to the extent that we had

14   to, we would come back and revisit that issue.  I

15   am confident that the way we have come back and

16   revisited them is appropriate.  I think that these

17   regulations have been improved very much as a

18   result of the public review process and the

19   deliberations of this Commission. Things that were

20   potentially problematic and that were called out

6

1      in public testimony before this Commission have

2      been addressed, and I think that what we have now

3      is a set of amendments that clarify and uphold the

4      original scope and intent of our action.  I am

5      confident that it meets every legal issue that has

6      been raised in regard both to the original text

7      and through this public review process and as an

8      important step in maintaining and straightening

9      the protections that exist in terms of the quality

10     of life in our residential neighborhoods while

11     maintaining appropriate constitutional

12     protections, I am happy to vote, Yes.

13     **WOMAN**: Commissioner Abney.

14     COMMISSIONER ABNEY:  Agreeing with the Chairman. I

15     think it is needed and I also do vote, Yes.

16     **WOMAN**: Commissioner Battaglia.

17     COMMISSIONER BATTAGLIA:  I too agree with the

18     Chairman.  With the proposed text modification,

19     which provides for an amortization period, and

20     also omits the separation criteria to protect

0841

1    types of establishments which do not have

2    secondary impacts, I vote, Yes. We must insure,

3    however, that enforcement efforts are thorough but

4    remain objective and unbiased.

5    **WOMAN**: Commissioner Burden.

6    COMMISSIONER BURDEN: I commend the Chair and the

7    Department for very, very thoughtful work. The

8    amendments clarify definitions, they make

9    enforcement easier with objective criteria. It is

10    really a substantial improvement and I am very

11    pleased to vote, Yes.

12    **WOMAN**: Commissioner Cantor.

13    COMMISSIONER CANTOR: Yes.

14    **WOMAN**: Commissioner Garvin.

15    COMMISSIONER GARVIN: When we passed these

16    regulations some years ago, our intent was to

17    prevent negative impact on surrounding

18    neighborhoods. At that time, it was not our

19    intent to define pornography or what people could

20    and could not purchase in stores or see in

0842

Case 1:02-cv-04431-LJL-SDA Document 162-6 Filed 05/09/22 Page 214 of 315

8

1    performances.  People said that it might be that

2    we would preclude the continuation of such

3    establishments.  That is not what happened.  We

4    have, in fact, had a positive impact.  There is a

5    reduction of establishments by 23%, but access is

6    still available.  The initial proposals that came

7    before us, however, might have been intrusions

8    into the way businesses were run, or where they

9    kept their stock, or what their stock was, and it

10   had never been out intent to do that or to enforce

11   the provisions by having anybody determine what

12   was or was not an adult use.  For that reason, we

13   passed the initial legislation.  It is normal to

14   make adjustments when we see how things work and

15   it should be done more often.  And, I commend the

16   administration on making those adjustments.  I am

17   happy to say that we have in no way intruded into

18   the daily functioning of commercial establishments

19   that are involved with what might or might not be

9

1    termed by somebody as pornography, and I am

2    pleased to vote, Yes.

3    **WOMAN**:  Commissioner Gelber.

4    COMMISSIONER GELBER:  Yes.

5    **WOMAN**: Commissioner Grinker.

6    COMMISSIONER GRINKER:  Three years ago, when I

7    voted in favor of the adult use zoning text, I

8    stated my belief that the proposal met

9    constitutional muster because the city had

10   adequately demonstrated two crucial criteria.

11   One, that there was a serious problem in terms of

12   proliferation of adult use establishments; and,

13   two, it had proposed a reasonable solution for

14   meeting that problem without violating free speech

15   protections.  In the current situation, the city

16   has proposed an alternative solution but,

17   unfortunately, I think it is a solution in search

18   of a problem.  I say this because, first, there is

19   no documentation of any proliferation but rather,

20   the number of adult use facilities has gone down

0844

1    substantially, as Commissioner Garvin has said, by

2    23%, which was the original intent of the zoning

3    plan.  Secondly, there is nothing but anecdotal

4    information presented on the failure of the 60/40

5    rules.  For example, I have no clear idea how many

6    establishments are honestly trying to meet the

7    standards set forth compared to how many of the

8    kind of sham that is the source of this concern.

9    And, finally, the community boards in Manhattan

10   where fully 40% or more of these establishments

11   exist have expressed satisfaction that there are

12   no significant secondary impacts from the

13   remaining adult use establishments in their

14   neighborhoods.  Given these facts, or lack of

15   alternative facts, while certainly the proposals

16   make good sense, I believe that, over all, there

17   is no justification for the extensive

18   modifications to the zoning requirements that are

19   being proposed, and it could be argued that this

20   is a little more than an effort at ongoing

0845

1    harassment which has no place in our

2    constitutional interpretation of free speech.  I

3    will not comment on the content of the proposed

4    modifications except to note that I believe they

5    are likely to raise a host of serious issues that

6    again will result, at best, in extensive

7    litigation and delay.  I would like to be

8    supportive of the City's efforts.  These proposals

9    put forth in highly unfriendly political

10    atmosphere and without adequate justification

11    violate my own standards of fairness when it comes

12    to the protection of First Amendment rights.  I

13    must, therefore, respectively abstain.

14    **WOMAN**: Commissioner Knuckles.

15    COMMISSIONER KNUCKLES:  I believe the proposed

16    amendment, similar to the amendments adopted in

17    1998, attempt to mitigate what are clearly

18    established negative secondary impacts of adult

19    establishments as they are defined in the text of

20    the zoning code.  I do not believe these

0846

12

1    amendments seek to get into the role of the

2    content of the material within these adult

3    establishments.   Therefore, I vote, Aye.

4    **WOMAN**: Commissioner Merolo.

5    COMMISSIONER MEROLO:   I fully support all the

6    statements that were made today by the Chairman

7    regarding this issue and I vote, Yes.

8

9    **WOMAN**: A favorable report proposed to be modified

10   has been adopted on Calendar NO. 34.

11

12

13

14

15

16

17

# Exhibit 38

0848

CITY COUNCIL
CITY OF NEW YORK

------------------------------------------------X:
                                                 :
                                                 :
                                                 :
                                                 :
IN THE MATTER OF THE REGULARLY SCHEDULED MEETING :
                                                 :
                 OF THE                          :
                                                 :
ZONING AND FRANCHISES SUBCOMMITTEE               :
                                                 :
   :                                             :
------------------------------------------------X:


                              CITY HALL
                              NEW YORK, NEW YORK
                              OCTOBER 1, 2001
                              AT 9:45 A.M.


COUNCIL MEMBER WALTER McCAFFREY,  CHAIRPERSON

0849

in the hope that this can be resolved.

Let me just say to the tenant, I mean I understand your concern, but I know for a fact that Community Board 14 does not want this to go on forever, and hopefully we can come to some kind of conclusion on this very soon.

MR. WICZYK:  Thank you.

COUNCIL MEMBER McCAFFREY:  Thank you very much. Is there anyone else who wishes to testify on this item?    (No Response).

There being no one else to testify, the hearing is now closed.

On the City-wide item, 1112, I will ask the city's representative to come forward.  Mr. Karnovsky, welcome.  Mr. Karnovsky, you're the lead witness for the Administration.  Would you care to begin your statement?

MR. DAVID KARNOVSKY:  Actually David Jaffee, Counsel to the Criminal Justice Coordinator could begin.

MR. DAVID JAFFEE:  Thank you.  My name is David Jaffee, and I'm General Counsel to Steven Fishner, the Criminal Justice Coordinator.

Mr. Chairman, and members of the Subcommittee, thank you for the opportunity appear on

behalf of Mayor Giuliani and Criminal Justice Coordinator Steven Fishner to be heard on Land Use Number 112, which amends New York City Zoning Resolution 12-10, the City's adult establishment zoning laws.

Land Use 1112 would close the judicially-created loopholes that illegal adult establishments have utilized to remain in operation while only maintaining sham compliance with the City's zoning laws.

A hallmark of the Giuliani Administration has been the dramatic improvement in the quality of life in every community of the City of New York.

Before the Mayor took over, New York suffered from what many experts and pundits described as a mindset of defining deviancy downward. Crime was rampant, streets were filthy and graffiti was everywhere. Businesses suffered and residents fled the City in record numbers. New York City was seen as a symbol of urban decay in America.

COUNCIL MEMBER McCAFFREY: Mr. Jaffee, you're not going to read seven pages to us?

MR. JAFFEE: Okay.

COUNCIL MEMBER McCAFFREY: Okay. Seven pages we are capable of reading. Cut to the chase.

0851

29

MR. JAFFEE:  Basically, one of the effective quality of life initiatives was the comprehensive zoning laws implemented by the City Council and the Mayor.

It should be noted, the one that the City Council instituted in 1995, was truly remarkable, in that several communities throughout the United States recognized a need for progressive policy.

This effort was based upon the pronounced secondary impacts that adult establishments had on residences and businesses, and really this City Council was the first to, along with the Mayor and the City Planning Commission in adopting the original 1995 adult use zoning amendments, based upon studies by the Times Square Business Improvement District and similar studies in other jurisdictions.

COUNCIL MEMBER McCAFFREY:  We followed them, yes.

MR. JAFFEE:  It is now well recognized that specified distances of retail zoned areas and facilities, and areas where children and families congregate may be used for prohibiting adult entertainment uses in order to avoid the undesirable impacts associated with the clustering, and that is why in essence we are here today, because what those

JNR-000803

0852

situations did.

What happened then, and not surprisingly the adult entertainment industry launched a series of court challenges, and the courts began to accept what I submit are terribly misconstrued views and misconceptions.

Some judges accepted arguments that a strip club was not a sex business if, in addition to strippers, it also had a sushi bar or a computer, or a golf range that took up 60% of the businesses floor space. Another Judge said it wasn't a pornographic bookstore if it also had Disney cartoon videos on display, even though they were in the back of the store gathering dust.

The situation became so ridiculous that some adult video stores would not even bother to display the sham videotapes, instead leaving them in a box in the corner of the store, or buried in the basement, and they were still considered compliant.

These loopholes are simply wrong, for they so distort the original law passed by the Council as to make it almost meaningless. There was no so-called "60-40" provisions for these businesses.

Moreover, while adult bookstores and video stores are defined in the law as having 40% or more of

their stock in trade being adult, the statute did not say, and certainly did not intend to mean, that a store could be non-adult if it merely kept 500 copies of the same western video somewhere on its premises, and had no intention of actually selling them.

COUNCIL MEMBER McCAFFREY:  So, Mr. Karnosky, tell me how we now address this?

MR. KARNOVSKY:  The amendment there relates to the '95 changes, and the principal changes relate to the definition of an adult bookstore, and an adult eating or drinking establishment.  So changes arise of the situations that David has described.

As you will recall, under the current zoning of adult bookstores, book sales are a substantial portion of the stock and trade of adult material and a substantial portion of the floor area.

That particular text was adopted for two reasons. One, to request adult bookstores to have at least 40% of its accessible stock and floor area dedicated to adult material, also to provide clear guidance to enforcement officials in its course of enforcement.

The enforcement since 1998, has--since 1999--demonstrated the need to focus on the floor area, which regulate those establishments, and I quote, "with

0854

a predominant, on-going focus on sexually explicit materials or activities", and that's because of the sham measures that  Mr. Jaffee described.

At the same time, we should continue to have a physical layout which reflects the (Inaudible) so that we know where booths and peep-holes and other adult material is located.

