UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
689 EATERY CORP., etc., *et ano.,*                     :

                      Plaintiffs,          :

        - against -                     :          Civil Action No.
                                   02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,                     :

                      Defendants.      :
-------------------------------------------------------------X
59 MURRAY ENTERPRISES INC., etc., *et al.,*      :

                      Plaintiffs,          :

        - against -                     :          Civil Action No.
                                   02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,                     :

                      Defendants.      :
-------------------------------------------------------------X
CLUB AT 60TH STREET, INC., etc., *et al.,*       :

                      Plaintiffs,          :

        - against -                     :          Civil Action No.
                                   02 CV 8333 (LJL)
THE CITY OF NEW YORK,                     :

                      Defendant.      :
-------------------------------------------------------------X
336 LLC., etc., *et al.,*                     :

                      Plaintiffs,          :

        - against -                     :          Civil Action No.
                                   18 CV 3732 (LJL)
THE CITY OF NEW YORK,                     :

                      Defendant.      :
-------------------------------------------------------------X

**VOLUME 7 OF EXHIBITS TO**
**JOINT REQUEST AND STIPULATIONS REGARDING**
**<u>THE TAKING OF JUDICIAL NOTICE</u>**

JNR-000896

**EXHIBITS VOL. 7 of 10; pp. JNR-000898 – JNR-001080**
**(Exhibits 48 - 53)**

|  |  | **Page(s)** |
|---|---|---|
| Exhibit 48 | Correspondence between Edward S. Rudofsky and New York City Council (October 9, 2001), and David Karnovsky and New York City Council (October 24, 2001) | 000898-000905 |
| Exhibit 49 | Transcript of October 25, 2001 Meeting of Zoning and Franchises Subcommittee of New York City Council | 000909-000916 |
| Exhibit 50 | Transcript of October 25, 2001 Meeting of Land Use Committee of New York City Council | 000917-000923 |
| Exhibit 51 | Transcript of October 31,2001 Meeting of the New York City Council | 000924-001035 |
| Exhibit 52 | Affidavit of David Karnovsky, Counsel to the New York City Department of City Planning, sworn to October 23, 2002, filed in State Action (Index No. 121197/2002) on October 25, 2002 (without internal exhibits) | 001036-001071 |
| Exhibit 53 | Excerpts from Affidavit of David Karnovsky, sworn to October [date left blank] 2002, filed in State Action (Index No. 121080/02) on unknown date | 001072-001080 |

**633**

# ZANE AND RUDOFSKY
A PARTNERSHIP OF PROFESSIONAL CORPORATIONS

*Attorneys and Counsellors at Law*

CARNEGIE HALL TOWER
152 WEST 57ᵀᴴ STREET
NEW YORK 10019

(212) 245-2222

| | |
|---|---|
| FAX | (212) 541-5555 |
| VOICE MAIL | (212) 541-4444 |
| E-MAIL | info @ zrlex. com |
| INTERNET | http://www. zrlex. com |

EASYLINK
MCI MAIL
TELEX
CABLE

6284-5474
258-4388
31-7465
"ZANELEX"

October 9, 2001

Zoning & Franchises Subcommittee
of the Land Use Committee
New York City Council
City Hall
New York, New York  10007

Re:  Proposed City-Wide Amendments to
Text of New York City Zoning Resolution

Dear Chairman McCaffrey and Members
of the Zoning & Franchises Subcommittee:

I appeared before the Committee on Monday, October 1, 2001, at which time I submitted a lengthy report and testified against the new proposed "adult-use" amendments to the text of the Zoning Resolution.

At that hearing, David Karnovsky, Esq., the General Counsel of the New York City Planning Commission ("CPC"), testified, in response to a direct question by Councilwoman Quinn, that (in substance) the City did not have any new survey or study to justify the proposed further restrictions on "adult eating & drinking establishments" (i.e., the elimination of the "substantial portion" test from the definition of such establishments).

However, another witness, Mark Alonso, Esq., the attorney for Ten's, subsequently testified that a confidential source had provided him, and Mr. Alonso thereupon provided to the Subcommittee, inter-departmental reports between high-ranking New York City Police Department (NYPD) officers, prioritizing the "problem clubs" in the Manhattan South Patrol Command, during the months of February and March, 2001.  Interestingly (and as pointed out by Mr. Alonso in his testimony), the only club mentioned in the precinct reports which would

ZANE AND RUDOFSKY

be deemed "adult" under the new amendments (New York Dolls) had the fewest violations of any of the clubs mentioned (two reported assults, as compared with 82 violations at The Tunnel, a non-adult club).

What is of more significance, however, is that from the form and appearance of these reports, they are clearly submitted periodically, apparently by all Borough Patrol Commands, and are circulated to the Chief of the Department, the Chief of Patrol, the Chief of the Organized Crime Control Bureau (OCCB), and the Commanding Officers of at least eight (8) different other special units.

Mr. Alonso also testified (as I heard him) that his confidential source had also disclosed to him that the statistics compiled on the basis of these periodic reports are known to the Department of City Planning (DCP) and the Mayor's Office.

The disclosure that these reports exist and are being covered up by the NYPD, DCP and the Mayor, is far more disturbing than the substantive fact (itself of constitutional Free Speech & Expression significance) that the City's own data may (and apparently does) not support the proposed amendments. It is arrogant and constitutionally abusive in the extreme, and reflects a fundamental disrespect not only for the rights of citizens but for the critical role of the City Council in making legislative choices in a democratic society based upon the honest disclosure of data by City officials charged with the responsibility for collecting, analyzing and reporting the data to the legislature and citizenry.

The failure to make honest and forthright disclosure of the existence and substance of this data also precludes and perverts the judicial review of legislation which is central to the constitutional scheme of both our State and the nation. Much has been made of the alleged failure of the Courts to enforce the 1996 Adult Use Amendments to the Zoning Resolution in the manner desired by the Mayor, the Chairman, and those who supported the legislation. Putting aside our legal and political debate over the truth of these allegations, one thing is clear: if the Subcommittee, the full Land Use Committee, and ultimately the Council itself are going to permit the City administration to dissemble and obfuscate the truth, there is little or no reason why the City Council legislative process should be respected.

635

Zane and Rudofsky

Simply put, either these hearings are a sham or they are for real. If they are for real, make the City tell the truth. Otherwise, the sham will not be in the industry's unexpected compliance with the "substantial portion" test, but in the Council's willingness to "look the other way" and let the "big lie" prevail.

I do not, for a minute, believe that the Subcommittee, the full Committee, and/or the Council as a whole, will permit the City to continue to deny that statistics exist after Mr. Alonso has proven that they do exist by producing them in the Hearing Room. What more could possibly be necessary to justify further inquiry and legislative power being invoked to defend the Council itself from a fraud being perpetrated on it.

Accordingly, I most respectfully urge the Subcommittee, the Committee, and the Council itself, to utilize every power at its and their disposal to demand and ensure that the City make full disclosure of the relevant NYPD data, as well as of all statistical summaries and analyses of the data, including but not limited to: re-opening the hearing; re-calling Mr. Karnovsky and questioning him about the material produced by Mr. Alonso; calling the relevant NYPD Commanders & DCP officials as witnesses to explain what reports are submitted and to whom, and what data is maintained; and, if necessary, disapproving the proposed amendments and proposing remedial legislation requiring the DCP and/or CPC (as the case may be) to conduct a statistically valid "Secondary Effect Survey" and issue a full report, including all NYPD data, as a condition precedent to any future proposals to amend the definition of "adult eating & drinking establishment".

Respectfully submitted,

Edward S. Rudofsky

cc:    Peter Vallone, Speaker
       June Eisler, Chair, Land Use Committee
       Members of the City Council

0893

**636**

ZANE AND RUDOFSKY

David Karnovsky, Esq.
Mark Alonso, Esq.
Herald Price Fahringer, Esq.
Beth Haroules, Esq.

4

0894

**BLANK PAGE**

0895



**DEPARTMENT OF CITY PLANNING**
**CITY OF NEW YORK**

OFFICE OF THE COUNSEL

Joseph B. Rose, *Director*
Department of City Planning

DAVID KARNOVSKY, Counsel

BARBARA J. ROSEN, Deputy Counsel
EDWARD FORTIER
LISA HOCHMAN

WRITER'S DIRECT DIAL
(212) 720-

October 24, 2001

Hon. Walter L. McCaffrey
Chairman
Zoning & Franchises Subcommittee
New York City Council
City Hall
New York, NY 10007

Dear Chairman McCaffrey:

I write in response to the letter, dated October 9, 2001, from Edward S. Rudofsky to yourself and members of the Zoning and Franchises Subcommittee concerning the proposed City-wide amendments to the zoning regulations adopted in 1995 for adult establishments.

As discussed at the October 1, 2001 Subcommittee hearing, the purpose of the amendments is to clarify the regulations and reaffirm their original intent, in order to address attempts by the operators of adult establishments to remain in operation through superficial or 'sham' compliance measures. In the case of topless bars or restaurants such as those represented by Mr. Rudofsky, these measures have generally taken the form of artificially dividing up an adult eating or drinking establishment into purportedly "adult" and "non-adult" sections, with the intent of avoiding application of the regulations. There is, however, no basis in the history of the 1995 regulations to suggest that only the specific area where topless or nude entertainment is offered in a bar or restaurant constitutes the "adult eating or drinking establishment."

Mr. Rudofsky nevertheless asserts that, in order to adopt clarifying amendments to eliminate this obvious subterfuge, the City must first conduct a new 'secondary impacts' study for adult bars and restaurants similar to the one conducted by the Department of City Planning in connection with adoption of the 1995 regulations (the "DCP Study"). We acknowledged at the October 1 hearing that no such study has been prepared in connection with the proposed amendments, for the simple reason that none is necessary.

Under the 1995 regulations, an "adult eating or drinking" establishment was defined as an

**639**

"eating or drinking establishment" that "regularly features" adult entertainment. Under this definition, inspectors are not required to analyze how floor space is utilized within the establishment. This type of analysis was only made relevant for "adult bookstores", because book and video stores were a type of use recognized by the City as sometimes having a mixed presentation of adult and non-adult materials. Adoption of the "substantial portion" floor space test for adult bookstores was thus considered important to avoid forcing small neighborhood video or bookstores with only a small amount of adult material to close or move. By contrast, the DCP Study did not identify the existence of neighborhood bars or restaurants with only 'incidental' topless or nude entertainment. There was and is no basis to conclude that the negative secondary effects of adult establishments are any less present where topless or nude dancers frequent only part of the customer-accessible floor space in an eating or drinking establishment.

As discussed in the City Planning Commission Report on the proposed amendments (N010508ZRY), court rulings have nevertheless mistakenly applied an analysis under which, once it is found that an eating and drinking establishment "regularly features" adult entertainment, it must then be determined whether a "substantial portion" of the floor area of the establishment is dedicated to that adult entertainment. If, under this approach, the amount of the floor area dedicated to adult entertainment is 40% or less, then the eating or drinking establishment is not an "adult establishment". This approach has encouraged the artificial separation of adult eating or drinking establishments into purportedly "adult" and "non-adult" sections. The courts have repeatedly recognized the absurdity of this result, one court stating, with respect to a so-called '60/40' eating or drinking establishment:

> There is still no conceivable reason why anyone uninterested in topless dancing would choose defendants' club over the many other nightclubs, bars and restaurants... Defendant's establishment is still clearly an integrated adult enterprise and of the type that was intended, under ZR 12-10, to be removed from residential city areas...

However, due to the judicial interpretation of how the "substantial portion" test applies to these establishments, the result has nonetheless been that such '60/40' eating or drinking establishments have continued in operation.

As noted by you at the October 1 hearing, the notion that only the specific area where adult entertainment is offered in an "eating or drinking establishment" constitutes the "adult eating or drinking establishment" is plainly inconsistent with the intent of the 1995 regulations and has no basis in the City Council legislative history. Under the proposed amendments, therefore, the definition of "adult eating or drinking establishment" would be modified to provide that such an establishment is an "eating or drinking establishment" which regularly features adult live performances in "any portion of the establishment (emphasis added)", thereby eliminating any ambiguity concerning the intent of the 1995 regulations that it is immaterial how much floor space in the establishment is used for the presentation of adult entertainment, such as topless dancing.

0897

**640**

As the above makes clear, the sole purpose of the amendments as they relate to topless bars and restaurants is to allow the City to implement the regulations according to their original intent. No new study or analysis is needed to do so.

Mr. Rudofsky's allegation that the Department of City Planning has engaged in a 'cover up' of data relevant to the amendments is thus entirely fanciful, it being our clearly-stated position that no additional data analysis is necessary for the City to clarify the 1995 regulations in response to pervasive efforts by the operators of adult establishments to subvert their intent. We note, moreover, that there has never been a finding of fact in any judicial or other enforcement proceeding that adverse secondary impacts are curtailed through superficial measures such as installing a curtain between the 'adult' and 'non-adult' portions of a topless bar. To the contrary, the courts have repeatedly acknowledged that these "mechanical" or "Pavlovian" approaches to compliance make a mockery of the regulations.

Mr. Rudofsky's insistence that the validity of the amendments depends upon incident reports for topless bars and restaurants also misunderstands the nature and breadth of the secondary impacts caused by adult establishments. As discussed at length in the DCP Study and the City Planning Commission Report on the 1995 regulations (N950384ZRY), the secondary impacts associated with adult establishments are numerous and include negative impacts on economic development, neighborhood revitalization and property values. Moreover, the correlation between adult establishments and criminal activity identified in several of the studies relied upon by the City in adopting the 1995 regulations was not restricted to incidents occurring within or outside the entrance to an adult establishment. Instead, the studies demonstrated a general relationship between the presence of adult establishments and criminal complaints/incidents in a neighborhood. A description of one such study — — the report prepared by the Times Square Business Improvement District — — is set forth at pages 13-14 of the Court of Appeals decision in Stringfellow's v. City of New York et. al. which upheld the 1995 regulations as a valid enactment "aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose...".

Please let me know if you require further information.

Sincerely,

David Karnovsky

1   CITY COUNCIL
    CITY OF NEW YORK
2

3   ----------------------------------------------------X
                                                        :
4                                                       :
                                                        :
5   IN THE MATTER OF THE REGULARLY SCHEDULED MEETING    :
                                                        :
6                        OF THE                         :
                                                        :
7   ZONING AND FRANCHISES SUBCOMMITTEE                  :
                                                        :
8                                                       :
9   ----------------------------------------------------X:

10

11                              CITY HALL
                                NEW YORK, NEW YORK
12                              OCTOBER 25, 2001
                                AT 10:15 A.M.

13

14

15  COUNCIL MEMBER WALTER McCAFFREY, CHAIRPERSON

16

17

18

19

20

21

22

23

24

25

0900

1         COUNCIL MEMBER WALTER McCAFFREY, CHAIRPERSON,

2  SUBCOMMITTEE ON ZONING AND FRANCHISES:  Good morning.  The

3  Subcommittee on Zoning and Franchises is in session.

4         I have one item for a public hearing which is item

5  1159 and 1160, which are related items in Manhattan Community

6  Board Number 5.  I have Robert Flahive who signed up to

7  testify.

8         Sergeant-At-Arms, please be sure that Council

9  Member Quinn is coming up to testify please.  Mr. Flahive,

10 would you give a brief presentation?

11        MR. ROBERT FLAHIVE:  Yes.  Good morning Council

12 Member McCaffrey, and members of the Subcommittee.  My name

13 is Robert Flahive of the firm Rosenman & Colin, and we

14 represent "Vornado Development", the applicant of the two

15 actions being requested today.

16        The first is a Zoning Text Amendment, L.U. 1159

17 the second is a Zoning Map Amendment.  If approved these

18 applications would establish Penn South within  the Special

19 Midtown District.  The objective of the district is to

20 establish an identity for Penn South.

21        The purpose of these actions is to establish an

22 identity for the Penn South that reflects its hold as a

23 regional center of retail development and in commercial

24 activity, and the expanded accessibility to the area's

25 transportation district.

0901

1        The property includes almost 90% of it along

2  Seventh Avenue between West 34th and 35th streets.    Our

3  intention is to establish a special designation so that it

4  has an identity both to travelers and as well as the visitors

5  to the retail and entertainment center.

6        The Zoning Amendment before you today will result

7  in a system of highly visible transit information signs that

8  will direct people to an underground passage, and serve as an

9  expansion of the public transportation network.

10        The proposed commercial signs which we would

11  sponsor, would be a critical  element at major intersections,

12  and would begin to display what is below level.  We believe

13  that the new transit signs with the commercial advertisement

14  signs will introduce this unified design of it, and hopefully

15  help to establish an unique identity.

16        We also recognize however, that signs alone will

17  not do this.  As I mentioned earlier, this has to be upgraded

18  publicly by a number of actions.  These actions include

19  expanding the retail entertainment uses, upgrading transit

20  entrances and providing increased lighting.

21        I  have member of the team here to provide you

22  with answers if the Subcommittee has any questions.  Thank

23  you.

24        COUNCIL MEMBER McCAFFREY:  I'm just waiting for

25  Council Member Quinn to come up since it's her area to see if

1   she's satisfied with it.

2          If you would just take a seat for a moment, I'll

3   go to the items in Brooklyn, 1187, 1188, 1189 and 1190, and

4   I'll ask representatives of the Economic Development

5   Corporation to come forward.  Introduce yourself for the

6   record, please.

7          MR. HARDY ADASKO:  Hardy Adasko, for the Economic

8   Development Corporation.

9          COUNCIL MEMBER McCAFFREY:  There is a concern

10  regarding an item that was raised at a public hearing on this

11  item involving the current business on this site.  Can you

12  tell us what we hope to accomplish with the support of the

13  applicant to address those concerns that were introduced?

14         MR. HARDY ADASKO:  Basically I think two things

15  are about to transpire.  We ran a search of the properties

16  that might been available as an alternate site for them, and

17  we found one property that met their stated needs and our

18  sole source criteria.

19         We suggested it to them and they looked at it.  Do

20  you want me to characterize the response of it?

21         COUNCIL MEMBER McCAFFREY:  Yes.

22         MR. ADASKO:  They said it did not meet their

23  needs.  That was in fact the only property--(Inaudible) it

24  didn't meet all the zoning requirements that they laid out.

25         The second thing is, that there have been

JNR-000909

0903

1  discussions about extending the date that they must vacate

2  the property.  It is a month to month lease.  It's a total of

3  60 days beyond that to December 15th, and we would be

4  prepared to extend that date to that date.

5          COUNCIL MEMBER McCAFFREY:  And EDC and the

6  property--or the business rather, will work out a document

7  that indicates the agreement in that regard?

8          It is our hope that this then will clearly

9  delineate their opportunity to remain at that time.  But, at

10  the same time, not to keep the project from moving forward

11  when in fact there is going to be a construction phase again.

12          We would ask in our hope while we are voting in

13  the Subcommittee today, the Land Use Committee, that prior to

14  the Full Council Meeting, that we will see an exchange of

15  this and that.  Thank you very much.  Are there any other

16  questions?

17  (No Response).

18          Council Member Quinn, we had a brief presentation

19  on Land Use Numbers 1159 and 1160.  Do you have any questions

20  or items that you might raise?

21          COUNCIL MEMBER CHRISTINE QUINN:  No.  We actually

22  had numerous meetings with the applicants and as recently as

23  this week, but they have been quite thorough in giving my

24  office all the information we need.  Thank you.

25          COUNCIL MEMBER McCAFFREY:  On the item, is there

0904

1  anyone else who wishes to testify on 1159 and 1160?

2  (No Response) .

3          There being no one else wishing to testify on

4  those items, the hearings are closed.

5          On today's Agenda, there is an item, L.U. 1112,

6  which is the City-wide application as it applies to Adult

7  Establishments.

8          We have had various items that have been sent

9  following up on the Chair's indication-- on 1112, we have

10  received as I indicated other submissions, one of which is

11  also a submission that I received today.

12          At this point, I will ask that the Clerk call the

13  Roll, although Council Member Dear has a briefing that is

14  underway, and I'll ask that at this point that the other

15  items be called.

16          On the item in question--first of all, is Council

17  Member Berman outside?  Let's just wait for him.  On Roll

18  Call, I'll ask our Counsel to call the Roll.

19          MS. PATRICIA PROTHRO, COUNSEL TO THE SUBCOMMITTEE:

20  McCaffrey?

21          COUNCIL MEMBER McCAFFREY:  Aye on all.  Let me

22  just indicate on 1112, we have been for a long period of time

23  attempting to address the concerns of those members who might

24  be impaired and understanding of the Council's actions a

25  number of years ago.

0905

1    It is my belief, that at the end day we will

2  provide another level of protection for our neighborhoods

3  that will be greatly important for their stability.   I vote

4  aye on all Coupled items.

5    MS. PROTHRO:  Berman?

6    COUNCIL MEMBER HERBERT BERMAN:  Aye.

7    MS. PROTHRO:  Malave-Dilan?

8    COUNCIL MEMBER MALAVE-DILAN: Aye.

9    MS. PROTHRO:  Quinn?

10    COUNCIL MEMBER QUINN:  May I be temporarily

11  excused to explain my vote?

12    COUNCIL MEMBER McCAFFREY:  Certainly.

13    COUNCIL MEMBER QUINN: I vote aye on all items

14  except Land Use number 1112.  I vote no on Land Use 1112.

15    Just for the record, I was someone, as was my

16  predecessor, who did not oppose the original Adult Use

17  voting.

18    I have questions about its Constitutionality.   I

19  have serious concerns about the impact that the original

20  zoning has had on my district.

21    We have actually seen an increase of the adult

22  establishments in my district, because my district is home to

23  many of the receiving sites.

24    I believe that this weakening, if you will, of the

25  Adult Use Zoning is only going to further raise

0906

·8·

1   Constitutional questions, and on top of that from a quality

2   of life perspective, put areas like the West Side Waterfront

3   a greater threat of becoming Times Square South.

4            COUNCIL MEMBER McCAFFREY:  Council Member Dear, do

5   you wish to vote?

6            COUNCIL MEMBER NOACH DEAR:  Yes on everything

7   except the Adult Use issue.

8            MS. PROTHRO:  The vote is five in favor, none in

9   the negative on L.U. Numbers 1159 and 1160, and four in favor

10  and one in the negative on L.U. 1112 and L.U. Numbers 1187,

11  1188, 1189 and 1190.

12           COUNCIL MEMBER McCAFFREY:  Thank you very much.

13  We are now adjourned.

14  (Time Noted: 10:29 A.M.)

15           COUNCIL MEMBER McCAFFREY:  The Subcommittee on

16  Zoning and Franchises is now re-opened.  Council Member

17  Berman?

18           COUNCIL MEMBER BERMAN:  Thank you, Mr. Chairman.

19  I forgot the Land Use Numbers.

20           COUNCIL MEMBER McCAFFREY:  Yes, on items 1187,

21  1188, 1189 and 1190.

22           COUNCIL MEMBER BERMAN:  I voted aye on this.  I

23  respectfully ask that we reconsider my vote.  I would like to

24  now ask for a reconsideration, and that this item be laid

25  over until next week so that the efforts that we are making

0907

1   in trying to accommodate everybody can be worked out.

2            COUNCIL MEMBER McCAFFREY:   The Chair agrees to

3   grant the request.

4            COUNCIL MEMBER BERMAN:   We are now requiring an

5   aye vote on this request, is that correct, sir?

6            COUNCIL MEMBER McCAFFREY:   Yes.   Please call the

7   Roll.

8            MS. PROTHRO:   McCaffrey?

9            COUNCIL MEMBER McCAFFREY:   Aye.

10           MS. PROTHRO: Berman?

11           COUNCIL MEMBER BERMAN:   Aye.

12           MS. PROTHRO:   Dear?

13           COUNCIL MEMBER DEAR:   Yes.

14           MS. PROTHRO:   Malave-Dilan?

15           COUNCIL MEMBER MALAVE-DILAN:   Aye.

16           MS. PROTHRO:   Quinn?

17           COUNCIL MEMBER QUINN:   Aye.

18           COUNCIL MEMBER McCAFFREY:   The item having

19  carried, what we will do is, we will ask staff, we will ask

20  the representative of EDC and the applicant and the

21  interested party to have discussions on this item.   It is my

22  sense that we could be potentially close in some regards on

23  this.

24           I would urge folks to have some quick discussions

25  on this, so that this is not going to be protracted for a

0908

1   long period of time.   Thank you very much.   The Subcommittee

2   is now recessed.

3   (Time Noted:   11:05 A.M.)

C E R T I F I C A T E

STATE OF NEW YORK  )
                   )
COUNTY OF NEW YORK )

     I, MICHAEL S. IEN, a Notary Public within and for the State of New York, do hereby certify:

     That I reported the proceedings of the within entitled matter, and that the within transcript is a true record of said proceedings.

     I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

     IN WITNESS WHEREOF, I have hereunto set my hand this 20th day of November, 2001.


_____
     MICHAEL S. IEN.

CITY COUNCIL
CITY OF NEW YORK

- - - - - - - - - - - - - - - - - - - -X
                                        :
IN THE MATTER OF THE REGULARLY SCHEDULED MEETING  :
                                        :
            OF THE                      :
                                        :
    LAND USE COMMITTEE                   :
                                        :
- - - - - - - - - - - - - - - - - - - -X

                        CITY HALL
                        NEW YORK, NEW YORK

                        OCTOBER 25, 2001
                        AT 10:03 A.M.


COUNCIL MEMBER JUNE EISLAND, CHAIRPERSON

0912

COUNCIL MEMBER JUNE EISLAND, CHAIRPERSON, COMMITTEE ON LAND USE:   Would the Full Committee on Land Use come to order.   Will you all open your Calendars?.

The first item is Land Use 1112, and that's the Zoning Text Amendment relating to definitions in the Adult Use Text.

The next item is Land Use 1156, which is a designation of the (Inaudible) maps for a historic district.

The next item which you all just heard the discussion, which will be discussed and rescheduled, and that's Land Use 1159 through--I'm sorry, the next item is Land Use 1159 and 1160, the applications to have a Penn Center Sub-district within the Special Midtown District.   One of them is a Zoning Text Amendment, and the other is a Zoning Map change.

Just as an addendum to this, I want to add, that if the members are not aware of the Signage Legislation that this Council worked very hard on, has been upheld in the Eastern District Federal Court, and what we are doing here today is consistent with the concerns of those individuals. That's Land Use Number 1159 and 1160.

The next item is Land Use 1187 and 1190, which you all heard it was laid over in the Subcommittee.

The next items are Land Use 1205, 1207 I believe through 1210, various applications with DCAS in connection

with a new Sanitation garage being constructed in Manhattan on 12th Avenue between 55th and 57th Streets to serve Community Districts 4 and 7.

The next items are Land Use 1203 and 1206 which is a Zoning Map Change and disposition of City-owned property, to facilitate the creation of Stuyvesant Cove Park and that's located in Manhattan Community Board Number 6.

If you want to check the last page of your Calendar, you will find UDAAP applications and dispositions in various addresses in various boroughs.  If you want to take a moment to check, please go ahead.

Do I hear any questions or comments on either of the UDAAP designations or dispositions, or anything else on the Calendar?

(No Response).

Hearing no questions we will vote on the Agenda in front of us today.  The Clerk will now  call the Roll.

THE CLERK:  Eisland?

CHAIRPERSON EISLAND: Aye.

THE CLERK:  Spigner?

COUNCIL MEMBER ARCHIE SPIGNER:  I'm going to pass for a moment, Madam Chair.

THE CLERK:  Berman?

COUNCIL MEMBER HERBERT BERMAN:  Aye.

THE CLERK: Dear?

0914

COUNCIL MEMBER NOACH DEAR:  Yes.

THE CLERK:  McCaffrey?

COUNCIL MEMBER WALTER McCAFFREY:  Aye on all.

THE CLERK:  Dilan?

COUNCIL MEMBER MARTIN MALAVE DILAN:  Aye on all.

THE CLERK:  Linares?

COUNCIL MEMBER GUILLERMO LINARES: Yes.

The CLERK:  Sabini?

COUNCIL MEMBER JOHN SABINI:  Aye on all.

THE CLERK:  Miller?

COUNCIL MEMBER GIFFORD MILLER:  Aye.

THE CLERK:  Carrion?

COUNCIL MEMBER ADOLFO CARRION:  Aye on all.

THE CLERK:  Perkins?

COUNCIL MEMBER WILLIAM PERKINS:  Aye on all.

THE CLERK:  Quinn?

COUNCIL MEMBER CHRISTINE QUINN:  Can I be excused to explain my vote?

CHAIRPERSON EISLAND:  Council Member Quinn?

COUNCIL MEMBER QUINN:  I vote aye on all, and I vote no on Land Use Number 1112.

