UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

689 EATERY CORP., etc., *et ano.,*                    :

                         Plaintiffs,          :

          - against -                              :          Civil Action No.
                                                02 CV 4431 (LJL)

THE CITY OF NEW YORK, et al.,                         :

                        Defendants.       :

-------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*          :

                         Plaintiffs,          :

          - against -                              :          Civil Action No.
                                                02 CV 4432 (LJL)

THE CITY OF NEW YORK, et al.,                         :

                        Defendants.       :

-------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*          :

                         Plaintiffs,          :

          - against -                              :          Civil Action No.
                                                02 CV 8333 (LJL)

THE CITY OF NEW YORK,                                 :

                        Defendant.         :

-------------------------------------------------------------X

336 LLC., etc., *et al.,*                             :

                         Plaintiffs,          :

          - against -                              :          Civil Action No.
                                                18 CV 3732 (LJL)

THE CITY OF NEW YORK,                                 :

                        Defendant.         :

-------------------------------------------------------------X

**VOLUME 8 OF EXHIBITS TO**
**JOINT REQUEST AND STIPULATIONS REGARDING**
**<u>THE TAKING OF JUDICIAL NOTICE</u>**


JNR-001081

**EXHIBITS VOL. 8 of 10; pp. JNR-001083 – JNR-001351**
**(Exhibits 54 - 59)**

**Page(s)**

| Exhibit 54 | Relevant pages from transcripts of evidentiary hearing in State Action (Index No. 121197/2002) in Supreme Court, New York County, on February 23 through March 2, 2009 | 001083-001309 |

| Exhibit 55 | Excerpt from Respondents' Brief of City of New York, et al., filed in NY Court of Appeals re Index Nos. 113049/96, 103568/96 and 103569/96, dated December 11, 1997 | 001310-001313 |

| Exhibit 56 | Excerpts from September 3, 1996 deposition testimony of Marilyn Mammano, Director of Zoning & Urban Design of the NYC Department of City Planning, in State Action (Index No. 103569/96) | 001314-001323 |

| Exhibit 57 | Maps (Reduced Size Versions) Generated by the DCP of Manhattan, Brooklyn, Bronx, Queens, and Staten Island, based on 1993-1995 data, indicating "Areas Where Adult Uses Would Continue to be Allowed Under the Proposal and Encumbered Property Within those Areas", filed State Actions (Index Nos. 103568/96 and 103569/96) as Exhibit RR to the Affidavit of Andrew S. Lynn, dated September 17, 1996 | 001324-001328 |

| Exhibit 58 | Maps generated by the DCP depicting the reduction in permissible areas for adult businesses based on Zoning Changes between 1995 and 2001, filed in State Action (Index No.  121080/02) on October 17, 2002, as Exhibit S to the Affidavit of David Karnovsky | 001329-001343 |

| Exhibit 59 | Litigation Management Agreement dated September 25, 2017 (Exhibit B to March 2, 2018 letter from Plaintiffs to Hon. William Pauley) | 001344-001351 |

**Transcript of Proceedings dated February 26, 2009 (Pages 448 Through 623)**

2  SUPREME COURT OF THE STATE OF NEW YORK
   NEW YORK COUNTY - CIVIL BRANCH - PART: 2
3  ------------------------------------------X
   TEN'S CABARET, INC., f/k/a Stringfellow's
4  of New York, Ltd., PUSSYCAT LOUNGE, INC.,
   d/b/a "Pussycat Lounge", CHURCH STREET
5  CAFE, INC., d/b/a "Baby Doll" and 69-20
   QUEENS BLVD., INC., d/b/a "Nickels",
6                                 . Plaintiffs,

                                               INDEX NO.
7             -against-                        121197/02

8  THE CITY OF NEW YORK, MAYOR MICHAEL
   BLOOMBERG, as MAYOR, etc., et al,
9                                 Defendant.
   ------------------------------------------X
10                      71 Thomas Street
                        New York, New York
11                      February 26, 2009

12  B E F O R E:

13      HONORABLE LOUIS B. YORK, Justice

14  A P P E A R A N C E S:

15      BERKMAN, GORDON, MURRAY & DEVAN, ESQS.
        For Plaintiffs
16           55 Public Square - Suite 2200
             Cleveland, Ohio  44113
17      BY:  J. MICHAEL MURRAY, ESQ., of Counsel

18      MEHLER & BUSCEMI, ESQS.
        For Plaintiffs
19           305 Broadway - Suite 1102
             New York, New York  10007
20      BY:  MARTIN P. MEHLER, ESQ., of Counsel

21      NEW YORK CITY LAW DEPARTMENT
        OFFICE OF THE CORPORATION COUNSEL
22      For Defendantss
             100 Church Street
23           New York, New York  10007
        BY:  ROBIN BINDER, ESQ.,
24           SHERYL NEUFELD, ESQ., and
             RACHEL K. MOSTON, ESQ., of Counsel
25
                              ANGELA TOLAS, CSR
26                            OFFICIAL COURT REPORTER

                        AT

JNR-001083

# PGS. 2-185
# OMITTED

JNR-001084

```
1                         EBT - Coppa

2                  THE WITNESS:  10024.

3                  COURT CLERK:  Thank you.  You may have a

4        seat.  The witness has been sworn.

5                  THE COURT:  Please inquire.

6                  MS. BINDER:  Thank you, your Honor.

7    DIRECT EXAMINATION

8    BY MS. BINDER:

9        Q     Mr. Iulo, until recently where were you

10   employed?

11       A     New York City Department of Buildings.

12       Q     And have you left the Department of

13   Buildings?

14       A     Yes, I have.

15       Q     Did you retire?

16       A     Yes, I did.

17       Q     Before we discuss your employment with the

18   Department of Buildings, will you describe your higher

19   educational background.

20       A     I have a degree, a Masters Degree in urban

21   planning from NYU.

22       Q     What about undergraduate?

23       A     Business degree, Pace.

24       Q     From Pace did you say?

25       A     Pace.

26       Q     Now when did you start?  When did you first
```

                              AT

                    Iulo - Direct - Binder

1

2    start working at the Department of Buildings?

3        A       In 1992.

4        Q       And when you started in 1992, what position

5    did you hold?

6        A       I was a construction inspector.

7        Q       And what does a construction inspector do?

8        A       Performs inspections as required for

9    compliance with building code and zoning resolution.

10       Q       And were you assigned to any particular

11   department?

12       A       Yes, I was assigned to the Mayor's office in

13   midtown enforcement.

14       Q       What is or was the Mayor's office of midtown

15   enforcement?

16       A       It as a group of different City agencies,

17   inspectors and police.  There were fire inspector,

18   health inspector, construction inspector, police

19   officers.  And we would conduct inspections throughout

20   the midtown area which was 14th Street to 16th Street,

21   river to river.

22       Q       And how long did you remain at the Office of

23   Midtown Enforcement?

24       A       Until 1998.

25       Q       Now did there come a time to your knowledge

26   where the City began to regulate the location of what

                           AT

1073

```
                        Iulo - Direct - Binder
 1
 2    are now called adult establishments?
 3        A      Yes, in 1998.
 4        Q      And what type of regulation?
 5               THE COURT:  Excuse me, you say you
 6    retired in 1998 from the Department of Buildings.
 7               THE WITNESS:  No, I retired last week.
 8               THE COURT:  Oh, but you were Midtown
 9    Enforcement until '98?
10               THE WITNESS:  That's right.
11               THE COURT:  I see, okay.
12        Q      To clarify, when you were assigned to midtown
13    enforcement, who was your employer?
14        A      The City of New York, Department of
15    Buildings.
16        Q      And Midtown Enforcement was where you were
17    assigned as a building Inspector working for the
18    Department of Buildings?
19        A      Yes, that's correct.
20        Q      You testified that in 1998 the City began to
21    regulate the location of what are now called adult
22    establishments.  What type of regulations were adopted?
23        A      Adult establishments weren't permitted in
24    certain zoning districts or within 500 feet of certain
25    zoning districts or within 500 feet of one another or
26    other sensitive receptors.

                             AT
```

Iulo - Direct - Binder

1

2       Q       Those were zoning regulations?

3       A       Yes.

4       Q       And when the City started to regulate adult

5   establishments through zoning in 1998, were you still

6   working out of the Mayor's office of Midtown

7   Enforcement?

8       A       No, early in 1998, I think it was March or

9   April, I took a position at the Department of Buildings.

10  So I was working at the Department of Buildings and no

11  longer with the Mayor's office in Midtown Enforcement.

12      Q       And what was that?  What was that position?

13      A       I was an Assistant to a Deputy Commissioner.

14      Q       And did you have any responsibilities with

15  respect to the City's efforts to regulate adult

16  establishments through zoning in 1998?

17      A       Yes, I did.

18      Q       What were they?

19      A       I directed, I trained and directed inspectors

20  who would do inspections of adult establishments in the

21  four boroughs outside of Manhattan.

22      Q       So the inspectors at the Department of

23  Buildings did they do the Manhattan inspections?

24      A       No.

25      Q       Who did the Manhattan inspections?

26      A       Mayor's office, Midtown Enforcement.

AT

Iulo - Direct - Binder

1

2      Q      How many inspections did you oversee at the

3   Department of Buildings?

4      A      There were different inspectors at various

5   times, but it was about 20.

6      Q      And what was the period of time that you

7   oversaw these inspectors doing inspections of adult

8   establishments outside the Borough of Manhattan in the

9   City?

10     A      The original group of inspections when I had

11  about 20 inspectors from our different borough offices

12  that started in July of 1998 and it went on for about a

13  year.

14     Q      And what were your day to day

15  responsibilities in terms of overseeing the inspectors

16  during that year?

17     A      What I would do would pass on addresses to

18  them of where they had to do inspections.  And when they

19  returned I would look over their inspection reports and

20  distribute those to different people.

21     Q      Did you give them any training materials?

22     A      Yes, I did.

23     Q      What types of materials did you give them?

24     A      Before I left the Mayor's office of Midtown

25  Enforcement earlier, early in 1998, I wrote a manual

26  which covered most of the zoning issues and how to issue

AT

Iulo - Direct - Binder

1  a violation and that type of thing.

2      And I trained inspectors while I was at the office

3  of Midtown Enforcement, I trained inspectors at the

4  Department of Buildings, and then continued that

5  training with other inspectors after I transferred to

6  the Department of Buildings.

7      Q      Okay, now you testified that this was a one

8  year long thing from '98 to '99.  Did DOB continue to

9  inspect adult establishments after that one year period?

10     A      Yes, at the beginning we sort of borrowed

11 inspectors from our five borough offices to do this type

12 of work.  And after about a year for other reasons we

13 formed a group, a centralized group of inspectors to

14 handle certain special projects, and those inspectors

15 continued the inspections.

16     Q      And was inspecting adult establishments the

17 only thing that this group of inspectors did?

18     A      No, it was originally put together to inspect

19 illegal advertising and business signs.  And then they

20 started doing the adult establishments because we

21 already had them together essentially.

22     Q      Was there anything else they did besides the

23 things that you mentioned so far?

24     A      About that time the Department of Buildings

25 was mandated to inspect all public school buildings once

AT

1077

Iulo - Direct - Binder

1

2   a year, and they also hand handled that.  And as time

3   went on other things were added.

4       Q      Did this unit have a name?

5       A      The name was the special projects inspection

6   team, SPIT.

7       Q      And what was your role in connection with the

8   SPIT unit?

9       A      I was the manager of the unit.

10       Q      And as the manager of the unit, what were

11   your day to day responsibilities?

12       A      To put together locations where they had to

13   go and to go and do inspections, and then to look at the

14   results of those inspections when they came back.

15       Q      And did there come a time where you left

16   SPIT?

17       A      Yes.

18       Q      When was that?

19       A      Well, I didn't exactly leave SPIT.  I got

20   another position which included some other units and

21   SPIT was part of it.  And I continued with that work

22   until June of '07.

23       Q      And then in June of '07 you went on to

24   another assignment at the Police Department?

25       A      Yes, I did.

26       Q      Now while you were employed at the buildings

AT

1078

Iulo - Direct - Binder

1

2   department, did there come a time in late 2008 when you

3   were asked by the Corporation Counsel's office to

4   conduct observations of certain cabarets offering

5   topless entertainment in a portion of their premises?

6       A     Yes, I did.

7       Q     Were you asked to make observations at an

8   establishment known as Lace 2 located at 689 Eighth

9   Avenue?

10      A     Yes, I did.

11      Q     And did you visit Lace 2 for that purpose in

12  2008?

13      A     Yes, I did.

14      Q     How many times?

15      A     Once.

16      Q     And at what time of day did you make this

17  visit?

18      A     Late afternoon.

19      Q     Did anyone accompany you?

20      A     No.

21      Q     And what was the duration of your visit to

22  Lace 2 in 2008?

23      A     It was about 45 minutes.

24      Q     Had you ever been to Lace 2 before you made

25  that visit?

26      A     No.

AT

1079

Iulo - Direct - Binder

1

2       Q       What did you do when you arrived at the

3    premises?

4       A       I went up to the front door and I asked for

5    the manager.  And when I met the manager I introduced

6    myself as being with the Department of Buildings and

7    said, "I'd like to take a look around."  And we went in

8    together, and walked throughout the establishment.

9       Q       Were you escorted around by the manager?

10      A       For most of the time, yes.

11      Q       And while you were there, did you observe the

12    layout of the establishment?

13      A       Yes, I did.  Upon entering there was a --

14      Q       Let me stop you for a second Mr. Iulo.  Did

15    Lace 2 occupy more than one story?

16      A       Yes, it did.

17      Q       How many stories?

18      A       Two stories.

19      Q       Okay, so now would you please describe what

20    you observed on the first floor of the establishment

21    during your visit in 2008?

22      A       At the entrance this was a coat check room.

23    Just beyond that was a spiral stair going up to the

24    second floor.  And then there was sort of the back of a

25    DJ booth in a wall.  On the other side of that wall

26    through the doors there was the entertainment area with

AT

                    Iulo - Direct - Binder

1
2   a stage and tables and chairs and a bar.
3        Q     Did you observe any activity on the stage?
4        A     Yes, there was one topless dancer on the
5   stage.
6        Q     Did you observe any customers in the area?
7        A     Yes, there were about six male customers.
8        Q     And what were they doing?
9        A     Sitting down drinking watching the
10  entertainment.
11       Q     Now did you observe the second floor?
12       A     Yes, I did.
13       Q     Would you please describe what you observed
14  on the second floor of the establishment during the
15  visit in 2008?
16       A     At the front end of it there were windows
17  overlooking Eighth Avenue.  There were some couches, a
18  pool table, and that was about it.
19       Q     Did you observe any customers on the second
20  floor of Lace 2?
21       A     No, I didn't.
22       Q     How long did you observe the second floor of
23  Lace 2?
24       A     About 45 minutes.
25       Q     And from where did you do that?
26       A     At the base of the spiral stairs.

                            AT

Iulo - Direct - Binder

1

THE COURT:  What time of day was that?

THE WITNESS:  I think it was about three, 4:00 o'clock.

Q     All right, Mr. Iulo, I'm going to show you a document that's been premarked as Defendant's Exhibit N-1.  Two exhibits, one is N-1 and one is N-2 premarked for Identification.

(Whereupon, Defendant's Exhibits N-1 and N-2 were marked for Identification at this time.)

Q     Mr. Iulo, can you identify this document and what's depicted in the document?  There are two different pages N-1 and N-2.

A     N-1 and N-2, they are both photographs of the exterior of Lace 2.

Q     And do these photographs fairly and accurately depict the exterior signs at Lace 2 on Eighth Avenue in 2008 when you visited there?

A     Yes, they do.

MS. BINDER:  We offer the photographs, your Honor, into evidence Exhibits N-1 and N-2.

THE COURT:  Mark them in evidence.

MR. MURRAY:  No objection.

(Whereupon, Defendant's Exhibits N-1 and N-2 were marked in Evidence at this time.)

Q     Mr. Iulo, could you just read for us what the

AT

Iulo - Direct - Binder

1

2      Q      Did anyone accompany you?

3      A      No.

4      Q      Had you been to Lace ever before before you

5   made that visit?

6      A      No.

7      Q      And did you identify yourself as a Department

8   of Buildings employee when you arrived at Lace?

9      A      Yes, I did.

10     Q      And were you escorted around?

11     A      Yes, I was.

12     Q      Did you observe the layout of the

13  establishment during your visit?

14     A      Yes.

15     Q      Did Lace occupy more than one story?

16     A      Yes, it did.

17     Q      How many stories?

18     A      Two.

19     Q      Would you please describe what you observed

20  on the first floor of the establishment when you visited

21  in 2008?

22     A      Walking in there was a coat check room in

23  sort of a lounge area.  Then there was a wall with doors

24  in it leading to the entertainment area where there were

25  tables and chairs and a stage.  And also just next to

26  the coat check area there is a stairway going up to the

AT

Iulo - Direct - Binder

second floor.

Q     Did you observe any activity on the stage?

A     Yes, there was one topless dancer.

Q     Did you observe any customers in the area?

A     Yes, there were eight male customers.

Q     And what were they doing?

A     Sitting down drinking, watching the dancer.

Q     Did you also visit the second floor of Lace?

A     Yes, I did.

Q     And what did you observe on the second floor
of Lace during your visit in 2008?

A     There was couches and a pool table and some
other things, but it looked like it was being
redecorated, maybe being painted at the time.

Q     What makes you think it was being
redecorated?

A     I saw paint cans and it looked a little bit
upset.

Q     Did you see anybody up there?

A     No.

Q     What was the duration of your visit to Lace
in 2008?

A     About 20 minutes.

Q     And why didn't you stay longer?

A     I saw it all in about 20 minutes.

AT

1084

```
1                    Iulo - Direct - Binder

2        Q     Did you observe the signs on the exterior of

3    the premises when you visited Lace in 2008?

4        A     Yes.

5        Q     What did the signs say?

6        A     "Lace, a Gentlemen's Club."

7        Q     Did you see the words "Sports Bar" on any

8    exterior sign on Lace when you visited in 2008?

9        A     No, I didn't.

10                   MS. BINDER:  We have no further

11       questions.

12                   THE COURT:  Cross-examination?

13                   MR. MURRAY:  Thank you, your Honor.

14   CROSS-EXAMINATION

15   BY MR. MURRAY:

16       Q     Mr. Iulo, if I understand correctly you went

17   into Lace on Seventh Avenue what time of day was that

18   one?

19       A     It was late in the afternoon, I think around

20   four.

21       Q     And you stayed there for around 20 minutes

22   did you say?

23       A     Right.

24       Q     And you were able to observe the downstairs

25   and the upstairs; is that correct?

26       A     Yes.

                            AT
```

Iulo - Cross - Murray

1

2     A     Correct.

3     Q     And during the course of the time that you

4   were there, you didn't see any actual sex acts such as

5   intercourse, oral sex or masturbation, did you?

6     A     No.

7     Q     Now you indicated, sir, that -- oh, by the

8   way, do you have N-1 and N-2 in front of you?

9     A     Yes.

10    Q     I just want to make sure that there is no

11  confusion about N-2.  Do you see directly underneath the

12  part of the picture that has the awning there is some

13  illuminated words on a storefront, do you see that?

14    A     Yes.

15    Q     That's next door?

16    A     Ah ha, yes.

17    Q     That's not part of this business, is it?

18    A     No, it's not.

19    Q     Now I think you testified on direct

20  examination that you've got a Masters Degree?

21    A     Yes.

22    Q     And that's in urban planning?

23    A     Yes.

24    Q     And you got it at New York University I think

25  you indicated?

26    A     Yes.

AT

204

Iulo - Cross - Murray

1

2    Q    And, in fact, isn't it true that one of your

3    interests that you pursued was the regulation of signs?

4    A    Yes.

5    Q    As a matter of fact you wrote a thesis for

6    your Masters Degree entitled "Regulating aesthetics in

7    commercial districts of New York City", did you not?

8    A    That's true.

9    Q    And that thesis dealt primarily with signs,

10   business signs and advertising signs in New York City;

11   correct?

12   A    Correct.

13   Q    As a matter of fact, you yourself had

14   observed sign damage on the east side of town,

15   particularly East 34th Street that was in compliance

16   with zoning regulations and communicated a very nice

17   aesthetic appeal; correct?

18   A    Yes.

19   Q    On the other hand when you went to the west

20   side, you discovered that the signs were more plentiful

21   and they were more garish and you found that they

22   communicated an entirely different feel; correct?

23   A    Correct.

24   Q    And you also knew that back in 1994 you were

25   familiar with the signs that existed for some of the

26   adult eating and drinking establishments, were you not?

AT

1087

1                    Iulo - Cross - Murray

2        A        Pardon me?  Say that again.

3        Q        Back in 1994, you observed the sign damage

4   that was prevalent for some of the eating and drinking

5   establishments that offered adult entertainment?

6        A        Yes, that's correct.

7        Q        And you knew and saw that those signs were

8   loud and garish, would you agree with that

9   characterization?

10       A        In some cases, yes.

11       Q        They had things communicated, messages like

12  "Girls, Girls, Girls" there were signs like that;

13  correct?

14       A        Correct.

15       Q        There were signs that said "Triple X" for

16  example associated with these adult eating and drinking

17  establishments back in those days?

18       A        I think so, yes.

19       Q        And, in fact, you learned as part of your

20  duties in connection with the City, you were involved

21  somewhat at the time that the zoning resolution

22  regulating adult establishments occurred; correct?

23       A        I'm sorry?

24       Q        You were working for the City at the time the

25  '95 ordinance that began to be enforced in '98 was

26  originally adopted; correct?

                            AT

1088

                    Iulo - Cross - Murray

1

2      A     Yes, that's correct.

3      Q     And you were familiar with some of the

4  history that lead up to that ordinance as a consequence

5  of your employment with the City?

6      A     Yes.

7      Q     And you knew for example that in the course

8  of considering the adoption of that ordinance that there

9  were citizens who testified in support of ordinances

10  that if you could only just regulate the signs, nobody

11  would care about what's going on inside; do you

12  recall that?

13                  MS. BINDER:  Objection, your Honor.

14                  THE COURT:  Would you read the question

15      back?

16                  (Record read.)

17                  THE COURT:  It's a rather complicated

18      question.  Maybe you should rephrase it.

19                  MR. MURRAY:  I will, your Honor.

20      Q     It's true, is it not, that around that

21  timeframe when the original zoning resolution to

22  regulate adult establishments was being considered, one

23  of the complaints that citizens had was with respect to

24  the sign damage; correct?

25                  MS. BINDER:  Objection, your Honor.

26                  THE COURT:  I'm going to have an offer

                           AT

1089

                    Iulo - Cross - Murray

1

2       of proof.  We'll do it on the record since there is

3       no jury.  Did you know that?

4                    THE WITNESS:  Yes.

5                    THE COURT:  How did you know that?

6                    THE WITNESS:  I followed it.  It was in

7       the papers.

8                    THE COURT:  All right.  You can ask him

9       the question provided you also ask him how he knew

10      it.

11                   MR. MURRAY:  Sure.

12      Q      You were aware that during this time period

13      when the zoning resolution was being considered,

14      citizens complained about the sign damage that was

15      associated with adult establishments; correct?

16      A      At least one, yes.

17      Q      And how did you know that?

18      A      I read it in the paper.

19      Q      Now it is true, is it not, that the zoning

20      resolution as passed in addition to the location

21      requirements that you described on direct examination

22      also had some sign damage regulations applicable to

23      adult entertainment establishments; correct?

24      A      That's correct.

25      Q      And it is true, is it not, that since those

26      sign regulations were adopted, you definitely noticed

                              AT

1090

1               Iulo - Cross - Murray

2    that the sign damage for the adult eating and drinking

3    establishments toned down quite a bit as a result of

4    that; correct?

5        A    No, not exactly.

6        Q    Well, you did discover, did you not, that

7    the -- well let me -- do you recall that you gave a

8    deposition or an examination before trial in this case

9    in October of 2007, do you not?

10       A    Yes.

11       Q    And you recall that you were placed under

12   oath and that there was a Court Reporter there to record

13   the questions and the answers; is that correct?

14       A    Yes.

15       Q    And you were asked a series of questions and

16   you gave a series of answers; correct?

17       A    Yes.

18            MR. MURRAY:  Your Honor, I would like to

19       mark for Identification and hand up to the witness

20       as Plaintiff's Exhibit 13 his transcript.

21            THE COURT:  Okay, 13 for Identification.

22            MS. BINDER:  Why is it going to the

23       witness?  I don't understand.  Objection, your

24       Honor.

25            THE COURT:  He wants to give it to the

26       witness.  You know you can give him anything.

                       AT

```
 1                    Iulo - Cross - Murray

 2        Q      Referring to page 181 of your deposition

 3   beginning at line seven.  And just if you need to you

 4   can look at the preceding page for context, but I will

 5   tell you you were talking about the changes in the sign

 6   damage.  Is it not true that you were asked this

 7   question?

 8                    THE COURT:  What line?

 9        Q      Line 7 on page 181, is it not true that you

10   were asked this question and you gave this answer under

11   oath.

12        "To your knowledge, and you've been there since the

13   beginning, have the eating and drinking establishments

14   adhered to the changes?"  And your answer was, "I think

15   they have toned down quite a bit."

16        Was that your testimony, sir?

17        A      Yes.

18        Q      And that was true of course at the time that

19   you gave that testimony?

20        A      But what you asked me before was about the

21   sign damage regulations.

22                    THE COURT:  There is no question

23        pending.

24        A      Okay.

25        Q      Now, just so that we're clear, it's true that

26   they toned it down quite a bit?

                         AT
```

1092

Iulo - Cross - Murray

1

2      A      Yes.

3      Q      And, in fact, it was toned down to the point

4 with respect to where quite a few of the eating and

5 drinking establishments you wouldn't even know what it

6 was from the outside; correct?

7      A      Correct.

8      Q      And you don't see any more signs like

9 "Triple X" or "Girls, Girls, Girls" associated with

10 these eating and drinking establishments; isn't that

11 true?

12      A      True.

13                  MR. MURRAY:  May I have one moment, your

14      Honor?

15                  THE COURT:  Yes.

16                  (Attorneys confer.)

17                  MR. MURRAY:  That's all I have.  Thank

18      you.

19                  THE COURT:  Redirect.

20.                  MS. BINDER:  Thank you, your Honor.

21 REDIRECT EXAMINATION

22 BY MS. BINDER:

23      Q      Mr. Iulo, you were asked some questions about

24 sign regulations for adult establishments.

25      Did those sign regulations apply to 60/40

26 establishments?  In other words you were asked,

                           AT

Iulo - Redirect - Binder

Mr. Murray asked you a question regarding whether as a result of sign regulations for adult establishments signs were toned down and you attempted to explain your answer.  Would you explain your answer to us?

A      The sign damage regulations were never enforced so they were toned down maybe for other reasons.

Q      Okay, now the sign regulations, what did they apply to?

A      They applied to adult establishments.

Q      Now if a topless bar limits adult entertainment to less than 40 percent of its customer accessible floor area, is it considered an adult establishment under the '95 zoning regulations?

A      No.

Q      So would the sign regulations applicable to adult establishments apply to what's not considered an adult establishment under the '95 zoning regulations?

A      No, they wouldn't.

Q      Now you've testified that you saw the words "Girls, Girls, Girls" on signs during the '90's on topless bars; correct?

A      Correct.

Q      And you also testified that you saw the words "X X X", yes?

AT

1094

Iulo - Redirect - Binder

1

2     A     Correct.

3     Q     Did you ever see a sign that contained the

4  words "X X X" and "Girls, Girls, Girls" and "Topless"

5  and "Adult" on the same establishment?

6     A     Probably not all of that.

7     Q     And, in fact, did you ever see a sign that

8  said "Adult" on the outside of a topless bar in the

9  '90's, the word "Adult"?

10    A     I don't think so, no.

11    Q     What about the word "Topless"?

12    A     Topless, yes.

13    Q     And what about the phrase "Open 24 hours"?

14    A     I can't remember ever seeing anything like

15  that.

16          MS. BINDER:  We have nothing else, your

17    Honor.

18          THE COURT:  Okay.

19          MR. MURRAY:  I have one recross, your

20    Honor.

21          THE COURT:  Go ahead.

22          MR. MURRAY:  To the extent that the '95

23    sign regulations did not and do not apply to the

24    60/40 establishments, it would be true then that

25    the toned down signage associated with those

26    establishments would have been voluntary on their

AT

```
 1                     Iulo - Redirect - Binder

 2      part; is that correct?

 3                     THE WITNESS:  I suppose so.

 4                     THE COURT:  You are excused, sir.

 5                     MS. BINDER:  Wait a second, your Honor,

 6      I have one.

 7                     THE COURT:  Re-redirect?

 8                     MS. BINDER:  Just one question.

 9                     THE COURT:  Go ahead.

10                     MS. BINDER:  Are there other sign

11      regulations that apply to non adult establishments

12      such as 60/40 clubs.

13                     THE WITNESS:  Yes, there are.

14                     MS. BINDER:  When were they adopted?

15                     THE WITNESS:  Since 1962.

16                     MS. BINDER:  Were they recently amended?

17                     THE WITNESS:  Sign regulations are

18      regularly amended.

19                     MS. BINDER:  Do you know when the most

20      recent amendment was?

21                     THE WITNESS:  No, I don't.

22                     MS. BINDER:  Okay, that's it, your

23      Honor.

24                     THE COURT:  Anything?

25                     MR. MURRAY:  No, thank you, your Honor.

26                     THE COURT:  You are excused.  Next

                            AT
```

1096

# PGS. 214-306
# OMITTED

1097

**449**

```
1                          Proceedings
2                THE COURT:  What do we have today?
3                MR. MURRAY:  Your Honor, you may recall
4       the City was gracious enough to allow me to put a
5       witness in out of order, so the plaintiff's are
6       going to call Dr. Daniel Linz.
7                THE COURT:  Okay.
8    D-R.   D-A-N-I-E-L   L-I-N-Z, called as a witness,
9    having been first duly sworn, was examined and
10   testifies as follows:
11               COURT CLERK:  Please state your name.
12               THE WITNESS:  Daniel G. Linz.
13               COURT CLERK:  Spell your last name,
14      please.
15               THE WITNESS:  L-I-N-Z.
16               COURT CLERK:  And your address?
17               THE WITNESS:  2107 Castillo
18   C-A-S-T-I-L-L-O Santa Barbara, California, 93105.
19               COURT CLERK:  Thank you.  You may have a
20      seat.  The witness has been sworn.
21               THE COURT:  You may sit down.  Please
22      inquire.
23               MR. MURRAY:  Thank you, your Honor.
24   DIRECT EXAMINATION
25   BY MR. MURRAY:
26      Q    Dr. Linz, tell the Court what your current
                              AT
```

JNR-001111

```
 1              Dr. Linz - Direct - Murray

 2   occupation is?

 3       A    I am a Professor at the University of

 4   California, Santa Barbara.  I share a joint appointment

 5   between the law and society program and the Department

 6   of Communication where I specialize in the effects of

 7   sexual and violent entertainment on attitudes,

 8   predispositions, beliefs of those exposed to those

 9   messages.

10       Q    And tell the Court what your educational

11   background is?

12       A    I received my Ph.D. at the University of

13   Wisconsin, Madison.

14              THE COURT:  In what?

15       A    In psychology.  Specialization in social

16   psychology and law.  I have a Masters Degree from the

17   Sociology Department at the University of Business and a

18   Ph.D. of the Psychology Department at the University of

19   Business.

20       Q    And tell the Court are you a full professor?

21       A    Yes, I am.

22       Q    And would you describe your work as a

23   professor over the past ten, 12 years?

24       A    Well, for the last ten years I've been

25   primarily looking at the effects of, or the alleged

26   affects of adult businesses in the community with regard
```

                                    AT

1          Dr. Linz - Direct - Murray

2     to what has been termed adverse secondary effects.

3          Before that and continuously I investigate the

4     effects of pornography on human behavior, the effects of

5     violent depictions on human behavior and attitudes, and

6     a variety of other fields that have to do with what I

7     would call psychology and law, or communication and law.

8          Q     And what courses do you teach?

9          A     I teach a variety of courses.  Currently for

10    example at the undergraduate level I am teaching a

11    course in communication law.  I am teaching a course

12    also on the effects of the exposure to sexually explicit

13    material.

