UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

689 EATERY CORP., etc., *et ano.,*                    :
                                   Plaintiffs,
                                                      :
        - against -                                       Civil Action No.
                                                      :   02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,
                                   Defendants.   :
----------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*           :
                                   Plaintiffs,
                                                      :
        - against -                                       Civil Action No.
                                                      :   02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,
                                   Defendants.   :
----------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*            :
                                   Plaintiffs,
                                                      :
        - against -                                       Civil Action No.
                                                      :   02 CV 8333 (LJL)
THE CITY OF NEW YORK,
                                   Defendant.    :
----------------------------------------------------------------X
336 LLC., etc., *et al.,*                             :
                                   Plaintiffs,
                                                      :
        - against -                                       Civil Action No.
                                                      :   18 CV 3732 (LJL)
THE CITY OF NEW YORK, *et al.*,
                                   Defendants.   :
----------------------------------------------------------------X

**JOINT STATEMENT OF FACTS**
**(as of May 23, 2022)**

Except to the extent any facts below are described simply as "uncontroverted," the following are agreed to by all parties as stipulated facts binding in all further proceedings herein, including trial. This stipulation supersedes and replaces in its entirety the Statement of Stipulated Facts filed on February 4, 2021. Uncontroverted facts, although not stipulated, may be used by all parties the same as stipulated facts. However, this stipulation does not represent, and shall not be construed to represent, an agreement by all parties that each and every stipulated or uncontroverted fact is material and/or relevant to the claims at issue herein.

I.     **HISTORICAL FACTS**

1.   Apart from a related and preceding moratorium, the City of New York (City) enacted its initial zoning restrictions specifically for "adult establishments" (including adult eating or drinking establishments, adult bookstores and adult theaters) in 1995 by adopting amendments (hereafter "the 1995 Amendments") to its Zoning Resolution ("Zoning Resolution" or "ZR").[1]

2.   Residence districts are the most common zoning districts in New York City, accounting for about 75 percent of the city's zoned land area.

3.   The 1995 Amendments defined "adult establishments," prohibited them from being located in all residential zoning districts, certain commercial and manufacturing districts and within 500 feet of those zoning districts, as well as schools, churches, and other adult establishments. The 1995 Amendments also imposed size limitations and

---

[1] A true copy of the 1995 Amendments is reproduced as Exhibit 1 in the Joint Request and Stipulations Regarding Taking Judicial Notice (hereafter "2022 JNR"), identical copies of which were filed in all four cases on May 9, 2022. It consists of a main document and 10 attached volumes of exhibits. To assist in quickly locating exhibits, all exhibits are bookmarked and are paginated consecutively at the bottom irrespective of the volume they are in.

signage restrictions on adult establishments. The 1995 Amendments only applied to adult establishments.

4.  In 1994, prior to the proposal and adoption of the 1995 Amendments, the New York City Department of City Planning ("DCP") completed an "Adult Entertainment Study" ("1994 DCP Study")[2].

5.  The 1995 Amendments in ZR 12-10 defined an "adult establishment" as "a commercial establishment where 'a substantial portion' of the establishment includes an adult bookstore, adult eating or drinking establishment, adult theater, or other commercial establishment, or any combination thereof."

6.  The 1995 Amendments in ZR 12-10 defined an "adult bookstore" as "a bookstore which has as a 'substantial portion' of its stock-in-trade any one or more of the following: (1) books, magazines, periodicals or other printed matter which are characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas'; or, (2) photographs, films, motion pictures, video cassettes, slides or other visual representations which are characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas.'"

7.  The 1995 Amendments in ZR 12-10 defined an "adult eating or drinking establishment" as "an eating or drinking establishment which regularly features any one or more of the following: (1) live performances which are characterized by an emphasis on 'specified anatomical areas' or 'specified sexual activities; or, (2) films,

---

[2] This is reproduced in 2022 JNR, Ex. 41.

motion pictures, video cassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas'; or (3) employees who, as part of their employment, regularly expose to patrons 'specified anatomical areas.' and which is not customarily open to the general public during such features because it excludes minors by reason of age."

8.  Following enactment of the 1995 Amendments, three years of litigation involving more than 100 plaintiffs in multiple cases was conducted in the state and federal courts regarding the constitutionality of the 1995 Amendments.  By 1998, the courts had rejected those challenges.

9.  In one of the federal cases challenging the 1995 Amendments, *Amsterdam Video v. City of New York*, S.D.N.Y. No. 96-cv-02204-MGC, the plaintiffs, including, adult bookstores, adult theaters and adult eating or drinking establishments, sought injunctive relief and asserted, *inter alia*, that, the 1995 Amendments were unconstitutionally vague in failing to define, *inter alia*, the phrase "substantial portion," as used in the definition of "adult establishment," applicable to all three types of adult establishments.

10. While the *Amsterdam Video* lawsuit was pending, on July 22, 1998, the City's Department of Buildings ("DOB") issued Operations Policy and Procedure Notice ("OPPN") # 4/98 (2022 JNR Ex. 11) which explained that an establishment would be deemed an adult bookstore by virtue of it having a "substantial portion" of its stock in adult materials if "at least 40 percent of the book store's total stock accessible or

available ("accessible") for sale or rent to customers is comprised of adult materials," or "if 40 percent of the establishment's floor area and cellar space accessible to customers contains stock in adult materials."  That same OPPN explained that an eating or drinking establishment would be deemed an adult eating or drinking establishment by virtue of having a "substantial portion" of the establishment devoted to an adult use if the establishment had "at least 40 percent of the floor and cellar area that is accessible to customers available for adult performance and viewing purposes." This became known as the "60/40 Rule."

11. On July 24, 1998, the federal court in *Amsterdam Video* convened to hear arguments on the various challenges to the 1995 Amendments. *See City of New York v. Show World*, 178 Misc. 2d 812, 819 (Sup. Ct. N.Y. Co. 1998).

12. It is uncontroverted that based upon the City's representations to the federal court about OPPN # 4/98's adoption of the 60/40 Rule, plaintiffs in Amsterdam Video withdrew their vagueness challenges to the 1995 Amendments.

13. It is uncontroverted that three weeks later, on August 13, 1998, the City's DOB issued a new OPPN, # 6/98 (2022 JNR Ex. 12), which stated that the calculation of "substantial portion" provided by OPPN # 4/98 would not apply to adult eating or drinking establishments. It is also uncontroverted that OPPN #6/98 stated that its purpose was to "clarify" the meaning of the phrase "substantial portion."

14. It is uncontroverted that after the courts vacated the injunctions and stays and allowed the 1995 Amendments to become enforceable in 1998, several of the regulated businesses permanently closed.

15. It is uncontroverted that, consistent with the positions the City had taken in Amsterdam Video and in the DOB's OPPN # 4/98, several other regulated businesses attempted to comply with the 1995 Amendments by reducing their floor space and stock in trade devoted to the sale or presentation of adult materials or entertainment and by toning down the exterior signage of their business.

16. It is also uncontroverted that several of the businesses attempting to comply with the 1995 Amendments made additional changes to their business (in varying degrees) beyond merely changing their floor space and stock percentages and their exterior signage.

17. The City concluded, and several courts agreed that several of the businesses which attempted to comply with the 1995 Amendments by modifying their floor space and stock percentages had engaged only in "sham" compliance and, it brought multiple actions attempting to enforce the 1995 Amendments against these businesses.

18. Subsequently, the New York Court of Appeals, in two separate decisions, held that the 1995 Amendments should be strictly construed such that bookstores and eating or drinking establishments presenting adult entertainment or materials in less than 40% of their public floor space, were not subject to the 1995 Amendments. *See City of New York v. Dezer Properties*, 95 N.Y.2d 771 (2000); *City of New York v. Les Hommes*, 94 N.Y.2d 267 (1999).

19. On October 31, 2001, the City adopted amendments to the provisions of its ZR regulating adult establishments, which Plaintiffs assert significantly expanded the type of businesses subject to the adult establishment zoning requirements ("the 2001

Amendments")[3] by eliminating 60/40 compliance for, *inter alia*, adult eating and drinking establishments, and significantly modifying 60/40 compliance for adult bookstores.

20. The first lawsuits challenging the 2001 Amendments were commenced in September 2002 shortly before the effective date of the 2001 Amendments and, from that time through the present date, there has been at least one such lawsuit pending in either State Court, Federal Court or both.

21. Because of a combination of court orders and litigation agreements, the 2001 Amendments have not been enforced against any of the Plaintiffs at any time through the present date.

22. The 2001 Amendments, among other things, modified the definitions of "adult eating or drinking establishment" and "adult bookstore" contained in ZR 12-10.

23. The City asserts that the legislative record supporting the 2001 Amendments states that the intent of the Amendments was to more accurately express the legislative intent behind the 1995 Amendments to regulate the siting of establishments that have "a predominant, on-going focus on sexually explicit materials or activities."

24. The definitions of "adult eating or drinking establishment" and "adult bookstore" contained in ZR 12-10 have not changed since their modification by the 2001 Amendments.

---

[3] The 2001 Amendments are set forth in New York City Council Resolution 2096-2001, enacting New York City Department of City Planning Application No. N 01058 to amend the New York City Zoning Resolution.  This resolution is reproduced as 2022 JNR, Exhibit 3.

25. The 2001 Amendments defined "Adult Establishment" (in ZR § 12-10) to include any commercial "adult eating or drinking establishment," defined in turn as including any eating or drinking establishment "which regularly features in any portion of such establishment," *inter alia*, live performances characterized by an emphasis on "specified anatomical areas" or "specified sexual activities." The 2001 Amendments removed the "substantial portion" language from the definition of an "adult establishment."

26. The 2001 Amendments also defined "Adult Establishment" (in ZR § 12-10) to include any commercial "adult book store," defined in turn as including any book store "that offers 'printed or visual material' for sale or rent to customers where a 'substantial portion' of its stock-in-trade of 'printed or visual material' consists of 'adult printed or visual material,' defined as 'printed or visual material' characterized by an emphasis upon the depiction or description of 'specified sexual activities' or 'specified anatomical areas."

