UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------

CLUB AT 60TH STREET, INC., et al.,

                  Plaintiffs,

               -against-                      02 Civ. 8333 (LJL)

THE CITY OF NEW YORK,

                  Defendant.


------------------------------------------------------------------

725 EATERY CORP., et al.,

                  Plaintiffs,

               -against-                      02 Civ. 4431 (LJL)

THE CITY OF NEW YORK, et al.,

                  Defendants.


------------------------------------------------------------------

59 MURRAY ENTERPRISES, INC., et al.

                  Plaintiffs,

               -against-                      02 Civ. 4432 (LJL)

THE CITY OF NEW YORK, et al.,

                  Defendants.

------------------------------------------------------------------

336 LLC, et al.,

                  Plaintiffs,                 18 Civ. 3732 (LJL)

               -against-

THE CITY OF NEW YORK, et al.,

                  Defendants.

------------------------------------------------------------------

## DECLARATION OF SUSAN E. AMRON

        **Susan E. Amron**, declares under the penalties of perjury, pursuant to 28 U.S.C. § 1746, as follows:

        1.     I am the General Counsel_of the New York City Department of City Planning ("DCP"), the city agency which provides staff assistance to the New York City Planning Commission ("Planning Commission"), a position I have held since January 2019.  I am an attorney admitted to practice law in the State of New York, and for twenty eight years before joining DCP I held a variety of positions (including chief) in the Environmental Law Division of the Law Department of the City of New York.  The Planning Commission is generally charged with planning for the orderly growth, development and improvement of the City of New York ("City"); its specific responsibilities include evaluating and giving preliminary approval to amendments of the New York City Zoning Resolution ("Zoning Resolution" or "Z.R.").  See New York City Charter, Chapter 8, §§ 191, et seq.  I make this declaration in support of the defendants' motions for summary judgment in these four lawsuits.

        2.     The Zoning Resolution (and other local laws) regulates the use and development of tracts of land known as zoning lots (e.g., most private property upon which buildings are constructed).  As set forth in its Preamble, in order to protect the "public health, safety and general welfare," the Zoning Resolution addresses, *inter alia,* the height and bulk of buildings and other structures; the area of yards, courts and other open spaces; the density of residential population; and the location of trades, industries and buildings designed for specific uses within the City and, to further these goals, the Zoning Resolution divides the City into districts. Z.R. § 11-01. Specifically, the Zoning Resolution divides the City into three basic types of zoning districts: residential, commercial and manufacturing; within these broad categories there

are numerous subgroups.  The intensity of permitted use on a particular property varies based upon, among other factors, its location.

3.      In 1995, the City amended the Zoning Resolution to include use regulations governing the areas in which adult establishments may be located throughout the City ("1995 Regulations").  These regulations governed the location of commercial establishments with a predominant, on-going focus on sexually explicit materials or activities, including adult or "triple X" book and video stores, many of which provide "peep booths" for private viewing on premises (referred to in the zoning text as "adult book stores"), topless bars and strip clubs (referred to in the text as "adult eating or drinking establishments"), and theaters regularly offering X-rated movies or topless or nude entertainment (referred to in the text as "adult theaters").

4.      By way of amendments to the Zoning Resolution approved by the New York City Council in October, 2001, the 1995 Regulations were amended to modify, as relevant here, the definitions of "adult establishment," "adult book store" and "adult eating or drinking establishment" to more accurately reflect the legislative intent behind the 1995 Regulations; the amendments did not alter the lots where adult uses could be located ("2001 Amendments").

5.      The 2001 amended definitions clarify that all restaurants and bars which "regularly feature" adult entertainment are governed by the adult establishment regulations, no matter the amount of floor area devoted to adult entertainment.  As to adult bookstores, the amendments clarify, among other things, that all stores with peep booths are governed by the adult use regulations, no matter the amount of floor area devoted to adult entertainment.  Other bookstores that do not have peep booths, that do not have adult printed or visual materials that make up a substantial portion of their stock-in-trade, and that otherwise do not have any of the indicia set forth in the definition of "adult establishment," are not adult establishments, do not have

to comply with the adult use regulations, and may be located in any area of the city in which other bookstores may operate.  See Z.R. 12-10, definition of "adult establishment" sub-divisions (1)(a), (2)(d).

