UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------

CLUB AT 60TH STREET, INC., et al.,

                          Plaintiffs,

                          -against-                              02 Civ. 8333 (LJL)

THE CITY OF NEW YORK,

                          Defendant.


-------------------------------------------------------------------

725 EATERY CORP., et al.,

                          Plaintiffs,

                          -against-                              02 Civ. 4431 (LJL)

THE CITY OF NEW YORK, et al.,

                          Defendants.


-------------------------------------------------------------------

59 MURRAY ENTERPRISES, INC., et al.

                          Plaintiffs,

                          -against-                              02 Civ. 4432 (LJL)

THE CITY OF NEW YORK, et al.,

                          Defendants.

-------------------------------------------------------------------

336 LLC, et al.,

                          Plaintiffs,                            18 Civ. 3732 (LJL)

                          -against-

THE CITY OF NEW YORK, et al.,

                          Defendants.

-------------------------------------------------------------------


# DEFENDANTS' MEMORANDUM OF LAW
# IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

HON. SYLVIA HINDS-RADIX
Corporation Counsel of the City of New York
*Attorney for Defendants*
100 Church Street
New York, New York 10007
(212) 356-2214

SHERYL NEUFELD
MARK MUSCHENHEIM
KERRI DEVINE
      Of Counsel

September 16, 2022

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF MATERIAL FACTS .............................................................. 5

HISTORY OF ADULT USE ZONING IN NEW YORK CITY ....................................... 5

DCP'S RECENT ANALYSIS OF LAND AREA AVAILABLE FOR 100% ADULT
ESTABLISHMENTS ......................................................................................... 13

PERMITTING OF ADULT ESTABLISHMENTS IN NEW YORK CITY ............................ 16

ARGUMENT

       POINT I

               LIKE THE 1995 REGULATIONS, THE 2001
               ADULT USE AMENDMENTS WITHSTAND
               FIRST AMENDMENT SCRUTINY. ADOPTED
               TO CLOSE LOOPHOLES IN THE 1995
               REGULATIONS, THE 2001 AMENDMENTS
               ADVANCE SUBSTANTIAL GOVERNMENT
               INTERESTS AND LEAVE OPEN REASONABLE
               ALTERNATIVE AVENUES OF
               COMMUNICATION. ................................................................. 17

            A.   Under Well-Established Zoning Law, the 2001
                   Adult Use Amendments Are Presumptively
                   Valid. ................................................................. 17

            B.   The 1995 Adult Use Regulations Have Been
                   Declared Constitutional By Both the New York
                   State Court of Appeals and the United States
                   Court of Appeals for the Second Circuit. ......................................... 21

            C.   Enforcement of the 1995 Adult Use
                   Regulations Led to Sham Compliance and the
                   Adoption of the 2001 Amendments................................................. 23

            D.   The 2001 Amendments are Constitutional for
                   the Same Reasons the 1995 Regulations Were
                   Found to Be Constitutional.............................................................. 25

**Page**

1. The 2001 Amendments are Content-neutral. ..................................................26

2. The 2001 Amendments are narrowly tailored to achieve a substantial governmental interest............................26

3. The 2001 Amendments afford ample alternative means of communication. ...................................32

4. Plaintiffs' anticipated arguments regarding Reed and Rock Against Racism are not persuasive. ................................38

POINT II

THE DOB PERMITTING PROCEDURES APPLICABLE TO ADULT ESTABLISHMENTS ARE CONSTITUTIONAL........................................................................40

A. Plaintiffs' Claims With Respect to the Permitting Procedures are Moot. ......................................41

B. Plaintiffs Lack Standing to Facially Challenge the Permitting Procedures Applicable to Adult Establishments. ..................................................42

C. The Permitting Procedures Applicable to Adult Establishments Are Not a Content-Based Prior Restraint on Expression. ...................................45

   1. The permitting procedures are not subject to strict scrutiny.....................................45

   2. The permitting procedures do not require time limits to survive a facial challenge. ..........................................47

   3. Even if time restrictions were required, the City's permitting procedures satisfy that requirement. ...................................49

D. The City's Permitting Procedures for Adult Establishments do not Create a "Sensitive Use Veto."..................................................51

ii

**Page**

    E.    The Permitting Procedures do not Violate Plaintiffs' Right to Equal Protection of the Law. ...............................................................................54

POINT III

    THE BOOKSTORE PLAINTIFFS' DUE PROCESS CLAIM FAILS AS A MATTER OF LAW...........................................56

        1.    Plaintiffs were not entitled to notice and an opportunity to be heard with respect to the 2001 Amendments as they are legislative.....................................................56

        2.    Plaintiffs' failure to identify a liberty or property interest they were deprived of is fatal to their due process claims. ......................57

        3.    To the extent the Bookstore plaintiffs assert a claim for violation of substantive due process, it fails as a matter of law. ........................................59

POINT IV

    PLAINTIFFS' CHALLENGE TO THE ONE YEAR TERMINATION PERIOD APPLICABLE TO ADULT ESTABLISHMENTS AS WELL AS THEIR ALTERNATIVE CLAIM THAT THE ONE YEAR ENFORCEMENT DATE SHOULD NOT COMMENCE UNTIL THE 2001 AMENDMENTS BECOME ENFORCEABLE BOTH FAIL. ...............................59

CONCLUSION.....................................................................................65

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

725 Eatery Corp. v. City of New York,
   408 F. Supp.3d 424 (S.D.N.Y. 2019) .................................................................................2

801 Conklin St. Ltd. V. Town of Babylon,
   38 F. Supp. 2d 228 (E.D.N.Y. 1999) ........................................................................59, 61

Agostini v. Felton,
   521 U.S. 203 (1997)...................................................................................................38

BBL, Inc. v. City of Angola,
   809 F.3d 317 (7th Cir. 2015) .......................................................................................38

Ben's Bar, Inc. v. Vill. of Somerset,
   316 F.3d 702 (7th Cir. 2003) ..................................................................................25, 36

Buzzetti v. City of New York,
   140 F.3d 134, 141 (2d Cir.),
   cert. denied, 525 U.S. 816 (1998)...................................................................23, 26, 33

Calvary Chapel Bible Fellowship v. Cty. of Riverside,
   2017 WL 6883866 (C.D.Cal. Aug. 18, 2017)
   aff'd, 948 F. 3d 1172 (9th Cir. 2020) ...........................................................................42

City of Austin v. Reagan Nat'l Adver. Of Austin, LLC,
   142 S. Ct. 1464, 1473 (2022)......................................................................................46

City of Eastlake v. Forest City Enterprises, Inc.,
   426 U.S. 668 (1976)...................................................................................................17

City of Erie v. Pap's A.M.,
   529 U.S. 277 (2000) (plurality opinion) .......................................................................18

City of Los Angeles v. Alameda Books, Inc.,
   535 U.S. 425 (2002)..........................................3, 11, 12, 25, 26, 27, 28, 36, 37, 38

City of New York v. Dezer Properties,
   259 A.D.2d 116, 697 N.Y.S.2d 41 (1st Dept. 1999),
   rev'd, 95 N.Y.2d 771, 710 N.Y.S.2d 836 (2000) .................................................30

City of New York v. Dezer Properties,
   95 N.Y.2d 771 (2000)............................................................................................9, 24

**Cases**                                                                                                    **Pages**

City of New York v. Dezer Properties,
   259 A.D.2d 116, 121, 697 N.Y.S.2d 41 (1st Dept. 1999),
   rev'd, 95 N.Y.2d 771, 710 N.Y.S.2d 836 (2000) ..................................................................30

City of New York v. J & J Tummy Yummies d/b/a Naked City,
   179 Misc.2d 527, 679 N.Y.S.2d 807 (Sup.Ct. Queens Co. 1998) ..........................................30

City of New York v. Les Hommes,
   94 N.Y.2d 267 (1999).................................................................................................9, 24, 31

City of New York v. Show World,
   178 Misc.2d 812 (Sup. Ct. N.Y. Co. 1998) ..........................................................................31

City of Renton v. Playtime Theatres, Inc.,
   475 U.S. 41 (1986)................................................18, 19, 20, 21, 25, 26, 34, 37, 38, 39, 53, 62

City v. Les Hommes,
   258 A.D.2d 284 (1st Dept.),
   rev'd, 94 N.Y.2d 267 (1999) ...............................................................................................30

College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,
   527 U.S. 666 (1999)..............................................................................................................57

Columbus Ale House, Inc. v. Cuomo,
   495 F. Supp. 3d 88 (E.D.N.Y. 2020) .............................................................................57, 58

Conn v. Gabbert,
   526 U.S. 286 (1999)..............................................................................................................58

Covenant Media of S.C., LLC v. City of N. Charleston,
   493 F.3d 421 (4th Cir. 2007) .....................................................................................46, 48, 49

Ctr. for Fair Pub. Policy v. Maricopa Cnty.,
   336 F.3d 1153 (9th Cir. 2003),
   cert. denied, 541 U.S. 973 (2004) .......................................................................................25

Dean v. Town of Hempstead,
   527 Supp. 3d 347 (E.D.N.Y. 2021) ......................................................................................45

DLS Inc. v. City of Chattanooga,
   107 F.3d 403 (6th Cir. 1997) ................................................................................................62

Entm't Prods., Inc. v. Shelby Cnty.,
   721 F.3d 729 (6th Cir. 2013) ................................................................................................25

**Cases**                                                                                          **Pages**

FCC v. Beach Communications, Inc.,
   508 U.S. 307 (1993)..................................................................................................55

Field Day, LLC v. County of Suffolk,
   463 F.3d 167 (2d Cir. 2006) ................................................................................48, 51

Fisher v. United States Atty.,
   722 F. App'x 40 (2d Cir. 2018) ................................................................................41

For the People Theatres of N.Y. Inc. v City of New York,
   29 N.Y.3d 340 (2017)................................................1, 2, 3, 11, 12, 21, 29, 31, 32, 39

For the People Theatres of N.Y. Inc. v City of New York,
   20 A.D. 3d 1 (2005)..............................................................................................59, 63

Fox v. Bd. Of Trs. Of the State Univ.,
   42 F.3d 135 (2d Cir. 1994) ................................................................................ 41-42

Free Speech Coal., Inc. v. AG United States,
   825 F.3d 149 (3d Cir. 2016) ................................................................................38, 39

Freedman v. Maryland,
   380 U.S. 51 (1965)..........................................................................................47, 48, 49

FW/PBS, Inc. v. City of Dallas,
   493 U.S. 215 (1990)............................................................................................47, 48

Gasparo v. City of New York,
   16 F. Supp. 2d 198 (E.D.N.Y. May 28, 1998)..........................................................62

Granite State Outdoor Adver., Inc., v. City of St. Petersburg,
   348 F.3d 1278 (11th Cir. 2003) ................................................................................48

H.D.V.- Greektown, LLC v. City of Detroit,
   568 F.3d 609 (6th Cir. 2009) ..............................................................................48, 50

Hart Book Stores, Inc. v. Edmisten,
   612 F.2d 821 (4th Cir. 1979) ................................................................................59

Heffron v. Int'l Soc'y for Krishna Consciousness,
   452 U.S. 640 (1981)................................................................................................36

Heller v. Doe,
   509 U.S. 312 (1993)................................................................................................55

**Cases**                                                                                    **Pages**

Hickerson v. City of New York,
 146 F.3d 99 (2d Cir. 1998),
 cert. denied, 525 U.S. 1067 (1999).......................................................21, 23, 32, 33, 36, 37, 39

Hopkins Hawley LLC v. Cuomo,
 518 F. Supp. 3d 705 (S.D.N.Y. 2021) ..................................................................................56

Hu v. City of New York,
 927 F.3d 81 (2d Cir. 2019) ............................................................................................ 57-58

Isbell v. City of San Diego,
 258 F.3d 1108 (9th Cir. 2001) ..............................................................................................55

JWJ Indus., Inc., v. Oswego Cty.,
 538 F. App'x 11 (2d Cir. 2013) .............................................................................................58

Lakewood v. Plain Dealer Pub. Co.,
 486 U.S. 750 (1988).........................................................................................42, 44, 45, 51

Lederman v. N.Y. City Dep't of Parks & Rec.,
 2010 WL 2813789 (S.D.N.Y. July 16, 2010) .......................................................................62

Logan v. Zimmerman Brush Co.,
 455 U.S. 422 (1982).............................................................................................................57

Lund v. City of Fall River,
 714 F.3d 65 (1st Cir. 2013)...................................................................................................34

Lungian Enters. v. Town of Windsor Locks,
 272 F. Supp. 3d 289 (D. Conn. 2017)..............................................................................46, 47

McCullen v. Coakley,
 134 S. Ct. 2518 (2014)..........................................................................................................39

Nat'l Endowment for the Arts v. Finley,
 524 U.S. 569 (1998)...............................................................................................................3

Nectow v. City of Cambridge,
 277 U.S. 183 (1928)..............................................................................................................17

New York Pet Welfare Ass'n v. City of New York,
 143 F. Supp. 3d 50 (E.D.N.Y. 2015),
 aff'd 850 F.3d 79 (2d Cir.),
 cert denied, 138 S. Ct. 131 (2017) .......................................................................................56

**Cases**                                                                          **Pages**

O'Bannon v. Town Court Nursing Center,
    447 U.S. 773 (1980)..............................................................................57

Our Wicked Lady LLC v. Cuomo,
    2021 WL 915033 (S.D.N.Y. Mar. 9, 2021)............................................56

Pao Xiong v. City of Moorhead,
    641 F. Supp. 2d 822 (D. Minn. 2009)....................................................59

Pena v. DePrisco,
    432 F.3d 98 (2d Cir. 2005) ...................................................................58

Pollok v. Chen,
    2020 WL 1456495 (2d Cir. 2020) ........................................................58

Reed v. Town of Gilbert, Arizona,
    576 U.S. 155 (2015)..........................................................................38, 39

S. Or. Barter Fair v. Jackson County,
    372 F.3d 1128 (9th Cir. 2004) ...................................................43, 48, 49

Sanchez v. Turner,
    2022 WL 1343754 (S.D.N.Y. June 19, 2002) .......................................62

Sanitation & Recycling Indus. v. City,
    925 F. Supp. 407 (S.D.N.Y. 1996) .......................................................57

Savage v. Mills,
    478 F. Supp. 3d 16 (D. Me. 2020)........................................................57

SDJ, Inc. v. Houston,
    837 F.2d 1268 (5th Cir. 1988) ..............................................................59

Snyder v. Buck,
    75 F. Supp. 902 (D.D.C. 1948)............................................................64

South Gwinnett Venture v. Pruitt,
    491 F.2d 5 (5th Cir.), cert. denied, 419 U.S. 837 (1974)......................17

Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.,
    560 U.S. 702 (2010)..............................................................................57

Story v. Green,
    978 F.2d 60 (2d Cir. 1992) ...................................................................62

**Cases**                                                                                                    **Pages**

Stringfellow's of New York, Ltd. v. City of New York,
   91 N.Y.2d 382 (1998) ........................................................................6, 8, 21, 22, 23, 29, 40, 59

Thomas v. Chi. Park Dist.,
   534 U.S. 316 (2002)........................................................................................47, 48, 49

TJS of N.Y. Inc. v. Town of Smithtown,
   598 F.3d 17 (2d Cir. 2010) ...........................................................................33, 34, 37

Tollis Inc. v. Cnty. of San Diego,
   505 F.3d 935 (9th Cir. 2007) ...............................................................................37

Town of Islip v. Caviglia,
   73 N.Y.2d 544 (1989)............................................................................20, 21, 60, 61, 63

United States v. Morrison,
   521 F. Supp. 2d 246 (E.D.N.Y. 2007),
   aff'd in part and rev'd in part on other grounds, 686 F.3d 94 (2d Cir. 2012).........................64

Ward v. Rock Against Racism,
   491 U.S. 781 (1989).........................................................................................39, 50, 51

Whalin v. Sears Roebuck & Co.,
   1995 WL 68823 (N.D. Ill. Feb. 13, 1995) ...............................................................64

World Wide Video of Wash., Inc. v. City of Spokane,
   368 F.3d 1186 (9th Cir. 2004) ...........................................................................37, 59

Young v. Am. Mini Theatres, Inc.,
   427 U.S. 50 (1976).......................................................................................18, 19, 26, 62

Young v. City of Simi Valley,
   216 F.3d 807 (9th Cir. 2000) ......................................................................25, 51, 52, 53, 54

**Statutes**

Admin. Code § 28-104.1 .....................................................................................43

Admin. Code § 28-104.2 ...............................................................................43, 44, 49

Admin. Code § 28-104.2.7 .............................................................................49, 50, 52, 54

Admin. Code § 28-104.2.8 ...............................................................................49, 50

**Statutes**                                                                  **Pages**

Admin. Code § 28-105.1 ....................................................................43, 44, 47, 50

Admin. Code § 28-105.4 ..............................................................................43

NYC Charter Chapter 8 ..............................................................................16

Z.R. §12-10 ............................................................................................64

Z.R. § 32-01(c) .........................................................................................14

Z.R. § 32-01 (d) ........................................................................................14

Z.R. § 52-77 ....................................................................................58, 59, 63

Z.R. § 72-41 .......................................................................................58, 59

## PRELIMINARY STATEMENT[1]

In June 2017, after close to 16 years of litigation, the New York State Court of Appeals issued a lengthy and well-reasoned decision[2] upholding, under both the United States and New York State constitutions, the provisions of law challenged by the plaintiffs herein – namely, amendments to the New York City Zoning Resolution ("Zoning Resolution" or "Z.R.") approved by the New York City Planning Commission ("Planning Commission") on August 8, 2001 and adopted by the New York City Council ("City Council") on October 31, 2001 ("the 2001 Adult Use Amendments" or "the 2001 Amendments").  The 2001 Amendments clarify the application of the City's zoning provisions governing the siting of "adult establishments" – i.e., establishments having a predominant, ongoing focus on sexually oriented materials or entertainment.  Under the 2001 Amendments, plaintiffs and other adult eating or drinking establishments (a/k/a topless bars and strip clubs) and adult bookstores (typically stores with "peep booths" for the on-site viewing of adult videos) now operating on a 60% non-adult, 40% adult basis ("60/40 establishments") in areas of the City where adult establishments are not allowed, must comply with the City's adult use zoning regulations either by relocating or, in the case of bookstores, complying with the operational requirements (including removal of their booths for on-site viewing of adult videos) set forth in the Zoning Resolution.

