UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------

CLUB AT 60TH STREET, INC., et al.,

                Plaintiffs,

                -against-                      02 Civ. 8333 (LJL)

THE CITY OF NEW YORK,

                Defendant.

-------------------------------------------------------------------

725 EATERY CORP., et al.,

                Plaintiffs,

                -against-                      02 Civ. 4431 (LJL)

THE CITY OF NEW YORK, et al.,

                Defendants.

-------------------------------------------------------------------

59 MURRAY ENTERPRISES, INC., et al.

                Plaintiffs,

                -against-                      02 Civ. 4432 (LJL)

THE CITY OF NEW YORK, et al.,

                Defendants.

-------------------------------------------------------------------

336 LLC, et al.,

                Plaintiffs,                            18 Civ. 3732 (LJL)

                -against-

THE CITY OF NEW YORK, et al.,

                Defendants.

-------------------------------------------------------------------

## **DECLARATION OF MATTHEW J. CROSWELL**

**Matthew J. Croswell**, declares under the penalties of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am the Geographic Information Systems Team Lead and Open Data Coordinator at the New York City Department of City Planning ("DCP"), the city agency which provides staff assistance to the New York City Planning Commission ("Planning Commission"). I have worked at DCP since September 2005 and hold a Bachelor of Arts degree in Urban Planning and Geography and a Graduate Certificate in Geographic Information Systems ("GIS"). I make this declaration in these four lawsuits in further support of the defendants' motions for summary judgment and in opposition to plaintiffs' cross-motions for summary judgment. I also submit this declaration as my direct testimony for the trial in these four lawsuits scheduled to begin on October 16, 2023.

2. As detailed below, DCP conducted an extensive analysis of available lots where adult establishments could be located in the City of New York ("City"). That analysis indicates that there are more than 1,200 lots where the 32 adult establishments identified by the parties will have to relocate if the 2001 Amendments to the City's Zoning Resolution ("ZR") are enforced. Consolidated Statement of Stipulated Facts, at ¶ 170.

3. To reach this determination, beginning in December 2019 DCP conducted an extensive GIS analysis of potentially available lots throughout New York City.[1] DCP used, among others, a geospatial dataset known as MapPLUTO version 19v2. MapPLUTO 19v2 is a

---

[1] The precise methodology followed, and the databases used (including their URL addresses), by DCP were provided to plaintiffs in response to specific questions that plaintiffs had propounded, and are set forth in the instruction sheet to DCP staff that conducted the analysis and the detailed technical methodology. 2022 Judicial Notice Request ("JNR"), Exs. 71-1 & 71-2. Defendants also provided four Excel spread sheets containing the permutations for best and worst case scenarios if adult use establishments sought to simultaneously relocate in these 1,700 plus lots.

tax lot data file that contains over seventy data fields derived from various source data files maintained by various City agencies.  MapPLUTO 19v2 establishes the land use of a particular tax lot by referring to the tax lot's land use code, which is based on the New York City Department of Finance's building class code.  MapPLUTO 19v2 identifies 857,298 lots in New York City.

4. DCP first identified adult establishment exclusion areas by creating 500 foot buffer areas around three zoning uses:  zoning districts where adult establishments are not allowed under the Zoning Resolution, schools and houses of worship.

5. For zoning districts where adult establishments are not allowed, DCP removed any tax lots that are located in or within 500 feet of the following Zoning Districts:  any Residential district, C1, C2, C3, C4, C5, C6-1, C6-2, C6-3 Commercial districts, and M1-5A, M1-58, M1-5M, M1-6M, and M*D Manufacturing districts.

6. For schools, DCP used the City's facilities database (December 2019) that identified schools (including pre-kindergarten and registered day cares, and kindergarten through 12th grade), which would then disqualify lots located within 500 feet of a particular school.

7. For houses of worship, DCP used MapPLUTO 19v2 as the primary source to identify them, which would then disqualify lots located within 500 feet of a particular house of worship.  MapPLUTO 19v2 also contains a building class code for each tax lot.  This code identifies the major use of structures on the tax lot.  MapPLUTO 19v2 identifies houses of worship or other structures associated with religious practices, such as non-residential mission houses, parsonages, rectories and convents, using the following building codes: M1, M2, M3, M4, M9.  Lots with one of the above-mentioned building codes were excluded regardless of whether the building code identified a house of worship (which is a sensitive receptor in that the Zoning Resolution specifically prohibits adult establishments from locating within 500 feet of them, *see*

