UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*                      :

                    Plaintiffs,

                               :

       - against -                     Civil Action No.

                               :   02 CV 4431 (LJL)

THE CITY OF NEW YORK, et al.,

                    Defendants.   :

-----------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*             :

                    Plaintiffs,

                               :

       - against -                     Civil Action No.

                               :   02 CV 4432 (LJL)

THE CITY OF NEW YORK, et al.,

                    Defendants.   :

-----------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*            :

                    Plaintiffs,

                               :

       - against -                     Civil Action No.

                               :   02 CV 8333 (LJL)

THE CITY OF NEW YORK,

                    Defendant.   :

-----------------------------------------------------------------X

_____

# CLUB PLAINTIFFS' JOINT
# REPLY MEMORANDUM IN SUPPORT OF THEIR MOTIONS FOR PARTIAL
# SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................................... 1

I   THE CITY HAS FAILED TO ESTABLISH ANY MATERIAL ISSUE OF FACT OR LAW PREVENTING ISSUANCE OF PARTIAL SUMMARY JUDGMENT TO PLAINTIFFS ON THEIR CHALLENGE TO THE CITY'S DISCRIMINATORY MANDATORY TERMINATION REQUIREMENT ................................................. 1

    A.   The City's Brief fails to properly consider the requirements of either the Plurality or Justice Kennedy's concurrence in *City of Los Angeles v. Alameda Books*. ... 1

    B.   Significantly, the City's Brief also fails to properly consider the *combined* impact of *Alameda Books, Reed v. Gilbert* and *City of Austin v. Regan Nat'l Advertising*. ..................................................................................................... 7

    C.   The City has also failed to adequately refute that the discriminatory treatment of *adult* non-conforming uses compared to most other non-conforming uses invalidates the mandatory termination requirements.......................................... 8

II   ENFORCING THE MANDATORY TERMINATION PROVISIONS AGAINST THE PLAINTIFFS WOULD AFFORD THEM NO REASONABLE OPPORTUNITY TO RELOCATE DUE TO THE CITY'S UNCONSTITUTIONAL PERMITTING SCHEME FOR ADULT BUSINESSES. ........................................ 13

    A.   The City's Assertion That Plaintiffs Lack Standing to Seek an Injunction Against Enforcement of the Zoning Restrictions' Mandatory Termination Provisions Based on the Facial Unconstitutionality of its Permitting Scheme for Adult Businesses is Not Well Taken. ........................................................................ 13

        1.   *Casanova* fully *supports* Plaintiffs' standing to challenge the City's permitting and vesting requirements. ........................................................... 13

        2.   *M.J. Entertainment*, properly construed, also supports Plaintiffs' standing and, if construed otherwise, would conflict with *Casanova*. ...................... 17

        3.   The unwillingness of several, though not all, of the Club Plaintiffs to relocate outside of Manhattan also does not defeat their standing to assert that the City denies a reasonable opportunity to relocate based on the facial invalidity of its permitting and vesting provisions. ....................................................... 21

4.   The City's potential future change in permitting procedures cannot deprive the Plaintiffs of standing because it has not happened and may never happen – but even if it were in effect now, it would neither save the unconstitutional procedures nor deprive the Plaintiffs of standing........................................23

B.   The City's Permitting Procedures for Adult Businesses are Facially Unconstitutional. ...............................................................................................25

1.   The City's assertion that Plaintiffs are barred from seeking summary judgment based on facts not specifically asserted in their Complaints is now moot.  25

2.   Obtaining building permits for adult businesses is more onerous, both in time and procedure, than obtaining building permits for non-adult businesses..26

3.   Contrary to the City's assertions, its permitting scheme for adult uses is *not* a content-neutral permitting scheme. ...........................................................33

4.   The City's permitting scheme for adult uses does not contain the procedural safeguards against delay that the First Amendment requires......................35

5.   The City does not contend that its permitting scheme includes an adequate remedy for an unconstitutional delay in the permitting process. ................36

III   ENFORCING THE MANDATORY TERMINATION PROVISIONS AGAINST THE PLAINTIFFS WOULD AFFORD THEM NO REASONABLE OPPORTUNITY TO RELOCATE DUE TO THE CITY'S UNCONSTITUTIONAL VESTING SCHEME FOR ADULT BUSINESSES. ...............................................37

A.   The record evidence of an unconstitutional sensitive-use veto is specific and certain, not speculative.....................................................................................37

B.   The City Does Not Even *Argue* That its Vesting Scheme for Adult Businesses is Facially Valid..................................................................................................39

CONCLUSION ............................................................................................................40

PRG8617.docx

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

## U.S. SUPREME COURT

*Agostini v. Felton*, 521 U.S. 203 (1977)..............................................................7

*Anderson v. Liberty Lobby, Inc.,* 422 U.S. 242 (1986) ....................................38

*Brown v. Ent. Merchs Ass'n.*, 564 U.S. 786 (2011) .........................................11

*Celotex v. Catrett*, 477 U.S. 317 (1986) ..........................................................38

*City of Austin v. Reagan Nat'l Advertising*, ___ U.S. ___, 142 S.Ct. 1464 (2022) ........7, 8

*City of Los Angeles v. Alameda Books,* 535 U.S. 425 (2002) .................2, 3, 7, 8

*City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41 (1986) ....................2, 15

*Freedman v. Maryland*, 380 U.S. 51 (1965) .....................................................31

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990) ..............................*passim*

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ...............................................7, 8

*Trinity Lutheran Church v. Comer*, 582 U.S. 449 (2017) ................................29

*U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2000) ..................38

*U.S. v. Stevens*, 559 U.S. 460 (2010)................................................................31

*Young v. American Mini Theaters, Inc.*, 427 U.S. 50 (1976) .............................4

## U.S. COURT OF APPEALS

*Akers v. McGinnis*, 352 F.3d 1030 (CA6 2003) ..............................................29

*Alameda Books, Inc. v. City of Los Angeles,* 631 F.3d 1031 (9th Cir. 2011)....................3

*Carpenter-Baker v. Ohio Department of Medicaid*, 752 F. Appx. 215 (CA6 2018) ........29

*Chesapeake B&M, Inc. v. Harford County, Md.*, 58 F3d 1005 (4th Cir. en banc 1995) ..31

*Redner v. Dean,* 29 F.3d 1495 (11th Cir.1994) ................................................31

*Speech First, Inc. v. Schlissel*, 939 F.3d 756 (CA6 2019)...............................29

*Young v. City of Simi Valley,* 216 F.3d 807 (9th Cir. 2000)............................39

## U.S. DISTRICT COURTS

PRG8617.docx

*801 Conklin St. Ltd. v. Town of Babylon*¸ 38 F.Supp.2d 228 (E.D.N.Y. 1999) .................. 9

*Casanova Entm't Group, Inc. v. City of New Rochelle*, 375 F.Supp.2d 321 (S.D.N.Y.

    2005) .................................................................................................................... *passim*

*M.J. Entm't Enters. v. City of Mt. Vernon,* 234 F.Supp.2d 306 (S.D.N.Y. 2002) ...... *passim*

## STATE COURTS

*Town of Islip v. Caviglia*, 73 N.Y.S.2d 544 (1989) ............................................................ 9

## CONSTITUTIONAL PROVISIONS

Article III ................................................................................................................ 20

First Amendment ..................................................................................................... 12

Fourteenth Amendment ........................................................................................... 12

## NYC RULES

1 RCNY § 9000-1(b) ............................................................................................... 34

## NYC DOB OPPNS

OPPN 6/96 ........................................................................................................ 27, 28

## NYC DOB BUILDINGS BULLETINS

BB 2016-010-2-C .................................................................................................... 27

BB 2016-010-4-A-1 ................................................................................................ 24

BB 2020-005 ........................................................................................... 23, 29, 30, 31

## NYC ADMINISTRATIVE CODE

NYCAC § 27-191 (Repealed in 2008) .................................................................... 36

v

**INTRODUCTION**

There are no controverted material facts pertinent to the Club Plaintiffs' Motion for Partial Summary Judgment.  For that reason, the Club Plaintiffs submit that their motion can and should be resolved as a matter of law, and there is no basis for a trial on any issues pertinent to that motion.

Moreover, based on the legal briefing provided by the Club Plaintiffs and the voluminous stipulated facts and mutually agreed Judicial Notice requests, the Club Plaintiffs believe it is clear that they are entitled to an award of Partial Summary Judgment on either one of the two alternative claims presented in their Partial Summary Judgment motions.

