UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

725 EATERY CORP., etc., *et ano.,*                        :
                                    Plaintiffs,
                                                          :

        - against -                                       :          Civil Action No.
                                                          :          02 CV 4431 (LJL)
THE CITY OF NEW YORK, et al.,
                            Defendants.                    :
-----------------------------------------------------------------X

59 MURRAY ENTERPRISES INC., etc., *et al.,*               :
                            Plaintiffs,
                                                          :

        - against -                                       :          Civil Action No.
                                                          :          02 CV 4432 (LJL)
THE CITY OF NEW YORK, et al.,
                            Defendants.                    :
-----------------------------------------------------------------X

CLUB AT 60TH STREET, INC., etc., *et al.,*                :
                            Plaintiffs,
                                                          :

        - against -                                       :          Civil Action No.
                                                          :          02 CV 8333 (LJL)
THE CITY OF NEW YORK,
                            Defendant.                     :
-----------------------------------------------------------------X


_____

# CLUB PLAINTIFFS' REPLY IN SUPPORT OF THEIR CROSS MOTIONS FOR SUMMARY JUDGMENT

_____

## Table of Contents

INTRODUCTION ...................................................................................................... 1

I. The preliminary injunction decision is not the law of the case. ...................... 2

    A. The law of the case doctrine doesn't apply to preliminary injunctions. ........................................................................................... 2

    B. Law of the case never applies to dicta. ................................................. 9

    C. Law of the case also does not apply where (as here) there is a significantly expanded evidentiary record, a change in case law, or other reasons that new consideration might lead to a different result. ................................................................................................. 10

    D. Law of the case could not apply to the mandatory termination point even if it somehow applied to any of the other challenges to the 2001 Amendments. .................................................................................. 14

II. The City offers little substantive defense of the 2001 Amendments – which makes sense, because they are facially content-based and presumptively unconstitutional. ................................................................................................. 16

III. Enforcement of the 2001 Amendments would (at best) achieve only an impermissible "proportional reduction" in secondary effects, and would leave insufficient alternative opportunities for expression (whether measured by *Alameda*'s "how speech would fare" test or by pre-*Alameda* tests for factoring in alternative sites) ......................................................................... 21

    A. The 2001 Amendments fail the proportionality test because they would, at best, achieve only a "proportional reduction" in secondary effects, and would leave neither the quantity nor accessibility of speech substantially intact. .............................................................. 21

    B. The City's asserted legally permissible alternative sites—even if accurate, and even if measured by pre-*Alameda* tests—would not leave adequate opportunity for expression. ..................................... 25

IV. The remainder of the City's brief is directed to issues raised only in Plaintiffs' fully briefed motions for partial summary judgment so are not included in this reply memo in support of Plaintiffs' Cross-Motion. ........... 30

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>

**U.S. SUPREME COURT**

*Anderson v. Liberty Lobby, Inc.,* 422 U.S. 242 (1986) .................................................................. 34

*City of Austin v. Reagan Nat'l Advertising,* ___ U.S. ___, 142 S.Ct. 1464 (2022)............... *passim*

*City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) ................................. 1, 2, 18, 25

*Pepper v. United States*, 562 U.S. 476 (2011) .......................................................................... 8

*Reed v. Town of Gilbert,* 576 U.S. 155 (2015) ................................................................... *passim*

*Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571 ....................................................... 5

*United States v. United States Smelting, etc.,* 339 U.S. 186 (1950)................................................ 3

*Univ. of Texas v. Camenisch,* 451 U.S. 390 (1981) .................................................................. 4, 6

**U.S. COURT OF APPEALS**

*DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73 (2nd Cir. 1992) ........................................... 6

*Gage v. Gen. Motors Corp.*, 796 F.2d 345 (CA10 1986)........................................................... 3

*Goodheart Clothing v. Laura Goodman Enterprises, Inc.*, 962 F.2d 268 (2nd Cir. 1992) . 5, 6, 7, 8

*Higgins v. Cal. Prune & Apricot Grower, Inc.*, 3 F.2d 896 (2nd Cir. 1924) ............................... 12

*ILGO v. Giuliani*, 143 F.3d 638 (2nd Cir. 1998) .................................................................... 7

*In re Meridian Reserve, Inc.*, 87 F.3d 406 (CA10 1996) ............................................................ 17

*Johnson v. Holder*, 564 F.3d 95 (2nd Cir. 2009)....................................................................... 12

*Norton v. City of Springfield*, 806 F.3d 411 (7th Cir. 2015)........................................................ 21

*United States v. Danilovich*, 731 Fed. Appx. 45 (2nd Cir. 2018)................................................. 12

*United States v. Quintieri*, 306 F.3d 1217 (2nd Cir. 2002) ......................................................... 5

*Wright v. Spaulding*, 939 F.3d 695 (6th Cir. 2019) ...................................................................... 17

*Young v. City of Simi Valley*, 216 F.3d 807 (9th Cir. 2000) ............................................................ 29

## U.S. DISTRICT COURTS

*725 Eatery Corp. v. City of New York*, 408 F.Supp.3d 424 (S.D.N.Y. 2019) ........................ *passim*

*City of New York v. Gordon*, 155 F. Supp.3d 411 (S.D.N.Y. 2015) ................................................ 9

*Dandong v. Pinnacle Performance, Ltd.*, 966 F. Supp.2d 374 (S.D.N.Y. 2013) ........................... 10

*Egiazaryan v. Zalmayev*, 880 F. Supp. 2d 494 (S.D.N.Y. 2012) .................................................... 10

*Fortunoff v. Triad Land Associates*, 906 F.Supp.107 (E.D.N.Y. 1995) .......................................... 5

*Friends of George's, Inc. v. Mulroy*, 2023 U.S Dist. LEXIS 96766, 2023 WL 3790583 (W.D. Tenn. June 2, 2023) ..................................................................................................... 23

*Garten v. Hochman*, 2020 U.S. Dist. LEXIS 59699, 2010 WL 2465479 (S.D.N.Y. June 16, 2010) ................................................................................................................................... 4

*Perreca v. Gluck*, 262 F. Supp.2d 269 (S.D.N.Y. 2003) ................................................................. 9

*Reefer & Gen. Shipping Co. v. Great White Fleet*, 1995 U.S. Dist. LEXIS 14169, 1995 WL 575290 (S.D.N.Y. Sept. 27, 1995) .............................................................................. 11

*Romero v. Manhattan & Bronx Surface Transit Operating Authority*, 2022 U.S. Dist. LEXIS 36892, 2022 WL 624451 (S.D.N.Y. Mar. 2, 2022) ............................................................. 9

*United States v. Doonan*, 2022 U.S. Dist. LEXIS 59041, 2022 WL 954600 (S.D.N.Y. Mar. 30, 2022) ................................................................................................................................... 3

## U.S. CODE

15 USC § 1117(a) ............................................................................................................................... 5

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 54(b) .......................................................................................................................... 7

**NYC ZONING RESOLUTION**

ZR § 52-77 ........................................................................................................................... 14

ZR § 72-41 ........................................................................................................................... 14

**INTRODUCTION**

This reply memorandum is submitted by the Club Plaintiffs in response to the portion of Defendants' Memorandum of Law[1] filed in opposition to Plaintiffs' (renewed) alternative cross-motions for summary judgment, filed June 12, 2023, and in further support of Plaintiffs' cross-motions.