The courts have recognized that there is kind of a mechanical mockery of the regulations.  So what the amendment does, is establish objective factors relating to the physical layout and method of operation by which a bookstore which has engaged in only superficial compliance with the Substantial Portion Test would be considered an adult book store.

Now, with respect to adult eating or drinking establishments, the '95 regulations define that kind of type of establishment as "that regularly features adult entertainment", and under that definition, unlike the bookstore, the amount of floor area in terms of the establishment, and the question is very simple:  Does the bar or restaurant feature adult live performances or films in any portion of the establishment?

That's what we consider to be a bizarre reading of the regulations that led to the artificial separation of adult and non-adult sections.

As a result of it, the Court themselves also recognize the absurdity of this result.  However, due to the judicial interpretation of how the Substantial Portion Test applies to these establishments, the result has been that the 60-40% eating or drinking establishments have continued in operation at locations where they were never intended to be allowed.

Those are the two principal changes that address both the pervasive efforts of the operators, and some of the results of litigation.  There are other provisions which I'll be glad to discuss if you ever any questions, but those are  the main features.

The intent of the amendment is to allow the City to move forward in enforcing these regulations.

This addresses the fact that today by our own calculations, there are approximately 101 establishments in zoning districts where they are not intended to be, which they have been operating under this 60-40 basis.  In addition to the fact that we see establishments opening up in districts where they are intended for, because they abide by the rules.

COUNCIL MEMBER McCAFFREY:  There is a one year amortization period?

MR. KARNOVSKY:  That's correct.  That's what's under the original rule.

0856

COUNCIL MEMBER McCAFFREY:  Okay.  Are there any questions?  Council Member Quinn?

COUNCIL MEMBER CHRISTINE QUINN:  Yes, thank you.  Where are these sham compliances?  What is the impact you talked about?  You began your testimony with a long list of horrors that had befallen the City, that have now been eliminated.  So, if you can now detail for me where the sham compliances have occurred and the level to which negative impacts continued in their own areas versus compliance, and where it relates to crime stats.

My point being, I want to make sure that we are not tightening this loophole just to say that we are tightening, but that we are making it more effective.

MR. KARNOVSKY:  Let me start with a couple of statistics to give you an overall picture with respect to these stats.

In 1993, when the City Planning Commission did its study  which led to the adoption of these regulations, we identified 177 establishments around the city.  In 1998, when enforcement began at the end of a long series of litigations which the courts uniformly upheld testimony, there were 149.

In 2000, we did a survey which identified

136.  Of that 136, 101 were operating in locations where the zoning does not allow adult uses, and of those 101, 60 were establishments that have been identified in the original 1993 survey.

COUNCIL MEMBER QUINN:  Could I just ask a question?  The 101 establishments that are in areas that zoning does not allow, are they in proximity to local neighborhood establishments, or in hard-core areas?  Is that included in what you're saying about the zoning?

MR. KARNOVSKY:  It includes both the zoning districts where they are not allowed, and it reflects our examination of the application of the Exempt Rule, the  500-foot rule .

COUNCIL MEMBER QUINN:  So would it include a place like Christopher Street?

MR. KARNOVSKY:  I can't speak to the specifics of Christopher Street.

COUNCIL MEMBER QUINN:  Thank you.

COUNCIL MEMBER McCAFFREY:  Just so that everyone is clear on the record though, we are not in the process of expanding the number of areas that will be subject to adult entertainment enforcement?

MR. KARNOVSKY:  I think fundamentally we are not changing where adult establishments are allowed to

0858

exist.

COUNCIL MEMBER McCAFFREY:  So that means that the area had prepared and took the issues that these areas became the same, but that these businesses are operating essentially under the same policy?

MR. KARNOVSKY:  Absolutely.  Before I answer your question more directly, there's one more fact.  By our calculations, of those 101 operating locations where they are not supposed to operate under the zoning, 26 have opened up under the 60-40 (Inaudible).

In terms of the secondary impacts, of course the 1995 regulations were adopted based on studies and in consideration of evidence that was provided.  So I hope that answers your question.

COUNCIL MEMBER QUINN:  So we don't actually know if that may be the case, because it's just too much asking for 60-40.  We don't know whether they had continued to cause secondary negative effects.

MR. KARNOVSKY:  That certainly is an interesting question.  I can't draw a conclusion on that at the moment.

COUNCIL MEMBER QUINN:  Do you believe, or is there any concern, with secondary negative impacts regarding the receiving sites?

To me, that's already a concern since there

was no indication that the West Side of Manhattan would
not end up with the same amount or more, than say some
place in Queens.

Do we believe that the City will monitor and
enforce the 300 adult entertainment establishments
under the 60-40, that have relocated into other
receiving areas, and therefore cause more Triple X's
and adult establishments in neighborhoods that have
already borne the brunt of these kinds of businesses?

MR. KARNOVSKY:  The first thing is, that
there have been new establishments relocated where the
law fully reflects that those locations are viable.  At
the same time--

COUNCIL MEMBER QUINN:  That's in fact my
concern.

MR. KARNOVSKY:  Let me go to the second
point.  At the same time, the overall numbers with the
City has declined, and I believe I gave you the overall
numbers.

COUNCIL MEMBER QUINN:  Thank you.

COUNCIL MEMBER McCAFFREY:  MR. Karnovsky, let
me just ask you, in essence there is no need for
additional studies of secondary impacts that were cited
in the Council at that time of the adoption, is that
correct?

0860

MR. KARNOVSKY:  That's correct.

COUNCIL MEMBER McCAFFREY:  What about with the 60-40 rule?

MR. KARNOVSKY:  We are not quite sure that the 60-40--you cannot change the text without doing another study to see that establishments of that nature have secondary impacts.

COUNCIL MEMBER McCAFFREY:  Council Member Dilan?

COUNCIL MEMBER MARTIN MALAVE-DILAN:  Thank you, Mr. Chair.  My question is, outside of Manhattan, has there been an increase?  Do you have a number of those secondary impacts of those new establishments outside of Manhattan?

MR. KARNOVSKY:  The text of course is a City-wide text so it would be required to have all the figures, and I can provide those numbers to you in writing.

COUNCIL MEMBER MALAVE-DILAN:  Thank you.

COUNCIL MEMBER McCAFFREY:  Any questions.

(No Response).

Gentlemen, thank you very much.  We ask that you remain. I'm now going to go to panels of witnesses in favor and opposed, and first, I would like to call up someone I have known for a very long time, Herald

Price Fahringer, along with Beth Haroulos of the NYCLU.

MR. HERALD PRICE FAHRINGER:  Mr. Chairman, and members of the Subcommittee, my name is Herald Price Fahringer.  I represent more than 40 businesses that in some measure, furnish and dispense adult information to the public.

Since this law as has been pointed out will virtually abolish the 60-40 Rule, I would just like with your permission, to just spend a moment on historical perspectives.

Mr. Chairman, since I represent a large group, what I think is important here, and I attach a great significance to, is one of the charges leveled against the original law, was that the term "substantial" was unconstitutionally vague.

What is critically important, when a challenge was leveled, the City's attorneys, capable and distinguished, came into Federal Court, and before a Federal Judge said we are prepared to, as if it were part of a text, define "substantial".  If a person abides by the 60-40 Rule and utilizes 40% of the floor space, that will comply with the law, and they will not be considered an adult entertainment establishment.

So, as a consequence, when this became a law on July 28, 1998, at least 101 businesses were able to

0862

fulfill those requirements.

We believe, and I think you can see the common sense in this, we believe that the City was sensitive to the First Amendment.

Under the First Amendment, we know that you cannot ban this kind of information because it is constitutionally protected.  The City has never claimed that the material  that is sold is unconstitutional or unlawful in any aspect.

So, recognizing that the 60-40 law came into existence, this new law now virtually abolishes the 60-40 law, and that is what we are discussing here today.

After the 60-40 Rule came into existence, and, incidentally, it was a great rule.  We were involved ourselves personally, myself and Beth in the litigation of close to 30 cases.

As a consequence, the important aspect of this litigation that I think deserves comment, is, that the City proceeded under the Nuisance Abatement Law, so that every one of their complaints was lodged in the concept that this establishment was a threat to the public health, safety and welfare of the community.

Another fact is, very tough standards have now been built into this new amendment, because they

felt that the Building Inspectors were ill-equipped to administer this law where it stands subjective.  So we understand the radical consequences.

If this were to be approved by this Committee, and if it were to be passed into law, it would abolish the 101 operators that now exist and function in this City.

When it comes to secondary adverse effects, what I find certainly significant, is that the Community Boards that are the most concerned, deal with this problem.

COUNCIL MEMBER McCAFFREY:  Let me just say, that a bunch of these properties are located in several Community Board areas, not just two or three Community Board areas.

MR. FAHRINGER: Mr. Chairman, I welcome that comment, because certainly it is significant that over one-third of the adult establishments in the five boroughs are concentrated in these Community Boards that felt that there was no need for any further regulations.

Finally, what I would want to say, without intruding on the Committee's time any further, is that if you look at those standards, and I know enough about the membership  of this Committee, that you're alert

0864

42

and sensitive to issues, that if you have provisions that enable a person to exercise their discretions, then it is not our view, or your view to determine what materials are acceptable and what are not acceptable.

The last thing I want to say, this will give the Commissioner of Buildings the power to regulate, or initiate rules to effectuate this law.

Now, I can see this when you're talking about safety issues, or the sale of liquor standards, but certainly not when you're dealing with a First Amendment issue.

In conclusion, and I hope it's not inappropriate for me to say as we sit here today in the shadows of one of the worse terrorist attacks that ever struck this country and affected the rest of the world, and President Bush said, this assault upon this nation, is a strike against our freedom, and I'm quoting him verbatim, and he talked about freedom of religion, freedom of speech and the right to vote.

So, I would urge this Committee to strike down this law. I have confidence that this Committee and this Council, that they will do what's right and strike down this law. Thank you.

COUNCIL MEMBER McCAFFREY: Thank you. Next speaker.

0865

MS. BETH HAROULES:  Good morning.  I am Beth Haroules.  I am a Staff Attorney for the New York Civil Liberties Union.  We have long been devoted to the protection and enhancement of those fundamental rights and constitutional values embodied in the Bill of Rights.

As has been pointed out in 1995, zoning amendments ultimately did withstand Federal and New York State constitutional challenges.  And, in July, 1998, as the City began its enforcement efforts against establishments that offered sexually-explicit adult material, the Commissioner of Buildings formally adopted the 60-40 Rule.

Under that rule, a commercial establishment was deemed not to be an adult establishment if it restricted its sexually-explicit materials or entertainment to less than 40% of its stock in trade.

As City officials learned, almost all of the then existing adult establishments complied with the dictates of the 60-40 Rule, and changed the nature of their businesses to conform to the City's rulemaking.

Indeed, the Department of City Planning's Briefing Sheet that was issued suggested some who 40 new so establishments have begun to offer sexually-explicit adult entertainment in mainstream

JNR-000817

commercial locations throughout the five boroughs.

After three years of defeats in the enforcement actions brought by the City against bona fide, legitimate commercial establishments that offer sexually explicit entertainment, and that complied fully with the City's interpretative regulations, the City has launched a new offensive against sexually-explicit adult entertainment.

We believe that the proposed amendments represents a constitutionally impermissible, selective interference with protected sexually-explicit speech whose content is thought to produce distasteful effects.