As I said in the Subcommittee, this tightening and weakening of the Adult Establishment Zoning Resolution, I prior to being on the Council opposed the Triple X zoning changes, and I believe there are serious zoning issues that

go beyond that.

The point of this legislation was to improve the quality of life in neighborhoods.  However, it looks like that no neighborhood had an extraordinary amount of Triple X movies than mine, and, as it relates to the 60-40 Rule, I believe it's going to send more Triple X establishments into the West Side into my district and directly into the area that abuts our new park by the waterfront.

THE CLERK:  Abel?

COUNCIL MEMBER MICHAEL ABEL:  Aye.

THE CLERK:  Spigner?

COUNCIL MEMBER SPIGNER:  Yes as it relates to the landmarking.  I understand that there are no owners or business interests opposed to the landmarking and none appeared in opposition, and the Subcommittee voted unanimously.

CHAIRPERSON EISLAND:  Let me interrupt you a moment.  There were some concerns.  If you want some detail, it was not here.

COUNCIL MEMBER SABINI:  At the Commission?

CHAIRPERSON EISLAND:  Not here at the Council, but at the Commission, two property owners did come forward, but not at the City Council.

COUNCIL MEMBER SPIGNER:  I understand there are concerns with your property being landmarked or not.  I would

be more vigorous in (Inaudible).

CHAIRPERSON EISLAND:   That is consistent with what you expressed in the past, Councilman.

COUNCIL MEMBER SPIGNER:   I vote aye on all that, and the Brooklyn item is going to be laid over? I vote aye on all.

CHAIRPERSON EISLAND:   Proceed please.

THE CLERK:   Clerk by a vote of thirteen in the affirmative, zero in the negative and no abstentions, with the exception of Land Use 1112, by a vote of twelve in the affirmative, one in the negative and no abstentions, the items are approved.  Please sign the reports.

CHAIRPERSON EISLAND:   That completes the business of the Land Use Committee.  There are no items to be briefed.  Hearing no other business the Committee on Land Use is adjourned.  Thank you.

(Time Noted: 11:00 A.M.)

7:

# C E R T I F I C A T E

STATE OF NEW YORK  )
                   )
COUNTY OF NEW YORK )

       I, MICHAEL S. IEN, a Notary Public within and for the State of New York, do hereby certify:

       That I reported the proceedings of the within entitled matter, and that the within transcript is a true record of said proceedings.

       I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

       IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of November, 2001.

                                 MICHAEL S. IEN

0918

1

2   CITY COUNCIL

3

CITY OF NEW YORK

4   -------------------------------x

5

THE TRANSCRIPT OF THE MINUTES

6

            of the

7

STATED COUNCIL MEETING

8   -------------------------------x

9

10

                    October 31, 2001
11                  Start:  12:45 p.m.
                    Recess: 2:45 p.m.
12
                    City Hall
13                  Council Chambers
                    New York, New York
14

15      B E F O R E:

16          ARCHIE SPIGNER
                Acting Public Advocate
17

18          COUNCIL MEMBERS:  Michael Abel
                              Herbert Berman
19                            Una Clarke
                              Noach Dear
20                            Stephen DiBrienza

21

22

23

24

25          LEGAL-EASE COURT REPORTING SERVICES, INC.
                217 Broadway -  Suite 511
                New York, New York 10007

2

1

2    A P P E A R A N C E S  (CONTINUED)

3

COUNCIL MEMBERS: June Eisland
4                   Ronnie Eldridge
                    Kenneth Fisher
5                   Wendell Foster
                    Kathryn Freed
6                   Lloyd Henry
                    Karen Koslowitz
7                   Sheldon Leffler
                    Guillermo Linares
8                   Helen Marshall
                    Martin Malave-Dilan
9                   Walter McCaffrey
                    Stanley Michels
10                  A. Gifford Miller
                    Eva Moskowitz
11                  Thomas Ognibene
                    Jerome O'Donovan
12                  Mary Pinkett
                    Morton Povman
13                  Annette Robinson
                    Archie Spigner
14                  John Sabini
                    Lawrence Warden
15                  Juanita Watkins
                    Priscilla Wooten
16                  Tracy Boyland
                    Martin Golden
17                  Adolfo Carrion
                    Madeline Provenzano
18                  Philip Reed
                    Joel Rivera
19                  Pedro Espada
                    Margarita Lopez
20                  Bill Perkins
                    Angel Rodriguez
21                  Christine Quinn
                    Michael Nelson
22                  James Oddo

23

24

25

3

1

2   A P P E A R A N C E S (CONTINUED)

3                    STAFF:          Victor Robles
4                                    City Clerk

5                                    Claude Cherry,
                                     Council Clerk

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JNR-000926

1   STATED COUNCIL MEETING

2                   SPEAKER VALLONE: Okay, let's start

3   off with our ceremonials today. We have some very

4   important presentations to make. Everything we are

5   saying here is being recorded.

6                   Council Member Dear.

7                   COUNCIL MEMBER DEAR: Thank you, Mr.

8   Speaker.

9                   I stand before you today to introduce

10  some very great people.

11                  We have honored many different people

12  before September 11th, after September 11th, and

13  there are a lot of good people out there and they

14  should be recognized. I'm of the mindset that when

15  the people in government go beyond the call of duty,

16  then we should recognize them in every way we can,

17  because I think it's the right thing to do.

18                  In fact, in the Bible, in Genesis, it

19  talks about being, recognizing someone when they do

20  something good, and in this case, we have, we're

21  honoring today the Director of INS, the Director of

22  Immigration for New York, Ed McElroy, and Richard

23  Berryman, also of Immigration, and the reason I felt

24  we should honor them this time, although I could

25  honor them almost every day because of the calls we

1   STATED COUNCIL MEETING

2   make to them and how they respond to people, is that

3   we had a particular case of a young man who is an

4   Israeli who is marrying a young American woman, and

5   a week before his wedding, the American Consulate in

6   Israel denied his Visa and wanted him to get a

7   particular Visa that will be issued by INS. And I

8   think basically they were putting roadblocks in the

9   way because they figured that INS will just prolong

10  it and will just take too long, but they were in for

11  a surprise when I reached out to Ed McElroy.

12  Although it might not have been directly under his

13  jurisdiction, he took it under his jurisdiction

14  because he had compassion, he cared about people.

15  And every time my office, and I know others, called

16  on Ed McElroy, the response is "how can we be

17  helpful?"

18           When there are difficulties and there

19  are blame, everybody likes to blame people, and will

20  say some nasty things about the INS. I can tell you,

21  with McElroy, with Ed McElroy, and with his team at

22  the helm here in New York, there are only good

23  people working here, because he finds the good in

24  people, and all of his employees, the way he treats

25  people. And of course, when there are issues that we

1  STATED COUNCIL MEETING

2  have to deal with, criminal investigations and so

3  forth, that are his responsibility, he responds in

4  the same way. But he will never abuse an individual;

5  on the contrary, he will always help people.

6            I remember once I said, Ed, would you

7  like to do a mitsvah? And I described what a mitsvah

8  is, a good deed, and when he called me back he says,

9  Noach, the mitsvah man came through. So, I know in

10 my office we call him "Ed, the mitsvah man," because

11 he's a man who really goes beyond the call of duty,

12 and is not afraid. Believe me, he has taken on his

13 superiors in Washington, I know it for a fact, where

14 they were wrong in making a call, and they were

15 abusing somebody, he turned things around.  He is

16 not afraid. He's not afraid to tell anybody when he

17 sees something, when someone is being wrong, he's

18 not afraid to stand up there. He doesn't care about

19 his career, he cares about people, and that's why I

20 felt it so compelling that we have to recognize

21 people like that, not that he needs recognition, but

22 I believe that we are required, and in my tradition

23 that has been taught, always recognize the good

24 people when they do good.

25            Ladies and gentlemen, my colleagues

1   STATED COUNCIL MEETING

2   and people here in the room, if we can give a nice

3   round of applause and call upon both Ed McElroy and

4   Richard Berryman of the Immigration Services.

5                    SPEAKER VALLONE: Please step right

6   up. Come right up.

7                    COUNCIL MEMBER DEAR: And while they

8   come up, I also want to recognize his assistant,

9   Michael Hart, who has done so much for immigration,

10  both here and New Jersey, and I hope one day that we

11  will see him a director of some other port around

12  the United States.

13                   SPEAKER VALLONE: Okay, Mr. McElroy,

14  and Richard (Mitsvah) Berryman, we have never had a

15  proclamation with "mitsvah" in it, but we're

16  apparently going to have one now. We would ask the

17  City Clerk to please read these great proclamations

18  into the record, which now become part of the

19  history of our City, which as you see goes back to

20  1625.

21                   Mr. Clerk.

22                   CITY CLERK ROBLES: The Council, City

23  of New York, Proclamation.

24                   Whereas: The Council of the City of

25  New York is proud and pleased to honor those members

1    STATED COUNCIL MEETING

2    of the United States Immigration and Naturalization

3    Service whose successful efforts to secure a visa

4    for a young man allowed him to enter the United

5    States for his wedding; and

6                        Whereas: In August of this year,

7    Aaron Rabinowitz was denied a tourist visa to return

8    to the United States to wed a young woman whom he

9    had met on a previous visit, and within ten days

10   before his planned wedding, was still without the

11   necessary documents; and

12                       Whereas: It was only through the hard

13   work and dedicated effort of a number of members of

14   the Immigration and Naturalization Service in

15   obtaining the necessary visa that Mr. Rabinowitz was

16   able to return to the United States in a timely

17   manner for his wedding, which was held on August 20

18   in the presence of an estimated one-thousand guests;

19   and

20                       Whereas: Especially invaluable were

21   the efforts of Deputy Executive Associate William F.

22   Yates, Assistant Deputy Executive Associate Joseph

23   Cuddihy, and Peter M. Becraft of the Washington,

24   D.C. Office; District Director Edward McElroy and

25   Assistant District Director for Adjudications

1  STATED COUNCIL MEETING

2  Richard Berryman of the New York Office; and Paul

3  Novak and Grace E. Carswell of the Vermont Office;

4  and

5           Whereas: These agents are worthy of

6  commendation for service above and beyond the call

7  of duty; now, therefore

8           Be It Known: That the Council of the

9  City of New York salutes Richard Berryman and Edward

10  McElroy for their dedicated service.

11           Signed this 31st day of October in

12  the year Two Thousand and One, Peter F. Vallone,

13  Speaker For The Entire Council; Noach Dear, Council

14  Member, 44th District, Brooklyn.

15           SPEAKER VALLONE: On behalf of the

16  entire Council, Mr. McElroy, would you like to

17  address us and find out what services you might be

18  able to provide to the City Council?

19           MR. McELROY: Well, we are in very

20  troubled times and the Immigration Service is always

21  challenged, but we are never too challenged to

22  assist this City and the City Council, and

23  especially in the time of need.

24           We will continue to do so. We are

25  banned together, we speak as one, and through these

1   STATED COUNCIL MEETING

2   trying hard times, I have no doubt we will come out

3   better.

4                    Thank you, Mr. Speaker.

5                    SPEAKER VALLONE: Thank you very much.

6                    Mr. Berryman, would you like to say

7   something?

8                    MR. BERRYMAN: Thank you, Mr. Speaker.

9                    I just want to say how grateful we

10  are at INS to receive this honor today. We certainly

11  have our share of critics at INS, and when we are

12  recognized, and when the people that work for us are

13  recognized, we are truly grateful.

14                   We do do some good things at INS I

15  think a lot. I'm in the benefits part of the

16  business. One of the things we have is a home-bound

17  service, and tomorrow my director is sending me to

18  administer the oath of naturalization to a lady who

19  is 105 years old and wants to be a citizen, and I'm

20  going to be very proud to do that today. But I do

21  thank all the Council for the honor. I know that the

22  people who work hard at INS, and we do, are truly

23  grateful.

24                   Thank you, Mr. Speaker.

25                   SPEAKER VALLONE: Thank you, Mr.

1   STATED COUNCIL MEETING

2   Berryman. Thank you, Mr. Director. Thank you very

3   much, Mr. Director, and thanks for coming and keep

4   up the good work. Thank you, sir.

5                       Council Member Berman.

6                       Do we have representatives from NYU

7   Hospital here and St. Vincent's? Anybody from NYU or

8   St. Vincent's here? Okay, we don't have anybody

9   here, so ring the bells and we will start the

10  meeting.

11                      ACTING PUBLIC ADVOCATE SPIGNER: All

12  right, members, please take your seats. This meeting

13  is called to order.

14                      Mr. Clerk, can we have a roll call.

15                      CITY CLERK ROBLES: Abel.

16                      COUNCIL MEMBER ABEL: Here.

17                      CITY CLERK ROBLES: Berman.

18                      COUNCIL MEMBER BERMAN: Here.

19                      CITY CLERK ROBLES: Boyland.

20                      COUNCIL MEMBER BOYLAND: Here.

21                      CITY CLERK ROBLES: Carrion.

22                      COUNCIL MEMBER CARRION: Here.

23                      CITY CLERK ROBLES: Clarke.

24                      COUNCIL MEMBER CLARKE: Here.

25                      CITY CLERK ROBLES: Cruz.

1    STATED COUNCIL MEETING

2                    (No response.)

3                    CITY CLERK ROBLES: Dear.

4                    COUNCIL MEMBER DEAR: Here.

5                    CITY CLERK ROBLES: DiBrienza.

6                    COUNCIL MEMBER DiBRIENZA: Here.

7                    CITY CLERK ROBLES: Dilan.

8                    COUNCIL MEMBER DILAN: Here.

9                    CITY CLERK ROBLES: Eisland.

10                   COUNCIL MEMBER EISLAND: Here.

11                   CITY CLERK ROBLES: Eldridge.

12                   COUNCIL MEMBER ELDRIDGE: Here.

13                   CITY CLERK ROBLES: Espada.

14                   COUNCIL MEMBER ESPADA: Here.

15                   CITY CLERK ROBLES: Fiala.

16                   (No response.)

17                   CITY CLERK ROBLES: Fisher.

18                   COUNCIL MEMBER FISHER: Here.

19                   CITY CLERK ROBLES: Foster.

20                   COUNCIL MEMBER FOSTER: Here.

21                   CITY CLERK ROBLES: Freed.

22                   COUNCIL MEMBER FREED: Here.

23                   CITY CLERK ROBLES: Golden.

24                   COUNCIL MEMBER GOLDEN: Here.

25                   CITY CLERK ROBLES: Harrison.

1    STATED COUNCIL MEETING

2                    (No response.)

3              CITY CLERK ROBLES: Henry.

4         COUNCIL MEMBER HENRY: Here.

5              CITY CLERK ROBLES: Koslowitz.

6         COUNCIL MEMBER KOSLOWITZ: Here.

7              CITY CLERK ROBLES: Lasher.

8              (No response.)

9              CITY CLERK ROBLES: Leffler.

10        COUNCIL MEMBER LEFFLER: Here.

11             CITY CLERK ROBLES: Linares.

12        COUNCIL MEMBER LINARES: Here.

13             CITY CLERK ROBLES: Lopez.

14        COUNCIL MEMBER LOPEZ: Here.

15             CITY CLERK ROBLES: Marshall.

16        COUNCIL MEMBER MARSHALL: Here, Mr.

17   Clerk.

18             CITY CLERK ROBLES: McCaffrey.

19        COUNCIL MEMBER McCAFFREY: Here.

20             CITY CLERK ROBLES: Michels.

21        COUNCIL MEMBER MICHELS: Here.

22             CITY CLERK ROBLES: Miller.

23        COUNCIL MEMBER MILLER: Here.

24             CITY CLERK ROBLES: Moskowitz.

25        COUNCIL MEMBER MOSKOWITZ: Here.

1  STATED COUNCIL MEETING

2                    CITY CLERK ROBLES: Nelson.

3            COUNCIL MEMBER NELSON: Here.

4            CITY CLERK ROBLES: Oddo.

5            COUNCIL MEMBER ODDO:  Here.

6            CITY CLERK ROBLES: O'Donovan.

7            COUNCIL MEMBER O'DONOVAN: Here.

8            CITY CLERK ROBLES: Perkins.

9            COUNCIL MEMBER PERKINS: Here.

10           CITY CLERK ROBLES: Pinkett.

11           COUNCIL MEMBER PINKETT: Here.

12           CITY CLERK ROBLES: Povman.

13           COUNCIL MEMBER POVMAN: Here.

14           CITY CLERK ROBLES: Provenzano.

15           COUNCIL MEMBER PROVENZANO: Here.

16           CITY CLERK ROBLES: Quinn.

17           COUNCIL MEMBER QUINN: Here.

18           CITY CLERK ROBLES: Reed.

19           COUNCIL MEMBER REED: Here.

20           CITY CLERK ROBLES: Rivera.

21           COUNCIL MEMBER RIVERA: Here.

22           CITY CLERK ROBLES: Robinson.

23           COUNCIL MEMBER ROBINSON: Here.

24           CITY CLERK ROBLES: Rodriguez.

25           COUNCIL MEMBER RODRIGUEZ: Here.

1   STATED COUNCIL MEETING

2                    CITY CLERK ROBLES: Sabini.

3            COUNCIL MEMBER SABINI: Here.

4            CITY CLERK ROBLES: Spigner.

5            COUNCIL MEMBER SPIGNER: Here.

6            CITY CLERK ROBLES: Stabile.

7            (No response.)

8            CITY CLERK ROBLES: Warden.

9            COUNCIL MEMBER WARDEN: Here.

10           CITY CLERK ROBLES: Watkins.

11           COUNCIL MEMBER WATKINS: Here.

12           CITY CLERK ROBLES: White.

13           (No response.)

14           CITY CLERK ROBLES: Wooten.

15           COUNCIL MEMBER WOOTEN: Here.

16           CITY CLERK ROBLES: Ognibene.

17           COUNCIL MEMBER OGNIBENE: Here.

18           CITY CLERK ROBLES: Speaker Mr.

19   Vallone.

20           SPEAKER VALLONE: Here.

21           CITY CLERK ROBLES: We have a quorum.

22           ACTING PUBLIC ADVOCATE SPIGNER: Okay,

23   a quorum is counted and present. Members, please

24   rise and give your attention to Rabbi Jonathan Glass

25   of the Civic Center Synagogue, for the Invocation.

1    STATED COUNCIL MEETING

2              RABBI GLASS: Thank you.

3              Men and women of the City Council,

4    although the present world crisis is fraught with

5    peril and chaos, there is another angle we should

6    consider after the tensions calm, and they will

7    calm, the world will enter a new era. The

8    international community has coalesced to begin to

9    solve a political crisis and we hope that former

10   adversaries will work together to solve more of the

11   difficult problems besetting our planet.

12             Similarly, the government of this

13   City of New York will undergo a dramatic transition.

14             No doubt, in the short term the

15   situation will have its share of difficulties.

16   Nevertheless, as things straighten out, our elected

17   officials will have the opportunity to work together

18   and make this body of government more efficient and

19   effective than ever.

20             I extend my blessing, therefore,

21   toward making this Council meeting part of that

22   continuing process of leading us through this great

23   challenge.

24             Amen.

25             SPEAKER VALLONE: Amen.

1   STATED COUNCIL MEETING

2                    ACTING PUBLIC ADVOCATE SPIGNER: I

3   don't see Council Member Reed in the auditorium, so

4   I will recognize him for the purpose of a motion to

5   spread the invocation upon the record, Council

6   Member Povman, Dean of the Queens Delegation, and

7   the Council.

8                    COUNCIL MEMBER POVMAN: I move to

9   spread the invocation, the wonderful invocation by

10  Rabbi Glass on the record.

11                   ACTING PUBLIC ADVOCATE SPIGNER:

12  Without objection, so ordered.

13                   Okay, Adoption of the Minutes.

14                   COUNCIL CLERK CHERRY: None, sir.

15                   ACTING PUBLIC ADVOCATE SPIGNER:

16  Messages and Papers from the Mayor.

17                   COUNCIL CLERK CHERRY: None, sir.

18                   ACTING PUBLIC ADVOCATE SPIGNER:

19  Communication from City, County and Borough Offices.

20                   COUNCIL CLERK CHERRY: M 1308.

21  Communication from OMB. Withdrawing two budget

22  modifications.

23                   SPEAKER VALLONE: Received, ordered,

24  printed and filed.

25                   COUNCIL CLERK CHERRY: M 1309.

1   STATED COUNCIL MEETING

2   Communication from the City Loft Board.

3                   SPEAKER VALLONE: Received, ordered,

4   printed and filed.

5                   ACTING PUBLIC ADVOCATE SPIGNER:

6   Petitions and Communications.

7                   COUNCIL CLERK CHERRY: None, sir.

8                   ACTING PUBLIC ADVOCATE SPIGNER: Land

9   Use Call-Ups.

10                  COUNCIL CLERK CHERRY: M 1310. By

11  Council Member Eisland.

12                  SPEAKER VALLONE: This is coupled on a

13  Call-Up vote.

14                  COUNCIL CLERK CHERRY: M 1311. By

15  Council Member Eisland.

16                  SPEAKER VALLONE: Coupled on a Call-Up

17  vote.

18                  COUNCIL CLERK CHERRY: M 1312. By

19  Council Member Eisland.

20                  SPEAKER VALLONE: Coupled on a Call-Up

21  vote.

22                  COUNCIL CLERK CHERRY: M 1313. By

23  Council Member Golden.

24                  SPEAKER VALLONE: Coupled on a Call-Up

25  vote.

1   STATED COUNCIL MEETING

2                   At this time I would ask for a Land

3   Use Call-Up vote on these four items only, please.

4                   Roll call.

5                   ACTING PUBLIC ADVOCATE SPIGNER: Roll

6   call, please.

7                   COUNCIL CLERK: Abel.

8                   COUNCIL MEMBER ABEL: Aye.

9                   COUNCIL CLERK: Berman.

10                  (No response.)

11                  COUNCIL CLERK: Boyland.

12                  COUNCIL MEMBER BOYLAND: Aye.

13                  COUNCIL CLERK: Carrion.

14                  (No response.)

15                  COUNCIL CLERK: Clarke.

16                  COUNCIL MEMBER CLARKE: Aye.

17                  COUNCIL CLERK: Dear.

18                  (No response.)

19                  COUNCIL CLERK: DiBrienza.

20                  COUNCIL MEMBER DiBRIENZA: Aye on all.

21                  COUNCIL CLERK: Dilan.

22                  COUNCIL MEMBER MALAVE-DILAN: Aye.

23                  COUNCIL CLERK: Eisland.

24                  COUNCIL MEMBER EISLAND: Yes.

25                  COUNCIL CLERK: Eldridge.

1  STATED COUNCIL MEETING

2           COUNCIL MEMBER ELDRIDGE: Yes.

3           COUNCIL CLERK: Espada.

4           COUNCIL MEMBER ESPADA: Yes.

5           COUNCIL CLERK: Fisher.

6           COUNCIL MEMBER FISHER: Yes.

7           COUNCIL CLERK: Foster.

8           COUNCIL MEMBER FOSTER: Aye on all.

9           COUNCIL CLERK: Freed.

10           COUNCIL MEMBER FREED: Aye.

11           COUNCIL CLERK: Golden.

12           COUNCIL MEMBER GOLDEN: Aye.

13           COUNCIL CLERK: Harrison.

14           (No response.)

15           COUNCIL CLERK: Henry.

16           COUNCIL MEMBER HENRY: Yes.

17           COUNCIL CLERK: Koslowitz.

18           COUNCIL MEMBER KOSLOWITZ: Aye.

19           COUNCIL CLERK: Lasher.

20           (No response.)

21           COUNCIL CLERK: Leffler.

22           COUNCIL MEMBER LEFFLER: Aye.

23           COUNCIL CLERK: Linares.

24           COUNCIL MEMBER LINARES: Yes.

25           COUNCIL CLERK: Lopez.

JNR-000943

```
 1   STATED COUNCIL MEETING

 2                   COUNCIL MEMBER LOPEZ: Yes.

 3                   COUNCIL CLERK: Marshall.

 4                   COUNCIL MEMBER MARSHALL: Aye.

 5                   COUNCIL CLERK: McCaffrey.

 6                   (No response.)

 7                   COUNCIL CLERK: Michels.

 8                   (No response.)

 9                   COUNCIL CLERK: Miller.

10                   COUNCIL MEMBER MILLER: Aye.

11                   COUNCIL CLERK: Moskowitz.

12                   (No response.)

13                   COUNCIL CLERK: Nelson.

14                   COUNCIL MEMBER NELSON: Aye.

15                   COUNCIL CLERK: Oddo.

16                   COUNCIL MEMBER ODDO: Yes.

17                   COUNCIL CLERK: O'Donovan.

18                   COUNCIL MEMBER O'DONOVAN: Aye.

19                   COUNCIL CLERK: Perkins.

20                   (No response.)

21                   COUNCIL CLERK: Pinkett.

22                   (No response.)

23                   COUNCIL CLERK: Povman.

24                   COUNCIL MEMBER POVMAN: Aye.

25                   COUNCIL CLERK: Provenzano.
```

```
 1    STATED COUNCIL MEETING

 2                 COUNCIL MEMBER PROVENZANO: Aye.

 3                 COUNCIL CLERK: Quinn.

 4                 COUNCIL MEMBER QUINN: Aye.

 5                 COUNCIL CLERK: Reed.

 6                 COUNCIL MEMBER REED: Aye.

 7                 COUNCIL CLERK: Rivera.

 8                 (No response.)

 9                 COUNCIL MEMBER ROBINSON: Yes.

10                 COUNCIL CLERK: Rodriguez.

11                 COUNCIL MEMBER RODRIGUEZ: Yes.

12                 COUNCIL CLERK: Sabini.

13                 COUNCIL MEMBER SABINI: Aye.

14                 COUNCIL CLERK: Spigner.

15                 COUNCIL MEMBER SPIGNER: Aye.

16                 COUNCIL CLERK: Warden.

17                 COUNCIL MEMBER WARDEN: Aye.

18                 COUNCIL CLERK: Watkins.

19                 COUNCIL MEMBER WATKINS: Aye.

20                 COUNCIL CLERK: White.

21                 (No response.)

22                 COUNCIL CLERK: Wooten.

23                 (No response.)

24                 COUNCIL CLERK: Berman.

25                 COUNCIL MEMBER BERMAN: Yes.
```

1   STATED COUNCIL MEETING

2                  COUNCIL CLERK: Carrion.

3                  (No response.)

4                  COUNCIL CLERK: Carrion.

5                  COUNCIL MEMBER CARRION: Yes.

6                  COUNCIL CLERK: Dear.

7                  (No response.)

8                  COUNCIL CLERK: Rivera.

9                  COUNCIL MEMBER RIVERA: Yes.

10                 COUNCIL CLERK: Ognibene.

11                 COUNCIL MEMBER OGNIBENE: Aye.

12                 COUNCIL CLERK: McCaffrey.

13                 COUNCIL MEMBER McCAFFREY: Aye on all.

14                 COUNCIL CLERK: Speaker, Mr. Vallone.

15                 SPEAKER VALLONE: Aye.

16                 ACTING PUBLIC ADVOCATE SPIGNER: By a

17   vote of 37 in the affirmative, none in the negative,

18   the Land Use items are adopted and referred to the

19   various committees.

20                 Communication from the Speaker.

21                 SPEAKER VALLONE: Yes. As you know,

22   the Mayor was scheduled to address us this

23   afternoon, but that will be put off until a future

24   meeting. There are problems. The person who

25   developed anthrax passed away this morning, so there

1  STATED COUNCIL MEETING

2  are serious medical problems that the Mayor has to

3  attend to. But in terms of the financial situation

4  of the City of New York, and of the money that is

5  due to us from the federal government, our Council

6  Finance staff has prepared the present fiscal

7  condition of the City and the present revenue

8  estimates of the City, and there will be a briefing

9  of the negotiating team tomorrow at 11:00. So, I ask

10  all the members of the negotiating team to meet with

11  me tomorrow at 11:00.

12              Any other members of the Council that

13  wish to be briefed are welcome to come 11:00

14  tomorrow morning. We will release the information to

15  the press and I will have a statement to make

16  together with the negotiating team at that time.

17              Everyone is invited, anyone who wants

18  to participate, 11:00 tomorrow.  We anticipate

19  releasing the information as we have it at noon to

20  the press. We think it's important that facts be

21  made known and that we give the truth of the matter

22  as it stands now without any ifs, ands or buts about

23  it, and then when we know what the situation is, we

24  as a City will be able to address it in a proper

25  way, as well as the state and the federal

1   STATED COUNCIL MEETING

2   government.