14          I also teach at the graduate level a course on

15    methodological and statistical applications in the area

16    of communication and communication law.

17          Q     And do you supervise any graduate students?

18          A     Yes, I do.  Over the past, oh, how long have

19    I been doing it, 25 years, I have probably supervised at

20    least 20 or so either MA's or Ph.D. students.

21          Q     Now, doctor, I want to hand up to you what

22    has been marked for Identification as Plaintiff's

23    Exhibit 5.

24               (Whereupon, Plaintiff's Exhibit 5 was

25          marked for Identification at this time.)

26          Q     Doctor, can you identify that document?

                    AT

Dr. Linz - Direct - Murray

1

2       A       This is a copy of my curriculum vitae dated

3   September 2007.

4       Q       And does it accurately depict your

5   experience, background and education at least as of

6   September of '07?

7       A       Yes, it does.

8               MR. MURRAY:  Your Honor, I would move to

9       admit Plaintiff's 5.

10              MS. BINDER:  Your Honor, we object to

11      that.  It's hearsay.

12              THE COURT:  It's not hearsay if he is

13      here and he performed it.

14              MS. BINDER:  He's here and he can

15      testify about it.

16              THE COURT:  That's a different story.

17              MS. BINDER:  Something he wrote is

18      hearsay.

19              THE COURT:  No, it's not hearsay if he

20      wrote it and he can be cross-examined to it.  But I

21      agree with you, he's here, he's already testified

22      to most of his qualifications, and I don't think

23      it's really necessary to put in the curriculum

24      vitae.

25              MR. MURRAY:  That's fine, your Honor.

26      It was just a matter of convenience for the Court

                        AT

1101

Dr. Linz - Direct - Murray

2   and the parties.  All right, doctor, what I'd like

3   you to now do --

4          THE COURT:  Has it been marked for

5   identification?

6          MR. MURRAY:  It has, Judge.

7      Q     Doctor, have you written any scholarly

8   publications that have been published in the journals?

9      A     Yes, many, actually probably in the area of

10  about perhaps 85 published articles.

11     Q     And can you tell the court what topics those

12  published articles have covered?

13     A     They have covered the topics of exposure to

14  sexually explicit messages, and the effects of those

15  messages on human behavior, attitudes and beliefs.

16  Covered the topics of exposure to violence, violent

17  television, sexual violence and its effects on human

18  behavior, attitudes as well as beliefs.

19     And then more recently as I indicated the

20  relationship between the presence of adult businesses in

21  the community and adverse secondary effects primarily in

22  the area of changes in or levels of crime that may be

23  associated with or not associated with adult businesses.

24     Q     What are some of the scholarly peer reviewed

25  journals that these articles have appeared in?  Can you

26  identify some of the journals?

AT

Dr. Linz - Direct - Murray

1

2     A     Yes, for example in 2001 an article appeared

3   in which we had my graduate associate at the time and I

4   had reviewed approximately 110 or 120 studies that had

5   been undertaken by municipalities across the nation with

6   regard to the alleged adverse secondary effects of adult

7   businesses.

8        And then that's a study that was published in the

9   communication law and policy journal which is a peer

10   review journal in, if you may forgive me for not

11   remembering exactly, but I think it was 2000.

12        Then beyond that in 2004 we published an article in

13   the law and society review in which we examined the

14   impact of adult businesses in North Carolina, in this

15   case Charlotte Mecklenburg specifically the Charlotte

16   area.

17        And that article as I mentioned was published in

18   the law and society review in 2004 in which we found no

19   association between presence of those businesses and

20   adverse secondary affects in that community.

21        And then in 2000, forgive me for being a little

22   sketchy here without it in front of me, but roughly 2006

23   we published another article in the Journal of Sex

24   Research which is also, as were the other two, peer

25   reviewed journals in which we examined the impact of

26   peepshows as they are known, or peepshow establishments

AT

Dr. Linz - Direct - Murray

1  

2  as they are legally termed in San Diego, California.

3       And then most recently in 2008 as I recall we just

4  recently published another article, peer reviewed

5  journal in which we examined the impact of liquor

6  serving adult establishments in four Ohio cities.

7       So over the course of ten years I suppose you can

8  say I published on a fairly regular basis with regard to

9  this question of adverse secondary effects.

10      Q      And then the other 80 or so have they been --

11  just identify a couple of the journals that have

12  published, those other articles?

13      A      I have published in the Journal of

14  Personality and Social Psychology, as I mentioned also

15  the Journal of Law, and it's called actually Law and

16  Society Review.

17      The Communication Research, the Journal of

18  Communication, Human Communication Research, these are

19  all journal titles.  The Public Opinion Quarterly.

20  Those tend to be my primary outlets.

21      Q      Now, have you yourself served as a journal

22  referee for any scholarly journals?

23      A      Yes, frequently I'm asked to referee.  I'm

24  currently reviewing a manuscript, for example, for the

25  Journal Media Psychology.

26      Q      Now, doctor, you said that there came a point

                              AT

1              Dr. Linz - Direct - Murray

2    in the last I think ten years or so where you began

3    cultivating an interest in the question of adverse

4    secondary effects of adult businesses?

5         A     That's correct.

6         Q     And can you tell the Court as part of your

7    background and experience, have you yourself, not

8    talking about this present case, done any studies of

9    adverse secondary effects of adult businesses?

10        A     Yes, I have.

11        Q     And approximately how many studies have you

12   yourself done?

13        A     I would say in the neighborhood of 30 such

14   empirical studies of the possibilities that adult

15   businesses are associated with adverse secondary

16   effects.

17        Q     And approximately how many of those studies

18   have been actually published in the journals?

19        A     Well, in the journals that I mentioned that

20   would be four, five of those studies.

21        Q     Now, doctor, turning to the case that brings

22   us to Court today, did there come a time when you

23   undertook a secondary effects study of what are known as

24   60/40 businesses in the City of New York?

25        A     Yes.

26        Q     And approximately when did you perform that

                          AT

Dr. Linz - Direct - Murray

1

2    study?

3        A    We initially began to inquire of the Police

4    Department about the possibility of obtaining crime

5    information in August, 2001.  And then after 9/11 it was

6    difficult to resume our work, but we continued through

7    2005 to obtain the data, and then eventually analysis

8    and so forth undertaken more recently.

9        Q    And when did you complete the study?

10       A    The completion was approximately the early

11   part of, the late part of 2006, early part of 2007.

12       Q    What question did you actually study?

13       A    Well, we had most broadly the question of

14   whether or not adult businesses are associated with

15   crime.

16       Q    Which adult businesses?

17       A    More specifically the 60/40 businesses.  Now

18   to use the term adult in this case may be a misnomer,

19   but these were businesses that had some form of erotic

20   communication, although as I understand the regulation

21   it would be less than 40 percent of the business space

22   devoted to that.

23       Q    And so what were you asked to determine?

24       A    We were asked to review the secondary effects

25   studies that had been conducted by other municipalities

26   and to determine if we could undertake a study that

AT

Dr. Linz - Direct - Murray

2   would allow us to scientifically determine whether or

3   not there was a relationship between the presence of an

4   adult business and police activity.  In this case we

5   chose to use calls for service as an index of that

6   police activity.

7        Q     Now you mention adults businesses again?

8        A     I'm sorry, the 60/40 businesses; correct.

9        Q     So your study was confined to 60/40

10  businesses, this empirical study that you just

11  mentioned?

12       A     Yes, it was.  We only examined 60/40

13  businesses.

14       Q     Did you use accepted methods in your field

15  for studying that question?

16       A     I feel confident that we did, yes.

17       Q     Were you able to, and we'll get into it in

18  more detail, but were you able to come to a conclusion

19  as a result?

20            THE COURT:  Before we get to that, what

21      are the tools that you used to write your report?

22       A     Well, we approach it from a three prong kind

23  of approach.  One, we identified the business in its

24  location geographically.

25       And then within the census block and then the

26  emanating census blocks from the business location we

AT

1107

Dr. Linz - Direct - Murray

tabulate the number of calls for service to the police,

and measured the extent to which proximity related to

that business is associated with the calls to the

police.

A second prong of our research involves what we

might refer to as a hot spot analysis in which in the

surrounding area from the adult business in the area

immediately surrounding the adult business.

We look at the calls for service that have been

made to the police attributable to certain addresses so

that we may rank the adult business within that array of

addresses under the theory that if it was a problem in

that particular area it would rise to the top of those

rankings.

And then a third methodology that we employ is a

kind of before after approach whereby we look at some

change into the opening of a business, a 60/40 business.

Or the closing of a 60/40 business under the theory

that if one opened and there were adverse crime affects,

we should see a spike in crime, and that may continue

during the course of the opening.

Or as the business continues to operate, and

conversely if a business closed and the theory of

adverse effects was correct, we should see a decrease in

crime.

AT

1                    Dr. Linz - Direct - Murray

2         So those three methodology then are kind of a

3   geographical approach where we look at crime emanating

4   from a central location, in this case a 60/40 business,

5   an approach whereby we look at the rankings or

6   determination of whether or not the business is a hot

7   spot for criminal activity, and then the third the kind

8   of before after design that I mentioned.

9                    THE COURT:  When you talk about on

10          opening whether there is a spike, that means you

11          have figures for the level of crime in that area,

12          you know, the area that you concluded emanates from

13          that particular location, you have statistics on

14          the crime before the establishment was opened?

15                    THE WITNESS:  That is correct.

16                    THE COURT:  Okay.

17      Q     Doctor, I want to hand you what's been marked

18   for identification plaintiff's Exhibit 6.

19         Now can you, doctor, and we'll get into this in

20   more detail, but generally speaking can you identify

21   what Plaintiff's Exhibit 6 is?

22      A     Yes this is a copy of a report that we

23   prepared April 14, 2005, entitled measuring the

24   secondary effects of 60/40 businesses in New York City.

25   A study of calls for service to the police by me, Daniel

26   Linz, and Bryant Paul.

                             AT

319

Dr. Linz - Direct - Murray

1

2      MR. MURRAY:  Your Honor, I should advise

3    the Court that as you will see counsel and I have

4    conferred and the result of that conference was

5    while she may have other objections, we redacted

6    pages five through part of page 16 after consulting

7    with counsel and indicating that she would object

8    to those pages and we had no problem redacting

9    them.

10              THE COURT:  Have they been redacted?

11              MR. MURRAY:  Yes.

12              THE COURT:  So I don't have copies of

13    that in my copy, right?

14              MR. MURRAY:  No, I think you'll see it

15    goes from page four to 16 on your copy, I hope

16    anyway.

17              THE COURT:  What about page four?

18              MR. MURRAY:  No, we included page four.

19    We knew you, the City, would object to beginning on

20    page five through part of 16 and so we took that

21    out.  She may have other objections, but we honored

22    that particular objection.

23    Q      Doctor, tell the Court whether Plaintiff's

24    Exhibit 5 accurately reports the study that you did on

25    the adverse secondary effects of 60/40 businesses in New

26    York City?

AT

1110

1              Dr. Linz - Direct - Murray

2       A     It does.

3       Q     Does it accurately describe the methodology

4  that you used?

5       A     Yes, sir.  It does.

6       Q     And does it accurately include the tables and

7  the statistics that you used?

8       A     Well, I have to say that there is -- well,

9  the figures appear to be here.  The tables are not.

10              THE COURT:  Are there tables at the

11         back?  This is what I have among others.

12              THE WITNESS:  Yes, I was referring to

13         those, I have those also, your Honor, as figures.

14         And then there are some separate tables, I believe.

15              THE COURT:  Yeah, but you say there are

16         some tables missing.  Is that what you are saying?

17              MS. BINDER:  They are all missing.

18              MR. MURRAY:  I think in the redaction

19         process we probably didn't include everything in

20         that, we have them in the unredacted form.

21              MR. MEHLER:  No, I don't.

22              MS. BINDER:  I have an extra copy of

23         just the tables.  Would you like to borrow them,

24         not the figures.

25              MR. MURRAY:  I have it all.  Why don't

26         we mark this.  I only have this copy.  We'll make

                          AT

                    Dr. Linz - Direct - Murray

1

2      more copies later, your Honor.

3                   THE COURT:  Why don't we take back the

4      other one.

5                   MR. MURRAY:  This is going to go in

6      addition to it, this is the rest of it.

7                   THE COURT:  I see.

8                   MR. MURRAY:  We'll mark that 6A.

9                   MS. BINDER:  This is going to be 6A, but

10     this is already part of six.  You mentioned that it

11     was Exhibit 5 a while ago.

12                  MR. MURRAY:  No, this is six.

13                  THE COURT:  No, the report is six.

14                  MR. MURRAY:  The CV is five.

15                  MS. BINDER:  Leave it all as 6A, I

16     agree, that's fine.

17                  THE COURT:  Five was the curriculum

18     vitae which was marked in for Identification.

19                  MS. BINDER:  I thought I heard

20     Mr. Murray refer to this as Exhibit 5, but if he

21     did it was a mistake.

22                  (Whereupon, Plaintiff's Exhibits 6 and

23     6A were marked for Identification at this time.)

24     BY MR. MURRAY:

25         Q     Doctor, Plaintiff's Exhibit 6A is in front of

26     you.  And can you identify that as the remainder of what

                              AT

1                    Dr. Linz - Direct - Murray

2    should have been included in Plaintiff's Exhibit 6?

3         A     Yes, that is the remainder of the tables.

4                    MR. MURRAY:  And at this time, your

5    Honor, and I will get into it in more detail, but

6    at this time I would move to admit Plaintiff's

7    Exhibit 6 and 6A.

8                    MS. BINDER:  Your Honor, we have no

9    objection to 6A, but the 6A are the tables and the

10   figures, but we object to 6 because 6 is his expert

11   report and expert reports are inadmissible to

12   bolster the actual expert testimony.

13                   If you look at the beginning of it, your

14   Honor, you'll see that it says our report statement

15   as to what he did, and he is here to testify as to

16   what he did.

17                   And they say in plain English what his

18   conclusions are, and he is here to testify as to

19   what his conclusions are.

20                   His report is inadmissible, expert

21   reports are inadmissible to bolster the expert

22   testimony.  In fact, the CPLR doesn't even require

23   expert reports need to be done in New York.

24                   THE COURT:  Whether they are required I

25   have no knowledge of any case that says where the

26   witness is on the stand and he establishes a

                              AT

Dr. Linz - Direct - Murray

1

2    foundation for his expert report by stating that

3    the method that was used to obtain the information

4    in the expert report, as far as I'm concerned he's

5    established a valid foundation and it's admissible.

6            He's here to testify.  The other side

7    has the expert report in front of him and can

8    cross-examine for that.  That eliminates the

9    hearsay objection.  Overruled.

10           MS. BINDER:  Your Honor, just let me

11   just make my record, your Honor.  I do have a case

12   cite, the case is Borden versus Brady 92AD 2d 983.

13   It's a Third Department case from 1983, and it says

14   that the data that an expert relied upon is

15   admissible, but the report itself is not

16   admissible.

17           The report itself is hearsay, even

18   though he is here to testify about it, he's

19   testifying the report itself is his out of Court

20   statement that is being offered for its truth.  The

21   report is hearsay, and he is here.

22           THE COURT:  There are three foundations

23   for a hearsay statement.  One, and the most

24   important is that the witness is not available in

25   the courtroom to be cross-examined.

26           It's an out of Court statement offered

AT

Dr. Linz - Direct - Murray

1
2    for the truth of the consequences by a witness who
3    created, by a witness who's not available for
4    cross-examination.  I'm not familiar with the Third
5    Department case.  At this point I'm marking it in
6    evidence.
7                I will read that case, although I don't
8    think its necessarily binding on me.  Theoretically
9    it's binding if there are no First Department cases
10   on the issue.  But if there are and they allow this
11   kind of information in, then I think it's
12   admissible.
13               So I'm going to, for the time being, I'm
14   going to allow it into evidence.  If it's not, I
15   doubt if I am wrong, but if I am wrong I'll redact
16   it.
17               MS. BINDER:  Your Honor, just to let me
18   finish making my record.
19               THE COURT:  Go ahead.
20               MS. BINDER:  It's the same thing as if a
21   police officer comes to testify if he prepared a
22   writing, a police report.
23               We can't introduce the police officer's
24   report of what he said to bolster his testimony.
25   The police officer is there, they are in Court, but
26   the police officer can't, we can't use his police

AT

Dr. Linz - Direct - Murray

1

2    report to show that what he is saying is true.

3         THE COURT:  I'm very familiar with those

4    cases because they come up in torte cases all the

5    time.  And the point is that the things that were

6    told to the police officer are not admissible

7    because when he records them they are hearsay.

8         However, whatever the police officer was

9    a witness to, whatever he saw or heard at the time

10   that he was there is admissible.  The other stuff

11   is redacted.

12        The balance of the police report is in

13   evidence.  He's recording what the results are of

14   his own examination.  And like the police report

15   his individual writings from his own knowledge are

16   admissible.

17        MS. BINDER:  Just one last point, your

18   Honor, which is that I believe there are some

19   hearsay statements in the report in addition to his

20   own writings as to what he did.

21        THE COURT:  That can be redacted.

22        MS. BINDER:  Thank you.

23        MR. MURRAY:  And, your Honor, just so

24   that our record is complete, this is not just a

25   report, it's an actual empirical study that was

26   done.

AT

1          Dr. Linz - Direct - Murray

2              And everything the Court said is

3      correct, but it's also an actual empirical study,

4      not just some expert report.

5              This is a study of the kind that

6      municipalities rely upon.  For example many years

7      ago when the case was tried, I'm sure the City

8      introduced the empirical studies that it had,

9      that's what this is.

10             (Whereupon, Plaintiff's Exhibit 6 and 6A

11     were marked in Evidence at this time.)

12 BY MR. MURRAY:

13     Q     Doctor, please explain to the Court, I know

14 you began and gave some information on this subject in

15 response to the Court's questions, but can you describe

16 exactly the method that you used to test the question

17 whether 60/40 businesses are associated with adverse

18 secondary effects?

19     A     Yes, if I may I'll start with the hypotheses

20 that were generated.  We had three hypotheses concerning

21 the secondary effects of 60/40 businesses, or as the

22 City termed it 60/40 eating drinking establishments in

23 New York City.

24     We first of all speculated that if the 60/40

25 businesses were associated with crime we should see a

26 higher number of crime incidents in the immediate

AT

Dr. Linz - Direct - Murray

1    localized area surrounding the 60/40 businesses than

2    would be the case as one moved further and further away

3    from the area in which the 60/40 business was located.

4       If there was not an adverse secondary effect

5    associated with the 60/40 eating drinking

6    establishments, we would not see such a cluster of crime

7    around the immediate vicinity of the 60/40 business.

8       Secondly we wondered whether or not the 60/40

9    businesses would range as I mentioned as hot spots in

10    the area for criminal activity.  And that relative to

11    other addresses with the 60/40 establishments would rise

12    to the level of being a top offender if you will with

13    regard to adverse secondary effects.

14       And then thirdly we looked at the changes in the

15    presence and absence of a business either opening or

16    closing to determine if closing decreased the crime

17    incidence and opening increased the crime interest in a

18    kind of before and after design.

19       And I should mention that we also have a control

20    there in that third phase whereby we not only look at

21    opening and closing of the adult business and the crime

22    events associated perhaps or the crime events as they

23    occurred during that period, but then we used the other

24    surrounding census blocks as controls to see if in

25    general the area experiences the same kind of crime

AT

Dr. Linz - Direct - Murray

1    pattern.

2        Our theory being that if it looks identical to the

3    broader area because crime tends to fluctuate over time,

4    and in fact crime in New York City as many people have

5    noted is actually going down, had been going down for

6    each year particularly during our study period, we

7    wanted to make sure that we didn't capitalize on that

8    trend of going down and instead wanted to look at

9    control areas as well.

10        That's known as a before after control group, a

11    quasi experimental design. I'm sorry for the

12    technicality there.

13        So then we were interested in those three ways of

14    determining whether or not a 60/40 business was

15    associated with calls for service to the police.

16        We then upon satisfying ourselves that that was the

17    proper methodology having examined all of the secondary

18    effects literature, I'm fairly confident it could

19    possibly be found in the United States from communities

20    across the country as well as whatever information could

21    be gleaned from criminological articles and other

22    studies of crime.

23        We applied what might be referred to in the first

24    of the three approaches, what might be referred to as

25    social disorganization theory which would say to us that

AT

1119

Dr. Linz - Direct - Murray

1

2 there are a number of variables that need to be taken

3 into account or controlled for in an analysis before we

4 get to the point of establishing whether or not the

5 adult business is responsible for the criminal, or

6 excuse me the 60/40 business is responsible for the

7 criminal activity.

8 So for example you have to control a number of

9 demographic features in the vicinity of the business and

10 beyond.  And what's controlling for those these features

11 we know as an area of social disorganization theory,

12 once we control for those variables the last question we

13 ask in our statistical model is does the proximity to

14 the 60/40 business account for any of the variability in

15 crime as it's reported to the police through calls for

16 service.

17 That's the first of the three approaches.  In the

18 second we don't use those variables associated with the

19 social disorganization theory.

20 Q What data did you obtain from the City of New

21 York in order to do this analysis?

22 A Well, we obtained calls for service from the

23 City for a period ranging from 19, the entire year of

24 1998, to June of 2002.  These calls for service ranged,

25 as you would note for example in figure one from

26 everything including firearms being present, knife

AT

1           Dr. Linz - Direct - Murray

2  fights occurring, shots being fired, down to a variety

3  of mischief or other kinds of activities that the police

4  are called for in an area surrounding the business in

5  New York City.

6       Q     And how did you obtain and where did you

7  obtain from the list of the 60/40 businesses that you

8  were studying?

9       A     That was obtained from the City.

10      Q     They had a list?

11      A     Well, they had a list of 60/40 eating

12 drinking establishments by address that was entitled

13 "Adult Establishments 2000".  And that was a report

14 prepared March 26, 2001, it was a report to the City

15 Planning Commission.

16      Q     How much police data does that involve when

17 you talk about calls for service for that period of

18 time?  What's the dimension of that?

19      A     It's very large.  It's over five million

20 calls for service across that period of time.  And we

21 had to sift them down to the specific areas that we were

22 interested in because obviously 60/40 businesses don't

23 permeate all of the five boroughs.  And we were only

24 interested in that criminal activity that occurred

25 within a relatively confined area around those

26 businesses.

                    AT

1121

Dr. Linz - Direct - Murray

1

2    Q    Now you mentioned that you used calls for the

3    service.  What are calls for service, what does that

4    mean?

5    A    Well calls for service are part of the

6    citizenry response to crime and crime activity as well

7    as dispatches that may occur from the Police Department

8    to a crime or an alleged crime or disturbing scene.

9        The citizen will often make a call, or a passerby

10   may make a call concerning some disturbance, or a

11   neighbor.  Or in the case of the 60/40 businesses base

12   they are located in neighborhoods that by my estimation

13   having visited many of these places neighborhoods that

14   are high in residential areas, my assumption is calls

15   from this area would emanate from either passers by or

16   neighbors in the immediate vicinity.

17   Q    Now is that the only way to measure crime

18   scientifically?

19   A    There are many ways to measure crime.  Each

20   have their advantages and disadvantages.

21   Q    What are the advantages and disadvantages of

22   using calls for service in a study like this?

23   A    Well, the advantage of using calls for

24   service I think is three fold.  One is it is the coin of

25   the realm if you will with many of the other

26   municipalities and police departments across the country

AT

Dr. Linz - Direct - Murray

1      when attempting to debate the secondary effects issue.

2           There are, if police are asked to testify before

3      legislatures for example or before a city body or a city

4      counsel, they'll often bring with them calls for service

5      as a demonstration that a particular business or a

6      particular area is problematic or not problematic in

7      terms of crime.

8           The second reason that I favor calls for service

9      and the criminologists do also is that they are kind of

10     a raw unfiltered communication between the citizenry and

11     the Police Department.

12          Very often if you are dealing with other indices of

13     crime, it is the case that the police are able to

14     manipulate that information in a variety of ways, not

15     necessarily to be nefarious, but because for their

16     record keeping it is necessary for them to eliminate

17     certain things, respond to others and so forth.

18          So that UCR's for example another measure of crime,

19     unified crime reports, because for example those are

20     given to the federal government as a means of counting

21     the amount of crime in a particular vicinity or state or

22     county, there is a lot of filtering that goes on in that

23     case.  But I think the calls for service represent a

24     direct citizen response to the police unfiltered.

25          And then the third reason that I think calls for

                              AT

1123

Dr. Linz - Direct - Murray

2  service are particularly appropriate in this debate is

3  because they tend to, there is a possibility of

4  measuring community disorder and level of mischief if

5  you will, or level of lesser crime that would not be

6  reflected in the more narrow, the measurements of crime

7  covered for example by the uniformed crime reports.

8      Q      Have you used both forms in some of your

9  studies?

10     A      Yes, I would like to use all forms all of the

11 time, but of course time and money preclude that.  And

12 these were the data that I felt were most appropriate

13 given what has transpired in the debate about secondary

14 effects across the country.

15     Q      Now, explain to the Court then what you did

16 with this data in connection with the first test that

17 you identified which was asking whether crime in

18 proximity to these businesses was higher or lower, how

19 did you do that?

20     A      Well, maybe the best thing to do if I may is

21 refer you to a figure, which starts with a picture.  And

22 that is figure two.  And this will illustrate how we

23 make this approach.  And in figure two -- am I allowed

24 to unsnap these?  I don't want to lose them.

25     In figure two for example we have located right

26 here New York Dolls.  And now then we have also located

AT

1                    Dr. Linz - Direct - Murray

2     the streets and the census blocks associated with the

3     area surrounding New York Dolls.

4         Now each of these dots represent a call or calls to

5     the police for a particular kind of disturbance or

6     crime.  Our method is one of counting all of those calls

7     for service, and then in effect establishing a one for

8     the proximity that is the census block that New York

9     Dolls is located in; two for every census block that

10    touches this middle block, an area that we call three

11    labeled as number three out here, and an area called

12    number four which is labeled in the periphery here.

13        Now it would be very nice to be able to say that we

14    just want to look at the correlation between being close

15    or further away from New York Dolls.  But we know other

16    features are associated with crime in an area, so we

17    have to take those variables into account, in effect

18    control for them, and then add the variable that says

19    are you one, two, three or four from your distance from

20    the 60/40 business or New York Dolls in this case.

21        And so the first analysis is something called a

22    regression analysis in which we first take the number of

23    crimes that we have been able to count in the area, and

24    regress those on a series of variables that we know

25    through social disorganization theory are important ones

26    for understanding crime in a particular area.

                              AT

1125

Dr. Linz - Direct - Murray

1          There I might refer you then to if I may another

2     table which would be table two.  And in table two this

3     is entitled Regression Analysis for Crimes against

4     Person using all 60/40 businesses in New York.

5          Now you might look at this New York Dolls as an

6     example, we didn't produce a figure for every one of the

7     businesses.  But we did, we undertook the same

8     methodology for each of the businesses.

9          And then we introduced, put some variables we knew

10    were important for determining whether or not crime was

11    present or could account for the probability of crime in

12    a particular area.  Knowing that there are males age

13    roughly 18 and over for example in the area by the

14    census count is important.

15         I should mention here that what we're able to do

16    with our program is meld the geographic information that

17    tells us the location of each of these crimes with

18    social demographic information.

19         So that in the same file for a particular block

20    group we will know that there is one, two, three, four,

21    five, six, seven, eight, nine, 10, 11, 12, 13, 14, so

22    forth crimes.

23         But we also know how many males age 18 and over are

24    in the particular block group, we know the composition

25    of the block group with regard to ethnicity, we know the

AT

1126

1              Dr. Linz - Direct - Murray

2    composition of the block group with regard to whether or

3    not households are headed by families or non family

4    occupants in the household, and then finally once we

5    control for those which we know are important predictors

6    of crime we say what is the impact of being two, three

7    or four blocks away from the 60/40 business.

8         So that's put in what's called a statistical

9    regression where first we enter the variables associated

10   with crime, and then once they explain what they can

11   with regard to the distribution of the crimes in the

12   block groups, we in effect ask what's left over for

13   proximity to the adult business to explain in terms of

14   our crime count.

15        And what we find that uniformly there is a trivial

16   or non significant amount of variability in crime

17   explained by proximity to the business compared to these

18   other variables that I was speaking of.  So that's the

19   first way that we attempt to understand whether or not

20   there is a crime or secondary effects associated with

21   the closeness or distance from large or small distance

22   from the 60/40 business.

23        Q    And can you just then enunciate what were the

24   results of that first analysis with respect to that

25   question of whether the adverse secondary effects are

26   associated with 60/40 businesses?

                         AT

Dr. Linz - Direct - Murray

1

2        A        Using the regression method we found no

3    evidence of adverse secondary crime effects associated

4    with the adult, with the 60/40 businesses.

5        Q        Now you then mentioned that you did the hot

6    spot analysis.  Would you please explain in a little

7    more detail to the Court what that involved?

8        A        Yes, and here I might also refer you to a set

9    of tables since we're going with Baby Doll I'll refer

10   you to the Baby Doll Lounge which is labeled as such.

11   And what we attempted to do there then was to count up

12   if you will the frequency of crime in the immediate

13   vicinity surrounding -- I'm sorry, this is Baby Doll

14   Lounge and New York Dolls, I'm sorry, too many dolls

15   here.  Excuse me, New York Dolls.

16       The first procedure is to look at the calls for

17   service that occur in the area, and so that we find for

18   example that 180 calls for service for crimes against

19   persons occur within the immediate vicinity of New York

20   Dolls.  And then with the calls for service were the

21   police to attach an address to that call, that's either

22   provided by the person who is calling in or was provided

23   by the police once they arrive at the location.

24       Then we range those addresses according to most

25   frequent calls for service to the police.  New York

26   Dolls is at 59 Murray Street for example and over the

AT

Dr. Linz - Direct - Murray

2  course of our five year study period they received to

3  their address five calls for service to the police.

4  That makes them in their immediate vicinity ranged

5  number 16 in terms of being a crime problem compared to

6  other addresses.

7       The most frequent address being for example the

8  intersection of Warren Street and Church Street which

9  had a frequency of 19 calls for service.  So in each

10  case for each of these 60/40 businesses we were able to

11  range them relative to other addresses in the

12  neighborhood with regard to the number per of calls for

13  service to the police across these various categories,

14  one of which I just mentioned, crimes against persons.

15  We did the same for crimes involving property and a

16  variety of other forms of crime as well.

17       Now this has been referred to as a hot spot

18  analysis by which the police are able to identify those

19  addresses in a particular locality that may be hot spots

20  for crime.  And then relative to that, those hot spots

21  we're able to identify where the 60/40 business falls.

22       Q     And what was the result of doing that hot

23  spot analysis of the 60/40 businesses?

24       A     The 60/40 businesses never reached a level of

25  calls for service to the police that would be described

26  as sufficient to call them in any sense of the word a

AT

```
 1              Dr. Linz - Direct - Murray

 2   hot spot for crime.  In fact, many of the 60/40

 3   businesses fell off the chart.  They had so few calls

 4   for service that they didn't even range among the top 20

 5   or 25 addresses in that relatively small locale that

 6   comes to the attention of the police.

 7       Q     And then tell the Court about the third

 8   method that you used in a little bit more detail?

 9       A     Well, the third method is slightly more

10   complicated in that we attempt to take those businesses

11   for which we knew something had changed between 1998 and

12   2002.

13       So for example Billy's Topless as it was known on

14   729 Avenue of the Americas changed during our course of

15   study and was no longer topless in '01.  Club 44 was at

16   689 Eighth Avenue opened in October of 2001.

17   Gallagher's and Gallagher's 2000, Gallagher's closed in

18   mid 2000 and then at a new address Gallagher's 2000

19   opened at the end of 2000.

20       The Cozy Cabin and other addresses either opened or

21   closed during the study period.  And when that happens

22   that allows us to take advantage of these openings and

23   closing as kind of a natural experiment in the area.

24       Now because we can't really randomly assign

25   neighborhoods to having a 60/40 club or not, it's not a

26   true experiment, so this funny word is used quasi

                          AT
```

1130

Dr. Linz - Direct - Murray

1

2   experiment to describe the methodology.  But it does

3   allow for a natural occurrence that we can take

4   advantage of and study.