27. The 2001 Amendments also enumerated factors to be used in determining "whether a 'substantial portion' of a book store's stock-in-trade of 'printed or visual' material consists of 'adult printed or visual material.'"   The factors to be considered include: "(i) the amount of stock of 'adult printed or visual material' accessible to customers as compared to the total stock of 'printed or visual material' accessible to customers in the establishment; and (ii) the amount of floor area and cellar space accessible to customers containing stock of 'adult printed or visual material'; and (iii) the amount of floor area and cellar space accessible to customers containing stock of 'adult printed

or visual material' as compared to the amount of floor area and cellar space accessible to customers containing 'printed or visual material' which is not 'adult printed or visual material,' provided that 'printed or visual material' which is not 'adult printed or visual material' (hereinafter for the purposes of this paragraph 'other printed or visual material') shall not be considered stock-in-trade for purposes of this paragraph where such store has one or more of the following features: (aa) an interior configuration and layout which requires customers to pass through an area of the store with 'adult printed or visual material' in order to access an area of the store with 'other printed or visual material;' (bb) one or more individual enclosures where adult movies or live performances are available for viewing by customers; (cc) a method of operation which requires customer transactions with respect to 'other printed or visual material' to be made in an area of the store which includes 'adult printed or visual material;' (dd) a method of operation under which 'other printed or visual material' is offered for sale only and 'adult printed or visual material' is offered for sale or rental; (ee) a greater number of different titles of 'adult printed or visual material' than the number of different titles of 'other printed or visual material'; (ff) a method of operation which excludes or restricts minors from the store as a whole or from any section of the store with 'other printed or visual material;' (gg) a sign that advertises the availability of 'adult printed or visual material' which is disproportionate in size relative to a sign that advertises the availability of 'other printed or visual material,' when compared with the proportions of 'adult' and 'other printed or visual materials' offered for sale or rent in the store, or the proportions of *floor area* or *cellar* space

accessible to customers containing stock of 'adult' and 'other printed or visual materials'; (hh)  a window display in which the number of products or area of display of 'adult printed or visual material' is disproportionate in size relative to the number of products or area of display of 'other printed or visual material,' when compared with the proportions of adult and 'other printed or visual materials' offered for sale or rent in the store, or the proportions of *floor area* or *cellar* space accessible to customers containing stock of 'adult' and 'other printed or visual materials'; (ii) other features relating to configuration and layout or method of operation, as set forth in rules adopted by the Commissioner of Buildings, which the Commissioner has determined render the sale or rental of 'adult printed or visual material' a substantial purpose of the business conducted in such store. Such rules shall provide for the scheduled implementation of the terms thereof to *commercial* establishments in existence as of October 31, 2001, as necessary.

28.  Under the 2001 Amendments, a bookstore that devotes less than 40% of its stock and floor space to adult material, but has private video booths or any of the other features enumerated in the 2001 Amendments, is an adult bookstore.

29.  It is uncontroverted that all of the plaintiffs herein presently operate businesses defined by the 2001 Amendments as "adult," but which would not be deemed adult establishments but for the enactment of the 2001 Amendments.

30.  It is uncontroverted that all of the plaintiffs' businesses regularly present adult materials or performances in less than 40% of their relevant floor space, and, in the case of bookstores, less than 40% of their stock consists of adult materials, in

conformity with OPPN 4/98. Hereafter such a business shall be described either as a "60/40 Business", a "60/40 Bookstore," or a "60/40 Eating or Drinking Establishment."

31. It is uncontroverted that, following the enactment of the signage restrictions in the 1995 Amendments, and the courts' upholding of those amendments, the vast majority, if not all, of the businesses which switched to the 60/40 model, also made changes in toning down their signage in compliance with the requirements of that ordinance, even though they did not then consider themselves "adult" establishments as defined in the ordinance.

32. It is uncontroverted that gaudy lighting and graphic signage were complaints of the proponents of the 1995 Amendments.

33. Signage on currently existing 60/40 Businesses has not been a significant source of complaints.

34. It is uncontroverted that in adopting the 2001 Amendments the City did not undertake any new study of purported negative secondary effects alleged to be attributable to establishments operating as 60/40 Businesses, and did not make any findings of the extent to which purported negative secondary affects attributable to adult establishments in the 1994 Adult Entertainment Study and the 1995 City Planning Commission Report were eliminated by the 1995 Amendments.

35. It is uncontroverted that the New York State Court of Appeals concluded, as a matter of law, that 60/40 businesses retained a predominant, ongoing focus on sexually explicit materials or activities.

11

36.  Since converting to 60/40 Businesses prior to the adoption of the 2001 Amendments, none of the sites of the 60/40 Businesses presently operated by Plaintiffs have been the subject of any nuisance action based upon claims of conduct or activities other than operation of "Adult Establishments" in locations not permitted by the Zoning Resolution.

37.  On September 30, 2019, this Court, per Judge Pauley, granted the Plaintiffs' motion for a preliminary injunction preventing enforcement of the 2001 Amendments.

## II.   COMMON   FACTS   RELATED   TO   MANDATORY   TERMINATION CHALLENGE

38.  It is uncontroverted that the sites presently operated by the following plaintiffs operating eating or drinking establishments, specifically Plaintiffs 725 Eatery Corp. (located at 725 7th Avenue in Manhattan), 689 Eatery Corp. (located at 689 8th Avenue in Manhattan), 59 Murray Enterprises, Inc. (located at 59 Murray Street in Downtown Manhattan), AAM Holding Corp. (located at 320 W. 45th Street in Midtown Manhattan),  JNS Ventures Ltd. (located at 60-07 Metropolitan Avenue in Ridgewood, Queens), and Jacaranda Club, LLC (located on the ground floor of 333 E. 60th Street in Manhattan), as well as the sites presently operated by the following plaintiffs operating bookstores or video stores, specifically 336 LLC, d/b/a "The Erotica" (located at 336 8th Avenue in Manhattan), 725 Video Outlet Inc. (located at 725 6th Avenue in Manhattan), and 557 Entertainment, Inc. (located at 557 8th Avenue in Manhattan) were all being operated as 60/40 Businesses prior to adoption of the 2001 Amendments.

39. It is uncontroverted that, with the exception of any periods of discontinuance of less than two years, the addresses of the businesses in the preceding paragraph have continuously operated as 60/40 Businesses since prior to the adoption of the 2001 Amendments.

40. Under § 52-11 of the Zoning Resolution, non-conforming uses in New York City may be continued indefinitely *except* as specifically limited by other provisions of Article V, Chapter 2 of the Zoning Resolution.

41. Adult Establishments (as that term is defined in ZR § 12-10) are required to terminate their use within one year from the date that they become non-conforming uses, unless otherwise allowed to continue under either ZR § 52-77 or § 72-41.

42. Other than an Adult Establishment and certain non-conforming signs, no other type of non-conforming occupant in New York City is required to terminate as early as one year from the point it becomes non-conforming.

43. Only non-conforming Adult Establishments, non-conforming signs, certain non-conforming uses in residence districts, and some non-conforming uses which may remain in place only if walls are built around them (e.g., salvage yards) have mandatory termination periods; all other non-conforming uses in New York City must terminate only if they have been discontinued for two years or expanded or increased in intensity, as set forth in ZR Article V, Chapter 2.

44. Under the general non-conforming use provisions of ZR 52-61, when a non-conforming use in a building is discontinued for less than two years, that non-conforming use may be resumed in that building. For purposes of determining

whether a non-conforming use has changed, the ZR considers the use and does not consider whether the owner or operator of the use has changed.

45. Pursuant to Section 4 of Emergency Executive Order 110 (EEO 110) signed by Mayor de Blasio on April 29, 2020 and continued, as required by law, every five days until June 30, 2021, ZR 52-61 was suspended, as a result of the Covid-19 state of emergency "to the extent such section requires that, following a continuous two-year period of discontinuance of a non-conforming use of land, building or other structure, such land, building or other structure shall be used only for a conforming use, and order that any such two-year period is tolled for the duration of the emergency."

46. In addition, ZR 65-01 further tolls ZR 52-61 as a result of the Covid-19 emergency, through May 11, 2023.

47. Where a non-conforming use was discontinued less than two years prior to April 29, 2020, the time limits associated with restoring active operation of such use to retain its non-conforming status has been tolled as a result of both EEO 110 for the duration that EEO remained in effect, and ZR 65-13 through May 11, 2023.

48. Commencing on May 12, 2023, the remaining time associated with restoring active operations of a non-conforming use discontinued less than two years prior to April 29, 2020 is the amount of remaining time existing prior to April 29, 2020.

49. A currently lawful conforming Adult Establishment becomes non-conforming and is compelled to terminate within a year if land other than the land the Adult Establishment is on is re-zoned to any of the zoning districts from which the City's

zoning regulations require new adult businesses to be separated by at least 500 feet and the Adult Establishment is within 500 feet of such rezoned land.

50. There are no uses other than Adult Establishments which are subject to mandatory termination of the use based solely on changes only in the zoning of land other than the land on which it is located.

51. There are other uses which can be rendered non-conforming, though not required to terminate (absent two-year discontinuance, expansion or increase in intensity), based upon changes to the zoning of land other than the land on which the use is located.

52. Plaintiffs challenge the mandatory one-year termination requirement for Adult Establishments on First Amendment and equal protection grounds alleging that, on its face, it disadvantages non-conforming Adult Establishments as compared to all other non-conforming uses, including even those engaged in expression. Plaintiffs do not challenge the mandatory one-year termination requirements for Adult Establishments on the ground that any of them have been given an inadequate amount of time to recoup or amortize their current investments.

## III.  PLAINTIFF-SPECIFIC FACTS

53. **Unique Facts Specific to Plaintiff 725 Eatery Corp.**

   a. It is uncontroverted that, except for the period of the Covid-19 "shutdown," "Platinum Dolls," which was previously known as "Lace," has been continuously operated, and has regularly featured entertainment by "topless" dancers, at the premises located at 725 7th Avenue, Manhattan, since 1972.

b.  It is uncontroverted that from 1995 to approximately September 2018, the business located at 725 7th Avenue was operated by MLB Enterprises, Corp.

c.  It is uncontroverted that in September 2018, Plaintiff 725 Eatery Corp. was formed and succeeded to the operation of the 725 7th Avenue location, which it continues to operate to the present day.

d.  It is uncontroverted that sometime prior to 1999, the business located at 725 7th Avenue renovated the premises to conform to the 60/40 Rule, by expanding onto the second floor and creating a sports bar area to divide the premises into a licensed bar and an entertainment venue presenting "topless" entertainment.

e.  It is uncontroverted that the <40% portion of the premises has been used continuously to present "topless" entertainment since 1972, except for the period of the Covid-19 "shutdown."

f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff 725 Eatery Corp. will not be able to continue its present business at the 725 Eatery premises and in order to do so will be forced to seek another location.

54.  **Unique Facts Specific to Plaintiff 689 Eatery Corp.**

a.  It is uncontroverted that, except for the period of the Covid-19 "shutdown," "Satin Dolls" has regularly featured entertainment by "topless" dancers, at the premises located at 689 8th Avenue, Manhattan, since 1992.

b.  It is uncontroverted that from 1992 to approximately September 2018, the business located at 689 8th Avenue was operated by 44th Enterprises, Corp.