6.      Pursuant to these regulations, all adult establishments (including adult bookstores and adult eating or drinking establishments) are allowed in the following commercial zoning districts: C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 and C8, and in most manufacturing ("M") zoning districts; adult establishments are prohibited in residential zoning districts, and in manufacturing and most commercial districts where residential uses are permitted (including MX districts).  The Zoning Resolution treats all adult establishments, including bookstores fitting within that definition, distinctly from non-adult establishments, including non-adult bookstores, and hence, the prohibition against non-adult bookstores in certain zoning districts does not apply to such adult establishments (adult bookstores may be located where all other adult establishments may be located).

7.      The following is a list of zoning districts where adult establishments are currently permitted:

| Not permitted | Permitted |
|---|---|
| All R Districts | |
| *Local commercial service districts:*<br>**C1, C2, C3, C4, C5**<br>**C6-1** through **C6-3** | *Central commercial office districts:*<br>**C6-4** through **C6-9**<br>**C7, C8**<br>• limited to 10,000 sf or less<br>• at least 500' from other adult uses, houses of worship, schools, or most boundaries of zoning districts in which adult uses are not permitted |
| M1-[x]D (which allow joint living-work quarters for artists)<br>M1-5A, M1-5B, M1-5M, M1-6M,<br>MX Special Districts | **M1, M2, M3**<br>• limited to 10,000 sf or less<br>• at least 500' from other adult uses, houses of worship, schools, or the boundaries of zoning districts in which adult uses are not permitted, except permitted within 500 feet of a boundary of a M1-6M |

Adult establishments that are not in any of these permitted zoning districts will have to relocate once the 2001 Amendments are enforced.

8.      To the extent these zoning districts are rezoned to other zoning districts that do not permit adult establishments, such rezoned districts will not be available for relocation of adult uses.  And in the event of such re-zonings, existing adult establishments must terminate within one year from the date they become non-conforming.[1]  Also limiting the availability of lots for relocation of adult establishments is the fact that in those zoning districts where adult establishments are permitted, they are subject to the further requirement that no new adult establishments may locate within 500 feet of a house of worship, a school or another adult establishment (known as sensitive receptors).  However, in areas where adult establishments have or will be lawfully established, to the extent that thereafter one or more sensitive receptors locate within 500 feet of an adult establishment, the adult establishment may remain notwithstanding the subsequent addition of a sensitive receptor.

9.      The parties agree that currently there are ten adult establishments that will not have to relocate if the 2001 Amendments are enforced.  2022 Joint Statement of Facts ("JSF"), at ¶ 167.[2]  The parties also agree that 32 adult establishments will have to relocate if the 2001 Amendments are enforced.  JSF, at ¶ 170.  Of those that will have to relocate, there are numerous

---

[1]     Although Z.R. Section 52-77 does establish a route whereby adult establishments may seek permission from the New York City Board of Standards and Appeals to continue in business for a period of longer than a year in order to amortize the costs of such establishments, the provision has never been timely utilized, to the knowledge of the Department of City Planning.

[2]     The ten adult establishments are spread across all five boroughs: four in Manhattan (Larry Flint's Hustler Club, Rick's Cabaret New York and Vivid Cabaret, adult eating and drinking establishments, and 300 Video Center, an adult bookstore), two in Queens (Sugardaddy's Gentlemen's Club and Show Palace, adult eating and drinking establishments), two in Brooklyn (Peyton's Gentlemen's Club and Pumps, adult eating and drinking establishments), one in the Bronx (J.R.'s Cabaret, an adult eating and drinking establishment) and one in Staten Island (Nitecap, an adult bookstore).  In addition, there is an adult theater in Queens, the Fair Theatre, that will not have to relocate as a result of a lawsuit between the Fair Theatre and the City.  JSF, at ¶ 182.

lots in New York City where these 32 adult establishments can operate.  Specifically, there are likely over 1,700 lots where these adult establishments could relocate.  JSF, at ¶ 145 & 2022 Judicial Notice Request ("JNR"), Ex. 71.