---

[1] In an effort to avoid duplicate filings, this memorandum of law is submitted in support of the City's motion for summary judgment on the entirety of the most recent complaints filed in all of the four above-captioned matters.  Specifically, Club at 60th Street, Inc. case [ECF No. 42]; 725 Eatery Corp. [ECF No. 77], and 59 Murray Enterprises Inc. [ECF No. 26] (collectively "Club cases") and 336 LLC, d/b/a "the Erotica, et. al." [ECF No. 26] ("Bookstore case").

[2] For the People Theatres of N.Y. Inc. v City of New York, 29 N.Y.3d 340 (2017) ("People Theatres").

Immediately following the issuance of the Court of Appeals' decision, plaintiffs herein notified the City of their intent to revive previously discontinued litigation, or in the case of the bookstores, commence new litigation, challenging these same zoning amendments, should the state court plaintiffs be unsuccessful in seeking review by the United States Supreme Court.[3]   The Supreme Court denied certiorari in February 2018 and the instant litigation ensued, including the filing of motions by plaintiffs for a preliminary injunction enjoining the enforcement of the 2001 Amendments during the pendency of this litigation.[4]

Plaintiffs' preliminary injunction motions, which were opposed by defendants, were decided by Judge Pauley in a lengthy decision filed on September 20, 2019.   725 Eatery Corp. v. City of New York, 408 F. Supp.3d 424 (S.D.N.Y. 2019) ("PI decision").   While he granted the preliminary injunction, Judge Pauley nonetheless largely disagreed with the primary arguments advanced by plaintiffs in support of these latest challenges to the 2001 Amendments.   Indeed, as is apparent from Judge Pauley's decision, the primary concern expressed, and the reason for granting the preliminary injunction, was that the City had not demonstrated that there were, in fact, sufficient alternative areas for current 60/40 establishments to relocate, as the City had completed a lot by lot analysis of the available areas in Manhattan only at the time it opposed the plaintiffs' motion.   As detailed herein, the New York City Department of City Planning ("DCP") has now undertaken a detailed lot by lot analysis citywide and has determined that there are over 1700

---

[3] The Club cases were initially commenced in 2002.   Shortly after their commencement the City moved for summary judgment. In 2003, prior to a decision on those motions, the Club cases were administratively closed by this Court as a result of the State Supreme Court having issued a decision (later overturned) declaring the 2001 Amendments to be unconstitutional.

[4] The 2001 Amendments would have been enforceable against 60/40 establishments as of November 1, 2002, but for interim injunction orders issued by the New York State Supreme Court temporarily enjoining their enforcement.   See Litigation history, outlined in People Theatres, supra.

locations throughout the City where adult establishments are permitted to operate. To the extent plaintiffs may take issue with any number of these sites, defendants submit that there is no question that even a small fraction of sites would be legally sufficient and warrant upholding the 2001 Amendments as a matter of law.

As set forth in their complaints, the thrust of plaintiffs' challenge to these already upheld zoning amendments is the availability and viability of alternative sites for adult establishments that must now relocate to areas of the City where adult establishments are permissible. In this regard, plaintiffs theorize that, notwithstanding the New York State Court of Appeals' People Theatres decision, the 2001 Amendments are actually unconstitutional because intervening changes to the City's zoning map allegedly reduce the areas of the City open to relocating adult establishments, and Justice Kennedy's concurring opinion in City of Los Angeles v. Alameda Books, Inc., 535 U.S. 425 (2002) ("Alameda Books") changed the applicable standard of review so as to require an assessment of whether a "secondary effects" ordinance reduces the quantity and accessibility of protected speech. Not only has the applicable standard of review not changed – as Judge Pauley appropriately recognized in his decision on plaintiffs' preliminary injunction motions—the results of the comprehensive citywide analysis undertaken by DCP demonstrate that that there are a legally sufficient number of alternative channels for plaintiffs' expression.

Plaintiffs also raise a series of secondary challenges, none of them availing. First, plaintiffs claim that by requiring non-conforming adult establishments to terminate after a period of time allowed for amortization (rather than remain subject to requirements in zoning for non-conforming uses), their Fourteenth Amendment equal protection rights will be violated. Plaintiffs also allege that these mandatory termination provisions constitute an invalid content-based

restriction in violation of the First Amendment. While Judge Pauley did not reach these claims in deciding the preliminary injunction motions, it is nonetheless clear that defendants are entitled to summary judgment dismissing them. First, amortization provisions akin to the ones at issue here have routinely been upheld by reviewing courts. Second, despite the one-year amortization period, all of the club plaintiffs and many of the bookstore plaintiffs have in effect benefitted from a nearly twenty-year amortization period due to the protracted litigation concerning the 2001 Amendments. For those bookstore plaintiffs that opened more recently, they did so knowing (or reasonably being expected to know) about the enactment of the 2001 Amendments and the ongoing court challenges to those amendments. Third, adult establishments are simply not similarly situated to other establishments that are permitted to remain as non-conforming uses at locations where zoning regulations have changed; nor is the mandatory termination requirement based upon the content of speech, and thus there is no Equal Protection or Due Process violation here.

The Bookstore plaintiffs also assert a cause of action for deprivation of property under the Fourteenth Amendment's Due Process Clause. While it is unclear whether this cause of action is premised on an alleged violation of procedural or substantive due process, either fails as a matter of law. The Bookstore plaintiffs were not entitled to procedural due process prior to the enactment of the 2001 Amendments as they are legislative and not subject to the requirements of notice and an opportunity to be heard. Even were that not the case, plaintiffs have not been deprived of the ability to operate their adult establishments, a fatal defect to a procedural due process claim. Rather, the 2001 Amendments have merely restricted the number of locations in which adult establishments may operate. To the extent the Bookstore plaintiffs assert a violation of substantive due process, this claims fails as the Bookstore plaintiffs do not even allege that the 2001 Amendments are conscience shocking. Moreover, the 2001 Amendments cannot be so

4

arbitrary so as to rise to a substantive due process violation when they withstand First Amendment scrutiny.

Finally, all plaintiffs assert a facial challenge to the permitting procedures employed by the City's Department of Buildings ("DOB") for adult establishments, alleging that they constitute an unconstitutional prior restraint on expression in violation of the First Amendment and discriminate against adult establishments in violation of the Fourteenth Amendment. The permitting procedures challenged by plaintiffs are those generally applicable to all types of buildings and establishments and entirely separate and apart from the 2001 Amendments. This claim is largely moot as it is premised on two aspects of the current permitting procedures which will no longer be applicable should the 2001 Amendments be upheld. Additionally, plaintiffs lack standing to facially challenge the applicable permitting procedures as they are content neutral and applied to adult establishments and non-adult establishments alike, and not specific to expressive activity. In any event, the currently applicable permitting procedures for adult establishments do not constitute a content-based prior restraint on expression subject to strict scrutiny.

## STATEMENT OF MATERIAL FACTS

### HISTORY OF ADULT USE ZONING IN NEW YORK CITY

In 1995, the City amended the Zoning Resolution to include use regulations governing establishments that deal principally in sexually oriented adult entertainment ("the 1995 Adult Use Regulations" or the "1995 regulations") to address their negative secondary effects, including increased crime, diminished property values, reduced shopping and commercial activity, and a perceived decline in residents' quality of life, as identified by the DCP in an "Adult Entertainment Study" completed in September 1994 ("1994 DCP Study"), while at the same time allowing sufficient opportunity for access to adult materials. See 1995 City Planning Commission

Report ("1995 CPC Report") - Exhibit 41-3 to the Parties' Judicial Notice Request ("JNR")[5] - at

Bates No. 401, 405.[6]  See also CPC Resolution approving 1995 Text Amendments, JNR Exhibit

1; and Declaration of Susan E. Amron, DCP General Counsel dated June 22, 2022 ("DCP Dec."

or "Amron Declaration"), at ¶ 3.  The PI decision contains a lengthy recitation of the purpose,

contents, conclusions and recommendations of the 1994 DCP Study,  PI Decision, 408 F. Supp.

3d at 432-37, as well as a lengthy discussion of the 1995 CPC Report accompanying the proposed

1995 regulations and the public review process that preceded their enactment. Id. at 437-41.  See

also 1994 DCP Study, JNR Exhibit 41 and 1995 CPC Report, JNR Exhibit 41-3.

        The 1995 regulations were intended to apply to book and video stores, theaters,

eating or drinking establishments and other commercial enterprises with a "predominant, on-going

focus on sexually explicit materials or activities," while allowing "general interest book or video

stores with a selection of adult materials that is modest in scale as compared to the overall size of

the establishment" to remain. See 1995 CPC Report, JNR Exhibit 41-3, at Bates No. 449-51.

Under the 1995 regulations, adult establishments are prohibited from operating in most zoning

districts where residential uses are permitted and, in addition, from locating within 500 feet of a

"sensitive receptor" (e.g., a school or church), another adult establishment, or a zoning district

where adult establishments are prohibited.  See Joint Statement of Facts ("JSF") at ¶ 3. See also,

Stringfellow's, 91 N.Y.2d at 392-93.

---

[5] The JNR has been filed in each of the four cases. For reference, it is filed as ECF No. 147 in the
Club at 60th Street, Inc. case.

[6] Prior to November 1994, the Zoning Resolution did not distinguish between "adult" uses and
other commercial uses.  Rather, adult establishments were classified in general commercial use
categories such as "book store," "eating or drinking establishment," and "theater" and, as such,
were permitted in many zoning districts where residential uses were also permitted.  See
Stringfellow's of New York, Ltd. v. City of New York, 91 N.Y.2d 382, 392 (1998)
("Stringfellow's").

The 1995 regulations defined an "adult establishment" as a commercial establishment, a "substantial portion" of which is used as an "adult book store," an "adult eating or drinking establishment," an "adult theater," or "other adult commercial establishment." See JSF at ¶ 5.[7] As relevant here, the term "adult book store" was defined in the 1995 regulations to include any book or video store that has adult materials as a "substantial portion of its stock in trade." See JSF at ¶ 6. The term "adult eating or drinking establishment" was defined in the 1995 regulations to include any restaurant, bar or theater that "regularly features" adult entertainment and that customarily excludes minors. See JSF at ¶ 7.

Used in the definitions of "adult establishment" and "adult book store," the meaning of the term "substantial portion" was amplified by administrative guidelines set forth in DOB Operations Policy and Procedure Notice ("OPPN") 6/98. See JNR Exhibit 11; JSF at ¶ 13. As to adult book stores, OPPN 6/98 essentially provided that, for purposes of enforcement, a book or video store would be considered an adult book store if it had at least 40 percent of its stock or floor area devoted to adult materials. OPPN 6/98 also clarified that, as used in the definition of adult establishment, the "substantial portion" test applied to multi-use establishments containing one or more adult uses and at least one bona fide non-adult use, and provided that such a multi-use establishment would be considered an adult establishment if at least 40 percent of the floor area was occupied by an adult use. See JNR Exhibit 11.

After the 1995 regulations were adopted, adult establishments unsuccessfully challenged them on federal and state constitutional grounds contending inter alia that the 1995 regulations failed to provide constitutionally adequate alternative sites for adult establishments.

---

[7] The JSF has been filed in each of the four cases. For reference, it is filed as ECF No. 148 in the Club at 60th Street, Inc. case.

See JSF at ⁋ 8. In denying the adult establishments' complaints, the court upheld the 1995

regulations on the basis that they were adopted to address the negative secondary effects caused

by adult establishments, were no broader than necessary to effectuate that legitimate governmental

purpose, and afforded adult establishments ample opportunities to locate and relocate within New

York City. See Stringfellow's, 91 N.Y.2d 382.

Following the Stringfellow's decision, the City commenced a comprehensive

initiative to enforce the 1995 Regulations against adult establishments operating at prohibited

locations. See Affidavit of David Karnovsky, former DCP Counsel, submitted in support of the

City's cross-motion for summary judgment in the state court litigation arising out of the 2001

Amendments ("Karnovsky Aff.") – JNR Exhibit 52 at ⁋ 45.  In response to these enforcement

efforts, the adult entertainment industry largely attempted to evade enforcement through sham

compliance.  In this regard, to pass the 60/40 test, numerous book and video stores sought to

increase the percentage of non-adult stock and floor area without having any reasonable

expectation that the non-adult stock would attract customers, and without altering the nature of the

stores as sexually oriented adult establishments. See Karnovsky Aff., JNR Exhibit 52 at ⁋ 46.

Numerous topless bars and strip clubs operating at prohibited locations erected partitions so as to

limit their regularly featured adult entertainment to less than 40 percent of the total floor area

accessible to customers, even though the substantial portion test was not intended to apply to eating

or drinking establishments. See Karnovsky Aff, JNR Exhibit 52 at ⁋⁋ 47-54.  While several courts

agreed that some of the businesses which attempted to comply with the 1995 amendments by

modifying their floor space and stock percentages had engaged only in "sham" compliance [JSF

at ⁋ 17], the New York Court of Appeals subsequently held that the 1995 amendments should be

strictly construed such that bookstores and eating or drinking establishments presenting adult

entertainment or materials in less than 40 percent of their public floor space were not subject to the 1995 amendments. See JSF at ¶ 18, citing City of New York v. Dezer Properties, 95 N.Y.2d 771 (2000) and City of New York v. Les Hommes, 94 N.Y.2d 267 (1999).

  As a result, in 2001 DCP set forth a proposal to amend the 1995 regulations. The proposal, the City Planning Commission's Report, and the public review process are detailed at length in the PI decision. PI Decision, 408 F. Supp. 3d at 445-48. See also, 2001 City Planning Commission Report, JNR Exhibit 45. The 2001 Adult Use Amendments amend the 1995 Adult Use Regulations by, *inter alia*, modifying the definitions of "adult book store" and "adult eating or drinking establishment" to close the loopholes utilized by adult establishments to evade enforcement, and thus more accurately and completely express the legislative intent behind the 1995 Adult Use Regulations to regulate the siting of establishments that have "a predominant, on-going focus on sexually explicit materials or activities." See 2001 CPC Report, JNR Exhibit 45 at Bates No. 661-63, 688-96. See also, DCP Dec., at ¶ 4.

  In this regard, the 2001 Amendments clarify that restaurants, clubs and bars which "regularly feature" topless or nude entertainment are subject to the adult use regulations, no matter the amount of floor area devoted to adult entertainment. See JSF at ¶ 25; 2001 Amendments, JNR Exhibit 1 at Bates No. 673-4, 690-96; and DCP Dec., at ¶ 5. With respect to adult book and video stores, the 2001 Amendments improve upon the definition of "adult bookstore" by setting forth objective criteria for determining whether the stock-in-trade is devoted to adult materials. These criteria are common among and exclusive to book and video stores that have achieved superficial compliance with 1995 regulations but nonetheless have maintained a predominant focus on adult materials. Thus, under the 2001 Amendments, a bookstore that has private viewing booths or any of the other enumerated features is an adult bookstore. Bookstores that devote less than 40 percent

of their stock and floor space to adult material and do not have any of the other features enumerated in the zoning text are non-adult bookstores and may remain in any zoning district where a bookstore is allowed. See JSF at ¶¶ 26-8, 172; 2001 Amendments, JNR Exhibit 1 at Bates No. 670-73, 689-90; and DCP Dec., at ¶ 5.