*e.g.*, ZR § 32-01(a)) or other structures associated with religious practices (which are not sensitive receptors in that the Zoning Resolution does not prohibit adult establishments from locating within 500 feet of them).[2]

8.      After creating a 500 foot buffer around these the zoning districts where adult establishments are not allowed, schools and houses of worship, DCP then established 500 foot buffers around 72 lots that appeared to be adult establishments.  DCP also eliminated an M3-1 district in the Brooklyn core covering parts of Greenpoint and Williamsburg along Newtown Creek that was proposed for rezoning (that proposal was not adopted), and also eliminated the M districts that were proposed to be rezoned in the Gowanus area of Brooklyn.  After combining all of the above-mentioned exclusion areas, DCP then excluded lots within these buffers, but kept parts of lots falling outside these buffers.  5,009 lots remained after this process, and these lots were subject to further review.

9.      A further review resulted in the removal of lots that were publicly owned, parks, or identified as being used for transportation or utility purposes, as well as lots that were smaller than 5,000 square feet.  Publicly owned lots were identified by using the Ownership Type field in MapPLUTO 19v2 and excluding lots with C - City, M - Mixed, or O - Other public values.  Additional lots were identified as publicly owned by using the Owner field in MapPLUTO 19v2 and excluding lots that contain public agencies using key words values.  JNR 71-2, at 001579.  Lots containing parks were removed by overlaying Parks in the Zoning District dataset on top of

---

[2]  The term "house of worship" replaced the term "church" in the Zoning Resolution in 2004.  The term "house of worship" is not defined in the Zoning Resolution.  The Zoning Resolution separately identifies the use group for houses of worship (see ZR § 22014) and the use groups for monasteries, convents, novitiates, rectories and parish houses (see ZR §§ 22-13, 22-14).  To the extent the ZR's adult use zoning restrictions mention a "house of worship" as a sensitive receptor which disqualifies an adult use establishment within 500 feet, a lot's use group classification is not necessarily controlling of the zoning question of whether it is a "house of worship."

MapPLUTO 19v2 lots and eliminating or deleting the MapPLUTO 19v2 lots that overlap with the Park zoning districts using the Erase tool in ArcGIS.  Lots with a Transportation or Utility land use were identified by using the Land Use field in MapPLUTO 19v2 and eliminating lots with a '07' - Transportation & Utility value.  Lots smaller than 5,000 square feet were determined by using the Shape Area field and selecting lots with shape areas smaller than 5,000 square feet.  These exclusions left 2,217 remaining lots.

    10. These 2,217 lots were then each manually reviewed by DCP staff using various computer programs, and their knowledge of the areas.  Specifically, eight DCP staff each reviewed approximately 275 lots each.  These staff members were directed to check the ownership and use of each lot and exclude lots that were publicly owned or appeared to contain a house of worship, a school, major infrastructure (such as railways, heliports, or roads) or major utilities (such as Con Edison, National Grid, or Port Authority) in active use.  Staff were also directed to exclude lots without street frontage or that appeared too irregular to develop.  If the reviewer was uncertain about whether the lot should be excluded, the reviewer was directed to identify the lot as questionable.  Of the 2,217 lots reviewed by DCP planners, 514 were excluded as either fitting the above criteria or questionable.  Attached hereto as Exhibit A is a list of these excluded lots.  The remaining 1,703 lots were originally identified as available for adult establishments.  2022 Judicial Notice Request ("JNR"), Ex. 71.

    11. DCP recently conducted additional analysis of all lots that contained more than one use (specifically, those tax lots that contain multiple structures or multiple uses within a single building or tax lot).  In such cases, the building class code indicates that the lot contains mixed uses without specifically identifying each underlying use.  There are several building codes that represent multiple uses, or a mix of uses, assigned to a tax lot.  These include S0, S1, S2, S3,

5

S4, S5, S9, RC, RD, RM, RX and RZ.  The building class codes for mixed uses do not specify whether a house of worship is contained in the structure.  MapPLUTO 19v2 identifies 37,104 mixed use building code lots in New York City (four percent of the total lots in New York City).  Of the 37,104 mixed use building code lots, 96 percent (35,595) are in a zoning district that does not allow adult establishments, leaving 1,509 mixed use building code lots.[3]

12. Since hypothetically each one of these 1,509 mixed used building code lots could contain a house of worship, DCP created 500 foot buffers around these 1,509 mixed use building code lots, as well as two of the 514 lots excluded during the DCP staff review described in paragraph 10 above (because those two lots were identified as containing houses of worship).  As a result of this buffering, 1,275 lots remain where adult establishments could be located.[4]  Attached hereto as Exhibit B is a list of those 1,275 available lots.  Also attached hereto as Exhibit C is a list of the 1,703 lots originally identified with an indication if each lot is contained within the list of 1,275 lots.