**I**

**THE CITY HAS FAILED TO ESTABLISH ANY MATERIAL ISSUE OF FACT OR LAW PREVENTING ISSUANCE OF PARTIAL SUMMARY JUDGMENT TO PLAINTIFFS ON THEIR CHALLENGE TO THE CITY'S DISCRIMINATORY MANDATORY TERMINATION REQUIREMENT**

**A.    The City's Brief fails to properly consider the requirements of either the Plurality or Justice Kennedy's concurrence in *City of Los Angeles v. Alameda Books*.**

The City's Renewed Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment filed in all four actions on May 26, 2023[1] (hereafter "City's PSJ

---

[1] This is [Doc. No. 202 in Action No. 3](#) (*Club at 60th, et al. v. City of New York*, 02-CV-8333). Hereafter all references to document numbers of documents filed in all four actions, as well as all

Opp. Memo") incorrectly asserts that the Court's decision in *City of Los Angeles v. Alameda Books,* 535 U.S. 425 (2002) "did not materially alter [the] long-standing analytical framework" under *City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41 (1986).[2] However, as explained in the Club Plaintiffs' Renewed Memorandum in Support of their Motions for Partial Summary Judgment filed on May 26, 2023,[3] not only did the *Alameda plurality's* new burden-shifting test materially alter that analytical framework[4] but, much more significantly the City has ignored two of the key aspects of Justice Kennedy's controlling concurring opinion which also significantly altered it.

First, Justice Kennedy's opinion made it very clear that he would apply a very different test to an adult zoning ordinance affecting only new uses compared to one requiring existing ones to terminate:

> If two adult businesses are under the same roof, an ordinance requiring them to separate will have one of two results:  One business will either move elsewhere or close.  *The city's premise cannot be the latter.*  It is true that cutting adult speech in half would probably reduce secondary effects proportionately.  But again, a promised proportional reduction does not suffice.  Content based taxes could achieve that, yet these are impermissible.
>
> The premise, therefore, must be that businesses - even those that have always been under one roof - *will for the most part disperse rather than shut down.*

*Id.* at 450-51 (emphases added.)

---

hyperlinks to such documents, shall, for convenience and simplicity, be solely to the filings in that action.

[2] City's PSJ Opp. Memo at ECF p. 8, n.2.

[3] Hereafter "Club Plaintiffs' PSJ Memo."

[4] For example, the Plurality's test (stated at 535 U.S. at 438-439) requires the City to effectively respond to any evidence of the lack of secondary effects put on by the challengers, such as the evidence Plaintiffs have put on here, none of which has been refuted.

> The claim, therefore, must be that this ordinance will cause two businesses to split rather than one to close, that the quantity of speech will be substantially undiminished, and that total secondary effects will be *significantly* reduced. This must be the rationale of a dispersal statute.

*Id.* at 451 (emphasis added).

Based on that language, the focus of the Ninth Circuit and District Court on remand was to see how speech would *actually fare* under the challenged ordinance, *i.e.*, the primary issue on remand was if one of the existing uses were forced to cease, would new ones, for the most part, be likely to arise so there would be no significant net loss of expression? *See, e.g., Alameda Books, Inc. v. City of Los Angeles,* 631 F.3d 1031, 1037 (9th Cir. 2011) and its quote at 1038 (without disagreement) from the District Court's opinion which articulated the issue to resolve as follows:

> "The question in this case is not whether the arcade portion of the combination business is profitable ... [but] whether the arcade as a standalone business will continue to exist once unmoored from the bookstore component." *Alameda Books,* 2008 U.S. Dist. LEXIS 108860, at *37–38.

Contrary to the City's suggestion, that is clearly a very materially different framework of analysis than existed prior to the *Alameda Books* decision.

Significantly, Justice Kennedy's approach was consistent with the concerns for pre-existing businesses and their patrons originally identified by Justice Stevens writing for the Plurality in the Supreme Court's initial adult zoning case, *Young v. American Mini Theaters, Inc.*, 427 U.S. 50 (1976), where he went out of his way to point out the following:

> "There is no claim that . . . the viewing public is unable to satisfy its appetite for sexually explicit fare.  Viewed as an entity, the market for this commodity is essentially unrestrained."

*Id*. at 61.

He further recognized that the ordinance had only a prospective application:

The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that *"(t)he Ordinances do not affect the operation of existing establishments but only the location of new ones."*

*Id.* at 71, n.35 (emphasis added.)

Justice Kennedy, in *Alameda*, clearly had the same concerns when he wrote that the effect of how speech will *actually fare* was a relevant part of the analysis (*id.* at 450), and when he wrote that the Plurality's "application of *Renton* might constitute a subtle expansion, with which I do not concur." *Id.* at 445.

Under the mandatory amortization provisions challenged here, the facts are not in dispute as to how speech will actually fare if the few remaining adult 60/40 clubs are not allowed to remain as lawful non-conforming uses. Every one of them will be forced to close or relocate[5] and their owners have all filed sworn declarations that they would *not* relocate so long as the existing permitting and vesting scheme remains in place (and most, additionally, would not relocate outside Manhattan, where the City agrees there are not even enough "legally permissible" relocation sites for all the businesses there which would be forced to close or relocate). There is no record evidence that contradicts the club owners' sworn statements regarding their unwillingness to relocate (and they are further

---

[5] *See* ¶ 174 of the Consolidated Statement of Stipulated Facts ("CSF") filed in all four actions on May 19, 2023.

supported by the previously filed Berzak PSJ Declaration,[6] but even if there were some reason in the record to dispute the reasonableness of the Club Plaintiffs' position, the bottom line is that it *is* their intention to close their clubs if the mandatory termination provisions are enforced, and the clubs' closures will immediately and very significantly reduce the *public's* access to the type of expression which they present.  That is precisely the outcome on how speech will fare which Justice Kennedy said must result in the invalidation of such an ordinance.

And the Court need not even rely on the declarations of the club owners to prove that impact.  The facts of the last 23 years demonstrate beyond *any* doubt that new businesses will not arise to take the place of those forced to quit.  Specifically, although the City's asserted hundreds of "permissible" locations for adult businesses have existed for decades, the unassailable fact noted in both the Consolidated Statement of Stipulated Facts and the Club Plaintiffs' prior briefing[7] is that the number of adult businesses has been *dramatically decreasing* throughout that entire time period notwithstanding the existence of those assertedly permissible sites.[8]  Consequently, if the few remaining 60/40 adult

---

[6] "Declaration of Michael Berzak in Support of Club Plaintiffs' Motion for Partial Summary Judgment" filed in all four actions on September 16, 2022.

[7] *See* CSF ¶¶ 160-168, and *see* the Club Plaintiffs' PSJ Memo at ECF pp. 13-14.

[8] As noted in Plaintiffs' prior briefing, the number of adult establishments of *all* types in New York City has decreased from 177 in 1993 (CSF ¶ 160) to just 10 100% businesses and 32 60/40 business (CSF ¶ 170) in *all* of New York City.

PRG8617.docx

clubs[9] are forced to close, there is no reasonable likelihood that most, if any, will be replaced by new adult clubs.

Lastly, the third significant change in the analytical framework for adult zoning laws is Justice Kennedy's requirement that there be a net gain in reduction of secondary effects which *substantially* outweighs any impact in reducing expression.  That is the most obvious test of all which the challenged mandatory termination requirements clearly fail.  The facts set out by Plaintiffs at length in their prior briefing[10] and in the joint judicial notice requests,[11] none of which are refuted by any controverting evidence,[12] all show that the 60/40 clubs were, and are, *not* causing significant adverse secondary effects.[13] .[14] Because they are not causing significant adverse secondary effects, enforcement of the mandatory termination provisions against the very few remaining 60/40 clubs could not possibly generate a significant reduction of secondary effects.

---

[9] For example, it is stipulated that there are now only *five* 60/40 eating and drinking establishments remaining in Manhattan (CSF ¶ 174), all of which would be required to close.

[10] *See* the Club Plaintiffs PSJ Memo at ECF pp. 16-17 and 25-27.

[11] *See* Exhibits 62-64 in Volume 9 of the Joint Request and Stipulation Regarding the Taking of Judicial Notice filed in all four actions on May 9, 2022.

[12] The City has stipulated that it did not conduct any secondary effects studies of 60/40 businesses. CSF ¶ 34.

[13] The City has also stipulated that in the two decades of their operation there have been no nuisance actions filed against any of the Club Plaintiffs' 60/40 businesses based upon claims of conduct or activities other than operation of "adult establishments" in locations not permitted by the Zoning Resolution.  CSF ¶ 36.

[14] The City has also stipulated that in the two decades of their operation there have been no nuisance actions filed against any of the Club Plaintiffs' 60/40 businesses based upon claims of conduct or activities other than operation of "adult establishments" in locations not permitted by the Zoning Resolution.  CSF ¶ 36.

PRG8617.docx

Finally, even if one *accepts* the City's unproven assumption that enforcing its mandatory termination requirements against 60/40 businesses would reduce secondary effects, any such reduction would be a mere "proportional" reduction, something Justice Kennedy clearly stated would require invalidation of the ordinance: "[A] promised proportional reduction does not suffice." 535 U.S. at 451.  To put it differently, even if the question of whether enforcing the mandatory termination requirements against 60/40 businesses would reduce secondary effects is a disputed issue of fact on this record, it is not a *material* issue of fact because the most the City could achieve would be a mere "proportional" reduction. The Plaintiffs are entitled to summary judgment either way.