If the Plaintiffs' earlier (renewed) motions for *partial* summary judgment are granted, their cross-motion is moot for the reasons explained in their brief in support of the cross-motion itself (Doc. 201 at ECF p. 10-11). However, if the motions for partial summary judgment are not granted, the alternative cross-motions should be. The Plaintiffs are entitled to judgment as a matter of law because the 2001 Amendments to the Zoning Resolution ("ZR") are unconstitutional content-based restrictions on their face and do not survive either strict scrutiny as required by *Reed v. Town of Gilbert,* 576 U.S. 155 (2015) and *City of Austin v. Reagan Nat'l Advertising,* ___ U.S. ___, 142 S.Ct. 1464 (2022), or the heightened intermediate scrutiny required by Justice Kennedy's opinion in *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002).

---

[1] This Memorandum (hereafter simply "City's Opposition") is, *e.g.*, Doc. 204 filed in Case no. 3 (Club at 60ᵗʰ v. NYC, 02-CV-8333).  All docket number references hereafter shall be to their number in that action.  Moreover, all references to ECF page numbers not otherwise specifically tied to a different pleading shall be understood as references to the City's Opposition.

## I.    The preliminary injunction decision is not the law of the case.

The City contends (at ECF p. 9-15 of the City's Opposition) that the Plaintiffs' cross-motions for summary judgment are precluded because the validity of the challenges presented by those motions[2] was conclusively resolved by Judge Pauley's preliminary injunction decision.[3]  That is wrong for several reasons.

### A.  The law of the case doctrine doesn't apply to preliminary injunctions.

Common sense shows that the discussion in the preliminary injunction decision is not conclusive of the merits of this case in any respect. If it were, there would have been no need for the parties to expend great amounts of time and money since then to fully develop the factual record.

---

[2]  In no particular order, these challenges include that the 2001 Amendments are unconstitutional because: (1) they lack adequate *justification* to survive either strict scrutiny (under *Reed* and *Austin*) or heightened intermediate scrutiny under *Alameda Books*; (2) they do not provide sufficient alternative sites to survive either under the pre-*Alameda* standard of review or certainly under the "how speech will fare" standard required by *Alameda*; (3) the *balance* of the justification for the 2001 Amendments compared to their adverse impact on the public's access to expression violates the "proportionality" test of *Alameda Books*; and (4) the unique impact on the public's access to expression specifically in Manhattan (*i.e.*, how speech will fare *there*) independently warrants the invalidation of the 2001 Amendments' application to the plaintiffs' Manhattan locations.   Additionally, the Plaintiffs Cross-Motions for Summary Judgment alternatively sought a stay of enforcement of the mandatory termination provisions for one year from the date of any final judgment against them. *See, e.g.,* Doc. 200, ¶ 3 at ECF p. 3.  Neither side has recently briefed that issue (though it was briefed earlier in the case at the time of the preliminary injunction briefing – *see, e.g.,* Doc. 58 at ECF pp. 71-72 and Doc. 87, at ECF pp. 58-59), but it would presumably be litigated if and only if the Court were otherwise to grant summary judgment to the City on all issues, an event which has not and may never occur.

[3] Doc. 106, published at *725 Eatery Corp. v. City of New York*, 408 F.Supp.3d 424 (S.D.N.Y. 2019).

The law of the case doctrine is intended to discourage parties from re-raising arguments or motions that have already been definitively decided; it exists to keep litigation moving forward. *See, e.g., Gage v. Gen. Motors Corp.*, 796 F.2d 345, 349 (10th Cir. 1986) (the doctrine is "a rule based on sound public policy that litigation should come to an end [citations omitted] and is designed to bring about a quick resolution of disputes by preventing continued re-argument of issues already decided"). "The law of the case rule applies only when there has been a final decision." *Id.,* citing to *United States v. United States Smelting, etc.,* 339 U.S. 186 (1950). Here, the Plaintiffs are not asking the Court to reconsider its final decision on the issuance of a preliminary injunction – rather they are asking it to grant summary judgment on the merits. Those are different motions, and while a preliminary injunction decision may be the law of the case *as to preliminary injunctions*, it does not preclude any party from making any argument on summary judgment.

There is no shortage of case law on this issue: "[T]he law of the case doctrine is not typically applied in connection with preliminary determinations, such as a ruling on a motion for preliminary injunction." *United States v. Doonan*, 2022 U.S. Dist. LEXIS 59041, 2022 WL 954600, at *15, n.3 (S.D.N.Y. Mar. 30, 2022) (Cronan, *D.J.*) (quoting *Garten v. Hochman*, 2020 U.S. Dist. LEXIS 59699, 2010 WL 2465479, at n.1 (S.D.N.Y. June 16, 2010) (Gardephe, *D.J*).

The reason for that was perhaps best explained by the Supreme Court in *Univ. of Texas v. Camenisch,* 451 U.S. 390, 395 (1981): "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be

held.  Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary-injunction hearing [citation omitted]."

As a result, *Camenisch* definitively ruled that "*the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits*."  *Id.* (emphasis added).

No less significantly, the City fails to mention that Judge Pauley *himself* recognized that his preliminary injunction legal conclusions would not be binding as these cases went forward for definitive motions: "Fundamentally, the purpose of such interim equitable relief *is not to conclusively determine the rights of the parties*, but to balance the equities as the litigation moves forward."  *725 Eatery Corp. v. City of New York*, 408 F.Supp.3d at 458 (emphasis added), quoting from *Trump v. Int'l Refugee Assistance Project,* 582 U.S. 571, ___, 137 S.Ct. 2080, 2087 (2017), quoting in turn from *Camenisch.*

The Second Circuit has also so held: " A preliminary determination of likelihood of success on the merits in a ruling on a motion for preliminary injunction is ordinarily tentative, pending a trial or motion for summary judgment." *Goodheart Clothing v. Laura Goodman Enterprises, Inc.*, 962 F.2d 268, 273-74 (2nd Cir. 1992).  A preliminary injunction is fundamentally unlike a proceeding that gives rise to a final judgment from a

district court (such as summary judgment or trial) or the mandate of an appellate court[4]: "a party is not required to prove his or her case in full at a preliminary injunction hearing." *Fortunoff v. Triad Land Associates*, 906 F.Supp. 107, 113 (E.D.N.Y. 1995) (quoting from *Camenisch*, *supra*). As a result, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at a trial on the merits," *id.*, and "the decision of both the trial and appellate court on whether to grant or deny a temporary injunction does not preclude the parties in any way from litigating the merits of the case." *Id.* (quoting from *DiLaura v. Power Auth. of State of N.Y.*, 982 F.2d 73, 77 (2nd Cir. 1992)).