We believe for two reasons, that the proposed amendment fails constitutional scrutiny. In the first instance, the proposed amendments confer unfettered discretion on Building Department Inspectors and inject precisely the level of discretion into an enforcement effort which the City Planning Commission believed in 1995 was unnecessary and to be avoided.

Further, the amendments establish constitutionally impermissible irrebuttable presumptions that violate the dictates of the Due Process Clause.

The proposed amendments to the Zoning

Resolution confer both unlimited and standardless discretion to the Commissioner of Buildings and to the inspection staff of the Buildings Department to determine what an adult establishment is.

For example, an adult establishment is defined as a commercial establishment where a substantial portion of the establishment includes any of the adult uses set forth in Section 12-10 of the Zoning Resolution.

An adult book store has a substantial portion of its stock in trade in certain material characterized by an emphasis upon certain specified sexual activities, or specified anatomical areas.

An adult eating or drinking establishment, an adult theater and other adult commercial establishments regularly feature certain media or live performances characterized by an emphasis upon certain specified sexual activities or specified anatomical areas.

How often is regularly?  How much of the described activity is permissible before it becomes characterized by an emphasis upon the specified sexual activities or anatomical areas?

By their very terms, the proposed amendments sweep within their ambit locations as diverse as internet cafes and Barnes & Noble.  We submit, that the

0868

Zoning Resolution, by failing to specify adequate procedures or standards for enforcement, has conferred unfettered discretionary authority upon the Buildings Department, thereby inviting the risk of content based censorship.

While the proposed amendments to the zoning ordinance purport to offer guidelines to Building Inspectors in assessing the term "substantial portion" for purposes of determining whether a commercial establishment is adult or not, such guidelines must fail constitutional scrutiny.

Those subsections direct the Building Inspectors to draw an irrebuttable presumption that a commercial establishment is an adult commercial establishment merely because the establishment contain certain features.

Such features include a mix of factors ranging from the configuration of commercial retail space to how stock is displayed, to how customer transactions are handled to a form of forensic accounting to determine whether only certain portions of the establishment's stock in trade generate income to the establishment.

As I mentioned before, these guidelines are unconstitutional because they establish conclusive or

0869

irrebuttable presumptions.  According to the Supreme

Court, irrebuttable presumptions have long been

disfavored under the Due Process Clause, because such

presumptions are not necessarily, or universally true

in fact, and standards of due process requires that the

State allow such an individual the opportunity to rebut

such presumptions.

    For example, at Tower Video's Upper West Side

location, adult materials are not separated by

partition from the other videos and DVD's offered for

sale or rent, and because of the layout of the store,

customer transactions for other materials may occur in

or adjacent to the adult area.  The presence of such

features confer adult establishment status on Tower

Video, and that store is afforded no opportunity to

rebut the presumption created by the amendments to the

Zoning Resolution.

    With that, that's where we were when we

appeared before you last.

    There are alternative ways for the City to

regulate adult establishments.  Most of the folks who

have testified before you have indicated that they

don't appreciate the in your face nature of the

sexually-explicit expressions.  However, we believe the

City should not be engaged in the censorship of

JNR-000821

protected expression.

I thank you for the opportunity to testify today, and I urge the Committee not to support the passage of this particular amendment.

COUNCIL MEMBER McCAFFREY:  Thank you.  Let me at the outset ask a couple of questions.   Any New Yorker can tell you, that in every neighborhood in the City there are candy stores that display and sell adult books and adult paraphernalia.

Adult entertainment material is available in these so-called candy stores and institutions, and we seen that and targeted that since the Council's action in 1995.  I think that's something that everyone accepts.

We do not in any way eliminate that type of activity, or availability to those locations, do you agree with me?

MS. HAROULES:  We don't eliminate it because the many operators might shy away from the showing of that in such a place.  What may be one person's discretion, might be another's indiscretion.

COUNCIL MEMBER McCAFFREY:  But we would subsequently say that it's an expanded choice that we have seen?

MS. HAROULES:  Exactly, and we applied it

because again, it reflects the market-place.

COUNCIL MEMBER McCAFFREY:  As you recall,
when the original concept of this 60-40 arose, it arose
as the Council asking how do you delineate between a
Barnes & Noble and these other establishments.

Mr. Fahringer, you said you represented about
30% of the cases on this issue, is that correct?

MR. FAHRINGER:  During the litigation
process, there were a number of clients that I
represented.

Mr. Chairman, what I would like to do, is
submit some written material because I can accommodate
these  questions, but I can think of three right now
that did involve a cabaret operation that did involve
live entertainment.

COUNCIL MEMBER McCAFFREY:  And the rest were?

MR. FAHRINGER:  The rest were video stores.
Some of my clients at that point made motion pictures.

I might just say Mr. Chairman, that there are
representatives that are here today who are going to
testify  who do represent what we call the cabaret
industry.

What I would like to simply say, that the
preamble to the law, the opening paragraph that
dominates the entire law, specified "substantial".  And

0872

I think the Courts were correct when they said that would modify every one of the uses that thereafter come under that opening paragraph.

COUNCIL MEMBER McCAFFREY:  I'm going to leave the record open.  We are not going to vote this on Thursday because of the important nature of this.

MR. FAHRINGER:  I'm grateful for that.  May I ask could we have two weeks to do that?  Would that be sufficient?

COUNCIL MEMBER McCAFFREY:  I'll certainly say ten days.

MR. FAHRINGER:  Ten days will be fine.

COUNCIL MEMBER McCAFFREY:  We are in a state of influx because we have a certain amount of business that we have to catch up on.

MR. FAHRINGER:  We welcome that.

COUNCIL MEMBER MCCAFFREY:  Thank you very much.  The last three witnesses who are signed up, Mark Alonso, Steve Aslan and Ed Rudofsky.

We also have another future member of this body.  Council Member Dilan, please.

COUNCIL MEMBER MALAVE-DILAN:  Thank you very much.  It's my honor and pleasure to introduce the new Council Member for the 37th District in Brooklyn, my son, Eric Malave-Dilan. Thank you.

JNR-000824

0873

COUNCIL MEMBER McCAFFREY:  Thank you and good luck.  Which one of you gentlemen would like to go first?

MR. MARK J. ALONSO:  My name is Mark J. Alonso of Alonso, Ferrigno, Andalkar & Kahn, the attorneys for Ten's Cabaret, Inc., which features topless entertainment.  It's a 60-40 club.

I urge you to reject these amendments, or at least delay your vote until the Police Department reveals to you its secret data on topless cabarets.

COUNCIL MEMBER McCAFFREY:  Would you just go through the other names that the premises had?

MR. ALONSO:  It was originally Stringfellows. Now it's Ten's.

First, obviously the general items I would like to cover, are the topless cabarets provide a substantial benefit to this City's economy.  Tourists and people here on business like these establishments, regardless of how some regard them now.

Right now, when the restaurants are suffering dearly from a lack of business, topless nightclubs in Manhattan are doing a brisk business.  The employees pay their taxes and spend their paychecks in New York City. The nightclubs buy food and beverages from wholesalers, who employ truckdrivers and warehouse

0874

staff to fill the orders.

All those tourists, business people, New York residents and workers putting money into and taking salaries out of these businesses are staying in hotels, eating in restaurants, shopping in our stores and taking our taxis.

This is a time when we should look extra carefully at any law which would close any taxpaying business and potentially make New York City less attractive to business people and tourist.

There is precedent for this given by another great Mayor, who shepherded New York City through troubled times.  Mayor Fiorello LaGuardia originally issued an edict which forbade any topless entertainment at the 1939 New York World's Fair during its first season.

The following season, in order to avoid a disastrous decline in attendance, he reversed himself and allowed topless entertainment at the World's Fair. It is beyond question that there are a lot of people who enjoy this type of entertainment.

To some, topless dancing is offensive entertainment.  However, judgment calls about what is moral and immoral entertainment depends on your perspective.  I urge tolerance.  And, Mr. Fahringer in

0875

his statement--

COUNCIL MEMBER McCAFFREY:  You didn't hear

(Inaudible) anything in terms of morality.

MR. ALONSO:  I understand there are current

issues regarding this.

COUNCIL MEMBER McCAFFREY:  Thank you.  Please

continue.

MR. ALONSO:  I have made and delivered to

Council Member Quinn's office, a list of the suggestive

laws, some way more restrictive than what you are

presently considering, and if you care to hear them, I

would ask that you give me a few more minutes.

COUNCIL MEMBER McCAFFREY:  You can submit

them.

MR. ALONSO:  Fine.  I believe that these

suggestions would be satisfactory to you and to the

topless nightclub industry.

I also would suggest that this is not the

time for this legislation.  It is divisive in a time

that we need unity.  It is also not a priority.

However, if you decide to consider this

amendment, I'm going to ask you to delay your vote

until you have the opportunity to consider the Police

Department documents, which up until now have been kept

secret.

0876

One of the biggest reasons for passing these amendments, in fact, the main reason for the original ordinance itself, has always been that topless bars cause crime.

In 1994, the Department of City Planning compiled Police Department data, and were unable to conclude that adult establishments cause crime. The data analyzed was never tracked to individual establishments. It seemed as though there was no data kept on topless nightclubs.

Mr. Chairman, they wrote in their DCP report, the "Department of City Planning study analyzed this data to see if there was any association between it and adult uses."

They concluded, in summary, it was not possible to draw definitive conclusions for the analysis of criminal complaints. Land uses other than adult entertainment establishments, e.g., subway station access, appear to have a far stronger relationship to criminal complaints. It was not possible to isolate the impact of adult uses relative to criminal complaints.

COUNCIL MEMBER McCAFFREY: Mr. Alonso, you recall we discredited the Department of City Planning's analysis?

0877

MR. ALONSO:  Yes.

COUNCIL MEMBER McCAFFREY:  It was not the only basis for your statement?

MR. ALONSO:  It was a strong one.

COUNCIL MEMBER McCAFFREY:  I'm a Legislator sitting on this side of the table, and I'm telling you that did not have any bearing on the matter.  Do you have another point you want to raise?

MR. ALONSO:  Yes. In fact, the Police Department had kept a study that indicates that nightclubs do not cause crime.  They have kept monthly reports for years that have never been revealed, never been disclosed and passed out to the Council Members.

A few months ago, a copy of one monthly report kept by the New York City Police Department were distributed to Precinct Commanders and to the Mayor's Office. Apparently it never gets to the City Council.

The report details the entire history of each nightclub in the City of New York which has crimes committed in it, or related to it.  The report shows the history of crimes going back for an undetermined number of years.  It shows only the date of the last violation.

However, it clearly also indicates that it incorporates a long history; the Tunnel lists 82 prior

0878

56

violations, the Cheetah had 49.  Problem clubs are
targeted for further enforcement, and there is an
analysis of "Specific Problems".

For the purposes of this Committee, this
report is important because it shows that topless clubs
do not cause crime, foster crime, create a crime area
in their vicinity or in any way cause the secondary
adverse effects which are the reason you are
considering this amendment.

How do we know that these reports include
topless nightclubs?  Because on the monthly list for
the 1st Precinct is New York Dolls, a topless nightclub
at 59 Murray Street in Manhattan.  Obviously, the list
includes topless nightclubs.  I  also would like to
mention, that New York Dolls, the only topless
nightclub to make this list, had only two violations.

The non-topless nightclubs have up to 82
violations each, and not one club had fewer than two
violations, make the lone topless club the club with
the least wrongdoing on this list.