3                    There will be two more meetings of

4   this Council body in November, and two more meetings

5   in December. So, that means there are approximately

6   four Stated meetings left for this Council, barring

7   any emergency meetings that might be called in

8   between. So, please check your calendars and make

9   sure that for the Committee meetings and for the

10  Stated meetings, that you set aside every other

11  activity because there will be some important

12  matters for us to continue and finish before this

13  tour of duty for this particular Council is over.

14                   So, please, just as if there is an

15  emergency with an adoption of a budget, if anybody

16  has changed their phone numbers or has a different

17  telephone number, let my office know, in case we

18  have to get you back here within an hour or so,

19  because there may be matters that we have to act on

20  that are different from the times that we are now

21  scheduling.

22                   So, it's 11:00 tomorrow morning for

23  the negotiating team, any other members that want to

24  be briefed, they're welcome to come and tomorrow

25  we'll brief them.

1  STATED COUNCIL MEETING

2           Thank you, Mr. Acting President

3  Pro-Tem.

4           ACTING PUBLIC ADVOCATE SPIGNER: Okay,

5  now we move to Item Number 9, which is Discussion of

6  General Orders.

7           Any item on today's General Order

8  Calendar can be discussed.

9           I'm going to call Council Member

10 Foster.

11          Council Member Foster, will you

12 assume the chair for a minute, because there is an

13 item that I want to discuss at this point, because

14 I've learned while it's on today's calendar, it will

15 probably be laid over, so I need to discuss it right

16 now.

17          ACTING PUBLIC ADVOCATE FOSTER:

18 Discussion of General Orders.

19          Mr. Spigner.

20          COUNCIL MEMBER SPIGNER: Thank you.

21          SPEAKER VALLONE: This is a discussion

22 of matters on today's calendar.

23          Council Member Spigner.

24          ACTING PUBLIC ADVOCATE FOSTER: Thank

25 you, Mr. Spigner.

1   STATED COUNCIL MEETING

2                COUNCIL MEMBER SPIGNER: Members, Mr.

3   Speaker, and colleagues. There is an item on today's

4   general order calendar, and it's regarding the

5   appointment to the City Planning Commission, and

6   I've learned that it's not going to be taken up,

7   that it's going to be laid over, so I need to speak

8   now to let you know that if we lay it over it still

9   takes effect, and I don't know how nice that is to

10  circumvent a process. We still are left with a City

11  Planning Commission that is as just out of sync, and

12  non-representative, as anybody you would have found

13  in the darkest days of apartheid in South Africa or

14  the darkest days --

15               ACTING PUBLIC ADVOCATE FOSTER: Quiet,

16  please.

17               Please take your conversations

18  outside.

19               Just a minute, Mr. Spigner.

20               Please take your conversations

21  outside so we can hear the speaker.

22               All right, Mr. Speaker.

23               COUNCIL MEMBER SPIGNER: The darkest

24  days of slavery and oppression in the deep south. We

25  have a City Planning Commission which has very, very

1  STATED COUNCIL MEETING

2  heavy responsibilities and authorities far reaching

3  of all of the citizens of this City, and today that

4  body has no Latinos, the one Asian member is being

5  removed, and has one member from the

6  African-American community. Now, that's just not

7  fair. It's outrageous, and this Administration has

8  no shame. It continues to send these

9  unrepresentative members to this body and we should

10  not, as a City Council that represents all of the

11  people of New York, we should not go along with it.

12  We should reject this nomination until the Mayor and

13  his representatives send the appropriate balance.

14        The body is now all Manhattan -- not

15  all Manhattan because the Borough Presidents have

16  five -- but it's totally out of sync, and if you

17  just read the Green Book and do a little research,

18  you will see how far reaching the authorities and

19  the powers of the City Planning Commission are. And,

20  so, I hope you share my views, and join me whenever

21  these issues come before the body and we can try to

22  assert ourselves for those that we represent.

23        Thank you.

24        ACTING PUBLIC ADVOCATE FOSTER: Thank

25  you, Mr. Spigner.

1  STATED COUNCIL MEETING

2          SPEAKER VALLONE: Thank you, Council

3  Member Spigner.

4          Please resume the chair.

5          ACTING PUBLIC ADVOCATE SPIGNER: Does

6  anyone else want to be heard on today's calendar?

7          SPEAKER VALLONE: On any item on

8  today's calendar?

9          ACTING PUBLIC ADVOCATE SPIGNER: Helen

10 Marshall. Council Member Marshall.

11         COUNCIL MEMBER MARSHALL: I come from

12 the Borough of Queens, where we have a very, very

13 large Asian community, which clearly has made an

14 indelible mark upon the borough of development and

15 strengthening our community, especially in all of

16 our commercial areas, residential areas, and I just

17 feel that that one representative that they have on

18 the Board should be protected and should stay there.

19 I have nothing against Mrs. Gol, but the fact that

20 she is removing an Asian member of the Board I think

21 is something that I object to. And I would like to

22 not see that happen. And I urge all my colleagues to

23 vote against the appointment of Ms. Gol, G-o-l, Jane

24 Gol, because she is replacing a woman representing a

25 very large segment of our City.

1   STATED COUNCIL MEETING

2                    Thank you.

3                    ACTING PUBLIC ADVOCATE SPIGNER:

4   Council Member Lopez.

5                    Followed by Council Member Watkins.

6                    COUNCIL MEMBER LOPEZ: At this moment

7   I am opposed about the procedures that are being

8   conducted in this house. I cannot believe that we

9   are going to proceed with naming more individuals to

10  the Board, to the Planning Board, when we are going

11  through the situation in this City in which many

12  decisions have to be made. How could in my good

13  conscience I vote for somebody who I don't even know

14  who it is? How could in my good conscience, I can

15  vote for somebody, or vote against somebody that I

16  don't even have a resume on my hand?

17                   It is appalling to me to see that

18  business that are being conducted in this house

19  right now, when we don't even get information from

20  who this individual is, and we are removing

21  individuals from the Board based on what? We don't

22  even know the rationale, we don't even know the

23  question why, and the only thing we know is that

24  government in New York City is taking place based on

25  the dictatorship kind of policies that are happening

1    STATED COUNCIL MEETING

2    in here.

3                    Are we going to suspend the

4    constitution next time? Is this the next thing that

5    we're going to do? And at this point I ask all of my

6    colleagues in this house to be very careful of what

7    we're doing in here. If we're going to replan and

8    make New York City better and bigger, this is not

9    the way to do it. The way that we are doing it is in

10   a dark room, deals that are made by an

11   administration that is leaving and is not even given

12   the opportunity to the new Administration that is

13   coming in place. This is wrong. It's plain wrong,

14   and I ask you not to do this.

15                    ACTING PUBLIC ADVOCATE SPIGNER:

16   Council Member Watkins.

17                    COUNCIL MEMBER WATKINS: Thank you,

18   Mr. President Pro-Tem.

19                    I have to join with my colleague. I

20   have great concerns about the composition of the

21   City Planning Commission.

22                    I had those concerns for many years.

23   My concerns are greater now.

24                    One of the major things that the new

25   government, the new City government is going to be

1   STATED COUNCIL MEETING

2   faced with is the rebuilding of Lower Manhattan.

3   There is a large Asian population, Lower Manhattan,

4   Chinatown is in Lower Manhattan, it is inconceivable

5   that in this day and age, when the City has changed,

6   that we are considering replacing and removing the

7   only Asian member of the City Planning Commission,

8   whether all members of the City government and the

9   power brokers want to recognize it or not, this City

10  has become a mosaic that is increasingly brown and

11  black in color. The City Planning Commission must

12  reflect the people who live in this City. It is a

13  paternalistic approach to think that people of color

14  cannot plan for themselves. To replace the one Asian

15  on that Commission with someone other than another

16  Asian is insulting and it is ill-conceived and I do

17  feel that we should not approve this change at this

18  time.

19                  ACTING PUBLIC ADVOCATE SPIGNER:

20  Council Member Eldridge.

21                  COUNCIL MEMBER ELDRIDGE: I'd like to

22  also express my dismay at our not being able to vote

23  on this, and to express my opposition to this

24  proposed appointment. Not only have for years we

25  talked about making the City Planning Commission

1   STATED COUNCIL MEETING

2   more representative and similar to the population of

3   the City, but we also have, and I think that we

4   should understand this, we have a new Administration

5   that will be elected within a week, and I don't care

6   whether it's the tradition or not, I do not believe

7   that this body and this Mayor should have the

8   prerogative to fill the vacancies that are now on

9   the City Planning Commission for the next four

10  years.

11          We've come through a particularly

12  bruising primary, we are trying very hard to have

13  this City be the strongest, most wonderful we can

14  have, we have a lot facing us in the future. To put

15  on the City Planning Commission a person who is not

16  of color, a person who is a real estate lawyer, a

17  person who does not have a background in the

18  environment, a person who does not have a background

19  in any of the other issues that surround the

20  communities at this time is totally inappropriate,

21  and I would wish that this body had the opportunity

22  to express our opposition to it.

23          I therefore urge my colleagues to do

24  whatever they can, I don't know what we can do if

25  it's laid over, because this appointment will take

1   STATED COUNCIL MEETING

2   effect if it's laid over. But this appointment is

3   really an insult to the people of this City.

4             Thank you.

5             ACTING PUBLIC ADVOCATE SPIGNER:

6   Council Member Pinkett.

7             COUNCIL MEMBER PINKETT: I rise to

8   speak on this particular appointment and to say that

9   I believe the City Planning works with what they're

10   given to work with. But City Planning is not the

11   only agency and Board that is afflicted with similar

12   limitations.

13             My concern, though, at this

14   particular time, is that we are asked quite often to

15   look at this City in this particular time of crisis,

16   because it's a time we are told that we have all

17   come together, no matter who we are, no matter what

18   we look like, because this City has demonstrated its

19   courage, its inability to look at color and class

20   and work together for the benefit of the total City.

21             Everyone was exuding in joy and

22   talking about the wonders of America because finally

23   from Queens, I believe, we elected the first

24   Asian-American Council Member, and this was a

25   breakthrough, and yet, we can't have another one on

1    STATED COUNCIL MEETING

2    City Planning. There is something wrong with that,

3    there is something wrong with that kind of thinking.

4                    I don't want to blame anyone. I don't

5    say that the Administration hasn't got the right to

6    make an appointment. What we're saying is that

7    ethically there ought to be some concern about what

8    kind of New York City we leave as a legacy for the

9    future.

10                    I think further, this Council has a

11   responsibility to function today with what is

12   brought before them, and to say we want to set a

13   standard, and not to challenge the right of a

14   leadership to move when something is brought before

15   them and say you have no right to do that, because

16   clearly, they have the right to do that.

17                    But I am suggesting that I would like

18   to see this Administration, this Administration in

19   the Council say, for the good of this City we would

20   like to see that the Administration not remove a

21   person who should be there, and not exclude someone

22   because politically it is expedient to do so. And

23   remember who we are, what this country was founded

24   on and act accordingly.

25                    Thank you.

1    STATED COUNCIL MEETING

2                    COUNCIL MEMBER ELDRIDGE: I have a

3    point of order.

4                    ACTING PUBLIC ADVOCATE SPIGNER: I

5    don't remember your name being called. I didn't hear

6    your name.

7                    COUNCIL MEMBER ELDRIDGE: I have a

8    point of order.

9                    ACTING PUBLIC ADVOCATE SPIGNER: Point

10   of order?

11                   COUNCIL MEMBER ELDRIDGE: Yes.

12                   ACTING PUBLIC ADVOCATE SPIGNER: State

13   your point of order.

14                   COUNCIL MEMBER ELDRIDGE: Is there a

15   motion to lay it over, or does it automatically get

16   laid over?

17                   ACTING PUBLIC ADVOCATE SPIGNER: It's

18   on today's general order calendar.

19                   COUNCIL MEMBER ELDRIDGE: What does

20   that mean. It's on today's general order calendar of

21   being laid over, or will there be a motion to lay it

22   over?

23                   ACTING PUBLIC ADVOCATE SPIGNER: I

24   don't know, they haven't told me yet.

25                   COUNCIL MEMBER ELDRIDGE: Would you

1   STATED COUNCIL MEETING

2   please ask?

3                      ACTING PUBLIC ADVOCATE SPIGNER: Right

4   now it's on today's general order calendar.

5                      COUNCIL MEMBER ELDRIDGE: So it hasn't

6   been laid over yet?

7                      ACTING PUBLIC ADVOCATE SPIGNER: It

8   has not.

9                      COUNCIL MEMBER ELDRIDGE: And if the

10  decision is made to lay it over, who makes that

11  decision?

12                     ACTING PUBLIC ADVOCATE SPIGNER: Well,

13  we'll refer to rules then. We will refer to the

14  Council rules.

15                     COUNCIL MEMBER ELDRIDGE: What are the

16  Council rules then?

17                     ACTING PUBLIC ADVOCATE SPIGNER: When

18  that issue arises, Council member, we will refer it

19  to the Council rules, all right? Thank you.

20                     ACTING PUBLIC ADVOCATE SPIGNER:

21  Council member --

22                     COUNCIL MEMBER MARSHALL: A

23  clarification, Mr. Deputy Chair?

24                     ACTING PUBLIC ADVOCATE SPIGNER: Yes.

25                     COUNCIL MEMBER MARSHALL: What does

1  STATED COUNCIL MEETING

2  that mean? Does that mean it takes effect without

3  our vote?

4                    ACTING PUBLIC ADVOCATE SPIGNER: No.

5  What I'm saying is, as of now it's on the calendar

6  for a vote. It's on the calendar for a vote, and if

7  there, in fact, comes a time if it is laid over, and

8  it can be laid over, then we will refer it to the

9  rules of the Council.

10                   COUNCIL MEMBER MARSHALL: And then

11 this lady will be made the Commissioner?

12                   ACTING PUBLIC ADVOCATE SPIGNER: We

13 will refer, we will be governed by the rules of the

14 Council, whatever they are. Whatever they are.

15                   Council Member Povman, the last

16 speaker.

17                   COUNCIL MEMBER PERKINS: I did want to

18 speak on this.

19                   ACTING PUBLIC ADVOCATE SPIGNER:

20 Council Member Perkins, you are recognized.

21                   COUNCIL MEMBER PERKINS: For a

22 clarification, before I state my opposition, what do

23 we have to do to vote this from happening? What do

24 we have to do to stop this from happening? What do

25 we do to stop this from happening?

1  STATED COUNCIL MEETING

2                    ACTING PUBLIC ADVOCATE SPIGNER:

3  Council member, as we see, this issue is on today's

4  general order calendar, okay?

5                    COUNCIL MEMBER PERKINS: And the

6  members that want to stop it from happening, if they

7  vote no --

8                    ACTING PUBLIC ADVOCATE SPIGNER: Sir.

9                    COUNCIL MEMBER PERKINS: I just want

10  to be clear.

11                    ACTING PUBLIC ADVOCATE SPIGNER: Well,

12  I want to try to make it as clear as I can. When we

13  arrive at that point in the proceedings, I will

14  refer to the rules of the Council which determine

15  how these matters are handled. So, right now the

16  matter is on today's general order calendar. Do you

17  want to speak --

18                    COUNCIL MEMBER PERKINS: Well, I just

19  wanted to join my colleagues in strong opposition to

20  this nomination.

21                    ACTING PUBLIC ADVOCATE SPIGNER:

22  Members, friends and guests who have nothing else

23  but to do but to chatter, please exit this Chamber.

24  Please. Particularly staff, people who work for John

25  Banks. John, if you will control your crew I would

1 STATED COUNCIL MEETING

2 appreciate it. Ask them to remove themselves if all

3 they have to do is chat.

4                    COUNCIL MEMBER PERKINS: At this time

5 when our language of unity is phrased united we

6 stand, for us to take a position that denies one

7 very important part of our community that will help

8 us to fulfill our mission of diversity, would be a

9 smack in the face of that logo that says united we

10 stand.

11                    So, I would like to strongly urge

12 that we stand united in this time of crisis, we

13 stand united by recognizing the diversity, and that

14 we do not support any measure that in any way will

15 cripple that, and would in any way suggest an insult

16 to any community in the City. So, I want to join my

17 colleagues in urging that we do not support this at

18 this time.

19                    ACTING PUBLIC ADVOCATE SPIGNER: Okay,

20 no other speaker, I will recognize the Chair of the

21 Rules Committee, Council Member Povman.

22                    COUNCIL MEMBER POVMAN: Thank you.

23                    I just would like to tell the Council

24 that this candidate is perfectly qualified for the

25 job. In regards to her ethnicity, that's a separate

1   STATED COUNCIL MEETING

2   issue, but there is no reason to deny this candidate

3   an appointment to the City Planning Commission

4   because compared to the others that we have passed,

5   she stands up as well as all the others.

6                   So, if it's going to be an ethnic

7   vote, let's call it an ethnic vote, but on the

8   merits she deserves to be appointed.

9                   ACTING PUBLIC ADVOCATE SPIGNER: Any

10  other member at this time?

11                  Okay, let's move the agenda, and move

12  the agenda to Report of Special Committees.

13                  COUNCIL CLERK CHERRY: None, sir.

14                  ACTING PUBLIC ADVOCATE SPIGNER:

15  Report of Standing Committees.

16                  COUNCIL CLERK CHERRY: Report of the

17  Committee on Finance.

18                  Intro. 983-A. Selecting a firm for

19  annual audit.

20                  SPEAKER VALLONE: This is amended and

21  coupled on general order with a message of

22  necessity.

23                  COUNCIL CLERK CHERRY: Preconsidered

24  Reso, 2086. Amending real property tax law.

25                  SPEAKER VALLONE: That's coupled.

1   STATED COUNCIL MEETING

2                    COUNCIL CLERK CHERRY: Preconsidered

3   Reso 2087. Amending real property tax law.

4                    SPEAKER VALLONE: That's coupled on

5   general order.

6                    COUNCIL CLERK CHERRY: Preconsidered M

7   1314 and companion Reso 2090, amending Real Property

8   Tax Law and the Charter of the City of New York.

9                    SPEAKER VALLONE: It's coupled.

10                   COUNCIL CLERK CHERRY: M 1295 and

11  companion Reso 2091. Transfer of funds.

12                   SPEAKER VALLONE: Coupled.

13                   COUNCIL CLERK CHERRY: Preconsidered

14  LU 1212 and companion Reso 2092, Hargrave House,

15  Manhattan.

16                   SPEAKER VALLONE: Coupled.

17                   COUNCIL CLERK CHERRY: Preconsidered

18  Land Use 1213 and companion Reso 2093. Senior

19  citizen housing, Brooklyn.

20                   SPEAKER VALLONE: Coupled.

21                   COUNCIL CLERK CHERRY: LU 1203 and

22  companion Reso 2094. ULURP Application No. 20025036

23  HAX, Bronx.

24                   SPEAKER VALLONE: Coupled.

25                   COUNCIL CLERK CHERRY: Report of the

1   STATED COUNCIL MEETING

2   Committee on Land Use.

3                    LU 705 and companion Reso 2095. ULURP

4   application number 20000354 ZMM, Manhattan.

5                    SPEAKER VALLONE: That's coupled.

6                    COUNCIL CLERK CHERRY: LU 1112 and

7   companion Reso 2096, application number 010508 ZRY,

8   zoning.

9                    SPEAKER VALLONE: Coupled.

10                    COUNCIL CLERK CHERRY: LU 1156 and

11  companion Reso 2097. Non-ULURP Number 20025005 HKM,

12  Manhattan.

13                    SPEAKER VALLONE: Coupled.

14                    COUNCIL CLERK CHERRY: LU 1159 and

15  companion Reso 2098. Application 010653 ZRM, zoning.

16                    SPEAKER VALLONE: Coupled.

17                    COUNCIL CLERK CHERRY: LU 1160 and

18  companion Reso 2099. ULURP application number 010652

19  ZMM, Manhattan.

20                    SPEAKER VALLONE: Coupled.

21                    COUNCIL CLERK CHERRY: LU 1180 and

22  companion Reso 2100. Application number 20025018

23  HAX, Bronx.

24                    SPEAKER VALLONE: Coupled.

25                    COUNCIL CLERK CHERRY: LU 1181 and

1   STATED COUNCIL MEETING

2   companion Reso 2101. Application number 20025019

3   HAX, Bronx.

4                    SPEAKER VALLONE: Coupled.

5                    COUNCIL CLERK CHERRY: LU 1187 and

6   companion Reso 2102. ULURP application number 010484

7   ZSK, Brooklyn.

8                    SPEAKER VALLONE: Coupled.

9                    COUNCIL CLERK CHERRY: LU 1188 and

10  companion Reso 2103. ULURP application number 010486

11  ZSK, Brooklyn.

12                   SPEAKER VALLONE: Coupled.

13                   COUNCIL CLERK CHERRY: LU 1189 and

14  companion Reso 2104. ULURP application number

15  C010026 MMK, Brooklyn.

16                   SPEAKER VALLONE: Coupled.

17                   COUNCIL CLERK CHERRY: LU 1190 and

18  companion Reso 2105. ULURP application number 010483

19  ZMK, Brooklyn.

20                   SPEAKER VALLONE: Coupled.

21                   COUNCIL CLERK CHERRY: LU 1199 and

22  companion Reso 2106. Application number 20025039

23  HAK, Brooklyn.

24                   SPEAKER VALLONE: Coupled.

25                   COUNCIL CLERK CHERRY: LU 1200 and

1   STATED COUNCIL MEETING

2   companion Reso 2107. Application number 20025040

3   HAM, Manhattan.

4                    SPEAKER VALLONE: Coupled.

5                    COUNCIL CLERK CHERRY: LU 1201 and

6   companion Reso 2108. Application number 20025041

7   HAM, Manhattan.

8                    SPEAKER VALLONE: This is LU 1201 or

9   1203?

10                   COUNCIL CLERK CHERRY: That was 1201.

11                   SPEAKER VALLONE: That's coupled.

12                   COUNCIL CLERK CHERRY: LU 1203.

13   Application number 20025036 HAX, ULURP, Bronx.

14                   SPEAKER VALLONE: Approved and

15   referred to Finance, pursuant to 6.50.

16                   COUNCIL CLERK CHERRY: Correction.

17   That was a UDAAP.

18                   LU 1205 and companion Reso 2109.

19   ULURP application number 010382, ZMM, Manhattan.

20                   SPEAKER VALLONE: It's coupled.

21                   COUNCIL CLERK CHERRY: LU 1206 and

22   companion Reso 2110.

23                   ULURP, application number C010381

24   PPM, Manhattan.

25                   SPEAKER VALLONE: Coupled.

1    STATED COUNCIL MEETING

2                    COUNCIL CLERK CHERRY: LU 1207 and

3    companion Reso 2111. ULURP application number

4    C010098 MMM, Manhattan.

5                    SPEAKER VALLONE: Coupled.

6                    COUNCIL CLERK CHERRY: LU 1208 and

7    companion Reso 2112. ULURP application number 000353

8    PMC, Manhattan.

9                    SPEAKER VALLONE: Coupled.

10                   COUNCIL CLERK CHERRY: ULURP. LU 1209

11   and companion Resolution 2113. ULURP application

12   number 000355 ZSM, Manhattan.

13                   SPEAKER VALLONE: Coupled.

14                   COUNCIL CLERK CHERRY: LU 1210, and

15   companion Reso 2114. ULURP application number 000356

16   ZSM, Manhattan.

17                   SPEAKER VALLONE: Coupled.

18                   COUNCIL CLERK CHERRY: LU 1211 and

19   companion Reso 2115. ULURP application number

20   N010720 HAX, Bronx.

21                   SPEAKER VALLONE: Pursuant to motion

22   of rules, coupled.

23                   COUNCIL CLERK CHERRY: Report of the

24   Committee on Rules, Privileges and Elections.

25                   M-1294 and companion Reso 2116.

1   STATED COUNCIL MEETING

2   Appointing Jane Gol, member of the City Planning

3   Commission.

4                  SPEAKER VALLONE: Pursuant to motion

5   of rules, coupled.

6                  ACTING PUBLIC ADVOCATE SPIGNER:

7   General Order Calendar.

8                  COUNCIL CLERK CHERRY: SLR 24.

9   Requesting New York State Legislature to pass bills

10   Senate 1439, Assembly 771.

11                  SPEAKER VALLONE: Laid over. That's

12   laid over again.

13                  COUNCIL CLERK CHERRY: Resolution

14   appointing various persons Commissioner of Deeds.

15                  SPEAKER VALLONE: That's coupled.

16                  ACTING PUBLIC ADVOCATE SPIGNER: Okay,

17   members, as it related to the questions asked about

18   M 1294, M 1294 and companion Resolution 2116, that

19   is on today's General Order Calendar, and it will

20   be, as all other items on today's General Order

21   Calendar, voted up or down.

22                  Mr. Clerk, can I have a roll call,

23   please. Please commence.

24                  COUNCIL CLERK: Abel.

25                  COUNCIL MEMBER ABEL: Aye on all, with

1   STATED COUNCIL MEETING

2   the exception of preconsidered Resos 2086, 2087, and

3   preconsidered M-1314 and companion Resolution 2090,

4   on those I vote no.

5               COUNCIL CLERK: Councilman, can you

6   repeat your negative votes, please.

7               COUNCIL MEMBER ABEL: Resos,

8   preconsidered Resos 2086, 2087, M-1314 and the

9   companion Reso 2090.

10              COUNCIL CLERK: Thank you, sir.

11              COUNCIL CLERK: Berman.

12              COUNCIL MEMBER BERMAN: Yes.

13              COUNCIL CLERK: Boyland.

14              COUNCIL MEMBER BOYLAND: I vote no on

15   M-1294, on Reso 2116; and yes on everything else.

16              COUNCIL CLERK: Carrion.

17              COUNCIL MEMBER CARRION: May I please

18   be excused to explain my vote?

19              ACTING PUBLIC ADVOCATE SPIGNER:

20   Certainly, Borough President Carrion.

21              COUNCIL MEMBER CARRION: Thank you,

22   sir.

23              I would like to make a comment before

24   I vote about M 1294 and companion Resolution 2116,

25   and with all due respect to Ms. Gol, who I

Legal-Ease Court Reporting Services, Inc. (800) 756-3410

1   STATED COUNCIL MEETING

2   understand is sitting in this room, and as the

3   Chairman of the Committee that recommended that we

4   approve her said, that she is absolutely qualified,

5   and I'm certain that she is, if I were Mark Green or

6   Michael Blumberg, I would want the opportunity to

7   fill this appointment for three and a half years,

8   which is the lion's share of the new administration,

9   the full first term, if either of them is lucky

10  enough to get re-elected. And I don't think that we

11  should allow this simply on principle.

12              I understand the concern about the

13  fair share of representation on the Commission,

14  which is a very legitimate issue, but I don't think

15  that that is the only issue that stands here, I

16  think that we need to, on process and on respect to

17  the new administration that's about to come in in

18  about eight weeks, to not accept this appointment

19  and have Ms. Gol continue in her pursuit of wanting

20  to serve on the City Planning Commission. So, on

21  these items I vote no; and on all others, I vote

22  yes. Thank you.

23              ACTING PUBLIC ADVOCATE SPIGNER:

24  Continue the roll call.

25              COUNCIL CLERK: Clarke.

Legal-Ease Court Reporting Services, Inc. (800) 756-3410

JNR-000972

0968

1  STATED COUNCIL MEETING

2              COUNCIL MEMBER CLARKE: May I be

3  excused to explain my vote?

4              ACTING PUBLIC ADVOCATE SPIGNER: Yes,

5  Councilwoman.

6              COUNCIL MEMBER CLARKE: I think I've

7  always said that my colleague Council Member Carrion

8  is very bright, smart and analytical, and,

9  therefore, I do not need to repeat what he already

10  said, but just to vote no on both items.

11              ACTING PUBLIC ADVOCATE SPIGNER: You

12  vote no on 1294, 2116 and aye on all others, right?

13              COUNCIL MEMBER CLARKE: Aye on all

14  others.

15              ACTING PUBLIC ADVOCATE SPIGNER:

16  Continue the roll call.

17              COUNCIL CLERK: Dear.

18              COUNCIL MEMBER DEAR: Yes.

19              COUNCIL CLERK: DiBrienza.

20              COUNCIL MEMBER DiBRIENZA: Pass.

21              COUNCIL CLERK: Dilan.

22              COUNCIL MEMBER MALAVE-DILAN: Yes. I

23  would like to vote no on M-1294 and Reso 2116. I

24  associate myself with the remarks of Council Member

25  Carrion and vote yes on all other items.

1   STATED COUNCIL MEETING

2                   COUNCIL CLERK: Eisland.

3                   COUNCIL MEMBER EISLAND: Yes.

4                   COUNCIL CLERK: Eldridge.

5                   COUNCIL MEMBER ELDRIDGE: I'd like to

6   just draw attention to the fact that on the calendar

7   is another Land Use item, which changes, it gives

8   the building inspectors, from what I understand, the

9   discretion to decide in adult stores whether in fact

10  they're genuinely adult stores.