5       Now if the secondary effects theory that the City

6   is proposing is correct and the 60/40 businesses are a

7   problem, we should see crime increase after the 60/40

8   business opens or crime decrease according to on the

9   City's theory once the 60/40 business closes.

10      Now one way to examine the results of this is to

11  take an example I think this copy is probably better

12  because it's in color.  We'll just take Gallagher's for

13  example which opened in 2000 opened for business in 2000

14  as a 60/40 business.

15      Gallagher's is represented by the blue diamond.

16  And if you follow Gallagher's that the pattern of crime

17  activity in the blocks surrounding in the area

18  surrounding Gallagher's, and then in the areas as you

19  move further and further away from Gallagher's which we

20  use as a control or series of control areas, you see

21  that Gallagher's number of incidents hovers around four

22  for '98, probably three for '99, in 2000 when the

23  business is about to open pops up, as do a number of

24  others, to ten, but then once the business is open in

25  2001 and 2002 drops to four incidents, and then in a

26  similar pattern with the rest of the surrounding area

AT

1               Dr. Linz - Direct - Murray

2  pops back up to about six incidents.

3       So in each case we trace across our five year

4  period the crime incidents that can be on average or can

5  be attributed to, not on average but attributed to the

6  block either immediately present where Gallagher's is

7  immediately present upon opening, and then the

8  surrounding blocks.

9       And we find that the pattern around Gallagher's is

10 very similar to the pattern for the surrounding blocks.

11 Further, there is no indication once Gallagher's opens

12 that crime increases.  In the case of Gallagher's for

13 example crime decreases calls for service of police

14 decrease after the opening of that 60/40 business.

15      Q    And can you summarize what the results were

16 for the other openings and closings that without

17 identifying each one?

18      A    Yes, in general we found the same pattern of

19 results for all of those 60/40 businesses that had

20 experienced the kind of change that I am referring to,

21 either in the opening or the closing.  No evidence of

22 crime increasing after the opening of such a 60/40

23 business, no evidence of crime decreasing after the

24 closure of such business.

25      Q    So can you summarize then taking into account

26 the totality of your study in all three of it's

                        AT

1132

Dr. Linz - Direct - Murray

2   dimensions what the results were?

3        A     Yes.  I conclude as a result of the three

4   methodology that we employed that the 60/40 businesses

5   are not associated with adverse secondary effects in the

6   form of calls for service to the police.  And that this

7   cast a fairly substantial amount of doubt on the City's

8   theory that such businesses are associated with these

9   kinds of crime effects.

10       Q     And do you hold those opinions to a

11  reasonable degree of scientific certainty?

12       A     I do.

13       Q     Now, doctor, in addition to the study that

14  you performed, did you visit any of the 60/40 clubs

15  during the course of your work?

16       A     Oh, yes, I have.

17       Q     And on how many occasions approximately did

18  you visit?

19       A     Well, I visited New York City at least two

20  times prior to my current visit in which I investigated

21  the 60/40 businesses.  And then in the current visit I

22  spent the last two days visiting the 60/40 businesses.

23  One in Queens and the remainder in the Manhattan area.

24       Q     And did you visit in the last two days any of

25  the hundred percent clubs?

26       A     Yes, I did.

AT

Dr. Linz - Direct - Murray

1

2          And then Dr. Linz came to my office last

3   summer and I deposed him about what was in his

4   report, but obviously not what he did this week.

5   It's too late for him to go and make observations

6   this week and testify about them now.

7          He was here years ago, a number of years

8   he's been working on this.  He could have looked at

9   the hundred percent clubs and made his comparison

10  of the hundred percent club and 60/40 club before,

11  and it could have been put in a disclosure to us

12  and I would have had an opportunity to depose him

13  about it.

14          It's too late for him to go out and do

15  field work the week of the trial, your Honor.

16          MR. MURRAY:  Mr. Mehler sent a letter to

17  the City.

18          MR. MEHLER:  Ten days ago.

19          MR. MURRAY:  Ten days, two weeks ago,

20  explaining that he was going to revisit the 60/40

21  clubs for purposes of his testimony and he was

22  going to visit a hundred percent clubs.

23          MS. BINDER:  I don't have a letter.  We

24  don't have that letter, your Honor.  Let me see it.

25  I don't have it, honestly, I don't have a letter.

26  And even so I wouldn't have had an opportunity to

AT

Dr. Linz - Direct - Murray

1

2      Q      And which hundred percent clubs did you visit

3  in the area?  Did you visit Hustler?

4      A      Yes.  I'm sorry, Mr. Murray, I was responding

5  to you.

6              MS. BINDER:  Thank you.  Your Honor, I

7         have an objection to the line of inquiry for two

8         reasons.  The first is that we had discovery as to

9         what professor or Dr. Linz was going to testify

10        about.  And we had his report and we took his

11        deposition and we questioned him about what he

12        visited.

13             And we did not have an opportunity

14        obviously to examine him about what he just did

15        this week.  In addition, we have what we have, the

16        report which was given to us in lieu of a 3101D

17        disclosure and the 3101D disclosure obviously

18        didn't include what Dr. Linz looked at this week.

19             THE COURT:  You don't have a 3101D

20        disclosure, is that what you are saying?

21             MS. BINDER:  We never had a 3101D

22        disclosure as to this aspect of the testimony, what

23        he did this week.  We got a 3101D disclosure, we

24        got this report that's in evidence as Exhibit 6 and

25        6A in lieu of a 3101D disclosure, but the report

26        was prepared in 2005.

                          AT

1135

```
 1                Dr. Linz - Direct - Murray

 2    depose him about it, but no we did not get a

 3    letter.

 4                THE COURT:  Well, I'm not going to couch

 5    my decision on whether or not the witness could be

 6    deposed because obviously in New York the

 7    depositions are conducted on consent because you

 8    don't have a right to depose an expert witness.

 9                However, they were entitled to some

10    advanced, reasonably advanced information regarding

11    the result of his study.  If they didn't get it, I

12    think it would be very unfair to hoist that upon

13    them at this last minute.

14                MS. BINDER:  Even if Mr. Mehler sent us

15    a letter saying Dr. Linz was going to go out and do

16    this, we wouldn't have had the results of what Dr.

17    Linz determined, but we don't have even a letter.

18                MR. MURRAY:  Your Honor, I view this

19    more as fact testimony.  This is not expert

20    testimony what we're eliciting.  We're just

21    eliciting testimony about observations by what is

22    now a fact witness.

23                It doesn't, as the City has pointed out

24    time and time again, it doesn't require you to be

25    an expert to describe what you saw when you went

26    into an establishment.  So I don't know why we
```

AT

Dr. Linz - Direct - Murray

1

2   can't ask him what he saw when he visited

3   particular establishments as a fact witness.

4               THE COURT:  You're entitled to depose

5   fact witnesses too.

6               MS. BINDER:  That would have been my

7   point, your Honor.  If he was a fact witness he

8   would have had to have been identified to us as a

9   fact witness and we would have had an opportunity

10  as of right to depose him on the fact witness

11  portion of his testimony.

12               In fact, in the companion case the

13  People Theater case, the expert in that case was

14  identified both as a fact witness and as an expert

15  witness.  And we would have at least as of right

16  the opportunity to depose the expert as a fact

17  witness even if we hadn't agreed as to the expert

18  testimony as to the deposition about the expert

19  testimony.

20               MR. MURRAY:  Your Honor, we're perfectly

21  willing to make him available for a deposition

22  after Court today.  And then resume his testimony

23  after they have had an full opportunity if that's

24  what they want to do.  We have no objection to

25  that.

26               I can't speak for Mr. Mehler, but I saw

AT

Dr. Linz - Direct - Murray

1

2 the email that he sent to the City and ten days ago

3 at least explaining that he was going to make these

4 visits for the purposes of preparing for his

5 testimony.

6 And I can't explain why the City might

7 not have received that.  But if they want to know,

8 we'll be glad to make him available later today.

9 It won't take him more than ten minutes to explain

10 to them what he did, and he can answer whatever

11 questions they have, your Honor, and we'll bring

12 him back to finish this part of the testimony.

13 MS. BINDER:  If you call him a fact

14 witness as to this it's too late.  We sent our

15 inspectors out in the fall and we had an agreement,

16 and it was in the note of issue that if anybody

17 went to inspect anything they were available for

18 deposition up to 30 days before trial.

19 And we produced our people for their

20 2008 observations so that they could be deposed.

21 If it's a belated 3101D disclosure, we have lots of

22 case law that 3101D disclosure on the eve of trial

23 are not accepted unless they can show that they

24 have some kind of good cause for the belated 3101D

25 disclosure.

26 And it looks like Mr. Murray thought of

AT

JNR-001151

1           Dr. Linz - Direct - Murray

2     this line of inquiry when he was preparing and he

3     decided to quickly send his witness out to do some

4     kind of investigation and come back and do this

5     kind of inquiry without the City having any notice

6     about it.  It isn't fair, and it isn't permitted by

7     the CPLR.

8               MR. MURRAY:  They were given notice.

9               THE COURT:  They weren't given the

10    information that they are entitled to prior to the

11    trial.

12              MR. MEHLER:  Could I gain access to a

13    computer for about two seconds and I can show that

14    the--

15              THE COURT:  Can you give him access?

16              COURT CLERK:  I don't have it.

17              THE COURT:  The point is that as I said

18    before even though you gave them notice that you

19    were going to conduct this, that your witness was

20    going to conduct this investigation, they had a

21    right to see that, the results of that in advance,

22    at least some sort of supplemental bill or

23    something like that to tell them what additional

24    testimony that was not in his report he's going to

25    testify to.

26              MR. MEHLER:  My letter indicated that he

                         AT

Dr. Linz - Direct - Murray

2 was going to be coming in, that if they wanted to

3 depose him we had no objection to.

4            MS. BINDER:  We never saw a letter like

5 that, your Honor.  Obviously we never saw a letter

6 like that.

7            MR. MURRAY:  I don't know why they

8 didn't see the letter.

9            THE COURT:  I'd like to see what was in

10 the letter since there is some dispute as to what

11 is in the letter.

12            MR. MEHLER:  I'm literally five minutes

13 away.  I can go get it.

14            MS. BINDER:  If it was emailed to me I

15 can search my BlackBerry.

16            THE COURT:  Let's take a break now while

17 you do that.

18            (Brief recess.)

19            THE COURT:  Doctor, you can come back

20 up.  Back on the record.

21            MR. MURRAY:  We are at the point, your

22 Honor, where as I said we would be happy to make

23 Dr. Linz available for a deposition after Court

24 today, and we would ask the opportunity to do that

25 so that following that deposition the City could

26 then determine whether it would continue to object

AT

```
1               Dr. Linz - Direct - Murray

2       to this testimony.

3                    THE COURT:  Denied.

4                    MR. MURRAY:  I have no other questions

5       then.

6                    THE COURT:  Okay, cross-examination.

7                    MS. BINDER:  Yes.  Your Honor, I'm ready

8       to do my cross-examination, but we're just trying

9       to figure out if we should have another witness

10      before lunch because we could have the officer come

11      over here or we could break before Dr. Linz.

12                   THE COURT:  I think we should break.

13      The officer can come in this afternoon.

14                   MS. BINDER:  We just didn't know when to

15      call him.

16                   THE COURT:  We'll break after the

17      testimony.

18                   MS. BINDER:  Okay.

19                   THE COURT:  Go ahead.

20      CROSS-EXAMINATION

21      BY MS. BINDER:

22          Q     Dr. Linz, nice to see you again.

23          A     Good to see you.

24          Q     Dr. Linz, you are familiar with the term

25      60/40 club as it's used in New York City; correct?

26          A     Yes, I am.

                         AT
```

Dr. Linz - Cross - Binder

1

2     Q     And what does it mean?

3     A     Well, I understand it means 60/40 eating

4 drinking establishment is the official terminology.  And

5 to my understanding 39.99 percent of the business

6 activity may feature erotic, or floor space may feature

7 erotic entertainment.  The other sixty percent must be

8 devoted to a nonerotic use.

9     Q     And it's your understanding that the 60/40

10 clubs in New York City adopted a 60/40 configuration in

11 order to comply with zoning requirements that regulate

12 adult use; correct?

13    A     That's my understanding, yes.

14    Q     And it's true, isn't it, that you were

15 retained by the plaintiffs in this case to give expert

16 testimony on the issue of whether 60/40 clubs in New

17 York City cause crime?

18    A     That's correct.

19    Q     And by the way, you don't consider yourself

20 to be a criminologist, do you?

21    A     No, I am not trained as a criminologist.

22    Q     Now you first looked at this issue in

23 connection with a federal case that was filed on behalf

24 of a club called Lace and a few other 60/40 clubs; isn't

25 that true?

26    A     As best as I can recall.  The legal

AT

1            Dr. Linz - Cross - Binder

2   interested in adverse secondary effects.  If it got to a

3   court case or not, I'd have to check.  Some cases they

4   do, some cases they are settled.

5        Q    But you did about five cases involving

6   obscenity charges; correct?

7        A    Yes, that's correct.

8        Q    And so the other 45 or so cases, or maybe

9   it's not the exact number, involved government

10  regulation of sexually oriented businesses through

11  either zoning or public nudity ordinances; correct?

12       A    That's correct.

13       Q    And you were retained as an expert on behalf

14  of one or more sexually oriented businesses that were

15  subject to these regulations?

16       A    That is correct.

17       Q    And you testified at trial in at least ten of

18  those cases; isn't that right?

19       A    That's correct, ma'am.

20       Q    And your testimony in each of those cases was

21  that the regulated sexually oriented businesses didn't

22  cause crime or other negative secondary effects;

23  correct?

24       A    That's correct.

25       Q    And you testified on direct that you've

26  conducted in the neighborhood of 30 studies on the issue

                          AT

352

Dr. Linz - Cross - Binder

1

2   proceedings have been rather complicated and confusing

3   to me, but that is the case.

4        Q       But you were retained first for another case

5   before this one?

6        A       As I understand it, yes.

7        Q       And that was back in 2002 or maybe I think

8   you testified?

9        A       I think it was actually before 9/11.  So it

10  was in the -- I think it was actually June of 2001 when

11  I was initially contacted.

12       Q       So that was shortly before the City of New

13  York amended its zoning regulations to change the

14  definition of adult eating or drinking establishments so

15  as to cover 60/40 clubs; correct?

16       A       Yes, I think that was in anticipation of that

17  occurring.

18       Q       And, in fact, the owner of Lace consulted you

19  in connection with that zoning change before it was

20  enacted?

21       A       If that would be -- that is correct.

22       Q       And it's true that you have previously been

23  retained as an expert witness for approximately 50

24  different court cases; correct?

25       A       It's hard to say if it is fifty different

26  Court cases, but certainly fifty different individuals

AT

1144

354

1                   Dr. Linz - Cross - Binder

2    of whether sexually oriented businesses cause negative

3    secondary effects; correct?

4        A      That's correct.

5        Q      Now isn't it true that you've never found a

6    statistically significant secondary effect associated

7    with a sexually oriented business?

8        A      That is incorrect.

9        Q      How many times have you found a statistical--

10       A      Well, we have to make a distinction about

11   what is important and what might be technically

12   statistically significant.

13       Q      Have you ever found an important secondary

14   effect associated with a sexually oriented business?

15       A      No.

16       Q      Now it's also true that you take issue with

17   the studies conducted by many state and local

18   governments that have reached the conclusion that

19   sexually oriented businesses do cause negative secondary

20   effects?

21                   MR. MURRAY:  Your Honor, I'm going to

22           object.  The City throughout these proceedings has

23           taken the position that studies that generally do

24           or don't establish that businesses cause adverse

25           secondary effects is irrelevant.  In fact, that's

26           what we redacted.

                         AT

1145

```
1              Dr. Linz - Cross - Binder

2              THE COURT:  I'm entertaining argument on

3       it.  I said I'm open without making a decision on

4       whether it's relevant or not that I will allow the

5       evidence in.

6              MR. MURRAY:  I'll withdraw the

7       objection, your Honor.

8              MS. BINDER:  Can we have the question

9       read back?

10             (Record read.)

11      A      That's correct with one caveat, many of the

12      studies themselves conclude that there are no adverse

13      secondary effects.

14      Q      I'm talking about the ones that do cause

15      secondary effects.  You take issue with those; correct?

16      A      Yes, I do.

17      Q      And that's true of businesses that devote a

18      hundred percent of their establishment to the adult

19      entertainment; correct?

20      A      That's correct.

21      Q      Studies of those kinds of businesses not just

22      60/40 businesses; correct?

23      A      That's correct.

24      Q      And, in fact, you coauthored an article in

25      2001 entitled "Government Regulation of Adult Businesses

26      Through Zoning and Antinudity Ordinances Debunking the

                           AT
```

1146

Dr. Linz - Cross - Binder

```
 1   Legal Myth of Negative Secondary Effects"; correct?

 2       A     I will assume that is correct because I do

 3   not have my vitae before me.

 4               THE COURT:  You didn't have your what?

 5       A     I do not have me vitae before me.

 6       Q     Would you like to see a copy of the article

 7   to refresh your recollection as to what it is called?

 8       A     Yes, please.

 9               MS. BINDER:  Your Honor, I assume we

10           need to mark this.  We have it premarked as

11           Defendant's Exhibit PP.

12               (Whereupon, Defendant's Exhibit PP was

13           marked for Identification at this time.)

14       Q     Dr. Linz, take a look at what I've shown you

15   and ask you if it refreshes your recollection as to the

16   title of the article that you coauthored in 2001?

17       A     Yes, this is the article.

18       Q     You can put it down.  The officer will get

19   it.  So you coauthored an article entitled, "Government

20   Regulation of Adult Businesses through Zoning and

21   Antinudity Ordinances Debunking the Legal Myth of

22   Secondary Effects"?

23       A     Yes, I have.

24       Q     It's true, isn't it, in your opinion some of

25   the studies relied upon by local governments to
```

AT

```
 1                 Dr. Linz - Cross - Binder

 2    establish secondary effects didn't adhere to the

 3    professional standards of scientific inquiry, did not?

 4         A      Did not.

 5         Q      In your opinion, the studies relied upon by

 6    local governments, some of them did not adhere to the

 7    professional standards of certificate inquiry?

 8         A      That's correct.

 9         Q      And it's true, isn't it, that one example of

10    the poor methodology used in many of the government

11    studies is the use of opinion surveys instead of

12    statistical data to identify secondary effects?

13         A      Well, you'd have to make a distinction there

14    between opinion surveys that are generally taken in

15    order to establish real estate value effects, and

16    opinion surveys that are taken in order to establish

17    crime victimization.  I am not critical of crime

18    victimization methods for obtaining information about

19    crime in an area.

20         Q      But you are critical of neighborhood surveys

21    regarding real estate values in a neighborhood?

22         A      I'm critical of the studies that have

23    generally been conducted because they have a number of

24    methodological problems.  And then I further criticize

25    the notion that one can obtain property value

26    estimations by a survey then instead it's necessary to

                            AT
```

Dr. Linz - Cross - Binder

1

2      look at the actual property valuation.

3           Q      Okay, but now as to the -- okay, so now as to

4      the government studies that use actual statistical

5      analysis, it's your opinion that they too often don't

6      adhere to the criteria for insuring a scientifically

7      valid study of secondary effects?

8           A      I would say that they adhere neither to a

9      common sense notion of what is reliable information, nor

10     do they then by extension adhere to what might be a more

11     reliable form of information obtained through standard

12     scientific inquiry.

13          Q      Okay, now it's fair to say, isn't it, Dr.

14     Linz, that in your opinion sexually oriented businesses

15     are no more likely to cause, no more or less likely to

16     cause crime than a variety of other kinds of businesses?

17          A      That's correct.

18          Q      And you would agree, wouldn't you, Dr. Linz

19     that there are a number of different kinds of businesses

20     that are associated with increased crime or police

21     activities?

22          A      That's correct.

23          Q      And wouldn't you agree that for example rock

24     clubs and hip hop clubs are among the type of businesses

25     that are likely to be associated with increased police

26     activity?

AT

1              Dr. Linz - Cross - Binder

2        A     Well, I would prefer to see empirical

3    evidence about that.

4        Q     But haven't you seen empirical evidence that

5    supports the notion that rock clubs and hip hop clubs

6    are the type of business that's likely to be associated

7    with police activity?

8        A     The kind of evidence that I have seen from

9    the criminological reports has consistently identified

10   alcohol service but has not necessarily identified the

11   type of entertainment available as being associated with

12   crime in a vicinity.

13       Q     Let me ask you this, doctor, you testified

14   that there are a number of different kinds of businesses

15   that are associated with increased crime or police

16   activity.  Why don't you give me an example of one or

17   two types of those businesses.  You just said businesses

18   that serve alcohol.  Can you give us another example?

19       A     Well, businesses generally where a number of

20   people congregate as well as if you look at the

21   so-called hot spots associated with crime in many City's

22   and look at the empirical evidence collected by

23   criminologists, you see that there are a number of

24   locations.

25       Shopping malls for example are often times crime

26   hot spots.  The local high school is oftentimes a crime

                         AT

Dr. Linz - Cross - Binder

2  hot spot to a far greater degree than any other

3  location.  Bus stations and parking lots are oftentimes

4  crime hot spots.  The shelters and other missions are

5  oftentimes crime hot spots and then ironically or not

6  they are oftentimes associated with churches or other

7  voluntary organizations.

8      There are often hot spots associated with, in

9  addition to those that I mentioned, with a variety of

10  other businesses that might include a substantial amount

11  of customer traffic.

12      Q    And isn't it true that in New York City rock

13  clubs and hip hop clubs are often on the hot spot list

14  for police activity and criminal activity, Dr. Linz?

15      A    Now I would have to, you'd have to probe me a

16  little bit further in the sense that I am familiar with

17  only the briefest of information that was obtained and

18  provided to me concerning calls for service by the

19  police in which they indicated that the, that there were

20  a number of crime centered businesses.  My understanding

21  was, and the reason I was interest interested in it is

22  that none of those included the 60/40 businesses.

23      Q    Okay, now you studied your study for the

24  60/40 businesses, you testified that you got the names

25  and locations of the various 60/40 clubs from a New York

26  City department of planning list entitled, "Adult

AT

                    Dr. Linz - Cross - Binder

1

2  Establishments 2000" that was prepared in connection

3  with the 2001 rezoning; correct?

4        A      That's correct.

5        Q      And is that list included not just 60/40

6  eating or drinking establishments, but also other kinds

7  of adult establishments and 60/40 establishments in New

8  York City; isn't that right?

9        A      That is an interesting question.  As best I

10  can recall it said "Adult Establishments 2000" on the

11  top of the list.  What was included in the entirety of

12  the list I do not recall.

13        Q      Okay now you conducted a statistical analysis

14  regarding whether 15 of the 60/40 clubs on the list were

15  associated with police activity, correct?  I mean I can

16  direct your attention to the --

17        A      Yes, if you don't mind, please direct me.

18        Q      To the exhibit that's in evidence, I believe

19  its Plaintiff's 6 which is a copy of your report, I

20  believe?

21                    THE COURT:  If it's in evidence, the

22        Court Officer can get it.

23                    THE COURT OFFICER:  I think he has it.

24        A      I have it.

25        Q      He still has it there, your Honor.  I think

26  you probably do too if you want to follow along.  The

                            AT

1      Dr. Linz - Cross - Binder

2 page with the list?

3      MR. MURRAY:  Eighteen.

4   Q  Thank you, Mr. Murray.  Page 18, on the

5 bottom of page 18, actually on page 18, you've got at

6 the bottom of page 18 I direct your attention to where

7 it says, "60/40 businesses open throughout the period of

8 1998 to June 2002."

9   And then it goes over to page 19 and in that list

10 there there are 15 businesses, 15 60/40 businesses that

11 you looked at; is that correct, Dr. Linz?

12   A  I would have to take your 15 without counting

13 as the number that is presented here.

14   Q  I can wait for you to count.

15   A  Okay.

16   Q  It starts at the bottom of page 18 and goes

17 to the top of page 19?

18   A  Those are the 15 that had the, A, criteria

19 associated with them or criterion associated with them

20 which is that 60/40 businesses open throughout the

21 entire study period of 1998 through June 2002.  Then the

22 second category of businesses would be those that opened

23 or closed or changed entertainment formalities between

24 those same periods.

25   Q  I'm talking about the first category there,

26 the 15 that were opened from 1998 through 2002, you used

          AT

```
 1                 Dr. Linz - Cross - Binder

 2    those clubs in the first part of your statistical

 3    analysis that you described today regarding whether

 4    60/40 clubs on the list were associated with incidents

 5    of crime; isn't that right?

 6        A     That's correct.

 7        Q     And you did a different analysis for the six

 8    clubs that are in the second box that's in the middle of

 9    page 19 where it says business opening closing changing

10    format between January '98 and June of 2002; correct?

11        A     That's correct.

12        Q     You did a different analysis?

13        A     That's correct.

14        Q     And we'll get to that analysis in a while.

15    And then you have a third category of businesses there

16    that were listed and you didn't study the 14 businesses

17    that are listed in the third box because you couldn't

18    contact them to confirm that they were operating 60/40

19    during the entire period from '98 to 2000?

20        A     Yes, I had two problems there, one is that

21    the City could not guarantee that they were in fact

22    60/40 businesses.  And then the other problem is that I

23    have seen other investigators not attempt to contact the

24    business and then be fooled at the end and such that

25    they thought that they were operating as, for example,

26    an adult use when they were not and that can be not only

                               AT
```

1                    Dr. Linz - Cross - Binder

2    detrimental but fatal to your findings.

3         Q     Okay, so you used the 15 for the first part

4    of your analysis, you didn't use the six and then the

5    other 14; correct?

6         A     That's correct.

7         Q     Okay, now as to the 15 you told us that you

8    looked for the first part of your analysis.  You looked

9    at police calls for service to the police as an

10   indicator of crime; correct?

11        A     That's correct.

12        Q     Is that the same thing as 9/11 calls?

13        A     It can be.

14        Q     Did you get any data from the City other than

15   9/11 calls?

16        A     No, we did not.

17        Q     So if somebody called 9/11, that's what you

18   looked at?

19        A     That's correct.

20        Q     And 9/11 calls as you testified, that's not

21   the only way to measure incidents of crime; isn't that

22   right?

23        A     That's correct.

24        Q     One other way to look at it at crime is to

25   look at complaint data?

26        A     Pardon me?

                              AT

```
1                    Dr. Linz - Cross - Binder

2       Q       Complaint data.  You use the acronym UCR but

3  that looks at criminal complaints, doesn't it?

4       A       It's much more extensive than that, it looks

5  at confirmed instances of criminal activity that were

6  reported to the federal government.

7       Q       It looks at more than the fact that somebody

8  called 9/11, it looks at confirmed incidences based on

9  complaint data and other data that's available to

10 determine whether, in fact, there has been a crime?

11      A       Yes.

12      Q       Did I wrap that up properly?

13      A       Yes, it is data that is reported by the

14 enforcement agency to the federal government.

15      Q       So if somebody for example has a theft and

16 goes and makes out a police report and that goes and

17 makes out a complaint and that becomes a police report,

18 that would be one of the things that would be used to

19 determine UCR data that's reported to the federal

20 government; is that right?

21      A       Well, that may trigger an event that would

22 ultimately be reported, that is correct.  But in the

23 case of a homicide for example where the victim may not

24 be able to fill out such report it would be a problem.

25      Q       Got it.  Okay, so now you looked at 9/11

26 calls for the years 1998 through 2002, or to be more
```

AT

```
 1              Dr. Linz - Cross - Binder

 2   accurate I believe you testified January of 1998 through

 3   June of 2002?

 4        A     That's correct.

 5        Q     Okay, now you would agree, wouldn't you Dr.

 6   Linz, that for a study of secondary effects to be

 7   methodologically sound, at least one year needs to have

 8   elapsed after the event on your study before looking at

 9   any data reflecting neighborhood crime?

10        A     My feeling is that the more years before and

11   after an event has occurred the better off one is in

12   studying any kind of trend.

13        Q     And, in fact, it's your opinion that a number

14   of governmental secondary effects studies were

15   scientifically flawed precisely because they sought to

16   measure the secondary effects of an adult entertainment

17   business less than one year after the business had

18   opened?

19        A     Yes, I think that the longer the trend that

20   one can establish, the better off one is.

21        Q     So you would agree that less than a year you

22   can't tell anything, yes?

23        A     I would say that you are much less confident

24   as the time period recedes.

25        Q     Okay, now isn't it true that topless cabarets

26   didn't start converting to a 60/40 configuration in New

                            AT
```

```
1              Dr. Linz - Cross - Binder

2  York City until the adult zoning regulations went into

3  effect in July of 1998?

4              MR. MURRAY:  Objection, your Honor.  I

5      don't know how he would have personal -- that's a

6      factual question.

7              THE COURT:  Ask him if he knows this and

8      how does he know it.

9      Q    Well, let me ask you this, Dr. Linz, were you

10 told by the lawyers who retained you that the 60/40

11 restriction went into effect in July of 1998?

12     A    That I don't recall.

13     Q    Wouldn't you agree that if there were no

14 60/40 clubs in existence prior to 1998, then any police

15 call data from early 1998 would not be useful in seeing

16 whether 60/40 clubs are associated with police activity?

17     A    I'm not sure about the question.  I would

18 stand by my assertion that as much data as could

19 possibly be collected would be good.  I strove for five

20 years worth of data collection.  But I don't quite know

21 what you mean by the before the '98 part.  It's a little

22 confusing.

23     Q    Let me ask you a different question.  If the

24 clubs did not convert to 60/40 until at least July of

25 1998, wouldn't your data collected between January of

26 '98, you know your data from the period January of '98
```

AT

Dr. Linz - Cross - Binder

2  to July of '98, wouldn't that have no relevance to the

3  question of whether 60/40 establishments cause crime?

4      A     I see what you are saying.  You are saying

5  there may be a time period there where they were in fact

6  not 60/40 businesses?

7      Q     Yes.

8      A     I think that does introduce noise into the

9  system; that is correct.

10     Q     And now it's also true that if the businesses

11  didn't configure to 60/40 until July of '98, then any

12  police call data from July of '98 to July of '99

13  wouldn't be particularly useful and reliable in seeing

14  whether 60/40 clubs are associated with police activity?

15     A     No, I don't think I'd agree with that.  Isn't

16  that when the 60/40 businesses are 60/40 businesses.

17     Q     They are 60/40 businesses, but didn't you

18  just tell us Dr. Linz if you don't wait a year in order

19  to measure the effect of some kind of an event that it

20  is scientifically that the analysis is scientifically

21  flawed?

22     A     That's why we aggregate across the several

23  years until the 2001 period.

24     Q     I'm asking you about the first year of your

25  analysis.  Isn't it true that the first year of the

26  analysis the data might not be that helpful because the

AT

**511**

1          Dr. Linz - Cross - Binder

2   impact of changing a business to 60/40 recently wouldn't

3   have been effectuated yet?

4          A     I would agree with you if we had stopped

5   there.  But because we were able to aggregate across the

6   '99, the 2000, and the 2001 period, that we're more

7   confident.

8          Q     Okay now when you did your analysis of police

9   call data, you prepared census blocks with 60/40

10  businesses to nearby census blocks that didn't have

11  60/40 businesses; correct?

12         A     That is correct.

13         Q     And you looked at, and I'm quoting from your

14  report, you looked at demographic features known to be

15  related to crime, yes?

16         A     That's correct.

17         Q     And those demographic, excuse me, demographic

18  features known to be related to crime include features

19  like the number of African Americans in an area and the

20  number of men over 18 in an area?

21         A     That's correct.

22         Q     And you concluded that the number of African

23  Americans on a block was significantly related to the

24  number of 9/11 calls?

25         A     That's correct, with one caveat which is that

26  as criminologists have noted it is not race per say but

AT

Dr. Linz - Cross - Binder

2  race as a surrogate for socioeconomic status that seems

3  to be the, seems to account for the relationship.

4      Q       And you also concluded that the number of

5  males over 18 on a block was significantly related to

6  the number of 9/11 calls, correct, males over 18?