16

c.  It is uncontroverted that in September 2018, Plaintiff 689 Eatery Corp. was formed and succeeded to the operation of the 689 8th Avenue location, which it continues to operate to the present day.

d.  It is uncontroverted that sometime prior to 1999, the business located at 689 8th Avenue renovated the premises to conform to the 60/40 Rule, by dividing the premises into a licensed bar and an entertainment venue presenting "topless" entertainment.

e.  It is uncontroverted that the <40% portion of the premises has been used continuously to present "topless" entertainment since 1992, except for the period of the Covid-19 "shutdown."

f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff 689 Eatery Corp. will not be able to continue its present business at the 689 Eatery premises and in order to do so will be forced to seek another location.

55. **Unique Facts Specific to Plaintiff 59 Murray Enterprises, Inc.**

a.  It is uncontroverted that, except for the period of the Covid-19 "shutdown," "New York Dolls" n/k/a "Flashdancers Downtown" has been continuously operated, and has regularly featured entertainment by "topless" dancers, at premises located at 59 Murray Street, Manhattan, since 1978.

b.  It is uncontroverted that from 1978 until May 2001, the lessee/operator of the 59 Murray location was DJL Restaurant Inc.

c.  It is uncontroverted that in May 2001 Plaintiff 59 Murray Enterprises, Inc. was formed and succeeded to the leasehold and operation of the 59 Murray location, which it continues to operate to the present.

d.  It is uncontroverted that at some time between 1998 and September 30, 2001, the "New York Dolls" premises were renovated to conform to the 60/40 Rules, *inter alia,* by installing new, subdued exterior signage, erecting partitions, installing interior signage, and installing opaque glass to divide the premises into a licensed bar and an entertainment venue presenting "topless" entertainment.

e.  It is uncontroverted that the <40% portion of the premises has been used continuously to present "topless" entertainment since 1978, except for the period of the Covid-19 "shutdown."

f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff 59 Murray Enterprises will not be able to continue its present business at the 59 Murray premises and in order to do so will be forced to seek another location.

56.  **Unique Facts Specific to Plaintiff AAM Holding Corp.**

a.  It is uncontroverted that, except for the period of the Covid-19 "shutdown," "Private Eyes" n/k/a "Flashdancers NYC" has been continuously operated, and has regularly featured entertainment by "topless" dancers, at premises located at 320 West 45th Street, Manhattan, since 1993.

b.  It is uncontroverted that from 1993 until June 2000, the lessee/operator of the 320 West 45th Street location was 320 West 45th Street Restaurant Corp.

c.  It is uncontroverted that in June 2000 Plaintiff AAM Holding Corp. was formed and succeeded to the leasehold and operation of the 45th Street location, which it continues to operate to the present.

d.  It is uncontroverted that at some time between 1998 and September 30, 2001, the "Private Eyes" premises were renovated to conform to the 60/40Rules, *inter alia,* by installing new, subdued exterior signage, erecting partitions, installing interior signage, and installing opaque glass to divide the premises into a licensed bar and an entertainment venue presenting "topless" entertainment.

e.  It is uncontroverted that the <40% portion of the premises has been used continuously to present "topless" entertainment since 1993, except for the period of the Covid-19 "shutdown."

f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff AAM Holding Corp. will not be able to continue its present business at the 320 West 45th Street premises and in order to do so will be forced to seek another location.

57.  **Unique Facts Specific to Plaintiff JNS Ventures Ltd.**

a.  It is uncontroverted that, except for the period of the Covid-19 "shutdown," "Vixen" has been continuously operated by Plaintiff JNS Ventures Ltd. and has regularly featured entertainment by "topless" dancers, at premises located at 60-07 Metropolitan Avenue, Ridgewood, Queens, since 1992.

b.  It is uncontroverted that at some time between 1998 and September 30, 2001, the "Vixen" premises were renovated to conform to the 60/40 Rules, *inter alia,* by installing new, subdued exterior signage, erecting partitions, installing interior

signage, and installing opaque glass to divide the premises into a licensed bar and an entertainment venue presenting "topless" entertainment.

c.   It is uncontroverted that the <40% portion of the premises has been used continuously to present "topless" entertainment since 1993, except for the period of the Covid-19 "shutdown."

d.   It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff AAM Holding Corp. will not be able to continue its present business at the Metropolitan Avenue premises and in order to do so will be forced to seek another location.

58.   **Unique Facts Specific to Plaintiffs Club at 60th, Inc. and Jacaranda, LLC**

a.   It is uncontroverted that Plaintiff Club at 60th, Inc., currently holds a sub- lease for the premises on the ground floor at 333 E. 60th Street in Manhattan ("the 60th Street Premises") and first acquired that sub-lease in May of 2001.  At that time those premises were occupied by a 60/40 Eating or Drinking Establishment operating under the name "Scores".

b.   It is uncontroverted that Scores operated at the 60th Street Premises as a fully adult eating or drinking establishment prior to enactment of the 1995 Amendments.

c.   It is uncontroverted that the 60th Street Premises Scores were remodeled and reconfigured, commencing in 1998, following the City's adoption of the 60/40 Rule such that Scores could operate there as a lawful 60/40 Business.

d.   It is uncontroverted that Scores operated as a 60/40 Business from the time of the reconfiguration/remodeling of the 60th Street Premises until 2008.

e.   It is uncontroverted that in December of 2008, Club at 60th Street sublet the 60th Street Premises to its current tenant, plaintiff Jacaranda Club, LLC ("Jacaranda").

f.   It is uncontroverted that Club at 60th conducted its own extensive renovation and remodeling of the 60th Street Premises at a cost of approximately $2,500,000 after Scores' departure and prior to the opening of Jacaranda's club, Sapphire.

g.   It is uncontroverted that Jacaranda opened as a 60/40 Eating or Drinking Establishment at the 60th Street Premises, known as "Sapphire" in January of 2009.

h.   It is uncontroverted that at no point following the adoption of the 2001 Amendments has the period of non-operation of the 60th Street Premises as a 60/40 Business been two years.

i.   It is uncontroverted that David M. Talla is and has always been the CEO and sole shareholder of Plaintiff Club at 60th Street.

j.   It is uncontroverted that Mr. Talla is and also has always been the Manager of plaintiff Jacaranda Club, LLC.

k.   It is uncontroverted that since 1998, Mr. Talla has also been the CEO and a Director of the Sports Club Company, Inc., ("SCC") which, since 1998, has held the master sublease to the 60th Street Premises and which is the sub-lessor to plaintiff Club at 60th Street.

l.   It is uncontroverted that, in 1998, when SCC took over the master sublease to the building where the 60th Street Premises are located, that it did so initially because it was looking for a site to place another Sports Club fitness facility and there was an existing health club on a different floor of that building which it intended to take

over.  At that time, it considered a renovation of the building which would have cost approximately $20 million.  However, because it was aware of the City's adoption of the 60/40 Rule, it concluded the far greater rental value for the building would be to continue to have a tenant there presenting live adult performances.  In order to insure that any tenant presenting live adult performances would continue to comply with the 60/40 rule, Sports Club conducted a far different and far more expensive renovation of the building which cost approximately $60 million, $40 million more than it would have expended had it not intended to have a tenant presenting adult entertainment on the first floor.

m.  It is uncontroverted that the redesign of the 60th Street Premises which commenced in 1998 included building a sports bar, a full-service restaurant and kitchen facilities in 60+% of the square-footage attributable to its customer-accessible space.

n.  It is uncontroverted that Mr. Talla directed his company to expend this money because he believed that the 60th Street Premises were far more valuable if operated as a lawful 60/40 Business than if it had been converted to any other type of use.

o.  It is uncontroverted that it is the desire of Mr. Talla and Club at 60th, his wholly owned corporation, to be a landlord to businesses which present live expressive performances consisting of adult entertainment.

p.  It is uncontroverted that it is also the desire of Mr. Talla and Jacaranda to own and manage businesses which present live expressive performances consisting of adult entertainment.

59.  **Unique Facts Specific to Plaintiff 336 LLC, d/b/a "The Erotica"**

a. It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 336 Eighth Avenue in Manhattan ("the 336 Eighth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2000, except for the period of the Covid-19 "shutdown."

b. It is uncontroverted that Plaintiff 336 LLC, d/b/a "The Erotica" leased and currently occupies the 336 Eighth Avenue Premises.

c. It is uncontroverted that the 336 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

d. It is uncontroverted that there are 10 private video booths in the 336 Eighth Avenue Premises.

e. It is uncontroverted that it is the desire of Plaintiff 336 LLC to own and manage a business which presents adult expression and material to the public through private video booths and other means.

f. It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff 336 LLC will not be able to continue its present business at the 336 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

g. It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff 336 LLC could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 336 Eighth Avenue Premises, but could not do so by exhibiting videos in private video booths.

60.  **Unique Facts Specific to Plaintiff Chelsea 7 Corp.**

    a.  It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 155 Eighth Avenue in Manhattan ("155 Eighth Avenue Premises"). and consistently offered constitutionally protected adult expression since at least 2013, except for the period of the Covid-19 "shutdown."

    b.  It is uncontroverted that Plaintiff Chelsea 7 Corp. leased and currently occupies the 155 Eighth Avenue Premises.

    c.  It is uncontroverted that the 155 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

    d.  It is uncontroverted that there are 3 private video booths at the 155 Eighth Avenue Premises.

    e.  It is uncontroverted that it is the desire of Plaintiff Chelsea 7 Corp to own and manage a business which presents adult expression and material to the public through private video booths and other means.

    f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Chelsea 7 Corp will not be able to continue its present business at the 155 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

    g.  It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Chelsea 7 Corp. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the

public at the 155 Eighth Avenue Premises, but could not do so by exhibiting videos in private video booths.

61. **Unique Facts Specific to Plaintiff Gotham Video Sales & Distribution Inc.**

   a. It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 687 Eighth Avenue in Manhattan ("the 687 Eighth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2003, except for the period of the Covid-19 "shutdown."

   b. It is uncontroverted that Plaintiff Gotham Video Sales & Distribution Inc. leased and currently occupies the 687 Eighth Avenue Premises.

   c. It is uncontroverted that the 687 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

   d. It is uncontroverted that there are 27 private video booths in the 687 Eighth Avenue Premises.

   e. It is uncontroverted that it is the desire of Plaintiff Gotham Video Sales & Distribution Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

   f. It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Gotham Video Sales & Distribution Inc. will not be able to continue its present business at the 687 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

   g. It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Gotham Video Sales & Distribution Inc. could make to its present business

and still be allowed to own and manage a business which presents adult expression and material to the public at the 687 Eighth Avenue Premises, but could not do so by exhibiting videos in private video booths.