10.     To reach this determination, beginning in December 2019 DCP conducted an extensive Geographic Information Systems ("GIS") analysis of potentially available lots throughout New York City.[3]  To start, DCP identified adult establishment exclusion areas by creating 500' buffer areas around three zoning uses:  zoning districts where adult establishments are not allowed under the zoning resolution, houses of worship and schools (including kindergarten through 12th grade, pre-kindergarten and registered day cares).  DCP then established 500' buffers around 72 lots that appeared to be adult establishments.  DCP also eliminated an M3-1 district in the Brooklyn core covering parts of Greenpoint and Williamsburg along Newtown Creek that was proposed for rezoning (that proposal was not adopted), and also eliminated the M districts that were proposed to be rezoned in the Gowanus area of Brooklyn.  After merging these exclusion areas, DCP then excluded lots within these buffers, but kept parts of lots falling outside these buffers.  5,009 lots remained after this process, and these lots were subject to further review.

---

[3]  The precise methodology followed, and the databases used, by DCP were provided to plaintiffs in response to specific questions that plaintiffs had propounded (JNR Ex. 71-1), and are set forth in the instruction sheet to DCP staff that conducted the analysis and the detailed technical methodology.  JNR Ex. 71-2.  Defendants also provided four Excel spread sheets containing the permutations for best and worst case scenarios if adult use establishments sought to simultaneously relocate in these 1,700 plus lots.

11.     A further review resulted in the removal of lots that were publicly owned, parks, or identified as being used for transportation or utility purposes, as well as lots that were smaller than 5,000 square feet.[4]  These exclusions left 2,217 remaining lots.

12.     These 2,217 lots were then each manually reviewed by DCP staff using various computer programs, and their knowledge of the areas.  Specifically, eight DCP staff each reviewed approximately 275 lots.  These staff members were directed to check the ownership and use of each lot and exclude lots that were publicly owned or appeared to contain a house of worship, a school, major infrastructure (such as railways, heliports, or roads) or major utilities (such as Con Edison, National Grid, or Port Authority) in active use.   Staff were also directed to exclude lots without street frontage or that appeared too irregular to develop.  If the reviewer was uncertain about whether the use was an excluded use, the reviewer was directed to identify the lot as questionable.[5]  Of the 2,217 lots reviewed by DCP planners, 514 were excluded as either fitting the above criteria or questionable.  The remaining 1,703 lots were identified as available for adult use establishments.

---

[4]  As noted in defendants' opposition papers to the plaintiffs' preliminary injunction motion, many of the adult bookstores are located in buildings on lots that are less than 5,000 square feet. 1/30/19 Laremont Decl. Ex. A.  For instance, the building where plaintiff Chelsea 7 Corp. is located has less than 5,000 square feet. Id.  Similarly, the building where plaintiff Video Lovers Inc. is located has less than 5,000 square feet. Id.

[5]  As is apparent, DCP expended numerous resources conducing this manual review of over 2,200 lots.  In addition to the eight DCP staff members that reviewed over 2,200 lots, DCP's data engineering team created a proximity model to determine the number of available lots if adult use establishments sought to simultaneously relocate to the 1,703 lots.  The entire project was overseen by DCP's GIS Team lead and Open Data Coordinator, Matthew Croswell, who performed the GIS analysis described in paragraphs 10 and 11 above; and throughout the project Mr. Croswell frequently consulted with me.  Recreating this project to update the data would be a significant (and unwarranted) expenditure of DCP resources.  More importantly, such an update would not change the results in any substantial manner since there has only been one major re-zoning since December 2019 (that was not taken into account in DCP's analysis), the SoHo/NoHo rezoning in Manhattan that did not result in any significant decrease in the number of available lots.

13.     The 1,703 number is a very conservative count of the actual number of available lots since, as noted, DCP eliminated all lots that were deemed questionable, all potential lots in the M3-1 district along Newtown Creek, and all lots less than 5,000 square feet. In addition, DCP measured the 500 foot buffer from the lot line of the above mentioned 72 lots that appeared to be adult establishments, not the principle entrances of the establishment as permitted by the City's Department of Buildings. JNR, Ex. 18, at 6. As a result, the number of available lots for relocation by adult establishments is likely well above the 1,703 number.[6]

14.     DCP recognizes that if an adult establishment relocates to one of the 1,703 available lots, the number of remaining lots available for such use may be further reduced due to the buffer requirement in Z.R. Sections 32-01(c), 42-01(c) and 42-01(d) (which requires a 500-foot buffer from existing adult establishments for new adult establishments), and the prohibition (Z.R. Section 32-01(d)) against more than one adult establishment on a zoning lot. DCP analyzed what the effect would be on the 1,703 available lots if adult establishments were located in these available lots; in that case, there would be at least 245 lots available (including 147 available lots where adult bookstores could be located if, assuming arguendo, they were not permitted in M2 and M3 districts, as the bookstore plaintiffs assert).