The 2001 Amendments did not change the substance of the location restrictions set forth in the 1995 regulations. As before, adult establishments are largely prohibited from operating within 500 feet of a sensitive receptor, another adult establishment, or a zoning district where adult establishments are prohibited. See 2001 CPC Report, JNR Exhibit 45 at Bates No. 688; and JSF at ¶¶ 119, 123. All adult establishments (including adult bookstores and adult eating or drinking establishments) are allowed in the following commercial ("C") zoning districts: C6-4, C6-5, C6-6, C6-7, C6-8, C6-9, C7 and C8, and in most manufacturing ("M") zoning districts; adult establishments are prohibited in residential zoning districts, and in manufacturing and most commercial districts where residential uses are permitted (including MX districts). See JSF at ¶¶ 117-18, 120, 122.

The Zoning Resolution treats all adult establishments, including bookstores fitting within that definition, distinctly from non-adult establishments, including non-adult bookstores, and hence, the prohibition against non-adult bookstores in certain zoning districts does not apply to such adult establishments (thus adult bookstores may be located where all other adult establishments may be located, regardless of whether non-adult bookstores are permitted there). Adult establishments that are not in any of these permitted zoning districts will have to relocate once the 2001 Amendments are enforced. See DCP Dec., at ¶¶ 6-7. The 2001 Amendments established a one-year amortization period for establishments that made investments to comply with the 60/40 substantial portion test, which was subject to extension upon individual application.

10

No establishment timely filed for such an extension.  See Karnovsky Aff., JNR Exhibit 52 at ¶ 46.
See also DCP Dec., at ¶ 8, fn. 1.

In September 2002, almost eleven months after the 2001 Amendments were adopted and one month before the deadline for compliance, certain 60/40 establishments commenced litigation in state court (People Theatres) challenging the constitutionality of the 2001 Amendments on their face.  At the trial level, the New York State Supreme Court initially declared the 2001 Amendments unconstitutional and held that the defendants were "constitutionally required to provide evidence showing that the 60/40s did not remedy the secondary effects" identified in the 1994 DCP Study.  Subsequently, however, the Appellate Division, First Department and the Court of Appeals both held that a new secondary impacts study was not necessary.  People Theatres, 29 N.Y.3d at 348, 350.

While the case ping-ponged between the trial and appellate level courts for many years on the issue of what the City's burden was at the third stage of the Alameda Books three part burden-shifting framework,[8] the New York Court of Appeals was steadfast in its holding that a new secondary impacts study was not required.  In so holding, the Court of Appeals reasoned that if the City established that sham 60/40 book or video stores and eating or drinking establishments were essentially adult establishments in that they retained a predominant focus on adult materials

---

[8]The Alameda Books burden-shifting framework for determining the constitutionality of zoning that regulates adult establishments provides, in summary, as follows, "First, a 'municipality's evidence must fairly support the municipality's rationale for its ordinance'. Second, the municipality prevails '[i]f plaintiffs fail to cast direct doubt on this rationale, either by demonstrating that the municipality's evidence does not support its rationale or by furnishing evidence that disputes the municipality's factual findings'. Third, '[i]f plaintiffs succeed in casting doubt on a municipality's rationale in either manner, the burden shifts back to the municipality to supplement the record with evidence renewing support for a theory that justifies its ordinance.'" People Theatres, 29 N.Y.3d at 349, citing, Alameda Books, 535 U.S. at 438-39 (internal citations omitted).

or activities then, consequently, the previously conducted secondary effects study of adult establishments was still applicable. Id. at 350. Accordingly, upon remand, the Court of Appeals specifically directed the lower courts as follows:

> We anticipate that the City will produce evidence relating to the purportedly sham character of self-identified 60/40 book and video stores, theaters and eating [or] drinking establishments or other commercial establishments located in the city. This does not mean that the City has to perform a formal study for a statistical analysis, or to establish that it has looked at a representative sample of 60/40 businesses in the city. *If the trier of fact determines, after review of this evidence, that the City has fairly supported its position on sham compliance* – i.e., despite formal compliance with the 60/40 formula, these businesses display a predominant, ongoing focus on sexually explicit materials or activities, and thus their essential nature has not changed – *the City will have satisfied its burden to justify strengthening the 1995 Ordinance by enacting the 2001 Amendments, and will be entitled to judgment in its favor.* [Emphasis included in original.]

Id. at 351.

Consequently, the only remaining factual issue in the People Theatres case was whether the City had established that adult establishments "retained a predominant, ongoing focus on sexually explicit activities or materials." Id. at 361. Ultimately, the Court of Appeals held that the City had met its burden at the third stage of the Alameda Books burden shifting framework by producing, "relevant evidence reasonably adequate to support its conclusion that the adult establishments retained a predominant, ongoing focus on sexually explicit activities or materials" despite sham compliance with the 1995 Adult Use Regulations and, thus, found the 2001 Amendments to be constitutional. Id. at 360-61, 363. See also, JSF at ¶ 35.

12

## DCP'S RECENT ANALYSIS OF LAND AREA AVAILABLE FOR 100% ADULT ESTABLISHMENTS

As noted above, beginning in December 2019, the Department of City Planning undertook a detailed lot by lot citywide analysis to determine the sites in the City that are permissible for the operation of an adult establishments.  As detailed in the Amron Declaration, DCP first undertook a Georaphic Information System analysis of potentially available lots throughout New York City.  This review included buffering out adult establishment exclusion areas and eliminating certain proposed rezoning areas.  5,009 potential lots remained after this process. See DCP Dec., at ⁋ 10.  From there, DCP removed lots that were parks, publicly owned, or that were identified as being used for transportation or utility purposes, as well as lots that were smaller than 5,000 square feet. These exclusions left 2,217 remaining lots.  See DCP Dec., at ⁋ 11.

These 2,217 lots were then each manually reviewed by DCP staff using various computer programs and their knowledge of the areas.  Staff members were directed to check the ownership and use of each lot and exclude lots that were publicly owned or appeared to contain a house of worship, a school, major infrastructure (such as railways, heliports, or roads) or major utilities (such as Con Edison, National Grid, or Port Authority) in active use.   Staff were also directed to exclude lots without street frontage or that appeared too irregular to develop.  If the reviewer was uncertain about whether an adult establishment was permitted, the reviewer was directed to identify the lot as questionable, and exclude it from the list of available lots.  Of the 2,217 lots reviewed by DCP planners, 514 were excluded as either fitting the above criteria or questionable.  The remaining 1,703 lots were identified as available for adult establishments. See DCP Dec., at ⁋ 12.  As explained in the Amron Declaration, the 1,703 number is a very conservative count of the actual number of available lots since DCP excluded all lots that were

13

deemed questionable, excluded all lots that were less than 5,000 square feet, and measured the 500 foot buffer from the lot line rather than the principle entrances of the establishments as set forth as the proper procedure for measuring in DOB guidance.  See DCP Dec., at ¶ 13.

Defendants also recognize that if an adult establishment relocates to one of the 1,703 available lots, the number of remaining lots available for such use may be further reduced due to the buffer requirement in Z.R. Section 32-01(c) (which requires a 500-foot buffer from existing adult establishments for new adult establishments), and the prohibition (Z.R. Section 32-01 (d)) against more than one adult establishment on a zoning lot.  As a result, DCP analyzed what the effect would be on the 1,703 available lots if adult establishments were located in these available lots; in that case, there would be at least 245 lots available (including 147 available lots where adult bookstores could be located if, assuming arguendo, they were not permitted in M2 and M3 districts, as the bookstore plaintiffs assert).  See DCP Dec., at ¶ 14.

As of the filing of the Joint Statement of Facts on May 23, 2022, the parties agree that there are 32 known 60/40 businesses in the City of New York that would need to relocate when the 2001 Amendments are able to be enforced.  See JSF, at ¶¶ 170-71.  Of those 32, 19 are located in Manhattan, 5 in Brooklyn, 5 in Queens, 3 in the Bronx and none in Staten Island.  See JSF, at ¶ 173.  The parties also agree that as of the filing of the Joint Statement of Facts there are 10 known 100% adult establishments operating at lawful locations in New York City. Of these, 8 are adult eating and drinking establishments and 2 are 100% adult bookstores.  These 100% businesses will not need to relocate when the 2001 Amendments are able to be enforced. See JSF, at ¶ 167.  In addition, an adult theater in Queens will not have to relocate.  DCP Dec., at ¶ 9; JSF, at ¶ 182.

The areas in Manhattan permitting adult establishments, such as the Hudson Yards, Meatpacking and Hell's Kitchen neighborhoods, are largely accessible by public transportation and are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial uses. These districts are typically vibrant, flourishing commercial centers supporting a wide range of activities from professional offices to entertainment uses.  See DCP Dec., at ⁋ 15.

Similarly, the available lots in Brooklyn are in various neighborhoods that are largely accessible by public transportation such as Sunset Park, Coney Island, East New York, Downtown Brooklyn, and Red Hook, that are zoned for and developed with a wide variety of commercial uses, including retail, office, service and entertainment, in addition to manufacturing and industrial uses. As with the examples in Manhattan, the districts mapped in these neighborhoods are in easily accessible areas with an established commercial character, which feature a vibrant mix of professional, entertainment, and other commercial uses, benefitting from the access to a broad base of potential customers provided by multiple subway lines and bus routes. See DCP Dec., at ⁋ 16.

The available lots in Queens are located in various neighborhoods, including Long Island City, Sunnyside, Maspeth and College Point, that provide access to the City's broad customer base through their proximity to multiple subway lines and bus routes. These areas have an established pattern of commercial development, and in addition to their transit accessibility, have a high degree of accessibility to customers arriving by taxi, personal automobile, and increasingly, users of ride-hailing services.  Some of these neighborhoods, such as Long Island City, La Guardia, Flushing and Jamaica-JFK have developed hotels with over 3,000 rooms for

tourists and are located in M1 districts where adult establishments are permitted.  See DCP Dec., at ⁋ 17.

The Bronx neighborhoods with available lots, including Hunts Point, Port Morris/Mott Haven and Eastchester, provide access to the City's broad customer base through their proximity to multiple subway lines and bus routes. These areas have an established pattern of commercial development, and in addition to their transit accessibility, have a high degree of accessibility to customers arriving by taxi, personal automobile, and increasingly, users of ride-hailing services.  The Bronx has over 1,000 hotel rooms available for tourists who could be using Bronx-based entertainment establishments.  Approximately 36 percent of hotel rooms in the Bronx are located in M1 districts where adult establishments may be located. See DCP Dec., at ⁋ 18.

Finally, the lots available in Staten Island are located in a variety of neighborhoods including the West Shore and Charleston, which are characterized by an established pattern of commercial development, albeit on a smaller scale than that in other boroughs.  These areas are transit-accessible to borough residents by car.  See DCP Dec., at ⁋ 19.

New York City encompasses five county-level administrative divisions called boroughs, and each borough is coextensive with a respective county.  Pursuant to Chapter 8 of the New York City Charter, planning and zoning for the City, including all boroughs, is the responsibility of DCP.  Hence, the consideration of where adult establishments may locate must be undertaken on a City-wide basis, as is the case with respect to all uses under zoning.  As is clear from the above analysis, there is more than sufficient space in vibrant areas within the City for adult establishments to operate.  See DCP Dec., at ⁋ 20.

### PERMITTING OF ADULT ESTABLISHMENTS IN NEW YORK CITY

Additionally, it is not onerous for a relocating 60/40 establishment to obtain the approvals necessary to open and operate in a location permissible for 100% adult establishments.

16

Should the 2001 Zoning Amendments be upheld and 60/40 establishments consequently need to relocate, such establishments can simply apply for any necessary permits in the same manner as non-adult establishments would, including by submitting professionally certified building plans and applications.  See JSF at ¶¶72, 88; JNR Exhibit 17 at Bates No. 000157; and Declaration of DOB Bronx Borough Commissioner Rodney Gittens dated July 7, 2022, ("DOB Dec."), at ¶ 14.

## ARGUMENT

### POINT I

**LIKE THE 1995 REGULATIONS, THE 2001 ADULT USE AMENDMENTS WITHSTAND FIRST AMENDMENT SCRUTINY.  ADOPTED TO CLOSE LOOPHOLES IN THE 1995 REGULATIONS, THE 2001 AMENDMENTS ADVANCE SUBSTANTIAL GOVERNMENT INTERESTS AND LEAVE OPEN REASONABLE ALTERNATIVE AVENUES OF COMMUNICATION.**

**A.     Under Well-Established Zoning Law, the 2001 Adult Use Amendments Are Presumptively Valid.**

The general principles that guide judicial review of zoning enactments are well-settled.  Municipalities are vested with broad discretion to address their land use problems through the adoption of zoning ordinances and such regulations are clothed with a strong presumption of validity.  See South Gwinnett Venture v. Pruitt, 491 F.2d 5, 7 (5th Cir.), cert. denied, 419 U.S. 837 (1974).  As an exercise of the municipal police power, a zoning regulation will withstand judicial scrutiny so long as it is found to bear a reasonable relationship to the health, safety or welfare of the public.  See City of Eastlake v. Forest City Enterprises, Inc., 426 U.S. 668, 676 (1976); Nectow v. City of Cambridge, 277 U.S. 183 (1928).

Like the City of New York, a number of municipalities throughout the country have adopted zoning regulations governing adult entertainment uses, thereby impacting upon expressive conduct that is protected by the First Amendment, albeit a protection that is of a lesser magnitude

than that afforded to traditional political speech as Judge Pauley correctly recognized in deciding the PI motion. See PI decision, 408 F.Supp.3d at 431, citing City of Erie v. Pap's A.M., 529 U.S. 277, 289 (2000) (plurality opinion) (explaining that nude dancing may constitute expressive conduct that "falls only within the outer ambit of the First Amendment's protection"); Young v. Am. Mini Theatres, Inc., 427 U.S. 50 (1976) (plurality) ("[E]ven though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the interest in untrammeled political debate . . . ."). In assessing the validity of these zoning regulations, the courts have sought to maintain the traditional deference accorded to municipal land use planning judgments while assuring that the rights of free expression are protected.

The standards for assessing the facial constitutionality of an adult use zoning ordinance were established by the United States Supreme Court in City of Renton v. Playtime Theatres, Inc., 475 U.S. 41 (1986). Brought by the owner of an adult theater, that case involved a challenge to the validity of a municipal zoning ordinance prohibiting adult theaters in Renton, Washington from locating within 1,000 feet of any residential zoning district, residential dwelling, church, park or school. When adopting its zoning ordinance, Renton relied on studies conducted by the City of Seattle, which had adopted an adult theaters ordinance after finding that such theaters produced a number of negative secondary effects. Reversing the Court of Appeals for the Ninth Circuit, the Supreme Court upheld the Renton ordinance as constitutionally valid.

The Supreme Court determined that the Renton zoning regulation was designed, not to suppress the content of the films shown at adult theaters, but to control the secondary effects that such theaters may have on the surrounding community, such as increased crime, a reduction

in property values, harm to retailing and a diminution in the general quality of life.  Because the zoning regulation could thus be justified without reference to the content of the affected speech, the Court found that it was properly viewed as a content-neutral "time, place and manner" regulation. See Renton, 475 U.S. at 47-50.

In so viewing the Renton ordinance, the Supreme Court expanded upon its previous analysis set forth in the plurality opinion in Young v. American Mini Theaters, Inc., supra.  There, the Court upheld a Detroit zoning ordinance that prohibited theaters showing adult films from locating within 500 feet of a residential area or within 1000 feet of two other such theaters or other "regulated uses," such as adult bookstores, taverns, hotels and pawnshops.  The Detroit ordinance was premised upon testimony from urban planners and real estate experts indicating that "the location of several such business in the same neighborhood tends to attract an undesirable quantity and quality of transients, adversely affects property values, causes an increase in crime, especially prostitution, and encourages residents and businesses to move elsewhere."  427 U.S. at 55.  The plurality determined that, because the ordinance was designed to address this "secondary effect," and not to bar the dissemination of "offensive" speech, it did not violate "the government's paramount obligation of neutrality in its regulation of protected speech."  Id. at 70.  The ordinance was thus upheld as a content-neutral "limitation on the place where adult films may be exhibited" that serves "the city's interest in the present and future character of its neighborhoods."  Id. at 71-72.