---

[3] 1,428 of these 1,509 lots are in areas that do not permit adult establishments because they are within a 500-foot buffer of a sensitive receptor.  Of the remaining 81 mixed use building code lots, only 43 lots are in areas that fully permit adult establishments, and a portion of 38 lots are in areas where at least part of the lots are zoned to permit adult establishments.  64 of the 81 lots were eliminated as potential lots during DCP's in-office review of 2,200 plus lots as described in paragraph 10 above, leaving 17 lots where adult establishments could be located (that have mixed use building class codes that could potentially contain a house of worship).

[4] DCP expended numerous resources conducing this manual review of over 2,200 lots as described in paragraph 10.  In addition to the eight DCP staff members that reviewed over 2,200 lots, DCP's data engineering team created a proximity model to determine the number of available lots if adult use establishments sought to simultaneously relocate.  I oversaw the entire project and performed the GIS analysis described in paragraphs 3-9 above; throughout the project I frequently consulted with Susan Amron, DCP's General Counsel.  Recreating this project to update the data would be a significant expenditure of DCP resources but, more importantly, such an update would not change the results in any substantial manner since there has only been one major re-zoning since December 2019 (that was not taken into account in DCP's analysis), the SoHo/NoHo rezoning in Manhattan that did not result in any significant decrease in the number of available lots.

13. DCP recognizes that if an adult establishment relocates to one of the 1,275 available lots, the number of remaining lots available for such use may be further reduced due to the buffer requirement in Z.R. Sections 32-01(c), 42-01(c) and 42-01(d) (which requires a 500-foot buffer from existing adult establishments for new adult establishments), and the prohibition (Z.R. Section 32-01(d)) against more than one adult establishment on a zoning lot. DCP analyzed what the effect would be on the 1,275 available lots if adult establishments simultaneously were located in these available lots; in that case, there would be at least 204 lots available (including 110 available lots where adult bookstores could be located if, assuming arguendo, they were not permitted in M2 and M3 districts, as the bookstore plaintiffs assert). Attached hereto as Exhibit D are the results of DCP's analysis; specifically, the analysis identifies the available lots by borough, block and lot number.[5]

14. The 1,275 number is a very conservative count of the actual number of available lots since, as noted in paragraphs 8-10 above, DCP eliminated all lots that were deemed questionable, and all potential lots in the M3-1 district along Newtown Creek.[6] DCP also buffered all C5 districts even though only C5-1 must be buffered, and also buffered M1-6M districts even though those districts are not required to be buffered. In addition, DCP measured the 500 foot buffer from the lot line of 72 lots mentioned in paragraph 8 above that appeared to be adult

---

[5] DCP prepared this analysis by creating a computer program (known as a python script) that assumed that one of the 1,275 lots had an adult establishment, created a 500 foot buffer around that establishment (which would buffer out (i.e. eliminate) one or more of the remaining 1,275 lots within 500 feet of that establishment), and then moved on to the next unbuffered lot, assumed an adult establishment on that lot, created a 500 foot buffer around that lot (which similarly would have buffered out one or more of the remaining lots with 500 feet of that establishment), and repeated that pattern until no more lots were available. The computer program then repeats that process until every combination of siting establishments within that universe of lots is exhausted.

[6] DCP did not exclude from its analysis coastal areas since the City's shoreline materially remains unchanged since 2002, and does not affect the areas available for adult establishments.

establishments, not the principle entrances of the establishment as permitted by the City's Department of Buildings. JNR, Ex. 18, at 6. And as noted in paragraph 7 above, all building code lots M1, M2, M3, M4 and M9 were excluded even though the Zoning Resolution permits adult establishments to be located within 500 feet of structures that are associated with religious practice but are not houses of worship. Finally, DCP also eliminated over 1,900 lots of less than 5,000 square feet.[7] As a result, the number of available lots for relocation by adult establishments is likely well above the 1,275 number.

Dated:   New York, New York
         May 19, 2023

                                                         **Matthew J. Croswell**

---

[7] As noted in defendants' opposition papers to the plaintiffs' preliminary injunction motion, many of the adult bookstores are located in buildings on lots that are less than 5,000 square feet. 1/30/19 Laremont Decl. Ex. A. For instance, the building where plaintiff Chelsea 7 Corp. is located has less than 5,000 square feet. Id. Similarly, the building where plaintiff Video Lovers Inc. is located has less than 5,000 square feet. Id.