**B.** **Significantly, the City's Brief also fails to properly consider the *combined* impact of *Alameda Books, Reed v. Gilbert* and *City of Austin v. Regan Nat'l Advertising*.**

While the City's Opp. Memo valiantly attempts to distinguish not only Justice Kennedy's controlling concurring opinion in *City of Los Angeles v. Alameda Books,* 535 U.S. 425 (2002), but also the Court's subsequent decisions in *Reed v. Town of Gilbert,* 576 U.S. 155 (2015), and *City of Austin v. Reagan Nat'l Advertising*, ___ U.S. ___, 142 S.Ct. 1464 (2022), the City's legal position fails to take into account the *combined* impact of those decisions.

Given the clarity of *Reed* and *Austin*, Plaintiffs assert that they apply here, require strict scrutiny of the City's mandatory termination provisions, and agree with those cases previously cited by Plaintiffs which conclude likewise (though acknowledging that the lower courts are split on that issue).

To further its argument, citing *Agostini v. Felton*, 521 U.S. 203, 237 (1977), the City argues that because *Reed* and *City of Austin* are not adult zoning cases, the Court should ignore their holdings and follow, instead, earlier decisions specifically involving adult zoning laws.[15]  But even if that approach were accepted, it would mean that Justice Kennedy's opinion in *Alameda* should then be accepted as the controlling decision (as well as the Plurality's burden-shifting requirement), yet the City likewise refuses to accept even *that* decision as the governing one.

Regardless of which of the three decisions control here, both *Reed* and *Austin* and Justice Kennedy (joined by a majority) in *Alameda Books,* now define content-based in a way that recognizes the obvious, i.e., that ordinances such as adult zoning laws, are not content-neutral, but are content-based because, on their face, they single out certain types of expression for differential treatment.

Given that *both* the *Reed-Austin* line of cases, as well as Justice Kennedy's concurrence in *Alameda Books,* would apply *at least* a very heightened level of intermediate scrutiny to content-based time, place and manner restrictions, it would be wrong to conclude that the mere deferential scrutiny of *Renton* remains the controlling test.

**C.    The City has also failed to adequately refute that the discriminatory treatment of *adult* non-conforming uses compared to most other non-conforming uses invalidates the mandatory termination requirements.**

As discussed above, the City's mandatory termination provisions fail *at least* under the holding in *Alameda Books,* if not also under *Reed* and *City of Austin* simply because

---

[15] *See* City's PSJ Opp. Memo at ECF p. 15.

PRG8617.docx

they enforce the City's content-based adult zoning regulations without meeting the various tests established by those cases. However, wholly apart from that constitutional failing, they *also* fail because they are impermissibly discriminatory in that they unjustifiably treat *adult* non-conforming uses in a far harsher way than the vast majority of all other non-conforming uses.

In its Opposition Memorandum, the City does not dispute that the issue of the constitutionality of non-conforming use provisions which single out *adult* non-conforming uses for differential treatment far more harsh than imposed on all *other* non-conforming uses, is an issue of first impression.[16] However, their primary argument seems to be that this issue should be resolved in its favor because a very small number of other non-conforming uses, none of which are retail businesses and none of which are expressive businesses, are subject to at least *some* amortization requirement (*see* City's PSJ Opp. Memo at ECF pp. 10-11), though none of those amortization requirements are remotely as severe as the one imposed on non-conforming *adult* uses..

---

[16] At ECF p. 5 of City's Opp. Memo, it acknowledges Plaintiffs' contention that their motion is one of first impression and never dispute that it is such an issue, although attempting to mute its force by citing two cases it claims have recognized, though never litigated, the validity of, such provisions. In fact, one of those cases, *801 Conklin St. Ltd. v. Town of Babylon,* 38 F.Supp.2d 228, 249 (E.D.N.Y. 1999), merely upheld a challenge to a since-repealed-and-replaced Babylon's zoning code provision that apparently created an "amortization schedule" for non-conforming uses (it is not clear if it applied to *all* non-conforming uses or only adult ones since it is no longer available online) but there was absolutely no argument asserted or addressed that the amortization provision was invalid because the Town treated *adult* non-conforming uses differently than all *other* non-conforming uses. The other case cited by the City, *Town of Islip v. Caviglia,* 73 N.Y.S.2d 544, 560-561 (1989), merely noted that the Town had an amortization requirement for adult uses and did not mention how it treated other non-conforming uses and, again, certainly didn't address the issue here: whether disparate non-conforming use provisions for only *adult* non-conforming uses are presumed valid or must be justified by evidence showing the need for the disparate treatment.

PRG8617.docx

While adult uses must discontinue within one year of becoming non-conforming (though minimal and discretionary hardship provisions exist to potentially delay that compliance somewhat), the City concedes that the very few other uses it cites which are required to ultimately terminate are allowed a 10-year amortization period as a matter of right.  *Id.*  According to the City, these are uses such as "coal storage, dumps, marine transfer stations for garbage, slag piles, junk yards or salvage yards … [and] manure … storage" facilities.  *Id.*  Each of these non-conforming non-adult uses –all of which have obvious significant negative impacts beyond their lot lines – are treated far more favorably than non-conforming adult establishments.

When comparing the treatment of non-conforming adult uses to all other types of retail or commercial non-conforming uses, the amount of differential treatment is even worse.  All those uses may continue in perpetuity absent a change of use or an increase in the intensity of the use.  But the City has no studies to show that non-conforming adult uses create greater neighborhood problems than any other types of non-conforming uses.[17]

The City argues that its differential treatment can be justified by the rationale that it is only those uses which have secondary effects "beyond their property line" which are required to terminate after an amortization period.  However, not only is the amortization period for adult non-conforming uses far shorter than that for the above-described uses

---

[17] Interestingly, the City also argues that other nonconforming uses aren't problematic because they were fine originally but merely become undesirable because the neighborhood around them has changed.  Yet the City requires termination even of *currently* complying adult uses whenever the City, in the future, may happen to change the zoning around them to make them non-conforming (which can be done either by changing the zoning of the property of the adult use or any properties within 500 feet of such use, including spot zoning type changes of just one parcel).

10

which the City concedes have effects beyond their property line, but the list of such uses is dramatically underinclusive.  For example, the City has no studies to suggest that non-conforming adult eating and drinking establishments have greater secondary effects beyond their property line than non-conforming traditional bars and nightclubs, yet the latter uses may remain in perpetuity whereas only those presenting adult entertainment must terminate.  The only difference is the *content of their expression*.

In short, the City's own response makes clear that it singles out one type of non-conforming use, defined by the content of its expression, for harsh treatment beyond that imposed on any other use.  Accordingly, the Zoning Resolution's non-conforming use provisions are clearly underinclusive, in violation of both the First Amendment and the constitutional guarantee of Equal Protection.  As stated by the Court in *Brown v. Ent. Merchs Ass'n.*, 564 U.S. 786, 801-802 (2011), "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint," and this puts a very heavy burden of justification on the City.  Yet here, the City has presented nothing to even *attempt* to show that the secondary effects of coal and manure storage facilities, or garbage, salvage or junk yards, have significantly less impact on their neighbors, and neighborhoods, than the 60/40 businesses that include expressive, but adult, content.  Nor has it shown that the secondary effects of nonconforming "adult" eating or drinking establishments are significantly greater than those of nonconforming "non-adult" bars or nightclubs, or are even worse than a wide

11

variety of other non-conforming uses which create increased traffic or other problems, e.g., convenience stores,[18] movie theaters, amusement parks, etc.

Under the relevant case law cited by the Club Plaintiffs previously, this discriminatory treatment of non-conforming adult uses puts a very strong burden of justification on the City, and the City clearly has not met that heavy burden.  As such, wholly apart from the reasons described in Points I-A and I-B, *supra,* these provisions should be found in violation of both the Free Speech and Equal Protection guarantees of the U.S. Constitution due to their impermissibly discriminatory treatment of non-conforming adult uses.

---

[18] In n.11 of the City's PSJ Opp. Memo, (ECF pp. 12-13), the City asserts, without any proof, that "a non-conforming convenience store typically does not have any effect beyond its property line." Not only is this assertion wholly unsupported by any evidence, but it does not even seem intuitively true.  It is well known that, at a minimum, impairment of traffic flow, litter and police calls for service can be affected by convenience stores.  While not admissible evidence, the following report from a grocers' website makes clear that the issue is certainly not beyond doubt and that the City may not merely *assume* that such businesses do not have secondary effects beyond their property line:

> According to FBI data, there were 22,838 incidents of violent crime at U.S. convenience stores in 2021, double the number from 2017, and 3% of the nation's total violent crimes. Gas stations, a separate FBI category, accounted for another 14,723 (nearly triple 2017's numbers) and grocery stores 6,960.

https://www.winsightgrocerybusiness.com/stores/retail-safety-security-when-prevention-isnt-enough#:~:text=According%20to%20FBI%20data%2C%20there,numbers)%20and%20grocery%20stores%206%2C960

PRG8617.docx

## II

**ENFORCING THE MANDATORY TERMINATION PROVISIONS AGAINST THE PLAINTIFFS WOULD AFFORD THEM NO REASONABLE OPPORTUNITY TO RELOCATE DUE TO THE CITY'S UNCONSTITUTIONAL <u>PERMITTING</u> SCHEME FOR ADULT BUSINESSES.**

A.   **The City's Assertion That Plaintiffs Lack Standing to Seek an Injunction Against Enforcement of the Zoning Restrictions' Mandatory Termination Provisions Based on the Facial Unconstitutionality of its Permitting Scheme for Adult Businesses is Not Well Taken.**

Point II of <u>Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion For Partial Summary Judgment ("Defendants' PSJ Opp. Memo")</u>, starting at <u>ECF p. 16</u>, asserts that Plaintiffs lack *standing* to facially challenge its permitting (and presumably the vesting) procedures with respect to adult establishments.  That argument is not well taken.