The Second Circuit's *Goodheart* decision applies this rule and refuses to give preclusive effect to a preliminary injunction later in the same case. The *Goodheart* plaintiff accused the defendants of trademark infringement, and obtained a preliminary injunction that explicitly found the defendants to have acted in bad faith in the course of that infringement. *Goodheart*, 962 F.2d at 270. The defendants then made an offer of judgment, the plaintiff accepted, and the district court entered a partial judgment providing in relevant part that the plaintiff was entitled to a permanent injunction "in accordance with the [preliminary injunction] Order." *Id.* at 271. The plaintiff then moved for an award of attorney's fees (as contemplated by the partial judgment) under 15 USC § 1117(a), which

---

[4] Law of the case is most often applied upon remand from the court of appeals. In fact, this aspect of law of the case is often called the "mandate rule." *See United States v. Quintieri*, 306 F.3d 1217, 1225 (2nd Cir. 2002). Because there has been no interlocutory appeal, the mandate rule is not at issue here. This case involves only the "second and more flexible branch" of the doctrine, *id.*, which applies to whether a district court, prior to judgment, is bound by its prior decisions.

permitted fee awards in "exceptional cases," including those in which the defendant acted in bad faith. *Id.* at 272.

The plaintiff argued that because the preliminary injunction order explicitly held that the infringement was in bad faith, and because the judgment granted a permanent injunction "in accordance with" the preliminary injunction order, the question of whether the defendants had acted in bad faith had been conclusively established, and the defendants could not contest the issue for purposes of an attorney's fee award. The district court agreed. *Id.* at 271-272, 273.

The Second Circuit reversed. The court allowed that non-final orders sometimes can have preclusive effect *in other cases* under doctrines of res judicata or collateral estoppel, particularly if there is some component of partial finality or appellate review to them. *See Goodheart*, 962 F.2d at 274 n.1 (noting that a First Circuit decision reversing a district court's preliminary injunction had been given preclusive effect in another proceeding). *See also, e.g., ILGO v. Giuliani*, 143 F.3d 638, 645 (2nd Cir. 1998) (holding that preclusive effect may be given to a denial of a preliminary injunction where the order also dismissed claims on the merits). But when a court's own prior decisions are at issue, it is not res judicata or collateral estoppel that is implicated. It is only law of the case – and law of the case is a "somewhat more flexible" doctrine in the first place, and has only limited application to inherently "tentative" orders like preliminary injunctions. *Goodheart*, 962 F.2d at 274. "It would therefore be anomalous at least in most cases, and here, to regard the initial ruling as foreclosing the subsequent, more thorough consideration of the merits that

the preliminary injunction expressly envisions." *Id. See also* Fed. R. Civ. P. 54(b) (absent an express finding that there is no just reason for delay, even orders that adjudicate some claims in their entirety "may be revised at any time" before all claims are fully adjudicated).

The preliminary injunction in this case is just such a "tentative" "initial ruling" and it does not "foreclose[e] the subsequent, more thorough consideration of the merits" of the case under *Goodheart*. The preliminary injunction explicitly made only preliminary determinations and conclusions, did so under relaxed evidentiary standards and without an evidentiary hearing or oral argument , and did not purport to make any final determination (and indeed, as noted *supra,* Judge Pauley himself stated that his ruling would not "conclusively determine the rights of the parties." 408 F.Supp.3d at 458.).  Thus, the law of the case doctrine does not give rise to preclusive effect of that order at all.

Further, none of the City's cases require the Court to treat the preliminary injunction decision as conclusive on any issue.  For example, in *Pepper v. United States*, 562 U.S. 476, 506 (2011)  (cited by the City at ECF p. 10), the Court rejected an argument that a district judge resentencing a criminal defendant was obligated to apply a downward departure made by an earlier sentencing judge. *Pepper* thus *declined* to apply law of the case, even though the exact same question (calculating the appropriate sentence) was being addressed by the court in both instances.

In *Perreca v. Gluck*, 262 F. Supp.2d 269, 272 (S.D.N.Y. 2003) (Ellis, *M.J.*) (cited by the City at ECF p. 10), the district court said that the defendant could not again contest issues that the Second Circuit had previously ruled upon. However, the *Perreca* court was

applying the "mandate rule" to preclude relitigation of a question *actually decided* by the appellate court. This aspect of law of the case doctrine is irrelevant here, where there has been no interlocutory appeal or appellate ruling.

In *City of New York v. Gordon*, 155 F. Supp.3d 411, 419 (S.D.N.Y. 2015) (Broderick, *D.J.)* (cited by the City at ECF pp. 10-11), the district court explicitly stated that it "would give little if any weight to any factual determinations," "inferences," and "the application of law to facts" from a preliminary injunction decision – precisely the opposite of what the City is seeking here, where it asks the Court (at ECF p. 9) to defer to a preliminary determination about whether the 2001 Amendments were adequately "justified."

In *Romero v. Manhattan & Bronx Surface Transit Operating Authority*, 2022 U.S. Dist. LEXIS 36892, 2022 WL 624451, at *45 (S.D.N.Y. Mar. 2, 2022) (Liman, *D.J.)* (cited by the City at ECF p. 10), this Court applied law of the case doctrine to grant a motion to dismiss because the plaintiffs had previously filed "identical" claims, had those claims dismissed, "abandoned their appeal," and then re-filed them. That is a proper application of a preclusive rule because it involved a dispositive resolution of the exact same issue (i.e., a motion to dismiss) in both instances. That is nothing like precluding summary judgment based on a preliminary injunction.

In *Dandong v. Pinnacle Performance, Ltd.*, 966 F. Supp.2d 374, 385 (S.D.N.Y. 2013) (Furman, *D.J.*) (cited by the City at ECF p. 11), the court applied law of the case to preclude a defendant's attempt to dismiss an amended complaint after an earlier judge denied a motion to dismiss an earlier complaint on the same theory. *Dandong* thus involved

two motions to dismiss, both premised on the same argument. It did not involve two different types of motions, let alone a preliminary injunction and a motion for summary judgment.

None of the City's cases hold that a decision on preliminary injunction precludes any arguments or re-evaluation at trial or summary judgment. The law of the case doctrine does not apply at all.