We had requested these documents through the
Freedom Of Information Act.  I am providing to you
copies of our requests.  I have also provided the
Police Department's correspondence saying first that my
request was partly disclosable, and then rejecting my

JNR-000830

request on the grounds that the information requested was too broad in nature. When asked what they needed to clarify my request, they ceased all correspondence with us entirely.

Before you vote on this important issue, I ask you to use your power on this Committee to get the Police Department to disclose these reports.

As lawmakers, it seems to me that you and your fellow Council Members would want to see all the facts so that you can make an educated and informed decision as to what kind of statutory scheme is needed for this industry. Thank you.

COUNCIL MEMBER McCAFFREY: Thank you. Next speaker.

MR. STEVEN ASLAN: My name is Steven Aslan, and I run a business on West 20th Street. A lot of what I wanted to say has been mentioned already, so I'll make it brief and not duplicate too much of what has already been said.

We have had over the years a great of support from our Community Board. They have been supporting us, and calling us a good neighbor in the neighborhood, and I think we have been.

Now all of a sudden, since there's been a few incidents with different segments of our industry, we

0880

have felt the brunt of these allegations.

I'm going to talk about cabarets, because that's an area I know about.  There's been a lot of allegations and misinformation about us that's not true, and we gave a lot of evidence that we at the high end, are not responsible for that.

Our Community Boards, 4, 5 and 7, voted that was not the case, from the people who live and work on our streets, and in speaking the Police Officers in our Precinct, they will verify that there are very few problems in our industry.  We are completely different from regular nightclubs.

Anyway, my point is, that this is apparently a City-wide resolution.  But, I think what is only obvious, are the different effects this will have on the industry.

What I'm here to encourage the Board to see, is, if they can figure out the way this will effect those clubs in Manhattan as opposed to the outer-boroughs.  I think there will be a different effect in Manhattan.

Our industry is a major producer of jobs, and people who economically rely on us.  We are a major source of businesses coming into the City.  We bring in large amounts of money into the City from outside the

0881

City.   We generate a lot of tax dollars.

So while the economy is reeling at the moment, the Council should reconsider this.   Thank you.

COUNCIL MEMBER McCAFFREY:   Thank you.   Next speaker.

MR. ED RUDOFSKY:   Thank you, Mr. Chairman and Members of the Subcommittee.   My name is Ed Rudofsky, and I am an attorney with the firm Zane & Rudofsky.

First, Martin Mehler, an attorney representing Nickels, could not be here today, and asked me to deliver this letter (Indicating).

COUNCIL MEMBER McCAFFREY:   We'll include it in the record.

MR. RUDOFSKY:   Thank you, Mr. Chairman. Secondly, we have submitted an analysis which my firm has prepared for you regarding the history of whether or not the substantial portion, the so-called 60-40 Rule was intended for adult eating and drinking establishments.   It's very long, and I don't intend to read it, but I do intend to summarize it for you if I may.

Mr. Chairman, you recognize Mr. Fahringer and Mr. Alonso as honorable adversaries, and I know that. I attempted to be an honorable adversary in this whole process which has gone on from 1995, 1996.

JNR-000833

I don't know if you recall, but I had the pleasure  of sitting at one of the Court of Appeals' arguments, and I certainly recognized what was happening from listening and observing what was going on (Inaudible).

Because of that, I ask you and the Members of the Committee to stop, look and listen.  Listen to what Mr. Alonso  said.  Stop and read the material that we have submitted to you.

Mr. Chairman, I understand that how you may have strongly regarding the application of the substantial portion text to the adult eating and drinking portion of the adult industry.

And, you may have articulated that in prior dates, but the reality Mr. Chairman, is that statute was drafted in a way that was so clear, and if it wasn't clear, it was made clear in the stipulation by "Judge Cedarbrown" in Federal Court.

When this statute was passed, what the statute does, with all due respect, the statute does not say--what the statute does say, is, that substantial portion applies to everything in the entire industry.

And, in fact, Mr. Alonso argued on behalf of his client, that they were not causing the type of

0883

problems that are alleged in this industry.  You cannot divide this industry.  One rule applies to everyone; high-end, low-end.

The Supreme Court's response to this, was, no, the statute applies across the board equally to the entire industry.  And, the Court of Appeals noted that there would be great constitutional issues raised if this were attempted to enforce the statute.

Now, the statement was made earlier by Mr. Karnovsky, who is also an honorable person, and I crossed swords with him professionally, that the prior study of this proposal was rejected for one simple reason.

The out of town studies and the New York City study to the extent that the New York City study--

COUNCIL MEMBER McCAFFREY:  Which was upheld by the courts.

MR. RUDOFSKY:  They were upheld, and that is the point.  They they all involved the concentration of adult establishments.

There has never been a study by New York City, or anybody else involving the affect of a 60-40 Rule, a Substantial Portion Rule, or anything to the regime that was opposed.

Mr. Jaffee started to say, and Mr. Karnovsky

0884

wisely pulled him over, and Mr. Jaffee started to say how successful the Mayor's regime had been.  Mr. Karnovsky acknowledged that there has been no study for the 60-40 Rule.

COUNCIL MEMBER McCAFFREY:  Nor is one necessary.

MR. RUDOFSKY:  Well, with all due respect, that's part of what I said.  I know how seriously you address this.  I don't think that you or the Members of the Subcommittee,  or the Members of the Council want to pass this just as an exercise.

Ms. Haroules and Mr. Fahringer were trying to tell  you about the dramatic changes in the attempt to wipe out the 60-40, or whatever, to the adult establishments, and if that is the basis for this proposal, we are suggesting that we will not survive.

COUNCIL MEMBER McCAFFREY:  Let me say something.  At the Court of Appeals, when the Justices were asked the question following Mr. Fahringer's presentation, which he said the effect was that it would  eliminate all those locations before it was saved by the 60-40 Rule.

The Court of Appeals upheld that, taking for granted that every one of those locations out there was going to be eliminated, and the question was then will

there be sufficient space for these type of venues.

MR. RUDOFSKY:  I don't know if the Court of Appeals--what Mr. Fahringer was arguing--

COUNCIL MEMBER McCAFFREY:  No, the Judges went on the premise that the arguments presented were true.

MR. RUDOFSKY:  Yes, but he didn't win.  If you look, the City never said we are putting everyone out of business.

COUNCIL MEMBER McCAFFREY:  Mr. Rudofsky, the Judges heard the argument that the businesses were going to be put out of business in their current locations, and that they had to relocate some place else if they wanted to stay in business.  That was the position that was presented.

MR. RUDOFSKY:  But, you're talking about what went on at the oral arguments.  The Court of Appeals never said directly, or indirectly, we are approving the eradication of this industry.  They rejected the expert's affidavit as using the wrong legal--

COUNCIL MEMBER McCAFFREY:  Mr. Rudofsky, as you recall, the City said those businesses were going to have to close down.

MR. RUDOFSKY:  Unless they complied with the Substantial Portion test.

0886

COUNCIL MEMBER McCAFFREY:  Yes, the
Substantial Portion test.

MR. RUDOFSKY:  I say to you with all due
respect, I am a lifelong New Yorker, and this is the
first time I ever had the privilege, and I mean that,
to participate at a City Council proceeding.  I very
much respect what you do.  I respect our grass-root
democracy, but I think the decision was wrong in the
way this statute was passed.

COUNCIL MEMBER McCAFFREY:  Mr. Rudofsky, that
is the reason why we are here today.

I have just one last question.  Mr. Alonso,
are you a owner or principal in your venture?

MR. ALONSO:  Yes.

COUNCIL MEMBER McCAFFREY:  Have you been a
restaurant or club owner in the past?  The only reason
I ask this is because is for the pejorative sense, but
to ask the question, is there another form of activity
that would allow you at this location to remain in
business to employ New Yorkers, because at your present
location there's (Inaudible) Marie's in the same
general vicinity, which is a fabulous restaurant.

MR. ALONSO:  Under the stipulation we would
be running a certain type of business.  Because of that
type of business we are paying a higher rent than other

JNR-000838

establishments.

COUNCIL MEMBER McCAFFREY:  I thank you very much, and again, as I said previously, if there are any written submissions that you would like to make, please do so now.

MS. ALONSO:  Ms. Quinn was not here, but she requested us to do so.

COUNCIL MEMBER McCAFFREY:  Thank you very much.  The hearing is now closed.  We will recess until 9:55 tomorrow morning to able to vote on those other items before  us.  With that, the Subcommittee on Zoning and Franchises is now closed.

(Time Noted:  11:55 A.M.)

0888

## C E R T I F I C A T E

STATE OF NEW YORK   )
                    )
COUNTY OF NEW YORK  )

I, MICHAEL S. IEN, a Notary Public within and for the State of New York, do hereby certify:

That I reported the proceedings of the within entitled matter, and that the within transcript is a true record of said proceedings.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of November, 2001.

_____

MICHAEL S. IEN

There were 136 adult establishments in 2000, with 101 or 74%, consisting of '60/40' establishments. The breakdown by type of establishment is as follows: Book stores - 35 (with 29 operating as '60/40'establishments); Eating or drinking - 57 (with 36 operating as '60/40' establishments); and Theaters - 44 (with 36 operating as '60/40' establishments). The breakdown of the number of establishments by borough is as follows: Bronx - 9 (with 6 operating as '60/40' establishments); Brooklyn - 13 (with 9 operating as '60/40' establishments); Manhattan - 69 (with 56 operating as '60/40' establishments); Queens - 41 (with 29 operating as '60/40' establishments); and Staten Island - 4 (with 1 operating as a '60/40' establishment).

B. Trends

Citywide Trends: 1993 to 2000: The 1994 DCP Study identified 177 adult establishments in New York City as of 1993. As indicated above, in 2000, there were 136 adult establishments, which represents a 23 percent decline over the seven year period. Factors apart from enforcement of the Zoning Resolution which likely contributed to this decline include redevelopment of Times Square and a strong local economy in which landlords have a

---

establishment which comprises no more than 40% of the establishment's total floor area. The interior configurations and method of operation of these establishments are, however, subject to change. Accordingly, the numbers and locations of adult establishments as of any given date may vary from the information presented here.

choice of tenants other than adult establishments. The number of adult establishments may also be affected by the increased availability of adult material on cable television, and the burgeoning phenomenon of access through the internet.

Trends by Borough from 1993 to 2000: The greatest decline in adult establishments between 1993 and 2000 was in Manhattan, from 107 to 69. In 1993, 60% of the City's adult uses were in that borough; in 2000, 51% were so located.  The number of adult establishments declined by three in Queens, although 29 of 41 current establishments (71%) are operating as '60/40' establishments. The number of adult establishments declined by two in Brooklyn, although 9 of 13 current establishments (69%) are operating as '60/40' establishments. The Bronx and Staten Island each experienced an increase of one establishment, with 6 of 9 current establishments (67%) in the Bronx and 1 of 4 current establishments (25%) in Staten Island operating as '60/40' establishments.