11                  It seems to me that we're voting on

12  this in this day and age is absurd, and not only do

13  we still have questions as to what people when they

14  want to, I mean how much we interfere with people's

15  freedom to read or look at what they want, we are in

16  a country now faced with all kinds of restrictions

17  on our personal freedoms, and for this Council to

18  take the only action that we're taking so far to be

19  about what they buy or look at in a video store, or

20  go to a topless bar, seems to me to be totally

21  absurd today.

22                  So, I'm voting no on LU 1112 and Reso

23  2096, and also no on 1294 and 2116. Thank you, and

24  I'll vote yes on all other coupled general orders.

25                  COUNCIL CLERK: Espada.

1    STATED COUNCIL MEETING

2    seems like a perfectly lovely individual, it was

3    clear there is first the question of diversity,

4    which I think is a real question in the City that we

5    as a Council should be concerned about. And I will

6    say that certainly Council Member Spigner has

7    consistently brought this point up.

8              But in addition to that is the fact

9    that when I questioned Ms. Gol as to her

10   qualifications, her response was that she was going

11   to put the time in to learn about Land Use and about

12   zoning, but it was clear that had not really worked

13   in that area in the City itself, and my feeling is,

14   since I do represent the area with the World Trade

15   Center and it is very clear that to me this is not

16   time to have on-the-job training. We need people in

17   City Planning who have a real background knowledge

18   and some vision as to where we should go.

19             So, I vote no on M-1294 and Reso

20   2116. I'm abstaining on Land Use 1112 and aye on all

21   others. Thank you.

22             COUNCIL CLERK: Golden.

23             COUNCIL MEMBER GOLDEN: No on

24   preconsidered Resolution 286, preconsidered

25   Resolution 287, M-314 and Resolution 290, also no;

1    STATED COUNCIL MEETING

2    and aye on all others.

3                    COUNCIL CLERK: Henry.

4                    COUNCIL MEMBER HENRY: I vote no on

5    M-1294, Reso 2116; aye on all others.

6                    COUNCIL CLERK: Koslowitz.

7                    COUNCIL MEMBER KOSLOWITZ: I vote no

8    on M 1294 and Reso 2116; and aye on all.

9                    COUNCIL CLERK: Leffler.

10                   COUNCIL MEMBER LEFFLER: Pass.

11                   COUNCIL CLERK: Linares.

12                   COUNCIL MEMBER LINARES: May I be

13   excused to explain my vote?

14                   ACTING PUBLIC ADVOCATE SPIGNER: Yes,

15   by all means, Council Member Linares.

16                   COUNCIL MEMBER LINARES: I'm going to

17   abstain on Land Use 1112 and Resolution 2096. And

18   with regards to 1294, accompanying Resolution 2116.

19   I would just like to echo with regard to the

20   comments of my colleague regarding this appointment.

21                   And I don't think it has so much to

22   do with the qualification that Ms. Gol may have. I

23   think that we have to put in context what this

24   City's diversity is and how the wealth of talent

25   that we have within that diversity needs to be

1    STATED COUNCIL MEETING

2    placed into account, particularly when we look at

3    planning, growth, where we see the City going and

4    the context of the crisis that we face and this is a

5    seat that is being occupied by an Asian-American,

6    and I believe that it has been long since this City

7    Planning Commission has not had adequate, and it

8    still does not have adequate representation, and I

9    think this is very fundamental, and I think that's

10   the height of why there is an overwhelming objection

11   to this appointment.

12              So, I vote no on that particular

13   item, as well, and I vote yes on the rest.

14              ACTING PUBLIC ADVOCATE SPIGNER:

15   Continue the roll call.

16              COUNCIL CLERK: Lopez.

17              COUNCIL MEMBER LOPEZ: I'm voting no

18   on LU 1112 and Reso 2096. I believe government have

19   no business regulating the sexuality of human

20   beings.

21              I'm voting no in M-1294, Reso 2116.

22   And I want to make clear that I'm voting no on that,

23   not because I believe that somebody should belong to

24   a particular race, ethnicity, sex, gender, tall,

25   short, white, black, it's that I don't know who this

1   STATED COUNCIL MEETING

2   lady is. I have never seen here. Today is the first

3   day that I hear her name. I don't even know if she's

4   a woman. Then to me the procedure that has been

5   taking place here is what is wrong, and I'm voting

6   no for that reason, because the procedure is wrong.

7   And it's based on making a decision without giving

8   us information and telling us who this person is, or

9   what he stands for. That's the reason I'm voting no

10  on it, yes on the rest.

11              ACTING PUBLIC ADVOCATE SPIGNER:

12  Continue the roll call.

13              COUNCIL CLERK: Marshall.

14              COUNCIL MEMBER MARSHALL: I spoke

15  before so I cannot now.

16              I vote no on Resolution 2116, coupled

17  with M-1294 and aye on all others. Thank you.

18              COUNCIL CLERK: McCaffrey.

19              COUNCIL MEMBER McCAFFREY: Aye.

20              COUNCIL CLERK: Michels.

21              COUNCIL MEMBER MICHELS: May I be

22  temporarily excused to vote on Land Use Call-Ups?

23              ACTING PUBLIC ADVOCATE SPIGNER: I

24  can't hear you, Council Member.

25              COUNCIL MEMBER MICHELS: I asked for

1   STATED COUNCIL MEETING

2   permission to vote on Land Use Call-Ups.

3                  ACTING PUBLIC ADVOCATE SPIGNER:

4   Without objection, so ordered.

5                  COUNCIL MEMBER MICHELS: I vote aye.

6                  And I vote yes on all general coupled

7   orders, except LU 1112 and Reso 296, for which I

8   abstain because I really was not here during the

9   hearings. I studied the law and I believe there are

10  some problems here that have to be more succinctly

11  and more objectively -- the standard is not

12  objective enough, and I vote no on M-1294 and

13  Resolution 2116, for reasons that I gave at the

14  hearing. I believe that while the candidate is a

15  fine person, and may be qualified for other things,

16  I don't believe she has the requisite qualifications

17  to be a member of the City Planning Commission at a

18  time when this City is in such a crisis situation.

19                  Thank you.

20                  I withdraw my request and --

21                  ACTING PUBLIC ADVOCATE SPIGNER:

22  Continue the roll call.

23                  COUNCIL CLERK: Miller.

24                  COUNCIL MEMBER MILLER: Aye on all,

25  with the exception of Reso 2116, which I vote no.

1   STATED COUNCIL MEETING

2                     COUNCIL CLERK: Moskowitz.

3                     COUNCIL MEMBER MOSKOWITZ: May I be

4   temporarily excused to explain my vote?

5                     ACTING PUBLIC ADVOCATE SPIGNER: By

6   all means.

7                     COUNCIL MEMBER MOSKOWITZ: Thank you.

8                     I certainly appreciate Council Member

9   Spigner's concern about diversity, and I think it is

10  a very, very important issue, and I wish that this

11  process was different because it seems to me that

12  there is no doubt that we can find many people of

13  color who would not only want to contribute but

14  would bring enormous expertise.

15                    Having said that, I do know Jane Gol

16  personally, and have the highest regard

17  substantively for her, and, therefore, I vote yes on

18  all. Thank you.

19                    ACTING PUBLIC ADVOCATE SPIGNER:

20  Continue the roll call.

21                    COUNCIL CLERK: Nelson.

22                    COUNCIL MEMBER NELSON: Pass.

23                    COUNCIL CLERK: Oddo.

24                    COUNCIL MEMBER ODDO: May I be

25  temporarily excused to explain my vote?

1   STATED COUNCIL MEETING

2                    ACTING PUBLIC ADVOCATE SPIGNER: Yes,

3   by all means, Councilman.

4                    COUNCIL MEMBER ODDO: I vote aye on

5   all, with the exception of preconsidered Resos 2086,

6   2087, 2090 and accompanying preconsidered M-1314.

7                    And if I may make one comment on LU

8   1112? I, like probably all of my colleagues,

9   received a letter from the law firm of Alanzo,

10  Forigno and Delacar and Kahn, alleging the profound

11  economic impact that the adult entertainment

12  industry has on New York, and how more than ever we

13  should leave it alone because in these tough fiscal

14  times we can't put another industry out of business.

15                    I give this letter an A minus for

16  creativity, a B plus for the humor that I found in

17  it, and a D in its premise, particularly when it

18  talks about alleged police statistics and the

19  finding that topless nightclubs do not lead to more

20  crime.

21                    Come to Midland Beach in my district,

22  a community that's on the rebound, a community that

23  was fighting, not only the reality but a perception.

24  Come there and we find a Goldfingers that just

25  opened up because they exploited the 60/40 rule, and

1   STATED COUNCIL MEETING

2   has knocked that community back down on its knees.

3   That's real.

4              This letter, Mark Alanzo, who is the

5   attorney, thank you for the laugh. I needed it

6   during these trying times, but your premise is a

7   bunch of happy horse feathers.

8              ACTING PUBLIC ADVOCATE SPIGNER:

9   Continue the roll call.

10             COUNCIL CLERK: O'Donovan.

11             COUNCIL MEMBER O'DONOVAN: Aye.

12             COUNCIL CLERK: Perkins.

13             COUNCIL MEMBER PERKINS: Yes, I would

14  like to have permission to vote on Land Use.

15             ACTING PUBLIC ADVOCATE SPIGNER:

16  Without objections.

17             COUNCIL MEMBER PERKINS: I want to

18  vote aye on all.

19             I'd like to also again vote against

20  M-1294, Reso 2116, otherwise vote aye on all.

21             COUNCIL CLERK: Pinkett.

22             COUNCIL MEMBER PINKETT: I'm going to

23  vote no on 1294, and 2116; and aye on all others.

24             COUNCIL CLERK: Povman.

25             COUNCIL MEMBER POVMAN: Aye.

1   STATED COUNCIL MEETING

2                    COUNCIL CLERK: Provenzano.

3                    COUNCIL MEMBER PROVENZANO: Yes on

4   all.

5                    COUNCIL CLERK: Quinn.

6                    COUNCIL MEMBER QUINN: If I may be

7   excused to explain my vote?

8                    ACTING PUBLIC ADVOCATE SPIGNER:

9   Without objections, you may.

10                   COUNCIL MEMBER QUINN: First, on a

11  positive note, I want to thank the Chair of our

12  Landmarks Subcommittee, Council Member Sabini and

13  the Land Use staff for the leadership that they have

14  taken today.

15                   We are voting on an item which will

16  create another landmarked district in my Council

17  district, the Madison Square North district. So, I

18  want to thank Council Member Sabini and Eisland and

19  the staff for their leadership on that item.

20                   I'm going to vote yes on all items,

21  except I'm going to vote no on LU 1112 and

22  Resolution 2096, those are the tightening of the

23  adult use establishment zoning.

24                   I opposed the original changes in the

25  zoning plan and believe that this move today is a

1  STATED COUNCIL MEETING

2  further restriction on the first amendment, and also

3  will further limit the area in the City where these

4  establishments can open, further concentrating them

5  in certain districts in the City, including my own,

6  which is in fact the district that in theory was one

7  of the districts which spurred the need for the

8  original change in zoning.

9            I'm also going to vote no on M-1294

10  and Resolution 2116, voting no on those regarding

11  the appointment to the City Planning Commission.

12  Thank you.

13            ACTING PUBLIC ADVOCATE SPIGNER:

14  Continue the roll call, please.

15            COUNCIL CLERK: Reed.

16            COUNCIL MEMBER REED: I'd like to be

17  excused to explain my vote?

18            ACTING PUBLIC ADVOCATE SPIGNER: Yes,

19  Council Member Reed, by all means.

20            COUNCIL MEMBER REED: I agree with the

21  urgency and concerns that my colleagues have

22  registered in the case of the City Planning

23  Commission. This is just not a time for us to be

24  rewarding people. I don't know this woman, she might

25  be fabulous, but I can't imagine that we want to

1  STATED COUNCIL MEETING

2  move forward with a recommendation that just, as a

3  visual, conflicts with the notion that we have in

4  this City that all voices and colors should be

5  represented.

6                    So, I would be happy to entertain Ms.

7  Gol's nomination if I had a chance to see it at some

8  other point, but I'm not able to entertain it right

9  now. So, I'm going to vote no on M-1294 and

10  Resolution 2116.

11                    As regard to LU 1112 and Resolution

12  1096, I'm in support of my colleague, Council Member

13  Quinn. I think this is excessive, inarbitrary, and

14  pushes things into a district. This issue could have

15  been resolved in a much more intelligent fashion and

16  I think this is just pandering once more to a Mayor

17  who thinks he has to have it his way. So, he

18  couldn't get it defined the way he wanted by a

19  court, so he's coming back around this way; I vote

20  no. Aye on all others. Thank you.

21                    ACTING PUBLIC ADVOCATE SPIGNER:

22  Continue the roll call.

23                    COUNCIL CLERK: Rivera.

24                    COUNCIL MEMBER RIVERA: I vote no on

25  1294 and Resolution 2116 and aye on all others.

1   STATED COUNCIL MEETING

2                   COUNCIL CLERK: Robinson.

3                   COUNCIL MEMBER ROBINSON: Mr. Speaker

4   Pro-Tem, may I be excused to explain my vote?

5                   ACTING PUBLIC ADVOCATE SPIGNER:

6   Council Member Robinson.

7                   COUNCIL MEMBER ROBINSON: I would like

8   my remarks to be associated with those of my

9   colleague that have spoken in opposition to M 1294

10  and Resolution 2116. I would like to vote on all

11  general coupled orders, thank you, yes.

12                  COUNCIL CLERK: Rodriguez.

13                  COUNCIL MEMBER RODRIGUEZ: No on

14  M-1294, no on Reso 2116; aye on all others.

15                  COUNCIL CLERK: Sabini.

16                  COUNCIL MEMBER SABINI: Mr. Presiding

17  Officer, may I be excused to explain my vote?

18                  ACTING PUBLIC ADVOCATE SPIGNER: Yes,

19  by all means.

20                  COUNCIL MEMBER SABINI: I want to just

21  note for my colleague the creation, as Council

22  Member Quinn stated, of the Madison Square North

23  Historic District. This is a district that will

24  enhance the census of preserved communities in our

25  City, it's one not without its challenges. There are

1  STATED COUNCIL MEETING

2  some very, very unique architecture. Historians will

3  tell you that that area was the hub of the

4  entertainment industry in the 1890s,  the turn of

5  that century as well, and, yet, the usage of that

6  district is now a lot of wholesalers, a lot of

7  stores that, frankly, are not in compliance now. It

8  will be a challenge to both the Landmarks

9  Commissions, the laws that Council Member Fisher and

10  I have passed to make complaints easier but

11  enforcement tougher to preserve that district, but I

12  LPC will be up to that challenge.

13            I also want to note for my colleagues

14  a package of Land Use matters and companion

15  resolutions that will consolidate the sanitation

16  operations in the west side of Manhattan, and allow

17  for a more user-friendly Hudson River Park, and our

18  Committee which does both public siting and historic

19  preservation has worked hard to help the Sanitation

20  Department locate garages which no one really wants,

21  with longer, cheaper leases, saving the taxpayer

22  money. In this case we're not doing that, but we're

23  helping keep the Sanitation Department moving and

24  helping the west side and all of New York enjoy the

25  Hudson River Park.

1    STATED COUNCIL MEETING

2              So, I'm going to vote aye on all

3    coupled general orders with the exception of the

4    appointment of Jane Gol as a member of the City

5    Planning Commission, and 1294 and Resolution 2116,

6    as a representative of New York's most diverse

7    Council district, I think that the Planning

8    Commission should look like the City. I have

9    professionals in my district that would make very

10   fine appointees, engineers, planners, attorneys, and

11   this is nothing against the qualifications of a

12   nominee, but for a nomination that's going to last

13   well into the next administration, I think we could

14   have done something a little better to make the

15   Planning Commission look like all New York.

16             Thank you.

17             ACTING PUBLIC ADVOCATE SPIGNER:

18   Continue the roll call.

19             COUNCIL CLERK: Spigner.

20             COUNCIL MEMBER SPIGNER: Aye on all,

21   with the exception of M-1294 and resolution 2116.

22             COUNCIL CLERK: Warden.

23             COUNCIL MEMBER WARDEN: I vote no on

24   M-1294, no on Resolution 2116; and aye on all

25   others.

1   STATED COUNCIL MEETING

2                    COUNCIL CLERK: Watkins.

3                    COUNCIL MEMBER WATKINS: I vote no on

4   M-1294, Resolution 2116; and aye on all other

5   coupled orders.

6                    COUNCIL CLERK: DiBrienza.

7                    (No response.)

8                    COUNCIL CLERK: Fisher.

9                    COUNCIL MEMBER FISHER: Without any

10  reflection on the nominee, I abstain on the

11  appointment to the Planning Commission, and I vote

12  aye on all the other items.

13                    COUNCIL CLERK: Leffler.

14                    COUNCIL MEMBER LEFFLER: Yes, I also

15  abstain on M-1294 and Reso 2116. And with respect to

16  LU 1112 and Reso 2096, I'd just like to say that I

17  believe there is a role for well done adult use

18  zoning, and I think there's a need for it in New

19  York City. I regret that the clearly foreseeable

20  challenge to the zoning that was established several

21  years ago was invalidated by the courts. I hope that

22  this is being done now in a way that will be upheld.

23  I vote aye on all other than M-1294.

24                    COUNCIL CLERK: Nelson.

25                    COUNCIL MEMBER NELSON: Aye on all,

1   STATED COUNCIL MEETING

2   but I abstain on M-1294 and Reso 2116.

3                    COUNCIL CLERK: DiBrienza.

4                    ACTING PUBLIC ADVOCATE SPIGNER: I

5   don't think he wants to be involved in this one.

6                    COUNCIL CLERK: Ognibene.

7                    COUNCIL MEMBER OGNIBENE: May I be

8   excused to explain my vote?

9                    ACTING PUBLIC ADVOCATE SPIGNER: Yes,

10  Council Member Ognibene.

11                   COUNCIL MEMBER OGNIBENE: I vote no on

12  preconsidered Reso 2086, 2087 and M-1314, Reso 2090.

13                   With respect to the appointment of

14  Ms. Gol, while I understand the concerns that have

15  been raised by some of my colleagues, I'm wondering

16  whether this is an appropriate mechanism that we're

17  choosing, particularly with the idea that we

18  shouldn't appoint beyond the term of this Council or

19  the Mayor.

20                   I know that we made many appointments

21  on behalf of the former Mayor that went beyond the

22  term, even under the current list we have of our

23  appointments. Campaign Finance Board, Joseph O'Hare,

24  Alfred Cerullo, Dale Christiansen, Joseph Pataznak;

25  the City Planning Commission, Angela Batalia, Edward

1   STATED COUNCIL MEETING

2   Rogowsky, Irwin Cantor, Angela Calvaluzzi, Amanda

3   Burden, Kenneth Knuckels we had appointed for a term

4   expiring June 30th, 2005. Civilian Complaint Review

5   Board, Hector Gonzales, and Sherry Holland, again

6   expiring beyond our term. Board of Elections,

7   Michael Chilmi, Terrance O'Connor, Wayman Carey,

8   Nancy Schackner, Doug Kelner, Frederick Umane,

9   Steven Weiner, Mark Herman, Vincent Volella. Equal

10  Employment Practices Commission, Sherry Buggs. New

11  York City Housing Authority, Landmarks Preservation,

12  Pablo Venegilecia. Commission on Public Information

13  and Communications, Richard Olelia. New York City

14  Sports Commission, Mitchell Model, Robert Harding,

15  Peter Vallone, Herb Berman, Mary Perry. Board of

16  Standards and Appels, Peter Caliendo, Mitchell

17  Corby. New York City Tax Appeals Tribunal, Mark

18  Friedlander, Arthur Strauss. Tax Commission, Taxi

19  and Limousine Commission, every one of them.

20  Teachers Retirement Board, Mona Romaine, Mel Arance

21  and Lauren Blumberg. We never hesitated to make

22  appointments that the expiration date went beyond

23  the term of our office and I think it's an

24  obligation that we have, while we are still elected

25  officials, and notwithstanding the term, that people

1  STATED COUNCIL MEETING

2  be judged on their own particular merits.

3                    Clearly Ms. Gol has an outstanding

4  record, and while I empathize with those who have

5  raised their concerns about race and ethnicity, I

6  think it's a mistake to make that issue focused on

7  one individual. There's an opportunity to sit down

8  and to discuss these matters with both the

9  leadership of the Council and at the Mayor's Office

10  and come up with a more responsible resolution I

11  think than having this kind of racially tainted

12  debate publicly and within this body.

13                    I vote aye on all other coupled

14  general orders.

15                    COUNCIL CLERK: Speaker, Mr. Vallone.

16                    SPEAKER VALLONE: Aye.

17                    COUNCIL MEMBER OGNIBENE: And, of

18  course, Victor Robles, City Clerk.

19                    ACTING PUBLIC ADVOCATE SPIGNER: All

20  items on today's general order calendar are adopted,

21  by a vote of 42 in the affirmative, no negatives, no

22  abstentions, with the exception of M-1294 and

23  Resolution 2116, which is not approved by a vote of

24  23 affirmatives and 26 negative votes, and three

25  abstentions.

1   STATED COUNCIL MEETING

2                   Similarly, Resolution 2086 and

3   Resolution 2087, and M-1314, are approved by a vote

4   of 39 in the affirmative, three negatives and no

5   abstentions.

6                   Land Use 1112 is approved by a vote

7   of 38 in the affirmative, four negatives and three

8   abstentions.

9                   The Land Use Call-Ups. The amended

10  vote is 42 in the affirmative -- 43 in the

11  affirmative and none in the negative.

12                  Just a minute, we have to get a

13  calculator up here.

14                  SPEAKER VALLONE: Unless the new

15  members are voting, we have a few too many votes.

16                  ACTING PUBLIC ADVOCATE SPIGNER:

17  Correction. The LU 1112 --

18                  SPEAKER VALLONE: While we're waiting

19  I want to remind the members we have lunch waiting.

20                  ACTING PUBLIC ADVOCATE SPIGNER: Okay,

21  we've got it right now. The M-1294, 13 in the

22  affirmative, 26 negatives. Thirteen affirmatives, 26

23  negatives.

24                  SPEAKER VALLONE: And three

25  abstentions.

1   STATED COUNCIL MEETING

2                    ACTING PUBLIC ADVOCATE SPIGNER: And

3   three abstentions.

4                    So, that concludes the vote on

5   today's general order calendar.

6                    Council Member Quinn, you wish to be

7   recognized?

8                    COUNCIL MEMBER QUINN: Yes, thank you.

9   I would have I guess a point of procedure. I would

10  believe now since M-1294 and Reso 2116, since the

11  appointment has not been approved, that the

12  appropriate next step would be a vote to file that

13  item.

14                   ACTING PUBLIC ADVOCATE SPIGNER: Let

15  me check.

16                   COUNCIL MEMBER QUINN: Thank you.

17                   ACTING PUBLIC ADVOCATE SPIGNER: The

18  motion is in order.

19                   Now, there have been some discussion

20  about the make-up of the Council. We have two

21  vacancies, the Fiala seat hasn't been filled, the

22  Robles seat hasn't been filled, so regardless to

23  whether we have -- I am informed that it requires

24  the 26 votes, no matter what the make-up of the

25  Council is. So, that being said, so a motion to file

1   STATED COUNCIL MEETING

2   M-1294 and Resolution 2116 I am told is in order.

3                   Roll call, please.

4                   SPEAKER VALLONE: The Committee

5   Chairperson just wants to be recognized.

6                   COUNCIL MEMBER POVMAN: At this point

7   I think that the situation is becoming --

8                   COUNCIL MEMBER MARSHALL: Morty, could

9   you please talk louder.

10                   ACTING PUBLIC ADVOCATE SPIGNER:

11   Morty, speak up, please.

12                   COUNCIL MEMBER POVMAN: I said at this

13   point the situation has become so ethically tied up,

14   I'm recommending a no vote or an abstention on this

15   motion.

16                   ACTING PUBLIC ADVOCATE SPIGNER: A no

17   vote or an abstention.

18                   COUNCIL MEMBER MARSHALL: What does

19   that mean?

20                   SPEAKER VALLONE: That's a no vote or

21   an abstention on a vote to file.

22                   ACTING PUBLIC ADVOCATE SPIGNER: Okay.

23   We disagree respectfully.

24                   Continue the roll call, please.

25                   COUNCIL CLERK: Abel.

1    STATED COUNCIL MEETING

2                 COUNCIL MEMBER ABEL: No.

3                 COUNCIL CLERK: Berman.

4                 COUNCIL MEMBER BERMAN: No.

5                 COUNCIL CLERK: Boyland.

6                 COUNCIL MEMBER BOYLAND: Excuse me.

7    When we vote yes, we're saying that --

8                 ACTING PUBLIC ADVOCATE SPIGNER: When

9    you vote yes you are voting to file it.

10               COUNCIL MEMBER BOYLAND: -- You are

11   voting to file it?

12               ACTING PUBLIC ADVOCATE SPIGNER:

13   That's an important vote, yes.

14               COUNCIL MEMBER BOYLAND: And a

15   negative means we want to kill it.

16               Okay, I vote yes then.

17               ACTING PUBLIC ADVOCATE SPIGNER: A yes

18   is to file. A yes vote is to file.

19               COUNCIL MEMBER BOYLAND: A yes is to

20   file.

21               COUNCIL CLERK: Carrion.

22               COUNCIL MEMBER CARRION: Aye.

23               COUNCIL CLERK: Clarke.

24               COUNCIL MEMBER CLARKE: Aye.

25               COUNCIL CLERK: Cruz.

```
1   STATED COUNCIL MEETING

2                   (No response.)

3                   COUNCIL CLERK: Dear.

4                   COUNCIL MEMBER DEAR: No.

5                   COUNCIL CLERK: DiBrienza.

6                   (No response.)

7                   COUNCIL CLERK: Dilan.

8                   COUNCIL MEMBER MALAVE-DILAN: Yes.

9                   COUNCIL CLERK: Eisland.

10                  COUNCIL MEMBER EISLAND: No.

11                  COUNCIL CLERK: Eldridge.

12                  COUNCIL MEMBER ELDRIDGE: Yes.

13                  COUNCIL CLERK: Espada.

14                  (No response.)

15                  COUNCIL CLERK: Fisher.

16                  COUNCIL MEMBER FISHER: Pass.

17                  COUNCIL CLERK CHERRY: Council Member

18  Fisher, how did you vote?

19                  COUNCIL MEMBER FISHER: I just passed.

20                  COUNCIL CLERK: Foster.

21                  COUNCIL MEMBER FOSTER: Yes.

22                  COUNCIL CLERK: Freed.

23                  COUNCIL MEMBER FREED: Yes.

24                  COUNCIL CLERK: Golden.

25                  (No response.)
```

1  STATED COUNCIL MEETING

2           COUNCIL CLERK: Henry.

3           (No response.)

4           COUNCIL CLERK: Koslowitz.

5           COUNCIL MEMBER KOSLOWITZ: Yes.

6           COUNCIL CLERK: Lasher.

7           (No response.)

8           COUNCIL CLERK: Leffler.

9           COUNCIL MEMBER LEFFLER: Yes.

10          COUNCIL CLERK: Linares.

11          COUNCIL MEMBER LINARES: Yes.

12          COUNCIL CLERK: Lopez.

13          COUNCIL MEMBER LOPEZ: Yes.

14          COUNCIL CLERK: Marshall.

15          COUNCIL MEMBER MARSHALL: Yes.

16          COUNCIL CLERK: McCaffrey.

17          COUNCIL MEMBER McCAFFREY: Yes.

18          COUNCIL CLERK: Michels.

19          COUNCIL MEMBER MICHELS: Yes.

20          COUNCIL CLERK: Miller.

21          COUNCIL MEMBER MILLER: Yes.

22          COUNCIL CLERK: Moskowitz.

23          (No response.)

24          COUNCIL CLERK: Nelson.

25          (No response.)

1   STATED COUNCIL MEETING

2                  COUNCIL CLERK: Oddo.

3                  COUNCIL MEMBER ODDO: No.

4                  COUNCIL CLERK: O'Donovan.

5                  COUNCIL MEMBER O'DONOVAN: No.

6                  COUNCIL CLERK: Perkins.

7                  COUNCIL MEMBER PERKINS: Yes.

8                  COUNCIL CLERK: Pinkett.

9                  (No response.)