7      A       That is correct.

8      Q       And so you controlled for those demographic

9  features in your statistical analysis?

10     A       Those as well as others, that's correct.

11     Q       But you didn't control for the presence of

12 any kind of establishment that might be associated with

13 increases in police activity, did you?

14     A       Well, you may say that we did in the sense

15 that in the second study what we list as in the hot spot

16 study we list addresses that may be those types of

17 establishments that that occur, or that have a higher

18 level of crime incidents than do the 60/40

19 establishments.

20     Q       Right, but I'm not talking about the hot spot

21 analysis yet, I'm talking about the first part of your

22 analysis where you are controlling for things that might

23 have an impact on crime.

24     You testified that there are certain kinds of

25 businesses that might cause crime, and my question is

26 you didn't control for the presence of those kind of

AT

```
 1                 Dr. Linz - Cross - Binder

 2   businesses in the first part of your analysis?

 3        A       That's correct.

 4        Q       Okay, and in fact you didn't control for any

 5   differences in building use, or what we call land use in

 6   the first part of your analysis?

 7        A       That's correct.

 8        Q       You only controlled for these demographic

 9   variables?

10        A       That's correct.  Well, I should say that

11   that's not totally correct.  We do control for land use

12   in the sense that we have a variable that has to do with

13   whether or not the household is inhabited by family

14   members or non family members as an index of the degree

15   of social heterogeneity in the area.

16        Q       But you don't control for the different types

17   of say commercial use, et cetera, or other uses --

18        A       No, we do not.

19        Q       -- that might be present in the neighborhood

20   or in the census block is the end of my question that

21   you cut off, and I need the end of the question for the

22   record.

23        A       Can I elaborate just a little bit in the

24   sense that we did examine many of the census variables,

25   but New York City is a relatively unique place and many

26   of the census variables that would be surrogates for
```

AT

Dr. Linz - Cross - Binder

1

2    land use did not appear to be associated with crime.

3    But my experience has been that is because things can

4    change very rapidly block to block in New York City.

5         Q    You didn't control for those things that was

6    my question?

7         A    That is correct.

8         Q    Now based on your analysis, the first part of

9    your analysis, you determined that the presence of a

10   60/40 club on a block didn't make a difference in the

11   number of 9/11 calls between '98 and 2002, correct?  Or

12   June of 2002 didn't have an impact?

13        A    That's correct.

14        Q    And you would agree, wouldn't you, Dr. Linz

15   that not all crimes are reported via the 9/11 system?

16        A    I don't think that there is good evidence one

17   way or the other to suggest what types of crimes are or

18   are not reported with regard to the 9/11 system.

19        Q    Wouldn't you agree for example that a topless

20   club patron who has his wallet stolen while he's at a

21   topless club might not call 9/11 on his cell phone to

22   report the crime while he is there?

23        A    No.

24        Q    You wouldn't agree to that?

25        A    No.

26        Q    You don't credit the possibility that he

AT

1163

```
 1                Dr. Linz - Cross - Binder

 2   might not call 9/11 on his cell phone?

 3        A      I don't think there is any more or less

 4   likely than someone in another business.  Particularly

 5   in the 60/40 situation.  Because this is a situation in

 6   which there are from my experience a variety of forms of

 7   entertainment and customers, and I see no reason why

 8   there wouldn't be a huge sting about a wallet being

 9   missing, and a call being made.  It just would seem to

10   me to be similar to any other business.

11        Q      You wouldn't agree that he would be more

12   likely to after the fact file a police report

13   complaining about the incident than he would be to call

14   9/11 from the establishment Itself on his cell phone?

15        A      No, I mean there is every reason to believe

16   that he would be more likely to call, because perhaps he

17   has taken his last $200 to have a wonderful evening in

18   60/40 and that has been stolen, and he's really

19   interested in doing something about it.

20        Q      Let me ask you this, Dr. Linz, would you

21   agree that prostitution is what's often called a

22   victimless crime?

23        A      That is how it's referred to by

24   criminologists often, yes.

25        Q      And that's because in general neither the

26   prostitute nor the person who hires the prostitute is
```

AT

Dr. Linz - Cross - Binder

1

2   likely to report the crime of prostitution to the

3   police; isn't that true?

4        A     Well, that's the assertion about who the

5   victim is.   However, if the victim is a neighbor whose

6   witnessing prostitution and they are victimized by that

7   blight in their neighborhood perhaps I think they would

8   be very willing to call.

9        Q     But neither the prostitute nor the victim is

10  typically someone who makes that call; correct?

11       A     I think the evidence are from criminologists

12  is that those individuals are not willing, but that

13  doesn't mean that that dampens the amount of calls to

14  the police for prostitution by citizens or others that

15  may observe that kind of activity.

16       Q     Now let's move onto your hot spot analysis.

17  As to the 60/40 clubs that were operating, you looked at

18  data from '98 through the middle of 2002, and you did an

19  analysis where you -- withdrawn.

20       In your hot spot analysis you analyzed where the

21  addresses of the 60/40 clubs range among the other

22  addresses in the census block in terms of determining

23  the frequency of 9/11 calls; correct?

24       A     That is correct.

25       Q     And you concluded that 60/40 businesses

26  account for less than ten percent of the crime in their

AT

1165

1                    Dr. Linz - Cross - Binder

2    census blocks; correct?

3        A      Yes, that's correct.

4        Q      And you give us a list of addresses here,

5    let's take a look.  Could you maybe direct my attention

6    since you can find it faster than me in Exhibit 6A to

7    where your hot spot analysis is?

8        A      You can start with table seven.

9        Q      I'm sorry?

10       A      Beginning with table seven, unfortunately

11   these table pages.

12       Q      Let me find table seven.  I had a hard time

13   finding it during your direct examination.  Where does

14   it start?  I see three, four, five, six.

15                  MS. BINDER:  It's not an exhibit, but I

16       do have a copy of it.

17                  THE COURT OFFICER:  Of 6A, that's what

18       he is talking about.

19                  MS. BINDER:  I had an extra copy of the

20       tables.  You keep yours, Dr. Linz, we'll find your

21       Honor a copy, I have an extra copy of the tables

22       although actually that's the one I'm using to

23       examine the witness.

24                  THE COURT:  Okay, let's continue because

25       it's not absolutely necessary.

26       Q      Okay, so now table seven you have lists of

                            AT

1              Dr. Linz - Cross - Binder

2     addresses and the frequency of the 9/11 calls associated

3     with that address; correct?

4          A     That's correct.

5          Q     But you don't identify the nature of what

6     these addresses are as part of this analysis, do you?

7          A     No, we do not.

8          Q     And you testified before that you know there

9     are a number of different types of businesses that are

10    associated with police activity; correct?

11         A     That is correct.

12         Q     But essentially not controlling for the

13    difference in the uses of these particular addresses in

14    this study, you are just listing the addresses and the

15    number of police calls associated with those addresses;

16    correct?

17         A     I'm not controlling again for what?

18         Q     You're not controlling for the type of

19    business or the actual use of the premises that's listed

20    in table seven.  You are just listing the business and

21    the number of 9/11 calls for that business?

22         A     I have to disagree.  We are controlling for

23    it in that if any of those businesses are part of this

24    list, they'll appear there.  Do I know that those

25    businesses are?  You are absolutely right, I do not.

26         But I mean it takes into account the idea that

                          AT

1167

1                    Dr. Linz - Cross - Binder

2    there maybe other businesses aside from the 60/40

3    business that are alcohol serving.   For example

4    businesses or other kinds of venues that come to the

5    attention of the police more often.

6         Q     All I'm saying, Dr. Linz, is you can't tell

7    from this analysis what's at any of these addresses, can

8    you?

9         A     No, you cannot tell from this table.   I

10   wouldn't say you can't tell from the analysis because

11   someone could go to that address or call that aside and

12   determine what's there.

13        Q     Someone could.   But in your assessment of

14   whether 60/40 clubs are hot spots you just looked at

15   pure address data without controlling for differences in

16   the type of businesses?

17        A     We may just have a slight difference in the

18   vocabulary.   I wouldn't use the word "controlling" for

19   it.   What I would say is I cannot tell you that those

20   addresses are or are not alcohol serving establishments,

21   for example, which I know are associated with calls for

22   service to the police unless I would do further

23   investigation.

24        Q     So my only point, Dr. Linz, is that some of

25   these businesses that, the businesses that out rank the

26   60/40 business we can't see what they are from this

                             AT

1168

1                   Dr. Linz - Cross - Binder

2    analysis, that is the nature of the business; correct?

3        A      That's correct.

4        Q      Now in your hot spot analysis you looked at

5    15 clubs that you determined were operating through,

6    operating 60/40 between '98 and 2002.  You looked at the

7    same 15 clubs that you looked at in the first part of

8    the analysis; correct?

9        A      That's correct.

10       Q      But you also included a 16th club in this

11   analysis, Club 44, and you can look for Club 44 in table

12   seven and see if it is present.  I have it, it's about

13   maybe seven pages into table seven.

14       A      After Bare Elegance, Club 44, that's correct.

15       Q      But you note elsewhere in your analysis that

16   Club 44 didn't open as a 60/40 establishment until 2001;

17   correct?  I mean take a look at Exhibit 6, page 19?

18       A      I don't dispute that, you may be exactly

19   right.

20       Q      So it may have been if Club 44 didn't open

21   until 2001 it was a mistake to put Club 44 in this?

22       A      I wouldn't say that.  I would say it's

23   apparently more information than what you want.  What it

24   says is that during that course of activity, that period

25   1998 to 2002, that Club 44 had ten calls for service

26   that may have been during the period they were 60/40 may

                              AT

1           Dr. Linz - Cross - Binder

2    not have been, but that represented two percent of the

3    crime in the area.

4         Q      But you identified elsewhere in your analysis

5    that they didn't open 60/40 until 2001; correct?

6         A      That's correct.

7         Q      And, in fact, well are you aware as to

8    whether Club 44 was a bikini bar between 1998 and 2001?

9         A      No, I'm not sure of it's exact status.  I may

10   be able to review this report and determine that, but

11   upon you asking it I do not recall.

12        Q      Now you did, Dr. Linz, you did this before

13   and after analysis of some of the other 60/40 clubs;

14   correct?

15        A      That's correct.

16        Q      And you examine 9/11 calls before and after

17   the opening of a few different 60/40 clubs that were on

18   the City planning list from 2000, correct, to the year

19   2000, yes?

20        A      I'm sorry?

21        Q      Okay, you examined 9/11 calls before and

22   after the opening of a few different 60/40 clubs that

23   were on the City planning list in 2000?

24        A      Yes, I would amend that only in the sense

25   that we look for an event of either opening or closing.

26        Q      During that window that you were studying?

                              AT

1               Dr. Linz - Cross - Binder

2        A      That's correct.

3        Q      And you sought to determine whether the

4   opening of a new 60/40 club would have an impact on

5   police activity; correct?

6        A      That is correct.

7        Q      And you also looked at the closing of a

8   couple of 60/40 clubs; correct?

9        A      Yes.  Some.

10       Q      But you didn't do any before and after

11  analysis for clubs that reconfigured from a hundred

12  percent adult to 60/40, did you?

13       A      No, I don't know that during the study period

14  we were able to necessarily determine that.

15       Q      You determined that clubs had reconfigured to

16  60/40 at some point because you identified those clubs

17  and you studied the data associated with those clubs?

18       A      Right.

19       Q      And attempted to study them?

20       A      I see, yes, our mandate was to study whether

21  the 60/40 club changed or not throughout the study

22  period.  I only examined, I was only interested in the

23  60/40 businesses, that is correct.

24       Q      I understand that and I'm asking you took for

25  example if a 60/40 club opened out of the blue, it

26  wasn't any cabaret before, but it was a new cabaret, it

                             AT

1171

Dr. Linz - Cross - Binder

1

2     opened for the first time say in the year 2000 as a

3     60/40 club, you attempted to study whether that opening

4     of a 60/40 club had an impact on police activity

5     through, you know, on police calls for service?

6          A     That's correct.

7          Q     But you didn't take the clubs that had

8     reconfigured from a hundred percent to sixty percent,

9     you didn't study calls for service back in say '97 when

10    they were a hundred percent adult, and then look at

11    calls for service after '98 when they configured?

12         A     I see what you are saying.  That's an

13    interesting hypothesis, that would not seem to be what

14    the City's contention is.

15         If that's the hypothesis that would be the City's

16    hypothesis that changing to 60/40 would reduce crime and

17    that wasn't the question that we were examining.

18         If the City assumed that going to 60/40 was going

19    to decrease crime, we would have been happy to look at

20    that.  But the hypothesis was the 60/40 businesses as I

21    understand it were sufficiently adult in the City's mind

22    that they should be associated with crime.

23         Q     Isn't it fair to say that the City's

24    hypothesis is that a 60/40 business is the same,

25    essentially the same as an 100 percent business, so

26    isn't that essentially the City's hypothesis?

AT

Dr. Linz - Cross - Binder

1

2      A      I think that that's what has emerged as the

3   City's hypothesis.  I'm not sure that was the hypothesis

4   at the time.  But if that is not a question which we

5   would have examined, because the assumption was I

6   thought on the part of the City that if you change to

7   60/40 or had someone change to 60/40, there would be no

8   difference, so why would I examine that.

9      Q      If the City's assumption is that if you

10  change to 60/40 there is no difference, and wouldn't you

11  want to show that the City was wrong by examining the

12  impact of the club when it was a hundred percent, and

13  then subsequently examining the impact of the club when

14  it was 60/40?

15     A      Well, I'm not sure.  I mean my mandate what I

16  was asked to investigate was the impact of the 60/40

17  establishments in the community.  As time went on,

18  however, it seems to me the City had various theories

19  about what the difference was between the 100 and the

20  60/40.

21     Q      But it's fair to say that your statistical

22  analysis doesn't support the conclusion that decreasing

23  adult entertainment from a hundred percent to 40 percent

24  would cause a decrease in police activity or crime?

25     A      I would say my analysis substantiates the

26  notion that 60/40 businesses are not associated with

AT

1                    Dr. Linz - Cross - Binder

2   crime.  That is the most I would say confident opinion

3   that I can render.

4                    THE COURT:  I think we'll break for

5        lunch.

6                    MS. BINDER:  Your Honor, I have two more

7        questions of this witness and then I can at least

8        finish.

9                    THE COURT:  Okay.

10                    MS. BINDER:  Isn't it -- now I've lost

11        my train of thought.  Maybe we should pick up after

12        lunch.

13                    THE COURT:  We'll return at 2:15.

14                    MS. BINDER:  Okay.

15                    (Luncheon Recess.)

16                    (Afternoon session).

17                    THE COURT:  Any further

18        cross-examination?

19                    MS. BINDER:  I do, your Honor, just a

20        little more.  And I also want to point out that

21        over the lunch break we went back and looked for

22        cases on that issue of the admissibility of expert

23        reports, and I found a case that's more on point

24        than the cite I gave your Honor this morning.

25                    Although this one also is not a First

26        Department case it's a Fourth Department case, it's

                              AT

                    Dr. Linz - Cross - Binder

1

2      called Ornon versus Craig, and the cite is 184 AD

3      2d 1048.  And it's a 1992 case.

4                    THE COURT:  Could you give me the

5      citation again?

6                    MS. BINDER:  I'm sorry, your Honor, 184

7      AD 2d 1048.  And it's a Fourth Department 1992.

8      And what it basically says is that expert reports

9      are prior consistent statements, and like prior

10     consistent statements can't be used to bolster the

11     testimony of a testifying expert.

12                   THE COURT:  But in this case the report

13     was offered only after he gave us the foundation

14     for the report.  He had not testified to the

15     contents yet.  Then it's not a prior consistent

16     statement because he hadn't given us a statement

17     yet.  And I think that that applies only when he

18     testifies to all the contents of the report and

19     then he wants to put it in evidence.

20                   MS. BINDER:  It's just our position,

21     your Honor, for the record that it doesn't matter

22     which order because as a practical matter the

23     report is serving to be a writing that he prepared

24     prior to coming to Court that bolsters his

25     testimony that he gave in Court.  I'm just trying

26     to make a record on this, your Honor.

                              AT

Dr. Linz - Cross - Binder

2    THE COURT:  Okay.

3    MS. BINDER:  So I'll just continue with

4    the cross-examination a few more questions for Dr.

5    Linz.

6  BY MS. BINDER:

7    Q    Dr. Linz, it's true, isn't it, that with

8  respect to your analysis of police calls for service,

9  you didn't do a before and after study showing the

10 impact of any particular cabaret changing from a hundred

11 percent to 60/40?

12   A    That is correct.

13   Q    And it's also true that you didn't do an

14 analysis of 9/11 calls that compares the class of 60/40

15 clubs to the class of a hundred percent adult clubs that

16 are still in existence; correct?

17   A    That's correct.

18   Q    And, in fact, you yourself have never seen

19 any evidence sufficient to convince you that a hundred

20 percent adult establishment has an impact on crime or

21 police activity?

22   A    That is correct.

23   Q    In fact, you don't believe that the class of

24 a hundred percent adult establishments have any impact

25 on crime or police activity?

26   A    That is what my empirical studies show.

AT

```
 1                  Dr. Linz - Cross - Binder

 2        Q     And so it's fair to say, isn't it, that had

 3   you done a before and after study of a club's change

 4   from a hundred percent to 60/40, you wouldn't expect to

 5   find any change in the impact of the club on crime or

 6   police activity?

 7        A     No, that's an empirical question.

 8        Q     It's an empirical question, but it's fair to

 9   say that you've never seen any evidence so far that a

10   hundred percent, that hundred percent adult clubs have

11   an impact on crime or police activity?

12        A     My empirical studies don't show that, that's

13   correct.

14              MS. BINDER:  Okay.  I have nothing

15        further, your Honor.

16              THE COURT:  Cross-examination?

17   CROSS-EXAMINATION

18   BY MR. MURRAY:

19        Q     Dr. Linz, tell us what empirical studies

20   you've done on that subject?

21        A     I have never --

22        Q     On the subject of a hundred percent?

23        A     What empirical studies I've done?

24        Q     To conclude that they don't cause adverse

25   secondary effects?

26        A     Among the published studies that I have

                            AT
```

Dr. Linz - Cross - Murray

1

2  completed, we for example could mention the North

3  Carolina study, the Charlotte North Carolina study in

4  which we've examined 20 100 percent adult businesses in

5  neighborhoods across Charlotte North Carolina and found

6  no affects for crime associated with these businesses.

7      Another published study as I mentioned was a study

8  of peepshow establishments in San Diego.

9      Q    Let's stick with adult nightclubs.

10     A    Okay, that further would be a study recently

11 conducted or recently published I should say for Ohio

12 City's which we examined the impact of liquor serving

13 adult nightclubs on crime measured in a variety of ways

14 found no effects for the presence of those businesses in

15 the communities of Dayton, Toledo, Columbus and

16 Cleveland that is published as well last year.

17     Q    Did you do a study in Fort Wayne?

18     A    Yes, I have.

19     Q    Tell the Court about that?

20     A    That was a 100 percent business study,

21 although they don't make the distinction between partial

22 and 100 percent, it's the study of adult nightclubs that

23 served alcohol in Fort Wayne Indiana looking at the

24 impact at those nightclubs on criminogenic activity and

25 found not only a no association, but a mild decrease of

26 criminal activity around those fully adult businesses

AT

```
1                    Dr. Linz - Cross - Murray

2     compared to control sites in the City.

3          Q     Was that study published?

4          A     That study was not published but has been

5     peer reviewed in a number of circumstances.  One

6     involving an academic meeting in which it had been peer

7     reviewed by those that accepted it for presentation, and

8     then the Justice Department has also examined that study

9     and it received an award for crime mapping or

10    applications in crime mapping some years ago.

11         Q     Now you were asked about Defendant's Exhibit

12    PP.  Is that still in front of you for identification?

13                    THE COURT OFFICER:  I gave that back to

14         plaintiff because it was identification.

15         Q     That was your article?

16         A     Yes, that was the article published in

17    communication law and policy.

18         Q     And what was the subject matter of that

19    article?

20         A     That was a review of many studies that are

21    being conducted by municipalities all that could be

22    obtained at the time, but then a ranking of the top ten

23    studies that were cited by municipalities across the

24    country, and we evaluated those studies in terms of four

25    methodological criteria which we've developed to

26    determine whether or not the studies could reliably
```

AT

1          Dr. Linz - Cross - Murray

2    reveal something about the impact of adult businesses on

3    crime, and I should say proposal rules.

4          Q     And without going through the whole thing,

5    what were the basic four criteria?

6          A     I'd like to ask four questions when thinking

7    about this.  One is compared to what question that is to

8    say has the municipalities or the persons engaged in

9    studying adult businesses attempted to compare the adult

10   business to a suitable control area or control region

11   that might allow us to say compared to comparable

12   matched control area, does the area surrounding that

13   adult business have more or less crime.

14         The second question I think that is important is

15   always to ascertain that there has been enough data to

16   make a reliable inference about the effects.  And as I

17   mentioned before I'm skeptical of the studies that only

18   have a few days or months or a year of data as opposed

19   to those that have multiple years and data because crime

20   tends to fluctuate up and down.

21         The third question that we always ask is a means of

22   trying to determine whether or not there is reliability

23   is the idea of whether or not the police or other crime

24   information has been obtained in a reliable fashion.

25         One thing for example that often happens is that

26   municipalities are interested in finding crime or

                              AT

1                    Dr. Linz - Cross - Murray

2    conducting special investigations that may yield more

3    crime because of an interest or suspicion about adult

4    businesses.  And my contention is that if one spends

5    time looking for crime you're likely to find more crime.

6    Finally then would be the case if you weren't under a

7    mission of that sort.

8         And then the fourth question asked is do the

9    municipalities that are conducting studies adhere to

10   some of the standard methodology acceptable for

11   conducting a survey.  Research which contains or which

12   includes rather some ideas such as is there sufficient

13   response rate to the questionnaire if it's questionnaire

14   research, has there been an attempt to determine whether

15   or not there is bias associated with those people that

16   did respond.

17        And in that case the City or municipality not just

18   getting opinions from people who wish to complain or be

19   vocal about the problem as opposed to a random sample of

20   individuals that might adequately represent the

21   community, and has there been proper statistical

22   measures taken so that an error rate can be calculated

23   regarding this survey.

24        So I asked those four questions of all of the

25   municipality studies to determine if they meet if you

26   will methodological muster.  And I have been oftentimes

                             AT

Dr. Linz - Cross - Murray

2   very disappointed with the quality of those studies.

3        Q     Now in fact talking about surveys and what

4   your criticism has been, I'm glad you mentioned that, do

5   you have any objection to surveys being done if the

6   questions are unbiased and if the respondents are given

7   a free opportunity to answer the questions or not, and

8   if statistical then analysis is done of those survey

9   questions?

10       A     No, if the surveys are conducted in what's

11  according to proper methodological standards I have no

12  problems.  In this area many surveys tend to be done

13  with regard to property values, and I'm not so sure that

14  people can, even real estate professionals can

15  necessarily tell you what the impact of an adult

16  business is on property values simply by hypothesizing.

17  I think that you have to have actual data for this.

18       Q     That's for real estate values?

19       A     That's correct.

20       Q     Now speaking of real estate values, you were

21  asked a question and just repeated it that you need a

22  sufficiently lengthy period of time in order to

23  determine crime statistics; is that correct?

24       A     Well, you need a sufficient period of time in

25  order to determine if any increases or decreases in

26  crime are due to what we know are the continually

AT

1182

1          Dr. Linz - Cross - Murray

2   fluctuations of crime in many areas including New York

3   City.

4        So for example if you looked at our charts on the

5   page the figure, let's just find one that illustrates

6   this.  You might look at the crime patterns around

7   Gallagher's.  As you can see they jump around from year

8   to year.  And then by the difference between 2002 for

9   example on average in 1998 is a fairly substantial one.

10       So if I were to measure this point right here in

11  which I were to see a business change and I saw that

12  crime went down I might say, holy cow, if you introduce

13  a 60/40 business into the community crime decreases.

14  But I'd be wrong about that because in general crime had

15  been decreasing without those comparable controls.  I

16  wouldn't really know that that is the case.

17       So because crime does in various as you can see

18  where ten blocks here bounces around from place to

19  place, the fair number of deviations you've got to be

20  careful that you have enough observations pre and post

21  any change in the business configuration.

22       Q     Now in giving that testimony I want to be

23  clear in what you are talking about, if the subject

24  matter is whether the presence of the businesses cause

25  the adverse secondary effects of lower property values,

26  is the same standard applicable or a shorter period of

AT

1                    Dr. Linz - Cross - Murray

2    time?

3        A      A shorter period of time is fine in my

4    estimation because real estate prices don't fluctuate

5    with the same degree of uncertainty that crime

6    fluctuates.

7        Q      Now you were asked about your hot spot

8    analysis and whether you took into account the control,

9    some controls with respect to the businesses that were

10   higher up on the list; do you recall that?

11       A      Yes.

12       Q      Explain if it's true why that isn't relevant

13   to a hot spot analysis?  What is a hot spot analysis?

14       A      Well, a hot spot analysis is the

15   identification of a particular geographic area of those

16   points defined by addresses or perhaps smaller regions

17   within the area that attract a kind of a confluence of

18   victims who were targets and crime perpetrators as well.

19       And so the hot spot reveals that area on a

20   practical level that the police might want to

21   concentrate their activities towards.

22       In terms of analysis of the hot spot is merely

23   arranging from top to bottom of those identifiable

24   points that are more versus less problematic to the

25   police, in this case measured by calls for service.

26       Q      And if 60/40 businesses were hot spots, what

                            AT

1              Dr. Linz - Cross - Murray

2    would you expect to have found when you did that

3    analysis?

4         A     Well, there is always a question about what

5    the criteria is but I would have expected some major

6    portion of the crime that calls for service to be

7    attributed to the 60/40 businesses they would have risen

8    to the top of that ranking.  What we found was almost

9    universally that they were either not on the chart at

10   all or they had fallen in substantially at lower points

11   on the ranking of crime hot spots within the areas

12   surrounding those businesses.

13        Q     You've been talking about calls for service

14   that you used for your report, and counsel was asking

15   you, I think she used the term 911 calls; do you recall

16   that?

17        A     Yes, I do.

18        Q     What are the various sources for calls for

19   service for a Police Department?

20        A     Well, primarily it is 911 calls that would be

21   a citizen or some other individual calling in and

22   saying, "I'd like to report that something is occurring,

23   there is a suspicious activity, or there is a loud

24   noise, or there is a group of people outside my

25   apartment window, or there are, there is a drunken

26   person on the sidewalk", or any number of such reports.

                            AT

1              Dr. Linz - Cross - Murray

2        Or it could be a merchant calling saying, "I've

3   just been robbed or suspected I've been robbed or

4   burglarized".  So those would be calls primarily to the

5   police by someone who feels that there has been a

6   disturbance or a law broken or something that warrants

7   the police attention.  And for the most part what we

8   have in our data set are those 911 calls.

9        There are other ways that the police could become

10  involved, however, that wouldn't involve necessarily a

11  911 call, but could still be registered in the system.

12  There is for example a burglar alarms and other things

13  that oftentimes automatically registers something in the

14  system.  But if they are burglar alarms that are false

15  alarms for example that is almost noted in every case we

16  eliminate those are from our analysis.

17        Q    What if somebody just calls the regular

18  Police Department number not 911 and reports a problem

19  that a police officer has to come out and investigate?

20        A    It is my impression that will also register

21  in the system as a dispatch.

22        Q    Now there has been some talk about UCR's as

23  distinguished from calls for service.  In the universe

24  of crimes that are captured by UCR's, are there criminal

25  incidents that are not captured by UCR statistics that

26  are captured by calls for service?

                        AT

**538**                                                    396

Dr. Linz - Cross - Murray

1

2       A       Are there criminal incidents?  Yes.

3       Q       Explain why that would be?

4       A       Well, it would be the case for example that

5  someone may call in with regard to the hooliganism or

6  drunkenness which is a large part of the urban blight

7  kinds of ideas that people have about adult businesses.

8       And those incidents may result in someone being

9  taken for questioning, or someone cited or given a

10  ticket, or the street being cleared, or someone being

11  taken into the police by the automobile and sat down and

12  talked to and questioned, none of that, however, would

13  ever register with something like the UCR which only

14  takes into account a small set of violent crimes and a

15  small set of property crimes that would have to be

16  processed through the system and ultimately result in an

17  arrest where there would be a report to the, or at least

18  a verification of the crime oftentimes through arrest

19  and a report made to the federal government.

20       So it scoops up a tremendously wide amount of

21  possible disturbances in the neighborhood that would not

22  be touched at all by something like UCR.

23       Q       And finally, doctor, in terms of you were

24  asked about again your opinion about the studies that

25  have shown or not shown a hundred percent adult

26  nightclubs to cause or not cause adverse secondary

AT

1                    Dr. Linz - Cross - Murray

2   effects; correct?

3        A      That's correct.

4        Q      Are you aware of any study other than your

5   own that you have testified to today in any of the

6   studies that cities and counties and other governmental

7   entities have done on the subject of adverse secondary

8   effects that have actually studied the 60/40 business

9   model that is prevalent in New York City?

10       A      No.

11                    MR. MURRAY:  May I have one moment, your

12       Honor?

13                    THE COURT:  Okay.

14                    MR. MURRAY:  That's all I have.

15                    MS. BINDER:  Just two things briefly on

16       recross.

17                    THE COURT:  Go ahead.

18   RECROSS-EXAMINATION

19   BY MS. BINDER:

20       Q      Dr. Linz, isn't it true that the data you got

21   from New York City consisted only of 911 calls?

22       A      I think that is primarily so.  I think that

23   is also the case that a dispatch may register in this as

24   well.

25       Q      You didn't get data of police dispatches, did

26   you?

                             AT

1                  Dr. Linz - Recross - Binder

2        A       It was not called specifically.

3        Q       I'm sorry?

4        A       My experience, however, has been that these

5   records will oftentimes contain dispatches as well.

6        Q       Just so we're clear, wasn't the record itself

7   identified as being instances of 911 calls?

8        A       Yes, it was.

9        Q       Okay, now earlier you testified when I was

10  examining you before that there were certain kinds of

11  places, certain kinds of businesses that you would

12  expect to be associated with increases in criminal

13  activity, and the examples you gave were things like

14  shopping malls, high schools, bus stations, and even

15  church because these are places that have a substantial

16  amount of customer traffic; correct?

17       A       That's correct.

18       Q       And your hot spot analysis where you rank

19  places based on the number of arrests is, or the number

20  of police calls at the particular place you don't

21  indicate what type of customer traffic that place has,

22  do you, Dr. Linz?

23       A       No, we do not.

24       Q       And you didn't indicate the type of business

25  that it was?