62. **Unique Facts Specific to Plaintiff Rainbow Station 7 Inc.**

    a.  It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 203 Eighth Avenue in Manhattan ("the 203 Eighth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2014, except for the period of the Covid-19 "shutdown."

    b.  It is uncontroverted that Plaintiff Rainbow Station 7 Inc. leased and currently occupies the 203 Eighth Avenue Premises.

    c.  It is uncontroverted that the 203 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

    d.  It is uncontroverted that there are 10 private video booths in the 203 Eighth Avenue Premises.

    e.  It is uncontroverted that it is the desire of Plaintiff Rainbow Station 7 Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

    f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Rainbow Station 7 Inc. will not be able to continue its present business at the 203 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

g.  It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Rainbow Station 7 Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 203 Eighth Avenue Premises, but could not do so by exhibiting videos in private video booths.

63. **Unique Facts Specific to Plaintiff Video Lovers Inc.**

a.  It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 746 Third Avenue in Brooklyn ("the 746 Third Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2014, except for the period of the Covid-19 "shutdown."

b.  It is uncontroverted that Plaintiff Video Lovers Inc. leased and currently occupies the 746 Third Avenue Premises.

c.  It is uncontroverted that the 746 Third Avenue Premises are specifically configured to conform to the 60/40 Rule.

d.  It is uncontroverted that there are 10 private video booths in the 746 Third Avenue Premises.

e.  It is uncontroverted that it is the desire of Plaintiff Video Lovers Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Video Lovers Inc. will not be able to continue its present business at the 746 Third Avenue

Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

g. It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Video Lovers Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 746 Third Avenue Premises, but could not do so by exhibiting videos in video booths.

64. **Unique Facts Specific to Plaintiff Vishara Video, Inc.**

a. It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 781 Eighth Avenue in Manhattan ("the 781 Eighth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2005, except for the period of the Covid-19 "shutdown."

b. It is uncontroverted that Plaintiff Vishara Video, Inc. leased and currently occupies the 781 Eighth Avenue Premises.

c. It is uncontroverted that the 781 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

d. It is uncontroverted that there are 24 private video booths in the 781 Eighth Avenue Premises.

e. It is uncontroverted that it is the desire of Plaintiff Vishara Video, Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

28

f.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Vishara Video, Inc. will not be able to continue its present business at the 781 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

g.  It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Vishara Video, Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 781 Eighth Avenue Premises, but could not do so by exhibiting videos in private video booths.

65.  **Unique Facts Specific to Plaintiff Vishans Video, Inc.**

a.  It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 797 Eighth Avenue in Manhattan ("the 797 Eighth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2016, except for the period of the Covid-19 "shutdown."

b.  It is uncontroverted that Plaintiff Vishans Video, Inc. leased and currently occupies the 797 Eighth Avenue Premises.

c.  It is uncontroverted that the 797 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

d.  It is uncontroverted that there are 24 private video booths in the 797 Eighth Avenue Premises.

e. It is uncontroverted that it is the desire of Plaintiff Vishans Video, Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

f. It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Vishans Video, Inc. will not be able to continue its present business at the 797 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

g. It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Vishans Video, Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 797 Eighth Avenue Premises, but could not do so by exhibiting videos in video booths.

66. **Unique Facts Specific to Plaintiff 725 Video Outlet Inc.**

a. It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 725 Sixth Avenue in Manhattan ("the 725 Sixth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2000, except for the period of the Covid-19 "shutdown."

b. It is uncontroverted that Plaintiff 725 Video Outlet Inc. leased and currently occupies the 725 Sixth Avenue Premises.

c. It is uncontroverted that the 725 Sixth Avenue Premises are specifically configured to conform to the 60/40 Rule.

d.  It is uncontroverted that at no point following the adoption of the 2001 Amendments has the period of non-operation of the 725 Sixth Avenue Premises as a 60/40 Business been two years.

e.  It is uncontroverted that there are 12 private video booths in the 725 Sixth Avenue Premises.

f.  It is uncontroverted that it is the desire of Plaintiff 725 Video Outlet Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

g.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff 725 Video Outlet Inc. will not be able to continue its present business at the 725 Sixth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

h.  It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff 725 Video Outlet Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 725 Sixth Avenue Premises, but could not do so by exhibiting videos in private video booths.

67.  **Unique Facts Specific to Plaintiff Jaysara Video, Inc.**

a.  It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 308 West 36th Street in Manhattan ("the 308 West 36th Street Premises"), and consistently offered constitutionally protected adult expression since at least 2002, except for the period of the Covid-19 "shutdown."

b.   It is uncontroverted that Plaintiff Jaysara Video, Inc. (a/k/a Jayasara Video) leased and currently occupies the 308 West 36th Street Premises.

c.   It is uncontroverted that the 308 West 36th Street Premises are specifically configured to conform to the 60/40 Rule.

d.   It is uncontroverted that there are 11 private video booths in the 308 West 36th Street Premises.

e.   It is uncontroverted that it is the desire of Plaintiff Jaysara, Video Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

f.   It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff Jaysara Video, Inc. will not be able to continue its present business at the 308 West 36th Street Premises and, in order to offer adult expression to the public through private video booths, will be forced to seek another location.

g.   It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff Jaysara Video, Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 308 West 36th Street Premises, but could not do so by exhibiting videos in video booths.

68.   **Unique Facts Specific to Plaintiff DCD Exclusive Video Inc.**

a.   It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 102-30 Queens Boulevard in Queens ("the 102-30 Queens Boulevard Premises"), and consistently offered constitutionally protected

adult expression since at least 2004, except for the period of the Covid-19 "shutdown."

b. It is uncontroverted that Plaintiff DCD Exclusive Video Inc. leased and currently occupies the 102-30 Queens Boulevard Premises.

c. It is uncontroverted that the 102-30 Queens Boulevard Premises are specifically configured to conform to the 60/40 Rule.

d. It is uncontroverted that there are 7 private video booths in the 102-30 Queens Boulevard Premises.

e. It is uncontroverted that it is the desire of Plaintiff DCD Exclusive Video Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

f. It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff DCD Exclusive Video Inc. will not be able to continue its present business at the 102-30 Queens Boulevard Premises and in order to offer adult expression to the public through private video booths will be forced to seek another location.

g. It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff DCD Exclusive Video Inc. Video Lovers Inc. could make to its present business and still be allowed to own and manage a business which presents adult expression and material to the public at the 102-30 Queens Boulevard Premises, but could not do so by exhibiting videos in video booths.

69. **Unique Facts Specific to Plaintiff 557 Entertainment, Inc.**

a.  It is uncontroverted that a 60/40 Book Store with private video booths has operated at the commercial space at 557 Eighth Avenue in Manhattan ("the 557 Eighth Avenue Premises"), and consistently offered constitutionally protected adult expression since at least 2000, except for the period of the Covid-19 "shutdown."

b.  It is uncontroverted that Plaintiff 557 Entertainment Inc. leased and currently occupies the 557 Eighth Avenue Premises.

c.  It is uncontroverted that the 557 Eighth Avenue Premises are specifically configured to conform to the 60/40 Rule.

d.  It is uncontroverted that at no point following the adoption of the 2001 Amendments has the period of non-operation of the 557 Eighth Avenue Premises as a 60/40 Business been two years.

e.  It is uncontroverted that there are 10 private video booths in the 557 Eighth Avenue Premises.

f.  It is uncontroverted that it is the desire of Plaintiff 557 Entertainment Inc. to own and manage a business which presents adult expression and material to the public through private video booths and other means.

g.  It is uncontroverted that if the 2001 Amendments are enforced, Plaintiff 557 Entertainment Inc. will not be able to continue its present business at the 557 Eighth Avenue Premises and in order to offer adult expression to the public through private video booths, will be forced to seek another location.

h.  It is uncontroverted that under the 2001 Amendments there are modifications that Plaintiff 557 Entertainment Inc. could make to its present business and still be

allowed to own and manage a business which presents adult expression and material to the public at the 557 Eighth Avenue Premises, but could not do so by exhibiting videos in video booths.

## IV.   COMMON FACTS RELATED TO PERMITTING

### A.   Professional certification

70. Under Building Bulletin 2016-010 (2022 JNR Ex.16), qualified architects may professionally certify their building plans, and they are to be accepted by the Department of Buildings with no Department examination.  This policy has been in effect since DOB issued it by Directive 14 in 1975 (2022 JNR Ex. 6).

71. The DOB has prohibited architects from professionally certifying building permit applications for Adult Establishments since the DOB published OPPN # 17/95 on December 27, 1995 (2022 JNR Ex. 7).  That publication was superseded by OPPN # 6/96, published on October 25, 1996 (2022 JNR Ex. 8), but its prohibition was not eliminated.

72. Buildings Bulletin 2020-005, issued April 2, 2020 (2022 JNR Ex. 17), which prospectively and partially supersedes OPPN # 7/02 states that at such time as the 2001 Amendments may become enforceable, "the use of Directive 14 of 1975 and/or Professional Certification of Application and Plans Process will not be prohibited solely because the applications propose adult establishments." (Footnote omitted).

73. DOB has issued Buildings Bulletins in place of OPPNs since 2008.

74. As was the case with OPPNs, Buildings Bulletins are issued by the DOB and are not subject to prior approval by the City Council.

75. As was the case with OPPNs, the DOB has the authority to modify or repeal any Buildings Bulletin at any future date, including Buildings Bulletin 2020-005 to the extent not inconsistent with other applicable laws.

76. Professional certification of a building permit application typically allows faster final completion of the processing of a building permit application than of the processing of plans which are not professionally certified.

77. If a building permit application seeks a change to a type of use which is different from the existing use for purposes of its characterization under the City's zoning laws, the applicant, as part of its efforts to obtain a building permit, must seek zoning approval from the City.

78. Professionally certified building permit applications for uses representing a changed type of use for zoning purposes are subject to a post-approval zoning audit by DOB prior to issuance of the building permit.[4]

79. If a changed use noted on a professionally certified building permit application is in compliance with the applicable zoning requirements for its location, DOB's post-approval zoning audits for such uses are typically resolved in no more than 3 to 4 weeks, provided no further review is necessary.

80. Following a zoning audit which approves the zoning of a professionally certified building permit application, a building permit is generally issued within 48 hours, but may take longer.

---

[4] *See, e.g.,* DOB's Buildings Bulletin 2016-010 (2022 JNR, Ex. 16).

81. In circumstances where a building permit application involves a change of use for zoning purposes, proceeding via a professionally certified application typically shortens the overall time for obtaining a building permit.

82. For those applications not involving a change of use for zoning purposes, issuance of a building permit for a project which is not professionally certified will typically take longer than issuance of a building permit for that same project if it is professionally certified.

83. Even when a building permit application does involve a change of use for zoning purposes, proceeding via a professionally certified application typically reduces the time for the ultimate issuance of a building permit.