15.     The areas in Manhattan permitting adult establishments, such as the Hudson Yards, Meatpacking and Hell's Kitchen neighborhoods, are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial uses. And these areas are largely accessible by public transportation. The zoning districts mapped in these neighborhoods are high-density commercial districts which

---

[6]  DCP did not exclude from its analysis coastal areas since the City's shoreline materially remains unchanged since 2002, and does not affect the areas available for adult establishments.

are typically only mapped in areas with a high degree of transit accessibility as well as an established pattern of commercial development, where a high degree of future commercial development is anticipated. Thus, these districts are typically vibrant, flourishing commercial centers supporting a wide range of activities from professional offices to entertainment uses. Given their accessibility to regional rail connections, multiple subway lines and bus routes, these districts attract a wide range of potential customers, and are therefore some of the most desirable locations to locate for commercial establishments of all types.

16.     Similarly, the available lots in Brooklyn are in various neighborhoods such as Sunset Park, Coney Island, East New York, Downtown Brooklyn, and Red Hook, that are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial uses.  Moreover, some of these neighborhoods, such as Downtown Brooklyn and Red Hook, as well as North Brooklyn, have developed hotels with over 2,000 rooms for tourists and are located in or near M1 districts, where adult entertainment uses are permitted. And these areas are largely accessible by public transportation.  As with the examples in Manhattan, the districts mapped in these neighborhoods are in easily accessible areas with an established commercial character, which feature a vibrant mix of professional, entertainment, and other commercial uses, benefitting from the access to a broad base of potential customers provided by multiple subway lines and bus routes.

17.     The available lots in Queens are located in various neighborhoods, including Long Island City, Sunnyside, Maspeth and College Point, that provide access to the city's broad customer base through their proximity to multiple subway lines and bus routes. These areas have an established pattern of commercial development, and in addition to their transit accessibility, have a high degree of accessibility to customers arriving by taxi, personal

automobile, and increasingly, users of ride-hailing services. Given this unique mix of accessibility, these neighborhoods have a high degree of commercial activity suitable for a wide range of potential establishments. Moreover, some of these neighborhoods, such as Long Island City, La Guardia, Flushing and Jamaica-JFK have developed hotels with over 3,000 rooms for tourists and are located in M1 districts where adult entertainment uses are permitted.

18.     The Bronx neighborhoods with available lots, including Hunts Point, Port Morris/Mott Haven and Eastchester, provide access to the City's broad customer base through their proximity to multiple subway lines and bus routes. These areas have an established pattern of commercial development, and in addition to their transit accessibility, have a high degree of accessibility to customers arriving by taxi, personal automobile, and increasingly, users of ride-hailing services. Given this unique mix of accessibility, these neighborhoods have a high degree of commercial activity suitable for a wide range of potential establishments. The Bronx has over 1,000 hotel rooms available for tourists who could be using Bronx-based entertainment establishments. Approximately 36 percent of hotel rooms in the Bronx are located in M1 districts where adult establishments may be located.

19.     Finally, the lots available in Staten Island are located in a variety of neighborhoods include the West Shore and Charleston, which are characterized by an established pattern of commercial development, albeit on a smaller scale than that in other boroughs. These areas are transit-accessible to borough residents by car, but transit accessibility from outside the borough is more limited than in similar areas in other boroughs, due to the lack of robust public transit options.

20.     Plaintiffs have argued that each borough should be considered separately to determine where permissible adult uses may locate, given that they are different counties. This

assertion is simply incorrect.   New York City encompasses five county-level administrative divisions called boroughs, and each borough is coextensive with a respective county.   Pursuant to Chapter 8 of the New York City Charter, DCP is responsible for planning and zoning for the entire City, including all five boroughs.   Hence, the consideration of where adult establishments may locate must be undertaken on a City-wide basis, as is the case with respect to all uses under zoning. As is clear from the above analysis, there is more than sufficient space in vibrant areas within the City of New York for adult establishments to operate.

Dated:        New York, New York
              June 22, 2022

                                              Susan E. Am

                                         SUSAN E. AMRON