Having determined that the Renton ordinance was a time, place and manner regulation, the Court applied the traditional two-prong test for determining the constitutional validity of such a regulation — that is, whether the regulation was "designed to serve a substantial governmental interest, and whether it allows for reasonable alternative avenues of

19

communication." Renton, 475 U.S. at 50.  As to the first prong of the test, the Court emphasized

that the purposes behind the Renton ordinance were indeed legitimate and substantial, noting that

"a city's interest in attempting to preserve the quality of urban life is one that must be accorded

high respect."  Id. at 50.  Finding that the Court of Appeals had "imposed on the city an

unnecessarily rigid burden of proof," the Supreme Court ruled that Renton had properly relied on

the "experiences of Seattle and other cities" to establish the purpose behind Renton's own

ordinance.  Id. at 50-51.  In that regard, the Court stated as follows:

> The First Amendment does not require a city, before enacting such
> an ordinance, to conduct new studies or produce evidence
> independent of that already generated by other cities, so long as
> whatever evidence the city relies upon is reasonably believed to be
> relevant to the problem that the city addresses.

Id.  Finally, as to the second prong of the test, the Court found that the ordinance left open

reasonable alternative avenues of communication, as it left available some 520 acres, or more than

five percent of the entire land area of Renton, for use as adult theater sites.  Id. at 53.  Accordingly,

the Renton zoning regulations were upheld on their face.

The New York Court of Appeals first considered the viability of adult use zoning

regulations in Town of Islip v. Caviglia, 73 N.Y.2d 544 (1989), addressing claims brought under

both the federal and the state constitutions.  In that case, the owner of an adult book store

challenged an Islip zoning ordinance that placed restrictions on adult bookstores, theaters, motels,

cabarets and massages parlors: these adult uses were confined to certain industrial zoning districts

and, in addition, were not permitted to locate within 500 feet of a school, church, park, playground,

playing field, or residential zoning district, or within half a mile of another adult use.

As to the First Amendment claim, the Court of Appeals found that, like the

ordinance at issue in Renton, the Islip ordinance was designed, not to regulate expression, but to

eliminate the unwanted secondary effects associated with adult uses, as identified in a detailed

study performed by Islip as well as studies performed by other municipalities.  73 N.Y.2d at 553.

Moreover, the Court found that, like the ordinance in Renton, the Islip ordinance was narrowly

tailored to accomplish its purpose and left open ample land area for adult uses within Islip.  Id. at

554-55.

      As to the state constitutional claim, the Court of Appeals noted that the applicable

test was similar to that set forth in Renton:  a content-neutral regulation – that is, one "justified

without reference to the content of the regulated speech and relating only to the time, place and

manner of the expression" – will be upheld if it is "designed to carry out legitimate and important

governmental objectives" and is "no broader than necessary to achieve its purposes."  73 N.Y.2d

at 556-57, 559.  Applying that test, the Court reiterated its determination that the Islip zoning

ordinance was content-neutral and designed to further important government interests, and also

found that the ordinance was no broader than necessary to achieve its goals, insofar it did not

represent a total ban on adult uses but left open ample channels for dissemination of adult material.

Id.

**B.**    **The 1995 Adult Use Regulations Have Been Declared Constitutional By Both the New York State Court of Appeals and the United States Court of Appeals for the Second Circuit.**

      Against this backdrop, the New York Court of Appeals considered a challenge to

the 1995 Adult Use Regulations on state constitutional grounds in Stringfellow's.  Applying the

standards set forth in Renton and Islip, the Court of Appeals affirmed the grant of summary

judgment to the City in Stringfellow's and two related cases – Hickerson v. City of New York and

Amsterdam Video, Inc. v. City of New York – and upheld the 1995 regulations on their face.  See

Stringfellow's, 91 N.Y.2d 382.

      In its opinion, the New York Court of Appeals first considered the "threshold issue"

of whether the 1995 regulations were "purposefully directed at controlling the content of the

21

message conveyed through adult businesses or [were] instead aimed at an entirely separate societal goal." Stringfellow's, 91 N.Y.2d at 397.  In that regard, the Court examined the 1994 DCP Study and the source material considered therein, reiterating its explicit acknowledgment in Islip as to the "value of studies from other jurisdictions." Id. at 397-99.  The Court held that, in view of the legislative record which included the 1994 DCP Study, the 1995 regulations were "not an impermissible attempt to regulate the content of expression but rather [were] aimed at the negative secondary effects caused by adult uses, a legitimate governmental purpose." Id. at 399.  The Court further determined that the 1995 Adult Use Regulations were no broader than necessary to accomplish that purpose, finding that the regulations represented "a coherent regulatory scheme designed to attack the problems associated with adult establishments," and sought to protect "only those communities and community institutions most vulnerable to their adverse impacts." Id. at 400.  In so doing the Court noted that the CPC had considered, and rejected, less restrictive methods of addressing the problems associated with adult uses including the possibility of sign regulations alone.  In that regard, the CPC had concluded "based on the studies before it, that such a narrow approach would not suffice to address such ills as reduced property values, economic stagnation, heightened crime and change in neighborhood character." Id. at 401.

Finally, the Court held that the 1995 regulations assured "reasonable alternative avenues of communication" in that there was "sufficient land area open for use by adult businesses," the available areas were zoned "to permit a wide mix of commercial, retail, entertainment and manufacturing uses," and, in most instances, these areas were "within a 10-minute walk from a subway line or major bus route." Id. at 402-03 (1995 regulations assured reasonable alternative avenues of communication for the plaintiffs, insofar as they left "at least 500 potential sites for adult establishments to relocate and operate," which was more than

sufficient to accommodate the approximately 146 establishments then expected to relocate). See also, Buzzetti v. City of New York, 140 F.3d 134, 141 (2d Cir.), cert. denied, 525 U.S. 816 (1998) (concluding that the 1995 regulations provided "reasonable alternative avenues of communication," by leaving ample land area available for adult uses).

After their state constitutional claims were rejected in Stringfellow's, the Hickerson and Amsterdam Video plaintiffs subsequently attempted to pursue their federal claims in this Court. However, their facial First Amendment claims were rejected on collateral estoppel grounds. Recognizing that the federal and state constitutional standards were similar, as explained in Islip, this Court determined that the issues that were dispositive of the First Amendment claims had already been decided against the plaintiffs in Stringfellow's. That decision was affirmed by the United States Court of Appeals for the Second Circuit, and thereafter the United States Supreme Court declined review. See Hickerson v. City of New York, 146 F.3d 99 (2d Cir. 1998), cert. denied, 525 U.S. 1067 (1999).

**C.      Enforcement of the 1995 Adult Use Regulations Led to Sham Compliance and the Adoption of the 2001 Amendments.**

Having been upheld on their face, the 1995 Adult Use Regulations were implemented in July 1998 when judicial stays of enforcement were lifted. During the next two years, the City commenced a comprehensive enforcement initiative which, although initially successful, ultimately resulted in widespread attempts by adult establishments to evade enforcement through sham compliance. As relevant here, numerous adult eating or drinking establishments erected partitions to limit adult entertainment to less than 40 percent of their floor area. Seizing upon an ambiguity in the definition of "adult establishment," they argued over the City's objection that the "substantial portion" analysis applied not only to adult book stores and multi-use establishments, but also to single-use eating or drinking establishments. See Karnovsky

23

Aff, JNR Exhibit 52 at ¶¶ 47-54.  Their interpretation of the text was ultimately accepted by the New York Court of Appeals in City of New York v. Dezer Properties, Inc., 95 N.Y.2d 771 (2000).

Similarly, numerous triple-X book and video stores sought to increase the percentage of non-adult stock and floor area in an attempt to pass the 60/40 "substantial portion" test and avoid classification as adult book stores, even though there was no reasonable expectation that the non-adult stock would attract customers.  Although it was apparent that the presence of non-adult materials in these bookstores did not alter their essential nature as sexually oriented adult establishments, the Court of Appeals ultimately held in City of New York v. Les Hommes, 94 N.Y.2d 267 (1999), that the 1995 regulations and OPPN 6/98 explicitly limited the "substantial portion" inquiry to the percentage of stock and floor area devoted to adult and non-adult materials and "must be enforced as written," even where the inclusion of non-adult materials was found to be a sham.

As a result, the 2001 Adult Use Amendments were adopted to modify the definitional language in the 1995 text so as to clarify that the "substantial portion" test was not applicable to adult eating or drinking establishments and to improve upon the definition of "adult bookstore" by setting forth objective criteria for determining whether a "substantial portion" of the stock-in-trade of an adult book or video store is devoted to adult materials, thereby maintaining a predominant focus on adult materials despite the store's 60/40 configuration.  In its accompanying report, the Planning Commission explained that these definitional amendments were adopted to better effectuate the intent behind the 1995 regulations, which sought to address the negative secondary effects of all commercial establishments having a predominant, ongoing focus on adult entertainment or materials.  See 2001 CPC Report, JNR Exhibit 45 at Bates No. 661-63, 688-96. See also, DCP Dec., at ¶ 4.

24

**D.     The 2001 Amendments are Constitutional for the Same Reasons the 1995 Regulations Were Found to Be Constitutional**

Like the 1995 regulations, the 2001 Amendments pass muster under the constitutional standards set forth in Renton.  That is, the 2001 Amendments are a content-neutral time, place and manner regulation that is designed to serve a substantial governmental interest and allows for reasonable alternative avenues of communication.  Renton, 475 U.S. at 50.  Indeed, in ruling on the preliminary injunction motions herein, Judge Pauley recognized, and was appropriately guided by, the "Supreme Court's secondary-effects doctrine developed by Young v. American Mini Theaters, City of Renton v. Playtime Theatres, and their progeny," PI decision, 408 F.Supp. 3d at 460, and it is that framework that should guide the Court's decision here. Moreover, as will be further discussed herein, Judge Pauley correctly concluded that Justice Kennedy's concurrence in Alameda Books did not materially alter this long-standing analytical framework. See PI Decision, 408 F.Supp. 3d at 464-65.

Indeed, the differences between Justice Kennedy's opinion and the plurality opinion in Alameda Books are "quite subtle."  See Ben's Bar, Inc. v. Vill. of Somerset, 316 F.3d 702, 721 (7th Cir. 2003).  See also, e.g., Entm't Prods., Inc. v. Shelby Cnty., 721 F.3d 729, 742 (6th Cir. 2013) (rejecting broad interpretation of Kennedy's concurrence); Ctr. for Fair Pub. Policy v. Maricopa Cnty., 336 F.3d 1153, 1162-64 (9th Cir. 2003), cert. denied, 541 U.S. 973 (2004) (reasoning that Kennedy's concurrence was not meant to cause a "sea change" in adult use zoning law).  Justice Kennedy agreed with most of the plurality's holdings, including that: (1) Renton's central holding was sound, (2) courts should apply intermediate scrutiny in this context, (3) the legislative judgments underlying adult use zoning ordinances are entitled to deference, and (4) a municipality is required to produce only "very little evidence" to support its judgments.  See Alameda Books, 535 U.S. at 448-49, 451 (Kennedy, J., concurring in the judgment).

25

1.     **The 2001 Amendments are content-neutral.**

Using the Young and Renton framework, Judge Pauley first concluded "that the City's adult-use regulations are content-neutral. Despite the fact that they apply only to adult establishments the 1995 Regulations and the 2001 Amendments are at bottom justified by the desire to reduce the adverse secondary effects of adult establishments, based on a fair read of the 1994 DCP Study, the 1995 CPC Report, and the 2001 CPC Report." Id. at 462, citing Renton (emphasis in original).  There is no basis for the Court to disrupt Judge Pauley's conclusion in this regard.

2.     **The 2001 Amendments are narrowly tailored to achieve a substantial governmental interest.**

As for narrow tailoring, Judge Pauley first noted that "[d]efendants' stated interest of reducing the negative secondary effects of establishments with predominant, ongoing focus on adult-oriented expression clearly qualifies as a 'substantial governmental interest.'" PI Decision, 408 F.Supp. 3d at 465, citing Alameda Books, Renton and Buzzetti.  Judge Pauley then correctly concluded that the 2001 Amendments are sufficiently tailored to meet the City's interest in reducing negative secondary effects caused by adult-oriented businesses, having first noted that the City met its burden of providing evidence that supports a link between the regulated speech and the asserted secondary effects (especially as the City need only demonstrate that the 2001 Amendments promote the City's interest in reducing secondary effects more efficiently than if they did not exist). Id.  More specifically, Judge Pauley aptly stated:

> The DCP Study certainly demonstrates some nexus between deleterious secondary effects and establishments with a predominant, ongoing focus on adult-oriented expression – both through its survey of the experiences of other municipalities as well as its own surveys and analysis.  And the 2001 CPC Report, which cites to judicial determinations that mechanical compliance with the 60/40 Standard leaves the essentially non-conforming nature of the adult business intact, fairly supports the underlying rationale for the

> 2001 Amendments that 60/40 establishments may still have a
> predominant and ongoing focus on adult-oriented expression.
> Therefore, Defendants had a reasonable basis to infer that regulating
> the location of 60/40 establishments would alleviate the negative
> secondary effects associated with establishments with a
> predominant, ongoing focus on sexual activity or materials.

Id. at 465-66 (internal citations omitted).

Plaintiffs' anticipated contention that after Alameda Books municipalities must satisfy a higher evidentiary burden for a zoning ordinance regulating the location of adult establishments to pass constitutional muster, is incorrect. See Alameda Books, 535 U.S. at 449 (Kennedy, J., concurring in the judgment). Rather, far from requiring a municipality to prove that its regulations will successfully reduce secondary effects, the Alameda Books plurality held that a municipality may rely on any evidence that is reasonably believed to be relevant, and may draw reasonable inferences from the evidence. See id. (plurality opinion).

Indeed, as is the case here, Alameda Books concerned a challenge to the constitutionality of an amendment to an adult use zoning ordinance. As initially enacted by the City of Los Angeles in 1978, the zoning ordinance prohibited the establishment of an adult arcade, bookstore, cabaret, motel, theater, or massage parlor within 1,000 feet of another such enterprise or within 500 feet of any religious institution, school or public park. These use regulations were adopted because the city's "comprehensive study" of adult establishments had concluded in 1977 that "concentrations of adult businesses are associated with higher rates of prostitution, robbery, assaults and thefts in surrounding communities." 535 U.S. at 430-31.

The original zoning ordinance intended "not only to disperse distinct adult establishments housed in separate buildings, but also to disperse distinct adult businesses operated under common ownership and housed in a single structure." Id. Nonetheless, its ordinance provided that "the distance between any two adult entertainment businesses shall be measured in

27

a straight line from the closest exterior structural wall of each business.'" Id. (citation to Los Angeles Municipal Code, internal quotation marks and ellipses omitted). After the ordinance was enacted, "the city realized that this method of calculating distances created a loophole permitting the concentration of multiple enterprises in a single structure" which could "defeat the goal of the original ordinance." Id. Consequently, consistent with its initial intent, Los Angeles amended its ordinance in 1983 to prohibit the operation of more than one adult business in the same building. In so doing, Los Angeles did not conduct an additional study specifically addressed to the impacts of multi-use establishments, but relied upon its original study which had concluded that clusters of adult establishment are associated with higher crime rates.

The two plaintiffs in Alameda Books challenged the facial constitutionality of the amended zoning ordinance based on the absence of a further study. Affirming the grant of summary judgment to the plaintiffs, the Ninth Circuit found that an additional study was necessary, Los Angeles having failed to demonstrate that its regulation of multiple-use establishments was intended to serve the city's substantial interest in reducing crime. The Supreme Court reversed and remanded for further proceedings. In its plurality opinion, the Court found that "it [was] rational for [Los Angeles] to infer that reducing the concentration of adult operations in a neighborhood, whether within separate establishments or in one large establishment, will reduce crime rates." Id. at 436. Likewise, Justice Kennedy did not require Los Angeles to come forward with any other evidence to satisfy the further inquiry he had outlined. Instead, based on the evidence already before the Court, he held that the City's locational restrictions, which would require the plaintiff adult business to move locations but not necessarily shut down, and which were based on a reasonable inference that two adult businesses in the same location would cause

more secondary effects than one, satisfied this inquiry. Id. at 452-53 (Kennedy, J., concurring in the judgment).