The City's sole asserted support for this position are the cases of <u>*M.J. Entm't Enters. v. City of Mt. Vernon,* 234 F.Supp.2d 306, 311 (S.D.N.Y. 2002)</u> (McMahon, J.), and <u>*Casanova Entm't Group, Inc. v. City of New Rochelle*, 375 F.Supp.2d 321, 335 (S.D.N.Y. 2005)</u> (Conner, J.).  While both decisions involved an adult business challenging an adult zoning and permitting scheme, one of the cases, *Casanova,* actually expressly *rejects* the City's argument of a lack of standing, and the other, *M.J. Entm't*, is either distinguishable or directly conflicts with *Casanova,* as well as binding Supreme Court precedent on Article III standing.

1.   *Casanova* **fully** *supports* **Plaintiffs' standing to challenge the City's permitting and vesting requirements.**

In *Casanova,* the plaintiff was attempting to open an adult entertainment business at a location in New Rochelle's Downtown Business zoning district where it had then operated a non-adult cabaret.  375 F.Supp.2d at 324.  New Rochelle did not allow adult businesses in the Downtown Business zoning district but did allow them in the I and LI districts, although subject to several buffer restrictions, *e.g.,* a 400-foot separation requirement from residentially used areas, other adult businesses, and a variety of what are commonly called sensitive uses.  *Id.* at 325.  It also required a special use permit before any adult business could open.

The plaintiff made two claims.  The first was that there was no "reasonable opportunity" to open an adult business in New Rochelle.  This was based on two arguments.  First, plaintiff asserted that there were no constitutionally countable "available" locations which complied with the zoning restrictions as well as all those buffer requirements.  The second was that even if the city *did* allow a sufficient number of constitutionally countable alternative locations for establishment of an adult businesses, it nonetheless still denied a reasonable opportunity to relocate anywhere in the city because *wherever* an adult use might attempt to open, it would first have to obtain a "special permit"[19] which the plaintiff contended was a facially invalid prior restraint because it would require it to submit to a licensing "process that is both discretionary and subject to undue delay."  *Id.* at 334.  That is *exactly* analogous to the claim of Plaintiffs here.  The *Casanova* plaintiff argued that, under

---

[19] Unlike the special permit requirement challenged in *M.J. Entm't,* which applied only in one zoning district, the special permit requirement challenged in *Casanova* applied in *all* zoning districts.

either theory, the city had denied it a "reasonable opportunity" to open and operate, in violation of the First Amendment requirement articulated in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S.41 54 (1986).

The *Casanova* plaintiff's second claim – independently – was for an injunction preventing enforcement of the special use permit requirement on the ground that it was an invalid prior restraint for the reasons mentioned above.

> *Casanova began* its discussion of the standing issues pertinent here as follows:

> The City contends that plaintiff does not have the requisite standing to raise a challenge to the Code's provisions relating to special use permits because under the Code an adult-oriented establishment is permitted to locate only in the I and LI Districts, and plaintiff is located in the Downtown Business District, which does not permit adult-oriented establishments by special permit or otherwise. … Consequently, the City asserts that since plaintiff is not adversely affected by the law requiring a special use permit, plaintiff has failed to allege an "injury in fact" ….

> We agree with the City that plaintiff does not have standing to assert that the Code is unconstitutional based on the special use permit provisions because plaintiff has not alleged an injury in fact, i.e., plaintiff's inability to operate an adult-oriented cabaret at its current location is not attributable to the requirement of a special use permit. *See M.J. Entm't Enters. v. City of Mt. Vernon*, 234 F.Supp.2d 306, 311-312 (S.D.NY. 2002).

*Casanova*, 375 F.Supp.2d at 335.

But, importantly, after rejecting the plaintiff's claim seeking an order to *enjoin enforcement* of the challenged permit requirement, the Court *expressly ruled* that the plaintiff *did* have standing to facially challenge the permit requirement when doing so in the context of an injunction against enforcement of the adult zoning scheme based on plaintiff's assertion that the city denied adult businesses a "reasonable opportunity" to open. That is *exactly* the same type of argument Plaintiffs are making here:

PRG8617.docx

> However, the special use permit requirement ***is relevant*** to plaintiff's assertion that there are no available avenues of communication in New Rochelle because plaintiff maintains that any allegedly "available' site is illusory because of the unfettered discretion of the Planning Board and the Sign Review Board and the possibility of undue delay in obtaining a decision on a special permit application.

*Id.* at 335 (emphases added).  The court then concluded:

> Thus, if New Rochelle's ordinance requiring special permits for adult-oriented uses grants the governmental body unbridled discretion or fails to place limits on the time within which the decisionmaker must issue the special use permit, it must be held unconstitutional.

*Id.* at 336.

After recognizing the plaintiff's *standing* to challenge New Rochelle's permitting scheme, Judge Conner nonetheless concluded, on the merits, that New Rochelle's permitting scheme was *not* unconstitutional.  Plaintiffs believe *that* portion of the decision was clearly erroneous and will address it later herein.  But, on the issue of standing, *Casanova* fully supports Plaintiffs' position here.  Plaintiffs here, just like the plaintiff in *Casanova*, assert that the City has denied them a "reasonable opportunity" to relocate due to, *inter alia,* the City's unconstitutional permitting and vesting scheme, which applies *city-wide,* and applies to every applicant for a permit to operate an adult entertainment use anywhere in the City.

For that reason, the only *injunctive* relief Plaintiffs have sought here is *limited* to an order preventing enforcement of the *zoning* restrictions, allowing them to stay at their current locations.  They do not seek, and have not sought, an injunction preventing

enforcement of the City's unconstitutional permitting and vesting provisions.[20]   The right to seek such *limited* relief is fully endorsed by the standing ruling in *Casanova.*

It is also significant that Judge Conner, in *Casanova,* was well aware of the earlier decision by Judge McMahon, *M.J. Entm't*, having cited it in his decision, and nonetheless concluded that the plaintiff before it *did* have standing to challenge the special use permit requirement *in the context* of a claim to enjoin enforcement of the *zoning* scheme based on the argument that the City of New Rochelle had denied a reasonable opportunity to open an adult business *anywhere* in the city.

### 2.  *M.J. Entertainment*, properly construed, also supports Plaintiffs' standing and, if construed otherwise, would conflict with *Casanova.*

For several reasons, *M.J. Entm't* would not apply to defeat Plaintiffs' standing here, and any contrary construction would conflict with the clear ruling on standing in *Casanova.* First, as will be shown below, the plaintiff in *M.J. Entm't* sought significantly *different relief* from that sought by Plaintiffs here.   Additionally, as will be shown below, *M.J. Entm't's* evaluation of the relevant *Article III standing principles* appears to require a different standing ruling in the present case.   Finally, it is clear that *Casanova,* a later decision in which Judge Conner expressly cited Judge McMahon's earlier ruling in *M.J. Entm't*, did not construe *M.J. Entm't's* standing ruling to apply under circumstances like those in the present case and in fact concluded that standing *was* properly alleged.

---

[20] *See, e.g.,* not only the [notices of the Plaintiffs' partial summary judgment motions](#) (re)filed in all four cases on May 26, 2023, but also the Plaintiffs' Renewed PSJ Memo at [ECF p. 12](#), both making clear that the only *injunctive* relief sought by Plaintiffs' PSJ motions is to prevent enforcement of the mandatory termination requirements.

In *M.J. Entm't,* the City of Mt. Vernon had a zoning scheme which allowed adult businesses only in the "I" zoning district.  It had a "special use permit" requirement for adult businesses that applied *only* in *that* zoning district.  The plaintiffs challenged the special use requirement as an unconstitutional prior restraint, asserting that it lacked adequate time limits for ruling on permit applications for an expressive business.  The plaintiff, however, was an adult business operating in the "CB" zoning district.  Because the *M.J. Entm't* plaintiff's business was in a district which didn't allow adult businesses, it asserted that there were no locations in the CB district and it couldn't be forced into the I district since there was an unconstitutional permit requirement in effect in that district.