### B. Law of the case never applies to dicta.

"[D]ictum, i.e., a statement not essential to the holding, is not the law of the case." *Egiazaryan v. Zalmayev*, 880 F. Supp.2d 494, 502 (S.D.N.Y. 2012) (Castel, D.J.). *See also, e.g., Reefer & Gen. Shipping Co. v. Great White Fleet*, 1995 U.S. Dist. LEXIS 14169, 1995 WL 575290, at *12-13 (S.D.N.Y. Sept. 27, 1995) (Kram, D.J.) (dicta "did not constitute the law of the case").

In *Egiazaryan*, the court "state[d] in an earlier opinion [on a motion to dismiss] that [the plaintiff] had adequately alleged false assertions of fact" in two sets of letters written by the defendant. *Egiazaryan*, 880 F. Supp.2d at 503. But the court's *holding* was that the plaintiff had not adequately pleaded a defamation claim because he had not plausibly alleged that the defendant had "acted with actual malice in making any assertions in the letters." *Id.* Because the ultimate holding was that the plaintiff had not alleged a viable defamation claim, "any conclusions as to whether the letters contained false assertions of fact were unnecessary to the holding and cannot operate as law of the case." *Id.*

Here, the court's ultimate *holding* with respect to the preliminary injunction was that the Plaintiffs were entitled to equitable relief. Therefore, any statements in the decision *adverse* to the Plaintiffs—whether they were about the purpose of the 2001 Amendments, the justifications for them, or even whether they passed muster under intermediate scrutiny—were not necessary to the ruling in the Plaintiffs' favor. Any such statements are merely dicta, and cannot be a basis for law of the case.

### C. Law of the case also does not apply where (as here) there is a significantly expanded evidentiary record, a change in case law, or other reasons that new consideration might lead to a different result.

Law of the case is only a guideline, rather than a rule, *see United States v. Danilovich*, 731 Fed.Appx. 45, 48 (2nd Cir. 2018) (calling it "a discretionary practice"), and it has a number of exceptions. The "doctrine 'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2nd Cir. 2009) (quoting *Higgins v. Cal. Prune & Apricot Grower, Inc.*, 3 F.2d 896 (2nd Cir. 1924) (L. Hand, J.)).

Among the reasons a court might decline to apply law of the case – if the doctrine applied in the first place – include an expanded evidentiary record, new case law, or some other reason to think that blind carryforward of a prior ruling might be manifestly unjust. *Johnson* at 99-100.

All three of those factors are present here.

First, while the preliminary injunction record certainly was not insubstantial, the record now is far more extensive and complete for summary judgment purposes. As the

10

Court knows, the parties have spent several years gathering and developing additional evidence in the form of stipulations and affidavits, including multiple versions of the stipulated facts (culminating in a final Consolidated Statement of Stipulated Facts filed on May 19, 2023, containing no less than 246 stipulated facts) as well as a ten volume Joint Judicial Notice Request (filed on May 9, 2022) and then numerous additional declarations and affidavits by both sides. The import of this evidence is discussed elsewhere in this and the other summary judgment briefs, but it suffices to say that the record is far more complete and developed now than it was even when a substantial record was before Judge Pauley at the time of the preliminary injunction decision.

Second, about two and a half years after the preliminary injunction was decided, the Supreme Court decided *City of Austin v. Reagan National Advertising*, ___ U.S. __, 142 S.Ct. 1464 (2022). That case reaffirmed the change in the legal landscape in terms of whether and when to apply intermediate or strict scrutiny. As discussed more below and in other briefs,[5] *City of Austin* clarified what constitutes a content-based restriction, and also clarified that (consistent with *Reed*) strict scrutiny was required for all content-based restrictions. Inasmuch as the preliminary injunction decision disregarded *Reed* and applied only intermediate scrutiny, the new case law of *City of Austin* makes clear that the preliminary injunction subjected the 2001 Amendments to the wrong level of constitutional review.

_____

[5] *See* Doc. 199 at ECF p. 51.

And third, while the City would have the Court accept as final Judge Pauley's preliminary conclusions on the questions of whether the 2001 Amendments were content-neutral and whether they were "justified" by the need to reduce adverse secondary effects (see ECF p. 54-55), Judge Pauley himself expressly stated that his conclusions of law were not "conclusive,"[6]—and his own findings seemed to give reason to doubt those conclusions.

Specifically, by the penultimate page of the preliminary injunction decision (408 F.Supp.3d at 470), Judge Pauley wrote that the 2001 Amendments were "a throwback to a bygone era." Quoting Proust, he said that "the reality [on which the 2001 Amendments were based] no longer exist[s]." He further observed that "The City's landscape has changed dramatically since the Defendants last studied the secondary effects of adult establishments twenty-five years ago" – now much closer to 30 years ago.

At bottom, whatever the City might have thought about its justifications in 1994[7] or 2001, and whatever the Court might have thought about them in 2019, we know now that they are not closely related – and certainly not narrowly tailored – to the stated goal of reducing the supposed adverse secondary effects, because three decades of lived experience

---

[6] 408 F.Supp.3d at 458.

[7] For example, even the 1994 DCP Study said that "it was not possible to draw definitive conclusions" and that the evidence on the issue of whether adult businesses decrease nearby property values is, at best, "necessarily ambiguous". On this point the record has *not* changed. The preliminary injunction decision summarized and quoted some of this evidence, including the 1994 DCP Study, at 408 F.Supp.3d at 437.

has so shown.[8]  Allowing the 2001 Amendments to go into effect today would be "solving" a "problem" that no longer exists – if it ever did.  (*Id.*)  These are compelling reasons to consider the issues anew even if the law of the case "doctrine" might otherwise have applied.

Finally, even on the issue of whether the impact of the 2001 Amendments could be independently assessed as they apply just to Manhattan, the preliminary injunction opinion rejected that based on an argument it ascribed to the Plaintiffs which the Plaintiffs never made.  Specifically, the Plaintiffs had argued that Manhattan was a uniquely significant portion of the City of New York as a national media center, and, for that reason, the particularly devastating impact of the 2001 Amendments in Manhattan, and its tourists, etc., should be separately considered.  *See* Doc. 58 at ECF pp. 39-41 and Doc. 96 at ECF p. 13.  But rather than addressing this argument, the preliminary injunction opinion incorrectly re-phrased Plaintiffs' argument as simply being that Plaintiffs contend that alternative sites must be proven to exist in all five boroughs. [9] The Plaintiffs never made that argument, and do not make it now. Because the preliminary injunction ruling was in Plaintiffs' favor, they never had occasion to bring this error to the Court's attention.

---

[8] Again, see the substantial and unrefuted evidence which Plaintiffs submitted, *inter alia,* in Exhibits 61-64 in Volume 9 of the Joint Judicial Notice Requests as well as the findings of Justice York (set out in Doc. 201 at ECF pp. 27-28, n.20) and, significantly, the City's stipulations on the lack of a variety of findings supporting the 2001 Amendments, as discussed in Doc. 201 at ECF pp. 19-22.