Trends in Concentrations by Community District: As in 1993, the greatest concentration of adult uses in 2000 was found in Community District 5, which includes part of the Times Square area.  In 1993, 53 or 30% of the City's adult uses were located there; in 2000, the number had declined to 29 establishments, or 21% of the Citywide total.  Thirteen adult establishments closed on West 42nd Street between 7th and 8th Avenues. Of the 29 current

7

N 010508 ZRY

0715

1

1

2

3

4                    CITY PLANNING COMMISSION

5                    PUBLIC HEARING

6

7

8                         August 8, 2001

9

10

11                    ADULT USES VOTE

12

13

14

15

16

17

18

19

20

0836

2

1

2      CITY PLANNING COMMISSION PUBLIC HEARING OF AUGUST

3                          8, 2001

4          VOTE:  CAL. NO. 34 - CITYWIDE - N 010508 ZRY

5

6      Good Morning, this is the Public Hearing for the

7      City Planning Commission, held in City Hall.

8      Today is August 8, 2001.  The time is 10:16 A.M.

9

10     ROLL CALL:

11     Chairman Rose                    Present

12     Commissioner Abney               Present

13     Commissioner Battaglia           Present

14     Commissioner Burden              Present

15     Commissioner Cantor              Present

16     Commissioner Cavaluzzi           Absent

17     Commissioner Chin                Absent

18     Commissioner Garvin              Present

19     Commissioner Gelber              Present

20     Commissioner Grinker             Present

0837

3

| | | |
|---|---|---|
| 1 | Commissioner Knuckles | Present |
| 2 | Commissioner Merolo | Present |

3

4    A quorum is present.

5

6    CITYWIDE

7    CALENDAR NUMBER 34:        N010508 ZRY

8

9    **WOMAN**: In the matter of an application for an

10    amendment of the zoning resolution of the City of

11    New York relating to adult establishments.  For a

12    favorable report proposed as modified, Chairman

13    Rose.

14    CHAIRMAN ROSE:  When this Commission adopted, in

15    conjunction with the City Council, zoning to

16    regulate the location of adult uses within the

17    City of New York, we were very explicit at the

18    time about what we were trying to do, what kind of

19    establishments we were seeking to regulate and

20    this commission put in place a set of restrictions

0838

4

1     to make sure that these regulations were being

2     enforced against the kinds of businesses that we

3     were intending and not against the kinds of

4     businesses that we were not intending.  And, we

5     put protections in place to make sure that there

6     was a clear direction to the Department of

7     Buildings.  We also explicitly acknowledged the

8     fact that it might be, in putting those

9     protections and restrictions in place, that we

10     would inadvertently allow for either loopholes or

11     misinterpretations in terms of what we were trying

12     to do,    while the regulations that we adopted

13     have met every legal and constitutional test

14     unanimously being upheld by 19 judges throughout

15     every step of the judicial process.  As we noted

16     at the time of adoption, the interpretation of the

17     regulations have clearly indicated a need for us

18     to come back and further clarify exactly what we

19     were doing to make sure that the spirit and the

20     intent and the letter of the original regulations

0839

1     are, in fact, enforced. And those two provisions

2     are that **BLANK SPACE IN TAPE** book stores and

3     video stores that are not adult in nature from

4     being enforced again. We never discussed or

5     intended that those sets of provisions to be

6     applied to strip bars, to eating and drinking

7     establishments, and the amendment that is before

8     us now clarifies that. Similarly, we always

9     envisage the fact that to the extent that

10    mathematical calculations that still left adult

11    businesses as what they were, and simply

12    subterfuges or sham demonstrations of compliance

13    with those provisions, to the extent that we had

14    to, we would come back and revisit that issue. I

15    am confident that the way we have come back and

16    revisited them is appropriate. I think that these

17    regulations have been improved very much as a

18    result of the public review process and the

19    deliberations of this Commission. Things that were

20    potentially problematic and that were called out

0840

6

1    in public testimony before this Commission have

2    been addressed, and I think that what we have now

3    is a set of amendments that clarify and uphold the

4    original scope and intent of our action.  I am

5    confident that it meets every legal issue that has

6    been raised in regard both to the original text

7    and through this public review process and as an

8    important step in maintaining and straightening

9    the protections that exist in terms of the quality

10    of life in our residential neighborhoods while

11    maintaining appropriate constitutional

12    protections, I am happy to vote. Yes.

13    **WOMAN:** Commissioner Abney.

14    COMMISSIONER ABNEY:  Agreeing with the Chairman. I

15    think it is needed and I also do vote, Yes.

16    **WOMAN:** Commissioner Battaglia.

17    COMMISSIONER BATTAGLIA:  I too agree with the

18    Chairman.  With the proposed text modification,

19    which provides for an amortization period, and

20    also omits the separation criteria to protect

Case 1:02-cv-04431-LJL-SDA Document 162-61 Filed 05/09/22 Page 269 of 315

1   types of establishments which do not have

2   secondary impacts, I vote, Yes. We must insure,

3   however, that enforcement efforts are thorough but

4   remain objective and unbiased.

5   **WOMAN**: Commissioner Burden.

6   COMMISSIONER BURDEN: I commend the Chair and the

7   Department for very, very thoughtful work. The

8   amendments clarify definitions, they make

9   enforcement easier with objective criteria. It is

10  really a substantial improvement and I am very

11  pleased to vote, Yes.

12  **WOMAN**: Commissioner Cantor.

13  COMMISSIONER CANTOR: Yes.

14  **WOMAN**: Commissioner Garvin.

15  COMMISSIONER GARVIN: When we passed these

16  regulations some years ago, our intent was to

17  prevent negative impact on surrounding

18  neighborhoods. At that time, it was not our

19  intent to define pornography or what people could

20  and could not purchase in stores or see in

0842

8

1   performances.  People said that it might be that

2   we would preclude the continuation of such

3   establishments.  That is not what happened.  We

4   have, in fact, had a positive impact.  There is a

5   reduction of establishments by 23%, but access is

6   still available.  The initial proposals that came

7   before us, however, might have been intrusions

8   into the way businesses were run, or where they

9   kept their stock, or what their stock was, and it

10  had never been out intent to do that or to enforce

11  the provisions by having anybody determine what

12  was or was not an adult use.  For that reason, we

13  passed the initial legislation.  It is normal to

14  make adjustments when we see how things work and

15  it should be done more often.  And, I commend the

16  administration on making those adjustments.  I am

17  happy to say that we have in no way intruded into

18  the daily functioning of commercial establishments

19  that are involved with what might or might not be

9

1    termed by somebody as pornography, and I am

2    pleased to vote, Yes.

3    **WOMAN**:  Commissioner Gelber.

4    COMMISSIONER GELBER:  Yes.

5    **WOMAN**: Commissioner Grinker.

6    COMMISSIONER GRINKER:  Three years ago, when I

7    voted in favor of the adult use zoning text, I

8    stated my belief that the proposal met

9    constitutional muster because the city had

10   adequately demonstrated two crucial criteria.

11   One, that there was a serious problem in terms of

12   proliferation of adult use establishments; and,

13   two, it had proposed a reasonable solution for

14   meeting that problem without violating free speech

15   protections.  In the current situation, the city

16   has proposed an alternative solution but,

17   unfortunately, I think it is a solution in search

18   of a problem.  I say this because, first, there is

19   no documentation of any proliferation but rather,

20   the number of adult use facilities has gone down

0844

1    substantially, as Commissioner Garvin has said, by

2    23%, which was the original intent of the zoning

3    plan.  Secondly, there is nothing but anecdotal

4    information presented on the failure of the 60/40

5    rules.  For example, I have no clear idea how many

6    establishments are honestly trying to meet the

7    standards set forth compared to how many of the

8    kind of sham that is the source of this concern.

9    And, finally, the community boards in Manhattan

10   where fully 40% or more of these establishments

11   exist have expressed satisfaction that there are

12   no significant secondary impacts from the

13   remaining adult use establishments in their

14   neighborhoods.  Given these facts, or lack of

15   alternative facts, while certainly the proposals

16   make good sense, I believe that, over all, there

17   is no justification for the extensive

18   modifications to the zoning requirements that are

19   being proposed, and it could be argued that this

20   is a little more than an effort at ongoing

0845

11

1    harassment which has no place in our

2    constitutional interpretation of free speech.    I

3    will not comment on the content of the proposed

4    modifications except to note that I believe they

5    are likely to raise a host of serious issues that

6    again will result, at best, in extensive

7    litigation and delay.    I would like to be

8    supportive of the City's efforts.    These proposals

9    put forth in highly unfriendly political

10   atmosphere and without adequate justification

11   violate my own standards of fairness when it comes

12   to the protection of First Amendment rights.    I

13   must, therefore, respectively abstain.

14   **WOMAN**: Commissioner Knuckles.

15   COMMISSIONER KNUCKLES:    I believe the proposed

16   amendment, similar to the amendments adopted in

17   1998, attempt to mitigate what are clearly

18   established negative secondary impacts of adult

19   establishments as they are defined in the text of

20   the zoning code.    I do not believe these

0846

12

1    amendments seek to get into the role of the

2    content of the material within these adult

3    establishments.   Therefore, I vote, Aye.

4    **WOMAN**: Commissioner Merolo.

5    COMMISSIONER MEROLO:  I fully support all the

6    statements that were made today by the Chairman

7    regarding this issue and I vote, Yes.

8

9    **WOMAN**: A favorable report proposed to be modified

10   has been adopted on Calendar NO. 34.

11

12

13

14

15

16

17

CITY COUNCIL
CITY OF NEW YORK

-------------------------------------------------X:
                                                  :
                                                  :
                                                  :
                                                  :
                                                  :
IN THE MATTER OF THE REGULARLY SCHEDULED MEETING  :
                                                  :
              OF THE                              :
                                                  :
ZONING AND FRANCHISES SUBCOMMITTEE                :
                                                  :
    :                                             :
-------------------------------------------------X:


                              CITY HALL
                              NEW YORK, NEW YORK
                              OCTOBER 1, 2001
                              AT 9:45 A.M.


COUNCIL MEMBER WALTER McCAFFREY, CHAIRPERSON

0849

in the hope that this can be resolved.

Let me just say to the tenant, I mean I understand your concern, but I know for a fact that Community Board 14 does not want this to go on forever, and hopefully we can come to some kind of conclusion on this very soon.

MR. WICZYK:   Thank you.

COUNCIL MEMBER McCAFFREY:   Thank you very much. Is there anyone else who wishes to testify on this item?      (No Response).

There being no one else to testify, the hearing is now closed.

On the City-wide item, 1112, I will ask the city's representative to come forward.  Mr. Karnovsky, welcome.   Mr. Karnovsky, you're the lead witness for the Administration.  Would you care to begin your statement?

MR. DAVID KARNOVSKY:   Actually David Jaffee, Counsel to the Criminal Justice Coordinator could begin.

MR. DAVID JAFFEE:    Thank you.  My name is David Jaffee, and I'm General Counsel to Steven Fishner, the Criminal Justice Coordinator.

Mr. Chairman, and members of the Subcommittee, thank you for the opportunity appear on

0850

behalf of Mayor Giuliani and Criminal Justice
Coordinator Steven Fishner to be heard on Land Use
Number 112, which amends New York City Zoning
Resolution 12-10, the City's adult establishment zoning
laws.

Land Use 1112 would close the
judicially-created loopholes that illegal adult
establishments have utilized to remain in operation
while only maintaining sham compliance with the City's
zoning laws.

A hallmark of the Giuliani Administration has
been the dramatic improvement in the quality of life in
every community of the City of New York.

Before the Mayor took over, New York suffered
from what many experts and pundits described as a
mindset of defining deviancy downward.  Crime was
rampant, streets were filthy and graffiti was
everywhere.  Businesses suffered and residents fled the
City in record numbers.  New York City was seen as a
symbol of urban decay in America.

COUNCIL MEMBER McCAFFREY:  Mr. Jaffee,
you're not going to read seven pages to us?

MR. JAFFEE:  Okay.

COUNCIL MEMBER McCAFFREY:  Okay.  Seven pages
we are capable of reading.  Cut to the chase.