10                 COUNCIL CLERK: Povman.

11                 COUNCIL MEMBER POVMAN: No.

12                 COUNCIL CLERK: Provenzano.

13                 COUNCIL MEMBER PROVENZANO: No.

14                 COUNCIL CLERK: Quinn.

15                 COUNCIL MEMBER QUINN: Yes.

16                 COUNCIL CLERK: Reed.

17                 COUNCIL MEMBER REED: Yes.

18                 COUNCIL CLERK: Rivera.

19                 COUNCIL MEMBER RIVERA: Yes.

20                 COUNCIL CLERK: Robinson.

21                 COUNCIL MEMBER ROBINSON: Yes.

22                 COUNCIL CLERK: Rodriguez.

23                 COUNCIL MEMBER RODRIGUEZ: Yes.

24                 COUNCIL CLERK: Sabini.

25                 (No response.)

1   STATED COUNCIL MEETING

2              COUNCIL CLERK: Spigner.

3              COUNCIL MEMBER SPIGNER: Yes.

4              COUNCIL CLERK: Warden.

5              COUNCIL MEMBER WARDEN: Yes.

6              COUNCIL CLERK: Watkins.

7              COUNCIL MEMBER WATKINS: Yes.

8              COUNCIL CLERK: Fisher.

9              COUNCIL MEMBER FISHER: Abstain.

10             COUNCIL CLERK: McCaffrey.

11             COUNCIL MEMBER McCAFFREY: Abstain.

12             COUNCIL CLERK: Henry.

13             COUNCIL MEMBER PERKINS: He already

14   voted yes. He voted yes.

15             ACTING PUBLIC ADVOCATE SPIGNER: No,

16   he did not.

17             COUNCIL CLERK: Henry.

18             (No response.)

19             COUNCIL MEMBER MALAVE-DILAN: I want

20   to change my vote to an abstention.

21             ACTING PUBLIC ADVOCATE SPIGNER: The

22   chair has good hearing and he can speak for himself

23   and any member wanting to be recognized can be

24   recognized. You do not need to speak for the

25   members.

1  STATED COUNCIL MEETING

2                  All right, have all the votes been

3  taken?

4                  COUNCIL MEMBER MALAVE-DILAN: I would

5  like to be recognized and change my vote to an

6  abstention. Thank you.

7                  ACTING PUBLIC ADVOCATE SPIGNER:

8  You're recognized. So be it. Maybe I should change

9  my vote, too, and I will not.

10                 COUNCIL CLERK: Ognibene.

11                 ACTING PUBLIC ADVOCATE SPIGNER:

12  Never.

13                 COUNCIL MEMBER OGNIBENE: No.

14                 COUNCIL CLERK: Speaker, Mr. Vallone.

15                 SPEAKER VALLONE: No.

16                 ACTING PUBLIC ADVOCATE SPIGNER: Okay.

17                 COUNCIL CLERK: Warden.

18                 COUNCIL MEMBER WARDEN: Yes.

19                 ACTING PUBLIC ADVOCATE SPIGNER: Have

20  all the members voted who wanted to vote?

21                 SPEAKER VALLONE: Anybody who hasn't

22  voted?

23                 ACTING PUBLIC ADVOCATE SPIGNER:

24  Koslowitz, do you want to be recognized?

25                 COUNCIL MEMBER KOSLOWITZ: Yes.

1   STATED COUNCIL MEETING

2                   SPEAKER VALLONE: You voted already.

3                   ACTING PUBLIC ADVOCATE SPIGNER: She

4   wanted to make sure you knew her vote is yes.

5                   Okay, by a vote of 23 in the

6   affirmative, ten in the negative and no abstentions,

7   the motion which you understand requires 26 votes,

8   so an abstention is like a no vote, that motion then

9   is defeated. The motion to file is defeated. And

10  then I guess by extension the nomination is still

11  alive or something like that.

12                  COUNCIL MEMBER ELDRIDGE: Excuse me. A

13  point of order.

14                  ACTING PUBLIC ADVOCATE SPIGNER: Yes.

15                  COUNCIL MEMBER ELDRIDGE: Does that

16  mean the name can be resubmitted, or is this

17  original nomination?

18                  ACTING PUBLIC ADVOCATE SPIGNER: It's

19  a gray area which I'm not qualified to answer right

20  now.

21                  SPEAKER VALLONE: I'll answer that, as

22  long as we go on with the normal course.

23                  Under the rules, as I understand

24  them, when it comes to Land Use or an appointment by

25  the Office of the Mayor, unless it's defeated or

1  STATED COUNCIL MEETING

2  filed, it goes in as a matter of operational law

3  after 30 days of action.

4                    COUNCIL MEMBER ELDRIDGE: But it was

5  defeated?

6                    SPEAKER VALLONE: It was defeated.

7                    The motion to file, or the motion to

8  defeat or the motion to disapprove was defeated.

9                    COUNCIL MEMBER ELDRIDGE: The motion

10  to disapprove was defeated? So, it was defeated?

11                    ACTING PUBLIC ADVOCATE SPIGNER: No,

12  the motion to file was defeated.

13                    COUNCIL MEMBER ELDRIDGE: Even if the

14  motion to file was not defeated?

15                    SPEAKER VALLONE: No, no. If the Mayor

16  chooses, she will go into it as a matter of

17  operational law after 30 days.

18                    COUNCIL MEMBER ELDRIDGE: So, in other

19  words, we've been totally fooled. The people who

20  voted yes and intended to defeat this nomination

21  were not told to stay.

22                    SPEAKER VALLONE: They voted yes to

23  defeat.

24                    COUNCIL MEMBER ELDRIDGE: They did and

25  they defeated it.

1    STATED COUNCIL MEETING

2                    SPEAKER VALLONE: By 23 votes --

3                    COUNCIL MEMBER ELDRIDGE: Then we

4    voted to file.

5                    SPEAKER VALLONE: Madam, 26 votes

6    necessary here.

7                    COUNCIL MEMBER ELDRIDGE: Exactly.

8                    SPEAKER VALLONE: Not 23.

9                    COUNCIL MEMBER ELDRIDGE: We had 26

10   votes --

11                   SPEAKER VALLONE: Now let's stop the

12   argument.

13                   COUNCIL MEMBER ELDRIDGE: Excuse me,

14   Mr. Speaker. We had 26 votes against the nomination.

15                   SPEAKER VALLONE: That was against the

16   motion to approve.

17                   COUNCIL MEMBER ELDRIDGE: A later

18   motion was then filed.

19                   SPEAKER VALLONE: It was not filed.

20                   COUNCIL MEMBER ELDRIDGE: A later

21   motion was then made to file.

22                   SPEAKER VALLONE: It was not filed.

23                   COUNCIL MEMBER ELDRIDGE: I understand

24   that. But people left this meeting thinking they had

25   defeated the nomination.

1    STATED COUNCIL MEETING

2                    SPEAKER VALLONE: The same amount of

3    votes.

4                    COUNCIL MEMBER ELDRIDGE: You may want

5    to interpret it differently, but Mr. Speaker, you

6    are overriding the majority of this Council, and I'm

7    sorry --

8                    SPEAKER VALLONE: That's simply the

9    rules.

10                    COUNCIL MEMBER ELDRIDGE: -- I thought

11   finally for the last two months of this Council the

12   members of the Council might have something to say

13   positively and be able to have what they think

14   carried out instead of having tricks played on us.

15                    ACTING PUBLIC ADVOCATE SPIGNER:

16   Council Member, please. I guess there are proper

17   procedures if you have grievances or challenges with

18   the rules. I don't know where you take them. But

19   right now I'm informed, and I'm as passionate about

20   this as you are, I share your strong feelings on

21   this matter.

22                    COUNCIL MEMBER ELDRIDGE: I'm glad.

23                    ACTING PUBLIC ADVOCATE SPIGNER: But

24   I'm informed that it requires 26 votes to pass a

25   measure in this body, regardless of whether we only

```
 1   STATED COUNCIL MEETING

 2   have 26, right now we have a membership of 49, we

 3   started out with 26 --

 4               COUNCIL MEMBER ELDRIDGE: Mr. Acting

 5   Chairman, there were 26 votes --

 6               COUNCIL MEMBER MARSHALL: Who had the

 7   26 votes?

 8               COUNCIL MEMBER ELDRIDGE: -- Who voted

 9   no.

10               ACTING PUBLIC ADVOCATE SPIGNER: Yes,

11   and --

12               COUNCIL MEMBER MARSHALL: Nobody here

13   has 26 votes on this.

14               ACTING PUBLIC ADVOCATE SPIGNER: Okay,

15   Council member, we needed 26 votes to file. Now, I'm

16   told that the process --

17               COUNCIL MEMBER MARSHALL: But you only

18   had ten to file.

19               ACTING PUBLIC ADVOCATE SPIGNER: No,

20   no. We had ten --

21               COUNCIL MEMBER MARSHALL: Twenty-three

22   to file.

23               ACTING PUBLIC ADVOCATE SPIGNER: We

24   had ten in opposition. I mean -- what am I saying?

25   Twenty-three to file, ten not to file. Clearly, the
```

1  STATED COUNCIL MEETING

2  majority is clear. The sentiment of this body is

3  clear, but the rules say, the rules state that we

4  need 26 votes. Now, if there is someone in the room

5  that can tell me different, I hope there is, then

6  this motion is defeated.

7              COUNCIL MEMBER ELDRIDGE: But people

8  who were trying to vote and exercise our opinions

9  asked expert advice on this floor and were told that

10 we had to vote no. It was only when someone, because

11 they're especially smart, realized that we also had

12 to vote no -- we had to vote yes to file it.

13             ACTING PUBLIC ADVOCATE SPIGNER:

14 That's right.

15             COUNCIL MEMBER ELDRIDGE: We were not

16 given the proper advice at the time that we tried to

17 define it.

18             ACTING PUBLIC ADVOCATE SPIGNER:

19 Council member --

20             COUNCIL MEMBER ELDRIDGE: And if

21 anyone can interpret this as following the will of

22 this body, then they are really magicians, and this

23 is a time in the world when everything is bright and

24 rosy, next year we'll have a surplus in the budget.

25             ACTING PUBLIC ADVOCATE SPIGNER: Yes,

1   STATED COUNCIL MEETING

2   thank you. And some of us share --

3              COUNCIL MEMBER MARSHALL: Mr. Deputy

4   Speaker, may I please address this?

5              ACTING PUBLIC ADVOCATE SPIGNER: Yes,

6   Council Member Marshall.

7              COUNCIL MEMBER MARSHALL: The will of

8   this body was stated in opposition to this

9   nomination.

10             ACTING PUBLIC ADVOCATE SPIGNER: Very

11  clearly.

12             COUNCIL MEMBER MARSHALL: If there was

13  going to be a change, and if there was going to be a

14  rule that was pulled out, in all fairness, we should

15  have been told about that, because many people left

16  this room, I know many of them were told to leave

17  the room, but on the other hand, there were many

18  people who left this room thinking that the vote was

19  in, and I think that that's totally unfair. It might

20  be correct by the rules, but it's appearance is not.

21             ACTING PUBLIC ADVOCATE SPIGNER:

22  Council Member, I totally agree with you. It's not

23  one of our finer hours, and I think the people of

24  the City of New York will find ways of expressing

25  their dissatisfaction. But right now I'm informed by

1  STATED COUNCIL MEETING

2  Counsel, who is also our parliamentarian who is

3  supposed to be an expert on the rules, so I defer to

4  him, as unhappy as I am about this outcome.

5            Council Member DiBrienza, you were

6  out of the room, sir.

7            COUNCIL MEMBER DiBRIENZA: I was out

8  of the room. So, if it helps, if I can vote, I will

9  vote to file.

10            ACTING PUBLIC ADVOCATE SPIGNER: Hold

11  it now, just a moment.

12            On other occasions we have extended

13  without objections to members who were absent from

14  the room at the time a roll call was taken the right

15  to vote. So, I will ask, Council Member DiBrienza

16  wants to be recorded, are there any objections?

17            Are there any objections to Council

18  Member DiBrienza voting?

19            All right, then please call Council

20  Member DiBrienza's name for a vote.

21            COUNCIL CLERK: DiBrienza.

22            COUNCIL MEMBER DiBRIENZA: Yes, may I

23  be excused to explain my vote?

24            ACTING PUBLIC ADVOCATE SPIGNER: Sure.

25            COUNCIL MEMBER DiBRIENZA: Just for a

1 STATED COUNCIL MEETING

2 second, it's important. For absolutely none, for

3 absolutely none of the reasons stated with regard to

4 ethnicity, race or other extraneous characteristics,

5 it seems to me that the only reason one might say

6 start all over and let this well-qualified nominee

7 have her day fairly, it's because a new Mayor should

8 make these appointments.

9                 With that on the record, I vote to

10 file.

11                 ACTING PUBLIC ADVOCATE SPIGNER: All

12 right. So, the vote is changed by one. It's still

13 short.

14                 Council Member McCaffrey.

15                 COUNCIL MEMBER McCAFFREY: I now ask

16 for orders of the day.

17                 ACTING PUBLIC ADVOCATE SPIGNER: I

18 can't hear you.

19                 COUNCIL MEMBER McCAFFREY: I ask for

20 orders of the day.

21                 ACTING PUBLIC ADVOCATE SPIGNER: All

22 right, I think we spent enough time on this. Clearly

23 there is grave dissatisfaction. So, unless you have

24 some other maneuver by which we can circumvent --

25                 COUNCIL MEMBER ELDRIDGE: I have a

1   STATED COUNCIL MEETING

2   point of information. Has anybody asked downstairs

3   if there are any members still downstairs? Can the

4   Sergeant-At-Arms do that?

5                    ACTING PUBLIC ADVOCATE SPIGNER:

6   Council Member Eldridge, members have a

7   responsibility to be here in this room from the

8   beginning of the meeting until the end of the

9   meeting, and we've extended an extraordinary right

10  to Councilman DiBrienza by unanimous consent, and I

11  don't think we are obligated to go searching for

12  members. We've done that, too.

13                   COUNCIL MEMBER ELDRIDGE: Well, I

14  would think that if I was in the leadership of this

15  Council I would be obligated to search for people.

16                   ACTING PUBLIC ADVOCATE SPIGNER: All

17  right, let's read on. Introduction and Reading of

18  Bills, please.

19                   Introduction and Reading of Bills.

20                   SPEAKER VALLONE: At this time I ask

21  that the bills be referred to the committees as

22  indicated, with the exception of those that are on

23  for immediate consideration.

24                   There are none for immediate

25  consideration, so that the Council can discuss

1    STATED COUNCIL MEETING

2    anything it wants, and lunch is waiting across the

3    hall.

4                    ACTING PUBLIC ADVOCATE SPIGNER:

5    Council Member Sabini asked to be recognized. Is he

6    in the room? Council Member Sabini?

7                    All right, Council Member Clarke.

8                    COUNCIL MEMBER CLARKE: I just want to

9    draw to the attention of my colleagues that on the

10   8th there will be a hearing on the Subcommittee of

11   Mental Health to look at the mental health needs

12   following the World Trade Disaster, and would like

13   to invite my colleagues to attend, since we want to

14   get both the federal, state and City coordination as

15   to where resources are needed and how to get the

16   resources to those communities that are hurting the

17   most.

18                   Thank you, my colleagues, and I hope

19   to see you on the eighth.

20                   SPEAKER VALLONE: Members of the

21   Contracts Committee, the Contracts Committee meeting

22   tomorrow has been deferred, members of the Contracts

23   Committee.

24                   ACTING PUBLIC ADVOCATE SPIGNER:

25   Council Member Watkins.

1    STATED COUNCIL MEETING

2                COUNCIL MEMBER WATKINS: Thank you,

3    Mr. President Pro-Tem. I'm sorry that Council Member

4    Ognibene is not here.

5                I listened to his reading of the roll

6    call of the distinguished hail and hardy who are

7    going to last into the next administration. He

8    started by saying that he understood the concerns of

9    many of his colleagues. Obviously he does not.

10               I want to say to some of my

11   colleagues, playing by the rules is what we're

12   supposed to do, and I hope, for those of you who

13   look into the mirror when you brush your teeth or

14   shave tomorrow morning, I hope you are able to feel

15   in good conscience that ten years down the line when

16   your children and grandchildren sit in this body,

17   and the body has a majority of people who don't look

18   like you, that the rules that that majority will use

19   are rules that are inclusive and rules that do not

20   seek to penalize, exclude and make the rules take

21   those people who have not achieved parity feel

22   denied.

23               Do not rest comfortably thinking that

24   you are protected by fancy use of rules. All of us

25   have learned the rules, and we have looked back in

1  STATED COUNCIL MEETING

2  history and understood that those rules that have

3  been used for generations, and in some cases

4  centuries to deny us, to prohibit us, to exclude us,

5  are rules that we are learning how to use for our

6  protection of benefit and our growth.

7           I hope and pray that those of us who

8  look like me and who look like Margarita Lopez and

9  Adolpho Carrion will use the power of the rules in a

10  more compassionate, a more inclusive, and a more

11  united manner.

12           Look in the mirror tomorrow morning,

13  because I grant you I promise you, your time will

14  come.

15           ACTING PUBLIC ADVOCATE FOSTER:

16  Council Member Robinson.

17           COUNCIL MEMBER ROBINSON: Thank you

18  very much.

19           I rise to speak to the issue and to

20  address to my colleagues, I think that we must be

21  very vigilant during these times while there is

22  attention to the tragic circumstances that occurred

23  at the World Trade Center and the community that

24  surrounds it, we must be very vigilant about the

25  programs and services that we put into place during

1   STATED COUNCIL MEETING

2   the budget process.

3                   Many of those programs and services

4   are falling apart because the agencies that we put

5   money in for our programs, our youth programs, our

6   health services, they are being asked to take a

7   substantial cut. What does that mean? That means

8   cuts in library services, that means cuts in health

9   services, it means cuts in programs that we hold

10  very dear and very valuable.

11                  In addition to that what I want to

12  say is that, while we are resourceful around

13  ensuring that the uniformed forces are taken care of

14  and their families, there are people throughout the

15  City of New York that, too, have suffered, and we

16  must make sure that we take care of all of the

17  people who have been victimized by this World Trade

18  Center tragedy.

19                  Thank you.

20                  ACTING PUBLIC ADVOCATE FOSTER: Thank

21  you.

22                  Council Member Freed.

23                  Council Member Oddo.

24                  COUNCIL MEMBER ODDO: Thank you, sir.

25                  If the people of the 50th District

1  STATED COUNCIL MEETING

2  are so generous, I'll be one of the Council members

3  that will be returning for the new Council, and I

4  have received various correspondence from people

5  that would like to be the next Speaker, and many of

6  them have written about rule changes that they want

7  to see happen in this body.

8           I've been in this body for three

9  years as a Councilperson and seven years before that

10 as a staff member, and for ten years I've heard

11 Speaker Vallone and his staff implore the members to

12 stay from the beginning of the session to the end,

13 and, unfortunately for ten years there have been

14 some of you who have stayed, and many of your

15 colleagues who have left. In fact, many of the

16 people who are the leading advocates for rules

17 changes in this body are the very same people who

18 are not here to cast the votes that many of you

19 wanted.

20          So, I say to the would be powers that

21 be, to all the Speaker wanna-bees, you want to make

22 rules changes that matter? Make sure that every

23 member of this body stays from the beginning to the

24 end. And I'll say this, many, many times, even prior

25 to being elected, the Minority Caucus, the

1  STATED COUNCIL MEETING

2  Republicans, have been the people who have stayed

3  from beginning to end. You had 26 votes. You should

4  have had 26 votes in the filing, and you didn't

5  because a lot of your colleagues left, and they've

6  been leaving since the first day they got to this

7  body, and that really is a shame of today, and

8  that's been the shame of 1999 and 1998 and 1997.

9            So, if you want to point blame at

10  people, point blame at the people who voted with you

11  and left. And I don't want to hear about medical

12  emergencies. Some of our colleagues have more

13  medical emergencies than Staten Island University

14  North. It's a disgrace.

15            So, if you want to point fingers and

16  put blame, you know, those folks left, you had 26 at

17  one point, and it's a joke. So, I say to all the

18  Speaker wanna-bees, you want to make rules changes?

19  Make sure that your members stay here from beginning

20  to end.

21            ACTING PUBLIC ADVOCATE SPIGNER: Well,

22  you also should note, Councilman, that some members

23  did stay and they changed their votes from an

24  affirmative vote to an abstention which was equally

25  destructive to the process.

1   STATED COUNCIL MEETING

2                    Council Member Eldridge.

3                    COUNCIL MEMBER ELDRIDGE: I'd like to

4   say that I believe also that people should stay

5   through the whole meeting. But let me just add that

6   that really was not the reason that we lost on the

7   second count. There are several reasons we lost. One

8   is that it was not the rules of the Council, but it

9   was Robert's rules. Robert's rules I think; is that

10  right? I'd like a clarification from the Chair. In

11  the absence of a rule from the Council rules, is it

12  then Robert's rules that prevails? And does this

13  enable us to now introduce a motion to disapprove?

14                   ACTING PUBLIC ADVOCATE SPIGNER: Well,

15  if our rules are silent on an issue, yes, Robert's

16  rules do prevail. That's my understanding of

17  parliamentary procedure. If there are no provisions

18  in our rules for a situation --

19                   COUNCIL MEMBER ELDRIDGE: Right.

20                   ACTING PUBLIC ADVOCATE SPIGNER: So,

21  if you want to cite a situation in our rules --

22                   COUNCIL MEMBER ELDRIDGE: But I'm

23  asking if Robert's rules provides the opportunity

24  for us now to introduce another motion to

25  disapprove? I'm just asking, I'd like to know.

1  STATED COUNCIL MEETING

2                    ACTING PUBLIC ADVOCATE SPIGNER: Well,

3  there was a motion to file, which was not approved.

4                    COUNCIL MEMBER ELDRIDGE: Let me just

5  say --

6                    ACTING PUBLIC ADVOCATE SPIGNER: So,

7  if the motion to file was not approved that means,

8  as I understand it, that we are still bound by the

9  vote that was taken on the issue on the general

10  order calendar, which was to defeat it.

11                    COUNCIL MEMBER ELDRIDGE: Right.

12                    ACTING PUBLIC ADVOCATE SPIGNER:

13  However, I'm told, too, that you had to make a

14  motion to file in order to, and that, to me, is very

15  cloudy, and as a member of this body I'm not happy

16  with that, but it seems that I'm informed by my

17  Council here, who is the parliamentarian, that if

18  the filed vote is not successful, then somehow or

19  another a defeated motion still has life and this

20  woman is appointed. I don't understand that either.

21                    COUNCIL MEMBER ELDRIDGE: Thank you

22  for your explanation. I'll accept it if I don't

23  understand it. But I would like, although --

24                    ACTING PUBLIC ADVOCATE SPIGNER: Watch

25  your wallet in this room, you know --

1  STATED COUNCIL MEETING

2                COUNCIL MEMBER ELDRIDGE: While I

3  agree with Council Member Oddo, that people should

4  stay through the whole meeting, am I correct in

5  saying that we had 26 votes against the nomination

6  --

7                ACTING PUBLIC ADVOCATE SPIGNER: Yes,

8  you did. You had 26 votes --

9                COUNCIL MEMBER ELDRIDGE: And 23 votes

10  to file?

11                ACTING PUBLIC ADVOCATE SPIGNER: Yes,

12  correct.

13                COUNCIL MEMBER ELDRIDGE: So, we were

14  missing three people. But let me just note, and I

15  think I'm not incorrect and maybe the Speaker wants

16  to argue with me --

17                COUNCIL MEMBER PERKINS: I believe the

18  number is 24 not 23.

19                COUNCIL MEMBER ELDRIDGE: Twenty-four.

20                ACTING PUBLIC ADVOCATE SPIGNER:

21  Twenty-four, because Mr. DiBrienza. And your time is

22  going to expire.

23                COUNCIL MEMBER ELDRIDGE: We're

24  missing two people.

25                SPEAKER VALLONE: A point of

1    STATED COUNCIL MEETING

2    privilege.

3                    I don't want to argue with you.

4                    COUNCIL MEMBER ELDRIDGE: Pardon me?

5                    SPEAKER VALLONE: I don't want to

6    argue with you.

7                    COUNCIL MEMBER ELDRIDGE: I know you

8    don't want to argue with me, but I'm going to argue

9    with you because I think that part of what's

10   happened today is a very interesting lesson for the

11   new Council to understand and for the public to

12   understand, that when people vote, and the

13   leadership has one point of view, and there is a

14   question that is particularly sensitive to the

15   constituencies, members are said, are told, it's

16   fine to vote this way the first time, but on the

17   second round, then you vote the other way. Or let's

18   be cute and just abstain, which usually is an

19   inability to express one's true view.

20                   ACTING PUBLIC ADVOCATE SPIGNER: Your

21   time has expired, Council Member.

22                   COUNCIL MEMBER ELDRIDGE: It's a

23   political interpretation, but Mr. Acting, whatever

24   you are --

25                   ACTING PUBLIC ADVOCATE SPIGNER:

1   STATED COUNCIL MEETING

2   President Pro-Tem. President Pro-Tem.

3                    COUNCIL MEMBER ELDRIDGE: Mr.

4   President Pro-Tem, it is an important interpretation

5   because the will of this body has been thwarted.

6                    ACTING PUBLIC ADVOCATE SPIGNER: Yes,

7   it has. I totally agree with you.

8                    COUNCIL MEMBER ELDRIDGE: Thank you.

9                    ACTING PUBLIC ADVOCATE SPIGNER: Okay,

10  Council Member Marshall.

11                   COUNCIL MEMBER MARSHALL: Yes,

12  briefly.

13                   Two of the people who voted --

14                   ACTING PUBLIC ADVOCATE SPIGNER: If

15  you want to leave, please feel free to leave, but

16  close the door.

17                   COUNCIL MEMBER MARSHALL: Two of the

18  people who voted against this nomination were in

19  this room, and when they came back in they changed

20  their vote. Something happened between them being in

21  this room, leaving the room and coming back.

22                   ACTING PUBLIC ADVOCATE SPIGNER: Yes,

23  no doubt about that.

24                   Council Member Lopez.

25                   COUNCIL MEMBER LOPEZ: This is in

1   STATED COUNCIL MEETING

2   response to Councilman Oddo.

3                    I always stay until the end, okay?

4   But the votes were in the room and they were

5   changed.

6                    ACTING PUBLIC ADVOCATE SPIGNER:

7   Council Member Lopez.

8                    COUNCIL MEMBER LOPEZ: Yes, I believe

9   that the issuing question in this house today is not

10  about who leaves and who stays, it's about that this

11  issue, the way that it was done is wrong. It's about

12  a tower, a second tower that was torn down, and that

13  Manhattan is going to go through an incredible

14  redevelopment process, and the naming of a new

15  person in the City Commission is wrong in this

16  matter.

17                   It's about taking advantage of the

18  disorganization that is happening right now in

19  government, and that is wrong. It's about a Mayor

20  who is leaving now because his term is over, and

21  he's trying to put people in place to maintain his

22  leadership and exercise power when he is gone, over

23  the will of the people who have decided that he has

24  to go. That's what this issue is about. It's wrong

25  what happened here today.

1 STATED COUNCIL MEETING

2 This nomination never should have

3 happened, only because the manner and the way it was

4 done. It doesn't have nothing to do with ethnicity,

5 it doesn't have anything to do with gender, again,

6 it is wrong because it is ethically inappropriate to

7 do this at the minute that it's done and in the

8 manner that it's done.

9 ACTING PUBLIC ADVOCATE SPIGNER: The

10 last speaker is Council Member Warden.

11 Council Member Warden.

12 COUNCIL MEMBER WARDEN: I rise to

13 change the subject a little bit, a very important

14 subject, which is education and the cuts.

15 We have been notified that we are

16 going to be taking across the board cuts of 15

17 percent, with the exception of the educational

18 institutions of the schools, which are going to

19 require a two percent cut.

20 However, the City University has been

21 notified that they are being treated as an agency

22 and not an educational institution, which is beyond

23 the realm of credulity, and they are being hit by a

24 15 percent cut.

25 Since they are at almost the point at

1  STATED COUNCIL MEETING

2  the end of their semester, and have to go into the

3  new semester with a 15 percent cut, it's going to

4  actually equal approximately a 25 percent cut in

5  their budget.

6           What we need to explore is how is the

7  Board of Education considered to be an educational

8  institution and the Board of Higher Education

9  considered to be an agency? I think there is an

10 injustice here and before we do any modifications I

11 think this injustice must be addressed.

12          Thank you very much.

13          ACTING PUBLIC ADVOCATE SPIGNER:

14 Council Member Marshall, you have spoken again and

15 again.