26       A       No.

                          AT

```
1                    Dr. Linz - Recross - Binder

2         Q     You just compared addresses with other

3    addresses?

4         A     That's correct.

5                    MS. BINDER:  I have nothing further.

6                    THE COURT:  You are excused, sir.

7                    THE WITNESS:  Thank you.

8                    MR. MURRAY:  Your Honor, in order to

9    complete my record, could I just make a proffer for

10   the record of what, not with the witness, but what

11   we would have established had the questions and

12   answers that were objected to and the objections

13   were sustained what evidence we would have put into

14   the record?

15                   THE COURT:  An offer of proof, yes.

16                   MR. MURRAY:  Your Honor, had the witness

17   been permitted to get into it he would have

18   explained that he visited four 100 percent clubs

19   two nights ago, Penthouse, Hustler, Flashdancers

20   and Rick's Cabaret.

21                   That his observations included the fact

22   that there was a very intense erotic message

23   communicated from the moment you walked into the

24   door throughout the entire premises.  That the

25   premises were saturated with erotic displays,

26   photographic art with a very large number of
```

AT

PGS. 400 – 484

OMITTED

# 624

Transcript of Proceedings dated February 27, 2009 (Pages 624 Through 756) 485

```
 2   SUPREME COURT OF THE STATE OF NEW YORK
     NEW YORK COUNTY - CIVIL BRANCH - PART: 2
 3   -----------------------------------------X
     TEN'S CABARET, INC., f/k/a Stringfellow's
 4   of New York, Ltd., PUSSYCAT LOUNGE, INC.,
     d/b/a "Pussycat Lounge", CHURCH STREET
 5   CAFE, INC., d/b/a "Baby Doll" and 69-20
     QUEENS BLVD., INC., d/b/a "Nickels",
 6                                  Plaintiffs,
                                                INDEX NO.
 7                  -against-                    121197/02

 8   THE CITY OF NEW YORK, MAYOR MICHAEL
     BLOOMBERG, as MAYOR, etc., et al,
 9                                  Defendant.
     -----------------------------------------X
10                        71 Thomas Street
                          New York, New York
11                        February 27, 2009

12   B E F O R E:

13        HONORABLE LOUIS B. YORK, Justice

14   A P P E A R A N C E S:

15        BERKMAN, GORDON, MURRAY & DEVAN, ESQS.
          For Plaintiffs
16             55 Public Square - Suite 2200
               Cleveland, Ohio  44113
17        BY:  J. MICHAEL MURRAY, ESQ., of Counsel

18        MEHLER & BUSCEMI, ESQS.
          For Plaintiffs
19             305 Broadway - Suite 1102
               New York, New York  10007
20        BY:  MARTIN P. MEHLER, ESQ., of Counsel

21        NEW YORK CITY LAW DEPARTMENT
          OFFICE OF THE CORPORATION COUNSEL
22        For Defendantss
               100 Church Street
23             New York, New York  10007
          BY:  ROBIN BINDER, ESQ.,
24             SHERYL NEUFELD, ESQ., and
               RACHEL K. MOSTON, ESQ., of Counsel

25                        ANGELA TOLAS, CSR
26                        OFFICIAL COURT REPORTER

                          AT
```

# PGS. 486 – 571

# OMITTED

**711**

```
                          Proceedings

 1

 2              THE COURT:  Okay, plaintiffs.

 3              MR. MURRAY:  Yes, your Honor.  We would

 4      call Michael Anastas at this time, your Honor.

 5  M-I-C-H-A-E-L    A-N-A-S-T-A-S, called as a witness,

 6  having been first duly sworn, was examined and testifies

 7  as follows:

 8              COURT CLERK:  Please state your name.

 9              THE WITNESS:  Michael Philip Anastas.

10              COURT CLERK:  Spell the last name

11      please?

12              THE WITNESS:  A-N-A-S-T-A-S.

13              COURT CLERK:  And your address?

14              THE WITNESS:  ███████   █████████   ██████

15      █████   ████████   █████████

16              COURT CLERK:  And the zip code.

17              THE WITNESS:  ███████

18              COURT CLERK:  Thank you.  You may be

19      seated.  The witness has been sworn, your Honor.

20              THE WITNESS:  Thank you.

21              THE COURT:  Okay, you may inquire.

22              MR. MURRAY:  Thank you, your Honor.

23  DIRECT EXAMINATION

24  BY MR. MURRAY:

25      Q    Mr. Anastas, please tell the Court what your

26  occupation is or was?

                          AT
```

**712**

573

Anastas - Direct - Murray

1

2     A     I am a market research consultant

3     specializing in consumer perception.

4     Q     And are you retired or still active?

5     A     Yes, I'm semi retired.

6     Q     When did you go into semi retirement?

7     A     Around 2005, 2006.

8     Q     What is your educational background?

9     A     I graduated from Ohio University in Athens

10    with a Bachelor of Science and in journalism.

11    Q     What year?

12    A     1959.

13    Q     What has your career been since graduating

14    from college?  Why don't you briefly describe it for the

15    Court?

16    A     Well, in most recent years I have been a

17    consultant using market research to help companies

18    understand the perception consumers have of their

19    products and services.

20    My clients have included Xerox Corporation, Jersey

21    Central Power and Light, Cannon Corporation, People's

22    Bank of Bridgeport, and any number of other financial

23    and business concerns.

24    I also was a specialist in consumer goods, so my

25    clients had included Proctor and Gamble and the Guldens

26    Mustard people and any number of package goods products.

AT

1195

**713**

574

Anastas - Direct - Murray

1

2    And I started my company in 1983.

3        Q     What's the name of the company?

4        A     Focus Probe, Inc.

5        Q     And what are the categories of services that

6    Focus Probe Inc.'s provided to various clients?

7        A     Primarily consumer perception and opinion is

8    investigating using qualitative research, that is most

9    familiar are focus groups, focus group discussions where

10   ten people are gathered to represent the consumer group

11   and discuss an issue.

12       I also pioneered the use of short but in depth

13   interviews up until the time I started it.  In depth

14   interviews were generally 90 minutes long and quite

15   cumbersome and expensive, so I found a way to focus on

16   the client's issue and still achieve the benefits of an

17   in depth interview.

18       Q     What other techniques have you used in your

19   business to gather information about products or other

20   subject matters?

21       A     I was a very heavy user of mall intercepts

22   which is, perhaps you've seen the people with clipboards

23   out in the mall recruiting people for taste tests and

24   other research.  I liked to get people on the spur of

25   the moment.  They were more free with their opinion and

26   they were very easy to interview, as opposed to

AT

**714**

575

```
1              Anastas - Direct - Murray

2   prerecruiting them by telephone and having them make an

3   appointment and there is a certain amount of anxiety

4   involved in going to an interview.

5        Q     So that's a technique, I'm sorry, it's called

6   a mall intercept?

7        A     Mall intercept.  There are or had been at

8   that time dozens of market research companies with

9   facilities in large shopping malls where I could rent

10  the space and the recruit test and have respondents

11  brought to you.

12       I did a major study for Warner Lambert on the

13  repositioning of Trident.  Trident always used to talk

14  about the dentists using or recommending Trident.  What

15  that did is drove Trident's image down among young

16  people.  They associated it with dental hygiene and good

17  for you and the opposite of fun.

18       So I recruited 200 teenagers, not an easy group to

19  interview by the way, in malls across the country, and

20  places like Mesquite Texas, and showed them dozens of

21  photographs and asked them to project their feelings

22  about chewing gum and various brands.

23       And from that study Warner Lambert repositioned

24  Trident in a much more youthful energetic way with great

25  success.  I was very proud of that study.

26       Q     Now is a mall intercept any different from
```

AT

1197

## 715

1              Anastas - Direct - Murray

2    something known as a street intercept?

3        A      No, it's just the where.

4        Q      What is a street intercept?

5        A      A street intercept is when you use people

6    when they are outside perhaps in a park or in a place

7    where they are waiting.

8        I found that years ago I needed to do some quick

9    research for one of my clients and I discovered that

10   there are hundreds of people in line at the tickets

11   booth in Times Square, perhaps you've seen them, and

12   they are bored to tears.

13       So I had my interviewers go there and show them the

14   ad we were studying and interview them.  And you got

15   people in that case at the tickets booth you got people

16   from all over the country, and it was like an instant

17   research.  And of course we didn't pay them anything so

18   it was no expense.

19       And it taught me that doing research among people

20   out in the world is a good thing to do because you get

21   good honest answers.

22       Q      Is the street intercept method a recognized

23   method of gathering research on people's perception on

24   products and other subject matters in the industry?

25       A      Yes, yes, yes.

26       Q      Now did there come a time where you were

                          AT

## JNR-001211

## 716

1                    Anastas - Direct - Murray

2    asked to do a market research study of people's

3    perception in New York City with respect to the quality

4    of life as between what we're going to call subdued

5    signage for adult entertainment businesses versus loud

6    signage for such businesses?

7        A     Yes.   The issue at hand was quality of life.

8    Is there a difference in the quality of life between a

9    neighborhood in which one of the loud garish clubs was

10   operating versus the quality of life perceived, the

11   perceived quality of life in a neighborhood where the

12   signage was up and the presentation was more subdued and

13   didn't have the same offense.

14       Q     And did you, in fact, design a survey which

15   had as its object collecting data that would permit you

16   to answer that question?

17       A     Yes.

18       Q     And can you describe just generally, we'll

19   get into it in more detail, but generally speaking what

20   method did you choose to use?

21       A     The best thing to do would be to show people

22   a pair of pictures and let them rate these pictures on

23   various points, and ask their comparison.   And well we

24   wished to avoid, to eliminate as many variables as

25   possible.

26       I didn't want to show a current good looking

                              AT

**717**

Anastas - Direct - Murray

1

2   glamorous club against one of the more tawdry poorly

3   signed tacky clubs because there would be a difference

4   in overall architecture and so forth.

5       I wanted to eliminate all the variables around the

6   issue of presentation, so we decided I decided to show

7   the same club as if it were before signage and

8   presentation had been as I said cleaned up, and after as

9   it is now subdued.

10      Q       Did you decide to use the street intercept

11  method or some other method of questioning respondents?

12      A       No, it seemed like a simple thing to show New

13  Yorkers a pair of pictures and have them self administer

14  the questionnaire.  I thought it was important to have

15  them self administer the study so that there would be no

16  bias from the tone of voice of the interviewer and so

17  forth.

18      Q       Okay, we'll get into the details in a minute,

19  but did you, in fact, perform such a study?

20      A       Yes.

21      Q       And did you record the results of such a

22  study?

23      A       Yes.

24      Q       And did you conduct the study in accordance

25  with accepted principles in your industry with respect

26  to gathering this type of information?

AT

## 718

579

Anastas - Direct - Murray

1

2          A     Yes.

3          Q     I want to show you what has been marked for

4     identification as Plaintiff's Exhibit 12.

5                (Whereupon, Plaintiff's Exhibit 12 was

6          marked for Identification at this time.)

7          Q     Mr. Anastas, can you please identify what

8     Plaintiff's Exhibit 12 is, this document?

9          A     This is a traditional market research report

10    based on the findings of the study.

11         Q     And of the study that you and I have just

12    been talking about that you did in New York City?

13         A     Yes, I'll read the title.  "The perceived

14    differences between adult entertainment clubs with

15    subdued facade versus loud facades."

16         Q     And when did you perform this research, what

17    date?

18         A     November 16 and 17 in 2006.

19                MR. MURRAY:  Your Honor, at this time

20          before asking further questions about the content

21          of this document, I would move Plaintiff's Exhibit

22          12 into Evidence.

23                MS. NEUFELD:  Your Honor, defendants

24          object to portions of this document for the same

25          reasons we objected to the other documents.  Those

26          portions which simply set forth the numbers and the

AT

1201

580

Anastas - Direct - Murray

1
2   results of the study we don't object to.  But to
3   the extent that in the --
4               THE COURT:  You don't object to that?
5           MS. NEUFELD:  We don't object to that.
6   We object to the portions which state the witness'
7   opinion about what those results mean which are
8   interspersed.
9               THE COURT:  Why would his opinion be
10  objected to?
11          MS. NEUFELD:  It's an out of Court
12  statement in this document.
13              THE COURT:  He is an expert.
14          MS. NEUFELD:  He hasn't been qualified
15  as an expert.
16              THE COURT:  He's been doing this stuff
17  for about, what did you say?
18              THE WITNESS:  Forty.
19              THE COURT:  Forty years.
20          MS. NEUFELD:  It's still an out of Court
21  statement.
22              MS. BINDER:  It's the same objection we
23  had yesterday, your Honor, to the report yesterday.
24              THE COURT:  He's here to be
25  cross-examined on this.  Therefore, it should be
26  marked in evidence.

AT

1202

## 720

581

| | |
|---|---|
| 1 | Anastas - Direct - Murray |
| 2 | (Whereupon, Plaintiff's Exhibit 12 was |
| 3 | marked in Evidence at this time.) |
| 4 | MR. MURRAY:  Thank you, your Honor. |
| 5 | Q    Mr. Anastas, you mentioned before that the |
| 6 | survey was going to include showing pictures to the |
| 7 | respondents; correct? |
| 8 | A    Correct. |
| 9 | Q    And how did you create the pictures that you |
| 10 | were going to show the respondents? |
| 11 | A    We took pictures of three different clubs. |
| 12 | Instead of just using one club, I wanted to be fair and |
| 13 | make it as objective and as possible.  So I had the |
| 14 | photographer take a picture of three existing clubs, and |
| 15 | showed only one club to each respondent. |
| 16 | Q    Now I want to show you what's been marked for |
| 17 | identification as Plaintiff's Exhibits 12A, 12B and 12C. |
| 18 | THE COURT:  12A, B and C; right? |
| 19 | MR. MURRAY:  Yes, your Honor. |
| 20 | THE COURT OFFICER:  They are each a two |
| 21 | page document. |
| 22 | THE COURT:  Staple them. |
| 23 | MR. MURRAY:  They are stapled. |
| 24 | THE COURT OFFICER:  They are all photos. |
| 25 | THE COURT:  Why don't you show them to |
| 26 | counsel and see if they don't object to them going |

AT

1203

721

582

Anastas - Direct - Murray

1

2    into evidence.

3                MR. MURRAY:  We have, your Honor, a long

4    time ago.

5                (Whereupon, Plaintiff's Exhibit 12A,

6    12B, and 12C, were marked for Identification at

7    this time.)

8        Q    Mr. Anastas, I've put in front of you what

9    has been marked as Plaintiff's Exhibit 12A, B and C.  I

10   hope I've marked these correctly.  If I haven't I'm sure

11   you'll correct me.  Can you identify the exhibits that

12   are now in front of you, the photographs?

13       A    Yes.  There are two pictures of each club.

14   On the first page is a picture of the club on the top

15   with signage and presentation that echos how they may

16   have looked years ago, and the picture below on the

17   first page is exactly how it looks today.

18            On the second page they are the same two pictures

19   but they are flipped because we wanted to avoid order

20   bias.

21            So among those people that were shown this club,

22   half were shown the pictures 201 and 101.  And the other

23   half were shown pictures 101 and 201 so that there was

24   no order bias.  Is that clear?  It's a little

25   complicated to explain.

26       Q     I think it is.  And then the next two

AT

1204

583

2   photographs are of the other clubs?

3       A     Yes, the second one is called Frills and the

4   third one is Winners.  Frills and Winners.

5       Q     Now with respect to the what we're calling

6   the loud facade?

7       A     Yes.

8       Q     Are you familiar -- how long have you lived

9   in New York by the way?

10      A     I've worked in New York City since 1959.  And

11  I've lived in the New York area since then.

12      Q     And are you familiar yourself as a result of

13  that with the signage that was prevalent for some of the

14  adult establishments in the 1990's?

15      A     Yes.  Yes, for many years I had an office on

16  45th Street and I would head towards Times Square and

17  beyond for meals and theatre, and I was aware of the

18  many clubs in that area and how they presented

19  themselves.

20      Q     And with respect to the loud facades that you

21  depicted in these photographs, how did they compare with

22  the signage that you observed back in the '90's?

23      A     On the whole I think the presentations that

24  we showed are somewhat subdued to what I recall.

25      Q     Do you recall sealing signs that had the kind

26  of depictions of topless, triple X, girls girls girls,

AT

JNR-001218

1205

723

584

Anastas - Direct - Murray

1

2   that kind of things on signage?

3        A     Yes.

4             MS. BINDER:  Your Honor, I'm confused

5   about something.  Are these photographs in evidence

6   or not in evidence?  Because we're talking about

7   them and I don't think they have been offered.

8             THE COURT:  I don't remember them being

9   offered.

10            MR. MURRAY:  Your Honor, I'll just point

11   out that they are actually the same photographs in

12   a much smaller form are at the end of Plaintiff's

13   Exhibit 12.  And I should have told the Court that

14   this is just so that it's easier to see them.  And

15   I would move into evidence 12A, B and C so that we

16   don't have to look at such small ones at the tail

17   end of this report, this survey.

18             THE COURT:  Any objection?

19             MS. BINDER:  Well, your Honor, what we

20   would have done is voir dire on the photographs and

21   then I suppose we can move to strike.

22             THE COURT:  He's offering them now.  You

23   can have your voir dire.

24             MS. BINDER:  Why don't we do that, your

25   Honor.

26             THE WITNESS:  Nice to see you again.

                        AT

585

1

2          MS. NEUFELD:  Nice to see you again too

3     Mr. Anastas.

4  VOIR DIRE EXAMINATION

5  BY MS. NEUFELD:

6          Q     Now for the study that you conducted, you

7  used photographs which purported to depict the facade of

8  three clubs that were in operation as 60/40 clubs in the

9  fall of 2006?

10         A     Yes.

11         Q     And those are the documents that we're

12 talking about now 12A, B and C for Identification?

13         A     Yes.  Since we had these brighter colored

14 photos it seemed they were more clear than the photos

15 you've had in the research report that was entered

16 previously.

17         Q     Okay, so now in each pair of photos, one

18 photograph purports to show a facade virtually identical

19 to that which existed outside a 60/40 club in 2006;

20 right?  So one of these purports to look exactly like a

21 60/40 club that existed in 2006?

22         A     2006, yes.

23         Q     So in 12A that's 101, in 12B that's 301, and

24 in 12C that's 501?

25         A     Correct.

26         Q     Okay, now to create those three photos that I

AT

1207

**725**

Anastas - Voir Dire - Neufeld

1

2   just mentioned, you took an actual photo of a club

3   operating as a 60/40 topless club and digitally changed

4   the name to a fictitious name; right?

5        A    Correct.

6        Q    The other half in each pair is a computer

7   modified photo of the facade of the same club; right?

8        A    Correct.  You could use the common expression

9   photo shopped.

10       Q    Photo shopped, okay, good.  I'm familiar with

11  that expression.  And the photo shopping or the

12  modification that was done was to make the establishment

13  have a louder facade?

14       A    Correct.

15       Q    And what you mean by louder facade is a

16  facade with signage and graphics that you think are

17  consistent with the appearance of most topless clubs

18  prior to their conversion to 60/40?

19       A    Correct.

20       Q    And your knowledge about what the signs

21  looked like came primarily from representations made by

22  counsel for Pussycat as to what the pre 1998 signs

23  looked like; right?

24       A    Incorrect.  Part of it comes from my

25  recollection as a resident, I mean as a business person

26  in New York for many years.

AT

**726**

1             Anastas - Voir Dire - Neufeld

2      Q     But you don't have any recollection of what

3 any specific pre 1998 signs looked like, right?

4      A     I did not have any photographs of those

5 preexisting clubs.

6      Q     You didn't have any photographs.  And you

7 have no specific recollection yourself of what actual

8 clubs, what specific clubs looked like; right?

9      A     I don't know how to answer that.

10      Q     Well, let me ask you this, do you recall --

11      A     If you could reach the point you are trying

12 to make I might understand.

13      Q     I'm going to ask you do you recall coming to

14 my office and having your examination before trial

15 taken?

16      A     Of course.  And I think at that time I gave

17 you these pictures.

18      Q     Right.

19            MR. MURRAY:  Your Honor, I'm going to

20     object.  I think all the witness has said is that

21     he doesn't currently understand the question.  I

22     don't know how he could be confronted with prior

23     testimony.

24            THE COURT:  What if the same question

25     was asked of him and he understood it.

26            MR. MURRAY:  It wouldn't change the fact

                           AT

727

588

Anastas - Voir Dire - Neufeld

1

2       that currently he's not completely understanding

3       what counsel is asking.

4                       THE COURT:  It goes to credibility.    Go

5       ahead.

6           Q       You were asked the following question on page

7       30 at line 17, actually the first two words are not a

8       question, it's a comment, but it says, "Question:

9       That's all.  I know you went to see what the signs

10      looked like now.  I just want to know if you ever saw

11      what the signs looked like before?  Answer:  Yes, but I

12      have only a vague recollection."

13          Do you recall being asked that question?

14          A       I said that that's my answer.

15          Q       Okay.  So you have a vague recollection of

16      what signs looked like prior to 1998 and you were told

17      things by counsel for the plaintiffs about what signs

18      looked like; correct?

19          A       Correct.

20          Q       And you weren't shown photographs of actual

21      pre 1998 signs; right?

22          A       Correct.

23          Q       And you didn't visit any of the specific

24      clubs that you used prior to 2002; right?

25          A       That's correct, yes.

26          Q       And you never even went to a topless bar in

                                AT

1210

728

589

Anastas - Voir Dire - Neufeld

2    New York City before 1998; right?

3    A    I actually don't recall.  I never -- I can't

4    say I never went into one, I think I might have walked

5    into one, but I don't recall.

6    Q    At that same deposition, Mr. Anastas, do you

7    recall on page 26 line 17 being asked the following

8    question and giving the following answer.  "Question:

9    So you never went to a topless bar in New York City

10   before 1998; is that fair to say?  Answer:  Yes."

11   A    That's my answer.

12   Q    Okay.  So based upon what you were told and

13   your vague recollection what you saw, you designed

14   louder facade with signs that say things like "Girls,

15   Girls, Girls", "X X X", right?

16   A    No.  In actual fact I'm aware of clubs around

17   New York that did not modify their signage and did not

18   soften their presentation and they still have salacious

19   and loud signage in various ways around New York.

20   Q    Which clubs are those?

21   A    I don't have a list of them.  I can get it

22   for you if you would like.

23   There are non-conforming clubs in New York,

24   correct?

25   Q    I'm asking the questions today.  We can talk

26   about it some other time.

AT

1211

**729**

590

Anastas - Voir Dire - Neufeld

1

2      Okay, the louder the signs in these photographs

3  aren't actual signs, right, they are digitally created

4  images of signs?

5      A     Yes.

6      Q     And you created these loud facades to be as

7  garish as possible so as to provide a noticeable

8  contrast between the two photos between each pair; isn't

9  that fair to say?

10      A     Yes.

11      Q     And the loud facade signs that you created,

12  they didn't come from anyone particular example of an

13  adult establishment; right?

14      A     That's correct.  I cannot take you to a club.

15      Q     Each facade was created by compiling examples

16  of signs that come from many establishments, and it's

17  more or less a composite of graphics taken from

18  establishments and you put them onto one establishment?

19      A     Yes, that's fair.

20      Q     Each loud facade photo has a sign that says,

21  "Open 24 hours", right?  Two cases it's neon, that's on

22  12A and 12B, and on 1C it's not in neon but it still

23  says "Open 24 hours"?

24                 THE COURT:  What was the question about

25      24 hours?

26      Q     They all have signs that say "Open 24 hours".

                         AT

1212

**730**

591

```
1              Anastas - Voir Dire - Neufeld
2    That's right, isn't it?
3         A      Yes, two of the -- I don't see it on the
4    third one.
5         Q      On the third one on photo 601?
6         A      Oh, yes.  Now I see it, yes, yes.
7         Q      So do you know if bars that sell alcohol in
8    New York City are permitted to remain open 24 hours?
9         A      No.
10        Q      Did you attempt to ascertain that information
11   before you designed the facade photos?
12        A      No.
13        Q      Okay, let's look at some of the specific
14   photos that you made.  Exhibit for identification
15   Plaintiff's 12A, photos 101 and 102.  They depict a
16   fictitious club called "Player", right?
17        A      Are you talking about 12A?
18        Q      Yes?
19        A      And those are pictures 101 and 201?
20        Q      Yes?
21        A      Not 102?
22        Q      Sorry, I misspoke.
23              MR. MURRAY:  Your Honor, I would move to
24        strike the answer and question two or three ago.
25        I apologize for being so late.  She asked whether
26        or not the witness was aware that alcohol
```

AT

**729**

590

Anastas - Voir Dire - Neufeld

1

2        Okay, the louder the signs in these photographs

3   aren't actual signs, right, they are digitally created

4   images of signs?

5        A     Yes.

6        Q     And you created these loud facades to be as

7   garish as possible so as to provide a noticeable

8   contrast between the two photos between each pair; isn't

9   that fair to say?

10       A     Yes.

11       Q     And the loud facade signs that you created,

12  they didn't come from anyone particular example of an

13  adult establishment; right?

14       A     That's correct.  I cannot take you to a club.

15       Q     Each facade was created by compiling examples

16  of signs that come from many establishments, and it's

17  more or less a composite of graphics taken from

18  establishments and you put them onto one establishment?

19       A     Yes, that's fair.

20       Q     Each loud facade photo has a sign that says,

21  "Open 24 hours", right?  Two cases it's neon, that's on

22  12A and 12B, and on 1C it's not in neon but it still

23  says "Open 24 hours"?

24                THE COURT:  What was the question about

25       24 hours?

26       Q     They all have signs that say "Open 24 hours".

                              AT

1214

```
 1              Anastas - Voir Dire - Neufeld

 2    That's right, isn't it?

 3         A    Yes, two of the -- I don't see it on the

 4    third one.

 5         Q    On the third one on photo 601?

 6         A    Oh, yes.  Now I see it, yes, yes.

 7         Q    So do you know if bars that sell alcohol in

 8    New York City are permitted to remain open 24 hours?

 9         A    No.

10         Q    Did you attempt to ascertain that information

11    before you designed the facade photos?

12         A    No.

13         Q    Okay, let's look at some of the specific

14    photos that you made.  Exhibit for identification

15    Plaintiff's 12A, photos 101 and 102.  They depict a

16    fictitious club called "Player", right?

17         A    Are you talking about 12A?

18         Q    Yes?

19         A    And those are pictures 101 and 201?

20         Q    Yes?

21         A    Not 102?

22         Q    Sorry, I misspoke.

23              MR. MURRAY:  Your Honor, I would move to

24         strike the answer and question two or three ago.

25         I apologize for being so late.  She asked whether

26         or not the witness was aware that alcohol

                           AT
```

**731**

592

Anastas - Voir Dire - Neufeld

1

2  dispensing places cannot stay open 24 hours a day.

3  That is not correct.  There are certain hours as I

4  understand it during which --

5            THE COURT:  She can ask the question

6  though.  He can give the answer if he knows it.

7            MR. MURRAY:  He said he didn't know.

8  The question was improper because it assumes

9  something.

10           THE COURT:  So what?  You didn't get an

11  answer, so it's not evidence.

12           MR. MURRAY:  Thank you, your Honor.

13  Q       So Player in the photos 101 and 201 purports

14  to be the VIP Club located on West 20th Street in

15  Manhattan, right?

16  A       I'm sorry, the word "purport".

17  Q       Because it's called Player instead of VIP, so

18  it's not actually the VIP?

19  A       It's not purporting to be, it was based on.

20  Q       Okay, was based on the VIP Club in Manhattan?

21  A       I think there is a difference.

22           THE COURT:  What was based on the VIP

23  Club, the 201?

24           THE WITNESS:  Yes.

25  Q       Let me take you back.  Photo 101 looks like

26  the way the outside of the VIP club looks today except

AT

1216

732

593

```
 1              Anastas - Voir Dire - Neufeld

 2   that the word VIP Club was replaced with the word

 3   Player, right?

 4        A     Exactly, correct.

 5        Q     And photo 201 is a digitally created image of

 6   what VIP could have looked like prior to 1998; right?

 7        A     I'd like to think of it as an example of the

 8   kinds of clubs that were in existence in Manhattan at

 9   the time that the changes were formulated.   There is a

10   difference.

11        Q     Okay, but 101 looks like the outside of VIP

12   today except for the name, and 201 is a digitally

13   created image?

14        A     Correct.

15        Q     Okay, now among the digitally created images

16   on photo 201 are two neon signs saying "Adult" one sign

17   saying "Topless" with neon "X X X" below it and a neon

18   "Girls, Girls, Girls" sign "Must be 21 to enter" sign

19   and a neon "Open 24 hours" sign; right?

20        A     Yes.

21        Q     And these are not depictions of the actual

22   signs that were on the facade of the VIP Club prior to

23   1998; right?   These signs weren't actually on the VIP

24   Club?

25        A     We had never said we were showing what the

26   VIP Club might have looked like in the pass.
```

                              AT

                                                1217

# 733

594

Anastas - Voir Dire - Neufeld

1

2   Q   So you don't know if the VIP Club actually

3   had a sign saying "Adult"?

4   A   I consider the question irrelevant, but I

5   can't say so because I'm a witness.

6   Q   But I still need you to answer my question?

7   A   Ask it again?

8   Q   Okay, you don't know if the VIP Club actually

9   had a neon sign actually saying "Adult", right?

10   A   No, I don't know.

11   Q   And you don't know if the VIP Club actually

12   had a neon sign saying "Girls, Girls, Girls"; right?

13   A   Correct.

14   Q   You don't know if VIP Club actually had a

15   sign saying "Topless X X X", right?

16   A   That's right.

17   Q   And you don't know what the VIP facade looked

18   like prior to 1998, right?

19   A   If it existed.

20   THE COURT:   I didn't hear the answer?

21   A   If it existed.   I didn't even know if it

22   existed.

23   Q   And if it even existed you have no evidence

24   that the pre 1998 VIP facade looked the way that Player

25   is depicted in 201; right?

26   A   Right.

AT

1218

734

595

Anastas - Voir Dire - Neufeld

1

2      Q      Now let's look at photos 301 and 401 which

3  are 12B.   Now these photos depict a club called Frills;

4  right?

5      A      Right.

6      Q      And Frills is based upon a club called Lace

7  which is located on Seventh Avenue in Manhattan?

8      A      Correct.

9      Q      And the photo in 301 is the actual outside of

10 Lace with the name changed to Frills?

11     A      Correct.

12     Q      And in 401 you took the same outside of Lace

13 and digitally created images and put them on the facade;

14 right?

15     A      That's right.

16     Q      And among those digitally created images are

17 hanging neon signs which say "Adult" and "Open 24 hours"

18 a sign saying "Topless, must be 21 years old to enter" a

19 neon "X X X" sign, and a neon "Girls, Girls, Girls"

20 sign; right?

21     A      Yes.

22     Q      And those digitally created images in photo

23 401 are not depictions of the actual signs that were on

24 the facade of Lace prior to 1998; right?

25     A      I don't know.

26     Q      Well, Lace didn't even exist prior to 1998;

AT

1219

**735**

596

Anastas - Voir Dire - Neufeld

1

2  right?

3      A    I don't have their contract in my hand.

4      Q    Okay, so you don't know if the pre 1998

5  facade actually had a hanging neon sign saying "Adult";

6  do you?

7      A    No.

8      Q    And you don't know if the pre '98 facade

9  actually had a hanging neon sign saying "Open 24 hours";

10  right?

11      A    Correct.

12      Q    And you don't know if the pre '98 facade

13  actually had a neon sign saying "Girls, Girls, Girls"?

14      A    Correct.

15      Q    You don't know whether the pre '98 facade

16  actually had a neon sign saying "Topless X X X"?

17      A    Correct.

18      Q    And you have no evidence that the pre 1998

19  facade looked the way that Frills is depicted in photo

20  401; right?

21      A    Right.

22      Q    Let's look at pictures 501 and 601 which is

23  exhibit 12C.

24          THE COURT:  With regard to 501, would

25      your answers to the same questions that you

26      answered to 12A and 12B be the same here?

AT

1220

736

597

Anastas - Voir Dire - Neufeld

1

2          THE WITNESS:  Exactly.

3          THE COURT:  That's it.

4     Q       Now your purpose of the study here was to

5  determine whether the change to lower profile signage on

6  clubs would have a significant impact on how people

7  perceived the quality of life in a neighborhood in which

8  the businesses operated; right?

9               MR. MURRAY:  Your Honor, I'm going to

10         object.  This is a voir dire I thought just of the

11         photographs.  I haven't completed my direct.  This

12         sounds like the cross now that should be done when

13         I am done with my direct.

14               THE COURT:  I'm not so sure.  Are you

15         still in the voir dire stage about the

16         admissibility of these photographs?

17               MS. NEUFELD:  I am, your Honor, because

18         what I am going to be arguing in a moment is that

19         the entire study is based solely on these

20         photographs, and these photographs depict nothing

21         about what clubs actually looked like in New York

22         City prior to 1998.

23               THE COURT:  Okay, I'm going to allow her

24         to continue.

25               MR. MURRAY:  Okay.

26

AT

598

Anastas - Voir Dire - Neufeld

1

2   BY MS. NEUFELD:

3        Q      Mr. Anastas, the purpose of your study was

4   whether the change to lower profile signage that used to

5   exist on a hundred percent clubs, topless clubs, prior

6   to 1998, the change to the more subdued facade would

7   have had a significant impact on how people perceived

8   the quality of life in a neighborhood in which the

9   businesses operated; right?

10       A      Correct.

11       Q      And the way you went about finding the answer

12  to this question was to ask New York City residents

13  questions about the photos we've just discussed?