### B.    Preliminary review of permit applications by DOB counsel

84. Until February 2016, and at all times prior to that since the 2001 Amendments were enacted, permit applications that propose 100% Adult Establishments[5] had been routinely referred to DOB's Legal Counsel.

85. The City asserts that, since February 2016, DOB's Legal Counsel no longer routinely reviews permit applications that propose 100% Adult Establishments.

---

[5]  As used herein throughout, the term "100% Adult Establishments" shall mean, in the case of adult theaters and adult eating or drinking establishments, those in which 40% or more of the customer accessible space regularly features live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities" (as defined in the ZR); or films, motion pictures, videocassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or employees who, as part of their employment, regularly expose to patrons "specified anatomical areas" (as defined in the ZR) or, in the case of bookstores, customer accessible space and/or customer accessible stock devoted to "adult printed or visual material," as defined in the ZR).

86. Until March 23, 2022, and at all times prior to that since the 2001 Amendments were enacted, Permit Applications that propose 60/40 Establishments[6] have been subject to review by DOB's Legal Counsel to ensure, at a minimum, that no more than 40% of the floor area is devoted to adult entertainment and that the relevant plans include DOB's standard endorsement language with respect to the stay of enforcement of the 2001 Zoning Amendments.

87. The City asserts that, since March 23, 2022, DOB's Legal Counsel no longer routinely reviews permit applications that propose 60/40 Establishments.

88. Buildings Bulletin 2020-005, issued April 2, 2020 (2022 JNR Ex. 17), which prospectively and partially supersedes OPPN # 7/02 states that at such time as the 2001 Amendments may become enforceable, "Applications that propose Adult Establishments need not be subject to routine review by the Departments' General Counsel's Office."

89. Until February 2016, and at all times prior to that since the 2001 Amendments were enacted, DOB's policy, procedure, and regular practice had been to not process a

---

[6]  As used herein throughout, the term "60/40 Establishments" shall mean in the case of adult theaters and adult eating or drinking establishments, those in which less than 40% of the customer accessible space regularly features live performances which are characterized by an emphasis on "specified anatomical areas" or "specified sexual activities" (as defined in the ZR); or films, motion pictures, videocassettes, slides or other photographic reproductions which are characterized by an emphasis upon the depiction or description of "specified sexual activities" or "specified anatomical areas"; or employees who, as part of their employment, regularly expose to patrons "specified anatomical areas" (as defined in the ZR) or, in the case of bookstores, customer accessible space and/or customer accessible stock devoted to "adult printed or visual material," as defined in the ZR). 60/40 Establishments are sometimes described herein as 60/40 Businesses.

building permit application for any 100% Adult Establishment until such application had first been, respectively, referred to or reviewed by DOB's Legal Counsel.

90. Until March 23, 2022, and at all times prior to that since the 2001 Amendments were enacted, DOB's policy, procedure, and regular practice had been to not process a building permit application for any self-identified 60/40 Establishment until such application had first been, respectively, referred to or reviewed by DOB's Legal Counsel.

91. The City asserts that, since February 2016, DOB's Legal Counsel no longer routinely reviews permit applications that propose 100% Adult Establishments.

92. The City asserts that, since March 23, 2022, DOB's Legal Counsel no longer routinely reviews permit applications that propose self-identified 60/40 Establishments.

93. There are no published time limits for the preliminary review of building permit applications by DOB Legal Counsel.

94. Besides Adult Establishments and self-identified 60/40 Establishments, the permit applications for no other type of use are categorically put on hold pending preliminary review by DOB legal counsel.

### C.    Facts Related to Vesting Priority

95.  If a proposed Adult Establishment has a building permit application in process, it would still be denied a building permit if a proximate (i.e., within 500 feet) house of worship or school, as those terms are defined by the City (hereafter "Sensitive Use") was granted a building permit prior to final approval of the application for the Adult Establishment, even if the Sensitive Use submitted its building permit application after the date the Adult Establishment's application was submitted.

96.  Building permits for both schools and houses of worship are allowed to be professionally certified by their architects.

97.  DOB has public information available online regarding all building permit applications.

98.  Building permit applications are public records.  A member of the public inquiring as to the existence or status of a building permit application for a particular address will be able to receive that information from the City.

99.  An Adult Establishment that obtains a new-building or alteration permit on or after July 10, 2010, that has not obtained a Temporary Certificate of Occupancy (TCO) or, if applicable, a DOB sign-off, within one year from the date of permit issuance, or started operating within six months of obtaining its TCO or sign-off will lose priority to operate as an Adult Establishment if a new Adult Establishment, house of worship, or school obtains a permit to be located within a 500-foot radius of the Adult Establishment.  (2022 JNR Ex. 18, p. JNR-000162)

### D.   Timing of Permit Issuance and Recourse for Non-Compliance

100. The DOB previously had a deadline set forth in New York City Administrative Code ("Administrative Code") § 27-144, which has since been rescinded, of 40 days for issuing a building permit following approval of the plans submitted in connection with a building permit application (2022 JNR Ex. 37 pp, JNR-000294-295).

101. The 40-day deadline provision for issuing a building permit following plan approval was repealed in 2008 by Local Law 33/2007, which became effective on July 1, 2008, and was not replaced with a new deadline.

102. A building permit will not issue until all required "construction documents" (as defined in Administrative Code § 28-101.5) have been approved by DOB.

103. There is currently no published deadline for DOB to issue a building permit after it has approved an application for approval of construction documents.

104. Administrative Code § 28-104.2.7 ("Time period for review") requires DOB to approve a completed application for approval of construction documents by "no later than 40 calendar days after the submission of a complete application."

105. Administrative Code § 28-104.2.8 ("Notification of rejection") requires DOB, when rejecting completed applications for approval of construction documents, to give notice to the applicant "promptly and not later than the date required in § 28-104.2.7," i.e., "no later than 40 calendar days after the submission of a complete application."

106. There is no administrative remedy available to a building permit applicant if the DOB fails to adhere to its own deadlines for approval or denial of an application for approval of construction documents.

107. If an applicant proposes a new use, (either for a new building or via an alteration to an existing building), the applicant must submit a building permit application to DOB.

108. Even if a location for a new or relocating Adult Establishment will require no physical alterations, the business must still obtain a new certificate of occupancy to indicate that the location is permissible for the new Adult Establishment, in order to establish priority.

109. In order to obtain a certificate of occupancy, a business as described in the preceding paragraph would have to obtain what DOB refers to as a "no-work" permit.[7]

110. Obtaining a "no-work" permit is a requirement in order to vest the right of the Adult Establishment to continue to operate at its location should any Sensitive Use or other Adult Establishment subsequently be established or attempt to be established near it.

111. Obtaining a "no-work" permit requires zoning approval from DOB.

112. Where Adult Establishments are permitted, no building permit or certificate of occupancy is required in order to open or operate an Adult Establishment if there is no physical alteration nor any change in the zoning use group.  However, a no-work permit would still be required in order to obtain priority so as to vest the use as against any nearby adult use or sensitive use.

---

[7] *See, e.g.,* 1 RCNY § 9000-01 (b)(2) (2022 JNR Ex. 75); paragraph I-C of the DOB's Operations Policy and Procedural Notice ("OPPN") # 7/02 (2022 JNR Ex. 14, p. JNR-000137); and p. 5 of a DOB "Code Note" entitled "Adult Establishment applications" (2022 JNR Ex. 18, p. JNR-000162).

113. Until February 2016, and at all times prior to that since the 2001 Amendments were enacted, before DOB would issue a "no-work" permit to a 100% Adult Establishment, the application was routinely subject to referral to or review by DOB legal counsel.

114. Until March 23, 2022, and at all times prior to that since the 2001 Amendments were enacted, before DOB would issue a "no-work" permit to a self-identified 60/40 Establishment, the application would have been routinely subject to referral to or review by DOB legal counsel.

115. The City asserts that, since March 23, 2022, it is no longer the case that DOB routinely refers "no-work" permit applications that propose any Adult Establishment or self-identified 60/40 Establishment to DOB's Legal Counsel.

116. There have never been any time limits for DOB legal counsel to complete its review set forth in the paragraphs above.

## V.   FACTS RELATED TO LOCATIONAL RESTRICTIONS

117. Adult Establishments are allowed only in the commercial and manufacturing zoning districts specified in ZR § 32-01 (commercial zone restrictions on Adult Establishments) and § 42-01 (manufacturing zone restrictions on Adult Establishments).

### A.    Adult Establishments in Commercial Zoning Districts

118. Pursuant to ZR § 32-0l(a), with respect to *commercial districts,* Adult Establishments are allowed, subject to locational restrictions, in C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 or C8 Districts (hereafter "Permissible Commercial Districts") and in no others, and are expressly prohibited in C1, C2, C3, C4, C5, C6- l, C6-2 and C6-3 Districts.

119. Within the Permissible Commercial Districts, all Adult Establishments are prohibited from locating:

a.    Pursuant to ZR § 32-0l(b)**:** Within 500 feet of "a Cl, C2, C3, C4, C5-l, C6-1, C6-2 or C6-3 District, or a Manufacturing District, other than an M1-6M District, in which new residences or new joint living-work quarters for artists are allowed as-of-right or by special permit or authorization." Per ZR § 74-782, such manufacturing districts include the Ml-5A, Ml-5B, Ml-5M and Ml-6M. Per ZR § 42-02, such manufacturing districts additionally include, among others, the Ml-1D, Ml-2D, Ml-3D, Ml-4D districts.

b.    Pursuant to ZR § 32-0l(b): Within 500 feet of any Residence District.

c.    Pursuant to ZR § 32-0l(b): Within 500 feet of any house of worship or school.

d.    Pursuant to ZR § 32-0l(c) and 1 RCNY 9000-01(d) (2022 JNR Ex. 75): Within 500 feet of any existing lawful Adult Establishment or any

former Adult Establishment that has discontinued operations for less than one year.

    e.    <u>Pursuant to ZR § 32-0l(d)</u>: On a zoning lot with any other Adult Establishment.

120. Adult Eating or Drinking Establishments presenting live entertainment are, subject to the other restrictions enumerated above, legally permissible in all the Permissible Commercial Districts described above.

121. Pursuant to ZR § 32-0l(e), the ZR prohibits Adult Establishments from exceeding 10,000 square feet of floor area (exclusive of any cellar areas used solely for storage or mechanical equipment).