Applying that same reasoning here, the 1995 regulations (combined with the 2001 Amendments) satisfy the relevant inquiry. Far from banning adult establishments entirely, the regulations restrict adult establishments to certain locations. Moreover, like the Los Angeles' regulations, the regulations employ locational restrictions based on reasonable inferences that multiple adult establishments in the same location increase secondary effects, and that adult establishments in residential areas create secondary effects that they would not create in nonresidential areas. See Stringfellow's, 91 N.Y.2d at 399. In this regard, in People Theatres, the Court of Appeals recognized that Justice Kennedy's opinion was controlling but, nonetheless, rejected the plaintiffs' broad interpretation of that opinion (which was essentially the same as the plaintiffs' interpretation here), and concluded that insofar as sham 60/40 establishments have a predominant focus on sexually explicit material and activities, there was no need for the City to have conducted a new study prior to enacting the 2001 Amendments because the secondary effects of the 60/40 businesses covered by the 2001 Amendments were already studied by the City in 1994. See People Theatres 6 N.Y.3d 63, 84 (2005); People Theatres 29 N.Y.3d at 363 (2017).

The Court of Appeals' decision is well reasoned. The 2001 Amendments are amply supported by the 1994 DCP Study, as Judge Pauley also recognized. The negative secondary effects of topless bars, strip clubs and adult bookstores were extensively documented in the DCP Study and the source material described therein. See 1994 DCP Study, JNR Exhibit 41. There simply would have been no basis for the Planning Commission to conclude at any point in time that these negative impacts would be any less present where the topless or nude dancers frequent only part of the customer-accessible floor space, or where the adult bookstores added non-adult

inventory that consisted of multiple copies of outdated videotapes in dusty packages, or was kept in piles on the floor or in the basement.

Topless bars and strip clubs achieve their identity as adult establishments through the entertainment they regularly feature and not the amount of floor area that entertainment occupies. See, e.g., City of New York v. J & J Tummy Yummies d/b/a Naked City, 179 Misc.2d 527, 528-30, 679 N.Y.S.2d 807 (Sup.Ct. Queens Co. 1998) (finding that a strip club which had limited adult entertainment to less than 40% of the customer-accessible floor area was an adult establishment, since "there was demonstrated by testimony … that almost every defined sex activity was openly conducted and displayed publicly to customers of the place" and in advertising, the business "holds itself out to the public as an adult establishment"); City of New York v. Dezer Properties, 259 A.D.2d 116, 121, 697 N.Y.S.2d 41 (1st Dept. 1999) (rejecting as "a sham" the VIP Club's attempt to separate its restaurant and topless dancing areas to comply with "the 60/40 rule," and finding that "[VIP] is still essentially a topless bar," there being "no conceivable reason why anyone uninterested in topless dancing would choose [that] club over the many other nightclubs, bars and restaurants" in the area), rev'd, 95 N.Y.2d 771, 710 N.Y.S.2d 836 (2000).  The notion that the negative impacts of a topless bar or strip club can be curtailed through superficial measures, such as the installation of a curtain between the "adult" and "non-adult" portions, runs counter to common sense.

Similarly, covered bookstores have maintained their predominant focus on sexual materials notwithstanding their superficial compliance with the 60/40 rule. See, e.g., City v. Les Hommes, 258 A.D.2d 284, 285 (1st Dept.) (notwithstanding its efforts to achieve superficial conformity with 60/40 rule, "Les Hommes in its true aspect remains a non-conforming adult video

establishment"); rev'd, 94 N.Y.2d 267 (1999)[9] <u>City of New York v. Show World</u>, 178 Misc.2d

812, 824 (Sup. Ct. N.Y. Co. 1998) (rejecting the "mechanical application of the 60/40 rule" as an

absurd "Pavlovian approach," which "does not comport with the history or spirit of the Zoning

Resolution and, in fact, makes a mockery of the legislation" but denying preliminary injunction on

other grounds).

      Any suggestion that 60/40 eating or drinking establishments and covered 60/40

bookstores "are less intense" than 100% establishments and therefore do not have a predominant

sexual focus, should be swiftly rejected by this Court as this argument was already raised,

considered and rejected by the court in <u>People Theatres</u>.   Moreover, with respect to signage

---

[9] In reversing the Appellate Division and determining that the 1995 regulations could not reach
60/40 bookstores like Les Hommes, the Court of Appeals did not find these establishments to be
different in nature from those adult bookstores that fell within the strict letter of the 1995
regulations.  Rather, the Court of Appeals held that, absent additional criteria in the zoning text,
the City could not treat these establishments as adult establishments.  Indeed, the Court of Appeals
opinion essentially invited the City to adopt additional zoning criteria so as to cover establishments
like Les Hommes:

> Given the City's precise guidelines, we cannot cast a
> wider net to capture unspecified considerations ….
> In the end, we must enforce the City's administrative
> guidelines as written.  Either the stock is accessible
> or available, or it is not; either the appropriate
> amount of square footage is dedicated to nonadult
> uses, or it is not.  Questions about whether the owner
> of Les Hommes had a good-faith desire to sell
> nonadult products, whether the "essential nature" of
> Les Hommes is adult or nonadult, or whether the
> volume of nonadult is stable or profitable are not part
> of the inquiry here, where we are only called upon to
> determine whether items are accessible or available
> as stock.  We cannot rewrite the City's guidelines to
> include these additional considerations.

94 N.Y.2d at 273.  The 2001 Amendments provide these additional objective criteria to better
define "adult bookstore" so that the definition can now be enforced as written.

specifically, the Court of Appeals concluded that notwithstanding any changes in signage the 60/40 businesses covered by the 2001 Amendments retain a predominant adult focus. People Theatres, 29 N.Y.3d 362 ("Whether signs are garish has little bearing on whether a business retains a sexual focus."). Significantly, when the CPC reviewed proposed alternatives to the City's 1995 adult use zoning regulations, it explicitly rejected proposals that would have merely required adult establishments to change their signage. It concluded that the key secondary effects it had identified—including reduced property values, the creation of economic dead zones, heightened crime, and change in neighborhood character—existed independently of the garish signage often used by adult establishments. See 1995 CPC Report, JNR Exhibit 41-3, at Bates No. 457-58.

Thus, any suggestion that in modifying the 1995 regulations to clarify its application to 60/40 eating or drinking establishments and bookstores with booths, the City was not entitled to rely on the prior legislative record which included the DCP Study, and was instead required to conduct additional studies specifically addressed to the negative secondary impacts of 60/40 eating or drinking establishments and bookstores with booths which are purportedly new types of establishment created in response to the 1995 regulations, must be rejected.

### 3. The 2001 Amendments afford ample alternative means of communication.

Finally, with the Stringfellow's (and Hickerson) findings as a backdrop and, as detailed in the Amron Declaration filed herewith, the 2001 Amendments afford reasonable opportunities for adult establishments to locate and operate in the City of New York. In this regard, as recognized by Judge Pauley, '[i]n the adult entertainment context, the Second Circuit has reaffirmed that 'whether the challenged restriction leaves open adequate alternative avenues of communication' requires 'an assessment of available other locations, and whether those alternatives afford a reasonable opportunity to locate and operate such a business.'" 408 F.

32

Supp.3d at 466, quoting TJS of N.Y., 598 F.3d at 21-22 (citing Hickerson, 146 F.3d at 107-08 &

Buzzetti, 140 F.3d at 140-41).  As Judge Pauley further recognized, the "availability inquiry

centers on 'whether proposed sites are physically and legally available, and whether they are part

of an actual commercial real estate market in the municipality." Id.

Factors that should be considered in determining physical and legal availability

include "(1) 'pragmatic likelihood of [sites] ever becoming available to a generic commercial

enterprise,' which connotes 'genuine possibility'; (2) 'accessibility to the general public'; (3) 'the

surrounding infrastructure'; and (4) 'whether the sites are suitable for some generic commercial

enterprise,'" but does not require a finding that "the acquisition or use of land must be profitable

or commercially practicable, and sites are not rendered unavailable simply by being 'already

occupied by existing businesses,' not 'currently for sale or lease' or 'otherwise not 'commercially

viable.''" Id. at 466-67.  Sites are also considered to be physically and legally available when they

are located in industrial or manufacturing zones and even when they must be developed. Id. at 467.

See, also, TJS of N.Y., Inc., 598 F.3d at 28 ("whether or not sites fit the specific needs of adult

businesses – or any other precise type of commercial enterprise – is constitutionally irrelevant").

The Second Circuit considered these factors in ruling on a challenge to an adult

zoning ordinance passed by the Town of Smithtown. TJS of N.Y. Inc. v. Town of Smithtown, 598

F.3d 17 (2d Cir. 2010).  In rejecting TJS's objections to the physical size and nature of the

businesses currently operating at potential relocation sites identified by Smithtown, the Court

explained:

> the possibility that sites will be unprofitable or commercially
> unviable for adult businesses like TJS--or even for non-adult
> businesses that are similar in size--is not relevant to the availability
> inquiry. "The ideal lot [for a particular type of business] is often not
> to be found." An adult entertainment establishment must compete
> for commercial real estate like any other market participant. And,

33

> like for other market participants, the physical size or nature of the
> business may affect the availability of commercially viable sites or
> the willingness of property owners to sell or lease to them. There
> are, in short, inevitable impediments to a business's relocation. But
> obstacles such as the possibility of "making due with less space than
> one desired," or "having to purchase a larger lot than one needs," do
> not render property unavailable for the purpose of constitutional
> analysis. Alternative sites need only be available, not attractive.
> (emphasis added) (internal citations omitted).

Id., at 29. Likewise, as recognized by the First Circuit, "[t]he proper enquiry looks to restrictions

imposed by the government, not to the market effects of other people's commerce or the economics

of site clearance." Lund v. City of Fall River, 714 F.3d 65, 70 (1st Cir. 2013) (upholding adult use

zoning ordinance which left 8 sites, consisting of 28.53 acres or 0.24 percent of the City available

for adult uses and stating "even if we credit Lund's representation that sites identified by the district

court are subject to long-term leases, the fact that other competing private parties got ahead of him

is not alone of any moment in the constitutional analysis, and the cost of development is nothing

more than a business consideration for Lund to weigh."). See also, Renton 475 U.S. at 54 ("That

[plaintiffs] must fend for themselves in the real estate market, on an equal footing with other

prospective purchasers and lessees, does not give rise to a First Amendment violation."); M.J.

Entm't Enters., 328 F. Supp.2d at 484 (recognizing that sites that are currently in use are available

despite the fact that the sites "would have to be acquired or leased, and even subdivided").

At present, in the City of New York there are 10 100% adult establishments located

in permissible zoning districts that may remain at their current locations when the 2001

Amendments take effect.   See JSF, at ⁋ 167.   There are also currently 32 identified 60/40

establishments that will need to relocate once the 2001 Amendments take effect.  See JSF, at ⁋

170.  In contrast, DCP has determined that City-wide there are at least 1,703 lots available for adult

use establishments to relocate citywide. See DCP Dec., at ⁋⁋ 12-13.  It should also be noted that

60/40 bookstores have the option of reconfiguring their stores to become non-adult while still

providing access to adult printed and visual material, rather than relocating. See JSF, at ¶ 172. Moreover, recognizing that once a 60/40 establishment relocates to one of the 1,703 permissible lots there may be implications for the availability of other lots due to 500 foot buffering requirements, DCP conducted a further analysis of those 1,703 lots and determined that at least 245 lots can be simultaneously occupied by adult establishments (including 147 available lots where adult bookstores could be located if, assuming arguendo, they were not permitted in M2 and M3 districts, as the bookstore plaintiffs assert). See DCP Dec., at ¶ 14. As further detailed in the Amron Declaration, the areas of the City that are available for new or relocating adult use establishments are largely accessible by public transportation and zoned for and developed with a wide variety of uses, including services and entertainment. See DCP Dec., at ¶¶ 15-19.

Therefore, it is clear that the 2001 Amendments afford reasonable opportunities for adult establishments to locate and operate in the City. Judge Pauley's conclusion to the contrary at the preliminary injunction stage was based upon the fact that the City had not conducted a lot by lot analysis of the number of available lots outside of Manhattan. See PI Decision, 408 F. Supp. 3d at 468-69. Having now completed a review and determined that there are more than 1700 legally available locations for adult establishments citywide, with the ability of at least 147 and as many as 245 establishments to simultaneously relocate, defendants submit that any concerns expressed by Judge Pauley initially have been more than addressed.

Additionally, any continued contention by plaintiffs that there must be sufficient sites for all existing Manhattan 60/40 establishments to relocate in Manhattan is legally incorrect, as Judge Pauley recognized in the PI Decision. In this regard, Judge Pauley stated as follows:

> [T]his Court rejects Plaintiffs' unsupported contention that the availability of adequate sites must, as a categorical matter, be considered on a county-by-county basis-namely, that Defendants must demonstrate the presence of sufficient alternative channels for

adult expression in Manhattan.  See Hickerson, 146 F.3d. at 108 n.5
(rejecting argument that "the First Amendment requires proof of
adequate available sites on a borough-by-borough basis" as "without
foundation and unsupported by case law"); cf. Mastrovincenzo, 435
F.3d at 101 (explaining that the "requirement that 'ample alternative
channels' exist does not imply that alternative channels must be
perfect substitutes for those channels denied to plaintiffs by the
regulation at hand").  Whatever the merits of Plaintiffs' arguments
as to Manhattan's uniqueness with respect to real estate,
entertainment or culture, . . . the First Amendment simply "does not
guarantee the right to communicate ones views at all times and
places and in any manner that may be desired," Heffron v. Int'l
Soc'y for Krishna Consciousness, 452 U.S. 640, 647 (1981).

PI Decision, 408 F. Supp. 3d at 467.  See also, DCP Dec., at ¶ 20.

Finally, any suggestion by plaintiffs that Justice Kennedy's concurrence in
Alameda Books changed the requirements of the "available alternatives" analysis by creating a
new and materially different "proportionality test" addressed to the question of "how speech will
fare," must be rejected.  Plaintiffs' purported proportionality test – that the City should be required
to prove that its regulations decrease secondary effects more than they decrease the availability of
the relevant expression – is based on a flawed and overbroad reading of Justice Kennedy's
concurrence in Alameda Books.  It is also a substantial departure from established zoning
jurisprudence that should not be adopted by this Court.  Indeed, in the PI decision, Judge Pauley
correctly viewed Justice Kennedy's "'how speech will fare' discussion as clarifying or restating
familiar analytical principles, including that a time, place, and manner regulation must leave open
adequate alternative channels for the regulated speech." PI Decision, 408 F. Supp. 3d at 465.

In fact, as Justice Kennedy explained, he wrote primarily to clarify that, in adopting
an adult use zoning ordinance, a municipality could not propose to decrease negative secondary
effects by decreasing speech.  See id. at 450.  But that proviso is hardly the equivalent of a
requirement that a municipality prove that its ordinance would decrease secondary effects more
than it would decrease speech.  See Ben's Bar, 316 F.3d at 721. Rather, the inquiry "dovetails with

36

the requirement that an ordinance must leave open adequate ample alternatives of communication." World Wide Video of Wash., Inc. v. City of Spokane, 368 F.3d 1186, 1195 (9th Cir. 2004); see also Tollis Inc. v. Cnty. of San Diego, 505 F.3d 935, 939-41 (9th Cir. 2007) ("We reject Déjà vu's contention that *Alameda Books* imposed a heightened evidentiary burden on the County to show 'how speech would fare' under the ordinance. So long as there are a sufficient number of suitable relocation sites, the County could reasonably assume that, given the draw of pornographic and sexually explicit speech, willing patrons would not be measurably discouraged by the inconvenience of having to travel to an industrial zone."). Indeed, as recognized by the Second Circuit in TJS of N.Y., 598 F.3d at 21-2 (2d Cir. 2010), a reviewing court must look to whether the adult use zoning ordinance leaves available alternative locations that "afford a reasonable opportunity to locate and operate such a business."[10] As detailed above, the 2001 Amendments clearly leave ample space for the operation of adult establishments.

As a result, with respect to alternative areas for new and relocating adult use establishments under the 2001 Amendments, it is clear that the requirements of Renton (and Alameda, to the extent applicable) have been satisfied. See also, Casanova Entm't Group, 375 F. Supp. 2d 321 (concluding New Rochelle ordinance to be constitutional where there are six sites available for adult oriented establishments to operate); M.J. Entm't Enters., 328 F. Supp.2d at 484-85 (finding Mount Vernon ordinance to be constitutional where four sites already in use by other commercial businesses were available for new adult establishments).

---

[10] The Second Circuit further stated that "[t]his does not mean that a municipality must identify the exact locations to which adult establishments may locate, 'as opposed to identifying the general areas that remain available and proving that such areas contain enough potential relocation sites that are physically and legally available to accommodate the adult establishments.'". TJS of N.Y., 598 F.3d at 22, n. 4 (quoting Hickerson, 146 F.3d at 107).