The clearest reason why *M.J. Entm't* is distinguishable is the *different relief* sought by the plaintiff there, compared to that sought by Plaintiffs here or the plaintiff in *Casanova.*  The plaintiff in *M.J. Entm't* presented two claims.  First, in its Count I, the plaintiff sought, and was granted, an injunction similar to the one sought here, *i.e.*, to prevent enforcement of the City's *zoning* provisions on the ground that the zoning scheme denied a reasonable opportunity to locate anywhere in the City.  However, the only *basis* for that claim in that case (unlike here), was that the only district where the City allowed adult businesses was the I district and there weren't any relocation sites in *that* district where adult businesses could comply with the various other locational restrictions on such businesses. (234 F.Supp.2d at 309.)

In contrast, *M.J. Entm't* ruled differently on the plaintiff's Count II, which, independently, sought an injunction to prevent enforcement only of the special use permit requirement (which applied only in the "I" Zoning District).  The sole asserted basis for

18

that injunctive claim was its assertion that the special use permit requirement was facially unconstitutional, rather than that the plaintiff was denied a reasonable opportunity to relocate.  *See* the court's description of the plaintiff's Count II, which makes no mention of being tied to any "reasonable opportunity" requirement.  [234 F.Supp.2d at 310-311](#). Since the plaintiff was not trying to open a business in the one zone where the special permit requirement applied, the court appropriately concluded that it lacked standing to independently challenge that permit requirement.  Again, that is entirely consistent with both *Casanova* and Plaintiffs' claims here.

In short, the Court in *M.J. Entm't* held that the plaintiffs in that case *did* have standing to bring its "reasonable opportunity" challenge seeking an injunction of its zoning/locational restrictions.  That is consistent with both *Casanova* and Plaintiffs' injunctive claims here which, again, are directed solely at the City's *zoning* enforcement.

In contrast, *M.J. Entm't* ruled differently on the plaintiff's Claim II which, independently, sought an injunction against enforcement of the permitting and vesting provisions.  Plaintiffs here have at all times recognized that they would not have standing to seek such relief so have not requested it.  Consequently, *M.J. Entm't* is reasonably *supportive* of the Club Plaintiffs' claim seeking an injunction against enforcement of the *zoning scheme's mandatory termination provisions* because the zoning scheme denies them a reasonable opportunity to relocate due to the current lack of a constitutional permitting and vesting scheme for adult businesses.  That is the exact claim that *Casanova* held the plaintiff *did* have standing to make.

19

Next, *M.J. Entm't's* analysis of the standing requirements of *Article III* also suggests that *Casanova* did not err in finding standing in a case remarkably similar to the present one.  *M.J. Entm't* correctly concluded that Article III of the Constitution required it to dismiss plaintiff's Claim II for lack of standing if it found "a lack of "redressability." 234 F.Supp.2d at 311.  Because the only *relief* related to the permit requirement which was sought by the plaintiff in *M.J Entm't* was a preliminary injunction against enforcement *of the permit requirement*, such relief would not have provided redress of the plaintiff's claimed injury as its businesses was not in the one zone where that permit was required. By failing to make its permitting challenge simply a component of a request for an injunction of the *zoning* requirement, it failed to seek relief which would have brought it any redress.

Since the only injunctive relief sought by the Club Plaintiffs here on their Motion for Partial Summary Judgment is an injunction against enforcement of the mandatory termination requirements (as distinguished from an injunction against enforcement of the permitting and vesting provisions), there is no question that an injunction *so limited* would provide full and immediate redress to the Club Plaintiffs.  In short, such an injunction would prevent enforcement of the mandatory termination requirements until such time, if ever, as the City removed the chilling effect by amending its permitting and vesting provisions.

And the City also implies that the Plaintiffs' concerns over the permitting and vesting provisions challenged here (again, as part of Plaintiffs' "no reasonable opportunity" argument) are too speculative to give them standing.  However here, unlike in *M.J. Entm't*,

there is not only a facially invalid vesting scheme (which would deter *all* attempts at relocation to any new site), but clear evidence of a history of abuse of the permitting procedures.  This is more than enough evidence to show that the permitting and vesting scheme would chill and deter any reasonable business-person from trying to relocate an adult club in New York City, and the evidence is that it *has* so deterred the Club owners. *See, e.g.,* the previously-filed Declaration of Michael Berzak in Support of the Club Plaintiffs' Motion For Partial Summary Judgment (hereafter either "Berzak's PSJ Decl." or "Berzak's PSJ Declaration") (Doc. 156 in case no. 02-CV-8333) and the Declaration of David M. Talla (Doc.157), the CEO of the owner of Sapphire 2, as well as the declarations of the other Club Plaintiff owners[21] filed in support of the Club Plaintiffs' Partial Summary Judgment Motions (all of which are uncontroverted).

Finally, if *M.J. Entm't* were construed as denying Plaintiffs' standing here, such a ruling would be in clear conflict with the standing ruling in *Casanova.*  Since the relief in *Casanova* was much more congruent with the relief sought here than that sought in *M.J. Entm't*, there is no question that any perceived conflict in the opinions should be resolved in favor of the standing ruling in *Casanova.*

> **3. The unwillingness of several, though not all, of the Club Plaintiffs to relocate outside of Manhattan also does not defeat their standing to assert that the City denies a reasonable opportunity to relocate based on the facial invalidity of its permitting and vesting provisions.**

---

[21] *See*  Doc. 171 (Warech Declaration) in *689 Eatery Corp. v. New York*, 02 CV 4431 at ECF p. 2, ¶ 6; Doc. 138 (Lipsitz Declaration) in *59 Murray Enterprises v. New York*, 02 CV 4432 at ECF p. 3, ¶ 6; and Doc. 139 (D'Amico Declaration) in *59 Murray Enterprises v. New York*, 02 CV 4432 at ECF pp. 2-3, ¶¶ 6-7.

The City's next argument against Plaintiffs' standing is invalid for the same reasons it would have been unavailing in *Casanova.*  Specifically, Plaintiffs here seek injunctive relief against enforcement of the mandatory termination provisions based on the lack of a reasonable opportunity to relocate (due to the facial invalidity of the permitting and vesting provisions).  The *Casanova* plaintiffs were not required to allege that they would move to the LI or I zoning districts.  Instead, their sole claim was that "none of the sites proposed by New Rochelle 'count for purposes of assessing the adequacy of the alternative avenues of expression because the First Amendment requires adequate sites where adult businesses may locate as a matter of right.'"  375 F.Supp.2d at 334.

The *relief* which Plaintiffs at bar seek in their challenges to the permitting and vesting provisions is to prevent being forced to close or move, and the *basis* for that relief is that the City has failed to provide a reasonable opportunity to relocate, and because of that the zoning scheme is *facially* invalid.  (*I.e.*, they are *not* seeking an injunction against enforcement of either the permitting or vesting provisions.)  It is just as irrelevant here as it was in *Casanova* whether the Plaintiffs would be willing to relocate to some other part of the City. If a city's adult zoning scheme is facially invalid, it cannot be enforced, *anywhere*.  Just as in *Casanova,* the Plaintiffs here are entitled to the relief of an injunction against enforcement of the *zoning* ordinance's termination requirements so they may remain at their current locations unless the City can show that it *does* provide a reasonable opportunity to relocate.

PRG8617.docx

**4. The City's potential future change in permitting procedures cannot deprive the Plaintiffs of standing because it has not happened and may never happen – but even if it were in effect now, it would neither save the unconstitutional procedures nor deprive the Plaintiffs of standing.**

At ECF p. 21 of Defendant's PSJ Opp. Memo, the City relies on Buildings Bulletin ("BB") 2020-005 for its assertion that it will no longer be the case that it will take longer for adult uses to obtain permits than any competing sensitive uses because the Buildings Department has said it will no longer bar architects for adult uses from certifying their building permit applications once the 2001 Amendments become enforceable. However, as Plaintiffs pointed out at length at ECF pp. 86-87 of their Response in Opposition to City's Motion for Summary Judgment filed in all four actions on May 26, 2023,[22] and as the City's own factual stipulations demonstrate, the City's assertion about the *significance* of that promised future change in its procedures is *unequivocally* incorrect.

First, professional certification is only of *construction documents*. It does not confer *permit* approval (*see* CSF ¶¶ 208 and 210), nor does it establish the date that an adult use vests.

As noted in Plaintiffs' prior Response to the City's Summary Judgment Motion at ECF p. 86, *after* any professional certification, the Department will then "conduct a zoning audit of each application . . . prior to acceptance." CSF ¶ 210. Moreover, "[a]dditional

---

[22] The full title of that document, initially filed in all four actions on March 27, 2023 and re-filed in all four actions on May 26, 2023, is "Club Plaintiffs' Joint Memorandum of Law in Support of Their Alternative Cross Motion for Summary Judgment and Response in Opposition to City's Motion for Summary Judgment." For brevity, it will hereafter alternatively be referred to as either "Plaintiffs' Response to City's SJ Mot." or "Plaintiffs' Cross SJ Memo."