[9] "[T]his Court rejects Plaintiffs' unsupported contention that the availability of adequate sites must, as a categorical matter, be considered on a county-by-county basis." 408 F.Supp.3d at 467.

### D. Law of the case could not apply to the mandatory termination point even if it somehow applied to any of the other challenges to the 2001 Amendments.

Plaintiffs' preliminary injunction motions asserted three distinct requests for relief and the Court ruled on only one of them.  Specifically, the Plaintiffs moved for three alternative forms of preliminary injunction relief: first, an injunction preventing the defendants "from enforcing the 2001 Amendments to New York City's 1995 adult business zoning laws"; second, and "[i]n the alternative, … an injunction preventing the defendants from enforcing the mandatory termination provisions"; and third, "[i]n the alternative to both of the foregoing," an injunction preventing the defendants from enforcing the foregoing provisions "for not less than one year from the date on which Plaintiff[s'] businesses become[] subject to enforcement." *See*, *e.g.* Doc. 57 in action no. 3 at ECF pp. 1-2.

Notwithstanding its length,[10] the court's preliminary injunction decision actually ruled on only the first of the Plaintiffs' three requests for injunctive relief.  Because the decision addressed only the Plaintiffs' request to enjoin the "2001 Amendments"—i.e., the *zoning* question of where adult businesses could locate in the future—as distinct from their request to enjoin "the termination provisions codified at AZR §§ 52-77 and 72-41," *see* 408 F.Supp.3d at 454, it cannot be concluded that it would have assessed the relevant legal issues identically if it had needed to separately consider the validity of the mandatory termination challenges.  Accordingly, even if this Court were somehow to conclude that

---

[10] Some two thirds of the decision is dedicated to framing the decision with history and procedural context of other litigation. The Court's legal discussion starts on ECF p. 49 (out of 70).

law of the case applied to any portions of the *dicta* in Judge Pauley's preliminary injunction ruling, it could not possibly apply to any of Plaintiffs' challenges to the mandatory termination provisions as it never addressed them. *See* 408 F.Supp.3d at 459 (because it ruled in favor of Plaintiffs on first issue, the court "does not address their alternative theories for finding the 2001 Amendments unconstitutional.").

When it applies at all, law of the case applies only to issues that were actually decided (either explicitly or by necessary implication). *See In re Meridian Reserve, Inc.,* *87 F.3d 406, 409-10 (10th Cir. 1996)* (declining to apply law of the case when the "discussion" of a prior issue "was general in nature"). The doctrine operates much like the rules for determining whether a statement in a prior case is binding precedent, which hold that "[q]uestions which merely lurk in the record" do not qualify. *Wright v. Spaulding,* 939 F.3d 695, 702 (6th Cir. 2019) (on precedential value of earlier decisions: "it must be clear that the court considered the issue and consciously reached a conclusion about it").

Clearly Judge Pauley never considered whether his discussion of the legal standards applicable to Plaintiffs' general challenges to the 2001 Amendments would also apply to their more unique challenges specifically to the ZR's discriminatory mandatory termination provisions for adult businesses.  Accordingly, under no circumstances could law of the case apply to any aspect of Plaintiffs' challenges to the mandatory termination provisions. [11]

---

[11] And, of course, a fortiori, since the preliminary injunction did not address any legal issues remotely potentially applicable to Plaintiffs' permitting or vesting challenges, there could not even be a *contention* that law of the case might somehow apply to *those* challenges.

**II.**   **The City offers little substantive defense of the 2001 Amendments – which makes sense, because they are facially content-based and presumptively unconstitutional.**

The City's main defense of the 2001 Amendments' constitutionality is to insist that they are facially content-neutral because the preliminary injunction said so. The Court should not adopt that conclusion for all the reasons discussed above, but also one more: it is plainly incorrect.

At the time the preliminary injunction was decided, both *Alameda Books* and *Reed* would have called the 2001 Amendments facially content-based, even though they would have employed somewhat different levels of review to do so (the heightened intermediate scrutiny of Justice Kennedy's concurrence, and strict scrutiny, respectively). But the preliminary injunction decision did not follow either *Alameda Books* or *Reed*, and did not apply either of those standards. *See* 408 F.Supp.3d at 463 ("this Court analyzes the 2001 Amendments through the lens of intermediate scrutiny").

Plaintiffs have heavily briefed the required application of *Alameda Books* and the Kennedy opinion on the issue of its required standards of review, and so will not re-brief that aspect of it here.  However, as to their alternative argument on strict scrutiny, they provide the following additional discussion.  The preliminary injunction reasoned that even though the 2001 Amendments make content-based distinctions, they were nevertheless content-neutral because they "are at bottom justified by the desire to reduce the adverse secondary effects of adult establishments." 408 F.Supp.3d at 462. This conclusion cannot be squared with cases like *Reed*, which states that "an innocuous justification cannot

16

transform a facially content-based law into one that is content neutral." *Reed*, 576 U.S. at 165.[12]

The City has little to say about *Reed*, acknowledging it in a single sentence that mainly points to the preliminary injunction's apparent conclusion (reached by relying on non-binding courts) that *Reed* did not really mean what it said, seemingly because it was a sign-ordinance case rather than a zoning case. *See* ECF p.12.

But, to the contrary, *Reed* has *plenty* to say about what constitutes a content-based or content-neutral restriction on speech. *Reed* defined "content-based laws" as "those that target speech based on its communicative content." *Reed*, 576 U.S. at 163. *Reed* further explained that "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed *or* the idea or message expressed. . . . *Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter*, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64 (emphases added). Strict scrutiny applies to a law with facial content-based distinctions even if those laws have a "content-neutral justification." *Id.* at 165. Laws can be content-based without placing "restrictions

---

[12] The preliminary injunction is internally inconsistent in its discussion of this aspect of *Reed*. The decision actually correctly cites this part of *Reed*'s holding, stating that "the Supreme Court recently reemphasized . . . that facially content-based regulations must survive strict scrutiny, even if they are justified without reference to a content-based purpose." 408 F.Supp.3d at 462. But it then cited non-binding cases and concluded, in essence, that *Reed* didn't really mean what it certainly appeared to say.

on particular viewpoints"; a law that has a prohibition that applies to "an entire topic" is also content-based. *Id.* at 169.

Even though *City of Austin* is a First Amendment case that was decided during summary judgment briefing (and, of course well after the preliminary injunction) the City has even less to say about it than about *Reed,* arguing only – in but a single, conclusory sentence – that *City of Austin* "does not alter the analysis applicable to zoning regulations like the 2001 Amendments," ECF p. 12.