0851

MR. JAFFEE:  Basically, one of the effective quality of life initiatives was the comprehensive zoning laws implemented by the City Council and the Mayor.

It should be noted, the one that the City Council instituted in 1995, was truly remarkable, in that several communities throughout the United States recognized a need for progressive policy.

This effort was based upon the pronounced secondary impacts that adult establishments had on residences and businesses, and really this City Council was the first to, along with the Mayor and the City Planning Commission in adopting the original 1995 adult use zoning amendments, based upon studies by the Times Square Business Improvement District and similar studies in other jurisdictions.

COUNCIL MEMBER McCAFFREY:  We followed them, yes.

MR. JAFFEE:  It is now well recognized that specified distances of retail zoned areas and facilities, and areas where children and families congregate may be used for prohibiting adult entertainment uses in order to avoid the undesirable impacts associated with the clustering, and that is why in essence we are here today, because what those

JNR-000858

0852

situations did.

What happened then, and not surprisingly the adult entertainment industry launched a series of court challenges, and the courts began to accept what I submit are terribly misconstrued views and misconceptions.

Some judges accepted arguments that a strip club was not a sex business if, in addition to strippers, it also had a sushi bar or a computer, or a golf range that took up 60% of the businesses floor space. Another Judge said it wasn't a pornographic bookstore if it also had Disney cartoon videos on display, even though they were in the back of the store gathering dust.

The situation became so ridiculous that some adult video stores would not even bother to display the sham videotapes, instead leaving them in a box in the corner of the store, or buried in the basement, and they were still considered compliant.

These loopholes are simply wrong, for they so distort the original law passed by the Council as to make it almost meaningless. There was no so-called "60-40" provisions for these businesses.

Moreover, while adult bookstores and video stores are defined in the law as having 40% or more of

31

their stock in trade being adult, the statute did not
say, and certainly did not intend to mean, that a store
could be non-adult if it merely kept 500 copies of the
same western video somewhere on its premises, and had
no intention of actually selling them.

COUNCIL MEMBER McCAFFREY:  So, Mr. Karnosky,
tell me how we now address this?

MR. KARNOVSKY:  The amendment there relates
to the '95 changes, and the principal changes relate to
the definition of an adult bookstore, and an adult
eating or drinking establishment.  So changes arise of
the situations that David has described.

As you will recall, under the current zoning
of adult bookstores, book sales are a substantial
portion of the stock and trade of adult material and a
substantial portion of the floor area.

That particular text was adopted for two
reasons. One, to request adult bookstores to have at
least 40% of its accessible stock and floor area
dedicated to adult material, also to provide clear
guidance to enforcement officials in its course of
enforcement.

The enforcement since 1998, has--since
1999--demonstrated the need to focus on the floor area,
which regulate those establishments, and I quote, "with

0854

a predominant, on-going focus on sexually explicit materials or activities", and that's because of the sham measures that Mr. Jaffee described.

At the same time, we should continue to have a physical layout which reflects the (Inaudible) so that we know where booths and peep-holes and other adult material is located.

The courts have recognized that there is kind of a mechanical mockery of the regulations. So what the amendment does, is establish objective factors relating to the physical layout and method of operation by which a bookstore which has engaged in only superficial compliance with the Substantial Portion Test would be considered an adult book store.

Now, with respect to adult eating or drinking establishments, the '95 regulations define that kind of type of establishment as "that regularly features adult entertainment", and under that definition, unlike the bookstore, the amount of floor area in terms of the establishment, and the question is very simple: Does the bar or restaurant feature adult live performances or films in any portion of the establishment?

That's what we consider to be a bizarre reading of the regulations that led to the artificial separation of adult and non-adult sections.

0855

As a result of it, the Court themselves also recognize the absurdity of this result.  However, due to the judicial interpretation of how the Substantial Portion Test applies to these establishments, the result has been that the 60-40% eating or drinking establishments have continued in operation at locations where they were never intended to be allowed.

Those are the two principal changes that address both the pervasive efforts of the operators, and some of the results of litigation.  There are other provisions which I'll be glad to discuss if you ever any questions, but those are  the main features.

The intent of the amendment is to allow the City to move forward in enforcing these regulations.

This addresses the fact that today by our own calculations, there are approximately 101 establishments in zoning districts where they are not intended to be, which they have been operating under this 60-40 basis.  In addition to the fact that we see establishments opening up in districts where they are intended for, because they abide by the rules.

COUNCIL MEMBER McCAFFREY:  There is a one year amortization period?

MR. KARNOVSKY:  That's correct.  That's what's under the original rule.

0856

COUNCIL MEMBER McCAFFREY:  Okay.  Are there any questions?  Council Member Quinn?

COUNCIL MEMBER CHRISTINE QUINN:  Yes, thank you.  Where are these sham compliances?  What is the impact you talked about?  You began your testimony with a long list of horrors that had befallen the City, that have now been eliminated.  So, if you can now detail for me where the sham compliances have occurred and the level to which negative impacts continued in their own areas versus compliance, and where it relates to crime stats.

My point being, I want to make sure that we are not tightening this loophole just to say that we are tightening, but that we are making it more effective.

MR. KARNOVSKY:  Let me start with a couple of statistics to give you an overall picture with respect to these stats.

In 1993, when the City Planning Commission did its study  which led to the adoption of these regulations, we identified 177 establishments around the city.  In 1998, when enforcement began at the end of a long series of litigations which the courts uniformly upheld testimony, there were 149.

In 2000, we did a survey which identified

136.  Of that 136, 101 were operating in locations where the zoning does not allow adult uses, and of those 101, 60 were establishments that have been identified in the original 1993 survey.

COUNCIL MEMBER QUINN:  Could I just ask a question?  The 101 establishments that are in areas that zoning does not allow, are they in proximity to local neighborhood establishments, or in hard-core areas?  Is that included in what you're saying about the zoning?

MR. KARNOVSKY:  It includes both the zoning districts where they are not allowed, and it reflects our examination of the application of the Exempt Rule, the  500-foot rule .

COUNCIL MEMBER QUINN:  So would it include a place like Christopher Street?

MR. KARNOVSKY:  I can't speak to the specifics of Christopher Street.

COUNCIL MEMBER QUINN:  Thank you.

COUNCIL MEMBER McCAFFREY:  Just so that everyone is clear on the record though, we are not in the process of expanding the number of areas that will be subject to adult entertainment enforcement?

MR. KARNOVSKY:  I think fundamentally we are not changing where adult establishments are allowed to

0858

exist.

COUNCIL MEMBER McCAFFREY:  So that means that the area had prepared and took the issues that these areas became the same, but that these businesses are operating essentially under the same policy?

MR. KARNOVSKY:  Absolutely.  Before I answer your question more directly, there's one more fact.  By our calculations, of those 101 operating locations where they are not supposed to operate under the zoning, 26 have opened up under the 60-40 (Inaudible).

In terms of the secondary impacts, of course the 1995 regulations were adopted based on studies and in consideration of evidence that was provided.  So I hope that answers your question.

COUNCIL MEMBER QUINN:  So we don't actually know if that may be the case, because it's just too much asking for 60-40.  We don't know whether they had continued to cause secondary negative effects.

MR. KARNOVSKY:  That certainly is an interesting question.  I can't draw a conclusion on that at the moment.

COUNCIL MEMBER QUINN:  Do you believe, or is there any concern, with secondary negative impacts regarding the receiving sites?

To me, that's already a concern since there

was no indication that the West Side of Manhattan would not end up with the same amount or more, than say some place in Queens.

Do we believe that the City will monitor and enforce the 300 adult entertainment establishments under the 60-40, that have relocated into other receiving areas, and therefore cause more Triple X's and adult establishments in neighborhoods that have already borne the brunt of these kinds of businesses?

MR. KARNOVSKY: The first thing is, that there have been new establishments relocated where the law fully reflects that those locations are viable. At the same time--

COUNCIL MEMBER QUINN: That's in fact my concern.

MR. KARNOVSKY: Let me go to the second point. At the same time, the overall numbers with the City has declined, and I believe I gave you the overall numbers.

COUNCIL MEMBER QUINN: Thank you.

COUNCIL MEMBER McCAFFREY: MR. Karnovsky, let me just ask you, in essence there is no need for additional studies of secondary impacts that were cited in the Council at that time of the adoption, is that correct?

0860

38

MR. KARNOVSKY:  That's correct.

COUNCIL MEMBER McCAFFREY:  What about with the 60-40 rule?

MR. KARNOVSKY:  We are not quite sure that the 60-40--you cannot change the text without doing another study to see that establishments of that nature have secondary impacts.

COUNCIL MEMBER McCAFFREY:  Council Member Dilan?

COUNCIL MEMBER MARTIN MALAVE-DILAN:  Thank you, Mr. Chair.  My question is, outside of Manhattan, has there been an increase?  Do you have a number of those secondary impacts of those new establishments outside of Manhattan?

MR. KARNOVSKY:  The text of course is a City-wide text so it would be required to have all the figures, and I can provide those numbers to you in writing.

COUNCIL MEMBER MALAVE-DILAN:  Thank you.

COUNCIL MEMBER McCAFFREY:  Any questions.

(No Response).

Gentlemen, thank you very much.  We ask that you remain. I'm now going to go to panels of witnesses in favor and opposed, and first, I would like to call up someone I have known for a very long time, Herald

0861

Price Fahringer, along with Beth Haroulos of the NYCLU.

MR. HERALD PRICE FAHRINGER:  Mr. Chairman, and members of the Subcommittee, my name is Herald Price Fahringer.  I represent more than 40 businesses that in some measure, furnish and dispense adult information to the public.

Since this law as has been pointed out will virtually abolish the 60-40 Rule, I would just like with your permission, to just spend a moment on historical perspectives.

Mr. Chairman, since I represent a large group, what I think is important here, and I attach a great significance to, is one of the charges leveled against the original law, was that the term "substantial" was unconstitutionally vague.

What is critically important, when a challenge was leveled, the City's attorneys, capable and distinguished, came into Federal Court, and before a Federal Judge said we are prepared to, as if it were part of a text, define "substantial".  If a person abides by the 60-40 Rule and utilizes 40% of the floor space, that will comply with the law, and they will not be considered an adult entertainment establishment.

So, as a consequence, when this became a law on July 28, 1998, at least 101 businesses were able to

0862

fulfill those requirements.

We believe, and I think you can see the common sense in this, we believe that the City was sensitive to the First Amendment.

Under the First Amendment, we know that you cannot ban this kind of information because it is constitutionally protected.  The City has never claimed that the material  that is sold is unconstitutional or unlawful in any aspect.

So, recognizing that the 60-40 law came into existence, this new law now virtually abolishes the 60-40 law, and that is what we are discussing here today.

After the 60-40 Rule came into existence, and, incidentally, it was a great rule.  We were involved ourselves personally, myself and Beth in the litigation of close to 30 cases.

As a consequence, the important aspect of this litigation that I think deserves comment, is, that the City proceeded under the Nuisance Abatement Law, so that every one of their complaints was lodged in the concept that this establishment was a threat to the public health, safety and welfare of the community.

Another fact is, very tough standards have now been built into this new amendment, because they

felt that the Building Inspectors were ill-equipped to administer this law where it stands subjective.  So we understand the radical consequences.

If this were to be approved by this Committee, and if it were to be passed into law, it would abolish the 101 operators that now exist and function in this City.

When it comes to secondary adverse effects, what I find certainly significant, is that the Community Boards that are the most concerned, deal with this problem.