16          COUNCIL MEMBER MARSHALL: Yes, and I'm

17 speaking now as Chair of the Higher Education

18 Committee. We held a hearing on the effects of the

19 Ground Zero on our City University, and as many of

20 you know, the Borough of Manhattan Community College

21 is right within range of the World Trade Center.

22          Finamin Hall, which cost $6 million

23 to retrofit, was just about destroyed.  Boxes with

24 computers that hadn't been opened were destroyed.

25 The City of New York has been negligent in its

1  STATED COUNCIL MEETING

2  responsibility to our community colleges. The City

3  of New York is only responsible for the budget of

4  the community colleges.

5              We do not live up to our

6  responsibility. The State lives up to their

7  responsibility, the City, the students are absorbing

8  41 percent of the bottom line, the State is

9  absorbing their 30 some odd percent. The City of New

10 York is only in the 20 percentile, 21 or 22 percent

11 of their responsibility. It seems unreasonable and

12 unreal that we should be cutting the City University

13 by 15 percent, because we also are going to lose

14 state matching funds, and it's going to amount to a

15 lot more than the 15 percent for our community

16 colleges, which is the City of New York's only real

17 responsibility to the City University.

18             I implore you, I mean we have no way

19 of really right now replacing Finamin Hall, and for

20 a 15 percent cut, it's unreal for the City

21 University, and I really urge that before we move on

22 any budget modifications, that we really need to

23 reconsider the plight of the City University.

24             ACTING PUBLIC ADVOCATE SPIGNER: Mr.

25 Foster. Council Member Foster.

1   STATED COUNCIL MEETING

2           COUNCIL MEMBER FOSTER: I believe you

3   stated with reference to the vote awhile ago this is

4   not our finest hour --

5           COUNCIL MEMBER MARSHALL: We can't

6   hear you, Councilman.

7           COUNCIL MEMBER FOSTER: The Speaker

8   said, the Acting Public Advocate said, this is not

9   our finest hour in this chamber, I think it's one of

10   our most disgraceful hours, period.

11           Thank you.

12           ACTING PUBLIC ADVOCATE SPIGNER:

13   Council Member Pinkett.

14           COUNCIL MEMBER PINKETT: May I speak

15   on an issue of a vote that was taken, I had to step

16   out for a moment?

17           ACTING PUBLIC ADVOCATE SPIGNER: By

18   all means.

19           COUNCIL MEMBER PINKETT: But I wanted

20   to be registered as voting on a very important

21   issue, the issue of filing. And I could not let this

22   pass without voting to file, I think that's very,

23   very important, and I wanted to be registered as

24   voting with those who voted to file.

25           ACTING PUBLIC ADVOCATE SPIGNER: Thank

1    STATED COUNCIL MEETING

2    you.

3                    COUNCIL MEMBER PINKETT: Thank you.

4                    ACTING PUBLIC ADVOCATE SPIGNER: There

5    being no other --

6                    COUNCIL MEMBER PINKETT: What is the

7    vote so far, sir?

8                    ACTING PUBLIC ADVOCATE SPIGNER: That

9    makes it about 25. We're still --

10                   COUNCIL MEMBER PERKINS: Mr. President

11   Pro-Tem?

12                   ACTING PUBLIC ADVOCATE SPIGNER: Yes.

13                   COUNCIL MEMBER PERKINS: May I

14   understand something?

15                   ACTING PUBLIC ADVOCATE SPIGNER:

16   Council Member Perkins.

17                   COUNCIL MEMBER PERKINS: At this

18   point, just understand where this is heading. The

19   matter now has 25 votes, am I correct?

20                   SPEAKER VALLONE: Council Member

21   Pinkett voted already.

22                   COUNCIL MEMBER PERKINS: Excuse me,

23   Mr. Speaker?

24                   ACTING PUBLIC ADVOCATE SPIGNER: I am

25   informed by our clerk that Council Member Pinkett

1   STATED COUNCIL MEETING

2   has voted.

3                    COUNCIL MEMBER PERKINS: Okay. Does

4   that make it number 26 or 25?

5                    ACTING PUBLIC ADVOCATE SPIGNER: She

6   voted.

7                    COUNCIL MEMBER PERKINS: I can't

8   understand --

9                    ACTING PUBLIC ADVOCATE SPIGNER:

10  Council Member Pinkett voted to file.

11                   COUNCIL MEMBER PERKINS: So are we at

12  26 now?

13                   COUNCIL MEMBER PERKINS: Not yet.

14                   ACTING PUBLIC ADVOCATE SPIGNER:

15  Twenty-four.

16                   COUNCIL MEMBER PERKINS: We're at 25.

17                   ACTING PUBLIC ADVOCATE SPIGNER:

18  Twenty-four.

19                   COUNCIL MEMBER PERKINS: Twenty-four?

20                   ACTING PUBLIC ADVOCATE SPIGNER: Yes.

21                   COUNCIL MEMBER PERKINS: You announced

22  it was 24 with Steve DiBrienza, Mr. President

23  Pro-Tem.

24                   Mr. President Pro-Tem, I don't mean

25  to --

JNR-001029

1 STATED COUNCIL MEETING

2                 ACTING PUBLIC ADVOCATE SPIGNER: Yes,

3 Council member.

4                 COUNCIL MEMBER PERKINS: When Council

5 Member DiBrienza was allowed to vote, you announced

6 that that made 24.

7                 ACTING PUBLIC ADVOCATE SPIGNER:

8 That's correct.

9                 COUNCIL MEMBER PERKINS: And, so, now

10 that Councilwoman Pinkett has voted, that should

11 make it 25.

12                 ACTING PUBLIC ADVOCATE SPIGNER: The

13 tell me, I'm told by the clerks, that Council Member

14 Pinkett has already been recorded as voting to file

15 on the original roll call on that issue.

16                 COUNCIL MEMBER PERKINS: So, now, let

17 me be clear about this. That makes it 24 again?

18                 ACTING PUBLIC ADVOCATE SPIGNER:

19 That's correct.

20                 Council Member Pinkett has voted once

21 and we're not going to let her vote twice.

22                 COUNCIL MEMBER PINKETT: Excuse me.

23 What had happened was, there was a misunderstanding

24 in thinking that there was another issue that you

25 were debating when I came through, and it was

1   STATED COUNCIL MEETING

2   thought that I had not voted on that --

3                   ACTING PUBLIC ADVOCATE SPIGNER: You

4   voted to file.

5                   COUNCIL MEMBER PINKETT: I did vote on

6   whether to file in order. So, I am registered --

7                   ACTING PUBLIC ADVOCATE SPIGNER:

8   Appropriately.

9                   COUNCIL MEMBER PERKINS: So, when they

10  called your name before, what did you do?

11                  ACTING PUBLIC ADVOCATE SPIGNER:

12  Council Member Perkins, thank you.

13                  COUNCIL MEMBER PINKETT: To file.

14                  COUNCIL MEMBER PERKINS: Oh, I see.

15  Because I wasn't sure. I appreciate it. Thank you

16  very much.

17                  ACTING PUBLIC ADVOCATE SPIGNER:

18  Council Member Speaker, the last speaker. You are

19  sure now? Council Member Linares, please.

20                  Council Member Linares.

21                  COUNCIL MEMBER LINARES: Yes. I want

22  to first register formally here before this body

23  that on this particular resolution and item, there

24  was a majority of this Council that expressed itself

25  in terms of this appointment. It's 26, and I think

1 STATED COUNCIL MEETING

2 that basically lays the ground for what this body's

3 intention was, how the rules may be interpreted, in

4 terms of what happened after that rejection I think

5 is a separate matter, but as far as the working of

6 the majority dictating a decision, that was

7 registered today, and I think it was registered with

8 a number 26, which is a majority rejecting a

9 nomination. That's what must stand. And I believe

10 that if people want to play with that, then maybe we

11 need to go to another dimension for appropriate

12 interpretation of what a majority rejection of a

13 nomination is. And I want to make that part of the

14 record, because when those of us were here and voted

15 on the general calendar, with that nomination, we

16 basically expressed what the sense was of this body,

17 which is what dictates the actions that follow, and

18 I think that that's the point that I want to make.

19 We could spend a lot of time in terms of what the

20 rule says and what interpretation it may have, what

21 counts is that 26 members of this body said no to

22 that nomination, and that should hold pretty firm in

23 a court of law.

24            ACTING PUBLIC ADVOCATE SPIGNER: Well,

25 Council member, any dimension, you feel free to take

1  STATED COUNCIL MEETING

2  it to. I am sure you will find members of this body

3  who agree with you.

4                    COUNCIL MEMBER LINARES: The majority

5  of 26 in this body.

6                    ACTING PUBLIC ADVOCATE SPIGNER: Okay,

7  there being no other requests to speak, I just want

8  to acknowledge --

9                    SPEAKER VALLONE: I think Council

10 Member Clarke --

11                   COUNCIL MEMBER CLARKE: I just rise to

12 confirm what Council Member Linares just said.

13                   I think that the maneuvering to

14 thwart the desire of 26 members of this body, I

15 think it is pretty obvious that the fix went in, as

16 what it is, that people tried to thwart the desire

17 of the majority of this City Council, and that we

18 need to make sure that it stays on the record that

19 we do not like this candidate, that we think that it

20 in many ways, at a time when we are pushing for

21 unity in the City and all of New York City residents

22 who are qualified for positions should be placed in

23 those positions. To take an Asian American out of

24 office to put somebody else in I think is both

25 uncalled for and unnecessary and it sends the wrong

1  STATED COUNCIL MEETING

2  message at a time when everybody is trying to pull

3  together in our City.

4  ACTING PUBLIC ADVOCATE SPIGNER: Thank

5  you, Council Member.

6  I just wanted to, before we adjourn

7  to recognize, Mr. Speaker, and acknowledge for the

8  first time in his new capacity, the new City Clerk

9  Victor Robles, the Honorable Victor Robles. Give him

10  a hand.

11  Mr. Speaker, if there is no other

12  business at this time?

13  SPEAKER VALLONE: No, I ask that we

14  adjourn.

15  ACTING PUBLIC ADVOCATE SPIGNER: This

16  meeting is adjourned.

17  (Hearing concluded at 2:45 p.m.)

18

19

20

21

22

23

24

25

1

2                        <u>CERTIFICATION</u>

3

4

5      STATE OF NEW YORK     )

6      COUNTY OF NEW YORK    )

7

8

9                    I, <u>CINDY MILLELOT</u>, a Certified

10   Shorthand Reporter and Notary Public in and for the

11   State of New York, do hereby certify that the

12   foregoing is a true and accurate transcript of the

13   within proceeding.

14                    I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage, and that I am in no way

17   interested in the outcome of this matter.

18                    IN WITNESS WHEREOF, I have hereunto

19   set my hand this 31st day of October 2001.

20

21

22

23

24              _Cindy Millelot CSR_

25                    CINDY MILLELOT, CSR.

JNR-001035

267

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------ x

TEN'S CABARET, INC., f/k/a Stringfellow's of New
York, Ltd.,

                                        Plaintiff,

            -against-                                    **AFFIDAVIT OF**
                                                         **DAVID KARNOVSKY**
THE CITY OF NEW YORK, MAYOR MICHAEL
BLOOMBERG, as MAYOR OF THE CITY OF NEW           Index No. 121197/02
YORK, and PATRICIA LANCASTER, as
COMMISSIONER OF THE DEPARTMENT OF
BUILDINGS OF THE CITY OF NEW YORK,

                                        Defendants.

------------------------------------------------------------------ x

STATE OF NEW YORK      )
                       ) .ss.:
COUNTY OF NEW YORK     )

        **DAVID KARNOVSKY,** being duly sworn, deposes and says:

        1.  I am Counsel to the Department of City Planning ("DCP"), the city agency

which provides staff assistance to the New York City Planning Commission ("Planning

Commission"). The Planning Commission is generally charged with planning for the orderly

growth, development and improvement of the City of New York ("the City"); its specific

responsibilities include evaluating and giving preliminary approval to amendments of the New

York City Zoning Resolution ("Zoning Resolution" or "Z.R."). See, New York City Charter

("Charter"), Chapter 8, §§ 191, et seq. I make this affidavit in opposition to plaintiff's motion

for a preliminary injunction and in support of defendants' cross-motion for summary judgment

declaring to be valid and enforceable an amendment to the Zoning Resolution which modified

1033

268

the definitions of "adult establishment" and "adult eating or drinking establishment" so as to clarify their application to plaintiff and others similarly situated.

2. In 1995, the City amended its Zoning Resolution to include use regulations governing establishments that deal principally in sexually oriented adult entertainment ("the 1995 Adult Use Regulations" or "the 1995 regulations"). These regulations governed the location of commercial establishments with a predominant, on-going focus on sexually explicit materials or activities, including adult or "triple X" book and video stores (referred to in the zoning text as "adult book stores"); topless bars and strip clubs (referred to in the text as "adult eating or drinking establishments"), and theaters regularly offering X-rated movies or topless or nude entertainment (referred to in the text as "adult theaters").

3. By way of amendments to the Zoning Resolution adopted by the Planning Commission on August 8, 2001 and finally approved by the New York City Council ("Council") on October 31, 2001 ("the 2001 Adult Use Amendments" or "the 2001 amendments"), the 1995 Adult Use Regulations were amended to modify the definitions of "adult establishment," "adult book store" and "adult eating or drinking establishment" to close certain loopholes utilized by the adult entertainment industry to evade enforcement, and thus more accurately and completely express the legislative intent behind the 1995 regulations.

4. The plaintiff in this action, Ten's Cabaret, Inc. ("Ten's" or "plaintiff") is the operator of a commercial establishment in Manhattan that regularly features topless entertainment (purportedly in less than 40% of its customer-accessible floor area). Notwithstanding its predominant ongoing focus on adult entertainment, Ten's and other topless bars and strip clubs have continued to operate at locations where adult uses are prohibited, as a result of court decisions which misread the 1995 definitions of "adult establishment" and "adult eating or drinking establishment" so as to exclude them.

2

1034

**269**

5.  The 2001 Adult Use Amendments clarify that the 60%-40% "substantial portion" test is not applicable to adult eating or drinking establishments.  Rather, Ten's and all other restaurants and bars which "regularly feature" adult entertainment are subject to the adult use regulations, no matter the amount of floor area devoted to adult entertainment.  Thus, under the 2001 amendments, Ten's will be required either to discontinue its topless entertainment, or to move to a location where adult uses are permitted, by October 31, 2002.

6.  This affidavit is intended to more fully explain the nature and basis of the 2001 Adult Use Amendments and the necessity for their adoption, matters about which I am fully familiar as counsel to DCP.  The text of the 2001 amendments is included at pp. 50-66 of the report released by the Planning Commission when it approved the amendments ("2001 Report"), a copy of which is submitted as Exhibit A.[1]

**The DCP Study**

7.  In late 1993, in response to concerns expressed about the proliferation of sexually oriented adult establishments in the City, DCP undertook an "Adult Entertainment Study" ("the DCP Study").  A copy of the study, which was completed in September 1994, is submitted as Exhibit B.  The purpose of the DCP Study was to identify the nature and extent of the impact that adult establishments have on surrounding communities and, by so doing, to assist the Planning Commission in determining whether to adopt zoning regulations specifically applicable to adult establishments.

---

[1] The exhibits identified in this affidavit and defendants' other cross-motion papers are submitted under separate cover in a bound volume consisting of Exhibits A-E and G-U.  The 1995 Maps identified as Exhibit F are oversized documents submitted in an envelope.

3

1035

270

8.      At that time, the Zoning Resolution's use regulations did not distinguish between "adult" uses and other commercial uses.  Whether or not they featured adult materials or entertainment, all "book stores" and "eating or drinking establishments" (i.e. restaurants and bars) were classified as "retail or service establishments" and permitted in zoning districts where residential uses were also permitted.  Z.R. §§ 32-00; 32-15.  All "theaters" were classified as "amusement" establishments and likewise permitted in many zoning districts where residential uses are permitted.  Z.R. §§ 32-00, 32-17.[2]

9.      The DCP Study focused on three types of adult establishments with a primary focus on sexually oriented materials or activities:  adult or "triple-X" video and book stores, topless bars and strip clubs, and adult theaters showing films or live entertainment.  The DCP Study included a description of how and where these businesses operated in the City at the time the study was conducted, a review of trends in growth and development of adult uses prior to that time, a survey of adult entertainment studies performed by other communities and adult use zoning regulations adopted in other areas, a review of previous studies and reports on adult establishments in New York City, and DCP's own survey of the impact that isolated adult establishments had on several City communities.

10.      With respect to growth trends, the DCP Study found that the number of adult establishments in New York City had increased substantially between 1965 and 1976 and

---

[2] Under the Zoning Resolution, there are three types of zoning districts:  residential districts, commercial districts, and manufacturing districts.  Generally, residential uses are permitted in residential districts, most commercial districts, and a few manufacturing districts containing loft dwellings.  Z.R. §§ 22-11, 32-11, 42-133.

4

again between 1984 and 1993;[3] that adult uses were generally concentrated within certain neighborhoods (such as Times Square) or along certain major vehicular routes (such as Queens Boulevard or Third Avenue in Brooklyn); and that a large majority of the City's adult establishments were located in zoning districts that permit residential development. DCP Study at 16-24.

11.     The DCP Study also considered the extent to which adult establishments have secondary impacts such as the reduction in the value of surrounding properties and the increase in neighborhood crime. As part of this analysis, DCP examined studies of adult uses previously conducted by nine communities located throughout the country, recognizing that "a municipality may rely on the experiences of other jurisdictions that have determined that adult uses have secondary impacts." DCP Study at iii. In this regard, DCP noted that while "[t]he term 'adult use' is technically defined differently from municipality to municipality," it "generally refers to a commercial establishment that purveys materials or services of a sexual nature." DCP Study at 2.

12.     In its study of adult uses conducted in 1980, the Town of Islip found that adult establishments located in downtown areas tended to create a "dead zone" which shoppers and other pedestrians avoided. Adult businesses located near residential areas were found to cause parking impacts, noise, and excessive night-time activity. DCP Study at 3-4. A 1978 study by the City of Whittier, California found higher turnover rates in commercial and residential areas adjacent to adult uses, numerous reports of excessive noise, drunkenness and

---

[3] In 1965, there were nine adult entertainment establishments in the City. By 1993, that number had increased to 177. Between 1984 and 1993, the number of adult bookstores, peep shows and video stores increased from 29 to 86, and the number of topless bars and strip clubs increased from 54 to 68. DCP Study at 20, 21.

JNR-001040

272

pornographic litter connected with adult businesses, and far higher crime rates in areas containing adult businesses than in the city as a whole. DCP Study at 6. A study conducted in 1986 by the City of Austin, Texas found that the rate of sex-related crimes was substantially higher in areas housing adult businesses than in areas containing similar land uses but no adult businesses. The Austin study included a survey of real estate brokers and appraisers, a large majority of whom believed that the addition of an adult business would produce a decrease in the value of property on the same block as the adult business. DCP Study at 7.[4]

       13.     DCP also looked at several studies of adult uses conducted by larger cities. A 1977 Los Angeles study included a survey of real estate professionals and business persons. Those surveyed believed that a concentration of adult establishments had an adverse impact on the value of surrounding commercial and residential property, made it more difficult to rent office space and retain commercial tenants in the area, and made it harder for area businesses to attract and retain customers. DCP Study at 4. A 1984 study conducted for the City of Indianapolis found higher crime rates in areas containing at least one adult establishment than in similar areas without adult uses. The Indianapolis study also included a nationwide survey of real estate appraisers. A large majority of the appraisers indicated that, in their professional opinions, an adult book store would have a negative effect on the value of both residential and commercial properties located within a one block radius of the store. DCP Study at 5.

_____

[4] DCP also examined studies conducted by Manatee County, Florida and New Hanover County, North Carolina. In considering whether to adopt adult use regulations, these counties relied exclusively on studies of adult uses performed by other municipalities. According to the reports issued by these counties, the studies that were examined identified a number of impacts associated with adult establishments, including increased crime, declining neighborhood conditions, a decrease in the value of residential property in areas with multiple adult establishments, and a decline in neighborhood-oriented businesses. DCP Study at 8-9.

6

JNR-001041

273

14.     In 1979, Phoenix, Arizona conducted a study of adult businesses and arrests for sex-crimes. The study found that the sex-crime arrest rate for several areas containing adult businesses was six times higher than the rate for similar control areas that did not contain adult uses. DCP Study at 7. In a 1989 report, the Minnesota Attorney General reviewed various adult use studies performed within that state, including one conducted in 1980 by Minneapolis and one conducted in 1978 by St. Paul. The Minneapolis study found that the opening of even a single adult establishment within a census tract area resulted in a significant increase in the crime rate for that area. The St. Paul study found lower housing values and higher crime rates in areas with multiple adult businesses in comparison with areas containing no more than one such business. DCP Study at 8.

15.     The DCP Study noted that, as a result of these and other studies, numerous cities and towns have adopted zoning regulations that place restrictions on adult uses including Boston, Phoenix, Detroit, Seattle, Atlanta, Kansas City, Los Angeles, San Diego, Chicago, and the Long Island communities of Islip, Brookhaven, Smithtown, Babylon, and Huntington. The regulations in these municipalities generally are designed either to restrict all adult uses to a designated area, or to prevent adult uses from concentrating. DCP Study at 9-11.

16.     In addition to reviewing studies conducted by other municipalities, the DCP Study also examined several prior studies which had been conducted in New York City. In 1977, the Planning Commission preliminarily approved several zoning amendments concerning adult establishments, but the amendments were not given final approval by the Board of Estimate. In connection with the proposed zoning amendments, the Commission reported that there was substantial evidence that the Times Square area had experienced significant negative impacts as a result of the proliferation of adult uses in the area. For example, during a two-year period in the early 1970's, sales tax revenues in the area declined by 43 percent compared to an

7

274

11 percent increase citywide. Using crime data for 1975 and comparing midtown police posts with one or more adult uses to posts without an adult use, complaints for felonious assault were 142 percent higher, grand larceny complaints were 89 percent higher, and rape complaints were 185 percent higher in the posts with one or more adult uses. DCP Study at 34-35.

17.    In 1983, the Mayor's Office of Midtown Enforcement ("OME") issued an annual report which surveyed recent trends regarding sex-related businesses in the Times Square area. The report noted that in the early and mid-1970's, that area was filled with more than a hundred sex-related businesses and was overrun with prostitutes, pimps, drug addicts, and muggers. Using a variety of law enforcement strategies and with the assistance of crucial legislative changes, OME obtained the closure of almost half of the sex-related businesses in Times Square by 1983. The OME report noted a corresponding drop in arrests for sex-related offenses such as prostitution and an increase in investment and development for the area. DCP Study at 35-36.

18.    In 1993, the Borough President of Manhattan formed a Task Force on the Regulation of Sex-Related Businesses in response to community concerns about increasing concentrations of sex-related businesses in Manhattan. At a public hearing conducted by the Task Force in October 1993, a number of persons testified about the impacts caused by adult uses, such as noise, littering, late night operations, offensive signage, and a perceived decline in street or neighborhood character. DCP Study at 38-39.

19.    Also in 1993, the Chelsea Action Coalition and Manhattan Community Board 4 prepared a study of the effects that sex-related establishments have on other businesses in the Chelsea section of Manhattan. The study included a survey of 100 Chelsea businesses located near one of the triple-x video stores and peep shows that had opened in the neighborhood. A majority of the survey respondents indicated that adult uses had a negative

8

1040

275

impact on their businesses and on the economic viability of the community as a whole.  DCP Study at 37-38.

20.      In April 1994, the Times Square Business Improvement District released a study of adult uses in Times Square.  The study compared two study areas where adult uses have concentrated with several nearby control areas without adult uses.  It found that, between 1986 and 1994, the aggregate assessed value of property in the study areas increased at a lower rate than did the value of property in the control areas.  The study also examined crime statistics and found that criminal complaints were approximately twice as high in the study areas as in the control areas.  DCP Study at 40-41.

21.      As part of its study, DCP also conducted its own survey of street and signage conditions, local organizations and businesses, real estate brokers, and police and sanitation officers, and analyzed criminal complaint and property assessment data to obtain information about the impacts of adult entertainment establishments in six areas in New York City.[5]  The study areas were mostly in the outer boroughs in areas with lesser concentrations of adult uses.  Within each study area, DCP selected a "survey" block front, containing one or more adult establishments, and a "control" block front, which had similar land uses but no adult establishments.  DCP Study at 47.  DCP's survey identified a strong body of opinion that adult entertainment uses were having negative impacts and that a further proliferation of these uses in the community would bring about a decrease in property values and a general economic decline.  DCP Study at vi, 47-51.

_____

[5] For purposes of the survey, DCP defined the term adult establishment as "a commercial use that defines itself as such through exterior signs and other advertisements."  Under this definition, "triple-X or XXX" video stores were included in the survey, while "neighborhood video stores that devote a small area to triple-X videos" were not.  DCP Study at 1.

9

276

22.    On the basis of its own findings and that of other organizations and localities, DCP concluded that adult entertainment establishments, particularly in concentration, produce negative secondary impacts upon the communities in which they are located and that the Zoning Resolution should therefore regulate adult establishments more closely than other commercial uses. Although a specific set of zoning proposals was beyond the scope of the DCP Study, DCP generally recommended that the Planning Commission consider adopting amendments to the Zoning Resolution that would place restrictions on the proximity of adult uses to residential areas, schools, houses of worship, and other adult establishments. DCP Study at 65.

**The Moratorium**

23.    On November 7, 1994, the Planning Commission approved a proposed amendment to the Zoning Resolution which established a one-year moratorium on the operation of new adult establishments (and the extension or enlargement of existing establishments). At that time, the Planning Commission released a report, a copy of which is submitted as Exhibit C, describing the nature of the moratorium regulations and the reasons therefor ("Moratorium Report"). The moratorium regulations received final approval from the Council on November 23, 1994.

24.    Adopted as a preliminary response to the DCP Study, the moratorium regulations sought to contain the proliferation of adult uses in the City while allowing sufficient time for DCP to develop permanent regulations governing such uses (as recommended by the DCP Study), and to allow for public review of the proposed regulations prior to their consideration by the Planning Commission and the Council. Moratorium Report at 1, 29-30. The moratorium was intended to apply only to the three types of adult establishments which were evaluated in the DCP Study and found to have adverse secondary effects: "adult

10

277

book/video stores, topless/nude bars, and adult movie or live theaters." Moratorium Report at 2, 30.

25.   The moratorium regulations applied to any "adult establishment," defined as any "use" which includes an "adult book store," an "adult eating or drinking establishment," or an "adult theater." These latter terms were defined by their customary exclusion of minors, inasmuch as "the New York Penal Code prohibits the sale of adult materials and the presentation of adult entertainment for a fee to minors." Moratorium Report at 30-31, 36-37. In addition, the term "adult eating or drinking establishment" was further defined by its customary presentation of "topless or nude dancers, strippers or similar entertainments." Id. at 36.[6] Modeled after language used by other municipalities, these definitions sought to confine the application of the moratorium to the three types of establishments studied by DCP and "found to produce adverse secondary effects." Id. at 30-31.

**The 1995 Adult Use Regulations**

26.   On March 21, 1995, while the one-year moratorium was in effect, DCP and the Council's Land Use Committee filed a joint application to amend the Zoning Resolution to create a set of permanent regulations governing the types of adult establishments which were the subject of the DCP Study and the moratorium. In accordance with Charter §§ 200 and 201, the proposed regulations were referred to the City's community and borough boards and the borough presidents for review and comment, and the Planning Commission held public hearings on the proposed amendments on July 26 and 27, 1995.

---

[6] Similarly, the term "adult theater" was further defined by its customary presentation of "motion pictures, films, videotapes, slide shows, or live performances featuring topless or nude dancers, strippers or similar entertainments, including an establishment where such entertainment is viewed from an enclosure." Id. at 36-37.

11

1043

278

27.    On September 18, 1995, the Planning Commission approved the proposed adult use regulations, with certain minor modifications.  At that time, the Planning Commission released a report, a copy of which is submitted as Exhibit D, describing the proposed regulations and explaining the planning considerations behind them ("1995 Report").   The proposed regulations were then considered by the Council, in accordance with Charter §§ 197-d and 200. After the conduct of additional public hearings and committee meetings, the Council gave final approval to the adult use regulations on October 25, 1995, at which time they became effective. The text of the 1995 Adult Use Regulations appears in the 1995 Report at 67-77.