14       A      Correct.

15       Q      Other than asking New York City residents

16  questions about the photos, you didn't do anything else

17  to try to ascertain whether change to lower profile

18  signage would have had a significant impact on

19  neighborhood quality of life, do you?

20       A      Could you restate the question?

21       Q      So the whole study that you conducted was

22  just asking residents of New York City questions about

23  the photographs we just discussed?

24       A      Yes.

25       Q      You didn't do anything else to try to answer

26  the question about changes and perception to quality of

AT

1222

738

599

1                    Anastas - Voir Dire - Neufeld

2        life in a neighborhood?

3            A    No.

4            Q    Okay.

5                    MS. NEUFELD:  Your Honor, defendants

6        move to, one, exclude these photographs; and, two,

7        actually exclude and strike what has been admitted

8        into evidence as Exhibit 12.

9                    The photographs used in the study are

10       entirely fictitious, they have no basis in reality.

11       The witness testified that he has absolutely no

12       evidence of what Lace, VIP and actually Scores is

13       the club in 501 and 601 looked like before 1998.

14                   Mr. Iulo testified on our case that he

15       never saw signs saying "Adult" or "Open 24 hours".

16       Mr. Kremer, the owner of the Pussycat, testified

17       that pre and post 1998, the signs outside his

18       premises were only on the awning, and they were

19       never any bigger than they were today.

20                   We read in testimony from Paul Coppa,

21       the former owner of Ten's, that the signs outside

22       Ten's remained the same as pre and post 1998.

23       Mr. D'Amico testified this morning that Vixen never

24       had neon signs, the results of a study that are

25       based upon fictitious photos simply has no

26       relevance here, and we move that the entire study

                              AT

1223

Anastas - Voir Dire - Neufeld

1

2    should be excluded.

3             MR. MURRAY:  May I respond, your Honor?

4             THE COURT:  Yes.

5             MR. MURRAY:  It seems to me the City

6    misses the whole point of this study.  The point of

7    this study is very simple.  We have evidence from

8    this witness, from Mr. D'Amico, meaning could be

9    corroborated by Mr. Iulo, by Mr. Davis, that there

10   was a time when the signage for adult nightclubs

11   was extremely garish, was very loud, was eye

12   popping, sensational, and had the very features

13   that are contained in the examples that this

14   witness used as a basis for comparison.

15             THE COURT:  Let me ask you this, there

16   is no single club that has all of the features

17   itself with regard to, you know, the more garish

18   recreation.

19             MR. MURRAY:  We think that the testimony

20   of Mr. D'Amico is to the effect that there were

21   clubs that had all of those things.  In fact,

22   worse.  And this witness testified --

23             THE COURT:  How could he know that if he

24   is not even familiar with the clubs that he's

25   talking about, that you are talking about.

26             MR. MURRAY:  Well, he said he knew it

AT

JNR-001237

1224

## 740

601

Anastas - Voir Dire - Neufeld

1

2       from having seen it.

3              THE COURT:  I didn't hear him say that

4       any of these were an actual, the actual.  I'm

5       talking about the recreations.  The computer

6       simulations, whatever want to call them.

7              He didn't say that there were any one of

8       them had the same -- that any club in the '90's

9       that he knows of had all of these features, that's

10      my impression.

11             MR. MURRAY:  Well, I understood him to

12      say --

13             THE COURT:  Why don't you ask him?

14             MR. MURRAY:  I think I did, your Honor,

15      and I think he indicated that he saw signs that

16      were even more --

17             THE COURT:  I'm not asking, I'm talking

18      about the signs in this photograph, not that are

19      outside the photograph.  Is there any particular

20      club that he saw that had all of these features on

21      the simulation?

22             MR. MURRAY:  Let me ask this witness

23      whether he ever observed such a club.

24             THE COURT:  Go ahead.

25      Q      Have you ever observed such a club?

26      A      I'm a prickly liberal individual, and I

AT

**741**

602

Anastas - Direct - Murray

1

2  believe people should be allowed to pursue their own

3  pleasures however they see fit.  But I recall clubs in

4  Manhattan in midtown where there were barkers outside

5  luring passersby with promise of sexual favors and great

6  offense to the sensibility of people.

7       Q       The question is, sir, did you see any signs

8  that had all of these features, not barkers, can you

9  answer that question?

10      A       I cannot say that I saw a facility that had

11 these particular signs except for the ones where we

12 photographed them and brought them into play here.  I

13 have such a picture here.  And it has a whole bunch

14 of -- it's from a different kind of current club and I'd

15 be happy to show it.

16      Q       Let's see it.

17              THE COURT:  Here counsel.  We'll need it

18 marked.  Mark it as what?

19              MR. MURRAY:  12D, your Honor.

20              (Whereupon, Plaintiff's Exhibit 12D was

21 marked for Identification at this time.)

22              THE COURT:  Let's deem it moved in

23 evidence so that you can complete your voir dire.

24 BY MR. MURRAY:

25      Q       So if I understand what you are saying, 12D

26 is an illustration of one of the clubs that was used to

AT

1226

**742**

603

```
1                  Anastas - Direct - Murray

2    create the composite?

3         A     It's a pleasure facility in New York.  It

4    shows "Live girls", "Girls, Girls, Girls", in the

5    various features of that facility.

6         Q     Does it have the triple X?

7         A     I can't see it right here.  No, it doesn't.

8    But neighboring clubs did.  I don't have pictures of all

9    the places that we stole graphics from.

10                    THE COURT:  Do you want to voir dire on

11        this.

12                    MS. NEUFELD:  Yes, please, your Honor.

13   VOIR DIRE

14   BY MS. NEUFELD:

15        Q     Mr. Anastas, when did you take that photo?

16        A     It was taken in 2006.

17        Q     Was it taken by you?

18        A     No.

19        Q     Who was it taken by?

20.       A     The graphic designer was sent out to get

21   graphics to use for the study so that we could make the

22   comparison.

23        Q     Is the establishment depicted in that photo a

24   club that serves alcohol or food and features topless

25   entertainment?

26        A     It features topless entertainment, but does

                               AT
```

1227

743

Anastas - Voir Dire - Neufeld

1

2    not serve alcohol.

3         Q    Is it an eating or drinking establishment?

4         A    I don't believe so, no.

5         Q    Is it, in fact, a book store that has

6    peepshows in it?

7         A    Yes.

8              MS. NEUFELD:  Your Honor, this document

9    is completely irrelevant.  This case is about

10   topless clubs, not book stores.

11             THE COURT:  But he said it was topless.

12             MS. NEUFELD:  It's about a book store

13   that has peepshows.

14             THE COURT:  It says "Live girls".

15             MS. NEUFELD:  It's a peepshow place.

16             THE COURT:  It says "Live girls".

17             THE WITNESS:  "Girls, Girls, Girls."

18             THE COURT:  I don't see "Girls, Girls,

19   Girls."

20             THE WITNESS:  In the middle there.

21             THE COURT:  Oh, yeah, it says, "Girls,

22   Girls, Girls.  Live."

23             Well, whether it's a topless or not,

24   it's a legitimate photograph, is it not.

25             THE WITNESS:  Yes.

26             THE COURT:  Okay, it's an illustration,

                         AT

**744**

1          Anastas - Voir Dire - Neufeld

2    it's a reasonably similar illustration for his

3    study for the point that he wishes to find out

4    about as to whether or not the reactions of people

5    on the street are the same or different for these

6    photographs.

7          I'm going to allow it.  I'm going to

8    allow them all into evidence.

9          MS. NEUFELD:  The whole study?  The

10   whole study is based on a fiction.  That isn't a

11   topless club.

12          THE COURT:  I understand that it's based

13   on proving a particular point, not necessarily that

14   it's proving a point about anything that existed

15   but if it did, if it does, it's a valid point as

16   far as I'm concerned.

17          Whether it's true or not, it's a

18   reasonable example of his point which is trying to

19   show whether or not there is any contrast between

20   the subdued clubs, and the more garish ones.  I

21   will an allow it into evidence.

22          (Whereupon, Plaintiff's Exhibit 12D was

23   marked in Evidence at this time.)

24          THE COURT:  Let's take a break.

25          (Brief recess.)

26

                        AT

Anastas - Direct - Murray

1

2   BY MR. MURRAY:

3       Q       Mr. Anastas, you formulated some questions I

4   take it for the survey that you were going to undertake;

5   is that correct?

6       A       Yes.

7       Q       And what were the rules in a sense that you

8   followed to make sure that the questions were good as

9   opposed to bad questions in your field?

10      A       Well, we drafted the questions to get at the

11  issues issue of quality of life.  And we asked, we had

12  them in different levels, overall quality of life and

13  someplace people would like to live near or they thought

14  other people would like to live near.  And whether or

15  not the district would be some place they would go

16  shopping.

17      The exact language of the questions was consulted

18  with Professor Paul, Bryant Paul of Indiana who helped

19  in correcting the language and the style of the

20  questions so that it would be as objective and get at

21  the answer in the best possible way because we knew that

22  it would be in evidence and we wanted to make sure that

23  it was done properly.

24      Q       And then once you had the questions agreed

25  upon and you had the pictures, what exactly did you do

26  to actually conduct the survey?  Did you hire a group of

AT

746

607

1              Anastas - Direct - Murray

2    people?

3        A     Yes, the most important variable was getting

4    the right people to distribute the picture and

5    questionnaire to each respondent.

6        I hired a contractor who is used to hand out

7    samples in city streets or to do other kinds of group

8    work.  And he had a team assembled for me that I met

9    with and gave them the rules of how I wanted this

10   conducted.  Most of the individuals are about to be

11   actors and actresses.

12       Q     And then did you have a goal as to how many

13   respondents?

14       A     Yes, I wanted to have a total of

15   approximately 400, and I told the interviewers or the

16   people handing out the questionnaires to be as energetic

17   as they could.  And they ended up achieving a total of

18   651 finished interviews.

19       Q     By the way, did you pre test the

20   questionnaire?

21       A     Yes.

22       Q     What does that mean in your business?

23       A     Well, you are spending a lot of time and

24   money with a questionnaire that people are going to have

25   to administer themselves, it's called a self

26   administered questionnaire.

                         AT

747

608

Anastas - Direct - Murray

2  You want to make sure, you want to make sure that
3  they understand it.  So I showed the questionnaire to a
4  dozen and a half individuals to see how they reacted to
5  it.

6  Q   By the way one point I think I forgot to make
7  clear, the three photographs of the three existing
8  clubs, you changed the names of those clubs and I'm sure
9  there was a reason for that?

10  A   Yes.  I mean some of these are very well
11  known and I felt that would bias it.  So I obscured the
12  name calling VIP Player, and Lace Frills, and Scores
13  Winners.

14  Q   That was to diminish any bias from people
15  recognizing the name of the club?

16  A   A couple of the interviews picked up the
17  questionnaire and says, "Oh that looks like Scores", but
18  it didn't make a difference.

19  Q   Now the test was administered over what
20  period of time?

21  A   Two days.

22  Q   What dates?

23  A   November 16 and 17.

24  Q   And where did you instruct the people to go
25  do the test?

26  A   I knew that we couldn't use the tickets line

AT

JNR-001245

1232

## 748

1                    Anastas - Direct - Murray

2    which I liked so much because that's out of towners.  I

3    wanted this to be all New Yorker's.

4         So we knew there were great concentrations of

5    people in Bryant Park behind the library, Union Square,

6    and I wanted to get some geographic dispersion.  So I

7    sent a team out to Brooklyn and they found a pedestrian

8    mall on Flatbush.

9         Q    Anyplace else?

10        A    No.

11        Q    Okay, now would you turn to page 21 of

12   Plaintiff's Exhibit 12, please?

13        A    Yes.

14              THE COURT:  12A, B or C?

15        Q    Just 12, your Honor.  I want you to go at the

16   bottom rather than look at the summary.  I'd ask you to

17   read the first question at the bottom that you actually

18   posted to the respondents.  What question is that?

19        A    "Based only on these pictures, which of the

20   immediately surrounding neighborhoods do you think is

21   more likely to have a better all quality of life."

22        Q    Let's go to the next page.  We won't do this

23   with every question, but just so we understand how these

24   results are tabulated, what was the result of that

25   question?

26        A    "Out of 650 of people answering it 68 percent

                         AT

**749**

1            Anastas - Direct - Murray

2  said that the subdued facade neighborhood would be much

3  more likely or somewhat more likely to have a better

4  overall quality of life."

5      Q    And then in the chart on that page can you

6  briefly explain how we're supposed to interpret the

7  various columns?

8      A    Yes, let me simplify it.  The chart we're

9  talking about is in this document on numbered page 22 on

10  the bottom.  The first column is the total of those

11  interviewed.  It's headed 651, a hundred percent.

12      The next three columns are the results of the

13  different clubs.  The Players Club, Frills Club and

14  Winners Club.  The next two columns are by gender, and

15  the last two columns are by age.

16      Q    Now then go to the next page, what was the

17  second question that the respondents were asked to

18  answer?

19      A    "Question number two is based only on these

20  pictures.  In which neighborhood do you think it would

21  be safer to walk down the street?"

22      Q    And what was the result of that?

23      A    Looking at the first column you could see

24  among the total sample of 650, 64 percent made a

25  positive response for the subdued facade, that it would

26  look much safer of somewhat safer.

                        AT

**750**

611

1                    Anastas - Direct - Murray

2        Q      What was the third question that was posted

3   to the respondents?

4        A      "Suppose you live in or near each of these

5   two neighborhoods, based only on these pictures in which

6   neighborhood do you think you would prefer to continue

7   living?"

8        Q      And what was the result?

9        A      Among the total, 63 percent said they would

10  prefer to continue living much more or somewhat more in

11  the subdued facade neighborhood.

12       Q      And then question four, what was that?

13       A      "Based only on these pictures, in which

14  neighborhood do you think the average person would

15  prefer to continue living?"

16       Q      And what was the result of the question?

17       A      And in the total column, this is on page 25

18  of the report, the total column for subdued facade

19  63 percent said they would, they think the average

20. person would much more prefer or somewhat more prefer.

21       Q      And then the final question you asked was

22  what?

23       A      "Based only on these pictures and assuming

24  all of the stores in each neighborhood were exactly the

25  same, in which of these two neighborhoods do you think

26  you would be more likely to go shopping?"  And in the

AT

JNR-001248

1235

## 751

1          Anastas - Direct - Murray

2   total column 59 percent said they would prefer the

3   subdued facade neighborhood.

4              MR. MURRAY:   Thank you.   I have nothing

5       further.

6              THE COURT:   Cross-examination?

7              MS. NEUFELD:   Yes, your Honor.

8   CROSS-EXAMINATION

9   BY MS. NEUFELD:

10       Q     Mr. Anastas, on the second page of Exhibit 12

11  which actually says page 13, at the bottom, the second

12  paragraph or the first paragraph says, "Focus Probe,

13  Inc. Focus Probe was commissioned to conduct market

14  research by the lawyer representing Pussycat Lounge and

15  others in cases pending in the Supreme Court for the

16  State of New York."

17       And then in the second paragraph it says, "Focus

18  Probe was informed that Pussycat Lounge and many similar

19  businesses originally operated adult cabarets with loud

20  garish exterior signage, and most if not all of the

21  interior floor space was devoted exclusively to the

22  presentation of the form of adult entertainment commonly

23  known as topless or nude dancing."

24       Right, that's what it says?

25       A     Yes.

26       Q     Then it says, "Focus Probe was further

                        AT

752

613

```
 1              Anastas - Cross - Neufeld

 2   informed that following certain amendments to the City

 3   zoning resolution Pussycat Lounge and these other

 4   businesses modified their exterior signage and remodeled

 5   their exterior space changing them in two important

 6   respects.

 7        "One, modifying the exterior signage so as to

 8   significantly deemphasize or eliminate any ongoing focus

 9   on the topless or nude nature of the entertainment being

10   presented.  And, two, reducing the amount of space

11   devoted to such adult entertainment to less than

12   40 percent of the floor space of the preexisting

13   cabaret, and developing the other 60 percent of the

14   floor space for a variety of non adult business purposes

15   not involving topless or nude dancing or other forms of

16   adult entertainment."

17        Right?

18        A       Correct.

19        Q       That's what you were informed by the

20   attorneys for Pussycat Lounge?

21        A       As well as reading the New York Times of the

22   news of these events contemporaneously.

23        Q       Okay, now it doesn't say in here that you

24   took photographs of examples of signs actually existing

25   prior to 1998; right?

26        A       Correct.

                        AT
```

1237

753

1          Anastas - Cross - Neufeld

2      Q      And again just very briefly, you used VIP

3   Club in photos 101 and 201, but you don't know what VIP

4   Club ever looked like pre 1998; right?

5      A      Correct.

6      Q      And you used in 301 and 401 Lace, but you

7   don't know what Lace actually looked like prior to 1998?

8      A      Correct.

9      Q      And in 501 and 601, you used Scores, but you

10   don't know what Scores actually looked like prior to

11   1998; right?

12      A      Correct.

13      Q      And there is still no actual topless club --

14   well, first of all, you were provided, you provided

15   earlier as Exhibit 12D an example for what you used of

16   signs on a book store called Playpen; right?

17      A      That's one of the places we took pictures of

18   the signage, yes.

19      Q      Okay.

20      A      There were others, but I don't have them with

21   me.

22      Q      I direct your attention to that photo for a

23   moment for, there is nothing hanging down from the

24   awning in that photo, is there, that's related to the

25   Playpen establishment?

26      A      No.

                        AT

615

Anastas - Cross - Neufeld

2  Q    And there is no open 24 hour neon sign, is
3  there?

4  A    I don't see it, no.

5  Q    And there is no X X X neon sign, is there?

6  A    Not on this one as there were on others.

7  Q    And there is no topless sign, right?

8  A    No.

9  Q    So there is no actual, and there is still
10  also no evidence of any actual topless club that looked
11  like any of the loud, garish photos depicted in photos
12  201, 401 or 601; right?

13  A    Didn't we go over this before?

14  Q    We did, I just need you to answer that
15  question and then I'll be done.

16  A    Repeat the question.

17          (Record read.)

18  A    None has been presented in evidence.

19          MS. NEUFELD:  Thank you.

20          THE COURT:  Redirect, Mr. Murray.

21  REDIRECT EXAMINATION

22  BY MR. MURRAY:

23  Q    Just for the record, Mr. Anastas, in terms of
24  the report, was it Mr. Mehler who hired you initially or
25  myself?

26  A    No, I was first contacted by Dan Silver.

AT

1239

616

Anastas - Redirect - Murray

1

2     Q     So that was the lawyer you were referring to

3     in your report?

4     A     Yes.

5     Q     Is it the case, however, that -- do I

6     understand it to be correct that you yourself have

7     personally seen garish signs similar to the ones that

8     you used to convey the loud facade in New York City

9     yourself?

10    A     Yes.  And I could find them today.

11          MR. MURRAY:  Thank you.  That's all I

12    have, your Honor.

13          THE COURT:  Okay.  Does that exhaust the

14    witnesses for today?

15          MR. MURRAY:  Yes.

16          MS. NEUFELD:  Yes.

17          THE COURT:  Okay, sir, you are excused.

18          THE WITNESS:  Thank you, Judge.

19          THE COURT:  Let's go off the record.

20          (Discussion held off the record.)

21          THE COURT:  Do you have another witness?

22          MR. MURRAY:  We have nothing more to

23    offer today.

24          THE COURT:  Then the record is closed.

25          MS. NEUFELD:  Thank you, your Honor.

26          MR. MURRAY:  Thank you.

AT

1240

756

617

1                      Anastas - Redirect - Murray

2                 THE COURT:  Thank you.

3                 (Whereupon, the case is adjourned until

4        March 2, 2009.)

5                 (Continued on page 621.)

6

7                      *       *       *

8

9    CERTIFIED TO BE A TRUE AND CORRECT
     TRANSCRIPT OF THE FOREGOING PROCEEDINGS.

10

11   ANGELA TOLAS, OFFICIAL COURT REPORTER

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

                          AT

1241

# PGS. 618-620

# OMITTED

1242

Page 621


SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:    TRIAL TERM PART 2
- - - - - - - - - - - - - - - - - - - - - - - X
TEN'S CABARET, INC., f/k/a Stringfellow's of
New York, Ltd., PUSSYCAT LOUNGE, INC., d/b/a
"Pussycat Lounge," CHURCH STREET CAFE, INC.,
d/b/a "Baby Doll" and 69-20 QUEENS BLVD., INC.,
d/b/a "Nickels",

                Plaintiffs,

                         INDEX NUMBER:
      - against -          121197/02
THE CITY OF NEW YORK, MAYOR MICHAEL BLOOMBERG,
as MAYOR, etc., et al.,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - X
                71 Thomas Street
                New York, New York
                March 2, 2009

BEFORE:

        HONORABLE LOUIS B. YORK, Justice


APPEARANCES:


    BERKMAN, GORDON, MURRAY & DEVAN, ESQS.
    Attorneys for Plaintiffs
    55 Public Square - Suite 2200
    Cleveland, Ohio  44113
    BY:   J. MICHAEL MURRAY, ESQ., Of Counsel


    MEHLER & BUSCEMI, ESQS.
    Attorneys for Plaintiffs
    305 Broadway- Suite 1102
    New York, New York  10007
    BY:   MARTIN P. MEHLER, ESQ., Of Counsel


    NEW YORK CITY LAW DEPARTMENT
    OFFICE OF THE CORPORATION COUNSEL
    Attorneys for Defendants
    100 Church Street
    New York, New York  10007
    BY:   ROBIN BINDER, ESQ.,
        SHERYL NEUFELD, ESQ.
        RACHEL K. MOSTON, ESQ., Of Counsel

1243

Page 622

ROBERT E. CHODOS
OFFICIAL COURT REPORTER

 4          COURT OFFICER:  All rise.

 5          THE COURT:  Be seated.

 6          Plaintiff.

 7          MR. MURRAY:  Thank you, your Honor.

 8          The Plaintiff will call Dr. Lance Freeman.

 9          COURT OFFICER:  Come to the podium, please.

10          Stand in front of the chair.

11          L A N C E     F R E E M A N, Ph.D., residing

12    at 560 Riverside Drive, Apartment K, New York, New

13    York, 10027, called as a witness by and on behalf of

14    Plaintiff herein, having been first duly sworn, was

15    examined and testified as follows:

16          THE WITNESS:  Lance F-R-E-E-M-A-N.

17          560 Riverside Drive, Apartment K, New York,

18    New York, 10027.

19          COURT OFFICER:  You may have a seat.

20          Witness has been sworn.

21          THE COURT:  You may inquire.

22          MR. MURRAY:  Thank you, your Honor.

23    DIRECT EXAMINATION

24    BY MR. MURRAY:

25      Q   Will you please state what your occupation is,

26    sir?

1244

1          Dr. Freeman - by Plaintiff - Direct/Murray

2     A     I am an Associate Professor of urban planning at

3   Columbia University here in New York City.

4     Q     How long have you been a professor at Columbia

5   University?

6     A     This is my tenth year.

7     Q     Tell the Court what your educational background

8   is?

9     A     I have a Bachelor's in business administration

10   from State University of New York at Buffalo.

11          Master's degree in city and regional

12   planning from Chapel Hill, North Carolina Ph.D. in city

13   and regional planning from University of North Carolina at

14   Chapel Hill.

15     Q     What is city and regional planning?

16     A     City and regional planning is a discipline that

17   deals with the orderly development of urban environment,

18   for example, it's concerned with development of public

19   structures such as highways, roads,, development of

20   housing.

21          It's an attempt to systemically build and

22   develop urban environment.

23     Q     Does that include the issues involving zoning?

24     A     Yes.

25          Zoning is one of the tools that is used to

26   attempt to build a desirable urban environment.

1245

Page 624

1          Dr. Freeman - by Plaintiff - Direct/Murray

2     Q     Prior to becoming professor, what was your

3  employment history?

4     A     I worked at a research consulting firm called

5  Mathematical Policy Research in Washington, D. C.

6               I also worked as a city manager for the New

7  York City Housing Authority.

8               And I worked as a budget analyst for the New

9  York City Department of Environmental Protection.

10    Q     What courses have you taught at Columbia

11 University?

12    A     I have taught courses on introduction to

13 statistics, advanced quantitative method.

14              I have taught research design.

15              I have taught housing policy.

16              I have taught community development policy.

17              And I also have taught thesis workshop and

18 Ph.D. colloquium.

19    Q     What kind of students do you teach?

20    A     Graduate students, primarily Master's degree.  We

21 have a Ph.D. program as well.

22              THE COURT:  Are all these graduate students

23     specializing in urban planning?

24              THE WITNESS:  Yes.

25              Occasionally I have students from other

26     programs, law students, business students, public

Page 625

1        Dr. Freeman - by Plaintiff - Direct/Murray

2    policy students.

3        Primarily they're students in urban planning

4    at Columbia.

5    Q    Tell the Court whether or not you have published

6   any books?

7    A    Yes, I have.

8        I published one book called There Goes The

9   Hood, Struggles of Gentrification From The Ground Up.

10    Q    What year was that book published?

11    A    2006, by Temple University Press.

12    Q    Is that book directed to the lay public or--

13    A    Temple University is a scholarly press.  Its

14   audience primarily is academician.  It's also for the

15   educated lay public as well.

16    Q    Is the book used in universities in courses?

17    A    Yes, it is.

18        I am personally aware of several professors

19   at different universities throughout the country who use

20   the book that I have spoken to.

21        New York University, for example.

22        Drew University, California State.

23   Northridge would be another example.  There are others.

24        THE COURT:  Do you use it?

25        THE WITNESS:  I also use it.

26    Q    I will not ask you how much it costs the students

1247

1              Dr. Freeman - by Plaintiff - Direct/Murray

2    to buy.

3                 What is the general subject matter of that

4    scholarly book?

5         A    The book addresses the issue of gentrification,

6    which is when predominantly high/low income inner city

7    neighborhoods start to experience influx of higher

8    intercom residents and also investment in properties,

9    upscale properties.

10                The book tries to address how the residents

11   in the neighborhood are impacted by this type of

12   neighborhood transformation.

13        Q    Have you published any other scholarly articles

14   in journals?

15        A    Yes, I have.

16                I've published a number of peer reviews.

17        Q    Approximately, how many articles?

18        A    Approximately, 18 or 20.  Approximately.

19        Q    Do any of those articles have relevance to the

20   case we are here today on?

21        A    Yes.

22                Several articles do deal with the issue of

23   how various type of land uses affected property values.

24   So I think that would be germane to this topic.

25                For example, there was an article that looks

26   at how subsidy housing affects property value.

1248

1          Dr. Freeman - by Plaintiff - Direct/Murray

2                   There was an article that I published in

3    Urban Affairs Review with George Foster and Ron Maleger

4    (phon), that look at how different investments by Fannie

5    Mae and Freddie Mac, how they've affected neighborhood

6    property values.

7                   There was another study I looked at, the tax

8    credit, and how that is related to neighborhood change.

9                   Those are examples that I think are germane

10   to the, to the topic at hand.

11      Q     Have you received honors or awards in your

12   professional career?

13      A     Yes, I have.

14                  My -- the book won, There Goes The Hood, won

15   the best book award for the Urban Affairs Association in

16   2007.

17                  I was also selected by the United States

18   Department of Housing and Urban Development as urban

19   scholar of the year.  I believe it was 2002, around about

20   that time.

21      Q     Now, in addition to your teaching at Columbia

22   University, do you also occupy any roles with respect to

23   refereeing in professional journals or roles of that kind?

24      A     I do.

25                  Some peer review journals, articles select

26   outside experts to review articles that are submitted for

1249

Page 628

1          Dr. Freeman - by Plaintiff - Direct/Murray

2    publication, and I have served as a referee on a number of

3    different peer review journals.

4        Q    Are you a member of any professional association?

5        A    Yes.

6               The Planning Association in Urban Affairs.

7               Also the National Economics Association.

8        Q    Now, Dr. Freeman, did there come a time when you

9    undertook a study of property values associated with

10   certain commercial enterprises in the City of New York

11   known as 60/40 businesses?

12       A    Yes.

13       Q    Can you tell the Court approximately, when you

14   did that work?

15       A    I was contacted initially in the fall of 2000, I

16   believe, and so the work was conducted from then until --

17   I believe it was beginning of 2002, when I completed the

18   first report.

19               Subsequently, I made revisions to that

20   report in 2005.  Finished the second version, which is in

21   evidence in the court.

22       Q    Not yet.

23       A    Okay.  Sorry.

24       Q    Hopefully it will be soon.

25       A    Okay.

26       Q    Can you tell the Court, what questions were you

Page 629

1      Dr. Freeman - by Plaintiff - Direct/Murray

2   asked to study?

3      A    The question was:  Do 60/40 clubs have an adverse

4   secondary impact on surrounding residential property

5   values.

6      Q    Now, I want to show you what has been marked for

7   identification as Plaintiffs' Exhibit 8.

8               (Handed.)

9               (Plaintiffs' Exhibit 8 for identification,

10      so marked.)

11              (Handed.)

12     Q    Now, Doctor, in front of you is what has been

13  marked for identification as Plaintiffs' Exhibit 8.

14              Is that correct?

15     A    Yes.

16     Q    Can you identify -- I should tell, your Honor,

17  again, we have redacted pages from this study after

18  consultation with the City, in which they were going to

19  register some objections.  We had no problem honoring

20  those objections.

21              You will see some pages missing from the

22  exhibits.

23              With that qualification in mind, Doctor, can

24  you identify what Plaintiffs' Exhibit 8 is?

25     A    Yes.  It's the report that I revised in 2005.

26     Q    What is the title of the report?

1251

Page 630

1        Dr. Freeman - by Plaintiff - Direct/Murray

2    A    Examining The Relationship Between Businesses

3   That Comply With The 60/40 Zoning Regulations And

4   Surrounding Property Values In New York City.

5    Q    We will talk a bit in a minute about the actual

6   method you used.

7            Did you use an accepted scientific method in

8   your field for answering that question?

9    A    Yes, I did.

10   Q    Can you explain that method and report your

11  result in this study that's marked Plaintiffs' Exhibit 8?

12   A    Yes, I did.

13           MR. MURRAY:  At this time, I move into

14  evidence Plaintiffs' Exhibit 8.

15           MS. BINDER:  Your Honor, note our continuing

16  objection to the admission of this report.

17           THE COURT:  You're not objecting that there

18  is a missing element?

19           MS. BINDER:  No.

20           As we indicated in the prior two reports, I

21  did not think I needed to go into it again.

22           THE COURT:  I want the record clear.

23           MS. BINDER:  We believe the report is

24  hearsay, they're out-of-Court statements offered for

25  the truth.

26           THE COURT:  Okay.

1          Dr. Freeman - by Plaintiff - Direct/Murray

2                    Mark it in evidence.

3                    (Plaintiffs' Exhibit 8, in evidence, so

4     marked.)

5     Q    Doctor, will you please explain to the Court what

6     hypothesis you were testing?

7     A    The hypothesis I was testing was that 60/40 clubs

8     have adverse impact on surrounding residential property

9     values.

10                    The theory being these clubs are viewed as a

11    nuisance or undesirable.

12                    Properties that are close to them would sell

13    for lower value to reflect that undesirability.

14    Q    How did you go about studying that question?

15    A    This is a question -- causal question, the

16    question being:

17                    If you look at properties that are

18    approximate to these clubs, 60/40 clubs, you will observe

19    them having a lower property value.

20                    In social science, the conventional way we

21    go about that, or the ideal way to go about that would be

22    to do an experiment where you would randomly build some

23    60/40 clubs in some neighborhoods and not in others and

24    observe the property values.  Clearly it will be

25    impractical to do an experiment.  We do what is called

26    quasi-experimental design.

Page 632

1          Dr. Freeman - by Plaintiff - Direct/Murray

2               We look at values that are close to 60/40

3     nightclubs and compare them to property values further

4     away.  And we want to try to conform any differences that

5     might exist between the property values that are close to

6     60/40 nightclubs and property values that are further

7     away.

8               For example, it's possible the properties

9     closer to 60/40 clubs happen to be older.  So, if we made

10    a straight comparison between property closer to 60/40

11    clubs and those further away, we might reach a conclusion

12    that property close to 60/40 clubs have a lower value

13    because they're closer to the 60/40 clubs and not because

14    they're older or dilapidated.