**B.    Adult Establishments in Manufacturing Zoning Districts**

122. Except as noted below, under ZR § 42-0l(a) Adult Establishments are generally allowed in any Manufacturing District other than those in which "residences" or "joint living-work quarters for artists" are allowed "as-of-right" or by "special permit" or "authorization." However, Adult Establishments are not allowed in any of the following Ml districts: Ml-1D, Ml-2D, Ml-3D, Ml-4D, Ml-5D, Ml-6D, Ml-5A, Ml-5B, M1-6M, Ml-5M (in Manhattan Community Districts 1, 2, 3, 4, 5 & 6), and the Ml-1 District (to the extent bounded by 95th Avenue, 148th Street, 97th Avenue and 147th Place in Community District 12 in the Borough of Queens). Bookstores are prohibited in the M2 and M3 zoning districts, but there is no agreed position between the parties on whether Adult Bookstores are allowed in these districts.

123. Within the Manufacturing Districts where Adult Establishments are allowed, no Adult Establishment may locate:

  a.  <u>Pursuant to ZR § 42-0l(b)</u>: Within 500 feet of a Cl, C2, C3, C4, C5- 1, C6-l, C6-2 or C6-3 District, or a Ml-5A, Ml-5B and Ml-5M Manufacturing District.

  b.  <u>Pursuant to ZR § 42-0l(b)</u>: Within 500 feet of a Residence District.

  c.  <u>Pursuant to ZR § 42-0l(b)</u>: Within 500 feet of any house of worship or school.

  d.  <u>Pursuant to ZR § 42-0l(c)</u>:  Within 500 feet of any existing lawful Adult Establishment or any former Adult Establishment that has discontinued operations for less than one year.

  e.  <u>Pursuant to ZR § 42-01(d)</u>:  On a zoning lot with any other Adult Establishment.

124. As is the case in commercial zones, Adult Establishments in manufacturing zones are likewise restricted to 10,000 square feet of floor area (exclusive of any cellar areas used solely for storage or mechanical equipment). ZR § 42-0l(e).

125. Pursuant to 1 RCNY § 9000-01(d)[8], for a full year after an Adult Establishment is either closed or converted to another use, the previous existence of that Adult Establishment will continue to act as a bar to the location of any new Adult Establishment within 500 feet of it.

---

[8] *Ibid.*

### C.    Maps

126. In connection with the enactment of the 1995 Amendments, the NYC Department of City Planning ("DCP") produced maps ("1995 Maps") for each borough, showing (a) "Areas zoned M1, C7 or C8 where Adult Entertainment Uses could continue to locate", (b) "Areas zoned M2 or M3 where Adult Entertainment Uses could continue to locate", (c) "Areas zoned C6-4, C6-5, C6-6, C6-7, C6-8, C6-9 where Adult Entertainment Uses could continue to locate," (d) "Encumbered sites within areas where Adult Entertainment Uses could continue to locate.  Encumbered sites include airports, utilities, fuel tank farms, transportation rights-of-way, large municipal facilities, certain large parcels of publicly-owned land and areas characterized by wetlands," and (e) "Proposed re-zonings that would preclude Adult Entertainment Uses."

127. The City introduced its 1995 Maps into evidence in the state court litigation challenging the validity of its 1995 Adult Use amendments and those maps were before the State Court of Appeals when it ruled to uphold those amendments in the cases of Stringfellow's of New York, Ltd. v. City of New York, 91 NY2d 382 (1998). True and accurate photographic copies of the 1995 Maps as submitted in the state court Stringfellow's litigation are reproduced as 2022 JNR Ex. 57.

128. Most, but not all, of the "encumbered sites" designated on the City's 1995 Maps remain encumbered today.

129. Each of the City's 1995 Maps bears the notation "Restrictions from existing adult entertainment uses not shown."  Had these restrictions been shown, each existing

Adult Establishment site would have prohibited a new Adult Establishment within a 500' radius.

130. The City's 1995 Maps used colors only to depict areas which had some potential significance to the permissible locations for Adult Establishments.

131. The City's 1995 Maps used one color to depict "All areas zoned M2 or M3 where City contended that adult entertainment uses in 1995 could exist under 1995 amendments" but used a different color to depict areas zoned M1 (which also included areas zoned C7 or C8).

132. The parties agree that both Adult Bookstores and Adult Eating or Drinking Establishments are permissible in several of the M1 zoning districts, all of which are shown on the city's 1995 Maps in the same color as the C7 and C8 zoning districts.

133. "Bookstores" are defined as either a Use Group 6 or a Use Group 12B use under the Zoning Resolution, and Use Group 6 and Use Group 12B uses are allowed in the M1 zoning districts, but, not in the M2 or M3 zoning districts.

134. Berzak maintains that in 2002, he obtained from DCP maps called "Tax Lot Base Maps" and "Tax Block Base Maps" for each community district in each borough and then used them to create the grids which were the starting point for his creation of Plaintiff's' "A" series of maps reproduced at PJA[9] 20, 32, 36, 40 and 44. Defendants have no basis to dispute this.

---

[9] PJA is a reference to the 17 Volumes of the Plaintiffs' Joint Appendix filed in all four actions herein on November 21, 2018.

135. Tax Lot Base Maps and Tax Block Base Maps, collectively, show all the major public streets and street names in a community district, as well as all the block and lot boundaries and block and lot numbers in a community district.

136. Defendants agree that they are unaware of any differences between the City's 1995 Maps and Plaintiffs' "A" series maps which are reproduced at PJA 20, 32, 36, 40 and 44, other than that the legend and title of each of Plaintiffs' "A" series maps has been modified to reflect that it is based on the 1995 Maps, and that a "north" arrow and scale were added to the Plaintiffs' "A" series maps.

137. A true and accurate copy of the DCP's 1993 Adult Establishment List is set forth as 2022 JNR Ex 41-1.

138. A true and accurate copy of the DCP's 2000 Adult Establishment List is set forth as Exhibit 43-1 of the 2022 JNR.

139. A true and accurate copy of Appendix B to CEQR Negative Declaration of New York City Planning Commission ("CPC") 2001 Report, setting forth the numbers of Adult Establishments in 1993 and 2000 by Borough and by Type is set forth as 2022 JNR Exhibit 43-2.

### D.  The Number of Legally Permissible Lots

140. The parties agree that between 1995 and 2019 there have been re-zonings throughout the City and that, as a result, the current number of legally permissible sites for Adult Establishments city-wide is smaller than the number of legally permissible sites for Adult Establishments at the time of the 1995 zoning amendments.

141. With respect to Manhattan, as of October 31, 2018, there were 28 lots which Plaintiffs and the City agree would provide legally permissible sites for new Adult Establishments and were unencumbered.  A list of those 28 lots is attached as Exhibit 69 of the 2022 JNR.  As detailed below, the City has identified 8 additional lots it believes are also permissible and unencumbered.

142. Of the 28 lots upon which the plaintiffs and defendants agree, because of the required 500' buffer between Adult Establishments, plaintiffs claim that there is the theoretical maximum potential for only 9 Adult Establishments to simultaneously relocate in Manhattan in compliance with the Zoning Resolution.

143. As of October 31, 2018, the City claims that there were 36 lots in Manhattan where Adult Establishments could be relocated, and that there is the potential for 13 Adult Establishments to simultaneously relocate in compliance with the Zoning Resolution. A list of these 36 lots is set forth as Exhibit 70 of the 2022 JNR.  Plaintiffs contend that even including those 8 asserted additional lots, there is still only the potential for 9 Adult Establishments to simultaneously relocate in Manhattan in compliance with the Zoning Resolution.

144. Plaintiffs further claim that only 3 of the City's asserted 36 lots in Manhattan would be commercially feasible for the establishment of a relocating adult eating or drinking establishment.  The City disputes this.

145. The City contends that, based on data collected in December 2019, throughout all five boroughs, there are a minimum of 1,703 legally permissible alternative sites for new or relocating adult establishments of which (it contends) a minimum of 245 could be

established simultaneously.  A list of these 1,703 sites is set forth as Exhibit 71 of the 2022 JNR.  In compiling these lists:

a.      the City maintains that private vehicles, mass transit, ride share, bike share and scooter share are all readily available in New York City, but did not conduct a specific transportation analysis to determine the accessibility of each or any site, nor relate each or any mode of transportation to each or any site;

b.      the City did not conduct a basic infrastructure (or equivalent) analysis for each or any site other than to observe that all of the listed sites have street frontage;

c.      the City did not determine for each or any of the sites on its list of legally permissible alternative sites the economic burdens which would be incurred in order to use the site as an adult establishment;

d.      the City did not determine for each or any site on its list of legally permissible alternative sites how much it would cost to convert the site into what is required for either (i) an adult establishment, or (ii) a commercial use, generally;

e.      the City did not analyze whether the presence of wetlands and/or flood plains precluded a site from being commercially developed; however the City maintains that it excluded sites from its list of available alternative sites that it identified would be unlikely to be available for development including those under public ownership and those used

for park, transportation or utility purposes and the City maintains that it also conducted visual confirmation of each site using imagery and excluded those that appeared unlikely to be available for development; further, the City maintains that location in a flood plain does not automatically preclude a site from being commercially developed;

f.      the City did not confirm that the listed sites would not be rendered unavailable by virtue of any pending proposed text amendments to the Zoning Resolution; however, the City maintains that it did exclude sites from its list of available alternative sites that it anticipated would be rendered unavailable by virtue of proposed text amendments and the City contends that none of the amendments would materially affect the conclusion that numerous sites are available for adult use establishments;

g.      the City did not specifically analyze every listed site as to whether it is suitable for some generic commercial enterprise; however the City represents that all of the sites on the City's list of alternative sites are zoned for use by commercial enterprises, and the City represents that these sites are zoned for use by one or more types of adult establishments.

h.      the City did not analyze the pragmatic likelihood of each of the listed sites ever becoming available to a generic commercial enterprise, as the City maintains that doing so would require an analysis of private

financial and contractual information that is not in the City's possession, custody or control; and

i.      the City's list includes sites ranging from a minimum of 5,000 sq ft. to a maximum of 7,346,540 sq. ft.; the City did not exclude any lots as being too large because some large lots can be sub-divided or used by multiple commercial enterprises, although plaintiffs maintain that the process for subdividing large lots is burdensome, costly and typically takes over a year to complete.

### E.    Flood Zone Facts

146. In November 2014, the City issued "NYC's Risk Landscape: A Guide to Hazard Mitigation" (hereafter "Hazard Report"), which was "developed by NYC Emergency Management in partnership with the NYC Department of City Planning and close collaboration with the NYC Mayor's Office of Recovery and Resiliency." Excerpts of the City's report are reproduced as 2022 JNR Ex. 30.

147. The City's Hazard Report states that "[e]rosion has already diminished portions of New York City's 520-mile coastline" (2022 JNR Ex. 30, p. JNR-000214).

148. According to the City's Hazard Report, "approximately 1,428 acres and roughly 135 buildings and other structures" are located within Coastal Erosion Hazard Areas (2022 JNR Ex. 30, p. JNR-000216).