4.   **Plaintiffs' anticipated arguments regarding <u>Reed</u> and <u>Rock Against Racism</u> are not persuasive.**

Finally, it is anticipated that plaintiffs will assert the 2001 Amendments are unconstitutional because, notwithstanding <u>Renton</u> and <u>Alameda</u>, under the Supreme Court's decision in <u>Reed v. Town of Gilbert, Arizona</u>, 576 U.S. 155 (2015), the 2001 Amendments are content based restrictions on speech and must be analyzed using strict, rather than intermediate, scrutiny. The Supreme Court in <u>Reed</u> considered whether a municipal sign ordinance improperly treated outdoor signs differently, depending on the category in which they fell – e.g., "ideological," "political," or "temporary directional." <u>Reed</u>, 576 U.S. at 159. In reversing the Ninth Circuit Court of Appeals, the Supreme Court found that the sign regulations were content based because the restrictions in the code applied differently, depending upon the type of sign in question, concluding that "[g]overnment regulation of speech is content based if a law applies to a particular speech because of the topic discussed or the idea or message expressed," and is thus subject to strict scrutiny review. <u>Id.</u> at 2228.

After the <u>Reed</u> decision, questions have been raised as to whether the reasoning behind the secondary-effects doctrine is still valid. However, the courts that have addressed the issue have rejected the proposition that <u>Reed</u> modified the Supreme Court's adult use zoning jurisprudence. <u>Free Speech Coal., Inc. v. AG United States</u>, 825 F.3d 149, 161 n.8 (3d Cir. 2016); <u>BBL, Inc. v. City of Angola</u>, 809 F.3d 317, 326 n.1 (7th Cir. 2015).

As these courts reasoned, courts follow the precedent that directly controls a case, <u>see</u> <u>Agostini v. Felton</u>, 521 U.S. 203, 237 (1997), and <u>Reed</u> is inapposite. The regulations at issue in <u>Reed</u> were subject to strict scrutiny because they subject different types of signs – political, directional, and ideological – to different regulations. See <u>Reed</u>, 576 U.S. at 163. Adult use zoning ordinances, by contrast, have long been subject to intermediate scrutiny because they do not target

the message conveyed by adult uses, or even the immediate effect of adult uses, but rather the negative secondary effects of those uses. See Renton 475 U.S. at 48. The Reed Court, which did not even mention adult use zoning, did not purport to reject this reasoning. Cf. McCullen v. Coakley, 134 S. Ct. 2518, 2531 (2014) (citing Renton's analysis with approval). Reed is also inapposite because the balancing of interests in the adult use zoning context is fundamentally different from the municipal sign context. Municipal interests in regulating how long temporary directional signs appear on its streets are simply not analogous to municipal interests in adopting reasonable adult use zoning ordinances. See Free Speech Coal., 825 F.3d at 161-63. Thus, Reed does not provide any basis to depart from three decades of controlling precedent addressing adult use zoning in City.  Stringfellow's, supra; Hickerson, supra; and People Theatres, supra.  In deciding the PI motions, Judge Pauley specifically recognized that Reed did not change the applicable law for zoning ordinances like the 2001 Amendments. See PI Decision, 408 F. Supp. 3d at 463.

For this same reason, Ward v. Rock Against Racism, 491 U.S. 781 (1989), a case which addressed whether a sound amplification regulation was a reasonable time, place and manner restriction on speech, is also inapposite here in light of the directly applicable decision in Renton. Thus, any argument that because they are substantially broader than necessary to achieve the City's goals, the 2001 Amendments are invalid under Ward, is not worthy of serious consideration.

In any event, because it is clear, as detailed above that: 1) the 2001 Amendments were designed to close loopholes in the 1995 Adult Use Regulations; 2) 60/40 eating or drinking establishments and covered 60/40 bookstores have a predominant adult focus just like 100% adult establishments; and; 3) the 1995 Adult Use Regulations were designed to address the negative

secondary effects caused by 100% adult establishments, the 2001 Amendments are not broader than necessary to achieve the City's goals of addressing negative secondary effects caused by adult establishments. See Stringfellow's, 91 N.Y.2d at 400-01 (finding 1995 Adult Use Regulations to be no broader than necessary to achieve the City's goals).

POINT II

### THE DOB PERMITTING PROCEDURES APPLICABLE TO ADULT ESTABLISHMENTS ARE CONSTITUTIONAL.

The City's permitting procedures for adult establishments are not an unconstitutional prior restraint on expression in violation of the First Amendment, nor do they discriminate against adult establishments in violation of the Fourteenth Amendment.[11] Plaintiffs' claims with respect to the permitting procedures are largely premised on a highly speculative scenario in which the issuance of DOB permits is inordinately delayed for an adult establishment and on two irrelevant permitting policies which are, (1) that adult establishments may not professionally certify applications or construction document approvals, and (2) that adult establishment applications, including plans are routinely referred to DOB's General Counsel's Office for review.[12] These procedures are irrelevant in that, (1) they will not be applicable once the 2001 Amendments become enforceable, at which time the permitting procedures for adult

---

[11] The permitting procedures plaintiffs challenge are entirely separate and apart from the 2001 Amendments plaintiffs also challenge herein.  Consequently, the constitutionality of the permitting procedures is not dependent on the constitutionality of the 2001 Amendments, and vice versa.

[12] See Club at 60th Street, Inc., et ano,  v. City of New York, Index No. 02CV833 Second Amended Complaint ("Club at 60th Compl.") at ¶ 123, 125, 206-207; 725 Eatery, Corp. v. City of New York, et al., Index No. 02CV4431 Second Amended Complaint ("725 Eatery Compl.") at 116, 118, 200-201; 59 Murray Enterprises, Inc., et ano, v. City of New York, et al., Index No. 02CV4432 ("59 Murray Compl.") at ¶ 122, 124, 205-206; 336 LLC, et al., v. City of New York, et al., Index No. 18CV3732 ("336 LLC Compl.") at ¶ 135.

establishments will be precisely the same as those for other establishments, and (2) should the Court not uphold the 2001 Amendments, plaintiffs' establishments will not be required to relocate and will consequently not need to apply for any permits to continue as a non-adult establishment, as they already have been approved and permitted as non-adult establishments. Even currently, permit applications for adult establishments are no longer subject to routine review by DOB's General Counsel's office. JSF at ¶¶ 91-92; DOB Dec., at ¶ 14. Accordingly, plaintiffs' claims with respect to the permitting procedures are moot. In any event, the current permitting procedures, which will be obsolete should this Court uphold the 2001 Amendments and lift the stay of their enforcement, are not a content-based prior restraint on expression or in any way unconstitutional.

### A.    Plaintiffs' Claims With Respect to the Permitting Procedures are Moot.

As reflected in Buildings Bulletin 2020-005, issued on April 2, 2020, JNR Exhibit 17, once the 2001 Amendments become enforceable, the use of professional certification will be permitted for filings related to adult establishments; additionally, applications for adult establishments are currently no longer subject to routine review by DOB's General Counsel's Office. See JNR Exhibit 17; JSF at ¶ 72, 88, 91, 92 DOB Dec., at ¶ 14. Plaintiffs' claims with respect to these procedures are therefore moot. Indeed, the issuance of Buildings Bulletin 2020-005 essentially provides plaintiffs with all of the relief they seek with respect to the permitting procedures, namely a modification of procedures for processing adult establishment applications.[13] See Fisher v. United States Atty., 722 F. App'x 40, 41 (2d Cir. 2018) (internal citations omitted) ("A case becomes moot, at any stage of litigation, when there is no longer a live case or controversy for a court to decide, such as when the plaintiff has already received the relief sought."); Fox v.

---

[13] Club at 60th Compl. ¶¶ 210-1; 59 Murray Compl. at ¶¶209-10.

Bd. Of Trs. Of the State Univ., 42 F.3d 135, 140 (2d Cir. 1994) (a federal court has no jurisdiction to decide a case where the parties lack a legally cognizable interest in the outcome of the litigation).

**B.     Plaintiffs Lack Standing to Facially Challenge the Permitting Procedures Applicable to Adult Establishments.**

Even if their claims with respect to DOB's permitting procedures were not moot, plaintiffs lack standing to facially challenge the permitting procedures. To have standing to assert a facial challenge on the grounds that a law violates the First Amendment, "[t]he law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks." Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 759 (1988).  With the removal of what plaintiffs refer to as "delay inducing procedural hurdles," i.e., the prohibition of professional certification of applications and DOB General Counsel's review of such applications, the permitting procedures applicable to adult establishments once the 2001 Amendments become enforceable will be identical to those generally applicable to all establishments, including sensitive receptors, and are not specific to expressive activity. Plaintiffs therefore lack standing to facially challenge the permitting procedures applicable once the 2001 Amendments become enforceable. See Calvary Chapel Bible Fellowship v. Cty. of Riverside, 2017 WL 6883866 *8 (C.D.Cal. Aug. 18, 2017) aff'd 948 F. 3d 1172 (9th Cir. 2020) (finding plaintiff lacked standing to facially challenge an ordinance that did not implicate expressive activity.)

Even the current permitting procedures for adult establishments, which no longer require review by DOB's General Counsel's office, but still do not allow applications for adult establishments to be professionally certified, are not amenable to a facial challenge.

"[A] facial challenge is proper only if the statute by its terms seeks to regulate spoken words or patently expressive or communicative conduct, such as picketing or handbilling,

or if the statute significantly restricts opportunities for expression." (internal citations omitted) <u>S.
Or. Barter Fair v. Jackson County</u>, 372 F.3d 1128, 1135 (9th Cir. 2004). The current permitting
procedures do not seek to regulate expressive conduct; any nexus between the permitting
procedures and expressive conduct is extremely tenuous. Indeed, they are the same permitting
procedures appliable to all establishments which are set forth in the New York City Administrative
Code ("Admin. Code"). <u>See</u> DOB Dec., at ¶¶ 2-5; New York City Administrative Code ("Admin.
Code") §§ 28-105.1, 28-104.1, 28-104.2. Specifically, Admin. Code § 28-105.1 requires a permit
to perform certain work on buildings or structures in New York City and provides:

> § 28-105.1 General. It shall be unlawful to construct,
> enlarge, alter, repair, move, demolish, remove or
> change the use or occupancy of any building or
> structure in the city, to change the use or occupancy
> of an open lot or portion thereof, or to erect, install,
> alter, repair, or use or operate any sign or service
> equipment in or in connection therewith, or to erect,
> install, alter, repair, remove, convert or replace any
> gas, mechanical, plumbing, fire suppression or fire
> protection system in or in connection therewith or to
> cause any such work to be done unless and until a
> written permit therefore shall have been issued by the
> commissioner <u>in accordance with the requirements
> of this code</u>, subject to such exceptions and
> exemptions as may be provided in section 28-105.4.
> (Emphasis added).

Prior to the issuance of a permit, Admin. Code § 28-104.1 requires the approval of all required
construction documents. Administrative Code § 28-104.2 provides for the approval of
construction documents, and states:

> § 28-104.2 Application for approval of construction
> documents. The department shall assign an
> application number to and docket all applications for
> approval of construction documents and any
> amendments thereto filed with it. The department
> shall examine the construction documents <u>promptly</u>
> after their submission. The examination shall be

made under the direction of the commissioner <u>for compliance with the provisions of this code and other applicable laws and rules</u>. The personnel employed for the examination of construction documents shall be qualified registered design professionals, experienced in building construction and design. The department shall provide written notification to owners of adjoining property at the time such application is submitted. (Emphasis added).

The review performed pursuant to Administrative Code §§ 28-105.1, 28-104.2 and determination of whether to approve construction documents and issue permits is unrelated to the content of speech. <u>See</u> DOB Dec., at ¶5. There are no allegations to the contrary; plaintiffs point to no provision of the Administrative Code or other applicable laws and rules that allow for consideration of the content of speech in approving construction documents or issuing permits. Rather, the applicable code provisions regulate building safety and proper zoning, which are factors wholly unrelated to content of speech.  The DOB permitting procedures at issue are akin to the "laws of general application" which carry "little danger of censorship," addressed in <u>Lakewood</u>, in which the Court stated:

In contrast to the type of law at issue in this case, laws of general application that are not aimed at conduct commonly associated with expression and do not permit licensing determinations to be made on the basis of ongoing expression or the words about to be spoken, carry with them little danger of censorship.  For example, a law requiring building permits is rarely effective as a means of censorship…. But such laws provide too blunt a censorship instrument to warrant judicial intervention prior to an allegation of actual misuse.

486 U.S. at 760-1.

Furthermore, plaintiffs do not allege that the building permitting procedures vest DOB with unbridled discretion in issuing permits. "While the Second Circuit has held that facial challenges to facially neutral licensing regulations may be permitted, the statute must 'vest[]

unbridled discretion in a government official over whether to permit or deny expressive activity.'" Dean v. Town of Hempstead, 527 Supp. 3d 347, 410 (E.D.N.Y. 2021) quoting Lakewood, 486 U.S. at 755. Rather, their claim with respect to permitting is entirely based on an alleged lack of sufficient time limits for approval,[14] which as set forth below, are not required, and in any event are provided.

**C.    The Permitting Procedures Applicable to Adult Establishments Are Not a Content-Based Prior Restraint on Expression.**

Moreover, assuming arguendo that plaintiffs have standing to facially challenge the permitting procedures, their claim that the procedures for adult establishments constitute a content-based prior restraint on expression subject to strict scrutiny fails as a matter of law.

**1.    The permitting procedures are not subject to strict scrutiny.**

As set forth above, the permitting procedures relevant to adult establishments, those currently in place as well as those applicable should the 2001 Amendments become enforceable, are generally applicable and content-neutral. Plaintiffs' claim that they are not content-neutral is based entirely on the fact that applications for construction document approval were previously subject to review by DOB's General Counsel's office and that such applications currently may not be professionally certified. However, pursuant to Buildings Bulletin 2020-005, the permitting procedures for adult establishments will be precisely the same as those for all other establishments, once the 2001 Amendments become enforceable.  JSF, at ¶ 72, 88; DOB Dec., at ¶ 17. The fact that applications for adult establishments are currently and until such time as the 2001 Amendments become enforceable, not permitted to be professionally certified, does not render the permitting process content-based.  The prohibition on professional certification is due to the

---

[14] See Club at 60th Compl. at ¶125; 725 Eatery Compl. at ¶118; 59 Murray Compl. at ¶124; 336 LLC Compl. ¶ 135.

current stay of enforcement of the 2001 Amendments and the consequent need for plans to identify the limitation of DOB's approval pending the outcome of the litigation as well as to ensure the applicants have notice of the same, coupled with the technical issues specific to adult establishments while the stay is in place such as floor space configurations to determine compliance with the 60/40 substantial portion test. DOB Dec., at 8. Thus, this restriction is tied to the fact that the establishment is classified as an adult establishment, and is not simply triggered by the presence of adult material or adult entertainment, and does not render it content-based. As recently noted by the Supreme Court, "[t]his court's First Amendment precedents and doctrines have consistently recognized that restrictions on speech may require some evaluation of the speech and nonetheless remain content neutral." City of Austin v. Reagan Nat'l Adver. Of Austin, LLC, 142 S. Ct. 1464, 1473 (2022). "To the extent that the Sign Regulation required looking generally at what type of message a sign carries to determine where it can be located, this 'kind of cursory examination' did not make the regulation content based... For a regulation with a clear content-neutral purpose to be content based, there must be a more searching inquiry into the content." Covenant Media of S.C., LLC v. City of N. Charleston, 493 F.3d 421, 434 (4th Cir. 2007). Accordingly, even the building permitting procedures in effect during the stay are neither content-based nor discriminatory. See "Q" Lungian Enters. v. Town of Windsor Locks, 272 F. Supp. 3d 289, 299 (D. Conn. 2017) (finding that the zoning code in question was a content-neutral time, place and manner restriction as "none of the grounds for granting or denying a building permit has anything to do with what a speaker might say.").

As the permitting procedures are not content-based, they are not, contrary to plaintiffs' assertions, a prior restraint subject to strict scrutiny.[15] "[T]he Supreme Court has made

---

[15] See Club at 60th Compl. at ¶ 207; 725 Eatery Compl. at ¶ 201; 59 Murray Compl. at ¶ 206.

clear that a prior-permitting scheme that does not depend on the content of speech is not subject to strict scrutiny like other forms of prior restraints." "Q" Lungian Enters., 272 F. Supp. 3d at 299 citing Thomas v. Chi. Park Dist., 534 U.S. 316, 322 (2002).  While plaintiffs rely on FW/PBS, Inc. v. City of Dallas, 493 U.S. 215 (1990), in support of their claim,[16] the permitting procedures challenged herein are distinguishable in that they do not impose additional requirements on adult establishments.