'targeted audits are performed of professionally certified applications pursuant to Buildings Bulletin 2016-010-4-A-1 *based on receipt of a complaint* … or at the discretion of the Commissioner"  (CSF ¶ 213; emphasis added) and DOB retains discretion to rescind an approval of an application for construction document approval, including its zoning aspect, *prior to issuance of any type of building permit*, including a no-work permit, and may elect to do so *based on receipt of a complaint* … or at the discretion of the Commissioner" (CSF ¶ 214; emphasis added).

As the Sapphire 2 circumstance clearly demonstrates,[23] the receipt of an anonymous private complaint was the primary, if not *sole,* basis for *several* of DOB's actions in repeatedly delaying issuance of Sapphire 2's requested building permits.  That same evidence also illustrates the substantial *substantive discretion* which DOB officials have to delay vesting of an adult use based solely on receipt of anonymous and unsupported complaints.

In sum, the City's own stipulations and the intact undisputed post-certification procedures for obtaining zoning approval clearly demonstrate that "sensitive use" permit applicants (who have comparatively uncomplicated zoning requirements) enjoy a huge time advantage over adult business permit applicants in a vesting race, and this would not be changed by the City's promised repeal of its adult business self-certification ban.

Additionally, there is no guarantee that removal of the professional-certification bar for adult business applicants will even actually happen should the 2001 Amendments

---

[23] Again, *see* the Berzak PSJ Declaration, and particularly *see* ¶¶ 16-27 starting at ECF p. 5.

PRG8617.docx

become enforceable.  As a mere administrative Buildings Bulletin, unlike an amendment to the Zoning Resolution, it can be unilaterally repealed at any time by DOB.  For that reason Plaintiffs do not believe the City can even rely on it here since it is not presently in effect and it is speculative whether it will ever in fact be in effect in the future.

Finally, and of no less importance, the Supplemental Declaration of Michael Berzak in Support of the Club Plaintiffs' Motion for Partial Summary Judgment, filed in all four actions on May 19, 2023 (Doc.190 in case no. 02-CV-8333), makes clear that even if BB 2020-005 should remain in effect if the 2001 Amendments were upheld, it is highly unlikely any adult business could find a licensed architect willing to guarantee the zoning of a new adult use via professional certification since the potential liability for a wrong guess (which could easily happen) is too great.  Consequently, even if BB 2020-005 took effect, it would be an empty remedy because adult businesses would still be at a serious disadvantage in terms of the time needed to obtain building permits, not only because professional-certification does not confer zoning or permit approval, but also because of the extreme unlikelihood of even being able to *obtain* such professional certification due to the unique difficulties and uncertainties which the City's zoning scheme creates for those attempting to prove zoning compliance for such businesses.

**B.    The City's Permitting Procedures for Adult Businesses are Facially Unconstitutional.**

**1.    The City's assertion that Plaintiffs are barred from seeking summary judgment based on facts not specifically asserted in their Complaints is now moot.**

25

At ECF p. 23 of Defendants' PSJ Opp. Memo, the City asserts that some of the evidence Plaintiffs presented to show that DOB's permitting requirements operate in a more onerous way for adult businesses cannot be considered on a motion for summary judgment because it was not set out in their complaints.  That argument is now moot since the parties have stipulated that the complaints should now be deemed conformed to include the evidence of onerousness that Plaintiffs have provided in their summary judgment briefing.  *See* Stipulation and (Proposed) Order to Conform Pleadings to Proof filed in all four actions on May 5, 2023, approved by the Court on May 8, 2023.[24]

**2.   Obtaining building permits for adult businesses is more onerous, both in time and procedure, than obtaining building permits for non-adult businesses.**

As Plaintiffs noted in their earlier memorandum, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990), held that an adult business plaintiff may challenge a city's permitting requirements for lack of adequate procedural safeguards to prevent discretionary delay *on their face*, so long as the plaintiff can show that the permitting scheme, however denominated, operates in a potentially more onerous time-consuming way for adult businesses than others.  *See id.* at 224-225 (allowing a *facial* challenge) and at 225 (the only requirement for *standing* to make a facial challenge is proof that the permitting scheme applies in a more onerous way to adult businesses than others). The City essentially asserts that its permitting requirements for adult businesses escape facial scrutiny under *FW/PBS* because, so it asserts, "DOB's requirements for construction

---

[24] This order was entered only in Case no. 02-cv-4431 (Doc. 208).

plan approval and permit issuance … are no more onerous for adult establishments than non-adult establishments."   As will be shown, that argument is refuted by the uncontroverted facts.

> **a.   The procedures for adult businesses to get zoning approval are, *on their face*, more onerous for adult businesses than others.**
>
> **(1)   Only *adult* businesses are subject to the time-consuming requirement to submit and obtain approval of area diagrams to demonstrate that there are no nearby potentially disqualifying uses.**

The City has stipulated that it is only *adult* businesses which are subject to the requirement to submit area diagrams to demonstrate that there are no nearby potentially disqualifying uses.[25]   There are no time limits for issuance of a permit after reviewing those area diagrams.[26]

The Berzak PSJ Declaration demonstrates the many steps involved in obtaining DOB approval of those diagrams, and the variety of obstacles one might face (some

---

[25] *See* CSF ¶ 223, and *see* OPPN 6/96, reproduced in the parties' Joint Judicial Notice Request ("JNR"), Volume 2, Exhibit 8, filed on May 9, 2022, in all four actions – and *see* specifically the first sentence on ECF p. 94 which states this requirement.

[26] If the area diagram is submitted without professional certification, DOB is required to approve the diagram before issuing any permit, a process which takes extended and indefinite duration.  In the event professional certification of adult permit applications is authorized in the future, DOB is required to "accept" the applicant's "construction documents," but subject to a mandatory zoning audit. *See* CSF ¶ 224 and BB 2016-010-2-C.  There are no time limits for completion of that zoning audit.

27

PRG8617.docx

justified, most not) in getting that approval.[27]  But the point is that all of these compliance steps take time, which is necessarily greater for adult businesses than all others.

Plaintiffs do not dispute that it is reasonable for DOB to check for potentially disqualifying uses before issuing zoning approval to an adult business, but the City must acknowledge that this unique procedural requirement adds significant extra delay in achieving permit issuance, thus not only significantly increasing the time and expense needed to open an adult business, but also opening the door to the possibility of a successful sensitive use veto (since there is no such requirement of zoning proof for sensitive uses which can get their zoning approvals immediately over the counter at DOB).  Because of this, it is critical that the procedural safeguards against discretionary delay required by *FW/PBS* must apply here as well.  Of course, the above arguments do not establish that the City's scheme *fails* the *FW/PBS* test.  They merely demonstrate that the permitting scheme is subject to *facial* challenge to see if it *satisfies FW/PBS'* prohibition of discretionary time limits.

> **(2)  Only *adult* business permit applications are potentially subject to prior review by DOB General Counsel and there are no time limits for that review.**

For a second reason DOB's permitting requirements are more onerous for adult businesses than others.  This is because they authorize DOB's General Counsel to engage

---

[27] There are no time limits in OPPN 6/96 (or anywhere else) for DOB's review of these area diagrams (and the City has not suggested otherwise) and the Berzak PSJ Declaration shows the incredible amount of senseless delay by City officials which not only can be caused by this requirement, but actually *has been* caused by this requirement.

in discretionary delays processing the permit applications of adult businesses and no others. The *current* status quo (*at least* through March 23, 2022) is that DOB's General Counsel review *all* adult business building permit applications and do so prior to DOB processing of the application, and without any time limits for General Counsel to complete that review. CSF ¶¶ 86, 89, 90,  and 93.[28]

While not even making an *argument* that the current scheme is constitutional, the City nonetheless asserts that Buildings Bulletin 2020-005 (reproduced as JNR Volume 2, Exhibit 17, at ECF p. 157), will, *in the future*,[29] solve its problems, but fails to note that the future procedure dictated by that Buildings Bulletin *expressly* give DOB discretion to defer review of adult business permit applications pending a preliminary review by DOB General

---

[28] While the City asserts that it has voluntarily discontinued *mandatory* review in every case since March 23, 2022, such assertion is no answer because it concedes that it still allows *discretionary* DOB General Counsel pre-processing review of adult businesses' (and no others') permit applications whenever DOB is so inclined.   And even to the extent DOB currently chooses to authorize discretionary, but not mandatory, review by DOB Counsel (substituting one type of standardless procedure - time-wise- for another), voluntarily ceasing any type of constitutionally challenged procedure during litigation does not moot constitutional claims.  This is especially true where the cessation is a change in policy or regulation rather than a change in law, where the change happened while the case was pending, and where the change is entirely within the defendant's control. *See, e.g., Trinity Lutheran Church v. Comer*, 582 U.S. 449,__, 137 S.Ct. 2012, 2019 at n.1 (2017) (even an announcement from the governor that a policy has changed does not "carr[y] the 'heavy burden' of making 'absolutely clear' that [the defendant] could not revert to its [challenged] policy"). *See also, e.g., Speech First, Inc. v. Schlissel*, 939 F.3d 756, 768-769 (CA6 2019) ("ad hoc, discretionary, and easily reversible actions" do not moot claims, particularly where the record lacks evidence that the change will not or cannot be reverted); *Carpenter-Baker v. Ohio Department of Medicaid*, 752 F. Appx. 215, 222-23 (CA6 2018) (formal change in state administrative code does not moot case); *Akers v. McGinnis*, 352 F.3d 1030, 1035 (CA6 2003) (First and Fourteenth Amendment challenges to policy not moot: "In the present case, as the promulgation of work rules appears to be solely within the discretion of the [defendant Michigan Department of Corrections], there is no guarantee that MDOC will not change back to its older, stricter Rule as soon as this action terminates.")