There is no need to rely on courts in other circuits to determine what *Reed* meant (as the City and preliminary injunction did), because in *City of Austin* the Supreme Court *tells* us what *Reed* meant. While the preliminary injunction did not have the benefit of *City of Austin* (the injunction predates *City of Austin* by over two years), the Supreme Court has now made clear exactly what the scope of *Reed* is and what *Reed* means for determining whether a regulation is content-based or content-neutral.

*City of Austin* explained that one lesson of *Reed* was that treating speech with certain content (such as "ideological messages" or "political speech") more favorably than speech with other content (such as "temporary directional messages") is indeed a "content based" scheme. *City of Austin*, 142 S.Ct. at 1472. This is distinguishable from a regulation that is "agnostic as to content." *Id.* at 1471. Similarly, the Seventh Circuit held that "*Reed* effectively abolishes any distinction between content regulation and subject-matter regulation. Any law distinguishing one kind of speech from another by reference to its

18

meaning now requires a compelling justification." *Norton v. City of Springfield*, 806 F.3d 411, 412 (7th Cir. 2015).)

The City's brief spills no ink on how or why the challenged portions of the 2001Amendments are "agnostic as to content," *City of Austin*, 142 S.Ct. at 1471. The City's brief does not show that the 2001 Amendments do *not* "appl[y] to particular speech because of the topic . . . or the idea or message," *Reed*, 576 U.S. at 163. The City's brief doesn't make these showings because it can't; the 2001 Amendments are content-based on their face. They apply only to specified businesses defined by the content of their expression.

Bars, clubs, and other venues, including those providing performances, but not "adult" entertainment, are not subject to the same restrictions as adult eating and drinking establishments, and the sole basis in the ZR for this differential treatment is *the difference in their expressive content*. The 2001 Amendments therefore *do* "regulate[] speech by subject matter" and *do* "target speech based on its communicative content," *Reed*, 576 U.S. at 163. The 2001 Amendments *do* treat [certain] messages "more favorably" than other messages and "single[] out specific subject matter for different[] treatment" than other subject matters, *City of Austin*, 142 S.Ct. at 1472. It is facially content-based and subject to strict scrutiny.[13]

---

[13] Just because the preliminary injunction did not have the benefit of the later-decided *City of Austin* does not mean that it was correct when issued. The Supreme Court in *City of Austin* said

*City of Austin* further explained that one "principle the *Reed* Court articulated" was that "While overt subject-matter discrimination is facially content based . . . so, too, are subtler forms of discrimination that achieve identical results based on . . . purpose . . . . In other words, a regulation of speech cannot escape classification as facially content based simply by swapping an obvious subject-matter distinction for a '. . . purpose' proxy that achieves the same result." *Id.* at 1474. This too directly contradicts Judge Pauley's statement in the preliminary injunction that the 2001 Amendments are content-neutral because they "are at bottom justified by the desire to reduce the adverse secondary effects of adult establishments." Once again, and with the utmost respect to Judge Pauley, his conclusion that the 2001 Amendments are content-neutral is simply wrong.

Finally, a very recent decision joins the Fifth Circuit case previously cited by Plaintiffs (*see* Doc. 201 at ECF p. 65 and Doc. 199 at ECF pp. 52-53) in concluding that aiming restrictions against "adult" performances provides no talismanic relief from strict scrutiny.  Just weeks ago, the Western District of Tennessee enjoined a state law which prohibited drag shows (and other things, all encompassed within the euphemistically Orwellian definition of "adult-oriented performances that are harmful to minors"). *Friends of George's, Inc. v. Mulroy*, 2023 U.S Dist. LEXIS 96766, 2023 WL 3790583 (W.D. Tenn. June 2, 2023). Relying on *Reed* and *City of Austin* (and other cases), the court determined that the law was facially content-based because it treats certain classes of speech (in the

_____

that it was merely describing the holding of *Reed*, not modifying it. The portion of the preliminary injunction that failed to follow or apply *Reed* was therefore wrong when that decision was issued, and the Court should not now perpetuate the earlier error.

form of certain expressive conduct) differently from others. It "draws distinctions based on the message a speaker conveys: adult-oriented performances that are harmful to minors are sanctioned with a criminal penalty while others are not." *Id.* at *58. The court also held that "a facially content-based law is subject to strict scrutiny regardless of the government's motive" or justification for it. *Id.* at *54 (citing *Reed*, 576 U.S. at 165 ("[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral.").

This Court should reach the same conclusion. As shown above, a litany of cases, including from the Supreme Court, all decided since the preliminary injunction decision, explain that laws that regulate speech by its subject matter and that treat some content more favorably than others are facially content based, are presumptively unconstitutional, and are subject to strict scrutiny.

**III. Enforcement of the 2001 Amendments would (at best) achieve only an impermissible "proportional reduction" in secondary effects, and would leave insufficient alternative opportunities for expression (whether measured by *Alameda*'s "how speech would fare" test or by pre-*Alameda* tests for factoring in alternative sites)**

**A. The 2001 Amendments fail the proportionality test because they would, at best, achieve only a "proportional reduction" in secondary effects, and would leave neither the quantity nor accessibility of speech substantially intact.**

The parties appear to agree that the zoning restrictions are unconstitutional if they do not leave sufficient legally permissible alternative sites for the regulated expressive activity. But that is only part of the constitutional test. First and foremost, an adult zoning

ordinance is unconstitutional if the reduction in secondary effects is no greater than merely being proportional to the reduction in expression. Any regulation of speech must also account for how speech will fare if the regulation is enforced, and, to survive the proportionality test, must have a minimal impact on expression while having a significant impact on reduction of secondary effects.

As Justice Kennedy put it in his *Alameda Books* concurrence, 535 U.S. at 449-450, "A city may not assert that it will reduce secondary effects by reducing speech in the same proportion. . . . It is no trick to reduce secondary effects by reducing speech or its audience." What that means is that a reduction in speech that is merely *proportional* to the reduction in secondary effects is unconstitutional: "It is true that cutting adult speech in half would probably reduce secondary effects proportionately. But again, a promised proportional reduction does not suffice. Content-based taxes could achieve that, yet these are impermissible." *Alameda Books*, 535 U.S. at 451.[14] To be constitutionally permissible, the City must show both that its regulations reduce the secondary effects, and that the reduction in secondary effects is significantly greater than (i.e., not merely proportional to) the reduction in speech.

The City's brief has no discussion whatsoever of either any evidence that the regulations would reduce secondary effects, nor of whether any reduction would be

---

[14] On this point, the *Alameda Books* plurality agreed with Justice Kennedy. While the plurality did not join his opinion in its entirety, it said that Justice Kennedy's statement that "[a] city may not assert that it will reduce secondary effects by reducing speech in the same proportion" was an "unobjectionable proposition," albeit attaching to it a different significance than the one Justice Kennedy outlined. 535 U.S. at 443.

anything other than merely proportional to the reduction in speech. The City instead addresses only the raw number of alternative available sites. The City's arguments on that issue have their own problems—see Point III-B below—but first and foremost, the City's failure to cite or discuss any record evidence relating to secondary effects and proportionality are glaring omissions (and tacit admissions) on its part. The City does not discuss them because the evidence does not support the City's position and the City cannot meet its summary judgment evidentiary obligation.