COUNCIL MEMBER McCAFFREY:  Let me just say, that a bunch of these properties are located in several Community Board areas, not just two or three Community Board areas.

MR. FAHRINGER: Mr. Chairman, I welcome that comment, because certainly it is significant that over one-third of the adult establishments in the five boroughs are concentrated in these Community Boards that felt that there was no need for any further regulations.

Finally, what I would want to say, without intruding on the Committee's time any further, is that if you look at those standards, and I know enough about the membership  of this Committee, that you're alert

0864

and sensitive to issues, that if you have provisions that enable a person to exercise their discretions, then it is not our view, or your view to determine what materials are acceptable and what are not acceptable.

The last thing I want to say, this will give the Commissioner of Buildings the power to regulate, or initiate rules to effectuate this law.

Now, I can see this when you're talking about safety issues, or the sale of liquor standards, but certainly not when you're dealing with a First Amendment issue.

In conclusion, and I hope it's not inappropriate for me to say as we sit here today in the shadows of one of the worse terrorist attacks that ever struck this country and affected the rest of the world, and President Bush said, this assault upon this nation, is a strike against our freedom, and I'm quoting him verbatim, and he talked about freedom of religion, freedom of speech and the right to vote.

So, I would urge this Committee to strike down this law. I have confidence that this Committee and this Council, that they will do what's right and strike down this law. Thank you.

COUNCIL MEMBER McCAFFREY: Thank you. Next speaker.

MS. BETH HAROULES:  Good morning.  I am Beth
Haroules.  I am a Staff Attorney for the New York Civil
Liberties Union.  We have long been devoted to the
protection and enhancement of those fundamental rights
and constitutional values embodied in the Bill of
Rights.

As has been pointed out in 1995, zoning
amendments ultimately did withstand Federal and New
York State constitutional challenges.  And, in July,
1998, as the City began its enforcement efforts against
establishments that offered sexually-explicit adult
material, the Commissioner of Buildings formally
adopted the 60-40 Rule.

Under that rule, a commercial establishment
was deemed not to be an adult establishment if it
restricted its sexually-explicit materials or
entertainment to less than 40% of its stock in trade.

As City officials learned, almost all of the
then existing adult establishments complied with the
dictates of the 60-40 Rule, and changed the nature of
their businesses to conform to the City's rulemaking.

Indeed, the Department of City Planning's
Briefing Sheet that was issued suggested some who 40
new so establishments have begun to offer
sexually-explicit adult entertainment in mainstream

JNR-000872

commercial locations throughout the five boroughs.

After three years of defeats in the enforcement actions brought by the City against bona fide, legitimate commercial establishments that offer sexually explicit entertainment, and that complied fully with the City's interpretative regulations, the City has launched a new offensive against sexually-explicit adult entertainment.

We believe that the proposed amendments represents a constitutionally impermissible, selective interference with protected sexually-explicit speech whose content is thought to produce distasteful effects.

We believe for two reasons, that the proposed amendment fails constitutional scrutiny. In the first instance, the proposed amendments confer unfettered discretion on Building Department Inspectors and inject precisely the level of discretion into an enforcement effort which the City Planning Commission believed in 1995 was unnecessary and to be avoided.

Further, the amendments establish constitutionally impermissible irrebuttable presumptions that violate the dictates of the Due Process Clause.

The proposed amendments to the Zoning

Resolution confer both unlimited and standardless discretion to the Commissioner of Buildings and to the inspection staff of the Buildings Department to determine what an adult establishment is.

For example, an adult establishment is defined as a commercial establishment where a substantial portion of the establishment includes any of the adult uses set forth in Section 12-10 of the Zoning Resolution.

An adult book store has a substantial portion of its stock in trade in certain material characterized by an emphasis upon certain specified sexual activities, or specified anatomical areas.

An adult eating or drinking establishment, an adult theater and other adult commercial establishments regularly feature certain media or live performances characterized by an emphasis upon certain specified sexual activities or specified anatomical areas.

How often is regularly?  How much of the described activity is permissible before it becomes characterized by an emphasis upon the specified sexual activities or anatomical areas?

By their very terms, the proposed amendments sweep within their ambit locations as diverse as internet cafes and Barnes & Noble.  We submit, that the

0868

Zoning Resolution, by failing to specify adequate procedures or standards for enforcement, has conferred unfettered discretionary authority upon the Buildings Department, thereby inviting the risk of content based censorship.

While the proposed amendments to the zoning ordinance purport to offer guidelines to Building Inspectors in assessing the term "substantial portion" for purposes of determining whether a commercial establishment is adult or not, such guidelines must fail constitutional scrutiny.

Those subsections direct the Building Inspectors to draw an irrebuttable presumption that a commercial establishment is an adult commercial establishment merely because the establishment contain certain features.

Such features include a mix of factors ranging from the configuration of commercial retail space to how stock is displayed, to how customer transactions are handled to a form of forensic accounting to determine whether only certain portions of the establishment's stock in trade generate income to the establishment.

As I mentioned before, these guidelines are unconstitutional because they establish conclusive or

0869

irrebuttable presumptions.  According to the Supreme

Court, irrebuttable presumptions have long been

disfavored under the Due Process Clause, because such

presumptions are not necessarily, or universally true

in fact, and standards of due process requires that the

State allow such an individual the opportunity to rebut

such presumptions.

For example, at Tower Video's Upper West Side

location, adult materials are not separated by

partition from the other videos and DVD's offered for

sale or rent, and because of the layout of the store,

customer transactions for other materials may occur in

or adjacent to the adult area.  The presence of such

features confer adult establishment status on Tower

Video, and that store is afforded no opportunity to

rebut the presumption created by the amendments to the

Zoning Resolution.

With that, that's where we were when we

appeared before you last.

There are alternative ways for the City to

regulate adult establishments.  Most of the folks who

have testified before you have indicated that they

don't appreciate the in your face nature of the

sexually-explicit expressions.  However, we believe the

City should not be engaged in the censorship of

0870

protected expression.

I thank you for the opportunity to testify today, and I urge the Committee not to support the passage of this particular amendment.

COUNCIL MEMBER McCAFFREY:  Thank you.  Let me at the outset ask a couple of questions.  Any New Yorker can tell you, that in every neighborhood in the City there are candy stores that display and sell adult books and adult paraphernalia.

Adult entertainment material is available in these so-called candy stores and institutions, and we seen that and targeted that since the Council's action in 1995.  I think that's something that everyone accepts.

We do not in any way eliminate that type of activity, or availability to those locations, do you agree with me?

MS. HAROULES:  We don't eliminate it because the many operators might shy away from the showing of that in such a place.  What may be one person's discretion, might be another's indiscretion.

COUNCIL MEMBER McCAFFREY:  But we would subsequently say that it's an expanded choice that we have seen?

MS. HAROULES:  Exactly, and we applied it

because again, it reflects the market-place.

COUNCIL MEMBER McCAFFREY:  As you recall, when the original concept of this 60-40 arose, it arose as the Council asking how do you delineate between a Barnes & Noble and these other establishments.

Mr. Fahringer, you said you represented about 30% of the cases on this issue, is that correct?

MR. FAHRINGER:  During the litigation process, there were a number of clients that I represented.

Mr. Chairman, what I would like to do, is submit some written material because I can accommodate these  questions, but I can think of three right now that did involve a cabaret operation that did involve live entertainment.

COUNCIL MEMBER McCAFFREY:  And the rest were?

MR. FAHRINGER:  The rest were video stores. Some of my clients at that point made motion pictures.

I might just say Mr. Chairman, that there are representatives that are here today who are going to testify  who do represent what we call the cabaret industry.

What I would like to simply say, that the preamble to the law, the opening paragraph that dominates the entire law, specified "substantial".  And

0872

I think the Courts were correct when they said that would modify every one of the uses that thereafter come under that opening paragraph.

COUNCIL MEMBER McCAFFREY: I'm going to leave the record open. We are not going to vote this on Thursday because of the important nature of this.

MR. FAHRINGER: I'm grateful for that. May I ask could we have two weeks to do that? Would that be sufficient?

COUNCIL MEMBER McCAFFREY: I'll certainly say ten days.

MR. FAHRINGER: Ten days will be fine.

COUNCIL MEMBER McCAFFREY: We are in a state of influx because we have a certain amount of business that we have to catch up on.

MR. FAHRINGER: We welcome that.

COUNCIL MEMBER MCCAFFREY: Thank you very much. The last three witnesses who are signed up, Mark Alonso, Steve Aslan and Ed Rudofsky.

We also have another future member of this body. Council Member Dilan, please.

COUNCIL MEMBER MALAVE-DILAN: Thank you very much. It's my honor and pleasure to introduce the new Council Member for the 37th District in Brooklyn, my son, Eric Malave-Dilan. Thank you.

COUNCIL MEMBER McCAFFREY:  Thank you and good luck.  Which one of you gentlemen would like to go first?

MR. MARK J. ALONSO:  My name is Mark J. Alonso of Alonso, Ferrigno, Andalkar & Kahn, the attorneys for Ten's Cabaret, Inc., which features topless entertainment.  It's a 60-40 club.

I urge you to reject these amendments, or at least delay your vote until the Police Department reveals to you its secret data on topless cabarets.

COUNCIL MEMBER McCAFFREY:  Would you just go through the other names that the premises had?

MR. ALONSO:  It was originally Stringfellows. Now it's Ten's.

First, obviously the general items I would like to cover, are the topless cabarets provide a substantial benefit to this City's economy.  Tourists and people here on business like these establishments, regardless of how some regard them now.

Right now, when the restaurants are suffering dearly from a lack of business, topless nightclubs in Manhattan are doing a brisk business.  The employees pay their taxes and spend their paychecks in New York City. The nightclubs buy food and beverages from wholesalers, who employ truckdrivers and warehouse

0874

staff to fill the orders.

All those tourists, business people, New York residents and workers putting money into and taking salaries out of these businesses are staying in hotels, eating in restaurants, shopping in our stores and taking our taxis.

This is a time when we should look extra carefully at any law which would close any taxpaying business and potentially make New York City less attractive to business people and tourist.

There is precedent for this given by another great Mayor, who shepherded New York City through troubled times.  Mayor Fiorello LaGuardia originally issued an edict which forbade any topless entertainment at the 1939 New York World's Fair during its first season.

The following season, in order to avoid a disastrous decline in attendance, he reversed himself and allowed topless entertainment at the World's Fair. It is beyond question that there are a lot of people who enjoy this type of entertainment.

To some, topless dancing is offensive entertainment.  However, judgment calls about what is moral and immoral entertainment depends on your perspective.  I urge tolerance.  And, Mr. Fahringer in

his statement--

COUNCIL MEMBER McCAFFREY:  You didn't hear (Inaudible) anything in terms of morality.

MR. ALONSO:  I understand there are current issues regarding this.

COUNCIL MEMBER McCAFFREY:  Thank you.  Please continue.

MR. ALONSO:  I have made and delivered to Council Member Quinn's office, a list of the suggestive laws, some way more restrictive than what you are presently considering, and if you care to hear them, I would ask that you give me a few more minutes.

COUNCIL MEMBER McCAFFREY:  You can submit them.

MR. ALONSO:  Fine.  I believe that these suggestions would be satisfactory to you and to the topless nightclub industry.

I also would suggest that this is not the time for this legislation.  It is divisive in a time that we need unity.  It is also not a priority.

However, if you decide to consider this amendment, I'm going to ask you to delay your vote until you have the opportunity to consider the Police Department documents, which up until now have been kept secret.