28.    The 1995 Adult Use Regulations rescinded the temporary moratorium regulations and replaced them with comprehensive permanent regulations designed to "minimize the potential for adverse secondary effects throughout the city" and to protect those areas and uses "particularly vulnerable to the negative effects of adult use."  1995 Report at 5, 42. Essentially, the 1995 regulations provided that adult establishments are prohibited in residential zoning districts and commercial and manufacturing districts where residential uses are permitted. In addition, the regulations required that any adult establishment be located at least 500 feet from a school or day care center, a house of worship, another adult establishment, or a zoning district where adult uses are prohibited.  1995 Report at 7-8; Z.R. § 32-01, 42-01.

29.    Like the moratorium regulations, the 1995 regulations were intended to cover only those types of establishments which were the focus of the DCP Study.  In that regard, the Planning Commission stated as follows:

> As a general matter, [these zoning regulations] are intend[ed] to [cover] only those establishments similar in nature to the types of enterprises described and studied in the DCP Study, namely book and video stores, theaters, eating or drinking establishments and other commercial enterprises with a predominant, on-going focus on sexually

12

279

> explicit materials or activities.   These are the
> establishments analyzed in the DCP [S]tudy and
> found to have adverse secondary effects and as such
> are the only establishments covered by the adult use
> regulations.

1995 Report at 49 (emphasis added).

    30.    The 1995 regulations defined the term "adult establishment" as a commercial establishment, a "substantial portion" of which is used as an "adult book store," "adult eating or drinking establishment," "adult theater" and/or "other adult commercial establishment." 1995 Report at 67. Although not used in the moratorium definitions, the "substantial portion" language was added to the 1995 definition of "adult establishment" to deal with the possibility of a bona fide mixed-use establishment consisting of both adult and non-adult uses (for example, a commercial establishment consisting of an adult eating or drinking establishment and a non-restaurant use, such as a bowling alley). 2001 Report at 38. However, as will be discussed further below, the inclusion of the "substantial portion" language to address the potential for multi-use establishments resulted in an ambiguity in the text that was seized upon by the operators of single-use eating or drinking establishments and theaters: they argued, over the City's objection, that the "substantial portion" test applied to single-use establishments (i.e., establishments consisting solely of an eating or drinking establishment or a theater) as well as multi-use establishments.

    31.    The 1995 regulations refined the definitions of the terms "adult bookstore," "adult eating or drinking establishment," and "adult theater" previously set forth in the moratorium regulations so as to "specifically detail the[ir] distinguishing characteristics." 1995 Report at 6, 67-68. More specifically, an "adult book store" was defined as "a book store which has as a substantial portion of its stock in trade" printed or visual material that is "characterized by an emphasis upon the depiction or description of 'specified sexual activities or

13

1045

280

specified anatomical areas.'"[7]  An "adult eating or drinking establishment" was defined as an eating or drinking establishment that "regularly features" live performances or films characterized by an emphasis on "specified sexual activities" or "specified anatomical areas" (or employees who, as part of their employment, "regularly expose to patrons 'specified anatomical areas'") and that customarily excludes minors.  1995 Report at 67-68.  Similarly, an "adult theater" was defined as a theater that "regularly features" live performance or films characterized by an emphasis on "specified sexual activities" or "specified anatomical areas" and that customarily excludes minors.  Id. at 68.[8]

32.     As explained in the 1995 Report, the definitional phrase "characterized by an emphasis upon specified sexual activities or specified anatomical areas" was used in the definitions of "adult book store," "adult eating or drinking establishment" and "adult theater" with "the intent of regulating those performances, videos and materials that have a principal focus on sexual activities or anatomy as entertainment," inasmuch as the Adult Use Regulations were "not intended to regulate performances or films displaying incidental nudity."

33.     The phrase "substantial portion" was used in the definition of "adult book store" to indicate that the 1995 regulations were intended to cover book and video stores with a

---

[7] "Specified sexual activities" are "(i) human genitals in a state of sexual stimulation or arousal; (ii) actual or simulated acts of human masturbation, sexual intercourse or sodomy; or (iii) fondling or other erotic touching of human genitals, pubic region, buttock, anus or female breast."  "Specified anatomical areas" are "(i) less than completely and opaquely concealed: (a) human genitals, pubic region, (b) human buttock, anus, or (c) female breast below a point immediately above the top of the areola; or (ii) human male genitals in a discernibly turgid state, even if completely and opaquely concealed."  Id. at 68-69; Z.R. § 12-10, definition of "adult establishment."

[8] An "other adult commercial establishment" was defined as any type of establishment (other than an eating or drinking establishment, bookstore or theater) that "features employees who as Continued...

14

281

predominant, ongoing focus on adult material, and not neighborhood or general interest book and video stores offering only a modest amount of adult material. 1995 Report at 50-51. The 1995 regulations listed three factors to be considered in determining whether a bookstore has a "substantial portion" of its stock in adult materials:  1) the amount of adult stock accessible to customers as compared to the total stock accessible to customers; 2) the amount of accessible floor area devoted to adult stock; and 3) the amount of accessible floor area devoted to adult stock as compared to the total accessible floor area. Id. at 50-51, 69. These factors were thought to be objective indicators of whether a bookstore had a predominant ongoing focus on adult material. Id. at 51.

34.    The "substantial portion" language was not used in the definitions of "adult eating or drinking establishment" or "adult theater." Rather, those adult uses were defined through the use of the phrases "regularly features" and "regularly expose." Those phrase were used to indicate that the 1995 regulations were intended to apply to all restaurants, cabarets and theaters "which offer adult entertainment on a frequent, ongoing basis" and not to "establishments which offer adult entertainment "on an occasional basis, such as a monthly live performance or a nightly midnight showing at a movie theater." 1995 Report at 51-52.

35.    In its 1995 Report, the Planning Commission noted that it would be important to monitor the location of adult establishments under the new regulations to make certain that the legislative goals had been achieved, stating as follows:

> Because of the Commission's concern that the regulations provide effective and comprehensive protection against the adverse secondary effects of

part of their employment, regularly expose to patrons 'specified anatomical areas'" and that customarily excludes minors (such as a topless car wash). 1995 Report at 67-68.

282

adult establishments, it believes that it is important
to monitor the location and operation of adult uses
under the proposed regulations to ensure that the
goal of comprehensive protection is achieved.

1995 Report at 62.  Accordingly, the Planning Commission directed DCP to report back "in two

years time on the effect and enforcement of the adult use regulations." Id.

### Implementation

36.   Immediately after their adoption, the 1995 Adult Use Regulations were

challenged in three lawsuits.[9]  Although not formally consolidated, these lawsuits were decided

by way of a single decision granting the City summary judgment upholding the regulations on

their face under the state constitution.  See, Stringfellow's of New York, Ltd. v. City of New

York, 91 N.Y.2d 382 (1998), aff'g, 241 A.D.2d 360 (1st Dept. 1997), aff'g, 171 Misc.2d 376

(Sup. Ct. N.Y. Co. 1996).  A copy of relevant portions of the joint appendix submitted to the

Appellate Division in Amsterdam Video and Hickerson ("1995 Appendix") is provided as

Exhibit E; a copies of the maps submitted in the City's supplemental appendix to Court of

Appeals in all three cases ("1995 Maps") are provided as Exhibit F.[10]

---

[9] Commenced by Ten's under its prior name, Stringfellow's of New York, Ltd. v. City of New
York, Index No. 113049/96 (Sup. Ct. N.Y. Co), challenged the 1995 regulations under the state
constitution only.  Amsterdam Video, Inc. v. City of New York, Index No. 103568/96 (Sup. Ct.
N.Y. Co.), was commenced by approximately 100 adult establishments and raised federal and
state constitutional claims.  Hickerson v. City of New York, Index No. 103569/96 (Sup. Ct. N.Y.
Co.), was brought by patrons of adult establishments and likewise raised federal and state claims.
After the City removed Amsterdam Video and Hickerson to the United States District Court, the
state constitutional claims were remanded to this court (and the federal claims were held in
abeyance).

[10] Submitted from the 1995 Appendix as Exhibit E are the affidavits of Joseph Rose, William
Bernstein and Andrew S. Lynn, which discuss the number of potential sites and the amount and
character of the land area available for adult use, and DCP's analysis of transit access to those
areas.  Exhibit F includes two sets of 1995 maps:  one set showing the amount of unencumbered
land in each borough available for adult uses in 1995, and the other set showing the accessibility
of those areas by public transportation.

16

283

37.      Applying state constitutional standards, the New York Court of Appeals determined, based on the legislative record which included the DCP Study, that the 1995 regulations were "not an impermissible attempt to regulate the content of expression but rather [were] aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose." 91 N.Y.2d at 399. The Court of Appeals further found that the 1995 regulations "represent[ed] a coherent regulatory scheme designed to attack the problems associated with adult establishments" and were "no broader than necessary" to effectuate that purpose. 91 N.Y.2d at 400.

38.      Finally, the Court held that the 1995 regulations assured reasonable alternative avenues of communication for the plaintiffs, insofar as there was sufficient land area open for use by adult businesses. Id. at 402. Moreover, this available land area was zoned to "permit a wide mix of commercial, retail, entertainment and manufacturing uses" and, in most instances, was "within a 10-minute walk from a subway line or major bus route." Id.

39.      The Amsterdam Video and Hickerson plaintiffs subsequently attempted to pursue their federal claims in the United States District Court. However, their facial First Amendment claims were rejected on collateral estoppel grounds, inasmuch as the issues that were dispositive of these claims had already been decided against them in state court. That decision was affirmed by the United States Court of Appeals for the Second Circuit, and thereafter the United States Supreme Court declined review. See, Hickerson v. City of New York, 146 F.3d 99 (2d Cir. 1998), cert. denied, 525 U.S. 1067 (1999). In addition, the Second Circuit had previously affirmed the grant of summary judgment to the City in a federal action challenging, on First Amendment and equal protection grounds, the differential treatment of male and female toplessness in the 1995 Adult Use Regulations. See, Buzzetti v. City of New York, 140 F.3d 134 (2d Cir. 1998).

17

284

40.     The 1995 regulations were not implemented until late July 1998, when judicial stays of enforcement were lifted. Prior to their implementation, the City's Department of Buildings ("DOB"), the agency responsible for enforcement of the Zoning Resolution [see, New York City Charter § 643], issued several Operation Policy & Procedure Notices ("OPPN's") to provide administrative guidelines regarding the meaning of certain terms and phrases used in the regulations.

41.     OPPN 6/98, a copy of which is submitted as Exhibit G, set forth criteria for determining whether a book or video store has a "substantial portion" of its stock in adult materials and is thus an "adult book store." OPPN 6/98 also addressed the application of the "substantial portion" test to multi-use commercial establishments.

42.     Issued on August 13, 1998, OPPN 6/98 superseded OPPN 4/98 which had been issued three weeks earlier on July 22, 1998. OPPN 4/98 was rescinded because its drafters had misread the text due to the ambiguity in the definition of "adult establishment" discussed above: they mistakenly read the text to require application of the "substantial portion" test to single-use adult eating or drinking establishments and adult theaters.[11] OPPN 6/98 clarified that

---

[11] Previously, in February 1998, the Mayor's Office of Midtown Enforcement (which coordinated inspections of Manhattan adult establishments) had prepared a training manual for anticipated use by inspection personnel. The OME training manual likewise erroneously indicated that the "substantial portion" test applied to single use eating or drinking establishments and theaters. Prior to implementation of the 1995 regulations, the Department of Buildings issued OPPN 4/98 setting forth formal administrative guidelines regarding the application of the substantial portion test, thereby perpetuating the erroneous interpretation reflected in the OME training manual. When OPPN 4/98 was superseded by OPPN 6/98 three weeks later, the portion of the in-house training manual cited by plaintiff was necessarily rendered obsolete. During the myriad inspections conducted subsequent to August 13, 1998, inspection personnel were governed by the administrative guidelines set forth in OPPN 6/98, which indicated that the "substantial portion" test was applicable only to adult bookstores and multi-use establishments with one or more adult uses. See, Exhibit G.

18

285

the "substantial portion" test applied only to adult bookstores and to multi-use commercial establishments "with one or more uses, at least one of which is <u>not</u> a book store, an eating or drinking establishment, a theater or an 'other adult commercial establishment'" (emphasis added).[12]

43.    As to adult bookstores, OPPN 6/98 stated that, for purposes of enforcing the 1995 Adult Use Regulations, a book/video store should be considered an "adult book store" if 1) at least 40 percent of the total accessible stock for sale or rent to customers is comprised of adult materials, 2) at least 40 percent of the total accessible floor area and cellar space contains stock in adult materials, or 3) 10,000 or more square feet is occupied by adult materials. As to multi-use commercial establishments with at least one <u>bona fide</u> non-adult use, OPPN 6/98 stated that such an establishment should be considered an "adult establishment" where it has "at least 40 percent of the floor and cellar area that is accessible to customers available to adult use" or 10,000 or more square feet occupied by an adult use.

44.    The 60%-40% "substantial portion" test set forth in OPPN 6/98 was in keeping with the general guideline set forth by the Planning Commission when approving the 1995 regulations. In that regard, the 1995 Report stated as follows:

> As a general guideline, the Commission believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an "adult

---

[12] Before it was rescinded, OPPN 4/98 was included in papers submitted to the United States District Court in <u>Amsterdam Video</u> to address the plaintiffs' remaining vagueness claim. In their complaint, the <u>Amsterdam</u> plaintiffs had contended that the terms "substantial portion" and "regularly feature" were vague. The plaintiffs withdrew that claim after the City issued OPPN 4/98 and OPPN 5/98, setting forth administrative guidelines as to the meaning of those terms. OPPN 4/98 was clarified and replaced by OPPN 6/98 shortly thereafter.

286

establishment" or an "adult bookstore."  However,
there may be exceptions to this general guideline.

1995 Report at 50.

## Successful Efforts to Evade Enforcement

45.     During the next two years, the City commenced a comprehensive initiative

to enforce the 1995 Adult Use Regulations which included the commencement of civil

enforcement actions against approximately 100 adult establishments operating at prohibited

locations.  These actions were brought pursuant to the City's Nuisance Abatement Law [Admin.

Code §§ 7-701, et seq.], which provides inter alia that any violation of the Zoning Resolution is,

by definition, a pubic nuisance subject to temporary and ultimately permanent closure by court

order.   Admin. Code §§ 7-703(k), 7-706, 7-709.   In most instances, the City was initially

successful in obtaining court orders requiring the closure of these establishments, having

established that they were "adult establishments" as defined in the 1995 regulations.

46. Following these initial closures, however, the adult entertainment industry

responded to the City's enforcement efforts with widespread and ultimately successful attempts

to evade enforcement through sham compliance.  To pass the 60%-40% "substantial portion"

test, numerous triple-X book and video stores sought to increase the percentage of non-adult

stock and floor area without having any reasonable expectation that the non-adult stock would

attract customers.[13]

---

[13] Because it was apparent that the presence of non-adult materials in these book/video stores did
not alter their essential nature as sexually oriented adult establishments, several courts
determined that their compliance efforts were a sham and that they remained in true nature adult
establishments subject to the 1995 Adult Use Regulations.  Indeed, the "mechanical application
of the 60/40 rule" was rejected by one court as an absurd "Pavlovian approach" which "does not
comport with the history or spirit of the Zoning Resolution and, in fact, makes a mockery of the
legislation."  See, City of New York v. Show World, 178 Misc.2d 812, 824, 683 N.Y.S.2d 376
(Sup. Ct. N.Y. Co. 1998) (denying preliminary injunction on other grounds).  Nonetheless, the

Continued...

JNR-001055

287

47. As to adult eating or drinking establishments, numerous topless bars and strip clubs operating at prohibited locations, including Ten's, erected partitions so as to limit their regularly featured adult entertainment to less than 40 percent of the total floor area accessible to customers. Seizing upon the aforementioned ambiguity in the text, they argued over the City's objection that the "substantial portion" test was applicable to adult eating or drinking establishments. 2001 Report at 35-36.

48. During court proceedings to enforce the 1995 regulations, the City explained, as discussed above, that the "substantial portion" analysis applied only to adult bookstores and multi-use commercial establishments. It did not apply to single-use eating or drinking establishments or theaters that regularly feature adult entertainment.

49. As intended, the 1995 regulations required a two-step analysis to determine whether a single use eating or drinking establishment, theater or book/video store was an "adult establishment." Under the first step of the analysis, an eating or drinking establishment or a theatre would qualify as an "adult eating or drinking establishment" or an "adult theater" if it "regularly featured" entertainment characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas" and customarily excluded minors (thus distinguishing it from a restaurant/bar or theater which featured adult entertainment only occasionally). A book/video store would qualify as an "adult book store" if a "substantial

New York State Court of Appeals ultimately rejected this position in City of New York v. Les Hommes, 94 N.Y.2d 267, 273, 702 N.Y.S.2d 576 (1999), rev'g, 258 A.D.2d 284, 685 N.Y.S.2d 49 (1st Dept.), holding that the 1995 regulations and the administrative guidelines set forth in OPPN 6/98 explicitly limited the inquiry to the percentage of stock and floor area devoted to adult and non-adult materials and "must be enforced as written," even where the inclusion of non-adult materials was found to be a sham.

21

288

portion of its stock-in-trade" was devoted to adult materials (thus distinguishing it from a neighborhood book/video store which offered only a modest amount of adult materials).

50.     Under the second step of the analysis, a determination was then to be made as to whether the adult eating or drinking establishment, the adult theater, or the adult book store occupied a "substantial portion" of the commercial establishment in question, so as to render that establishment an "adult establishment."   As explained above, the "substantial portion" test was included in this context to deal with the possibility of multi-use commercial establishments.  But where the commercial establishment in question consisted entirely of an adult eating or drinking establishment, adult theater or adult book store, 100% of the establishment was an adult establishment and the "substantial portion" test was clearly met.

51.     This two-step approach was contemplated by the Planning Commission. Indeed, were this not so, then in the case of adult book stores, the inclusion of the "substantial portion" test in both the definition of "adult establishment" and the definition of "adult book store" would have been superfluous.  However, the Planning Commission recognized that, in most instances, the commercial establishment in question would consist entirely of one or more adult uses.  See, 1995 Report at 6 (noting that "the proposed regulations would define "adult establishments and four types of facilities -- adult book stores, adult eating or drinking establishments, adult theaters, and other adult commercial establishments -- which alone or in combination would constitute an adult establishment.")

52.     Moreover, it would have made little sense for the Planning Commission to apply the "substantial portion" test to adult eating or drinking establishments such as Ten's, as there would have been no basis in the legislative record to conclude that the negative secondary impacts of a topless bar or strip club are any less present where the topless or nude entertainment is featured in only part of the customer-accessible floor space.  Indeed, the moratorium

22

289

regulations defined adult establishment so as to include <u>any</u> eating or drinking establishment

presenting "topless or nude dancers, strippers or similar entertainments," Moratorium Report at

36-37, and we know of no other jurisdiction which applies a "substantial portion" analysis to

establishments regularly featuring topless or nude dancers.

      53.    The City's position in this regard was accepted by some courts.   For

example, in <u>City of New York v. J & J Tummy Yummies d/b/a/ Naked City</u>, 179 Misc.2d 527,

528-30, 679 N.Y.S.2d 807 (Sup. Ct. Queens Co. 1998), the court rejected an argument that a

strip. club erecting a 10-foot high double curtain between its restaurant and stage areas to

allegedly limit adult entertainment to less than 40% of the customer-accessible floor area was not

an adult establishment, stating as follows:

> By these definitions, the "Naked City" is an adult
> establishment since there. was demonstrated by
> testimony ... that almost every defined sex activity
> was openly conducted and displayed publicly to
> customers of the place. ...   The very name of the
> establishment says it all: NAKED CITY. ...

> Moreover, the advertising of the business proclaims
> that it holds itself out to the public as an adult
> establishment. Customers are given a business card
> which reads in part:  "Over 200 Beautiful NUDE
> Girls"  "LESBIAN Shows Every Friday &
> Saturday" "Doors Unzip: Mon-Sat, 6 pm-4 am." In
> evidence is a magazine dealing in sexual subjects,
> "Xtreme," in which Naked City has a full page ad,
> in part which reads "The Greatest Nude Club in
> New York." ...

> The court does not accept the contention that the
> restaurant area in this case can be considered as a
> separate use from the live entertainment ....

See also, <u>City of New York v. Dezer Properties</u>, 259 A.D.2d 116, 121, 697 N.Y.S.2d 41 (1st

Dept. 1999) (rejecting as "a sham" the VIP Club's "attempt to comply with the 60-40 rule" by

separating its restaurant and topless dancing areas, and finding that "the VIP Club is still

JNR-001058

290

essentially a topless bar," there being "no conceivable reason why anyone uninterested in topless dancing would choose [that] club over the many other nightclubs, bars and restaurants in the Flatiron district ...."), rev'd, 95 N.Y.2d 771, 710 N.Y.S.2d 836 (2000).

54.     Nonetheless, the contrary position, urged by topless bars and strip clubs was ultimately adopted by the New York State Court of Appeals, which held in Dezer Properties, supra, that an eating or drinking establishment devoting less than 40 percent of its floor area to regularly featured adult entertainment was not an adult establishment subject to the 1995 regulations.[14] As a result, clubs like Ten's that regularly featured topless or nude entertainment in a portion of their premises evaded classification as adult establishments and continued to operate at prohibited locations.

## The 2001 Application

55. As of 2000, according to information compiled by DCP, there were 101 "60/40 establishments" operating in locations where adult uses are prohibited, including triple-X book and video stores, topless bars and strip clubs, and theaters offering adult entertainment. 2001 Report at 6, 10.   Of these 101 establishments, approximately 75 were pre-existing establishments that adopted 60/40 configurations in response to the 1995 regulations; the other

---

[14] The analysis of the Court of Appeals in Dezer Properties stemmed from a misreading of the 1995 regulations, as a result of the aforementioned ambiguity in the definition of "adult establishment."   As explained above, the 1995 regulations required a two-step analysis to determine whether an eating or drinking establishment (or a theater) was an "adult establishment":  if a single-use eating or drinking establishment (or a theater) regularly featured adult entertainment, it was an adult eating or drinking establishment (or an adult theater), and thus an adult establishment. The Court of Appeals collapsed this two-step analysis into one step, thus mistakenly requiring a comparison of the adult and non-adult areas of an eating or drinking establishment (or a theater) to determine whether a "substantial portion" of the floor area was dedicated to adult entertainment. 96 N.Y.2d at 773.

291

26 were new establishments which opened on a 60/40 basis after implementation of the 1995 regulations, with one going by the name "Sixty/Forty Video." Id. at 10.[15]

56. After "monitor[ing] the location and operation of adult uses under the [1995] regulations" and recognizing that "the goal of comprehensive protection" from adverse secondary effects had not been achieved, 1995 Report at 62, DCP filed a Land Use Review Application seeking to amend the 1995 Adult Use Regulations on March 23, 2001 ("2001 Application"). The 2001 Application proposed changes in the definitional language to better and more completely reflect the legislative intent behind the 1995 regulations to address the proliferation of 60/40 establishments operating at prohibited locations notwithstanding their continued predominant and ongoing focus on adult materials or entertainment.

57. On March 26, 2001, the 2001 Application was referred to the City's community and borough boards and the borough presidents for review and comment in accordance with Charter §§ 200 and 201. 2001 Report at 19-20. Three of the five borough boards submitted recommendations to the Planning Commission regarding the proposed amendments: the Brooklyn and Queens Borough Boards voted in favor of the application and the Manhattan Borough Board voted against the application. Copies of the recommendations of the borough boards are submitted as Exhibit H.

---

[15] Of the 101 "60/40 establishments," 56 were located in Manhattan, 29 in Queens, nine in Brooklyn, six in the Bronx, and one in Staten Island." 2001 Report at 6. Citywide, they consisted of 36 eating or drinking establishments, 29 bookstores, and 36 theaters. Id. In this regard, video stores with "peep booths" were categorized as theaters rather than bookstores, since the definition of "adult theater" set forth in the 1995 regulations included commercial establishments where regularly featured adult entertainment was "viewed from individual enclosures." 1995 Report at 68.

25

1057

292

58. In addition, two borough presidents commented on the proposal: the Queens Borough President recommended approval of the proposed amendments and the Manhattan Borough President recommended disapproval. Copies of the recommendations of the borough presidents are submitted as Exhibit I.

59. The Planning Commission also received comments and recommendations from 20 community boards covering all of the five boroughs. Fourteen community boards recommended adoption of the proposed amendments, and five boards voted against approval.[16] Copies of the recommendations of the community boards are submitted as Exhibit J.

60. The Planning Commission held a public hearing on the proposed amendments on May 23, 2001. Eighteen people spoke at the hearing, with five expressing support for the proposal and thirteen expressing opposition. 2001 Report at 24. A transcript of the public hearing is submitted as Exhibit K.

61. Following the public hearing, DCP proposed modifications to the proposed amendments to eliminate perceived ambiguities and to address certain concerns raised during the public review process. 2001 Report at 41-48. These modifications included the addition of a provision establishing a one-year amortization period for those existing establishments that made financial expenditures in reliance upon the 60%-40% "substantial portion" test. Id. at 42-44.

62. On August 8, 2001, the Planning Commission approved the proposed amendments as modified by DCP. A transcript of the Commission's meeting is submitted as

---

[16] In addition, one community board from Staten Island expressed opposition only to proposed language that would clarify that adult establishments are not permitted in or within 500 feet of manufacturing districts where residential use is permitted as of right or by special permit or authorization, see infra at fn. 15, because such an amendment would allegedly allow more residential development in Area M of the Special South Richmond Development District, a manufacturing district where residential use is permitted by special permit.

26

## 293

Exhibit L.  The proposed amendments were then referred to the Council for consideration.  The Council's Subcommittee on Zoning and Franchises conducted a public hearing on the proposed amendments on October 1, 2001.  A transcript of the Subcommittee hearing is submitted as Exhibit M.

63.    At the Council Subcommittee hearing, Ten's counsel, Mark Alonso, submitted a confidential Police Department report, allegedly obtained from an anonymous source, setting forth a list, in the order of priority, of 25 "problem clubs" in the precincts constituting Patrol Borough Manhattan South for the month of February 2001.  See, Exhibit C to Ten's moving papers. Because only one topless club was included in this priority list, Mr. Alonso claimed, in testimony at the Subcommittee hearing, that this report showed that 60/40 eating or drinking establishments "do not cause crime." See, Exhibit M at 55.

64.    By letter to the Subcommittee on Zoning and Franchises submitted a week after the public hearing on October 9, 2001, another attorney, Edward Rudofsky, contended that the Police Department report submitted by Mr. Alonso allegedly showed that DCP had suppressed evidence establishing that the 2001 amendments were unwarranted.  A copy of Mr. Rudofsky's letter is submitted as Exhibit N.

65.    I responded to Mr. Rudofsky's letter by way of a letter to the Subcommittee dated October 24, 2001, a copy of which is submitted as Exhibit O.  In my letter, I explained that the 2001 amendments were intended "to clarify the [1995] regulations and reaffirm their original intent, in order to address attempts by the operators of adult establishments to remain in operation through superficial or 'sham' compliance measures," and that there was "no basis in the history of the 1995 regulations to suggest that only the specific area where topless or nude entertainment is offered in a bar or restaurant constitutes the 'adult eating or drinking establishment.'"  Consequently, the proposed 2001 amendments were supported by the

27

1059

294

legislative record underlying the 1995 regulations, which included the DCP Study.  I further

stated as follows:

> Mr. Rudofsky's allegation that the Department of City Planning has engaged in a "cover up" of data relevant to the amendments is thus entirely fanciful, it being our clearly-stated position that no additional data analysis is necessary for the City to clarify the 1995 regulations in response to pervasive efforts by the operators of adult establishments to subvert their intent. ...

> Mr. Rudofsky's insistence that the validity of the amendments depends upon incident reports for topless bars and restaurants also misunderstands the nature and breadth of the secondary impacts caused by adult establishments.  As discussed as length in the DCP Study and [the 1995 Report], the secondary impacts associated with adult establishments are numerous and include negative impacts on economic development, neighborhood revitalization and property values.  Moreover, the correlation between adult establishments and criminal activity identified in several of the studies relied upon by the City in adopting the 1995 regulations was not restricted to incidents occurring within or outside the entrance to an adult establishment.  Instead the studies demonstrated a general relationship between the presence of adult establishments and criminal complaints/incidents in a neighborhood. ...

66.    On October 25, 2001, both the Subcommittee on Zoning and Planning and

the full Land Use Committee approved the amendments at regularly scheduled meetings.

Transcripts of these meetings are submitted as Exhibits P and Q, respectively.  On October 31,

2001, the full Council gave final approval to the amendments, in accordance with Charter

§§ 197-d and 200.  A copy of Council Resolution No. 2096 approving the 2001 Adult Use

Amendments is submitted as Exhibit R.