15              So, in this exercise I attempted to control

16    for other factors that might affect property values, to

17    try to hold the constant while I compare the property

18    values that are close to the 60/40 clubs and those that

19    are further away.  And --

20    Q    How do you do that?

21    A    The way I do that, using what is called hedonic

22    regression, which is a regression model.

23              In this approach, what we do is look at

24    property value as a variable, and we use the distance from

25    the 60/40 clubs as our independent variable.

26              According to the theory, these clubs have

Page 633

1          Dr. Freeman - by Plaintiff - Direct/Murray

2   adverse impact on property values.

3              We should find that the closer you are or

4   closer the property is to a 60/40 club, the lower the

5   property value.   So statistically we can correlate the

6   relationship between distance and the property value.

7              Because we use multi-regression, we have

8   more than one variable.   We can statistically control for

9   other factors that might affect the property value.

10             Those would include the size of the

11  property, for example, the age of the property, the zoning

12  of that neighborhood.   And we attempt to conform for the

13  neighborhood characteristics in general by limiting our

14  comparison of the properties that are within the same

15  neighborhood.

16    Q    Now, would you explain, you mentioned the hedonic

17  method.

18             What is that exactly?

19    · A    So, in real estate economics, social scientists

20  believe the thinking is, if you look at any given

21  property, you can decompose its value into its various

22  attributes.

23             So, for example, as I mentioned, the size of

24  the property would affect its property value.

25             The age, when it was built, newer property

26  might be expected to be valued more highly.   Also, the

Page 634

1          Dr. Freeman - by Plaintiff - Direct/Murray

2   surrounding condition.

3               There's a saying in real estate:  Location,

4   location, location, a very important determinant of

5   property value.

6               We control for physical attributes of the

7   structure as well as location.  In this case one of the

8   things we want to test is, is it in a neighborhood where

9   there is a 60/40 club.

10              We can isolate how each of these different

11  attributes affect the property value.

12              We focus in particular proximity to the

13  60/40 business.  That will tell us what role does that

14  play.  How does that affect a residential property value,

15  how close, or whether or not it's close to a 60/40 club.

16     Q    So then how did you proceed from that point

17  forward?

18     A    Okay.

19              Well, I obtained data from the City

20  Department of Finance, which assesses property values.  I

21  obtained data for 1998, that was -- at the time I was

22  commencing the study in 2000, that was the latest data

23  available.

24              I obtained the addresses from the counsel

25  that I was working with, and I had those addresses.  Using

26  a geographic system, I had those addresses plotted.  So I

Page 635

1      Dr. Freeman - by Plaintiff - Direct/Murray

2   was able to calculate the distance between each

3   residential property and each of the 60/40 clubs that were

4   in existence in 1998.

5          I limited the analysis only to those

6   properties that were in zip codes that had 60/40 clubs.

7   So, what I had is a data set that has all of the

8   properties that are in a zip code in New York City that

9   have a 60/40 club.

10         I have all of the addresses of the 60/40

11  clubs.

12         I have the distance between each property

13  and the nearest 60/40 club.

14         So, then, I performed a statistical analysis

15  which attempted to correlate the distance between the

16  60/40 club and the residential property value based on

17  assessed values in 1998.

18  Q   How many -- did you use a single model or several

19  models?

20  A   I used eight different models.

21         The first model I did was simply to look at

22  what is the distance between the residential property in

23  question and the 60/40 club.  That is probably the most

24  straightforward approach.  But, you know, it's possible

25  that that model specification may not accurately capture

26  the true relationship.

Page 636

1     Dr. Freeman - by Plaintiff - Direct/Murray

2          So, if we look at the distance between 60/40

3     businesses and a property that may ignore the fact the

4     relationship is not strictly linear.  You could find, as

5     you get closer to a 60/40 club, property values decrease

6     or increase at an increased or decreased rate.  I

7     attempted to capture that using a quadratic

8     specification.

9          I used another specification.

10         I looked at properties that were within 500

11    feet of a 60/40 club, those that were further away.

12         Here, I am comparing property values that

13    are within 500 feet of a 60/40 club and those further

14    away, but within the same zip code.

15         I also made similar comparison using 1,000

16    feet has a demarcation line, comparing property values

17    that were within 1,000 feet of a 60/40 club and those

18    further away, but within the same zip code.

19         Then I did another comparison using 2,000

20    feet as a demarcation line looking at properties within

21    2,000 feet and those further away.

22         The reason why I chose those distances is

23    that there was a study done by New York City Department of

24    Planning where they asked realtors what were the distances

25    at which they felt that the establishment might have a

26    negative effect.  And it was cited at 500 or 1,000 feet.

1258

1          Dr. Freeman - by Plaintiff - Direct/Murray

2               I included 2,000 feet as an additional

3     check.

4               Finally, I looked at whether or not being

5     approximate to more than one 60/40 club would have a

6     negative effect.  It's possible it's not simply being

7     close to a 60/40 club has a negative effect on property

8     value, but it's when a property is close to a

9     concentration of 60/40 clubs, that is when you see a

10    negative impact.

11              So, I did that analysis repeating the

12    distinction between properties that are approximate to

13    more than one 60/40 club or within 500 feet or greater,

14    within 1,000 feet or greater, or within 2,000 feet or

15    greater, all to gather those eight different

16    specifications to test this being approximate to a 60/40

17    club has a negative impact on property value.

18         Q    Overall, what were the results of your eight

19    models?

20         A    Overall, I found no consistent evidence that

21    supports the hypothesis that being a property close to a

22    60/40 club have lower values.  If anything, there is more

23    evidence to support there was a positive relationship

24    between property to 60/40 clubs and residential property

25    values.

26         Q    Now, then, let's talk about the specific result

Page 638

1          Dr. Freeman - by Plaintiff - Direct/Murray

2    of eight models.

3              I think the first one you said had to do

4    with just looking at the raw numbers without controlling

5    for any variables?

6      A    That is correct.

7              So that is on table 4.  So I just wanted to

8    make a comparison between property values that were close

9    to 60/40 club and those further away.

10             The first thing I did was look at average

11   assessed value of property within 500 feet of a 60/40 club

12   and those that were beyond 500 feet.

13             I also did that for 1,000 feet and for 2,000

14   feet, comparing properties that were within 500 feet of a

15   60/40 club to those further away.  There's a difference.

16   The difference is not significant statistically.

17             What that means that difference might be due

18   to chance.  We do not have much confidence.

19     Q    What is statistical significance?

20     A    That simply means if you calculate a statistic,

21   there is a sampling distribution associated with that

22   statistic.

23             If we are to repeat this exercise a number

24   of times, say a hundred or thousand times, what is the

25   chance we would observe a given result simply due to

26   chance.

Page 639

1           Dr. Freeman - by Plaintiff - Direct/Murray

2                In social science, it is to use 95 percent

3  level of confidence, meaning there is only five percent

4  probability that this result is due to chance.  So, if

5  something is not significant, it means it is greater than

6  five percent.

7                We do not have a lot of confidence in the

8  result.

9    Q   Is there a mathematical formula by which you can

10  calculate that?

11    A   Yes, there is.

12             Do you want me to write it?

13    Q   If you can in a way we might understand it.

14    A   Okay.

15           So, in this case, in table 4, the test, I am

16  comparing mean, the statistic here is calculated by taking

17  the difference of the means of property within 500 feet,

18  compared to properties that are beyond 500 feet, dividing

19  that by the overall standard error, we calculate a

20  standard error for property within 500 feet.  We calculate

21  a standard error for property within -- beyond 500 feet.

22  We take over all error and that's our denominator; that

23  yields a statistic that has a known sampling distribution

24  similar to normal distributions.

25           We can -- based on that statistic, we can

26  know with precision what is the likelihood of observing

Page 640

1          Dr. Freeman - by Plaintiff - Direct/Murray

2     this solely due to chance.

3          Q     If you look at table 4, do you see another 500

4     feet, the average assessed value within the 500-foot ring

5     is lower if you are-- it is for outside the ring, correct?

6          A     That is correct.

7          Q     You say not statistically  significant that is

8     what you mean?

9          A     Yes.

10         Q     This is the absolute raw numbers?

11         A     Yes.

12               It could be the properties that are within

13    500 feet could be much smaller, for example.  So that

14    could explain why you see the lower difference.  But, more

15    importantly, it's not statistically significant.  We do

16    not have a lot of confidence in the difference

17    irregardless.

18         Q     At the thousand foot level, the raw numbers shows

19    that if you are within a thousand feet of 60/40

20    businesses, your property values will be higher than if

21    you are more than a thousand foot?

22         A     That's correct.

23         Q     Again, is that of any statistical significance?

24         A     No.

25               We do not have much confidence in the

26    result.  It's a good deal of probability that is due to

1262

Page 641

1        Dr. Freeman - by Plaintiff - Direct/Murray

2   chance.

3        Q    You examined the raw numbers for 2,000 feet.

4             If I read this correctly, you discovered if

5   you are within 2,000 feet of 60/40 businesses, your

6   property value is going to be higher than if you are more

7   than 2,000 feet away from such businesses?

8        A    That is correct.

9             This result is statistically significant at

10  a 95 percent level of confidence.

11       Q    That was just the raw numbers.

12            Does the next table show what happens when

13  you control for variable?

14       A    It does.

15            Table 5 includes the control variable which

16  I listed in table 3.  So I only present the main

17  independent variable of interest in table 5.

18            Would you like me to go through the table?

19       Q    Yes, tell us the result of -- this is now the

20  second model or the second and third model?

21       A    Second and third model.

22       Q    Take us through the second and third model and

23  what the results were of those?

24       A    Okay.

25            So, the second and third column of table 5

26  simply compares the linear distance, in other words, the

Page 642

1          Dr. Freeman - by Plaintiff - Direct/Murray

2    number of feet away from a 60/40 club and assessed

3    property value.

4               What this result shows, the distance row,

5    the row labeled distance is the further away you move from

6    a 60/40 club, property values decline by .00283 of a

7    percent.  That result is statistically significant.  It is

8    perhaps not that meaningful.  It is a small number

9    relationship, the opposite is what the secondary effect

10   sustained, which would, where you would expect property

11   values to increase and not decreasing even if it's a

12   slight decrease.

13   Q    If I read this number correctly, it means the

14   closer you are to 60/40 businesses, your property value is

15   going to be very slightly higher?

16   A    Correct.

17   Q    Go ahead.

18   A    So that is the second and third column of table

19   5.

20               The fourth and fifth column here, I am

21   measuring, I am relaxing the assumption, the relationship

22   is linear.  As I mentioned earlier, if -- for example, if

23   you move away from a 60/40 club, property values increase

24   at an increased rate or decreases at a decreased rate,

25   this specification attempts to capture that.

26               Here, if you look at P- values, P- value

Page 643

1      Dr. Freeman - by Plaintiff - Direct/Murray

2      tells you probability of observing this result simply due

3      to chance.

4            So, using 95 percent level of confidence, we

5      are looking for P- value less than .05.

6            Here, the P- value for distance variable and

7      distance variables are above .05.  We do not have much

8      confidence in these relationships.  You know, there is a

9      20 percent chance for distance variable and 50 percent

10     chance for the distance variables that these observed

11     values are totally due to chance.

12     Q    What are the observed values?

13     A    They're negative .0000157.

14           This other is too small.  It is one to the

15     weight of power of--

16     Q    What does it mean, negative.

17           Can you translate that?

18           Are the property values getting lower as you

19     go father away, or getting higher?

20     A    They're getting higher.  They're getting higher.

21           THE COURT:  My question:  Are you talking

22     about property values?

23           Wouldn't a more accurate property value be

24     the market value rather than somebody assessed the

25     value, which is somebody's opinion about what this

26     property is worth?  What it would sell for in the open

Page 644

1    Dr. Freeman - by Plaintiff - Direct/Murray

2    market more accurate a determination of property

3    value?

4         THE WITNESS:  Market value, it is an actual

5    sale.  One disadvantage, though, is that not all

6    property sells, you know, every year in a timely

7    fashion.  There could be some bias in terms of what

8    properties are selling.

9         It may also be the case that only certain

10   types of properties are selling.  So, while it's true

11   there may be less measurement error with the sale

12   values, the assessed value covers the entire universe,

13   it is a more complete sampling.

14   Q    What are the assessed values as opposed to

15   mirror?

16   A    Mirror are to be reflective.

17        The City has three ways to assess property.

18   Mostly, I believe, reflect sale value for some property

19   income producing.  They are based on that.

20        And for newer properties just constructed,

21   there might not be any comparable or comparable units.

22   They use estimate based on construction cost.

23        So, assessed value in some way is more

24   complete.  It takes into account the differences in

25   properties which you would not find if you only had sales

26   of older buildings, residential, you know, residential

Page 645

1           Dr. Freeman - by Plaintiff - Direct/Murray

2     occupied buildings.

3       Q     Are assessed values supposed to represemt market

4     value as best as the City can do that, taking into account

5     all the factors that it has at its disposal?

6       A     Yes.

7       Q     With respect to table 5, depicting the second and

8     third models, do either of those models support the

9     proposition that 60/40 businesses cause adverse secondary

10    effects of lower property value?

11      A     No.

12      Q     Is one of the models statistically significant on

13    that table?

14      A     You said one of the models.

15      Q     One of the results of the two models

16    statistically significant on table 5?

17      A     Yes.

18            Linear distance model, which is presented in

19    column two and three, there the variable is statistically

20    significant.

21            I would note, the model as a whole, both of

22    the models as a whole, are statistically significant and

23    that is indicated by the statistics when we look at all

24    independent variables, which I did not include in all the

25    tables, but are in table 3.

26            If you look at the entire regression model,

Page 646

1          Dr. Freeman - by Plaintiff - Direct/Murray

2     it is statistically significant.

3              So, approximately 71 percent of assessed

4     value is explained by all variables listed in table 3, or

5     all variables I include.

6              In social science, 70 percent is a fairly

7     high statistic.

8              You may find, 10, 15, 20 percent of any

9     phenomena that a social scientist is trying to explain.

10    Here, we're doing a fairly good job in modelling the value

11    of assessed property value.

12    Q     What is the next table to demonstrate to us,

13    which models were they?

14    A     Okay.

15             Table 6.  Here, again, we are relaxing the

16    assumption that the relationship between proximity to a

17    60/40 club and assessed value is linear, and so we simply

18    use different ring metrics.

19             The first metric is using a 500-foot ring.

20    That is in column two and three.

21             Here, what we're doing is comparing assessed

22    property value within 500 feet of a 60/40 club and

23    assessed property value beyond 500 feet.  Holding constant

24    all the differences in the property values I mentioned.

25    These are properties within the same zip code.

26             The coefficient here tells us .109 or there

1        Dr. Freeman - by Plaintiff - Direct/Murray

2   is approximately, 11 percent premium associated with

3   assessed value within 500 feet of 60/40 club.

4            The P- value again tells us what the

5   probability of observing this results solely due to chance

6   using 95 percent level of confidence, we are looking for

7   P- value less than .05.  Higher P- value is less than

8    .01.

9            The probability of observing this

10  relationship solely due to chance is fairly low, less than

11  one percent.  We're pretty confident in this result.

12      Q    Does using this result support the proposition

13  that 60/40 businesses cause adverse secondary effect of

14  lower property value?

15      A    No.

16            Because the value is higher if you are

17  within 500 feet of a 60/40 club as opposed to being beyond

18  500 feet.

19      Q    Go ahead with the thousand foot and 2,000 foot

20  rings.

21            What does it show?

22      A    The fourth and fifth column under the heading

23  1,000 feet ring, here we are comparing property within

24  1,000 feet of a 60/40 club and property beyond 1,000 feet

25  within the same zip code.

26            Here, it shows that this property

Page 648

1          Dr. Freeman - by Plaintiff - Direct/Murray

2    characteristic, and here we see the property within 1,000

3    feet of 60/40 clubs are assessed at approximately, three

4    percent higher value than the property that is beyond a

5    thousand feet, but within the same zip code.

6                    If we look at the P- value, that tells us

7    the probability is due to chance.  Again, it is low,

8    .002.  We're looking for value less than .05.

9                    Here we are using 95 percent level of

10   confidence.  We are confident this result is not due to

11   chance.  The probability is very low it is due to chance.

12                   This, again, is not consistent with the

13   secondary effect which suggests coefficient should be

14   negative five and not positive.

15                   Finally, in the last two columns of table 6,

16   we compare property that is within 2,000 feet of a 60/40

17   club and property that is beyond 2,000 feet within the

18   same zip code.

19                   Here, we have very small coefficient.  It's

20   not statistically significant.  The probability of

21   observing this solely due to chance is .799,

22   approximately, 80 percent.

23                   We do not have a lot of confidence in this

24   result.  It's fairly small, in any event.

25                   Taken together, the evidence presented in

26   table 6 would seem to run counter to the secondary effect

1        Dr. Freeman - by Plaintiff - Direct/Murray

2   hypothesis.

3            In two of the three comparisons, the

4   property values were higher when they're closer to 60/40

5   clubs as opposed to being further away.

6       Q   Finally, tell us what the last table shows?

7       A   Table 7, we attempt to try to see whether being

8   close to a concentration of 60/40 clubs has a negative

9   impact on assessed property value.

10           So, here, we examine it more than one club

11  within 500 feet or more than one club within 1,000 feet

12  and so on.

13           The second and third column at table 7 shows

14  that property that are within more than 500 feet, of, are

15  assessed at 12 percent value higher than property beyond

16  500 feet of a 60/40 club.

17           If we look at the P- value, the probability

18  of observing this relationship solely due to chance is

19  less than one percent, as indicated by the less than .01.

20           So, we are fairly confident this result is

21  not solely due to chance.  That result is consistent with

22  the secondary effect.  We would expect property that are

23  within 500 feet or more would have lower assessed value.

24           Moving onto the fourth and fifth column of

25  table 7, here, we compare assessed property value for

26  property that are within 1,000 feet or to those beyond

Page 650

1         Dr. Freeman - by Plaintiff - Direct/Murray

2    1,000 feet.

3              Here, the relationship is negative.

4    However, if you look at P- value, this probability of

5    observing this solely due to chance is only -- is about 65

6    percent, .648.

7              So, the coefficient is very small.

8    Probability of observing this due to chance is very high.

9    We do not have a lot of confidence.  It does not really

10   tell us reliably what the relationship is.

11             The last two columns compare properties that

12   are within 2,000 feet of more than one-story property that

13   are within 2,000 feet of more than one 60/40 club to

14   property that are beyond 2,000 feet.

15             Here you see the coefficient is negative.

16   So properties that were within 2,000 feet, if more than

17   one 60/40 club are assessed about nine percent lower value

18   than properties that are beyond 2,000 feet of more than

19   one 60/40 club.

20             Here, the property value, here, the P- value

21   probability of observing this due to chance is less than

22    .01.

23             So this is a statistically significant

24   result.

25   Q    Having taken into account all eight models,

26   Doctor, can you summarize what conclusion you can draw to

1      Dr. Freeman - by Plaintiff - Direct/Murray

2   a reasonable degree of scientific certainty by taking all

3   the eight models as a whole?

4      A    Sure.

5            In social science we are looking for

6   consistent pattern that supports this hypothesis.

7            In this case the analyses do not support the

8   concept that proximity to 60/40 clubs has a negative

9   impact on property values.

10           Mostly the analyses were statistically

11  insignificant or, in fact, found properties closer to

12  60/40 clubs to have higher assessed values that contradict

13  the secondary effect thesis.

14           In this report we find no consistent

15  evidence that supports the argument that proximity to

16  60/40 club does have a negative impact on property values.

17     Q    Now, you have indicated that you used 1998

18  assessed property values.

19           Correct?

20     A    That is correct.

21     Q    Now, if you were to assume that in 1998, not all

22  of the clubs that you studied had all converted from 100

23  percent to 60/40, some had, some perhaps did not, by the

24  time of those property assessments, how would that affect

25  the analysis?

26     A    Well, that would -- if that were true and

Page 652

1        Dr. Freeman - by Plaintiff - Direct/Murray

2   assuming they were operating at hundred percent adult

3   establishment, that would be more consistent with the

4   notion that would provide even stronger evidence there is

5   no adverse impact.

6            Because you would expect on a hundred

7   percent club, it would have a stronger impact on a 60/40

8   club, this, if anything, we may be making too weak a case

9   or too weak an argument that adult establishments do not

10  have negative impact on property.

11           MR. MURRAY:  Thank you.

12           That is all I have.

13           THE COURT:  Cross examination.

14           MS. BINDER:  Thank you, your Honor.

15  CROSS EXAMINATION

16  BY MS. BINDER.

17      Q    Good morning, Dr. Freeman.

18      A    Good morning.

19      Q    Nice to see you again.

20      A    Nice to see you.

21      Q    You're familiar with the term 60/40 club as used

22  in New York.

23           Correct?

24      A    Yes.

25      Q    So, what does it mean?

26      A    It means that a club is attempting to comply with

Page 653

1           Dr. Freeman - by Plaintiff - Cross/Binder

2    zoning regulation would configure their establishment so

3    that no more than 40 percent of the establishment is

4    devoted to adult uses.

5        Q    It's your understanding the 60/40 club in New

6    York adopted their 60/40 configuration to comply with

7    zoning requirements to regulate that?

8        A    Yes.

9        Q    It's true, isn't it, you were retained to give

10   expert testimony on the issue of whether 60/40 clubs in

11   New York City are associated with decreased property

12   value?

13       A    Correct.

14       Q    Now, you, yourself, you do not believe there is

15   any scientific proof that the presence of 100 percent

16   sexually oriented business on a particular block is

17   associated with a decrease in property value?

18       A    Correct.

19       Q    You do not believe that.

20            You believe, don't you, many of the

21   secondary effect studies regarding crime and property

22   values utilized by different governmental entities are

23   floored because they do not adhere to certain professional

24   and scientific standards?

25       A    Yes.

26       Q    Do you agree it's important to adhere to

1275

Page 654

1          Dr. Freeman - by Plaintiff - Cross/Binder

2   professional scientific standards when undertaking a

3   secondary effect?

4       A    Yes.

5       Q    Now, you testified, I believe, you first looked

6   at the issue of 60/40 clubs and property values and then

7   you prepared a report in 2002.

8               Correct?

9       A    Correct.

10      Q    That report was used in a Federal case that was

11  filed on behalf of a club called LACE and some other club;

12  isn't that correct?

13      A    Yes.

14      Q    That was shortly after the City of New York

15  amended its zoning to change the definition of adult

16  eating or drinking establishments to cover 60/40 clubs,

17  correct?

18      A    I am less aware of that.

19      Q    You're aware that zoning regulations were changed

20  in New York so 60/40 clubs would also be considered adult

21  establishments.

22              Correct?

23      A    Yes.

24      Q    That litigation was in Federal Court.

25              This Court is about the constitutionality of

26  that change.

Page 655

 1          Dr. Freeman - by Plaintiff - Cross/Binder

 2               Correct?

 3     A    Yes.

 4     Q    Now, in 2002, you prepared a statistical analysis

 5   of property values for certain 60/40 clubs.

 6               Correct?

 7     A    Correct.

 8     Q    One like this, anyway.

 9               In your 2002 analysis you examined the

10   effect of only one 60/40 club on assessed property value?

11     A    Yes.

12     Q    You updated your analysis in 2005.

13               Correct?

14     A    Correct.

15     Q    2005, you examined the effect of 36 different

16   60/40 clubs on assessed property value?

17     A    Yes.

18     Q    You updated your report because subsequent to

19   preparation of the 2002 report, you learned that the City

20   of New York had reported the existence of 36 60/40 clubs

21   in connection with the 2001 rezoning.

22               Correct?

23     A    Correct.

24     Q    Now, prior to updating your study in 2005, did

25   you review a report prepared by Dr. Daniel Linz, L-I-N-Z

26   discussing his analysis of whether 60/40 clubs in New York

Page 656

1        Dr. Freeman - by Plaintiff - Cross/Binder

2    City caused crime?

3        A    This is prior to 2005, you're asking me?

4        Q    Prior to updating your study in 2005, did you see

5    his study?

6        A    I don't recall seeing it.

7        Q    Have you ever seen it, his study?

8        A    I don't believe so.  I don't believe so.

9        Q    Okay.

10           But at some point you become aware there

11   were more than one 60/40 club?

12       A    Right.

13       Q    So, you updated your report and you included a

14   list of the 36 60/40 clubs in table 1 to your 1995 report

15   that is in evidence as Plaintiffs' Exhibit 8?

16       A    Right.

17       Q    You did an analysis for all six of those clubs on

18   your table 1?

19       A    Yes.

20       Q    I think something is there twice, but, it is 36

21   without counting the one that is there twice?

22       A    Okay.

23       Q    Now, it's true, isn't it, that for both your 2002

24   and 2005 analysis you used assessment data?

25       A    Yes.

26       Q    As assessment data you used was the record of

Page 657

1          Dr. Freeman - by Plaintiff - Cross/Binder

2    assessed value for property in 1998, that New York City

3    uses for tax purposes.

4               I am quoting that language from page 20 of

5    the report in front of you.

6               Correct?

7    A    Yes.

8    Q    Now, assessed values are estimates of property

9    values used for purposes of determining how much real

10   estate tax the City gets to charge for the property.

11              Correct?

12   A    Correct.

13   Q    And so, assessed values do not necessarily

14   reflect the market value of the property at a given

15   minute.

16              Do they?

17   A    Not necessarily.

18   Q    In fact, you recognize on page 20 of your report

19   that assessed value is not an ideal measure of actual

20   market value of a property.

21              Correct?

22   A    It's not perfect.

23   Q    Okay.

24              It's fair to say a better measure of market

25   value of property would be the actual sale price when it

26   exchanges hands.

1279

Page 658

1           Dr. Freeman - by Plaintiff - Cross/Binder

2                   Correct?

3       A     Yes.

4       Q     Another way to measure market value, aside from

5   looking at the sale price, you can look at the appraised

6   value of a property.

7                   Correct?

8       A     You could.

9       Q     Appraisal is where an appraiser looks at actual

10  sales prices of comparable property in order to determine

11  the market value of a property that is going to be sold.

12  Correct?

13      A     Yes.

14      Q     In fact, when you did a study in Ohio, of effect

15  of sexually oriented business on property value, you used

16  sale data in that study, didn't you, Dr. Freeman?

17      A     Yes.

18      Q     The reason you used assessment data in this case,

19  rather than actual sale data or appraised value is, it was

20  the only way you could get value for all the property in

21  the study area.

22                  Correct?

23      A     Yes.

24      Q     But, as you testified in response to Justice

25  Yorks' question on direct, you recognized there is some

26  measurement error in the assessed value of a property?

Page 659

1          Dr. Freeman - by Plaintiff - Cross/Binder

2     A     Yes.

3     Q     Now, you're a professor right here at Columbia

4     University.

5               Correct?

6     A     Yes.

7     Q     You have expertise in urban affairs with a

8     particular focus on urban housing.

9               Correct?

10    A     Yes.

11              MS. BINDER:   Excuse me, your Honor.

12              (Pause.)

13    Q     I believe you testified you lectured and written

14    on the topic of urban gentrification?

15    A     Yes.

16    Q     You have examined property values in New York

17    City and other urban neighborhoods.

18              Correct?

19    A     Yes.

20    Q     Now, assessment for property in New York City,

21    they're prepared by the New York City Department of

22    Finance.

23              Correct?

24    A     Yes.

25    Q     I believe you testified to that.

26    A     Yes.  Correct.

1281

## 796

Page 660

1      Dr. Freeman - by Plaintiff - Cross/Binder

2      Q      They're prepared so that, as I think you

3   testified before, so that amount of real estate tax can be

4   determined.

5            Correct?

6      A      Yes.

7      Q      And, you're aware the tax year for real estate

8   tax in New York City runs from July 1 to June 30 of any

9   given year.

10           Correct?

11     A      Yes.

12     Q      And assessment for each particular property has

13  to be finalized before the tax bill goes out.

14           Yes?

15     A      Yes.

16     Q      So, now you're aware, Dr. Freeman, that the

17  Department of Finance releases its final assessment for

18  property in the City in May of that year before the tax

19  bill goes out.

20           Correct?

21     A      Yes.

22     Q      It's also true, isn't it, a few months before the

23  release, the final assessment, in May, they release a

24  tentative amount in January of that year?

25     A      I don't know for sure the exact sequence of, you

26  know, what the exact month it is released.

Page 661

1           Dr. Freeman - by Plaintiff - Cross/Binder

2       Q    You do know before the final assessment is

3   released, they release a computation of a tentative

4   assessment a few months before the final assessment is

5   released?

6       A    Yes.

7       Q    So, if a property owner has a problem, they can

8   go to the Department of Finance and say there's a problem,

9   I want you to fix it.

10              And so there is some time in there for the

11  property owner to be heard.

12              Correct?

13      A    Correct.

14      Q    Now, I believe you testified in your analysis in

15  this case for Plaintiffs' Exhibit 8 in evidence, you used

16  1998 assessment data?

17      A    Correct.

18      Q    So, that would be assessment data that was

19  released by the Department of Finance in May of 1998.

20              Correct?

21      A    Correct.

22      Q    Now, weren't you told by the lawyers who retained

23  you in this case that the zoning regulation that

24  establishes the 60/40 requirement did not go into effect

25  until July of 1998.

26              Right?

Page 662

1            Dr. Freeman - by Plaintiff - Cross/Binder

2        A     Well, 1998.

3              Yes.

4        Q     Did you know they did not go into effect until

5    July of 1998?

6        A     At the time I was doing my analysis, I don't

7    recall if I knew the exact month.

8        Q     In fact, when you did your analysis, you believed

9    that the 60/40 clubs you used were all open in 1998, and

10   they were, all adopted 60/40 configurations prior to

11   1998.

12             Isn't that true?

13       A     I know they were operating as adult

14   establishments prior to 1998.

15             That was something I ascertained to make

16   sure there was a sequence that the club was operating as

17   an adult establishment prior to the assessed values that I

18   was certain of.

19             The data, when they reconfigured, I don't

20   believe I knew when that happened.

21       Q     Isn't that true you assumed they reconfigured to

22   60/40 when you used this prior to the time the data was

23   selected by the City Finance Department?

24             Isn't that true?

25       A     I am not sure I had any way of knowing that for

26   certain.

Page 663

1          Dr. Freeman - by Plaintiff - Cross/Binder

2              I guess they were in the process of planning

3    to reconfigure without knowing the date when they were to

4    be reconfigured.  I think the key was they were operating

5    as adult establishments prior to 2008.

6      Q    You were retained to study impact of 60/40

7    establishments on property values, weren't you, Dr.

8    Freeman?

9      A    I was.

10     Q    Let me ask you this, Dr. Freeman:

11             You remember coming to my office, I think it

12   was last year, summer of 2008, for a deposition.

13             Correct?

14     A    Yes.

15     Q    You were asked questions by me and you gave

16   answers under oath.

17             Correct?

18     A    Correct.

19             MS. BINDER:  We have a copy of the

20   deposition transcript of Dr. Freeman.

21             We want it marked for identification.  It

22   was premarked as Defendants' Exhibit TT.

23             (Defendants' Exhibit TT for identification,

24   so marked.)

25             Page 38, line 25, do you remember being

26   asked these questions and giving these answers?

## 800

```
 1            Dr. Freeman - by Plaintiff - Cross/Binder

 2                 "QUESTION:  So, were all 36 clubs in your

 3       study, were they all open in 1998?

 4                 "ANSWER:  To my knowledge, they were.

 5                 "QUESTION:  And do you know when they

 6       adopted a 60/40 configuration?

 7                 "ANSWER:  To my knowledge, it was before

 8       1998."

 9                 Do you remember giving that answer?

10       A    I don't remember.

11       Q    Isn't it true you would not have used assessment

12  data from 1998 if you thought the assessment data predated

13  the establishment of the 60/40 club?

14                 Isn't that true?

15       A    You mean configuration.

16       Q    The configuration of the 60/40 club?

17       A    I mean, I think if any club is operating as an

18  adult establishment, that, that would tend to amplify to

19  the extent that thesis is true, would amplify that effect,

20  if anything, doing an analysis, as I did, would tend to --

21  we expect to see a bigger, bigger impact if they were

22  operating as a 100 percent club as opposed to a 60/40

23  club.

24                 So, in other words, that would work in my

25  favor.

26                 So, you know, ideally you would have them
```

Page 665

1              Dr. Freeman - by Plaintiff - Cross/Binder

2      set up a 60/40 club before you do an analysis to the

3      extent they were already opened and operating as 100

4      percent established.