149. The "NYC Flood Hazard Mapper" maintained by the DCP (2022 JNR Ex. 31) provides a "comprehensive overview of the coastal flood hazards that threaten the city

today, as well as how these hazards are likely to increase in the future with climate change." https://www1.nyc.gov/site/planning/data-maps/flood-hazard-mapper.page

150. As indicated by the DCP, "[a]s a city with 520 miles of waterfront and many low-lying neighborhoods, New York City is highly vulnerable to flooding. With climate change, flood risks are projected to increase throughout the city over time. However, given the city's diverse topography, especially along the coast, different neighborhoods will be affected in different ways." https://dcp.maps.arcgis.com/apps/webappviewer/index.html?id=1c37d271fba14163b bb520517153d6d5

151. In 2017, the City created Special Coastal Risk Districts to "address coastal areas that are currently at exceptional risk from flooding and may face greater risk in the future. The Special Districts place limits on new development in these highly vulnerable areas" (2022 JNR, Ex. 26, p. JNR-000192).

152. 2022 JNR Ex. 31 is a map generated by the DCP depicting current general citywide floodplain data. (*See* https://www1.nyc.gov/site/planning/data-maps/flood-hazard-mapper.page.)

153. 2022 JNR Ex. 32 consists of maps generated by the City indicating, in blue, the floodplain information (effective flood insurance rate maps for 2007 and 2015) and coastal zone boundary. These are areas with high levels of flood risk. The maps indicate in light blue the "A" Zones." The City defines these as follows: "A portion of the area subject to flooding from the 1% annual chance flood. These areas are not subject to high velocity wave action but are still considered high risk flooding areas."

The maps indicate in dark blue the "V Zones." These are the "portion of the 1% annual chance floodplain subject to high velocity wave action (a breaking wave 3 feet high or larger)."

154. Thirty-five of the 39 Manhattan lots that allow Adult Establishments initially identified by the City are located within the coastal zone boundary. Only four of the Manhattan lots are not in coastal zones: 380 11th Avenue, 400 11th Avenue, 432 West 31st Street, and 442 West 31st Street. While not within the coastal zone, they are each located across the street or at most one block from the coastal zone.

155. Twenty two of the 39 Manhattan lots, either completely or partially, are located within the A Zone. Fifteen of the lots are also located, either completely or partially, within the V Zone.

156. To assist its officials who are reviewing building permit applications for new Adult Establishments, the City's Buildings Department issued a Code Note regarding Adult Establishment Applications (Version 1 / 6.2016), which is reproduced as 2022 JNR Ex. 18 (the "Code Note").

157. There is no regulatory prohibition on any commercial establishment, including any Adult Establishment, locating within the flood zone. Furthermore, there is no prohibition on new construction of buildings in the flood zone, and the NYC Building Code provides specific regulations for flood-resistant construction in the flood zone.

158. The Code Note states that one of the "First Steps" in considering Adult Establishment applications is to consider "Zoning District, Site Designations" described as including

not only special-purpose districts, but also "waterfront area or block, flood hazard area." (2022 JNR Ex. 18, p. JNR-000160)

###### F.      The Changing Number of 100% and 60/40 Businesses Over Time

159. The number, type and location of adult businesses in New York City over time is undisputed information obtained from a number of City-provided sources.  Attached as Exhibit 72 of the 2022 JNR is a compilation of statements extracted from (a) the 2001 NYC Planning Commission report, and (b) the Declaration of David Karnovsky, Counsel to DCP, dated September 4, 2002 ("2002 Karnovsky Federal Court Declaration"), regarding the historical numbers of 100% and 60/40 establishments in New York City in 1993 and 2001, with accompanying interpretative charts based on the data set forth in the text.  Attached as Exhibit 41-1 of the 2022 JNR is Appendix B to the City's 1994 Study. Attached as Exhibit 41-2 of the 2022 JNR is p. 22 of the November 1994 DCP Adult Entertainment Study.  Attached as Exhibit 43-1 of the 2022 JNR is Appendix A to the 2001 Negative Declaration of the City Planning Commission.  Attached as Exhibit 45-1 of the 2022 JNR are pages 6-7 of the City Planning Commission's 2001 Report discussing changes in the number of adult businesses since 1993.

160. According to the City's above-referenced sources, in 1993 there were 177 known 100% adult establishments operating at locations in all of New York City.  Of these, 68 were what would now be called an "adult eating and drinking establishments (then called a "topless bar") and 86 were described as adult bookstores or video stores or

peepshows.  The balance consisted of 23 businesses categorized as adult "movie and live theaters."  Plaintiffs accept these numbers as accurate.

161. According to the City's above-referenced sources, in 2000 there were 136 known adult establishments with 35 consisting of 100% adult establishments and 101 consisting of 60/40 establishments operating at locations in all of New York City. Of these, 57 were eating or drinking establishments (with 36 operating as 60/40 establishments); 35 bookstores (with 29 operating as 60/40 establishments), and 44 theaters (with 36 operating as 60/40 establishments). Plaintiffs accept these numbers as accurate.

162. According to the City's above-referenced sources, the number of adult establishments declined between 1993 and 2000 in Manhattan from 107 to 69. Plaintiffs accept these numbers as accurate.

163. According to the City's above-referenced sources, in 2000, there were 3 known 100% adult eating and drinking establishments, and 11 known 60/40 eating and drinking establishments, operating at locations in Manhattan. Plaintiffs accept these numbers as accurate.

164. According to the City's above-referenced sources, in 2000, there were 5 known 100% adult bookstores with peepshows[10] (referred to as "theaters"), and 26 known 60/40 bookstores with peepshows (referred to as "60/40 theaters"), operating at locations in Manhattan. Plaintiffs accept these numbers as accurate.

165. According to the City's above-referenced sources, in 2000, there were 5 known 100% adult bookstores without peepshows, and 19 known 60/40 bookstores without

---

[10] Also known as private video booths.

peepshows, operating at locations in Manhattan.  Plaintiffs accept these numbers as accurate.

166. According to the City's above-referenced sources, in 1993 there were 107 known 100% adult establishments operating at locations specifically in Manhattan.  Of these, 21 were what would now be called an "adult eating and drinking establishment" (then called a "topless bar") and 69 were adult bookstores or video stores/peepshows. Plaintiffs accept these numbers as accurate.

167. Currently, there are 10 known 100% adult establishments operating at lawful locations in New York City.  Of these, 8 are adult eating and drinking establishments and 2 are 100% adult bookstores. These 100% businesses will not need to relocate if the 2001 Amendments are allowed to take effect.

168. Currently there are 4 known 100% adult businesses operating at permissible locations in Manhattan, of which 3 are adult eating and drinking establishments, and one is an adult bookstore without private video booths.

### G.   The Number of 60/40 Businesses to be Displaced

169. As of February 1, 2019, there were 45 known 60/40 businesses in the City of New York that would have needed to relocate if the 2001 Amendments had been allowed to take effect.

170. Currently there are 32 known 60/40 businesses in the City of New York which would need to relocate if the 2001 Amendments are allowed to take effect.

171. A chart accurately setting forth the name and location of the 32 known currently operating 60/40 businesses which would need to relocate if the 2001 Amendments are allowed to take effect is set forth as Exhibit 73 of the 2022 JNR.

172. Bookstores without private video booths may remain at locations where adult establishments are prohibited, subject to the eight additional factors included in the City's 60/40 requirements for bookstores.

173. Of the 32 known currently operating 60/40 establishments in the entire City of New York, 19 are located in Manhattan, 5 in Brooklyn, 5 in Queens, 3 in the Bronx, and 0 in Staten Island.

174. Currently, in Manhattan, there are 5 known 60/40 adult eating and drinking establishments, and 14 known 60/40 bookstores with or without private video booths. All of the eating and drinking establishments would have to close or relocate if the 2001 Amendments are allowed to take effect.  The 60/40 bookstores would have to close, relocate, or conform to the eight factors included in the City's 60/40 requirements for bookstores which, among other things, prohibits private video booths.

175. With regards to Manhattan, the City asserts that based upon the data collected in December 2019 there are 14 lots upon which adult establishments can simultaneously relocate, thus if the 2001 Amendments are allowed to take effect, at least 5 of these 19 60/40 businesses could not relocate in Manhattan at this time due to a lack of legally permissible and constitutionally countable locations. Plaintiffs assert that there are 9 lots in Manhattan upon which adult establishments can simultaneously relocate, thus

if the 2001 Amendments are allowed to take effect, at least 10 of these 19 60/40 businesses could not relocate in Manhattan at this time due to a lack of legally permissible and constitutionally countable locations.

176. The calculation and classification of businesses herein and throughout this stipulation and any attached exhibits is only for purposes of this litigation and does not constitute an admission or identification of a particular business as a certain type of use for any other purpose.

### H.   Additional Facts Related to Bookstores

177. Prior to the 1995 Amendments, the City's Department of City Planning identified 86 adult bookstores/peep shows/video stores citywide. *See* 1994 DCP Study at iii, 22 (2022 JNR Ex. 41, pp. 2022 JNR-000305 and 2022 JNR-000333).

178. Prior to the 1995 Amendments, there were no known bookstores operating as 60/40 businesses, because all adult establishments operated at 100%, and general-interest bookstores with a small portion of their stock consisting of adult materials have never been considered an adult bookstore.

179. It is uncontroverted that the Amended Complaint in *Amsterdam Video Inc., et al. v. City of New York, et al.*, Index No. 103568/96 (Sup. Ct. N.Y. Co.), which was filed on July 17, 1996, in litigation that challenged the constitutionality of the 1995 Amendments, identified 43 establishments with private video booths  existing at that time.

180. There are two known 100% adult bookstores in New York City; one is in Manhattan, which does not have private video booths, and one is in Staten Island, which does have private video booths.

181. There are no known 100% adult movie theaters currently in New York City.

182. There is one known 60/40 adult movie theater currently in New York City, which is located in Queens and has private video booths which, pursuant to prior litigation, would not need to relocate if the 2001 Amendments are allowed to take effect.

183. It is uncontroverted that 60/40 bookstores currently constitute the only known retail source for viewing adult videos in private video booths in New York City.

184. It is uncontroverted that if the 2001 Amendments are enforced, there are no known 60/40 bookstores currently in New York City with private video booths that would be able to continue to exhibit adult videos to the public in private video booths at their current locations.

185. It is uncontroverted that each viewing booth costs approximately $10,000.

186. It is uncontroverted that commercial locations may require electricians to rewire the premises to enable the installation of private video booths and that such work may require permits from the Buildings Department.