### 2.   The permitting procedures do not require time limits to survive a facial challenge.

Plaintiffs do not take issue with the general notion that a work permit of the type referenced in Admin. Code § 28-105.1 is required prior to the commencement of construction, nor do plaintiffs allege that DOB has unbridled discretion in determining whether to approve proposed plans and issue a building permit to an adult establishment.  Rather, plaintiffs base their facial challenge on the alleged failure to include time limits on the permitting procedures employed by DOB.  As set forth above, once the 2001 Amendments become enforceable, the process for obtaining permits from DOB for adult establishments will be the same as that for non-adult establishments, a process plaintiffs concede is "expeditious."[17] DOB Dec., at ¶ 17.  In any event, time limits are not required and the permitting procedures contain adequate time limits, nonetheless.

In Freedman v. Maryland, 380 U.S. 51 (1965), the Court held that a content-based prior restraint required certain procedural safeguards including imposing a brief time limitation for

---

[16] See Club at 60th Compl. at ¶ 206; 735 Eatery Compl. at 200; 59 Murray Compl. at ¶ 205.

[17] See Club at 60th Compl. at ¶¶122, 123 (b); 725 Eatery Compl. at ¶¶115, 116(b); 59 Murray Compl. at ¶¶121, 122(b); 336 LLC Compl. ¶ 135.

the issuance of a determination on a license application and assurance of a prompt final judicial determination on review of a license denial. Id. at 58-9. In Thomas v. Chi. Park Dist., 534 U.S. 316, 322 (2002), which post-dates the Supreme Court's plurality decision in FW/PBS, Inc. v. Dallas, 493 U.S. 215 (1990), the Supreme Court distinguished content-neutral permitting schemes from the content-based licensing scheme addressed in Freedman. In doing so, it stated that, "[w]e have never required that a content-neutral permit scheme regulating speech in a public forum adhere to the procedural requirements set forth in Freedman."

For a content-neutral permitting scheme to survive a facial challenge, Thomas held that it need only "contain adequate standards to guide the official's decision and render it subject to effective judicial review." See also Field Day, LLC v. County of Suffolk, 463 F.3d 167 (2d Cir. 2006); Granite State Outdoor Adver., Inc., v. City of St. Petersburg, 348 F.3d 1278, 1282 (11th Cir. 2003); S. Or. Barter Fair v. Jackson County, 372 F.3d 1128, 1139 (9th Cir. 2003). By logical extension, several Circuit Courts have interpreted Thomas as having held that time limitations, one of the procedural safeguards required by Freedman, are not required for a content-neutral permitting scheme to survive a facial challenge. See Granite, 348 F.3d at 1283; S.Or. Barter Fair, 372 F.3d at 1138; Covenant Media of S.C., 493 F.3d at 435; H.D.V.- Greektown, LLC v. City of Detroit, 568 F.3d 609 (6th Cir. 2009). In Granite, consistent with the Court's general distaste for facial challenges, the Court noted that in the context of a content-neutral permitting scheme, any processing delays could be more appropriately addressed in an as-applied challenge and stated, "[w]e realize City Officials could potentially delay the processing of certain permit applications and thereby arbitrarily suppress disfavored speech. We will not, however, address hypothetical constitutional violations in the abstract." Granite 348 F.3d at 1282. For similar reasons, Thomas has also been interpreted as obviating the need in content-neutral permitting schemes for the

procedural safeguard of prompt judicial review required by <u>Freedman</u>. <u>S. Or. Barter Fair</u>, 372 F. 3d at 1138.

       The permitting procedures at issue here provide the "adequate standards" required by <u>Thomas</u>.  DOB approves construction documents and issues permits once compliance with applicable codes, laws and rules has been established.  <u>See</u> Admin. Code § 28-104.2; DOB Dec., at ¶ 5. Accordingly, as the DOB permitting procedures for adult establishments involve only the application of content-neutral criteria, they are not subject to the procedural safeguards required by <u>Freedman</u>.  <u>See</u> <u>Covenant Media of S.C., LLC</u>, 493 F. 3d 421, 431-2.

### 3.    Even if time restrictions were required, the City's permitting procedures satisfy that requirement.

       The City's permitting procedures include adequate time restrictions.  In addition to the requirement set forth in Admin. Code § 28-104.2 that construction documents be reviewed "promptly" after submission, Administrative Code §§ 28-104.2.7 and 28-104.2.8 explicitly require that absent an extension, construction documents must be approved "no later than 40 calendar days after the submission of a complete application."  Specifically, the Administrative Code provides, in relevant part:

> **§ 28-104.2.7 Time period for review.** Completed construction documents complying with the provisions of this code and other applicable laws and rules shall be approved by the commissioner and written notice of approval shall be given the applicant promptly and no later than 40 calendar days after the submission of a complete application.
>
> Exceptions:
>
> 1. On or before the fortieth day, the commissioner may, for good cause shown and upon notification to the applicant, extend such time for an additional 20 calendar days.

> **§28-104.2.8 Notification of rejection.** Applications failing to comply with the provisions of this code and other applicable laws and rules shall be rejected and written notice of rejection, stating the grounds of rejection, shall be given the applicant promptly and not later than the date required in section 28-104.2.7.

The requirements set forth in Administrative Code §§ 28-104.2.7 and 28-104.2.8 are applicable to both professionally certified applications and applications which are not professionally certified. Contrary to plaintiffs' assertions, the prohibition against professional certification for adult establishments does not compromise DOB's ability to approve plans for, and issue permits to, adult establishments within the time requirements set forth in Administrative Code § 28-104.2.7.  DOB Dec., ¶ 10.  Moreover, while Admin. Code § 28-105.1 does not contain a time restriction within which permits must be issued after construction document approval, applicants can obtain permits promptly after construction documents are approved, provided applicants satisfy other applicable requirements, such as meeting insurance requirements, and payment of penalties.  Id. at ¶ 7.  Indeed, the issuance of a permit often occurs on the same day as construction document approval.  Supplemental Joint Statement of Facts ("SJSF") at ¶11.

The requirement that construction documents be approved within 40 days of the submission of a completed application and the fact that permits must be issued in accordance with the applicable code and are often issued on the same day as construction document approval satisfy any requirement for adequate time restrictions. Even the absence of an express time limit in the statute, particularly here, for a single and ministerial step in the permitting process does not bar the Court from finding that one exists.  "In evaluating a facial challenge to a state law, a federal court must … consider any limiting instruction that a state court or enforcement agency has proffered."  H.D.V. - Greektown, LLC, 568 F. 3d at 624 quoting Rock Against Racism, 491 U.S. at 795-96.  However, "[i]n the absence of state interpretation, federal courts 'will presume any

narrowing construction or practice to which the law is fairly susceptible.'" Field Day, LLC v. County of Suffolk, 463 F. 3d 167, 177 (2d Cir. 2006) quoting Lakewood, 486 U.S. at 770 n.11. "Perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," Field Day, LLC 463 F.3d at 178 (finding that, while statute did not specifically require the issuance of permits, the fact that New York law generally requires that licenses be issued where all the requirements are met permitted the Court to interpret the law as requiring the issuance of permits where all requirements are satisfied, quoting Ward 491 U.S. at 784). Moreover, in the unlikely event that issuance of a permit is for some reason delayed, plaintiffs may bring an as-applied challenge to the permitting procedures; their facial challenge, however, must be dismissed.

**D.    The City's Permitting Procedures for Adult Establishments do not Create a "Sensitive Use Veto."**

Plaintiffs incorrectly assert that because the priority rights of post-August 8, 2001 adult establishments and sensitive receptors attach at the time a work (or "no work") permit is issued by DOB, rather than when the permit application is filed, a non-adult sensitive receptor has an advantage in establishing priority.[18] This claim is based on factual misconceptions, far-fetched hypotheses, and a misreading of Young v. City of Simi Valley, 216 F.3d 807 (9th Cir. 2000), and is utterly baseless.

Plaintiffs complain that schools and churches may submit permit applications to DOB that are professionally certified, while adult establishments must await review by a DOB

---

[18] See Club at 60th Compl. at ¶ 132; 725 Eatery Compl. at ¶ 124; 59 Murray Compl. at ¶ 131; 336 LLC Compl. at ¶ 135.

plan examiner.[19]  Thus, they hypothesize that a church or school can defeat a proposed adult establishment even if the sensitive receptor applies for a building permit after the adult establishment does.  Once the 2001 Amendments become enforceable, the process for obtaining a building permit will be precisely the same for adult establishments and sensitive receptors. Accordingly, the playing field for any race to establish priority will be leveled, preventing the highly remote possibility of a sensitive use veto.

Even currently, with a prohibition on professional certification, the sensitive use veto scenario is far-fetched and highly speculative. While professional certification of a building permit application typically allows faster final completion of the processing of a building permit application, that is not always the case.  DOB Dec., at ¶10.  Furthermore, how much faster can vary, but it is typically not significant.  Id.  Indeed, pursuant to Buildings Bulletin 2016-010. even applications that are professionally certified are subject to routine audits.  See JNR Exhibit 16; SJFS at ¶¶4, 7. In any event, pursuant to Admin. Code § 28-104.2.7, DOB's initial review must be completed within a 40-day period (which DOB may extend by 20 days "upon notification to the applicant" and "on good cause shown").  Thus, the possibility that a church or school can obtain a permit, i.e., obtain approval of its construction documents and submit proof of the appropriate insurance, etc., after an adult establishment applies for construction document approval, and therefore establish priority before such adult establishment receives a DOB permit, is remote. Such a remote possibility should not serve as the basis for a facial challenge.  Indeed, plaintiffs point to no instances of such a sensitive use veto in New York City.  "We are reluctant, in any

---

[19] See Club at 60th Compl. at ¶ 132; 725 Eatery Compl. at ¶ 124; 59 Murray Compl. at ¶ 131; 336 LLC Compl. at ¶ 135.

event, to invalidate legislation on the basis of its hypothetical application to situations not before the Court." Nat'l Endowment for the Arts v. Finley, 524 U.S. 569, 584 (1998).

In this regard, plaintiffs' reliance on Young v. City of Simi Valley is misplaced. There, the ordinance at issue prohibited adult businesses from locating within 500 feet of a residential zone or youth-oriented business and within 1,000 feet of a school, park, place of worship, "noncommercial establishment operated by a bona fide religious organization," or another adult establishment. 216 F.3d at 812. An adult business was required to get a "special use permit, which [could] take from several months to a year to obtain." Id. When the ordinance was adopted, there were no adult businesses in Simi Valley. After the ordinance was passed, the Simi Valley conceded that, "at most, only four adult use sites could be available simultaneously because of the 1,000 foot buffer zone requirement between adult establishments." Id.

Because adult businesses were required to wait from several months to a year for a "special use permit," the plaintiff (whose chosen site was intentionally defeated by a later-arriving religious use) argued that the vulnerability of any chosen site to a "sensitive use veto" denied prospective adult business owners "a reasonable opportunity to open and operate their enterprise within the city" as required by Renton.[20]  Noting that "[a]n inquiry into the reasonableness of alternative avenues under Renton necessarily must be fact specific," the Ninth Circuit found that "[i]n a city of 100,000, with [no existing adult establishments,] only four potential simultaneously

---

[20] In Young v. Simi Valley, the City passed a moratorium on adult uses to defeat the plaintiff's first proposed location and thereafter adopted the challenged zoning ordinance prohibiting adult uses at that location. After plaintiff applied for a "special use permit" authorizing an adult establishment at an alternate location, "a newly established religious organization" filed an application "to operate an adult bible study class" at that location. The religious group intended to meet "for Bible study [at that location] one hour per week, … and its space was furnished only with several folding chairs." The leader of the religious group was an "admitted opponent of [the plaintiff's] proposed establishment" and believed that the weekly bible class would disqualify the plaintiff's permit application. 216 F.3d at 812-13.

available sites, and at least one known, active opponent of adult businesses, the heightened risk to establishing an adult business created by the sensitive use veto" denied an adult business owner a "reasonable opportunity to open and operate an adult enterprise in Simi Valley." 216 F.3d at 817-18.

Here, on the other hand, there are not merely four simultaneously available sites in the City; there are more than 1,700 available lots in total and between 147 and 245 lots that can be simultaneously occupied (taking into account the number of adult establishments that could simultaneously operate in these 1,700 plus lots). DCP Dec., ¶¶ 12-14. Nor is the permit review process likely to take up to a year. See Point II (A)(1) supra; DOB Dec., ¶ 9 Rather DOB's initial review of the construction documents, including for lawfulness pursuant to the Zoning Resolution, must be completed within 40 days pursuant to Admin. Code §28-104.2.7 and permits are often issued on the very same day as construction document approval. SJFS at ¶11. Accordingly, the heightened risk of a sensitive use veto identified in Young is not present here.

**E.      The Permitting Procedures do not Violate Plaintiffs' Right to Equal Protection of the Law.**

Plaintiffs incorrectly assert that by prohibiting adult establishments from professionally certifying applications for construction document approval, DOB has violated the Fourteenth Amendment's assurance of equal protection. First, this assertion is based on the outdated permitting procedures that will not be applicable to adult establishments should the 2001 Amendments become enforceable. Second, DOB clearly has a rational basis for prohibiting the professional certification of construction plans for adult establishments while the 2001 Amendments are stayed from being enforced. Accordingly, they do not violate the Fourteenth Amendment.

As the Supreme Court held in Heller v. Doe, 509 U.S. 312, 319 (1993), where a classification involves neither a fundamental right nor a suspect class, it is subject to rational-basis review. There is no dispute that the permitting procedures at issue do not involve suspect classification. Furthermore, as set forth above, the permitting procedures are content-neutral and therefore do not impinge on a fundamental right. Consequently, they are subject to rational-basis review and "accorded a strong presumption of validity." Id. The challenge herein is similar to that addressed by Isbell v. City of San Diego, 258 F.3d 1108 (9th Cir. 2001) in which the Court held:

> A regulation of secondary effects of adult businesses is not a regulation of content; a classification of adult businesses therefore does not impinge on a fundamental right, nor does it involve a suspect classification. The ordinance may therefore survive an equal protection challenge if it has a rational basis.

Id. at 1116.

Prohibitions of professional certification are not unique to adult establishments. Additional types of work such as subdivisions and full demolitions are also excluded from the professional certification program. See JNR Exhibit 16; DOB Dec., at ¶9; Whether purported 60/40 establishments have lawful 60/40 configurations is unique to adult establishments. Additionally, adult establishments have been the subject of ongoing litigation and unresolved applicable law for over twenty years. As a result of the stay of enforcement of the 2001 Amendments, DOB includes a plan exam note on approved construction documents indicating that the approval is limited pending the outcome of the litigation. DOB Dec., at footnote 4. These same issues do not generally arise in filings submitted by schools and churches. It is therefore clear that DOB's review for conformity to the Zoning Resolution's provisions governing adult establishment applications is directly and rationally related to the City's effort to ensure enforcement of the zoning regulations relevant to adult establishments so as to "minimize the potential for adverse

secondary effects throughout the city." See JNR Exhibit 41-3.  Under rational-basis review, a

classification "must be upheld against equal protection challenge if there is any reasonably

conceivable state of facts that could provide a rational basis for the classification." Heller, quoting,

FCC v. Beach Communications, Inc., 508 U.S. 307 (1993).  Clearly, DOB's review of applications

and plans submitted by adult establishments for conformity to the Zoning Resolution's applicable

proximity restrictions is supported by a rational basis.

**POINT III**

**THE BOOKSTORE PLAINTIFFS' DUE PROCESS CLAIM
FAILS AS A MATTER OF LAW[21]**

While it is unclear whether the Bookstore plaintiffs' due process claim is premised

on an alleged violation of procedural or substantive due process, either fails as a matter of law.

**1. Plaintiffs were not entitled to notice and an opportunity to be heard with
respect to the 2001 Amendments as they are legislative.**

Plaintiffs were not entitled to procedural due process prior to the enactment of the

2001 Amendments. The 2001 Amendments are legislative—they are generally applicable to all

adult establishments in New York City and do not target plaintiffs individually.[22]  As such they

are not subject to the due process requirements of notice and an opportunity to be heard.  New

York Pet Welfare Ass'n v. City of New York, 143 F. Supp. 3d 50, 70 (E.D.N.Y. 2015), aff'd 850

---

[21] Only plaintiffs in 336 LLC v. City of New York, Index No. 18 CV 3732 raise a procedural due process claim. 336 LLC Compl. at ¶ 173-4.