[29] Footnote 1 of that Buildings Bulletin states that its provisions will take effect only when and if the 2001 Amendments become enforceable.

Counsel.  It says: "Applications that propose Adult Establishments *need not* be subject to *routine* review by the Department's General Counsel."  (Emphases added.)  This clarifies that DOB retains unfettered discretion to impose such review whenever it wants to.

In short, contrary to the City's assertion, rather than *eliminating* the long-standing practice which allowed DOB to defer processing applications pending DOB General Counsel review, under BB 2020-005 the City would *expressly and affirmatively empower* DOB to exercise its unbridled discretion to force an adult business to go through this process whenever DOB wants it to do so.

Second, the time it takes for this review process is wholly subject to the discretion of DOB's General Counsel since the City has stipulated that there are no time limits for DOB's General Counsel to complete their review of adult business permit applications. CSF ¶ 93.  And any review by DOB General Counsel always occurs *prior* to processing of the adult business' application by DOB itself.  CSF ¶ 89.

Third, the City has stipulated that DOB's General Counsel are never called on to review zoning compliance for the permit applications of any uses *other than* adult uses. *See* CSF ¶ 94.

These uncontroverted facts are sufficient to show that, *on its face*, the City's proposed future permitting scheme will confer discretion on DOB to impose delays against adult business permit applicants which are not authorized to be imposed on any others. Under *FW/PBS*, that is sufficient proof that the scheme, on its face, is more onerous for adult businesses than others and thus must contain the procedural safeguards against discretionary delay required by that decision.

30

Lastly, for the same reasons given *supra* with respect to the speculative future existence and application of BB 2020-005 with regard to professional certification, the changes it proposes for review by DOB General Counsel are not even guaranteed to necessarily be in effect in the future.  And, since it is contained in a mere Bulletin, which DOB can unilaterally change at any time in the future, its provisions are too speculative to be judicially cognizable as a defense in this action.

> **b.    The uncontroverted evidence also shows that it is *common* for DOB to take more time to review zoning compliance for *adult* business permit applications than for any others.**

While proof of the actual abuse of a discretionary permitting scheme for adult businesses is not required to make a facial challenge to that scheme,[30] the uncontroverted evidence submitted by Plaintiffs makes clear that exercise of DOB's discretion to delay adult business permit applications is quite common, if not in fact the norm.  Specifically,

---

[30] *See, e.g., Freedman v. Maryland*, 380 U.S. 51, 56 (1965) ("In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office … whether or not he applied for a license"); and *Chesapeake B&M, Inc. v. Harford County, Md.*, 58 F3d 1005, 1011 (4th Cir. en banc 1995) (overruling a district court's refusal to enjoin enforcement of a discretionary licensing scheme because it did not *mandate* delay but only left that open as a possibility: "[T]he court apparently thought it determinative that the licensing scheme *could* be applied in a constitutional manner. But '[w]e cannot depend on the individuals responsible for enforcing the Ordinance to do so in a manner that cures it of constitutional infirmities.' *Redner v. Dean*, 29 F.3d 1495, 1501 (11th Cir.1994) (holding that the ordinance on its face failed to impose reasonable time limits on the administrative process), *cert. denied,* 514 U.S. 1066 (1995)"), and *U.S. v. Stevens*, 559 U.S. 460, 480 (2010) ("the First Amendment protects against the Government; it does not leave us at the mercy of noblesse oblige. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly").

31

*see* ¶¶ 27-31, 36 and ¶ 43-C of the Berzak PI Permitting Declaration[31] (describing the minimum amounts of time typically required to process adult business permit applications when DOB requires preliminary review by DOB General Counsel[32]) and *see* the *entirety* of the Berzak PSJ Declaration (describing the astonishing amount of unwarranted delay caused by DOB specifically in its processing of the fully qualified[33] permit application of Sapphire 2).   Regarding the latter, even *before* the seemingly endless delays caused by recissions *after* granting Sapphire 2 its no work permit, it is uncontroverted that even the initial granting of that mere "no-work" permit took 75 days, and this was even after the last notices of objections (following lengthy inspections) had been withdrawn 23 days earlier![34]

Moreover, none of the delay imposed on Sapphire 2 would have been eliminated had it been allowed to self-certify because, as discussed previously, self-certification only confers approval of *construction documents*, but *not* approval of a permit.  (And it is only

---

[31] Declaration of Michael Berzak in Support of Permitting Issues Presented in Plaintiffs' Motion For a Preliminary Injunction, appearing in the record starting at ECF p. 79 of Volume 4 of the Plaintiffs' Joint Appendix in Support of Plaintiffs' Motion for Preliminary Injunction, filed in all four actions on November 21, 2018 (hereafter "Berzak's PI Permitting Decl.").

[32] General Counsel review of adult business permit applications, when it has occurred, has taken a *minimum* of 3-4 months (*id.* at ¶ 30, ECF p. 90), far more than the 40 days DOB is allowed.

[33] Berzak's uncontroverted PSJ Declaration (*see* ¶¶ 6 and 9-13 at ECF pp.2-4) shows that Sapphire 2's permit application appropriately included the required area diagram which showed all surrounding uses within 500 feet and it was the *City* which *mistakenly* concluded that several of those surrounding uses would disqualify Sapphire 2's application.

[34] *See* Berzak PSJ Decl. ¶¶ 6-14 at ECF pp. 2-5.

issuance of the *permit* which confers vesting of the use.)  After the construction documents have been approved, zoning approval must still be obtained from DOB (CSF ¶ 210.) [35]

In short, the zoning approval process at DOB is not only *facially* more onerous for adult businesses than others (because of the dual problems of submitting and getting approval of an area diagram and the possibility, unique to adult businesses, to be subjected to preliminary zoning review by DOB General Counsel), but there is ample evidence to show that this type of delay is not uncommon.  For each and all of these reasons, Plaintiffs meet *FW/PBS's* required proof of unique onerousness conferring on Plaintiffs the standing to claim that DOB's permitting scheme is *facially* unconstitutional because its time limits are illusory and it confers on City officials the option of discretionary delay.

### 3. Contrary to the City's assertions, its permitting scheme for adult uses is *not* a content-neutral permitting scheme.

In Point III-B at p. 19 of the City's PSJ Opposition Memo it asserts that its permitting scheme does not lack the required procedural safeguards.  However, its primary argument is not that it *has* the required procedural safeguards, but its assertion that it doesn't *need* to have them because its zoning approval system is a "content-neutral permitting scheme."

---

[35] And the uncontroverted evidence is that DOB's zoning approval can even be called into question and its approval then further delayed, or even rescinded, *after* it is initially given. (CSF ¶ 213). DOB's various recisions of Sapphire 2's application show its routine lack of regard for any time limits for processing adult business permit applications, as it issued two separate delay-causing notices of recission of a prior zoning approval (*see* Berzak PSJ Declaration ¶¶ 18-21 and 29 at ECF p. 6  and ECF p. 9), and it is uncontested that it did not even have a reasonable or good faith basis for believing its prior approval had issued in error, having been based solely on an anonymous complaint about being too near an asserted "house of worship," which complaint DOB didn't even attempt to see if it was reasonable, which it could easily have done by first checking its own records to see if the asserted "house of worship" had a priority permit.

For *two* reasons the City is mistaken.  First, its *vesting* scheme requires a DOB permit to establish vesting and it is only *adult* businesses which require this permit in order to lawfully operate when there is a dispute between the entitlement of any two uses to operate within 500 feet of each other.  This permit requirement is therefore content-based *on its face.*[36]

Second, and no less importantly, the City overlooks the import of the Supreme Court's decision in *FW/PBS.*  Although it is correct that the permit required in *FW/PBS* was a permit specifically for an adult business, that is a distinction without a difference because the Supreme Court concluded that it was the meaningful lack of time limits on other agencies which enforce such things as zoning (e.g., the Building Department), whose approval was a prerequisite to getting the police permit, that rendered the entire permitting scheme for adult businesses unconstitutional.

The Court's rationale was that any scheme for a license which an expressive business requires in order to open or operate which allows for discretionary delay carries with it the *potential* for indirect censorship.  The Court acknowledged that a content-neutral permitting scheme cannot ordinarily be challenged facially, but that the *exception* is where the challenger can show that the supposedly content-neutral scheme applies in a more

---

[36] While a church or school has the *option* to seek a vesting priority permit (*see* 1 RCNY § 9000-1(b)), no provision of the ZR *requires* them to have one in order to operate near an existing adult use.  It is only adult uses which are *required* to have a vesting permit in order to operate when there is a potentially disqualifying use nearby (*e.g.*, either another adult business or a sensitive use).  Thus, the vesting scheme clearly operates exclusively as part of an *adult* permit requirement.

onerous way to adult businesses than others.  When that is the case, it doesn't matter what the license is called.  What matters is its potential for disguised censorship.