As discussed in the Plaintiffs' cross-motion briefing itself (*e.g.,* Doc. 201 at ECF pp. 14-17), New York City has seen a drastic reduction in adult establishments over the last thirty years. In 1994 there were 177 known 100% adult establishments in New York City. By 2000, there were only 136 adult establishments total (which number comprises both 100% and 60/40 establishments). At last count, that number of adult establishments had fallen to just 42. That is a reduction of more than two thirds since 2000, and much larger reduction since 1994—and all the while, the regulations at issue in this case have never been enforced. Given the very long length of time that the adult business regulations have been in effect, and the marked decrease in concentration of adult businesses, it is incumbent on the City to provide some *current* evidence of whether the remaining modified 60/40 businesses are causing any types of significant problems, much less enough that they would be so great as to allow the City to meet the ban on a mere "proportional reduction" in secondary effects.

The absence of a connection between 60/40 businesses and secondary effects is also explicitly identified in the record evidence: The DCP itself noted the lack of a causal connection back in 1994, *see* n. 7, *supra,* and the Plaintiffs' evidentiary submissions show this to have been true subsequently as well, *see* n. 19 and n. 20 of the Club Plaintiffs' Memorandum in Support of their Cross Motion for Summary Judgment (Doc. 201 at ECF pp 26-28). The City's obligation under Rule 56(c) was to "cit[e] to particular parts of materials in the record" to refute this evidence and establish a genuine question of fact as to whether the secondary effects are caused by or even linked to the number or concentration of 60/40 establishments, but instead the City adopted the ostrich approach and just ignored Plaintiffs' substantial evidentiary showing (and its own summary judgment evidentiary burden) entirely.

Nor does the City address proportionality at all. Once again, the reason is obvious: the 2001 Amendments would produce a drastic reduction in speech, such that neither the quantity nor the accessibility of the speech will remain substantially intact. As with the secondary-effects issue, the Plaintiffs detailed the record evidence on the issue of the 2001 Amendments' expected impact on expression in the memorandum in support of their cross-motion (Doc. 201, at ECF pp. 18-25). Without belaboring the points made in that brief, the record evidence (including in part the evidence discussed above) shows that the combination of zoning regulations and market conditions means that if adult businesses are forced to shutter their current locations, they will not relocate at all. They will simply close. The *quantity* of speech would therefore not be substantially intact. And even if the adult

businesses wanted to relocate, they would primarily be forced to do so outside of Manhattan, even though decades of experience has shown that there is little demand for adult establishments outside Manhattan. The *accessibility* of the speech would therefore not be substantially intact.[15]   The actual, on-the-ground reality of the 2001 Amendments would be to force adult businesses into places where they are not wanted, where they could not survive, and where most of them said they will not go.  As a practical matter, they would be all but banned. As with the secondary-effects evidence, the City just ignores this aspect of the cross-motion for summary judgment. It cites no record facts to counter this evidence, as it is required to do under Rule 56(c).

With both the quantity and accessibility of the speech being so substantially reduced, even a dramatic reduction in secondary effects (something for which there is no record evidence) would merely be proportional to the reduction in speech, and thus enforcement of the 2001 Amendments would be unconstitutional.

### B. The City's asserted legally permissible alternative sites—even if accurate, and even if measured by pre-*Alameda* tests—would not leave adequate opportunity for expression.

Instead of addressing secondary effects and proportionality, the City focuses exclusively on the number of legally permissible alternative sites for adult establishments

---

[15] And, given that the uncontroverted evidence shows that it would take any adult club a minimum of at least a year to relocate, and probably much longer (again, *see* the Berzak Permitting declaration submitted on Plaintiffs' Preliminary Injunction motion – Doc. 62 at ECF p. 94-95, ¶¶ 43-45), and that certainly none would do so until finality of this lawsuit, that means the *public's* access to this type of expression would necessarily be significantly reduced for a very substantial period in the event the 2001 Amendments were upheld.  That is the basis for Plaintiffs' final alternative request for an injunction preventing enforcement of the 2001 Amendments for at least a year after finality of these cases.

25

under the 2001 Amendments. It claims (at ECF p. 18) that there are 1275 City lots where adult establishments could locate, and asserts that that number represents an adequate alternative opportunity for expression.

Even if that were the appropriate analysis, the number "1275" does not tell the whole story. There are over 857,000 lots in New York City. *See* CSF ¶231. In terms of sheer lot numbers, that means that the potentially available sites are less than one sixth of one percent of all lots in the City. *Cf. Young v. City of Simi Valley*, 216 F.3d 807, 812 (9th Cir. 2000) (ordinance would have limited available adult sites to one half of one percent of city lots; thus, by proportion, the *Simi Valley* ordinance would have allowed three times as many alternative sites). Of those 1275 potential lots, less than one sixth of them (a maximum of 204 lots) could be simultaneously occupied, according to the City. *See* CSF ¶245. That is less than one fortieth of one percent of all City lots. That is a vanishingly small number.

Worse still, even if the City's contention is correct, then just *ten* of the 1275 lots are in Manhattan, *see* CSF ¶244, and only *five* of those could be simultaneously occupied – an incredibly small proportion.[16] *See* CSF ¶246.

Meanwhile, at all relevant times reflected in the record (1993, 2000, and 2022), demand for adult establishments has always been primarily located in Manhattan. *See* Exhibit 43-2 to the 2022 JNR [Doc. 147-5 at ECF p. 168], showing 107 of 177 adult establishments (i.e., 60.45%) in Manhattan as of 1993 and showing 69 of 136 (50.73%) in

---

[16] To put five simultaneously occupiable lots in context, the unconstitutional ordinance in *Simi Valley* would have allowed four simultaneously occupiable sites. *Young*, 216 F.3d at 811. Simi Valley has about 126,000 residents. Manhattan has about 1.7 million.

Manhattan as of 2000. *See also* CSF ¶¶160 – 168  ("The Changing Number of 100% and 60/40 Businesses Over Time"), CSF ¶¶169 – 176 ("The Number of 60/40 Businesses to be Displaced"), and CSF ¶¶177 – 186 ("Additional Facts Relating to Bookstores").   The record also shows that at last count more than half of all adult establishments in all of New York City were in Manhattan. *See* CSF ¶167 (ten 100% establishments in all of NYC), ¶168 (four 100% establishments in Manhattan), ¶173 (nineteen 60/40 establishments in Manhattan, out of thirty-two 60/40 establishments in all of NYC).  Accordingly, the most current data shows that 23 of 42 establishments presenting some type of adult entertainment (54.76%) are located in Manhattan.