0876

One of the biggest reasons for passing these amendments, in fact, the main reason for the original ordinance itself, has always been that topless bars cause crime.

In 1994, the Department of City Planning compiled Police Department data, and were unable to conclude that adult establishments cause crime.  The data analyzed was never tracked to individual establishments.  It seemed as though there was no data kept on topless nightclubs.

Mr. Chairman, they wrote in their DCP report, the "Department of City Planning study analyzed this data to see if there was any association between it and adult uses."

They concluded, in summary, it was not possible to draw definitive conclusions for the analysis of criminal complaints.  Land uses other than adult entertainment establishments, e.g., subway station access, appear to have a far stronger relationship to criminal complaints.  It was not possible to isolate the impact of adult uses relative to criminal complaints.

COUNCIL MEMBER McCAFFREY:  Mr. Alonso, you recall we discredited the Department of City Planning's analysis?

0877

MR. ALONSO:  Yes.

COUNCIL MEMBER McCAFFREY:  It was not the only basis for your statement?

MR. ALONSO:  It was a strong one.

COUNCIL MEMBER McCAFFREY:  I'm a Legislator sitting on this side of the table, and I'm telling you that did not have any bearing on the matter.  Do you have another point you want to raise?

MR. ALONSO:  Yes. In fact, the Police Department had kept a study that indicates that nightclubs do not cause crime.  They have kept monthly reports for years that have never been revealed, never been disclosed and passed out to the Council Members.

A few months ago, a copy of one monthly report kept by the New York City Police Department were distributed to Precinct Commanders and to the Mayor's Office. Apparently it never gets to the City Council.

The report details the entire history of each nightclub in the City of New York which has crimes committed in it, or related to it.  The report shows the history of crimes going back for an undetermined number of years.  It shows only the date of the last violation.

However, it clearly also indicates that it incorporates a long history; the Tunnel lists 82 prior

0878

56

violations, the Cheetah had 49.  Problem clubs are

targeted for further enforcement, and there is an

analysis of "Specific Problems".

For the purposes of this Committee, this

report is important because it shows that topless clubs

do not cause crime, foster crime, create a crime area

in their vicinity or in any way cause the secondary

adverse effects which are the reason you are

considering this amendment.

How do we know that these reports include

topless nightclubs?  Because on the monthly list for

the 1st Precinct is New York Dolls, a topless nightclub

at 59 Murray Street in Manhattan.  Obviously, the list

includes topless nightclubs.  I  also would like to

mention, that New York Dolls, the only topless

nightclub to make this list, had only two violations.

The non-topless nightclubs have up to 82

violations each, and not one club had fewer than two

violations, make the lone topless club the club with

the least wrongdoing on this list.

We had requested these documents through the

Freedom Of Information Act.  I am providing to you

copies of our requests.  I have also provided the

Police Department's correspondence saying first that my

request was partly disclosable, and then rejecting my

request on the grounds that the information requested was too broad in nature.  When asked what they needed to clarify my request, they ceased all correspondence with us entirely.

Before you vote on this important issue, I ask you to use your power on this Committee to get the Police Department to disclose these reports.

As lawmakers, it seems to me that you and your fellow Council Members would want to see all the facts so that you can make an educated and informed decision as to what kind of statutory scheme is needed for this industry.  Thank you.

COUNCIL MEMBER McCAFFREY:  Thank you.  Next speaker.

MR. STEVEN ASLAN:  My name is Steven Aslan, and I run a business on West 20th Street.  A lot of what I wanted to say has been mentioned already, so I'll make it brief and not duplicate too much of what has already been said.

We have had over the years a great of support from our Community Board.  They have been supporting us, and calling us a good neighbor in the neighborhood, and I think we have been.

Now all of a sudden, since there's been a few incidents with different segments of our industry, we

0880

have felt the brunt of these allegations.

I'm going to talk about cabarets, because that's an area I know about.  There's been a lot of allegations and misinformation about us that's not true, and we gave a lot of evidence that we at the high end, are not responsible for that.

Our Community Boards, 4, 5 and 7, voted that was not the case, from the people who live and work on our streets, and in speaking the Police Officers in our Precinct, they will verify that there are very few problems in our industry.  We are completely different from regular nightclubs.

Anyway, my point is, that this is apparently a City-wide resolution.  But, I think what is only obvious, are the different effects this will have on the industry.

What I'm here to encourage the Board to see, is, if they can figure out the way this will effect those clubs in Manhattan as opposed to the outer-boroughs.  I think there will be a different effect in Manhattan.

Our industry is a major producer of jobs, and people who economically rely on us.  We are a major source of businesses coming into the City.  We bring in large amounts of money into the City from outside the

City.  We generate a lot of tax dollars.

So while the economy is reeling at the moment, the Council should reconsider this.  Thank you.

COUNCIL MEMBER McCAFFREY:  Thank you.  Next speaker.

MR. ED RUDOFSKY:  Thank you, Mr. Chairman and Members of the Subcommittee.  My name is Ed Rudofsky, and I am an attorney with the firm Zane & Rudofsky.

First, Martin Mehler, an attorney representing Nickels, could not be here today, and asked me to deliver this letter (Indicating).

COUNCIL MEMBER McCAFFREY:  We'll include it in the record.

MR. RUDOFSKY:  Thank you, Mr. Chairman. Secondly, we have submitted an analysis which my firm has prepared for you regarding the history of whether or not the substantial portion, the so-called 60-40 Rule was intended for adult eating and drinking establishments.  It's very long, and I don't intend to read it, but I do intend to summarize it for you if I may.

Mr. Chairman, you recognize Mr. Fahringer and Mr. Alonso as honorable adversaries, and I know that. I attempted to be an honorable adversary in this whole process which has gone on from 1995, 1996.

JNR-000888

0882

I don't know if you recall, but I had the pleasure of sitting at one of the Court of Appeals' arguments, and I certainly recognized what was happening from listening and observing what was going on (Inaudible).

Because of that, I ask you and the Members of the Committee to stop, look and listen. Listen to what Mr. Alonso said. Stop and read the material that we have submitted to you.

Mr. Chairman, I understand that how you may have strongly regarding the application of the substantial portion text to the adult eating and drinking portion of the adult industry.

And, you may have articulated that in prior dates, but the reality Mr. Chairman, is that statute was drafted in a way that was so clear, and if it wasn't clear, it was made clear in the stipulation by "Judge Cedarbrown" in Federal Court.

When this statute was passed, what the statute does, with all due respect, the statute does not say--what the statute does say, is, that substantial portion applies to everything in the entire industry.

And, in fact, Mr. Alonso argued on behalf of his client, that they were not causing the type of

0883

problems that are alleged in this industry.  You cannot divide this industry.  One rule applies to everyone; high-end, low-end.

The Supreme Court's response to this, was, no, the statute applies across the board equally to the entire industry.  And, the Court of Appeals noted that there would be great constitutional issues raised if this were attempted to enforce the statute.

Now, the statement was made earlier by Mr. Karnovsky, who is also an honorable person, and I crossed swords with him professionally, that the prior study of this proposal was rejected for one simple reason.

The out of town studies and the New York City study to the extent that the New York City study--

COUNCIL MEMBER McCAFFREY:  Which was upheld by the courts.

MR. RUDOFSKY:  They were upheld, and that is the point.  They they all involved the concentration of adult establishments.

There has never been a study by New York City, or anybody else involving the affect of a 60-40 Rule, a Substantial Portion Rule, or anything to the regime that was opposed.

Mr. Jaffee started to say, and Mr. Karnovsky

0884

wisely pulled him over, and Mr. Jaffee started to say how successful the Mayor's regime had been.  Mr. Karnovsky acknowledged that there has been no study for the 60-40 Rule.

COUNCIL MEMBER McCAFFREY:  Nor is one necessary.

MR. RUDOFSKY:  Well, with all due respect, that's part of what I said.  I know how seriously you address this.  I don't think that you or the Members of the Subcommittee,  or the Members of the Council want to pass this just as an exercise.

Ms. Haroules and Mr. Fahringer were trying to tell  you about the dramatic changes in the attempt to wipe out the 60-40, or whatever, to the adult establishments, and if that is the basis for this proposal, we are suggesting that we will not survive.

COUNCIL MEMBER McCAFFREY:  Let me say something.  At the Court of Appeals, when the Justices were asked the question following Mr. Fahringer's presentation, which he said the effect was that it would  eliminate all those locations before it was saved by the 60-40 Rule.

The Court of Appeals upheld that, taking for granted that every one of those locations out there was going to be eliminated, and the question was then will

0885

there be sufficient space for these type of venues.

MR. RUDOFSKY:  I don't know if the Court of Appeals--what Mr. Fahringer was arguing--

COUNCIL MEMBER McCAFFREY:  No, the Judges went on the premise that the arguments presented were true.

MR. RUDOFSKY:  Yes, but he didn't win.  If you look, the City never said we are putting everyone out of business.

COUNCIL MEMBER McCAFFREY:  Mr. Rudofsky, the Judges heard the argument that the businesses were going to be put out of business in their current locations, and that they had to relocate some place else if they wanted to stay in business.  That was the position that was presented.

MR. RUDOFSKY:  But, you're talking about what went on at the oral arguments.  The Court of Appeals never said directly, or indirectly, we are approving the eradication of this industry.  They rejected the expert's affidavit as using the wrong legal--

COUNCIL MEMBER McCAFFREY:  Mr. Rudofsky, as you recall, the City said those businesses were going to have to close down.

MR. RUDOFSKY:  Unless they complied with the Substantial Portion test.

0886

COUNCIL MEMBER McCAFFREY:  Yes, the Substantial Portion test.

MR. RUDOFSKY:  I say to you with all due respect, I am a lifelong New Yorker, and this is the first time I ever had the privilege, and I mean that, to participate at a City Council proceeding.  I very much respect what you do.  I respect our grass-root democracy, but I think the decision was wrong in the way this statute was passed.

COUNCIL MEMBER McCAFFREY:  Mr. Rudofsky, that is the reason why we are here today.

I have just one last question.  Mr. Alonso, are you a owner or principal in your venture?

MR. ALONSO:  Yes.

COUNCIL MEMBER McCAFFREY:  Have you been a restaurant or club owner in the past?  The only reason I ask this is because is for the pejorative sense, but to ask the question, is there another form of activity that would allow you at this location to remain in business to employ New Yorkers, because at your present location there's (Inaudible) Marie's in the same general vicinity, which is a fabulous restaurant.

MR. ALONSO:  Under the stipulation we would be running a certain type of business.  Because of that type of business we are paying a higher rent than other

65

establishments.

COUNCIL MEMBER McCAFFREY:  I thank you very much, and again, as I said previously, if there are any written submissions that you would like to make, please do so now.

MS. ALONSO:  Ms. Quinn was not here, but she requested us to do so.

COUNCIL MEMBER McCAFFREY:  Thank you very much.  The hearing is now closed.  We will recess until 9:55 tomorrow morning to able to vote on those other items before  us.  With that, the Subcommittee on Zoning and Franchises is now closed.

(Time Noted:  11:55 A.M.)

JNR-000894

<u>C E R T I F I C A T E</u>

STATE OF NEW YORK  )
                   )
COUNTY OF NEW YORK )

     I, MICHAEL S. IEN, a Notary Public within and for the State of New York, do hereby certify:

     That I reported the proceedings of the within entitled matter, and that the within transcript is a true record of said proceedings.

     I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of November, 2001.


_____
MICHAEL S. IEN