JNR-001063

295

## The 2001 Adult Use Amendments

67. When the Planning Commission approved the 2001 Adult Use Amendments, it released a report, previously referred to as the "2001 Report" (Exhibit A), describing the proposed amendments and explaining the planning considerations behind them. As indicated in the 2001 Report, the 2001 amendments were "limited in nature" and were principally intended "to clarify certain definitions in the [1995 regulations] in order to effectuate the [Planning] Commission's original intent in response to efforts by the operators of adult establishments to undermine implementation of the 1995 regulations." 2001 Report at 29.

68. To accomplish this purpose, the definition of "adult eating or drinking establishment" was amended to make clear that it covers <u>any</u> eating or drinking establishment where adult entertainment is regularly featured, no matter the amount of floor area devoted to the adult entertainment. In this regard, the Planning Commission stated as follows:

> In the case of "adult eating or drinking establishments," court rulings have mistakenly applied an analysis under which, once it is found that an eating or drinking establishment "regularly features" adult entertainment, it must then be determined whether a "substantial portion" of the floor area of the establishment is dedicated to adult entertainment. ... This approach has led to artificial separation of adult eating or drinking establishments into purportedly "adult" and "non-adult" sections ... [resulting in] "60/40" eating or drinking establishments [which] have continued in operation.
>
> The concept that only the specific area where adult entertainment is offered in an "eating or drinking establishment" constitutes the "adult eating or drinking establishment" is plainly inconsistent with the intent of the 1995 Adult Use Regulations. Under the proposed amendments, the definition of "adult eating or drinking establishment" would be modified to provide that such an establishment is an "eating or drinking establishment" which regularly

29

JNR-001064

1061

296

features live performances or films in "any portion of the establishment," thereby affirming the intent of the 1995 Adult Use Regulations that it is immaterial how much floor space in the eating or drinking establishment is used for the presentation of adult entertainment, such as topless dancing.

2001 Report at 35-37.

69. Thus, the amended definition provides that an "adult eating or drinking establishment" is an "eating or drinking establishment which regularly features in any portion of such establishment" live performances or films characterized by an emphasis on "specified sexual activities" or "specified anatomical areas" (or employees who, as part of their employment, "regularly expose to patrons to 'specified anatomical areas'") and that customarily excludes or restricts minors.   2001 Report at 51-52; Z.R. § 12-10, definition of "adult establishment," ¶ 1(b) (emphasis added).

70. As to the definition of "adult book store," it was amended to address the proliferation of book and video stores which have evaded enforcement despite their primary focus on adult materials.  It now goes beyond a mechanistic analysis of stock and floor area to include additional objective criteria common among and exclusive to stores having a predominant focus on sexually explicit material.[17]

---

[17] Under the amended definition, an "adult book store" is a book or video store that offers adult materials as a "substantial portion" of its stock-in-trade.  2001 Report at 50; Z.R. § 12-10, definition of "adult establishment," ¶ 1(a).  As before, the "substantial portion" analysis looks to customer-accessible stock and floor area.  2001 Report at 54-55; Z.R. § 12-10, definition of "adult establishment," ¶ 2(d).  However, to include those establishments which have superficially complied with the "substantial portion" test but are still essentially adult establishments, the amended definition includes a proviso clarifying that non-adult material shall not be considered stock-in-trade for purposes of the "substantial portion" comparative analysis where one or more of eight specified physical or operational features are present.  Id.

30

297

71. Finally, the definition of "adult establishment" set forth in the Zoning Resolution was amended to clarify that an "adult establishment" is any "commercial establishment which is or includes an adult book store, adult eating or drinking establishment, adult theater, or other adult commercial establishment, or any combination thereof as defined below." 2001 Report at 50; Z.R. § 12-10, definition of "adult establishment, ¶ 1 (emphasis added).

72. Similar to the language used initially in the moratorium regulations, the phrase "which is or includes" replaced the phrase "where a substantial portion of the establishment includes" used in the 1995 regulations. Initially intended to apply to multi-use establishments, the "substantial portion" language was eliminated to remove the ambiguity in the text that allowed single-use eating or drinking establishments to evade enforcement, as discussed above.[18] Thus, as relevant here, the amended definition clarifies that an "adult establishment" is any establishment which is or includes an adult eating or drinking establishment.[19]

---

[18] As noted above, the 1995 language "anticipated the possibility of a bona fide 'mixed use' establishment consisting of both an adult and a non-adult use, although no such uses were identified in the DCP Study." 2001 Report at 38. However, some operators of adult establishments "claimed 'mixed use' status through artificial separation of an adult establishment into multiple components, e.g. a topless bar and a 'cigar lounge.'" Id. Because the "inspection and enforcement history demonstrate[d] that these so-called 'mixed use' establishments function[ed] as integrated adult establishments," the Planning Commission determined that the "substantial portion" language was unnecessary in this context. Id.

[19] In addition to amending the foregoing definitions, the 2001 Adult Use Amendments added language affirming that adult establishments are not permitted in any manufacturing districts in which residences, joint living-work quarters for artists or loft dwellings are allowed as-of-right or by special permit or authorization, nor are they permitted within 500 feet of such districts, even where the special permit or authorization determination requires an assessment of the impact of residences on commercial or manufacturing uses. 2001 Report at 58-61; Z.R. §§ 32-01(b), 42-01(a),(b). The 2001 amendments also added language clarifying which adult establishment has priority rights, for purposes of enforcing the provision prohibiting an adult establishment from locating within 500 feet of another adult establishment. In this regard, the amended text provides

Continued...

1063

298

73.    As noted above, the 2001 amendments include an amortization provision for adult establishments that made investments to comply with the 60%-40% substantial portion test.  The amended text provides that any establishment in existence as of August 8, 2001 which (i) "made financial expenditures so as to avoid becoming subject to the [1995 regulations]" and (ii) is defined as an adult establishment pursuant to the 2001 amendments, shall terminate as an adult establishment within one year of the effective date of the 2001 amendments -- that is, by October 31, 2002.  2001 Report at 63-65; Z.R. § 72-41.  Moreover, where the establishment "has not recovered substantially all such financial expenditures," the Board of Standards and Appeals ("BSA") may extend the amortization period beyond one year, upon application filed "at least 120 days prior to the date on which such establishment must terminate."  Id.  I am informed that no adult establishment currently operating at a prohibited location on a 60/40 basis timely filed an application with the BSA for an extension of the amortization period (and such an application would no longer be timely).

**Alternative Sites**

74.    As of 2000, there were 101 60/40 establishments that will be required to relocate by October 31, 2002, including 36 60/40 eating or drinking establishments.  2001 Report at 10.  Like the 1995 regulations, the 2001 amendments make available ample land area to accommodate these relocating establishments and any new adult establishments.  When the 1995 regulations were adopted, DCP conducted an analysis of potential development sites available for adult uses.  To make this assessment, DCP staff studied maps of the zoning districts where adult uses were permitted (approximately 11% of the City's overall land area), and excluded

---

that an adult establishment is "established upon the date of a permit issued by the [D]epartment of [B]uildings therefor," subject to DOB rules regarding the failure to perform authorized work  Continued...

JNR-001067

1064

299

from the analysis any "encumbered properties" unlikely to be developed for commercial use (such as sites occupied with public utilities or oil storage facilities, airports and large tracts of publicly owned vacant property) and any sites located within 500 feet of any "sensitive receptors" (i.e., houses of worship, schools and day care centers). Affidavit of Andrew S. Lynn sworn to September 17, 1996 ("Lynn Aff."), ¶ 6 [1995 Appendix at A 1679-80]; Borough Maps Showing Permitted Areas [1995 Maps].

75.    DCP determined that, in 1995, there were nearly 5,000 acres of unencumbered land available for adult uses, which allowed for the operation of more than 500 adult establishments, each having up to 10,000 square feet of usable floor area (far more than that occupied by most adult establishments). Affidavit of Joseph Rose sworn to August 20, 1996 ("Rose Aff."), ¶ 48 [1995 Appendix at A 498]. At that time, there were approximately 177 adult establishments, 29 of which were already operating at permitted locations and 148 of which would be required to relocate in order to continue their adult uses. 2001 Report at 9.[20] As recognized by the New York State Court of Appeals in Stringfellow's, and the United States Court of Appeals in Buzzetti, this available land area was more than enough to accommodate the 148 establishments that were required to relocate.

76.    Since 1995, there have been 13 changes in the zoning map which have rezoned certain areas where adult uses had been permitted. These map changes have reduced the amount of unencumbered land area available to adult establishments by about 200 acres. Maps

---

or to operate under the permit. 2001 Report at 41, 59-60, 62; Z.R. §§ 32-01, 42-01.

[20] When DCP determined that there were approximately 148 adult establishments that would be required to relocate when the 1995 regulations were implemented, DCP did not anticipate that a large percentage of these establishments would be permitted to evade enforcement and remain at their current locations through sham compliance.

33

300

showing the land area eliminated as a result of these zoning map changes are submitted as Exhibit S.[21] In addition, since 1995, changes in the number and location of "sensitive receptors" have further reduced the land area available to adult establishments by about another 65 acres, again reducing the number of potential development sites. Using the same approach as used in the 1995 analysis, DCP estimates that there are now approximately 4,800 acres of unencumbered land available for adult uses, allowing for the operation of approximately 450 adult establishments, each having up to 10,000 square feet of usable floor area (far more than typically required).

77.   As of 2000, the number of adult establishments citywide had decreased from 177 in 1993 to 136, with 101 operating at prohibited locations on a 60/40 basis and 35 operating at permissible locations. 2001 Report at 6, 10.[22] Consequently, notwithstanding the slight decrease in available land, there remains more than sufficient land area to accommodate the 101 establishments required to relocate. In fact, DCP determined that the estimated number of potential sites for adult business in New York City decreased by 9% between 1995 and 2000,

---

[21] DCP initially calculated the reduction of land area available for adult uses during its environmental assessment of the 2001 amendments. At that time, 11 post-1995 zoning map changes had been adopted, and four more had been proposed. Those calculations were recently updated, as two of the proposed map changes were not ultimately adopted, and the land area covered by a third was reduced by the Council.

[22] Of the 35 establishments at permissible locations, nine existed in 1993 and 26 were established during or after 1998, following implementation of the 1995 regulations. 2001 Report at 9-10. Three of the 35 establishments have since been rendered non-conforming by a zoning map change affecting Long Island City, which became effective in July 26, 2001. Under the 1995 regulations, these establishments had one year from the effective date of the map change to convert to a conforming use or to relocate. Z.R. § 52-77.

34

1066

**301**

while the number of nonconforming adult businesses required to relocate decreased by 32%

during the same period (from 148 in 1995 to 101 in 2000).[23]

78.    Moreover, the character of the areas where adult uses are permitted, and

the accessibility of these areas, have not changed since 1995.  As before, the zoning districts

permitting adult uses are zoned for and developed with a wide variety of commercial uses,

including retail, office, service and entertainment, in addition to manufacturing and industrial

uses.  See, Lynn. Aff., ¶ 2-4 [1995 Appendix at A 1677-79]; Affidavit of William Bernstein

sworn to August 21, 1996 ("Bernstein Aff."), ¶¶ 4-14 [1995 Appendix at A 502-508].[24]  And as

---

[23] During its environmental review of the 2001 amendments, DCP determined that this decrease in the total number of adult establishments took place largely in Manhattan and was attributable to market factors such as the redevelopment of Times Square.

[24] The Bernstein Affidavit includes a description of several specific areas where adult uses are permitted.  In that regard, the affidavit mistakenly characterizes all of Community District 3 in Staten Island as a permitted area.  Bernstein Aff., ¶ 13 [1995 Appendix at A 507-08].  In fact, adult uses are not permitted in the portion of Community District 3 zoned as Area M in the Special South Richmond District (see, Zoning Maps 32c and 32d).  As noted above, the 2001 amendments clarify that adult uses are prohibited in and within 500 feet of manufacturing districts where new residences, joint living-work quarters for artists or loft dwellings are permitted, whether as of right or by special permit or authorization, even where the grant of a special permit or authorization requires an assessment of the impact of a new residential us on commercial or manufacturing uses within a district.  As this was the intent of the 1995 regulations in the first instance, DCP did not treat these manufacturing districts as "permitted areas" when calculating the land area that remained available for adult uses after the adoption of the 1995 regulations.  Nonetheless, in performing these calculations, portions of one such district, Area M in the Special South Richmond District, were mistakenly characterized as a "permitted area" in 1995.  When the entirety of Area M is properly characterized as a prohibited area, it only reduces by approximately three the total number of potential sites for adult establishments.  No other manufacturing districts where residential uses are permitted were mistakenly characterized as permitted areas.  For example, the Special Lower Manhattan Mixed Use District is a manufacturing district where loft dwellings and joint living-work quarters for artists are permitted by special permit if "the conversion [to residential use] will not harm the commercial and manufacturing sectors of the economy" or "the commercial or manufacturing character of the surrounding area."  Z.R. § 111-50.  Similar in nature to Area M in the Special South Richmond District, this Manhattan area was properly treated as one where adult uses would be prohibited when calculating available land area in 1995.

JNR-001070

1067

## 302

before, these areas are largely accessible by public transportation.  <u>See</u>, Rose Aff., ¶ 47 [1995 Appendix at A 498); Bernstein Aff., ¶ 3 [1995 Appendix at A 502]; DCP Transit Analysis [1995 Appendix at A 819-22)]; Transit Access Maps [1995 Maps].

79.    It is therefore apparent that, the 2001 Adult Use Amendments were adopted to clarify and strengthen the 1995 text so as to further effectuate its legislative purpose. Thus, like the 1995 regulations, the 2001 amendments are a legitimate attempt to address the adverse secondary impacts of adult entertainment establishments that fully complies with constitutional standards.  Plaintiff's facial challenge to the 2001 amendments should therefore be rejected on the merits.

_____
DAVID KARNOVSKY

Sworn to before me this

23rd day of October, 2002.

_____
Notary Public

BRUNILDA MESA
Notary Public, State of New York
No. 01ME4873044
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires Oct. 6, 200_

36

1068

**254**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------- x

FOR THE PEOPLE THEATRES OF N.Y., INC. d/b/a
FAIR THEATRE and JGJ MERCHANDISE CORP., d/b/a
VISHANS VIDEO a/k/a MIXED EMOTIONS,

Plaintiffs,

-against-

THE CITY OF NEW YORK; HON. MICHAEL R.
BLOOMBERG, as Mayor of the City of New York;
AMANDA M. BURDEN, as Director of City Planning,
Department of City Planning of the City of New York, and
PATRICIA J. LANCASTER, as Commissioner of
Buildings, Department of Buildings of the City of New
York,

Defendants.

-------------------------------------------------------------------- x

**AFFIDAVIT OF
DAVID KARNOVSKY**

Index No. 121080/02

STATE OF NEW YORK      )
                       ) .ss.:
COUNTY OF NEW YORK  )

        **DAVID KARNOVSKY,** being duly sworn, deposes and says:

        1.  I am Counsel to the Department of City Planning ("DCP"), the city agency

which provides staff assistance to the New York City Planning Commission ("Planning

Commission"). The Planning Commission is generally charged with planning for the orderly

growth, development and improvement of the City of New York ("the City"); its specific

responsibilities include evaluating and giving preliminary approval to amendments of the New

York City Zoning Resolution ("Zoning Resolution" or "Z.R."). See, New York City Charter

("Charter"), Chapter 8, §§ 191, et seq. I make this affidavit in opposition to plaintiffs' motion

for a preliminary injunction and in support of defendants' cross-motion for summary judgment

1855

declaring to be valid and enforceable certain amendments to the provisions of the Zoning Resolution governing sexually oriented "adult" establishments. As counsel to DCP, I am fully familiar with the nature and basis of the challenged zoning text amendments.

2.    In 1995, the City amended its Zoning Resolution to include use regulations governing establishments that deal principally in sexually oriented adult entertainment ("the 1995 Adult Use Regulations" or "the 1995 regulations"). These regulations governed the location of commercial establishments with a predominant, on-going focus on sexually explicit materials or activities, including adult or "triple X" book and video stores, many of which provide "peep booths" for private viewing on premises (referred to in the zoning text as "adult book stores"); topless bars and strip clubs (referred to in the text as "adult eating or drinking establishments"), and theaters regularly offering X-rated movies or topless or nude entertainment (referred to in the text as "adult theaters").

3.    By way of amendments to the Zoning Resolution adopted by the Planning Commission on August 8, 2001 and finally approved by the New York City Council ("Council") on October 31, 2001 ("the 2001 Adult Use Amendments" or "the 2001 amendments"), the 1995 Adult Use Regulations were amended to modify the definitions of "adult establishment," "adult book store" and "adult eating or drinking establishment" to close certain loopholes utilized by the adult entertainment industry to evade enforcement, and thus more accurately and completely express the legislative intent behind the 1995 regulations.

4.    The definition of "adult book store" was adjusted to address attempts at sham compliance by many adult book/video stores. These establishments have evaded enforcement and remained in operation at impermissible locations by undertaking superficial compliance measures which have not altered their essential nature as sexually oriented adult establishments. Likewise, the definitions of "adult establishment" and "adult eating or drinking

1856

establishment" were adjusted in response to court decisions which read the 1995 definitional language too narrowly. The amended definitions clarify that all restaurants, bars and theaters which "regularly feature" adult entertainment are governed by the adult use regulations, no matter the amount of floor area devoted to adult entertainment.

5. There are two plaintiffs in this action. For The People Theatres of N.Y., Inc. d/b/a Fair Theatre ("Fair Theatre") is a theater located in Queens that regularly features adult films (purportedly in less than 40% of its customer-accessible floor area), and includes an separate area devoted exclusively to peep booths. Complaint, ¶¶ 1, 34; Kiriat Aff., ¶ 9. JCJ Merchandise Corp. d/b/a Vishans Video a/k/a Mixed Emotions ("Vishans Video") is a video store located in Manhattan. Complaint, ¶¶ 2, 40, 41. Vishans Video sells adult videotapes (purportedly as less than 40% of its stock and in less than 40% of its customer- accessible floor area) and has eight peep booths on premises. Complaint, ¶ 41. Under the 2001 amendments, Fair Theatre and Vishans Video are adult establishments that will be required either to convert to a conforming use, or to move to a location where adult uses are permitted, by October 31, 2002.

6. This affidavit is intended to more fully explain the nature and basis of the 2001 Adult Use Amendments and the necessity for their adoption, matters about which I am fully familiar as counsel to DCP. The text of the 2001 amendments is included at pp. 50-66 of the report released by the Planning Commission when it approved the amendments ("2001 Report"), a copy of which is submitted as Exhibit A.[1]

---

[1] The exhibits identified in this affidavit and defendants' other cross-motion papers are submitted under separate cover in a bound volume consisting of Exhibits A-E and G-Y. The 1995 Maps identified as Exhibit F are oversized documents submitted in an envelope.

**The DCP Study**

7.     In late 1993, in response to concerns expressed about the proliferation of sexually oriented adult establishments in the City, DCP undertook an "Adult Entertainment Study" ("the DCP Study"). A copy of the study, which was completed in September 1994, is submitted as Exhibit B. The purpose of the DCP Study was to identify the nature and extent of the impact that adult establishments have on surrounding communities and, by so doing, to assist the Planning Commission in determining whether to adopt zoning regulations specifically applicable to adult establishments.

8.     At that time, the Zoning Resolution's use regulations did not distinguish between "adult" uses and other commercial uses. Whether or not they featured adult materials or entertainment, all "book stores" and "eating or drinking establishments" (i.e. restaurants and bars) were classified as "retail or service establishments" and permitted in zoning districts where residential uses were also permitted. Z.R. §§ 32-00; 32-15. All "theaters" were classified as "amusement" establishments and likewise permitted in many zoning districts where residential uses are permitted. Z.R. §§ 32-00, 32-17.[2]

9.     The DCP Study focused on three types of adult establishments with a primary focus on sexually oriented materials or activities: adult or "triple-X" video and book stores, topless bars and strip clubs, and adult theaters showing films or live entertainment. The DCP Study included a description of how and where these businesses operated in the City at the time the study was conducted, a review of trends in growth and development of adult uses prior

---

[2] Under the Zoning Resolution, there are three types of zoning districts: residential districts, commercial districts, and manufacturing districts. Generally, residential uses are permitted in residential districts, most commercial districts, and a few manufacturing districts containing loft dwellings. Z.R. §§ 22-11, 32-11, 42-133.

1858

## 293

2001 amendments -- that is, by October 31, 2002.   2001 Report at 63-65; Z.R. § 72-41.

Moreover, where the establishment "has not recovered substantially all such financial

expenditures," the Board of Standards and Appeals ("BSA") may extend the amortization period

beyond one year, upon application filed "at least 120 days prior to the date on which such

establishment must terminate."  Id.  I am informed that neither the Fair Theatre nor Vishans

Video filed an application with the BSA for an extension of the amortization period (and such an

application would no longer be timely).

**Alternative Sites**

85.     As of 2000, there were 101 60/40 establishments that will be required to

relocate by October 31, 2002, including bookstores, eating or drinking establishments and

theaters.  2001 Report at 10.  Like the 1995 regulations, the 2001 amendments make available

ample land area to accommodate these relocating establishments and any new adult

establishments.   When the 1995 regulations were adopted, DCP conducted an analysis of

potential development sites available for adult uses.  To make this assessment, DCP staff studied

maps of the zoning districts where adult uses were permitted (approximately 11% of the City's

overall land area), and excluded from the analysis any "encumbered properties" unlikely to be

developed for commercial use (such as sites occupied with public utilities or oil storage facilities,

airports and large tracts of publicly owned vacant property) and any sites located within 500 feet

of any "sensitive receptors" (i.e., houses of worship, schools and day care centers).  Affidavit of

Andrew S. Lynn sworn to September 17, 1996 ("Lynn Aff."), ¶ 6 [1995 Appendix at A 1679-

80]; Borough Maps Showing Permitted Areas [1995 Maps].

86.     DCP determined that, in 1995, there were nearly 5,000 acres of

unencumbered land available for adult uses, which allowed for the operation of more than 500

adult establishments, each having up to 10,000 square feet of usable floor area (far more than

## 294

that occupied by most adult establishments). Affidavit of Joseph Rose sworn to August 20, 1996 ("Rose Aff."), ¶ 48 [1995 Appendix at A 498]. At that time, there were approximately 177 adult establishments, 29 of which were already operating at permitted locations and 148 of which would be required to relocate in order to continue their adult uses. 2001 Report at 9.[24] As recognized by the New York State Court of Appeals in Stringfellow's, and the United States Court of Appeals in Buzzetti, this available land area was more than enough to accommodate the 148 establishments that were required to relocate.

87.    Since 1995, there have been 13 changes in the zoning map which have rezoned certain areas where adult uses had been permitted. These map changes have reduced the amount of unencumbered land area available to adult establishments by about 200 acres. Maps showing the land area eliminated as a result of these zoning map changes are submitted as Exhibit S.[25] In addition, since 1995, changes in the number and location of "sensitive receptors" have further reduced the land area available to adult establishments by about another 65 acres, again reducing the number of potential development sites. Using the same approach as used in the 1995 analysis, DCP estimates that there are now approximately 4,800 acres of unencumbered land available for adult uses, allowing for the operation of approximately 450 adult

---

[24] When DCP determined that there were approximately 148 adult establishments that would be required to relocate when the 1995 regulations were implemented, DCP did not anticipate that a large percentage of these establishments would be permitted to evade enforcement and remain at their current locations through sham compliance.

[25] DCP initially calculated the reduction of land area available for adult uses during its environmental assessment of the 2001 amendments. At that time, 11 post-1995 zoning map changes had been adopted, and four more had been proposed. Those calculations were recently updated, as two of the proposed map changes were not ultimately adopted, and the land area covered by a third was reduced by the Council.

establishments, each having up to 10,000 square feet of usable floor area (far more than typically required).[26]

      88.     As of 2000, the number of adult establishments citywide had decreased from 177 in 1993 to 136, with 101 operating at prohibited locations on a 60/40 basis and 35 operating at permissible locations.  2001 Report at 6, 10.[27]  Consequently, notwithstanding the slight decrease in available land, there remains more than sufficient land area to accommodate the 101 establishments required to relocate.  In fact, DCP determined that the estimated number of potential sites for adult business in New York City decreased by 9% between 1995 and 2000, while the number of nonconforming adult businesses required to relocate decreased by 32% during the same period (from 148 in 1995 to 101 in 2000).[28]

      89.     Moreover, the character of the areas where adult uses are permitted, and the accessibility of these areas, have not changed since 1995.  As before, the zoning districts permitting adult uses are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial

---

[26] Bookstores are not permitted uses in M2 and M3 zoning districts.  Z.R. § 42-13.  However, under the 2001 amendments (and the 1995 regulations) a book/video store which includes one or more peep booths is classified as an adult theater.  Z.R. § 12-10, definition of "adult establishment," ¶ 1(c).  Since theaters are a permitted use in M2 and M3 districts, establishments such as plaintiff Vishans Video may (like plaintiff Fair Theatre) relocate to any of the zoning districts in which adult establishments are permitted, including M2 and M3 districts.

[27] Of the 35 establishments at permissible locations, nine existed in 1993 and 26 were established during or after 1998, following implementation of the 1995 regulations.  2001 Report at 9-10.  Three of the 35 establishments have since been rendered non-conforming by a zoning map change affecting Long Island City, which became effective in July 26, 2001.  Under the 1995 regulations, these establishments had one year from the effective date of the map change to convert to a conforming use or to relocate.  Z.R. § 52-77.

[28] During its environmental review of the 2001 amendments, DCP determined that this decrease in the total number of adult establishments took place largely in Manhattan and was attributable to market factors such as the redevelopment of Times Square.

uses.  See, Lynn. Aff., ¶ 2-4 [1995 Appendix at A 1677-79]; Affidavit of William Bernstein

sworn to August 21, 1996 ("Bernstein Aff."), ¶¶ 4-14 [1995 Appendix at A 502-508].[29]  And as

before, these areas are largely accessible by public transportation.  See, Rose Aff., ¶ 47 [1995

Appendix at A 498); Bernstein Aff., ¶ 3 [1995 Appendix at A 502]; DCP Transit Analysis [1995

Appendix at A 819-22)]; Transit Access Maps [1995 Maps].

90.     It is therefore apparent that, the 2001 Adult Use Amendments were

adopted to clarify and strengthen the 1995 text so as to further effectuate its legislative purpose.

Thus, like the 1995 regulations, the 2001 amendments are a legitimate attempt to address the

adverse secondary impacts of adult entertainment establishments that fully complies with

---

[29] The Bernstein Affidavit includes a description of several specific areas where adult uses are permitted.  In that regard, the affidavit mistakenly characterizes all of Community District 3 in Staten Island as a permitted area.  Bernstein Aff., ¶ 13 [1995 Appendix at A 507-08].  In fact, adult uses are not permitted in the portion of Community District 3 zoned as Area M in the Special South Richmond District (see, Zoning Maps 32c and 32d).  As noted above, the 2001 amendments clarify that adult uses are prohibited in and within 500 feet of manufacturing districts where new residences, joint living-work quarters for artists or loft dwellings are permitted, whether as of right or by special permit or authorization, even where the grant of a special permit or authorization requires an assessment of the impact of a new residential us on commercial or manufacturing uses within a district.  As this was the intent of the 1995 regulations in the first instance, DCP did not treat these manufacturing districts as "permitted areas" when calculating the land area that remained available for adult uses after the adoption of the 1995 regulations.  Nonetheless, in performing these calculations, portions of one such district, Area M in the Special South Richmond District, were mistakenly characterized as a "permitted area" in 1995.  When the entirety of Area M is properly characterized as a prohibited area, it only reduces by approximately three the total number of potential sites for adult establishments.  No other manufacturing districts where residential uses are permitted were mistakenly characterized as permitted areas.  For example, the Special Lower Manhattan Mixed Use District is a manufacturing district where loft dwellings and joint living-work quarters for artists are permitted by special permit if "the conversion [to residential use] will not harm the commercial and manufacturing sectors of the economy" or "the commercial or manufacturing character of the surrounding area."  Z.R. § 111-50.  Similar in nature to Area M in the Special South Richmond District, this Manhattan area was properly treated as one where adult uses would be prohibited when calculating available land area in 1995.

1862

constitutional standards.  Plaintiffs' facial challenge to the 2001 amendments should therefore be

rejected on the merits.

_____
DAVID KARNOVSKY

Sworn to before me this

day of October, 2002.

_____
Notary Public

BRUNILDA MESA
Notary Public, State of New York
No. 01ME4873044
Qualified in Bronx County
Certificate Filed in New York County
Commission Expires Oct. 6, 200⅃⊙

44

1863