5              The results that were reported later on

6      would tend to work less in my favor, so--

7      Q     You were not asked to analyze the impact of 100

8      percent establishments, were you, Dr. Freeman?

9      A     No.

10             I was asked to look at these clubs.

11     Q     You were asked to look at the impact of 60/40

12     clubs?

13     A     Yes.

14     Q     You used assessment data that predated the

15     establishment of any 60/40 club.

16             Correct?

17             MR. MURRAY:   Objection.

18             THE COURT:   I'll allow it.

19     A     Say that again.

20     Q     You, in fact, used assessment data that predated

21     the establishment of any 60/40 club.

22             Correct?

23     A     I don't know that is true.

24             Some of the clubs, the announcement was, I

25     believe, 1995.

26             I am assuming in between that time the club

Page 666

1    Dr. Freeman - by Plaintiff - Cross/Binder

2  started reconfiguring.  So by 1998, I would imagine they

3  would not wait until three days before.

4    Q    Let me ask you this:

5         If it turns out no club reconfigured before

6  July of 1998, then it would be true that you used

7  assessment data that predated the configuration of any

8  club to 60/40.

9         Correct?

10   A    If that were true, yes.

11   Q    If that were true.  Okay.

12        Now, you told us that you used 1998 data

13 because at the time you did your study that was the latest

14 data available.

15        Correct?

16   A    Correct.

17   Q    It's fair to say that had you had information

18 that clubs did not start to reconfigure until the latter

19 part of 1998 and '99 or 2000 data was available to you,

20 you would have used the '99 or 2000 data.

21        Correct?

22   A    Right.

23        Because, you know, that would work against

24 the counsel I am working with.

25        I would say, it would be better to wait

26 until they reconfigure to look at it.

## 803

1        Dr. Freeman - by Plaintiff - Cross/Binder

2        Q     If you had information that the reconfiguring was

3    done at the end of 1998, and you had the 1999 or 2000

4    data, you would have used the '99 or 2000 data.

5              Correct?

6        A     Yes.

7        Q     Now, when you updated your study in 2005, later

8    assessment data would be available to you.

9              Correct?

10       A     Yes.

11             I would be able to obtain it, yes.

12       Q     In fact, when you updated your study in 2005, you

13   added 20 other clubs to your analysis, you still used 1998

14   data.

15             Correct?

16       A     Correct.

17       Q     Okay.

18             Now, I believe you testified earlier that

19   you studied the 36 -- each of the 36 clubs listed in the

20   table.

21             Correct?

22       A     Yes.

23       Q     Would you agree that if one or more of the 36

24   clubs had not even opened in 1998, it should not have been

25   included in your analysis of the 1998 assessment.

26             Correct?

Page 668

Dr. Freeman - by Plaintiff - Cross/Binder

1

2    A    Right.

3    Q    Now, you testified that you do not recall having

4    seen Dr. Linz' report.

5              Were you aware of the nature of the analysis

6    that he did when you did your analysis in '95?

7    A    I have an idea of what he was doing.

8    Q    Okay.

9    A    I am saying I cannot recall specifically.  I may

10   have looked at it.  It has been several years.

11   Q    Why don't we get a copy of Dr. Linz' report and

12   show it to you.  It's in evidence as Exhibit 6.  The table

13   part is Exhibit 6A.

14             (Handed.)

15   Q    Now, I would like to direct your attention,

16   Dr. Freeman, to page 19 of Dr. Linz' report.

17             There is the end of one table and then there

18   are two other tables.

19             Now, if you look at the middle box of

20   Dr. Linz' report, it's true that report indicates that six

21   of the clubs either had not opened before, six clubs had

22   subsequently closed or had not been opened as of 1998.

23             Do you see where it says that?

24   A    It says" opening".

25             THE COURT:  What page?

26             MS. BINDER:  Sorry.

1290

Page 669

1           Dr. Freeman - by Plaintiff - Cross/Binder

2                 Page 19.

3      Q     There's a chart where it talks about six clubs

4   that had not been opened yet in 1998, or closed before

5   2000, before the year 2000.

6                 In fact, if you look, Dr. Freeman, look back

7   to the preceding page, page 18, preceding page that lists

8   Dr. Linz' report, lists 14 clubs he confirmed had

9   reconfigured in 1998 and were 60/40 from 1998 through

10  2002.

11                Then the second table on page 19 indicates

12  six clubs that were not opened during that entire 1998 to

13  2000 period because some of them had closed.  Some of them

14  had not been opened yet.

15                Do you see where it says that?

16     A     Yes.

17                I see, he says two were not opened yet.

18  Candlewood, bottom two.

19      Q     Okay.

20                And then, he has a third table where he

21  lists fifteen clubs that he says it could be confirmed

22  they were operating 60/40 between 1998 and 2002.

23                Right?

24     A     Could not determine status.

25      Q     He indicates in the second column of the study

26  that he did not use the six clubs and fifteen clubs, he

Page 670

1          Dr. Freeman - by Plaintiff - Cross/Binder

2     could not determine, the six clubs were not opened all the

3     way through, and the others he could not determine what

4     their status was.

5               Correct?

6     A    I don't know why they're listed in the table.

7     Q    But, that is what it says, though?

8     A    Where does it say he did not use them in the

9     analysis?

10    Q    I believe in the narrative, if you want to take a

11    look?

12    A    I just don't know, I did not read it.

13    Q    Let's talk about what you did.

14              You did not try to ascertain whether the 36

15    clubs on the list you got that was prepared by the City in

16    2000 know whether they were open, whether each of them was

17    opened even in 1998, did you, Dr. Freeman?

18    A    I did.

19              They were opened prior to 1998.

20    Q    You assume they were opened prior to 1998?

21    A    I know tried to ascertain that.

22    Q    How did you try to ascertain that?

23    A    Conversation with counsel.

24              I had a student to try to find that

25    information to the extent it was available on the

26    internet.

Page 671

1          Dr. Freeman - by Plaintiff - Cross/Binder

2                    I did try to ascertain they were opened

3     prior to 1998.

4        Q    Did you actually ascertain they were opened in

5     1998?

6        A    I was pretty confident they were.  That is why I

7     included them.

8        Q    Even the two on the list as not having been

9     opened in 1998?

10       A    You know, I don't know.  I mean, to be honest, I

11    don't know why he said they were not opened.  I know

12    Candlewood was opened prior to 1998.  I know that for a

13    fact.  It was opened prior to 1998.

14       Q    You attempted, in fact --

15            Withdrawn.

16                   You attempted to do a study to look at

17    effect of the presence of 60/40 businesses on neighborhood

18    property value.

19            Correct?

20       A    Yes.

21       Q    And, but you did not compare the value of

22    neighborhood property in proximity to 60/40 clubs before

23    and after the club changed its configuration from a 100

24    percent to 60/40.

25            Did you?

26       A    I did not.

1        Dr. Freeman - by Plaintiff - Cross/Binder

2        Q    You did not try to do that before and after

3   analysis to see if a change of 60/40 caused an increase in

4   property value?

5        A    If it caused an increase?

6        Q    An increase?

7        A    No, I did not.

8        Q    So, you have no statistical data to support the

9   conclusion any particular club reconfiguring from 100

10  percent adult to 60/40 caused an increase in property

11  value.

12            Do you?

13       A    No.

14            I don't have any data that supports that the

15  change from 100 percent establishment to 60/40 caused an

16  increase in property value.

17       Q    In fact, you do not agree 100 percent clubs are

18  even associated with a decrease in property value.

19            Do you?

20       A    I have not seen any evidence to support that

21  contention.

22       Q    You have not seen any evidence there is any

23  difference between a 60/40 club and a 100 percent club.

24            Isn't that right?

25            In terms of how they assess property value?

26       A    I am not aware of any study to explore that

1294

Page 673

1         Dr. Freeman - by Plaintiff - Cross/Binder

2 question.

3    Q   You are not aware of any evidence to support the

4 contention that 60/40 clubs have a different effect on

5 property value than 100 percent clubs.

6         Do you?

7   A   Right.

8         I am not aware of any evidence to support

9 that.

10    Q   In fact, your study, if it shows anything, if we

11 assume 60/40 clubs did not come into existence until the

12 latter part of 1998, your study, if it shows anything, it

13 shows 100 percent clubs do not have impact on property

14 value.

15         Isn't that right?

16   A   If it is true all of the clubs that are included

17 in the analysis, none of them were reconfigured until

18 after the assessment date, then that's true.

19         MS. BINDER:  I have nothing further, your

20 Honor.

21         THE COURT:  Redirect?

22         MR. MURRAY:  No.

23         No, thank you, your Honor.

24         THE COURT:  Thank you, Doctor.

25         Witness excused.

26         THE COURT:  Plaintiff?

1295

# PGS. 674 – 828

# OMITTED

N.Y. Co. Index
Nos. 113049/96, 103568/96,
and 103569/96

To be argued by:
**LEONARD KOERNER**
(25 minutes)

## COURT OF APPEALS
## STATE OF NEW YORK

STRINGFELLOW'S OF NEW YORK, LTD.,

Plaintiff-Appellant,

- against -

THE CITY OF NEW YORK, et al.,

Defendants-Respondents,

-and-

TIMES SQUARE BUSINESS IMPROVEMENT DISTRICT,

Intervenor-Defendant-Respondent,

-and-

CENTER FOR THE COMMUNITY INTEREST, et al.,

Intervenors-Defendants-Respondents.

-------------------------------------------------------------------------------x

AMSTERDAM VIDEO INC., et al.,

Plaintiffs-Respondents,

-against-

THE CITY OF NEW YORK, et al.,

Defendants-Respondents,

(and other Intervenors-Defendants-Respondents).

-------------------------------------------------------------------------------x

RACHEL HICKERSON,  et al.,

Plaintiffs-Respondents,

-against-

THE CITY OF NEW YORK, et al.,

Defendants-Respondents,

(and other Intervenors-Defendants-Respondents).

## CITY RESPONDENTS' BRIEF

**JEFFREY D. FRIEDLANDER,**
Acting Corporation Counsel of
the City of New York,
Attorney for the City
Defendants-Respondents,
100 Church Street,
New York, New York  10007.
(212) 788-1010 or 1033

LEONARD KOERNER,
ALBERT G. FREDERICKS,
ELIZABETH S. NATRELLA,
of Counsel.
December 11, 1997

Reproduced on Recycled Paper

JNR-001310

1444

**Pages i-xiii and 1-58 Omitted**

1445

subdivided and are also available, nor did it account for lots that do not front a roadway. Inclusion of those lots would have been entirely appropriate. . . .

Another factor used in assessing whether an adult use ordinance provides for sufficient public access to such uses is whether the ordinance under review allows for the operation of as many adult establishments as existed in the community at the time of the law's enactment. Islip, 73 N.Y.2d at 560.

The record here shows, as the Supreme Court found, that DCP calculated that a total of approximately 500 potential adult establishments may operate under the Amendments, which is more than adequate to cover the 177 existent businesses and almost a 3-to-1 ratio (A52-53). This calculation took into account only the 4% of the City's total land area which was found by DCP not to be encumbered by certain properties that are unlikely to be developed for any commercial use, including properties occupied with public utilities or oil storage facilities, property designated as wetlands by the State Department of Environmental Conservation, and publicly-owned property of more than 10,000 square feet (ante, pp. 18-20). In making this estimate, DCP also took into account both the limitation on districts where adult uses are permitted and the requirement that an adult establishment be located a 500-foot distance from certain zoning districts, specified community facilities and other adult establishments (id.).

The Amendments thus not only permit all of the City's existing adult establishments to continue to operate in New York City, but also provide for a significant expansion of the City's adult use market. Significantly, moreover, as the Supreme Court recognized (A49), in looking at reasonable access to adult uses, the following factors must be considered: 1) very few currently operating establishments are as large as the 10,000 square foot useable floor area size permitted; and 2) the Amendments do not restrict establishments which sell or display limited amounts of adult material, often found at the numerous general purpose book and video stores and newsstands throughout the City, a significant factor cited in Islip. 73 N. Y.2d at 558. Plaintiffs fail to acknowledge these significant factors.

-59-

**Pages 60-84 Omitted**

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------x
RACHEL HICKERSON, DEREK JONES, TY
McCONNELL, and ELLIOT STAMLER,

                                    Plaintiffs,
                                                    Index No.
        - against -                                 103569/96

THE CITY OF NEW YORK and HON.
RUDOLPH W. GIULIANI, as Mayor of the
City of New York, JOEL A. MIELE, SR.,
as Commissioner of the Department of
Buildings of the City of New York,
and JOSEPH B. ROSE, as the Director
of the Department of City Planning
of the City of New York,

                                    Defendants.
------------------------------------------x

                            September 3, 1996
                            12:20 p.m.


            Deposition of MARILYN MAMMANO, taken

by the Hickerson Plaintiffs, pursuant to Order,

at the offices of New York Civil Liberties

Union, 132 West 43rd Street, New York, New York,

before Loretta M. Bodtmann, a Shorthand Reporter

and Notary Public within and for the State of

New York.


            GREENHOUSE REPORTING, INC.
            363 Seventh Avenue - 20th Floor
              New York, New York 10001
                  (212) 279-5108

EXHIBIT C

2

```
 1

 2              A P P E A R A N C E S:

 3

 4    NEW YORK CIVIL LIBERTIES UNION
              Attorneys for the Hickerson Plaintiffs
 5            132 West 43rd Street
              New York, New York  10036
 6    BY:   BETH HAROULES, ESQ.

 7

 8

 9    LIPSITZ, GREEN, FAHRINGER, ROLL,
      SALISBURY & CAMBRIA
10            Attorneys for Amsterdam Video
              110 East 59th Street
11            New York, New York  10022-1304
      BY:   HERALD PRICE FAHRINGER, ESQ.

12

13

14    LAW OFFICES OF MARK J. ALONSO, P.C.
15            Attorneys for Stringfellow's
              275 Madison Avenue
16            New York, New York  10016
      BY:   MARK J. ALONSO, ESQ.
17

18

19    DEWEY BALLANTINE
20            Attorneys for American Alliance
                  for Rights & Responsibilities, et al.
21            1301 Avenue of the Americas
              New York, New York  10019-6092
22    BY:   HEATHER K. McDEVITT, ESQ.

23

24

25
```

GREENHOUSE REPORTING, INC.        (212) 279-5108

1450

3

1

2                    A P P E A R A N C E S (Continued):

3

4     CRAVATH, SWAINE & MOORE
               Attorneys for Times Square
5                 Business Improvement District
          825 Eighth Avenue
6         New York, New York  10019-7475
      BY:   DAVID A. STOLL, ESQ.
7

8

9

10    PAUL A. CROTTY, ESQ.
               Corporation Counsel
               for the City of New York
11        100 Church Street
          New York, New York  10007
12    BY:   ALBERT G. FREDERICKS, ESQ.

13

14

15    MELANIE MEYERS, ESQ.
               Attorney for the City of New York
16                Department of City Planning,
                  Zoning & Urban Design
17        22 Reade Street
          New York, New York  10007-1216

18

19

20

21

22    Also Present:

23          RITA LEDUC

24

25

GREENHOUSE REPORTING, INC.        (212) 279-5108

1451

4

1
2                        <u>STIPULATIONS</u>
3
4          IT IS HEREBY STIPULATED AND AGREED
5     by and between counsel for the respective
6     parties hereto that all rights provided by
7     the CPLR including the right to object to
8     any question except as to the form or to
9     move to strike any testimony at this
10    examination before trial shall not be a
11    bar or waiver to make such motion at, and
12    is reserved for the trial of the action.
13          IT IS FURTHER STIPULATED AND AGREED
14    by and between counsel for the respective
15    parties hereto that this examination may
16    be sworn to by the witness being examined
17    before a Notary Public other than the
18    Notary Public before whom this examination
19    was begun, but the failure to do so or to
20    return the original of the examination to
21    counsel, shall not be deemed a waiver of
22    the rights provided by Rule 3116 and Rule
23    3117 of the CPLR and shall be controlled
24    thereby.
25

GREENHOUSE REPORTING, INC.        (212) 279-5108

JNR-001317

1452

5

1
2   MARILYN MAMMANO ,
3          residing at 131 East 39th Street, New
4          York, New York 10016, having been duly
5          sworn by the Notary Public, was examined
6          and testified as follows:
7   EXAMINATION BY
8   MS. HAROULES:
9          Q.    Good afternoon, Ms. Mammano.  My
10  name is Beth Haroules.  I'm an attorney with the
11  New York Civil Liberties Union.  We represent
12  the plaintiffs in the Hickerson action against
13  the City of New York concerning the zoning
14  resolution that the City passed last October.
15          I will be asking you questions
16  primarily about the zoning resolution and how
17  that zoning resolution impacts on the number of
18  permissible sites for adult establishments in
19  New York City.  If there is anything I ask where
20  you are not clear, please let me know on the
21  record, and I will try to make sure that I
22  adjust the question accordingly.  Is that okay?
23          A.    That is fine.
24          Q.    Could you state your full name and
25  address on the record please.

JNR-001318

1453

6

M. Mammano

1

2      A.      My name is Marilyn Mammano.  I'm the

3  Director of Zoning and Urban Design with the New

4  York City Department of City Planning.

5              My work address is 22 Reade Street,

6  New York 10007.  My home address is 131 East

7  39th Street, New York 10016.

8      Q.      How long have you held the position

9  that you just described?

10     A.      I've been the director of Zoning and

11 Urban Design since 1991.

12     Q.      Could you describe your employment

13 history prior to that?

14     A.      Prior to that I was a member -- on

15 the City Planning Commission from 1987 to 19 --

16 the end of 1989.  And previous to that I was a

17 member of the Department of City Planning in

18 various positions, the most -- the closest to my

19 services at the Commission, I was Director of

20 Planning for Staten Island from 1981 to 1987.

21     Q.      Could you describe your educational

22 background briefly?

23     A.      I have a Bachelor's degree in

24 architecture and a Master's degree in City and

25 Regional Planning from Pratt Institute.

GREENHOUSE REPORTING, INC.      (212) 279-5108

JNR-001319

1454

Pages 7 -150 omitted

1455

151

M. Mammano

1   and strictly mathematical, strictly computer

2   oriented, as we were dealing with blank raw

3   space to determine this matter, these maps,

4   Exhibit 7 to 11, there was no consideration for

5   existing adult uses in that area?

6       A.    No, that is not correct.

7       Q.    There were?

8       A.    Yes.  Having done the capacity

9   analysis, we then indicated that the capacity

10  included what was to the best of our ability to

11  calculate the existing users which could remain

12  for each borough and for the City as a whole.

13  That is what the numbers on the August 3rd memo

14  represent for the proposal as it was presented

15  to the Commission, and that was later updated to

16  reflect that the chance that the City Planning

17  Commission --

18      Q.    I think you are misunderstanding my

19  question.  I mean on the map, if there was a big

20  facility or a little facility, for that matter,

21  in one of these zones which is now an adult

22  permissible zone?

23      A.    I understand your question now.  No,

24  the map indicates that legend that the exists

1456

152

M. Mammano

adult establishments were not considered in the

graphic representation of the map.

Q.    So there was no attempt to take any

of these, any of the businesses which are

underlined, and draw 500-foot circles around

them on the map?

A.    That's correct.

Q.    This only relates, is it a fair

statement to say that this statute only relates

to legal business?

A.    These are all legal businesses as

far as we are concerned.  If it is an illegal

business, it shouldn't be in operation.

Q.    Is the City aware that there might

be some adult businesses that are illegal?

A.    I am sorry, I don't know what you

mean by illegal.

Q.    That there might be some businesses

in New York that don't put them on a tax lot as

a topless bar or theater or video store, or is

the city not aware of that fact?

A.    I'm sorry, I don't know how to

answer that question because I don't know what

you are asking me.

1457

Pages 153-end omitted

1458

Areas where Adult Entertainment Uses would
be Allowed Under the Proposal*
and Encumbered Property within those Areas

Manhattan

* Restrictions from existing adult entertainment uses not shown

JNR-001324

1811



...Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

The Bronx

* Restrictions from existing adult entertainment uses not shown

JNR-001325

1812



Areas Where Adult Entertainment Uses would
Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

Brooklyn

* Restrictions from existing adult entertainment uses not shown

JNR-001326

Areas where certain Activities Would
Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

Queens



JNR-001327



Areas where Adult Entertainment Uses would
Continue to be Allowed under the Proposal*
and Encumbered Property within those Areas

Staten Island

* Restrictions from existing adult entertainment uses not shown

1815



Chelsea Rezoning Area

1839



**Downtown Flushing Rezoning Area**

500 ft

Rezoning

Decrease in available land area

City of New York — Department of City Planning



**DUMBO Rezoning Area**

City of New York — Department of City Planning



1842



**Flushing Bedford Rezoning Area**

■ Rezoning

▨ Decrease in available land area

500 ft

City of New York — Department of City Planning

1843



Greenpoint Rezoning Area

City of New York — Department of City Planning

1844



**Hostos Rezoning Area**

Rezoning

Decrease in available land area

500 ft

City of New York — Department of City Planning

1845



Long Island City Rezoning Area

500 ft

Rezoning

Decrease in available
land area

City of New York — Department of City Planning

1846



## Lynch Rezoning Area

Legend:
- Rezoning
- Decrease in available land area

500 ft

City of New York — Department of City Planning

1847



Mill Basin Rezoning Area

Rezoning

Decrease in available land area

500 ft

City of New York — Department of City Planning

1848



City of New York — Department of City Planning

1849



1850



Steinway Rezoning Area

City of New York — Department of City Planning

1851



Vinegar Hill Rezoning Area

City of New York → Department of City Planning

1852



Williamsburg Bridge Rezoning Area

Rezoning

Decrease in available land area

500 ft

City of New York — Department of City Planning

1853

## LITIGATION MANAGEMENT AGREEMENT

AGREEMENT made as of the 25th day of September, 2017, between and among the undersigned attorneys on behalf of the eating and drinking establishments enumerated on Schedule A hereto (hereafter "Plaintiffs"), and the Corporation Counsel of the City of New York, on behalf of the City of New York.

WHEREAS, in 2001 the City of New York ("City") adopted certain amendments to the Zoning Resolution of the City of New York, as amended, effective October 30, 2002 and set forth in Text Amendment N 010508 ZRY ("2001 Amendments"); and

WHEREAS, in 2002, the undersigned attorneys commenced the Federal Actions enumerated on Schedule B hereto, to declare the 2001 Amendments unconstitutional as they relate to eating and drinking establishments that regularly feature adult entertainment and enjoin their enforcement against eating and drinking establishments that regularly feature adult entertainment under the First Amendment to the United States Constitution ("Federal Actions"); and

WHEREAS, in 2002, multiple lawsuits (enumerated on Schedules C and D hereto) were commenced concurrently in the New York State Courts challenging the 2001 Amendments ("State Actions"); and

WHEREAS, prior to the adjudication of the Federal Actions on the merits, the 2001 Amendments were declared unconstitutional in the State Actions and their enforcement enjoined city-wide; and

WHEREAS, in light of the judgment and stays entered in the State Actions, the Federal Actions were administratively closed "with leave to petition to re-open for good cause shown"; and

*WHEREAS,* after closing the Federal Actions the Court indicated that it did not want to entertain re-opening the Federal Actions until there was a final resolution of all pending state court actions challenging the 2001 Amendments; and

*WHEREAS,* on June 6, 2017, the Court of Appeals of the State of New York issued its Opinion and Remittitur reversing the prior lower court judgments in the State Actions and upholding the 2001 Amendments ("June 6[th] Decision"), the effect of which is to allow enforcement of the 2001 Amendments; and

*WHEREAS,* a motion is *sub judice* in the New York Court of Appeals for reargument of a portion of the June 6th Decision ("Reargument Motion"); and

*WHEREAS,* the time to apply to the United States Supreme Court for any writ of certiorari will commence upon finality of the appeals to the New York Court of Appeals, including a ruling on the pending Reargument Motion; and

*WHEREAS,* all undersigned counsel have been engaged in ongoing discussions regarding how to proceed with the closed Federal Actions in light of the June 6th Decision, the potential enforcement of the 2001 Amendments by the City, and the Federal court's prior actions regarding re-opening the Federal Cases; and

*WHEREAS,* during these discussions, the City has refrained from enforcement of the 2001 Amendments, and Plaintiffs have similarly refrained from taking any action to revive the closed Federal Actions or to file new ones; and

*WHEREAS,* the undersigned attorneys for Plaintiffs have advised the Corporation Counsel that, but for this Litigation Management Agreement and the negotiations leading to its execution, they would

2

have immediately applied to the United States District Court to re-open the Federal Actions (other than Action No. 3 as set forth in Schedule B, which is moot), and/or filed new actions in Federal Court to declare the 2001 Amendments unconstitutional under the First Amendment to the United States Constitution, and sought temporary restraining orders and preliminary injunctions; and

       *WHEREAS,* the undersigned attorneys and the Corporation Counsel have consulted with one another and have concluded that it is in the best interests of the parties and the public to enter into this agreement in order to provide for the orderly and efficient management of litigation and conclusive determination of claims;

       *NOW, THEREFORE,* it is hereby agreed as follows:

       1.    The City of New York will continue to refrain from enforcing the 2001 Amendments in connection with the locations shown in Schedule A until 60 days after the District Court's determination of Plaintiffs' motions for preliminary injunctions against enforcement, upon the following terms and conditions:

       A.    The closed Federal Actions shall be re-opened and amended and supplemental complaints filed therein (or, alternatively, new actions shall have been commenced by the filing of new complaints) not later than 60 days after (a) December 11, 2017 (the expiration of the time provided by law for filing a petition to the Supreme Court of the United States for a Writ of Certiorari to review the New York Court of Appeals' June 6th Decision), if no certiorari petition is timely filed by a party listed in Schedule C ("a Schedule C Party" or collectively "the Schedule C Parties"), or (b) the final determination by the Supreme Court of the United States of any petition(s) for a Writ(s) of Certiorari filed by a Schedule C Party, (or, alternatively, in the

3

event certiorari is granted, within 60 days of the entry of the final judgment of the Supreme Court), whichever is the last to occur.

B.      Upon the service of Plaintiffs' amended and/or supplemental complaints in the re-opened Federal Actions (or, alternatively, Plaintiffs' new complaints filed in new actions), the parties shall consult with each other in good faith concerning (a) the possible extension of the time to move for preliminary injunction(s) established hereunder, (b) the possible consolidation of dispositive motions or the trial(s) on the merits of the actions with the hearing(s) on the motions for preliminary injunctions under F.R.Civ.P. 65(a)(2), and (c) the possible extension of this agreement to refrain from enforcement.   Nothing set forth herein is intended or shall be deemed or construed to obligate the City or Plaintiffs to agree to any of the foregoing.

C.      Absent the parties' agreement to the contrary, motions for preliminary injunctions shall be filed within 30 days of the service of the amended and supplemental complaints (or alternatively the filing of new complaints in a new action).

D.      The City of New York shall file its responses to the amended and supplemental complaints (or new complaints, as the case may be) within 60 days of service upon it.

E.      Notwithstanding the time frames set forth subsections A-C, the City may, at any time upon 75 days written notice to undersigned counsel for Plaintiffs, require that Plaintiffs take immediate steps to obtain judicial relief from the City's enforcement of the 2001 Amendments.

2.      The City of New York will continue to refrain from enforcing the 2001 Amendments in connection with the locations shown in Schedule C until the later of: (a) December 11, 2017 (the

4

expiration of the time for the Schedule C Parties to file a petition for writ of certiorari); or (b) if any such petition is filed, 30 days after the denial of the petition or entry of the final judgment of the Supreme Court, whichever is longer.

3.      The City shall not oppose Plaintiffs' motions, if any, for: (a) re-opening of the closed Federal Actions upon application therefore (other than Action No. 3 enumerated in Schedule B hereto, for the reasons set forth above), and/or (b) consolidation of the re-opened Federal Actions for any or all purposes.

4.      Nothing set forth herein is intended or shall be deemed or construed to preclude any application to the Federal Court for other, further and different relief not inconsistent herewith.

5.      Nothing in this agreement prevents the City from enforcing the provisions of City Zoning Resolution Text Amendment N 950384 ZRY in connection with the locations shown in Schedule A.

6.      Fed. R. Civ. Proc. 6 shall apply in computing any time period specified in this Agreement.

7.      The undersigned attorneys represent that they are each and all authorized to enter into this Agreement on behalf of their respective clients (including the City of New York); that this Agreement shall be binding upon and inure to the benefit of each and all of such attorneys and clients; and that this Agreement is enforceable against each of the parties hereto.

8.      This Agreement is the product of negotiation between the undersigned attorneys.  Any ambiguity shall not be construed against any party.

9.      In the event any provision of this Agreement is determined by any Court to be unenforceable for any reason, (a) any such provision shall be reformed to the extent necessary to render

5

it enforceable, and (b) in any event, the balance of the Agreement shall be nonetheless enforceable in accordance with the remaining terms.

10.     This Agreement integrates all understandings and agreements of the parties hereto with respect to the subject matter hereof.  Any prior understanding or agreement, written or oral, is hereby merged herein and shall not survive execution of this Agreement.

11.     This Agreement may be amended or modified only in a writing (including e-mail) signed by all of the parties hereto.

12.     There shall be no oral waivers of this Agreement.   Any waiver shall be in writing (including e-mail) signed by the party to be charged or confirmed in a transcribed record of a judicial proceeding.

13.     This Agreement may be executed in counterpart copies, all of which, taken together, shall constitute one and the same instrument.

14.     Facsimile signatures on behalf of any of the undersigned shall be deemed original for all purposes.

6

JNR-001349

15.    Neither party will rely on this agreement to suggest that any party has made any

admission, concession, or other waiver of any kind with respect to the merits of Plaintiffs' claims.

*WHEREFORE,* the undersigned have executed this Agreement at New York, New York, as of the

date first set forth above.

WESTON GARROU & MOONEY
*Attorneys for Sapphire*

By: _____ ( John H. Weston )

HON. ZACHARY W. CARTER
*Corporation Counsel of the City of New York*

By: _____
Mark Muschenheim

SILVER & SILVER
*Attorneys for Lace and Satin Dolls*

By: _____
Daniel A. Silver

ZANE and RUDOFSKY
*Attorneys for New York Dolls, Private Eyes
VIP, and Vixen*

By: _____
EDWARD S. RUDOFSKY

7

## SCHEDULE A

1) Sapphire, 333 E 60th St, New York, NY 10022
2) Lace, 725 7th Ave, New York, NY 10019
3) Satin Dolls (formerly Lace II), 689 8th Ave, New York, NY 10036
4) NY Dolls, 59 Murray St, New York, NY 10007
5) Private Eyes, 302 W 45th St, New York, NY 10036
6) VIP, 20 W 20th St #1, New York, NY 10011
7) Vixen, 60-07 Metropolitan Ave, Ridgewood, NY 11385

## SCHEDULE B

1) MLB Enterprises Corp. v. The City of New York, et al., SDNY Case No. 02-cv-04431-WHP
2) 59 Murray Corp., et ano. v. The City of New York, et al., SDNY Case No. 02-cv-04432-WHP
3) Pulse Nite Club, Inc. et al. v. The City of New York, et al., SDNY Case No. 02-cv-06193-WHP
4) Club at 60th Street, Inc. et ano. v. The City of New York, SDNY Case No. 02-cv-08333-WHP

## SCHEDULE C

1) Ten's Cabaret, Inc. v. City of New York, Supreme Court, New York County; Index No. 121197/2002
2) Pussycat Lounge, Inc. v. Bloomberg, Supreme Court, New York County, Index No. 122740/2002

## SCHEDULE D

1) For the People Theatres of N.Y., Inc. v. et al. v. City of New York, et al., New York County Index No. 121080/2002

8

JNR-001351

1467