## VI.   FACTS RELATED TO LEGISLATIVE HISTORY AND JUSTIFICATION

187. The City further amended the 1995 Amendment in 2001.  In paragraph 56 of an October 23, 2002 affidavit, New York City Department of City Planning Counsel David Karnovsky stated that it was necessary to do so, "to better and more completely reflect the legislative intent behind the 1995 regulations." (2022 JNR Ex. 52, p. JNR-001060)

188. The City did not conduct a new secondary effects study prior to passing the 2001 Amendments, and the "60/40" business model was not studied in 1994/1995 because it did not exist at that time.  According to the 2002 Karnovsky State Court Affidavit at ¶ 44 (2022 JNR, Exhibit 52, pp. JNR-001054-1055), quoting from the 1995 City Planning Commission report: "[a]s a general guideline, the Commission believes that an establishment would need to have at least 40 percent of its accessible floor area used for adult purposes to make it similar to the establishments studied in the DCP Study and thus be an 'adult establishment' or an 'adult bookstore.' ***"

189. On March 23, 2001, the DCP filed application N 010508 ZRY to further amend the ZR ("2001 Application") (2022 JNR Ex. 42), which the City asserted would "better and more completely reflect the legislative intent behind the 1995 regulations . . . ." [See 2002 Karnovsky State Court Affidavit at ¶ 56 (2022 JNR Ex. 52, p. JNR-001060)]

190. The environmental impact of the proposed 2001 Amendments was reviewed by the CPC pursuant to the New York State Environmental Quality Review Act ("SEQRA") and the City Environmental Quality Review ("CEQR"), which issued an

Environmental Assessment Statement ("EAS") setting out the universe of facts on which the 2001 Amendments were predicated, and a "Negative Declaration," concluding that adoption of the 2001 Amendments would have "no significant effect on the quality of the environment" and "neighborhood character," as defined by SEQRA and CEQR. (See 2022 JNR Ex. 43, p. JNR-000492)

191. The Negative Declaration and EAS were submitted to the City Council together with the 2001 CPC Report formally proposing the 2001 Amendments (*see* 2022 JNR Ex. 45).

192. The proposed 2001 Amendments were also subject to review by the Community and Borough Boards.  Twenty Community Boards and three Borough Boards voted on them.  Their reports are included with the CPC Report (See 2022 JNR, Ex. 45, at pp. JNR-000727 *et seq*.)

193. Following these submissions, the CPC held a public hearing on May 23, 2001. Eighteen people spoke at the hearing.  A true and accurate copy of the transcript is reproduced as 2022 JNR Ex. 44.

194. The 2001 Amendments were approved by the CPC at a public hearing held on August 8, 2001.  A true and accurate copy of the transcript is reproduced as 2022 JNR, Ex. 46.

195. 2022 JNR Ex. 48 is a true and accurate copy of letters to the City Council Subcommittee on Zoning ("Subcommittee"), from Edward S. Rudofsky dated October 9, 2001 and from David Karnovsky dated October 24, 2001.  In his letter, Mr. Karnovsky stated that "the sole purpose of the [proposed] amendments as they relate

to topless bars and restaurants is to allow the City to implement the [1995] regulations according to their original intent."

196. The 2001 Amendments were approved by the City Council Subcommittee on Zoning and Franchises October 25, 2001 by a vote of 3-1-1. A true and accurate copy of the transcript of that meeting is reproduced as 2022 JNR Ex. 49.

197. The full City Council Land Use Committee approved the 2001 Amendments on October 25, 2002, by a vote of 12-1. A full and accurate copy of the transcript of that meeting is submitted as 2022 JNR, Ex. 50.

198. The 2001 Amendments were approved at the New York City Council meeting held on October 31, 2001, by a vote of 38-4-3. A full and accurate copy of the transcript of that meeting is submitted as 2022 JNR Ex. 51.

199. Robert Iulo was a DOB Building Inspector, with a Master's Degree in Urban Planning from New York University, who trained New York City personnel in enforcement of the adult use provisions of the Zoning Resolution. In 2009, Mr. Iulo, no longer employed by DOB, testified under oath before Justice Louis York, at the trial of Ten's Cabaret, Inc., et al. v. City of New York, Index No. 121197/02.

200. At the trial, Mr. Iulo was asked the following questions and gave the following answers (2022 RJN, Ex. 54, p. JNR-001105-001106):

> Q   Line 7 on page 181, is it not true that you were asked this question and you gave this answer under oath:
>
> > "To your knowledge, and you've been there since the beginning, have the eating and drinking establishments adhered to the changes?"  And your answer was, "I think they have toned down quite a bit."
>
> Was that your testimony, sir?
> A   <u>Yes</u>.

Q  And that was true of course at the time that you gave that testimony?
A  But what you asked me before was about the sign damage regulations.
THE COURT: There is no question pending.
A  Okay.

Q  Now, just so that we're clear, it's true that they - toned it down quite a bit?
A  <u>Yes</u>.

Q  And, in fact, it was toned down to the point with respect to where quite a few of the eating and drinking establishments you wouldn't even know what it was from the outside; correct?
A  <u>Correct</u>.

Q  And you don't see any more signs like "Triple X" or "Girls, Girls, Girls" associated with these eating and drinking establishments; isn't that true?
A  <u>True</u>.

201. Marilyn Mammano was the Director of Zoning & Urban Design of the NYC DCP at the time the 1995 Amendment to the ZR were proposed and enacted.  She was deposed in Hickerson v. The City of New York, New York County Index No. 103569/96, one of the three companion challenges to the constitutionality of the 1995 ZR Amendment decided in Stringfellow's of New York, Inc. v. City of New York, 91 N.Y.2d 382 (1998).

202. *Inter alia*, Director Mammano testified in the Hickerson litigation that "exist[ing] adult establishments were not considered" in the City's calculation of the number of potentially available sites for adult establishments, and "there was no attempt to … draw 500-foot circles around them on [the City's] map[s]."  (*See* 2022 JNR, Ex. 56, pp. JNR-001321-1322.)

203. According to Study Reports of HR&A Advisors,[11] published by the Times Square Alliance,[12] tourism in the Times Square area had risen 74% since 1993, to 35 million visitors a year in 2007[13] and was estimated to have reached 39 million visitors a year in 2011.[14]

204. According to crime statistics maintained by the New York City Police Department, by 2016, crime in the Midtown South precinct, which includes Times Square, had declined to less than 20% of what it was in 1990.[15]

205. A chart generated by the Times Square Alliance for its Annual Meeting (2019) entitled "Annual Crime in Times Square" is is reproduced as Fig 1 in the Freeman Affidavit, (PJA 220). (It can presently also be found at https://www.timessquarenyc.org/sites/default/files/resource-pdfs/APM%20Slides%204.29.19%20for%20online.pdf.  NYPD Midtown South and Midtown North are indicated as the source for the data presented in the chart. The

---

[11]  HR&A Advisors is a national urban development consulting firm that provides strategic advice in the public, private and non-profit sectors that "led New York City and state efforts to reinvigorate Times Square."  *See* hraadvisors.com/portfolio/times-square.

[12]  The Times Square Alliance, founded in 1992, works to improve and promote Times Square. *See* timessquarenyc.org/about-the-alliance.  The Times Square Alliance was formerly known as the Times Square Business Improvement District.

[13]  HR&A. 2007. Valuing Times Square: The Economic Impact of Times Square. New York, NY: Times Square Alliance.

[14]  HR&A. 2011. Times Square Retail Study Update. New York, NY: Times Square Alliance.

[15]   *See*  http://www1.nyc.gov/site/nypd/stats/crime-statistics/crimestatistics-landing.page  (last visited Feb. 10, 2020).

chart details the decline in crime in Times Square from more than 2,500 in 1995 to slightly more than 500 in 2018 — a decline of approximately 80%.

206. Plaintiffs claim that, based upon the U.S. Census Bureau reports on Median Household Income for 1990, 2000, 2005/2009, 2011/2015, the median household income in the Times Square census tract nearly tripled between 1990 and 2011.  See Freeman Affidavit, PJA 221, Fig. 2.

Dated: May 23, 2022                    Respectfully submitted,

                                       **JENNIFER M. KINSLEY, ESQ.**
                                       *Lead Counsel for Plaintiffs in*
                                       *02 Civ 4431 (LJL)*
                                       Kinsley Law Office
                                       P. O. Box 19478
                                       Cincinnati, OH 45219
                                       (513) 708-2595
                                       *kinsleylawoffice@gmail.com*

                                       -and-

                                       **AMIT SHERTZER, ESQ.**
                                       **MITCHEL SCHUSTER, ESQ.**
                                       *Local Counsel for Plaintiffs in*
                                       *02 Civ 4431 (LJL)*
                                       Meister Seelig & Fein LLP
                                       125 Park Avenue, 7th Floor
                                       New York, NY 10017
                                       (212) 655-3500
                                       *as@msf-law.com*
                                       *ms@msf-law.com*


                                       By:    s/Jennifer M. Kinsley
                                              Jennifer M. Kinsley

**EDWARD S. RUDOFSKY, ESQ.**
*Counsel for Plaintiffs in*
*02 Civ 4432 (LJL)*
Zane and Rudofsky
Five Arrowwood Lane
Melville, NY 11747
(917) 913-9697
*ed@rudofskylaw.com*


By:   s/Edward S. Rudofsky
        Edward S. Rudofsky


**G. RANDALL GARROU, ESQ.**
**JEROME M. MOONEY, ESQ.**
*Lead Counsel for Plaintiffs in*
*02 Civ 8333 (LJL)*
Weston Garrou & Mooney
12121 Wilshire Blvd # 525
Los Angeles, CA 90025
(310) 442-0072
*randygarrou@wgdlaw.com*
*jerrym@mooneylaw.com*

-and-

**ALAN ABRAMSON, ESQ.**
*Local Counsel for Plaintiffs in*
*02 Civ 8333 (LJL)*
Abramson & Morak
35 Worth Street, # 3
New York, NY 10013
(212) 226-7098
*alanabramson@abramsonmorak.com*


By:     s/G. Randall Garrou
        G. Randall Garrou

**ERICA T. DUBNO, ESQ.**
*Counsel for Plaintiffs in*
*18 Civ 3732 (LJL)*
Fahringer & Dubno
43 West 43rd St #261
New York, NY 10036
(212) 319-5351
*erica.dubno@fahringerlaw.com*


By:___s/Erica T. Dubno_____
      Erica T. Dubno



**SHERYL NEUFELD, ESQ.**
**MARK MUSCHENHEIM, ESQ.**
**KERRI DEVINE, ESQ.**
*Counsel for Defendants in*
*All Actions*
Office of NYC Corporation Counsel
NYC Law Department
100 Church Street
New York, NY 10007
(212) 356-1000
*sneufeld@law.nyc.gov*
*mmuschen@law.nyc.gov*
*kdevine@law.nyc.gov*


By:___s/Sheryl Neufeld_____
      Sheryl Neufeld