[22] Hearings were held before the New York City Council and City Planning Commission with respect to the 2001 Amendments prior to their enactment at which the public had the opportunity to testify. See 1995 City Planning Commission Report, JNR Exhibit 41-3 at Bates 000422-432; Transcript of New York City Planning Commission Public Hearing held May 23, 2001, JNR Exhibit 44, Bates 00563-000638; Transcript of New York City Planning Commission Public Hearing held August 8, 2001, JNR Exhibit 46, Bates 000843-000854; Transcript of October 1, 2001 Hearing of Zoning and Franchises Subcommittee of New York City Council, JNR Exhibit 47, Bates 000855-000895.

56

F.3d 79 (2d Cir.), cert denied, 138 S. Ct. 131 (2017).  "It is black letter law that a person is not entitled to procedural due process protections against government action that is legislative in nature." Hopkins Hawley LLC v. Cuomo, 518 F. Supp. 3d 705, 714 (S.D.N.Y. 2021); see also Our Wicked Lady LLC v. Cuomo, 2021 WL 915033 *5 (S.D.N.Y. Mar. 9, 2021). An individual's due process rights are not violated by a law of general applicability since, "the legislative determination provides all the process that is due." Logan v. Zimmerman Brush Co., 455 U.S. 422, 433 (1982). Moreover, "[i]t is well established that a government's change in established policy, even if it works to an individual's commercial detriment, does not create entitlement to a hearing." Sanitation & Recycling Indus. v. City, 925 F. Supp. 407 (S.D.N.Y. 1996), citing O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 789 (1980).

### 2.   Plaintiffs' failure to identify a liberty or property interest they were deprived of is fatal to their due process claims.

Even if the 2001 Amendments did trigger due process protections, plaintiffs have failed to identify a protected property interest of which they have been deprived.  To the extent that plaintiffs claim that they have been deprived of lost revenue or a right to operate their businesses, their due process claim fails. "[B]usiness in the sense of *the activity of doing business*, or *the activity of making a profit* is not property in the ordinary sense," College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd., 527 U.S. 666, 675 (1999). "Harm to business interests…is not a 'plain, palpable invasion of rights' under the Fourteenth Amendment." Savage v. Mills, 478 F. Supp. 3d 16, 30 (D. Me. 2020), citing Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 721, (2010) (noting that "the liberties' protected by substantive due process do not include economic liberties"). Moreover, plaintiffs do not have a right to conduct business without conditions.  Columbus Ale House, Inc. v. Cuomo, 495 F. Supp. 3d 88, 93-94 (E.D.N.Y. 2020).

In any event, plaintiffs have not been deprived of the ability to operate their adult establishments.  The 2001 Amendments have merely restricted the number of locations in which adult establishments may operate; they have not prohibited them from operating completely. Accordingly, they do not run afoul of the Fourteenth Amendment.  See  Hu v. City of New York, 927 F.3d 81, 102 (2d Cir. 2019) ("the right of occupational choice is afforded Due Process protection only when a plaintiff is 'complete[ly] prohibit[ed]' from engaging in his or her chosen profession) (quoting Conn v. Gabbert, 526 U.S. 286, 292 (1999)); see also Columbus Ale House, 495 F. Supp. 3d at 94 (finding that plaintiff could not show that Covid-19 restrictions had prevented it from operating its business completely). Furthermore, lost revenue is insufficient to support a due process claim.  See Hu, 927 F. 3d at 102; see also JWJ Indus., Inc., v. Oswego Cty., 538 F. App'x 11, 14 (2d Cir. 2013) ("Due process has not been construed to preclude government actions that adversely affect a business's profitability").

### 3. To the extent the Bookstore plaintiffs assert a claim for violation of substantive due process, it fails as a matter of law.

In order to state a substantive due process claim, "a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" Pollok v. Chen, 2020 WL 1456495 *45 (2d Cir. 2020) (quoting Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005)).  The Bookstore plaintiffs fail to even allege that the 2001 Zoning Amendments shock the conscience, and accordingly, to the extent they assert a violation of substantive due process, it fails.  In any event, the 2001 Zoning Amendments cannot be so arbitrary so as to rise to a substantive due process violation when they withstand First Amendment scrutiny.  See Point I, supra.

## POINT IV

**PLAINTIFFS' CHALLENGE TO THE ONE YEAR TERMINATION PERIOD APPLICABLE TO ADULT ESTABLISHMENTS AS WELL AS THEIR ALTERNATIVE CLAIM THAT THE ONE YEAR ENFORCEMENT DATE SHOULD NOT COMMENCE UNTIL THE 2001 AMENDMENTS BECOME ENFORCEABLE BOTH FAIL.**

The Zoning Resolution, § 52-77 and § 72-41, requires that adult establishments located in zoning districts that do not allow such establishments to terminate within one year of the 2001 Amendments becoming effective.  This one year period, which was initially set to expire in October 2002, allows these establishments to recoup their investments.  Both provisions have previously been upheld by New York State courts.  See Stringfellow's, 91 N.Y.2d at 405 (rejecting plaintiffs' challenge to Z.R. § 52-77 since plaintiffs failed to seek an extension of the one-year amortization as provided in Z.R. provision); People Theatres, 20 A.D.3d 1, 21 (1st Dep't 2005) (same as applied to Z.R. § 72-41).  Like the two plaintiffs there, the plaintiffs here have not sought an extension of the one year termination provision.  DCP Dec., at ¶ 8, fn. 1.

Given that plaintiffs have had years—if not decades—to recoup their investments, not surprisingly plaintiffs do not challenge the termination requirements on the ground that they have been given an inadequate amount of time to recoup or amortize their investments.  JSF, at ¶ 52. Indeed, courts routinely uphold amortization provisions of one year or less in connection with adult use zoning ordinances.  See, e.g., Hart Book Stores, Inc. v. Edmisten, 612 F.2d 821, 830 (4th Cir. 1979) (six months); SDJ, Inc. v. Houston, 837 F.2d 1268, 1278 (5th Cir. 1988) (six months); World Wide Video of Wash., 368 F.3d at 1199-2000 (one year); Pao Xiong v. City of Moorhead, 641 F. Supp. 2d 822, 831 (D. Minn. 2009) (one year).  Given the multiple lawsuits challenging the 2001 Adult Use Amendments, adult establishments in the City have had over two decades to amortize their investments.  And those plaintiffs that invested funds after 2001 did so at their own

peril.  See, e.g., 801 Conklin St. Ltd. V. Town of Babylon, 38 F. Supp. 2d 228, 249 (E.D.N.Y.

1999) ("Any additional investment made in the [adult use] business after enactment of the Code

was made in derogation of the Code, not in reliance on the status quo ante.").  Rather, plaintiffs

challenge the termination requirements on First Amendment and Equal Protection grounds,

alleging that "it disadvantages non-conforming Adult Establishments as compared to all other non-

conforming uses, including even those engaged in expression." JSF, at ¶ 52.

       That non-conforming adult establishments are treated differently than most other

non-conforming uses is not surprising given the well-documented secondary effects of adult

establishments.  See 1994 DCP Study, JNR Exhibit 41.  As the 1995 City Planning Commission

Report noted: non-conforming adult establishments should not be "grandfathered" since that

"would substantially reduce the effectiveness of the proposed [zoning change] in responding to the

adverse secondary effects of adult establishments."  See 1995 CPC Report, JNR Exhibit 41-3 at

Bates No. 463-64.  See also 2001 CPC Report, JNR Exhibit 45 at Bates No. 701-03.  Specifically,

grandfathering adult establishments would freeze "certain locations and certain neighborhoods as

the situs of adult establishments," and those adult establishments "would in effect have a monopoly

in the area" which would create "a strong incentive to keep an inappropriate use operating within

a neighborhood."[23]  1995 CPC Report, JNR Exhibit 41-3 at Bates No. 464.

       This differential treatment between non-conforming adult establishments and most

other non-conforming uses is not unique to New York City. See, e.g., Islip, 73 N.Y.2d at 560-61

---

[23] Plaintiffs will presumably argue that the defendants need to point to contemporary evidence that existing 60/40 establishments are creating negative secondary effects. But as Judge Pauley noted in 2019, the defendants "have met their burden of providing evidence that supports a link between the regulated speech and the asserted secondary effects."  PI Decision, 408 F. Supp.3d at 60 (noting, among other evidence, that the 1994 DCP Study "certainly demonstrates some nexus between deleterious secondary effects and establishments with a predominant, ongoing focus on adult-oriented expression").

(holding that "the Town has established the damage caused to its neighborhoods by adult uses and the substantial investment it has made … to overcome the blight caused by them" and noting that the "intractable problem of eliminating nonconforming uses … has let the courts of this state to sustain amortization provision" (citations omitted)).  See also 801 Conklin St., 38 F. Supp. 2d at 249 (same).[24]

Since the evidence establishes that the City is justified in treating non-conforming adult establishments differently than most other non-conforming uses, plaintiffs' First Amendment and Equal Protection Clause claims fail.  To start, as detailed in Point I, supra, plaintiffs First Amendment claims fail for a host of reasons.  See, e.g., Islip, 73 N.Y.2d at 561 (rejecting claim that amortization provision "applied to uses enjoying constitutional free speech protection amounts to content-based regulation," Court holds that since "the [challenged adult use] ordinance is content-neutral under both the Federal and State Constitutions, the amortization provisions rest

---

[24] The Zoning Resolution typically permits non-conforming uses to remain while imposing a variety of limitations on such uses, including limitations on structural alterations (ZR 52-22), on changes to non-conforming uses (ZR 52-30) and on enlargements or extensions (ZR 52-40). However, the Zoning Resolution mandates that non-conforming uses -- such as adult establishments – that have secondary effects beyond their property line terminate after an amortization period.  ZR 52-70.  Thus, the Zoning Resolution mandates that in residential districts the following uses (that are not in a completely enclosed building below a certain assessed valuation) must have terminated within ten years of December 15, 1961 (or when the use became non-conforming):  "coal storage; dumps, marine transfer stations for garbage, or slag piles; junk or salvage yards …; lumber yards …; manure, peat or topsoil storage; [and] scrap metal, junk, paper or rags storage, sorting or baling."  ZR 52-74.  As was noted over sixty years ago, "many nuisances created by industries are not confined to immediate vicinity of the industrial plants.  For example, odors and other types of air pollution can adversely affect whole neighborhoods…."  Zoning New York City, Voorhees Walker Smith & Smith (August 1958), at 229 (available at https://www1.nyc.gov/assets/planning/download/pdf/about/city-planning-history/zoning_nyc.pdf).

upon the same legal foundation as such provisions generally and, on the facts presented here, are valid").

Plaintiffs' Equal Protection clause claim similarly fails.  "When a statute neither impinges on a fundamental right guaranteed by the Constitution nor uses a classification based on a suspect criterion such as race, nationality, alienage, or gender, the law generally will not be found to violate the Equal Protection Clause unless it is has no reasonable or rational basis."  Story v. Green, 978 F.2d 60, 63-64 (2d Cir. 1992).  As noted, the 2001 Amendments do not impinge on the plaintiffs' First Amendment rights; and since the plaintiffs are not members of a suspect class, the 2001 Amendments are examined under rational basis review.

The analytical basis of a First Amendment claim and an Equal Protection claim are similar, but the First Amendment test requires an additional showing—that there be "ample alternative channels of communication."[25]  See Gasparo v. City of New York, 16 F. Supp. 2d 198, 222 (E.D.N.Y. May 28, 1998).  Therefore, "the Equal protection Clause adds nothing to the First Amendment analysis; if a sufficient rationale exists for the ordinance under the First Amendment, then the City has demonstrated a rational basis for the alleged disparate treatment under the Equal Protection Clause."  DLS Inc. v. City of Chattanooga, 107 F.3d 403, 411 n.7 (6th Cir. 1997) (citing Renton, 475 U.S. at 55 n.4; Young v. American Mini Theatres, 427 U.S. 50, 63–73 (1976) (plurality opinion)).  See, e.g., Sanchez v. Turner, 2022 WL 1343754 *11 (S.D.N.Y. June 19, 2002) (since the Court found the agency policy reasonable for First Amendment purposes, "the policy also satisfies rational basis review in the equal protection context"); Lederman v. N.Y. City Dep't of Parks & Rec., 2010 WL 2813789 *11 (S.D.N.Y. July 16, 2010) (denying preliminary

_____

[25] As noted supra Point I, there are ample alternative lots for plaintiffs to engage in their First Amendment activity.

injunction motion, Court holds that plaintiffs "have not established that they are likely to carry the heavy burden of winning [an equal protection] rational-basis challenge" since it did not appear that their First Amendment rights have been infringed). Since plaintiffs' First Amendment claim fails its Equal Protection claim also fails.

As a fall back, plaintiffs also argue that if all of their other challenges to the 2001 Amendments fail, this Court should enjoin the City from enforcing these provisions for one year from the date that the stay of enforcement expires. That argument should be rejected. To start, since the June 2017 New York Court of Appeals decision in People Theatres, plaintiffs have known that the City could seek to enforce the 2001 Amendments. Indeed, while the City agreed to not enforce the 2001 Amendments while the People Theatres plaintiffs sought further review of that decision, the City reserved the right to require the plaintiffs to file preliminary injunction motions upon notice between 30 and 75 days.[26] In any event, given that the plaintiffs have been operating for years after the 2001 Amendments were scheduled to become effective, their claim to operate for one more year should be rejected. See, e.g., Islip, 73 N.Y.2d at 561 (noting that adult use establishments "have continued to operate well past the maximum five-year period"); For the People Theatre, 20 A.D.3d at 21 (noting that adult use establishments "have had the benefit of remaining in operation pending this appeal"). And plaintiffs' claim that their patrons' right to access to protected expression fails since, as plaintiffs themselves acknowledge, there are a variety of adult establishments that do not have to relocate. JSF, at ¶¶ 167 & 182. Moreover, there are over 1,700 lots where the 32 adult establishments could be sited if these establishments had to relocate as a result of enforcement of the 2001 Amendments. JSF, at ¶ 145; DCP Dec., at ¶ 9; JNR Exhibit 71.

---

[26] See JNR Exhibit 60 (8/2/17 Stip., at 30); JNR Exhibit 59 (9/25/17 Litig. Mgmt Agmt, at ¶ 1(E)).

Finally, plaintiff Jacaranda Club, LLC ("Jacaranda") claims that since it did not begin operating until 2009, based on its flawed reading of the Zoning Resolution it does not have to relocate until one year after the 2001 Amendments become enforceable. Club at 60th Street, SAC, at ¶¶ 213-220 [ECF 42]. Z.R. § 52-77 provides in pertinent part that "a non-conforming adult establishment shall terminate within one year from …[the] date that the adult establishment becomes non-conforming." Jacaranda relies on the definition of non-conforming use, which is "any lawful use … which does not conform to any one or more of the applicable use regulations of the district in which it is located." Z.R. §12-10 (emphasis added). Jacaranda claims that since the 2001 Amendments have not yet been enforced, the amendments were not "applicable;" Jacaranda essentially asserts that the terms "applicable" and "enforceable" are synonymous. They are not. See United States v. Morrison, 521 F. Supp. 2d 246, 254-55 (E.D.N.Y. 2007) (rejecting defendant's contention that since executive branch did not enforce statute it was not applicable), aff'd in part and rev'd in part on other grounds, 686 F.3d 94 (2d Cir. 2012). There is no dispute that the 2001 Amendments applied to the zoning district where Jacaranda is located (even though they were not enforced). See Snyder v. Buck, 75 F. Supp. 902, 907 (D.D.C. 1948) (term "applicable" means "capable of being applied"). See also Whalin v. Sears Roebuck & Co., 1995 WL 68823 *3 (N.D. Ill. Feb. 13, 1995) ("The common definition of the word applicable is 'capable of or suitable for being applied.'").

## **CONCLUSION**

For the forgoing reasons, defendants' motion for summary judgment on all of the

claims in the operative complaints – i.e., Club at 60th Street, Inc. case [ECF No. 42]; 725 Eatery

Corp. [ECF No. 77], 59 Murray Enterprises Inc. [ECF No. 26], and 336 LLC, d/b/a "the Erotica,

et. al." [ECF No. 26] - in these matters should be granted in its entirety.

Dated:        New York, New York
              September 16, 2022

                                    HON. SYLVIA O. HINDS-RADIX
                                    Corporation Counsel of the City of New York
                                    Attorney for Defendants
                                    100 Church Street
                                    New York, New York 10007
                                    (212) 356-2207

                                    By: _____
                                        Kerri Devine
                                        Assistant Corporation Counsel