Here, as noted in Point II-B-2 *supra,* this scheme, both on its face *and* as actually applied, applies in a more onerous time-consuming way to adult business permit applicants than to all others.

Accordingly, for *both* of the reasons above, the City's assertion that it is not required to have any of *FW/PBS's* procedural safeguards is not well taken.

### 4.  The City's permitting scheme for adult uses does not contain the procedural safeguards against delay that the First Amendment requires.

Finally, the City alternatively argues that its permitting scheme *does* contain adequate procedural safeguards, but this contention is easily shown to be false.

First, *FW/PBS* found Dallas' permitting scheme facially unconstitutional because its time limits were *illusory*, given that there was no way to guarantee that the Chief of Police would in fact issue (or deny) the permit within the required 30 days.  This, again, was because the other City departments, which had to approve the permit, were not required to act within any particular time limits.

Here, the City's permitting scheme is equally open-ended and illusory.  The only time limit the City *now* has is a 40 day time limit for DOB to issue approval of *construction documents.*[37]  (Surprisingly, in 2008, while this lawsuit was pending, the City *repealed* its

---

[37] *See* New York City Administrative Code Title 28, Article 104 (Construction Documents), § 28-104.2.7 (reproduced in Club Plaintiffs' Renewed Memorandum in Support of Partial Summary Judgment Motions at ECF pp. 79-80).

PRG8617.docx

former additional requirement that a permit must issue within 40 days of the approval of the applicant's "plans" – now called "construction documents."  CSF ¶¶ 100-101.[38])  But it is only the approval of a *permit* which confers vesting priority and allows construction to proceed.  And there is simply no time limit whatsoever on DOB's issuance of a permit.

Moreover, the 40-day time limit for approval of construction documents" doesn't even *apply* to "no-work" permits submitted to obtain vesting priority where no construction is required.

Accordingly, for all these reasons, the City cannot claim that it has any time limits which comply with the First Amendment and its interpretation by the Court in *FW/PBS*.

### 5. The City does not contend that its permitting scheme includes an adequate remedy for an unconstitutional delay in the permitting process.

Finally, the City does not address the deficiency in its zoning approval scheme noted in Point II-C-3-c of the Club Plaintiffs' PSJ Memo that it provides no effective *remedy* if the City fails to honor any of its own time limits.  But, pursuant to the case law previously cited in the Club Plaintiffs' PSJ Memo (at ECF p. 81), an effective remedy is constitutionally required for a scheme like this which has a unique permit requirement for adult businesses (i.e., the "vesting priority" permit) and which applies in a more onerous manner to adult businesses in order to get *any* of the permits needed to open.

---

[38] The former NYCAC § 27-191 is reproduced as Exhibit 39 found in Volume 4 of the JNR).

**III**

**ENFORCING THE MANDATORY TERMINATION PROVISIONS AGAINST THE PLAINTIFFS WOULD AFFORD THEM NO REASONABLE OPPORTUNITY TO RELOCATE DUE TO THE CITY'S UNCONSTITUTIONAL <u>VESTING</u> SCHEME FOR ADULT BUSINESSES.**

**A.   The record evidence of an unconstitutional sensitive-use veto is specific and certain, not speculative.**

Notwithstanding the extremely well-documented, detailed, and *entirely unrefuted* evidence which Plaintiffs provided in support of their Partial Summary Judgment motions, the City seeks to avoid a determination of the facial invalidity of its vesting provisions by asserting that Plaintiffs' claims are "based on pure speculation." Defendants' PSJ Opp. Memo. at ECF p. 20. That assertion is demonstrably false based on the uncontroverted evidence.

Plaintiffs have supplied uncontroverted evidence showing that the potential for an unconstitutional sensitive use veto is both very real and substantial and has a reasonable chilling effect which deters any attempt at relocation. *See* the substantial and detailed evidence of the daunting circumstances faced by Sapphire 2 in its extremely costly and time-consuming efforts to overcome a very real attempt at a sensitive use veto.[39]

---

[39] *See* the Berzak PSJ Declaration filed in all four actions on September 16, 2022. As to the uncontroverted proof of the actual chilling effect of these provisions, *see* ¶¶ 17 and 18 (and particularly the last sentence of ¶ 18) at ECF pp. 6-7 of the Talla PSJ Declaration filed on that same date, as well as ¶¶ I and J of Mr. Talla's previous declaration which was filed as Attachment 1 to that September 16th declaration. Likewise, *see* the declarations of the other club owners, all of which are referenced in n. 70 (at ECF p. 87-88) of the Club Plaintiffs' Renewed Joint Memorandum of Law Filed in Support of Their Alternative Cross Motion for Summary Judgment, etc., filed herein on May 19, 2023.

Under *U.S. v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 818 (2000), and the other cases cited at ECF p. 12 of the Club Plaintiffs' Refiled PSJ Memo, the City has the burden of proof at trial to prove the constitutionality of its restrictions on expression.

Under *Celotex v. Catrett*, 477 U.S. 317, 322 (1986), it has the same burden of proof in summary judgment proceedings as it has at trial.  Under *Anderson v. Liberty Lobby, Inc.*, 422 U.S. 242, 248 (1986), as the non-moving party (on Plaintiffs' PSJ motion), the City was required to present any evidence it has to refute any of Plaintiffs' evidence as part of its summary judgment papers:  "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'"  *Id.*  In short, *Anderson* holds that, on summary judgment, a dispute is not created by mere assertions, but requires the submission of controverting facts.

Since the City has supplied no evidence to refute the substantial and detailed evidence presented by Plaintiffs regarding this sensitive use veto attempt, and the City has presented no other argument or evidence to demonstrate that its vesting scheme is constitutional, Plaintiffs are denied a reasonable opportunity to relocate and are entitled to an award of Partial Summary Judgment enjoining enforcement of the City's mandatory termination provisions until such time, if ever, as the City eliminates the facial defects in its licensing scheme allowing for a sensitive use veto.

Defendant also asserts, as if relevant, that "plaintiffs admit that there was in fact no sensitive use veto" in the Sapphire 2 situation. *Id.*  That is *clearly* immaterial.  The facts indisputably demonstrate that but for the procedural ignorance of Sapphire 2's opponents

38

PRG8617.docx

(in not knowing that their *own* asserted use would first have to obtain a permit in order to defeat Sapphire 2), the asserted "house of worship" would have unquestionably gotten its permit first (since it required less than a week to get its permit once it finally applied), and now that that procedural hiccup is widely understood in the adult entertainment industry, the threat of a *successful* sensitive use veto in the future is very real.

Moreover, as *Young v. City of Simi Valley,* 216 F.3d 807 (9th Cir. 2000), made clear, proof of the successful exercise of the sensitive use veto is not required because a scheme which merely *allows* such a possibility is invalid "on its face." *Id.* at 820.

**B.    The City Does Not Even *Argue* That its Vesting Scheme for Adult Businesses is Facially Valid.**

By presenting no controverting argument on the *merits* of Plaintiffs' challenges to its vesting scheme, the City has essentially *conceded* that its vesting scheme must be found facially invalid if Plaintiffs have standing to challenge it.  Nothing further need be said.

PRG8617.docx

**CONCLUSION**

For all the reasons above, the Club Plaintiffs' Motion for Partial Summary Judgment is well taken and should be granted.

Respectfully submitted,

G. Randall Garrou
randygarrou@wgdlaw.com
Of Counsel to Weston Garrou & Mooney
12121 Wilshire Blvd., Suite 525
Los Angeles, CA 90025
(310) 749-6069

Jerome H. Mooney
jerrym@mooneylaw.com
Weston Garrou & Mooney
12121 Wilshire Blvd., Suite 525
Los Angeles, CA 90025
(310) 442-0072

Alan M. Abramson
alanabramson@abramsonmorak.com
Abramson & Morak
35 Worth Street
New York, NY 10013
(212) 226-7098

by    /s/ G. Randall Garrou
      G. RANDALL GARROU

      *Counsel for Plaintiffs* in
       02 Civ 8333 (LJL)

*(signatures continue on next page)*

40

PRG8617.docx

s/ Jeffrey M. Nye
JEFFREY M. Nye, ESQ.
jmn@sspfirm.com
*Counsel for Plaintiffs* in 02 Civ 4431 (LJL)
Stagnaro, Saba & Patterson Co., LPA
7373 Beechmont Avenue
Cincinnati, OH 45230
(513) 533-6714


/s/ Edward S. Rudofsky
EDWARD S. RUDOFSKY, ESQ.
ed@rudofskylaw.com
*Counsel for Plaintiffs* in 02 Civ 4432 (LJL)
Zane and Rudofsky
Five Arrowwood Lane
Melville, NY 11747
(917) 913-9697

41