But enforcement of the 2001 Amendments – if the City's numbers are correct – would mean that over 97% of "available sites" for location of new adult establishments would be *outside* of Manhattan, and just 2.4% of available sites in Manhattan. Even if adult establishments simultaneously occupied all Manhattan sites that could theoretically be simultaneously occupied, there would be a large net reduction in the number of adult establishments in Manhattan (and, as noted above, those Plaintiffs forced outside Manhattan would likely close rather than relocate). The inescapable conclusion from this record is that enforcement of the 2001 Amendments will restrict public access to this constitutionally protected expression over the entire City, and dramatically in Manhattan.

There is no other type of constitutionally protected expression to which the public would have so little access. There is no other type of constitutionally protected expression that is allowed to occur only on one fortieth of one percent of all City lots. There is no other

type of constitutionally protected expression that can simultaneously locate only in 204 places in the City as a whole. There is no other type of constitutionally protected expression that may legally be established simultaneously only in *five* places in Manhattan. Accepting the City's contentions as true,[17] enforcement of the 2001 Amendments would not leave ample alternative opportunities for this expression.

On top of this, there is reason to doubt the accuracy of the City's contentions. While Plaintiffs acknowledge that the Court cannot make credibility determinations on summary judgment, it *can* draw reasonable inferences from record facts. Here, at least two aspects of the record suggest that the City's contentions are not accurate.

One is that the City has stipulated that its analysis of the sites is extremely limited and encompasses only theoretical possibilities, not *actual* availability of alternative sites for expression. The Plaintiffs detailed the inadequacies of the City's evaluation of sites at ECF p. 20-22 of their Cross-Motion Memorandum [Doc. 201]. Other than relying on its law of the case argument, the City offers essentially no substantive response to these criticisms. The Plaintiffs are not contending that the City has an obligation either to convey usable sites or to subsidize their operation, but neither can the City destroy avenues for expression by regulating permissible sites into oblivion. (If, for example, the ZR limited adult businesses to the penthouses of the 204 tallest buildings in New York City, nobody would believe that it presented ample opportunity for expression, because most or all of

_____

[17] And, again, according to Plaintiffs' expert, only three of those sites would be commercially viable (*see* Doc. 59 at ECF p. 24, ¶ g and ECF pp. 35-36) and it is uncontroverted that there is no evidence that any are in fact available.

those sites are – in actual fact – inherently unviable on their face. On this record, there is no practical difference between that scenario and what the City has done here.)

Second, it's simply not clear that the City's numbers are correct, because they keep changing. At the preliminary injunction stage, the City contended that there were "over 2,800 lots" potentially available if the 2001 Amendments were enforced. *See* 408 F. Supp. 3d at 468 (citing ¶11 of Declaration of Anita Laremont, filed 1/31/19 in opposition to motion for preliminary injunction) . But by the time summary judgment briefing had started in 2022, that number had declined to 1,703. *See* City's Renewed MSJ filed 5/26/23, at ECF p. 24 (citing Amron Decl., filed 9/6/22, at ¶12). Now the City contends that the total number is 1,275. *See* CSF ¶243. Thus, the number has been cut by more than half.

Similarly, earlier in these proceedings there appeared to be either 36 or 28 potentially occupiable sites in Manhattan, whereas the City now contends there are 10; and earlier in these proceedings there appeared to be either 13 or 9 *simultaneously* occupiable sites in Manhattan, whereas now the City contends there are but 5. *See* CSF ¶141-143. These numbers have been cut by about two thirds.

Between the absence of any record evidence about reduction in secondary effects and whether the sites identified by the City would actually be likely to maintain the quantity and accessibility of the speech, the City has not met its burden of showing that there is adequate alternative opportunity for expression.

29

**IV.    The remainder of the City's brief is directed to issues raised only in Plaintiffs' fully briefed motions for partial summary judgment so are not included in this reply memo in support of Plaintiffs' Cross-Motion.**

Per p.2 of the Court's May 2, 2023, order (Doc. 184), the City's brief is not only its memorandum in opposition to the Plaintiffs' cross motions for summary judgment, but also its reply in support of its own motion for summary judgment. The issues covered in "Point II" of the City's brief[18] (ECF p. 18-27) all go to the latter, and the City is entitled to have the last word on its own motion, though it suffices to say that Plaintiffs believe that their prior briefing on their motions for partial summary judgment thoroughly refutes the City's contentions on all these points. This brief therefore will not address those issues again, and the Plaintiffs will stand on the arguments already made.

**CONCLUSION**

There is no reason to force this case to the expense of a trial. The Plaintiffs are entitled to summary judgment as a matter of law on any of a variety of grounds.

Moreover, it should be kept in mind, as stated and demonstrated in Plaintiffs' prior briefing, that the City has the burden to prove the constitutionality of its challenged ordinances in all respects, and if it fails to prove each required element of its case, it is not entitled to a trial, but, instead summary judgment must be awarded to Plaintiffs.  Again, *see Anderson v. Liberty Lobby, Inc.,* 422 U.S. 242, 248 (1986).

---

[18] These are the issues raised in Plaintiffs' Motions for *partial* summary judgment, *e.g.,* challenges based on the discriminatory mandatory termination provisions and the unconstitutional permitting and vesting provisions.

Respectfully submitted,

G. Randall Garrou
randygarrou@wgdlaw.com
Of Counsel to Weston Garrou & Mooney
12121 Wilshire Blvd. Suite 525
Los Angeles CA 90025
(310) 749-6069
randygarrou@wgdlaw.com

Jerome H. Mooney
jerrym@mooneylaw.com
Weston Garrou & Mooney
12121 Wilshire Blvd. Suite 525
Los Angeles CA 90025
(310) 442-0072

Alan M. Abramson
alanabramson@abramsonmorak.com

Abramson & Morak
35 Worth Street
New York, NY 10013
(212) 226-7098

by   /s/ G. Randall Garrou
     G. RANDALL GARROU

*Counsel for Plaintiffs in*
*02 Civ 8333 (LJL)*

s/ Jeffrey M. Nye
Jeffrey m. Nye, Esq.
*Counsel for Plaintiffs in 02 Civ 4431 (LJL)*
Stagnaro, Saba & Patterson Co., LPA
7373 Beechmont Avenue
Cincinnati, OH 45230
*(513) 533-6714*
jmn@sspfirm.com

31

/s/ Edward S. Rudofsky
Edward S. Rudofsky, Esq.
*Counsel for Plaintiffs in 02 Civ 4432 (LJL)*
Zane and Rudofsky
Five Arrowwood Lane
Melville, NY 11747
(917) 913-9697
*eed@rudofskylaw.com*